CASE NO. 25-2028

---

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

---

ASHLEY M. GJØVIK, *an individual*,

*Plaintiff-Appellant*

v.

APPLE INC., *a corporation*,

*Defendant-Appellee.*

On Appeal from the United States District Court

for the Northern District of California

No. 3:23-CV-04597

The Honorable Judge Edward M. Chen

---

APPELLANT'S EXCERPTS OF
RECORD VOLUME II | MOTIONS

---

**Ashley M. Gjøvik, JD**
*In Propria Persona*
2108 N. St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

i

**Ashley M. Gjovik, JD**
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# United States District Court

## Northern District of California

| | |
|---|---|
| **Ashley M. Gjovik**, | **Case No. 3:23-CV-04597-EMC** |
| *an individual*, | |
| | **Plaintiff's Civil Local Rule 7-11** |
| | **Administrative Motion** |
| Plaintiff, | |
| | **Request for** |
| | **Rule 54(b) Certification** |
| vs. | **Under Fed. R. Civ. P. 54(b)** |
| | |
| **Apple Inc.**, | **PLAINTIFF'S REPLY WITH** |
| *a corporation,* | **OBJECTIONS** |
| | |
| Defendant. | |

# I.  PLAINTIFF'S ADMINISTRATIVE MOTION FOR RULE 54(B) CERTIFICATION

1. Plaintiff Ashley Gjovik submits this reply in response to Defendant Apple Inc.'s opposition to Plaintiff's Rule 54(b) Administrative Motion, and in further support of certification of final judgment. Defendant's opposition raises two primary arguments: (1) that Plaintiff failed to meet and confer before filing this motion and (2) that a full briefing schedule is required before the Court may certify final judgment under Rule 54(b). Both assertions are unsupported.

2. First, the Plaintiff was under no obligation to meet and confer before filing this motion. Even if a meet and confer were required, the record demonstrates that Plaintiff made multiple outreach attempts, to which the Defendant did not respond until after this motion was filed. Second, Rule 54(b) certification is a procedural determination within the Court's discretion. The relevant considerations (whether the dismissed claims are fully adjudicated, legally distinct, and appropriate for immediate appeal) do not require full briefing when they have already been addressed by prior rulings. Courts routinely resolve Rule 54(b) motions on the record without additional briefing. For these reasons, and as supported by the attached *Exhibit A,* Plaintiff's motion should be granted.

## A.  MEET AND CONFER WAS NOT REQUIRED, AND DEFENDANT DECLINED TO ENGAGE BEFORE THIS MOTION WAS FILED

3. The defendant argues that Plaintiff failed to meet and confer before filing this motion. However, there is no requirement that parties meet and confer before seeking Rule 54(b) certification, as this is a procedural matter within the Court's discretion. See *Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 8 (1980) (noting that Rule 54(b) certification is based on judicial evaluation of finality and efficiency).

4. Even if a meet and confer were required, Plaintiff made multiple good faith attempts to schedule general discussion, but Defendant did not respond until after the motion was filed. The case docket and attached Exhibit A include:

- Defendant telling Plaintiff that they will only meet and confer with her if is there are no witnesses and no record of what is said, or else there can be recording but only if Plaintiff gives Apple Inc at least $500. (this might be extortion?) (Exhibit A).
- Judge Westmore's Order allowing the Plaintiff to record the conversation with the Defendant

— 1 —

during meet and confer sessions if Plaintiff is concerned about unlawful or unethical conduct by Defendant (Dkt. No. 181-182).

- Plaintiff's subsequent requests to Defendant to meet and confer, which received no response (Exhibit A).

- Plaintiff's follow-up emails, reiterating a willingness to discuss issues, which also received no response (Exhibit A); and

- Defendant's response after this motion was filed, at which point Defendant opposed the motion and complained about a lack of meet and confer (Dkt. No. 185).

5.      The timeline demonstrates that Plaintiff made multiple outreach attempts without success. Therefore, Defendant's claim that Plaintiff failed to engage in the meet and confer process is not supported by the record.

### B.  Rule 54(B) Certification Is a Procedural Determination, And Full Briefing Is Not Necessary

6.      Defendant asserts that a full briefing schedule is required before the Court may certify finality under Rule 54(b). However, Rule 54(b) certification is a procedural determination that courts routinely decide based on the existing record, particularly when the claims at issue have already been fully adjudicated.

7.      **Rule 54(b) Certification is Within the Court's Discretion.** The Ninth Circuit has affirmed that district courts have broad discretion to certify finality without additional briefing where the claims are fully adjudicated and legally distinct. See *Pakootas v. Teck Cominco Metals, Ltd.*, 905 F.3d 565, 574 (9th Cir. 2018). Where a motion seeks only procedural certification of finality, a full briefing schedule is not required unless the Court determines that additional information is necessary.

8.      **The Key Issues Have Already Been Litigated and Decided.** The claims at issue were dismissed with prejudice and without leave to amend, satisfying Rule 54(b)'s finality requirement. See *Wood v. GCC Bend, LLC*, 422 F.3d 873, 878–79 (9th Cir. 2005) (holding that Rule 54(b) certification is appropriate when dismissed claims are final and distinct). Defendant previously argued in its motions to dismiss that the dismissed claims were legally distinct from Plaintiff's remaining claims. See *Texaco, Inc. v. Ponsoldt*, 939 F.2d 794, 797–98 (9th Cir. 1991) (upholding Rule 54(b) certification where the dismissed

— 2 —

Plaintiff's Rule 54(B) Admin. Motion – Objections | Case No. 3:23-CV-04597-EMC

ER VII 5

claims were separate and distinct).

9.      Given that the legal standard has already been addressed, further briefing would serve only to delay resolution. The Court has the discretion to resolve this motion based on the existing record, prior rulings, and judicial efficiency considerations.

### C.   THIS REQUEST IS PROCEDURAL, AND THE E-FILING SYSTEM CONFIRMS NO BRIEFING OR DEADLINES APPLY

10.      Defendant asserts that this request required full briefing under Civil Local Rule 7-2. However, the Northern District of California's ECF system treats requests for *Certificates of Appealability* as a separate procedural category, distinct from motions requiring briefing or deadlines. The e-filing system provides a standalone option for *Certificate of Appealability* requests, rather than classifying them under motions that require full briefing.

11.      This procedural handling reflects that such requests do not require formal motion briefing under Local Rule 7-2. Courts retain discretion to issue Rule 54(b) certifications based on the record without additional briefing, particularly where claims are fully adjudicated and legally distinct. Se*e Pakootas v. Teck Cominco Metals, Ltd*., 905 F.3d 565, 574 (9th Cir. 2018) (upholding Rule 54(b) certification as a procedural determination left to the district court's discretion).

12.      Additionally, as reflected in Exhibit A, Plaintiff informed Defendant that the e-filing system confirmed no briefing was required and offered Defendant an opportunity to withdraw its opposition in light of this information. Plaintiff further explained that calling this an "*Administrative Motion*" was actually a courtesy to Defendant, as it allowed Defendant a procedural opportunity to respond that was not necessarily required. Defendant did not respond.

13.      Accordingly, Defendant's argument that a full motion and briefing schedule was necessary is not supported by the Court's procedural framework, local rules, or the Ninth Circuit's handling of Rule 54(b) requests.

### D.   RULE 54(B) CERTIFICATION REMAINS WARRANTED

As outlined in Plaintiff's motion, each of the three factors required for Rule 54(b) certification is met:

- **Finality Exists:** The Court dismissed these claims with prejudice, meaning they are conclusively

resolved. See *Wood v. GCC Bend, LLC*, 422 F.3d at 878–79.

- **The Claims Are Legally and Factually Distinct:** Defendant previously argued that these claims were unrelated to the remaining case. See *Pakootas*, 905 F.3d at 574.
- **Judicial Economy Favors Immediate Appeal:** Delaying certification would result in duplicative proceedings and inefficiency. See *Curtiss-Wright Corp.*, 446 U.S. at 8.

Because these claims are fully adjudicated, legally distinct, and certification would promote judicial efficiency, Rule 54(b) certification is warranted.

## E. Conclusion

14.     The Court has the discretion to certify these claims as final under Rule 54(b). Defendant's opposition does not contest the legal standard but instead relies on procedural objections that are not required by law and are not supported by the record.

Dated: March 21 2025

**/s/ Ashley M. Gjovik**
*Pro Se Plaintiff*

**Email**: legal@ashleygjovik.com
**Physical Address**: Boston, Massachusetts
**Mailing Address:** 2108 N St. Ste. 4553 Sacramento, CA, 95816
**Phone:** (408) 883-4428

— 4 —

Plaintiff's Rule 54(B) Admin. Motion – Objections | Case No. 3:23-CV-04597-EMC

ER VII 7

**Ashley M. Gjovik, JD**
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| **ASHLEY M. GJOVIK,** *an individual*, | **CASE NO. 3:23-CV-04597-EMC** |
|  | **PLAINTIFF'S MOTION REQUESTING CERTIFICATION OF APPEALABILITY UNDER FED. R. CIV. P. 54(B)** |
| Plaintiff, | |
| vs. | |
| | **MOTION & MEMORANDUM OF POINTS & AUTHORITIES** |
| **APPLE INC.,** *a corporation,* | **HEARING:** |
| | Dept: Courtroom 5, 17th Floor & Zoom |
| Defendant. | Judge: The Honorable Edward M. Chen |
| | Date: May 8 2025 \| Time: 1:30 PM |

# TABLE OF CONTENTS

I.    TABLE OF AUTHORITIES ......................................................... 2

II.   INTRODUCTION .................................................................... 3

III.  PROCEDURAL POSTURE ......................................................... 4

IV.   LEGAL STANDARD UNDER RULE 54(B) ..................................... 4

V.    ARGUMENT ......................................................................... 6

   A.   Finality of Dismissed Claims .............................................. 6

   B.   No Just Reason for Delay .................................................. 9

   C.   Apple Cannot Claim Factual Entanglement After Moving to Dismiss Based On
Separability .............................................................................. 11

   D.   Rule 54(b) Certification Will Not Cause Piecemeal Litigation—Denying It Will ........ 12

   E.   Plaintiff Would Be Severely Prejudiced by Further Delay .......................... 14

   F.   This Case Will Not Resolve at Trial Without Rule 54(B)—It Will Fracture ................. 15

   G.   Denying Certification Risks Multiple Trials, Inconsistent Verdicts, And Irreparable
Prejudice .................................................................................. 16

   H.   The Need to Protect the Legal Rights of All Harmed ............................... 17

   A.   Public Policy Supports Certification .................................................. 18

   B.   Retroactive Certification .............................................................. 20

VI.   CONCLUSION ...................................................................... 20

VII.  EXHIBIT A ........................................................................... 23

# I.  TABLE OF AUTHORITIES

**SUPREME COURT CASES**

*BMW of North America, Inc. v. Gore*, 517 U.S. 559, 576–77 (1996) ............................... 10

*Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 7–10 (1980) ................................... 4

*Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 8 (1980) ....................................... 8

*Noel v. Hall*, 568 F.3d 743, 747 (9th Cir. 2009) ..................................................... 13, 14

**TRIAL AND CIRCUIT COURT CASES**

*AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 951 (9th Cir. 2006) ........... 7

*Anderson v. Cryovac, Inc., 96 F.R.D. 431 (D. Mass. 1983)* ........................................... 19

*Cheng v. Comm'r*, 878 F.2d 306, 309 (9th Cir. 1989)................................................... 8

*Frank Briscoe Co. v. Morrison-Knudsen Co.,* 776 F.2d 1414, 1416 (9th Cir. 1985) ...3, 4, 12

*In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 145, 163 (2d Cir. 1987). ...................... 18

*James v. Price Stern Sloan, Inc.*, 283 F.3d 1064, 1066 (9th Cir. 2002)........................... 8

*James v. Price Stern Sloan, Inc.*, 283 F.3d 1064, 1068 (9th Cir. 2002) ........................ 15

*Morrison-Knudsen Co. v. Archer,* 655 F.2d 962, 965 (9th Cir. 1981)............................. 20

*Pakootas v. Teck Cominco Metals, Ltd.,* 905 F.3d 565, 577 (9th Cir. 2018).................... 20

*Texaco, Inc. v. Ponsoldt,* 939 F.2d 794, 797–98 (9th Cir. 1991)..................................... 3

*Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d 88 (2d Cir. 2000) ................................. 19

*WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc)................ 6, 8

*Wood v. GCC Bend, LLC*, 422 F.3d 873, 878-879 (9th Cir. 2005) ........................... 9, 12

*Wood v. GCC Bend, LLC*, 422 F.3d 873, 880 (9th Cir. 2005) .................................. 4, 13

# PLAINTIFF'S MOTION FOR RULE 54(B) CERTIFICATION: MEMORANDUM OF POINTS & AUTHORITIES

Pursuant to Federal Rule of Civil Procedure 54(b) and Civil Local Rule 7-2, Plaintiff, Ashley Gjovik, respectfully moves for certification of final judgment as to certain dismissed claims. The dismissed claims involve legally distinct and separate causes of action that have been resolved fully and finally, and there is no just reason for delay in certifying them for appeal.

**NOTICE OF MOTION.** TO DEFENDANT APPLE INC:  PLEASE TAKE NOTICE that on May 8, 2025, at 1:30 p.m. in Courtroom 5, on the 17th Floor of the above-titled Court, located at 450 Golden Gate Avenue, San Francisco, CA 94102, and virtually via Zoom, Plaintiff, Ashley Gjovik, will move the Court for an Order granting final judgement and certificate of appealability of certain of Plaintiff's dismissed claims. This Motion is based upon this Notice of Motion, the accompanying Memorandum of Points and Authorities, the complete pleadings and records on file, and other evidence and arguments as may be presented at the hearing on this Motion. The plaintiff will also be imminently filing responsive motions to Defendant's Answer and intends to schedule those motions for this same May 8 2025 hearing.

## II.  INTRODUCTION

On February 27, 2025 at Dkt. No. 179, this Court issued an order dismissing several of Plaintiff's claims with prejudice and without leave to amend. These dismissals resolved those claims in their entirety and left no further factual or legal issues remaining as to those matters. The dismissed claims include causes of action under federal constitutional law, federal statutory protections, and state tort law, all of which were fully briefed and resolved on the merits.

Plaintiff filed a Motion to Amend on Jan. 31 2025 at Dkt. No. 155, requesting to replead a number of her claims including under the RICO Act, Dodd-Frank Act, and Bane Civil Rights Act. The court's Feb. 27 2025 (Dkt. No. 179) also denied this request and denied leave to amend, further finalizing these dismissals.

The Ninth Circuit has held that Rule 54(b) certification is appropriate when the dismissed claims

are legally and factually separable and when an immediate appeal would promote judicial efficiency. See *Texaco, Inc. v. Ponsoldt,* 939 F.2d 794, 797–98 (9th Cir. 1991); *Frank Briscoe Co. v. Morrison-Knudsen Co.,* 776 F.2d 1414, 1416 (9th Cir. 1985). Since Plaintiff's dismissed claims satisfy these conditions, certification is warranted.

## III.  PROCEDURAL POSTURE

On February 27, 2025, the Court entered an order granting Defendant's motion to dismiss several of Plaintiff's claims with prejudice and without leave to amend. The dismissed claims include constitutional, statutory, and tort claims that were fully resolved on the merits. A separate order was entered the same day denying Plaintiff's motion for leave to amend. Together, those orders fully and finally disposed of the affected claims.

The plaintiff subsequently filed a Rule 54(b) motion on March 18, 2025, seeking certification of final judgment as to the dismissed claims. That motion was submitted using the administrative motion filing category in the Court's ECF system, which, at the time, appeared to be the most appropriate procedural workflow available.

On March 23, 2025, the Court issued a docket entry denying that motion without prejudice, indicating that requests for Rule 54(b) certification must be filed as regularly noticed motions under Civil Local Rule 7-2. The Court stated that Plaintiff may refile her motion in accordance with that rule.

Plaintiff now submits this motion under the "Judgment under 54(b)" category in the ECF system, which appears to align with the Court's instruction, and respectfully requests that the Court consider it under the applicable standard.

## IV.  LEGAL STANDARD UNDER RULE 54(B)

Federal Rule of Civil Procedure 54(b) provides that when an action involves multiple claims or parties, the Court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the Court expressly determines that there is no just reason for delay. This rule serves as a limited exception to the general rule that a final judgment must dispose of all claims as to all parties.

The Supreme Court has emphasized that Rule 54(b) certification is appropriate where the dismissed claims are final and severable, and where entry of judgment will not result in piecemeal or

duplicative appellate review. See *Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 7–10 (1980). A district court must make two determinations: (1) that the order is a "final judgment" as to one or more claims or parties, and (2) that there is "no just reason for delay." *Id.* at 7–8.

The Ninth Circuit applies Rule 54(b) certification where the dismissed claims are "*sufficiently separate and distinct*" from the remaining claims, such that appellate resolution will not interfere with or overlap the ongoing litigation. See *Wood v. GCC Bend, LLC*, 422 F.3d 873, 880 (9th Cir. 2005); *Frank Briscoe Co. v. Morrison-Knudsen Co.*, 776 F.2d 1414, 1416 (9th Cir. 1985).

Rule 54(b) is intended to promote judicial efficiency by allowing immediate review of final orders when appropriate, rather than forcing parties to wait for the resolution of unrelated or factually distinct claims. Courts are encouraged to consider whether an immediate appeal may streamline further proceedings or avoid unnecessary relitigation.

- To assist the Court in evaluating this motion, Plaintiff notes the following orders form the basis for the final judgments sought:
    - o ECF No. 112 (October 1, 2024): Dismissal with prejudice of multiple state-law tort and retaliation claims;
    - o ECF No. 179 (February 27, 2025): Final dismissal with prejudice of environmental nuisance and IIED claims, as well as denial of leave to amend;
    - o Together, these rulings resolve numerous discrete claims that are legally and factually distinct from those still pending.

These orders, read together, fully adjudicate multiple claims such that Rule 54(b) certification is appropriate.

Rule 54(b) requires that the claims for which final judgment is sought be fully adjudicated. Plaintiff seeks certification only as to claims that have been dismissed with prejudice and without leave to amend, and which are no longer subject to further litigation in this Court. Plaintiff does not seek certification as to any claims that remain pending or partially unresolved, such as the retaliation claims.

Specifically, Plaintiff seeks entry of final judgment under Rule 54(b) for the following causes of action, which have been finally adjudicated and dismissed with prejudice:

- Racketeer Influenced and Corrupt Organizations Act (RICO): 18 U.S.C. §§ 1962(a), (c), (d);

- Sarbanes-Oxley Act Whistleblower Protection: 18 U.S.C. § 1514A;

- Dodd-Frank Act Whistleblower Protection: 15 U.S.C. § 78u-6(h)(1)(A)(iii);

- Bane Civil Rights Act: Cal. Civ. Code § 52.1;

- Ralph Civil Rights Act: Cal. Civ. Code § 51.7;

- California Business & Professions Code § 17200 (Unfair Competition Law);

- Common Law Tort Claims:

  o Intentional Infliction of Emotional Distress (IIED) – including "fear of cancer" and traditional variants;

  o Negligent Infliction of Emotional Distress (NIED);

  o Ultrahazardous Activities (Strict Liability);

  o Nuisance (Private, Absolute, Per Se).

Each of the above claims was dismissed on the merits, with prejudice, and without leave to amend—either in the Court's October 1, 2024 order (ECF No. 112) or the February 27, 2025 order (ECF No. 179). No further factual or legal issues remain for these claims. Plaintiff does not seek Rule 54(b) certification for any claims that are factually or legally intertwined with active retaliation or employment-based causes of action that continue to be litigated.

## V. ARGUMENT

### A. FINALITY OF DISMISSED CLAIMS

Rule 54(b) permits certification of final judgment where one or more claims have been fully resolved and there is no just reason for delay. In the Ninth Circuit, a claim is "final" when it has been dismissed with prejudice or when leave to amend has been denied following an earlier dismissal. *WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc).

Plaintiff seeks Rule 54(b) certification only for claims that have been finally adjudicated and are not intertwined with the active causes of action still pending in this case. Each of the claims below has been resolved either by a dismissal with prejudice or by a denial of leave to amend after Plaintiff sought to reassert them.

- **RICO – 18 U.S.C. §§ 1962(c), (d):** Dismissed with (b) and without (c, d) prejudice,

then the plaintiff later sought to reassert the claim, and the Court denied leave to amend in ECF No. 179 (Feb. 27, 2025). The claims are now final.

- **Sarbanes-Oxley – 18 U.S.C. § 1514A:** Dismissed with prejudice and the Court denied leave to amend in ECF No. 179 (Feb. 27, 2025). The claim is now final.

- **Dodd-Frank – 15 U.S.C. § 78u-6(h)(1)(A)(iii):** Dismissed with prejudice and the Court denied leave to amend in ECF No. 179 (Feb. 27, 2025). The claim is now final.

- **Bane Act – Cal. Civ. Code § 52.1:** Dismissed without prejudice and plaintiff later sought leave to replead; the Court denied leave in ECF No. 179. The dismissal is now final.

- **Ralph Act – Cal. Civ. Code § 51.7:** Dismissed without prejudice and plaintiff later sought leave to replead; the Court denied leave in ECF No. 179. The dismissal is now final.

- **Unfair Competition Law – Cal. Bus. & Prof. Code § 17200:** Initially dismissed with leave to amend in ECF No. 73 (May 20, 2024); reasserted and dismissed again in ECF No. 112; leave to replead was later denied in ECF No. 179. The dismissal is final.

- **Intentional Infliction of Emotional Distress (IIED):** Dismissed with prejudice in ECF No. 179, including the "fear of cancer" theory.

- **Negligent Infliction of Emotional Distress (NIED):** Dismissed earlier with leave to amend; Plaintiff later sought to reassert, and the Court denied leave to amend in ECF No. 179. The claim is now final.

- **Ultrahazardous Activities (Strict Liability):** Dismissed with prejudice in ECF No. 179.

- **Nuisance (Private, Absolute, Per Se):** Dismissed with prejudice in ECF No. 179.

Courts routinely certify such claims where they do not overlap factually and legally with remaining claims. See *AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 951 (9th Cir. 2006). Additionally, Defendant Apple Inc. has repeatedly asserted that these claims are legally and factually distinct. In its Motion to Dismiss, Apple argued:

- *"Claims regarding alleged environmental issues at an Apple facility separate from Plaintiff's workplace, and of alleged emotional distress tethered to those issues, are plainly time-barred and should be excised from the case once and for all."* [Dkt. No. 145].

- *"Plaintiff has repeatedly attempted to expand a case that should be centered on the basis for her termination from Apple into a forum to air her sprawling critiques of Apple's environmental practices."* [Dkt. No. 145].

- *"Apple requests that the Court grant its motion and dismiss these claims with prejudice and without any further opportunity to amend, and that the Court direct the parties to proceed on the termination and retaliation-related claims that remain."* [Dkt. No. 145].

The Court's Order Granting Motion to Dismiss further supports this distinction:

- *"Ms. Gjovik's claims for nuisance and IIED (fear of cancer) are time-barred. The Court dismisses with prejudice because it previously gave Ms. Gjovik an opportunity to address the time bar but she failed to do so on amendment."* [Dkt. No. 179].

These statements confirm that the dismissed claims are legally distinct and fully resolved, justifying Rule 54(b) certification.

Finality for the purposes of Rule 54(b) does not require a separate judgment document for each claim. Rather, the Ninth Circuit has long held that a claim is final if it has been dismissed with prejudice, because such a ruling fully disposes of the claim and leaves nothing further for the district court to resolve. See *WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) ("A dismissal with prejudice is a final judgment for purposes of appeal."). In this case, multiple claims—including Plaintiff's emotional distress torts, nuisance theory, and federal statutory claims under SOX and Dodd-Frank—were dismissed with prejudice. No amendment was permitted, and those rulings are final and immediately appealable.

Even where certain claims were originally dismissed without prejudice, the Court's subsequent denial of leave to amend rendered those dismissals final. The Ninth Circuit has made clear that when a district court denies further amendment after a dismissal without prejudice, "*the order becomes final and appealable.*" *WMX Techs.*, 104 F.3d at 1136; see also *Cheng v. Comm'r*, 878 F.2d 306, 309 (9th Cir. 1989). Here, Plaintiff sought to reassert several claims—including RICO, the Bane Act, Ralph Act, and the UCL—in later pleadings or through a motion for leave to amend. The Court denied leave in its February 27, 2025 order (ECF No. 179). Those claims are now procedurally and substantively final.

Finally, Rule 54(b) certification is proper when the district court has definitively resolved a claim and denied further opportunity to amend, even if the claim was not dismissed with prejudice in the first

instance. See *James v. Price Stern Sloan, Inc.*, 283 F.3d 1064, 1066 (9th Cir. 2002); *Frank Briscoe Co. v. Morrison-Knudsen Co.*, 776 F.2d 1414, 1416 (9th Cir. 1985). In Plaintiff's case, the Court's February 27, 2025 order denying the motion to amend functionally closed the door on any reassertion of these claims. As a result, each claim listed in this motion has been finally adjudicated and is properly subject to entry of judgment under Rule 54(b).

## B. No Just Reason for Delay

Once a district court determines that a claim has been finally adjudicated, it must then assess whether there is "any just reason for delay." *Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 8 (1980). This inquiry requires consideration of both judicial administrative interests and the equities specific to the case. Id.; see also *Wood v. GCC Bend, LLC*, 422 F.3d 873, 878–79 (9th Cir. 2005).

Here, there is no just reason to delay entry of judgment. The claims for which Plaintiff seeks certification—specifically, those alleging direct physical harm from toxic exposures—are legally and factually distinct from the claims that remain pending. The dismissed claims, including those for private nuisance, ultrahazardous activities, and intentional infliction of emotional distress (IIED) based on fear of cancer, require Plaintiff to prove that Apple's conduct directly caused her physical harm through the release of toxic substances. For instance, to establish a private nuisance, Plaintiff must demonstrate that Apple's conduct was unreasonable and resulted in a substantial interference with her use and enjoyment of property. Similarly, claims involving ultrahazardous activities impose strict liability on defendants engaging in activities that inherently carry significant risk, regardless of the care exercised. The IIED claim based on fear of cancer necessitates showing that Apple's outrageous conduct led to Plaintiff's severe emotional distress stemming from a reasonable fear of developing cancer. These claims focus on the nature of Apple's actions and their direct impact on Plaintiff's health and safety.

In contrast, the surviving retaliation claims under the California Labor Code focus on whether Plaintiff engaged in protected activities, whether Apple was aware of these activities, and whether any adverse employment actions were taken as a result. The merits of these claims do not hinge on whether the alleged toxic exposures actually occurred or caused harm but rather on the reasonableness of Plaintiff's disclosures and Apple's response to them.

Although some of the dismissed and surviving claims arise from overlapping factual scenarios—

such as Plaintiff's allegations regarding hazardous chemical exposure at Apple facilities—the claims are legally and analytically distinct. The dismissed toxic tort and racketeering claims require proof of injury, causation, and legal responsibility for the underlying conduct. In contrast, the surviving retaliation claims under the California Labor Code turn on whether Plaintiff engaged in protected activity, whether Apple was aware of that activity, and whether it retaliated. The merits of the remaining claims do not depend on whether the alleged chemical exposures actually occurred or caused harm, but rather on the reasonableness of Plaintiff's disclosures and Apple's response.

These differences in legal theories, elements, burdens of proof, and remedies demonstrate that appellate review of the dismissed claims would not overlap with or interfere with the ongoing litigation. See *Wood*, 422 F.3d at 878 n.2 (claims need not be "factually unrelated" to be separable under Rule 54(b)). Entry of judgment now would thus avoid delay without creating a risk of duplicative litigation or piecemeal review.

In addition to the legal separability of the claims, there is an equitable imperative for early appellate review. Plaintiff joined these claims in a single action precisely because they arise from a series of related events involving her working conditions, environmental exposures, and Apple's response to her complaints. Although the legal theories are distinct, resolution of the dismissed claims in Plaintiff's favor would materially enhance the coherence and completeness of her case at trial. An appellate ruling restoring these claims would allow the jury to consider, in one proceeding, whether Apple engaged in dangerous and unlawful conduct, concealed its wrongdoing, and then retaliated against an employee who came close to uncovering it.

Importantly, the toxic tort claims Plaintiff seeks to certify under Rule 54(b) do not require any analysis of Apple's motive, knowledge, or intent to retaliate against the Plaintiff through her employment with the Defendant. Those claims are based on independent legal duties—such as the duty not to engage in ultrahazardous activity, the duty not to substantially interfere with a person's health and safety through a private nuisance, and the duty not to cause emotional distress through extreme and outrageous conduct. The legal sufficiency of these claims turns on whether Apple's conduct caused physical harm, not whether Plaintiff was later terminated or retaliated against. Evidence of retaliation is not required to establish liability under these tort theories. However, if the dismissed and surviving claims were ultimately

presented together to a jury, that body could evaluate the full scope of Apple's conduct, including whether any ongoing retaliatory behavior exacerbated the harms already inflicted—an important consideration in any punitive damages analysis. See *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 576–77 (1996) (punitive damages must be based on reprehensibility of conduct and its relation to the harm caused). Early appellate review would therefore not only avoid inefficiency but could restore a case framework in which the factfinder can assess Apple's conduct holistically and with appropriate evidentiary context.

Rule 54(b) exists not only to protect finality but to serve practical case management. See *Curtiss-Wright*, 446 U.S. at 8 ("sound judicial administration" is a central factor). Here, early appellate review may ultimately narrow the scope of trial, clarify evidentiary boundaries, and enable more efficient resolution of this case. Entry of judgment now would advance—not hinder—the just and efficient administration of justice.

### C.  APPLE CANNOT CLAIM FACTUAL ENTANGLEMENT AFTER MOVING TO DISMISS BASED ON SEPARABILITY

Apple will likely argue that the dismissed claims and the surviving retaliation claims arise from the "same set of facts," and thus must be reviewed together to avoid piecemeal litigation. That argument is both legally unsound and factually inconsistent with Apple's own prior positions.

#### 1.  A. APPLE PREVIOUSLY ARGUED THESE CLAIMS WERE SPECULATIVE, CONCLUSORY, OR UNRELATED

In its prior motions to dismiss, Apple asserted that many of the claims now subject to this Rule 54(b) motion failed because Plaintiff allegedly did not plead sufficient factual support to sustain them—particularly as to causation, injury, or duty. For example:

- o  Apple argued that Plaintiff's toxic tort and emotional distress claims lacked specificity as to the nature, source, and consequences of any harmful exposures.
- o  Apple argued that the constitutional and civil rights claims were unsupported by any state action, discriminatory animus, or viable theory of standing.
- o  Apple asserted that claims based on public policy or criminal conduct were improperly pleaded or insufficiently connected to actionable harm.

In doing so, Apple explicitly downplayed any overlap between those claims and Plaintiff's core

employment-based causes of action. It relied on factual distinctions to secure dismissals. Apple cannot now reverse course and assert that those same claims are "too intertwined" with the surviving ones to allow certification under Rule 54(b). "A party cannot, on the one hand, argue that a claim is unsupported by any specific facts, and on the other, argue that the same claim is so deeply interwoven with other claims that it must remain bound to them for appeal." — *Cf. New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (judicial estoppel prevents a party from taking contradictory positions in litigation).

## 2. LEGAL DISTINCTNESS, NOT FACTUAL ISOLATION, IS THE RULE 54(B) STANDARD

Rule 54(b) does not require that claims be "factually unrelated." The Ninth Circuit has repeatedly held that claims may arise from the same factual setting and still qualify for Rule 54(b) certification where they involve distinct legal rights, elements, and relief. "*We have never held that claims must be factually unrelated in order to be separate*." — *Wood v. GCC Bend, LLC*, 422 F.3d 873, 878 n.2 (9th Cir. 2005).

In *Wood*, the Ninth Circuit emphasized that the relevant question is not whether claims share a common background, but whether appellate review of one claim would involve legal or factual determinations that would overlap with the others. *Id.* at 880. Here, the dismissed claims require resolution of entirely different legal theories than the remaining retaliation claims—e.g., tort liability, civil rights violations, strict liability doctrines—which the Ninth Circuit can review independently.

## 3. APPLE CANNOT MANUFACTURE "ENTANGLEMENT" AFTER THE FACT

Having secured dismissal of these claims on grounds of independence, Apple cannot now invoke "factual entanglement" to avoid appellate scrutiny. Any such reversal is not only legally dubious, but it also contradicts Apple's own litigation strategy. This is especially problematic where the only connection between the dismissed and surviving claims is the general timeline of Plaintiff's employment—a background that does not defeat separability under Rule 54(b). See *Frank Briscoe Co. v. Morrison-Knudsen Co.*, 776 F.2d 1414, 1416 (9th Cir. 1985) (Rule 54(b) certification proper where resolved claims did not "substantially overlap" with remaining claims despite shared chronology).

## D. RULE 54(B) CERTIFICATION WILL NOT CAUSE PIECEMEAL LITIGATION— DENYING IT WILL

Apple may argue that granting Rule 54(b) certification will promote piecemeal litigation and judicial inefficiency. That objection misstates both the governing law and the actual structure of this case. In truth, certifying the dismissed claims now would avoid duplication, promote efficient resolution, and prevent multiple trials and discovery phases that would otherwise be necessary if these claims were revived later.

### 4. RULE 54(B) DOES NOT BAR ALL PIECEMEAL APPEALS—ONLY DUPLICATIVE ONES

Rule 54(b) exists to permit partial appeals—that is its entire function. What the rule guards against is duplicative or overlapping appellate review, where the Ninth Circuit might have to revisit the *same* legal or factual questions more than once. But where, as here, the certified claims are legally distinct and can be reviewed in isolation, Rule 54(b) serves its purpose: allowing a clean, self-contained appeal of resolved issues. "*The standard under Rule 54(b) is not whether the claims arise out of the same transaction, but whether they are sufficiently separable to avoid duplicate appellate review.*" — *Wood v. GCC Bend, LLC*, 422 F.3d 873, 880 (9th Cir. 2005).

Apple cannot identify any issue of law or fact that would require the Ninth Circuit to revisit its analysis in a subsequent appeal of the surviving retaliation claims. Each claim for which certification is sought requires a different legal framework, different factual proof, and different remedies.

### 5. DENYING CERTIFICATION WOULD GUARANTEE INEFFICIENCY AND DUPLICATIVE PROCEEDINGS

Far from avoiding piecemeal litigation, denying certification now would guarantee it. If the Ninth Circuit later reverses one or more of the dismissed claims, this Court would need to:

- o   Reopen discovery on those claims,
- o   Re-brief and potentially re-litigate motions *in limine* or summary judgment,
- o   Conduct a second trial, or a retrial, with overlapping evidence and witnesses.

This would burden both parties, the Court, and the appellate system itself. Rule 54(b) was designed to avoid exactly this kind of waste. "*Rule 54(b) was adopted... to avoid the hardship of delaying appeal until the entire case is concluded.*" — *Noel v. Hall*, 568 F.3d 743, 747 (9th Cir. 2009). The Court can avoid this by certifying the claims now, allowing the Ninth Circuit to rule once, efficiently, and with no disruption to the ongoing litigation of Plaintiff's remaining claims.

### 6. APPLE HAS ALREADY FRAGMENTED THIS CASE THROUGH

## Successive Dismissals

Ironically, Apple is the party that introduced segmentation and "piecemeal litigation" by seeking serial dismissals across multiple rounds of amended complaints. It should not now be heard to object to the logical procedural consequence of its own motion practice—namely, an immediate appeal of the claims it sought to sever from trial. *"A party that has pressed for final dismissal cannot simultaneously oppose the procedural consequences of that finality." — Cf. Curtiss-Wright*, 446 U.S. at 10 (certification appropriate where party sought full dismissal of claims now subject to appeal). This motion seeks to resolve what Apple has already carved away. That is not piecemeal litigation, it is judicial housekeeping.

## E.  Plaintiff Would Be Severely Prejudiced by Further Delay

Apple may contend that denying Rule 54(b) certification would not materially prejudice Plaintiff. That argument is not only legally incorrect—it is chillingly detached from the facts of this case. The plaintiff was exposed to lethal levels of arsine gas in her home, leading to severe physical harm, including heart failure, seizures, neurological damage, and long-term injury. This exposure occurred while Plaintiff was employed at Apple, and the company—upon learning she was investigating the source—fired her, stalked her, harassed her, burglarized her home, defamed her publicly, and ended her career.

Apple's conduct, if proven, would support multiple counts of civil and criminal liability. Yet its position in this litigation is effectively: *"There's no urgency to review these claims."* That is not a neutral posture—it is a calculated legal strategy to deny Plaintiff meaningful redress for what amounts to attempted corporate manslaughter and a campaign of terror.

### 7.  Plaintiff Has Suffered Irreparable Harm and Massive Financial Loss

Plaintiff's injuries are not speculative. She endured:

- o  Documented exposure to toxic semiconductor gases in her residential bedroom;
- o  Medical trauma, including cardiac events and neurological complications;
- o  Professional denylisting and reputational damage following her termination;
- o  Active retaliation, including surveillance, interference with housing, and digital and physical harassment;
- o  And economic damages valued at millions of dollars, including property damage, career

and relationship disruption, medical care, and safety-related costs.

Apple's actions transformed Plaintiff's life, and its litigation posture has only magnified the harm.

### 8.   FURTHER DELAY IS FUNCTIONALLY A DENIAL OF JUSTICE

Plaintiff is now facing imminent bankruptcy after four years of waiting for justice. Apple's requested delay—effectively asking Plaintiff to wait another 2–3 years for appellate review—would mean that claims concerning chemical injury may never be heard by a jury. "Rule 54(b) exists to prevent hardship caused by undue delay. It was created so litigants would not be forced to 'wait interminably' to vindicate claims already resolved by the district court." — *Noel v. Hall*, 568 F.3d 743, 747 (9th Cir. 2009). The suggestion that Plaintiff's near-fatal exposure, medical collapse, and sustained harassment do not justify appellate review is not just inaccurate—it is an insult to the principles of due process and judicial equity.

### F.   THIS CASE WILL NOT RESOLVE AT TRIAL WITHOUT RULE 54(B)—IT WILL FRACTURE

Apple may argue that Rule 54(b) certification is unnecessary because Plaintiff can simply proceed to trial on the remaining claims, and appeal everything together at the end. That argument misunderstands both the structure of this case and the purpose of Rule 54(b). Without certification, Plaintiff cannot appeal the dismissed claims at all, and the trial that Apple envisions would proceed without a central piece of the story—the toxic exposure, the civil rights violations, and the emotional and physical injury—that Apple worked so hard to suppress.

### 9.   DISMISSED CLAIMS WILL NOT "RESOLVE" AT TRIAL—THEY ARE ALREADY RESOLVED

The trial will not include the dismissed claims unless they are reinstated. Without Rule 54(b) certification, Plaintiff has no immediate appellate remedy. And if the Court later proceeds to final judgment solely on the remaining claims, Plaintiff may never have a clean procedural window to challenge the dismissals. See *James v. Price Stern Sloan, Inc.*, 283 F.3d 1064, 1068 (9th Cir. 2002) (absent 54(b) certification, appellate jurisdiction does not attach to resolved claims). This is not a matter of timing—it's a matter of jurisdiction. The appellate court cannot review the dismissed claims until this Court certifies them.

### 10.   TRIAL ON THE SURVIVING CLAIMS WILL BE FRAGMENTED

**WITHOUT RESOLUTION OF THE DISMISSED ONES**

The surviving retaliation claims cannot fill the evidentiary or narrative gap left by the dismissed tort and statutory claims. The jury will not hear the details of Plaintiff's toxic exposures, emotional trauma, or Apple's concealment unless those claims are reinstated. That will leave the trial structurally incomplete—and in many ways, misleading. Apple seeks to proceed to trial on a curated record, one in which the conduct that caused Plaintiff's harm is excluded, while only the fallout is litigated. That is not judicial efficiency. That is strategic sanitization of the trial record through procedural delay.

## 11. THIS CASE IS NOT "ONE TRIAL, ONE APPEAL"—IT IS ALREADY A SPLIT CASE

This litigation is not a single-track action. Apple already splintered it with multiple rounds of motion practice. The case now contains:

- o Final dismissals of toxic torts, emotional distress, racketeering, and civil rights claims;
- o Ongoing employment retaliation claims;
- o Procedural denial of leave to amend several core claims;
- o And disputed factual overlap across claim sets.

What remains is a fractured case—and without Rule 54(b), it becomes an unreviewable one. Certification is the only procedural mechanism available to ensure the appellate court can weigh in now, rather than years from now—when key witnesses, evidence, and Plaintiff's ability to litigate may be gone.

## G. DENYING CERTIFICATION RISKS MULTIPLE TRIALS, INCONSISTENT VERDICTS, AND IRREPARABLE PREJUDICE

If Rule 54(b) certification is denied, Plaintiff will be forced to wait until the conclusion of her surviving retaliation claims to appeal the dismissed causes of action. In that scenario, Plaintiff would proceed to trial on a partial case—one that omits core facts, legal theories, and damages associated with Apple's alleged toxic exposures and concealment of harm. The jury would award relief, if any, based on a limited and artificially narrowed record.

If the Ninth Circuit later reverses the dismissal of Plaintiff's toxic tort or civil rights claims, a second trial would be required—reopening discovery and fact-finding on events that occurred in 2020 or earlier. Key evidence may no longer exist. Apple may assert that records have been discarded as part of

routine document retention schedules. Witnesses may be unavailable, or their memories eroded. Yet Plaintiff would be forced to reassemble her case under far worse conditions than those available today.

Even if Plaintiff succeeds in that second trial, a third proceeding may be necessary—this time to correct or expand the punitive damages award in the retaliation case. A jury that never heard about the underlying chemical exposures, Apple's environmental practices, or its cover-up campaign could not have properly calibrated its damages assessment. To reach a just outcome, Plaintiff would be forced to seek post-judgment relief, a new trial on damages, or vacatur of prior verdicts. The very inefficiency Rule 54(b) seeks to avoid would come to pass—in triplicate.

This is not hypothetical excess—it is procedural inevitability. Certifying the dismissed claims now allows all parties to avoid this spiral, and ensures that Plaintiff's case is heard as a cohesive whole.

## H. The Need to Protect the Legal Rights of All Harmed

This case involves not only the rights of a single whistleblower, but also allegations of corporate misconduct involving hazardous chemicals, public safety, and the concealment of dangerous activity in highly sensitive environments. (See Exhibit A, the public U.S. EPA website page for Apple's factory showing multiple, serious violations that Apple's failed to correct over the last two years). The public has a right to know whether federal and state environmental safety laws are being properly enforced—and whether companies that expose employees and communities to dangerous toxins can evade judicial scrutiny through procedural delay.

Apple's conduct in this litigation reflects a broader pattern of aggressive defense tactics, including serial motion practice, procedural maneuvering, and weaponized delay. These tactics are not neutral—they are part of a strategy to deprive Plaintiff of access to timely adjudication and to exhaust her financial and emotional resources. The Court has the authority to consider a party's litigation posture when evaluating "just reason for delay" under Rule 54(b). See *Curtiss-Wright*, 446 U.S. at 10. Apple's tactics here exemplify the kind of abusive litigation behavior Rule 54(b) was designed to check.

The toxic tort claims dismissed in this case do not merely concern private injury. They implicate alleged chemical exposures affecting tens of thousands of individuals living or working near Apple's facilities—individuals who may have been exposed without notice, informed consent, or access to medical surveillance. Plaintiff's case alleges exposure to arsine gas and other semiconductor process emissions that

are among the most dangerous industrial chemicals known, including known carcinogens, neurotoxins, mutagens (alerting and mutating DNA), and cardiotoxic agents.

This Court's rulings—particularly those addressing the statute of limitations, accrual, and causation standards for toxic tort claims in California—now stand as precedents that may be cited against others similarly harmed. Unless and until those rulings are reviewed and clarified on appeal, they may operate to foreclose legal recourse for potentially thousands of people who have yet to understand or even discover that they were exposed.

Rule 54(b) certification is not just about one plaintiff's claims—it is about preserving appellate jurisdiction to clarify and correct rulings that impact a broader class of potential victims. Allowing appellate review now ensures that any errors of law or fact will not continue to ripple outward, damaging other injured parties' chances to seek redress in the future. The public has a compelling interest in ensuring that legal doctrines governing toxic exposures—especially those involving corporate secrecy, environmental concealment, and delayed discovery of injury—are subject to timely appellate review.

This case is not isolated. It is the first judicial test of alleged systemic contamination connected to Apple's industrial processes. The outcome of these claims may affect how public agencies, environmental monitors, injured workers, and civil litigants understand and address chemical injury arising from high-tech manufacturing. Rule 54(b) certification is not only the correct legal mechanism to preserve appellate jurisdiction—it is also a gateway to public accountability. Certification would allow affected individuals, advocacy organizations, environmental watchdogs, labor groups, and medical experts to participate through amicus briefs and ensure that the Ninth Circuit has the benefit of broader policy perspectives and scientific insight when reviewing the serious legal questions this case presents.

The consequences of the Court's dismissal order will extend far beyond this plaintiff. Rule 54(b) offers the Court a narrow but powerful procedural tool to permit immediate review, promote consistency in the law, and allow the voices of others potentially impacted by the same toxic exposures to be heard.

## A. PUBLIC POLICY SUPPORTS CERTIFICATION

The ramifications of this case extend beyond individual or community grievances, touching upon the health and safety of numerous others potentially exposed to similar hazardous conditions. Toxic tort litigation serves as a pivotal mechanism not only for addressing individual harms but also for safeguarding

public health and prompting governmental regulatory action.

Toxic tort cases often reveal systemic issues affecting entire communities. For instance, in *In re Agent Orange Product Liability Litigation*, veterans exposed to the herbicide Agent Orange during the Vietnam War suffered severe health consequences, leading to extensive litigation and subsequent compensation for affected individuals. This case underscored the widespread impact of toxic substances on both military personnel and civilians. *See*, *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 145, 163 (2d Cir. 1987).

The *Camp Lejeune* water contamination incident exposed thousands of military personnel and their families to hazardous chemicals, leading to widespread health issues and subsequent legal actions.[1] Similarly, the *Exide lead contamination case* in Los Angeles County highlighted the dangers of industrial pollution, affecting the health of nearby residents and prompting extensive environmental cleanup efforts.[2]

Such litigation frequently acts as a catalyst for governmental agencies to enforce environmental laws more stringently. The *Woburn Toxic Trial* (*Anderson v. Cryovac, Inc., 96 F.R.D. 431 (D. Mass. 1983)*) involved allegations that industrial solvents contaminated the local water supply, leading to a cluster of leukemia cases. The case not only resulted in settlements for the affected families but also spurred the Environmental Protection Agency to intensify its oversight and remediation efforts under the Comprehensive Environmental Response, Compensation, and Liability Act.

By holding corporations accountable for environmental hazards, toxic tort litigation serves as a deterrent against negligent practices. In *Wiwa v. Royal Dutch Petroleum Co.*, the plaintiffs alleged that the company was complicit in human rights abuses and environmental degradation in Nigeria. See, *Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d 88 (2d Cir. 2000). The settlement brought attention to corporate responsibility and environmental justice, reinforcing the necessity for companies to adhere to ethical and environmental standards.

Courts have increasingly recognized the importance of environmental justice, particularly for marginalized communities disproportionately affected by environmental hazards. The *Times Beach, Missouri* incident, where dioxin contamination led to the evacuation and demolition of an entire town,

---

[1] National Research Council (US) Committee on Contaminated Drinking Water at Camp Lejeune. *Contaminated Water Supplies at Camp Lejeune: Assessing Potential Health Effects,* Washington (DC): National Academies Press (US); 2009.
[2] Californnia EPA, DTSC, *Exide Cost Recovery Litigation, https://dtsc.ca.gov/exide-cost-recovery-litigation/*

highlighted the need for stringent environmental regulations and equitable enforcement to protect vulnerable populations.[3]

## B. Retroactive Certification

In addition to certifying the February 27, 2025 dismissal order, Plaintiff requests that this Court also certify the October 1, 2024 dismissal order for finality under Rule 54(b). The Ninth Circuit has long recognized that a district court has discretion to retroactively certify interlocutory dismissals as final judgments, particularly when appellate review would provide clarity and resolve distinct issues. See *Pakootas v. Teck Cominco Metals, Ltd.,* 905 F.3d 565, 577 (9th Cir. 2018) (holding that a district court may issue Rule 54(b) certification after an initial interlocutory dismissal if it determines that no just reason exists for further delay). Similarly, in *Morrison-Knudsen Co. v. Archer,* 655 F.2d 962, 965 (9th Cir. 1981), the Ninth Circuit emphasized that Rule 54(b) certification should be granted where the dismissed claims have been finally resolved and are factually distinct from remaining claims—a standard met here.

The Ninth Circuit's own concerns about the finality of the October 1 dismissal order further support this request. Rather than risk additional procedural complications or further delays in appellate review, this Court can resolve any lingering ambiguity by formally certifying the October 1, 2024 order as final under Rule 54(b). Doing so ensures that Plaintiff's pending interlocutory appeal proceeds efficiently and in accordance with the Ninth Circuit's jurisdictional requirements. Given that the October 1 order dismissed certain claims with prejudice and without leave to amend, its finality is not in dispute—what remains is only a procedural certification to allow the Ninth Circuit to proceed with review. Thus, to prevent unnecessary delay and procedural inefficiency, this Court should certify both the February 27, 2025 and October 1, 2024 dismissal orders as final.

# VI.  CONCLUSION

The plaintiff confirmed with the Ninth Circuit Clerk's office that she must file a second notice of appeal for the Feb. 27 2025 decision (in addition to her existing notice for the Oct. 1 2024 decision). The plaintiff lacked the funds to pay for the second notice of appeal but has now successfully completed

---

[3] U.S. EPA, *A Town, a Flood, and Superfund: Looking Back at the Times Beach Disaster Nearly 40 Years Later,* https://www.epa.gov/mo/town-flood-and-superfund-looking-back-times-beach-disaster-nearly-40-years-later

fundraising from interested members of the public to cover the cost of the second appeal. The plaintiff plans to file a Protective Notice of Appeal to the Ninth Circuit prior to the 30-day statute of limitations if a decision is not issued at that time on this request.

The plaintiff respectfully requests that the Court enter a final judgment under Federal Rule of Civil Procedure 54(b) as to the claims that have been fully and finally adjudicated. These claims—dismissed with prejudice, or dismissed without leave to amend—are legally distinct from the remaining retaliation causes of action and involve separate elements, factual inquiries, and remedies. Their resolution will not interfere with the litigation of surviving claims and will, if anything, promote judicial economy by reducing the risk of duplicative proceedings, evidentiary fragmentation, and inconsistent verdicts.

Rule 54(b) was designed to prevent litigants from being trapped in procedural limbo when discrete claims are resolved but appellate review is otherwise unavailable. That is precisely the situation Plaintiff now faces. Without certification, she risks losing the opportunity to pursue substantial claims involving physical injury, constitutional harm, and corporate misconduct of the highest order. And if those claims are later revived on appeal, this Court will be burdened with reopening discovery, retrying claims, and recalibrating damages years after the relevant events—and potentially after the evidence has disappeared.

Accordingly, Plaintiff respectfully requests that the Court:

- Certify its prior orders of dismissal as final judgments under Rule 54(b)[4] ;
- Enter final judgment on the following dismissed claims[5]:
  - Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(a), (c), (d);
  - Sarbanes-Oxley Act, 18 U.S.C. § 1514A;
  - Dodd-Frank Act, 15 U.S.C. § 78u-6(h)(1)(A)(iii);
  - California Civil Code §§ 52.1 (Bane Act) and 51.7 (Ralph Act);
  - California Business and Professions Code § 17200;
  - Claims for intentional infliction of emotional distress;

---

[4] Plaintiff does not include her breach of contract and breach of the implied covenant of good faith and fair dealing claims, or any dismissed sub-claims under surviving claims (such as under Cal. Labor Codes §§ 1102.5, 6310, 98.7, etc.) in this request due to factual and legal overlaps with the active district court claims – but does not waive her right to appeal these later.

[5] With RICO and IIED claims encompassing the common laws of the state of California, the state of New York, and the Commonwealth of Massachusetts.

- o Negligent infliction of emotional distress;

- o Strict liability for ultrahazardous activities;

- o Nuisance (private, absolute, and per se).

- Grant any further relief the Court deems just and proper.

*Justice delayed is justice denied—and these claims have already waited long enough.*

Dated: March 23 2025

**/s/ Ashley M. Gjovik**

*Pro Se Plaintiff*

**Email**: legal@ashleygjovik.com
**Physical Address**: Boston, Massachusetts
**Mailing Address:** 2108 N St. Ste. 4553 Sacramento, CA, 95816
**Phone**: (408) 883-4428

**Ashley M. Gjovik, JD**
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# United States District Court

## Northern District of California

| | |
|---|---|
| **Ashley M. Gjovik,** *an individual,* | **USDC Case No. 3:23-CV-04597-EMC** |
| | **USCA Case No.'s 24-6058 & 25-2028** |
| Plaintiff, | |
| | **Plaintiff's Reply in Support of her Motion for Cert. of Final Judgment Under Rule 54(b)** |
| vs. | |
| | **Hearing:** |
| **Apple Inc.,** *a corporation,* | **Dept**: Courtroom 5, 17th Floor & Zoom |
| | **Judge**: The Honorable Edward M. Chen |
| Defendant. | **Date**: June 12 2025 | Time: 1:30 PM |

# TABLE OF CONTENTS

I.      INTRODUCTION.................................................................................................2

II.     PROCEDURAL HISTORY....................................................................................2

III.    ANALYSIS...........................................................................................................3

    A.    The Dismissed Claims Are Final Within the Meaning of Rule 54(B)..................3

    B.    Apple Has Treated These Claims as Final — Everywhere Else .........................4

IV.     THE DISMISSED CLAIMS ARE LEGALLY AND FACTUALLY DISTINCT.........6

V.      LET'S ROLL THE TAPE: APPLE'S OWN FILINGS UNDERCUT ITS OPPOSITION ..........7

    C.    Apple's Own Motions to Dismiss Repeatedly Framed These Claims as Distinct and Concluded ......8

    D.    Apple Asked the Court to Strike These Claims as Immaterial .........................8

    E.    Apple Told the Ninth Circuit the Claims Were Conclusively Dismissed ...........9

    F.    Apple's Discovery Conduct Treated the Claims as Resolved ..........................9

    G.    Apple Has Made These Same Representations Across Multiple Rounds ...........9

VI.     CERTIFICATION WILL PROMOTE JUDICIAL EFFICIENCY AND FAIRNESS...............10

    H.    Certification Avoids Duplicative Litigation and Post-Verdict Appeals .................11

    I.     Apple's Changing Positions Undermine Judicial Economy..............................11

    J.     The Public Interest Supports Review of These Structural Issues .......................11

VII.    APPLE'S CONDUCT WARRANTS EQUITABLE SCRUTINY .......................12

VIII.   ALTERNATIVE RELIEF: RENEWED REQUEST FOR LEAVE TO AMEND...................13

IX.     APPLE'S CONDUCT WARRANTS EQUITABLE SCRUTINY .........................13

X.      CONCLUSION...................................................................................................14

XI.     EXHIBITS .........................................................................................................17

# Plaintiff's Reply in Support of Motion for Certification of Final Judgment Under Rule 54(b)

## I.   INTRODUCTION

Plaintiff respectfully submits this Reply in support of her Motion for Partial Final Judgment under Rule 54(b). The question before the Court is whether the claims Plaintiff seeks to appeal have been fully resolved. They have. Each was dismissed with prejudice or without leave to amend, and no claim remains from those rulings. Apple's opposition does not meaningfully dispute this finality.

Instead, Apple suggests that certification would create inefficiency due to purported overlap between the dismissed and surviving claims. This is a significant departure from Apple's long-held position. For more than a year—including in successive motions to dismiss, discovery conferences, and multiple court filings—Apple repeatedly emphasized that the claims at issue were legally and factually distinct. That view was central to its opposition to discovery, amendment, and prior attempts at consolidation. It is also reflected in the Court's orders, which dismissed the claims on separate legal grounds and limited discovery accordingly.

The record thus presents a straightforward case for certification. The dismissed claims are final. Apple has until now consistently described them as unrelated to the remaining claims. There is no just reason to delay appellate review. Certification under Rule 54(b) will allow the Ninth Circuit to evaluate the dismissed claims while the surviving claims proceed in the ordinary course—consistent with both judicial economy and the positions Apple has long maintained.

## II.   PROCEDURAL HISTORY

This case arises from Plaintiff's claims against her former employer, Apple Inc., including causes of action under federal and state constitutional provisions, whistleblower protections, public rights torts, and employment retaliation statutes. Over the course of the past year, Apple has filed multiple motions to dismiss, to strike, and to limit Plaintiff's ability to amend her complaint—resulting in the dismissal of several claims with prejudice or without leave to amend.

On March 15, 2025, Plaintiff filed a protective Notice of Appeal with the Ninth Circuit seeking review of those final dismissals. See *Gjovik v. Apple Inc.*, Case No. 25-2028, Dkt. 1. Apple moved to dismiss

or stay the appeal, arguing that the dismissed claims were not subject to appellate review. See Dkt. 5. Plaintiff opposed that motion on March 29, 2025, explaining that the claims were fully resolved and legally distinct. See Dkt. 10.

In response, Apple filed over 1,000 pages of excerpts of record, briefing, and supporting documents across the two consolidated Ninth Circuit appeals (Nos. 25-2028 and 24-6058)—despite simultaneously arguing that the appeal was improper and that the record was incomplete or premature. See Dkt. 11 and accompanying exhibits. Plaintiff brings this procedural history to the Court's attention through an Exhibit submitted concurrently with this Reply, which includes the Ninth Circuit filings and relevant excerpts.

Meanwhile, in this Court, Plaintiff moved for Rule 54(b) certification to confirm the finality of the dismissed claims. Apple now opposes that motion by adopting a position fundamentally at odds with its prior representations in both forums: namely, that the claims are not final, or not sufficiently distinct, to support certification. As detailed below, Apple's shifting positions undermine both judicial efficiency and fairness. Certification is proper, and the Court should grant the motion.

## III.    ANALYSIS

### A.    THE DISMISSED CLAIMS ARE FINAL WITHIN THE MEANING OF RULE 54(B)

Rule 54(b) permits entry of final judgment on fewer than all claims in an action where (1) the dismissed claims are final, and (2) there is no just reason for delay. *Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 7–10 (1980). The first prong is satisfied when the district court has rendered a complete and unequivocal decision disposing of the claims at issue. That requirement is clearly met here. Each of the claims Plaintiff seeks to appeal has been conclusively resolved. The Court dismissed the following claims in whole and with prejudice, or denied leave to amend them:

- Racketeer Influenced and Corrupt Organizations Act (RICO).
- California Civil Code § 52.1 (Bane Act).
- California Civil Code § 51.7 (Ralph Act).
- Dodd-Frank Act and SOX Act Whistleblower Protection.
- California Business & Professions Code § 17200 (Unfair Competition Law).
- Additional claims under common law environment and harassment torts.

The Court's orders granting Apple's motions to dismiss expressly declined to grant further leave

to amend as to these claims. In multiple instances—including the RICO and Dodd-Frank causes of action—the Court found amendment would be futile. See Dkt. No. 145 (MTD); Dkt. No. 150 (Opp.); Dkt. No. 152 (Reply). The plaintiff thereafter sought leave to file a Sixth Amended Complaint in order to incorporate new factual developments. See Dkt. No. 155 (Mot. to Amend). Apple opposed the motion on the grounds that these claims had been fully adjudicated, and the court denied leave. The claims thus remain dismissed and excluded from the operative Fifth Amended Complaint.

Apple has also treated the claims as final for all other purposes. In meet-and-confer correspondence, conferences, and formal discovery responses, Apple has maintained that the dismissed claims are no longer part of this case, and further, that they were never part of this case (such as their justification for refusing to provide 26(f) initial disclosures on these claims, and they still have not). Further, in response to Plaintiff's request for production related to the environmental and privacy claims, Apple objected on the basis that those claims were no longer at issue and therefore not subject to discovery. See Dkt. Nos. 162–165; see also Transcript of July 16, 2024 Hearing (Dkt. No. 75, noting Apple's position that disclosures and discovery obligations applied only to the employment-based claims).

Apple cannot reasonably contest the finality of these claims now without contradicting its prior representations. The Court's orders disposed of them in their entirety, denied further amendment, and the parties have litigated accordingly.

## B. Apple Has Treated These Claims as Final — Everywhere Else

Apple's opposition now rests on the assertion that the dismissed claims are not yet final, or that they remain too entangled with the surviving claims to support entry of judgment. That assertion is directly at odds with Apple's own consistent litigation conduct over the past year.

### 1. Apple Has Consistently Objected to Discovery on the Dismissed Claims

Apple has repeatedly and affirmatively taken the position that the claims Plaintiff now seeks to appeal are no longer part of this case and not subject to discovery. For example:

- In response to Plaintiff's requests for production concerning the RICO, environmental, and privacy-based claims, Apple asserted that these were not operative and therefore irrelevant to any discovery obligations.

- In meet-and-confer emails, Apple explicitly refused to produce documents or make disclosures relating to toxic exposure, racketeering allegations, post-termination harassment, biometric surveillance, or other dismissed matters, asserting that such claims had been resolved, and discovery was limited to employment claims.

- In its latest initial disclosures, Apple confined its responses to termination-related issues, again excluding any reference to claims it now contends are still live.

These discovery positions were not ambiguous. Apple was clear in its correspondence, court filings, and oral arguments that it viewed the dismissed claims as fully resolved. It objected to further disclosure, withheld documents, and declined to identify witnesses, all on the premise that the claims had been finally adjudicated.

### 2. APPLE'S REPRESENTATIONS TO THE COURT HAVE REAFFIRMED FINALITY

In open court and formal briefing, Apple reiterated that Plaintiff's dismissed claims were not subject to ongoing litigation. In a July 2024 hearing before this Court, Apple opposed Plaintiff's discovery efforts on the grounds that discovery should proceed only on the employment claims that are not subject to the motion to dismiss. Counsel reaffirmed that the environmental and privacy-related claims were no longer before the Court. Likewise, in Apple's opposition (Dkt. No. 158) to Plaintiff's motion to amend her complaint (Dkt. No. 155), Apple argued that Plaintiff was attempting to revive claims the Court had already dismissed with prejudice or without leave to amend. This directly contradicts the suggestion now advanced—that those same claims are not final and should remain within the district court's jurisdiction. *Id.*

Apple's procedural posture in the Ninth Circuit confirms its view of finality—at least until this motion. In its Motion to Dismiss or Stay the Appeal (9th Cir. Case No. 25-2028, Dkt. 5), Apple argued that the appeal should be dismissed for lack of a final judgment. But it did not argue that the claims themselves were unresolved. Instead, Apple asserted that Plaintiff was improperly appealing claims that were conclusively dismissed. That framing presumes finality. In Plaintiff's Opposition to that motion (Dkt. 10), she catalogued Apple's prior statements across this litigation confirming that the claims were final, distinct, and closed. Apple filed no reply. Apple's position before the Ninth Circuit and its position

here cannot be reconciled. In both forums, it has argued against Plaintiff's efforts to seek review—but with mutually exclusive rationales. If the claims are not final, Apple's repeated assertions to the contrary must be addressed. If the claims are final, Rule 54(b) certification is plainly appropriate.

## IV. THE DISMISSED CLAIMS ARE LEGALLY AND FACTUALLY DISTINCT

To satisfy Rule 54(b), the dismissed claims must be separable from those that remain. The standard is not strict independence, but whether the claims rely on different legal rights, remedies, or factual predicates such that appellate review of the former would not necessarily affect adjudication of the latter. *See Wood v. GCC Bend, LLC*, 422 F.3d 873, 879 (9th Cir. 2005). That standard is met here. The dismissed claims rest on legal theories entirely distinct from the surviving employment retaliation and Labor Code causes of action. For example:

| DISMISSED CLAIMS | LEGAL BASIS | FACTUAL FOCUS |
|---|---|---|
| RICO | 18 U.S.C. § 1961 et seq. | Pattern of racketeering, structural misconduct, multiple criminal acts |
| Bane Act / Ralph Act | Cal. Civ. Code §§ 52.1, 51.7 | Civil rights violations, post-termination harassment & intimidation |
| Unfair Competition Law (UCL) | Cal. Bus. & Prof. Code § 17200 | Unlawful conduct against the public interest |
| SOX / Dodd-Frank | Federal whistleblower statutes | Disclosures to federal agencies about fraud and corruption |
| Environmental Tort / Nuisance / IIED | State common law, public nuisance | Vapor intrusion, hazardous exposure, severe emotional distress |

By contrast, the remaining claims arise under California Labor Code and common law and involve the termination of Plaintiff's employment in alleged retaliation for workplace complaints. The dismissed claims involve broader conduct including environmental violations, public corporate disclosures, criminal harassment, and data collection for artificial intelligence development—that go beyond Plaintiff's employment relationship. The factual scope, actors involved, and relief sought (including injunctive remedies and structural accountability) differ materially from the employment-based claims that remain.

Apple itself has repeatedly emphasized this distinction. In its motions to dismiss, Apple argued that the dismissed claims rested on unrelated conduct, involved no connection to Plaintiff's employment, or failed to establish individualized harm. Its motion practice treated these claims as freestanding and unrelated, even when addressing overlap in timeline or personnel.

The Court's dismissal orders reflect the same conclusion. Each group of claims was addressed on distinct legal grounds and without reference to the survival or resolution of others. For example, the dismissal of the RICO claim was based on pleading insufficiency specific to racketeering standards. The Bane Act and UCL claims were dismissed for lack of standing. None of these rulings relied upon or intertwined with the employment-based causes of action that remain.

That the claims share some overlapping chronology or involve shared institutional actors does not render them inseparable. Courts routinely certify judgment under Rule 54(b) where dismissed claims share factual context but raise different legal issues. *See Noel v. Hall*, 568 F.3d 743, 747 (9th Cir. 2009). That is particularly true where, as here, the dismissed claims are broader in scope, allege distinct types of harm, and implicate rights and remedies not coextensive with the surviving allegations.

## V.  LET'S ROLL THE TAPE: APPLE'S OWN FILINGS UNDERCUT ITS OPPOSITION

In opposing Rule 54(b) certification, Apple now argues that the dismissed claims are not final or are too closely related to the surviving claims to be severed. This is not only inconsistent with the governing legal standards—it is inconsistent with Apple's own litigation record. Across no fewer than five motions to dismiss, two motions to strike, multiple discovery objections, and representations to both this Court and the Ninth Circuit, Apple repeatedly asserted that these claims were unrelated to Plaintiff's employment; dismissed with finality; ineligible for further amendment; and irrelevant to ongoing discovery.

Apple's opposition to Rule 54(b) certification suggests, for the first time, that the dismissed claims are somehow too interrelated to certify for immediate appeal. But this position cannot be reconciled with Apple's extensive litigation history in this case. In filings spanning more than a year—including motions to dismiss, motions to strike, discovery responses, hearing transcripts, and appellate briefing—Apple repeatedly and unequivocally took the opposite view: that the dismissed claims were factually and legally

distinct, fully resolved, and not subject to further litigation. (Dkt. Nos. 162–165).

## C. Apple's Own Motions to Dismiss Repeatedly Framed These Claims as Distinct and Concluded

Throughout its briefing on motions to dismiss—from the First Amended Complaint through the operative versions—Apple consistently represented that the now-dismissed claims were both legally deficient and factually distinct. Apple has, in multiple dispositive motions, affirmatively asserted that the dismissed claims are not part of the core case and cannot proceed:

- In its Motion to Dismiss the Third Amended Complaint, Apple argued that claims including RICO, SOX, Dodd-Frank, Bane Act, and nuisance should be dismissed because they arise from conduct untethered to Plaintiff's employment and are not legally cognizable. — Dkt. No. 48 at 1–2, 5–20

- In its Reply in Support of that Motion, Apple reiterated that these claims failed not only legally, but conceptually: they concerned public conduct and third-party issues unrelated to employment retaliation. — *Dkt. No. 58 at 2–7.*

- Apple's Motion to Dismiss the Fourth Amended Complaint again claimed that the privacy, environmental, and public health claims were time-barred, not tied to Plaintiff's employment, and involved theories the Court had already rejected. — Dkt. No. 78 at 1–2, 6–17

These were not isolated statements. They were core to Apple's legal strategy in seeking to narrow the case.

## D. Apple Asked the Court to Strike These Claims as Immaterial

At the May 16, 2024 hearing, the Court acknowledged that many of Plaintiff's dismissed claims had been raised and rejected under distinct legal standards. In response, Apple did not argue that these claims were intertwined with surviving ones—it agreed they were no longer in play. The transcript reflects that both parties, and the Court, were treating the dismissed claims as having been resolved. Apple took the added step of asking the Court to formally strike all references to the dismissed claims.

In its Motion to Strike portions of the Fourth Amended Complaint, Apple requested the Court strike allegations relating only to claims Apple is moving to dismiss, arguing that such content was immaterial and untethered to the surviving claims. — *Dkt. No. 79 at 2–3.* In its Reply ISO Motion to Strike, Apple emphasized the goal was to settle the pleadings and exclude any allegation that did not relate to the

remaining employment-based claims. — *Dkt. No. 59 at 1–2*

### E.  APPLE TOLD THE NINTH CIRCUIT THE CLAIMS WERE CONCLUSIVELY DISMISSED

In its motion to dismiss the Ninth Circuit appeal, Apple argued that Plaintiff was attempting to appeal claims that were conclusively dismissed. At no point in its Ninth Circuit briefing did Apple suggest those claims remained open or subject to reconsideration by this Court. That position, too, presumed finality. In the Ninth Circuit, Apple has taken the opposite position to what it now argues before this Court. In its Motion to Dismiss or Stay the Appeal, Apple argued the appeal should be dismissed because Plaintiff was appealing claims that were conclusively dismissed—a position that presumes finality. — *9th Cir. Case No. 25-2028, Dkt. 5 at 2–3*. Plaintiff's Opposition to that motion (Dkt. 10) included extensive citations to Apple's prior filings and court statements treating the claims as distinct and final. Apple filed no reply. (See Exhibit A, attached separately due to size and volume).

### F.  APPLE'S DISCOVERY CONDUCT TREATED THE CLAIMS AS RESOLVED

Apple has routinely refused to provide discovery into the dismissed claims on the ground that they are no longer part of the case. It has objected to requests for production related to surveillance, environmental exposure, and fraud disclosures as irrelevant and outside the scope of remaining claims and excluded the dismissed claims from its disclosures. (Dkt. Nos. 162–165).

Apple has also moved to strike any references to these claims from Plaintiff's amended complaints as *immaterial* and *redundant*, affirming its view that these causes of action were long since closed. Apple's representations during discovery further confirm it considered the dismissed claims closed. (Dkt. Nos. 162–165).

In response to Plaintiff's discovery requests, Apple objected to producing documents related to RICO, environmental, or biometric claims, asserting that those claims were dismissed and are no longer operative. — *See Apple RFP Objections, Dkt. Nos. 162–165*. In its General Order 71 disclosures, Apple limited its disclosures to employment-related claims only, excluding any reference to surveillance, public safety, or structural fraud allegations. — *Dkt. No. 77*. During a discovery meet and confer, Apple's counsel stated that discovery is limited to claims still in the case, and those claims were dismissed months ago. — *See Discovery Correspondence (Gjovik v. Apple Emails re RFPs)*.

### G.  APPLE HAS MADE THESE SAME REPRESENTATIONS ACROSS MULTIPLE

Rounds

As early as November 2023, in its Motion to Dismiss the First Amended Complaint, Apple argued that claims like RICO, Bane Act, Ralph Act, and environmental nuisance were not connected to Plaintiff's employment and not actionable under governing law. — *Dkt. No. 30 at 4–20.* At the May 16, 2024 motion hearing, Apple did not dispute the Court's characterization that certain claims had been resolved and some were clearly weaker or not viable. — *Transcript, Dkt.No. 75 at 3–6.*

### Summary Table: Apple's Litigation Positions Then vs. Now

| Issue | Apple Then | Apple Now |
|---|---|---|
| **Finality of dismissed claims** | Concluded and not subject to amendment (*Dkt.* 48, 58) | Not yet final (*Dkt.* 198) |
| **Discovery relevance** | Dismissed claims are not subject to discovery (*Dkt.* 77) | Claims are too intertwined to separate |
| **Appellate jurisdiction** | Appeal improper because claims were conclusively dismissed (9th Cir. Dkt. 5) | Court should retain jurisdiction pending resolution |
| **Relation to employment** | Untethered to employment (*Dkt.* 78, 79) | Too intertwined to sever (*Dkt.* 198) |

Apple cannot assert that these claims are irrelevant when resisting discovery, and then claim they are central when resisting appellate review. The record leaves no ambiguity: Apple has, in every procedural posture until this one, taken the position that these claims are both distinct and closed.

## VI.  CERTIFICATION WILL PROMOTE JUDICIAL EFFICIENCY AND FAIRNESS

Rule 54(b) is designed to permit appellate review where it will serve the interests of efficiency and justice. This is not a case where certification would lead to piecemeal litigation or duplicative proceedings. To the contrary, denying certification here would create unnecessary duplication and uncertainty—for the Court, the parties, and any future trier of fact. The dismissed claims raise complex and weighty questions of law, many of which involve issues that will not be addressed in the remaining claims, including the scope of RICO in the context of the systemic misconduct at issue here; statutory interpretation of California's Bane Act and Ralph Act; and personal injury and public rights torts such as nuisance and ultrahazardous activity.

These issues do not overlap with the surviving Labor Code and wrongful termination claims, which concern distinct statutes, evidence, and remedies. Moreover, as described above, Apple has consistently

acted as though the dismissed claims are entirely severable—seeking to exclude them from discovery, limit them from complaint amendments, and remove them from the pleadings.

## H. CERTIFICATION AVOIDS DUPLICATIVE LITIGATION AND POST-VERDICT APPEALS

Certifying these claims now will allow the Ninth Circuit to resolve threshold questions of law that will otherwise remain dormant until final judgment—potentially years from now. If those claims are revived on appeal at a later date, the Court and parties will face the possibility of having to reopen discovery, revisit dispositive motions, and re-try parts of the case already adjudicated.

Early appellate guidance would prevent that outcome. It would allow the parties to proceed with clarity and ensure that any remanded claims, if revived, could be integrated with the remaining ones efficiently and without undue delay. This is the paradigm Rule 54(b) was designed to address. *See Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 8 (1980) (certification appropriate where claims involve distinct facts, legal issues, and remedies).

## I. APPLE'S CHANGING POSITIONS UNDERMINE JUDICIAL ECONOMY

Allowing Apple to change positions midstream—to assert finality when opposing discovery and then deny it to block appeal—undermines the integrity of both proceedings. If Rule 54(b) certification is denied, Apple will continue to assert these claims are final in district court, while arguing the opposite in any future jurisdictional dispute in the Ninth Circuit.

Certification now offers a cleaner, more consistent resolution. It prevents forum-shopping arguments and reduces the risk of conflicting rulings. Most importantly, it serves the interests of judicial economy by allowing the Ninth Circuit to weigh in once—rather than forcing courts and parties to revisit these same issues later under less favorable conditions.

## J. THE PUBLIC INTEREST SUPPORTS REVIEW OF THESE STRUCTURAL ISSUES

Several of the dismissed claims raise public policy issues that extend beyond the scope of Plaintiff's employment. These are not claims that turn on a narrow factual record. They are legal questions about corporate obligations under constitutional, statutory, and common law frameworks. These questions will impact the rights of at least hundreds of thousands of other people. Immediate appellate review of those questions promotes transparency and accountability. It also reflects the type of public-facing litigation that

benefits from early appellate oversight, particularly where the outcome may influence how such claims are pled, litigated, or limited in the future.

## VII.   APPLE'S CONDUCT WARRANTS EQUITABLE SCRUTINY

Apple's current position is not merely inconsistent—it is irreconcilable with the procedural record it created. For over a year, Apple filed motion after motion asking the Court to dismiss specific claims on the grounds that they were unrelated, immaterial, or legally defective. In doing so, Apple shaped the course of this litigation, limited discovery, and defeated amendment efforts based on a theory of separability that it now disavows. Throughout this case, Apple has engaged multiple attorneys across multiple offices—each iteration seemingly revisiting and reversing the last procedural position.

To accept Apple's present argument—that those same claims are too interrelated to appeal—would be to accept a version of the case that directly contradicts Apple's own representations. This is not merely litigation strategy. It is the kind of conduct that triggers the application of equitable doctrines such as judicial estoppel, unclean hands, and volenti non fit injuria—the principle that a party cannot be heard to complain of consequences it engineered.

Apple has, in effect, argued that:

— The claims were unrelated (to block amendment and discovery),

— The claims were conclusively dismissed (to defeat appellate jurisdiction), and

— The claims are now too connected to appeal (to block Rule 54(b) relief).

These positions cannot coexist in good faith. *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001), instructs that judicial estoppel applies where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, only to adopt a contrary stance later. That standard is plainly met here.

Even aside from estoppel, the doctrine of unclean hands applies when a party seeks to benefit from its own procedural misconduct or misrepresentation. See *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945). Apple should not be permitted to leverage contradictory arguments in multiple forums to prevent any review—appellate or otherwise—of the dismissed claims. To do so would reward gamesmanship at the expense of fairness, efficiency, and respect for the Court's process.

If the dismissed claims are important and intertwined, as Apple now suggests, then Apple's repeated efforts to remove those claims through narrow procedural tactics were improper. If they were

properly dismissed, then Apple should stand by its past representations and allow appellate review to proceed. It cannot have it both ways. Apple's repeated use of Rule 12(b) to strike, dismiss, or preclude even minimal discovery into these claims now appears less about narrowing the case and more about denying any review at all—by any forum.

## VIII.   ALTERNATIVE RELIEF: RENEWED REQUEST FOR LEAVE TO AMEND

To the extent the Court agrees with Apple that the dismissed claims are not final or are inextricably intertwined with surviving claims, Plaintiff respectfully renews her prior request for leave to amend under Rule 15(a). See Dkt. No. 155. The claims at issue were dismissed primarily on procedural and discretionary grounds—such as timeliness, pleading sufficiency, and the scope of prior leave—not on a determination of substantive legal merit. In several instances, Plaintiff was denied leave to amend based on futility without the benefit of discovery or further factual development. Since then, Plaintiff has obtained additional evidence, clarified relevant legal theories, and narrowed the scope of the allegations, as would be reflected in a  proposed Sixth Amended Complaint.

If the Court now views these claims as insufficiently final to support Rule 54(b) certification, then denying both amendment and appellate review would effectively preclude any adjudication of those claims. That outcome would be inconsistent with Rule 15's liberal standard and would raise serious concerns of fairness, particularly where the dismissed claims involve matters of public concern, constitutional protections, and systemic corporate misconduct. Accordingly, in the alternative to granting Rule 54(b) certification, Plaintiff respectfully requests that the Court reconsider its prior denial of leave to amend and grant Plaintiff permission to amend the claims at issue in this motion.

## IX.   APPLE'S CONDUCT WARRANTS EQUITABLE SCRUTINY

Apple's current position is not merely inconsistent—it is irreconcilable with the procedural record it created. For over a year, Apple filed motion after motion asking the Court to dismiss specific claims on the grounds that they were unrelated, immaterial, or legally defective. In doing so, Apple shaped the course of this litigation, limited discovery, and defeated amendment efforts based on a theory of separability that it now disavows. Apple's strategic reversals have unnecessarily multiplied the proceedings across two forums—at great cost to the Court's resources and to the integrity of the process.

To accept Apple's present argument—that those same claims are too interrelated to appeal—would be to accept a version of the case that directly contradicts Apple's own representations. This is not merely litigation strategy. It is the kind of conduct that triggers the application of equitable doctrines such as judicial estoppel, unclean hands, and *volenti non fit injuria*—the principle that a party cannot be heard to complain of consequences it engineered.[1] Apple has, in effect, argued that:

1. The claims were unrelated (to block amendment and discovery),

2. The claims were conclusively dismissed (to defeat appellate jurisdiction), and

3. The claims are now too connected to appeal (to block Rule 54(b) relief).

These positions cannot coexist in good faith. *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001), instructs that judicial estoppel applies where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, only to adopt a contrary stance later. That standard is plainly met here.

Even aside from estoppel, the doctrine of *unclean hands* applies when a party seeks to benefit from its own procedural misconduct or misrepresentation. See *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945). Apple should not be permitted to leverage contradictory arguments in multiple forums to prevent any review—appellate or otherwise—of the dismissed claims. To do so would reward gamesmanship at the expense of fairness, efficiency, and respect for the Court's process. If the dismissed claims are important and intertwined, as Apple now suggests, then Apple's repeated efforts to remove those claims through narrow procedural tactics were improper. If they were properly dismissed, then Apple should stand by its past representations and allow appellate review to proceed. It cannot have it both ways.

## X. CONCLUSION

This is a straightforward case for Rule 54(b) certification. The claims at issue have been finally resolved: they were dismissed with prejudice or without leave to amend, and they have been treated as concluded in discovery, motion practice, and appellate briefing. Apple's argument that they are too intertwined to warrant certification is not only inconsistent with the procedural history—it is incompatible with Apple's own repeated statements to this Court and the Ninth Circuit.

---

[1] See also, *Falsus in uno, falsus in omnibus* — False in one thing, false in everything.

Apple's repeated use of Rule 12(b) to strike, dismiss, or preclude even minimal discovery into these claims now appears less about narrowing the case and more about denying any review at all—by any forum. The result is procedural gridlock: no amendment, no discovery, and no appeal. That outcome undermines not only judicial efficiency, but the basic architecture of fairness embedded in the Federal Rules.

Certification will promote judicial efficiency, avoid duplicative proceedings, and permit timely appellate review of distinct legal and constitutional issues. It will also ensure consistency across forums and avoid further prejudice to Plaintiff, who has otherwise been denied any avenue—through amendment or appeal—to adjudicate these claims. Plaintiff respectfully requests the Court:

1. Grant her Motion for Partial Final Judgment under Rule 54(b) as to the claims identified in her moving papers.

2. In the alternative, if the Court determines that the claims are not final or not sufficiently separable to support Rule 54(b) certification, reconsider its prior denial of leave to amend and grant Plaintiff permission to amend the dismissed claims.

A litigant should not be procedurally barred from both appeal and amendment, particularly where the claims at issue raise significant public policy and constitutional concerns. Plaintiff respectfully asks the Court to grant the requested relief in the interest of fairness, clarity, and judicial economy.

DISCLOSURE REGARDING ASSISTANCE IN PREPARATION: Pursuant to best practices and in the interest of transparency, Plaintiff discloses that she used the assistance of a generative AI platform (ChatGPT, developed by OpenAI) to help organize case records, draft sections of this reply, and cross-reference relevant docket entries and filings. The platform was used strictly as a research and drafting aid under Plaintiff's direction and supervision.

All legal arguments, factual assertions, citations, and procedural decisions were formulated and reviewed by Plaintiff personally. The final content reflects Plaintiff's own legal judgment, interpretation of the record, and responsibility for the filing. Use of this technology was limited to support tasks analogous to those performed by junior counsel or paralegals. No part of this filing was submitted without human review, editing, and substantive oversight.

Dated: April 15 2025



_____

**/s/ Ashley M. Gjovik**

*Pro Se Plaintiff*
**Email**: legal@ashleygjovik.com
**Physical Address**: Boston, Massachusetts
**Mailing Address:** 2108 N St. Ste. 4553 Sacramento, CA, 95816
**Phone**: (408) 883-4428

1

2  **Ashley M. Gjovik, JD**

3  *In Propria Persona*

   2108 N St. Ste. 4553
4  Sacramento, CA, 95816

   (408) 883-4428
5  legal@ashleygjovik.com

6

7

8                    **UNITED STATES DISTRICT COURT**

9                    **NORTHERN DISTRICT OF CALIFORNIA**

10

11

12

13                                        CAND No. 3:23-CV-04597-EMC

14                                        9th Cir No.: 24-6058

15   **ASHLEY GJOVIK**, *an individual*,

16          Plaintiff,                    **PLAINTIFF'S MEMORANDUM OF**

                                          **POINTS & AUTHORITIES**
17       vs.
                                          **IN SUPPORT OF THE**
18
                                          **MOTION TO AMEND &**
19   **APPLE INC**, a corporation,
                                          **SUPPLEMENT THE COMPLAINT**
20          Defendant.

21

22                                        **MOTION HEARING:**

23                                        Dept: Courtroom 5 (& Zoom)

                                          Judge: Honorable Edward M. Chen
24                                        Date: February 27, 2025

25                                        Time: 1:30 PM PT

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Table of Contents

**Introduction** ................................................................. **1**

    Factual Background on Newly Discovered Evidence .......................... 2

    Factual Background on Batterygate ........................................ 3

**Legal Standard for Amendment** ................................................ **4**

**Change of Circumstances** ..................................................... **5**

    New Legal Basis: California Civ. Code § 1708.85 .......................... 6

**Request to Replead the Bane and Ralph Civil Rights Acts, Dodd-Frank, & RICO Act Claims** ............................................................. **8**

    Violation of the Bane Civil Rights Act (Civ. Code § 52.1) ............... 9

    Violation of the Ralph Civil Rights Act (Civ. Code § 51.7) ............. 10

    Violation of the Dodd-Frank Act (15 U.S.C. § 78u-6(h)(1)) ............. 11

    Violation of the RICO Act (18 U.S.C. §§ 1962(c) and (d)) .............. 12

**Request to Replead Retaliation & UCL Claims Based on New "Revenge Porn" Facts** .................................................................. **15**

    Termination in Violation of Public Policy & Cal. Labor Code 1102.5 .15

    Violation of Cal. Bus. & Prof. Code § 17200 (UCL) ......................16

**Replead IIED Claims to include Revenge Porn** .............................. **17**

**Request to Replead Environmental Claims with Air Pollution Law Violations** .................................................................. **20**

    Ultrahazardous Activities, Absolute Nuisance, & Nuisance Per Se Claims ...................................................................... 20

    Retaliation for Reporting Env. Violations under Cal. Labor Code §§ 1102.5 & 6399 (via § 6310) .................................................. 22

**Civil Conspiracy and Corporate Liability** ................................. **23**

    Corporate Criminal Liability and Comparison to Similar Cases ....... 24

**Public Policy Impacts and The Need for Correction** ........................ **28**

    Apple's Deliberate Concealment of Crucial Information ................ 29

**Conclusion** ................................................................. **31**

# TABLE OF AUTHORITIES

**Supreme Court Cases**

*Digital Realty Trust, Inc. v. Somers*, 138 S. Ct. 767, 777 (2018) ...................... 12

*Foman v. Davis,* 371 U.S. 178 (1962)......................................................... 2, 4

*Foman v. Davis*, 371 U.S. 178, 182 (1962)....................................................16

*H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989)...................13

**Trial and Circuit Court Cases**

*Agis v. Howard Johnson Co.,* ...................................................................19

*Cabatit v. Sunnova Energy Corp.*, 60 Cal. App. 5th 317, 324 (2021) .............. 23

*Cabesuela v. Browning-Ferris Indus.*, 68 Cal. App. 4th 101, 112 (1998). ......... 10

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal.4th 163, 180 (1999)..16

*Cel-Tech*, 20 Cal.4th at 179; *Korea Supply*, 29 Cal.4th at 1144. ......................17

*Doe v. Internet Brands, Inc.*, 824 F.3d 846, 851 (9th Cir. 2016). ..................... 6

*Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) ....17

*Gong v. Google, Inc.*, 2016 WL 6025469, at *3 (N.D. Cal. Oct. 14, 2016) ......... 6

*Hager v. County of Los Angeles*, 228 Cal. App. 4th 1538, 1549 (2014) ............. 22

*Howell v. New York Post Co.*, 81 N.Y.2d 115, 122 (1993) .................................19

*Hughes v. Pair*, 46 Cal. 4th 1035, 1051 (2009) ............................................. 18

*Keith v. Volpe*, 858 F.2d 467, 473 (9th Cir. 1988). ....................................... 5

*Kennedy v. Eldridge*, 201 Cal. App. 4th 1197, 1205 (2011) ............................ 23

*Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1143 (2003).......16

*Lawson v. PPG Architectural Finishes, Inc.*, 12 Cal. 5th 703 (2022). ...............15

*Planned Parenthood of S. Ariz. v. Neely*, 130 F.3d 400, 402 (9th Cir. 1997). ...... 5

*San Luis & Delta-Mendota Water Auth. v. U.S. Dep't of Interior,* 236 F.R.D. 491, 496 (E.D. Cal. 2006).............................................................................. 5

*See Farmers Ins. Exch. v. Superior Court*, 2 Cal.4th 377, 383 (1992). ...............16

*Tameny v. Atlantic Richfield Co.*, 27 Cal. 3d 167 (1980). ...............................15

*United States v. Raniere*, 384 F. Supp. 3d 282, 293 (E.D.N.Y. 2019). .............. 7

*Venegas v. County of Los Angeles*, 32 Cal. 4th 820, 843 (2004). ..................... 10

*William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.,* 668 F.2d 1014, 1057 (9th Cir. 1981). ..................................................................................... 5

**Statutes**

15 U.S.C. § 78u-6(h)(1)(A)........................................................................11

17 U.S.C. § 102 .......................................................................................8

18 U.S.C. §§ 875 & 873 ...........................................................................13

18 U.S.C. § 2261A ....................................................................................8

18 U.S.C. § 875 ........................................................................................ 8

18 USC §§ 1962(c) and (d) ...................................................................... 13

Cal. Bus. & Pro. Code § 17200 ............................................................... 16

Cal. Bus. & Prof. Code § 17200 ....................................................... 16, 17

Cal. Bus. & Prof. Code § 17204 ............................................................. 17

Cal. Civ. Code § 1708.85 ................................................................. 16, 17

Cal. Civ. Code § 1708.85(c)-(d) ............................................................... 6

Cal. Civ. Code § 3344 ............................................................................. 8

Cal. Civ. Code § 51.7 ...................................................................... 10, 11

Cal. Civ. Code § 52.1 ......................................................................... 8, 9

Cal. Civil Code § 1708.85 ................................................................. 7, 15

Cal. Lab. Code § 1102.6 ......................................................................... 15

Cal. Labor Code § 1102.6 ....................................................................... 15

Cal. Penal Code § § 518 & 137 .............................................................. 13

California Civ. Code § 1708.85 ................................................................. 6

California Civil Code § 1708.85 ................................................................ 7

California Civil Code § 1708.85(a) .......................................................... 18

California Labor Code § 1102.5(b) .......................................................... 22

California Labor Code §§ 1102.5, 6310, and 6399 ................................... 22

California Labor Code §§ 6310 and 6399 ................................................. 23

Mass. Gen. Laws ch. 272, § 105 ............................................................. 19

New York Penal Law § 245.15 ............................................................... 18

**Rules & Regulations**

Federal Rule of Civil Procedure 15(a)(2) ................................................ 4

Federal Rule of Civil Procedure 15(d) ..................................................... 4

Federal Rules of Civil Procedure 12(b)(6) ............................................... 6

*SEC Exchange Act Rule 21F-17(a)*, 17 C.F.R. § 240.21F-17(a) ........................ 12

# Points & Authorities

## Introduction

1.      Plaintiff seeks leave to amend her complaint to (1) reassert some claims that were previously dismissed (some without prejudice and others with prejudice for reasons Plaintiff contends violated due process), (2) add newly discovered evidence pivotal to the dismissed claims, and (3) clarify allegations regarding the camera application and the employer's knowledge and abuse of nude photographs of Plaintiff. [1]

2.      Plaintiff initially filed her Complaint on Sept. 7 2023. Defendants moved to dismiss certain claims, including RICO, Bane Act, Ralph Act, and ultrahazardous activities, with the Court dismissing some with prejudice and some without prejudice on May 20 2024 and Oct. 1 2024. Plaintiff's Fifth Amended Complaint was filed on Nov. 26 2024, and after filing, Plaintiff discovered critical photographic evidence on Dec. 19 2024 that fundamentally alters the analysis of prior dismissals related to the camera app and Apple's knowledge. This newly uncovered evidence directly addresses the Court's or Defendants' prior objections regarding proof that the employer was aware of the complaints involving the camera application and nude photos it captured. This revealed that the employer had possession of, and knowledge about these photographs, contrary to arguments that Plaintiff could not prove the employer or Apple's awareness.

3.      This also revealed new legal violations and legal bases for the case – as it provided direct evidence of retaliation for matters pled in the SAC, but which were diminished due to the page limit reduction. Defendant also retaliated against Plaintiff for protesting Defendants use of nude photos of her to intimidate her to not tell anyone about misconduct occurring during Batterygate. Apple not only retaliated against Plaintiff for these protected, public complaints in Aug. 2021, but Defendant's retaliation included doing the same thing she was complaining about to her again (now with Gobbler photos).

4.      In addition, recent administrative findings by the Air Board bolster Plaintiff's ultra-hazardous activities claim that were dismissed with prejudice for discretionary or procedural

---

[1] Plaintiff does not waive the opportunity to appeal or request amendment of other claims not specifically mentioned here.

reasons, contrary to the liberal standard of amendment in the Federal Rules. On Aug. 29 2024 and Sept. 12 2024, the Air Board issued notice of findings of substantial violations reinforcing that the employer engaged in conduct consistent with strict liability and serves as a critical legal basis for the retaliation claims.

5.    Because Rule 15(a)(2) instructs courts to "freely give leave when justice so requires," and because none of the *Foman v. Davis,* 371 U.S. 178 (1962) factors (undue delay, bad faith, repeated failure to cure deficiencies, undue prejudice to defendant, or futility) would bar amendment, Plaintiff respectfully requests this Court grant leave. Another Motion to Dismiss is currently pending. Plaintiff moves to amend in good faith to avoid piecemeal litigation and to provide the Court with the most complete set of allegations for a proper adjudication.

### Factual Background on Newly Discovered Evidence

6.    Plaintiff filed her Fifth Amended Complaint on Nov. 26 2024. On Dec. 19 2024, U.S. Dept. of Labor finally released the documents in response to a FOIA request that Plaintiff filed on Dec. 17 2023. Initially, U.S. Dept. of Labor refused to release the documents despite being mandated to provide whistleblower retaliation case files to the complainant and respondent after an investigation. Plaintiff eventually threatened to report them to Senator Elizabeth Warren's office again and have her staff investigate as to what is taking so long – which resulted in U.S. Dept. of Labor releasing the documents ten business days later. The documents included the evidence and statements Apple, via counsel at Orrick, provided to U.S. Dept. of Labor on the environmental and health/safety claims. Apple had repeatedly refused to provide Plaintiff evidence about how, when, and why it terminated her employment and this was the first time she saw several critical documents – but it was through FOIA, not discovery.

7.    The U.S. Dept of Labor documents revealed an incredible amount of information, including the evidence and statements, but also allowing the Plaintiff to understand the timelines and involvement of different individuals. The FOIA documents revealed to her that the two pieces of evidence Apple used to justify her termination was a complaint filed anonymously from a public portal that complained of Plaintiff's social media activity, and appears Apple's lawyers may have written it themselves. The second document was an email sent from a global security employee with private texts with Plaintiff including photos taken of Plaintiff by the Gobbler application, including Plaintiff undressed and with her breasts showing. The global security employee declared

the content was Apple Confidentail and Intellectual Property, and Apple cited this as evidence as to why it fired the Plaintiff. When Apple send the documents to OSHA, it appears they did redact the Plaintiff's breasts with a caption of "Apple Confidential," implying some sort of property right to Plaintniff's naked body.

8.    On Dec. 26 2024, Apple's counsel released Plaintiff's performance review for the first time. Plaintiff had requested this critical evidence since early 2024 but Defendant had claimed it was confidential, protected by attorney client privilege, or otherwise unavailable to her. The review revealed multiple instances of direct evidence of retaliation for protected activities as well as additional Unfair Labor Practices under the NLRA. Defendant had this information since at least July 2021.

## Factual Background on Batterygate

9.    In 2016, Plaintiff worked as the Engineering Program Manager leading Software Engineering Failure Analysis for all of Apple's new and existing embedded products. In this role she was one of the first people brought into the Apple meetings to discuss the emerging issues which became known as "*Batterygate*." Plaintiff was retaliated against by her management in that role for trying to investigate the issue when they preferred to *"ignore it and hope it goes away."* The matter was very contentious. Plaintiff was told to find a new job, and transferred to Hardware Engineering.

10.    When Apple was sued over Batterygate, Plaintiff was called in for document collection by Apple legal and their external counsel, where she was forced to give them naked photos of her, which they demanded and told her they would take with or without her cooperation, and then said they would keep them in their "permanent evidence locker." The plaintiff interpreted this as witness intimidation, which was effective and kept her quiet until August 2021, when she complained about the matter, and it was covered the press. Plaintiff also complained about the application Apple put on her phone called "Gobbler" which took photos, videos, and biometrics 24/7 whenever it "thought it saw a face" in front of the front camera – including when she was in the bathroom, bedroom, and/or naked.

11.    Apple Inc. has faced significant legal repercussions due to the *"Batterygate"* scandal, which involved the company intentionally slowing down older iPhone models to manage battery performance without informing users. This practice led to allegations of consumer deception and

planned obsolescence. In November 2020, Apple agreed to pay $113 million to settle investigations by 34 U.S. states and the District of Columbia, which accused the company of concealing battery issues and throttling device performance to prompt customers into purchasing new devices. The settlement also required Apple to provide truthful information about iPhone power management across its website, software update notes, and device settings.

12.    Earlier, in March 2020, Apple settled a class-action lawsuit in the U.S. by agreeing to pay up to $500 million to affected iPhone users. Under this settlement, consumers could receive $25 per impacted device, with the total amount varying based on the number of claims submitted.[2]

13.    Internationally, in February 2020, France's consumer watchdog fined Apple €25 million (approximately $27 million) for failing to inform consumers that iOS updates could slow down older iPhones. The Directorate General for Competition, Consumption, and the Repression of Fraud concluded that consumers were not adequately informed, leading to the substantial fine. These legal actions underscore the global response to Apple's handling of iPhone battery performance issues and highlight the importance of corporate transparency and consumer rights.

## LEGAL STANDARD FOR AMENDMENT

14.    Under Federal Rule of Civil Procedure 15(a)(2), courts should "freely give leave [to amend] when justice so requires." The Supreme Court in *Foman v. Davis,* 371 U.S. 178 (1962), identified factors against granting leave—such as undue delay, bad faith, repeated failure to cure deficiencies, undue prejudice to the opposing party, or futility of amendment. Where none of these factors predominate, leave to amend is appropriate.

15.    A motion to supplement a complaint in federal court is governed by Federal Rule of Civil Procedure 15(d), which allows a party to file a supplemental pleading to include events that have occurred after the original complaint was filed. Under Rule 15(d), the court may permit supplementation when the new allegations are related to the original claims and supplement, rather than replace, the initial pleading. Courts in the Ninth Circuit have held that Rule 15(d) should be applied liberally in the interests of judicial economy and fairness. *Keith v. Volpe*, 858 F.2d 467, 473

---

[2] Cal. AG, *Attorney General Becerra Announces $113 Million Multistate Settlement Against Apple for Misrepresenting iPhone Batteries and Performance Throttling*, November 18, 2020, https://oag.ca.gov/news/press-releases/attorney-general-becerra-announces-113-million-multistate-settlement-against

(9th Cir. 1988).

16.     A supplemental complaint is appropriate where it adds claims based on facts arising after the original filing, provided that the supplementation does not cause undue prejudice, delay, or introduce futile claims. *Planned Parenthood of S. Ariz. v. Neely*, 130 F.3d 400, 402 (9th Cir. 1997). Courts assess whether the new facts share a common nucleus of operative fact with the original claims, whether the defendant would be prejudiced, and whether supplementation would serve the efficient resolution of the case. *San Luis & Delta-Mendota Water Auth. v. U.S. Dept. of Interior,* 236 F.R.D. 491, 496 (E.D. Cal. 2006). Given that Rule 15(d) is intended to promote the full adjudication of disputes, courts in the Ninth Circuit and California federal courts regularly grant motions to supplement when they facilitate a complete resolution of the issues in a single proceeding. *William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.,* 668 F.2d 1014, 1057 (9th Cir. 1981).

## Change of Circumstances

17.     Defendant argued that despite Plaintiff making public statements and them being asked to comment directly on those statements, that Plaintiff could not immediately offer proof that the Defendant knew about of her complaints about the Gobbler app taking nude photos. Now, it is clear Defendants had these photos and were thus aware. Granting leave to amend corrects the prejudice from the prior dismissal, which occurred before Plaintiff obtained vital evidence.

18.     Additional facts confirm the employer's ratification of, or conspiracy with employees who perpetuated harassment and intimidation. These new facts bolster Plaintiff's vicarious liability theory and conspiracy allegations, supporting an expanded claim that the employer participated in or knowingly allowed the employee's wrongful acts to further a corporate scheme of retaliation.

19.     Findings of the Air Board also warrant revision of the complaint. [See Notice of Pendency at Dkt # 151]. The California EPA agency has determined Apple had violated multiple air pollution regulations with hazardous, unauthorized, dangerous air emissions from their factory at 3250 Scott Blvd. Issue preclusion solidifies the strict liability claims.

20.     The plaintiff is promptly moving to amend upon discovering new evidence. Defendants have not yet proceeded to trial, and no insurmountable prejudice arises from allowing these allegations. Plaintiff seeks these amendments in good faith to align her pleading with newly

discovered facts. The new facts can correct previous deficiencies and satisfy the elements of each re-pled claim, meeting the plausibility standard under Federal Rules of Civil Procedure 12(b)(6).

### New Legal Basis: California Civ. Code § 1708.85

21.    California Civ. Code § 1708.85 provides a private right of action for individuals whose private, sexually explicit images or recordings have been distributed without consent, commonly referred to as nonconsensual pornography or revenge porn. Under this statute, a person may bring a civil lawsuit against anyone who intentionally or recklessly distributes a private, sexually explicit visual depiction of another without consent, causing harm. The statute applies when the depicted person had a reasonable expectation that the material would remain private, and the distribution was made with knowledge or reckless disregard of the harm it would cause. *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 851 (9th Cir. 2016).

22.    The law provides compensatory damages, injunctive relief, punitive damages, and attorney's fees (Cal. Civ. Code § 1708.85(c)-(d)). Additionally, Section 1708.85(e) explicitly states that a defendant cannot use the First Amendment as a defense if the distribution was made with an intent to harass, cause harm, or retaliate against the victim. Courts applying this statute in federal cases in California have upheld claims when the plaintiff establishes that the images were shared without consent and that they suffered reputational, emotional, or financial harm as a result *Gong v. Google, Inc.*, 2016 WL 6025469, at *3 (N.D. Cal. Oct. 14, 2016). Given the statute's intent to provide robust protection against the malicious distribution of private sexual content, courts have interpreted it broadly in favor of victims seeking redress.

23.    The legal framework established by § 1708.85 supports potential claims against corporate entities, especially if an employee or agent of the corporation is responsible for the unauthorized distribution within the scope of their employment. This aligns with principles of vicarious liability, where employers can be held accountable for the actions of their employees performed during their employment.

### 1. Comparison to NXIVM

24.    The NXIVM case provides a pertinent example of how organizations can misuse intimate information to manipulate and control individuals, drawing parallels to violations under Cal. Civil Code § 1708.85. NXIVM, under the leadership of Keith Raniere, operated a secret

society known as DOS, where women were coerced into providing "*collateral*"—including nude photographs and other compromising materials—which was then used to blackmail and intimidate them into compliance. *United States v. Raniere*, 384 F. Supp. 3d 282, 293 (E.D.N.Y. 2019). This coercion was a central element in the charges against Raniere, leading to his conviction on multiple counts, including sex trafficking and racketeering.[3]

25.    Similarly, California Civil Code § 1708.85 addresses the non-consensual distribution of intimate images, recognizing the profound harm such actions inflict on individuals. While the NXIVM case primarily involved criminal charges, the underlying misuse of intimate images as a means of control and coercion underscores the importance of legal protections like those provided by § 1708.85. This statute empowers victims to seek civil remedies against those who unlawfully distribute their private images, reflecting a societal commitment to safeguarding personal privacy and autonomy. In essence, the NXIVM case exemplifies the severe consequences of exploiting intimate information, reinforcing the necessity of robust legal frameworks to protect individuals from such violations.

## 2. A Profound Violation of Fundamental Human Rights

26.    A corporation attempting to assert property rights or intellectual property claim over an employee's breasts raises serious legal, ethical, and constitutional concerns, implicating privacy rights, bodily autonomy, intellectual property law, and workplace discrimination laws. Under Cal. Civil Code § 1708.85, the non-consensual distribution or claim of ownership over intimate images is explicitly unlawful, recognizing an individual's fundamental right to control their own body and private images. Any attempt by an employer to assert intellectual property rights over an employee's body—particularly intimate images obtained through workplace surveillance, document collection, or coercion—would likely constitute an invasion of privacy, sexual harassment (Title VII, FEHA), and a violation of the constitutional right to bodily autonomy. Further, such a claim could be a form of extortion, coercion, or retaliation, particularly if used to silence or intimidate the employee in connection with legal proceedings or whistleblower

---

[3] U.S. DOJ, *NXIVM Leader Keith Raniere Sentenced to 120 Years in Prison for Racketeering and Sex Trafficking Offenses,* October 27, 2020, https://www.justice.gov/usao-edny/pr/nxivm-leader-keith-raniere-sentenced-120-years-prison-racketeering-and-sex-trafficking

complaints.

27.    Copyright law (17 U.S.C. § 102) does not recognize a corporation's ownership of an individual's body or likeness, and any attempt to claim such rights could also run afoul of California's Right of Publicity laws (Cal. Civ. Code § 3344), the Bane Act (Cal. Civ. Code § 52.1), and federal labor laws protecting employees from coercion and intimidation. If an employer were to assert ownership over intimate images of an employee, it could face civil liability for invasion of privacy, sexual harassment, retaliation, and even potential criminal exposure under laws prohibiting non-consensual image distribution and coercion (e.g., 18 U.S.C. § 2261A – stalking, 18 U.S.C. § 875 – extortion). In sum, any corporate attempt to claim intellectual property rights over an employee's body would be legally indefensible and constitute a profound violation of fundamental human rights.

## Request to Replead the Bane and Ralph Civil Rights Acts, Dodd-Frank, & RICO Act Claims

28.    Appleseed, a former employee of Apple's Global Security team, played a pivotal role in the harassment and retaliation that Plaintiff endured after engaging in protected activities, including whistleblowing on toxic emissions from a semiconductor plant operated by Apple. Appleseed's conduct was not an isolated incident, but part of a coordinated, ongoing effort orchestrated by Apple to retaliate against Plaintiff and obstruct her legal rights.

29.    In violation of Plaintiff's privacy rights, Appleseed shared a private, non-consensual photograph of Plaintiff. This photograph, which was taken without Plaintiff's consent through an internal work app, was subsequently used by Appleseed in her harassment campaign and by Apple in their farcical defense.

30.    Appleseed engaged in a pattern of defamation, including labeling Plaintiff a *"liar"* and *"predator"* in both public and private forums. Appleseed's statements were aimed at undermining Plaintiff's credibility, isolating her from potential support, and discouraging others from speaking out in support of Plaintiff. Appleseed's actions were not only aimed at Plaintiff's personal reputation but also sought to intimidate witnesses and potential allies, in violation of Plaintiff's rights under state law, including the Bane Act and Ralph Act.

31.    Appleseed also engaged in cyberstalking by threatening individuals who showed

support for Plaintiff and attempting to coerce them into severing ties with her. These acts of intimidation were part of a larger campaign to silence Plaintiff and prevent her from pursuing legal action. Appleseed's conduct was egregious and is directly connected to the ongoing retaliation Plaintiff has faced for her whistleblowing.

32.  In a particularly egregious turn of events, Appleseed revealed that Apple's Global Security team had directly coerced her into filing a false complaint against Plaintiff. Appleseed disclosed that Apple Global Security threatened her, using her position within the company, to compel her to falsely accuse Plaintiff of wrongdoing. This act of coercion demonstrates that the retaliation and harassment faced by Plaintiff were not merely the acts of an individual employee but were directed and sanctioned by Apple itself. Appleseed's role in filing the complaint against Plaintiff was not voluntary, but rather a direct result of Apple's corporate policies aimed at protecting the company's image by silencing whistleblowers and retaliating against those who report misconduct.

33.  Apple's actions and omissions in this case go beyond mere negligence and instead reflect a pattern of intentional misconduct, as well as a deliberate attempt to obstruct justice, retaliate against Plaintiff for engaging in protected activities, and conceal evidence. The misconduct was orchestrated at the corporate level, with employees acting under the direct or tacit approval of Apple's leadership, specifically through its Global Security division. The plaintiff asserts that the following legal violations occurred as a result of Defendant's intentional actions:

34.  Plaintiff's RICO, Bane Act, and Ralph Act claims were dismissed without prejudice, and Plaintiff now has newly discovered evidence about a coordinated scheme involving the global security and legal, the camera application, and possible conspirators. This evidence addresses prior deficiencies and directly supports the elements of a pattern of misconduct and intimidation, which are crucial for these claims.

### Violation of the Bane Civil Rights Act (Civ. Code § 52.1)

35.  The Bane Act (Cal. Civ. Code § 52.1) prohibits any person or entity from interfering with an individual's constitutional or statutory rights through threats, intimidation, or coercion. Courts have held that coercive and retaliatory actions designed to deter an individual from exercising legal rights fall squarely within the Bane Act's protections. *Venegas v. County of Los Angeles*, 32 Cal. 4th 820, 843 (2004).

36.     The Bane Act provides a remedy for individuals whose constitutional rights are interfered with by threats, intimidation, or coercion. In this case, Apple's conduct constitutes a direct violation of Plaintiff's rights under the Bane Act and that now also includes a new legal base related to the newly discovered evidence.

37.     Defendant's deliberate misuse of Plaintiff's intimate images, coupled with its legal and security personnel's orchestrated efforts to harass and intimidate Plaintiff through false reports, legal threats, and retaliatory lawsuits, constitutes an unlawful attempt to suppress Plaintiff's rights through coercion and intimidation.

38.     Defendant engaged in coercive conduct designed to suppress Plaintiff's ability to seek legal redress and report workplace misconduct, including:

-   Retaliatory misuse of intimate images as a tool to intimidate and silence Plaintiff.
-   Fraudulent legal actions and false declarations designed to discredit Plaintiff in litigation and discourage further whistleblower disclosures.
-   Coordinated suppression of evidence and obstruction of justice to prevent Plaintiff from accessing materials necessary for her case.

39.     These actions establish intentional coercion by Defendant to interfere with Plaintiff's constitutional and statutory rights, including her rights under California labor and whistleblower laws, thereby violating the Bane Act.

## Violation of the Ralph Civil Rights Act (Civ. Code § 51.7)

40.     36. The Ralph Act (Cal. Civ. Code § 51.7) protects individuals from violence, threats, intimidation, and harassment based on their protected status or engagement in protected activity. Courts have held that threats of violence or intimidation aimed at suppressing legal rights constitute violations of the Ralph Act. *Cabesuela v. Browning-Ferris Indus.*, 68 Cal. App. 4th 101, 112 (1998). Defendant's retaliatory conduct, including the use of fraudulent legal processes and SWATing attempts against Plaintiff, directly constitutes unlawful intimidation under the Ralph Act.

41.     The Ralph Act offers protection against violent threats and harassment, similar to the Bane Act, but it specifically addresses discrimination and violence based on a person's protected activities. Apple's direct involvement in orchestrating the harassment and intimidation suffered by Plaintiff qualifies as a violation of the Ralph Act and that now also includes a new legal base related to the newly discovered evidence.

42. Key facts supporting Plaintiff's Ralph Act claim include: Appleseed's multiple false reports to law enforcement, which were intended to "SWAT" Plaintiff—an action that is per se a violation of the Ralph Act; Appleseed falsely accusing Plaintiff of crimes and filing a retaliatory lawsuit seeking a five-year gag order to prevent Plaintiff from speaking about harassment and sextortion; Coercive tactics designed to deter Plaintiff from engaging in protected speech and legal activity.

43. Under California law, the Ralph Act explicitly states that knowingly filing false reports to law enforcement to incite retaliatory harm, such as SWATing, is a per se violation. Cal. Civ. Code § 51.7. Given Defendant's coordination of these unlawful actions through its security and legal teams, its ongoing suppression of Plaintiff's rights through coercion and intimidation firmly meets the legal standards for both the Bane Act and Ralph Act violations.

**Violation of the Dodd-Frank Act (15 U.S.C. § 78u-6(h)(1))**

44. Plaintiff seeks to replead and strengthen her claim under the Dodd-Frank Wall Street Reform and Consumer Protection Act's whistleblower protections, codified at 15 U.S.C. § 78u-6(h)(1). The Dodd-Frank Act provides robust protections against retaliation for employees who report securities law violations to the U.S. Securities and Exchange Commission (SEC) or other regulatory authorities. Given newly discovered evidence of Defendant Apple's deranged retaliatory conduct, as well as findings from parallel investigations by the National Labor Relations Board (NLRB), repleading this claim is necessary to fully present the extent of Apple's unlawful retaliatory practices.

45. Under 15 U.S.C. § 78u-6(h)(1)(A), an employer may not discharge, demote, suspend, threaten, harass, or in any other manner discriminate against a whistleblower in the terms and conditions of employment because of lawful disclosures of securities law violations. Plaintiff engaged in protected whistleblowing activity when she submitted complaints regarding Apple's unlawful confidentiality policies, suppression of employee rights under federal labor and securities laws, and financial misconduct. Apple's retaliatory campaign—ranging from termination to continued post-employment harassment—constitutes clear violations of these protections. See *Digital Realty Trust, Inc. v. Somers*, 138 S. Ct. 767, 777 (2018) (confirming that employees who report violations to regulatory authorities are protected under Dodd-Frank's anti-retaliation provisions).

46. Furthermore, Apple's misconduct is bolstered by the recent NLRB finding that

Plaintiff's charge alleging that Apple's confidentiality policies violate federal labor laws is supported by substantial evidence, resulting in an administrative complaint against Apple. The NLRB's finding directly supports Plaintiff's argument that Apple's employment policies, including its nondisclosure agreements and internal restrictions on employee speech—violate not only labor laws but also Dodd-Frank policy rules designed to encourage whistleblower disclosures and prevent corporate cover-ups of securities violations. The SEC has issued guidance clarifying that employer-imposed restrictions on whistleblower communications—such as those found in Apple's policies—are illegal under Dodd-Frank. See *SEC Exchange Act Rule 21F-17(a)*, 17 C.F.R. § 240.21F-17(a) (prohibiting companies from enforcing agreements or policies that restrict individuals from communicating directly with the SEC about potential violations).

47.    Given these facts, Plaintiff's Dodd-Frank retaliation claim must be reinstated and expanded to reflect Apple's systemic efforts to silence whistleblowers, its retaliatory actions against Plaintiff, and its ongoing policy violations confirmed by federal enforcement agencies. Plaintiff respectfully requests leave to amend her complaint to fully plead Apple's violations of 15 U.S.C. § 78u-6(h)(1), as well as its violations of the SEC's whistleblower protection rules.

## Violation of the RICO Act (18 U.S.C. §§ 1962(c) and (d))

48.    Plaintiff asserts that Apple's actions, including the orchestration of harassment, intimidation, defamation, and the concealment of evidence, constitute an ongoing pattern of racketeering activity under the RICO Act. This includes Apple's deliberate efforts to suppress whistleblowers, obstruct justice, and intimidate those involved in investigating and reporting corporate wrongdoing.

49.    Unlike typical civil claims, the RICO Act is designed to address patterns of criminal conduct by organizations that systematically engage in illegal activity. Apple, through its Global Security division, engaged in such a pattern by orchestrating harassment and retaliation through its agents, with the intention of obstructing legal processes and protecting its corporate interests. This campaign, which involved coercing Appleseed to file a false complaint that threatened to review nude photos and manipulating the outcome of Plaintiff's legal claims, is a clear example of criminal racketeering conduct under the statute.

50.    Under RICO § 1962(c), it is unlawful for any person associated with an enterprise engaged in interstate commerce to conduct its affairs through a pattern of racketeering activity.

Under RICO § 1962(d), it is unlawful to conspire to engage in such racketeering activity. See *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989). The new evidence uncovered in this case further establishes Defendant's pattern of extortion, witness intimidation, and obstruction of justice, including through the misuse of Plaintiff's nude photos as a coercive tool to silence and retaliate against her, twice.

51.    The Hobbs Act (18 U.S.C. § 1951) defines extortion as the obtaining of property from another, with their consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right. Here, Defendant and its agents wrongfully retained and misused Plaintiff's nude images, leveraging them as a retaliatory tool to discredit and silence her in legal proceedings and public discourse. This constitutes wrongful coercion through fear and intimidation, a predicate act under RICO.

52.    Federal and state law prohibits extortion and blackmail (18 U.S.C. § § 875 & 873; Cal. Penal Code § § 518 & 137), including any attempt to threaten or coerce a person into refraining from exercising their legal rights through the use of threats involving personal or reputational harm. Defendant's agents, including its legal and security personnel, engaged in systematic efforts to use Plaintiff's private images as leverage to intimidate her into silence regarding workplace violations, labor law breaches, and whistleblower complaints – and they did so crossing state lines and impacting interstate commerce. The coercive and retaliatory use of these images, coupled with Defendant's attempts to shield this evidence from discovery, constitutes criminal extortion and blackmail under federal law and strengthens the RICO claim under 18 USC §§ 1962(c) and (d).

53.    Apple's corporate actions were not the result of inadvertent error but were intentionally designed to retaliate against Plaintiff, suppress her rights, and protect the company from the negative consequences of her whistleblowing. The fact that Appleseed, an agent of Apple, was coerced into filing a false complaint against Plaintiff under the direction of Apple's leadership and then the complaint used by Apple's counsel in their defense against Plaintiff, shows that this conduct was planned and executed with the intent to harm Plaintiff and obstruct justice, fulfilling the requirements for a RICO violation.

54.    Additionally, Defendant's ongoing refusal to disclose these materials in litigation, fraudulent assertions of privilege over them, and direct involvement in attempting to suppress Plaintiff's protected disclosures further establish a coordinated scheme of witness intimidation and

obstruction of justice. This evidence underscores Defendant's role as the central figure in a RICO enterprise designed to protect itself from liability through fraudulent, retaliatory, and coercive actions, making the amendment to the complaint necessary to reflect these violations.

55.     Apple's ongoing engagement in criminal misconduct is further demonstrated by the criminal bribery case against Apple's Chief Compliance Officer & Head of Global Security, Tom Moyer. Moyer was indicted in November 2020 for attempting to bribe Santa Clara County Sheriff's officials with $70,000 worth of iPads in exchange for concealed carry weapons permits for Apple's Global Security team. Although the case was initially dismissed in 2021, the California Sixth District Court of Appeal reinstated the charges in August 2023, determining that the evidence of bribery was sufficient to warrant prosecution.[4] Bribery under 18 U.S.C. § 201 (Bribery of Public Officials) and related California statutes constitutes a predicate act under RICO, as it demonstrates Apple's pattern of unlawful corporate conduct and its willingness to engage in corrupt dealings with law enforcement officials to protect its internal security and legal interests.

56.     This is particularly relevant given that Apple's Global Security employee, Appleseed, worked under Moyer and engaged in a pattern of harassment, intimidation, and retaliatory actions against Plaintiff. Appleseed's involvement in the misuse of Plaintiff's private images, filing false statements in litigation, and assisting Apple in concealing key evidence must be viewed in light of Apple's history of unlawful conduct within its Global Security operations. The direct connection between Moyer's bribery case and Appleseed's actions in furtherance of Apple's retaliation and suppression efforts further supports the existence of a RICO enterprise engaging in repeated corrupt, criminal conduct.

57.     Further exacerbating the intimidation and coercion, Appleseed falsely accused Plaintiff of crimes and filed a retaliatory lawsuit seeking a five-year gag order against Plaintiff. This lawsuit, which attempted to prohibit Plaintiff from speaking publicly or privately about Appleseed, Apple, or the retaliatory conduct she endured, was a direct effort to suppress Plaintiff's ability to report ongoing harassment, workplace misconduct, and the nonconsensual use of her private images. If successful, this gag order would have entirely silenced Plaintiff's ability to discuss the sextortion, threats, and witness intimidation that were perpetrated against her. The filing of

---

[4] *The People v. Moyer,* 94 Cal. App. 5th 999, 312 Cal. Rptr. 3d 773 (Cal. Ct. App. 2023).

fraudulent criminal accusations and the misuse of legal proceedings as a weapon to obstruct justice and suppress Plaintiff's claims further reinforce Apple's role in a RICO enterprise using coercion, threats, and legal retaliation as a means of control and suppression.

# REQUEST TO REPLEAD RETALIATION & UCL CLAIMS BASED ON NEW "REVENGE PORN" FACTS

## TERMINATION IN VIOLATION OF PUBLIC POLICY & CAL. LABOR CODE 1102.5

58.    Plaintiff's claims under Cal. Civil Code § 1708.85 directly reinforce her whistleblower retaliation (Cal. Lab. Code § 1102.6) and wrongful termination in violation of public policy (Tameny) claims, as the employer's misconduct constitutes both retaliation for protected disclosures and violations of fundamental public policy. Under Cal. Labor Code § 1102.6, once a plaintiff demonstrates that they engaged in protected activity—such as reporting misconduct or violations of law—the burden shifts to the employer to prove that the adverse action was based on legitimate, non-retaliatory reasons. *Lawson v. PPG Architectural Finishes, Inc.*, 12 Cal. 5th 703 (2022).

59.    Here, Plaintiff reported Apple's unlawful surveillance practices, privacy violations, and the misuse of intimate images both internally and to regulatory agencies, constituting protected activity under California law. Apple and its agents retaliated by using Plaintiff's nude images to intimidate and discredit her, falsely asserting confidentiality over them, and weaponizing legal threats to silence her. These acts violate public policy protections enshrined in Civil Code § 1708.85, which prohibits the malicious distribution of private images, making it a fundamental policy concern of the state.

60.    Because Tameny claims require a nexus between termination and a violation of public policy, Apple's actions—retaliating against Plaintiff by intentionally misusing her intimate images after she engaged in protected activity—directly satisfy the public policy exception to at-will employment. *Tameny v. Atlantic Richfield Co.*, 27 Cal. 3d 167 (1980). Thus, the employer's retaliatory conduct not only substantiates liability under Civil Code § 1708.85 but also strengthens Plaintiff's claims under Labor Code § 1102.6 and *Tameny* for wrongful termination in violation of public policy.

## Violation of Cal. Bus. & Prof. Code § 17200 (UCL)

61.    Plaintiff also seeks leave to amend the complaint to replead and supplement the cause of action under California's Unfair Competition Law (Cal. Bus. & Prof. Code § 17200 et seq.), predicated on the unlawful dissemination or threatened dissemination of intimate images in violation of Cal. Civ. Code § 1708.85 ("*Revenge Porn*" or nonconsensual pornography statute). This request is supported by newly discovered facts regarding the unauthorized capture and/or sharing of Plaintiff's nude photographs, and it aligns with Rule 15(a)'s instruction to *"freely give leave"* where justice so requires. *Foman v. Davis*, 371 U.S. 178, 182 (1962).

62.    The employer (and/or its agents, including the Global Security Employee obtained nude or intimate photographs of Plaintiff without her effective knowledge or consent. Defendants, through employees and agents, threatened to share or indeed shared these intimate images, in retaliation for Plaintiff's whistleblowing and other protected activities. This conduct violates Cal. Civ. Code § 1708.85, which prohibits the intentional distribution or threatened distribution of intimate images without consent, when done to cause emotional distress. By engaging in a practice that is "unlawful" (i.e., violating Cal. Civ. Code § 1708.85), Defendants' acts also constitute unlawful business practices under Cal. Business & Professions Code § 17200.

63.    California's UCL defines "unfair competition" as "any unlawful, unfair or fraudulent business act or practice" (Cal. Bus. & Prof. Code § 17200). To state a claim under the "unlawful" prong, a plaintiff need only allege a violation of another law—that violation then serves as the predicate act rendering the business practice unlawful. (*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal.4th 163, 180 (1999); *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1143 (2003).)

64.    Here, a new underlying predicate violation is Civ. Code § 1708.85, which expressly prohibits the intentional or reckless dissemination of intimate images without consent, commonly known as "*revenge porn*" or "*nonconsensual pornography."* By engaging in this unlawful conduct—threatening and actually disseminating Plaintiff's nude photos—Defendants have committed a statutory violation that "*independently violates the law." See Farmers Ins. Exch. v. Superior Court*, 2 Cal.4th 377, 383 (1992).

65.    Under the UCL, a private plaintiff must demonstrate economic injury (Cal. Bus. & Prof. Code § 17204). Plaintiff was severely injured by the Defendant terminating her employment

and denylisting her from future employment, causing direct and tangible losses of income and benefits. Plaintiff anticipates showing that she suffered economic losses, such as costs incurred to protect herself from further dissemination (e.g., security measures, internet takedown services, or other expenditures), as well as harm to her earning capacity or employment prospects stemming from the disclosure or threat of disclosure of intimate images.

66.    Plaintiff would be entitled to injunctive relief, restitution, or other relief authorized under the UCL. *Cel-Tech*, 20 Cal.4th at 179; *Korea Supply*, 29 Cal.4th at 1144. While the UCL does not typically allow damages, it can provide equitable remedies—including injunctions to prohibit further sharing of the images and restitution to restore any money or property lost due to Defendants' misconduct.

67.    Plaintiff only recently became aware of concrete evidence confirming the nude photos were captured and threatened to be shared in retaliation, thus clarifying the Civ. Code § 1708.85 violation. Defendant had this information for years, and intentionally concealed it from Plaintiff – however, as long as Plaintiff pursued her legal claims, it was always certain to come out eventually – or at least allow Apple to send nude photos of Plaintiff to any agency that would investigate her claims.

68.    The Legislature's enactment of Cal. Civ. Code § 1708.85 demonstrates a keen policy interest in protecting victims from nonconsensual pornography. Preventing such unlawful conduct is precisely the type of protective measure that Cal. Bus. & Prof. Code § 17200 was designed to address. (*See Cel-Tech*, 20 Cal.4th at 181.) Defendants cannot claim prejudice, as discovery is ongoing, and the Court has yet to resolve the matters on the merits. Adding a UCL claim at this juncture ensures all related issues are addressed in a single lawsuit, preserving judicial resources.

69.    Given Rule 15(a)'s "extreme liberality" (*Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003)), and the absence of any Foman factor such as bad faith, undue delay, or futility (*Foman, 371 U.S. at 182*), the Court should grant Plaintiff leave to amend her complaint to add a UCL cause of action predicated on the "unlawful" prong violation (Cal. Civ. Code § 1708.85 ).

## Replead IIED Claims to include Revenge Porn

70.    The newly revealed nude photographs taken by the employer's app, along with the

ongoing harassment, significantly escalate the extreme and outrageous nature of Defendants' conduct, thereby strengthening Plaintiff's IIED allegations. Given that Defendant's unlawful dissemination of Plaintiff's intimate images occurred across multiple jurisdictions—California, New York, and Massachusetts—Plaintiff seeks to incorporate relevant state laws from each jurisdiction to strengthen her Intentional Infliction of Emotional Distress (IIED) claim. Each of these states recognizes the severe emotional harm and reputational damage caused by the non-consensual distribution of intimate images and provides statutory protections against such conduct.

### 3. California Law: Civil Code § 1708.85 – Unauthorized Distribution of Intimate Images

71.    California Civil Code § 1708.85(a) provides that a person is liable for damages if they intentionally distribute intimate images of another without consent, knowing that the person depicted had a reasonable expectation of privacy, and the disclosure causes serious emotional distress. The September 15, 2021 email, in which Plaintiff's unauthorized nude images were sent as part of Defendant's retaliatory scheme, falls squarely within the scope of this statute.

72.    This conduct also meets the extreme and outrageous conduct threshold required for an IIED claim, as it was designed to shame, humiliate, and silence Plaintiff for engaging in protected whistleblowing activity. See *Hughes v. Pair,* 46 Cal. 4th 1035, 1051 (2009) (holding that conduct is sufficiently "outrageous" for an IIED claim when it is so extreme that it exceeds all bounds of decency in a civilized community).

73.    Furthermore, California law provides for both compensatory and punitive damages against individuals or entities who intentionally weaponize intimate images to cause harm. Given that Defendant deliberately withheld the existence of this evidence and misrepresented material facts regarding its possession and use of Plaintiff's intimate images, Defendant's conduct is even more egregious and supports an IIED claim under California law.

### 4. New York Law: Penal Law § 245.15 – Unlawful Dissemination or Publication of an Intimate Image

74.    New York Penal Law § 245.15 criminalizes the intentional and non-consensual dissemination of intimate images when the individual depicted has a reasonable expectation of privacy and the disclosure causes harm. The law specifically applies to instances where: The

offender acts with intent to cause harm to the depicted person, and the victim experiences serious emotional distress as a result of the disclosure.

75.     Here, Defendant's transmission and possession of Plaintiff's intimate images—without her consent and as part of a broader retaliatory scheme—fits within New York's statutory framework for unlawful dissemination. Plaintiff was harmed in New York, where she suffered significant emotional distress due to the unauthorized distribution of these images. Because New York law recognizes that revenge porn can cause long-term psychological harm and reputational damage, it directly supports Plaintiff's IIED claim.

76.     Furthermore, New York courts have held that intentional emotional distress claims can be supported by conduct that includes the unauthorized dissemination of private images when such conduct is intended to cause severe harm to the victim. See *Howell v. New York Post Co*., 81 N.Y.2d 115, 122 (1993) (holding that conduct sufficiently extreme and outrageous to support an IIED claim must be "beyond all possible bounds of decency" and "utterly intolerable in a civilized society").

### 5. Massachusetts Law: Chapter 272, Section 105 – Criminalization of Revenge Porn

77.     Massachusetts recently criminalized the non-consensual distribution of explicit images under Mass. Gen. Laws ch. 272, § 105, imposing penalties of up to two and a half years in jail and fines of up to $10,000 for individuals who engage in such conduct. Similar to California and New York, Massachusetts recognizes the severe emotional and psychological harm that results from the unauthorized dissemination of intimate images and allows for civil actions based on emotional distress. See *Agis v. Howard Johnson Co.,* 371 Mass. 140, 145 (1976) (recognizing IIED where conduct is so extreme and outrageous as to "exceed all bounds of decency").

78.     Defendant's actions meet this standard by intentionally distributing intimate images of Plaintiff as a retaliatory tactic, causing severe emotional and reputational harm. Because Plaintiff experienced emotional distress while in Massachusetts, and because Defendant's wrongful acts had effects in this jurisdiction, Massachusetts law further supports Plaintiff's IIED claim.

79.     Given that Defendant's unlawful dissemination of Plaintiff's intimate images caused harm in California, New York, and Massachusetts, Plaintiff is entitled to bring claims under each state's applicable statutes and case law. The intentional release of these images as part of a

coordinated retaliation campaign against Plaintiff constitutes extreme and outrageous conduct, meeting the threshold for an IIED claim in all three jurisdictions.

80. Moreover, Defendant's failure to disclose this material evidence until long after the statute of limitations for certain claims had run further demonstrates their bad faith litigation tactics. Because California, New York, and Massachusetts all provide remedies for the non-consensual distribution of intimate images, Plaintiff seeks to replead her IIED claim to include violations of these laws as a basis for relief.

# REQUEST TO REPLEAD ENVIRONMENTAL CLAIMS WITH AIR POLLUTION LAW VIOLATIONS

## ULTRAHAZARDOUS ACTIVITIES, ABSOLUTE NUISANCE, & NUISANCE PER SE CLAIMS

81. Plaintiff respectfully requests an opportunity to amend the complaint to replead the ultrahazardous activities, absolute nuisance, and nuisance per se claims, in light of recent federal and state enforcement actions and Apple's admission to knowledge of the harmful conduct and the hazardous environment it facilitated. The recent enforcement actions by the U.S. Environmental Protection Agency (EPA) and Bay Area Air Quality Management District (BAAQMD), in addition to Apple's own admissions in its current motion to dismiss, have brought to light new facts that necessitate revisiting these claims. [See Notice of Pendency at Dkt. 151]

82. Although the ultrahazardous activities claim was dismissed with prejudice, that dismissal was based on "discretionary" grounds that prevented full discovery. Given the Air Board's new finding of violations, Plaintiff can now allege with specificity the employer's inherently dangerous practices that pose an extraordinary risk. Dismissing this claim with prejudice without considering the new regulatory findings would contravene the liberal amendment policy and Plaintiff's due process rights.

83. In light of recent enforcement actions by the EPA, BAAQMD, and other regulatory agencies, it is clear that Apple's semiconductor fabrication facility engaged in activities that can clearly be classified as ultrahazardous. These activities exposed the plaintiff and others to significant environmental harm, including toxic emissions and the release of dangerous chemicals. These actions—conducted knowingly and recklessly by Apple—fall within the scope of ultrahazardous activities that impose strict liability on the defendant for the harm caused,

regardless of fault. The plaintiff seeks to replead this claim to reflect the newly discovered enforcement actions, including penalties and regulatory findings, which demonstrate Apple's involvement in creating and perpetuating an ultrahazardous environment.

84.     Plaintiff requests leave to amend the complaint to include a claim for absolute nuisance based on Apple's operation of the hazardous semiconductor facility and the resulting toxic emissions that impacted the health and safety of surrounding residents. In its motion to dismiss, Apple acknowledges the presence of hazardous conditions yet continues to minimize or deny its responsibility for the consequences of those conditions. The plaintiff's allegations, as amplified by recent regulatory actions, show that Apple's conduct has created an unreasonable interference with the use and enjoyment of public and private property in the area. These new facts highlight that Apple's actions meet the standard for absolute nuisance—where strict liability applies due to the inherently dangerous nature of the activities involved.

85.     Additionally, the plaintiff requests leave to replead the nuisance per se claim, based on Apple's operation of a facility that violated numerous state and federal environmental laws, including air quality regulations enforced by the BAAQMD and EPA. Apple's conduct has not only violated laws but also created a public health hazard, causing severe damage to the plaintiff's health and well-being, as well as to the broader community. These new facts, combined with Apple's admissions in its motion to dismiss, underscore that Apple's conduct constitutes a public nuisance per se. By operating the semiconductor plant in flagrant violation of environmental protections, Apple's actions are not only unlawful but also endanger the public, further justifying the need for the plaintiff to replead this claim in light of these newly disclosed facts.

86.     Apple's motion to dismiss, while seeking to dismiss these claims, inadvertently admits to its knowledge of the hazardous environment created by its operations and its failure to take corrective action. These admissions, when viewed alongside the ongoing federal and state investigations, provide further grounds for the plaintiff to amend the complaint. The newly discovered regulatory actions demonstrate that Apple's conduct has been not only harmful but also flagrant, with no efforts to mitigate the damage caused by its ultrahazardous activities. The plaintiff seeks to update these claims to fully reflect the current state of the law, enforcement actions, and evidence that now implicates Apple in direct violation of environmental statutes and regulations.

87.     Plaintiff respectfully requests that the Court grant the opportunity to amend the

complaint to include these updated allegations, based on new information that has come to light, including federal and state enforcement actions and Apple's own admissions. The amended complaint will provide a more comprehensive and accurate picture of the ongoing harm caused by Apple's actions and ensure that the claims align with the current state of the law, regulatory actions, and evidence.

### RETALIATION FOR REPORTING ENV. VIOLATIONS UNDER CAL. LABOR CODE §§ 1102.5 & 6399 (VIA § 6310)

88.     Plaintiff seeks to replead her environmental subclaims under California Labor Code §§ 1102.5 and 6399 (under 6310), which protect employees from retaliation for reporting workplace safety hazards, hazardous material exposure, and violations of state and federal environmental laws. These subclaims were previously dismissed for discretionary reasons; however, recent findings by the U.S. Environmental Protection Agency (EPA) and the California Air Resources Board (CARB) confirming Defendant Apple's violations of environmental regulations provide new and compelling evidence supporting reinstatement of these claims. Additionally, on December 26, 2024, Defendant Apple released Plaintiff's 2021 performance review, which contained material evidence—including direct evidence of retaliation for these specific environmental complaints—that Apple previously concealed, misrepresented, and failed to disclose in prior filings.

89.     Under California Labor Code § 1102.5(b), an employer may not retaliate against an employee for disclosing information regarding violations of federal or state laws, regulations, or public policies to a government agency. Plaintiff's whistleblower complaints regarding Apple's improper handling and disposal of hazardous materials, unlawful air emissions, and chemical exposures in the workplace fall squarely within the protections of § 1102.5. The EPA and CARB's findings that Apple violated environmental laws further confirm that Plaintiff's disclosures were not only reasonable but also legally and factually substantiated. These violations, which threaten workers and public health, are precisely the type of environmental hazards that § 1102.5 is designed to encourage employees to report without fear of retaliation. See *Hager v. County of Los Angeles*, 228 Cal. App. 4th 1538, 1549 (2014) (holding that an employer may not retaliate against an employee for reporting violations of environmental and workplace safety laws).

90.     Similarly, California Labor Code §§ 6310 and 6399 provide additional protections for employees who report unsafe working conditions and violations of California's occupational

safety and hazardous materials handling laws. Under § 6310, an employer may not retaliate against an employee for complaining about unsafe work conditions, including exposure to toxic substances. Further, § 6399 mandates compliance with regulations governing hazardous material exposure in the workplace. Plaintiff's complaints about chemical exposure risks and Apple's failure to comply with environmental safety regulations fall directly under the scope of these protections. Now that state and federal regulatory agencies have confirmed Apple's violations of environmental laws, the Court has substantial new evidence warranting reinstatement of these claims. See *Cabatit v. Sunnova Energy Corp.*, 60 Cal. App. 5th 317, 324 (2021) (holding that agency findings confirming an employee's safety complaints strengthen a Labor Code § 6310 claim and make dismissal improper).

91.     Furthermore, Apple's recent disclosure of Plaintiff's 2021 performance review on December 26, 2024, provides additional direct evidence of retaliation and fraudulent concealment. Despite being aware of the existence of this document and its relevance to Plaintiff's claims, Apple concealed this performance review and misrepresented its contents in prior court filings. The document contains clear evidence that Apple retaliated against Plaintiff for her hazardous waste and environmental safety complaints—contradicting Apple's previous assertions that Plaintiff's termination was unrelated to her protected disclosures. Notably, Apple strategically waited to release this critical document until after Plaintiff had already filed her most recent amended complaint, further demonstrating Apple's bad faith litigation tactics and obstruction of evidence. See *Kennedy v. Eldridge*, 201 Cal. App. 4th 1197, 1205 (2011) (holding that suppression of material evidence constitutes a basis for sanctions and potential disqualification of counsel).

92.     Because newly obtained regulatory findings establish that Plaintiff's whistleblower complaints about hazardous waste exposure and workplace safety risks were well-founded, and that Apple was indeed in violation of environmental laws, and because Apple has now belatedly produced critical evidence confirming retaliatory motives that it previously concealed, Plaintiff respectfully requests leave to amend her complaint to reinstate her California Labor Code §§ 1102.5, 6310, and 6399 claims based on this substantial new evidence.

## Civil Conspiracy and Corporate Liability

93.     The deliberate actions by Apple's employees, and the direct involvement of Apple's

leadership in these activities, suggest a conspiracy designed to retaliate against Plaintiff. Apple's orchestrated actions — from enabling and facilitating harassment to covering up the misconduct — reflect a coordinated effort at all levels of the organization, making it clear that the company's leadership was either complicit in or directly responsible for this course of action.

94.    Even if Apple's leadership did not expressly order the harassment, the company is still liable for the intentional misconduct of its employees under the principles of corporate liability. Just as eBay was held criminally accountable for the actions of its employees in the cyberstalking case despite the absence of direct orders from senior management, Apple too must be held accountable for the actions of its agents, particularly when those actions are undertaken in furtherance of the company's interests — in this case, silencing a whistleblower and obstructing an investigation into the company's illegal activities.

95.    The actions of Apple in this case are not only unlawful but also highly damaging to public trust and corporate accountability. Companies that engage in retaliation against whistleblowers and attempt to obstruct justice are sending a dangerous message that they are above the law. Such conduct undermines the ability of employees and the public to hold corporations accountable for harmful and illegal practices, especially when those corporations have the resources to conceal wrongdoing and intimidate those who report it. This conduct, if left unchecked, would have serious public policy implications, as it would further erode the protections afforded to whistleblowers and discourage individuals from coming forward with vital information regarding corporate misconduct.

## Corporate Criminal Liability and Comparison to Similar Cases

96.    Apple's conduct, orchestrated through the actions of its employees, warrants legal scrutiny not only for the specific harassment, retaliation, and intimidation endured by the plaintiff but also for the broader implications of corporate liability for the actions of employees. This case bears striking similarities to other high-profile corporate criminal cases where the corporation itself was held accountable for the actions of its employees, even where senior leadership did not explicitly direct the misconduct.

97.    In recent years, the U.S. Department of Justice and other governmental agencies have pursued criminal cases against companies and their employees for similar misconduct, further

underscoring the need to hold corporations accountable when their employees engage in intentional acts of retaliation or harassment in the service of the company's interests.

### 6. eBay: Corporate Liability and Employees' Misconduct.[5]

98.    The eBay case offers a crucial precedent for corporate criminal liability. eBay's executives and employees were involved in a criminal conspiracy to harass and intimidate a couple that operated an online blog critical of eBay's leadership. The company was forced to settle, paying $3 million in fines, and several individuals within the company were criminally charged, including a former senior security executive. Notably, eBay was held accountable despite the fact that the leadership did not directly instruct criminal activities.

99.    The DOJ found that eBay, as a corporation, was responsible for the unlawful actions taken by its employees, showing that corporations can be held liable for unlawful conduct even when senior leadership did not explicitly approve or direct such actions. This principle applies to Apple's situation, where Appleseed's conduct—enabled, facilitated, and, in some instances, directed by Apple's Global Security team—reflects a systemic pattern of retaliation designed to undermine the plaintiff's whistleblowing efforts and intimidate her.

### 7. Wells Fargo: Corporate Responsibility for Employee Misconduct.[6]

100.    Similarly, in the case of Wells Fargo, the bank faced significant penalties, including a $3 billion settlement, after employees engaged in widespread fraudulent activities by opening millions of unauthorized accounts to meet sales targets. While the misconduct was carried out by rank-and-file employees, Wells Fargo faced liability as a corporate entity. The bank's failure to prevent or correct the actions of its employees showed a systemic failure that ultimately led to criminal charges and penalties.

101.    In this case, the analogy to Apple is clear: just as Wells Fargo was held accountable for the actions of employees, Apple must also bear responsibility for the illegal acts of employees,

---

[5]  U.S. DOJ, *eBay Inc. to Pay $3 Million in Connection with Corporate Cyberstalking Campaign Targeting Massachusetts Couple,* January 11, 2024, https://www.justice.gov/usao-ma/pr/ebay-inc-pay-3-million-connection-corporate-cyberstalking-campaign-targeting

[6] U.S. DOJ, *Wells Fargo Agrees to Pay $3 Billion to Resolve Criminal and Civil Investigations into Sales Practices Involving the Opening of Millions of Accounts without Customer Authorization,* February 21, 2020, https://www.justice.gov/opa/pr/wells-fargo-agrees-pay-3-billion-resolve-criminal-and-civil-investigations-sales-practices

including Appleseed, who engaged in a deliberate pattern of harassment and retaliation against the plaintiff. Apple not only failed to intervene but appears to have been complicit in inciting Appleseed's actions to further its own interests in discouraging the plaintiff's whistleblowing.

### 8. Volkswagen: Corporate Liability for Employee Actions.[7]

102.    The Volkswagen emissions scandal, in which the company programmed vehicles to cheat on emissions tests, further illustrates the principle that companies must be held accountable for their employees' actions even when senior executives are not directly involved. In this case, Volkswagen's top management did not explicitly direct employees to engage in fraudulent conduct, but the company still faced substantial criminal liability because the actions were seen as part of a systemic pattern within the corporation to protect the company's commercial interests at the expense of consumer rights and the public interest.

### 9. Uber: Covering Up Employee Misconduct.[8]

103.    In the case of Uber, the company faced significant criminal penalties after it was revealed that it had covered up a data breach that affected millions of its customers. Several Uber executives, including the CEO at the time, were involved in the decision to conceal the breach and avoid public disclosure. Uber was criminally prosecuted for its failure to take immediate corrective action and disclose the breach to its customers, despite the actions being carried out by employees.

104.    Similarly, Apple's failure to address their employee's actions and its deliberate efforts to shield her from accountability mirrors Uber's conduct. Apple, by covering up the harassment and retaliation and failing to take appropriate steps to hold wrongdoers accountable, reflects corporate complicity in the unlawful acts committed in furtherance of the company's interests. Note: the long-time Board member and Chair of Apple's Finance & Audit Committee, Ronald Sugar, is also Board Chair at Uber. Gjovik filed a SEC complaint about him related to conflicts of interest, fraud, and cover-ups prior to Apple terminating her employment.

---

[7] BBC, *How VW tried to cover up the emissions scandal,* 4 May 2018, https://www.bbc.com/news/business-44005844
[8] U.S. DOJ, *Former Chief Security Officer Of Uber Sentenced To Three Years' Probation For Covering Up Data Breach Involving Millions Of Uber User Records,* May 5, 2023, https://www.justice.gov/usao-ndca/pr/former-chief-security-officer-uber-sentenced-three-years-probation-covering-data; U.S. DOJ, *Former Chief Security Officer Of Uber Convicted Of Federal Charges For Covering Up Data Breach Involving Millions Of Uber User Records,* October 5, 2022, https://www.justice.gov/usao-ndca/pr/former-chief-security-officer-uber-convicted-federal-charges-covering-data-breach

### 10.    Activision Blizzard: Corporate Internal Control Requirements.

105.    The facts in this case bear striking similarities to the U.S. Securities and Exchange Commission (SEC) enforcement action against Activision Blizzard, Inc. in 2023, where the SEC charged Activision Blizzard with failing to maintain adequate controls to ensure that employee complaints regarding workplace misconduct were properly assessed and disclosed.[9] In that case, the SEC found that:

106.    Activision Blizzard concealed material information from investors by failing to disclose internal complaints of workplace misconduct, including harassment and retaliation. The company used overly broad NDAs and internal policies to prevent employees from speaking about illegal conduct, violating whistleblower protection laws. The SEC imposed penalties on Activision Blizzard for misleading public disclosures and engaging in conduct that suppressed employees' rights to report violations. In Plaintiff's case against Apple, similar violations have occurred, including:

- Apple's failure to disclose and actively suppress workplace misconduct complaints—including whistleblower retaliation, harassment, and misuse of private data (such as Plaintiff's nude photos).
- Apple's legal team's strategic use of NDAs, confidentiality policies, and legal intimidation tactics to suppress employee speech and prevent disclosures about corporate wrongdoing.
- Apple's ongoing concealment of material information in discovery and fraudulent assertions of privilege to obstruct the litigation process and prevent key facts from being uncovered.
- The involvement of Apple's legal and security teams in direct retaliation against whistleblowers, mirroring the systemic suppression of complaints seen in Activision Blizzard's case.

107.    The SEC's enforcement action against Activision Blizzard underscores the increasing scrutiny on corporate misconduct involving suppression of whistleblower complaints and the obstruction of internal and external investigations. Just as Activision Blizzard faced financial penalties and reputational damage, Apple's similar conduct—especially its weaponization of legal processes to intimidate and silence Plaintiff—exposes it to significant legal liability under

---

[9] U.S. SEC, *Activision Blizzard to Pay $35 Million for Failing to Maintain Disclosure Controls Related to Complaints of Workplace Misconduct and Violating Whistleblower Protection Rule*, 2023-22, https://www.sec.gov/newsroom/press-releases/2023-22

federal and state whistleblower protection laws, as well as SEC regulations governing corporate disclosures. Given the parallels between Apple's misconduct and the violations found in the Activision Blizzard case, this case presents a strong argument for regulatory and judicial intervention to hold Apple accountable for its unethical and unlawful corporate practices.

## PUBLIC POLICY IMPACTS AND THE NEED FOR CORRECTION

108.    The misconduct in this case has significant public policy implications that go beyond the interests of the parties involved. Apple's actions serve to further entrench a corporate culture where retaliation and harassment are tolerated, and where employees are discouraged from reporting misconduct for fear of retribution. The broader societal implications of such behavior cannot be overstated. Allowing companies like Apple to avoid accountability for such actions would send a dangerous message—that corporations can act with impunity, shielded from the consequences of their illegal and unethical practices by the sheer volume of their legal resources and their ability to manipulate the judicial process.

109.    There is also public interest in ensuring that cases like this are resolved fairly and transparently. By filing frivolous motions to dismiss, withholding crucial evidence, and otherwise obstructing Plaintiff's efforts to seek justice, Apple is abusing the legal system in a manner that undermines the rule of law. If left unchecked, this type of behavior can set a dangerous precedent, discouraging future whistleblowers and employees from coming forward to report illegal or harmful activities. The Court must send a clear message that it will not tolerate such practices, both to protect the interests of the Plaintiff and to uphold the integrity of the judicial process.

110.    Moreover, the discovery violations and motions to dismiss are particularly egregious in light of the public health implications related to the toxic emissions from the facility at issue. The Plaintiff's claims involve not only personal harm but also a broader societal concern regarding the environmental impact of Apple's operations. The Court must ensure that such misconduct is fully investigated and remedied, not only for the sake of the Plaintiff but also for the welfare of the public, who may be affected by the Defendant's actions.

111.    Apple has also engaged in blatant discovery violations. Despite multiple requests for documentation and evidence related to Appleseed's conduct, Apple delayed and refused the production of key materials that would support Plaintiff's claims. These materials include internal

communications from Apple related to Appleseed's actions, documentation of any complaints or investigations into her behavior, and records showing how Apple responded to the Plaintiff's whistleblowing. This obstruction of discovery not only impedes Plaintiff's ability to properly plead the case but also exacerbates the harm caused by Appleseed's actions.

## APPLE'S DELIBERATE CONCEALMENT OF CRUCIAL INFORMATION

112.    Apple's pattern of withholding or hiding vital facts—both from the affected employee and from the government—highlights is a systemic disregard for public health, environmental regulations, and fundamental employee rights. First, Apple concealed the EPA inspection of the Superfund site office, preventing meaningful oversight and remedy of vapor intrusion hazards. This deception struck at the heart of transparency obligations that businesses owe to employees and regulators in environmental compliance. By hiding the safety issues, namely the improper installation and sub-slab depressurization system modifications, Apple evaded scrutiny about conditions that posed serious health risks to anyone working in or near the facility. Such conduct undermines the regulatory framework that relies on accurate information to protect workers' safety and the environment.

113.    Similarly, Apple concealed its operation of a semiconductor fabrication plant near Plaintiff's residence, a facility releasing dangerous chemicals without appropriate abatement. The company's purposeful secrecy not only thwarted the government's right to monitor hazardous emissions but also deprived Plaintiff of the knowledge she needed to protect her own health. Most gravely, Apple's covert awareness that it had almost killed Plaintiff—by exposing her to life-threatening toxins—demonstrates an unconscionable choice to place corporate expedience above human life and regulatory compliance. Each instance of withholding crucial safety and environmental data violated not just statutory requirements but also the public policy that favors full disclosure of hazards to both employees and enforcement agencies.

114.    Worse still, Apple hid the September 15, 2021 complaint containing nude photographs of Plaintiff from both Plaintiff and the Court, a shocking demonstration of corporate obstruction in the judicial process. By failing to disclose a key document that formed the basis for Plaintiff's termination. Apple deprived Plaintiff of her due process right to understand the allegations against her and to address them in a timely manner. This concealment impeded the Court's ability to assess the legitimacy of Apple's disciplinary decisions and to prevent abuse of

legal processes. From a public policy standpoint, such conduct tarnishes the integrity of judicial proceedings and fosters a chilling effect on any employee who dares to bring forth claims of unlawful workplace conditions or whistleblowing.

115.    Collectively, Apple's pattern of concealment—of an EPA inspection, HVAC hazards, the semiconductor plant, near-fatal environmental exposure, and critical documentary evidence—represents an affront to the regulatory frameworks designed to safeguard public health and worker safety. It also subverts the judicial function by omitting key facts needed to adjudicate claims fairly. Such behavior not only violates the spirit of environmental, labor, and whistleblower protection laws, but it also erodes public trust in corporate accountability. As a matter of legal and public policy, courts should not tolerate such deliberate and injurious cover-ups.

# Conclusion

116.    The intentional nature of the actions taken by Apple in this case goes beyond mere negligence and rises to the level of deliberate misconduct. Plaintiff respectfully requests that the Court grant leave to amend the Complaint to reflect these newly discovered facts, which provide a more comprehensive and accurate account of the misconduct and show that Apple's actions were undertaken with the specific intent to retaliate against Plaintiff, obstruct justice, and suppress whistleblowing activities.

117.    By granting this motion, the Court will ensure that the full scope of Apple's misconduct is adequately addressed and will allow Plaintiff to seek redress for the harm caused by Defendant's intentional actions. By taking corrective action, the Court would not only ensure fairness in this case but would also affirm its commitment to upholding public policy interests that prioritize the protection of employees, the environment, and the integrity of the judicial process.

118.    Please note: Plaintiff has not yet read Defendant's Reply at Dkt 152, so nothing in this motion is a response to Defendant's Reply.

Executed on: Jan. 31 2025

Signature:

/s/ Ashley M. Gjovik

*Pro Se Plaintiff*

**Email**: legal@ashleygjovik.com

**Physical Address**: Boston, Massachusetts

**Mailing Address:** 2108 N St. Ste. 4553 Sacramento, CA, 95816

**Phone**: (408) 883-4428

**Ashley M. Gjovik, JD**
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# United States District Court

## Northern District of California

| | |
|---|---|
| **Ashley M. Gjovik**, *an individual*, | CAND No. 3:23-CV-04597-EMC |
| | 9th Cir No.: 24-6058 |
| Plaintiff, | |
| | **Plaintiff's Memorandum of Points & Authorities In Support of Motion to Disqualify** |
| vs. | |
| **Apple Inc.**, a corporation, | |
| | HEARING: |
| Defendant. | Dept: Courtroom 5 (& Zoom) Judge: Honorable Edward M. Chen Date: February 27, 2025 Time: 1:30 PM PT |

# TABLE OF CONTENTS

I.  Table of Authorities .................................................................... iii

II.  Issues to be Decided. .......................... Error! Bookmark not defined.

III.  Statements Of Facts ........................... Error! Bookmark not defined.

IV.  Legal Standard ........................................................................ 1

V.  Arguments ............................................................................. 3

   A.  Defense Counsel Must Be Disqualified Under ABA Model Rule 3.7
   (Lawyer as a Witness) ............................................................. 3

   B.  Orrick's Prior Representation Creates a Lawyer-as-Witness Conflict
   and Warrants Disqualification ................................................. 8

   C.  Defense Counsel's Role in Witness Intimidation and Retaliation ..... 10

   D.  Defense Counsel's Concealment of Material Evidence and Fraud on
   the court ..............................................................................11

   E.  Orrick's Lack of Competence in Environmental and Privacy Law & Its
   Impact on These Proceedings ................................................. 13

   F.  Failure to Disclose Evidence ................................................. 15

   G.  The Defendant's Improper and Malicious Conduct ......................... 16

   H.  Vicarious Liability and Corporate Ratification of Misconduct ......... 18

VI.  Conclusion ......................................................................... 20

— ii —

1

# I. Table of Authorities

2

**Trial and Circuit Court Cases**

3   *Colyer v. Smith*, 50 F. Supp. 2d 966, 971 (C.D. Cal. 1999) ........................ 8, 9, 10

*Dept. of Corrections v. Speedee Oil Change Syst.,* 20 Cal. 4th 1135, 1143 (1999) .... 3

4   *Estate of Adams v. City of San Bernardino,* 658 F. Supp. 3d 784, 788-89 (C.D. Cal.

5      2023). ....................................................................................................... 2

6   *Estate of Adams v. City of San Bernardino,* 658 F. Supp. 3d 784, 791 (C.D. Cal.

    2023) ......................................................................................................... 2

7   *FDIC v. O'Melveny & Myers*, 61 F.3d 17, 19 (9th Cir. 1995) ........................... 18

8   *Felarca v. Birgeneau*, Case No. 11-cv-05719-YGR, 2 (N.D. Cal. May. 12, 2015) 4, 5

9   *Felarca v. Birgeneau*, Case No. 11-cv-05719-YGR, 2 (N.D. Cal. May. 12, 2015).... 5

    *Finnie v. Town of Tiburon* (1988) 199 Cal.App.3d 1, 12. ..................................... 7

10  *Great Lakes Constr., Inc.*, 186 Cal. App. 4th at 1358, 114 Cal.Rptr.3d 301 .......... 2

11  *Hazard v. Shulman*, 556 F. Supp. 1171 (S.D.N.Y. 1983) ................................... 4

    *Hazel-Atlas Glass Co. v. Hartford-Empire Co.,* 322 U.S. 238, 246 (1944) ........... 12

12  *In re A.C.* (2000) 80 Cal.App.4th 994, 1001, 96 Cal.Rptr.2d 79. ....................... 3

13  *In re A.C.,* 80 Cal.App.4th 994, 1001 (2000)................................................... 6

    *In re Abrams*, 521 N.E.2d 1104 (N.Y. 1988) ................................................. 3

14  *In re County of Los Angeles*, 223 F.3d 990, 995 (9th Cir. 2000) ........................ 2

15  *In re County of Los Angeles*, 223 F.3d 990, 996 (9th Cir. 2000)........................15

16  *In re Grand Jury Subpoena (Mark Torf/Torf Envtl. Mgmt.)*, 357 F.3d 900, 908 (9th

    Cir. 2004) .................................................................................................19

17  *In re Marriage of Reese & Guy*, 73 Cal. App. 5th 562, 570 (2021) .....................13

18  *In re Marriage of Reese & Guy,* 73 Cal.App.4th 1214, 1220-21 (Cal. Ct. App. 1999)

19      ................................................................................................................ 7

    *Jorgensen v. Cassiday*, 320 F.3d 906, 912 (9th Cir. 2003)................................15

20  *Kennedy v. Eldridge*, 201 Cal. App. 4th 1197, 1204, 135 Cal.Rptr.3d 545 (2011) ... 2

21  *Kennedy v. Eldridge,* 201 Cal. App. 4th 1197, 1205 (2011) ..............................13

    *Kennedy v. Eldridge,* 201 Cal. App. 4th 1197, 1210 (2011) ............................. 5

22  *Kennedy v. Eldridge*, 201 Cal.App.4th 1197, 1205 (Cal. Ct. App. 2011)...............3

23  *Kennedy v. Eldridge*, 201 Cal.App.4th 1197, 1208-9 (Cal. Ct. App. 2011) ........... 4

24  *Kohlman v. Village of Midlothian*, 833 F. Supp. 2d 922, 932 (N.D. Ill. 2011).......14

    *Legacy Villas at La Quinta Homeowners Ass'n v. Centex Homes,* Case No. EDCV

25     11-00845 VAP (OPx), 9 (C.D. Cal. Apr. 30, 2012). .......................................... 3

26  *Love v. Permanente Med. Grp.*, 2016 WL 4492586 (N.D. Cal. 2016) ..................13

    *Lyle v. Superior Court*, 122 Cal. App. 3d 470, 482 (1981) ............................8, 10

27  *People v. Donaldson*, 93 Cal.App.4th 916, 927-28 (2001)................................. 5

28  *Rutherford Holdings, LLC v. Plaza Del Rey*, 223 Cal. App. 4th 221, 235 (2014)...19

— iii —

*Smith v. Superior Court,* 68 Cal. App. 4th 706, 714 (1998)...................................14

*Tech., Inc. v. EasyLink Servs. Int'l Corp.*, 913 F. Supp. 2d 900, 906 (C.D. Cal. 2012)........................................................................................................... 2

*Trone v. Smith,* 621 F.2d 994, 999 (9th Cir. 1980) ......................................... 2

*United States v. Kovel*, 296 F.2d 918, 921 (2d Cir. 1961) ............................ 18

*United States v. Locascio*, 6 F.3d 924 (2d Cir. 1993) ..................................... 3

*United States v. Prantil,* 764 F.2d 548, 553 (9th Cir. 1985).......................... 5

**Statutes**

29 U.S. Code  §§ 107, 109 ................................................................................ 8

Cal. Code Civ. Proc. § 527.3. ......................................................................... 8

**Rules & Regulations**

ABA Model Rule 1.1 ......................................................................................14

ABA Model Rule 3.3 ....................................................................................... 3

ABA Model Rule 3.4 (Fairness in Litigation) ..............................................11

ABA Model Rule 3.7 ...............................................................................3, 5, 8

ABA Model Rule 3.7 [Comment 2]. ............................................................... 5

ABA Model Rule 8.4(d) .................................................................................. 3

ABA Model Rule 8.4(g) .................................................................................. 4

ABA Model Rules 3.3 (Candor to the Tribunal) ...........................................11

California Rule of Professional Conduct 1.1 ................................................14

California Rule of Professional Conduct 3.7 ................................................. 8

California Rules of Professional Conduct 3.3(a)(1) ..................................... 12

California Rules of Professional Conduct Rule 3.7 ....................................... 3

California Rules of Professional Conduct Rule 8.4 ....................................... 3

California Rules of Professional Conduct Rule 8.4.1 ..................................... 4

Fed. R. Civ. P. 12(f) ........................................................................................ i

Federal Rule of Civil Procedure 12(b)(6) .....................................................17

Federal Rule of Civil Procedure 37 (Sanctions for Discovery Violations) .........13

Federal Rule of Evidence 613 .......................................................................13

Federal Rule of Evidence 801(d)(2) ............................................................. 10

**Treatises**

Luna, *Avoiding a "Carnival Atmosphere"*: *Trial Court Discretion and the Advocate-witness Rule* (1997) 18 Whittier L.Rev. 447, 452–453...................................... 4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## Plaintiff's Motion to Disqualify Defense Counsel
### Points & Authorities

1. Plaintiff, Ashley Gjovik, appearing pro se, moves this Court for an order disqualifying Orrick, Herrington & Sutcliffe LLP ("Orrick") as defense counsel for Defendant, Apple Inc, due to multiple conflicts of interest, ethical violations, fraudulent misrepresentations to the Court, obstruction of justice, and violations of professional responsibility rules. The continued participation of Orrick as defense counsel irreparably prejudices Plaintiff, taints these proceedings, and violates fundamental principles of fairness and justice.

2. This motion is brought pursuant to the American Bar Association (ABA) Model Rules of Professional Conduct, applicable state bar ethical rules, local rules, and relevant case law governing disqualification of counsel where attorneys have become fact witnesses, engaged in fraud, and participated in improper litigation conduct.

3. Defense counsel's involvement in Plaintiff's employment matters, termination strategy, and whistleblower complaints make them material witnesses, necessitating their disqualification. Defense counsel played an active role in advising Defendant on employment matters, apparently including Plaintiff's suspension and termination, making them key fact witnesses in the dispute. Despite this, they have concealed their prior involvement, failed to disclose their dual role, and improperly invoked attorney-client privilege over factual business decisions rather than legal advice.

## II. Legal Standard

4. Federal courts apply state law to decide motions to disqualify. *Advanced Messaging Tech., Inc. v. EasyLink Servs. Int'l Corp.*, 913 F. Supp. 2d 900, 906 (C.D. Cal. 2012) (citing *In re County of Los Angeles*, 223 F.3d 990, 995 (9th Cir. 2000)). Pursuant to Rule 11-1 of the Local Rules of the Northern District of California, attorneys who practice in this district must *"comply with the standards of professional conduct required of members of the State Bar of California."* L.R. 11-1. Ultimately, the decision to disqualify counsel is within the district court's discretion. *Trone v. Smith*,

— 1 —

621 F.2d 994, 999 (9th Cir. 1980). "When a conflict of interest requires an attorney's disqualification from a matter, the disqualification normally extends vicariously to the attorney's entire law firm." *SpeeDee Oil,* 20 Cal. 4th at 1139, 86 Cal.Rptr.2d 816, 980 P.2d 371. *Estate of Adams v. City of San Bernardino,* 658 F. Supp. 3d 784, 788-89 (C.D. Cal. 2023).

5. A nonclient may bring a motion to disqualify based on a third-party conflict of interest or ethical violation in a case "where the ethical breach is manifest and glaring and so infects the litigation in which disqualification is sought that it impacts the moving party's interest in a just and lawful determination of his or her claims." *Kennedy v. Eldridge*, 201 Cal. App. 4th 1197, 1204, 135 Cal.Rptr.3d 545 (2011). Where an "attorney's continued representation threatens an opposing litigant with cognizable injury or would undermine the integrity of the judicial process, the trial court may grant a motion for disqualification, regardless of whether a motion is brought by a present or former client of recused counsel." *Id.* at 1205, 135 Cal.Rptr.3d 545. *Estate of Adams v. City of San Bernardino, 6*58 F. Supp. 3d 784, 791 (C.D. Cal. 2023).

6. "In reviewing a motion to disqualify counsel, the district court must make 'a reasoned judgment and comply with the legal principles and policies appropriate to the particular matter at issue.'" *Visa U.S.A., Inc.,* 241 F. Supp. 2d at 1104 (quoting *Gregori*, 207 Cal. App. 3d at 300). "The district court is permitted to resolve disputed factual issues in deciding a motion for disqualification and must make findings supported by substantial evidence." Id. (citing *Dept. of Corrections v. Speedee Oil Change Syst.,* 20 Cal. 4th 1135, 1143 (1999)). *Legacy Villas at La Quinta Homeowners Ass'n v. Centex Homes,* Case No. EDCV 11-00845 VAP (OPx), 9 (C.D. Cal. Apr. 30, 2012).

7. "[T]he court has an *independent interest* in ensuring trials are conducted within ethical standards of the profession and that legal proceedings appear fair to all that observe them." *In re A.C.* (2000) 80 Cal.App.4th 994, 1001, 96 Cal.Rptr.2d 79. Accordingly, where an attorney's continued representation threatens an opposing litigant with cognizable injury or would undermine the integrity of the judicial process, the trial court may grant a motion for disqualification, regardless of whether a motion is brought by a present or former client of recused counsel. *Kennedy v. Eldridge*, 201 Cal.App.4th 1197, 1205 (Cal. Ct. App. 2011).

— 2 —

8.     Under California Rules of Professional Conduct Rule 3.7 and ABA Model Rule 3.7, a lawyer shall not act as an advocate at trial where they are likely to be a necessary witness, except under limited exceptions that do not apply here. Courts have consistently held that when an attorney has direct knowledge of material facts underlying the litigation, they must withdraw from representation. See *United States v. Locascio*, 6 F.3d 924 (2d Cir. 1993) (disqualifying attorney due to his role as a material fact witness).

9.     Under California Rules of Professional Conduct Rule 8.4 and ABA Model Rule 8.4(d), it is professional misconduct for an attorney to engage in conduct that is prejudicial to the administration of justice, including witness intimidation, retaliation, and the use of legal proceedings as a tool of harassment. Courts have held that when a lawyer facilitates or participates in improper coercion or suppression of evidence, disqualification is warranted. See *In re Abrams*, 521 N.E.2d 1104 (N.Y. 1988) (attorney disqualified for engaging in coercive and retaliatory tactics against opposing party).

10.     Under California Rules of Professional Conduct Rule 8.4 and ABA Model Rule 3.3, an attorney has a duty of candor to the court and must not knowingly make false statements of fact or law or fail to correct a material omission. Courts have consistently ruled that attorneys who deliberately conceal evidence or misrepresent facts must be disqualified. See *Hazard v. Shulman*, 556 F. Supp. 1171 (S.D.N.Y. 1983) (disqualifying attorneys for fraudulently misrepresenting material evidence).

11.     Under California Rules of Professional Conduct Rule 8.4.1 and ABA Model Rule 8.4(g), that it is professional misconduct for a lawyer to "engage in conduct that the lawyer knows or reasonably should know is harassment or discrimination." Engaging in or facilitating online harassment to intimidate an opposing party violates this ethical standard.

## III.  ARGUMENTS

### A.  DEFENSE COUNSEL MUST BE DISQUALIFIED UNDER ABA MODEL RULE 3.7 (LAWYER AS A WITNESS)

12.     The Plaintiff previously worked in Defendant's legal department, leading efforts to draft the company's first ethics policy regarding the responsible use of artificial intelligence, which

— 3 —

1   directly related to Defendant's use of an application that surreptitiously collected biometric data

2   and took photos of employees without consent. Plaintiff's complaints about this application and

3   Defendant's unethical legal tactics form one of the bases of her claims in this case.

4        13.    The "advocate-witness rule," which prohibits an attorney from acting both as an

5   advocate and a witness in the same proceeding, has long been a tenet of ethics in the American legal

6   system, and traces its roots back to Roman Law. (Luna, *Avoiding a "Carnival Atmosphere"*: *Trial*

7   *Court Discretion and the Advocate-witness Rule* (1997) 18 Whittier L.Rev. 447, 452–453). Luna quotes

8   a 1980 version of rule 3.7 of the Model Rules of Professional Conduct of the American Bar

9   Association (ABA Model Rules). *Felarca v. Birgeneau*, Case No. 11-cv-05719-YGR, 2 (N.D. Cal.

10   May. 12, 2015) quoting *Kennedy v. Eldridge*, 201 Cal.App.4th 1197, 1208-9 (Cal. Ct. App. 2011). The

11   American Bar Association Model Rules of Professional Conduct also address the "advocate-witness

12   rule," requiring disqualification of an attorney as an advocate at trial where the attorney is "likely to

13   be a necessary witness" unless such disqualification "would work a substantial hardship on the

14   client." *Id.* at 1209 (citing 2007 amendment of ABA Model Rule 3.7) *Felarca v. Birgeneau*, Case No.

15   11-cv-05719-YGR, 2 (N.D. Cal. May. 12, 2015).

16        14.    As explained by the California Court of Appeals in *People v. Donaldson*, 93

17   Cal.App.4th 916, 927-28 (2001), the advocate-witness rule is necessary, in part, because "if a

18   lawyer is both counsel and witness, he becomes more easily impeachable for interest and thus may

19   be a less effective witness. Conversely, the opposing counsel may be handicapped in challenging

20   the credibility of the lawyer when the lawyer also appears as an advocate in the case. An advocate

21   who becomes a witness is in the unseemly and ineffective position of arguing his own credibility.

22   The roles of an advocate and of a witness are inconsistent; the function of an advocate is to advance

23   or argue the cause of another, while that of a witness is to state facts objectively." *Id.* at 927-928.

24   *Felarca v. Birgeneau*, Case No. 11-cv-05719-YGR, 2 (N.D. Cal. May. 12, 2015).

25        15.    The Comments to ABA Model Rule 3.7 note that the rule is necessary because "[i]t

26   may not be clear whether a statement by an advocate-witness should be taken as proof or as an

27   analysis of the proof." ABA Model Rule 3.7 [Comment 2]. Further, and as noted by the court in

28   Kennedy, supra, the interconnected entanglements inherent in being both advocate and potential

witness may create an "appearance of impropriety and undermine the integrity of the judicial system." *Kennedy*, 201 Cal.App.4th at 1211. "The very fact of a lawyer taking on both roles will affect the way in which a jury evaluates the lawyer's testimony, the lawyer's advocacy, and the proceedings themselves." *Donaldson*, 93 Cal.App.4th at 928. *Felarca v. Birgeneau,* Case No. 11-cv-05719-YGR, 2 (N.D. Cal. May. 12, 2015).

16.     The Ninth Circuit has held that the advocate-witness rule is "a necessary corollary to the more fundamental tenet of our adversarial system that juries are to ground their decisions on the facts of a case and not on the integrity or credibility of the advocates." *United States v. Prantil*, 764 F.2d 548, 553 (9th Cir. 1985). "[A]dherence to this time-honored rule is more than just an ethical obligation of individual counsel; enforcement of the rule is a matter of institutional concern implicating the basic foundations of our system of justice." Id.

17.     Thus, courts have applied CRC 5-210 and ABA Model Rule 3.7 to find that an attorney who takes on the role of a percipient witness should be disqualified. See *Kennedy v. Eldridge,* 201 Cal. App. 4th 1197, 1210 (2011) (disqualifying counsel in custody proceeding before the court); *Donaldson*, 93 Cal. App.4th at 928 (disqualifying prosecutor in criminal case of child endangerment). Further, "the court has an independent interest in ensuring trials are conducted within ethical standards of the profession and that legal proceedings appear fair to all that observe them." *In re A.C.,* 80 Cal.App.4th 994, 1001 (2000). *Felarca v. Birgeneau,* Case No. 11-cv-05719-YGR, 3 (N.D. Cal. Feb. 3, 2016).

### 1. Orrick's Pattern of Retaliatory Online Harassment and Its Role in Coordinated Intimidation Tactics Against Plaintiff

18.     Newly discovered evidence strongly suggests that the attorneys from Orrick have been directly involved in online harassment, intimidation, and retaliatory legal tactics against Plaintiff since at least 2021, even before Plaintiff was terminated. Orrick's involvement in this harassment campaign is particularly evident from the timing and pattern of online attacks against Plaintiff, which correlate directly with Orrick's legal setbacks in other employment cases where they represented Apple. These bursts of harassment have repeatedly escalated immediately after Orrick has lost key motions in Apple-related employment cases, further suggesting a coordinated

— 5 —

1    effort to intimidate Plaintiff and others who have brought legal claims against Apple.

2        19.    A striking example of this pattern is the massive escalation of online harassment

3    immediately following Orrick's filing of a notice of appearance in Plaintiff's U.S. Department of

4    Labor whistleblower retaliation case. Prior to this, Plaintiff had already experienced targeted

5    harassment and intimidation efforts linked to Apple's legal team, but the intensity and organization

6    of these attacks increased dramatically after Orrick formally appeared in that proceeding. Notably,

7    in the weeks leading up to the deadline for Orrick to submit Apple's official position statement in

8    the U.S. DOL case, there was a deliberate and strategic effort to silence Plaintiff through a

9    retaliatory legal attack—namely, the fraudulent restraining order and gag order lawsuit.

10        20.    The sequence of events strongly suggests that Orrick was not merely defending

11   Apple in litigation but was actively involved in orchestrating harassment and intimidation against

12   Plaintiff as part of Apple's broader retaliation strategy. Specifically:

13   -    Shortly after Orrick appeared in the U.S. DOL case, an intensification of online harassment

14        occurred, mirroring prior spikes in harassment following Orrick's legal losses in other

15        Apple employment lawsuits.

16   -    Between January and February 2022, during one of the most aggressive waves of online

17        harassment, there were coordinated efforts by anonymous accounts to provoke Plaintiff into

18        making statements that could later serve as a pretext for the retaliatory gag order lawsuit.

19   -    Once the gag order lawsuit was filed, additional suspicious social media accounts appeared,

20        dedicated to harassing Plaintiff, taunting her that she would "never work again" and that she

21        would "never be able to become a lawyer." These statements were designed to inflict

22        maximum reputational harm and align precisely with Apple's and Orrick's interests.

23   -    Orrick and Apple's legal team requested and obtained a copy of the restraining order on the

24        same day they filed Apple's position statement with the Department of Labor, suggesting

25        the order was a deliberate, premeditated tactic to suppress Plaintiff's ability to present

26        evidence.

27   -    Now, in this lawsuit, Orrick refuses to provide any discovery on key issues, asserting blanket

28        attorney-client privilege over all communications regarding these events—an implicit

— 6 —

1    admission that they were involved in these coordinated retaliation tactics.

2    21.    These facts create a strong inference that Orrick's attorneys have not only been

3 representing Apple in litigation but have also been directly involved in Apple's retaliatory campaign

4 against Plaintiff, including efforts to silence Plaintiff through strategic harassment, intimidation,

5 and suppression of evidence. Such conduct goes far beyond zealous legal advocacy and instead

6 crosses into unethical, coercive, and potentially unlawful misconduct.

7    22.    A bad faith action or tactic is considered *"frivolous"* if it is *"totally and completely*

8 *without merit"* or instituted *"for the sole purpose of harassing an opposing party."* (§ 128.5, subd. (b)(2).)

9 Whether an action is frivolous is governed by an objective standard: Any reasonable attorney would

10 agree it is totally and completely without merit. *In re Marriage of Reese & Guy,* 73 Cal.App.4th 1214,

11 1220-21 (Cal. Ct. App. 1999) quoting *Finnie v. Town of Tiburon* (1988) 199 Cal.App.3d 1, 12. Here,

12 if the Defendant and its counsel had disclosed that its key evidence in this labor and environmental

13 dispute are naked photos of the Plaintiff emailed to Apple's legal team by Appleseed, then any

14 request for an injunction against the plaintiff specific to Appleseed, including her role in the Apple

15 litigation, would be "*totally and completely without merit*" considering 29 U.S. Code §§ 107, 109 and

16 Cal. Code Civ. Proc. § 527.3.

17    **2. Orrick Cannot Serve as Defense Counsel If It Is a Fact Witness in Coordinated Retaliation and Harassment**

18

19    23.    Given the substantial evidence linking Orrick's attorneys to acts of intimidation and

20 retaliatory harassment, Plaintiff has a strong basis for conducting discovery on Orrick's role in these

21 events. If the firm's attorneys have engaged in, coordinated, or had prior knowledge of retaliatory

22 attacks, then their communications, documents, and internal discussions about these matters are

23 relevant and discoverable. Courts have recognized that when defense counsel becomes a fact

24 witness in the litigation they are defending, disqualification is necessary to preserve fairness and

25 avoid undue advantage. See *Colyer v. Smith,* 50 F. Supp. 2d 966, 971 (C.D. Cal. 1999) (holding that

26 disqualification is warranted where an attorney's continued representation would threaten the

27 integrity of the adversarial process).

28    24.    Further, under ABA Model Rule 3.7 and California Rule of Professional Conduct

— 7 —

3.7, attorneys who are likely to be necessary witnesses in a case cannot continue to represent a client in the same matter. Orrick's direct involvement in the timing, coordination, and execution of retaliatory legal maneuvers suggests that its attorneys may be key witnesses in discovery and potential trial testimony. Disqualification is necessary to prevent Orrick from shielding its own misconduct under the guise of legal representation while simultaneously obstructing discovery into its own actions. See *Lyle v. Superior Court*, 122 Cal. App. 3d 470, 482 (1981) (holding that disqualification is required where an attorney's role as a fact witness would taint the trial).

25. The mounting evidence of Orrick's involvement in Plaintiff's harassment and intimidation campaign, along with its refusal to provide discovery on these matters, necessitates disqualification. A law firm cannot ethically serve as defense counsel while simultaneously acting as a fact witness to the very retaliation and obstruction at issue in the case. Further, if Orrick's attorneys were directly involved in the retaliatory restraining order litigation, suppression of evidence, or online harassment campaigns against Plaintiff, this conduct constitutes unethical and potentially unlawful activity that must be fully investigated through discovery. Given these circumstances, Plaintiff respectfully requests that the Court grant this motion to disqualify Orrick and allow Plaintiff to conduct discovery on the firm's role in Apple's broader retaliation campaign.

26. Courts have consistently disqualified attorneys where their failure to disclose material facts and active participation in misleading the Court would prejudice the opposing party and compromise the integrity of the judicial process. See *Colyer v. Smith*, 50 F. Supp. 2d 966, 971 (C.D. Cal. 1999) (finding that disqualification is warranted when an attorney's role as a fact witness threatens the adversarial process).

## B. Orrick's Prior Representation Creates a Lawyer-as-Witness Conflict and Warrants Disqualification

27. Part of Apple's defense in this case is premised on the assertion that there were no prior complaints and no known issues regarding one of Plaintiff's supervisors. However, evidence establishes that Apple's external counsel, Orrick, Herrington & Sutcliffe LLP ("Orrick"), and counsel Jessical Perry specifically, previously defended Apple in a lawsuit brought by Plaintiff's coworker, Crystal, in 2018—alleging discrimination, harassment, and intentional infliction of

1  emotional distress ("IIED") against the same supervisor.[1] This prior lawsuit was settled in mid-
2  2019 and directly contradicts Apple's claim that there was no history of complaints against the
3  supervisor and demonstrates that Apple HR's statements to Plaintiff were false.

4      28.    Because an Orrick attorney was directly involved in managing Apple's defense in
5  the 2018 lawsuit, that attorney has firsthand knowledge that Apple's HR statements to Gjovik were
6  misleading or false. This places Orrick's lawyers in an impossible ethical position—they are now
7  both Apple's legal advocates and key fact witnesses to a material issue in dispute.

8      29.    Under California Rules of Professional Conduct Rule 3.7 (Lawyer as Witness Rule),
9  an attorney must not act as an advocate in a trial where they are likely to be a necessary witness.
10  Here, the Orrick attorney's testimony is necessary to impeach Apple HR's statements and establish
11  that Apple knowingly misrepresented the existence of prior complaints against the supervisor.
12  Given the centrality of this issue, Orrick's continued representation of Apple in this matter would
13  violate ethical standards and prejudice Plaintiff's ability to litigate her claims fairly.

14      30.    Courts have routinely disqualified counsel where their direct knowledge of disputed
15  facts makes them a material fact witness. See *Lyle v. Superior Court,* 122 Cal. App. 3d 470, 482
16  (1981) (holding that disqualification is required where an attorney's testimony is necessary to
17  resolve key factual disputes); *Colyer v. Smith*, 50 F. Supp. 2d 966, 971 (C.D. Cal. 1999) (finding that
18  disqualification is necessary when an attorney's role as a fact witness threatens the integrity of the
19  adversarial process).

20      31.    Furthermore, under Federal Rule of Evidence 613 (Prior Inconsistent Statements),
21  Plaintiff is entitled to use the Orrick attorney's testimony to impeach Apple HR's false statements
22  regarding the history of complaints against Plaintiff's supervisor. Because the Orrick attorney was
23  responsible for defending Apple in the 2018 lawsuit, their testimony about their direct knowledge
24  of that case and Apple's awareness of prior complaints is not only relevant—it is critical to proving
25  that Apple engaged in fraudulent concealment of material facts. Additionally, under Federal Rule
26  of Evidence 801(d)(2) (Admission by a Party Opponent), the Orrick attorney's knowledge is non-

27  ───────────────
28  [1] *Crystal Brown v. Apple Inc*, Santa Clara County Superior Court, No. 18CV330796, filed June 28, 2018, settled and dismissed April 12 2019.

— 9 —

1     hearsay and admissible as an admission against Apple. This further underscores the necessity of

2     disqualifying Orrick as Apple's defense counsel, as their attorneys cannot simultaneously serve as

3     both advocates and key witnesses without undermining the fairness of these proceedings.

4         For these reasons, Plaintiff respectfully requests that the Court disqualify Orrick,

5     Herrington & Sutcliffe LLP from representing Apple in this matter and permit Plaintiff to conduct

6     discovery on the firm's knowledge of prior complaints against Plaintiff's supervisor. The lawyer-

7     as-witness conflict, coupled with Apple's concealment of material evidence, renders Orrick's

8     continued representation untenable and prejudicial to the integrity of this litigation.

9    **C. Defense Counsel's Role in Witness Intimidation and**
10        **Retaliation**

11        32.    In August 2021, Plaintiff publicly disclosed that Defendant had improperly obtained

12    nude photos of her during prior litigation (Batterygate) and retained them with no legitimate

13    justification. Shortly after these disclosures, Plaintiff was subjected to harassment, intimidation,

14    and threats from anonymous social media accounts, which explicitly warned her against speaking

15    out about Defendant. Plaintiff repeatedly complained that these accounts were linked to Defendant

16    and/or its legal representatives.

17        33.    The harassment escalated when, in January 2022, a global security employee from

18    Defendant's legal team—who had previously sent the nude photos to Defendant—filed a

19    restraining order lawsuit against Plaintiff. The lawsuit effectively criminalized Plaintiff's ability to

20    discuss key facts related to her whistleblower complaints, including the nude photos and witness

21    intimidation. Plaintiff later overturned the restraining order and discovered that Defendant's legal

22    team had actively used the lawsuit to attempt to suppress critical evidence and further intimidate

23    her.

24        34.    Courts have held that misconduct designed to suppress evidence and intimidate a

25    litigant is grounds for attorney disqualification. See *Kennedy v. Eldridge*, 201 Cal. App. 4th 1197,

26    1205 (2011). However, this misconduct needs to be investigated as part of the claims in this lawsuit,

27    which also calls for disqualification.

28

## D. Defense Counsel's Concealment of Material Evidence and Fraud on the court

35.     Plaintiff, through a FOIA request, obtained government records proving that Defense counsel falsely reported Plaintiff's OSHA complaint to OSHA itself, accusing her of leaking confidential information. This act constitutes a direct retaliatory measure against protected whistleblower activity. Additionally, Defense counsel strategically sent only one witness to the U.S. Department of Labor to defend the employer—the same global security employee who had sent the nude photos and later filed a lawsuit against Plaintiff. In 2023, this global security employee again contacted U.S. Department of Labor officials and falsely accused Plaintiff of fraud. Despite these facts, Defense counsel failed to disclose this individual as a key witness in their initial disclosures, refused to provide discovery on the matter, and falsely asserted attorney-client privilege over non-privileged evidence. This constitutes fraud on the court and obstruction of justice.

36.     Defendant Apple, through its legal counsel, has deliberately misrepresented and suppressed the role of a key defense witness, referred to herein as "Appleseed." Appleseed has submitted multiple declarations to this Court in support of Apple's legal filings, portraying themselves as an independent, neutral third party. However, Defendant and its counsel have concealed that:

- Appleseed was directly involved in Apple's retaliatory campaign against Plaintiff.
- Appleseed personally transmitted unauthorized nude photos of Plaintiff to Apple, which Apple later used as pretextual "evidence" to justify Plaintiff's termination.
- Appleseed's declarations are part of a broader harassment and intimidation effort coordinated with Apple and its legal team.
- Orrick knowingly withheld these facts from the Court while allowing Appleseed to submit sworn declarations in support of Apple.
- These deliberate omissions constitute fraud upon the court, obstruction of justice, and a violation of Orrick's ethical obligations as legal counsel.

37.     Under ABA Model Rule 3.3 (Candor to the Tribunal) and ABA Model Rule 3.4

— 11 —

(102 of 293), Page 102 of 293
Case: 25-2028, 05/09/2025, DktEntry: 17.2, Page 102 of 293
Case 3:23-cv-04597-EMC     Document 156-1     Filed 01/31/25     Page 16 of 24

(Fairness in Litigation), attorneys may not engage in conduct involving fraud on the court, withholding of evidence, or obstructive tactics.

### 3. Orrick's Concealment of Material Facts Violates Rule 3.3(a)(1) (Duty of Candor to the Tribunal)

38.     Under California Rules of Professional Conduct 3.3(a)(1), attorneys must not knowingly make false statements of fact or law to a tribunal or fail to correct false statements previously made. See *Hazel-Atlas Glass Co. v. Hartford-Empire Co.,* 322 U.S. 238, 246 (1944) (holding that suppression of material evidence and misleading court submissions constitute fraud upon the court).

39.     Here, Orrick failed to inform the Court that Appleseed was not an independent witness, but a key defense participant in Apple's retaliatory scheme against Plaintiff. Orrick's silence allowed Apple to rely on Appleseed's declarations without disclosing Appleseed's history of misconduct, bias, and direct involvement in transmitting unauthorized nude images of Plaintiff to Apple.

### 4. Orrick's Suppression of Appleseed's Role Violates Rule 3.4(a) (Duty to Disclose Evidence)

40.     Under California Rules of Professional Conduct 3.4(a), a lawyer must not unlawfully obstruct another party's access to evidence or alter, destroy, or conceal a document with potential evidentiary value. See *Kennedy v. Eldridge,* 201 Cal. App. 4th 1197, 1205 (2011) (disqualifying counsel where misrepresentations and suppression of material evidence tainted the fairness of the proceeding).

41.     Here, Orrick not only failed to disclose Appleseed's true role in Apple's retaliation scheme, but also suppressed evidence that would reveal Appleseed's credibility issues and bias. Courts have long held that an attorney's intentional failure to disclose material evidence warrants disqualification and potential sanctions. See *In re Marriage of Reese & Guy*, 73 Cal. App. 5th 562, 570 (2021) (finding that attorneys may not use litigation tactics to conceal material conflicts in a witness's testimony).

**5. Appleseed's False Declarations Are Grounds for Exclusion and Sanctions**

42. Under Federal Rule of Evidence 613, a party may impeach a witness with prior inconsistent statements or concealed information. If the Court had been aware of Appleseed's role in transmitting Plaintiff's private images to Apple and the evidence of their direct involvement in retaliatory efforts, it would have severely undermined the credibility of Appleseed's declarations. Orrick's intentional suppression of these facts has deprived Plaintiff of the ability to fully impeach Appleseed's statements and may have prejudiced this court against the Plaintiff.

43. Additionally, under Federal Rule of Civil Procedure 37 (Sanctions for Discovery Violations), courts may impose sanctions when a party fails to disclose or actively suppresses evidence relevant to a case. See *Love v. Permanente Med. Grp.*, 2016 WL 4492586 (N.D. Cal. 2016) (holding that suppression of key evidence warrants sanctions and potential disqualification of counsel).

**E.  ORRICK'S LACK OF COMPETENCE IN ENVIRONMENTAL AND PRIVACY LAW & ITS IMPACT ON THESE PROCEEDINGS**

44. Under ABA Model Rule 1.1 and California Rule of Professional Conduct 1.1, lawyers have a duty of competence, requiring that they possess the necessary legal knowledge, skill, thoroughness, and preparation to handle a given legal matter. Courts have recognized that attorneys must be reasonably knowledgeable in the substantive areas of law at issue in a case and that representation in a highly technical field—such as environmental law or privacy law—requires specialized expertise. See *Smith v. Superior Court,* 68 Cal. App. 4th 706, 714 (1998) (holding that attorneys who accept representation in complex cases must have "the necessary competence or must associate with those who do").

45. Here, Orrick has staffed this case with employment lawyers, despite the fact that environmental violations, toxic torts, and privacy breaches form the core of Plaintiff's claims. Instead of engaging counsel with environmental expertise, Orrick has attempted to reframe the litigation as purely an employment dispute, seeking to dismiss or minimize all environmental claims by arguing they are too complex or unnecessary for the court to consider. This is an improper litigation strategy designed to distort the nature of the case, rather than a legitimate legal defense.

— 13 —

46.     By failing to assign environmental counsel, Defendant and Orrick have knowingly deprived the court of informed legal arguments, expert-driven defenses, and an accurate assessment of liability under environmental laws. The absence of environmental expertise is particularly alarming given the pending EPA and BAAQMD investigations and the fact that Defendant's misconduct includes hazardous waste violations, unlawful toxic emissions, and concealment of regulatory breaches that pose a direct risk to public health. This failure to obtain competent legal representation in environmental law is an obstructionist tactic aimed at suppressing Plaintiff's legitimate claims. See *Kohlman v. Village of Midlothian*, 833 F. Supp. 2d 922, 932 (N.D. Ill. 2011) (disqualifying counsel where their lack of expertise in the central issues of the case suggested an attempt to "artificially narrow the scope of litigation in a prejudicial manner").

## 6. Bad-Faith Litigation Strategy to Eliminate Environmental Claims

47.     Orrick's insistence on minimizing, dismissing, or avoiding the environmental claims—despite their centrality to the case—further evidences a bad-faith litigation strategy designed to mislead the court and obstruct justice. Courts have held that repeated mischaracterization of the core issues of a case to avoid scrutiny of a defendant's conduct may warrant disqualification. See *Jorgensen v. Cassiday*, 320 F.3d 906, 912 (9th Cir. 2003) (disqualifying counsel where their litigation strategy "obscured the real issues at play" in a way that prejudiced the opposing party).

48.     Here, Orrick's refusal to engage with the substantive environmental violations—including those that have already been confirmed by regulatory agencies—demonstrates a deliberate effort to shield Defendant from accountability. This is particularly problematic because environmental law is highly specialized, requiring knowledge of federal and state environmental regulations, administrative agency procedures, and scientific evidence related to toxic exposure. Employment lawyers with no expertise in these areas cannot ethically or competently argue that these claims are irrelevant or unnecessary to the case. By continuing to do so, Orrick is acting in bad faith and engaging in obstructionist tactics that undermine the fair administration of justice.

### 7. Failure to Hire Environmental Counsel Undermines Judicial Integrity & Warrant Disqualification

49.     Defendant's failure to retain qualified environmental counsel—and Orrick's insistence on litigating complex environmental and privacy matters without expertise in these fields—creates a significant ethical problem and threatens the integrity of these proceedings. Courts have an obligation to ensure that all parties receive competent legal representation and that litigation is conducted in a manner that allows for the full and fair adjudication of all claims. When a law firm deliberately avoids engaging competent counsel in an effort to suppress certain claims or strategically misrepresent the nature of the case, disqualification may be warranted to prevent further prejudice. See *In re County of Los Angeles*, 223 F.3d 990, 996 (9th Cir. 2000) (holding that disqualification is necessary where "counsel's continued representation would create an unfair advantage by obscuring the issues properly before the court").

Orrick's continued representation of Defendant—without the necessary expertise in environmental and privacy law—violates ethical duties of competence, misleads the court, and prejudices Plaintiff's ability to litigate her claims fully. The firm's refusal to hire qualified environmental counsel while simultaneously seeking to dismiss or diminish Plaintiff's environmental claims is a deliberate strategy to obstruct justice, rather than a legitimate legal defense. Given these ethical violations and the prejudicial impact on Plaintiff's case, Orrick must be disqualified from further representation of Defendant in this matter.

### F.  FAILURE TO DISCLOSE EVIDENCE

50.     During discovery, Apple withheld critical evidence that would have exposed the full scope of Appleseed's actions. Apple failed to produce emails, internal communications, and photographs that were directly relevant to Plaintiff's claims. It was only through Plaintiff's own independent investigation, including filing a FOIA request, that the full extent of Appleseed's misconduct came to light. Apple's deliberate concealment of this evidence constitutes an obstruction of justice and a violation of Plaintiff's right to a fair trial.

51.     For over two years, Apple has failed to disclose key documents and evidence related to Appleseed's role in Plaintiff's termination. Notably, Apple concealed a critical email from

— 15 —

Appleseed containing private communications and compromising photographs of Plaintiff that were used as a basis for Plaintiff's wrongful termination. This information was only revealed to Plaintiff after a FOIA request to the U.S. Department of Labor in December 2023. By withholding this evidence, Apple has deprived Plaintiff of the opportunity to fully understand the basis of her termination and mount an adequate defense.

52.   Apple has acted in bad faith by failing to disclose Appleseed as a key witness in this case. Apple has consistently failed to mention Appleseed's involvement in Plaintiff's termination, despite the fact that Appleseed's statements and actions have been used as evidence in the U.S. Department of Labor case. Furthermore, Appleseed filed multiple declarations in this case under the premise that she does not know the Plaintiff and has nothing to do with the case. For example:

- *"…Plaintiff uses this public lawsuit against Apple Inc, who has no stake in the way Plaintiff characterizes me, to make statements that Apple Inc's lack of denial of her allegations about me is some kind of proof that what she has alleged is true…"* Dkt. 99  at ¶ 3.

- *"…No plaintiff should be permitted to impede on the rights of another person, harassing them via court…. This is a lawsuit between the Plaintiff and Apple Inc." Dkt 99 at page 4.*

- *"I have no stake in the outcome of this case…"* Dkt 66 at ¶ 3.

- *"…lawsuit against a corporation by a person I have never even met..."* Dkt 62 at ¶ 4.

- *"…My inclusion in this lawsuit is improper…"* Dkt 62 at ¶ 4.


53.   Apple's silence regarding Appleseed's testimony and their refusal to disclose documents related to her involvement is an obstructionist tactic that cannot be tolerated by the Court. Apple has also failed to take any meaningful steps to protect Plaintiff from further retaliation or to stop Appleseed's ongoing campaign of defamation and intimidation.

## G.  The Defendant's Improper and Malicious Conduct

54.   Apple's actions throughout this litigation demonstrate a flagrant disregard for the Court's authority, the procedural rules, and basic principles of fairness. Plaintiff's case is based on well-supported claims that involve serious violations of law, including labor misconduct and whistleblower retaliation. Despite the strength of these claims, Apple has made repeated attempts

1    to derail the proceedings with motions that are legally unfounded and designed to frustrate
2    Plaintiff's ability to seek redress.

3         55.    The motion to dismiss currently before the Court represents Apple's fifth attempt
4    to dismiss the Plaintiff's claims under Federal Rule of Civil Procedure 12(b)(6). Notably, the
5    Defendant's argument in this motion flies in the face of newly discovered evidence. Apple's
6    repeated motions to dismiss, demonstrate an improper attempt to avoid responsibility and delay
7    the litigation process in bad faith.

8         56.    In addition to its ongoing motions to dismiss, Apple's discovery practices have been
9    equally problematic. The Defendant has repeatedly failed to comply with its discovery obligations,
10   withholding critical documents that would substantiate Plaintiff's claims. Only after extensive,
11   independent efforts did Plaintiff uncover additional evidence showing how Appleseed, under
12   Apple's direction or knowledge, engaged in retaliatory behavior that impacted the Plaintiff's
13   professional and personal life. Apple's failure to produce this evidence in a timely manner not only
14   violates discovery rules but also undermines the Plaintiff's ability to pursue justice in an effective
15   and timely manner.

16        57.    As outlined in Plaintiff's prior filings and the Court's rulings, Apple has engaged in
17   a systematic pattern of bad faith litigation practices that have delayed and obstructed Plaintiff's
18   pursuit of her claims. Apple has concealed critical evidence, misrepresented facts, filed frivolous
19   motions, and engaged in discovery violations designed to harass and intimidate Plaintiff. These
20   actions have caused undue delay and significant prejudice to Plaintiff's ability to prosecute her case.
21   The Court should not allow this conduct to continue unchecked.

22   **H.  MANDATORY DISCLOSURE OF DATA BREACH IMPACT ON PLAINTIFF**

23        58.    Orrick, Herrington & Sutcliffe LLP, as Defendant's legal counsel, has been in
24   possession of Plaintiff's private and intimate images, which Defendant claims were used as
25   justification for Plaintiff's termination. However, in 2023-2024, Orrick suffered a significant data
26   breach impacting over 637,000 individuals, leading to an $8 million settlement in a class action
27   lawsuit. If Plaintiff's private images were stored by Orrick and compromised in this breach, this
28

1   constitutes a severe violation of Plaintiff's privacy rights under California Civil Code § 1708.85,

2   negligence, and a breach of ethical duties to maintain the confidentiality of privileged materials.

3   Further, Orrick has not disclosed whether Plaintiff's private data was impacted by this breach, nor

4   have they taken steps to mitigate the potential harm caused by the unauthorized disclosure of such

5   sensitive material.

6   59.    Regardless of if Orrick is disqualified from this matter, the firm must be compelled

7   to disclose whether Plaintiff's private and intimate images were among the data compromised in

8   its 2023-2024 data breach. Plaintiff has a fundamental right to know whether her sensitive materials

9   were leaked, improperly accessed, or disseminated. California law, including the California

10  Consumer Privacy Act (CCPA) (Cal. Civ. Code § 1798.100 et seq.), requires entities to notify

11  individuals if their personal data was breached. If Plaintiff's private images were exposed due to

12  Orrick's negligence, Orrick may be liable under California Civil Code § 1708.85, privacy statutes,

13  and other state and federal laws.

14  **I.   VICARIOUS LIABILITY AND CORPORATE RATIFICATION OF MISCONDUCT**

15

16  60.    Under agency and respondeat superior principles, Defendant is liable for the actions

17  of its attorneys and employees when those actions are undertaken in furtherance of the company's

18  defense strategy. By allowing its legal representatives to engage in misconduct and benefitting from

19  it, Defendant has ratified these unethical practices, further justifying disqualification.

20  61.    Under well-established legal principles, a corporate defendant can be held liable for

21  the acts of its attorneys when those attorneys act as the corporation's agents in furtherance of its

22  interests. An attorney retained by a corporation is not merely an independent advocate; rather, they

23  function as the corporation's legal representative and agent, meaning their misconduct, fraud, or

24  unethical behavior in the course of representation is imputable to the client. Courts have

25  consistently recognized that a principal (here, Defendant Apple) is responsible for the actions of its

26  attorneys when they act within the scope of their agency. See *United States v. Kovel*, 296 F.2d 918,

27  921 (2d Cir. 1961) (holding that "an attorney's acts on behalf of a client may be attributable to the

28  client for legal liability purposes"); *FDIC v. O'Melveny & Myers*, 61 F.3d 17, 19 (9th Cir. 1995)

1    (confirming that "as a general rule, the knowledge and conduct of an attorney acquired within the

2    scope of employment are imputed to the client").

3         62.    Here, Defendant Apple has knowingly retained and continues to employ Orrick,

4    Herrington & Sutcliffe LLP ("Orrick") despite mounting evidence that the firm has engaged in

5    unethical, obstructive, and potentially unlawful conduct. This includes concealing key evidence,

6    obstructing discovery, suppressing whistleblower retaliation evidence, participating in or

7    facilitating a coordinated harassment campaign against Plaintiff, and misrepresenting material facts

8    to regulatory agencies and the Court. Apple cannot claim to be insulated from liability for these

9    actions when Orrick's conduct was carried out in Apple's defense and on Apple's behalf in multiple

10   legal proceedings. See *In re Grand Jury Subpoena (Mark Torf/Torf Envtl. Mgmt.)*, 357 F.3d 900, 908

11   (9th Cir. 2004) (holding that a corporation may be held liable for the conduct of its attorneys where

12   they act as agents in legal proceedings).

13        63.    Moreover, by refusing to disqualify Orrick despite clear evidence of ethical and legal

14   violations, Defendant is not only tolerating but actively ratifying and endorsing the firm's

15   misconduct. Under agency law, a principal that retains an agent after learning of wrongful acts is

16   deemed to have ratified those acts and may be held directly responsible. See *Rutherford Holdings,*

17   *LLC v. Plaza Del Rey*, 223 Cal. App. 4th 221, 235 (2014) (holding that "when a principal, with full

18   knowledge of the material facts, retains the benefits of the unauthorized act of an agent, ratification

19   is established as a matter of law"). Here, Apple is on notice of Orrick's misconduct and nonetheless

20   insists on keeping the firm as its defense counsel. By doing so, Apple signals its endorsement of

21   Orrick's actions, making Apple equally responsible for the firm's misconduct.

22        64.    For these reasons, Orrick's continued representation of Defendant is not only

23   improper, but Apple's decision to retain the firm despite its misconduct should be construed as

24   ratification of those wrongful acts. Plaintiff respectfully requests that this Court disqualify Orrick

25   from representing Apple in this matter and take any further steps necessary to prevent Apple from

26   benefiting from its attorneys' unethical and obstructive behavior.

27

28

## IV. Conclusion

In conclusion, for the foregoing reasons, Plaintiff respectfully requests that this Court disqualify Orrick from representing Defendant in this matter. Their continued representation is a fundamental conflict of interest that undermines the fairness of these proceedings.

Please note: Plaintiff has not yet read Defendant's Reply at Dkt 152, so nothing in this motion is a response to Defendant's Reply.

Dated: Jan. 31 2025

Signature:

**/s/ Ashley M. Gjovik**

*Pro Se Plaintiff*

**Email:** legal@ashleygjovik.com

**Physical Address:**
Boston, Massachusetts

**Mailing Address:**
2108 N St. Ste. 4553 Sacramento, CA, 95816

**Phone:** (408) 883-4428

**Ashley M. Gjovik, JD**
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
|  | CAND No. 3:23-CV-04597-EMC |
|  | 9th Cir No.: 24-6058 |
| **ASHLEY M. GJOVIK**, *an individual*, | **PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE** |
| Plaintiff, |  |
| vs. | *In Support of Plaintiff's Motion to Amend & Motion to Disqualify* |
| **APPLE INC.**, a corporation, | **Motion Hearing:** |
|  | **Dept: Courtroom 5 (& Zoom)** |
| Defendant. | **Judge: Honorable Edward M. Chen** |
|  | **Date: Feb 27 2025** |
|  | **Time: 1:30 PM** |

PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTIONS TO AMEND AND TO DISQUALIFY DEFENSE COUNSEL

## I.   INTRODUCTION

Plaintiff Ashley Gjovik, appearing pro se, respectfully requests that this Court take judicial notice of publicly available and official government records that directly support Plaintiff's Motions to Amend the Complaint and Motion to Disqualify Defense Counsel Orrick, Herrington & Sutcliffe LLP ("Orrick"). Judicial notice is warranted under Federal Rule of Evidence 201(b), as the facts contained in these official records, public documents, and prior court filings are not subject to reasonable dispute and are capable of accurate and ready determination from sources whose accuracy cannot reasonably be questioned.

## II.   FACTS SUBJECT TO JUDICIAL NOTICE

Plaintiff seeks judicial notice of the following publicly available and official records, which are highly relevant to Apple's knowledge of the claims at issue, Apple's involvement in misconduct, and the disqualification of its legal counsel. Plaintiff has attached seven exhibits categorized into three groups.

### Group 1: OSHA FOIA Documents

1. **Exhibit A: Apple's Official Filings in the U.S. Department of Labor ("DOL") Case Containing the Email with Plaintiff's Nude Photos** – These documents establish that Apple was in possession of these images, knowingly transmitted them, and relied on them in legal proceedings. This supports the motion to disqualify due to Orrick's involvement and bad-faith litigation tactics. Courts may take judicial notice of prior administrative filings under *United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992).

1    Given that Apple has repeatedly attempted to suppress or downplay its involvement with these

2    images in the present case, judicial notice of these DOL filings contradicts Apple's litigation

3    position and further supports the disqualification of Orrick due to their direct participation in

4    misconduct involving Plaintiff's personal images. Judicial notice of prior administrative

5    proceedings is proper under *United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*,

6    971 F.2d 244, 248 (9th Cir. 1992) (courts may take notice of proceedings in other courts and

7    agencies if they have a direct relation to matters at issue).

8

9    **GROUP 2: BATTERYGATE SEXTORTION AND RELATED RETALIATION**

10       2.  **Exhibit B: August 30, 2021, News Article Discussing Plaintiff's Twitter Posts About**

11         **Batterygate Sextortion** – The article reports on Plaintiff's public disclosures regarding

12         Apple's misconduct, supporting Apple's knowledge of her claims prior to her termination.

13         Courts may take judicial notice of news articles when relevant to the public record. See *Von*

14         *Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010).

15

16       3.  **Exhibit C: Plaintiff's Twitter Posts from August and September 2021 Regarding**

17         **Batterygate Sextortion** – These social media posts demonstrate that Plaintiff publicly

18         complained about Apple's unlawful actions before her termination, contradicting Apple's

19         claims that it was unaware of her concerns. Courts have taken judicial notice of public social

20         media posts. See *Daniels-Hall v. National Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010).

21

22    **Group 3: Crystal Brown v. Apple Lawsuit and Related Retaliation**

23       4.  **Exhibit D: Court Filing from Crystal Brown v. Apple Showing Orrick and Jessica**

24         **Perry as Defense Counsel** – This filing proves that Orrick was actively involved in

25         defending Apple in a lawsuit regarding similar employment law violations. Judicial notice

26         of court records is well-established. See *Rosales-Martinez v. Palmer*, 753 F.3d 890, 894 (9th

27         Cir. 2014).

28

5.  **Exhibit E: Plaintiff's September 7, 2021, Social Media Posts Discussing Crystal Brown v. Apple** – Plaintiff publicly commented on discovering the lawsuit, highlighting Apple's pattern of misconduct. She was fired two days later, supporting her retaliation claim.

Because these documents are official records, court filings, and publicly available documents that contradict Apple's litigation positions and support Plaintiff's motions to amend and disqualify counsel, judicial notice is proper.

**GROUP 4: RESTRAINING ORDER LITIGATION FROM APPLESEED**

6.  **Exhibit F: Plaintiff's December 2022 Motion Filed Against Appleseed in Restraining Order Litigation** – Plaintiff explicitly stated in this filing that Apple was coercing Appleseed into participating in a harassment campaign against her, supporting the argument that Apple was directing or ratifying Appleseed's conduct. Courts may take judicial notice of prior litigation. See *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006).

7.  **Exhibit G: Plaintiff's January 2023 Motion Filed Against Appleseed in Restraining Order Litigation** – Plaintiff requested that the court refer Appleseed's conduct to the District Attorney for criminal review, further demonstrating Apple's continued involvement in coercing Appleseed into retaliatory conduct.

**GROUP 5: PUBLIC JOB DESCRIPTIONS FOR APPLE SECURITY EMPLOYEES**

8.  **Exhibit H: Job Description for the Crisis Manager Who Contacted Plaintiff on October 2, 2024**

— 3 —

These official job postings are relevant to understanding the responsibilities and duties of Apple's Global Security personnel, including those involved in this case; and the role of Appleseed, who has engaged in extensive harassment and interference with Plaintiff's legal proceedings, and whose job duties likely included direct coordination with Apple's executives and legal teams.

Judicial notice of job postings is proper where they are publicly available on a company's official website or widely recognized employment platforms. See *Peralta v. Hispanic Business, Inc.*, 419 F.3d 1064, 1068 (9th Cir. 2005) (holding that publicly available employment records and job descriptions may be subject to judicial notice as reliable and readily verifiable sources).

## III.    LEGAL STANDARD

Under Federal Rule of Evidence 201(b), a court may take judicial notice of facts that are "not subject to reasonable dispute because they... can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Courts regularly take judicial notice of:

- Prior administrative filings and agency records (*Robinson Rancheria Citizens Council*, 971 F.2d at 248).

- Publicly available employment records and job descriptions (*Peralta v. Hispanic Business, Inc.*, 419 F.3d at 1068).

- Filings in related litigation (*Rosales-Martinez v. Palmer*, 753 F.3d at 894).

## IV.    REQUEST FOR JUDICIAL NOTICE

Plaintiff respectfully requests that this Court take judicial notice of:

1. Apple's official filings in the U.S. DOL case that contain the email with Plaintiff's unauthorized nude images.

2. Publicly available job descriptions for Apple Global Security employees, including the

— 4 —

1    Crisis Manager who harassed Plaintiff on October 2, 2024.

2    3.  Plaintiff's January 2023 filing in the Appleseed litigation, wherein Plaintiff documented

3    Apple's direct involvement in coercing Appleseed into targeting Plaintiff.

4    These documents are reliable, publicly available, and not subject to reasonable dispute,

5    warranting judicial notice under Federal Rule of Evidence 201(b). Given that Apple has taken

6    contradictory positions regarding its knowledge, involvement, and responsibility for Appleseed's

7    actions, judicial notice is necessary to prevent Apple from benefitting from misrepresentations and

8    omissions in its legal arguments.

9

10   **V.  CONCLUSION**

11   For the foregoing reasons, Plaintiff respectfully requests that the Court grant this Request

12   for Judicial Notice and consider the publicly available and administrative records that demonstrate

13   Apple's prior knowledge, involvement, and misconduct, all of which directly support Plaintiff's

14   pending motions.

15

16   Respectfully submitted,

17

18

19   Dated: Jan. 31, 2024.

20

21   Signature:

22

23

24

25

26   _____

27   **/s/ Ashley M. Gjovik**

28   *Pro Se Plaintiff*

— 5 —

1

2   **Email**: legal@ashleygjovik.com

3   **Physical Address**:
    Boston, Massachusetts

4   **Mailing Address:**

5   2108 N St. Ste. 4553 Sacramento, CA, 95816

6   **Phone**: (408) 883-4428

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## VI.   Appendix: Exhibits

# Request for Judicial Notice

| EXHIBIT NO. | RECORD DESCRIPTION | ASSOCIATED CLAIMS & REQUETS |
|---|---|---|
| Exhibit A | *FOIA docs for Ashley Gjovik v. Apple, CERCLA, OSHA, & SOX Retaliation cases* | Motion to Amend & Motion to Disqualify |
| Exhibit B | *Batterygate Sextortion - Article* | Motion to Amend & Motion to Disqualify |
| Exhibit C | *Batterygate Sextortion – Social Media Posts* | Motion to Amend & Motion to Disqualify |
| Exhibit D | *Crystal Brown v. Apple Inc (2018-2019)* | Motion to Amend & Motion to Disqualify |
| Exhibit E | *Crystal Brown v. Apple Inc (2018-2019)* | Motion to Amend & Motion to Disqualify |
| Exhibit F | *C.S. v. Ashley Gjovik, Dec. 2022 Legal Filing, King County Superior Court* | Motion to Amend & Motion to Disqualify |
| Exhibit G | *C.S. v. Ashley Gjovik, Jan. 2023 Legal Filing, King County Superior Court* | Motion to Amend & Motion to Disqualify |
| Exhibit H | *Job Postings for Apple Global Security* | Motion to Amend & Motion to Disqualify |

**Ashley M. Gjovik, JD**
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# United States District Court

## Northern District of California

| | |
|---|---|
| **Ashley M. Gjovik**, *an individual*, | Case No. 3:23-CV-04597-EMC |
| | Ninth Circuit No. 24-6058 |
| Plaintiff, | |
| | **Plaintiff's Reply** |
| vs. | |
| | MOTION TO DISQUALIFY |
| | ORRICK, HERRINGTON & |
| | SUTCLIFFE LLP |
| **Apple Inc.**, a corporation, | |
| | |
| Defendant. | HEARING: |
| | Dept: Courtroom 5, 17th Floor. |
| | Judge: Edward M. Chen |
| | Date: March 13 2025 |
| | Time: 1:30 PM PT |

PLAINTIFF'S REPLY IN SUPPORT OF HER FIRST MOTION TO
DISQUALIFY DEFENDANT'S COUNSEL .................................. 1

I.    APPLE'S FAILURE TO ADDRESS THE ISSUE ........................ 1

II.   APPLE'S ABUSE OF ATTORNEY-CLIENT PRIVILEGE............. 2

III.  APPLE'S BAD-FAITH ENGAGEMENT WITH THE PLAINTIFF..... 3

IV.   APPLE'S KEY WITNESS ENGAGED IN PERJURY. ................. 4

V.    APPLE IS FEIGNING AMNESIA & WITHHOLDING INFORMATION
      6

VI.   OMISSIONS & DIVERSIONS ......................................... 9

VII.  APPLE'S ATTEMPT TO USE PLAINTIFF'S PRIVATE IMAGES AS
      A DEFENSE AND THREAT .......................................... 11

VIII. APPLE'S NEWLY RAISED ARGUMENTS ARE MISLEADING AND
      IRRELEVANT ....................................................... 12

IX.   ENVIRONMENTAL LAW IS COMPLICATED & IMPORTANT. ..... 13

X.    JUVINALL'S ABRUPT WITHDRAWAL .............................. 14

XI.   CONCLUSION ...................................................... 15

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Plaintiff's Reply in Support of her first Motion to Disqualify Defendant's Counsel

1.      Plaintiff, Ashley Gjovik respectfully submits the following Reply in support of her pending Motion to Disqualify. Defendant Apple Inc. ("Apple") counsel, Orrick, Herrington & Sutcliffe LLP ("Orrick"), have filed an opposition to Plaintiff's Motion to Disqualify (Dkt No. 156-1) that is rife with contradictions, mischaracterizations, misrepresentations, and omissions. Apple's response fails to meaningfully rebut the key arguments for disqualification and instead relies on conclusory statements, misstatements of fact, redirection, and legally deficient justifications.

2.      The Court should reject Apple's attempts to sidestep Orrick's clear conflicts of interest and grant Plaintiff's motion in full. Apple also attempts to confuse and distract by introducing a draft Protective Order, framed as if it was something Plaintiff agreed to, but which Plaintiff fervently opposes, and as such Plaintiff will concurrently file an Objection to Apple's statements about the order in its Opposition.

3.      Apple's opposition fails to meaningfully address several core issues raised in Plaintiff's motion. Plaintiff's Motion to Disqualify (Dkt No. 156-1) set forth multiple independent grounds for disqualification, each of which Apple either fails to rebut or tacitly concedes. Rather than addressing these facts, Apple asserts a blanket denial without evidence. Apple also fails to cite any authority supporting its claim that attorneys who act as key witnesses should nonetheless be allowed to represent a party. For these reasons, and those outlined in Plaintiff's motion, this Court should grant Plaintiff's motion and disqualify Defendant's counsel.

## I. Apple's Failure to Address the Issue

4.      Plaintiff's motion outlined how Apple's legal counsel is a material witness to the events leading to Plaintiff's termination and engaged in conduct that directly gives rise to the claims in this case. Apple, in its opposition, provides no substantive response to this critical argument. The defendant has known there are material conflicts in this lawsuit for years. The plaintiff filed this civil lawsuit on Sept. 7 2023. Apple's counsel (Orrick) filed notices of appearance and contacted Plaintiff for the first time on Oct. 5 2023. On Oct. 5 2023, Plaintiff responded and provided notice of potential conflicts of interest in this litigation for the Orrick attorneys who had contacted her. (*see concurrently filed Declaration*). Orrick never even responded to Plaintiff's concerns.

5.      Defendant's counsel claims: *"Defendant's legal counsel has never been a witness to any*

— 1 —

1    *material fact in this litigation."* Further, Counsel focuses on the retaliation conflicts and avoids

2    acknowledge that they material witnesses in relation to Plaintiff's statute of limitations tolling theory

3    for her toxic torts – as Orrick actively misled her about the semiconductor fabrication during the U.S.

4    Dept. of Labor proceedings, acting as agents of Apple.

5         6.    Plaintiff demonstrated that Apple's legal team was involved in creating the rationale for

6    Plaintiff's termination, making them key witnesses. Apple does not dispute this involvement, nor does

7    it offer any legal argument to justify allowing conflicted counsel to continue representing the company.

8    Courts routinely disqualify counsel when attorneys become material witnesses. See *Kennedy v.*

9    *Eldridge*, 201 Cal. App. 4th 1197, 1205 (2011) (*"An attorney who is a material witness to disputed facts must*

10   *be disqualified to protect the integrity of judicial proceedings."*). An attorney who becomes a material

11   witness in a case must withdraw from representation to avoid conflicts of interest and ethical

12   violations." *Kennedy v. Eldridge*, 201 Cal. App. 3d 718, 727 (1988) "

13        7.    Orrick attorneys were directly involved in Apple's internal response to Plaintiff's

14   whistleblower complaints, termination decision-making, and legal strategy regarding Apple's

15   dissemination of Plaintiff's private photographs. The advocate-witness rule prohibits attorneys from

16   acting as both counsel and witnesses. Apple conclusory states that "no Orrick attorney is likely to be a

17   witness" but fails to rebut the specific examples provided in Plaintiff's motion. Apple does not deny

18   that Orrick attorneys had direct communication about these key issues. The advocate-witness rule

19   applies when attorneys have firsthand knowledge of disputed facts material to the case. Apple's refusal

20   to acknowledge this does not negate the rule's application.

## II. Apple's Abuse of Attorney-Client Privilege

21        8.    Apple is attempting to withhold any documents concerning the decision to terminate

22   Plaintiff by claiming they are protected by attorney-client privilege. (*see concurrently filed Declaration*).

23   "Privilege does not apply to factual business decisions related to employment actions." *Wellpoint Health*

24   *Networks, Inc. v. Superior Ct.,* 59 Cal. App. 4th 110 (1997). "A corporation cannot shield business

25   decisions from discovery under the guise of attorney-client privilege." *United States v. Ruehle*, 583 F.3d

26   600 (9th Cir. 2009).

27        9.    Plaintiff has presented credible evidence that Apple's legal team was involved in

28   fabricating a paper trail to justify termination. Apple's Opposition did not directly deny this allegation,

     effectively conceding its validity. Apple has admitted this issue for years. In Apple's Dec. 18 2023

— 2 —

General Order 71 Initial Disclosures, Apple responded to the prompt about any documents "upon which the defendant relies to support the defense" and any "documents describing the reasons for the adverse action" by saying *"There is no operative answer on file."* (*see Declaration*). Courts have held that the knowing creation of false evidence is grounds for disqualification *(People v. Bell,* 49 Cal. 3d 502, 537 (1989)). If Apple knows it will lose this case on the merits, it should consider engaging in a settlement process in good faith, instead of wasting the court and plaintiff's time.

### III. Apple's Bad-Faith Engagement with The Plaintiff.

10.    Apple attempted to fabricate misconduct allegations against Plaintiff during prior meet-and-confers. When Plaintiff recorded a meet-and-conference proving Apple was lying, Apple demanded she delete it. Apple is again demanding a meet-and-confer where no record is allowed, setting the stage for more false claims. This is witness intimidation—Plaintiff was fired for requesting written records to prevent lies like this.

11.    During the April 1 2024 26(f)-styled meet and confer between Apple (Orrick) and Plaintiff for the Dept. of Labor matter, Apple's counsel stonewalled the Plaintiff and refused to share even basic information with her. Apple asked about Plaintiff's claims and Plaintiff detailed her allegations. Plaintiff then asked Defendant about their defenses and Defendant refused to answer the Plaintiff, despite persistent questioning from Plaintiff, other than saying their defense is *"what the [OSHA] investigator found -- that is what our defenses are."* Adding: *"If you want to know what our claims are, just read the [OSHA] investigator's opinion. That's a summary of our claims"* (id at 13) and *"Why do you need me to read the opinion of the investigator to tell you what our defenses are?"* (id at 13-14).

12.    Because Appleseed was the one and only witness that OSHA interviewed in Gjovik's complaints against Apple, and on April 1 2024, Apple insisted that its defense with OSHA is its only defense, (a defense that required Appleseed), that makes Appleseed a material witness for Apple's defense in all pending litigation and adjudication on the same issues.

13.    During the April 1 2024 meeting, Plaintiff questioned Defendant about how Apple plans to handle the EPA inspection of her office that occurred due to her disclosures. Plaintiff complained that this same counsel hid this inspection from her and from U.S. Dept. of Labor for nearly a year. Apple's counsel simply responded that the inspection was irrelevant because they *"will show [her] why [she was] let go and whether if [her] making a complaint to the EPA was or was not the reason."* (Id at 18). Adding, *"It's very simple."* (Id at 18-19). The plaintiff repeatedly objected to this line of response, but

— 3 —

1   Apple persisted.

2       14.    During the April 1 2024 call the Defendant made it clear they did not want to participate

3   in discovery. The plaintiff asked Apple if Apple planned to request any discovery from her and what

4   types of documents she should prepare. Counsel stammered and responded, "*Well at this time I*

5   *don't…*" with the other interrupting her "*I'm sorry this is…*" (inaudible mumbling). Counsel then

6   blurted out "*I'm late for my call, but we haven't decided*" and both ended the meeting. (Id at 27). Despite

7   repeated requests from Plaintiff to Defendant as to what kind of discovery they will want related to

8   their defenses, Defendant has refused to answer other than a repeated belligerent insistence that

9   Plaintiff immediately provide them full General Order 71 discovery (which is likely to be tens of

10  thousands of documents – due to the wide range of  protected activity and cornucopia of retaliation

    tactics deployed against her).

11  ## IV.   APPLE'S KEY WITNESS ENGAGED IN PERJURY.

12      15.    Apple's key witness in its defense that it was not engaging in witness intimidation and

13  whistleblower retaliation against the Plaintiff, was only involved in Apple's defense as a result of Apple

14  intimidating and retaliating against Appleseed., in order to coerce her to help them falsify a paper trail.

15      16.    Apple claims it's never talked to Appleseed, yet Appleseed was the one and only witness

16  that U.S. Dept. of Labor interviewed for *Gjovik v. Apple* OSHA investigation. OSHA did not interview

17  any of Gjovik's witnesses and only interviewed one of the Apple's witnesses – Appleseed. (*see*

18  *Declaration*). OSHA's case notes explained that based on the information provided by Apple's counsel

19  (including the email from Appleseed with photos of Plaintiff's breasts) and the testimony, actions, and

20  information provided by Appleseed, they found in favor of Apple. Apple's counsels are claiming that

21  they never communicated with and have no connection to their one and only witness, who they

22  effectively weaponized to get OSHA to dismiss the plaintiff's complaint in Dec. 2023.

23      17.    Apple's reliance on this individual—who has demonstrably committed perjury—

24  undermines the integrity of its defense. Apple offers no response to the fact that this witness's actions

25  amount to obstruction for justice. This is a clear attempt to rewrite the record and avoid accountability.

26  Further, Apple's unethical use of Plaintiff's private photos in a retaliatory manner exemplifies its bad

27  faith. Apple claims ownership over Plaintiff's personal images, alleging Plaintiff had no right to share

28  them. Yet, Apple fails to explain how it can claim "ownership" over Plaintiff's body, particularly when

    the photos were unlawfully distributed by Apple's own key witness. The implications of this argument

— 4 —

1    are deeply troubling, and Apple's failure to address this issue head-on speaks volumes.

2        18.    Apple's primary defense witness, who fabricated a paper trail to justify Plaintiff's

3    termination, has submitted three declarations and claimed she has never met Plaintiff. This directly

4    contradicts Apple's claims and raises serious credibility issues regarding its defense. This witness was

5    also responsible for distributing the private photos that Apple is now using as a defense, demonstrating

6    bad faith and unethical litigation tactics. Perjury and obstruction of justice are independent grounds

7    for disqualification (*See United States v. Talao*, 222 F.3d 1133, 1139 (9th Cir. 2000)). Apple does not

8    address this contradiction. By failing to explain this contradiction, Apple effectively concedes that its

9    witness's credibility is compromised. This further underscores the need for disqualification, as Orrick

    attorneys are implicated in coordinating this defense.

10        19.    The witness engaged in perjury by falsely claiming that she was not involved in

11    Plaintiff's case. However, email records, internal reports, and Apple's own prior statements contradict

12    this assertion. (*See, e.g., United States v. Contreras*, 581 F.3d 1163, 1168 (9th Cir. 2009) (*"False testimony*

13    *under oath that materially affects the proceedings constitutes perjury."*)). Apple offers no response to the

14    fact that this witness's actions amount to obstruction of justice. This same witness was instrumental

15    in Apple's scheme to falsify the record of Plaintiff's termination, creating a complaint after the decision

16    to terminate had already been made. This constitutes fraud on the court and necessitates

17    disqualification. (*See Combs v. Rockwell Int'l Corp.*, 927 F.2d 486, 488 (9th Cir. 1991) (*"When an attorney*

18    *is complicit in falsifying evidence, disqualification is necessary to preserve the fairness of proceedings."*)).

19        20.    The record clearly establishes that Apple engaged in coercion and intimidation by

    pressuring Appleseed to assist in its retaliation against whistleblowers, including Plaintiff. As

20    documented in the NLRB case no. 32-CA-282396, the U.S. government has already found substantial

21    evidence that by Sept. 1 2021, Apple made Appleseed's continued employment conditioned on her

22    abandonment of protected NLRA activities and that Apple made illegal threats to stop the protected

23    NLRA activities Appleseed already started. (Id at 5-6, 9). At this time Plaintiff had an open NLRB

24    charge against Apple, and the exact same external counsel were representing Apple on both Plaintiff

25    and Appleseed's cases (MWE, a *"union avoidance"* firm).

26        21.    During this same time frame, the NLRB found that Apple illegally threatened Plaintiff

27    and illegally terminated Plaintiff's employment in retaliation for Plaintiff's protected NLRA activities,

28    among other protected conduct (See Notice of Pendency). All of this lawless intimidation and coercion

converged on September 15, 2021, with Appleseed's coerced complaint against Plaintiff, which included Plaintiff's private nude photos.

22.    Then, on December 20, 2021, Apple's attorneys at McDermott Will & Emery (MWE)—the same firm handling Apple's legal defense against Plaintiff's NLRB charges—sent Appleseed a demand letter threatening her with litigation and potential financial ruin for alleged violations of a settlement agreement. (*see Declaration*). This letter was issued Appleseed was employed at Apple just a few weeks prior, and just weeks later she proceeded to report Plaintiff to law enforcement, including the police and FBI, and then initiated her lawsuit against Plaintiff. (*see Declaration*). Given this well-documented record (see exhibits), Apple's current attempt to distance itself from Appleseed or feign ignorance of her role is both disingenuous and contradicted by its own prior conduct.

23.    Around Feb. 1 2023, Appleseed publicly posted that she filed a complaint to the U.S. SEC about Apple, and as part of that complaint she disclosed (which was the first time Plaintiff learned this fact), that in late August 2021, her Global Security coworkers had been threatening her that she must condemn the Plaintiff for speaking out about work conditions, and on Sept. 15 2021, she was threatened that Apple was obtaining Plaintiff's private text messages and would find out that she spoke with Plaintiff about Plaintiff's privacy concerns and could be fired for not openly condemning Plaintiff's protected activities – leading her to file the complaint, which became Apple's key evidence in their farcical defense. (*see Declaration*). Appleseed noted in the SEC complaint that the complaint she filed for Apple against Plaintiff "*served no legal purpose.*" (Id.)

## V.  Apple is Feigning Amnesia & Withholding Information

24.    Apple's attorneys claiming they have never communicated with Appleseed is beyond absurd. Appleseed was the central and, in fact, only witness Apple relied on in the OSHA investigation, providing testimony and evidence that directly led to the dismissal of the case against Apple. If Apple truly never communicated with Appleseed, then how did they acquire and submit her evidence? How did she know to repeatedly contact OSHA in Apple's defense? Apple's own filings in the OSHA matter confirm that they relied on Appleseed's statements as a key justification for their actions against me—yet now they want to pretend they have no connection to her? Either they are blatantly lying, or they are admitting to a level of negligence that is legally indefensible.

25.    Apple's attempt to distance itself from Appleseed is barred by judicial estoppel, which

— 6 —

1    prevents parties from taking contradictory positions in different legal proceedings. The U.S. Supreme

2    Court has made clear that "[w]here a party assumes a certain position in a legal proceeding, and

3    succeeds in maintaining that position, he may not thereafter assume a contrary position, simply because

4    his interests have changed." *New Hampshire v. Maine,* 532 U.S. 742, 749 (2001). Here, Apple

5    successfully relied on Appleseed's testimony to defend itself before OSHA. Now, faced with the reality

6    that their connection to Appleseed is legally inconvenient, Apple reverses course and denies any

7    relationship. Such a blatant contradiction is precisely what judicial estoppel is designed to prevent. See

8    also *Rissetto v. Plumbers & Steamfitters,* 94 F.3d 597, 600 (9th Cir. 1996) (holding that judicial estoppel

     applies even when a party's initial position was made in an administrative proceeding, like OSHA).

9    

10       26.    If Apple falsely stated in this litigation that they never communicated with Appleseed,

11   while simultaneously using her as their sole witness in the OSHA matter, that would constitute fraud

12   on the court. Courts have held that "[t]ampering with the administration of justice in the manner

13   indisputably shown here involves far more than an injury to a single litigant. It is a wrong against the

14   institutions set up to protect and safeguard the public." *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*,

15   322 U.S. 238, 246 (1944). Fraud on the court occurs when a party engages in "an unconscionable plan

16   or scheme" to mislead the tribunal. *Pumphrey v. K.W. Thompson Tool Co.*, 62 F.3d 1128, 1131 (9th Cir.

17   1995). If Apple deliberately withheld information about its communications with Appleseed or falsely

     claimed there were none, then they have engaged in precisely the kind of deception courts condemn.

18       27.    If Apple is not outright lying and truly never communicated with Appleseed, then their

19   actions reflect gross negligence in submitting unverified, uncorroborated information to a federal

20   agency. Courts have long held that a party submitting evidence has a duty to ensure its reliability. For

21   instance, in *Napue v. Illinois,* 360 U.S. 264 (1959), the Supreme Court found that knowingly presenting

22   false or misleading testimony constitutes misconduct. Similarly, in *Brady v. Maryland,* 373 U.S. 83

23   (1963), the Court underscored that material evidence must be properly disclosed and verified. By

24   Apple's own admission, it used Appleseed's statements as a justification for my termination, yet now

25   claims it never followed up, questioned Appleseed's credibility, or verified the plaintiff's claims. That

     kind of reckless disregard for the truth is not only irresponsible but legally indefensible.

26       28.    Allowing a corporation like Apple to weaponize an unverified witness for its benefit in

27   one proceeding, only to later disown that witness when challenged, undermines the integrity of both

28   administrative and judicial processes. The judicial system relies on parties acting in good faith and

— 7 —

maintaining consistent positions. If Apple is permitted to get away with such a blatant contradiction, it sends a dangerous signal that large corporations can manipulate government agencies and courts at will, without consequence.

29.    Furthermore, OSHA and other administrative agencies depend on accurate, truthful information to ensure workplace safety and whistleblower protection. If Apple truly submitted Appleseed's statements without ever communicating with her, that would mean they influenced a federal agency's decision without exercising due diligence—a reckless practice that should not be tolerated. As the Ninth Circuit has noted, when parties submit false or misleading statements in official proceedings, it "corrupts the truth-seeking function of the process" and "undermines public confidence in the fairness of government adjudications." *United States v. Estate of Hage*, 810 F.3d 712, 720 (9th Cir. 2016). Fortunately - now we have the chance to adjudicate and litigate these claims properly under California labor laws like 6310, 1102.5 and the Tameny termination in violation of public policy tort.

30.    Plaintiff learned the Sept. 15 2021 complaint including nude photos of her through a FOIA request to OSHA, despite OSHA delaying a year and attempting to get Plaintiff to give up on her request. In addition to the nude photos, Plaintiff also discovered Apple lied about the supposed Informed Consent Form they say she signed related to the Gobbler application. Plaintiff has requested a copy of this ICF from Apple repeatedly and they refuse to provide her a copy but insist she "consented." Apple either lost the ICF records, or the document is so illegal Apple knows it cannot be shared outside the company – because it told OSHA it provided the document but instead provided a general NDA for a completely different program that took place over a year after Apple signed Plaintiff up for Gobbler. Apple intentionally redacted the headers and documented information that would have revealed it was a different document than what they told OSHA it was. (*see Declaration*). Plaintiff had also complained to OSHA in 2022 that Apple's position statement, made under penalty of perjury, referenced multiple meetings that never happened, and emails that were never sent – and when asked for documentation, Apple had nothing to provide OSHA, because Apple lied. (*see Declaration*).

31.    Defendant and OSHA both knew how harmful this information is to Apple's position, especially following Appleseed's retaliatory lawsuit against Plaintiff in 2022 over Plaintiff's federal complaints against Apple. In Apple's Dec. 18 2023 General Order 71 disclosures, Apple attempted to intimidate and coerce the Plaintiff to not try to file FOIA requests to NLRB or U.S. Dept of Labor related to her Apple complaints. Apple's counsel argued to her in the disclosures that "the FOIA is not

— 8 —

intended to function as a private discovery tool." (*see Declaration*).

32.     At its core, Apple's argument in its Opposition is either a blatant lie or an admission of gross misconduct. They do not get to use Appleseed's statements when it benefits them and then pretend, she doesn't exist when it doesn't. The record is clear: Apple and Appleseed were in communication, and Apple leveraged her testimony and actions when it suited them. They don't get to disown that relationship now.

## VI.   OMISSIONS & DIVERSIONS

33.     "A lawyer's misconduct, including falsification of records or participation in witness intimidation, may serve as grounds for disqualification." *United States v. Talao*, 222 F.3d 1133, 1139 (9th Cir. 2000). "Disqualification is appropriate when an attorney's prior representation or misconduct prejudices the integrity of judicial proceedings." *Openwave Sys. Inc. v. Myriad France S.A.S.*, 2011 WL 1225978, at *2 (N.D. Cal. Apr. 1, 2011). One of the most fundamental and determinative facts in evaluating the disqualification issue is the date when Apple's counsel first began providing legal advice related to Plaintiff. If that date were, for example, December 2021, then Apple's attorneys would have a much stronger argument that they had not played a material role in the September 2021 termination decision. However, if the date were instead May 2021—or even earlier—then that would present a serious and undeniable conflict, as it would confirm that Apple's current counsel was directly involved in the decision-making leading up to Plaintiff's termination.

34.     If Apple had a clean answer that supported their position, they would have every incentive to provide it clearly and enthusiastically. Instead, they have refused to disclose this crucial information and are attempting to distract the Court by improperly shifting the focus to protective orders and discovery disputes—issues entirely irrelevant to the threshold disqualification question.

35.     The Ninth Circuit has recognized that when a party withholds key information that should be readily available, it raises a strong inference that the truth is unfavorable to them. See *In re Napster, Inc. Copyright Litig.*, 479 F.3d 1078, 1092 (9th Cir. 2007) (finding that a party's refusal to provide material evidence supported an inference that the withheld information was averse to their position).

36.     Moreover, courts have held that when a party facing disqualification deliberately evades providing a key fact that would resolve the dispute, it suggests bad faith. In *Clark v. Superior Court,* 196 Cal. App. 4th 37, 52 (2011), the court stated that "[w]hen a party in exclusive possession of material

— 9 —

1    information refuses to provide it, an adverse inference may be drawn." Apple's refusal to disclose this

2    one essential date—the first moment its counsel became involved—suggests that disclosure would

3    reveal a conflict so clear and undeniable that it would compel disqualification.

4        **37.**    Apple's legal team has engaged in a pattern of harassment against Plaintiff through

5    anonymous social media accounts, with the timing of these attacks closely aligning with key

6    developments in employment cases involving Apple. These bursts of online harassment were not

7    random; rather, they escalated at pivotal moments, including major filings, hearings, and investigative

8    actions. (*see Declaration*). Given the sophisticated coordination and insider knowledge required to time

9    these incidents with litigation events, and the language used being similar and very similar to the

10   language of an attorney,  the evidence strongly suggests that Apple's counsel, or individuals acting

11   under their direction, were involved in an effort to intimidate and retaliate against Plaintiff through

12   extrajudicial means. Such conduct violates professional ethics and legal prohibitions against attorney

13   misconduct, including the duty to refrain from conduct prejudicial to the administration of justice. See

14   ABA Model Rule 8.4(d) ("It is professional misconduct for a lawyer to engage in conduct that is

15   prejudicial to the administration of justice."); see also California Rule of Professional Conduct 8.4.1

16   (prohibiting discrimination, harassment, and retaliation by attorneys).

17       **38.**    Further demonstrating this pattern of misconduct, Appleseed's lawsuit against Plaintiff

18   commenced immediately after Apple was required to file an answer in the U.S. Department of Labor

19   case. Instead of timely responding, Apple repeatedly sought extensions and strategically delayed its

20   answer until after securing a gag order against Plaintiff on March 4, 2022. (*see Declaration*). This timing

21   was not coincidental. The delay ensured that if Plaintiff discovered and attempted to expose Apple's

22   and Appleseed's misuse of her private images—including the unauthorized distribution of her nude

23   photographs—she could be subjected to incarceration for speaking out. Such conduct constitutes an

24   abuse of the judicial process and violates established case law prohibiting strategic litigation conduct

25   designed to suppress adverse information. See *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44 (1991)

26   ("[F]raud on the court includes conduct that abuses the judicial process in a manner inconsistent with

27   the orderly administration of justice."); see also *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 764 (1980)

28   (holding that courts have inherent authority to sanction parties who engage in bad-faith litigation

     practices).

         **39.**    The deliberate synchronization of these events—harassing social media attacks, legal

— 10 —

delays, and the strategic use of gag orders—reflects a calculated campaign to intimidate and suppress Plaintiff. Apple's actions go beyond aggressive litigation tactics and enter the realm of unlawful retaliation and witness intimidation. Courts have routinely recognized that retaliatory legal actions designed to silence a party or suppress evidence constitute an abuse of process and may warrant sanctions. See *U.S. ex rel. Newsham v. Lockheed Missiles & Space Co.,* 190 F.3d 963, 970 (9th Cir. 1999) ("The right to petition includes the right of access to courts, but that right does not extend to litigation that is a mere sham to cover an abuse of process."). The Court should not allow Apple to benefit from its misconduct, nor should it permit the continued abuse of legal mechanisms to silence Plaintiff.

## VII.  APPLE'S ATTEMPT TO USE PLAINTIFF'S PRIVATE IMAGES AS A DEFENSE AND THREAT

40.    Apple has further demonstrated bad faith litigation tactics by attempting to justify Plaintiff's termination based on a fabricated intellectual property claim over her own nude images. Apple's key witness obtained and distributed Plaintiff's private photos, and Apple has since attempted to use these images to justify Plaintiff's firing under a disturbing claim of property ownership over her body. Apple and its counsel engaged in post hoc justifications for termination, weaponizing Plaintiff's personal privacy against her.

41.    Apple's recent attempts to downplay Appleseed's involvement and dismiss the significance of the email containing Plaintiff's intimate images are both factually incorrect and legally indefensible. Apple asserts that the email was not part of the termination decision, which is technically accurate only because the email was sent six days after Plaintiff's termination. However, this argument overlooks the critical context: the email was part of a post-termination effort to fabricate a justification for the retaliatory firing. Appleseed admitted she sent the email under coercion from Apple and acknowledged it lacked any legitimate legal purpose.

42.    If Apple now contends that the email is legally irrelevant, then its own actions— repeatedly referencing the email in official proceedings, including its OSHA position statement where the email was cited and attached—were also without legal merit. This pattern of behavior aligns with harassment and retaliation, precisely as Plaintiff alleges. Moreover, Apple's portrayal of Appleseed as an uninvolved third party is contradicted by the facts. Appleseed was Apple's sole witness in the OSHA investigation, yet Apple deliberately omitted her from its initial disclosures, creating a false impression of her non-involvement. Appleseed not only provided the primary witness statement for Apple but also

1    proactively contacted OSHA to advocate for the dismissal of Plaintiff's case and reported Plaintiff's

2    protected disclosures and complaints as misconduct. These actions demonstrate a concerted effort by

3    Apple to retaliate against Plaintiff and manipulate the investigatory process.

4          43.    Apple's counsel also claim that the email does not include any nude photographs,

5    however, the email (*see Declaration*), clearly shows the first message that Appleseed distributed to

6    Apple included Plaintiff introducing the photo as "More boobs…. Nips removed." (Plaintiff meant

7    *redacted*). In the conversation, which was filed to Apple in the Sept. 15 2021 complaint, Plaintiff

8    complained to Appleseed (a member of Apple's Global Security team and someone who potentially

9    could impact Apple's surveillance policies), that she has "nudes in this too that [she] thinks get

10    uploaded [to Apple]." When Apple filed its statement to OSHA, Apple redacted the photo of Plaintiff's

11    breasts and also omitted Plaintiff's complaint about nude photos, including surrounding text but

12    replacing the complaint about Apple hoarding non-consensual nude photos of the plaintiff., with an

13    ellipsis. (*see Declaration*). Apple knew and knows that its claim was absurd and highly offensive. Apple

14    demanded that Apple treat its position statement (its only real Answer its filed in 3 years), be treated

15    as Confidential information.

16          44.    Apple's response to this motion is not only legally deficient but also a blatant

17    continuation of the very misconduct Plaintiff has alleged. This is an ongoing effort to silence her

18    through threats of punishment while they continue to violate her rights. The plaintiff has already

19    alleged that Apple conspired with Appleseed to retaliate against her and suppress her complaints about

20    their misconduct. Apple's latest demand for a protective order is merely a further escalation of this

21    strategy. Instead of addressing the serious ethical concerns raised in this motion to disqualify, Apple is

22    now asking this Court to actively participate in silencing Plaintiff by imposing judicial sanctions if she

23    continues to speak out about their ongoing violations. Apple is not seeking a protective order in good

24    faith—it is attempting to co-opt the Court's authority to further its unlawful retaliation.

### VIII.   Apple's Newly Raised Arguments Are Misleading and Irrelevant

25          45.    Rather than substantively rebutting Plaintiff's arguments, Apple raises several new,

26    misleading points in its opposition. These include: a mischaracterization of Plaintiff's legal claims; a

27    baseless assertion that disqualification would "prejudice" Apple; and an attempt to shift blame onto

28    Plaintiff for Apple's own misconduct. Apple fails to explain how disqualifying conflicted counsel would

prejudice a corporation with vast legal resources. Courts routinely hold that a party's choice of counsel is not an absolute right when ethical violations are present. (*See In re Cendant Corp. Sec. Litig., 124 F. Supp. 2d 235, 238 (D.N.J. 2000)*). Further, Apple's already hired four different law firms on this matter.

46.     Apple asserts that removing Orrick would unfairly prejudice its ability to defend against Plaintiff's claims.: Courts have consistently held that attorney disqualification is warranted when an advocate's continued representation would create an unfair advantage or compromise the integrity of the proceedings. The fact that disqualification may inconvenience Apple does not outweigh the ethical violations at issue. Apple falsely claims that Plaintiff unreasonably delayed filing this motion. In reality, Plaintiff moved for disqualification promptly after obtaining evidence of misconduct. The Ninth Circuit has ruled that a party seeking disqualification must act diligently, and Plaintiff has met this standard (*See Openwave Sys. Inc. v. Myriad France S.A.S.*, 2011 WL 1225978, at *2 (N.D. Cal. Apr. 1, 2011)). Further, Apple is the party that has repeatedly refused to engage in good faith discovery discussions, evaded Court-ordered disclosures, and stonewalled depositions. If any party is engaged in delay tactics, it is Apple. The Plaintiff has no incentive to delay.

## IX.  Environmental Law is Complicated & important.

47.     Apple's opposition to this motion to disqualify completely ignores one of the most fundamental issues: their attorneys are not environmental lawyers, yet they insist on litigating a case that is at its core, an environmental and toxic tort claims (including much of the protected activity that is the basis of the retaliation claims). Throughout this litigation, Apple's counsel has categorically refused to engage in any substantive discussion of environmental law or science, dismissing these issues as "irrelevant" simply because they do not serve Apple's goal of getting the case dismissed. Apple's position is not based on the actual legal or factual merits—it is based entirely on what is most convenient for them procedurally. This is not how litigation is supposed to work, and it raises serious concerns about their ability to competently represent their client in this case.

48.     Attorneys handling environmental and toxic tort litigation are required to have the necessary legal and scientific competence to understand and engage with the complex factual and regulatory issues at stake. The American Bar Association's Model Rule 1.1 mandates that attorneys provide "competent representation," which includes the legal and technical knowledge required for the case. Courts have repeatedly recognized that where an attorney lacks the expertise necessary for a particular field of law, they must either acquire the knowledge, associate with specialists, or decline

— 13 —

representation altogether. Instead of meeting this ethical obligation, Apple's attorneys have taken the opposite approach: they have attempted to narrow the scope of this case to avoid addressing the environmental claims at all, rather than ensuring they are qualified to litigate them. Their refusal to engage in discussions of environmental science and law is not just bad lawyering, it is a deliberate litigation strategy designed to sidestep the core merits of the case. This is not a good-faith defense; it is a blatant attempt to manipulate the court process to avoid accountability.

49.    Apple's failure to address this argument in its opposition speaks volumes. If Apple's attorneys had a legitimate basis to claim they are competent to litigate an environmental and toxic tort case, they would have said so. Instead, they simply pretend the issue doesn't exist, much like they pretend the environmental violations themselves do not exist. This Court should not permit Apple's attorneys to use procedural tactics to evade the core legal and factual issues of this case, particularly when their own lack of expertise in environmental law is a key reason, they continue to misrepresent the scope and relevance of Plaintiff's claims.

## X. Juvinall's Abrupt Withdrawal

50.    Apple's legal team repeatedly argued that there is no conflict of interest requiring disqualification and that Apple never engaged in harassment or misconduct. They even went as far as to weaponize Plaintiff's filing of an NLRB complaint—which explicitly raised concerns about Apple's counsel threatening the plaintiff regarding a protective order and discovery—as supposed evidence of plaintiff's own improper conduct.

51.    Yet, two days ago, the very Orrick attorney at the center of those threats and the NLRB charge (Kate Juvinall, *esq.*) suddenly withdrew from representation, with a new Orrick attorney taking her place. (Dkt. No. 169). This abrupt withdrawal directly contradicts Apple's prior representations to the court. If there were truly no conflict and no misconduct, why did Apple's attorney—who had been involved from the beginning—remove herself from the case at this critical moment? The timing makes it clear: there was a conflict, there was a basis for disqualification, and instead of acknowledging it, Apple's attorneys deliberately misled this Court.

52.    This kind of bad faith litigation conducts warrant scrutiny under well-established legal precedent. Courts have long held that attorneys cannot misrepresent material facts to avoid disqualification, only to later take actions that reveal the truth. In *Gas-A-Tron of Ariz. v. Union Oil Co. of Cal.,* 534 F.2d 1322 (9th Cir. 1976), the Ninth Circuit affirmed that disqualification is warranted

— 14 —

1    where an attorney's prior conduct gives rise to ethical concerns, and failing to disclose such conflicts

2    can compromise the fairness of the proceedings. Similarly, in *People ex rel. Dep't of Corps. v. SpeeDee Oil*

3    *Change Sys., Inc.*, 20 Cal. 4th 1135 (1999), the California Supreme Court emphasized that a conflict

4    requiring disqualification exists when an attorney's prior actions could materially affect their ability to

5    represent a client impartially and ethically—even if the attorney denies the conflict.

6        53.    Furthermore, the timing of this withdrawal underscores the deceptive nature of Apple's

7    litigation tactics. In *Alexander v. Primerica Holdings, Inc.,* 10 F.3d 155 (3d Cir. 1993), the Third Circuit

8    held that an attorney's withdrawal—when done in a manner that suggests prior misrepresentations to

9    the court—can itself be grounds for sanctions. This is precisely what has happened here. Apple's

10   counsel fought disqualification, denied conflicts, and tried to gaslight the Court into believing there

11   was no misconduct, only to quietly remove the attorney in question once the scrutiny intensified. Such

     tactics erode the integrity of judicial proceedings and should not be tolerated.

12   ## XI. CONCLUSION

13       54.    Apple's opposition fails to meaningfully rebut Plaintiff's core arguments for

14   disqualification. Instead, it relies on obfuscation, misrepresentation, and outright contradictions.

15   Apple's legal team is directly implicated in the actions giving rise to this lawsuit, rendering continued

16   representation improper under binding precedent. Apple's Counsel's role as material fact witnesses

17   mandates disqualification (*Kennedy v. Eldridge*, *People v. Bell*). Their involvement in fabricating

18   evidence further supports removal (*United States v. Talao*). Their abuse of privilege to hide

19   employment decisions is legally improper (*Wellpoint Health Networks*, *United States v. Ruehle*). Their

20   contradictions on discovery scope are sanctionable (*Payne v. Exxon Corp.*, *Nat'l Ass'n of Radiation*

21   *Survivors*). The Court should reject Apple's attempt to shield its counsel from the consequences of

22   their misconduct. Disqualification is necessary to preserve the integrity of these proceedings. For the

23   foregoing reasons, Plaintiff respectfully requests that the court: Grant Plaintiff's Motion to Disqualify

24   Orrick, Herrington & Sutcliffe LLP; bar Orrick from further representation of Apple in this matter;

     and Order Apple to identify new, non-conflicted counsel within a reasonable timeframe.[1]

25

26   Dated: Feb. 21 2025

27

28   _____

     [1] OMM and MWE are also conflicted for similar reasons.

     — 15 —

1

2

3

4

**/s/ Ashley M. Gjovik**

*Pro Se Plaintiff*

**Email**: legal@ashleygjovik.com

**Physical Address**:

Boston, Massachusetts

**Mailing Address:**

2108 N St. Ste. 4553 Sacramento, CA, 95816

**Phone**: (408) 883-442

— 16 —

**Ashley M. Gjovik, JD**
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

**ASHLEY GJOVIK**, *an individual*,

    Plaintiff,


    vs.


**APPLE INC**, a corporation,

    Defendant.

**Judge**: The Honorable Edward Chen

**Case No.** 3:23-CV-04597-EMC


**Ashley Gjovik's Declaration**

**in Support of Plaintiff's Reply**

**re: Plaintiff's Motion to Disqualify**

Civil L.R. 7-3, 7-5

# DECLARATION OF ASHLEY M. GJOVIK IN SUPPORT OF PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO DISQUALIFY ORRICK, HERRINGTON & SUTCLIFFE LLP

Pursuant to 28 U.S.C. § 1746, I, Ashley M. Gjovik, hereby declare as follows:

My name is Ashley Marie Gjovik. I am a self-represented Plaintiff in this above captioned matter. I make this Declaration based upon my personal knowledge and in support of my pending Motion to Disqualify the Defendant's counsel]. I have personal knowledge of all facts stated in this Declaration, and if called to testify, I could and would testify competently thereto.

I submit these exhibits in support of my Motion & Reply because they are directly relevant to Apple's opposition and to the key factual issues before the Court. It is well established that courts may consider extrinsic evidence when ruling on a motion to disqualify counsel (*In re Complex Asbestos Litig.*, 232 Cal. App. 3d 572, 588 (1991)). Courts recognize that motions to disqualify opposing counsel are fact-intensive and require an examination of the record and supporting evidence (*SpeeDee Oil Change Sys., Inc.*, 20 Cal. 4th 1135, 1145 (1999)).

Additionally, courts permit parties to submit new evidence in reply if it rebuts arguments made in the opposition Because Apple's opposition contains factual misstatements, mischaracterizations, and omissions, Plaintiff submits these exhibits to correct the record and provide the Court with the necessary factual basis to resolve the motion. Courts have broad discretion to consider documents submitted with motions and declarations when they assist in ruling on a motion. Because these exhibits establish Apple's attorneys' conflicts of interest, their involvement in retaliatory conduct, and their manipulation of legal proceedings, they are directly relevant to Plaintiff's disqualification motion.

1.  Attached hereto as Exhibit A is a true and correct copy of Defendant's discovery responses, claiming Attorney Client Privilege for facts over a six-month period, as referenced on page 2 of the Reply.

2.  Attached hereto as Exhibit B is a true and correct copy of Defendant's initial disclosures, which do not include it's only witness for the U.S. Dept. of Labor proceeding, and responses to Request for Production, which refuse production, as referenced on page 3 of the Reply.

3.  Attached hereto as Exhibit C is a true and correct copy of the April 1 2024 Meet & Confer transcript, documenting quoted text on multiple pages in the Reply.

4.  Attached hereto as Exhibit D is a true and correct copy of the documents related to Apple's legal interactions with Appleseed, as mentioned on page 5-6 of the Reply.

5.  Attached hereto as Exhibit E is a true and correct copy of Defendant's communications with U.S. Dept. of Labor in the Ashley Gjovik v. Apple Inc OSHA investigation, and the OSHA investigation log, showing Appleseed as the only witness, as referenced on multiple pages of the Reply.

6.  Attached hereto as Exhibit F is a true and correct copy of Apple's counsel's request for copies of court records from Appleseed's lawsuit against the Plaintiff, and the notices of appearance for MWE and Orrick, as mentioned in the Reply.

7.  Attached hereto as Exhibit G is a true and correct copy of Appleseed's communications with OSHA as a defense witness for Apple, as released by U.S. Dept of Labor in Dec. 2024, and mentioned in the Reply.

8.  Attached hereto as Exhibit H is a true and correct copy of the chapter in my U.S. Dept. of Labor complaint that Apple reported to OSHA as "leaking," which includes information that reveals Apple filed a falsified Informed Consent Form for the Gobbler study, as referenced on page 8 of the Reply. ].

9.  Attached hereto as Exhibit I is a true and correct copy of some of the social media posts I alleged that I believe are not only Apple, but I now believe are the Orrick attorneys, as referenced on page 10 of the Reply.

The documents attached as exhibits are referenced in my Reply and provide supporting evidence for the arguments therein. These documents include records produced by Apple, communications, court filings, agency determinations, and other materials directly relevant to the issues before the Court.

Finally, Apple's counsel also accuses me of misconduct due to typos in my legal citations in my motion, and accuses me of using AI to generate the complaint. I already disclosed I started using AI tools to assist me after Judge Chen warned me I cannot be late on deadlines – because I was already trying to finish as quickly as I could, and without additional resources, or extensions, then the quality is what must

suffer, unfortunately. I did confirm all four cases are relevant and they do support my arguments. However, the complaint unfortunately used quotes around summaries (not actually quotes), and the citations for *Smith v. Superior Court* were slightly incorrect, with the correct citation being *Smith v. Superior Court*, 68 Cal.2d 547, 68 Cal. Rptr. 1, 440 P.2d 65 (Cal. 1968).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 24th day of February 2025, in Boston, Massachusetts

Signature:



_____

**/s/ Ashley M. Gjovik**
*Pro Se Plaintiff*

**Email**: legal@ashleygjovik.com
**Physical Address**: Boston, Massachusetts
**Mailing Address:** 2108 N St. Ste. 4553 Sacramento, CA, 95816
**Phone**: (408) 883-4428

**Ashley M. Gjovik, JD**
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# United States District Court

## Northern District of California

|  |  |
|---|---|
| | U.S. District Court Case No. 3:23-CV-04597 |
| | The Honorable Edward. M. Chen |
| **Ashley M. Gjovik**, | U.S. Court of Appeals Case No. 24-6058 |
| *an individual*, | |
| | **Motion to Stay Dist. Court Proceedings Pending Appeal** |
| Plaintiff, | Fed. R. App. P. 8(a)(1); 28 U.S.C. § 1292(a) |
| | **Plaintiff's Memorandum of Points & Authorities** |
| vs. | Filed: Oct. 22 2024 |
| | |
| | **Motion Hearing:** |
| **Apple Inc.**, | **Dept**: Courtroom 5, 17th Floor or Zoom |
| *a corporation*, | *See Admin. Motion re: connection issues* |
| | **Judge**: The Honorable Edward M. Chen |
| Defendant. | **Date**: Dec. 19 2024 (first availability) |
| | **Time**: 1:30 P.M. PT |
| | |
| | **UPCOMING DEADLINES:** |
| | Oct. 29 2024 – Fifth Amended Complaint |
| | *See Motion to Extend/Stay Deadline* |

# TABLE OF CONTENTS

I.  TABLE OF AUTHORITIES ...................................................................... iii

II.  Summary ......................................................................................... 2

    A.  Statement of Facts & Procedural History ........................................ 3

    B.  Nature and Status of the Case.......................................................... 7

III.  Issues to be Decided ................................................................... 9

IV.  Arguments in Support of a Motion to Stay.................................... 9

    C.  This appeal raises serious questions. .............................................. 9

    D.  Likelihood of Success on the Merits ...............................................13

    E.  Plaintiff will be irreparably injured if a stay is denied & granting a stay also primarily prejudices the Plaintiff. .................................... 20

    F.  The Public Interest ...................................................................... 22

    G.  Judicial Economy ........................................................................ 24

V.  Conclusion ................................................................................ 26

1    ## I. TABLE OF AUTHORITIES

2    **Supreme Court Cases**

3    *Abbott v. Perez*, 138 S. Ct. 2305, 2319 (2018) ....................................14

4    *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 44 (1974) ............................... 23

5    *Carson v. American Brands, Inc.*, 450 U.S. 79, 84 (1981) .................................14

6    *Cobbledick v. United States*, 309 U.S. 323, 325 (1940) ..................................... 21

7    *Digit. Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 868 (1994 ..................17

8    *Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 374 (1981) ........................17

9    *Gelboim v. Bank of America Corp.*, 574 U.S. 405, 135 S. Ct. 897 (2015) .............. 9

10   *Griggs v. Provident Consumer Discount Co.,* 459 U.S. 56, 58,  (1982)................... 1

11   *Hall v. Hall*, 138 S. Ct. 1118, 1122 (2018) ......................................................... 9

12   *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987) ............................................. 20

13   *Niken v. Holder,* 556 U.S. 418, 421 (2009) ....................................................... 2

14   *Richardson Merrell, Inc. v. Koller*, 472 U.S. 424, 430-431 (1985)..................17, 18

15   *Will v. Hallock*, 546 U.S. 345, 351–52 (2006) ................................................. 24

16   **Trial and Circuit Court Cases**

17   *Al-Torki v. Kaempen*, 78 F.3d 1381, 1384–85 (9th Cir. 1996)............................13

18   *Arizona v. United States Dist. Court* (*In re Cement Antitrust Litig.*), 688 F.2d

19      1297, 1307 (9th Cir. 1982) .........................................................................19

20   *Armstrong v. Wilson*, 124 F.3d 1019, 1021 (9th Cir. 1997)................................... 1

21   *Art Attacks Ink, LLC v. MGA Ent., Inc.,* No. 04-CV-1035-BLM, 2006 WL

22      8439887, at \*4 (S.D. Cal. June 21, 2006) ....................................................17

23   *Auster Oil Gas, Inc. v. Stream*, 764 F.2d 381, 386 (5th Cir. 1985) ......................16

24   *Barnes v. Sea Hawaii Rafting, LLC*, 889 F.3d 517, 537 (9th Cir. 2018............... 20

25   *Batzel v. Smith*, 333 F.3d 1018, 1025 (9th Cir. 2003) .........................................15

26   *Bauman v. United States District Court,* 557 F.2d 650, 654–55 (9th Cir.1977) .....19

27   *Beery v. Hitachi Home Electronics America, Inc.*, 157 FRD 477, 480; U.S. (C.D.

28      C.A. 1993) .................................................................................................16

*Bonanno v. Thomas,* 309 F.2d 320, 322 (9th Cir. 1962) .......................................16

*Buckingham v. Gannon (In re Touch America Holdings, Inc. ERISA Litig.)*, 563 F.3d 903, 906 (9th Cir. 2009) (per curiam).........................................................15

*Calderon v. United States Dist. Court,* 134 F.3d 981, 984 (9th Cir. 1998) ............19

*Cheney v. United States District Court,* 542 U.S. 367, 380– 81 (2004). ...............19

*City of Los Angeles v. Santa Monica Baykeeper*, 254 F.3d 882, 885-86 (9th Cir. 2001) .................................................................................................... 1

*City of Los Angeles v. Santa Monica Baykeeper*, 254 F.3d 882, 886 (9th Cir. 2001) 1

*Cook, Perkiss Liehe v. N.C. Collection Serv*, 911 F.2d 242, 247 (9th Cir. 1990)16, 17

*Cordoza v. Pac. States Steel Corp.,*320 F.3d 989, 998 (9th Cir.2003) .................19

*Cunningham v. Gates*, 229 F.3d 1271, 1284 (9th Cir. 2000) .............................. 20

*Does I thru XXIII v. Advanced Textile Corp.,* 214 F.3d 1058, 1066–67 (9th Cir. 2000).........................................................................................................14

*E.E.O.C. v. Alia Corp.*, 842 F.Supp.2d 1243, 1250 (E.D. C.A. 2012) .................16

*Erlich v. Glasner,* 352 F.2d 119, 122 (9th Cir. 1965) .........................................17

*Fantasy, Inc. v. Fogerty,* 984 F.2d 1524, 1528 (9th Cir. 1993)...........................17

*Gjovik v. Apple Inc*, Ninth Circuit Case No. 24-6058 ........................................ 1

*Gjovik v. Apple Inc.*, 23-cv-04597-EMC (N.D. Cal. Aug. 22, 2024) ................... 8

*Gjovik v. Apple Inc.*, 23-cv-04597-EMC (N.D. Cal. Jan. 30, 2024)..................... 8

*Gjovik v. Apple Inc.*, 23-cv-04597-EMC (N.D. Cal. May. 20, 2024) ............... 4, 8

*Gjovik v. Apple Inc.*, 23-cv-04597-EMC (N.D. Cal. Oct. 1, 2024) ...............3, 5, 8

*Guifu Li v. A Perfect Franchise, Inc.*, No. 5:10-CV-01189-LHK, 2011 WL 2293221, at *3 (N.D. Cal. June 8, 2011) ................................................................. 10

*Hall v. City of Santa Barbara*, 833 F.2d 1270, 1274 (9th Cir. 1986) ...................16

*Jackson v. Roe*, 425 F.3d 654 (9th Cir. 2005) .................................................19

*Koshak v. Malek,* 200 Cal.App.4th 1540, 1542 (2011). ....................................17

*Leiva-Perez v. Holder*, 640 F.3d 962, 971 (9th Cir. 2011) ............................. 2, 3

*Martinez-Gonzalez v. Elkhorn Packing Co.*, Case No. 18-cv-05226-EMC, 3 (N.D.

— iv —

1    Cal. Feb. 13, 2020) ................................................................................. 10

2    *Medhekar v. United States Dist. Court,* 99 F.3d 325, 327 (9th Cir. 1996) (per

3    curiam) ...................................................................................................19

4    *Medhekar v. United States District Court*, 99 F.3d 325, 327 (9th Cir.1996) ......... 18

5    *Miller v. Gammie*, 335 F.3d 889, 895 (9th Cir.2003) (en banc) .........................19

6    *Mohamed v. Technologies,* 115 F. Supp. 3d 1024, 1028 (N.D. Cal. 2015) .............. 2

7    *Mohamed v. Technologies*, 115 F. Supp. 3d 1024, 1028-29 (N.D. Cal. 2015) ........ 22

8    *Morse v. Servicemaster Glob. Holdings, Inc.*, No. C 08-03894, 2013 WL 123610, at

9    *3 (N.D. Cal. Jan. 8, 2013) ..................................................................... 10

10   *Negrete v. Allianz Life Ins. Co. of North America*, 523 F.3d 1091, 1097 (9th Cir.

11   2008) ........................................................................................................15

12   *Nehmer v. U.S. Dep't of Agric.,* 494 F.3d 846, 856 n.5 (9th Cir. 2007) ............. 18

13   *Perry v. Schwarzenegger,* 591 F.3d 1147, 1157 (9th Cir.2009) ......................... 18

14   *Pilgram v. Lafave,* No. 12-CV-5304 GAF-EX, 2013 WL 12124126, at *5 (C.D. Cal.

15   Feb. 7, 2013) ...........................................................................................17

16   *Plata v. Brown*, 754 F.3d 1070, 1075 (9th Cir. 2014) ....................................... 20

17   *Plourde v. Massachusetts Cities Realty Co.,* 47 F. Supp. 668, 670 (D.Mass. 1942) 23

18   *Sagan v. Apple Computer, Inc.*, 874 F. Supp. 1072, 1077 (C.D. Cal. 1994) ...........16

19   *Scott v. Eversole Mortuary*, 522 F.2d 1110, 1112 (9th Cir. 1975)........................13

20   *Sidebotham v. Robison*, 216 F.2d 816, 826 (9th Cir. 1954)..................................16

21   *Solis v. Jasmine Hall Care Homes, Inc.*, 610 F.3d 541, 544 (9th Cir. 2010) ......... 18

22   *Southern Cal. Edison Co. v. Westinghouse Elec. Corp. (In re Subpoena Served on Cal.

23   Pub. Util. Comm'n)*, 813 F.2d 1473, 1479–80 (9th Cir. 1987) ........................ 18

24   *Special Invs. Inc. v. Aero Air Inc.*,360 F.3d 989, 993 (9th Cir.2004) ..................19

25   *Stein v. Wood*, 127 F.3d 1187, 1189 (9th Cir. 1997)........................................... 24

26   *Townley v. Miller*, 693 F.3d 1041, 1042 (9th Cir. 2012) .................................... 24

27   *Tri–State Generation & Transmission Ass'n, Inc. v. Shoshone River Power,* Inc., 874

     F.2d 1346, 1351 (10th Cir. 1989) ..............................................................14

28

*Visioneering Constr. Dev. Co. v. United States Fidelity Guar.,* 661 F.2d 119, 124 n. 6
    (9th Cir. 1981) ................................................................................................ 1

*Walmer v. United States DOD* 52 F.3d 851, 854 (10th Cir. 1995) ...................... 10

*Wirtz v. C P Shoe Corp.,* 336 F.2d 21, 30 (5th Cir. 1964) ................................. 23

*Z.A. ex rel. K.A. v. St. Helena Unified Sch. Dist., No.* 09-CV-03557-JSW, 2010 WL
    370333, at *2 (N.D. Cal. Jan. 25, 2010) .......................................................17

**Statutes**

15 U.S. Code § 78u-6 ......................................................................................... 5

18 U.S. Code § 1962(a) ...................................................................................... 5

18 U.S. Code § 1962(c) ...................................................................................... 4

18 U.S. Code § 1962(d) ................................................................................... 4, 5

18 U.S. Code § 3771 ......................................................................................... 18

28 U.S. Code § 1292(a) ................................................................................ 1, 14

28 U.S. Code § 1292(b) .................................................................................... 18

28 U.S. Code § 1407 ........................................................................................... 9

28 U.S. Code § 1651 ........................................................................................... 1

42 U.S.C. § 9601 *et seq.* ..................................................................................... 5

Cal. Business Code § 17200, *et seq* ............................................................. 4, 11

Cal. Civ. Code § 52.1 .......................................................................................... 4

Cal. Civ. Code § 52.7 .......................................................................................... 4

Cal. Labor Code § 1102.5 ......................................................................... 3, 4, 11

Cal. Labor Code § 232.5 .............................................................................. 3, 4

Cal. Labor Code § 6310 .............................................................................. 3, 4

Cal. Labor Code § 6399.7 ................................................................................ 10

Cal. Labor Code § 96(k) ..................................................................................... 3

Cal. Labor Code § 98.6 ................................................................................ 3, 4

**Rules & Regulations**

Fed. R. Civ. P. 12(b)(6) ..................................................................... 3, 9, 15, 16

Plaintiff's Motion to Stay | Case No. 3:23-CV-04597-EMC

Fed. R. Civ. P. 12(f) ................................................................. i, 3

Fed. R. Civ. P. 12(g) ............................................................ 12, 13

Fed. R. Civ. P. 12(h) ..................................................................13

Fed. R. Civ. P. 8........................................................................16

**Agency Adjudications**

Apple Inc, U.S. NLRB Case: 32-CA-282142; 32-CA-283161 ............................ 6

Apple Inc, U.S. NLRB Case: 32-CA-284428 ................................................... 6

Apple Inc, U.S. NLRB Case: 32-CA-284441 .................................................. 6

*Ashley Gjovik v Apple Inc*, OALJ 2024-CER-00001, *Ashley Gjovik v Apple Inc*, ARB
  2024-0060................................................................................. 6

*Ashley Gjovik v. Apple Inc,* RCI-CM-842830, Cal. Dept. of Labor DIR. .............. 7

PLEASE TAKE NOTICE that on DECEMBER 19 2024 at 1:30PM, in Judge Chen's virtual courtroom, before the Honorable Judge Edward Chen, I will, and hereby do, move for an order granting a Stay of Proceedings pending appeal to the Ninth Circuit. Note: Dec. 19 2024 is the first date that appears to be available. Plaintiff does not require oral arguments and would be grateful if the matter could be decided well before Dec. 19 2024 due to several deadlines and conferences occurring prior to that date.

1             **MOTION TO STAY: POINTS & AUTHORITIES**

2         1.      Plaintiff, Ashley Gjovik, respectfully submits the following

3 Memorandum of Points and Authorities in Support of Plaintiff's Motion to Stay

4 District Court Proceedings Pending Appeal (see, *Gjovik v. Apple Inc*, Ninth Circuit

5 Case No. 24-6058). Plaintiff's appeal is an appeal by right, filed under the

6 authority of 28 U.S. Code § 1292(a) and 28 U.S. Code § 1651. *Armstrong v. Wilson*,

7 124 F.3d 1019, 1021 (9th Cir. 1997).

8         2.      The Ninth Circuit approved the request for an appeal and issued a

9 briefing schedule on Oct. 4 2024. (Dkt. 114). Upon the acceptance of the appeal

10 and issuing of scheduling order, the District Court appears to have transferred

11 jurisdiction over the order and the subject matter under appeal. Fed. R. App. P.

12 5(d)(2). *City of Los Angeles v. Santa Monica Baykeeper*, 254 F.3d 882, 886 (9th Cir.

13 2001). As a general rule, while an appeal from an interlocutory order is pending,

14 the district court retains jurisdiction to continue with other stages of the case. *See*

15 *Plotkin v. Pac. Tel. & Tel. Co.*, 688 F.2d 1291, 1293 (9th Cir. 1982).

16         3.      Plaintiff does not know how these types of requests are supposed to

17 be filed (including to which court) with a pending appeal – so I have also filed a

18 copy to the Ninth Circuit docket as well.[1]

19         4.      I attempted to meet/confer with the Defendant on this matter. I

20 contacted the Defendant on Oct. 17 2024, and they did not respond until Oct. 21

21 2024. Defendant initially said they do not agree to "any stay of proceedings in the

22

23 [1] The Supreme Court has concluded that jurisdiction is transferred from a district court to a court of appeals upon the filing of a notice of appeal. *See Griggs v. Provident Consumer Discount Co.,* 459 U.S. 56, 58, 103 S.Ct. 400, 74 L.Ed.2d 225 (1982) (per curiam) ("The filing

24 of a notice of appeal is an event of jurisdictional significance — it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal."); *Visioneering Constr. Dev. Co. v. United States Fidelity Guar.,* 661 F.2d

25 119, 124 n. 6 (9th Cir. 1981) ("Once a notice of appeal is filed jurisdiction is vested in the Court of Appeals, and the trial court thereafter has no power to modify its judgment in the

26 case or proceed further except by leave of the Court of Appeals."). Thus, the filing of a notice of interlocutory appeal divests the district court of jurisdiction over the particular issues

27 involved in that appeal. *City of Los Angeles v. Santa Monica Baykeeper*, 254 F.3d 882, 885-86 (9th Cir. 2001).

28

— 1 —

NDCA case... including the scheduled settlement conference" and they will oppose "a request to stay the ... proceedings as well as any request to extend the deadline to file a Fifth Amended Complaint." They also notified me for the very first time that they plan on filing a Motion to Dismiss my pending appeal.

5.      Upon further questioning, the defendant responded again today on Oct. 22 2024 and revised their position to say they "do not agree to stay the district court proceedings while the Ninth Circuit decides if it has jurisdiction" but "as for the settlement conference, [Apple sees] no need to continue the scheduling conference on November 12, as it is simply a precursor to the settlement conference that is not yet scheduled. Further, [Apple is] not in a position to evaluate how Apple will respond to the 5AC because [Plaintiff has] not yet filed it and [Apple has] not had an opportunity to review." It is unclear if Defendant knows what they want right now. Please see *Exhibit C* attached to the Declaration in Support of the Motion to Extend for a copy of the email exchange.

## II.  SUMMARY

6.      A U.S. District Court has discretion to stay a case pending appeal. *Niken v. Holder,* 556 U.S. 418, 421 (2009). Plaintiff, Ashley Gjovik, respectfully requests that this Court issue a stay pending appeal of its Decision and Order, entered on Oct. 1 2024.[2] (Dkt. 112)

7.      This request is made in light of the substantial legal questions raised in the appeal, the likelihood of success on the merits, the majority of prejudice only impacting the Plaintiff herself, and the potential for irreparable harm if the pleading progresses further before the appellate court has had the opportunity to review the matter. *Mohamed v. Technologies,* 115 F. Supp. 3d 1024, 1028 (N.D. Cal. 2015) citing *Nken*, 556 U.S. at 433–34, 129 S.Ct. 1749; *Leiva-Perez v. Holder*, 640 F.3d 962, 971 (9th Cir. 2011).

---

[2] *Gjovik v. Apple Inc.*, 23-cv-04597-EMC (N.D. Cal. Oct. 1, 2024).

— 2 —

8.     A stay is necessary to preserve the status quo, encourage judicial economy, and ensure that the appeal can be adjudicated without the risk of irreversible consequences. Therefore, Plaintiff seeks this Court's consideration and approval to stay this case until the conclusion of the appellate process. *Callahan v. PeopleConnect, Inc.*, 20-cv-09203-EMC, 3 (N.D. Cal. Nov. 1, 2021).

A. <u>**Statement of Facts & Procedural History**</u>

9.     This lawsuit was filed on Sept. 7 2023 and as of today, Oct. 22 2024, no Answer has been filed from the Defendant, over thirteen months later. Plaintiff has revised her complaint once per request of the Defendant, twice per request of the court, and once on her own is her right. Plaintiff has been asked to amend her complaint again and the Defendant allowed to file another responsive motion.[3]

10.     This Court has now considered and issued substantive decisions on two Fed. R. Civ. P. 12(b)(6) Motions to Dismiss and two Fed. R. Civ. P. 12(f) Motions to Strike. After the Oct. 1 2024 decision, and prior to amending the complaint again as Ordered by the court, the following claims were approved to proceed:[4]

- *Tamney* termination in violation of public policy (full claim)
- Cal. Labor Code § 1102.5 (partial)
- Cal. Labor Code § 6310 (partial)
- Cal. Labor Code § 98.6 (partial)
- Cal. Labor Code § 96(k) (full)
- Cal. Labor Code § 232.5 (partial)

In addition, on Oct. 1 2024, leave to amend was granted for:[5]

- Cal. Labor Code § 1102.5 (partial)
- Cal. Labor Code § 98.6 (partial, fines)

---

[3] Id.
[4] *Gjovik v. Apple Inc.*, 23-cv-04597-EMC (N.D. Cal. Oct. 1, 2024).
[5] *Gjovik v. Apple Inc.*, 23-cv-04597-EMC (N.D. Cal. Oct. 1, 2024).

— 3 —

1  - Cal. Labor Code § 232.5 (partial, § 232)

2  - Private Nuisance (full)

3  - IIED – Outrage (partial)

4  - IIED – Cancer (full)

5  The following claims were previously approved to move forward in the May 20

6  2024 Decision, but were then dismissed with prejudice, despite 12(g) and 12(h)

7  restrictions, and based on discretionary factors, in the Oct. 1 2024 Decision:

8  - Cal. Labor Code § 1102.5 (partial)

9  - Cal. Labor Code § 6310 (partial, § 6399.7)

10  - Cal. Labor Code § 232.5 (partial, § 1101, 1102).

11  - Cal. Business Code § 17200, *et seq.* with injunctive relief (full)

12  - Ultrahazardous Activities (full)

13  - Breach of Implied Cov. of Good Faith and Fair Dealing (full)

14  The following claim was allowed to proceed in the Oct. 1 2024 Decision following

15  leave to amend in the May 20 2024 Decision:

16  - Cal. Labor Code § 96k via § 98.6 (full)

17  The following claim was given leave to amend in the May 20 2024 decision, but

18  then dismissed with prejudice in the Oct. 1 2024 Decision:

19  - IIED – Outrage (partial, based on defamation)

20  Further, the May 20 2024 Decision allowed leave to amend for the following claims,

21  and they were not amended by the Plaintiff, due to the comments from the court

22  discouraging her from doing so, even though she could have:[6]

23  - RICO, 18 U.S. Code § 1962(c) (full)

24  - RICO, 18 U.S. Code § 1962(d) (partial)

25  - The Bane Act, Cal. Civ. Code § 52.1 (full)

25  - The Ralph Act, Cal. Civ. Code § 52.7 (full)

26  - Breach of Implied Contract (full)

27

28

---

[6] *Gjovik v. Apple Inc.*, 23-cv-04597-EMC (N.D. Cal. May. 20, 2024).

— 4 —

1       -   Nuisance Per Se (full)

2       -   Negligent Infliction of Emotional Distress (full)

3    Additionally, in the May 20 2024 decision, the following claims were dismissed

4    with prejudice and without leave to amend:[7]

5       -   RICO, 18 U.S. Code § 1962(a) (full)

6       -   RICO, 18 U.S. Code § 1962(d) (partial, 1962(a))

7       -   SOX whistleblower retaliation, 18 U.S. Code §1514A (full)

8       -   Dodd-Frank whistleblower retaliation, 15 U.S. Code § 78u-6 (full)

9       -   Ultrahazardous Activities(partial, RCRA re: pyrophoric gases –

10          explosions and fire; CERCLA, 42 U.S.C. § 9601 *et seq.*)

11      -   Private Nuisance (partial, RCRA re: pyrophoric gases – explosions and

12          fire; CERCLA, 42 U.S.C. § 9601 *et seq.*)

13   The following claim was dismissed in the May 20 2024 decision as being

14   duplicative of the Ultrahazardous Activities claim, but subsequently the

15   Ultrahazardous Activities claim was dismissed due to discretionary reasons.[8] It's

16   unclear if this claim can still be pled:

17      -   Absolute Nuisance (full)

18   Finally, while Defendant's Motions to Strike were denied, the court did repeatedly

19   agree to "dismiss" material and critical facts and allegations from the Complaint,

20   leaving an unknown impact to discovery and trial.[9]

21       11.    This court has also ordered the Plaintiff to follow page limits set with

22   the court's discretion and resulting in substantive impact and prejudice to

23   Plaintiff's litigation, has declined to consider exhibits and judicially noticeable

24   documents, declined to review or allow supplementary filings to cure deficiencies,

25   and the majority of the dismissals with prejudice have been on a discretionary

26   _____

27   [7] *Gjovik v. Apple Inc.*, 23-cv-04597-EMC (N.D. Cal. May. 20, 2024).
     [8] *Gjovik v. Apple Inc.*, 23-cv-04597-EMC (N.D. Cal. May. 20, 2024).

28   [9] *Gjovik v. Apple Inc.*, 23-cv-04597-EMC (N.D. Cal. May. 20, 2024); *Gjovik v. Apple Inc.*, 23-cv-04597-EMC (N.D. Cal. Oct. 1, 2024).

— 5 —

basis separate from the merits of the claims (i.e., did not include within the page limit, did not include in a specific section of the document, due to the court's internet connection issues during the hearing, and so on). (*see Administrative Motion* re: connection issues).

12.   Defendant has already had multiple years to prepare its defense on all of these claims. The litigation between Plaintiff and Defendant has been underway for much longer than this instant litigation. The first notice of potential litigation was provided to Apple Inc back in or around June 2021, three months before Apple Inc terminated the Plaintiff's employment. The first version of a complaint was provided to Apple on Aug. 23 2021. Multiple charges were filed with government agencies prior to and after the termination of her employment – with multiple agency compliance actions and adjudications underway, including:

- **Apple Inc, U.S. NLRB Case: 32-CA-284428** | NLRB filed a complaint on Sept. 27 2024 and ALJ hearing scheduled for Jan. 22 2025 | Plaintiff is representing all U.S. Apple employees

- **Apple Inc, U.S. NLRB Case: 32-CA-284441** | Decision of Merit issued in Jan. 2023 & NLRB Complaint to be filed | Plaintiff is representing all U.S. Apple employees

- **Apple Inc, U.S. NLRB Case: 32-CA-282142; 32-CA-283161** | Decision of Merit issued Oct. 15 2024 and NLRB Complaint to be filed imminently | Adjudication is specific to unfair labor practices directed at Plaintiff

- **U.S. Dept. of Labor environmental whistleblower case:** *Ashley Gjovik v Apple Inc*, OALJ 2024-CER-00001, *Ashley Gjovik v Apple Inc*, ARB 2024-0060 | Adjudication is specific to unlawful retaliation directed at Plaintiff

- **U.S. EPA CERCLA** re: TRW Microwave | Impacting: the SF Bay Area community

- **U.S. EPA RCRA** re: 3250 Scott | Impacting: the SF Bay Area community

- **Cal. EPA BAAQMD** re: 3250 Scott | Impacting: the SF Bay Area community

13. In addition, the following adjudications were "kicked-out" to this civil lawsuit:

- **Cal. Dept. of Labor Case:** *Ashley Gjovik v. Apple Inc,* RCI-CM-842830, Cal. Dept. of Labor DIR.

- **U.S. EEOC and Cal. DFEH:** Right to Sue letters issued in 2021.

Further, it appears that Defendant likely knew it almost manslaughtered the Plaintiff back in early or mid-2021, but well before her employment was terminated, and knowing it was part of their cover-up. In this litigation, the Defendant has been repeatedly rewarded for claiming without basis that the Plaintiff has failed to state claims for extremely serious matters the Plaintiff and Defendant have been in conflict over for years.

B. <u>Nature and Status of the Case</u>

14. This lawsuit could have been filed as at least four different lawsuits and in different courts (employment claims, environmental claims, racketeering & unfair business practices/antitrust, and non-employment intimidation and harassment claims). If the Plaintiff took that approach, she would likely later file for Joinder of claims into one consolidated lawsuit.

15. Plaintiff also has other adjudication underway in other venues (executive agencies) which she has tried her best to coordinate with this civil litigation. This is complex, multi-court/tribunal litigation.

16. Plaintiff filed one lawsuit with all claims in support of judicial economy and coherence – but has been restrained in her pleading to an extend that if she could, she would have filed four separate lawsuits and joindered them together later.

17. Plaintiff has claims for relief for multiple injuries. She has injuries requiring remedy starting in 2020 (or earlier depending on the claim), through

— 7 —

current day, and for some claims also into the future. She has been injured personally (including physically, mentally, and reputationally), and her real property interests and chattel property were also injured. Plaintiff alleges Defendant caused all of that harm to her and owes her a remedy. That is the entire controversy. There are multiple causes of action she may pursue, but ultimately the complaint and claims will conform to the evidence as the law demands. This lawsuit encompasses a wide array of serious issues supported by a substantial body of evidence.

18.    Public policy factors the determination of litigation on the merits rather than on procedural grounds – recognizing that justice is best served when all litigants have a chance to be heard. Procedural requirements should be given liberal construction in order to not deprive a litigant of her day in court because of technical requirements – especially when the litigant is a pro se employee arguing against professional attorneys who have attempted to drown the plaintiff in an avalanche of motions and other filings. Plaintiff has also already complained repeatedly about the Defendant's refusal to participate in discovery in good faith, and harassment of the Plaintiff outside of court.

19.    There have already been four decisions issued in this case:
—  *Gjovik v. Apple Inc.*, 23-cv-04597-EMC (N.D. Cal. Jan. 30, 2024)
—  *Gjovik v. Apple Inc.*, 23-cv-04597-EMC (N.D. Cal. May. 20, 2024)
—  *Gjovik v. Apple Inc.*, 23-cv-04597-EMC (N.D. Cal. Aug. 22, 2024)
—  *Gjovik v. Apple Inc.*, 23-cv-04597-EMC (N.D. Cal. Oct. 1, 2024)
This case would benefit from efforts to further consolidate and streamline, instead of the efforts thus far to split, separate, and conflict.

20.    Further, this lawsuit should be treated as complex litigation, which it is, and procedural adjustments should be considered to best ensure the claims are determined on the merits.

21.    For example, the Cal. Business Code § 17200 claim was dismissed

— 8 —

with prejudice, but could be seen as a freestanding claim that could have been litigated separately, and thus should be treated as if it was consolidated for M.D.L. under 28 U.S. Code § 1407 and with no delay in an appeal following disposition. *Hall v. Hall*, 138 S. Ct. 1118, 1122 (2018) (citing to *Gelboim v. Bank of America Corp.*, 574 U.S. 405, 135 S. Ct. 897 (2015)).

## III.  Issues to be Decided

22.    The District Court proceedings are currently scheduled so that the Plaintiff is to file a fifth amended complaint by Oct. 29 2024, and the Defendant would then file a response by Nov. 26 2024. Assuming that the Defendant files another Fed. R. Civ. P 12(b)(6) motion, then briefing and hearings would continue for two months after, until another decision is issued. At that point, perhaps Defendant will be ready to file their Answer. This court will need to decide whether to stay or rescope the pleading schedule pending an outcome from the appeal.

23.    The District Court proceedings also have initial discovery, and a settlement conference scheduled, with initial discovery underway and the next settlement conference scheduling meeting on Nov. 12 2024. (Dkt. 110). This Court ordered the completion of the settlement conference by Dec. 2024-Jan. 2025. (Dkt. 104). This court will need to decide whether to stay and/or delay the initial discovery and depositions, and/or the settlement conference as well.

24.    This Court scheduled the next Case Mgmt Conf. for Feb. 11 2025. This court will need to decide whether to keep that hearing scheduled or to stay/delay it – and/or to change the scope of the meeting. The court will also need to decide if Plaintiff needs to attend the hearing for this motion in person or if she can attend via Zoom, if there is a hearing for this motion.

## IV.  Arguments in Support of a Motion to Stay.

C.    **This appeal raises serious questions.**

— 9 —

25.    This appeal raises serious questions. A serious legal question is a "question going to the merits so serious, substantial, difficult and doubtful, as to make the issues ripe for litigation and deserving of more deliberate investigation." *Guifu Li v. A Perfect Franchise, Inc.*, No. 5:10-CV-01189-LHK, 2011 WL 2293221, at *3 (N.D. Cal. June 8, 2011) (citing *Walmer v. United States DOD* 52 F.3d 851, 854 (10th Cir. 1995))). "In the Ninth Circuit, serious legal questions often concern constitutionality." *Id*. Serious legal questions also "raise[] genuine matters of first impression within the Ninth Circuit." *Martinez-Gonzalez v. Elkhorn Packing Co.*, Case No. 18-cv-05226-EMC, 3 (N.D. Cal. Feb. 13, 2020) quoting *Morse v. Servicemaster Glob. Holdings, Inc.*, No. C 08-03894, 2013 WL 123610, at *3 (N.D. Cal. Jan. 8, 2013).

26.    Within the claims dismissed with prejudice thus far, there are several legal issues which provide an opportunity for the Ninth Circuit to clarify important and unsettled legal questions. These questions include but are not limited to the following substantive topics:

— Does Cal. Labor Code § 6399.7 apply to hazardous waste in addition to hazardous chemicals/materials? If § 6399.7 applies to hazardous waste in addition to hazardous chemicals/materials, does it also apply to hazardous waste related to a Superfund or Brownfield toxic waste dump clean up site, where the employees have assigned offices but are not directly involved in the toxic waste clean-up? (i.e., HAZWOPER: 29 CFR 1910.120; 8 C.C.R. § 5192).

— Can the operation of a semiconductor fabrication facility qualify as an ultrahazardous activity? Does the ultrahazardous traits of semiconductor fabrication include the storage/use/disposal of highly toxic and/or pyrophoric gases? Does the location of the fabrication near homes and schools influence the determination of whether it is an ultrahazardous activity or not?

— Does an *IIED – Fear of Cancer* claim over a dangerous fabrication facility releasing carcinogens and lethal gases into the air, and operating next to homes, require purposeful intent by the operators to harm a specific

— 10 —

person (criminal mens rea for assault) – or only recklessness / knowledge of the harm occurring to a general group of people? If the Defendant can see the thousands of apartments outside its facility where it knows it is venting these chemicals, is that sufficient knowledge?

— Does Cal. Labor Code § 1102.5 protect whistleblower disclosures made to 1) published by the press, 2) to the public on social media, and/or 3) made publicly and alongside other complaints to the government so the employer may reasonably assume the complaint had been made to the government in addition to the public?

— How specific does a claim need to be under Cal. Labor Code § 1102.5 – does the Plaintiff need to cite a specific section of a specific statute in order to have coverage?

— Can a Cal. Business Code § 17200, *et seq*. claim proceed with a request only for injunctive relief, or does it require a request for a monetary remedy? If the § 17200 claim can proceed with a request for injunctive relief, may the claim include injunctive relief that will benefit other employees if the relief also directly benefits the Plaintiff? (i.e., the relief of an order to cease a certain practice entirely, and/or delete/disgorge an entire type of data, etc.). If the Cal. Business Code § 17200 claim may proceed, does the statute of limitations begin at the very first allegation of continuing conduct, and/or first allegation in a group of different allegations? What is the procedure for arguing tolling of a § 17200 claim that is ongoing and interwoven with tolled employment and labor claims?

— Can a claim for *Breach of the Implied Cov. of Good Faith and Fair Dealing* be satisfied by referring to a contract generally (such as, the employment contract) or must specific contracts be cited by data and some type of identifying feature of the specific document?

— Can a *IIED – Outrage* claim include defamation as a basis if the claim is against a current/past employer and the defamation is expressly because of whistleblower activities and/or the defamation is equivalent to denylisting? Even if the defamation basis is not sufficient to justify the IIED claim alone, may it be included along with other bases to help support the claims?

— In a complex whistleblower retaliation case where there are dozens of

— 11 —

statutes implicated by the disclosures and retaliation, must a plaintiff plead every statute under every whistleblower claim (i.e., § 1102.5, *Tamney*, etc.) in order to pursue that claim at trial and in discovery?

This appeal also raises a number of important and serious procedural questions including:

— What is the process/procedure in a federal court located in California, for a victim of crimes that occurred in California, to trigger procedural protections afforded to them under their *Marsy's law* constitutional rights when they are pursuing civil action prior to any criminal actions?

— Should Fed. R. Civ. P. 12(g) and 12(h) be disregarded in order to allow dismissals with prejudice based on purely discretionary, procedural reasons?

— Can a court ordered page limit for a complaint essentially be used to justify dismissal / striking of content that has merit but simply cannot fit into the page limit? If so, does this apply with a pro se plaintiff? If so, does this apply to a pro se plaintiff with ADHD, PTSD, autism, and/or other disabilities?

— At what point does a pro se plaintiff lose the deference usually afforded to pro se plaintiffs? Does the completion of a Juris Doctor degree equate to the deference provided to a professional, practicing attorney? Does this analysis change if the pro se plaintiff is sitting across from at least five practicing attorneys, including three law firm partners? If the pro se Plaintiff is managing three separate, complex adjudications at once?

— Does a partially virtual hearing, where internet connection issues occurred at the court, and the plaintiff was not heard and cannot hear, be used to justify dismissal with prejudice because the court could not hear the pro se plaintiff, but it was not the plaintiff's fault?

The Plaintiff is still drafting her appellate brief, but the lists above should provide insight into the types of questions and issues she believes to be important for her own case as well as for the Ninth Circuit.

27.   In addition to other issues, the Plaintiff's appeal will include

— 12 —

1   dismissal with prejudice of whistleblower retaliation, labor law violations,
2   antitrust, racketeering, and toxic tort claims – all of which have overlapping facts
3   and law with the claims not subject to appeal.

4       28.    Plaintiff's appeal will also include procedural decisions that effected
5   all claims, including discretionary decisions related to Fed. R. Civ. P. 12(g) and
6   Fed. R. Civ. P. 12(h), rejection of the sur-reply (brief, objections, and proposed
7   supplement Dkt. 93), and court orders about page limits. Because the remaining
8   District Court claims and the claims to be reviewed by the appellate court are
9   overlapping and interlinking, it would be a best to not introduce additional
10  complexity and instead stay the District Court proceedings until a decision is
11  issued by Ninth Circuit. Further, because the Defendant was allowed to file a fifth
12  motion to dismiss in response to the Fifth Amended Complaint, the Defendant
13  may introduce new issues based on similar errors which will need to be added to
14  the appeal.

15      **D.**   **<u>Likelihood of Success on the Merits</u>**

16         **1.**  **There are multiple issues for appeal that were dismissed with**
17              **prejudice, and/or were final collateral orders.**

18      29.    First, many elements of this appeal include final decisions – either
19  through a dismissal with prejudice, or a dismissal without prejudice but that
20  cannot be amended under the circumstances ordered by the court (i.e., IIED –
21  Cancer re: intent), or an outcome equivalent to a *death knell* (environmental and
22  safety whistleblowing and organizing re: factual basis). There are also injunctions
23  dismissed with prejudice.

24      30.    A dismissal with prejudice is a final appealable order. See *Al-Torki v.*
25  *Kaempen*, 78 F.3d 1381, 1384–85 (9th Cir. 1996). Where the district court expressly
26  denies leave to amend, the order is final and appealable. See *Scott v. Eversole*
27  *Mortuary*, 522 F.2d 1110, 1112 (9th Cir. 1975). However, a district court order
28  dismissing a complaint with leave to amend under the Fair Labor Standards Act

— 13 —

1  for failure to include the employees' true names is also immediately appealable.

2  *Does I thru XXIII v. Advanced Textile Corp.,* 214 F.3d 1058, 1066–67 (9th Cir.

3  2000).

**2. Appellate jurisdiction is satisfied with multiple legal theories under 28 U.S. Code § 1292(a) and 28 U.S. Code § 1651**

6  31.    Appellate review is authorized under 28 U.S. Code § 1292(a)(1)

7  "[w]hen an order, although not expressly denying or granting an injunction, has

8  the practical effect of doing so." *Tri–State Generation & Transmission Ass'n, Inc.*

9  *v. Shoshone River Power,* Inc., 874 F.2d 1346, 1351 (10th Cir. 1989). The substantial

10  effect of the order, not its terminology, is determinative. See *Abbott v. Perez*, 138

11  S. Ct. 2305, 2319 (2018).[10]

12  32.    Here, the dismissal the Plaintiff's § 17200 claim was dismissed with

13  prejudice. The claim solely requested injunctive relief and argued irreparable

14  injury without that injunctive relief. The claim was dismissed in the Oct. 1 2024

15  order not due to the merits of request for injunction, but because the statute of

16  limitations tolling theory was not repeated in each of the claims it was to apply to

17  but instead was attempted to be integrated – and because the court decided to deny

18  Plaintiff's request to file a supplementary brief and to strike it from the record

19  (and it included the tolling theories and an alternative claim to supplement which

20  does call for monetary relief).

21  33.    An order that does not expressly grant or deny an injunction may

22  nevertheless be appealable under § 1292(a)(1) if it: (1) has the practical effect of

23  denying an injunction; (2) could cause serious or irreparable harm; and (3) can

24  only be "effectually challenged" by immediate appeal. *Carson v. American Brands,*

25  *Inc.*, 450 U.S. 79, 84 (1981); *see also Buckingham v. Gannon (In re Touch America*

26

27  [10] (Stating the Supreme Court has made it clear that the "label attached to an order is not
dispositive. [Rather,] where an order has the 'practical effect' of granting or denying an
28  injunction, it should be treated as such for purposes of appellate jurisdiction.")

— 14 —

1  *Holdings, Inc. ERISA Litig.)*, 563 F.3d 903, 906 (9th Cir. 2009) (per curiam);
2  *Negrete v. Allianz Life Ins. Co. of North America*, 523 F.3d 1091, 1097 (9th Cir.
3  2008)).

4      34.    The Oct. 1 2024 order denied an injunction, creating irreparable harm
5  – and because Plaintiff was requested to amend her complaint without this and
6  other dismissed claims, she risks 'waiving' the issue for later appeal. Further,
7  because this claim is the basis of the Defendant's primary defense in the
8  employment and labor claims, the effect of considering both the § 17200 claim at
9  the same time as the employment/labor claims is effectively unreviewable and
10  cannot be remedied after the trial.

11      Some denials of injunctions are also collateral orders, such as a denial of an
12  anti-SLAPP motion – which resolves a question separate from the merits in that it
13  merely finds that such merits may exist, without evaluating whether the plaintiff's
14  claim will succeed. *See* § 425.16(b)(3). The purpose of an anti-SLAPP motion is to
15  determine whether the defendant is being forced to defend against a meritless
16  claim – the anti-SLAPP issue therefore exists separately from the merits of the
17  defamation claim itself. *Batzel v. Smith*, 333 F.3d 1018, 1025 (9th Cir. 2003). This
18  is a similar situation as the Plaintiff's § 17200 and § 6399.7 claims being dismissed
19  with prejudice due to a discretionary findings and procedural guidelines, but not
20  the actual merits of the claim.

21  **3.  Many claims were dismissed under Rule 12(b)(6) for reasons
22       other than failure to state a claim and unrelated to actual merit.**

23      35.    Many of the claims and issues to be appealed are dismissals under
24  Fed. R. Civ. P. 12(b)(6) for reasons that were discretionary, were exceptions to the
25  Fed. R. Civ. P., and which did not arise out of the inability to state a claim. Ninth
26  Circuit decisions predictably grant appeals and reversals of dismissals with
27  prejudice under 12(b)(6) when dismissals are based on reasons that do not relate
28  to the legal test for 12(b)(6) dismissals. It is more likely than not that the Ninth

— 15 —

1 Circuit will approve at least some of the Plaintiff's appealed claims that fall into
2 this category.

3     36.     The Fed. R. Civ. P. 8 standard contains "a powerful presumption
4 against rejecting pleadings for failure to state a claim." *Auster Oil Gas, Inc. v.*
5 *Stream*, 764 F.2d 381, 386 (5th Cir. 1985); see also *Hall v. City of Santa Barbara*,
6 833 F.2d 1270, 1274 (9th Cir. 1986) ("It is axiomatic that '[t]he motion to dismiss
7 for failure to state a claim is viewed with disfavor and is rarely granted.'"). If the
8 court concludes that dismissal under Fed. R. Civ. P. 12(b)(6) is warranted, the
9 court should not dismiss the complaint "unless it determines that the pleading
10 could not possibly be cured by the allegation of other facts." *Cook, Perkiss Liehe v.*
11 *N.C. Collection Serv*, 911 F.2d 242, 247 (9th Cir. 1990).

12     37.     A Fed. R. Civ. P. 12(b)(6) or 12(e) motion cannot be used to challenge
13 just certain allegations within a claim while the underlying claim is not itself
14 challenged – and if the detail sought by a motion for more definite statement is
15 obtainable through discovery, the motion should be denied. *Beery v. Hitachi Home*
16 *Electronics America, Inc.*, 157 FRD 477, 480; U.S. (C.D. C.A. 1993); *E.E.O.C. v.*
17 *Alia Corp.*, 842 F.Supp.2d 1243, 1250 (E.D. C.A. 2012). "Parties are expected to
18 use discovery, not the pleadings, to learn the specifics of the claims being
19 asserted." *Sagan v. Apple Computer, Inc.*, 874 F. Supp. 1072, 1077 (C.D. Cal. 1994).

20     38.     The Ninth Circuit also predictably overturns dismissals and/or
21 striking of sub-claims when the overall claim is not contested, and the sub-claims
22 share a similar factual basis as the claims not challenged – which is the situation
23 with many of the dismissals with prejudice of Plaintiff's sub-claims in this lawsuit.

24     39.     In dismissals for failure to state a claim, a district court should grant
25 leave to amend even if no request to amend the pleading was made, unless it
26 determines that the pleading could not possibly be cured by the allegation of other
27 facts. *Bonanno v. Thomas,* 309 F.2d 320, 322 (9th Cir. 1962) (citing *Sidebotham v.*
28 *Robison,* 216 F.2d 816, 826 (9th Cir. 1954); see also *Erlich v. Glasner,* 352 F.2d 119,

1    122 (9th Cir. 1965); *Cook, Perkiss Liehe v. N.C. Collection Serv*, 911 F.2d 242, 247

2    (9th Cir. 1990). Here, the district court denied leave to amend due to purely

3    discretionary reasons and even acknowledging apparent merit in dicta.

4        40.    Where there is any doubt about the relevance of the challenged

5    allegations, courts in this Circuit err on the side of permitting the allegations to

6    stand. *Z.A. ex rel. K.A. v. St. Helena Unified Sch. Dist., No.* 09-CV-03557-JSW, 2010

7    WL 370333, at *2 (N.D. Cal. Jan. 25, 2010) citing *Fantasy, Inc. v. Fogerty,* 984 F.2d

8    1524, 1528 (9th Cir. 1993), rev'd on other grounds, *Fogerty v. Fantasy, Inc.,* 510

9    U.S. 517, 534, 114 S.Ct. 1023 (1994)); accord *Pilgram v. Lafave,* No. 12-CV-5304

10   GAF-EX, 2013 WL 12124126, at *5 (C.D. Cal. Feb. 7, 2013); *Art Attacks Ink, LLC*

11   *v. MGA Ent., Inc.,* No. 04-CV-1035-BLM, 2006 WL 8439887, at *4 (S.D. Cal. June

12   21, 2006).

13        **4. Many of the challenges are proper collateral order appeals.**

14

15        41.    An order is "final" as to the collateral matter when no further court

16   proceedings are required on the matters resolved by the order. *Koshak v. Malek*,

17   200 Cal.App.4th 1540, 1542 (2011). The Supreme Court has admonished that the

18   collateral order doctrine is a "narrow exception," *Firestone Tire & Rubber Co. v.*

19   *Risjord*, 449 U.S. 368, 374 (1981), to be "strictly applied," *Richardson Merrell, Inc.*

20   *v. Koller*, 472 U.S. 424, 430-431 (1985). Out of "healthy respect for the virtues of

21   the final-judgment rule," and with an eye toward "efficient judicial

22   administration," *Mohawk*, 558 U.S. at 106 (quoting *Firestone*, 449 U.S. at 374), the

23   doctrine must "never be allowed to swallow the general rule that a party is entitled

24   to a single appeal, to be deferred until final judgment has been entered," *Digit.*

25   *Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 868 (1994) (citation omitted).

26        42.    "[W]hen asking whether an order is 'effectively' unreviewable if

27   review is to be left until later," *Will*, 546 U.S. at 353, under *Cohen*'s third prong,

28   the Supreme Court has explained that there must be "some particular value of a

— 17 —

1    high order ... in support of the interest in avoiding trial," or some "compelling

2    public ends ... that would be compromised by failing to allow immediate appeal."

3    *Id*. at 352. The value at stake must be such that, "in the absence of an immediate

4    appeal," it would be "irretrievably lost." *Richardson Merrell, Inc. v. Koller*, 472

5    U.S. 424, 430-431 (1985).

6    43.    Here, there are several issues that are proper collateral orders for

7    appeal, including the Plaintiff's denied request to exercise her constitutional

8    *Marsy's law* rights during civil discovery.[11] If Plaintiff's request to the district

9    court is denied and not immediately appealed, then she is forced to complete

10   discovery without the protections she requested, and there would be no way to

11   appeal and prevent that harm after it already occurs.

12   **5.  Several issues for appeal may fall under mandamus and pendent**

13       **jurisdiction.**

14   44.    Lack of jurisdiction over an appeal does not necessarily foreclose

15   review by the Ninth Circuit court if the issues raised are significant enough to

16   warrant review by mandamus. See, e.g., *Perry v. Schwarzenegger,* 591 F.3d 1147,

17   1157 (9th Cir.2009) (holding that mandamus is appropriate to review a discovery

18   order that raises novel and important questions);[12] *Medhekar v. United States*

19   *District Court*, 99 F.3d 325, 327 (9th Cir.1996) (noting that mandamus is an

20   especially appropriate vehicle for review where the court is confronted with an

21

22   ───────────────
     [11] California Constitution article I, § 28, section (b) and/or her federal rights under 18 U.S.
23   Code § 3771. Denied during the Aug. 28 2024 hearing.
     [12] Appellate jurisdiction has been found proper despite a lack of a final order where: (1) the
24   order was "marginally final;" (2) it disposed of "an unsettled issue of national significance,"
     (3) review of the order implemented the same policy Congress sought to promote in 28 U.S.
25   Code § 1292(b); and (4) judicial economy would not be served by remand. *Southern Cal.*
     *Edison Co. v. Westinghouse Elec. Corp. (In re Subpoena Served on Cal. Pub. Util. Comm'n)*, 813
26   F.2d 1473, 1479–80 (9th Cir. 1987); see also  *Solis v. Jasmine Hall Care Homes, Inc.*, 610 F.3d
     541, 544 (9th Cir. 2010) (per curiam); *Nehmer v. U.S. Dep't of Agric.,*  494 F.3d 846, 856 n.5
27   (9th Cir. 2007) (holding that the district court's order involved an unsettled issue of national
     significance, was marginally final, furthered the policy underlying 28 U.S.C. § 1292(b), and
28   prevented harm further delay would cause).

— 18 —

1    issue of first impression). Here, the district court's May 20 2024 and Oct. 1 2024

2    orders raise many new and important problems and issues of first impression

3    which are ripe for 9th circuit review. *Plata v. Brown*, 754 F.3d 1070, 1076 (9th Cir.

4    2014).

5        45.    If for some reason the other appellate bases are denied, the Plaintiff

6    believes her appeal may also be entitled to a writ of mandamus because there are

7    no other adequate remedies, she has a "clear and indisputable" right to the relief

8    sought, and the issuance of the writ is an appropriate response to the situation.

9    *Cheney v. United States District Court,* 542 U.S. 367, 380– 81 (2004). The court

10   may construe an appeal of an otherwise non-appealable order as a petition for writ

11   of mandamus and consider the issues presented under the factors set forth in

12   *Bauman v. United States District Court,* 557 F.2d 650, 654–55 (9th Cir.1977).[13]

13       46.    Mandamus relief may be appropriate to settle an important question

14   of first impression that cannot be effectively reviewed after final judgment. See

15   *Medhekar v. United States Dist. Court,* 99 F.3d 325, 327 (9th Cir. 1996) (per curiam)

16   (noting that where the fifth Bauman factor is present, the third and fourth factors

17   generally will not be present). Some of the serious questions listed above could

18   justify this review.[14]

19       47.    Similarly, some of the contested discretionary procedural decisions

20   were decided knowing they were violations of the Fed. R. Civ. P. and/or court

21   rules, and the exception was repeated multiple times (i.e., repeatedly bypassing

22   Fed. R. Civ. P. 12(g) and 12(h), allowing the Defendant to extensively cite prior

23   mooted complaints but not allowing Plaintiff to use the same content, denying the

24   _____

25   [13] *Miller v. Gammie*, 335 F.3d 889, 895 (9th Cir.2003) (en banc); see also *Special Invs. Inc. v.*
     *Aero Air Inc.*,360 F.3d 989, 993 (9th Cir.2004); *Cordoza v. Pac. States Steel Corp.*,320 F.3d
26   989, 998 (9th Cir.2003). *Plata v. Brown*, 754 F.3d 1070, 1075-76 (9th Cir. 2014).
     [14] The court of appeals often relies on its supervisory mandamus authority in cases raising an
     important question of law of first impression. See *Calderon v. United States Dist. Court,* 134
27   F.3d 981, 984 (9th Cir. 1998), abrogated on other grounds as recognized by *Jackson v. Roe*, 425
     F.3d 654 (9th Cir. 2005); *Arizona v. United States Dist. Court* (*In re Cement Antitrust Litig.*),
28   688 F.2d 1297, 1307 (9th Cir. 1982).

1    pro se Plaintiff the deference a pro se litigant usually receives, dismissing
2    Plaintiff's meritorious claims because she did not make her argument in the
3    correct paragraph or document, or in a document with too many pages, etc.) See
4    also *Barnes v. Sea Hawaii Rafting, LLC*, 889 F.3d 517, 537 (9th Cir. 2018)
5    (concluding that the fourth and fifth factors supported mandamus relief where the
6    district court's error was oft-repeated, and the questions involved were of first
7    impression).

8       48.   If Mandamus relief or another justification is approved for some but
9    not all of the claims requested for appeal, pendent appellate jurisdiction may cover
10   most or all of the remaining issues and questions. Pendent appellate jurisdiction
11   refers to the exercise of jurisdiction over issues that ordinarily may not be
12   reviewed on interlocutory appeal, but may be reviewed on interlocutory appeal if
13   raised in conjunction with other issues properly before the court ... [and] if the
14   rulings were 'inextricably intertwined' or if review of the pendent issue was
15   necessary to ensure meaningful review of the independently reviewable issue."
16   *Cunningham v. Gates*, 229 F.3d 1271, 1284 (9th Cir. 2000).

17      **E.**   **Plaintiff will be irreparably injured if a stay is denied & granting**
          **a stay also primarily prejudices the Plaintiff.**
18

19       49.   Here, a stay will not substantially injure the other parties interested
20   in the proceeding. *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). In fact, a stay
21   would allow the Defendant to conserve significant resources and costs that would
22   be required in pursuing the district court matters concurrent with the appellate
23   matters, and especially if the appellate outcome is a remand that requires a re-do
24   of the complaint drafting and motions.

25       50.   The common concern of an interlocutory appeal causing piecemeal
26   litigation is reversed in this case, as the approval of the Defendant's requests to
27   split claims, attack sub-claims and allegations, and to dismiss valid claims on
28   discretionary basis not related to the merits – has already created unruly,

1    piecemeal litigation. *Cobbledick v. United States*, 309 U.S. 323, 325 (1940).[15] The
2    requested appeal is an attempt to reintegrate and recombine the claims, sub-
3    claims, allegations, and facts which had been splintered and fragmented.

4        51.    Further, this litigation is just one of three concurrent, active
5    litigations/adjudications around similar and related facts and events. Many of the
6    matters not subject to the appeal here are also still being argued within the U.S.
7    Dept. of Labor and U.S. NLRB adjudications, and thus the Defendant can still
8    progress in those matters even if the civil proceedings are stayed. Those agencies
9    surely also would appreciate if the decisions in this case, with overlapping and
10   interwoven facts, were made on the merits of the claims and in a predictable
11   fashion.

12       52.    It is also important to recognize that there are additional interested
13   parties in some of the facts/issues here that are not part of this litigation, but who
14   will be impacted by how this litigation proceeds. In addition to other victims of
15   Apple's environmental violations – there are also government agencies actively
16   investigating Apple, pursuing enforcement actions against Apple, and ordering
17   corrective actions and they all have a stake in this case. This case is the first
18   federal impression of a complex, high-risk matter of public interest, and it would
19   be in everyone's interest to ensure all decisions are made with thorough
20   consideration and deliberation, even if that slows these proceedings.

21       53.    Despite all of these issues, Plaintiff is otherwise ready for discovery
22   to start, and the Defendant has repeatedly objected to any discovery. Plaintiff also
23   has a large quantity of claims dismissed without prejudice which she could
24   consolidate and pursue in a new, additional lawsuit – causing Defendant to have
25   to respond to a fourth concurrent adjudication. Thus, absent a stay, the balance

26   _____

27   [15] "Since the right to a judgment from more than one court is a matter of grace and not a
     necessary ingredient of justice, Congress from the very beginning has, by forbidding
28   piecemeal disposition on appeal of what for practical purposes is a single controversy, set
     itself against enfeebling judicial administration."- Justice Frankfurter

— 21 —

1   of hardships tilts sharply in Plaintiff's favor, and unfavorably toward the

2   Defendant. *Mohamed v. Technologies*, 115 F. Supp. 3d 1024, 1028-29 (N.D. Cal.

3   2015). The Plaintiff is requesting a stay despite it causing her much prejudice,

4   because she feels it is necessary in this situation for her litigation to proceed.

5   Plaintiff believes an immediate appeal will materially advance the resolution of

6   this litigation.

7   **F.   The Public Interest**

8

9   54.   If the appeal is not heard now, and prior to further actions in the

10  District Court, then the Oct. 1 2024 Order will imperil important rights of

11  substantial public interest that cannot be vindicated on appeal from final

12  judgment, making the Oct. 1 2024 effectively unreviewable. Further, some issues

13  in the appeal, while not perfectly final or collateral, are still too important to the

14  public interest to be denied review. *Plata v. Brown*, 754 F.3d 1070, 1075 (9th Cir.

15  2014).[16]

16  55.   The basis of this lawsuit is environmental and labor violations –

17  including environmental torts, whistleblower protection, and antitrust – all of

18  which represent matters of public interest. Apple is one of the largest and most

19  powerful corporations in history – employing hundreds of thousands of workers

20  around the world, and manufacturing devices used by billions of people. By their

21  nature, environmental and labor legal claims are inherently representative of the

22  public interest. While an individual must have personal standing, the impact and

23

24

25

26

27  ---

    [16] ("[S]ome rulings that do not end the litigation will be deemed final because they are 'too

28  important to be denied review' and too independent of the merits of the case to require
    deferral of review."

1  reach of this type of litigation goes far beyond that individual.[17] To deny important

2  public rights due to an individual's typo or formatting decisions would be a

3  miscarriage of justice.

4      56.    This lawsuit is also the first of many lawsuits Apple will face over the

5  public safety hazard they created with their illegal fabrication operations next to

6  thousands of homes and dozens of businesses in Santa Clara. Any decisions made

7  about the merit of Plaintiff's claims in this lawsuit have the potential to impact

8  hundreds or thousands of other people's legal rights, and so decisions must be

9  made with thorough consideration and diligence – and if a mistake may have been

10  made which would prejudice the other victim's legal rights, or future government

11  litigation, that mistake should be corrected immediately.

12      57.    Here, the dismissal with prejudice of the Ultrahazardous Activities

13  claim could impact the legal rights of thousands of other people. The difference

14  between negligence and strict liability in cases like this is monumental. Similary,

15  the court is forcing the Plaintiff to amend her *IIED – Cancer* claims with an

16  incorrect legal theory (criminal intent) and threatened her with Rule 11 sanctions

17  if she does try to amend, but still gave her leave to amend. If the Plaintiff tries to

18  amend with the correct legal theory, she may not only have the claim dismissed,

19  but also be subject to Rule 11 sanctions. However, if she does not amend her claim,

20  she may be waiving the issue for later appeal – and in which case it still causes

21  confusion for anyone filing a similar claim later over the same facility.

22      58.    The issues and questions to be resolved are important ones. In this

23

24  [17] Employee suits to enforce their statutory rights benefit the general public. See *Wirtz v. C P Shoe Corp.,* 336 F.2d 21, 30 (5th Cir. 1964) (stating that in a FLSA suit brought by the

25  Secretary of Labor, "the Government becomes an active protagonist for the double purpose of protecting private interests and vindicating public rights"); *Plourde v. Massachusetts Cities*

26  *Realty Co.,* 47 F. Supp. 668, 670 (D.Mass. 1942) ("An employee, exercising his rights under[FLSA], exercises them, not only for his own benefit, but also for the benefit of the

27  general public."); see also *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 44 (1974) (stating that a private Title VII plaintiff "not only redresses his own injury but also vindicated the

28  important congressional policy against discriminatory employment practices").

PLAINTIFF'S MOTION TO STAY PENDING APPEAL | CASE NO. 3:23-CV-04597-EMC

1   unique and unusual case, the value of the interests that would be lost through

2   rigorous application of the final judgment requirement far outweigh the interests

3   of the final judgement requirements – especially considering the appeal would

4   address and fix the issues of piecemeal litigation, not cause it itself. *Will v.*

5   *Hallock,* 546 U.S. 345, 351–52 (2006).

6       **G.   Judicial Economy**

7

8       59.   As discussed, here the district court has created piecemeal litigation

9   and the request to the appellate court is to sew the pieces of the case back together

10  again. If the case is allowed to proceed in pieces, and perhaps be split into more

11  pieces with an additional 12(b)(6) motion, then discovery and the trial will be

12  untenable. Staying the district court proceedings while the appeal is underway will

13  limit the amount of additional piecemeal litigation and reduce future confusion

14  and conflicts.[18]

15      60.   The Ninth Circuit has explained that the finality determinations

16  require a balancing of "the inconvenience and costs of piecemeal review on the

17  one hand and the danger of denying justice by delay on the other." *Stone v. Heckler,*

18  722 F.2d 464, 467 (9th Cir. 1983) (citations omitted). Here, it is the piecemeal

19  litigation that already occurred which has created inconvenience, cost, and also

20  denial of justice – and here, the appeal would be an opportunity to address those

21  issues and prevent further delay, cost, and disruption.

22      61.   Here, immediate appeal will advance the matter because if the many

23  dismissed claims would have otherwise gone to trial and end up being critical to

24  the overall litigation, then the pro se Plaintiff will be forced to re-do all of the

25  ───────────────

26  [18] "As a general rule, the filing of a notice of appeal divests a district court of jurisdiction over those aspects of the case involved in the appeal." *Stein v. Wood*, 127 F.3d 1187, 1189 (9th Cir. 1997). The divestiture rule is a rule of judicial economy designed to avoid "the confusion and waste of time that might flow from putting the same issues before two courts at the same time." *Id.* (citation omitted). *See also Townley v. Miller*, 693 F.3d 1041, 1042 (9th Cir. 2012) (amended order) (concluding the filing of notices of appeal from order granting preliminary injunction divested district court of jurisdiction).

27

28

— 24 —

1   complex, costly litigation. Further, the Defendant has also engaged in discovery
2   avoidance shenanigans and other tactics to confuse and delay, and it will be easier
3   for the court to manage the case and keep it on track if the piecemeal dismissals
4   and discretionary rules can be addressed and resolved as soon as possible. All of
5   this would prevent the expense of litigating a matter that will only have to later be
6   re-litigated.

7       62.    Similarly, because this case raises so many novel issues of first
8   impression, these issues will surely need to be dealt with during summary
9   judgement and/or trial, and so having the Ninth Circuit address these important
10  questions and issues now will save substantial resources and avoid unnecessary
11  litigation by having those questions answered now rather than at the conclusion
12  of the case.

13      63.    Finally, most if not all of the issues raised for appellate review are
14  questions that can be determined based on the allegations presented in the
15  complaints and other documents already on the record. Because none of the issues
16  require a determination if the Plaintiff's claims actually have merit, and no
17  evidence is required – these questions are proper for review in this situation.
18  Importantly, what is at stake in this litigation is not simply the rights asserted, but
19  also the public policies underlying and supporting those rights, and an appellate
20  decision about those policies will have a meaningful impact on thousands, or even
21  millions, of people.

22      64.    As an additional note, while not a substantive consideration – the
23  winter holidays are quickly approaching and a stay during that period, at least,
24  seems beneficial to all parties.

25
26
27
28

Plaintiff's Motion to Stay Pending Appeal | Case No. 3:23-CV-04597-EMC

## V. Conclusion

66.     Plaintiff requests that the Court stay all proceedings related to the District Court adjudication until the resolution of the Ninth Circuit appeal. A stay would be an efficient means of avoiding wasted judicial and party resources. Plaintiff believes a stay of the October 1 2024 Order is warranted for the reasons set forth above and must be obtained no later than October 29 2024, absent a motion to extend the deadline for the Fifth Amended Complaint, in order to provide meaningful relief.

67.     Accordingly, Plaintiff respectfully request expedited consideration of this motion so that Plaintiff may seek emergency relief from the Court of Appeals in the event this Court does not agree that a stay is warranted.

68.     Plaintiff also requests a response to her concurrently filed administrative motion, inquiring as to if she is required to attend all future hearings in person, which would assumably include any hearing for this motion.

Dated: October 22 2024.

Signature:

**/s/ Ashley M. Gjovik**

*Pro Se Plaintiff*

**Email**: legal@ashleygjovik.com

**Physical Address**: Boston, Massachusetts
**Mailing Address:** 2108 N St. Ste. 4553 Sacramento, CA, 95816
**Phone**: (408) 883-4428

**Ashley M. Gjovik, JD**
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# United States District Court

## Northern District of California

| | |
|---|---|
| **Ashley M. Gjovik**, *an individual*, | Case No. 3:23-CV-04597-EMC |
| Plaintiff, | |
| vs. | **Emergency Administrative Motion** |
| **Apple Inc.**, a corporation, | Motion to Change Time Extend &/or Stay Deadline for Fifth Amended Complaint |
| Defendant. | |
| | **Motion Filed**: Oct. 22 2024 |
| | **5-AC Deadline: Oct. 29 2024** |

## MOTION FOR EXTENSION OF DEADLINE FOR 5AC

1
2

3     Plaintiff, Ashley Gjovik, respectfully submits the following Administrative
4  Motion requesting to Extend the Deadline for the Fifth Amended Complaint
5  (currently due on Oct. 29 2024), pending the concurrently filed Motion to Stay
6  and pending appeal.
7

8     Fed. R. Civ. P. 6(b) allows the extension of time periods set by the rules,
9  court order, or stipulation. It allows the court to extend deadlines "for good cause"
10  if the request is made before the original deadline expires. Civil L. R. 6-3 also
11  allows for motions to enlarge time.[1]
12

13     Plaintiff hereby respectfully requests from this Court an extension and/or
14  stay of the deadline for filing the Fifth Amended Complaint in the above-captioned
15  case. This request is based on the following grounds and is additionally supported
16  by the attached Declaration, Exhibit C, and the concurrently filed Motion to Stay
17  pending appeal. As required, a Proposed Order is also attached.
18

19     The deadline for the 5AC should be delayed as a matter of judicial economy.
20  The parties are currently engaged in an appeal in the United States Court of
21  Appeals for the Ninth Circuit which directly impacts the matters at issue in the
22  requested amendment. The appeal raises significant legal issues and there is a
23

24

25

26  [1] Civil L. R. 6-3(a): "...may be no more than 5 pages in length and must be accompanied by a
27  proposed order and by a declaration that sets forth with particularity the reasons for the
   requested enlargement or shortening of time; describes the efforts the party has made to
28  obtain a stipulation to the time change; identifies the substantial harm or prejudice that
   would occur if the Court did not change the time."

— 1 —

1   substantial likelihood that the appellate court will rule in favor of the

2   plaintiff/appellant. (See concurrently filed Motion to Stay).

3
4       Plaintiff respectfully requests that the deadline for filing the Fifth Amended

5   Complaint be extended to at least two weeks, ideally 30 days, following a decision

6   on the Motion to Stay – if the court denies the request for a Stay. Or if the Stay

7   of Proceedings is granted, then to stay the Fifth Amended Complaint along with

8   the other proceedings.

9
10      In the alternative, if the court denies the Motion to Stay, and otherwise

11  denies this request for extension, then Plaintiff respectfully requests to please

12  allow an increase in the page limit for the complaint in order to  1) retain the

13  claims dismissed with prejudice for the sake of preserving error for later appeal,

14  and to 2) ensure adequate pleading of claims that were given leave to amend.

15

16      As of right now, there is only one single page to contain all amendments for

17  multiple complicated claims and to still retain dismissed claims to preserve error.

18
19      After receiving a motion to enlarge or shorten time and any opposition, the

20  Judge may grant, deny, modify the requested time change or schedule the matter

21  for additional briefing or a hearing. Civil L. R. 6-3(6)(d).  Plaintiff respectfully

22  requests the court grant this motion to either:

23      -   Stay the deadline for the Fifth Amended Complaint pending a decision

24          on the concurrent Motion to Stay, or

25

26      -   Stay the deadline for the Fifth Amended Complaint under the Motion to

27          Stay all proceedings, or

28

— 2 —

1      -  Extend the deadline for the Fifth Amended Complaint at least 14

2         calendar days and allow up to 200 pages instead of 75 pages, in order to

3         preserve error of dismissed claims and to ensure due process.

4

5

6        This is the Plaintiff's first request for an extension of a deadline in this

7    litigation. Plaintiff discussed this matter with the Defendant and the Defendant

8    opposes this extension, the motion to stay, and the appeal. See Exhibit C attached

9    to the supporting Declaration.

10

11

12   Thank you.

13

14   Dated: October 22 2024.

15   Signature:

16

17

18

19

20   _____

21   **/s/ Ashley M. Gjovik**

22   *Pro Se Plaintiff*

23

24   **Email:** legal@ashleygjovik.com
     **Physical Address:**

25   Boston, Massachusetts

26   **Mailing Address:**
     2108 N St. Ste. 4553 Sacramento, CA, 95816

27   **Phone:** (408) 883-4428

28

**Ashley M. Gjovik, JD**
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# United States District Court

## Northern District of California

| | |
|---|---|
| **ASHLEY GJOVIK**, *an individual*, | Case No. 3:23-CV-04597-EMC |
| Plaintiff, | |
| vs. | **Emergency Administrative Motion** |
| | **Supporting Declaration** |
| **APPLE INC**, a corporation, | |
| Defendant. | |

## DECLARATION OF ASHLEY GJOVIK

Pursuant to 28 U.S.C. § 1746, I, Ashley M. Gjovik, hereby declare as follows:

My name is Ashley Marie Gjovik. I am a self-represented Plaintiff in this above captioned matter. I make this Declaration based upon my personal knowledge and in support of Plaintiff's Emergency Motion for Extension/Stay for the Deadline to file the Fifth Amended Complaint. I have personal knowledge of all facts stated in this Declaration, and if called to testify, I could and would testify competently thereto.

The basis for my request for an extension of time is the pending Ninth Circuit appeal. For the reasons discussed in the concurrently filed Motion to Stay, and summarized here, it would be in the best interest of the court and Parties to stay further proceeding until a decision is made in the appeal, as it is likely the appellate court will hear and decided at least some of the claims, and that will likely require amended the complaint once again. Staying the next amendment of the complaint and the proceedings will reduce unnecessary and duplicative work, reduce complexity and confusion, and promote judicial economy.

Further, I face irreparable harm if I am forced to remove and withdraw my claims dismissed with prejudice but pending appeal, and/or fail to plead claims given leave to amend but with a concurrent threat of sanctions for amending (ie, IIED – Cancer). Additionally, it is unfair for me to have to amend my complaint with major, significant, critical facts and allegations now dismissed with prejudice from the case.

I apologize for the extra work in reviewing these motions and adapting to the request for an appeal, and for how long it took me to draft these motions – I've never done this before and there is no pro se assistance for this (I did try the pro se clinic). The Ninth Circuit also has a pro se team, but it appears that group assists the court in dealing with pro se litigants, instead of helping pro se litigants navigate the court.

I believe the benefit in pursuing this appeal now outweighs any prejudice to the parties, as many of the issues raised for appeal are novel issues of first impression and would need to be dealt with anyways later in the litigation. Further, this case is the first of what is likely to be much litigation against the Defendant over their illegal fabrication facility.

Further, it would be a miscarriage of justice to deny due process in this proceeding for discretionary reasons, when it impacts the rights of thousands of others, as well as the U.S., California, and local governments who are all investigating these environmental violations. Without a stay, there will be irreparable harm.

Similarly, there are significant developments in related and relevant adjudications that would directly impact the matters contained in the pleadings. Since the Fourth Amended Complaint, the U.S. EPA issued a report of inspection findings, the BAAQMD has cited Apple for at least six formal violations of air quality laws (operating without permits, failure to notify BAAQMD they were operating a fab, and illegally exhausting large quantities of toxic chemicals into the outdoor air),

- 3 -

DECLARATION OF ASHLEY GJOVIK | 3:23-CV-04597-EMC

and the NLRB issued a complaint against Apple based on my charges that their confidentiality, non-disclosure and non-compete agreements, and a number of their work policies including misconduct and social media use, all violate federal labor law. (Dkt. 111).

The U.S. NLRB also just last week issued a Decision of Merit that Apple's suspension and termination of my employment in 2021 violated the NLRA, and cited at least eight additional individual violations of federal labor laws in Apple's conduct towards me between March 2021 – September 2021. An added benefit of the requested extension and stay is it will allow more time for these developments to progress and then they can be properly reflected in the complaint and allegations.

I contacted the Defendant to discuss this matter and they expressed they oppose an extension of the deadline and oppose the stay and oppose the appeal. My emails with them are attached as Exhibit C.

Despite the Defendant's stated position, it still has not cooperated in initial discovery and disclosures and has repeatedly argued that it believes court processes should be stayed/delayed until the "pleadings are settled," which they are not. Further, even after light questioning today, the Defendant has now said it wants the Settlement Conference proceedings stayed. I think Defendant will be fine if the complaint deadline is extended or stayed.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed on October 22 2024.

Executed on: Oct. 22 2024

Signature:



_____

**/s/ Ashley M. Gjovik**
*Pro Se Plaintiff*

**Email**: legal@ashleygjovik.com
**Physical Address**: Boston, Massachusetts
**Mailing Address:** 2108 N St. Ste. 4553 Sacramento, CA, 95816
**Phone**: (408) 883-4428

# Exhibit C

# RE: Meet/confer email about Motion to Stay District Court proceedings pending appeal

| | |
|---|---|
| From | Riechert, Melinda <mriechert@orrick.com> |
| To | Ashley Gjovik<ashleymgjovik@protonmail.com> |
| CC | Booms, Ryan<rbooms@orrick.com>, Juvinall, Kate<kjuvinall@orrick.com>, Mantoan, Kathryn G.<kmantoan@orrick.com>, Perry, Jessica R.<jperry@orrick.com> |
| Date | Tuesday, October 22nd, 2024 at 7:31 PM |

Ashley,

We disagree with many of the characterizations in your emails. We are responding to the main issues you raise.

As for the Motion to Dismiss the Ninth Circuit Appeal, the basis for the motion is that the Court of Appeals only has jurisdiction over "final decisions of the district courts" under 28 U.S.C. § 1291.  The order from which you appealed is non-final because it dismissed only some parts of some claims and explicitly contemplated further proceedings in the case. The collateral-order exception does not apply here, nor do any of the limited jurisdictional grants in § 1292. Thus, the Ninth Circuit lacks appellate jurisdiction.  If you disagree, please let us know why you think you have the right to file the appeal. If you agree, please dismiss the appeal. As noted below, we do not agree to stay the district court proceedings while the Ninth Circuit decides if it has jurisdiction to hear your appeal and see no need for a stay.

Regarding discovery in the NDCA case, you are incorrect when you say that the Judge stayed the GO71 disclosures. There is a difference between initial disclosures, including GO71 disclosures which are the initial disclosures used in employment cases, and discovery. The Judge has ordered the initial disclosures, including the GO71 disclosures, to go forward. Apple has complied with its obligations under GO71. With respect to discovery (documents requests, interrogatories, requests for admissions, depositions) the Court has allowed only limited discovery to proceed: "Based on the Court's ruling here, the only discovery permitted at this time is "Phase I" discovery (*i.e.,* discovery needed for the settlement conference) on Counts 1 and 3 (which Apple did not contest at all in its motion to dismiss) and those parts of the retaliation claims above that were not challenged or that otherwise survived." October 1, 2024 Order (Dkt. 112),  at 41. Since no discovery has been served, nothing further is required and there is nothing for you to move to compel.

As for the settlement conference, we see no need to continue the scheduling conference on November 12, as it is simply a precursor to the settlement conference that is not yet scheduled. Further, we are not in a position to evaluate how Apple will respond to the 5AC because you have not yet filed it and we have not had an opportunity to review.

Thanks,

**Melinda Riechert**

Partner

Orrick
Silicon Valley  

T 650/614-7423
M 6507591929
mriechert@orrick.com

![orrick]

---

**From:** Ashley M. Gjøvik <ashleymgjovik@protonmail.com>
**Sent:** Monday, October 21, 2024 9:03 PM
**To:** Riechert, Melinda <mriechert@orrick.com>
**Cc:** Booms, Ryan <rbooms@orrick.com>; Juvinall, Kate <kjuvinall@orrick.com>; Mantoan, Kathryn G. <kmantoan@orrick.com>; Perry, Jessica R. <jperry@orrick.com>
**Subject:** RE: Meet/confer email about Motion to Stay District Court proceedings pending appeal

**[EXTERNAL]**

Also, one more question -- you previously said you refuse to have a settlement conference until you know exactly which claims will be allowed to proceed -- but Judge Chen gave me leave to amend again, and did not restrict you to only filing an answer in response -- so assuming Apple files another Motion to Dismiss in district court, then you still would not know what claims are part of the lawsuit at the time of the settlement conference.

If Apple is insisting we proceed with the settlement conference as scheduled, is Apple also planning on filing an answer instead of a motion to dismiss, in response to the 5AC?

—

**Ashley M. Gjøvik**

**BS, JD, PMP**

Sent with [Proton Mail](#) secure email.

On Monday, October 21st, 2024 at 11:51 PM, Ashley M. Gjøvik <[ashleymgjovik@protonmail.com](#)> wrote:

> Hello,
>
> Thank you for finally responding.
>
> If Apple files motion to the 9th Circuit, that is even more activity in the 9th Circuit and would not change the need to stay the district court proceedings pending appellate decisions.
>
> As you do not even know my arguments for jurisdiction, or even specifically what issues I'm appealing - as you have not contacted me at all about this until now - would you want to save your Motion to Dismiss until after I file my opening brief? If you file a MTD first, it does give me more pages to argue jurisdiction in response, and then even more pages for the brief to focus on the substance under appeal itself. Or perhaps you have questions you'd like to ask now, to understand the merits of my appeal, prior to filing a MTD - so you're not just guessing what my appeal is about?
>
> Understood on your position for district court proceedings. I wish you could have simply said that sooner - as now I'm further behind schedule in filing the motions. Because you do not not want to stay anything in the DC proceedings, then we are well overdue for our initial discovery / high-level document exchange. I've already asked for some specific documents, and further disclosures, and there was no response from Apple. Again, I will be deposing 1-2 people involved in deciding to terminate my employment, prior to the settlement conference, and Apple still has not released to me any documents that reveal the timeline, people, and events that lead to the termination other than the formality of Yannick sending an email ghost written by unknown parties. I need that information and those documents at least a week before the next settlement conference scheduling meeting. I also asked Apple what documents they would need, repeatedly offering to share high level documents they feel are critical, and they have not said anything other than requesting full GO71 discovery (which was stayed after Apple asked to stay it), and wanting a deposition. The next ADR conference is 11/12 and the actual conference itself is supposed to be completed by Dec/January - which is soon. I also emailed you questions and requests about depositions which you have not responded to. I will file the motion to compel if Apple continues to refuse to participate in discovery (while Apple concurrently demands we continue discovery...).
>
> Let me know.
>
> Understood on Morgan Lewis. I'll still file an updated notice of pendency to the district court when the US gov complaint is served over my illegal termination and suspension, and 8+ ULPs. It sounds like NLRB will likely file it this week or next week. I will also add

the BAAQMD formal violation citations for operating without permits and illegal emissions. I'm waiting on copies of the formal notices that were served to Apple last month. If you could share those as part of the high level discovery, I'd appreciate it.

-Ashley

—

**Ashley M. Gjøvik**

**BS, JD, PMP**

Sent with Proton Mail secure email.

On Monday, October 21st, 2024 at 9:05 PM, Riechert, Melinda <mriechert@orrick.com> wrote:

> Ashley,
>
> We will be filing a motion to dismiss the Ninth Circuit appeal for lack of appellate jurisdiction. Under 9th Cir. R. 27-11(a)(1), the filing of the motion to dismiss will stay the appellate briefing schedule.
>
> In light of that, we do not agree any stay of proceedings in the NDCA case would be appropriate, including the scheduled settlement conference. As such, Apple will oppose a request to stay the NDCA proceedings as well as any request to extend the deadline to file a Fifth Amended Complaint.
>
> No need to cc us on your communications with Morgan Lewis.
>
> **Melinda Riechert**
>
> Partner
>
> Orrick
> Silicon Valley ⊙

T 650/614-7423
M 6507591929
mriechert@orrick.com



---

**From:** Ashley M. Gjøvik <ashleymgjovik@protonmail.com>
**Sent:** Monday, October 21, 2024 10:34 AM
**To:** Booms, Ryan <rbooms@orrick.com>; Juvinall, Kate <kjuvinall@orrick.com>; Mantoan, Kathryn G. <kmantoan@orrick.com>; Perry, Jessica R. <jperry@orrick.com>; Riechert, Melinda <mriechert@orrick.com>
**Subject:** Re: Meet/confer email about Motion to Stay District Court proceedings pending appeal

**[EXTERNAL]**

Hello,

I need to file the motion requesting a deadline extension very soon and I have not heard back from you about these questions. If I don't hear back soon, I will file both motions as mentioned and note that I tried to meet/confer with Apple but could not get a response.

-Ashley

—

**Ashley M. Gjøvik**

**BS, JD, PMP**

Sent with Proton Mail secure email.

On Thursday, October 17th, 2024 at 11:14 PM, Ashley M. Gjøvik <ashleymgjovik@protonmail.com> wrote:

> Hello,

A couple questions for you --

First, I'm preparing to file a Motion requesting a Stay of District Court proceedings pending the 9th Circuit Appeal. A stay seems like something beneficial for both parties -- as otherwise my next step is filing the Motion to Compel I've been talking about for a while now, and the revised complaint and response would probably need to be redone later anyway. I wanted to see if Apple would be willing to stipulate to a stay, and/or not oppose it.

If not, I will also be filing a motion to delay the deadline of the 5AC until a decision is made on the Motion to Stay, and would like to see if Apple would be willing to not oppose that (even if it opposes the motion to stay).

I also wanted to check if Apple had an opinion about staying the settlement conference or not. As mentioned, I've been concerned that Apple has no intention to settle -- so continuing with the conference along with the appeal is fine, but maybe we both stipulate to not doing the initial discovery. Otherwise, my position would be to stay the conference if I'm asking to stay everything else, then wait until the appeal is done, and then assess what needs to be done prior to the conference. Also, as mentioned, when Apple's actually ready to chat, it sounds like Scheinman is probably a good option.

Second, I just wanted to check to ensure you're up to date on the NLRB cases and/or check if you need anything related to those cases. Like, do you want me to cc one or more of you when I'm emailing with Morgan Lewis, or sending them documents, or whatever? Let me know if there's anything you'd expect - otherwise I will treat them separately.

Thanks,

-Ashley

—

**Ashley M. Gjøvik**

**BS, JD, PMP**

Sent with [Proton Mail](#) secure email.

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com*.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

**NOTICE TO RECIPIENT** | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com*.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

**Ashley M. Gjovik, JD**
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# United States District Court
## Northern District of California

Case No. 3:23-CV-04597-EMC

**Ashley M. Gjovik**, *an individual*,

Plaintiff,

vs.

**Apple Inc.**, a corporation,

Defendant.

**Plaintiff's Omnibus Motion for Leave to file Sur-reply and Objections; Sur-reply and Objections.**

*In Opposition to Defendant's Fourth Fed. R. Civ. P. § 12(b)(6) Motion to Dismiss, Third § 12(f) Motion to Strike, and Replies.*

**Motion Hearing & Case Management Conference:**
Dept: Courtroom 5 (Zoom)
Judge Edward M. Chen
Date: August 28, 2024
Time: 9:30 AM PT

**Request basis: Equity & Fairness.**

**Vigilantibus et non dormientibus jura sub veniunt.**

# TABLE OF CONTENTS

## CONTENTS

Plaintiff's Motion Requesting Leave to File a Sur-Reply ...................... 3

I.      Objections ......................................................... 6

  A.  Plaintiff concedes nothing! ................................ 6

  B.  Defendant repeatedly misrepresented Plaintiff's Fourth Amended
  Complaint and her Opposition to their 4th MTD. ....................... 6

  C.  Defendant does not want this case decided on the merit of the claims... 9

  D.  The Entire Controversy .................................. 10

II.     Substantive Arguments ......................................... 11

  E.  The Ultrahazardous Activities claim states a claim for Ultrahazardous
  Activities. ...................................................... 11

  F.  Apple trashed the Plaintiff's Property. ..............................15

  G.  The Statute of Limitations was tolled for the Toxic Torts (Nuisance,
  Ultrahazardous activities, IIED – Cancer). .............................. 20

  H.  Apple's Unfair Business Practices, in violation of UCL § 17200, caused
  Plaintiff harm to her property and economically. ...................... 28

  I.   Apple's Conduct was Outrageous, and it Intended to and Did Cause
  Extreme Distress. ............................................... 32

  J.   Apple's Knowing Exposure of Plaintiff and her Neighbors to
  Carcinogens was Evil. ........................................... 44

  K.  Cal.Lab.C. § 6399.7 (via § 6310) includes HAZWOPER..................... 45

  L.  Apple was certainly reading Plaintiff's Twitter posts......................... 55

  M.  Apple violated Cal.Lab.C. § 1102.5 dozens of times. .......................... 59

  N.  Claims for Cal.Lab.C. §§ 98.6 + 1101, 1102 (Politics) + 232.5 ............. 67

  O.  Claims for Cal.Lab.C. §§ 232 (Pay) & 232.5 ....................................71

  P.  Cal.Lab.C. §§ 98.6 + 96k + 232.5 claim (or Tamney &/or UCL)...........74

  Q.  Breach of Implied Covenant of Good Faith & Fair Dealing .................75

  R.  Plaintiff's request for Cal. Labor Code civil penalties is not relevant for
  a subsequent 12(b)(6) motion, or 12(f) motion. .........................76

III.    Conclusion .........................................................76

# Plaintiff's Motion Requesting Leave to File a Sur-Reply

1.    Plaintiff, Ashley Gjovik, respectfully submits the following Administrative Motion for Leave to file a Sur-reply in response to Defendant's Replies [Docket 89-90] to her Opposition to Defendant's Motions to Dismiss [Docket 78] and Strike [Docket 79]; and in support of Plaintiff's Oppositions to Defendant's Motions [Docket 84-87].

2.    Attached and incorporated are the sur-replies, proposed supplement, objections, declaration, and request for Judicial Notice. Plaintiff makes this request in the interests of justice, in equity, for the sake of decisions on the merits, because of the extreme power imbalance between Plaintiff and Defendant, and because Plaintiff has already been severely prejudiced by Defendant. [1]

3.    The Defendant made false statements and inferences, that are material to this matter, highly prejudicial, and should be corrected for the record and the Court's consideration. Defendant has also refused to meet/confer in good faith, refused to negotiate in good faith, repeatedly tried to surprise-attack Plaintiff procedurally, repeatedly made attacks on Plaintiff's character and competence, and repeatedly argued in bad faith knowing their arguments contradict the actual facts. Concurrently, Defendant continues to publicly harass, humiliate, and defame the Plaintiff, with a recent example provided in the 7/31 Declaration, which includes extensive harassment about this lawsuit and which Defendant urges this court to ignore.

4.    Defendant is a \$3.4T corporation, here represented by a \$1.4B/year

---

[1] *Bartlett v. Citibank*, Case No. 17-cv-00712-EMC, 2 n.1 (N.D. Cal. Apr. 19, 2017); *Jackson v. Applied Materials Corp.*, Case No. 20-cv-06007-VKD, 5 n.1 (N.D. Cal. Apr. 8, 2021); *Staley v. Gilead Sciences, Inc.*, 19-cv-02573-EMC, 1 n.3 (N.D. Cal. Jul. 16, 2021); *Alexsam, Inc. v. Wageworks, Inc.*, Case No. 19-cv-04538-EMC, 7 (N.D. Cal. Dec. 21, 2020); *Simmons First National Bank v. Lehman*, Case No. 13-cv-02876-DMR, (N.D. Cal. Apr. 1, 2015).

law firm – with essentially unlimited resources at their disposal. Plaintiff is one person, representing herself. Defendant has drawn this legal matter out for over three years now, attempting everything it can to try to ensure the matter is not decided on the merits.

5.      Defendant's prior 12(b)(6) motion to dismiss filings included tactics which violated FRCP and the local rules, and which Plaintiff expressed she was fearful to engage with as she did not want to break the rules as well.[2] Plaintiff was then punished for her attempt to comply with court rules, having two of her claims dismissed with prejudice partially due to her good intentions.[3] Even if the court will not consider this filing, Plaintiff did not concede & the Plaintiff tried to rebut Defendant's claims.

6.      Plaintiff requests this court's consideration of her arguments, of Defendant's actions, and of the extreme power dynamic between Plaintiff and Defendant. If Defendant is allowed to repeatedly violate the FRCP in order to attack Plaintiff's claims, while Plaintiff is forced to strictly comply with page limit and form rules, then the Defendant will whittle her lawsuit down to a toothpick,

---

[2] "Defendant's actions put Plaintiff in a difficult situation, as to get her 'day in court,' she is expected to object and correct statements made by the opposing party if she does not think they are accurate – yet if she were to do so where Defendant references and quotes its allegations on mooted pleadings, then Plaintiff joins Defendant in conduct this District has described as "wholly improper." *Williams v. County of Alameda*, 26 F. Supp. 3d 925, 947 (N.D. Cal. 2014). Instruction the Court "refuses" to allow parties to "engage in such conduct." *Id.* In *Williams v. County of Alameda,* the court refused to 'consider the arguments that [the party] improperly seeks to incorporate by reference.' *Id.* Plaintiff asks this court for similar discretion in response to Defendant's conduct, as Plaintiff does not plan to respond to those arguments." P's Opp to D's MTD at 4-5. Docket No. 54.

[3] "Accordingly, the Court dismisses the SOX claim. Dismissal is with prejudice, both because of Ms. Gjovik's failure to respond directly to Apple's argument in her opposition and her failure to articulate at the hearing new facts that would suggest a violation of the relevant criminal fraud statutes or securities laws… As indicated in the discussion above, Ms. Gjovik did not directly respond to Apple's challenge to the Dodd-Frank claim; furthermore, she has failed to explain how she provided information relating to a violation of the securities laws. Accordingly, dismissal of her Dodd-Frank claim, with prejudice, is warranted… Ms. Gjovik does not clearly respond to this argument in her papers, and thus the Court dismisses the NIED claim in its entirety." *Gjovik v. Apple Inc.*, 23-cv-04597-EMC, 23, 24, 45 (N.D. Cal. May. 20, 2024).

regardless of the actual merit of her claims.

7.    Defendant filed a fourth 12(b)(6) motion on July 15 2024 [D's MTD Docket No. 78] requiring extensive research and response drafting in a brief period of time, and then upon a best effort to respond by Plaintiff, Apple declared that anything not squarely addressed was "conceded" and should be dismissed with prejudice. Defendant has also declared a maximum total page limit rule for Plaintiff, forbid Plaintiff from filing requests for judicial notice or declarations, misrepresented (or even falsified) Plaintiff's statements, and repeatedly accused Plaintiff of misconduct and incompetence. Apple justifies its request to bypass FRCP 12(g) and 12(h) claiming 'efficiency' and narrowing of claims. This is a reasonable justification in some situations, but here what Apple means is that Apple wants to avoid this lawsuit and silence the Plaintiff.

8.    Defendant also filed pending motions, supposedly in equity, that are grossly unfair to the Plaintiff, and which could foreclose the majority of this lawsuit. Defendant attempts to railroad her and cause the Plaintiff to unjustly lose her only opportunity to seek a judicial remedy for the concrete and extensive harm Defendant caused in every aspect of her life.

9.    Because Defendant requests to have claims re-considered despite violating FRCP – Plaintiff also makes a request in equity. Plaintiff requests the Court consider her sur-reply (with proposed supplements), objections, declaration, and both requests for judicial notice in addition to her Opposition filings – or provide Plaintiff an opportunity to present proper evidence in a Summary judgement proceeding, if any of her claims would otherwise be dismissed with prejudice.

10.    The proposed supplement herein attempts to address the areas Apple demanded more detail. The point of a Rule 12(b)(6) motion is to determine if the claim could ever be pleaded, not if it's perfectly pleaded today. This supplement shows these claims can all be pleaded, even if some are not pleaded perfectly today.

Additionally, the Second Amended Complaint is referenced to prove the claims can be plead sufficiently with enough time and pages.

# I. OBJECTIONS

## A. Plaintiff concedes nothing!

11.    Apple repeatedly claimed Plaintiff conceded to its arguments. [Reply 8/5 at 4, 5, 9, 10, 13]. **I concede nothing.** Plaintiff responds to substantive points with additional detail herein. As for the Defendant's many misleading and/or inflammatory arguments – Plaintiff asks the Court to review what was actually filed if Apple attempts to quote Plaintiff's documents, as several "quotes" are not actually things she said and are not in the referenced documents. Apple similarly quoted the Court several times in misleading ways that attempt to prejudice the Court against the Plaintiff,[4] and so Plaintiff urges the Court to factcheck Apple's references and quotes to court filings as well.[5]

## B. Defendant repeatedly misrepresented Plaintiff's Fourth Amended Complaint and her Opposition to their 4th MTD.

---

[4] Apple repeatedly intentionally quotes the Court's May 20 2024 Order and Decision, but drops any mention of environmental issues, privacy, or harassment from the quotes, even if it means quoting a sentence fragment. Apple: "As the Court recognized in its May 20, 2024 order regarding Plaintiff's prior complaint, "[t]he gist of [Plaintiff's] suit is that Apple retaliated against her because she complained about conduct at the company[.]" Dkt. 73 (the "May 20 Order")." Def's MTD at 1, 23. Similar statement also at Def's Reply pg1-2 and MTS pg1.

[5] The Court actually wrote: "*The gist of her suit is that Apple retaliated against her because she complained about conduct at the company, including but not limited to environmentally unsafe conditions.*" May 20 2024 Order, Docket #73 at 1. (Continued at FN 3). The Court added: "*(1) During her employment with Apple, Ms. Gjovik lived in an apartment near an Apple factory (known as the ARIA factory) and became ill because the factory released toxic substances into the environment. (2) Ms. Gjovik's office at Apple (known as Stewart 1) was located on a contaminated site subject to EPA regulation, i.e., a Superfund site, and she became ill because of Apple's actions/omissions related to the site. (3) Apple made employees, including Ms. Gjovik, participate in studies related to Apple products that were invasive to their privacy. (4) Apple retaliated against Ms. Gjovik for making complaints about harassment and environmental safety. Ms. Gjovik's complaints included internal complaints, complaints to governmental agencies, complaints to the press, and complaints made in social media. The retaliation by Apple included but was not limited to the termination of Ms. Gjovik from employment.*" -May 20 2024 Order, #73 at 2.

12.    Apple repeatedly uses their own misleading editorializations of statements from both Plaintiff and the Court as justification as to why Plaintiff's meritorious claims should be dismissed with prejudice. Apple wrote in it motions and replies, in different formats that: "*…this Court recognized in its May 20, 2024 order regarding Plaintiff's prior complaint [Apple's misquoting] …thus dismissal with prejudice of the other claims will facilitate efficient resolution of the … retaliation claims that would remain and enable appropriately focused discovery and motion practice going forward.*" [D's MTD at 1, 25; D's Replies at 15]. Apple thus also refers to this Court's discovery orders as "inappropriate" and threatens to file even more motions to dismiss after this one.

13.    In addition, despite the chaotic allegations Defendant thew at her, Plaintiff has not pled anything in bad faith, nor does she believe any claims were dismissed due to misconduct or incompetence. The only full claims dismissed with prejudice on substantive points were her pro se, first attempt to plead federal money laundering and securities fraud against a multinational corporation – which is difficult for any attorney to do successfully. Defendant also repeatedly complains about the length, detail, lack of detail, organization, reorganization, and content of her amended complaint – despite filing repeated Motions to Strike previously that urged Plaintiff to engage in significant rewrites.

14.    Defendant declares that existing claims are new even though they are not new, and it is quickly discernable that the claims are not new when reviewing the Plaintiff's complaint revision tracking table and indexes in her Declaration [Exhibits A-C], which Defendant urges this court to ignore. Defendant also repeatedly claims that Plaintiff was allowed or was not allowed to amend things that the Order seemed to say the opposite of whatever Apple is claiming now. [Def's MTD at 2, 5, 20]. Defendant also repeatedly claims Plaintiff pled new claims, theories, and/or "themes" – but the only major difference is Plaintiff voluntarily removing many claims that were given leave to amend hoping Apple

would file an Answer (which Defendant suggests several times is because Plaintiff deserves sanctions...?) and pleading new or revised facts. Plaintiff apologizes if she misunderstood the instructions, but she suspects Apple is just trying to distract and confuse from the substantive issues. [for example, Def's MTD at 1-3; MTS at 2-5, 11].

15.    The other major misrepresentation from the Defendant is falsely quoting Plaintiff about a material matter that could lead to the dismissal of three of her claims and multiple sub-claims. In Apple's 8/5 Reply, counsel wrote:

Apple: "The operative complaint makes clear that by at least March 2021—over two years before she filed the lawsuit on September 7, 2023— **"she suspect[ed] ... that her injury was caused by wrongdoing."** See 4AC ¶57 ("On March 26, 2021, the SF Bay View newspaper published an article Gjovik wrote about her chemical exposure experience with the air around [the Scott building]" entitled "I thought I was dying: My apartment was built on toxic waste.")." Def's MTD Reply at 9.

16.    However, the quoted text in bold is not anything Plaintiff wrote in her complaints, or in the article cited. In ¶ 57 of Plaintiff's 4AC she wrote:

Plaintiff: "On March 26, 2021, the SF Bay View newspaper published an article Gjovik wrote about her chemical exposure experience with the air around ARIA. More victims and witnesses promptly came forward; some were also Apple employees. On April 5, 2021, Gjovik told West about the other victims, and West warned her she was "*kicking a hornet's nest.*" West asked Gjovik not to send information about Gjovik's chemical exposure at her apartment next to ARIA to his personal work email, saying: "*Can you send that stuff to my Gmail instead of work? My mail account is routinely scanned for lawsuits.*" 4AC ¶ 57.

Due to the implication attempted by Defendant, the entirety of the SF Bay View article referenced is attached as Exhibit P in the expanded Request for Judicial Notice. The concluding summary in the article is open questions and brick walls – the opposite of what Apple implies.

Plaintiff: "So, what made me sick? While in the end everyone agreed it was VOCs, I may never know for certain if it was the chemicals in the soil or groundwater and, if so, which ones. I was faced with so many walls and dead ends and no real solution at the end. I kept asking myself, how do people facing poverty have any chance to advocate for themselves? How do Black and Brown people have any chance of being heard when they might face bias and discrimination at every point along the way? I knew that if I couldn't find a solution, there's no way these folks would. It's well known now that toxic waste sites are often located near low-income and racial and ethnic minority communities. So, these folks are more likely to suffer from these issues and have fewer resources to deal with the issues when they face them. It was the moment I really started to understand environmental justice." [6]

17.     Plaintiff reminds Defendant of the U.S. District Court for the Northern District of California's Guidelines for Professional Conduct, Rule 18(c): "A lawyer should not create a false or misleading record of events or attribute to an opposing counsel a position not taken."

### C.  Defendant does not want this case decided on the merit of the claims.

18.     Another argument made by Defendant so provocative as to compel Plaintiff to respond here was Defendant's repeated claims of essentially a new rule that only applies to Plaintiff where she is only allowed to file employment and labor lawsuits, but no other types of lawsuits, regardless of merit. Concurrently Defendant continues to refuse to cooperate outside of Court, even for the employment and labor claims.

19.     In addition, despite the facts related to 3250 Scott Blvd being the factual basis of several claims Defendant is not even challenging, Defendant

---

[6] Ashley Gjovik, "*I thought I was dying: My apartment was built on toxic waste,*" SF Bay View (March 26 2021). https://sfbayview.com/2021/03/i-thought-i-was-dying-my-apartment-was-built-on-toxic-waste/

suggests any reference to 3250 Scott Blvd be stricken from the lawsuit. This would nullify a number of Plaintiff's claims including her *Tamney* claims for Crime Victim [See, SAC ¶859, 4AC ¶ 162] and Legislative Witness [See, SAC ¶858, 4AC ¶ 163-165] retaliation and decimate her 1102.5 retaliation claims related to environmental laws and environmental crimes. Further, both the Crime Victim and Legislative Witness claims could stand alone without *Tamney*, either under their own statutes or standing for the Crime Victim claim as an injured member of the public[7] - but both require a factual basis that includes 3250 Scott Blvd.

20.    Removing all facts related to 3250 Scott Blvd would also prevent Plaintiff from providing a full factual basis for what happened with her and Defendant in all of her claims – including theories for reasonableness, motive, emotional distress, and an eggshell plaintiff in the whistleblower and labor claims. Further, there is already direct evidence of retaliation and animus from Defendant against Plaintiff related to 3250 Scott Blvd. Defendant's motion tries to conceal this.

21.    Finally, Defendant still does not even attempt to explain why it wants to strike the entirety of Section 98.6 from her 4AC despite no express justification or notice of such mentioned in the motions to dismiss or strike.

### D.    The Entire Controversy

22.    Public policy factors the determination of litigation on the merits rather than on procedural grounds – recognizing that justice is best served when all litigants have a chance to be heard. Procedural requirements should be given liberal construction in order to not deprive a litigant of her day in court because of technical requirements.[8]

---

[7] *Angie M. v. Superior Court (Hiemstra),* 37 Cal.App.4th 1217, 1223 (1995).
[8] *Eitel v. McCool,* 782 F.2d 1470, 1472 (9th Cir. 1986); *CNC Software, LLC v. Glob. Eng'g Ltd. Liab. Co.*, 22-cv-02488-EMC, 10 (N.D. Cal. May. 12, 2023).

23.    Defendant complains about how many claims there are, nitpicking different versions of counts. This is irrelevant. Plaintiff has one claim for relief for each injury. Here she has injuries requiring remedy starting in 2020 (or earlier depending on the claim), through current day, and for some claims also into the future. She has been injured personally (including physically, mentally, and reputationally)[9], and her real property interests and chattel property were also injured. Plaintiff alleges Defendant caused all of that harm to her and owes her a remedy. That is Plaintiff's claim. That is the entire controversy. There are multiple causes of action she may pursue, but ultimately the complaint and claims will conform to the evidence as the law demands.

## II.  SUBSTANTIVE ARGUMENTS

### E.    The Ultrahazardous Activities claim states a claim for Ultrahazardous Activities.

24.    Defendant argues Plaintiff has not addressed Defendant's concerns about whether her claims rise to the level of "Ultrahazardous Activities." [Def.'s MTD at 17-18, D's 8/5 Reply at 10]. First, that is a question of law for the Court to decide and the Court did decide that the Activities were Ultrahazardous in the May 20 2024 Decision and Order.[10]

25.    The only thing that has changed since the May 20 2024 decision is the US EPA Compliance and Enforcement Division released their report of findings from their RCRA inspections of 3250 Scott Blvd in August 2023 and January 2024, which described at least 19 unique violations of the RCRA (and some with hundreds of occurrences); confirmed semiconductor fabrication is

---

[9] "*Apple poisoned me: physically, mentally, spiritually: Ashley Gjøvik, who was fired by the tech giant after blowing the whistle on toxic waste under her office, says her fight will go on*", Index on Censorship, December 2021, https://www.indexoncensorship.org/2021/12/apple-poisoned-me-physically-mentally-spiritually/

[10] *Gjovik v. Apple Inc.*, 23-cv-04597-EMC, 27-31 (N.D. Cal. May. 20, 2024).

occurring at the facility; reported that Apple has been engaging in RCRA hazardous waste treatment and disposal (including air emissions) without required permits; and explained that Apple has no technology or system in place to monitor the quantity or safety of their air emissions at the plant. [P's 7/31 RJN Exhibit A pg 3-29]. Now Apple is requesting a re-consideration of the toxic torts and framing their request as a favor to the Court.

26.    Defendant also asks the court to disregard Plaintiff's RJN because of a new rule Defendant created about overall page limits per motion practice that only applies to Plaintiff. A RJN with policy materials to support legal analysis is not much different than an amicus brief and should be considered regardless.

27.    Further, Defendant's arguments are strawmen and red herrings. [Def's 7/15 MTD at 17-18]. There is no chemical that is absolutely prohibited without exception. Similarly, no activity is absolutely prohibited in any and all circumstances. Even the most dangerous well established "Ultrahazardous Activities" could perhaps be considered not ultrahazardous if they were conducted in Antarctica.

28.    There is a clear balancing test to examine activities. The analysis of a chemical is part of the danger analysis, but it does not define what is ultrahazardous or not. If the danger is related to a chemical or gas, the chemical does need to be dangerous in order to support an ultrahazardous claim – and these are. Defendant ignores Plaintiff's pleadings, opposition, and request for judicial notice (and encouraged the Court to do the same), but those filings describe the dangers of toxic gases with specific examples provided of Arsine, Phosphine, Silane, Fluorine, Diborane, and Stibine. [P.'s 7/31 RJN Exhibit E; P's Opp to D's MTD ¶ 64-77].

29.    As noted in the RJN at Exhibit E, the Int. Safety Cards for four of these chemicals warns that no exposure to the chemical is safe, and any exposure requires medical attention. Five of these gases are also listed on the 1910 Subpart

H "List of Highly Hazardous Chemicals, Toxics and Reactives"[11] (a list of chemicals that have the potential for catastrophe) and other lists of very dangerous chemicals. These gases are inherently dangerous, and they carry a high degree of risk of serious harm. *See*, RESTATEMENT 2ND OF TORTS § 520 (1997); Cal. H&S C. §§ 25115, 25117, 25122.7, 25532(i)(2).

30.    Similarly, these gases are not the only ultrahazardous substances, as Apple also stores, uses, and self-reported dumping into the air concentrations of mercury and arsenic, and other very dangerous substances.[12] [SAC ¶ 68, 74].

31.    Further, semiconductor fabrication is not a common activity and industry has ample resources to choose where to locate its factories. Thus, its highly inappropriate for Apple locate a fab next to apartments and/or to hide the fab activities while apartments were built next-door, especially as a $3.4 Trillion company with nearly unlimited resources and options. Ca. Health and Saf. Code § 25110.4 defines "buffer zone" as "an area of land that surrounds a hazardous waste facility and on which certain land uses and activities are restricted to protect the public health and safety and the environment from existing or potential hazards caused by the migration of hazardous waste." A buffer was required here, by law and logic, but there was none at all.

32.    While there is usually some justification of a benefit to the community where industry provides jobs and brings in tax money – this is a different situation, because Apple does not pay its taxes and also implicates its

---

[11] "*This appendix contains a listing of toxic and reactive highly hazardous chemicals which present a potential for a __catastrophic__ event...y.*" 1910 Subpart H 1910.119 App A; examples: Arsine (7784-42-1), Phosphine (7803-51-2), Stibine (Antimony Hydride) (7803-52-3), Fluorine (7782-41-4), Diborane (19287-45-7).

[12] "Extremely hazardous waste" means any hazardous waste or mixture of hazardous wastes which, if human exposure should occur, may likely result in death, disabling personal injury or serious illness caused by the hazardous waste or mixture of hazardous wastes because of its quantity, concentration, or chemical characteristics." Cal. H&S Code § 25115. See also, "Acutely hazardous waste," Cal. Code Regs. Tit. 22, § 66260.10.

employees in environmental crimes.[13]

33.     That's not the end of the analysis though. It is also critical to determine if there is any way to manage the chemicals safely.[14] The RJN's Exhibits D-O [RJN ¶ 13, 16, 18] explain that when it comes to these specific toxic gases used for semiconductor fabrication, there is no way to avoid a catastrophe. This is often the heaviest factor in the analysis for Ultrahazardous Activities – there is nothing that can be done to limit risk other than strictly restrict the amount of the substance allowed and how far it must be kept away from human life and sensitive environments. That is the case here – as noted by the city, county, and fire code [P's 7/31 RJN Exhibit O], that Apple asks this court to ignore [D's 7/15 MTD at 17]. Even if Apple were to take all reasonable precautions and exercised all reasonable care, there would still be unavoidable risk remaining in their use of toxic gases for semiconductor fabrication at 3250 Scott Blvd directly next to thousands of homes.

34.     The next critical factor is how appropriate the activity is for the location. 7/31 RJN Exhibit B [RJN ¶19-21] shows the position of this fab in relation to residential housing. Not only are there laws in place that are supposed to prevent this from ever happening, but any reasonable person viewing this distance is likely to shout "*Outrageous*!" – as thousands of people did with Plaintiff's recent Twitter thread about the RCRA inspection report for 3250 Scott

---

[13] "*Cupertino's mayor says Apple is 'not willing to pay a dime' in taxes,*" The Verge, May 5 2016, https://www.theverge.com/2016/5/5/11604704/apple-tax-evasion-cupertino-mayor-barry-chang-reform; "*Apple's Agreement With Cupertino Is Taxpayer-Fleecing Collusion,*" Bloomberg, April 18 2023, https://news.bloombergtax.com/tax-insights-and-commentary/apples-agreement-with-cupertino-is-taxpayer-fleecing-collusion; "*Want a lower tax bill? So do Apple and Genentech,*" San Francisco Chronicle, Aug. 12 2018, https://www.sfchronicle.com/business/article/Want-a-lower-tax-bill-So-do-Apple-and-Genentech-13148121.php -- "…In Santa Clara County, Apple is the leading appealer of tax assessments, with 489 open cases dating back to 2004, disputing $8.5 billion in property value…").
[14] Note: Apple argues that because these chemicals are regulated by the RCRA, that shows they are not ultrahazardous – but Apple refers to RCRA's regulation of transport, storage, and disposal of all hazardous wastes.

Blvd.[15] [See also, 7/31 Declaration re: June harassment].

35.    This is already a matter of public concern, and the opportunity to seek justice should not be prematurely or unfairly foreclosed for the Plaintiff or for the thousands of people who could sue Apple over the 3250 Scott matter in the future. It would also be inappropriate to close the matter now while there are open, active investigations into the same issues by the US EPA and BAAQMD enforcement teams which could potentially lead to criminal charges. [7/31 RJN Exhibit A; 8/18 RJN Exhibit T].

### F.    Apple trashed the Plaintiff's Property.

36.    Defendant also complained that Plaintiff did not provide enough detail about the damage to her property from these emissions. [Def's MTD at 15]. Her injuries were detailed, including photographs, in the SAC (for example at 488-492). Regardless, additional photos are included here, as well as the physical reactions cased by the six toxic gases from 7/31 RJN Exhibit E. Additional detail can also be pleaded if needed.

> **Arsine** (Arsenic trihydride). CAS #: 7784-42-1 Physical State; Appearance: colorless compressed liquefied gas with characteristic odor. Physical dangers: The gas is heavier than air and may travel along the ground; distant ignition possible. As a result of flow, agitation, etc., electrostatic charges can be generated. Chemical dangers: Decomposes on heating and under the influence of light and moisture. This produces toxic arsenic fumes. Reacts with strong oxidants. This generates explosion hazard. May decompose explosively on shock, friction or concussion. [7/31 RJN Exhibit E; SAC at page 482].

> **Chlorine**. CAS #: 7782-50-5 Physical State; Appearance: Greenish-<u>yellow</u> compressed liquefied gas with pungent odor. Physical dangers: The gas is

---

[15] Twitter, Ashley Gjovik, June 23 2024, https://x.com/ashleygjovik/status/1805006150410162322 [On just the first post of the thread - Impressions: 8M, Engagements: 427k, Likes: 75.36k, Retweets: 13.2k].

heavier than air. Chemical dangers: The solution in water is a strong acid. It reacts violently with bases and is corrosive. The substance is a strong oxidant. Reacts violently with combustible substances and reducing agents. The substance reacts with most organic and inorganic compounds, causing fire and explosion hazard. **Attacks metals, some forms of plastic, rubber and coatings.** [SAC at page 482].

**Diborane**. CAS #: 19287-45-7 Physical State: Appearance is colorless compressed gas with characteristic odor. Physical dangers: The gas mixes well with air, explosive mixtures are easily formed. Chemical dangers: The substance polymerizes. This produces liquid pentaborane. Reacts violently with oxidants. Decomposes rapidly on heating. This produces hydrogen, boric acid and boric oxide. Solubility in water: hydrolyzes to hydrogen and boric acid. [7/31 RJN Exhibit E].

**Fluorine**. CAS #: 7782-41-4 Physical State: Appearance is **yellow** compressed gas with pungent odor. Physical dangers: The gas is heavier than air. Chemical dangers: The substance is a strong oxidant. It reacts with combustible and reducing materials. Reacts violently with water. This produces toxic and corrosive vapors of ozone and hydrogen fluoride. Reacts violently with ammonia, metals, oxidants and many other materials. This generates fire and explosion hazard. Solubility in water: reaction. [7/31 RJN Exhibit E].

**N-methyl-2-pyrrolidone (NMP).** CAS #: 872-50-4. Physical state; appearance: Colorless hygroscopic liquid with characteristic odor. Physical dangers. Chemical dangers: Decomposes on heating and on burning. This produces toxic fumes including **nitrogen oxides.** It reacts violently with strong acids and strong bases. **Attacks copper and its alloys.** [SAC at page 483].

**Phosphine** (Phosphorus trihydride). CAS #: 7803-51-2 Physical State; Appearance: colorless compressed liquefied gas. Physical dangers: The gas is heavier than air and may travel along the ground; distant ignition possible. Chemical dangers: Decomposes on heating and on burning. This produces toxic fumes including phosphorus oxides. Reacts violently with air, oxygen, oxidants such as chlorine oxides, nitrogen oxides, metal nitrates, halogens and many other substances. This generates fire and explosion hazard. **Attacks many metals.** [7/31 RJN Exhibit E; SAC at page

482].

**Silane** (Silicon tetrahydride). CAS #: 7803-62-5. Physical State; Appearance: colorless gas with characteristic odor. Physical dangers: The gas is heavier than air. Chemical dangers: The substance may ignite spontaneously on contact with air. Decomposes on heating and on burning. This produces silicon and hydrogen. This generates fire and explosion hazard. The substance is a strong reducing agent. It reacts violently with oxidants. Reacts with potassium hydroxide solution and halogens. [7/31 RJN Exhibit E; SAC at page 482].

**Stibine** (Antimony hydride). CAS #: 7803-52-3 Physical State; Appearance: colorless compressed gas with pungent odor. Physical dangers: The gas is heavier than air and may travel along the ground; distant ignition possible. Chemical dangers: Decomposes slowly at room temperature. Decomposes quickly at 200°C. This produces metallic antimony and hydrogen. This increases fire hazard. Reacts violently with chlorine, concentrated nitric acid and ozone. This generates fire and explosion hazard. [7/31 RJN Exhibit E].

**Toluene** (Methylbenzene). CAS #: 108-88-3. Physical State; Appearance: Colorless liquid with characteristic odor. Physical dangers: The vapor mixes well with air, explosive mixtures are easily formed. As a result of flow, agitation, etc., electrostatic charges can be generated. Chemical dangers: Reacts violently with strong oxidants. This generates fire and explosion hazard. [SAC at page 483].

37.    While it's not clear yet which exact chemical caused what exact damage, it's clear some chemicals caused extensive damage (see photos) – as well as that many of the chemicals in use at 3250 Scott Blvd had the potential to cause extensive damage.



*Figure 4: Chemical reaction to copper alloy on Plaintiff's jeans*



*Figure 3: Plaintiff's shoe falling apart in use due to dissolved glues*



*Figure 1: Degraded plastic on Plaintiff's coffee grinder*



*Figure 2: Chemical reaction to copper alloy on Plaintiff's jeans*

(216 of 293), Page 216 of 293

Case: 25-2028, 05/09/2025, DktEntry: 17.2, Page 216 of 293
Case 3:23-cv-04597-EMC   Document 93   Filed 08/18/24   Page 19 of 77



*Figure 8: Yellowing of Plaintiff's white fabrics*



*Figure 7: Yellowing of Plaintiff's white fabrics: Yellowing of Plaintiff's white fabrics*



*Figure 6: Yellowing of Plaintiff's white fabrics*



*Figure 5: yellowing of some of Plaintiff's plastics, but not others*

### G.   The Statute of Limitations was tolled for the Toxic Torts (Nuisance, Ultrahazardous activities, IIED – Cancer).

38.   Defendant now demands that Plaintiff must prove how she discovered Apple's fab at 3250 Scott and otherwise her claims should be dismissed. [Def's 7/15 MTD at 16-17 and 8/5 Reply at 7-9]. Apple claims the statute of limitations accrued when Gjovik started to investigate (that's not the law) and that there's no explanation why she didn't file suit in 2020. [Id]. This is all false.

39.   The burden is not on Plaintiff to explain every detail of the facts supporting her tolling theory in a response to a motion to dismiss.[16] Plaintiff pled details about Apple's factory operating as a skunkworks, about how neither she or the government could figure out why she was injured, how Apple failed to have required permits and failed to file required reports to the government (ensuring there was no way someone like Plaintiff could investigate what they were doing), and when she contacted Apple and mentioned the facility in 2020, Apple said nothing to her about their operations there, but instead initiated a massive cover-up of the environmental issues. [4AC]. Out of fear her claims could be dismissed, Plaintiff pleads the additional details of the theory now.

40.   In 2022, Plaintiff was deeply traumatized by what happened to her in 2020-2021 and out of concern for public safety continued to monitor the nearby Superfund sites for any progress, updates, or possible revelations. Plaintiff primarily studied the TRW Microwave site, including monitoring the US EPA webpages and requesting extensive public records through FOIA. She also continued to ask questions and share information with the US EPA team overseeing the TRW Microwave site as they worked on the corrective actions with Apple and Northrop Grumman.

---

[16] Cal.Civ.C. § 458 "In pleading the Statute of Limitations it is not necessary to state the facts showing the defense, ... and if such allegation be controverted, the party pleading must establish, on the trial, the facts showing that the cause of action is so barred."

41.    Plaintiff also kept an eye on the Honeywell "Synertek" Superfund site in Santa Clara next to the apartments where she got sick in 2020. [SAC ¶ 31-35, 166, 168]. Back in 2020-2021, there were only a few theories about how she could have gotten so sick. There was an investigation by the regional US EPA CERCLA team around the Synertek site because its VOC groundwater plume was historically under where these apartments are now.

42.    At this point, Gjovik trusts no one and continued to monitor the groundwater well reporting on CalEPA's Geotracker GAMA application herself.[17] In July 2022, she noticed that US EPA had tested the Synertek wells in 2021 following her complaints (they did not tell her), and there was increasing TCE in the groundwater monitoring well closest to her prior apartment.

43.    Plaintiff's activism was deeply chilled after the retaliatory litigation resulted in a gag order from March 2022 and until the reverse and vacate in November 2022. It became a crime for her to talk to anyone aspects of her claims and complaints, and so she mostly stopped talking until she would no longer face prison time for doing so. She picked up her research again in the winter of 2022/2023. (Note – Plaintiff alleges this duress, Defendant is liable for, also impacted her ability to 'discover' what Defendant did – which was probably part of the reason they did it.)

44.    In early January 2023, while checking for updates, Gjovik noticed the US EPA had uploaded the 2022 Five Year Report for the Synertek site.[18] She read the report and had a number of questions about the report and emailed US EPA and USACE with her inquires on January 11 2023. Her email was organized into four parts she titled: *"Increasing TCE In Well 33-A per GAMA"; "2022 FYR Notes Remediation Injections In 2019 & 2020, With 'Rebound Effect'"; "Santa Clara*

---

[17] CalEPA, Geotracker: Groundwater Ambient Monitoring and Assessment (GAMA), https://www.waterboards.ca.gov/gama/
[18] "*6th 5-year review rpt for Synertek, Inc. Building 1 Superfund site, w/appendices A-F,*" 55 pp, Doc. ID 100029800 (September 8 2022). https://semspub.epa.gov/work/09/100029800.pdf

*Square Apartments In FYR"*; and *"3250 Scott Blvd."* (Because Apple has challenged three claims with an implication that Gjovik may be misleading the court about when/how she discovered the site, a copy of the email is attached to the 8/18 Declaration as Exhibit G.

45.     Gjovik was also reviewing the CalEPA CERS portal for information on all of Apple's California facilities as she was building a large spreadsheet of all of Apple's environmental and OSHA failures in California. (As of January 18 2023, there were 162 rows!). She noticed 3250 Scott Blvd had received many inspection violations in late 2020 (probably posted in 2021), including citations for somehow losing 1,700 gallons of diesel in 2020.

46.     In her January 11 2023 email, she wrote to US EPA: "*Was there an inquiry to 3250 about testing? Apple moved in 2015, per CERS records. In 2017, Honeywell General Counsel (Kate Adams) became General Counsel of Apple. Was this considered during any outreach about 3250? I'd be concerned about VI at 3250 not just for workers there, but also due to chemical reactivity with the stockpile of industrial chemicals they're apparently hoarding there, & even losing tracks of thousands of gallons of.*" (referring to the diesel). Gjovik was still focused on vapor intrusion. They did not respond.

47.     Gjovik became especially curious about a few of Apple's California properties that seemed to be more industrial than others. She filed Public Records Act requests for records about these sites. One of these requests (Request 23-127) was filed to Santa Clara city on February 9 2023 and included a request for 3250 Scott Blvd records in addition to three other Apple buildings in Santa Clara. On February 21 2023 the city of Santa Clara responded that it would take a while to gather the records but linked to four prior requests where some records had already been released in the interim. [8/18 Declaration Exhibit H]. The requests with records for 3250 Scott Blvd (Requests 22-1148 and 22-1149, filed October 11 2022) were from AEI Consultants explaining they were working on "property

condition assessment reports," assumably for Apple.

**48.** The only documents released were lists of permits. Gjovik skimmed the permits for 3250 Scott Blvd and was flabbergasted to see permits for semiconductor fabrication tools (which she recognized only due to her work on hardware development at Apple). She quickly communicated her findings.

**49.** She replied to US EPA complaining they still had not responded to her concerns about the groundwater wells and also added:

> "A new, additional question for you all - is how long have you known that Apple was doing literal actual silicon fab in that 3250 Scott Building since ~2016 through current? Like, back in the 1970s-1980s Silicon Valley silicon fab, and only .2 miles (.3 km) from RESIDENTIAL BUILDINGS. Apple's buildings permit (attached) notes solvent/chemical evaporation in the yards near the "gas bunkers" & a large number of solvent exhaust ducts to the roof from the variety of clean rooms & fab stations. The building is registered in CERS but is not a DTSC, Water Board, or US EPA site. A literal silicon fab factory that is spewing toxic chemicals into at least the air is only overseen by the city fire department & which only inspected a couple times - finding open violations but apparently never even following up on them." – Ashley Gjovik (2/22/23 12AM).

Plaintiff was very distressed.

**50.** On February 21 2023 around 11:20pm, Gjovik began tweeting about Apple's permits at 3250 Scott Blvd, trying to lead up to a grand reveal of the fab. However, an engineer spoiled the surprise, also recognizing what she did, and quickly posted "*@[account] do you have any IH/OH friends who can say exactly how stupid it is to do modern chip fab next to residential buildings?*" to which Gjovik responded, "*you spoiled the surprise for the non-hardware people, but good job, yes... APPLE IS SO [expletive] DUMB I'M GOING TO SCREAM.*" [19] Gjovik then tweeted out the formal announcement:

---

[19] Twitter, February 21 2023, https://x.com/ashleygjovik/status/1628249545367777281

"APPLE IS DOING LITERAL ACTUAL [expletive] SILICON FAB 0.2 MILES (0.3 KM) FROM THE APARTMENT WHERE I GOT SO SICK I THOUGHT I WAS DYING & APPLE VENTED THAT [expletive] INTO THE AIR FROM THEIR ROOF & THE YARD NEXT TO THEIR "GAS BUNKERS" RIGHT INTO MY 3RD FLOOR APARTMENT." [20] [4AC ¶ 149, FN 39].

Gjovik replied to her own post a moment later adding:

"I've been making muffled screaming noises for about twenty-five minutes now WTAF IS WRONG WITH THEM THEY MUST HAVE KNOWN THEY DID THAT [expletive] TO ME!!! No wonder they gave me that "extreme condition leave" to move out, Apple is the extreme condition." [21] (See, SAC ¶ 694-695).

51.     Gjovik started emailing with a friend, Lenny, about what she found. They met during her activism in late 2020 and emailed each other about environmental matters ongoing. She shared with Lenny she also found a "*cryptic fire department gas leak report from June 2019 at 3250 Scott*." Apple's name was redacted, and the chemical name misspelled. He explained, "*I believe the correct spelling is phosphine. This is why the county's fire departments led the development of the model hazardous materials storage ordinance…In general, the gas releases have more acute health effects than the releases to groundwater*." Lenny was involved it getting the Santa Clara County toxic gas ordinance passed in the 1980s and she trusted his expertise. [Gjovik's primary witness for the tolling of statute of limitations for environmental claims in this case is Lenny. He was also recently the mayor of Mountain View, as well as a City Council member, and member of the city's Planning Commission in the 1980s. He is also the executive director of the Center for Public Environmental Oversight. Lenny also tried to investigate

---

[20] Twitter, February 21 2023, https://x.com/ashleygjovik/status/1628250591779516416
[21] Twitter, February 21 2023, https://x.com/ashleygjovik/status/1628256067065880577

how Gjovik was injured and also could not figure out it out in 2020-2022.].

52.    Prior to Gjovik's February 2023 discovery, numerous government agencies and experts had reviewed Gjovik's complaints and the site data; they tried to figure out what could have made her sick. Eventually there was consensus that it was probably not the Superfund site, or the existing Brownfield contamination – and the best guess was maybe something in the building materials at the apartment. That's where it left off and that's why Gjovik wrote "*I thought I was dying…*" in desperation and which was published in March 2021. [8/18 RJN Exhibit P].

53.    Gjovik undertook months of research about the facility at 3250 Scott Blvd, consulting with more experts, meeting with government agencies, requesting more public records, and drafting a formal complaint, which she filed in early June 2023. A manager in US EPA's Enforcement and Compliance Assurance Division for Hazardous Waste and Chemicals Section confirmed receipt on June 20 2023 and told Gjovik they were reviewing the complaint and documents she provided. She had a call with the manager on June 21 2023. An inspector was assigned, and a formal investigation was opened around July 12 2023. She met with the investigator several times and provided additional evidence and records, leading up to the EPA's August 17-18 2023 unannounced onsite inspections of 3250 Scott Blvd. [P's 7/31 RJN Exhibit A].

54.    Gjovik started working on her first draft of the complaint in this instant civil lawsuit only on or around August 16 2023 and filed suit on September 7 2023, only two days prior to the statute of limitations expiration for her *Tamney* claim, and after only being able to spend roughly three weeks on research and drafting.

55.    Plaintiff's nuisance claim at 3250 Scott Blvd was included in the complaint from the first draft, however she did not think she could complete the required environmental and regulatory research in time, so she prepared to either

request an amendment, or to file a second suit in state court for the toxic torts. When Apple asked Gjovik to draft an amended complaint in October 2023 due to their delayed appearance into the litigation, Gjovik seized the opportunity to proactively merge in the toxic tort claims to this lawsuit.

56.    Earlier, Gjovik spent an incredible amount of time in 2020-2021 researching and investigating, trying to figure out what happened to her next to 3250 Scott Blvd. She reviewed public records for all the nearby next-door buildings including 3250 Scott Blvd. When she pulled 3250 Scott up on the US EPA portal in 2020, the ECHO page noted that there had been no TRI releases reported since the 1990s, cited no violations or issues, and made the office look quite benign. A copy of the exact PDF Plaintiff made of the page during her research in September 2020 is attached, dated September 8 2020. [P's 8/18 RJN U]. This same document was also in the evidence Box folders created for Apple to review from July-August 2021.

57.    Defendant's MTD cited the "*I Thought I was Dying...*" article as some sort of proof that the statute of limitations should expire. Defendant even added a quote (that is not from the article or the complaint) to attempt to cast doubt on Gjovik, as discussed earlier. [D's 7/15 MTD at 16-17]. Thus, in the 2nd RJN, the article is included for the fact of what Gjovik actually said about the matter in 2021. [P's 8/18 RJN Exhibit P].

58.    Plaintiff was exercising a fundamental right as a California citizen to request and review public records about hazardous waste.[22] In doing so, Plaintiff was finally discovered what Apple was doing, based on environmental activities undertaken by Apple and/or the property owner in late 2022.

---

[22] "The Legislature has found that access by the people of this state to public records is a fundamental and necessary right. The Legislature finds that it is necessary to further the public's right of access to public records pertaining to hazardous waste management, information, and cleanup, to assure the fullest opportunity for public participation in permitting and other decisions in order to protect public health and the environment." CA Health & Safety Code § 25103 (2023).

59.    Prior to her discovery of Apple's fab, Plaintiff only knew she was exposed to chemicals somehow – but did not know exactly what those chemicals were, did not know where they came from or how they got in her apartment, and did not know if there was wrongdoing or what type of wrongdoing might have occurred. Further, most of her efforts to investigate were focused on the potential of vapor intrusion occurring from the soil or groundwater under the apartments, and if that was the cause, the liable parties would be her property manager (not Apple), the Superfund responsible party (not Apple), and probably the contractors who worked on the clean-up (also not Apple) – unless Apple was dumping toxic waste in the groundwater too. Even if that was enough to trigger accrual of an action for vapor intrusion, discovery of one potential wrong does not accrue all other wrongs – the discovery rule still applies to other wrongs.

60.    If plaintiffs were required to file all causes of action when one cause of action accrued... they would run the risk of sanctions for filing a cause of action without any factual support.[23] "Indeed, it would be difficult to describe a cause of action filed by a plaintiff, before that plaintiff reasonably suspects that the cause of action is a meritorious one, as anything but frivolous.... the interest of the courts and of litigants against the filing of potentially meritless claims is a public policy concern."[24]

61.    Also, for example, suspecting lung disease was caused by chemicals at work is not enough for statute of limitations accrual – the victim must have knowledge of the specific chemical that caused the injury.[25] IIED accrual occurs when the plaintiff suffers severe distress as result of defendant's conduct, not necessarily at the time of the wrongful conduct itself.[26]

---

[23] Code Civ. Proc., § 128.5; see *Finnie v. Town of Tiburon* (1988) 199 Cal.App.3d 1, 14 [ 244 Cal.Rptr. 581] [holding lack of factual basis for claim to be grounds for imposing sanctions].
[24] *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal.4th 797, 815 (Cal. 2005).
[25] *Rosas v. BASF Corp.*, 236 Cal.App.4th 1378, 1394-99 (Cal. Ct. App. 2015).
[26] *Roman v. County of Los Angeles*, 85 Cal.App.4th 316, 323 (Cal. Ct. App. 2000).

62.     Action accrual in statute of limitations commenced to run at the time the plaintiff becomes aware of her exposure and defendants' responsibility for it. *In re Hawaii Federal Asbestos Cases*, 734 F. Supp. 1563, 1570 (D. Haw. 1990) – ("the statute of limitations does not begin to run until plaintiffs knew or should have known that they have suffered the functional impairment, that defendants manufactured a defective product, and that there exists a causal connection between the two.") Action accrues not simply with knowledge of injury but with knowledge an injury was caused by the wrongdoing of another. *Kernan v. Regents of the Univ. of Cal.*, No. A162750, 7 (Cal. Ct. App. Aug. 29, 2022). Constructive suspicion is not enough. *Nelson v. Indevus Pharmaceuticals, Inc.*, 142 Cal.App.4th 1202, 1205 (Cal. Ct. App. 2006).

63.     Finally, Apple and their agents (including these Orrick attorneys) went out of their way to ensure Plaintiff did not discover what Apple had done to her, including making false statements to the government. They failed to provide her information and tried to point her in other directions, all the while mercilessly harassing and tormenting her. Further they had a duty to disclose not only to her, but to the community and government too, what they were doing and had done, under multiple Right to Know, environmental, health and safety, and labor laws.

## H. Apple's Unfair Business Practices, in violation of UCL § 17200, caused Plaintiff harm to her property and economically.

64.     Defendant attacks Plaintiff's § 17200 standing and injuries. Plaintiff did more legal research, worried that without pleading restitution, her injunctive claim could be dismissed per Defendant's arguments. She reintegrates content from the SAC, and she proposes a supplemented pleading as follows. This also includes additional injury for standing, though she believes what she pled was sufficient. (Apple argues that a Lyft charge would not count because it's just going to the building before, they do things to her and ignores the fact, she would also

need to take a Lyft to leave the building). Further, studies like Gobbler were injuring her continuously.[27] The Gobbler app still tries to connect to her personal iCloud account, even years after her termination. [8/18 Declaration Exhibit I].

Plaintiff suffered numerous injuries due to Defendant's Unfair Business Practices including the cost of transportation to visit the "black sites" where Apple conducted some of these studies and hosted the secrecy trainings; and also costs of buying a required safe to store the prototype at home as required by many hardware programs. In addition, the time Plaintiff had to spend on these activities, is time that could have been spent on professional development and consulting. Plaintiff lost the opportunity to make additional income due to Dependent's policies and requests to spend so much time on these studies and data collection.[28]

But worse, Defendant claims it terminated Plaintiff because she publicly complained about these activities. Plaintiff's UCL claim also argues its unlawful and unfair that Apple requires secrecy about these activities. Thus, terminating her because she did not maintain that secrecy is a direct injury to her financially (i.e., lost income and benefits)[29] and to her property (i.e., trade libel; destroying her possessions from her desk prior to mailing them back to her, etc.) due to Apple's unfair business practices.[30]

In addition, due to Apple's "live on" policies, Plaintiff's only electronics

---

[27] *Clayworth v Pfizer, Inc.* (2010) 49 C4th 758, 789, 111 CR3d 666 (declining to read into Bus & P C § 17204 requirement that plaintiffs prove compensable loss at outset).

[28] *Cal. Med. Ass'n v. Aetna Health of Cal.*, 14 Cal.5th 1075, 1084-1085, 1089-1090 (Cal. 2023)— "CMA may not have incurred additional out-of-pocket costs in responding to Aetna's allegedly illegal practices; its employees were salaried and would have been paid regardless. But the economic value CMA received from their labor was reduced...That injury suffices for standing purposes."

[29] *Law Offices of Mathew Higbee v. Expungement Assistance Servs.*, 214 Cal.App.4th 544, 561 (Cal. Ct. App. 2013 )—"having alleged that he had been forced to pay increased advertising costs and to reduce his prices for services in order to compete, and that he had lost business and the value of his law practice had diminished, succeeded in alleging at least an identifiable trifle of injury as necessary for standing under the UCL."

[30] *Animal Legal Defense Fund v. LT Napa Partners LLC*, 234 Cal.App.4th 1279, 1283-84, (Cal. Ct. App. 2015) – "Where the economic injury is diversion of resources, the proper focus of the inquiry is ... on whether the plaintiff 'undertook the expenditures in response to, and to counteract, the effects of the defendants' alleged [misconduct].'"

were Apple products, including the ones she bought herself as a consumer. However, due to Apple's extensive surveillance capabilities, Apple's privacy policies which say she has no privacy ever again, and all of Apple's retaliation – Plaintiff had to purchase non-Apple computers, phones, and peripherals in 2021. This cost Gjovik a lot of money, and she lost the money she had invested in the Apple products, and it was only due to Apple's unfair business practices.

In addition to the requested injunctive and declaratory relief, including enjoining these Unfair Business Practices and disgorging at least the data of Gjovik and any products built off that data, Plaintiff also requests restitution of the back pay she is owed from Plaintiff. Because this claim is under UCL and not an employment or labor claim, the after acquired evidence and other imbalanced employment damages policies should not apply here. If Defendant attempts to argue these policies to reduce her damages under the labor and employment claims, Plaintiff asks that the back pay instead be restituted from the UCL claims without deductions, and with interest.[31]

65.     Data and software disgorgement is appropriate here and there is precedent of FTC using software disgorgement as a remedy with at least five cases since 2019, including against Amazon and Cambridge Analytica.[32] There is also recent FTC precedent for enjoining a company's use of biometric technology following violations of the Act.[33]

66.     A California Unfair Competition Law (UCL) claim generally accrues

---

[31] "*Espejo v. Copley Press, Inc.*, 13 Cal.App.5th 329, 377 (Cal. Ct. App. 2017) – "[T]he trial court's discretion to award restitution under the UCL is very broad....when necessary in order to arrive at fair compensation, the court in the exercise of a discretion may include interest or its equivalent as an element of damages."

[32] IAPP, *Algorithm disgorgement 'significant part' of FTC's AI enforcement strategy,* https://iapp.org/news/a/algorithm-disgorgement-significant-part-of-ftcs-ai-enforcement-strategy/

[33] US FTC, *"Rite Aid Banned from Using AI Facial Recognition After FTC Says Retailer Deployed Technology without Reasonable Safeguards,"* Dec 19 2023, https://www.ftc.gov/news-events/news/press-releases/2023/12/rite-aid-banned-using-ai-facial-recognition-after-ftc-says-retailer-deployed-technology-without (Rite Aid's unlawful conducted included employees using an app on their mobile phones to capture photos of customers that gathered the person's biometrics without notifying the person. Rite Aid is now prohibited from using facial recognition technology for surveillance purposes for five years.)

when each of the elements of the cause of action (wrongdoing, harm, and causation) are satisfied.[34] Defendant argues Plaintiff cannot prove the discovery rule for Gobbler, but the discovery rule is not relevant for Gobbler. [Def's MTD at 8].

67.     The UCL also supports equitable tolling which suspends or extends the statute of limitations where a plaintiff has reasonably chosen to pursue one remedy among several remedies and the notice function of the statute of limitations has been served;[35] the continuing violation doctrine by which a series of wrongs or injuries are aggregated, and the limitations period accrues for all of them on commission of the last of them;[36] and the continuous accrual rule by which a series of wrongs or injuries is viewed as each triggering its own limitations period...[37]). All of these apply here.

68.     In addition, there is duress as Apple threatened employees with termination if they were to even speak to their friends about the study [8/18 RJN Exhibit R], let alone file suit. Further, Apple claims it terminated Plaintiff over her speaking publicly about it and may still file a related counterclaim in this lawsuit, thus there is certainly still continuing and imminent harm. In addition, when Gjovik checks the settings of her "personal" iCloud account, it still shows "Gobbler" trying to connect to her data.

69.     It's also unlawful to propose an agreement for sale of consumer goods/services with provisions waiving consumer's right to make statements regarding the seller or its employees or agents or concerning the goods/services, and unlawful to penalize consumers for exercising these rights. Any contract with such terms is contrary to public policy and unenforceable. Cal. Civ Code

---

[34] *Beaver v. Tarsadia Hotels,* C.A.9 (Cal. )2016, 816 F.3d 1170, certiorari denied 137 S.Ct. 113, 580 U.S. 823, 196 L.Ed.2d 41.
[35] 3 Cal. Proc. (5th), Actions, § 720 et seq; § 147 Statute of Limitations., 13 Witkin, Summary 11th Equity § 147 (2024).
[36] 3 Cal. Proc. (5th), Actions, § 564.
[37] 3 Cal. Proc. (5th), Actions, § 522 et seq.

1670.8(a). The deed poll is just one example of the contracts Apple coerced employees to sign and is clearly unenforceable. [4AC ¶112; P's 8/18 RJN Ex. R].

70.    Apple's highly restrictive, and unlawful, policies threatened employees with punishment if they were to even speak to their family about what happen was doing to them. The Deed Poll includes restrictions on speech, a highly intimidating 'opt out' procedure, and a deeply unbalanced exchange between parties. This specific document was provided to Gjovik for a physical safety issue caused by a consumer product that Gjovik had bought with her own money. Gjovik was burned by the product, resulting in rashes and a blister, but Apple's contract says that is now a secret and she could be fired if she told anyone. She had been injured by products prior as well, mostly prototypes that Apple had her "live on" to do QA for them in her personal time, prototype batteries, rough edges, or development lasers. In 2019 Gjovik reported her "live on" iPhone had just blasted her in the face with a flash from the Face ID lasers that burnt her eyes. Apple Global Security rushed over to her and took her iPhone away in a Pelican Case. Is that a secret too?

71.    Cal. HSC 24170-24179.5 provides statutory rights for those harmed by unlawful experiments and to penalize those who conduct unlawful experiments. Among other requirements, human experiments but use informed consent with disclosure of the experiment prior to consent, deciding whether to consent without coercion or undue influence, and providing the participant a copy of the consent form. (Apple followed none of these rules with Gjovik & Gobbler, and other studies). A number of other statutes also protect Gjovik and her coworker from these experiments – including the prohibition of tracking employee's GPS outside of work while Gjovik "lived on" prototype Air Tags, or even the iPhones for that matter

I.    **Apple's Conduct was Outrageous, and it Intended to and Did Cause Extreme Distress.**

72.    Defendant claims Plaintiff's IIED complaint is simply complaining
that some Apple employees repeatedly called her a liar and said she deserved to
be hurt in retaliation for speaking out – that's only a tiny bit of the claim, but
that's fairly bad in itself? Numerous cases have held, and the Restatement
emphasizes, that there are only a few categories of conduct where an employer
may be found to have engaged in IIED, and most common are defamation –
especially accusations of dishonestly and/or criminal conduct; denigration and
humiliation;[38] deranged harassment;[39] and IIED used as a tool in the employer's
cover-up of wrong doing.[40] Calling the employee a liar, especially in retaliation for
the employee making labor or whistleblower complaints, is one of the few approved
buckets for potential IIED claims.

---

[38] "Cross humiliated Ferrell by publicly …spreading false rumors about her medical leave;
coerced her into taking unpaid leave; ridiculed her medical condition; took actions which
delayed her medical leave; attempted to "build a file" to get her fired; picked through her
trash to retrieve evidence of her errors; and engaged in efforts designed to degrade her and to
make her appear incompetent. The complaint also alleges that Cross and Henderson called
Ferrell a liar, mentally unstable, a chronic complainer, and often referred to her as a "bitch," a
"slut," and a "cunt." *Ferrell v. Cross*, 557 N.W.2d 560, 564 (Minn. 1997). "To be denied a right
granted to all other employees for conduct unrelated to her work was to degrade her as a
person. His unilateral action in purporting to remove any free choice on her part contrary to
his earlier assurances also would support a conclusion that his conduct was intended to
emphasize that she was powerless to do anything to assert her rights as an IBM employee.
And such powerlessness is one of the most debilitating kinds of human oppression." *Ruben
Miller v IBM Corp*, 21 Cal. 3d 910, 927-928.) [162 Cal. App. 3d 256] (1984).
[39] "Actions which may not make an actor liable in one situation may make him liable in
another. Here, both Knudson and Elmore had knowledge of Wangen's mental condition at the
time of the meeting." *Wangen v. Knudson*, 428 N.W.2d 242, 248 (S.D. 1988); "A statement to
the press by a physician assumed to know the facts that a person is suffering from a
potentially fatal disease, even though the physician was aware that the person was not
stricken with that condition. This, of course, constituted intolerable professional conduct.
Disseminating the falsehood through the national press compounded the harm."
*Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265, 1274 (3d Cir. 1979).
[40] "Plaintiff's contentions of persistent harassment and attempted coercion for filing union
grievances, though generalized at this point, are of the type that a trier of fact might find do
constitute extreme and outrageous conduct." *Lynn v. Smith*, 628 F. Supp. 283, 292 (M.D. Pa.
1985); "The defendants (acting in conspiracy) dragged her out of her house in the middle of
the night after searching it; told her children that she could have killed them and herself;
threw her in jail for ten hours; denied her access to a lawyer or court; and told her she would
remain in jail unless she agreed to check into a mental institution," *Baltz v. County of Will*,
609 F. Supp. 992 (N.D. Ill. 1985).

73. Defendant's summary is only a tiny bit of Plaintiff's IIED claim. Further, she was already in a very bad situation and Apple knew it (eggshell), with Plaintiff even complaining to Apple about IIED in August 2021 as part of her Issue Confirmation. In addition, Apple was in a position of power and authority to severely hurt Plaintiff's interests, and Apple did so knowing the harm it was causing and did so in order to cause that harm.

74. Gjovik's IIED claim captures the post-termination harassment, intimidation, and torment of Plaintiff by Apple – as well as her "emotional distress" damages associated with other claims but with future damages. (i.e., denylisting as part of employment claims). Apple did not challenge the IIED claim in the SAC. Apple's response is that it did not have sufficient page limit to do so. Does that mean Apple plans to file yet another MTD after this one against more claims?

75. Defendant accuses Plaintiff of misconduct and incompetence related to several claims, including this one – so Plaintiff provides additional details that could be supplemented to the 4AC. (Note: Def. also asks the court to not look at Plaintiff's declaration with emails and social media posts with Apple actively harassing her about this lawsuit – which is all the more reason the Court should review those documents).

76. First, vicarious liability can be established against employees employed with Apple at the time of the incident, under at least three theories: respondeat superior [Cal. Civ Code 2299, 2316], ratification [Cal. Civ Code 2307, 2310], and alter ego. [see, SAC ¶ 744-7, 844, 880, 1044, 1603-4]. She also argues outgrowth, customary incidents, benefits to employer, and risk inherent in the company's culture – all of which were reasonably foreseeable to Apple. (See SAC ¶ 922-935).

77. The harassment was undertaken by many Apple employees, under their names and identifying as Apple employees. They also frequently branded the

harassment as an Apple product of some sort, for instance citing Apple products or themes in their fake screennames (for example, "SquareinaRoundHole" referencing the famous Apple commercial), designing threats modeled after Apple heritage (i.e., threatening employees that if they speak publicly about work conditions they will get "Gjovik'd" – an iteration on the phrase "Steve'd" referencing Steve Jobs' habit of abruptly firing people, see SAC at 542).

78.     Several employees who harassed her online did so prior to and after she was terminated, and as an outgrowth of either prior retaliatory harassment (see Messick at SAC at 335, who also repeatedly threatened her with termination in retaliation for her speaking to the press about workplace safety at Apple prior to Gjovik being put on leave. He then took to social media to harass her after).

79.     Or, as a representation of the retaliatory animus of her managers (see, Neoform, SAC at 536-7, her coworker sitting across the aisle from her at 825 Stewart Drive, seeing her manager every day and participating in conversations about Gjovik. Ian took to Twitter and other social media to harass and threaten Gjovik starting in August 2021 and continuing through fall of 2021). Ian's comments included statements like: "*Based on her writings and twitter feed, I would not be surprised in the least to learn she has some kind of psychosis,*" "*You think there are law firms that will want to hire her? She's toxic,*" "*Now Apple has fired her for supposedly 'leaking' insider information. A brief glance at her twitter feed can resolve the 'supposedly' part,*" "*She's entirely to blame for her firing,*" and "*Vexatious litigant incoming!*" (SAC ¶ 536).

80.     Two employees posted horrible things about Gjovik under their own names. Ricky (a manager/supervisor, alter ego, Resp. Sup., ratification) and Shantini (Resp. Sup., ratification). Both accused Gjovik of lying, of acting in bad faith, having poor moral character – and urged people and the press to ignore Gjovik. Ricky specifically referenced Gjovik's protest of Gobbler and government filings as a source of his animus towards her, and Shantini posted a long Twitter

thread repeatedly complaining about Gjovik's government filings against Apple – claiming they were meritless and made in bad faith. This occurred while Gjovik was still an employee, was covered by Apple blogs who asked Apple for comment, and was amplified by other coworkers, including members of her first team at Apple under Venkat Memula. When Gjovik was terminated, Ricky, after posting about how Gjovik was a bad actor for filing government charges against Apple and speaking out about work conditions. They posted in response to the termination: "Sometimes you fuck around, sometimes you find out." Posts were shared and liked by hundreds of employees, with some of them replying and commenting to support the harassment, including by managers and senior leaders at Apple.

81.     Appleseed harassed Gjovik on social media as well as many other mediums (Resp. Sup., ratification). The social media harassment started in late August and early 2021, while both were still employees at Apple. Appleseed's defamatory, intimidating, and harassing comments were posted publicly, and also sent privately to individuals who interacted with Gjovik and expressed support for Gjovik. Public posts usually were positioned as being based on some sort of inside information from Apple Global Security and/or HR ("I know something you don't"), and as if she was speaking on behalf of the company about Gjovik. The content also revolved around animus over Gjovik's NLRB and other government charges against Apple. (See, for example, SAC at 598-604, 609-612, 654-7, 675, 680-3, 685-93, 712-726, 732).

82.     The burner accounts (not representative of real people and created just to harass Gjovik) also showed Apple connections through their activity (for example several accounts were used solely to harass Gjovik and other Apple legal adversaries including Epic Games and Corellium, see SAC at 456).

83.     See harassment examples in the SAC at 414-5, 430-32, 446, 456-81, 563-5, 587, 594, 596-600, 608, 612, 632-33, 635, 637, 650, 644, 886-7 874, 877-85, 1095-1109. See, spying and stalking examples in the SAC at 669, 889-891, 922-

929. See, false police report examples in the SAC at 590-92, 595, 1438. (This was conducted by multiple people – despite Apple's framing of the harassment as coming from a lone gunman).

84.     Apple was aware of the harassment and aware of the distress caused to Gjovik by it, through their surveillance of her online presence, of their own direct participation, the press 'asking for comment' on matters including the harassment, Apple's admitted "investigation" into Gjovik's social media in August-September 2021, employees filing complaints about things Gjovik complained about and/or about Gjovik, and a number of other supporting theories.

85.     Second, there are also agency and conspiracy theories for employees who left Apple after already starting the harassment as an employee, and continued that harassment after, or people who assisted in the harassment, were never an employee, but Apple is still liable for their actions (i.e., third party counsel).

86.     For example, one of Apple's four+ external counsel law firms hired to fight Plaintiff, MWE, was caught multiple times harassing Gjovik online and in real life. The firm filed notice of appearance on Gjovik's NLRB charges in August of 2021. In 2022, the firm somehow knew Appleseed sued Gjovik and quickly requested copies of the order against Gjovik and the entire case file for the matter. How did MWE know about it if they were not involved? How did MWE know the lawsuit was based on Gjovik's NLRB charges against Apple? What did they plan to do with the records?

87.     The firm was also caught in 2023 using a fake Twitter account to harass Gjovik. The account called Gjovik a liar, repeatedly degraded her over the weight she gained during the trauma, and otherwise ridiculed her. Gjovik identified the account was associated with the unique name of one of the attorneys and also spent most of its time harassing Gjovik and unions which the firm, and specific lawyer, was hired to oppose in labor organizing. [See "Praveen" examples

in the SAC ¶ 704, 730].

88.   The lawsuit filed against Gjovik on January 31 2022 was done so, admittedly in the petition and the TRO hearing testimony, because Gjovik filed an NLRB charge against Apple, because Gjovik claims she was retaliated against by Apple, and because Gjovik had complained about harassment from Apple Global Security, including Appleseed. Appleseed publicly posted she was in some sort of dire trouble with Apple in January 2022, and then after filing the lawsuit said the issues were resolved. The night after she filed the lawsuit, she posted a photo of her holding an Apple Global Security "challenge coin." Appleseed also repeatedly claimed some unnamed third-party told her to file the lawsuit. A few days later she also posted that she had personally never sued anyone – despite just suing Gjovik – which begs the question of who she was suing Gjovik for if it wasn't herself. (for example, SAC ¶ 601-605).

89.   The majority of Appleseed's complaints in the lawsuit were arguments focused on a legal filing Gjovik submitted to the government including law enforcement, where she had gathered evidence of the harassment against her, alleging Apple was engaging in criminal conduct. (See, for example, SAC at 600, 608-9, 699-700). Appleseed repeatedly demanded Gjovik alter, withdraw, and conceal this legal filing – and upon winning the first Court of Limited Jurisdiction hearing against Gjovik, then proceeded to report the federal legal filing to Gjovik's web server as "child porn." (SAC ¶ 1077).

90.   The Order prohibited Gjovik from speaking to anyone, even privately, about significant aspects of her litigation against Apple, and it had now become a crime to say/write the name of her office. (Note: Gjovik was certain Apple would use the Order to try to incarcerate Gjovik, and Gjovik did discover that Orrick – counsel here – employ a large number of prior Office of the Attorney General staff from state of Washington, including a prior AG. If Apple wanted to get Gjovik thrown in jail, they had the means to do so.

91.    Apple knew Gjovik had been facing harassment from Appleseed and other Apple employees, and when Gjovik filed her January 2022 NLRB claim, she communicated to Apple to send a cease & desist to a number of employees illegally harassing her, including Appleseed, Ricky, and Shantini – and also asked Apple to get them to stop reporting her to law enforcement. This was around January 11 2022, which was followed by even more reports to law enforcement. (SAC ¶ 593). Gjovik's post asking Apple to stop the harassment was also a subject of the lawsuit, claiming it was illegal for her to post it.

92.    While Appleseed apparently left Apple around December 2021 with a large settlement, she informed Gjovik in January-February 2022 that she remained in contact with Apple, they spoke about Gjovik, and they were both trying to censor her social media posts. Appleseed repeatedly urged Gjovik to drop her allegations against Apple. (SAC ¶ 1452). Appleseed emailed Plaintiff on February 5 2022, harassing Gjovik claiming that Gjovik complaining about Apple's threats of violence against her, and complaining about Apple trying to make her suicidal, was "*harmful to Apple*" and Appleseed said she "*reported*" Gjovik "*to Apple*" for making those statements, before proceeding to then threaten Gjovik with litigation and unspecified reprisals if Gjovik did not alter her federal testimony (SAC ¶ 1452).

93.    On September 1 2021, an Apple employee, Shantini wrote a long Twitter thread accusing Gjovik of being a *liar, racist, and a predator.* Vyas claimed Gjovik made "*bogus, unsubstantiated filings with the DOJ and other regulatory bodies.*" Shantini's posts were quickly reshared by Beezie Wacks and Mel Nayer, and other fake accounts, as well as named Apple employees and managers. On September 3 2021, at 4:46am, 9to5Mac.com published an article about Gjovik alleging there was doubt to the merits of her NLRB{ XE "NLRB" } charge against Apple, suggesting she was lying. (The blog retracted nearly the majority of the post after Gjovik threatened to sue them for defamation and false light). The

article included quotes from Shantini and Ricky. Ricky also shared Shantini's thread about Gjovik and Ricky stated Gjovik was on a "*warpath*" and had a "*vendetta*" against Apple. (SAC ¶ 481).

94. Third, there were a number of 'fake' accounts created solely to harass and interact with Gjovik that knew way too much about Gjovik, too much about Apple's internal operations, and too much about the labor and environmental disputes. Gjovik quickly responded to them either as "Apple HR" or "Apple's lawyers". One of the accounts, Beezie, started harassing Gjovik in August 2021, taking an extremely personal interest in Gjovik's complaints about Apple, and sent Gjovik URLs to the EEOC website. Gjovik responded, "*you sure know a lot about employment law, Beezie.*" (SAC ¶ 414-5). The day Gjovik was fired, Beezie posted "*#ashleygjovik the world is both pandering to you and also reaming you. This sounds about right. #narcissist #youdeserveit #coward,*" and then paid to 'promote' her Twitter post. (SAC ¶ 1052). (Note, a payment like that should be discoverable from Twitter).

95. The next one, Mel Nayer, tried to coerce Gjovik to delete the screenshots of internal documents she had posted, claiming the posts were leading to 'death threats' and proceeded to reference a number of internal Apple tools and systems. Another one, I'mPinkThereforeI'mSpam, posted, "*You'll never work as an attorney,*" (post then liked by other anonymous account "BeezieWacks"), and added "*The nail that sticks out, gets hammered.*" (SAC ¶ 1055).

96. On September 8-10 2021, yet another one, "crissnovak," started posting about Gjovik on Reddit, sharing a link to Shantini's Twitter posts harassing Gjovik about Gjovik's NLRB and US DOJ complaints, "*Shantini is my hero, best take on "A" with over 200+*

*be cringing.*" On September 10 2021, the account posted in a thread about Gjovik: "*The only thing toxic in all of this is HER. I wouldn't hire this person. I wouldn't rent to this person. I sure as hell wouldn't date this person. She needs serious help.*" The same day the account posted about Gjovik: "*I think when the NLRB, EEOC slams the door on Karen's face because there's no case, we'll see more Twitter tirades about how corrupt these agencies are. Dear Apple, please don't pay her a fcking dime; awarding toxic behavior will only perpetuate it. She needs to learn a hard lesson in life and gain some maturity.*" (SAC ¶ 532-533).

97.    On September 11 2021 the crissnovak account posted, "*I so hope Apple, Northrop Grumman, Irvine Company sue her and teach her a lesson. I think she things she is going to get rich, but she's going straight to the poor house. $300k + RSUs + healthcare + tuition reimbursement all up in smoke for this nonsense. Go Ashley go!*" Crissnovak then began threatening other Apple employees they may "*get Gjoviked!*" if they speak out. On September 13 2021, the crissnovak account posted on a thread about Gjovik: "*…. Apple (w/it's army of lawyers) can sue her and it would be an easy win because it's a simple breach of contract case. Her counter suit for retaliation/harassment will be very challenging especially if her coworkers don't have her back. They may be enjoying all that Apple $$$. Lawsuit would be chump change for Apple but will certainly bankrupt her. I've never seen anyone so intent on ruining their own reputation/livelihood…*" crissnovak sure knows a lot about employment law too. The account added that Gjovik was on the "*chubby side*" and had "*baby teeth lol.*" (SAC ¶ 532-533).

98.    Another, FirstNameBunchofNumbers, started harassing Gjovik in 2022, primarily taunting Gjovik about the lawsuit filed against her. The account's profile photo was the docket for Appleseed's lawsuit against Gjovik, and the biography was "*Ashley is a bitch.*" Among other deranged posts, the account tagged Gjovik with a link to the California Moral Character exam and inquired if Gjovik will still be able to be a lawyer with this lawsuit against her. The account added an

image of a smirking teenager.[41] (SAC ¶ 861-868). The retaliatory lawsuit also was filed with the intention of preventing Gjovik from becoming a licensed attorney. Gjovik had a right to become an attorney and Apple egregiously interfered with that right. This was not only an implied threat, but anonymous social media accounts (clearly Apple) harassed Gjovik about exactly this. The same account also posted about Plaintiff: "*honestly cannot believe this is being allowed to go on in public. She needs a conservatorship or something. Watching her go downhill live on Twitter seems irresponsible, but she won't listen to anyone. Where is the family to step in and help?*" and "*If they read her TL they see that she's a nutjob and can't even win a case on Twitter or Wikipedia, so they probably aren't much concerned about her winning in a court of law.*" (SAC ¶ 366).

99.     BabyHummingbird was the account who threatened Gjovik that Apple was mailing her a box with the severed head of one of her loved ones, but it really contained her possessions from her desk trashed and covered in glass shards, and a bug planted in one of her items of décor. 18 U.S. Code § 876. The account only posted to and about Gjovik, and its first "like" was an advertisement that read, "*Apple's back better than ever!*" BabyHummingbird also liked posts about Gjovik, including the "*don't get Gjovik'd*" posts.

100.     Gjovik also received messages via the webform on her website, which allowed anonymous people to message her, though it recorded their IP addresses. Messages were often vulgar and offensive, and also sent from IP addresses flagged for spam and malicious conduct. Examples include: "*Cunt*" (9/12/21); "*Nobody wants to see your nasty nudes. Next time use your work phone for work only you stupid moron*" (9/20/21); "*Remember what Jesus Christ taught about retaliation. You are retaliating back at Apple. Matthew 5:38-42…*" (12/8/21); "*If only Steve Jobs were*

---

[41] "*Can you still be admitted to the bar if you have had an anti-harassment judgement filed against you? Asking for Ashley Gjovik.  [Photo of young girl at computer drinking soda and smiling mischievously] link:* https://www.calbar.ca.gov/Admissions/Moral-Character/Guidelines" @FirstNa47437596 February 11 2022.

*still around. He'd drag you ... out to the street by your hair and tell you ... to go work a corner. It's the only talent you'll ever have.*" (4/5/22). Whether or not Apple was behind the fake accounts, Apple fostered an environment where people were rewarded for harassing Gjovik, and ostracized and ridiculed if they supported her. Apple encouraged the abuse.

101.    This type of harassment continued for years. In 2023, after discovering Apple's fab, two fake accounts threatened Gjovik to stop talking about Apple's illegal toxic waste dumping. The first "Sybil," was created just to harass Gjovik about her posts about the chemical NMP and the photos she posted of her damaged property – escalating to calling for Gjovik's Twitter account to be deleted. (SAC at 699-700). Shortly after, another, "Comrade Jones," contacted her claiming to be ex-EPA enforcement and threatened her to stop talking about both Apple's fab and also the vapor intrusion issues at her office. Comrade Jones sent an email via her webform from an IP address flagged for spam and malicious behavior. (SAC at 701-2).

102.    While this claim starts on 9/7/21, in order to plead agency, it must be addressed that it includes continued conduct from individuals and anonymous accounts that began prior to 9/7/21.  As explained in the 4AC and prior complaints, the digital harassment began in early August of 2021. Some of this was conducted by named Apple employees, or known Apple employees using a 'handle', but some of it was from anonymous 'burner' accounts. However, Apple knew it was occurring, that it caused Gjovik distress, but did nothing to stop it (or was behind it themselves) and accepted the benefits it provided them. He who takes the benefit must bear the burden. Cal. Civ Code. § 3521.

103.    These are only a few examples to try to show the variety, network,

and suspicious activity of these accounts.[42]  Gjovik will require discovery to be able to prove Apple's connection to the physical stalking, private investigators, break-ins, digital surveillance, and other activities that occurred and were surely Apple, but did not leave Gjovik concrete evidence of Apple's role in hand. These events are not speculative or vague – they have concrete dates and times, documentation and reporting, photos and videos, and even police reports. [RJN 8/18 Exhibit S, 2022 police report as an example]. Gjovik also asked Apple to stop the conduct, including asking the CEO to stop the burglaries when she notified him of this lawsuit, but there was at least one more burglary after that.

### J.   Apple's Knowing Exposure of Plaintiff and her Neighbors to Carcinogens was Evil.

104.   Defendant now claims that Plaintiff has not pled that Defendant had knowledge that Plaintiff would be impacted by its actions at 3250 Scott Blvd. This is not the test. The test is if the Defendant had knowledge or a reckless disregard for the fact that people just like Plaintiff would be injured. Defendant does not need to know who each person is or their name, but Defendant just needs to know beyond speculation that people would be injured.

105.   Here, this fab is across the street from these apartments – where every employee would see them, every day they're at work.  [7/31 RJN Exhibit B]. Apple spent millions for this fab, entered a long-term lease, and RCRA papers are

---

[42] *Pryor v. United Air Lines, Inc.*, 791 F.3d 488, 498 (4th Cir. 2015) – "An employer may be liable for hostile work environments created by co-workers and third parties "if it knew or should have known about the harassment and failed to take effective action to stop it … [by] respond[ing] with remedial action reasonably calculated to end the harassment." *EEOC v. Sunbelt Rentals, Inc.*,521 F.3d 306, 319 (4th Cir.2008; "An employer is not subject to a lesser standard simply because an anonymous actor is responsible for the offensive conduct. See *EEOC v. Xerxes Corp.,* 639 F.3d 658, 672-73 (4th Cir.2011) (holding an employer to the same standard for responding to harassment carried out by known and unknown individuals); *Cerros v. Steel Techs., Inc.*,398 F.3d 944, 951 (7th Cir.2005) (noting that a plaintiff's "inability to verify the authorship of … racist graffiti poses no obstacle to his establishing that this graffiti produced or contributed to a hostile work environment)."

signed by the Apple CFO. Every time Apple vented its fab exhaust into the ambient air, Apple knew people just like the Plaintiff would be injured and would be deeply traumatized if and when they discovered what they were exposed to.

106.  Apple's employees and contractors have already revealed not only evidence of knowledge, but also gross recklessness – with one of their ACT Environmental contractors who was leading the hazardous waste disposal efforts in 2020 at the site, when Gjovik was doused in chemicals, bragging in his LinkedIn profile that during that time he found "innovative" ways to save Apple money on hazardous waste disposal. (SAC ¶ 1415). Meanwhile, Gjovik still has bald spots after Apple burned all of her hair off.

107.  Further, Apple's continued harassment of Plaintiff despite everything else that's happened, including her exposures, is sick and depraved. The amount of stress puts her even more at risk for cancer and disease, after she has already suffered great bodily injury from Apple's illegal conduct and emissions. Cal. HSC § 42400.1 Cal. Penal Code § 12022.7.

## K.  Cal.Lab.C. § 6399.7 (via § 6310) includes HAZWOPER.

108.  Plaintiff does not 'concede' to waiving her Section 6399.7 claim. [Def's Reply at 12-13]. First, this claim has been in every complaint in this lawsuit. [7/31 Declaration Exhibits A-C]. Defendant has repeatedly taken advantage of Plaintiff's vulnerability in having to dramatically shorten the length of her complaint and continues to attack claims it knows she has pled and can plead but still exploits the page limits as a loophole. [MTD at 22; Reply at 5].

109.  Second, Defendant argues that Section 6399.7 should not apply in this case essentially because, they claim, there are no hazardous substance information, notification or training requirements for employees working at toxic waste dumps – and no protection from retaliation if those employees ask for information or training about the hazardous substances at those toxic waste dumps

and it irritates their managers. This is false, and probably unlawful for Apple to even claim.

110.   825 Stewart Drive is an active US EPA National Priorities List (NPL) Superfund site. As of mid-2021, the most recent vapor intrusion testing at 825 Stewart Drive was supposedly back in the summer and winter of 2015. The 2015 results were declared 'acceptable' under US EPA vapor intrusion risk levels, however both times the results showed vapor intrusion was actively occurring. During the 2015 testing of the indoor air,, the results identified the presence of TCE (Trichloroethene), PCE (Tetrachloroethene), Chloroform, 1,2-Diclorobenzne, 1,2-Dichlorethane, cDCE (cis-1,2-Dichloroethene), tDCE (trans-1,2-Dichloroethene), CFC-11, CFC 12, and Freon 113 – all of which were also found in the groundwater and/or the sub-slab vent space under the floor.

111.   Plaintiff did not simply "perceive" a "risk" of vapor intrusion – Apple's own tests showed that vapor intrusion was actively occurring. Every single vapor intrusion air test at 825 Stewart Drive always came back showing vapor intrusion. Just because chemical exposure does not exceed the max limits for that chemical, does not nullify exposure to that chemical within 'tolerated' limits for industrial work.

112.   In addition, several other chemicals were identified in the testing with an unknown source, as they are not formal "Contaminants of Concern" under the CERCLA Record of Decision. The 2015 testing of the indoor air and/or sub-slab vent space identified the presence of chemicals including: Benzene, Toluene, Ethylbenzene, 1,1,1-TCA, MEK, Xylenes, Acetone, and Methylene Chloride. These chemicals and Gjovik's exposure to them, if unrelated to the hazardous waste, would be governed by HAZCOM.

113.   Cal. Labor Code §6361 explains the intent of the Hazardous Substance and Information Training Act, "The Legislature finds and declares the following: Hazardous substances in the workplace in some forms and

concentrations pose potential acute and chronic health hazards to employees who are exposed to these substances. Employers and employees have a right and a need to know the properties and potential hazards of substances to which they may be exposed, and such knowledge is essential to reducing the incidence and cost of occupational disease. Employers do not always have available adequate data on the contents and properties of specific hazardous substances necessary for the provision of a safe and healthful workplace and the provision of information and training to employees as is the responsibility of the employer under existing law…. The Legislature, therefore, intends by this chapter to ensure the transmission of necessary information to employees regarding the properties and potential hazards of hazardous substances in the workplace."

114.    Cal. Labor Code § 6399.7 protects employees from retaliation for exercising their rights under this protection: "No person shall discharge or in any manner discriminate against, any employee because such employee has filed any complaint or has instituted, or caused to be instituted, any proceeding under or related to the provisions of this chapter, or has testified, or is about to testify, in any such proceeding, or because of the exercise of any right afforded pursuant to the provisions of this chapter on such employee's behalf or on behalf of others, nor shall any pay, seniority, or other benefits be lost for exercise of any such right. A violation of the provisions of this section shall be a violation of the provisions of Section 6310." (SAC  279-1281, "*§6310: Right-to-Know Retaliation [Cal. Labor Code §6399.7*]").

115.    Under Cal. Labor Code § 6380, "the director, pursuant to Section 6382, shall establish a list of hazardous substances and shall make the list available to manufacturers, employers, and the public." Cal. Code Regs. tit. 8 § 339 is the published "Hazardous Substances List" pursuant to 6380. "The substances on this list are subject to the provisions of Labor Code Sections 6360 through 6399.7 and Section 5194 in Title 8 of the California Code of Regulations."

116.   Cal. Code Regs. Tit. 8 5192(c)(8) requires employee notifications. "Any information concerning the chemical, physical, and toxicologic properties of each substance known or expected to be present on site that is available to the employer and relevant to the duties an employee is expected to perform shall be made available to the affected employees prior to the commencement of their work activities. The employer may utilize information developed for the hazard communication standard, 8 CCR 5194, for this purpose."

117.   Chapter 2.5 (where §§ 6380 and 6399.7 are located) does not define "hazardous substance," however Cal. Code Regs. Tit. 8, § 5161 (where the § 339 list is located) defines "hazardous substance" as "a substance, material, or mixture which by reason of being explosive, flammable, poisonous, corrosive, oxidizing, an irritant, or otherwise harmful, is likely to cause injury or illness. Hazardous substance includes a hazardous chemical as defined in section 5194(c) and hazardous waste as defined in section 5192(a)(3)."

118.   Under Cal. Code Regs. Tit. 8 § 5192(a)(3) (CAL HAZWOPER) the definition of "hazardous substance" includes among other things: "hazardous waste" defined as "a waste or combination of wastes as defined in 40 CFR 261.3, or regulated as hazardous waste in California pursuant to Chapter 6.5, Division 20, California Health and Safety Code, or those substances defined as hazardous wastes in 49 CFR 171.8." Cal. Code Regs. Tit. 8 § 5194(c) (CAL HAZCOM) defines "substance," as "Chemical elements and their compounds in the natural state or obtained by any production process, including any additive necessary to preserve the stability of the product and any impurities deriving from the process used." The definitions under § 5194 do not include "hazardous substance," but instead list "hazardous chemical."

119.   Federal OSHA promulgated the HAZWOPER (29 CFR § 1910.120) standard as a counterpart to the more well known HAZCOM (29 CFR § 1910.1200).   The HAZWOPER (Hazardous Waste Operations and Emergency

Response) standard covers "clean-up operations" "involving hazardous substances" at hazardous waste cleanup sites, including EPA's National Priority Site List. 1910.120(a)(1)(i). Where the standard overlaps with other federal regulations, the more protective of employee safety and health is to apply. 1910.120(a)(2)(i).

120.   Cal. Code Regs. Tit. 8 5192 (a)(2)(A) explains that all requirements of Title 8 of the California Code of Regulations apply pursuant to their terms to hazardous waste operations (whether covered by this section or not). If there is a conflict or overlap, the provision more protective of employee safety and health shall apply without regard to 8 CCR 3202(a). Apple asserts HAZWOPER does not apply and/or has less requirements. Further, HAZWOPER does apply, as does HAZCOM, and HAZWOPER creates additional obligations beyond that of HAZCOM.

121.   Under Cal. Labor Code § 142.7, California's government committed to enacting their own version of HAZWOPER that was at least as protective as the federal version if not more protective. The standard was enacted under Cal. Code Regs. Tit. 8 § 5192 which is to be at least equally protective as the federal version and may provide concurrent coverage at clean-up sites with § 5194, depending on the situation. Specific to US EPA NPL Superfund sites, as that is the situation in this case, § 5192 requires that the employer of any workers working at that Superfund site must develop site health and safety plan, provide hazard training and notifications to the employees, manage a medical surveillance program for potentially exposed workers, complete and maintain a thorough site characterization, and monitor site air quality and employee exposure ongoing. This requirement is not optional, and the employer is responsible for its own employees, regardless of the employer's position in the regulatory oversight of the Superfund site.

122.   Further, these HAZWOPER requirements are more specific and

detailed than the default health and safety obligations an employer has at any site, and those default requirements in California include: "Every employer shall furnish employment and a place of employment that is safe and healthful for the employees therein."[43] Cal. Labor Code § 6400.

123. Further, § 6407 adds: "Every employer and every employee shall comply with occupational safety and health standards, with Section 25910 of the Health and Safety Code, and with all rules, regulations, and orders pursuant to this division which are applicable to his own actions and conduct." Under § 6408, the coverage includes that "all employers shall provide information to employees" including to "observe monitoring or measuring of employee exposure to hazards" (c) "access by employees or their representatives to accurate records of employee exposures to potentially toxic materials or harmful physical agents."

124. In April 2021, Plaintiff complained to Apple that the US EPA documentation showed there's excess cancer risk at the site due to vapor intrusion, and asked Apple *Shouldn't employees be notified about this? Prop 65 at least?* Apple's response was, "*No Prop 65 requirements per internal review.*" (SAC ¶227, 1282-1286). On March 24 2021, Gjovik also complained to her managers that the EPA documentation for the site note an increased cancer risk due to the vapor intrusion exposure pathways. In April 2021 she emailed EPA asking about her Right to Know rights. (SAC ¶ 264). In July 2021, Gjovik, pleaded with Apple to test the air prior to fixing the cracked slab, so she knows what she was exposed to 'for cancer monitoring.' (SAC ¶ 300, 331). Apple said no.

125. Proposition 65 is incorporated into both Cal. Admin. Code tit. 8, §§ 5192 and 5194 through Cal. Code Regs. Tit. 27, § 25904, Cal. Labor Code Section 6382, and Cal. Code Regs. tit. 8 § 339. Cal. Admin. Code tit. 8, § 5194 also explains at (b)(6)(C) that Proposition 65 notifications are required in the workplace regardless of § 5194 (CAL HAZCOM) coverage. The Occupational Carcinogens

---

[43] *In re western pac. Roofing Corp.* Cal-OSHA App Bd. 1999 WL 276529.

Control Act of 1976 also includes requirements related to employee exposures to carcinogens, including one of the NPL Contaminants of Concern at the site: vinyl chloride. Cal. Lab. Code § 9004. Proposition 65 covers exposure to carcinogens through vapor intrusion.[44] (SAC ¶ 1282, "*§6310: Proposition 65 [Cal. Code of Reg. §5194(b)(6)],*" ¶ 1282-1286).

126.    In April 2021, Plaintiff asked Defendant, "*Shouldn't employees be notified this is a remediation site? Ideally informed consent for working there. At the very least Right to Know should require some sort to disclosure?*" Apple responded that they "*decided no legal requirement…*" Plaintiff asked, "W*ould you be willing to at least email or present at a staff meeting — to disclose the … management team … on the history & current conditions of the property & building?*" Apple responded, "*Larger message may be possible, but need to talk to legal.*"

127.    When Gjovik raised the topic in her March 17 2021 email to the management team about the Superfund status of their office, Gjovik's manager, immediately forwarded Gjovik's email to Human Resources and her Senior Director, complaining "*I think Ashley should be keeping these emails private and not needlessly scaring the team about something she doesn't know about. I want to have a talk with her.*" Powers gave Gjovik a 'warning' during their next 1:1 meeting and told her she is not allowed to talk about safety or toxic waste dumps with her coworkers. (4AC ¶ 56).

128.    In April 2021, Gjovik asked EPA about requirements for "*informing workers in these buildings about the chemicals, the gov status, etc. Maybe this is more OSHA & Right to Know — but any guidance you can provide here would be helpful. Also, anything about workers' rights to be able to talk about these sites.*" Plaintiff escalated her concerns to US EPA about the need to "communicate to workers in

---

[44] *Bayview Hunters Point Residents v. Tetra Tech EC, Inc.* (3:19-cv-01417) Docket No. 105, (N.D. Cal.), Order re Motions to Dismiss Re: Dkt. Nos. 64, 77 (03/31/2021); Proposition 65 Notice of Violation, Bayview Hunters Point Residents, July 9, 2020, https://oag.ca.gov/system/files/prop65/notices/2020-02666.pdf

these buildings about how to monitor for their issues (weird smells, weird health issues, etc.) or how to report trouble or what not to mess with (plugs, HVAC, etc.)."

129. Plaintiff complained to a Senior Director at Apple about Apple's EH&S team, summarizing a conversation with them: "*what happens if someone starts messing with one of the seals on the sub-slab vents because they don't know what it is (and in my building, literal Hades is beneath) — and [Apple EH&S was] like OMG DO NOT LET ANYONE DO THAT. And then [she] was like, what happens if people start feeling sick and it could be VI and they don't know that's happening and [EH&S is] like OMG IF YOU SMELL ANYTHING WEIRD CALL US IMMEDIATELY. And [she's] like, listen you fools, how is anyone supposed to know to do that if they don't even know it's remediation site.*" (SAC ¶ 1205).

130. On April 21 2021, Gjovik raised concerns to Apple's Inclusion & Diversity team, complaining of disparate impact of chemical exposure at Apple's offices toxic waste sites, disproportionally harming non-white people and women. The I&D manager asked Gjovik to draft a business justification for Apple to not expose Black and Brown people, and women, to industrial chemical vapors. Gjovik complained and asked that Apple should: "*1) inform apple employees of the presence of industrial chemicals in the soil & groundwater beneath their buildings, along with any anticipated health risks 2) empower apple employees to understand these sites and their rights around them (like who at the EPA to call if they have questions about their specific building and want a neutral 3rd party) 3) do ongoing vapor intrusion testing and monitoring on buildings who have VI risk and train employees on site how to identify possible VI issues (medical symptoms, smells, etc.) In a perfect world 4) require informed consent for employees to actually be assigned to work in the worst of these buildings.*" HR never replied. (SAC ¶ 244-246).

131. Cal. Code Regs. Tit. 8 5192(e) requires training for any and every person who works at a hazardous waste like a NPL Superfund. Even workers

working in areas of the site that are fully characterized and monitored must complete at least 24 hours of offsite instruction and a minimum of one day field training. 5192(e)(3)(C). The training is to cover topics including identification of "safety, health and other hazards present on the site," "work practices by which the employee can minimize risks from hazards," "safe use of engineering controls and equipment on the site," and "medical surveillance requirements including recognition of symptoms and signs which might indicate overexposure to hazards." 5192(e)(2)(B-D).

132.   Under Cal. Labor Code § 142.3(c), "Any occupational safety or health standard ... shall prescribe the use of labels or other appropriate forms of warning as are necessary to ensure that employees are apprised of all hazards to which they are exposed, relevant symptoms and appropriate emergency treatment, and proper conditions and precautions for safe use or exposure."

133.   Plaintiff complained in March 2021, "*there's a covenant with the government about what can and cannot be done on site. This includes no day care, elder care, hospital use, raising of food, or use of the building as a residence. Further, the site owner is supposed to notify the government agency in charge (now the EPA) if there are any damages to the vapor intrusion mitigation systems — or monitoring of groundwater — or if any soil is to be disturbed on site. Etc. From what I've seen, there are no warnings on site about any of this*." (SAC ¶ 374, 1186). Plaintiff also complained in April 2021, "*The land use covenant requires notice to be given to EPA if any damages to remediation systems — or any subsurface disturbance. How are employees supposed to follow this if there's no notice it's a remediation site?*" Apple responded, "*Not employee's responsibility....*" (SAC ¶ 226).

134.   In July of 2021, Gjovik complained to Apple that their EH&S team refused to provide her any details about work plans or protocols for site management. Upon further inquiry, they disclosed to her there are none and she can just Google it. (SAC ¶ 307). Plaintiff complained in July 2021 that Apple

EH&S kept saying the whole process was routine but eventually admitted they've never done it before for any of their Apple buildings with employees actively working inside." She also complained EH&S "won't give her any details of what the "floor sealing process" entails." (SAC ¶ 304).

135.    Cal. Code Regs. Tit. 8 5192(c) requires a thorough and ongoing site characterization and analysis. This includes ongoing air monitoring. 5192(c)(6). Any information concerning the chemical, physical, and toxicologic properties of each substance known or expected to be present on site that is available to the employer and relevant to the duties an employee is expected to perform shall be made available to the affected employees prior to the commencement of their work activities. The employer may utilize information developed for the hazard communication standard, 8 CCR 5194, for this purpose. Under 5192(c)(8) the employer also must develop and maintain and detailed safety and health plan for the site. 5192(b).

136.    In May 2021, Apple EH&S told Gjovik they would not answer any more of her environmental questions, including any of her prior pending questions. EH&S told her they *"feel it is safe"* so there is no need talking about it further. In July 2021, Apple EH&S told Gjovik they still will not answer her questions, nor will they provide her any guidance around risk and exposure other than "*they feel it is safe."* (SAC ¶ 307). They also refused to give her copies of prior air testing results. In May 2021, Apple EH&S also said they may not test the air now that Gjovik asked so many questions, and they did delay until the US EPA forced them, but they drug it out until mid-2023. (SAC ¶ 735).

137.    In April 2021, Gjovik complained to her manager about the site: *"None of this sounds safe. Based on all this data, seems more likely that not that my fainting spell in Mike's office in Sept 2019 was very likely related to the chemicals on this Superfund site. If not the TCE, PCE, or Chloroform — then the levels of Ethylbenzene and Toluene exceeding max industrial limits in 2015 that no one seems to*

*have ever followed up on*." (SAC ¶ 43-44, 229, 236, 306).

138.  Cal. Code Regs. Tit. 8 5192(f) requires medical surveillance of certain employees working at the hazardous waste site including "Any employee who is injured, becomes ill or develops signs or symptoms due to possible overexposure involving hazardous substances or health hazards from an emergency response or hazardous waste operation." 5192(f)(C).

139.  On August 23 2021, Gjovik submitted her "Issue Confirmation" to Apple Employee Relations and Business Conduct. The document included allegations of "Toxic Torts, occupational exposure (2017-current)" and "Violation of OSHA laws & Right to Know statute (2017-current)." (SAC ¶ 447, 784). Gjovik also included similar complaints in her complaints to US EPA on August 29 2021. (SAC ¶ 265).

140.  The legislative intent of the Hazardous Substance Information and Training Act (Lab. Code, § 6360 et seq.) is "to ensure the transmission of necessary information to employees regarding the properties and potential hazards of hazardous substances in the workplace." Lab. Code, § 6361(d).  California courts have found this intent is "merely [an] express[ion of] the broad scope of the undertaking and the legislative commitment to inform California workers of potential risks of hazardous substances."[45] All of this was covered by Section 6399.7, and actionable under Section 6310.

## L.  Apple was certainly reading Plaintiff's Twitter posts.

141.  Defendant continues to argue Plaintiff cannot prove they were surveilling her social media posts. [Def's Reply at 13-14]. First, Plaintiff can prove it. Second, it's beside the point because her posts and the associate content was also covered in the press, and Apple was directly notified of such by the press.

---

[45] *ICN Pharmaceuticals, Inc. v. State of California,* 3 Cal.App.4th 1131, 1136 (Cal. Ct. App. 1992).

Defendant was also repeatedly notified of her social media and press activity by reporters contacting them for 'comment' on the articles published while she was on leave and prior to her termination.

142.   Further, Apple was supposedly investigating Plaintiff's Twitter posts from around August 28 2021-Septembmer 9 2021, (which would assumably include reading her Twitter postings). Even prior to the leave, Plaintiff started threatening to talk to the press in June 2021 and did talk to the press and was quoted by NYT about Apple in July 2021. (See SAC at 539). Apple Employee Relations told Plaintiff they saw it, were aware, and were annoyed she figured out labor laws. Further, in mid-July Plaintiff directly notified Employee Relations that she and other coworkers were posting on social media complaining Apple was invading their privacy with overly aggressive medical release forms for ADA accommodation requests. (See SAC at 363). Employee Relations also interrogated Plaintiff around July 29 2021 about the statements she was making and urged her to stop talking about work conditions, even with her coworkers and on Apple systems. After being put on leave, Plaintiff quickly received an email from Apple Employee Relations on August 5 2021 complaining about the things she was posting on social media. (SAC ¶ 402).

143.   Gjovik observed an incredible response from her coworkers while she was sharing stories and documents in August 2021, with many discussions on Apple's Slack tool for employees, including many employees saying, and telling her, that they had reported the people she complained about and asked Apple to do the right thing with Gjovik. One post even led to a petition within Apple – Gjovik had shared a "Radar" work tracking ticket that was titled with the goal of making her life "a living Hell."

"#Apple makes great products, & some workers have a great experience, but some don't. Everyone who knows me at work knows I've dealt with more abuse than anyone should have. (See: "Make

Ashley's Life a Living Hell"... & they really did). No one seems surprised I finally broke." [Image] 10:55 PM · Aug 12, 2021 https://x.com/ashleygjovik/status/1426014545202479108

Dozens of employees started commenting in the Radar; after seeing it on her social media, demanding Apple improve its conduct. Several people said they had reported the Radar to Human Resources. (SAC ¶ 81, 82). This was around August 16 2021. One would think if dozens/hundreds of employees are complaining about abuse Gjovik faced, as shared on social media, that Apple might think to read her social media.

144.    Finally, as part of the steps leading to Plaintiff's termination, one of the supposed reasons she was to be terminated, as communicated by HR to her VP, was that she failed to participate in the Employee Relations investigation by redacting the evidence she provided Employee Relations. However, she did not redact any records in her Box folders for Employee Relations. [SAC page 125-6, 152] She did however redact the internal records she was posting on Twitter. HR must have gotten confused and mixed up their Twitter stalking screenshots with the records Plaintiff provided them directly. Defendant never brought it up again.

145.    Apple apparently  continued to monitor her posts through September 2021 (attempting to get Twitter to delete some of them, admitted in DOL filings) and January 2022 (Applegate wrote to Plaintiff upset that she tried to get Plaintiff's Twitter posts deleted but found out Apple also reported them and it was Apple's reports that resulted in the posts being deleted).

146.    After she was fired, on September 9 2021, Plaintiff was notified her Apple would mail her boxes to return her phone and computers. However, Apple had her old address. The termination letter said she has to talk to Workplace Violence if she has any questions, but she didn't want to talk to Workplace Violence. She tweeted "*my #Apple VP's term letter said they're mailing me a box to return my work stuff (including an iMac Pro?!) & sending my benefits info. They're*

*sending to my old address tho, & they say to work w/ the secret police guy if any issues. @Apple, I don't want to talk to him, he's scary... Can someone please tell @Apple #Apple to have someone reach out for my current address who doesn't work on a team that breaks into people's apartments, maybe? Thx.*" [46] On September 13 2021, three days later, her VP's executive assistant emailed her: *"Could you please verify your shipping address so that I can send out boxes and a return label for your Apple equipment."* This was not the only time Apple responded directly to Plaintiff's tweets – thus Apple was assumably reading her tweets.

147.   Further in late 2022, Apple's third-party counsel for a fraud class action (Cooley) who is not even involved in these matters (that Plaintiff's aware of) demanded her social media posts be read aloud by a law firm she was consulting for, prior to Apple's counsel then demanding Plaintiff be removed from the matter. When confronted with a motion for attorney's fees, Apple's attorneys then pretended they did not know who Gjovik is. [47] Why is Cooley reading Gjovik's tweets? How many billable hours have been spent on reading Gjovik's tweets?

148.   Further, as mentioned, MWE was reading her posts while they were harassing her under a fake account in 2023-2024. In addition, Orrick's filings have repeatedly referenced Plaintiff's social media.

149.   After Gjovik tweeted what she learned about 3250 Scott Blvd on February 21 2023, around February 25 2023 she received a notification in her LinkedIn account that a "iPhone Product Operations – Capex, Sr. Manager" at Apple had searched for and viewed her LinkedIn profile. Plaintiff then tweeted

---

[46] Twitter, Ashley Gjovik, https://x.com/ashleygjovik/status/1436541456101617665
[47] *Peters v Apple*, Superior Court of California, County of LA, Case No. 19STCV21787, Plaintiffs' *Omnibus Reply in Support of Motion for Attorneys' Fees, Costs, And Class Representative Service Payments* Mar 19 2024 10:31PM PDT "*Apple is well-aware of what "AM Gjovik Consulting LLC" is and why Plaintiffs have an associated cost for that entity. Ashley Gjovik is an Apple former employee who could have provided Plaintiffs with instrumental assistance but for Apple's objection to her expert disclosure... After Gjovik was hired, but before she turned over any materials, Apple objected to Gjovik's assistance, and Plaintiffs were unable to use any of Gjovik's knowledge and expertise.*" Pg9 2/6/24

that day: *"A sr manager for Apple product ops CapEx just looked at my LinkedIn via a direct search. Dude, if this is your doing &/or problem, please get the richest company in the world to give you a little more money so Apple can do something way less dumb & dangerous than this. Thanks."* [48]

150.    Just a few weeks later, Apple filed permit applications for 3250 Scott Blvd to install a new VOC abatement system ($5,300,000) and acid scrubber and exhaust ($3,100,000) [RJN 8/18 Exhibit V]. This was assumably the system that Apple could not actually explain to US EPA in August 2021 how it works or why they installed it the way they did, and basically acted like they had never seen it before on their own roof. [7/31 RJN Exhibit A]. Plaintiff got a $8.4M Capex investment approved via tweet!

151.    Apple is certainly reading Gjovik's Twitter and other social media and has been for years.

**M.  Apple violated Cal.Lab.C. § 1102.5 dozens of times.**

152.    Defendant argues Plaintiff's environmental claims should be stricken despite them being the basis for the environmental retaliation claims which they are not challenging. Defendant also tries to strike any mention of 3250 Scott from the entire case, which is the basis of the CAA and RCRA claims, as well as the *Tamney* crime victim[49] and legislative witness claims. (see SAC at 1323-5, 1332-3). Cal. Penal Code Section 1202.4 has broad construction requiring restitution to all victims of crime.[50] Apple can't just strike away its crimes to change that.

153.    Defendant attacks Plaintiff's smuggling and sanctions section, yet those statutes were detailed in her SAC and in emails to Apple in July 2021. Defendant then attacks that she included screenshots her SAC with this content.

---

[48] Ashley Gjovik, Twitter, https://x.com/ashleygjovik/status/1629702912527020034
[49] Cal. Labor Code Section 230(e), Cal. Gov. Code Section 9414, Cal. Penal Code Title 17 Rights of Victims and Witnesses of Crime, Section 67910(b)(3).
[50] *People v Broussard*, 856 P.2d 1134,22 Cal.Rptr.2d 278,5 Cal.4th 1067 (1993).

[Def's MTD at pg14]. She also raised the topic in the August 2021 Issue Confirmation: "*July 2021: escalated concerns one of our PSQ employees was bragging about smuggling iPods into Syria and running a side business transporting people across the Syria/Lebanon border. Complained about general lawlessness in my org.*" Issue Confirmation at 3.

154.   Defendant argues that Plaintiff still has not plead with required specificity which laws she alleges support her Section 1102.5 claim, yet Defendant did not challenge Section 1102.5 in her SAC and many aspects of it was detailed in her Issue Confirmation and other key docs. Accordingly Plaintiff suggests the following supplements:

– **Violations of CERCLA{ XE "CERCLA" } and implementing contracts**
- Made complaints to Apple about CERCLA reporting requirements, then to government, then notification to Apple that complaints were filed to the government. CA Civil Code § 1471 Covenant and Agreement to Restrict Use of Property dated August 10, 1992 (Covenant) and recorded as Instrument Number 11507222 in the official Records of Santa Clara County at Page 613 of Book M338.[51] This legal document was included in the Box folders of evidence she shared with Apple in late July 2021 when they were supposedly investigating her concerns. Cal. HSC 25220; HSC 25117.13. (see SAC at 226, 1207, 1471). Copies of the Cal. EPA Geotracker page for 825 Stewart Dr (SL721251223) sent in emails to managers and EH&S, in Box folders, and included in presentation slide deck made for EH&S in April 2021.
- Filed complaints to the US EPA and CalEPA. Complaints to US EPA trigged a proceeding with an inspection and corrective actions due to

---

[51] "*Covenantor covenants that the Restrictions shall be contained in each and all deeds and leases of any portion of the Property in accordance with Sections 1468, 1469, and 1470 of the California civil code,*" 825 Stewart LUC at pg 9.

Gjovik's disclosures. CERCLA § 103(d)(2); 42 U.S.C. 9603; 42 U.S.C. 9603(b). EPA, 1991. *Record of Decision, Advanced Micro Devices #901/902, Signetics, TRW Microwave. Combined Superfund Sites.* Sunnyvale, California, September 11, 1991.

- Made complaints and inquiries into the oversite and status of another CERCLA site. EPA, 1991, Record of Decision, *Synertek Building #1 Superfund Site,* Santa Clara, California, June 28 1991.

- Complained about Apple trying to cover up the cracked floor before anyone could report it or gather evidence. See, Knowing Alteration, Destruction, or Concealment of Records 40 C.F.R. 260 – 265 42 U.S.C. 6928(d)(4).

- Complaints about the Brownfield clean up at 3255 Scott Blvd. Made complaints to the CalEPA, US EPA, and city HazMat in September 2020 – April 2021 about the soil and groundwater contamination in the property next to her apartments and 3250 Scott Blvd. Also complained about Apple offices on Brownfield sites in documents sent to managers and leadership in 2021. Cal. HSC 25403.

## Violations of the RCRA{ XE "RCRA" }

- Made complaints to Apple management that Apple's statements to her directly contradict in a 2016 article about a settlement Apple made with DTSC over numerous RCRA violations where Apple claimed they always go above and beyond legal requirements, when Apple told her they only do the bar minimum – and the case showed evidence of systemic negligence. She sent these complains in emails, in Box folder, in Issue Confirmation, in government filings.
  - *Transportation of hazardous waste without a proper manifest*
  - *Failing to report and track exports of hazardous waste*
  - *Failing to label or otherwise mark used oil containers as "hazardous waste"*

- *Failing to provide notice of closure for the facility in Cupertino*
- *Failing to submit a written closure plan and cost estimate for closing the facility in Cupertino and for eventual closure of the one in Sunnyvale*
- *Failing to demonstrate financial assurance to fund the eventual closure of the two facilities*

- Made complaints to Apple management about Powers and West sabotaging a hardware reuse program she created, which had reduced universal hazardous waste. 22 CA ADC § 66261.9; HSC 25123.8; 25214.9. Included complaints in Issue Confirmation and Box folders.
- Wrote article and published in SF Bay View in March 2021 raising concerns about environmental and safety violations at her apartment: *"I thought I was dying; my apartment was built on toxic waste."* [P's 8/18 RJN Exhibit A].
  - Treatment, storage, or disposal without a permit 40 C.F.R. 260 – 265 42 U.S.C. 6928(d)(2)(A)
  - Treatment, storage, or disposal in violation of a permit 40 C.F.R. 260 – 265 42 U.S.C. 6928(d)(2)(B) and (C).
  - Knowing Endangerment 42 U.S.C. 6928(e) 40 C.F.R. 260 – 265.

### Violations of the Clean Air Act{ XE "Clean Air Act" }

- Made complaints to US EPA and CalEPA in September 2020 – April 2021 about the ambient air around 3250 Scott Blvd. 42 U.S.C. 7413(c)(4) & (5) [42 U.S.C. 7412(b)(1)] 40 C.F.R. 61 - 63
- Complaint to California Air Resource Board triggered proceeding with investigator contacting her for information and conducting an inspection in 2020 and 2024. 18 U.S.C. 3571. 40 C.F.R. 61. [8/18 RJN Exhibit T].
- Complaints about right to observe monitoring. Cal. Labor Code 340.1.

- Issues causing great bodily injury and Apple's failure to correct the issues. HSC 42400, 12022.7, 41700.

## Violations of Proposition 65

- Proposition 65 complaints to Apple managers, EH&S, and Employee Relations. Included in the Issue Confirmation. Cal. HSC 25249.5, 25249.14.
- Filed complaint to US EPA (8/29/21), in addition to emails to EPA, complaining of Apple's violations of Right to Know and Prop 65.
- See Section 6399.7 also.

## Other Criminal Conduct

- Made complaints and inquiries to the Santa Clara County District Attorney's office{ XE "Santa Clara County District Attorney's office" } in April – May 2021 about witness intimidation and environmental crimes.
- Made complaints to the US EPA in July 2021. Made formal complaint to Apple in August 2021.
- Complained in the August 2021 "Issue Confirmation v3" of:
  - Retaliation for whistleblowing (2016, 2020, 2021)
    - Retaliating against a witness (18 USC 1513)
  - Misrepresentation & fraud.
    - 18 U.S.C. § 1001 False Statements
    - 18 U.S.C. § 371 Conspiracy
  - Racketeering.
    - RICO 1962(c), (d). Issue Confirmation sent to Apple in August 2021 and filed to Business Conduct.
    - Twitter posts on Aug 21 2021, see SAC at 446, 443.
    - "Based on my experience, & the non-stop horror stories I now hear EVERY DAY from current & past #Apple employees, I'm now also asking

employee relations to investigate themselves. One "issue" I'm raising to them is literally RICO. @USDOL, I may need to schedule an interview soon.    4:12    PM    ·    Aug    21,    2021, https://x.com/ashleygjovik/status/1429174603713191936

- [Mel Nayer (see IIED) accuses Plaintiff of initiating death threats against her managers]. "Now that we're all fully distracted by whatever the f THAT was, plz keep in mind it happened just hours after I mentioned: 1) The corruption at #Apple may reach R.I.C.O. levels 2) Legal may have taken my nudes to intimidate me as a whistleblower re: that lawsuit Struck a    nerve?"    9:13    PM    ·    Aug    21,    2021, https://x.com/ashleygjovik/status/1429250234278825987

- "Progress! ✊ Apple Employee Relations told me today, for the first time, they're actually investigating, conducting witness interviews, & will provide me updates! It's a good start, @tim_cook! It only took a website, 1k Tweets, and dozens of articles. Oh yeah & saying "RICO." 11:42 AM · Aug 22, 2021 https://x.com/ashleygjovik/status/1429468934579712006

- Organized witness tampering.
  - Witness tampering (18 USC 1512)
  - 18 U.S.C. § 371 Conspiracy
- Organized intimidation.
  - 18 U.S.C. § 371 Conspiracy
  - 18 U.S.C. § 1501 Obstruction of Justice
- Corporate corruption.
- Burglary and impersonating police (Twitter posts on 9/9/21, see SAC at 510).
- Pimping & Pandering with Indirect Benefits.
  - Included in issue confirmation and Box Folders.
  - Tweeted    about    it    in    August    2021: https://x.com/ashleygjovik/status/1431680707433140226
- Criminal Bribery
  - "In Nov 2020, #Apple's head of Global Security & Business Conduct was charged with bribery. Moyer was accused of bribing the Santa Clara County Sheriff's Office (well known to be corrupt) in exchange for concealed

weapons permits. [Apple's head of global security indicted on bribery charges, From washingtonpost.com," 8:20 PM · Aug 28, 2021, https://x.com/ashleygjovik/status/1431773819715219458

- "Moyer served as #Apple's chief compliance officer from 2009-13 & one responsibility was to ensure Apple follows anti-bribery laws. The indictment comes 1yr after an Apple attorney in charge of enforcing the co's insider-trading policies was indicted on insider-trading charges." @ashleygjovik, Aug 28, 2021, https://x.com/ashleygjovik/status/1431774126272696328

- 18 USC Section 299 (See SAC at 1241)


## Smuggling{ XE "Smuggling" } and Violations of Sanctions{ XE "Sanctions" }

- Made complaints to West and Powers in 2020 and again in July 2021.
  - Note: Apple lists "violations of sanctions" in their whistleblower policy.
- Notification to managers she escalated in July 2021.
  - Iran Threat Reeducation and Syria Human Rights Act
  - 18 U.S.C. 833; 18 U.S.C. 846
- Filed a complaint to Apple Business Conduct in July 2021.
  - Met with Business Conduct team about it.
  - Included in August 2021 Issue Confirmation (HRC000017207) and Box folders.
- Filed a complaint to the US FBI{ XE "US FBI" } in September 2021. Tweeted about this prior to termination.
  - See SAC at 129-30, 336-40, 489, 913, 1213, 1315.
  - "July 20, 2021 - email with #Apple legal & biz conduct Reported possible violations of sanctions against Syria to my leadership & HR BP. Coworker was bragging about smuggling. No one took action for 10mo. Complained to biz conduct in July. Reported to the @FBI a few days ago.," 6:06 AM · Sep 6, 2021, https://x.com/ashleygjovik/status/1434820337166786563


## Invasions of Privacy (Face Gobbling)

- Plaintiff complained to coworkers and management, complained on social media, complained the press.
  - o Plaintiff had complained about a number of privacy issues to Apple

> in 2021 prior to complaining about Gobbler, and each time Apple
> ignored her concerns and became upset when she pressed the
> matter. Gjovik had to take the matter public in order to get help.

- California Civil Code 1051, 1708.8, 1798.1. California Labor Code 345,
  California Penal Code 637.7. Cal Con. Art 1.; GDPR; BIPA; OHCHR Art.
  VII; Wilson Directive; ICCPRA RS 2200A xxi; 18 USC Section 1028.

155.   Defendant argues again that Plaintiff needs to name the specific employees she talked to about Gobbler and her decision to take it public – while acting confused why Plaintiff would be worried about her friend being fired despite Apple concurrently saying talking about it publicly justifies immediate termination. [Def's MTD at 20; Def's Reply at 11-12]. This is a perfect example of why judicial declaratory relief is desperately needed on this matter.

156.   For this pleading it is enough that Gjovik shared details of Gobbler with The Verge and on social media, as she did so under the premise that nothing would change Apple's position except public pressure. Prior to this she had made a number of other privacy complaints, and each time Apple dismissed her complaints and refused to address the issue.

157.   Further, due to the number of complaints she was filing the government at that time, Apple surely perceived she disclosed it to the government or may disclose it to the government.[52] She did report it to numerous government agencies in 2022. Defendant also again asks for proof it was monitoring her social media. The Verge article notes it asked Apple for comment on the article and the article includes a video of Plaintiff's face, so Apple knew the matter was disclosed to the public, and Apple knew Gjovik made it clear she was involved in sharing it, even prior to the article being published. [P's 8/18 RJN Exhibit Q].

---

[52] *People ex rel. Garcia-Brower v. Kolla's Inc.*, No. G057831, 2 (Cal. Ct. App. Sep. 26, 2023).

### N.   Claims for Cal.Lab.C. §§ 98.6 + 1101, 1102 (Politics) + 232.5

158.   Defendant challenges Plaintiff's claims about Palestine, Uyghurs, and work conditions in China claiming it was the first time she's raised the topic. She openly admitted the 4AC appeared to be the first time she detailed it in this civil matter, but it is far from the first time she mentioned it. [P's Opp to D's MTD at 38]. If Apple's lawyers conducted any research at all into this matter, they would have reviewed one of the most critical pre-termination documents, the August 2021 "Issue Confirmation" sent to Employee Relations and Business Conduct. This matter is included expressly in the Issue Confirmation. It was also included in the Box folders where Gjovik shared her evidence for Apple's supposed investigation into her concerns in late July 2021 through September 2021. In addition, this topic later detailed in depth in her Position Statement for her NLRB case.

Apple complains that press coverage of Apple and the matter is not enough for Apple to know it happened. The articles referenced by Gjovik and her colleagues in their complaints were from large publishers, and had been out for several months – so Apple surely was aware.[53] Further, Apple would also be aware if it knew it had forced labor in its supply chain, which Apple clearly does know because it was caught lobbying against a prohibition on Uyghur forced labor.[54] Apple's motion and reply also try to claim this is all unrelated to work conditions

---

[53] "*Seven Apple Suppliers Accused of Using Forced Labor From Xinjiang,*" The Information, May 10 2021, https://www.theinformation.com/articles/seven-apple-suppliers-accused-of-using-forced-labor-from-xinjiang

[54] "*Apple is lobbying against a bill aimed at stopping forced labor in China. Apple wants to water down key provisions of the bill, which would hold U.S. companies accountable for using Uighur forced labor, according to two congressional staffers.*" Washington Post, Nov 21, 2020, https://www.washingtonpost.com/technology/2020/11/20/apple-uighur/ "*Apple Spent $90,000 Lobbying Lawmakers on Uyghur Forced Labor Bill,*" January 22, 2021 3:57 PM, National Review, https://www.nationalreview.com/news/apple-spent-90000-lobbying-lawmakers-on-uyghur-forced-labor-bill/

– but slavery is a work condition?[55]

159.   Defendant challenges Plaintiff's claims under Cal. Labor Code Sections 1101 and 1102 as if they were standalone 1101/1102 claims, but they're not. All topics discussed were also work conditions and so the 1101/1102 claims are not required to be met as fully as if they stood alone. (Cal. Labor Code Section 1103). [Def's 7/15 MTD at 22-23; Reply at 13-14]. That said, they could also stand alone. Either way, please see proposed supplement below.

Plaintiff's activism around Palestine was about work conditions as Gjovik saw many of her Muslim coworkers were facing harassment and abuse for speaking about Palestine.[56] She contacted her managers and HR asking for help for her coworkers, on behalf of her coworkers. "*I'm writing on behalf of myself and in support of the Muslim and Palestine employees at Apple…*" (May 21 2021). There was also heated discussion on Slack about the matter, which Gjovik participated in, and which Apple HR tried to shut down, even eventually deleting the Muslim Slack channel. Gjovik also included this matter in her "Issue Confirmation" she sent Apple in August 2021.

Gjovik made several posts on Twitter in early August 2021 criticizing Apple's use of Uyghur forced labor and Apple lobbying against prohibitions of it.

"#Apple lobbyists are trying to weaken a bill aimed at preventing #forcedlabor in #China. The Uyghur Forced Labor Prevention Act would require US companies to guarantee they don't use these imprisoned or coerced workers.

---

[55] "The mounting evidence is beyond troubling. Despite persistent assurances from Apple that their supply chains were free of forced labor, we now have evidence that it is tainted," said the Chairs. "We urge Apple CEO Tim Cook to divest from Chinese suppliers in Xinjiang who are implicated in forced labor in China. We also ask Apple to engage with U.S. Customs and Border Protection on their China supply chains to ensure that no Apple import is made with forced labor. There must be a concerted, tough, and global response to the atrocities being committed in Xinjiang." *Xinjiang: Chairs Issue Statement about Forced Labor in Apple's Supply Chain,* The Congressional-Executive Commission on China June 8, 2021 https://www.cecc.gov/media-center/press-releases/chairs-issue-statement-about-forced-labor-in-apple%E2%80%99s-supply-chain-in

[56] "A*pple employees call for company to support Palestinians in internal letter,*" The Verge, May 20 2021, https://www.theverge.com/2021/5/20/22446059/apple-employees-palestinians-support-internal-letter-tim-cook

https://washingtonpost.com/technology/2020/11/20/apple-uighur/…". @ashleygjovik Aug 7, 2021. https://x.com/ashleygjovik/status/1424130912774594560

"One of the oldest and most well-known #Apple #iPhone suppliers has been accused of using #forcedlabor by #Uighur Muslims in its factories, adding new scrutiny to Apple's #humanrights record in #China. https://washingtonpost.com/technology/2020/12/29/lens-technology-apple-uighur/…. @ashleygjovik Aug 7, 2021 https://x.com/ashleygjovik/status/1424130035405836288

"What #Apple would like is we all just sit and talk and not have any real consequences," said supporters of the bill. "They're shocked because it's the first time where there could be some actual effective #enforceability." @ashleygjovik Aug 7, 2021, https://x.com/ashleygjovik/status/1424137176946597888

"#Apple's iconic employee uniforms are sourced from a company that was sanctioned by the US gov for its involvement in #forcedlabor & other #humanrights abuses in #China, undermining Apple's claims to avoid suppliers that engage in such practices." @ashleygjovik Aug 7, 2021, https://x.com/ashleygjovik/status/1424131625743384582

Is this what "honor" looks like? "#Apple's lobbying against a bill aimed at stopping forced labor in #China. Apple wants to water down key provisions which would hold U.S. companies accountable." Great article by: @ReedAlbergotti at @washingtonpost https://washingtonpost.com/technology/2020/11/20/apple-uighur/," @ashleygjovik 8:03 PM · Sep 6, 2021 https://x.com/ashleygjovik/status/1435030966729265152. Quote: Tim Cook @tim_cook Sep 6, 2021 This Labor Day we honor and recognize all those whose work and imagination fuels the innovations of tomorrow.

She quickly received a message and a phone call from a senior leader at the company strongly urging her to not criticize those topics and warning her if she does there will be backlash from Apple. She did not stop criticizing the topics and she was fired.

Employee Relations, Lagares, was also offended by Gjovik's criticism of Apple's use of suicide nets, claiming "it was a vendor" and not him directly. (He managed Apple's labor relations with Beijing). Further, US DOL OSHA apparently decided it was some sort of evidence of misconduct by Plaintiff that she criticized Apple's use of suicide nets and Lagares' involvement, which assumably means Apple raised the matter to US DOL OSHA as one of the reasons for her termination.

> "#Foxconn had large nets installed outside many of the #Apple manufacturing buildings to catch falling bodies. The company hired counsellors and workers were made to sign pledges stating they would not attempt to kill themselves." https://theguardian.com/technology/2017/jun/18/foxconn-life-death-forbidden-city-longhua-suicide-apple-iphone-brian-merchant-one-device-extract... @ashleygjovik Aug 5, 2021 https://x.com/ashleygjovik/status/1423460606217048069

Suicide nets are surely work conditions – and while factory workers are contractors, they were still her coworkers.

160.   All of these examples have some evidence of Apple attempting to prevent participation, and direct and interfere with political activity. Plaintiff also spoke about some purely political matters as well including news coverage that Apple was extorting the legislatures of the states of Georgia and North Dakota. [see SAC at 440].

> "In Aug 2021, #Apple lobbied Georgia legislators on bills impacting the App Store, saying to do what Apple wants or else it would pull out of a $25 million investment in a historically Black college in Atlanta. https://politico.com/news/2021/08/20/apple-takes-on-state-legislatures-georgia-506299... " @ashleygjovik 8:18 PM · Aug 28, 2021. https://x.com/ashleygjovik/status/1431773140934352897

> Re: #Apple "We don't want to put the state in a position where we need to spend our taxpayer $ in litigation; these are some very big companies," Jerry Klein, a Republican state senator, said on the floor of the Senate. "Let's stay out of the courts." [North Dakota

lawmakers vote down a bill that threatened Apple's and Google's revenues. (Published...From nytimes.com), @ashleygjovik 8:35 PM · Aug 28, 2021, https://x.com/ashleygjovik/status/1431777441802960898

""#Apple's been able to intimidate & use a lot of money to kill legislation. They do it in different ways in each state, but it all comes down to strong-arming the legislature." Apple has threatened jobs, offered massive investments, & threatened litigation https://politico.com/news/2021/08/20/apple-takes-on-state-legislatures-georgia-506299...,@ashleygjovik, 8:30 PM · Aug 28, 2021, https://x.com/ashleygjovik/status/1431776176301740033

She also protested Apple's use of a British flag for Chagos emoji, including filing a formal complaint in June 2021 (Radar 79525856). She was also trying to organize with Pussy Riot about "activism at Apple," and Apple knew she was going to meet with them because she told Apple University about it. (see SAC at 527-8).

161.   The point of this is that Apple likely fired Plaintiff for a variety of illegal reasons, and until discovery is underway, it likely impossible to proactively list all of those illegal reasons – and Apple may be actively trying to dismiss some of those reasons now so they can later uses them as defenses and/or avoid discovery of documents showing their liability.

### O.   Claims for Cal.Lab.C. §§ 232 (Pay) & 232.5

162.   Defendant challenges Plaintiff's § 232 claim as new and insufficient. [D's MTD at 22-23; Reply at 13-14]. However, it's not new – it's been in prior complaints. [7/31 Declaration Exhibit A-C]. [See SAC at 1229-31, 1250].

163.   Further, Defendant's feigned confusion is a ruse. Defendant does know exactly what she's talking about. Please see a proposed supplement to this

section below. [57]

In August of 2021 Gjovik participated in an employee driven pay survey that was being shared on Slack. Gjovik suggested adding a question about gender and added it herself in the spreadsheet.

In the evening of August 3 2021, Gjovik posted on a popular Slack group at Apple, linking to three of Apple's policies, and quoting "Nothing in these guideless should be interpreted as restricting your right to speak freely about your wages, hours, or working conditions." Gjovik encouraged her coworkers to speak out and organize. Gjovik was put on leave the next morning. Gjovik posted on Twitter about doing this a few days later.

> "There's a strange idea in #Apple that speaking out about #workconditions violates our employment contract (a doc many of us never got a copy of nor is there a formal way to req) but I took pics & mine has rights in a footnote. I also reminded folks the eve before put on leave. @ashleygjovik 1:33 PM · Aug 9, 2021. https://x.com/ashleygjovik/status/1424785998152495107

After Plaintiff was put on leave, the pay survey was shutdown, supposedly because there was a question about gender. There was news coverage of Apple shutting down pay surveys and public criticism about the matter:
- *Apple keeps shutting down employee-run surveys on pay equity — and labor lawyers say it's illegal, the company bans surveys that include diversity data,*

---

[57] ***Apple keeps shutting down employee-run surveys on pay equity — and labor lawyers say it's illegal,*** The Verge, August 9, 2021, "Apple insists it does not have a problem with pay inequality. Skeptical Apple employees have been trying to verify that claim by sending out informal surveys on how much people make, particularly as it relates to women and underrepresented minorities. But the company has shut down three of those surveys, citing stringent rules on how employees can collect data. ...The first known survey began in the spring and asked people to volunteer salary information in addition to how they identify in terms of race, ethnicity, gender, and disability. After about 100 responses, Apple's people team — the company's name for what is commonly called human resources — asked employees to take the survey down, saying the demographic questions constituted personally identifying information, or PII. Last week, employees tried to start another pay equity survey but were again told to take it down **because it included a question on gender.** When they created a new survey without the gender question, the Apple people team allegedly said it had to be shut down because it was hosted on the company's corporate Box account." https://www.theverge.com/2021/8/9/22609687/apple-pay-equity-employee-surveys-protected-activity

Aug 9, 2021, "Apple did not respond to a request for comment from *The Verge*." [58]

- *Apple just banned a pay equity Slack channel but let's fun dogs channel lie. The company's rules around Slack usage are not being evenly enforced,* Aug 31, 2021, Apple did not immediately respond to a request for comment from *The Verge*. [59]

- *"Apple says it has pay equity, but an informal employee survey suggests otherwise: Employees say there's a six percent wage gap between the salaries of men and women who responded to the survey,"* Aug 23, 2021. In response to a request for comment from *The Verge*, Apple spokesperson Rachel Tulley sent the company's already public statement on pay equity." [60]

Gjovik also tweeted out her salary in solidarity to those organizing around pay. An NLRB charge was filed about Apple shutting down the pay surveys in September 2021, prior to Gjovik's termination, and NLRB issued a decision of merit in January 2023. Gjovik also found a prior US DOJ lawsuit against Apple for salary price fixing, posted about it, and compared it to Apple's recent actions shutting down pay surveys.

"The DOJ announced in 2010 that it had settled with #Apple & others, establishing that they would cease their illegal hiring practices. The DoJ noted this complaint is part of a larger antitrust inquiry into employment practices by high tech firms." 4:51 PM · Aug 31, 2021 https://x.com/ashleygjovik/status/1432808176026472448

"Lawsuit accuses Apple, others of fixing worker pay: large tech companies conspired with one another to lowball salaries." @ashleygjovik 4:55 PM · Aug 31, 2021 https://x.com/ashleygjovik/status/1432809271746383878

---

[58] "Last week, employees tried to start another pay equity survey but were again told to take it down because it included a question on gender. When they created a new survey without the gender question, the Apple people team allegedly said it had to be shut down because it was hosted on the company's corporate Box account."
"https://www.theverge.com/2021/8/9/22609687/apple-pay-equity-employee-surveys-protected-activity
[59] "Pay equity has been a hot topic among Apple employees over the past few months. The company has shut down multiple employee surveys aimed at gathering data on how much workers make." https://www.theverge.com/2021/8/31/22650751/apple-bans-pay-equity-slack-channel
https://www.theverge.com/2021/8/23/22633141/apple-pay-equity-survey-results-wage-gap

Not much has changed in 16 years.... 8/31 - "Apple just banned a pay equity Slack channel but let's fun dogs channel lie" https://theverge.com/2021/8/31/22650751/apple-bans-pay-equity-slack-channel @ashleygjovik 3:58 PM · Aug 31, 2021

## P. Cal.Lab.C. §§ 98.6 + 96k + 232.5 claim (or Tamney &/or UCL).

164.    Defendant again argues that Cal. Labor Code § 96(k) does not have a private right of action, which is only partially true. Standing alone, § 96k likely does not have a private right of action. [D's MTD at 23-24, Reply at 14]. However, combined with overlapping §§ 232.5 and 98.6 claims, there surely is a private right of action for § 96(k).

165.    Case law for § 96(k) is sparse, which is why Plaintiff does not make conclusive declarations as Defendant does. However, in this case, the employee would be not only be speaking about work conditions outside work hours and not on work property, but those work conditions would be rooted in inalienable Constitutional rights. As mentioned, this claim could likely also be pursued under *Tamney* as a ConTort. Further, § 96(k) could probably also be pursued under a UCL claim as well, or instead.

166.    Otherwise, would only the under resourced, five-years-behind-on-their-caseload CalDOL DIR office be able to pursue a § 96(k) claim? Have they ever pursued one? No private action at all effectively nullifies the statute. An interpretation which gives effect is preferred to one which makes void. Cal. Civ Code § 3541.

167.    Apple also claims, "her Seventh Claim does not make any mention of Section 98.6," but this is patently false. *See*, "Violation of Cal.Lab.C. § 96(k) via § 98.7)" [4AC page 55 line 13-14]. "Violation of Cal. Labor Code § 98.6 including § 96k, 232, and 232.5." [TAC page 59 line 8]. And so on. Plaintiff even discussed complimentary Cal. Labor Code § 980 protections as well in her SAC at 403.

168. Finally, Defendant still does not explain why it is suggesting striking the entirety of her Section 98.6 claim despite not expressly arguing it should be dismissed. Is Defendant trying to dismiss her 98.6 claim or not? [MTS pg53-54 Exhibit A]. Is Apple hoping the court approves all requests in the MTS without checking that the motion relates to what Apple says it does?

## Q.  Breach of Implied Covenant of Good Faith & Fair Dealing

169. Despite Plaintiff's claim for a breach of the implied covenant of good faith/fair dealing being approved to move forward in the May 20 2024 decision ("the Court...allows the claim for breach of the implied covenant to proceed...")[61] Defendant now rechallenges it with no new basis, and then claims Plaintiff did not sufficiently defend herself from their Blitzkrieg of a 4th MTD and so now her claim should be forfeited, despite already being approved. Further, Defendant says Plaintiff can't amend either. [MTD at 24-25; 14-15 Reply at 14-15].

170. Plaintiff has not alleged in her 4AC that Defendant violated any express terms of an employment contract, but rather, Defendant violated the *implied* covenant of good faith and fair dealing that applies to all contracts. Plaintiff does not allege one specific contract governs her relationship with Apple as Apple used hundreds of contracts and policies during her employment, and several of them were recently found to violate federal law. Its unclear which contract(s) govern at this point, or if any do (instead now an implied contract). The implied covenant of good faith and fair dealing would apply to any of these scenarios.

171. Defendant also argues her performance bonus is prospective and not earned. (Def's MTD at 24). Plaintiff pled that her performance bonus was already vested by the time she was terminated, citing the end of the review year.

---

[61] *Gjovik v. Apple Inc.*, 23-cv-04597-EMC, 41 (N.D. Cal. May. 20, 2024).

### R. Plaintiff's request for Cal. Labor Code civil penalties is not relevant for a subsequent 12(b)(6) motion, or 12(f) motion.

172.   Plaintiff has explained that these motions are not meant to be used to strike/dismiss penalties at this phase in the proceeding. [P's Opp to MTD at 19]. Further, couldn't a compromise just be Plaintiff contacting CalDOL after she wins and asking them if they want to fine Apple in addition to her lawsuit?  Do we have to decide this now?

## III. Conclusion

In Apple's latest Motions, Apple attempts to dismiss all but three of Plaintiff's claims, and even then, tries to dismiss significant portions of those three remaining claims as well.

A large corporation operated a secret, off-book factory, engaging in the illegal dumping of toxic waste for several years [P's 7/31 RJN, Exhibit A]. When an employee discovered the illegal activities, the corporation engaged in surveillance, harassment, and threats to silence her. Despite these efforts, she continued her investigation, gathering evidence and reporting to federal authorities. In response, the corporation deployed covert agents to obstruct her and her claims.

The corporation now requests that the court disregard these actions and limit its liability to a single day, September 9, 2021, arguing that excluding years of misconduct and potentially criminal conduct and focusing solely on the events occurring over a few hours on one day, will be more efficient. The corporation seeks to dismiss the victim's statements, judicially noticeable evidence, and her arguments, asking the court to accept their assertion of innocence and to characterize the situation as a misunderstanding.

Defendant's Motion to Dismiss and Motion to Strike should be denied. Plaintiff also respectfully requests that if any claims are dismissed or stricken, she

at least be given an opportunity to try to amend. Plaintiff also respectfully requests
Apple be ordered to file their answer and prohibited from filing additional 12(b)(6)
or 12(f) motions.

Dated: August 18, 2024.

Signature:

/s/ Ashley M. Gjovik

*Pro Se Plaintiff*

**Email**: legal@ashleygjovik.com
**Physical Address**: Boston, Massachusetts
**Mailing Address:** 2108 N St. Ste. 4553 Sacramento, CA, 95816
**Phone**: (408) 883-4428

**Ashley M. Gjovik, JD**
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# United States District Court

## Northern District of California

| | |
|---|---|
| **Ashley M. Gjovik**, *an individual*, | Case No. 3:23-CV-04597-EMC |
| Plaintiff, | |
| vs. | **Plaintiff's Opposition to Defendant's Emergency Motion to Dismiss** |
| **Apple Inc.**, a corporation, | Fed. R. Civ. P. 41(B) |
| Defendant. | |

# I. TABLE OF CONTENTS

I.   TABLE OF CONTENTS ........................................................ II

II.  ISSUES TO BE DECIDED ..................................................... 1

III. ARGUMENTS ................................................................ 1

    A.   *The cases Apple cites are not comparable.* ........................... 2

    B.   *FRCP Rule 41(b) dismissal requires a party to fail to comply with a court order and a display of willful or contumacious conduct.* ..................... 3

    C.   *Apple's counsel have also used similar fonts and formatting but also with single-spaced line abuse.* ..................................................... 9

    D.   *The delay caused by Plaintiff's late filing was minimal.* ........... 9

    E.   *This court has issued orders to Plaintiff with requirements that exceed the Federal Rules of Civil Procedure requirements.* ............................... 10

    F.   *A dismissal with prejudice would be too harsh.* .................... 11

IV.  CONCLUSION ............................................................... 13

— ii —

1

2 ## Points & Authorities

3      1.    Plaintiff, Ashley Gjovik, respectfully submits the following

4 Memorandum of Points and Authorities in Opposition to Defendant's Motion to

5 Dismiss and Motion for Shortened Time, at Docket No. 131 & 132. Defendant's

6 Motions should be denied as they are improper and without merit.

7 ## II. Issues to be Decided

8

9      2.    This court has to decide whether to grant Apple's motion for an

10 emergency decision on their Motion to Dismiss with prejudice due to Plaintiff's

11 failure to follow a court order. If this Court denies Defendant's motions, then the

12 court must decide whether to give Apple an extension on filing their next response

13 to the latest complaint.

14      Plaintiff responds to both motions here, despite only being provided two

15 days, in order to allow this court to quickly deny Defendant's motions and order

16 them to respond to her complaint. Their request for an extension should also be

17 denied due to unclean hands – though a two day extension from the original

18 deadline, due to Plaintiff's delay, is fine.

19 ## III. Arguments

20

21      3.    Here, Defendant has filed two frivolous and harassing motions,

22 accusing Plaintiff of misconduct and "malfeasance" for filing her complaint with

23 a two day delay due to time needed to deal with manifestations of severe emotional

24 distress intentionally caused by the Defendant, for changing the font she used in

25 her filings back in July 2024, for adjusting the spacing of lines in her filing, and

26 for not including line numbers in her latest complaint.

27

28

— 1 —

Pl's Opposition to Def's Emerg. Motion to Dismiss | 3:23-CV-04597-EMC

ER VII 278



*Plaintiff's Fifth Amended Complaint in question.*

### A.  The cases Apple cites are not comparable.

4.  The handful of cases Apple cites for its motions are not relevant here. Apple cited *Powerteq, LLC v. Moton,* No. C-15-2626 MMC, 2016 WL 80558, at *1 (N.D. Cal. Jan. 7, 2016) related to numbered lines, but the cite is to errata in a footnote of an unpublished case. Apple cited *Monegas v. City & Cnty. of San Francisco Dep't of Pub. Health*, No. 22-CV-04633-JSW, 2023 WL 5671933, at *2 (N.D. Cal. Sept. 1, 2023), related to filing past a deadline, but in that case the court found there was no merit in the claims, the person failed to file the case within the time limit set for EEOC right to sue letters, and the person failed to plead a statute of limitations tolling theory.

5.  Apple cited *Mostowfi v. I2 Telecom Int'l Inc.,* No. C-03-5784 VRW, 2006 WL 8443121, at *9 (N.D. Cal. Mar. 27, 2006), aff'd, 269 F. App'x 621 (9th Cir. 2008) related to a change in pleading formatting implying bad faith, but in that case the dismissal was primarily based on the plaintiff's failure to provide

— 2 —

Pl's Opposition to Def's Emerg. Motion to Dismiss | 3:23-cv-04597-EMC

ER VII 279

1  citations, despite being ordered to prior, and counsel admitted expressly to
2  attempting to evade page limits.

3      6.   Apple cited *Mandell v. Am. Exp. Travel Related Servs. Co., 933 F.2d*
4  *1014 (9th Cir. 1991)* related to a pro se plaintiff missing a deadline, but in that
5  case the Plaintiff's "*claims [were] wholly without merit.*" Apple cited *Gutierrez v.*
6  *City of Colton,* No. CV 07-4934 ODW (SSX), 2008 WL 11410020, at *4 (C.D. Cal.
7  June 9, 2008) related to the court granting an extension, but that case is
8  referencing failure to prosecute where the statute of limitations had expired for
9  most claims. None of these cases are relevant here – and they are the only cases
10  that Apple cites as a legal basis for its request.

11      **B.   FRCP Rule 41(b) dismissal requires a party to fail to comply with**
12          **a court order <u>and</u> a display of willful or contumacious conduct.**

13

14      7.   Plaintiff did note engage in willful or contumacious conduct, and
15  therefore 41(B) is not applicable here. "[T]rial courts possess only a narrow
16  inherent authority to dismiss claims based on limited circumstances (e.g., cases
17  involving a failure to prosecute, frivolous claims, or egregious misconduct)."
18  *Estrada v. Royalty Carpet Mills, Inc.,* 15 Cal. 5th 582, 317 Cal. Rptr. 3d 219, 541
19  P.3d 466 (Cal. 2024). Mere failure to comply with an order of court does not of
20  itself establish the propriety of invoking Fed. R. Civ. P. 41(b). *Gordon v. Federal*
21  *Deposit Ins. Corp.,* 427 F.2d 578, 13 Fed. R. Serv. 2d 811 (D.C. Cir. 1970)

22      8.   Intent of the plaintiff is an important, indeed crucial, factor
23  considered by the courts, dismissals being limited to intentional, willful, or
24  flagrant noncompliance, or repeated failures to comply from which willfulness or
25  extreme dilatoriness may be inferred. *Jones v. Thompson,* 996 F.2d 261, 26 Fed. R.
26  Serv. 3d 239 (10th Cir. 1993); *Tatum v. Liberty Housing Co.*, 726 F.2d 410 (8th Cir.
27  1984) If counsel presents a substantial question and is not outrightly defiant, a
28  lesser sanction may be appropriate, under the court's authority to make such order

1    as is just. *Gordon v. Fed. Deposit Ins. Corp.*, 427 F.2d 578, 581 (D.C. Cir. 1970)

2    *Syracuse Broadcasting Corp. v. Newhouse,* 271 F.2d 910, 914 (2d Cir. 1959); cf.

3    *Campbell v. Eastland,* 307 F.2d 478 (5th Cir. 1962), cert. denied, 371 U.S. 955, 83

4    S.Ct. 502, 9 L.Ed.2d 502 (1963).

5        9.    "The necessity justification for the contempt authority is at its

6    pinnacle, of course, where contumacious conduct threatens a court's immediate

7    ability to conduct its proceedings, such as where a witness refuses to testify, or a

8    party disrupts the court." *Int'l Union v. Bagwell*, 512 U.S. 821, 832 (1994). An

9    example of a pro se plaintiff engaging in "highly contemptuous" conduct that was

10   appropriate for a trial court to dismiss the case due to the conduct was when where

11   a self-represented attorney plaintiff threatened to use pepper spray and taser

12   against opposing counsel. *Crawford v. JPMorgan Chase Bank, N.A.* (2015) 242

13   CA4th 1265, 1271, 195 CR3d 868, 873. That is nothing like what happened here.

14       10.    There are three reasons why Apple's argument that Plaintiff engaged

15   in bad faith evidenced by her changed formatting in her complaint – is completely

16   without merit. First, she changed her formatting months ago. Second, the type of

17   formatting misconduct that this district sanctions if far from what she did. And

18   Third, even Apple has used the same formatting she did.

19       11.    There is no evidence that Plaintiff acted in bad faith or attempted to

20   defy the court.

21           **1. Defendant claims Plaintiff changed the formatting and layout of**

22               **her legal filings starting with her Fifth Amended Complaint.**

23               **This is not true.**

24

25       12.    Apple claimed the Plaintiff changed her formatting, font, line

26   spacing, etc. just for this Fifth Amended Complaint, and did not change it prior.

27   That's is demonstrably false. Plaintiff changed her formatting and fonts in July of

28   2024, following the Typography for Lawyers guidebook and typeface. (See Exhibit

— 4 —

A). Nothing Plaintiff did was malfeasance or contempt.

Case 3:23-cv-04597-EMC Document 100 Filed 08/27/24 Page 2 of 52

I. Notice of Administrative Pendency

Plaintiff files this notice of administrative pendency regarding her Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) whistleblower claim currently with the U.S. Department of Labor. The CERCLA (toxic waste dump laws) provides statutory protection from whistleblower retaliation under 42 U.S.C. § 9610. [Exhibit D].

Plaintiff filed a whistleblower retaliation complaint in August of 2021. These types of environmental whistleblower claims proceed through federal OSHA Wage & Hour before being allowed a de novo hearing with an ALJ at the U.S. Dept. of Labor OALJ. The hearing is supposed to be a formal A.P.A. adjudication. OSHA did not release Plaintiff's claim until December of 2023 and she filed a timely request for de novo hearing with OALJ on January 7 2024.

Per 29 CFR Part 24, appeals of OALJ decisions go to the U.S. Dept. of Labor Admin. Review Board, and then there is an optional review by the Sec. of Labor if they so choose. After that, then the CERCLA decision is appealable to a U.S. District Court. *Id.* [Exhibit E].[1] If the case also has additional environmental statutes beyond CERCLA, then those claims are appealable to an appellate court, not a District Court. Plaintiff did request inclusion of additional statutes (RCRA, CAA, and TSCA), but her request was denied by the ALJ.

The U.S. Dept. of Labor OALJ ALJ abruptly dismissed Plaintiff's CERCLA case on August 7 2024. [Exhibit C]. Plaintiff timely filed a request for appellate review to the U.S. Dept. of Labor ARB on August 21 2024, and review was granted on August 27 2024. [Exhibit A and B]. The ARB case is *Ashley Gjovik v Apple Inc,*

[1] 29 CFR, § 24.112 Judicial review. "(d) Under the CERCLA, after the issuance of a final order... for which judicial review is available, any person adversely affected or aggrieved by the order may file a petition for review of the order in the US district court in which the violation allegedly occurred. For purposes of judicial economy and consistency, when a final order under the CERCLA also is issued under any other statute listed in §24.100(a), the adversely affected or aggrieved person may file a petition for review of the entire order in the United States Court of Appeals for the circuit in which the violation allegedly occurred or the circuit in which the complainant resided on the date of the violation."

— 2 —

Plaintiff's Notice of Pendency | Case No. 3:23-CV-04597-EMC

Case 3:23-cv-04597-EMC Document 101 Filed 08/27/24 Page 2 of 2

Motion to Strike

PLEASE TAKE NOTICE that on AUGUST 28 2024 at 9:30AM, in Judge Chen's virtual courtroom, before the Honorable Judge Edward Chen, I will, and hereby do, move for an order granting a Motion to Strike the improper amicus document filed to Docket No. 99.

The motion if concurrently filed with a Memorandum of Points and Authorities, Proposed Order, and a Declaration in Support.

Dated: August 27 2024

Signature:

/s/ Ashley M. Gjovik
*Pro Se Plaintiff*

**Email**: legal@ashleygjovik.com
**Physical Address**:
Boston, Massachusetts
**Mailing Address:**
2108 N St. Ste. 4553 Sacramento, CA, 95816
**Phone**: (408) 883-4428

— 1 —

Plaintiff's Motion to Strike | Case No. 3:23-CV-04597-EMC

Case 3:23-cv-04597-EMC Document 94 Filed 08/18/24 Page 2 of 18

Declaration of Ashley Gjovik

Pursuant to 28 U.S.C.§ 1746, I, Ashley M. Gjovik, hereby declare as follows:

My name is Ashley Marie Gjovik. I am a self-represented Plaintiff in this above captioned matter. I have personal knowledge of all facts stated in this Declaration, and if called to testify, I could and would testify competently thereto.

I make this Declaration based upon my personal knowledge and in support of Plaintiff's Opposition (Docket No. 84 and 85) to Defendant's Motion to Dismiss (Docket No. 78) and Motion to Strike (Docket No. 79), and in Support of Plaintiff's Motion for Leave to file a sur-reply.

The prior July 31 2024 Declaration is integrated here, including statements and Exhibits A-F.

Attached as Exhibit G is a true and correct copy of the email I sent US EPA when I started looking into the Superfund site next to 3250 Scott Blvd in January 2023, and when I discovered the fab at 3250 Scott in February 2023.

Attached as Exhibit H are true and correct captures of the Public Records Act request I filed to city of Santa Clara that led to the discovery of 3250 Scott Blvd, and the two requests filed by AEI Consulting prior.

- 2 -

2ND Declaration & Exhibits | 3:23-CV-04597-EMC

Case 3:23-cv-04597-EMC Document 96 Filed 08/19/24 Page 2 of 125

I. Notice & Judicial Notice

Plaintiff Ashley Gjovik respectfully provides notice of new 9th Circuit legal precedent and US District Court persuasive authority established over the last three months (9th Circuit on July 25 2024; District Court in May 2024). The precedent is material and directly relevant to the instant lawsuit; specifically, Plaintiff's IIED (Outrage), Cal. Labor Code (§§ 1102.5, 6310, 98.6), and *Tamney* claims and sub-claims.

The 9th Circuit case denied a Motion for Summary Judgement and the US District Court of Vermont case denied a Motion to Dismiss, finding sufficient claims for adverse employment actions based on coworker/manager harassment that occurred through social media (Instagram and Facebook, respectively).

- Exhibit 1: *Okonowsky v. Garland*, No. 23-55404 (9th Cir. Jul. 25, 2024).
- Exhibit 2: *Su v. Bevins & Son, Inc.*, 2:23-cv-560 (D. Vt. May. 7, 2024).

The 9th Circuit decision is the first federal appellate decision to reference the new US EEOC Guidance on Harassment in the Workplace released on April 29 2024 with guidance on social media harassment and coworker harassment. (link to EEOC website).

- Exhibit 3: (Analysis) *Expert Insights—when Social Media Posts Become Workplace Harassment,* Wolters Kluwer Employment Law Daily, August 5 2024, WL 3644805.

— 1 —

Pl.'s Req. for Jud. Not. in Supp. of Pl.'s Opp. | Case No. 3:23-CV-04597-EMC

Case 3:23-cv-04597-EMC Document 93 Filed 08/18/24 Page 7 of 77

12. Apple repeatedly uses their own misleading editorializations of statements from both Plaintiff and the Court as justification as to why Plaintiff's meritorious claims should be dismissed with prejudice. Apple wrote in it motions and replies, in different formats that: "*...this Court recognized in its May 20, 2024 order regarding Plaintiff's prior complaint [Apple's misquoting] ...thus dismissal with prejudice of the other claims will facilitate efficient resolution of the ... retaliation claims that would remain and enable appropriately focused discovery and motion practice going forward.*" [D's MTD at 1, 25; D's Replies at 15]. Apple thus also refers to this Court's discovery orders as "inappropriate" and threatens to file even more motions to dismiss after this one.

13. In addition, despite the chaotic allegations Defendant thew at her, Plaintiff has not pled anything in bad faith, nor does she believe any claims were dismissed due to misconduct or incompetence. The only full claims dismissed with prejudice on substantive points were her pro se, first attempt to plead federal money laundering and securities fraud against a multinational corporation - which is difficult for any attorney to do successfully. Defendant also repeatedly complains about the length, detail, lack of detail, organization, reorganization, and content of her amended complaint - despite filing repeated Motions to Strike previously that urged Plaintiff to engage in significant rewrites.

14. Defendant declares that existing claims are new even though they are not new, and it is quickly discernable that the claims are not new when reviewing the Plaintiff's complaint revision tracking table and indexes in her Declaration [Exhibits A-C], which Defendant urges this court to ignore. Defendant also repeatedly claims that Plaintiff was allowed or was not allowed to amend things that the Order seemed to say the opposite of whatever Apple is claiming now. [Def's MTD at 2, 5, 20]. Defendant also repeatedly claims Plaintiff pled new claims, theories, and/or "themes" - but the only major difference is Plaintiff voluntarily removing many claims that were given leave to amend hoping Apple

— 7 —

Pl.'s Opp. to Def.'s. Mot. To Dismiss & Strike | Case No. 3:23-CV-04597-EMC

Case 3:23-cv-04597-EMC Document 95 Filed 08/18/24 Page 2 of 43

I. Judicial Notice Arguments; Points & Authorities

Plaintiff Ashley Gjovik respectfully requests, pursuant to Fed. R. Civ. E. 201, that the Court take judicial notice of the following of the public records described below and attached as Exhibits. Plaintiff incorporates her Memorandum of Points and Authorities filed 7/31.

I verified the authenticity of each of these documents. A true and correction version of each document is attached in each exhibit. I declare under penalty of perjury this is true and correction.

Dated: August 18, 2024.
Signature:

/s/ Ashley M. Gjovik
*Pro Se Plaintiff*

**Email**: legal@ashleygjovik.com
**Physical Address**:
Boston, Massachusetts
**Mailing Address:**
2108 N St. Ste. 4553 Sacramento, CA, 95816
**Phone**: (408) 883-4428

— 1 —

Pl.'s Req. for Jud. Not. in Supp. of Pl.'s Opp. | Case No. 3:23-CV-04597-EMC

***Plaintiff's filing to this case in August & September 2024.***



Case 3:23-cv-04597-EMC Document 84 Filed 07/31/24 Page 11 of 37

**B. The majority of Defendant's arguments are barred by Rule 12(g) and 12(h).**

9. Fed.R.Civ.Pro. 12(g) provides in pertinent part: If a party makes a motion under this rule but omits therefrom any defense or objection then available to the party which this rule permits to be raised by motion, the party shall not thereafter make a motion based on the defense or objection so omitted, except a motion as provided in subdivision (h)(2) hereof on any of the grounds there stated. *Aetna Life Ins. v. Alla Med. Servs., Inc.*, 855 F.2d 1470, 1474 (9th Cir. 1988). The Defendant is foreclosed from asserting in a subsequent Rule 12(b)(6) motion "a defense . . . that was available . . . but omitted from [an] earlier motion" to dismiss. Fed R. Civ. P. 12(g)(2). *In re Anthem, Inc. Data Breach Litigation*, Case No. 15-MD-02617-LHK, 79-80 (N.D. Cal. May. 27, 2016).

10. Rule 12(g) is designed to avoid repetitive motion practice, delay, and ambush tactics. *Allstate Ins. Co. v. Countrywide Financial Corp.*, 824 F. Supp. 2d 1164, 1175 (C.D. Cal. 2011). Rule 12(g) applies to situations in which a party files successive motions under Rule 12 for the sole purpose of delay[.]"); *Doe v. White*, No. 08-1287, 2010 WL 323510, at *2 (C.D. Ill. Jan. 20, 2010) (citing the "substantial amount of case law which provides that successive Rule 12(b)(6) motions may be considered where they have not been filed for the purpose of delay, where entertaining the motion would expedite the case, and where the motion would narrow the issues involved"). *Schwartz v. Apple Inc.* (In re Apple iPhone Antitrust Litig.), 846 F.3d 313, 319 (9th Cir. 2017).

11. Defendant now seeks to assert defenses against the Fourth Amended Complaint that pertain to a failure to state a claim, but which were available and omitted from their earlier Rule 12 motions. *Hernandez v. City of San Jose*, 241 F.Supp.3d 959, 984-85 (N.D. Cal. 2017).

12. The Fourth Amended Complaint largely shares the same factual

— 3 —

PL.'S OPP. TO DEF.'S. MOT. TO DISMISS | CASE NO. 3:23-CV-04597-EMC

Case 3:23-cv-04597-EMC Document 86 Filed 07/31/24 Page 10 of 50

*Puma Biotechnology, Inc.*, slip op. at 7. 8:15-cv-00865 (C.D. Cal. Sept. 30, 2016).

**A. Legal & Government Records (Exhibits A, B, E, G, N, O).**

8. The Court may take judicial notice of letters from agencies related to environmental matters. See, e.g., *Alliance for the Wild Rockies v. Savage*, 897 F.3d 1025, 1032 n.11 (9th Cir. 2018) (in Endangered Species Act case, reviewing court notices USFS letter requesting re-consultation with Fish and Wildlife Service before approving forest management project). The Court may take judicial notice of records related to permits See, e.g., *Massachusetts v. Westcott*, 431 U.S. 322, 97 S. Ct. 1755, 52 L. Ed. 2d 349 (1977) (records of the Vessel Documentation Division of the Coast Guard that an individual's vessel is enrolled and licensed); *Olympic Forest Coalition v. Coast Seafoods Co.*, 884 F.3d 901, 904 (9th Cir. 2018) (reviewing court notices letter from Washington Department of Ecology to defendant about pollution discharge permit).

9. A court may take judicial notice of consent orders between private parties and environmental agencies related to hazardous waste liability. See, e.g., *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 124 (2d Cir. 2010) (noticing consent order executed by property owner and state Department of Environmental Conservation indicating release of CERCLA liability). A court may take judicial notice of agency reports that are "factual findings resulting from an investigation made pursuant to authority granted by law" and which suggest a pattern of violations with a company's day-to-day operations. *United States v. Ramirez-Jiminez*, 967 F.2d 1321, 1326 (9th Cir. 1992).

— 1 —

PL.'S REQ. FOR JUD. NOT. IN SUPP. OF PL.'S OPP. | CASE NO. 3:23-CV-04597-EMC

Case 3:23-cv-04597-EMC Document 87 Filed 07/31/24 Page 2 of 96

**DECLARATION OF ASHLEY GJOVIK**

Pursuant to 28 U.S.C.§ 1746, I, Ashley M. Gjovik, hereby declare as follows:

My name is Ashley Marie Gjovik. I am a self-represented Plaintiff in this above captioned matter. I make this Declaration based upon my personal knowledge and in support of Plaintiff's Opposition (Docket No. 84 and 85) to Defendant's Motion to Dismiss (Docket No. 78) and Motion to Strike (Docket No. 79), and to swear to the accuracy of exhibits in the Request for Judicial Notice (Docket No. 86). I have personal knowledge of all facts stated in this Declaration, and if called to testify, I could and would testify competently thereto.

On July 30-31 2024, I created a table summarizing the claims challenged in each motion to dismiss, as referenced in the Opposition memo. Attached as Exhibit A is a true and correct copy.

On July 30-31 2024, I copied the table of contents from all my filed complaints and combined them into this document. Attached as Exhibit B is a true and correct copy.

On July 30-August 1 2024, I manually created a rough index from my complaints (original, first amended, second amended, third amended) and combined them into this document. Attached as Exhibit C is a true and correct copy. I believe this to be accurate.

On July 31-August 1 2024, I gathered copies of my emails with Apple's lawyers where I attempted to meet/confer with them. Attached as Exhibit D is a true and correct copy of these documents.

- 1 -

DECLARATION & EXHIBITS | 3:23-CV-04597-EMC

***Plaintiff's filing to this case in July 2024 – with new format.***

Case 3:23-cv-04597-EMC Document 76 Filed 06/18/24 Page 1 of 74

Ashley M. Gjovik, JD
*Pro Se Plaintiff*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

**ASHLEY GJOVIK**, *an individual*,
Plaintiff,
v.
**APPLE INC**, *a corporation*, et al,
Defendant.

**Case No. 3:23-cv-04597-EMC**

**FOURTH AMENDED COMPLAINT ("4AC")**

**PLAINTIFF'S CLAIMS:**

1. **Termination in Violation of Public Policy** California *Tamney* tort claim
2. **Violation of Cal. Whistleblower Protection Act**, Cal.Lab.C. § 1102.5
3. **Retaliation for Protected Safety Activities**, Cal.Lab.C. § 6310; § 6399.7 via § 6310
4. **Retaliation for Filing Labor Complaints**, Cal.Lab.C. § 98.6 via § 98.7
5. **Retaliation for Organizing Around Pay and Work Conditions**, Cal.Lab.C. §§ 232, 232.5 via § 98.7
6. **Retaliation for Exercising Constitutional Rights outside of the Workplace**, Cal.Lab.C. § 96(k) via § 98.7
7. **Breach of the Implied Covenant of Good Faith and Fair Dealing**
8. **Unfair Competition Law**, Cal.B&P.C. § 17200
9. **IIED – Outrageous Conduct** California and New York
10. **Tort of Private Nuisance** Cal.Lab.C. § 3479
11. **Tort of Ultrahazardous Activities** California Strict Liability claim
12. **IIED – Fear of Cancer** California / NY tort claims

**DEMAND FOR JURY TRIAL**

FOURTH AMENDED COMPLAINT | 3:23-CV-04597-EMC PAGE 1 of 74

Case 3:23-cv-04597-EMC Document 76 Filed 06/18/24 Page 2 of 74

**I. SUMMARY OF THE CASE**

1. Over the last ten years, Apple Inc ("Defendant") intentionally engaged in a course of unlawful conduct and unfair business practices that resulted in direct, severe, and ongoing harm to Ashley Gjovik ("Plaintiff") as a community member, as an employee, and as a consumer.

2. This lawsuit arises from Apple's disregard of environmental regulations and safety requirements at two different Silicon Valley properties starting in 2015. Apple's unlawful toxic waste dumping in Santa Clara (unrelated to her employment relationship with Apple) severely disabled and nearly killed Gjovik in 2020. Gjovik began filing complaints about the public safety issue, and Apple began retaliating against her for doing so, knowing what they had done to her. Then, in 2021, Gjovik also discovered numerous safety and compliance issues at her Apple office located on a federally managed toxic waste dump in Sunnyvale. She began also filing complaints about her office, and Apple then retaliated against Gjovik about those complaints well.

3. During Apple's marathon of retaliation against Gjovik in 2021, Gjovik was in law school studying to become a human rights lawyer. She was in a unique position to effectively report serious environmental and safety issues, and to lobby for general policy reform. Gjovik utilized her knowledge, experience, and resources to confer with numerous government agencies, to meet with a variety of elected officials and their staff, to publish op-eds calling for new legislation, was interviewed and written about by the press, and served as a witness for government agencies and legislative committees. Gjovik organized her workers, lobbied on their behalf, and called for systemic change with Apple's environmental and labor practices. Gjovik's public advocacy also brought awareness to her prior neighbors of the pollution issues where she had lived, leading to additional chemical exposure victims coming forward and joining Gjovik in complaining to the government and requesting help.

4. With every action Gjovik took to speak out about matters of public concerns, to

FOURTH AMENDED COMPLAINT | 3:23-CV-04597-EMC PAGE 2 of 74

Case 3:23-cv-04597-EMC Document 67 Filed 05/01/24 Page 3 of 4

| | | |
|---|---|---|
| 3<br>FALSE | Plaintiff's Docket No. 63 (re: *Banko v Apple*) is not in response to or related to the non-party.<br>*"Plaintiff filed two responses to my declaration ... Dockets No. 63 & 64."* ¶ 2<br>Docket No. 64 Declaration and Exhibits is 98 pages long and includes all formal petitions, court minutes, and Orders from the related litigation.<br>*"Plaintiff added a partial record... in the matter... It is entirely irrelevant and hundreds of pages long."* ¶ 5 | Sustained: ______<br>Overruled: ______ |
| 4<br>HEARSAY | Proffering Hearsay evidence from non-parties. (Fed. R. Evid. §§ 106, 801).<br>*("the appellate court decided..." "the appellate court... proffered a motivation"* ¶ 5). | Sustained: ______<br>Overruled: ______ |
| 5<br>NON-PARTY REQUESTS TO THE COURT | Improper request to the Court to consider unsolicited non-party evidence at all, but especially for a 12(b)(6) motion. Improper requests by non-party with no standing or *"stake in the outcome of the case"* requesting to *"introduce exhibit[s]."* (Fed. R. Pro. §§ 12(b)(6), Rule 24(b)(3).<br>*"(I ask the court so show the utmost care in considering the validity of my testimony." "I am introducing Exhibit A"* ¶ 4, 5. | Sustained: ______<br>Overruled: ______ |
| 6<br>INCONSISTENT STATEMENTS | Inconsistent statements made between Declarations in Docket No. 62 and 66. (Fed. R. Evid. §§ 801(d)(1)(A)).<br>Docket 62: *"I met the Plaintiff in June 2021 while we were both employed by Apple..."* ¶ 4<br>Docket 66: *"The plaintiff and I did not work together and never met each other in the course of our work."* ¶ 3 .... *"A person I have never even met."* ¶ 4<br>Docket 62: *"The only counsel I could afford to seek that was helpful advised that I may speak to the facts about myself in support of striking..."* ¶ 2 | Sustained: ______<br>Overruled: ______ |

2

PLAINTIFF'S MOTION TO STRIKE IMPROPER AMICUS BRIEF 3:23-CV-04597-EMC APRIL 23 2024

***Plaintiff's filing to this case in May-June 2024. This was the last time she used her prior formatting, roughly five months ago.***

**Defendant claims that Plaintiff's formatting and layout are facial violations of court rules, but Defendant has been warned for intentional and defiant formatting far worse then anything Plaintiff did here.**

body is not supported by the claim language." *Id.* at 22-23. Taction argued strenuously against both constructions.

**B. Taction's Infringement Allegations**

On October 31, 2022, Taction served its final post-claim construction infringement contentions. Despite losing on the core claim construction issues—including one that gutted its infringement theory across every asserted claim—Taction's post-claim construction infringement contentions barely acknowledged the change. As this Court is well-aware, Taction's post-claim construction contentions offered a paper-thin explanation for the "highly damped output" limitation:

> To the extent that the Court's statement concerning "transducers with highly damped output" is ultimately imposed as a requirement of any asserted claim, Taction contends that the Taptic Engines in the accused products are "transducers with highly damped output." Apple itself, for example, has stated that "[t]he frequency response of the module is controlled, including the frequency response at the resonant frequency, through the use of a closed loop software controller . . . ." Apple's First Supplemental Response to Taction's Interrogatory No. 9 at 20. So, too, the frequency response graphs included in Taction's infringement claim charts, show that the Taptic Engines are transducers that have a "highly damped output." Taction

2
MEMORANDUM ISO DEFENDANT'S MOTION FOR ATTORNEY'S FEES
Case No. 3:21-cv-00812-TWR-JLB

Case 3:21-cv-00812-TWR-JLB Document 389-1 Filed 08/25/23 PageID.18654 Page 7 of 18

> anticipates that fact and expert discovery will provide additional corroborating information. Additionally, Taction contends that, to the extent that the Court's statement concerning "transducers with highly damped output" is ultimately determined to be a requirement of any asserted claims, that the requirement for a "highly damped output" may be satisfied by any mechanism.

ECF No. 378 at 13. Taction continued to rely on its existing frequency response graphs from its previous contentions to support the assertion that in the accused Taptic Engine, "the ferrofluid reduces at least a mechanical resonance within the frequency range of 40-200 Hz in response to electrical signals applied to the plurality of

Case 5:11-cv-01846-LHK Document 3490-2 Filed 04/21/17 Page 19 of 26

*Elecs.*, 137 S. Ct. 429 (No. 15-777). But the earliest of these "six times" occurred less than one week before trial, when Samsung contended in a trial brief that the ***Court*** should determine the "article of manufacture" ***as a matter of law*** if the jury found infringement (although Samsung did not propose how § 289 damages would be calculated if the Court determined the article to be anything less than the whole phones). Dkt. 1300 at 19-22. By then, discovery had closed, the parties had long ago identified their damages theories, and Samsung had not disclosed any basis from which the jury could calculate profits on anything other than its entire phones.[6]

The other five instances identified by Samsung's counsel were even later and included a proposed jury instruction (discussed below) and Samsung's four motions for judgment as a matter of law. *See* Transcript of Oral Argument at 17-18, *Samsung Elecs.*, 137 S. Ct. 429 (No. 15-777). Even then, Samsung's motions did not advance the "article of manufacture" argument Samsung now raises. Rather, they reiterated Samsung's now-abandoned theory that Samsung's profits should have been apportioned between the design applied to the infringing phones and other technical, non-infringing features. Dkt. 1819 (Samsung's Written Rule 50(a) Motion) at 5 (alleging that "Apple failed to apportion Samsung's profits for [] design patent infringement");[7] Dkt. 2013 (Samsung's Rule 50(b) Motion) at 18-19 ("Apple did not limit its calculations of Samsung's profits to those attributable to use of the patented designs. ... Unless limited to the portion of the profits attributable to infringement of the patented design rather than other,

[6] Samsung has accused Apple of arguing that § 289 entitled it to Samsung's total profit on entire products as a matter of law. Samsung Statement (Dkt. 226) at 2-3, *Apple*, No. 14-1335. But Apple originally disclosed its § 289 damages theory during fact discovery. Dkt. 1384-27 at 4 (interrogatory response). After Samsung failed to dispute the article of manufacture at trial and both parties' experts calculated § 289 damages based on the entire phones, Apple did argue that it was entitled to total profits on entire products under Rule 50—where that was the only conclusion supported by the evidence.

[7] In its oral Rule 50(a) motion, which came five days before its written Rule 50(a) motion, Samsung stated that Apple was "assuming that the article to which the design is applied is the entire product, which is erroneous as a matter of law" because Apple had "not factored out, for example, the technology and what drives those profits." Dkt. 1839 at 2190. This was an apportionment argument. To the extent Samsung referred to the "article" in its oral motion, it did not make any argument challenging the identity of the article of manufacture in its written Rule 50(a) motion or in its Rule 50(b) motion. And, in any event, such an argument would have been unsupported by the evidence.

APPLE'S OPENING BRIEF RE: SAMSUNG'S WAIVER OF ARGUMENTS ABOUT THE "ARTICLE OF MANUFACTURE"
Case No. 11-cv-01846-LHK 15

Case 5:14-cv-05659-EJD Document 129 Filed 05/17/22 Page 34 of 44

because they already knew that iOS 8 occupied space (*see* Section IV.A), and determining whether a given consumer could have been injured requires a case-by-case inquiry. Consumers who bought/upgraded their devices knowing that iOS 8 took up space (or who would have bought/upgraded), for example, got the benefits they expected and have no possible injury. McCrary Rpt. ¶ 30; *Johnson*, 285 F.R.D. at 581; *Turcios*, 296 F.R.D. at 646; *Sevidal v. Target Corp.*, 189 Cal. App. 4th 905, 924 (2010) ("Even after the *Tobacco II* decision, the UCL and FAL still require some connection between the defendant's alleged improper conduct and the unnamed class members who seek restitutionary relief."). And as discussed in Section IV.A.1, determining whether a given consumer had such knowledge depends on individual facts (*e.g.*, exposure to Apple's Upgrade Screens, media articles, and prior ownership experience). Groehn's failure to even attempt to grapple with these issues causes his proposed "methodology" to lead to absurd results—under Groehn's model, for example, Endara and Neocleous would be "injured" (and entitled to full compensation) for 16GB iOS 8 devices that they bought *after suing Apple*.

***Second***, even regarding those consumers who were somehow injured, Rule 23(b)(3) is still not met because Groehn's methodology fails to actually calculate the *extent* of that damage (*i.e.*, "translat[e] ... the *legal theory of the harmful event* into an analysis of the economic impact *of that event*"). *Comcast*, 569 U.S. at 38 (emphasis in original). The "implicit price" that Groehn's damages model calculates is arbitrary. Specifically, Groehn's "implicit prices" are "not tethered to any economic fundamentals related to [the] disclosure" at issue (McCrary Rpt. ¶ 54), and are "fundamentally unreliable." *Id.* ¶ 63. The "implicit price" that Groehn's "model" calculates varies wildly,[25] and reflects the device he chooses as a point of comparison, not the at-issue "class device." *Id.* ¶ 69.[26]

[25] The "implicit price" that Groen's model calculates varies by 300% ($2.08-$6.25 per GB) across device and time period. Dkt. 124-31 at p. 34 (Table 4); McCrary Rpt. ¶ 55. For example, Groehn calculates an implicit price of $6.25/GB for the "WiFi+Cellular" iPad Mini 3, but an implicit price of only 1/3 that amount—$2.08—for the "WiFi Only" model, even though the lack of a cell connection would suggest that on-device storage would be even more important.

[26] Although Plaintiffs claim that courts "frequently certify classes based on a similar damages methodology," the sole case they cite, *Carlotti v. ASUS*, provides no support for Groehn's approach. *See* Mot. at 30:3-4 (citing 2019 WL 6134910, at *6 (N.D. Cal. Nov. 19, 2019). *Carlotti* settled as a result of mediation, with "no briefing ... for class certification" (*id.* at *2). It did not rigorously assess the validity of this damages model, and instead merely reiterated class counsel's description of the damages approach. *Id.* at *6. Indeed, as plaintiffs' counsel conceded in their request to approve the class settlement, proceeding with litigation would have posed

25 APPLE'S OPP. TO MOT. FOR CLASS CERT.
NO. 5:14-CV-05659-EJD

Case 5:14-cv-05659-EJD Document 129 Filed 05/17/22 Page 40 of 44

The first step considers whether the "law in each potentially concerned state ... materially differs from the law of California." *Wash. Mut.*, 24 Cal. 4th at 919. The relevant inquiry here is a comparison between Plaintiffs' claims under California's UCL (Count I), FAL (Count II), and CLRA (Count III), and other states' corresponding consumer protection statutes. As many courts (including in this District) have held, state consumer protection laws vary in material ways, including on: statutes of limitations, scienter, reliance and causation, the availability of class actions, damages, statutory penalties, and punitive damages. *See, e.g.*, *Mazza*, 666 F.3d at 591 (CA and FL state law differences were "not trivial or wholly immaterial" where scienter and reliance requirements, and available remedies, differed); *Cimoli v. Alacer*, 2022 WL 580789, at *7 (N.D. Cal. Feb. 25, 2022) ("material" differences in scienter and remedies between CA and PA); *Frezza v. Google*, 2013 WL 1736788, at *6 (N.D. Cal. Apr. 22, 2013) (similar, CA and NC); *Cover v. Windsor Surrey*, 2016 WL 520991, at *6 (N.D. Cal. Feb. 10, 2016) (similar, CA and RI).[31] Apple's **Appendix A**, attached hereto, outlines these material state law differences.

*First*, applicable statutes of limitations under California law differ substantially from those for other states.[32] Thus, claims that might be timely here would be barred elsewhere (and vice versa), affecting the substantive rights of consumers to even assert claims in the first instance, based on the state in which they reside. *See In re Volkswagen*, 349 F. Supp. 3d 881, 920 (N.D. Cal. 2018) ("state statutes of limitations and tolling rules are viewed as substantive not procedural law"). *Second*, California allows class actions, while several states do not.[33] *Third*, the standards

[31] *Davison v. Kia*, 2015 WL 3970502, at *2 (C.D. Cal. June 29, 2015) ("Courts in this circuit, in assessing the propriety of nationwide class actions, have held that California's consumer protection statutes are materially different from those in other states.") (collecting cases).

[32] *Compare* **CLRA:** 3 years from date of improper practice (Cal. Civ. Code § 1783); **UCL:** 4 years (Cal. Bus. & Prof. Code § 17208); **FAL:** 3 years from discovery of facts constituting fraud (Cal. Bus. & Prof. Code § 17500; Cal. Civ. Proc. Code § 338(d)); *with, e.g.*, **AL:** 1 year from discovery, but no later than 4 years from transaction date (Ala. Code § 8-19-14); **FL:** 4 years from date of alleged violation; no "discovery rule" (Fla. Stat. Ann. § 95.11(3)); **ME:** 6 years from discovery (Me. Rev. Stat. Ann. tit. 14, § 752); **NY:** 3 years from alleged violation; no "discovery rule" (*Gaidon v. Guardian Life Ins.*, 750 N.E.2d 1078, 1084 (N.Y. 2001)); **TX:** 2 years after occurrence or discovery by reasonable diligence (Tex. Bus. & Prof. Code Ann. § 17.565).

[33] *Compare* **CA:** class actions permitted (Cal. Civ. Code § 1780; Cal. Bus. & Prof. Code §§ 17203, 17535), *with, e.g.*, class actions prohibited in **GA:** Ga. Code Ann. § 10-1-399(a); **LA:** La. Rev. Stat. Ann. § 51:1409(A); **SC:** S.C. Code Ann. § 39-5-140(a). Other jurisdictions address class action mechanism in more nuanced fashions. *E.g.*, **FL:** class actions not expressly permitted or prohibited, but courts decide FDUTPA claims within class action context (*see* Fla. Stat. § 501.202(2); *e.g.*, *Philip Morris v. Hines*, 883 So. 2d 292, 294 (Fla. 4th Dist. Ct. App. 2003)); **NY:** class actions permitted, but class members may not receive more than actual

31 APPLE'S OPP. TO MOT. FOR CLASS CERT.
NO. 5:14-CV-05659-EJD

**All of these are Apple's filings in other cases, where they got warnings from the court about single spaced lines.**

13. In addition, not specific to Apple, this District has warned parties in other cases about line spacing when the spacing is closer to one-line.

Case 4:22-md-03047-YGR Document 506 Filed 12/18/23 Page 2 of 3

Pursuant to Discovery Management Order No. 1 (Dkt. 503), the Meta Defendants submit the following response to the State AG Plaintiffs' Position Statement Regarding Protective Order (Dkt. 478), and to their proposed language for a carve-out exemption from Section 7.6 thereof (Dkt. 502).

This Court should deny the State AG Plaintiffs' request to remove the Highly Confidential expert disclosure provision (Section 7.6) from the Protective Order and/or to add a carve-out that would effectively exempt the State AG Plaintiffs' experts from that provision.

In support of their request to remove Section 7.6 from the Protective Order, the State AG Plaintiffs principally argue that Meta agreed to a different set of confidentiality protections for documents produced to the State AGs in connection with the AGs' pre-suit *investigation*. But that has no bearing on the terms applicable to Meta's Highly Confidential documents in this *litigation*. By its terms, the pre-suit Confidentiality Agreement between Meta and the State AG Plaintiffs is limited to "the 'Investigation'" brought by the State AGs, and covers only documents "produced in response to formal or informal discovery requests … *in connection with [the AGs'] Investigation*." Confidentiality Agreement at 1 (attached as **Exhibit 1**). ¶ 10 (emphasis added). Paragraph 6 of the Confidentiality Agreement expressly contemplates that, to the extent the State AGs sought to use documents from their Investigation in litigation, those documents would be governed by "the terms of a protective order *entered in the case*." *Id.* ¶ 6 (emphasis added). The Confidentiality Agreement's sharing provisions are similarly limited to the "furtherance of [the AGs'] *investigation*," *id.* ¶ 14; they do not apply to *subsequent litigation* filed by the State AGs. Accordingly, to the extent the State AG Plaintiffs wish to continue using any experts retained in connection with their Investigation as *litigation* experts, and those experts have been or will be permitted access to Meta's Highly Confidential material, those experts should be disclosed to the Meta Defendants pursuant to Section 7.6—for the same reasons any other Party's experts should be disclosed to Meta in such scenario.[1]

The State AG Plaintiffs' proposed "carve-out" language should be rejected for similar reasons. That carve-out would exempt "information or material received outside of this [litigation]" from Section 7.6, regardless of whether such material is also produced *to* this litigation. Such a carve-out would allow the State AG Plaintiffs an end-run around Section 7.6 insofar as the Highly Confidential material from Meta they share with their experts was produced both in the course of the State AGs' pre-suit Investigation and also to Plaintiffs in this litigation. The State AG Plaintiffs provide no reason why Meta should be afforded less protection when their Highly Confidential documents are shared with litigation experts for the State AGs as opposed to other Parties' litigation experts, and there is none.

[1] To be clear, the Meta Defendants are not requesting that the State AG Plaintiffs' experts return any Highly Confidential material to which they may already have access—only that those experts be disclosed *to the extent* the State AGs wish to continue using them in connection with this litigation.

1

META DEFENDANTS' SUPPLEMENTAL RESPONSE TO STATE AG PLAINTIFFS' SUPPLEMENTAL BRIEFING REGARDING PROTECTIVE ORDER (DKT. 478)

Case 4:22-cv-03460-DMR Document 20 Filed 09/02/22 Page 15 of 36

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

purchas[e] … Italian durum" and manufacture "classic pasta formats … us[ing] 100% Italian wheats").

- **Company's Italian Heritage Carried Through to Modern-Day.** Defendant repeatedly emphasizes its Italian heritage, throughout its digital marketing campaign, for example: describing itself as "an Italian family-owned food company" (FAC ¶ 18a., Ex. 3a); chronologizing the company's history from birth to present day, repeatedly noting its first pasta shop in Italy, the construction of multiple factories and a wheat transportation system in Italy throughout the past half-century, and each of its company's leaders' Italian birth (*id.* ¶¶ 19b.(1), (3)-(4), 19c., Ex. 4d); identifying its headquarters or location in Italy on social media (*id.* ¶ 20a); and announcing its acquisition or launch of multiple Italian food brands over time (*id.* ¶ 19b.(3), Ex. 4c). Indeed, Defendant features a video depicting the company's origins, including a reenactment of the company's founder in the fields of Italy harvesting wheat and examining grains; the humble beginnings of the first pasta shop and factory opening in Italy; as well as the attention to detail in the handcraftsmanship of making pasta, to explain the company's modern-day return to its beginnings in the wheat fields of Italy and how the company's past, grounded in Italy and Italian culture, is its future. FAC ¶ 19e.[3] And, Defendant admits that "[t]he history of Barilla has intertwined for more than a century with that of the city and, more generally, with the history of the Italian economy and culture," inextricably tethering the entire Barilla® brand and company's identity to the country and culture of Italy. FAC ¶ 19f.(1), Ex. 5b.
- **Repeated Use of Italian Imagery, Music, Language, and Culture.** Defendant consistently uses imagery, music, language, and other means to associate its company, brand, and Products with Italian culture, including, for example: using the Italian language to identify its artisanal collection as "Collezione Artisanal" (FAC ¶ 18c.; Ex. 1-34 – 1-40, Ex. 3c); emphasizing that the quality of its Products derives from its "Italian culture" (*id.* ¶ 19a.(1), Ex. 4b); featuring a musician singing the theme song from an iconic Italian film, set to recognizable Italian folk melodies, to harness the notoriety of the award winning movie and its soundtrack to associate the brand with Italy (*id.* at ¶ 19a.(2), Ex. 3b); hosting a Spotify playlist overwhelmingly comprised of Italian music (*id.* at ¶ 19a.(3), Ex. 4b); and using Italian media personalities, advertisements on "Italian TV," and famous Italian directors and cartoonists to advertise Barilla® brand Products (FAC at ¶ 19b.(3), Ex. 4c).
- **Historical Archive Documenting Long-Standing, Pervasive, and Expansive Italian-Origin Marketing Scheme, Including the Infiltration into Non-Commercial Spaces.** To document the company's Italian culture and values, Defendant established an online Barilla Historical Archive ("Archivio Storico Barilla") that catalogues over 60,000 documents showing the history, economic activity, and, importantly, marketing of iconic Barilla® brand products over decades that repeatedly uses iconic Italian imagery and pop culture references to undeniably promote the company, brand, and its products as Italian. FAC ¶ 19f.(1), Ex. 5b. To be sure, the company admits that this archive does not simply safeguard historical documents, but it is also used to *market* the Barilla® brand and company as belonging to Italy. *Id.* (quoting Ex. 5b, stating the archive, containing thousands of promotional materials readily identifiable as Italian, "is also involved in the cultural promotion of Barilla."); *see also id.* ¶ 19f.(2) (quoting Ex. 5c, explaining its mission to "promote[] and enhance[] … the cultural evolution of the enterprise and the historic memory of the Company generations, documenting the social development of Italy"; and the deliberate "disseminat[ion of] its knowledge" on an "international" level). "Indeed, the Ministry of Cultural Heritage and Activities, on November 30, 1999, declared the company's archive 'of considerable historical interest' as it 'witnessed the development of the food industry in Parma and the evolution of customs in Italy.'" *Id.* ¶ 19f.(5) (quoting Ex. 5h [Archivio Storico Barilla Declaration]). Similarly, Defendant promotes and inaugurated its Pasta Museum, located in Italy, that emphasizes its pastas are: made from Italian durum wheat; manufactured using processes that evolved throughout Italian history; and marketed as an Italian staple food deeply rooted in Italian culture. *Id.* ¶ 19f.(3), Ex. 5d; Ex. 5f. Likewise, Defendant promotes and inaugurated the Barilla

[3] Video also available at YOUTUBE, Barilla Group, *Barilla – The Dream*, at https://www.youtube.com/watch?v=oSp29neAjNk&t=45s (accessed 6/10/2022); and ARCHIVIO STORICO BARILLA, Home Page, https://www.archiviostoricobarilla.com/en/ (accessed 6/10/2022) (Video "Dream").

Case No.: 4:22-cv-03460-DMR -4-
PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FAC

Case 2:24-cv-04055-JXN-LDW Document 86-1 Filed 08/01/24 Page 14 of 49 PageID: 656

many decisions about how to balance that access with minimizing risks to users and preserving the exceptional user experience that distinguishes iPhone. Apple's policies governing third-party access to its products reflect these decisions, *see id.* ¶ 41, and are an important way in which Apple competes and differentiates its brand. *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 987 (9th Cir. 2023).

The Government disagrees with Apple's business decisions, alleging that its product design and other decisions regarding third-party access constitute unlawful conduct that maintains—or, alternatively, attempts to maintain—monopolies on smartphones and so-called "performance smartphones" in violation of Section 2 of the Sherman Act and three states' statutes. FAC ¶¶ 199–235. The complaint charges that Apple harms competition by (1) "set[ting] the conditions for apps it allows on the Apple App Store through its App Store Review Guidelines," and (2) by deciding which iPhone features and application programming interfaces ("APIs") to make available to app developers. *Id.* ¶¶ 41–42.

The complaint points to five purported "examples" of Apple using one or both of those mechanisms to regulate access by third-party technologies:

- *Super apps*. The complaint alleges Apple hampered the development of "super apps"—defined as apps that "provide a user with broad functionality in a single app" by "serv[ing] as a platform for smaller 'mini' programs"—by limiting the ways in which developers can categorize and display mini programs in the App Store as well as their access to Apple's in-app payment system. *Id.* ¶¶ 9, 60–70. The Government acknowledges, as it must, that Apple has since extended its in-app payment system to mini programs and no longer limits how mini programs are displayed. *See id.* ¶¶ 60, 69–70. There is thus nothing "continuing" to "[e]njoin." *Id.* ¶ 236.

Case 2:24-cv-04055-JXN-LDW Document 86-1 Filed 08/01/24 Page 15 of 49 PageID: 657

- *Cloud streaming apps*. The Government challenges Apple's prior decision to allow streaming games on its platform only if they were submitted as standalone apps for Apple's review instead of *en masse* in a single app, depriving Apple of the ability to review the code and content of those games. *Id.* ¶¶ 71–79. Today, however, Apple makes it easier for developers to offer streaming games by not requiring each to be submitted for review. *See id.* ¶ 77. Here too, then, there is nothing to enjoin.
- *Messaging apps*. The Government complains that Apple does not enable third-party messaging apps to send and receive text messages on iPhone using the short message service ("SMS") protocol, run in the background while the apps are closed, or sometimes access iPhone's camera. *Id.* ¶¶ 82–86. The Government also alleges Apple should be compelled to develop a version of its proprietary iMessage service for Android devices. *Id.* ¶ 80.
- *Smartwatches*. The Government alleges Apple does not allow third-party smartwatches paired with an iPhone to respond to iPhone notifications, maintain a Bluetooth connection in some circumstances, or receive messages using their own cellular connections without disabling iMessage. *Id.* ¶¶ 100–03. The Government also complains that Apple has not offered an Apple Watch that is compatible with rival Android devices. *Id.* ¶ 94.
- *Digital wallets*. The complaint criticizes Apple's decision to limit developers' access to highly-sensitive financial information and allegedly not allow digital wallet apps, other than Apple Wallet, to access iPhone's near-field communication ("NFC") antenna to enable NFC tap-to-pay or to serve as alternatives to certain Apple payment methods. *Id.* ¶¶ 111–17.

The Government asserts this alleged conduct has built a "moat" around Apple's supposed "smartphone monopoly." *Id.* at ¶¶ 119–25.

The complaint also asserts other Apple products and services are or could be part of an unlawful "playbook" with little or no explanation. According to the complaint, Apple "uses a similar playbook to maintain its monopoly," *id.*, in location tracking devices, video communication apps, iPhone web browsers, cloud storage apps, voice and AI assistants, subscription services, digital car keys, Apple's CarPlay infotainment system, and undefined smartphone "sales channels." *Id.*

7

***Example Northern District cases with warnings about spacing. Most involved single-spaced lines.***

### C. Apple's counsel have also used similar fonts and formatting but also with single-spaced line abuse.

14. Counsel representing Apple have even recently used nearly the exact same formatting that Apple complains about here, but when Apple did it, Apple also used extensive single-spaced footnotes.

Case 2:24-cv-04055-JXN-LDW Document 86-1 Filed 08/01/24 Page 40 of 49 PageID: 682

Courts reject complaints, like this one, that merely *presume* that the purported conduct causes anticompetitive effects in the smartphone market. *See, e.g.*, ¶ 129. In *Blix Inc. v. Apple, Inc.*, for example, the plaintiff challenged Apple's requirement that developers on its platform offer users Apple's "single-sign-on" option as an alternative to other single-sign-on options. 2021 WL 2895654, at *4 (D. Del. July 9, 2021). The plaintiff perfunctorily alleged that "a 'moat'" made it "difficult and expensive for Apple iOS users to leave" Apple's ecosystem, but failed to "explain how Apple's [challenged] requirement" with respect to single-sign-on features "restricts competition in the [at issue] mobile operating system market." *Id.* The court dismissed the claim. *Id.* at *6. For the same reasons, the complaint here does not allege the facts needed to plausibly claim that Apple's conduct in a handful of scattered domains has had a significant anticompetitive effect on smartphone competition. Absent allegations supporting any factual link, the Government fails to state a claim.[6]

[6] For this reason, the Plaintiff States also lack standing to pursue their claims, including in their sovereign capacities or under a *parens patriae* theory. *See Harrison v. Jefferson Par. Sch. Bd.*, 78 F.4th 765, 769–74 (5th Cir. 2023) (requiring a "tangible interference" with a state's "authority to regulate or to enforce its laws" not present here); *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982) (requiring a state, unlike here, to have a "quasi-sovereign interest" that is "apart from the interests of particular private parties" for *parens patriae* standing). The Plaintiff States have not alleged that Apple's conduct has impaired their ability to enforce their laws and the harms they cursorily plead—higher prices, a worse iPhone experience—are harms for which private parties could seek their own remedies and, indeed, already have.

32

Case 2:24-cv-04055-JXN-LDW Document 86-1 Filed 08/01/24 Page 9 of 49 PageID: 651

**INTRODUCTION**

The Government asks this Court to endorse a theory of antitrust liability that no court has ever recognized and to sanction a judicial redesign of one of the most innovative and consumer-friendly products ever made: iPhone. Apple has invested billions of dollars to create a revolutionary, cutting-edge product and to distinguish iPhone in a fiercely competitive smartphone market through consumer-oriented features. This lawsuit is based on the false premise that iPhone's success has come not through building a superior product that consumers trust and love, but through Apple's intentional degradation of iPhone to block purported competitive threats. That outlandish claim bears no relation to reality. And the Government's theory that Apple has somehow violated the antitrust laws by not giving third parties broader access to iPhone runs headlong into blackletter antitrust law protecting a firm's right to design and control its own product.

The truth, of course, is that Apple has granted third parties exceptionally broad access to iPhone, its features, and the App Store, while also enforcing reasonable limitations to protect consumers and ensure the safe, secure, and seamless iPhone experience for which Apple is justifiably known. But even setting that aside, it is simply not a viable theory of antitrust law for the Government to contend that Apple must open its own platform and its own technologies to third parties on the terms and conditions that those parties prefer. The third parties at issue here are well-

***U.S. v. Apple, 2:24-cv-04055 (D.N.J.), Dkt. No. 86-1, filed by Apple Inc on 8/1/24***

### D. The delay caused by Plaintiff's late filing was minimal.

15. The delay of only a couple days was a very minimal delay – and Plaintiff filed the complaint as soon as there was a presentable draft to file. Plaintiff has no objection if Defendant is given two extra days beyond their original

1  deadline, to make up for here delay. However, here the Defendant is intentionally
2  causing even more delays – and asking for court approval of additional delays, all
3  which is prejudicial.

4      16.   The court order did provide a deadline and Plaintiff regrets not
5  meeting that deadline, however, an example of a dismissal of action for failure to
6  obey court's order that plaintiff replead after failing to satisfy requirement of Rule
7  8 was proper where two and one half months passed beyond 20 days allowed by
8  court's order with no effort on plaintiff's part to comply. *Agnew v. Moody*, C.A.9
9  (Cal.) 1964, 330 F.2d 868, certiorari denied 85 S.Ct. 137, 379 U.S. 867, 13 L.Ed.2d
10  70.  Two days and two months are very different durations.

11      17.   Here, Plaintiff also already apologized for the delay, explained the
12  delay, and complained to Defendant that the delay was caused by them – as her
13  PTSD symptoms were severely disabling due to Apple's continued harassment of
14  Plaintiff within and outside this lawsuit – including Apple Global Security calling
15  her directly to harass her about this lawsuit just last month. (See Def's
16  Declaration Exhibit).

17     **E.**   **This court has issued orders to Plaintiff with requirements that**
18         **exceed the Federal Rules of Civil Procedure requirements.**

19

20      18.   This court has issued a number of custom orders to Plaintiff that have
21  requirements well beyond the FRCP. District should not dismiss plaintiff's action
22  for failure to comply with order to supply complaint that substantially exceeded
23  requirements of rules of civil procedure. *Wynder v. McMahon*, C.A.2 (N.Y.) 2004,
24  360 F.3d 73,. *Wynder v. McMahon*, 360 F.3d 73, 77 (2d Cir. 2004) Rule 8 would
25  become a dead letter if district courts were permitted to supplement the Rule's
26  requirements through court orders demanding greater specificity or elaboration of
27  legal theories, and then to dismiss the complaint for failure to comply with those
28  orders. Plaintiff respects the orders she is given and attempts to comply with

— 10 —

Pl's Opposition to Def's Emerg. Motion to Dismiss | 3:23-CV-04597-EMC

ER VII 287

1  them, but sometimes cannot comply with them, and apologizes and is regretful
2  about it.

3       **F.    A dismissal with prejudice would be too harsh.**
4

5       19.    Dismissal of a case for disobedience of a court order is an exceedingly
6  harsh sanction which should be imposed only in extreme cases, and then only after
7  exploration of lesser sanctions. *Pond v. Braniff Airways, Inc.*, 453 F.2d 347 (5th
8  Cir. 1972)*; Flaksa v. Little River Marine Construction Co.*, 389 F.2d 885 (5th Cir.),
9  cert. denied, 392 U.S. 928, 88 S.Ct. 2287, 20 L.Ed. 1387 (1968). Failure to amend
10 a complaint after it has been dismissed with leave to amend is not such an extreme
11 case of disobedience, if it is disobedience at all. *Mann v. Merrill Lynch, Pierce,*
12 *Fenner & Smith, Inc.*, 488 F.2d 75, 76 (5th Cir. 1973)

13      20.    Here, if the court feels the Plaintiff should be punished, there are
14 many other options available to the court other than a dismissal with prejudice.

15      21.    Such a dismissal is a severe sanction, and should be used only in
16 extreme circumstances and as a last resort, where there is a clear record of delay
17 or contumacious conduct8 or intentional disobedience of the court's order, and
18 where lesser sanctions would not be appropriate. Lesser sanctions will normally
19 suffice in all but the most flagrant of circumstances. Thus, where the court does
20 not even consider lesser sanctions, the appellate court may find an abuse of
21 discretion. *Oliva v. Sullivan*, 958 F.2d 272, 22 Fed. R. Serv. 3d 554 (9th Cir. 1992)
22 *Jackson v. City of New York,* 22 F.3d 71, 28 Fed. R. Serv. 3d 1392 (2d Cir. 1994)

23      22.    Dismissal is an extraordinary remedy, which should not be invoked
24 where failure to comply is inadvertent or excusable, or when the effect would be
25 to punish an innocent litigant for the transgressions of his lawyer. *Dyotherm Corp.*
26 *v. Turbo Machine Co.*, 392 F.2d 146 (3d Cir. 1968); *Council of Federated*
27 *Organizations v. Mize*, 339 F.2d 898 (5th Cir. 1964); *Woodham v. American*
28 *Cystoscope Co.*, 335 F.2d 551 (5th Cir. 1964); *Meeker v. Rizley,* 324 F.2d 269 (10th

— 11 —

Pl's Opposition to Def's Emerg. Motion to Dismiss | 3:23-CV-04597-EMC

ER VII 288

1   Cir. 1963); 5 J.Moore, Federal Practice P41.12 at 1139.

2         23.     Even when the plaintiff has caused delay or engaged in contumacious

3   conduct before the district court dismisses for failure to comply with the court

4   order it must consider whether the ends of justice would be served better by a

5   lesser sanction. *Guyer v. Beard,* 907 F.2d 1424 (3d Cir. 1990). 10 Wright and Miller

6   et al., Federal Practice and Procedure, Civil § 2369 (4th ed.).

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Pl's Opposition to Def's Emerg. Motion to Dismiss | 3:23-CV-04597-EMC

## IV. Conclusion

24.    In conclusion, Apple's arguments about the delay and formatting are without basis, are a delay tactic, is an attempt to harass the Plaintiff, and should be denied.

25.    Plaintiff has replied to both Apple's motions to dismiss and for a shorter deadline in order to empower the court to quickly deny these motions and to order Apple to file a response to the Complaint. Apple fired Plaintiff over there years ago, and this Docket is up to 152 entries, but Apple still has not filed an Answer. Apple needs to file an answer.

Dated: Nov. 15 2024

Signature:

_____

/s/ Ashley M. Gjovik

*Pro Se Plaintiff*

**Email:** legal@ashleygjovik.com

**Physical Address**:
Boston, Massachusetts

**Mailing Address:**
2108 N St. Ste. 4553 Sacramento, CA, 95816

**Phone:** (408) 883-4428

— 13 —

Pl's Opposition to Def's Emerg. Motion to Dismiss | 3:23-CV-04597-EMC

ER VII 290

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

— 14 —

Pl's Opposition to Def's Emerg. Motion to Dismiss | 3:23-CV-04597-EMC

ER VII 291

## V. Exhibit A: Typography for Lawyers

Typography for Lawyers

2nd edition

*Figure 4: https://typographyforlawyers.com/*

E·qui·ty, *n.* A text family designed by Matthew Butterick. Available only at mbtype.com.

*Figure 1: https://typographyforlawyers.com/equity.html*

What purpose do line numbers serve today? I have no idea. It's just another obsolete TYPEWRITER HABIT. As a pin-cite system, paragraph numbers make more sense. Page and line references are dependent on a specific paginated rendering of a document. Paragraph numbers are not.

*Figure 3: https://typographyforlawyers.com/line-numbers.html*

**line spacing**

*120–145% of the point size*

*Line spacing* is the vertical distance between lines of text. Most writers use either double-spaced lines or single-spaced lines—nothing in between—because those are the options presented by word processors.

These habits are obsolete TYPEWRITER HABITS. Originally, a typewriter's platen could only move the paper vertically in units of a single line. Therefore, line-spacing choices were limited to one, two, or more lines at a time. Single-spaced typewritten text is dense and hard to read. But double-spacing is still looser than optimal.

The traditional term for line spacing is **leading** (rhymes with **bedding**), so named because traditional print shops put strips of lead between lines of type to increase vertical space.

Most courts adopted their line-spacing standards in the typewriter era. That's why court rules usually call for double-spaced lines. On a typewriter, each line is the height of the font, thus double spacing means twice the font size. So if you're required to use a 12-point font, double line spacing means 24 points.

Curiously, the so-called "double" line-spacing option in your word processor doesn't produce true double line spacing. Microsoft Word's "double" spacing, for instance, is about 15% looser, and it varies depending on the font. To get accurate spacing, you should always set it yourself, exactly.

*Figure 2 https://typographyforlawyers.com/line-spacing.html*

1

2  *How to interpret court rules*

3  Among legal documents, court filings must conform to the
4  narrowest typographic restrictions—court rules. But except
   for a few jurisdictions, court rules still give lawyers plenty of
5  typographic latitude.

6  So why do 99.99% of the court filings in any jurisdiction look alike?

7  One reason is the bandwagon effect. Lawyers usually assume that all
   the other lawyers are following the rules, so if everyone uses 12-point
8  Times New Roman or puts two vertical lines in the left margin, it
   must be that the court demands it. Possible, but unlikely. Read your
9  court rules carefully—you'll probably be surprised at how much is
   left to your discretion.

10 Another reason is fear. "The judge will sanction me because my fil-
   ings aren't as ugly and hard to read as everyone else's." Again—pos-
11 sible, but unlikely. If your typography conforms to the court rules in
   good faith, you should be on solid ground. No judge or clerk ever
12 complained about the typography in my filings. Nor has any reader of
   this book reported any similar consequences.

13 A third reason is force of habit. To create today's filing, lawyers will
   often just start with last week's filing, which was based on the filing
14 from the week before that, and so on back to about 1979. Formatting
   choices get entrenched even if they don't relate to the rules.

15 A fourth reason is lack of typographic skill. How do you depart from
   the usual dreck while still adhering to the rules? Armed with the in-
16 formation in this book, you should have no problem understanding
   where court rules are strict and where they're flexible.

17

18 ③  LINE SPACING rules should be interpreted arithmetically, not
       as word-processor lingo. If a rule calls for double-spaced lines,
19     set your line spacing to exactly twice the point size of the body
       text. Don't rely on the "Double" line-spacing option in your
20     word processor, which may not be equivalent. For instance, in
       Word, "Double" line spacing is about 15% larger than true dou-
21     ble spacing. This reduces the number of lines per page.

22 ④  Avoid putting rules and borders within or around the page that
       aren't explicitly required. It clutters the page. For example, in
       Los Angeles courts, almost every litigator puts two vertical
23     lines on the left edge of the page and one vertical line on the
       right. But this practice is not required by any rule. In state
24     court, the line on the left is optional—you can use a solid sin-
       gle or double line, but you can also use a "vertical column of
25     space at least ⅓ inch wide". (Calif. Rule of Court 2.108(4).)
       Nothing is required on the right side. Meanwhile, our federal
26     court requires no vertical lines on either side. Follow the rules,
       not the crowd.

27

28 From: https://typographyforlawyers.com/how-to-interpret-court-rules.html

WHY DO COURT RULES ABOUT TYPOGRAPHY EXIST?

Consistency of typography in court filings helps ensure fairness to
the parties. For instance, in jurisdictions that use page limits, if law-
yer A sets his briefs at 12 point and lawyer B sets hers at 10 point,
then lawyer B will get more words per page. Court rules about typog-
raphy prevent abuse of these limits.

Court rules about typography also exist as a convenience to the judge
and the court staff. Judges don't want to read sheaves of 9-point text.
Rules that set minimum page margins or point size ensure a mini-
mum standard of legibility.

As you put your typographic discretion to work, keep these two goals
in mind. Don't expect your judge to be happy if you exploit typo-
graphic loopholes in the rules that defeat these goals.

FOR INSTANCE, THE U.S. DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFOR-
NIA CALLS FOR A PROPORTIONALLY SPACED FONT THAT'S 14 POINT OR LARGER.
(C.D. CAL. L.R. 11-3.1.1.) HOW ABOUT THIS ONE? IT'S PROPORTIONALLY
SPACED. IT'S SET LARGER THAN 14 POINT. TECHNICALLY SPEAKING, I'VE COMPLIED
WITH THE RULE. BUT WILL A FEDERAL JUDGE BE IMPRESSED WITH HOW I'VE INTER-
PRETED THE RULE? NO WAY.

Conversely, you shouldn't worry about typographic improvements
that result in fewer words per page, like larger page margins. Unless
you need every word or every page allocated to you—and good legal
writers never do—why not use the extra white space to improve the
typography? (See MOTIONS for an example.)

Keep in mind that court rules about typography are not designed to
produce good typography. That's your job. Court rules set mini-
mums and maximums. They're usually phrased in terms of "at least"
and "no more than". Very rarely do they completely eliminate
discretion.

I'm not suggesting you should use this discretion to be different for
the sake of being different. Rather, you should use this discretion to
fill in what the court rules deliberately leave incomplete.

*Figure 5: https://typographyforlawyers.com/how-to-interpret-court-rules.html*