CASE NO. 25-2028

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

**ASHLEY M. GJØVIK**, *an individual*,

*Plaintiff-Appellant*

v.

**APPLE INC.**, *a corporation*,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Northern District of California
No. 3:23-CV-04597
The Honorable Judge Edward M. Chen

---

## APPELLANT'S EXCERPTS OF RECORD
## VOLUME IV | TRANSCRIPTS

---

**Ashley M. Gjøvik, JD**
*In Propria Persona*
2108 N. St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

i

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3

    ASHLEY M. GJOVIK                    3:23-CV-04597-EMC
 4
              VERSUS                    FEBRUARY 21, 2025
 5
    APPLE, INC.                         SAN FRANCISCO, CA
 6

 7


 8           BEFORE THE HONORABLE EDWARD M. CHEN
                  UNITED STATES DISTRICT JUDGE
 9

10              TRANSCRIPT OF MOTION HEARING

11


12
    A P P E A R A N C E S:
13
    FOR THE GOVERNMENT:
14                       ASHLEY M. GJOVIK, ESQUIRE
                         2108 N. ST
15                       SACRAMENTO, CA 95816
                         ashleymgjovik@protonmail.com
16
    FOR THE DEFENDANT:
17                       MELINDA S. RIECHERT, ESQUIRE
                         ORRICK, HERRINGTON & SUTCLIFFE LLP
18                       1000 MARSH ROAD
                         MENLO PARK, CA 94025
19                       mriechert@orrick.com

20

21


22   ------------------------------------------------------
              BETH A. KRUPA, RMR, CRR (VIA ZOOM)
23                United States Court Reporter
                    401 West Evans Street
24                  Florence, SC  29501
                 Beth_krupa@scd.uscourts.gov
25
              (Stenotype/Computer-Aided Transcription)
```

Beth A. Krupa, RMR, CRR

2

```
 1            SAN FRANCISCO, CA, FEBRUARY 21, 2025
 2            HONORABLE EDWARD M. CHEN, PRESIDING
 3                          * * *
 4        (Proceedings commence at 9:15 a.m.)
 5            THE CLERK:  Next case is Gjovik versus Apple,
 6   Inc., Case No. 23-4597.  Please state your appearance for
 7   the record beginning with the plaintiff.
 8            MS. GJOVIK:  My name is Ashley Gjovik.  Good
 9   morning, Your Honor.
10            THE COURT:  All right.  Good morning.
11            MS. RIECHERT:  Melinda Riechert from Orrick
12   representing Apple.
13            THE COURT:  All right.  Good morning,
14   Ms. Riechert.  Okay.  We're on for defendant's motion to
15   dismiss portions of the fifth amended complaint and so
16   let me address, ask the parties to address some of the
17   key issues as I see them.
18            First has to do with the statute of
19   limitations.  And I will say at the outset that I think
20   Ms. Gjovik is correct in that with respect to the delay
21   discovery rule, federal law applies even though there may
22   be state claims.
23            I think the Ninth Circuit has held in the
24   O'Connor Boeing case that federal standard applies and
25   there's a slight difference between the state and federal
```

3

1    standard.  I think the federal standard requires that
2    the -- it turns on whether the defendant knows or
3    reasonably should have known of the cause and not just
4    mere suspicion to the extent the state court -- state law
5    could be construed to have that more lenient standard.
6         So here the question of known or should have
7    known turns on inquiry notice, in my view, and that is
8    whether or not a reasonable inquiry that would have been
9    undertaken would have put the plaintiff on notice of her
10   claim and here the -- it's clear that Ms. Gjovik had
11   reason to believe there was some kind of a problem given
12   all the activities.
13        Her contention here is that she didn't
14   know -- she had no reason to know that specifically
15   that -- of the actual nature of the activities that were
16   going on at the plant that was nearby and that would have
17   given rise to the kind of alleged injuries she claims.
18        But she knew there was something going on and
19   knew that there was some risk of toxics and in her
20   filings reflect that she believed there were reported
21   amounts of various chemicals, including arsenic, carbon
22   monoxide, mercury, et cetera.
23        But the key question it seems to me is whether
24   she knew it or not at the time.  There appears to have
25   been a public file containing the permit that made it

Beth A. Krupa, RMR, CRR

4

1    clear what was -- that there was semiconductor

2    fabrication going on.

3         So that's what I would like to -- so if that's

4    evident, then there's a very good argument that one would

5    be on inquiry notice, and that inquiry notice would have

6    led to the discovery of, in fact, that the Aria factory

7    was engaged in semiconductor fabrication.

8         I take it that's the defense argument, that

9    given the public information that the notice

10   requirement -- the should have known requirement was

11   satisfied; is that correct, Ms. Riechert?

12        MS. RIECHERT:  Correct, Your Honor.

13        THE COURT:  I'll let you respond to that,

14   Ms. Gjovik.  I know you say you did not know, but that's

15   not the standard.  The standard is should have known and

16   based on a reasonable inquiry would have uncovered the

17   fact that the Aria factory was, in fact, engaged in

18   semiconductor fabrication.

19        MS. GJOVIK:  Thank you, Your Honor.  I think

20   this is a very unique case that has such a strong holding

21   for the reasonable inquiry where when I knew that there

22   was something going on, I alerted just about every

23   government agency that could possibly be implicated by

24   that.

25        And as a project manager, ensured that they all

5

1  did an inquiry on their behalf to see if they could

2  figure out what was going on.

3       Many agencies took this extraordinarily

4  seriously, the EPA looked into it for weeks.  They were

5  distracted also by the super fund issues, but I had the

6  city looking at it, I had the state governments looking

7  at it.

8       It went on for some time.  That was the article

9  I published was frustration that even with all of these

10  experts, all of these agencies trying to figure out what

11  was going on, they couldn't figure it out.

12       So if this standard, if we would say, I was on

13  inquiry notice, I should have figured it out.  But the

14  federal EPA could not figure it out and it's their job to

15  regulate these things and they would have even more

16  access than I would have to the records, then no one is

17  ever going to meet this legal standard.

18       THE COURT:  Well, let me ask you, when you say

19  couldn't figure out, maybe they did not, at least in

20  their view find a -- come up with a specific finding.

21  But the issue is not conclusively determining -- what if,

22  in fact, there were no emissions that were sufficiently

23  concerning, that doesn't mean that you couldn't bring a

24  claim.

25       And to bring a claim, all you have to know is

6

1    what the source is.  So the fact that the agencies

2    couldn't come to a conclusion doesn't necessarily mean

3    that you didn't have sufficient reason to believe that it

4    was coming from this factory, because it was engaged in

5    semiconductor manufacture.

6          MS. GJOVIK:  Well, first, I would say that

7    evidence that Apple filed, there's no actual evidence

8    that was available at the time.  They just said it's

9    available now and it's a very difficult website to

10   navigate.

11         I spent a freakish amount of time investigating

12   this.  I had friends intervening, telling me I just need

13   to move on.  This is, again, where I'm concerned, that if

14   I didn't do enough, I don't think anyone would have ever

15   done enough.

16         I didn't find that for some time.  The public

17   records portal points you to a complete different place.

18   It doesn't ever send you there.  I think there's also an

19   issue that if we say that the standard for semiconductor

20   exposure would be looking at the permits and knowing that

21   semiconductor fab, again, it's going to be very hard for

22   anyone to ever meet that standard.

23         It's just because I worked in hardware at Apple

24   and was around the semiconductor process that those words

25   meant something to me.  So there's a lot of people that

7

1    don't understand the ultra hazardous nature of that type

2    of operation and it is Silicon Valley, so there's tons of

3    industrial facilities all over the place doing different

4    kinds of level of industrial work.

5            Sometimes it's a problem, sometimes it's not.

6    So it's very difficult to try to -- and so the EPA

7    explained to me their process when they were

8    investigating and evaluating to try to figure out if

9    there were red flags.

10           And they go through the filings.  They go

11   through -- the problem here was, Apple was not

12   filing -- they were not registered as semiconductor fab

13   in the required systems.  They were not filing their

14   error emission reports to the federal government.

15           They did file some for the local government,

16   but they were not registered for semiconductor fab, and

17   that is something that they face violations for now.

18   They're written up by the Bay Area Air Quality Management

19   District.

20           This also, the violations raise the issue, once

21   the government found out what they were doing, it was so

22   facially illegal, they faced so many inspections, and

23   they've been written up, violations and investigations,

24   that, again, to say I should have been able to figure it

25   out, if these agencies who it's their job to figure it

8

1    out and once they figured out what Apple specifically was

2    doing in this situation, jumped on it and opened very

3    formal extensive investigations and are working on

4    enforcement actions.  I don't think anyone would ever

5    meet that standard if to say that I did not do enough.

6           THE COURT:  Okay.  Well, hold on for a second.

7    You also allege that there are filings that show that the

8    facility exhausted reportable amounts of mercury,

9    arsenic, carbon monoxide, formaldehyde in the ambient air

10   around the factory and Apple says that was available

11   through the Bay Area Air Quality Management District

12   publicly online back in August of 2021.

13           So why wouldn't that be enough to bring -- to

14   believe that you had a claim?  It was -- if you're

15   brining in arsenic, carbon monoxide, formaldehyde, maybe

16   you don't know every substance and maybe fabrication of,

17   you know, of these chips and stuff could have even more,

18   but at that point why wouldn't there be enough notice to

19   say there's a problem here and I've got a claim?

20           MS. GJOVIK:  So there's an argument there could

21   be, but what I put on that claim, again, we're

22   in -- we're in Silicon Valley which is even worse than

23   San Francisco when it comes to the industrial operations

24   near residential and schools, and just about every office

25   you're going to be around is probably going to be

9

1    emitting something.

2              And this was a conversation, this was reflected

3    in the article I wrote in my frustration, that there's a

4    lot of air pollution around here and it's trying to

5    figure out what is unusual enough that it could cause

6    such a severe health issue.

7              And the issues I was having and the other

8    victims were having, was so severe, it had to be

9    something that was just, you know, a very, very, extreme

10   dangerous activity.

11             Again, once the Bay Area Air Quality Management

12   District, who received those filings from Apple and knew

13   the address, once they found out that Apple was actually

14   doing semiconductor fabrication, had multiple

15   inspections, they're written up for multiple violations,

16   they failed to register.

17             They're supposed to get permission from the air

18   board to even operate in a location like that.  There's a

19   whole planning process and zoning that they surely would

20   have been denied.

21             So one of the big issues here is what Apple was

22   doing was so egregiously inappropriate, like, no one

23   would think to screen for something like that, and that's

24   why I argued ultra hazardous.

25             To me, this is the same thing as your neighbor

1   drilling for oil next to your backyard.  Where you're

2   like, you're doing what?  That's crazy.  That's so

3   dangerous.  You can't do that.

4         So it's -- this is kind of an unusual one.  I

5   also, like, I'm carrying a lot of burden of thousands of

6   other victims.  So, again, I did freakish amounts of

7   research.

8         I have an engineering background.  I have the

9   legal background, in law school learning enough that I

10  could navigate some of this.  I was frequently told by

11  these agencies that I was, like, the best researcher

12  they've ever seen.

13        So if I did not do enough, no one would have

14  ever done enough.  And if I was to file a complaint, I

15  think it's an argument against judicial economy, that if

16  there's so many buildings around that area and there's so

17  many potential sources, whether it was existing

18  contamination that they're not properly venting and

19  controlling or new stuff, I'm going to file a complaint

20  with like 15 potential parties listed.

21        And what would I even -- I would say, chemicals

22  came from maybe the ground, maybe the water, maybe the

23  sewers, maybe the exhaust, here's a list of like 20

24  suspects.

25        That would just clog the pipes of all of the

1    Silicon Valley, especially, courts, because

2    it's -- that's just too vague.  You -- you need another

3    step forward.  And we've been having, I think, what,

4    three motions to dismiss now discussing my toxic tort

5    cases.

6            So they're very hard to get through and I think

7    just having, you know, file it if you think you were

8    exposed to chemicals would -- would not be good for the

9    courts.

10           THE COURT:  All right.  Let me ask Ms. Riechert

11   to respond in terms of how easy it would have been to

12   find that the source of these various chemicals in the

13   air was emanating from this factory, the Aria factory

14   because it was doing semiconductor fabrication.

15           MS. RIECHERT:  Yes, Your Honor.  So the

16   documents that she relies on to support her claim, she

17   found in 2023.  Those documents were all available in

18   2021, in 2020.

19           So there's no reason if she could find them in

20   2023 that she couldn't have found them earlier in 2021

21   and 2020 and that's the essential part of the claim.  She

22   hasn't shown that she could not have found them earlier

23   if she used reasonable diligence.

24           THE COURT:  And what's the proof?  We're

25   getting an echo here.  I'm not sure why that is.  Why --

12

```
1    what's your proof that these were, in fact, available as
2    of 2020 and 2021?
3              MS. RIECHERT:  We submitted all of that with
4    our motion, Your Honor, in a request for judicial notice
5    which has the links, how we got to the links, how they
6    were available, when they were made public.
7              THE COURT:  It relies on the way back?
8              MS. RIECHERT:  Some of it in the way back --
9              MS. GJOVIK:  No.
10             MS. RIECHERT:  -- but you can see the
11   information on the website.  If you go through all the
12   RJN, you can see how we found all of that --
13             MS. GJOVIK:  I objected.  There's no way back.
14   There's no proof that was even available other than the
15   day --
16             THE COURT:  Hold on.  Hold on.  You are not to
17   interrupt.  I will come back to you.
18             So continue, Ms. Riechert.
19             MS. RIECHERT:  Yes, Your Honor.  So in the RJN,
20   we go through all the documents that she now relies on to
21   support her claim that she found in -- she says she found
22   in 2023.  And we show how that stuff was available on the
23   website in 2020 or 2021.
24             One of them we don't have a way back going back
25   that far.  That doesn't mean it wasn't available before
```

1    then, we just didn't have a way back.  But for all of the

2    others, we show that they were available in 2020 and 2021

3    and she could have found them then if she used the same

4    diligence in 2023, that she uses -- she should have used

5    that same diligence in 2021.

6            So if she did find them in 2023, they were

7    available in 2021.  So why didn't she find them in 2021?

8    Maybe they were difficult to find, but she ultimately

9    found them.  And so, therefore, she could have found them

10   earlier.

11           THE COURT:  What's your response to the notion

12   that there's at least a factual question here about how

13   reasonably or how easily they were -- could have, this

14   record, this information about the factory could have

15   been found when she went to all these different agencies

16   and as she put it, they couldn't figure it out?

17           MS. RIECHERT:  The agencies couldn't figure out

18   because there was no problem.  Believe me, they would

19   have come after Apple if there was a problem.  It's the

20   plaintiff who's claiming there's a problem not the

21   agencies.

22           But we have submitted all of this evidence to

23   show that it was available.  It's not disputed that it

24   was available back then.  We submitted all of the

25   evidence that showed it was.

14

```
1            So there is no factual dispute about whether it
2    was available in 2021, and there's no dispute that she
3    found it in 2023.  And if she had done in 2023 -- in 2021
4    what she did in 2023, she would have found it because it
5    was there and there's no factual dispute on that.
6            THE COURT:  All right.  I'll let you respond to
7    that specific point that what you found in 2023 could
8    have been found two years earlier.
9            MS. GJOVIK:  Thank you, Your Honor.  There's no
10   evidence that it was available then, that was my
11   objection, that they have not proven that it was
12   available at the time, how it would have been accessed.
13           I think that's fact finding.  That's something
14   that gets past motion to dismiss 12(b)(6) where it's
15   talking to agencies, where it's understanding what a
16   reasonable person would be expected to do.
17           If I may, I also just want to say that I also
18   have the additional arguments of fraud and some version
19   of duress of where she asks, why couldn't I figure that
20   out in 2021.
21           One of the factors would be the extensive
22   harassment and retaliation I was facing, that was a bit
23   distracting from my environmental investigations.
24           THE COURT:  All right.  Well, so it seems like
25   the key is how -- whether that information was available
```

15

1    and how accessible it was back in 2021, and I will take a

2    closer look at your request for judicial notice, because

3    that may be key in whether or not there's a factual

4    question there.

5            MS. RIECHERT:  What she did is she has her

6    request for judicial notice where she says how she found

7    all of this stuff and then we responded that with respect

8    to all of the stuff that you list in your RJN that you

9    found in 2023, all of that stuff was available in 2021.

10           THE COURT:  Okay.

11           MS. RIECHERT:  So we went through all of the

12   exhibits in her RJN and we showed Exhibit 1 was

13   available, Exhibit 2 was available, Exhibit 3 was

14   available, so all of the ones you rely on now were

15   available in 2021.

16           THE COURT:  All right.  Let me turn to the

17   retaliation claims.  I know there's other issues with

18   respect to the environmental claim and I have a pretty

19   good handle on those other issues, if we get there, if we

20   get past the statute of limitations.

21           Retaliation claim, with respect to the

22   Section 1102.5, the California whistleblower, with

23   respect to tolling, the key is whether the prior

24   administrative filings would have been sufficiently

25   similar in nature as to give -- to alert the defendant

16

1    about the claims that are being made in this lawsuit.

2              It doesn't have to be precisely coextensive,

3    but it has to give, sort of, reasonable, again, sort of

4    inquiry notice.

5              And it seems to me that in looking at the

6    filings, that there is enough for retaliation based on

7    some of the disclosures and the activities and the claims

8    that were made in the DIR complaint with respect to

9    retaliation for workplace issues, workplace safety.

10             But I don't see anything in there that would

11   have alerted the defendant about the violation of privacy

12   rights.  That seems to be a different kind of animal than

13   a workplace safety and the complaints were -- I don't see

14   much about -- I see something about environmental safety

15   that can be inferred and maybe about organization and

16   other things, but not about privacy.

17             So I'll let you respond to that problem,

18   Ms. Gjovik.

19             MS. GJOVIK:  Thank you, Your Honor.  So one

20   thing I've raised is privacy is inherent in this lawsuit

21   because of Apple's defense which is they're allowed to

22   invade my privacy.

23             So this would have been raised in part of the

24   discussion no matter what in these type of adjudications

25   and Apple would have known that because it's their

17

1    defense.

2           They would have had to know whether we have to

3    debate whether that's a proper reason to fire someone, if

4    that's really why they fired me.  We'd have to talk about

5    my complaints about invasion of privacy.

6           The citation that Apple uses for the article

7    where I talk about this thing that really upset them, the

8    article is called Apple Cares About Privacy Unless You

9    Work At Apple.

10           And it's an interview with current and prior

11    employees talking about privacy as a work condition, and

12    concerned about hypocrisy from Apple.

13          THE COURT:  Well, what we're talking about is

14    tolling the statute of limitations which would otherwise

15    run because of your filing in another forum, that gives

16    you the benefit of extending the statute of limitations

17    through tolling.

18           But in order to get that benefit, that pursuit

19    in another forum such as the Department of Public

20    Relations have to serve the function of the lawsuit.

21           It has to put the defendant on notice of the

22    nature of the claim and I'm -- I find that that -- was on

23    notice of retaliation based upon workplace reported

24    safety violations and environmental, it's the privacy

25    aspect that is brought in this suit but not -- I don't

18

1   see it in the DIR complaint.

2          MS. GJOVIK:  You are correct, and I am trying

3   to have a creative policy argument.  But if we're going

4   by prima facie, you are correct.  It was not in the

5   original complaint.

6          THE COURT:  Let me ask about the 98 points.

7          MS. RIECHERT:  May I respond on that point?

8          THE COURT:  Okay.  Go ahead.

9          MS. RIECHERT:  So there were a number of claims

10  that we believe that she's asserting retaliation for

11  under 1102.5 that are not covered by her DIR complaint

12  for workplace safety.

13         THE COURT:  All right.  So under the privacy,

14  what else do you claim is not?

15         MS. RIECHERT:  The NLRA claim under Section

16  8(a)(1) of the National Labor Relations Act.  That was

17  not raised.  That's not a workplace safety issue and that

18  was not raised in her DIR complaint.

19         There's an OSHA complaint, 29 U.S.C. 660 which

20  is OSHA 11-C, that was not raised in her DIR complaint.

21  There's the right of privacy, there's 42 U.S.C. 2000(e),

22  that had nothing to do with workplace safety.

23         And then the last one is the antidiscrimination

24  laws of the government code in California 1298 -- 12920.

25  So those were all claims that she's now saying she was

19

1 retaliated against for making, but none of those were

2 covered by the DIR complaint related to workplace safety.

3     THE COURT:  Why wouldn't the OSHA claim of

4 retaliation be covered or at least implied by the DIR

5 complaint?

6     MS. RIECHERT:  It would have to be very

7 implied, I think, for it to be covered.

8     THE COURT:  I mean, at least it's within the

9 realm of the kind of things we're talking about.

10     MS. RIECHERT:  Possibly.  I would want to make

11 one other point with respect to her allegations under

12 1102.5 which is that a number of the things that happened

13 to her, she says, after she made -- relate to the conduct

14 that occurred after she made the DIR complaint and,

15 therefore, they could not have been covered by the DIR

16 complaint.

17     For example, she talks about that she was

18 retaliated against for making the DIR complaint, but

19 obviously, if she's retaliated against for making the

20 complaint, the things that happened to her could not have

21 been in the DIR complaint because they occurred after the

22 DIR complaint.

23     THE COURT:  But it's still outside the

24 limitations period, because if she complained about

25 issues within the limitations period, then you don't need

Beth A. Krupa, RMR, CRR

20

1  the tolling.

2       MS. RIECHERT:  Correct.  We're talking about

3  things that occurred outside of the limitations period,

4  but were not tolled by the DIR complaint because they

5  occurred after the DIR complaint but outside the

6  limitations period.

7       THE COURT:  What would be your response to, as

8  you know in the Title 7 exhaustion arena, which is a

9  little bit analogous, that that exhaustion is deemed

10  satisfied not only by things that are raised in an EOC

11  complaint, but things that are reasonably related or

12  reasonably could be expected to have grown out of the

13  original complaint.

14       And one could argue here, if you use that kind

15  of notion, that retaliation for the DIR complaint even

16  though, you know, you expect somebody to file another DIR

17  complaint, it seems like it's transactionally related and

18  it would be --

19       MS. GJOVIK:  I did, I did.

20       THE COURT:  Let me ask Ms. Riechert to respond

21  to that first.

22       MS. RIECHERT:  Yes, Your Honor.  So there are a

23  lot of rules with the EOC, as you know, where it has to

24  be covered by the complaint or arise out of it.  If the

25  complaint is for discrimination, then you allege

21

1    retaliation.

2            That's not covered by the original complaint,

3    and so you have to allege amended complaint.  If you

4    allege race discrimination, and then you later allege age

5    discrimination, you have to amend your complaint.

6            She didn't amend the DIR complaint, and so

7    these things that were not related to workplace safety,

8    including discrimination and things like that, do not

9    relate back and are not tolled because they don't relate

10   to workplace safety, but was in the DIR complaint.

11           THE COURT:  But the DIR complaint did raise a

12   retaliation claim, it's just that now she's raising

13   further acts of retaliation, so it's not like, you know,

14   a brand new -- it does seem different to me.  I don't

15   know if there's case law on this, but it feels different.

16   I'll let Ms. Gjovik respond to that question.

17           MS. GJOVIK:  Sorry, I jumped in again.  I just

18   get very excited about labor rights.

19           So first I just want to make clear that when I

20   filed that complaint, it was not specific to safety.  It

21   was all the labor rights.  I got very, very excited to

22   learning about all the wonderful labor laws in

23   California.

24           I was not aware that California is the, like,

25   the leading law with state labor protections, and this is

22

1  when I was getting very engaged about LRB, and California

2  has the right to talk about work conditions, talking

3  about invasion of privacy.  That's why I took part in

4  that article.

5  I want to point out that all of this happened

6  well before I was fired.  This stuff is definitely

7  included in those complaints and some of the things that

8  the counsel just said were incorrect.

9  So like the NLRB, I filed my NLRB complaint

10 prior to the DIR complaint and Apple was served.  And

11 they had notice of counsel that they were representing

12 that NLRB charge.  I think it's like the same day I filed

13 the DIR charge.

14 So I think it's a bit of puzzling they're doing

15 of maybe it wasn't the exact same lawyer and stuff, but

16 like Apple as a company was aware and all of this was

17 growing out of the complaints that I made to Apple which

18 were very extensively documented.

19 This is stuff that rooted out of the issue

20 confirmation I wrote with them, which is a long detailed

21 document of all of my concerns which covered a huge broad

22 of issues.  That was about August 22nd that that was

23 filed.

24 I wasn't fired until September 9th.  They said

25 that they were investigating all of those things,

23

 1   supposedly.  So they were fully on notice there and I
 2   started discovery with them.  I called it prediscovery.
 3   I told them I was suing them at that point and I gave
 4   them over 500 documents to support these claims they were
 5   making.
 6         And, again, it was -- they actually said that
 7   they would not investigate the safety issues.  So
 8   everything they were supposedly investigating was not
 9   safety, even though I kept bringing up the safety issues,
10   too.
11         THE COURT:  All right.  Let me -- let me ask
12   about the other retaliation basis, the Labor Code 98.6,
13   that one of the keys there is whether or not there's a
14   sufficient allegation that Apple knew that Ms. Gjovik was
15   engaged in the activity because without the knowledge, as
16   I previously mentioned, you can't retaliate.
17         There is some suggestion here, at least, for
18   instance, the timing of the events that's alleged, that
19   the day after Ms. Gjovik shared a post on Slack
20   referencing the policies on rights to speak freely about
21   wages, et cetera, she was placed on leave, that Apple was
22   aware of the survey because they shut it down.
23         Maybe it's a little thin, but isn't that
24   enough, Ms. Riechert, to -- especially if the inferences
25   are to be drawn in favor of the pleader to find a basis

24

1    for knowledge?

2          MS. RIECHERT:  Yes, Your Honor.  My

3    understanding on the Slack is that she said that she was

4    questioned about the Slack posts on July 27, 2021, but

5    she didn't participate in the pay survey until August of

6    2021.

7          And, therefore, even if the company had been

8    asking her about her Slack in July of 2021, it would not

9    have found something that she later put in Slack and,

10   therefore, it couldn't -- there would be no reason to say

11   that it knew that she had posted the paid survey in

12   August of '21 just because they looked at her Slack on

13   July 28th -- July 27, 2021.

14         THE COURT:  All right.  Your response to that

15   specific point, Ms. Gjovik?

16         MS. GJOVIK:  Yeah.  So I think that is

17   completely disconnected from the reality of corporations

18   who highly prioritize keeping their employees quiet about

19   concerns and not having stuff aired publicly.

20         We've seen this with Apple and other tech

21   companies, even the CEOs sending emails yelling at their

22   employees to not speak about anything publicly, keep it

23   all private.

24         Apple, like these other companies, does the

25   same thing.  Once you're on a list, they're going to

25

1    interrogate you ongoing.  They're going to keep an eye on

2    what you're doing.

3           There are probably hundreds of articles about

4    Apple once you're on their list, they're following up

5    with you, saying, hey, we said stop posting that.

6           So to think that they became concerned about

7    what I was doing and then I continued to escalate my

8    advocacy to think that they stopped paying attention, I

9    think is -- doesn't make any sense.

10          And then especially since they said they

11   started investigating me, supposedly over a week before

12   they fired me, my question then would be, what did they

13   investigate if they were saying that they fired me for

14   making statements that were leaking, wouldn't they then

15   inherently be searching all of my social media, Slack,

16   conversations with employees, to try to figure out

17   whatever they're looking for about that leaking unless

18   they weren't investigating and it was just pretential?

19          THE COURT:  Do you want to respond,

20   Ms. Riechert, to that?

21          MS. RIECHERT:  Yes, Your Honor.  She's required

22   to allege facts that show that Apple did know that she

23   was complaining about her wages and she just hasn't

24   alleged those facts in the complaint.

25          THE COURT:  All right.  Well, I'm going to take

 1     these matters under submission and we'll determine what

 2     sort of survives and what doesn't.

 3             I will say that matters that were repled in

 4     this complaint that were outside the scope of what I had

 5     allowed, I'm going to look at that and there may be

 6     things that are not cognizable here.

 7             I also will feel that whatever I rule with

 8     respect to this complaint, I am not inclined to allow

 9     further amendments to the pleadings here.

10             We need to get going on this case and there's

11     been enough back and forth on the pleadings, but I will

12     rule on those matters once we -- I rule on what's before

13     me now.

14             MS. RIECHERT:  I would just like to make one

15     more point, Your Honor, if I could.

16             THE COURT:  Okay.

17             MS. RIECHERT:  You've admonished the plaintiff

18     in this case that she needs to comply with the rules,

19     meet the deadlines, meet the page limit requirements and

20     yet she's continuing to not do that.

21             She filed her opposition late.  She filed --

22     the second version of the opposition was late and it was

23     30-some pages long.

24             So again, it violated your rules by being late

25     and I just think it's really important that we make it

27

1    clear, you make it clear to the plaintiff that she's got

2    to comply with your rules.  She's got to get these things

3    done on time and she's got to comply with the page limit

4    requirements.

5             THE COURT:  Right.  I am going to say that in

6    my order, whatever I decide, that I expect at this point,

7    I've given dispensation, because she's not represented

8    although she has a legal education.

9             But from this point on, the rules are going to

10   be enforced.  So I will make that clear and I'm going to

11   make that clear in the order.  Whatever goes forward from

12   here, that's going to be my expectation.

13            So I will take the matter under submission, but

14   it's my intent to close the pleading stage of this case

15   and move forward with whatever is left and we'll set a

16   further schedule at that point.

17            MS. RIECHERT:  There is another motion by the

18   plaintiff to further amend the complaint that is set for

19   hearing.

20            THE COURT:  Well, I've already indicated that

21   my inclination is to close the pleadings in this case.

22   We've already had now a fifth amended complaint.  We need

23   to move forward with what we've got after I decide the

24   issue before me now.  So you will hear from me shortly.

25            MS. RIECHERT:  Thank you very much, Your Honor.

28

1      THE COURT:  Thank you, everyone.

2      MS. GJOVIK:  Thank you, Your Honor.

3      THE CLERK:  This hearing is concluded.

4      *(Proceedings adjourned at 9:49 a.m.)*

5      **************************************************

6                   CERTIFICATE OF REPORTER

7      I certify that the foregoing is a correct transcript

8   of the proceedings taken from my stenographic notes in

9   the above-entitled matter.

10

11   /S/ *Beth A  Krupa*          __March 28, 2025___
                                    Date
12   Beth A. Krupa, RMR, CRR
     Official Court Reporter
13   U.S. District Court
     District of South Carolina

14

15

16

17

18

19

20

21

22

23

24

25

Beth A. Krupa, RMR, CRR

1

2

3

4 UNITED STATES DISTRICT COURT

5 NORTHERN DISTRICT OF CALIFORNIA

6

7 ASHLEY M GJOVIK,    Case No. 23-cv-04597-EMC

8             Plaintiff,

          **ORDER RE PLAINTIFF'S MOTION**
9     v.     **FOR CLARIFICATION AND**
          **CORRECTION**
10 APPLE INC.,

11             Defendant.    Docket No. 116

12

13

14      Plaintiff has filed a motion in which she seeks a clarification and a correction to a hearing

15 transcript. Defendant has filed a statement of nonopposition. The Court hereby rules as follows.

16      1.      Absent further order of the Court, Plaintiff may make Zoom appearances for case

17 management conferences/status conferences.

18      2.      Absent further order of the Court, Plaintiff may also appear by Zoom for a hearing

19 on any substantive (*i.e.*, nonadministrative) motion. However, (a) there is the risk that there may

20 be connectivity or other technical problems which the Court cannot predict and (2) Defendant has

21 the right to attend in person.

22      3.      The Court shall not order any correction to the transcript for the hearing on August

23 28, 2024. This order reflects the Court's understanding that there were connectivity or other

24 technical problems with the hybrid (Zoom/in-person) hearing. The Court's rulings on the motion

25 / / /

26 / / /

27 / / /

28 / / /

to dismiss which was heard on that day were not impacted or otherwise affected by any

connectivity or other technical problems.


This order disposes of Docket No. 116.


**IT IS SO ORDERED**.


Dated: October 25, 2024


EDWARD M. CHEN
United States District Judge

United States District Court
Northern District of California

2

CAND-ECF

To accept charges shown below, click on the 'View Document' button, otherwise click the 'Back' button on your browser.

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| Fri May 9 08:03:17 2025 | | | |
| **Pacer Login:** | ashleygjovik | **Client Code:** | |
| **Description:** | Image106-0 | **Case Number:** | 3:23-cv-04597-EMC |
| **Billable Pages:** | 25 | **Cost:** | 2.50 |

| Warning! |
|---|
| **This document is restricted.** |

[ View Document ]

**Ashley M. Gjovik, JD**
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# United States District Court

## Northern District of California

| | |
|---|---|
| **ASHLEY GJOVIK**, *an individual*, | Case No. 3:23-CV-04597-EMC |
| Plaintiff, | |
| | **ADMIN. MOTION & DECLARATION** |
| vs. | **REQUESTING INFORMATION.** |
| | - *Inquiry about hearing attendance* |
| **APPLE INC**, a corporation, | - *Addendum to 8/28/24 transcript* |
| Defendant. | **Civil Local Rule 7-11** |

# Administrative Motion & Declaration:

My name is Ashley Marie Gjovik. I am a self-represented Plaintiff in this above captioned matter. I make this Declaration based upon my personal knowledge. I have personal knowledge of all facts stated in this Declaration, and if called to testify, I could and would testify competently thereto. This is an Administrative Motion under Civil L.R. 7-11, requesting 1) clarification of a court order issued Aug. 28 2024, and 2) an addendum or notation to be added to the Aug. 28 2024 transcripts.

## I. Summary

On Aug. 28 2024 this Court held a hearing for the Defendant's latest Motions to Dismiss and Motion to Strike. Previously, the Court ordered that any hearings where one party needs to join via Zoom will be held on Zoom for all parties. (May 16 2024, Dkt. 75, pages 23-24, excerpt on the next page).

However, on Aug. 26 2024 the court asked the Defendant to join the Aug. 28 2024 hearing in person. With such little notice, there was no way for me, a pro se Plaintiff, to fundraise and arrange a way to travel across the country for the hearing. I joined the hearing through Zoom and the Defendant joined in person as the Courthouse.

During the hearing there were severe internet connection issues that appeared to have originated from the court's connection and/or Zoom instance, as other people on the Zoom experienced the same connection issues that I did. I reported this to the Deputy on Aug. 28 2024.

Because Apple had attorneys in person at the court room, a significant portion of the hearing was unavailable to me, and which ended up essentially being an ex parte conversation between Apple and the court, and that I was not able to hear or participate in.

On Aug. 30 2024, the deputy communicated that a ticket was filed with IT about the connection issues. ("*Thank you for your email. This problem has been reported to our IT department.*")

8        MS. GJOVIK:  Thank you, Your Honor.

9        I live in Boston, and I don't have expendable income

10   for travel so I would be very appreciative, and I was going to

11   reach out to your deputy and ask what the preferred way to

12   request to convert is.

13        THE COURT:  Well, you can request that now.  I mean,

14   normally you could -- and that's exactly the kind of situation,

15   if somebody's got to come across country and it's a financial

16   difficulty, or to fly counsel across country for a 10-minute

17   argument, you know, I want to be reasonable about that.

18        So, yeah, if you're across country and you're

19   representing yourself at this point, I'd -- let's just do this

20   one by Zoom.  We'll note that.

21        MS. RIECHERT:  I can appear in person because I'm

22   local, but I'm also happy to do it by Zoom, whichever Your

23   Honor prefers.

24        THE COURT:  Yeah, I think it's -- hybrid can be done

25   but it's easier if we're all on the screen instead of half and

UNITED STATES DISTRICT COURT

24

1   half, so we'll do it by Zoom.

2        MS. RIECHERT:  Sounds good.

3        THE COURT:  Okay.  Thank you, everyone.

4        MS. RIECHERT:  Thank you very much.

5        THE COURT:  Thank you.

6        MS. GJOVIK:  Thank you, Your Honor.

7        (Proceedings concluded at 2:01 p.m.)

*May 20 2024 Transcripts at pages 23-24, Dkt 75.*

As reported to the Deputy, I could only hear a small portion of the hearing and had no idea what was asked or said by the court or Defendant during that time. I only learned of some questions and instructions when I read the transcripts after the fact. Please see Exhibit B for an attached witness statement from another person who was on the Zoom version of the Aug. 28 hearing and also witnessed the connection issues.

The transcripts also revealed to me that many things I tried to say were never heard by the court – including answering the court's questions on substantive matters (resulting in dismissals with prejudice), and also trying to tell the court about the internet connection issues I was experiencing. I was concerned about my supplementary brief being denied and I had requested permission to file a short brief with the critical points I was trying to make during the hearing. The court denied this request on Oct. 1 2024 and dismissed claims with prejudice regardless of the actual merit.

On Sept. 13 2024 I contacted the Deputy and asked if I could file a letter apologizing to the court. The transcripts revealed that the court was very upset with me and thought I was intentionally interrupting Judge Chen. I said I was "mortified" and asked for a way to apologize – as Judge Chen had told me not to file anything else to the docket for the pending Motion to Dismiss.

The transcript revealed to me that the court had ordered that I was no longer able to attend hearings via Zoom, and that I must fly across the country for any future hearings. I did not hear this at that time due to the court's internet connection issues. At the end of the hearing, the court scheduled the next hearing on Zoom for all parties – and I did hear that.

Thus, I also asked the deputy for clarification if I am still expected to join in person. The Deputy never responded to my request or statement. Attached as Exhibit A is a true and correct copy my emails with the court deputy about the hearing. The emails are dated between Aug. 28 2024 and Sept. 14 2024.

## II.  IMPACT & PREJUDICE

It appears some of my claims may have been dismissed with prejudice at

least partially due to these technical issues.

Further, despite my attempt to dispute the Defendant's points in my Opposition,[1] the supplementary brief,[2] and during the hearing – the points I made were disregarded or not heard, and instead the court said I "conceded" to these points.

```
1   there's a distinction between the word "workplace," which is
2   unqualified, and you can't --
3           MS. GJOVIK:  So this is actually defined --
4           THE COURT:  Hold on.  Hold on.
5           MS. GJOVIK:  -- in the statutory analysis that they --
6           THE COURT:  Hold on.
7           MS. GJOVIK:  -- that they also said there were --
8           THE COURT:  Hold on.  Ms. Gjovik, Ms. Gjovik I'm going
9   to cut you off.
10          MS. GJOVIK:  -- interpretations that "operations" --
11          THE COURT:  Ma'am --
12          MS. GJOVIK:  -- means workplace.
13          THE COURT:  Ma'am, I'm going to cut you off if you
```

*Aug 28 2024 Transcript at page 11. (Dkt 106).*

I did not concede these points and instead provided an extensively detailed analysis of the statute and statutory scheme in the supplemental brief, and attempted to argue these points in depth during the hearing. However, it appears the court did not hear most of my arguments due to the connection issues. I also could not hear a significant amount of the court's statements and questions.[3]

---

[1] Note: which was already over the page limit and I complained in my response I did not have enough time to respond to all of their points in only two weeks.

[2] "Apple repeatedly claimed Plaintiff conceded to its arguments. [Reply 8/5 at 4, 5, 9, 10, 13]. I concede nothing. Plaintiff responds to substantive points with additional detail herein." Plaintiff's supplemental brief and objections, Dkt. 93 at page 6, ¶ 11.  "Plaintiff does not 'concede' to waiving her Section 6399.7 claim." Id. at page 45, ¶ 108. (Aug. 18 2024).

[3] "The Court therefore deems any opposition waived. Although Ms. Gjovik is a pro se litigant, she appears to have a J.D. and is thus aware of the consequences of a failure to oppose. As a practical matter, the Court notes that its ruling here... prevents Ms. Gjovik from including the

suffered great bodily injury from Apple's illegal conduct and emissions. Cal. HSC § 42400.1 Cal. Penal Code § 12022.7.

### K. Cal.Lab.C. § 6399.7 (via § 6310) includes HAZWOPER.

108. Plaintiff does not 'concede' to waiving her Section 6399.7 claim. [Def's Reply at 12-13]. First, this claim has been in every complaint in this lawsuit. [7/31 Declaration Exhibits A-C]. Defendant has repeatedly taken advantage of Plaintiff's vulnerability in having to dramatically shorten the length of her complaint and continues to attack claims it knows she has pled and can plead but

*Aug 18. 2024 Sur-Reply (Brief, Objections, & Proposed Supplement)*

```
16    don't say "hazardous substances"; they say "hazardous
17    chemicals." HAZWOPER will define hazardous substances as both
18    chemicals and waste specifically.
19          THE COURT:  How does this -- hold on a second.
20          MS. GJOVIK:  So there are interpretations that the
21    terminology used --
22          THE COURT:  Ms. Gjovik --
23          MS. GJOVIK:  -- in the specific statute includes
24    hazardous waste.
25          THE COURT:  Ms. Gjovik, hold on for a second.
```

9

```
1         What you are talking about, how does that relate to
2    Section 6310, which is the question I had?  You are reciting
```

*Aug 28 2024 Transcript at pages 8-9. (Dkt 106).*

---

factual predicate that she complained about employees' "right to know." *Gjovik v. Apple Inc.*, 23-cv-04597-EMC, 18 (N.D. Cal. Oct. 1, 2024)

Despite the connection issues, the transcript appeared to show the court heard me and accepted my arguments – however, based on the Oct. 1 2024 decision, now it is unclear if the court heard me at all.[4]

```
10   it?

11           MS. GJOVIK:  In the surreply I briefed this with the

12   statutes, the quotes, the citing the interpretations from the

13   agencies.  They've been very clear that just because an

14   employer is a tenant at a remediation site, that does not give

15   them an excuse to not train their employees and inform their

16   employees of the potential risks under the right-to-know rules.

17           THE COURT:  All right.  Let me ask one final question

18   I have, and that is this:  With respect to the private
```

*Aug 28 2024 Transcript at page 12. (Dkt 106).*

Further, the Section 6399.7 challenge should have been waived under 12(g) and 12(h), as Apple failed it challenge it in the prior Motion to Dismiss, and thus I was not required to respond at all under the Fed. R. Civ. Pro., other than to protest the 12(g) and 12(h) violations, which I did.  I also had to waste precious page limit space in my opposition on protesting that it was not a "new" claim after the Defendant falsely asserted it was not in my prior complaints.

All of this to say, I believe my Constitutional right to Due Process was violated at least partially based on the internet connection issues and the severe punishment of a dismissal with prejudice of critical, core claims in my litigation (at least partially due to the inability of the court to hear my oral arguments).

The dismissal with dismissals with prejudice of the factual basis of "*right to know*" retaliation, along with the CERCLA retaliation under Section 1102.5,  both

---

[4] "The Court therefore deems any opposition waived. Although Ms. Gjovik is a pro se litigant, she appears to have a J.D. and is thus aware of the consequences of a failure to oppose. As a practical matter, the Court notes that its ruling here ... prevents Ms. Gjovik from including the factual predicate that she complained about employees' "right to know." *Gjovik v. Apple Inc.*, 23-cv-04597-EMC, 18 (N.D. Cal. Oct. 1, 2024)

due to purely discretionary reasons, resulted in the equivalent of a *death knell* for this lawsuit. (See concurrently filed Motion to Stay pending appeal).

| | | |
|---|---|---|
| | 10 | potential hazards of hazardous substances in the workplace."). On the other hand, the California |
| | 11 | legislature could have specified that the statute applies to hazardous substances present in the |
| | 12 | workplace *without* the qualifier "as a result of workplace operations," but did not. The fact that |
| | 13 | the legislature chose to use the qualifier should not be discounted. In any event, the Court need |
| | 14 | not resolve the matter definitively because, in her opposition brief, Ms. Gjovik failed to address |
| | 15 | Apple's argument. The Court therefore deems any opposition waived. Although Ms. Gjovik is a |
| | 16 | pro se litigant, she appears to have a J.D. and is thus aware of the consequences of a failure to |
| | 17 | oppose. As a practical matter, the Court notes that its ruling here has a limited impact on Ms. |
| | 18 | Gjovik's case; it simply prevents Ms. Gjovik from including the factual predicate that she |
| | 19 | complained about employees' "right to know." This ruling does not entirely bar her from |

*Oct. 1 2024 Decision, page 18. (Dkt 112).*

These claims are important enough to this lawsuit, if the dismissals cannot be appealed, it would be preferable to me to start the entire litigation over again from the start instead of proceeding with gutted claims. If I had known this would have happened, I would have insisted I attend the hearing in person.

## III.  REQUESTS

I am filing this administrative motion to correct the record, to ensure the District Court is aware of these issues (as I will be raising this as part of my Ninth Circuit appeal – Dkt. 113, 114), and with two requests, please.

First, I request clarification if I am no longer able to attend hearings via Zoom or if I can still attend via Zoom. I would also appreciate if the Defendant would be subject to the same instructions in order to avoid another ex parte type situation.

Second, I am requesting a note to be added to the Aug 28. 2024 transcript and/or docket documenting the reported internet connection issues. As of now, without further context, the current transcript could potentially denylist me from future legal opportunities, due to what appeared to be grossly disrespectful conduct by me in court. However, I had no idea what was happening or being said, and the issue apparently originated with the courthouse and/or the court's Zoom

instance. I am very troubled by all of this and that the cause of the issue is not reflected in the transcript (Dkt. 112) or the minutes. (Dkt. 104). Thank you.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed on October 22 2024 in Boston, Massachusetts.


Executed on: Oct. 22 2024


Signature:


_____

**/s/ Ashley M. Gjovik**
*Pro Se Plaintiff*

**Email**: legal@ashleygjovik.com
**Physical Address**: Boston, Massachusetts
**Mailing Address:** 2108 N St. Ste. 4553 Sacramento, CA, 95816
**Phone**: (408) 883-4428

# EXHIBIT A

| From: | Ashley M. Gjøvik <ashleymgjovik@protonmail.com> <=?utf-8?Q?Ashley_M._Gj=C3 =B8vik_<ashleymgjovik@protonmail.com>?=> |
|---|---|
| Sent: | Saturday, September 14, 2024 2:57 PM |
| To: | EMC CRD |
| Subject: | Re: FW: 3:23-cv-04597-EMC | 8/28 9:30 AM Hearing | Motion to Strike just filed |

Thank you, Ms. Galang! I will confirm once Ms. Ayala returns.

—
**Ashley M. Gjøvik**
**BS, JD, PMP**

Sent with Proton Mail secure email.

On Saturday, September 14th, 2024 at 12:04 PM, EMC CRD <EMCCRD@cand.uscourts.gov> wrote:

Dear Ms. Gjøvik,

It appears your next hearing for a further case management conference is set for 2/11/2025 at 2:30 p.m. by Zoom. Please confirm with Ms. Ayala upon her return on Monday, 16, 2024 on your appearance for the scheduled Zoom conference.

Respectfully,

Jenny Galang

Relief Courtroom Deputy to

The Honorable Edward M. Chen

---

**From:** Ashley M. Gjøvik <ashleymgjovik@protonmail.com>
**Sent:** Friday, September 13, 2024 4:13 PM
**To:** EMC CRD <EMCCRD@cand.uscourts.gov>
**Subject:** RE: 3:23-cv-04597-EMC | 8/28 9:30 AM Hearing | Motion to Strike just filed

**CAUTION - EXTERNAL:**

Hello Ms. Ayala,

I hope you're doing well. I'm so sorry to bother you again.

I received a copy of the transcripts from this 8/28 hearing and was horrified to see that I was interrupting Judge Chen. I could not hear anything during those times and the video was also frozen, so I did not think he was speaking. If I knew he was speaking, I would have <u>never</u> interrupted him. I also see he asked me to confirm I understood not to interrupt him, but I didn't answer him (because I did not hear the request).

I left you a voicemail today too saying the same and that I want to ask if there is any way to send a formally apology to Judge Chen about it and explain what happened. I'm cautious to not file anything more to the docket as he seemed clear he didn't want anything else filed at this point - but I also feel horrible and am mortified that it appeared I was disrespecting Judge Chen.

Per the transcripts, there were several other exchanges where Judge Chen had asked me a question or made a comment that I did not hear related to the substantive matters as well, and it looks like no one could hear my response either around that time --- but the interruptions are the biggest issue to me. Again, <u>I am so sorry.</u>

Per the transcripts, Judge Chen has also ordered me to fly to SF and appear in person for any future hearings. If he tells me to do that, I will borrow money and find a way to do that. (I'm also concerned the disruption may have been intentional by non-court staff in the court room and I asked an US agency to look into that with the court IT group per your note below - but I don't know if they will).

I also have a question for you, please. At the end of the transcript, Judge Chen seemed to approve the next hearing being via Zoom for both parites. But earlier he said I can no longer appear via Zoom. Can you please clarify for me so I don't upset him again? Thank you.

Again, **I am so sorry.**

Respectfully,

-Ashley Gjovik

—

**Ashley M. Gjøvik**

**BS, JD, PMP**

Sent with [Proton Mail](#) secure email.

On Friday, August 30th, 2024 at 11:11 AM, EMC CRD <[EMCCRD@cand.uscourts.gov](mailto:EMCCRD@cand.uscourts.gov)> wrote:

Good Morning Ms. Gjovik,

Thank you for your email.  This problem has been reported to our IT department.

Best regards,



**Vicky L. Ayala**
Courtroom Deputy to the Honorable Edward M. Chen
United States District Court
Northern District of California
[https://cand.uscourts.gov](https://cand.uscourts.gov)
Office: 415-522-2034

---

**From:** Ashley M. Gjøvik <[ashleymgjovik@protonmail.com](mailto:ashleymgjovik@protonmail.com)>
**Sent:** Wednesday, August 28, 2024 10:20 AM
**To:** EMC CRD <[EMCCRD@cand.uscourts.gov](mailto:EMCCRD@cand.uscourts.gov)>

**Subject:** RE: 3:23-cv-04597-EMC | 8/28 9:30 AM Hearing | Motion to Strike just filed

**CAUTION - EXTERNAL:**

Thank you! I'm so sorry I couldn't hear what the Judge was saying during the hearing. I missed a lot of what the Judge said -- the audio completely cut out several times.

I asked a couple people who joined today as attendees and they also said they could not hear the Judge most of the time he was speaking to us. I thought you would want to know if you have more Zoom meetings today -- there may be an issues with the internet connection in the court room since I was not the only one impacted.

Thanks,

-Ashley

—

**Ashley M. Gjøvik**

**BS, JD, PMP**

Sent with Proton Mail secure email.

On Wednesday, August 28th, 2024 at 12:07 AM, EMC CRD <EMCCRD@cand.uscourts.gov> wrote:

Good Evening Ms. Gjovik,

Thank you for your email, I've sent your filings to the Judge.

4

Best regards,



**Vicky L. Ayala**

Courtroom Deputy to the Honorable Edward M. Chen

United States District Court

Northern District of California

https://cand.uscourts.gov

Office: 415-522-2034

---

**From:** Ashley M. Gjøvik <ashleymgjovik@protonmail.com>
**Sent:** Tuesday, August 27, 2024 5:25 PM
**To:** EMC CRD <EMCCRD@cand.uscourts.gov>; CAND EMCpo
<emcpo@cand.uscourts.gov>
**Subject:** 3:23-cv-04597-EMC | 8/28 9:30 AM Hearing | Motion to
Strike just filed

<mark>CAUTION - EXTERNAL:</mark>

Hello,

I'm so sorry for the last minute filing, but I was only notified today
that a non-party filed a document to the docket a week ago (it was
only posted a few hours ago). I drafted a Motion to Strike in
response as quickly as I could and its now filed under Docket 101.
The draft Proposed Order is attached. I scheduled it for our Motion
hearing tomorrow morning at 9:30 AM.

FYI for Ms. Ayala, and also, I just filed a Notice of Pendency for the
ARB case under Docket 100.

Thank you!

-Ashley

—

**Ashley M. Gjøvik**

**BS, JD, PMP**

Sent with [Proton Mail](#) secure email.

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when attachments or clicking on links.

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

# EXHIBIT B

$SFM - 1/3$

## Declaration of Stephen Meier

Pursuant to 28 U.S.C.§ 1746, I, Stephen Meier, hereby declare as follows:

My name is Stephen Meier. I make this Declaration based upon my personal knowledge and in support of the Plaintiff's Administrative Motion pertaining to the August 28 2024 hearing. I have personal knowledge of all facts stated in this Declaration, and if called to testify, I could and would testify competently thereto.

On August 28 2024, I viewed and listened the hearing over zoom and was unable to hear the judge for several large sections of the hearing. The audio transmission was garbled or silent and I was unable to hear the judge's statements. I also noticed that the plaintiff was appearing struggling to hear at the same time which caused confusion and chaos to the proceeding.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed on October 22, 2024. I am a long time resident of Sunnyvale California and my address is 595 Templeton Dr 94087.

Executed on: October 22, 2024

Signature:

Stephen F. Meier

$1 \text{ of } 3$

SFM -2/3

/s/ **Stephen F. Meier** SFM

**Location**: Sunnyvale CA
**Email**: stevemeier853@gmail.com
**Phone**: 408-393-8246

Stephen Meier

2 of 3

$S\text{#}M - 3/_3$

Case 3:23-cv-04597-EMC Document 104 Filed 08/28/24 Page 1 of 1

#### OFFICE OF THE CLERK
#### UNITED STATES DISTRICT COURT
#### Northern District of California

#### CIVIL MINUTES

**Date:** August 28, 2024     **Time:** 9:40-10:10        **Judge:** EDWARD M. CHEN
30 minutes

**Case No.:** 3:23-cv-04597-EMC     **Case Name:** Gjovik v. Apple Inc.

**Pro Se Plaintiff:** Ashley Gjovik
**Attorney for Defendant:** Melinda Riechert

**Deputy Clerk:** Vicky Ayala        **Court Reporter:** Kelly Shainline

#### PROCEEDINGS HELD BY ZOOM WEBINAR

Motion to Dismiss; Motion to Strike; Initial Case Management Conference – Held.

#### SUMMARY

Parties stated appearances.

Oral argument presented. Matter submitted; order to issue. The Court shall not accept any further filings related to the motion to dismiss.

The Court shall refer the case to a settlement conference with a magistrate judge (to be held within 120-150 days)

In addition, the Court shall require the parties to complete initial disclosures. However, it temporarily stays discovery pending a ruling on Apple's motion to dismiss. It makes sense to stay discovery temporarily so that the parties will have the benefit of the Court's ruling which will then inform the scope of the litigation.

Once the Court rules on Apple's motion to dismiss, then it shall allow discovery to proceed. Discovery shall be limited, for the time being, to "Phase I" discovery – i.e., discovery narrowly tailored to that needed in order for the parties to be adequately prepared for the settlement conference. The Court does not see a need for more than 1-2 depositions per side for purposes of Phase I discovery. Plaintiff indicated that she cannot afford to take depositions; that is a decision for her to make. Plaintiff cannot avoid having her deposition taken.

If the case does not settle, then the Court shall open discovery in full.

#### REFERRALS:
Case referred to Magistrate Judge for settlement conference to be completed within 120-150 days.

Stephen Meier

$3 \text{ of } 3$

Pages 1 - 24

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge Presiding

ASHLEY GJOVIK,              )
                            )
          Plaintiff,        )
                            )
   VS.                      )      **Case No. 3:23-cv-04597-EMC**
                            )
APPLE, INC.,                )
                            )
          Defendant.        )
_____    )

San Francisco, California
Wednesday, August 28, 2024

**<u>TRANSCRIPT OF PROCEEDINGS</u>**

**<u>APPEARANCES</u>**:

For Plaintiff:
                    ASHLEY M. GJOVIK, PRO SE
                    2108 N Street, Suite 4553
                    Sacramento, California  95816

For Defendant:
                    ORRICK, HERRINGTON & SUTCLIFFE
                    1000 Marsh Road
                    Menlo Park, California  94025
              BY:  **MELINDA S. RIECHERT, ATTORNEY AT LAW**

Stenographically Reported By:
Kelly Shainline, CSR No. 13476, RPR, CRR
Official Stenographic Reporter

```
 1   Wednesday - August 28, 2024                    9:39 a.m.

 2                    P R O C E E D I N G S

 3                        ---000---

 4        THE CLERK:  The Court is calling the case Gjovik vs.

 5   Apple, Inc, Case Number 23-4597.

 6        Counsel, please state -- excuse me -- please state your

 7   appearance for the record, beginning with the plaintiff.

 8        MS. GJOVIK:  I'm the plaintiff.  I'm Ashley Gjovik.

 9        THE COURT:  All right.  Thank you, Ms. Gjovik.

10        MR. RIECHERT:  Good morning, Your Honor.  Melinda

11   Riechert from Orrick representing the defendant Apple.

12        THE COURT:  All right.  Thank you, Counsel.

13        I'm not going to go through every issue here, but I have

14   some questions I want to get some clarification on.

15        One is, there's a statute -- there's a time bar issue

16   certainly with respect to, for instance, 1102.5 of the

17   whistleblower statute, and it appears, at least on the face,

18   that the complaint here is outside the limitations period, but

19   I think Ms. Gjovik has suggested that there may be some tolling

20   here, maybe equitable tolling.

21        And what I want to find out is if you have a response,

22   Ms. Gjovik, in terms of why should the limitations period be

23   tolled.  Is that because of the administrative claims filed

24   with the Department of Labor?  Or what's your response to that?

25        MS. GJOVIK:  I'm sorry, Your Honor.  The 1102.5, I
```

3

1    don't think the statute of limitations expired other than the

2    issue they raised about the penalty.  Are you asking about the

3    penalty?

4             THE COURT:  Yeah, the civil penalty.

5             MS. GJOVIK:  Okay.  I could not find a lot of law

6    about whether that penalty would apply or not outside a PAGA

7    lawsuit, so I don't know if it's decided or not.  If it doesn't

8    apply or if the statute of limitations expired, that is what it

9    is.

10        But I -- you know, I was in the administrative process for

11   over two years.  I filed the charges on time.  They're just

12   really behind on their cases.  They said they're, like,

13   four years behind.  So that, you know, delayed my decision to

14   file a civil lawsuit.

15            THE COURT:  All right.  Let me ask Ms. Riechert.  To

16   the extent that there is a potential tolling issue based on

17   Ms. Gjovik's filing an administrative claim that has taken some

18   time, is that not a classic basis for equitable tolling?

19            MR. RIECHERT:  Are we talking about the civil

20   penalties on the one-year statute of limitations?

21            THE COURT:  Yeah, the civil penalty.

22            MR. RIECHERT:  I was not aware that was an issue that

23   was pending before this Court.  I'm sorry if I missed it in the

24   papers.

25            THE COURT:  Well, maybe --

4

1    **MR. RIECHERT:** My understanding is it's a one-year

2    statute of limitations. If it was a PAGA case, then it would

3    be tolled for the 65 days, but I didn't understand that there

4    was an argument being made that that one-year statute --

5    **THE COURT:** Well, that's kind of a small part of this.

6    It only pertains to the civil penalty. I understand that there

7    are other issues with respect to scope and all that sort of

8    stuff, which I'm aware of and have read the briefing.

9    Let me ask a question about the claim under 63 -- 6310,

10   which has to do with exposure to hazardous substances resulting

11   from I think, quote, "workplace operations."

12   And I think there's a construction question here whether

13   sort of vapors from the -- I don't know, from the soil or from

14   the ground or from environmental conditions, not from the

15   actual operation of machinery and that sort of thing, can that

16   constitute exposure to hazardous substance from workplace

17   operations within the meaning of the statute.

18   And I'd like to hear just a brief response, maybe first

19   from Ms. Riechert, given the sort of broad remedial purpose of

20   the statute, why shouldn't that include sort of exposure to

21   toxic substances in the environment of the workplace be it an

22   office, be it a factory, even though it doesn't emanate from

23   any workplace machinery or computers and that sort of thing?

24   **MR. RIECHERT:** I think this is the fourth cause of

25   action under the Hazardous Substances Information and Training

1  Act; is that correct, Your Honor?

2        **THE COURT:** Yes.

3        **MR. RIECHERT:** Yeah. She was not granted leave to

4  amend to add that cause of action, so I would like to make that

5  as my first point. You granted leave to fix the prior problems

6  in the third and second and first amended complaint.

7        **THE COURT:** That's right. I didn't allow a standalone

8  action, but I think it's incorporated under the 6399.7 still

9  and, therefore, it still may be at play. We may still have to

10  reach the issue because if it's -- if it doesn't have merit to

11  it, then the 6399.7 claim under Labor Code doesn't apply. So

12  I'm not sure I can avoid the statutory construction question.

13        **MR. RIECHERT:** So my understanding is that she has to

14  allege that she actually complained about substances that were

15  present at 825 Stewart and that those substances were due to

16  workplace operations.

17      But what she says in the complaint is that they were not

18  due to workplace operations, but due to prior issues that had

19  existed on the property. And so I don't believe that there's

20  an allegation in the complaint that there were any complaints

21  of substances that were present at 825 Stewart that were due to

22  workplace operations.

23      She says, for example, that she was concerned about

24  substances that were potentially present at 825 Stewart

25  prior -- due to contamination by prior tenants and owners, not

1   the work of Apple.

2        **THE COURT:** So she complained about the exposure, but

3   the main point, your point, is that this was not exposure to a

4   workplace operation, these are prior preexisting conditions?

5   Is that your --

6        **MR. RIECHERT:** Right. And she doesn't say -- give any

7   detail on who she complained to or when she complained or what

8   she complained about, which would be another point; but, yes,

9   it was also that it was not due to workplace operations, which

10   is what is required.

11        **THE COURT:** All right. Ms. Gjovik, your response.

12        **MS. GJOVIK:** Yeah, I have three points. The first one

13   is this claim has been in the complaint since the very first

14   complaint. It's not new. I did organize the cover page a

15   little bit, and I'm sorry if that was not allowed, but this has

16   always been there. This is a core claim.

17      The second part is I definitely did complain about

18   substances that even Apple itself had argued was not part of

19   the remediation. There was air tests that came back with high

20   levels of toluene and ethyl benzene. When I was asking about

21   it, they said it's not part of the superfund site; it must be

22   part of something at the office.

23      So there were specific complaints made in writing, and

24   those were things I raised to the EPA of, "Hey, there were

25   these chemicals too. It sounds like they might be in the

1  plume, the larger plume.  Is that part of our workplace or is

2  that part of the remediation?"

3       And then my third point, which is a much bigger issue and

4  I briefed in depth in the surreply, I did a bunch of statutory

5  analysis and reviewed the whole California statutory scheme

6  around HazCom and HAZWOPER, and I actually learned something

7  about HAZWOPER, which is a complement to the HazCom, the

8  right-to-know material data safety sheet, that more standard

9  one that people are familiar with.

10      HAZWOPER is specific for mediation sites.  There's a

11 federal OSHA version and there's a California OSHA version, and

12 both of them required Apple to inform us we were on a superfund

13 site and provide at least 24 hours of training per person

14 regardless of whether they think there's activate intrusion or

15 not.  That was actually inquired by law, so I went and detailed

16 that, and HAZWOPER does apply to this Hazardous Substance and

17 Training Act.  It's not just HazCom.

18      **THE COURT:**  Ms. Gjovik, I'm going to ask you to slow

19 down a bit because we have a court reporter and you're speaking

20 so fast that it's not -- I'm having trouble understanding you

21 as well, so you need to slow down.  Go ahead.

22      **MS. GJOVIK:**  So the third point is there's this law

23 called HAZWOPER, H-A-Z-W-O-P-E-R.  It's an abbreviation for the

24 idea of a haz communications, hazard communications, but at

25 remediation sites.  The statute itself says MPL superfund sites

1  are covered by this. Regardless of whether the tenant or

2  responsible party thinks that they're making progress, they're

3  not.

4      It's also very specific that you cannot try to claim that

5  you don't have to tell your employees at the office that

6  they're not being exposed because you're not testing or you

7  don't have data. Like, if there's still a potential risk, you

8  still have to inform them. You have to train them. You have

9  to -- there's a health and safety plan that was supposed to be

10  created.

11      And the California statutory framework makes it very clear

12  that this HAZWOPER also clearly applies under 6377.9. And

13  there's also, I think, one of the biggest call-outs is that

14  statute that we're talking about uses the term "substances,"

15  "hazardous substances." When you go and look at HazCom, they

16  don't say "hazardous substances"; they say "hazardous

17  chemicals." HAZWOPER will define hazardous substances as both

18  chemicals and waste specifically.

19        **THE COURT:** How does this -- hold on a second.

20        **MS. GJOVIK:** So there are interpretations that the

21  terminology used --

22        **THE COURT:** Ms. Gjovik --

23        **MS. GJOVIK:** -- in the specific statute includes

24  hazardous waste.

25        **THE COURT:** Ms. Gjovik, hold on for a second.

9

1　　　　What you are talking about, how does that relate to

2　Section 6310, which is the question I had?  You are reciting

3　now other things as a basis for a 6399.7.  I'm asking about the

4　6310, which is the subject of this motion.

5　　　　**MS. GJOVIK:**  Yeah, so that -- this statute is about

6　right to know, which is what HAZWOPER is.  Your employees have

7　a right to know they're on a remediation site, they have a

8　right to know that there are these dangers around them.

9　They're supposed to receive training, formal training.  They're

10　supposed to have plans.  This all goes to that right to know.

11　　　　And in that surreply where I briefed all of this, I also

12　included extensive quotes of complaints.  I sent to Apple an

13　e-mail on these topics.  Again, them claiming that I didn't

14　have in the complaint is them playing games that because I had

15　to shorten the page length, I wasn't able to detail this, but

16　all of this exists.  And so I detailed those specific claims

17　about Proposition 65 and disclosures and right to know.

18　　　　It was something I disclosed to Apple, I raised to the EPA

19　because I was not satisfied with Apple's answers.  I informed

20　Apple I was escalating to the EPA.  This was a huge issue.

21　　　　**THE COURT:**  All right.  Let me give Ms. Riechert a

22　chance to respond, if you have a response.

23　　　　**MR. RIECHERT:**  Yeah, I'm still trying to focus is the

24　arguments that she's making.  I'm focusing on the allegations

25　in the complaint, not things that were in the surreply, which

```
 1    was stricken, or other things.
 2         And looking at the allegations in the complaint, I'll be
 3    focusing on the claim of hazardous substances in the fourth
 4    cause of action.  Is that what we're talking about?  Because,
 5    again, I would say she hasn't shown who she complained to.  She
 6    hasn't shown that they were in the workplace; and, in fact, she
 7    says they were not in the workplace.
 8         MS. GJOVIK:  But they're in the workplace.  The
 9    statute defines that as workplace if you're working on a
10    remediation site, and I have briefed these in detail.
11    Your Honor, the surreply also included some of this briefing as
12    proposed supplements if Apple was to try this game of it wasn't
13    in this version of the complaint due to the page length, so
14    let's pretend it doesn't exist.  It does exist.  There's
15    evidence, there's concrete --
16         THE COURT:  Well, hold on for a second.  I have a
17    specific question for you.
18         The statute talks about workplace operations, as I
19    understand it, not just workplace.  So the term "operations"
20    must mean something.  Why -- just workplace, exposure in the
21    workplace, then you have a broader argument, but it says
22    "exposure from workplace operations."  That suggests that
23    there's -- it's not just something that was preexisting having
24    nothing do with the actual nature of the workplace operation
25    but nature of the site.  So why shouldn't the Court find
```

```
 1    there's a distinction between the word "workplace," which is

 2    unqualified, and you can't --

 3              MS. GJOVIK:  So this is actually defined --

 4              THE COURT:  Hold on.  Hold on.

 5              MS. GJOVIK:  -- in the statutory analysis that they --

 6              THE COURT:  Hold on.

 7              MS. GJOVIK:  -- that they also said there were --

 8              THE COURT:  Hold on.  Ms. Gjovik, Ms. Gjovik I'm going

 9    to cut you off.

10              MS. GJOVIK:  -- interpretations that "operations" --

11              THE COURT:  Ma'am --

12              MS. GJOVIK:  -- means workplace.

13              THE COURT:  Ma'am, I'm going to cut you off if you

14    don't let me speak.  And next time I'm going to have you here

15    in court because you're not listening to me.  You are talking

16    over me.  You are not to do that.  Do you understand?

17              MS. GJOVIK:  I couldn't hear anything you just said.

18    I'm sorry, Your Honor.

19              THE COURT:  You are not to talk over me.  I'm asking

20    you a question and you talked over me.  So the next time we

21    have a hearing, I'm going to make you come here into court.

22         I asked you a specific question.  Why does the statute say

23    "workplace operations" and not just "workplace"?  Why shouldn't

24    that mean that the exposure must come from operations and not

25    from preexisting ambient conditions?
```

1    **MS. GJOVIK:**  I'm so sorry, Your Honor.  You're -- I'm

2  only hearing a couple words.

3       But the operations, it is defined in the statutory

4  interpretation from the government as having employees assigned

5  to work in that office, and through their operations they

6  potentially could be exposed to --

7    **THE COURT:**  What's your citation for that?  What's

8  your citation for you said the government defines "operations"

9  in such a way?  Do you have a regulation or a statute?  What is

10  it?

11    **MS. GJOVIK:**  In the surreply I briefed this with the

12  statutes, the quotes, the citing the interpretations from the

13  agencies.  They've been very clear that just because an

14  employer is a tenant at a remediation site, that does not give

15  them an excuse to not train their employees and inform their

16  employees of the potential risks under the right-to-know rules.

17    **THE COURT:**  All right.  Let me ask one final question

18  I have, and that is this:  With respect to the private

19  nuisance, which is this limitation period is governed by what

20  we call the discovery rule, the question here is it's clear

21  that you knew about toxic exposure in your apartment.  You

22  had -- you know, you wrote about it.  You had things measured.

23  What you didn't know was the source.

24       So my question is:  How -- when and how did you find out

25  that ARIA was the alleged source of the exposure here and not,

1   for instance, your apartment itself?

2       **MS. GJOVIK:** Yeah, so this is also something I briefed

3   in depth because I was worried about this. So I have -- and

4   the e-mail where I discovered it. I discovered it through

5   public records requests that were not targeted at that

6   building. It was just public records requests about Apple

7   buildings generally. I was doing an analysis of it seems like

8   they have a lot of violations in their Santa Clara County

9   buildings.

10     Through that public record request, I got a list of

11   permits that only because I worked in hardware engineering did

12   I recognize those permits were for semiconductor fabrication

13   tools. Semiconductor fabrication is a very, very dangerous

14   thing. I had a visceral reaction. I shared it online. Other

15   people had a visceral reaction from people that know what

16   semiconductor fab is.

17     Apple had not filed permits saying it was semiconductor

18   fab. Apple had not filed reports that they were emitting

19   chemicals when I was looking in 2020. The government also,

20   multiple agencies, investigated with me to try to figure out if

21   there could be a source, and they could not find anything.

22     The article I wrote ended with frustration that no one

23   could figure it out. I was really worried other people could

24   be getting hurt and we need a better solution, but I had no

25   answer.

1    I also cited in the surreply there's case law that says

2  that even if you discover one potential vector, one potential

3  misconduct, that doesn't start the limitations for all for

4  discovery.  So the example I think was a medical surgery one.

5    But the fact that I knew there was a remediation site,

6  there could be vapor intrusion, does not start the accrual for

7  Apple operating a secret semiconductor fabrications plant

8  without filing any of the paperwork or signage or any way for

9  us to know.  Those would be potentially two separate acts of

10  misconduct with two separate parties.

11    **THE COURT:**  So when did you discover that this was the

12  source?

13    **MS. GJOVIK:**  I discovered it in January 2023.

14    **THE COURT:**  All right.  So let me ask Ms. Riechert.

15  Why shouldn't the limitations period not run until -- in this

16  case until that was discovered so long as the plaintiff

17  exercised due diligence?  This is not an easy source to

18  discover under the discovery rule.  I think plaintiff normally

19  gets a benefit so long as they exercise due diligence.  Why

20  isn't that a factual question here?

21    **MR. RIECHERT:**  So, first of all, you only have to know

22  that you've got -- been injured.  The case law, including the

23  *Bernson* case at 7 Cal.App. 4th 932 and the *Norgart* case that we

24  cited in our papers, show that ignorance of the identity of the

25  wrongdoer does not toll the statute of limitations.

15

```
1          THE COURT:  So there's a difference between cases
2    where you know, you know, if you've been injured in a hospital
3    or you've been injured by a number of police officers
4    effectuating an arrest or the brakes, you know that the car
5    didn't stop.  You may not know the mechanism, you may not know
6    who was the manufacturer, you may not know which doctor, you
7    may not know which of the police officers, but at least you
8    know the general source.
9          Here, there's a more fundamental question and that is, if
10   there is, in fact, exposure to toxic chemicals, but you don't
11   know the source.  Particularly if it's airborne, that seems to
12   me qualitatively a different kind of animal.
13         MR. RIECHERT:  Right, but she alleged in paragraph 184
14   of her second amended complaint that in September of 2020 she
15   was aware that Apple had a facility at the Scott building and
16   she'd previously alleged that in September 2020 she was aware
17   that the Scott building was registered with the EPA for toxic
18   releases, and then she started researching at that time that
19   information.  So we believe that that is sufficient to prevent
20   the delayed discovery.
21         THE COURT:  All right.  So now there's evidence,
22   there's an allegation, she had specific information that with
23   due diligence would have led to sufficient information to start
24   the limitations period at least sometime shortly thereafter.
25         MR. RIECHERT:  That is correct.
```

1     THE COURT:  All right.  Ms. Gjovik.

2          MS. GJOVIK:  So I responded to this in depth, and I

3     included a copy of that TRI report that I saw on that date in

4     2020.  It said there had been no TRI filings since the 1990s.

5          I was telling Apple I saw the TRI filings, so they even

6     knew how I knew it was an Apple building because it was

7     stealth.  So I told them I saw it was registered with this.

8     That's how I know it's Apple, but Apple had filed no paperwork

9     saying there were releases.

10         So, in fact, I think this is evidence that I did a lot of

11    due diligence.  I evaluated a lot of buildings and, in fact,

12    this is on Apple now with a potential fraud tolling that when I

13    reached out to them and told them what was going on and I

14    identified that building, they said nothing to me about their

15    operations and, actually, I would argue misled me to get me

16    fixated on the vapor intrusion and not think about active

17    releases from facilities and operation now.

18         MR. RIECHERT:  But that's inconsistent with 184's --

19    paragraph 184 of the second amended complaint where she said

20    she was aware that the Scott building was registered with the

21    EPA for toxic releases in September 2020.

22         THE COURT:  All right.  I will --

23         MS. GJOVIK:  That's not filing reports of releases.

24    They didn't file any.

25         THE COURT:  Well, the question is in the exercise of

1  due diligence, when you should have given the information you

2  had, you should have discovered or actually discovered, and so

3  I will have to look at both the allegations.

4      This is of the second amended complaint you say,

5  Ms. Riechert?

6          **MR. RIECHERT:**  That's correct, Your Honor.

7          **THE COURT:**  And it doesn't appear in the fourth?

8          **MR. RIECHERT:**  Right.  It's in Docket 32, page 32.

9          **THE COURT:**  All right.  But you would argue that's

10  admissible for purposes of a motion to dismiss because it's a

11  pleading?

12          **MR. RIECHERT:**  That is correct, Your Honor.

13          **THE COURT:**  All right.

14          **MS. GJOVIK:**  Your Honor, I'd ask for a chance to

15  respond to that.  I did respond in my surreply, so if you're

16  willing to reconsider it.  They're kind of sneak attacking this

17  without giving me a chance to respond.

18          **THE COURT:**  No.  She's only responding to my

19  questions, and so -- and it's a question that was fairly

20  anticipated and I'm going to base it on the pleadings that I

21  have.  I'm not going to allow any more filings unless I ask for

22  it at this point.

23      So I will take the matter under submission.  Thank you.

24      Call the next case.

25          **MR. RIECHERT:**  Your Honor, we did have a case

1  management conference today on calendar.

2      **THE COURT:**  All right.  Well, let's talk about that.

3      So what's your view of the next step?  I mean, obviously I

4  have to rule on these pleadings so there's only so much we can

5  do, but what -- do you have some suggestion as to next steps?

6      **MR. RIECHERT:**  Yeah.  So at the last hearing you asked

7  us to do the Rule 26 disclosures --

8      **THE COURT:**  Yes.

9      **MR. RIECHERT:**  -- and that is due September the 16th.

10     And then once we get a ruling on the motion to dismiss,

11 then I think we will be ready to move forward on what we hope

12 is just the retaliation for complaining part of the case, which

13 is what Your Honor has said is the gist of this case.  She

14 complained, she was fired; therefore, she was fired for

15 complaining.

16     That's what we think this case is about and should be

17 about, and we're trying to get it narrowed so that there are

18 not disputes on discovery, which we anticipate if we don't get

19 a very clear statement of what this case is about.

20     **THE COURT:**  All right.  Well, I'm going to require

21 that at least the disclosures, because that's not that

22 burdensome, proceed as we go.

23     With respect to discovery, although I normally don't stay

24 discovery pending a motion to dismiss, here it's sort of

25 fundamental, and I think given the breadth of the complaint, I

1    am going to stay discovery until I rule so you-all know what

2    the scope of this case is.  But once I do, I'm going to order

3    that discovery commence forthwith and that the discovery plan

4    be negotiated, et cetera, et cetera.

5        But I will suspend that for now, but once I decide what's

6    in this case, I will order that discovery commence.  I would

7    like you pursuant to Rule 16, Rule 26, to work out a discovery

8    plan.

9        Remind me about what did we talk about in terms of any

10   ADR.

11       **MR. RIECHERT:**  What we talked about is the -- we

12   wanting to have ADR.  We've agreed to have a settlement

13   conference with a magistrate judge.  We would like to do that

14   after we've taken the plaintiff's deposition.

15       The plaintiff has said in her case management conference

16   statement that she would prefer ENE.  We do think a settlement

17   conference is better with a magistrate judge.

18       **THE COURT:**  All right.  Ms. Gjovik, your thought about

19   ADR?

20       **MS. GJOVIK:**  Yeah, I do not have -- I've not seen any

21   actions from the defendant that they actually have any

22   intention to settle.  I actually think they're avoiding ENE,

23   and there's been major issues with just basic disclosures.

24   They still haven't even told me who fired me, which, in their

25   own words, is the core of this case.  I still don't know who

1   made that decision, and they won't tell me.

2      So I have very little information.  I don't think they

3   want to say.  I think ENE would be helpful for a sanity check,

4   and I really don't feel comfortable participating in a

5   settlement conference if they have no intention to settle.  I

6   think that, you know, maybe they're just trying to get

7   information out of me or whatever.

8      I've also given them some counteroffers of what settlement

9   could look like if they're ready, and they never even responded

10   to my e-mails.

11      And I feel like there's been a lot of personal attacks and

12   harassment against me, and I raised the demand to have a

13   deposition before even considering settling without even giving

14   me this information feels like harassment, and I want to see if

15   I can exercise my victim of crime rights to say "no" or put

16   some boundaries around what that deposition would look like.

17      **THE COURT:**  Well, the way it works, Ms. Gjovik, is

18   once I decide on a form of ADR, which could be a magistrate

19   judge settlement conference, I will direct the parties to come

20   up with a pre-ADR discovery plan, which I'll call Phase 1,

21   which often does involve the deposition of key people.  I try

22   to limit the number of depositions to keep costs down.

23      But you being the plaintiff would normally be subject to a

24   deposition and notwithstanding your objections, that's the kind

25   of thing I would allow.  It's the kind of thing that happens in

1    every case.

2        And you, conversely, have the right to take perhaps one or

3    two depositions of key people.  You could take what's called a

4    30(b)(6) deposition where -- on designated topics if they're

5    well defined, et cetera, et cetera.

6        But that's the kind of thing that I would ask the parties

7    to sit down and work out and come up with what I call sort of

8    Phase 1 basic discovery, enough information so that you can go

9    into some form of ADR with some educated basis.

10       Now, the form of ADR sounds like you favor ENE.  The Apple

11   is favoring magistrate judge settlement conference.  I think

12   because of the self-represented nature of this case and the

13   complexity of this case, this is appropriate for a magistrate

14   judge settlement conference because it can be more

15   comprehensive, and I think it's appropriate for this kind of

16   case.

17       What I'm going to do -- I've got to rule on this issue

18   first and, yet, I know it takes time to get to a magistrate

19   judge.  So what I'm going to do is start the wheels turning by

20   putting this for assignment for a magistrate judge settlement

21   conference to be held within I'll say 120 days or as long as

22   150 days because that's often how long it's taking now, but I

23   want to get it on the wheel now.

24       Once I rule on the pending motion, I'm going to direct the

25   parties to start that discovery process, but the first thing to

```
 1   do would be to decide on what discovery, presettlement
 2   conference Phase 1 ADR-related discovery, that you can agree
 3   on, and my expectation is that would be in the nature of one or
 4   two depositions apiece.
 5           MS. GJOVIK:  I can't afford any, Your Honor.  I
 6   mentioned that.  I don't have any resources, so I'm not
 7   planning on taking any because of that.
 8           THE COURT:  Okay.  Well, that's up to you, but you
 9   have the right to if you want.
10       But I'd like you-all to meet and confer once I issue the
11   decision on the pending motion to get ready so that you can be
12   prepared to go before a magistrate judge for a settlement
13   conference anywhere from four to five months out.  That should
14   give you some time.  Hopefully I'll get a ruling out in the
15   next week or two in this matter.
16       So I'll set that wheel going, and let's set a further
17   status conference for, let's say, 150 days out, five months
18   out, Vicki.
19           THE CLERK:  Let me get you a date.
20                   (Pause in proceedings.)
21           THE CLERK:  February 4th at 2:30?
22           THE COURT:  Let's see, can we do the week after?  I
23   may be...
24           THE CLERK:  Sure.  February 11th at 2:30?
25           THE COURT:  February 11th at 2:30.
```

1    MS. GJOVIK:  Your Honor?

2    THE COURT:  Pardon?

3    MS. GJOVIK:  Would you be willing to perhaps allow me

4  to file a, like, 10-page brief on the key things we talked

5  about just so I can point out those laws I was trying to cite,

6  that there are --

7    THE COURT:  No, I'm not going to take any more.

8  There's been a lot of briefing on this and everybody's had

9  their chance, and so I'm going to base it on the briefing that

10  I have.

11    MS. GJOVIK:  Okay.

12    THE COURT:  So the matter is submitted.  Thank you.

13    MR. RIECHERT:  February the 11th at 2:30, Your Honor?

14    THE COURT:  Yes.

15    MR. RIECHERT:  And I should appear in person and

16  Ms. Gjovik can appear by Zoom?

17    THE COURT:  Same thing, yeah.

18    MR. RIECHERT:  Thank you, Your Honor.

19    THE COURT:  For the status conference, yes.

20    THE CLERK:  The status conference is going to be in

21  person for defense counsel?

22    THE COURT:  Actually, we can do that -- for status

23  conference, we can do that all by virtual.

24    MR. RIECHERT:  Okay.  And do we -- I can check the

25  rules, but do we file statements?

1    THE COURT:  A week before --

2    MR. RIECHERT:  Yeah.

3    THE COURT:  -- CMC statement.

4    All right.  Thank you.

5    MS. GJOVIK:  Thank you, Your Honor.

6    MR. RIECHERT:  Thank you.

7    (Proceedings adjourned at 10:08 a.m.)

8    ---oOo---

```
1
2
3                    CERTIFICATE OF REPORTER

4           I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:    Monday, September 2, 2024

8

9

10

11    _____

12           Kelly Shainline, CSR No. 13476, RPR, CRR
                      U.S. Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25
```

Pages 1 - 22

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

```
ASHLEY GJOVIK,              )
                           )
          Plaintiff,        )
                           )
  VS.                       )      NO. 23-CV-04597-EMC
                           )
APPLE, INC.,                )
                           )
          Defendant.        )
_____)
```

San Francisco, California
Tuesday, July 16, 2024

<u>TRANSCRIPT OF REMOTE ZOOM VIDEOCONFERENCE PROCEEDINGS</u>

<u>APPEARANCES:</u>

For Plaintiff:

ASHLEY M. GJOVIK, PRO SE
2108 N Street, Suite 4553
Sacramento, CA 95816

For Defendant:

ORRICK, HERRINGTON & SUTCLIFFE LLP
405 Howard Street, 7th Floor
San Francisco, CA 94105
BY:  KATHRYN G. MANTOAN, ATTORNEY AT LAW

ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025
BY:  MELINDA S. RIECHERT, ATTORNEY AT LAW

REPORTED REMOTELY BY:  Kendra A. Steppler, RPR, CRR
Official United States Reporter

```
 1   Tuesday - July 16, 2024                      1:30 p.m.

 2                   P R O C E E D I N G S

 3                       ---oOo---

 4        THE COURTROOM DEPUTY:  These proceedings are being

 5   recorded by this court.  Any other recording of this

 6   proceeding, either by audio, video, including screenshots or

 7   any other copying of the hearing, is strictly prohibited.

 8        This Court is now in session, the Honorable Edward M. Chen

 9   presiding.

10        Court is calling the case Gjovik v. Apple, Inc., Case

11   Number 23-4597.

12        Please state your appearance for the record, beginning

13   with the plaintiff.

14        MS. GJOVIK:  Hi, I'm Ashley Gjovik.  I'm the

15   plaintiff.

16        THE COURT:  All right.  Good afternoon, Ms. Gjovik.

17        MS. GJOVIK:  Good afternoon.

18        MS. RIECHERT:  Melinda Riechert appearing for the

19   defendant, Apple.

20        THE COURT:  All right.  Good afternoon, Ms. Reichert.

21        MS. MANTOAN:  And Katie Mantoan, also from Orrick,

22   also appearing for Apple.

23        THE COURT:  All right.

24        MS. MANTOAN:  Thank you.

25        THE COURT:  Thank you, Ms. Mantoan.
```

1          I understand that defendants have just filed, maybe

2     yesterday, a motion to dismiss the most recent complaint; is

3     that correct?

4               MS. RIECHERT:  That's correct, Your Honor.

5               THE COURT:  And does it seek dismissal -- I haven't

6     had a chance to really look at it -- does it seek dismissal of

7     some or all claims?

8               MS. RIECHERT:  Some, Your Honor, not all.

9               THE COURT:  Okay.

10               MS. RIECHERT:  It keeps the employment claims in,

11     essentially.

12               THE COURT:  Employment claims.  Okay.  So -- and

13     what's -- so far -- as I understand it, what's been produced so

14     far are things primarily along the lines of General Order 71 on

15     the employment side.  Is that what's -- maybe if someone can

16     bring me up to date just roughly --

17               MS. GJOVIK:  Yeah.

18               THE COURT:  -- what's been produced so far.

19               MS. GJOVIK:  I didn't believe that General Order 71

20     applied, because the website for the court says it would be

21     added to the docket.  And I found other cases where it was

22     specifically noted in the docket and said if it's not noted, it

23     doesn't apply.

24          I was also really worried that if we did the General

25     Order 71, it could interfere with the nonemployment claims.

```
 1   That we wouldn't have the normal procedure with the -- all the
 2   claims in the case.
 3          THE COURT:  Well, let me ask the defendants, then,
 4   what's your view -- we have sort of concurrent sets of claims.
 5   Some are employment related that might fall under, in a
 6   traditional situation, General Order 71.  But then there are
 7   environmental and other claims, as well.
 8      What's your vision of how 71 and the rest of discovery --
 9   putting aside the question about the stay -- but once
10   discovery -- if there are employment claims remaining and if
11   there are, for lack of a better word, environmental claims,
12   should -- should General Order 71 apply alongside of normal
13   discovery, or how do you -- how does the defendant see it?
14          MS. RIECHERT:  Yeah.  We believe that General Order 71
15   applies.  If there are employment claims, there are employment
16   claims, and, therefore, we believe General Order 71 applies.
17   We complied with General Order 71 with respect to the
18   employment claims.  The nonemployment claims are the ones that
19   are subject to the motion to dismiss.
20          THE COURT:  Okay.
21          MS. GJOVIK:  May -- may I --
22          THE COURT:  Yeah.
23          MS. GJOVIK:  Thank you, Your Honor.
24      I just want to say, if General Order 71 was to apply,
25   whether it actually did or we just decide to apply it, I would
```

(88 of 131), Page 88 of 131 Case: 25-2028, 05/09/2025, DktEntry: 17.4, Page 88 of 131
Case 3:23-cv-04597-EMC   Document 88   Filed 08/05/24   Page 5 of 22

5

 1  say that the defendant has not completed all the disclosures

 2  listed on that page.  There's a lot of stuff I haven't received

 3  yet.  So whether or not it applies, I think there's still more

 4  to do --

 5          THE COURT:  Okay.

 6          MS. GJOVIK:  -- even under that umbrella.

 7          THE COURT:  Okay.  Let me ask about the defendant's

 8  position with respect to the stay.  If -- the motion to dismiss

 9  is directed, you say, at the nonemployment-related claims; is

10  that correct, Ms. Riechert?

11          MS. RIECHERT:  That's correct, largely.

12          THE COURT:  Is there -- there's -- so there's no

13  reason to halt the GO 71 process, at least in these early

14  stages; is there?

15          MS. RIECHERT:  There is none.  And that's why we

16  complied with it.

17          THE COURT:  Okay.  And so the kind of discovery that

18  you think should be delayed because of the pendency -- what are

19  you anticipating that that would look like?  Or what kinds of

20  things that -- would be coming -- you anticipate coming your

21  way -- that you would like to defer until the ruling on the

22  pleadings?

23          MS. RIECHERT:  Anything that's not related to the

24  employment claims that are not the subject to the motion to

25  dismiss.  We don't see there's any benefit to doing discovery

1    on a claim that we believe should be dismissed.

2                THE COURT:  Well --

3                MS. RIECHERT:  We'd like you to rule on the motion to

4    dismiss, and then we can do the discovery.

5                THE COURT:  All right.  Well, let me ask you -- I

6    mean, it is -- I hear this from defendants often, that we'd

7    like to defer discovery until the pleadings are settled.  And

8    my usual response is, well, that's not the typical way it's

9    done, unless there's something pretty extraordinary, like

10   there's an obvious statute of limitations problem or a standing

11   problem.

12        What I typically do is say, well, let's -- let's keep --

13   take into account that there is a pending motion.  But

14   perhaps -- that there can be the commencement of some

15   high-level discovery that's not cost-prohibitive but at least

16   sort of gets the balling rolling, whether it's some basic, you

17   know, fundamental document productions that are not extremely

18   voluminous or -- you know -- I don't know.  But, I mean, it

19   wouldn't be depositions and that kind of thing, at this point,

20   but kind of just to start that process.

21        And, you know, the discussions -- if this is one of those

22   cases where there's a lot of digital documents and searching --

23   you know -- the usual discussion about what the scope of the

24   search is going to be, what documents are retained, how many

25   custodians, et cetera -- I don't see why those kinds of

1  early -- the kinds of things you'd do in the first 60 days, or

2  so, to kind of, you know, lay the groundwork without getting

3  into deep, extensive discovery, which will come if those claims

4  survive.

5      So my inclination is -- I'll call it sort of a staging

6  process, not a complete halt.  On the other hand, the door's

7  not wide open.  But at least get some of the preliminaries

8  done, the groundwork, maybe some basic requests.  I mean, there

9  is the early disclosures.  I don't know if -- you know -- I

10  mean, the Rule 26 disclosures probably should proceed.

11          MS. RIECHERT:  We've done those, as well, Your Honor.

12          THE COURT:  Okay.

13          MS. GJOVIK:  Only for employment though.  They did not

14  do it for any of the other claims.

15          THE COURT:  All right.  Well --

16          MS. RIECHERT:  So -- so we think that the -- between

17  the GO 71 disclosures -- we also have the companion Department

18  of Labor case, and we're going through discovery on that case,

19  as well.  So we just -- we're fine with doing discovery on the

20  employment cases.  We believe that -- on the employment

21  claims -- we believe we're doing that -- have done that.  It's

22  the nonemployment claims that we think should be dismissed,

23  that we don't want to open discovery, because that would be a

24  whole additional area of discovery that we don't think is

25  necessary at this stage.

```
 1              THE COURT:  All right.
 2              MS. RIECHERT:  The motion will be ruled on I would
 3     think in a month or so.
 4              THE COURT:  Well --
 5              MS. GJOVIK:  Your Honor, I was hoping to get your --
 6     sorry, go ahead.
 7              THE COURT:  Go ahead.  Go ahead.
 8              MS. GJOVIK:  I was hoping to get your guidance today,
 9     because I'm very confused by the motion Apple filed.  And I'm
10     new here.  This is my first lawsuit.  But it looks like they're
11     rechallenging some of the decisions you already made under
12     this --
13              THE COURT:  Oh, well, I haven't looked at it, so I
14     can't --
15              MS. GJOVIK:  Okay.
16              THE COURT:  I'm not in a position to give you
17     guidance.  I mean, if you feel that there's some parts of that
18     that are improper for some reason, you can -- that can be part
19     of your response.  But, frankly, I haven't -- I haven't looked
20     at it.  It just got filed yesterday.
21              MS. GJOVIK:  Understood.
22              THE COURT:  And normally --
23              MS. GJOVIK:  My thought, though, is they're
24     challenging ultrahazardous under the exact same theory that
25     they did last time that you already approved to go forward.
```

```
1    And then they had waived nuisance, because they didn't

2    challenge nuisance, but now they're challenging it.

3         So I agree with your staging, and that's probably

4    practically right too, but I also am kind of worried about

5    halting everything else if it seems unlikely, procedurally,

6    that they would even be considered.

7              THE COURT:  Well, I'm not going to weigh in, because I

8    haven't looked at it on the potential merits.  But my usual

9    rule -- which I will apply here because I think there's a low

10   cost -- and that is I do want to start the wheels -- the

11   gears -- turning on the nonemployment stuff.  I'd like you to

12   meet and confer to talk about --

13             MS. RIECHERT:  On the employment stuff?

14             THE COURT:  On the nonemployment stuff.  The

15   employment stuff will be covered by General Order 71 --

16             MS. RIECHERT:  Okay.

17             THE COURT:  -- in the early disclosures.  I think

18   there should be the early disclosures on the nonemployment

19   stuff.  And I'd like you to meet and confer to talk about, you

20   know, sort of a -- what discovery -- high-level discovery --

21   might look like over the next, let's say, 60 days.  Then maybe

22   a handful of key documents that could be exchanged or that

23   could be sought.  Information about document retention, if

24   that's an issue -- what's available and what -- you know --

25   what the lay of the land is in terms of access to
```

 1  documentation.

 2      So I think a fair amount can be accomplished without

 3  getting deep into discovery in the next 60 days while I have a

 4  chance to look at the motion and then hopefully rule on it

 5  quickly.  And then we can decide.  If I decide to dismiss all

 6  those claims, then there wouldn't be a whole lot of time

 7  invested in it.  A little bit.  But at least it opens the door

 8  then.  If there's some claims that survive, we'd be set up to

 9  go to the next stage.  So I'd like you to meet and confer

10  about -- I call it "Stage 1."

11          MS. RIECHERT:  Your Honor, if I might speak briefly on

12  that subject --

13          THE COURT:  Yeah.

14          MS. RIECHERT:  -- with respect to the meet-and-confer.

15  We did meet-and-confer with the plaintiff with respect to the

16  motion to dismiss.  The plaintiff wanted to record that call.

17  We said that we did not.  I declined to allow her to record the

18  call, and she recorded the call anyway.  And so I would like

19  for us not to have to meet-and-confer.  We believe that the

20  recording was not permitted by California law.  And I don't

21  think we should be required to meet-and-confer and have calls

22  recorded against my consent and in violation of California law.

23          THE COURT:  Okay.

24          MS. GJOVIK:  Your Honor, the defendant is

25  intentionally misrepresenting what that was.  That was me

```
1    gathering evidence for a pending NLRB proceeding where these
2    lawyers were named in December, and it was further evidence of
3    that to give strictly to NLRB as part of their investigation as
4    well as a new charge.  I explained this.
5          And the recent Starbucks NLRB decision last year made very
6    clear that the Garmon preemption applies to those two-way
7    consent laws if you're gathering evidence for NLRB.  So I'm
8    kind of distressed they continue to bring it up with this
9    framing, which sounds like I'm -- have misconduct, but I'm
10   actually trying to help the government investigate.
11         I'm also kind of concerned because, even before that
12   recording, Apple repeatedly refused -- they didn't want to meet
13   and confer.  The last time we talked about meet and conferring,
14   they demanded there be no witnesses or record.  But they've
15   already used that meeting we had -- the one without a court
16   reporter or anything -- and I feel like misrepresented our
17   conversation in my Department of Labor case.  And I filed a
18   complaint about that.
19         So I -- I would be happy to meet with Apple and talk.  I
20   do prefer to have a record based on, I mean, what's happening
21   in this lawsuit.  But that's also part of my lawsuit from three
22   years ago --
23               THE COURT:  All right.  Well, there's --
24               MS. GJOVIK:  -- is this kind of stuff.
25               THE COURT:  There are separate issues here.  Whatever
```

```
 1    you do with respect to MLRBs is a separate question.  I'm

 2    talking about meeting and conferring to see if you can come to

 3    an agreement.  There's nothing binding coming out of that until

 4    there's an agreement.  So there's no need to record that.

 5         And I can't order and I won't order, at this juncture,

 6    recording of an informal meet-and-confer just to see if you can

 7    agree on a discovery plan for the next, let's say, 60 days or

 8    90 days.  It's a very narrow scope.  It's not intended for

 9    anybody to make admissions.  It's intended to say here's what

10    we can do, et cetera, et cetera.

11         Now, if it gets to a point where the parties continue to

12    have differing versions of, well, you agree to do X, and I

13    agree to do Y; no, you didn't agree to do X, et cetera, et

14    cetera, you know, then I will consider, you know, other --

15    other things.

16         Now, one of the things I am considering and I will do --

17    I'm also going to appoint a magistrate judge to assist with

18    discovery.  And if there's a problem with the meet-and-confer,

19    there's somebody you can go to very quickly if -- that can

20    manage this discovery.  So I'm going to assign that.  It will

21    go to a randomly assigned magistrate judge.  And you'll get

22    notice of that.

23              MS. GJOVIK:  Your Honor --

24              THE COURT:  But that magistrate judge will act under

25    my directive.  And that is for the parties to meet-and-confer,
```

```
 1   figure out Phase 1 -- or Stage 1 -- of the nonemployment.  That
 2   the GO 71 will apply concurrently to the employment so that
 3   we're not at a total standstill.  But discovery's got to
 4   proceed sort of phased.  Because if I end up dismissing all the
 5   nonemployment cases, then there won't be any more discovery.
 6   So we will address that.
 7        So I will give some overall directive with respect to
 8   staging.  But in terms of working out the details, if there's
 9   dispute over what the scope should be for Phase 1, I want the
10   magistrate judge to help you all resolve that.  So --
11        MS. RIECHERT:  Can we have an agreement with -- from
12   Your Honor that she will not record any phone calls that we
13   have going forward?
14        MS. GJOVIK:  I gathered evidence for the federal
15   government for an ongoing --
16        THE COURT:  Okay.
17        MS. GJOVIK:  -- government investigation.
18        THE COURT:  What I'm going to order is that, with
19   respect to this case, any meet-and-confer, whether it's by
20   phone or live, will not be recorded unless I order or the
21   magistrate judge orders otherwise.
22        I don't have jurisdiction over whatever NLRBs.  If there's
23   a call with respect to some other proceeding, I don't have
24   jurisdiction over that, so I can't say "yes" or "no" on that
25   front.  So your conversations should be clear that if you're
```

```
 1    talking about this case before me, that won't get recorded.

 2    Now, if you want to have another conversation about NLRB

 3    evidence gathering, that's between you all and the NLRB, not --

 4    I'm not intervening there.

 5              MS. GJOVIK:  Understood, Your Honor.  I am concerned

 6    though -- I mean, this is four years running -- about

 7    misrepresentations of communications when they're not written.

 8    This has been an ongoing issue with the defendant.  And I even

 9    asked if I can bring a witness just to sit with me, so if

10    someone had to testify to what happened, there could be someone

11    that's not just me.  And they said "no," expressly.  If

12    recordings are completely forbidden, can I get approval to have

13    a witness with me?

14              THE COURT:  I'm going to allow the magistrate judge to

15    determine what is the best process for you all to

16    meet-and-confer, whether you meet and confer in a physical

17    place, maybe with a magistrate judge, or, you know, you can

18    talk to the magistrate judge about the disputes you've had and

19    whether it makes any sense or not, at this point, until further

20    developments.

21         So let me ask about ADR.  Defendant indicates that there's

22    been a meet-and-confer, but -- and I see that plaintiff's

23    preference -- what are your thoughts about mediation or some

24    form of ADR?

25              MS. RIECHERT:  We're willing to consider it at some
```

```
 1    point, Your Honor; we just think it's premature right now.

 2             THE COURT:  All right.  Would that "some point" likely

 3    be, for instance, after the pleadings are set?

 4             MS. RIECHERT:  Potentially.  And I -- maybe some

 5    deposition -- the deposition of the plaintiff.  I'm not sure

 6    yet.  Usually I like to take the deposition of the plaintiff to

 7    be able to provide a full case assessment to my client.

 8             THE COURT:  All right.

 9             MS. RIECHERT:  And then we can talk about --

10             THE COURT:  And that's one of the things I also want

11    you to meet-and-confer about.  Because, normally, I also phase

12    discovery in terms of trying to -- with an eye towards ADR.

13    That is, there has to be a certain amount of exchange of

14    information to have the parties intelligently talk about their

15    settlement position.  And it may be sometimes that depositions

16    are required, sometimes not, if it's a document-heavy case.

17    But if it's one of those cases where a deposition is required,

18    sometimes I'll allow each side to take a deposition, maybe two.

19        But I'd like you to meet-and-confer to talk about,

20    number one, which form of ADR, whether you want mediation,

21    Court-sponsored, private mediation, settlement conference

22    before another magistrate -- a different magistrate judge than

23    the discovery judge -- and then what kind of discovery do you

24    need in order to prepare for that ADR process.  I'd like for

25    you to discuss that, also, so that when we come back together
```

```
 1   next time, we have a plan.  So that will also be included in

 2   the meet-and-confer.

 3            MS. GJOVIK:  Your Honor, may I ask a question?

 4            THE COURT:  Yeah.

 5            MS. GJOVIK:  Yeah.  So the General Order 71 -- I

 6   assume you're referring to that as kind of the general, like,

 7   employment whistleblower case portfolio.  The scope is really

 8   prescribed on it.  And there is stuff that I would want to

 9   request beyond just what's on that paper and some stuff I don't

10   think would apply.  Are you saying more like start discovery

11   generally on the employee --

12            THE COURT:  Yeah.  I mean, the way -- the way General

13   Order 71 works, it's like an initial phase.  I mean, there's

14   some things that should be produced in every case, whether it's

15   the employment file, whether it's -- you know -- et cetera, et

16   cetera.  That's not to say that's the only discovery you get,

17   because -- but it's meant to get that early exchange out often

18   to facilitate, for instance, a mediation or to guide future

19   discovery.

20        So it does not -- I don't think -- and I've never used

21   General Order 71 to say, well, that's -- that's the lid.  You

22   still have rights under the Federal Rules of Civil Procedure.

23   There's a presumptive limit on the number of depositions, the

24   number of interrogatories, et cetera, et cetera.  But this is

25   intended to get the basic information out without having to go
```

1  through the formal process of formally requesting the

2  employment file or the wage records or that kind of thing.

3      MS. GJOVIK:  So, for now, do you want us to stop at

4  the scope of General Order 71?

5      THE COURT:  I think -- since we're only talking about

6  60 days, I think whatever is to be exchanged under General

7  Order 71 plus the early disclosures under Rule 26 -- that

8  should give you a pretty good start.  And then let's revisit it

9  once we hear the motion to dismiss, and we'll get a better idea

10  where this is at.

11      So you've noticed the date -- what date have you noticed,

12  Ms. Riechert, for the hearing --

13      MS. RIECHERT:  I think it's the 22nd of August.

14      THE COURT:  Okay.  Well, then I'll double that up as a

15  further status conference, as well, so we can talk about some

16  of these things, including ADR, further discovery, et cetera,

17  et cetera.  Hopefully, at that point, I can give you a pretty

18  good idea where I see that motion to dismiss.  If I don't rule

19  from the bench, you'll certainly get a flavor for where I think

20  it's going and what may be left.  So we'll double that up as a

21  hearing on the motion as well as a status conference.

22      Meanwhile, I will appoint a magistrate judge to assist you

23  with any meet-and-confer disputes, or discovery disputes, scope

24  questions.  And then we'll talk about ADR.  I'd like you to

25  think about whether you -- what form of ADR would be useful.

```
 1          Let me ask -- I do have a question about the relationship
 2    between the various administrative actions here that are going
 3    on.  There's --
 4          MS. GJOVIK:  Department of Labor and NLRB.
 5          THE COURT:  And NLRB.  What is -- what are the
 6    parties' views about the interrelationship and the effect of
 7    one versus -- on the other?  Is this Court -- will the NLRB
 8    proceeding, for instance, or Department of Labor -- will that
 9    affect --
10          MS. GJOVIK:  Yes.
11          THE COURT:   -- the scope of this case?
12          MS. GJOVIK:  And vice versa.  I'm expecting claim
13    preclusion issues, at least probably through NLRB, even though
14    I wouldn't be a party.  Department of Labor is going to be some
15    of the exact same questions we're asking in this case.  So my
16    plan was to figure out which one can go first and -- which one
17    I'd prefer -- but I wouldn't do both, because, of course, you
18    don't want to do it twice.
19          I was also -- I've mentioned in the memo -- hoping if
20    there's some way we can do some kind of coordination with the
21    ALJ on Department of Labor since that's a concurrent hearing.
22    But there's been a lot of confusion about how these cases
23    interact.  Like, defendant introduced one of my civil
24    complaints as -- to the Department of Labor judge and asked him
25    to read that in as part of their case.  It's just been weird.
```

1    So if there's a notice of pendency I'm supposed to file or some

2    kind of request that there can be some kind of coordination,

3    I'd like to do that.

4         THE COURT:  All right.

5      Ms. Riechert, your views about the interrelationship and

6    whether there's something we should do to take into account

7    these administrator proceedings?

8         MS. RIECHERT:  I believe we filed a notice of pendency

9    or we indicated in our case management conference statement

10   that there were with these related proceedings.  The Department

11   of Labor case is going to trial next March.  And it will

12   involve the same claims -- many of the same claims -- that we

13   have here.  We do have a motion to dismiss in that case.  But

14   if the motion to dismiss is not granted in full, then there is

15   a hearing set for next March.

16        THE COURT:  And that will result in some adjudication

17   after administrative hearing and evidentiary hearing?

18        MS. RIECHERT:  That's correct, Your Honor.

19        MS. GJOVIK:  Notice and hearing and opportunity to --

20   the formal Administrative Procedure Act hearing.

21        THE COURT:  And so --

22        MS. RIECHERT:  And so we believe that it would be a

23   determination of whether the plaintiff, for example, was fired

24   for the reasons Apple stated or for the reasons the plaintiff

25   stated.

1          MS. GJOVIK:  Which is --

2          MS. RIECHERT:  But, again, we do have a motion to

3    dismiss pending in that case too.

4          MS. GJOVIK:  Which is why I'm very concerned about the

5    lack of coordination.  Because these cases could impact each

6    other so much on some very specific issues.  And, so far, it's

7    mostly just been me trying to coordinate from, like, the

8    background.  And I don't think it's --

9          THE COURT:  Well, when you say "coordinate," what do

10   you have in mind?

11         MS. GJOVIK:  So I don't know how this works either.  I

12   was reading the Conflicts Litigation Guide, and it sounds like,

13   depending on -- when you have multi-jurisdiction cases, it's

14   kind of customized for each situation.  And sometimes there is

15   help from usually the federal court of kind of getting the

16   ALJ -- I don't know if you guys talk to each other -- but kind

17   of aligning decisions and making sure when it's a decision like

18   exclude evidence or something that could very much impact how

19   the trial would go in the other case -- that both judges talk

20   about it before they'd make that decision.

21      Because Apple's -- in their motion to dismiss in

22   opposition to my motion amend in the Department of Labor case

23   are trying to exclude things already that would also then be

24   excluded in this case.

25         THE COURT:  Well, I don't -- I'm not familiar with all

1    the rules there.  So I don't know.  Their rules of evidence may

2    be different.  Their rules of procedure may be different.

3        Ms. Riechert, do you have any comments on coordination, or

4    not, or what this Court should do in light of these other

5    pending administrative proceedings?

6        MS. RIECHERT:  No.  I don't -- I don't think that

7    there's any way to coordinate the two.  They should go forth in

8    parallel.

9        THE COURT:  Yeah.  I don't -- sometimes we coordinate

10   with state courts that have parallel claims.  Sometimes -- you

11   know -- or with another federal court.  But with respect to an

12   agency, I'm loath to sort of interfere with whatever an agency

13   is doing.  And I don't know what might happen in terms of any

14   claim preclusion or not.  I guess we'll just have to cross that

15   bridge when we get there.

16       MS. GJOVIK:  I didn't think of separation of powers.

17   You're right.  You probably can't go to the agency.

18       THE COURT:  Yeah.

19       MS. GJOVIK:  Okay.  That makes sense.

20       THE COURT:  All right.  So -- well, we'll keep those

21   in mind.  And we'll see what happens in that regard.  But I do

22   have those in mind.  And we will have to -- and I'm sure that

23   the administrative agencies know there's this pendency of this

24   case and -- but, other than that, I don't know what else I can

25   do.

```
 1          So let's -- let's just move forward on this pending
 2   motion.  Let's move forward on discovery, hopefully with a plan
 3   that you can agree to with or without the help of the
 4   magistrate judge, and talk about an ADR process also when we
 5   get together next month.  So it looks like I'll see you in
 6   August it sounds like.
 7               MS. RIECHERT:  Thank you very much, Your Honor.
 8               THE COURT:  Great.  Thanks, everyone.
 9               MS. GJOVIK:  Thank you.
10               THE COURT:  Thank you, Your Honor.
11                   (Proceedings adjourned at 1:53 p.m.)
12                              ---oOo---
13
14                       CERTIFICATE OF REPORTER
15          I certify that the foregoing is a correct transcript
16   from the record of proceedings in the above-entitled matter.
17
18   DATE:   Thursday, August 1, 2024
19
20
21   _____
22             Kendra A. Steppler, RPR, CRR
23           Official Reporter, U.S. District Court
24
25
```

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

———————————————

| | |
|---|---|
| **Ashley M. Gjovik,** | ) |
| | ) No. 3:23-cv-04597-EMC |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) San Francisco, California |
| **Apple Inc.,** | ) May 16, 2024 |
| | ) 1:30 p.m. |
| Defendant. | ) |
| ——————————————— | ) |

**BEFORE:   THE HONORABLE EDWARD M. CHEN, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS VIA ZOOM VIDEOCONFERENCE**

**MOTION HEARING**

Official Court Reporter:
Jennifer Pancratz, RMR, CRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 42
Phoenix, Arizona 85003
(602) 322-7198

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                    **A P P E A R A N C E S**

2      (By Zoom Videoconference)

3    For the Plaintiff:

4        **ASHLEY M. GJOVIK**
         In propria persona
5        2108 N St., Suite 4553
         Sacramento, CA  95816
6

7    For the Defendant:

8        ORRICK, HERRINGTON & SUTCLIFFE LLP
         By:  **Melinda S. Riechert, Esq.**
9        1000 Marsh Rd.
         Menlo Park, CA  94025
10
         ORRICK, HERRINGTON & SUTCLIFFE LLP
11       By:  **Kathryn G. Mantoan, Esq.**
         405 Howard St., 7th Floor
12       San Francisco, CA  94105

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

1              **P R O C E E D I N G S**

2              (Proceedings commenced at 1:30 p.m.)

3              THE COURTROOM DEPUTY:  Court is calling the case

4   Gjovik versus Apple Inc., Case No. 23-4597.

5              Please state your appearance for the record, beginning

6   with the plaintiff.

7              MS. GJOVIK:  My name is Ashley Gjovik.

8              THE COURT:  All right.  Thank you, Ms. Gjovik.

9              MS. RIECHERT:  My name is Melinda Riechert, and I'm

10  appearing for Apple.

11             THE COURT:  All right.  Thank you, Ms. Riechert.

12             MS. MANTOAN:  Good afternoon, Your Honor.  My name is

13  Katie Mantoan, appearing for Apple.

14             THE COURT:  All right.  Your audio is a little bit

15  muffled.  It kind of comes in and out.  I'm not sure why.  I

16  could catch most of what you said, but when you first started

17  it was a little muted or something there.  You might want to

18  see if you can make any adjustment to that.

19             All right.  So this is a wide-ranging complaint with

20  many claims.  I think there are some 15 causes of action here.

21  But I will observe that with every claim that is brought, every

22  legal claim, there are obviously very particular requirements.

23  If you're bringing a claim under RICO, if you're bringing a

24  claim under Sarbanes-Oxley, there are certain requirements.  If

25  you're bringing a claim under the Ralph Civil Rights Act, there

1    are certain requirements.

2         And so we have, and we could, spend a lot of time,

3    perhaps multiple rounds, going through and looking at, you

4    know, each claim, each element, and determining whether or not

5    there's enough specificity, enough has been alleged.

6         But when one steps back and looks at the whole

7    picture, it seems to me that Ms. Gjovik's complaint certainly

8    alleges certain things, for instance, about some environmental

9    issues, which may or may not be proven ultimately, but at

10   least, you know, I understand the theory of that, of those

11   claims; and claims that she had engaged in protected activity

12   that was subject to retaliation, and I think those tell -- at

13   least the allegations set forth a fairly clear and coherent

14   story.

15        I think that -- and therefore, certain claims, I think

16   they may require a little bit more detail and things, but in my

17   view, are likely to get to the next stage such as, for

18   instance, the violation -- alleged violation of the California

19   Whistleblower Act, which is pretty broad:  Prohibits an

20   employer from retaliating against an employee for reporting

21   various things and disclosing information to a government or

22   law enforcement agency about a violation of federal or state

23   statute or noncompliance with a regulation, et cetera,

24   et cetera.

25        And one could argue about the level of specificity

5

1    that's needed in terms of identifying the statutes, et cetera,

2    et cetera; but given the facts here, it just seems to me that's

3    one that's one of the stronger claims that she has.

4         On the other hand, if you look at some of the claims

5    like RICO or Sarbanes-Oxley and Dodd-Frank where, for instance,

6    under Sarbanes-Oxley, the whistleblower action there has to

7    pertain to a report of a securities law violation or a certain

8    species of criminal fraud like wire fraud, bank fraud, and

9    that's much harder to see.  It's not obvious from this

10   complaint.

11        And similarly, Dodd-Frank is really concerned with

12   information that pertains to securities laws violation, and I

13   think it just appears to me to be a stretch to kind of fashion

14   a securities fraud violation here or a claim of a securities

15   fraud violation that underlies a whistleblower complaint.  It's

16   much easier to say there's a retaliation for reporting

17   environmental violations.

18        So I made that observation and maybe partly throw the

19   ball to your court, Ms. Gjovik.  I know you've got all these

20   cause of actions, but -- and I know you had filed a much larger

21   complaint before.  We asked you to file something that was more

22   compact.

23        But I guess I'm first directing my comments to you,

24   and that is, it does seem like some of these claims are much

25   closer to what would likely survive or has a good chance of

UNITED STATES DISTRICT COURT

1    surviving than others.  I don't know if you see it that way,

2    but I've given you a couple examples where Sarbanes-Oxley and

3    Dodd-Frank would have certain requirements that don't appear to

4    be met, but you're closer to the target when you're talking

5    about the Whistleblower Act under California law.

6            I'll take your observations at this point.

7            MS. GJOVIK:  Thank you, Your Honor.

8            I agree, some of my claims are stronger than others.

9    My intention with the large number of claims was to have broad

10   discovery for claims I thought that I had a valid claim for,

11   but when it comes to a trial, my plan would be to definitely

12   simplify of the strongest claims.

13           For the Dodd-Frank and SOX claims, I did have to

14   really, really simplify them to meet the page limit, and I

15   tried my best to cover that.

16           There's -- there's allegations of fraud related to

17   statements that Apple makes publicly about its environmental

18   practices that I had raised prior to being terminated,

19   specifically pointing to articles, specifically pointing to a

20   prior lawsuit; and my major concern was it appeared that Apple

21   was making fraudulent statements publicly in order to have more

22   brand loyalty, to make more money, when actually they were not

23   doing the things they were doing.

24           And I had raised that to someone in Apple's

25   environmental and lobbying team even, and she worked there, and

1    she agreed with me and she said she escalated it to the head of

2    Apple government affairs before I was fired.

3            Another matter was the Ronald Sugar issue.  There were

4    kind of two parts.  There was a lot of briefing about the -- my

5    concern that to raise a concern about my office and what -- how

6    Apple was managing it related to the Superfund responsible

7    party, I'd be raising it to a person I was concerned might have

8    been involved.  So that one, there was a lot of briefing about

9    that one.

10           But the other side of that is that person I was

11   concerned about who's on Apple's board of directors was the CEO

12   of the company who was responsible for the pollution, and it

13   sounds like he even worked at my office in the '80s when, you

14   know, they found the contamination.  They did the cleanup.

15           And I was very curious, and I raised these concerns --

16   these are in the complaints -- before I was fired, if he

17   disclosed his conflict of interest related to his prior company

18   to Apple when Apple decided to lease this building to do all

19   the installation they were doing.  Because it seemed peculiar

20   to me the building was vacant for about 13 years prior, with no

21   one in it until Apple moved in.

22           So I had some of those, and then I was also raising

23   concerns about my coworkers coming forward also claiming that

24   they had raised concerns that were met with retaliation.

25   There's actually a very similar case that the SEC just decided

1    for Activision Blizzard.  I did not have time to brief it, but

2    I wanted to, and it was exactly that.  There was a culture of

3    discrimination and retaliation while the company held itself

4    out as progressive and that not happening, and the SEC decided

5    that that was an SEC violation, that they were covering up the

6    issues and that violated their rules.  And I'd be happy to

7    brief that more if that would help.

8         For RICO, some of the similar things I just

9    mentioned --

10        THE COURT:  Well, before you go off to RICO --

11        MS. GJOVIK:  Yeah.

12        THE COURT:  -- I mean, I think under your theory, as I

13   understand it, though, that anything about the company that

14   could affect its public image and thus the stock value is a

15   sort of form of potential securities fraud.

16        But that would be true of any -- whether the

17   statement, you know, actually is a commission of a securities

18   fraud, it would be so broad that anything material about the

19   company that is adverse -- you know, usually when we see a

20   securities fraud case, it's a statement made to the

21   shareholders in a -- you know, in an SEC filing or in a press

22   release that misconveys some truth about, you know, something

23   about the company's finances or its future sales.

24        And that's why the securities fraud violation usually

25   is much more specific and focused on something to do with

9

1    shareholders and not sort of general statements to the public,

2    although, you know, that's not to say that general statements

3    to the public can't be a securities violation.

4         MS. GJOVIK:  I agree, Your Honor.  I also, I should

5    emphasize, the concerns about the prior CEO of the company

6    responsible for the pollution at my office, when I was raising

7    concerns about whether he might have had something to do with

8    it, I believe probably the clearest SEC claim would be failure

9    to disclose or failure to manage a related party transaction.

10        And I actually had specifically, you know, quoted the

11   director rules about that, and I was wondering if he might have

12   been doing some self-dealing to help out his old company.  And

13   I had -- I filed a business conduct complaint before I was

14   fired, and it was supposedly raised to, per policies,

15   Mr. Ronald Sugar to investigate himself, and then I was

16   complaining about that too.

17        But I hear your concerns and I definitely am open to

18   focusing on the strongest claims, but I felt like I might have

19   a plausible claim for SOX and Dodd-Frank.

20        THE COURT:  Okay.  Let me just hear response from

21   defendants on -- just take those, the SOX and Dodd-Frank, the

22   argument that there has been, for instance, nondisclosure of

23   conflict of interest.  There's been public statements that

24   are -- belie the actual situation via the business, the working

25   environment, that could affect stock prices, et cetera,

 1    et cetera.

 2          Why doesn't, in your view, that come within these

 3    statutes?

 4          MS. RIECHERT:  Yes.  First of all, I just wanted to

 5    say that we do think this is a whistleblower -- employee

 6    whistleblower complaint, and we wanted to keep it simple; that,

 7    you know, she complained and that she was fired because she

 8    complained.

 9          And as Ms. Gjovik said, she wants to assert a broad

10    claim so that she can get broad discovery, and that's the exact

11    reason why we do not think that she has the right to assert

12    these broad claims and that this is the time to rule that there

13    is -- these broad claims don't have merit, for all the reasons

14    we've said in our papers, and so there shouldn't be this broad

15    discovery.

16          We're going to have plenty of discovery in this case

17    on, you know, the complaints she made and the reasons for her

18    termination.  She has other administrative proceedings that she

19    has asserted where she's asserting other claims, and she'll

20    have plenty of time to do the discovery in those cases.

21          But this does not need to be a RICO case or a SOX case

22    or a -- any of the other types of claims that we moved to

23    dismiss, because let's just focus on the employment claims that

24    she is legally entitled to bring that we did not seek to

25    dismiss on our motion to dismiss.

(117 of 131), Page 117 of 131 Case: 25-2028, 05/09/2025, DktEntry: 17.4, Page 117 of 131
Case 3:23-cv-04597-EMC   Document 75   Filed 05/23/24   Page 11 of 25

11

1          I can go through the various SOX allegations that were

2     pled in the complaint and explain why I don't think that they

3     meet the criteria of mail fraud, wire fraud, bank fraud,

4     securities fraud.  You know, SOX is very specific as to the

5     types of things that you can bring a claim for.  And --

6          THE COURT:  Why don't you address the, for example,

7     the one that Ms. Gjovik raised about the not reviewing, not

8     disclosing the conflict of interest to the person who was

9     responsible for allegedly making sure that that office was not

10    in a polluted zone.

11         MS. RIECHERT:  So we have a case that we cited,

12    Denmeny, D-E-N-M-E-N-Y [sic], versus MBDA.  And in that case,

13    they rejected a SOX claim based on a concern that an

14    individual's membership on two boards might influence one

15    board's decision-making and then influence the company's

16    finances.

17         So I don't think that asserting that somebody's on two

18    boards and that there's a conflict of interest meets those mail

19    fraud, wire fraud, bank fraud requirements for SOX.

20         THE COURT:  What about potential securities fraud --

21    securities law violation?  If there's a conflict that results

22    in taking on, for instance, a project that has a lot of

23    liability to it but that hasn't been disclosed, is that too

24    many steps removed from the shareholder transaction?  Would

25    that be your position?

1        MS. RIECHERT:  Absolutely, Your Honor.  And I can also

2   talk, if you want, about these allegedly false public

3   statements, but I think, again, we covered that pretty well in

4   our brief.  She doesn't say what false public statements we

5   specifically made, and obviously she's accusing the company of

6   fraud, and we know that fraud has to be pled with specificity.

7        So I don't believe that she's pled with any

8   specificity what fraudulent statements we made.  And the Erhart

9   case, E-R-H-A-R-T, versus Bofi Holding that we cited in our

10  papers specifically says that without knowing what particular

11  conduct the plaintiffs complained about, we cannot -- the Court

12  cannot meaningfully analyze whether she plausibly alleges --

13       THE COURT:  So if Ms. Gjovik is then given a chance to

14  amend and she comes back and just theoretically says, well,

15  here's a statement made to the press generally about the

16  culture and the nondiscrimination and the clean -- you know,

17  compliance with environmental laws and making sure of workplace

18  safety and all that sort of stuff, and she alleges that all

19  that was knowingly and falsely made to the public -- in other

20  words, if she were then to specify the statement, I take it you

21  would still take the position that that would not rise to the

22  level of an allegation of a securities fraud violation.  Or

23  what would your response be to that?

24       MS. RIECHERT:  That's exactly what our response would

25  be.  And she did that in the second amended complaint, and we

1   dealt that with a motion to dismiss the second amended

2   complaint, and then it got out of the third amended complaint.

3   So we do not believe that making -- that she's made any

4   allegations that were linked to securities fraud, and touting

5   environmental practices is not securities fraud.

6          THE COURT:  What about on the RICO?  She's made RICO

7   claims.  I think -- I think some of the arguments here is that

8   in order to state a RICO claim, you have to demonstrate that

9   there are distinct entities.  You can't have a RICO claim

10   against the corporation itself and its employees and its

11   actors, so it has to be a non-Apple organization.

12          But, you know, if they're engaged in a pattern of

13   racketeering activity, what's your response to the general RICO

14   claim?

15          MS. RIECHERT:  So there's an (a) and a (b) and a (d),

16   and I have a specific response on each.

17          THE COURT:  Okay.

18          MS. RIECHERT:  So on the 1962(a), she was not injured

19   by the alleged use of investment or racketeering income.  And

20   again, if Ms. Gjovik is allowed to assert a RICO claim based on

21   the allegations in the complaint, then every employment case

22   could be a RICO case.

23          RICO is very, very specific on what it requires, and

24   she has to show that she was injured by the use of the

25   investment or racketeering income.  And simply reinvesting the

(120 of 131), Page 120 of 131    Case: 25-2028, 05/09/2025, DktEntry: 17.4, Page 120 of 131
Case 3:23-cv-04597-EMC   Document 75   Filed 05/23/24   Page 14 of 25

14

1    proceeds of the racketeering income isn't enough to get a RICO

2    claim, and that's the Westways World Travel case that we cited

3    in our papers.

4            THE COURT:  All right.

5            MS. RIECHERT:  So under (a), the allegations do not

6    meet the requirements of (a), and she doesn't have standing to

7    assert those claims.

8            On (c), 1962(c), again, our argument, primary

9    argument, is the one that you've asserted, which is there's got

10   to be a conspiracy between Apple and some other entity, and

11   there isn't.  It's just the allegations in the complaint.  The

12   enterprise is not different from Apple itself.

13           And your own -- Your Honor's own decision in

14   Coronavirus Reporter versus Apple Inc. clearly shows you know a

15   lot about this area of the law, much more than I do; but I do

16   think that that decision, where you said that PR firms and law

17   firms and rival developer cronies do not meet the requirements

18   of an enterprise in order to assert a claim under (c).

19           And so there just isn't enough there to assert that

20   there was an enterprise separate from Apple.

21           THE COURT:  All right.  And I'll give you a chance,

22   Ms. Gjovik, to respond on the RICO, if there's any additional

23   points you'd like to make on that.

24           MS. GJOVIK:  Yes.  Thank you, Your Honor.

25           So for the 1962(a), I don't think I included the case

1    and I'd appreciate a chance to try to bring it in potentially,

2    but I did find a case in this district where investing the

3    proceeds into a cover-up and witness intimidation effort was

4    found to be a plausible claim.

5         I hear what Apple's saying with you can't just invest

6    the money back into the enterprise, and I agree with that.

7    There's a lot of cases that say that.  I think my allegation

8    that they were investing their proceeds into these efforts with

9    their global security team and contractors and lawyers to

10   silence employees and whistleblowers, to cover up the stuff

11   they were trying to expose, I think is a plausible claim.

12        As for the not having a separate enterprise, I did

13   plead a number of separate parties outside of Apple.  I pleaded

14   a lot more in previous ones, so I could definitely amend to add

15   more, and more specificity.  But there's a lot of precedent

16   that -- alleging that a law firm is separate than the company

17   even if they're representing the company.  That was in a Philip

18   Morris case, so the allegations of their lawyers helping them

19   engage in the racketeering.

20        Also, their environmental consulting firms, which are

21   separate companies completely, one specifically with the --

22   relating to chemical weapons.  They did have this -- an

23   environmental group, ACT Environmental, at that silicon

24   fabrication facility assisting them with the manifests and the

25   regulatory paperwork, which are state and federal filings where

1    you're subject to perjury if you are to write the wrong thing.

2          So they -- my allegation is that those consulting

3    groups were definitely part of the enterprise and helping Apple

4    conspire on that charge too.

5          THE COURT:  Well, all right.  So if you're alleging

6    actual conspiracy and that they had a common purpose, they had

7    to have shared a common purpose under -- you have to have

8    nonconclusory allegations, you know, something to back that up.

9          MS. GJOVIK:  I do.  So my -- my kind of smoking gun on

10   this one was discovering that it appears that Apple falsified

11   their TRI filings, was an air quality filing for chemicals

12   under TSCA in 2020.  They entered that a certain amount of this

13   chemical, which is regulated under TSCA, was taken off-site

14   from the facility.  However, there were no manifests that it

15   was taken off-site.  The environmental contractor is in charge

16   of manifests and overseeing a lot of this paperwork.

17         So that actually can be a federal crime, and the U.S.

18   EPA is investigating this exact matter, to be determined.  But

19   I believe that fraud of the paperwork filing, I believe that's

20   a material, you know, omission or misleading or fraudulent

21   statement.  There's no way Apple could have done that itself.

22   It would have had to conspire with ACT Environmental; and they

23   would have to have a common purpose because ACT Environmental

24   would know exactly what was happening, that it was fraud, it

25   was going to mislead, and so their participation with that

1   common purpose.

2         THE COURT:  All right.  Let me get Ms. Riechert's

3   response just on that specific example, that allegation of

4   fraud between the environmental company and the false filing or

5   missing manifests with regard to disposal of, I don't know,

6   some kind of toxic chemical.

7         MS. RIECHERT:  Again, I don't think that that's been

8   the focus of the allegations to date.  But, again, if it's just

9   reinvesting in the same business, not in a separate legitimate

10   business that caused the plaintiff harm, but if you're just

11   reinvesting the proceeds of your conspiracy in your business,

12   that's just not a RICO violation, for the reasons that we've

13   said in the case.  The Sybersound versus UAV is one of the

14   cases that we rely on.

15         And, again, your decision in the Coronavirus Reporting

16   case says that you -- using PR firms and law firms and all of

17   that is not sufficient.

18         So I'm not sure specifically what the allegation is

19   here about some manifest and -- but I -- that's not what this

20   complaint is about.

21         And, again, she's had -- Ms. Gjovik's had -- this will

22   be the third amended complaint, and I just think it's time to

23   move this case forward on the claims that she -- that she can

24   legally assert and that we shouldn't keep spending more time

25   trying to add claims that are not claims that she can legally

18

1    assert.

2          THE COURT:  All right.  Well, and there are

3    requirements with respect to, for instance, a common law theory

4    or a theory under ultrahazardous or abnormally dangerous

5    activities, and I'm familiar with that.  But, again, it does

6    seem to me that there are varying degrees of strength and

7    weaknesses, and the whistleblower does seem to be certainly a

8    more recognizable, traditional approach.

9          And so what I'm going to do is look at the complaint

10   carefully and determine where it's been adequately alleged or

11   not alleged, and if not adequately alleged, whether there will

12   be any further leave to amend.

13         I do believe it would be beneficial for us to get this

14   complaint sort of cleaned up, and let's frame what the issues

15   are going to be and then move on to the next step.  I think

16   that's in everybody's interest here.

17         Do we have a CMC scheduled in this case yet?

18         MS. RIECHERT:  I think you took it off calendar.

19         THE COURT:  Okay.  What I will do is once I rule on

20   the pleadings here, I will set a CMC, and at that point I'll

21   also want to talk about, you know, how we can move this case

22   along, whether there's any interest in any kind of alternative

23   dispute resolution, is there some way that the parties can

24   engage in a process that might avert a longer litigation

25   process here.  So I'd like you to think about that as well.

1          MS. RIECHERT:  If I could just speak on the 1102.5,

2     the whistleblower claim.

3          THE COURT:  Yeah.

4          MS. RIECHERT:  Again, there has to be a violation of a

5     statute or a regulation or the Constitution.  And I think you

6     have to say to whom you complained.  I mean, it's only fair for

7     us to know who she complained to.

8          But she says she was protesting the Gobbler

9     application, but that's not illegal, and there is no statute

10    that she says it's illegal to have the Gobbler application.

11         She did talk about audio, video recordings in the

12    bathroom under 437 -- 435 of the Labor Code.  But all she says

13    is that the photo -- some sort of photo was taken, not that it

14    was -- you know, that it violated that statute.

15         So I still think on 1102.5 there's not enough; but if

16    we're just going to go forward, take out the ones that we don't

17    think are appropriate, we can live with 1102.5.

18         THE COURT:  Let me ask you -- actually, I do have a

19    question about that, Ms. Riechert.

20         MS. RIECHERT:  Uh-huh.

21         THE COURT:  Because you do have to identify, under the

22    whistleblower statute, that, you know, there's been an alleged

23    claim of a violation of a federal or state statute or a local

24    regulation, et cetera, et cetera.

25         What degree of specificity do you think that statute

20

1    requires?  In other words, if you say "CERCLA" or if you say

2    "Labor Code" or if you say -- you know, do you have to then

3    say, and I'm specifically referring to section, you know, XYZ,

4    subsection 2, or can you refer to the statute -- is there case

5    law on the degree of specificity that's needed?

6              MS. RIECHERT:  Yeah.  We believe that there is a

7    degree of specificity and that just saying "CERCLA" is not

8    enough.  I think the -- Cleveland is the case that says that

9    just saying "CERCLA" is not enough.  Just saying "Labor Code"

10   is not enough.  We know the Labor Code is like 900 pages.

11             So I do believe that some form of specificity -- we

12   have to know what statute she complained that we violated.  And

13   she doesn't have to use a code number or anything like that

14   when she made the complaint, but she needs to say, I made a

15   complaint about this, and that violated this statute.  And we

16   don't have that in this complaint yet.

17             And I complained to this person on -- about this.

18   Whether the law requires you have to say the person, I can't

19   say a hundred percent that that's required, but I do think

20   we're entitled to know who she complained to and the nature of

21   the complaint.  And then in the complaint she needs to say:

22   And that violated this section of the Labor Code, that section

23   of CERCLA.

24             THE COURT:  All right.

25             MS. RIECHERT:  Again, these issues are being litigated

1    in other forums.  We have a CERCLA case already before the

2    Department of Labor administrative appeal.

3              THE COURT:  Yeah.  Yeah.

4              All right.  Any comments you'd like to make on that

5    specific question, Ms. Gjovik, about how specific the complaint

6    needs to have been -- needs to be?

7              MS. GJOVIK:  Yes, please.  Thank you, Your Honor.

8              I can definitely amend or brief post-hearing in far

9    more specificity.  I was trying to keep it simple.  I was

10   trying to heed Your Honor's advice of not duplicating my

11   allegations in multiple sections, so I was hoping that the

12   allegations I was making in the fact bank and the other claims

13   would then be incorporated into that section so I didn't have

14   to say everything twice and thrice.

15             I have a list of probably dozens of statutes that I

16   alleged were violated prior to me being terminated, including

17   my formal complaints to the California Department of Labor, the

18   U.S. Department of Labor, NLRB, EEOC.  Apple received notice of

19   many of these complaints prior to me being terminated, if not

20   saw me posting about it and talking to the press about it,

21   which they would have been asked for comment.

22             So I think they've known for a very long time of those

23   specific things.  You can't fill out those forms for those

24   agencies without having to specify why you think that law was

25   broken that that agency oversees.  So if Your Honor would like

(128 of 131), Page 128 of 131
Case: 25-2028, 05/09/2025, DktEntry: 17.4, Page 128 of 131
Case 3:23-cv-04597-EMC   Document 75   Filed 05/23/24   Page 22 of 25

22

 1    more specificity, I'm more than happy to provide that in

 2    writing, however you'd like.

 3            THE COURT:  Well, I will, in the order dealing with

 4    this, I will let you know where we need specificity and what it

 5    is that I think is needed to satisfy.  Sounds like you're

 6    confident you have the information that you could provide if

 7    necessary.

 8            So let's -- let's see where we go.  As I stated, it

 9    may be that in the final analysis some of these claims sort of

10    fall by the wayside, but some of the central claims may well

11    survive here.  So we'll take it from there.  All right.

12            MS. RIECHERT:  Do you want to set a date for the CMC,

13    or are you just going to --

14            THE COURT:  Let's -- probably depends on how quickly I

15    can get to this.  I will set a date in the CMC --

16            MS. RIECHERT:  Perfect.

17            THE COURT:  -- in the order, you know, probably a

18    couple weeks thereafter.  So I anticipate within the next

19    couple months we'll be seeing each other again.

20            MS. RIECHERT:  Okay.  And then would that be also

21    online?

22            THE COURT:  Yes.  Well, I've started a -- starting

23    in -- is it June? -- we are going back by default to a live

24    calendar.  However, I would certainly entertain requests to

25    appear remotely.

(129 of 131), Page 129 of 131
Case: 25-2028, 05/09/2025, DktEntry: 17.4, Page 129 of 131
Case 3:23-cv-04597-EMC   Document 75   Filed 05/23/24   Page 23 of 25

23

1        So the rules will change.  I don't -- I think it may

2  be under my standing order now or it's going to come out soon,

3  but as we get into June and thereafter, I'm following most of

4  my colleagues here and kind of reverting back to live hearings.

5  But to accommodate counsel and parties and everything else, I'm

6  not necessarily adverse to holding Zoom hearings as well.

7        Yeah, Ms. Gjovik?

8        MS. GJOVIK:  Thank you, Your Honor.

9        I live in Boston, and I don't have expendable income

10  for travel so I would be very appreciative, and I was going to

11  reach out to your deputy and ask what the preferred way to

12  request to convert is.

13        THE COURT:  Well, you can request that now.  I mean,

14  normally you could -- and that's exactly the kind of situation,

15  if somebody's got to come across country and it's a financial

16  difficulty, or to fly counsel across country for a 10-minute

17  argument, you know, I want to be reasonable about that.

18        So, yeah, if you're across country and you're

19  representing yourself at this point, I'd -- let's just do this

20  one by Zoom.  We'll note that.

21        MS. RIECHERT:  I can appear in person because I'm

22  local, but I'm also happy to do it by Zoom, whichever Your

23  Honor prefers.

24        THE COURT:  Yeah, I think it's -- hybrid can be done

25  but it's easier if we're all on the screen instead of half and

24

```
1    half, so we'll do it by Zoom.

2              MS. RIECHERT:  Sounds good.

3              THE COURT:  Okay.  Thank you, everyone.

4              MS. RIECHERT:  Thank you very much.

5              THE COURT:  Thank you.

6              MS. GJOVIK:  Thank you, Your Honor.

7                (Proceedings concluded at 2:01 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

1

2

3

4

5                    **C E R T I F I C A T E**

6

7          I, JENNIFER PANCRATZ, do hereby certify that I am

8    duly appointed and qualified to act as Official Court Reporter.

9          I FURTHER CERTIFY that the foregoing pages constitute

10   a full, true, and accurate transcript of all of that portion of

11   the proceedings contained herein, had in the above-entitled

12   cause on the date specified therein, and that said transcript

13   was prepared under my direction and control.

14          DATED this 23rd day of May, 2024.

15

16

17                         s/Jennifer Pancratz
                           _____
18                         Jennifer Pancratz, RMR, CRR, CRC

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT