CASE No. 25-2028

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

**ASHLEY M. GJØVIK**, *an individual*,

*Plaintiff-Appellant*

v.

**APPLE INC.**, *a corporation*,

*Defendant-Appellee.*

On Appeal from the United States District Court

for the Northern District of California

No. 3:23-CV-04597

The Honorable Judge Edward M. Chen

---

# APPELLANT'S DECLARATION II:
# SUCCESS & BALANCING OF EQUITIES

---

**Ashley M. Gjøvik, JD**
*In Propria Persona*
2108 N. St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# TABLE OF CONTENTS

**DECLARATION II: LIKELIHOOD OF SUCCESS** ............................... 3

I.      BACKGROUND AND STATUS AS A CRIME VICTIM & WHISTLEBLOWER ...... 3

II.     PLAUSIBILITY AND PROBABLE CAUSE .......................................... 7

III.    FEDERAL AGENCY ENFORCEMENT CONFIRMS RETALIATION ............. 9

IV.    DISTRICT COURT ERROR AND NEW EVIDENCE............................. 11

V.     VIOLENT CRIME ........................................................................ 12

VI.    INSTITUTIONAL ABANDONMENT................................................. 14

VII.   JUDICIAL CONFLICT & DUE PROCESS BREAKDOWN....................... 16

VIII.  REGULATORY CAPTURE AND INSTITUTIONAL RETALIATION ............. 17

IX.    BREAKDOWN OF PROCEDURAL PROTECTIONS AND JUDICIAL REFUSAL TO INTERVENE ................................................................................. 21

**CONCLUSION** ............................................................................ 23

## DECLARATION II: LIKELIHOOD OF SUCCESS

I, Ashley Marie Gjovik, declare as follows: This declaration is submitted in support of Appellants' Motion for Injunction Pending Appeal, specifically to address the likelihood that Appellants will succeed on the merits of their claims. Based on my personal knowledge and professional assessment of the legal and factual issues in this case, I believe there is a strong probability of success on appeal.

### I. BACKGROUND AND STATUS AS A CRIME VICTIM & WHISTLEBLOWER

I was employed by Apple Inc. from 2015 through September 2021 in various high-level program management roles. I was terminated after engaging in protected whistleblower activity, including raising concerns internally and externally about hazardous environmental conditions, retaliation, and rights violations. I hold a J.D. and certificate in Public International Law from Santa Clara University School of Law.

In early 2020, I resided in an apartment adjacent to Apple's semiconductor fabrication facility at 3250 Scott Blvd. in Santa Clara, California. Without informing the public, Apple was conducting industrial fabrication activities there under the codename "Aria," exhausting toxic chemicals directly into the air and sewer system near thousands of residents and a children's playground.

3

While living next to this facility, I suffered acute and unexplained medical symptoms including fainting, cardiac irregularities, neurological dysfunction, skin burns, and hair loss. My medical records from that period document these symptoms, and my environmental testing detected industrial solvent vapors including benzene, acetone, xylene, and other compounds consistent with Apple's disclosed emissions.

At the time, I was unaware of the nature or existence of Apple's fabrication activity. Only in February 2023 did I discover that the facility responsible for those emissions was owned and operated by Apple and had been discharging over 7.8 tons of VOCs annually, with documented leaks of phosphine, silane, and fluorine gas.

I immediately filed regulatory complaints, which led to multiple EPA inspections and at least 19 formal violations of the Resource Conservation and Recovery Act (RCRA) being cited by the EPA against Apple. The Bay Area Air Quality Management District (BAAQMD) later issued violation notices for operating without required air permits and exhausting pollutants above allowable limits.

I also discovered my Apple office, on a CERCLA governed Superfund site, was out of compliance with the Land Use Cov. and Record of Decision. I began complaining to Apple and U.S. EPA about it. Following my report, the EPA acknowledged receipt of my concerns and began an inquiry. This led to an

4

unannounced on-site inspection conducted by the EPA on August 19, 2021 — less than six weeks after my complaint.

When I began engaging in whistleblowing and speaking to regulators about both locations, Apple retaliated against me. This included abrupt termination after a workplace "violence" interrogation attempt, denial of internal transfer requests, surveillance, false pretextual justification for my firing involving the use of personal data.

The EPA's follow-up confirmed that my disclosures triggered the inspection and guided the agency's review of Apple's compliance. This demonstrates clear causation and agency reliance on my protected activity — a key element of "success on the merits" in whistleblower retaliation cases. Additionally, subsequent enforcement actions (as referenced in agency disclosures and my court filings) validate the substantial risk I identified and the public interest my whistleblowing served.

On August 22, 2021, I submitted a formal revision to Apple's internal "Issue Confirmation" process. That document included allegations of racketeering under the federal RICO statute, including obstruction of justice, falsification of internal records, suppression of employee reports, and coordinated retaliation by senior managers across Apple's engineering, legal, and operations teams. I submitted the revised version directly to Employee Relations, and I also filed it with Apple's

5

Business Conduct group as a formal complaint on August 23, 2021. Apple terminated my employment on September 9, 2021 — less than three weeks later. (See Ex. R-22, R-23).

On August 22, 2021, I submitted a revised Issue Confirmation document to Apple Employee Relations, formally alleging retaliation, obstruction, and misconduct under federal law. This included claims under Title VII, ADA, OSHA, and the RICO Act. I specifically referenced Batterygate-related suppression of field defect reports and documented that I had been constructively discharged from my role after briefing executive leadership on iPhone battery defects in 2016. I also alleged that Apple had used intimidation tactics — including coercive threats and retaliatory actions — in response to my efforts to report these events to federal authorities. I submitted this revised version to Apple's Business Conduct office the next day, August 23, 2021. Apple terminated my employment on September 9, 2021. (See Ex. R-22, R-23)

Over the past three years, I have submitted multiple charges to the National Labor Relations Board (NLRB) related to Apple Inc.'s unlawful suspension, termination, surveillance, and retaliation against me for engaging in protected concerted activity under the National Labor Relations Act (NLRA).

The NLRB has issued the following merit findings, complaints, and scheduled hearings in my favor. In October 2024, the NLRB issued a formal decision of merit

6

finding substantial evidence that Apple's actions in placing me on administrative leave and later terminating my employment violated federal labor law.  Dkt. 142, Fifth Amended Complaint, at 17.

In January 2023, the NLRB found that an internal company-wide email sent by Apple CEO Tim Cook discouraged protected concerted activity and amounted to retaliation.  Dkt. 142, at 18

In April 2025, the NLRB issued a nationwide complaint and entered into a settlement with Apple, after finding its confidentiality, surveillance, and conduct policies violated NLRA §8(a)(1). These same policies were used to discipline and silence me for raising workplace concerns.  Email Exhibit, May 2025

Apple produced a Privilege Log which is honestly one of the most incriminating things I've ever seen. It not only contradicts most of the their prior statements about our dispute, but it appears to facially acknowledge retaliation and cover-up conspiracies amongst high level executives, spanning over multiple months.

Apple has already faced complaints and charges, and entered into federal settlements and agreements, acknowledging the validity of the core conduct underlying this appeal.

## II.  PLAUSIBILITY AND PROBABLE CAUSE

I respectfully submit that there is probable cause to believe that I have been the

7

target of multiple crimes committed in retaliation for my whistleblower activity and protected disclosures, in violation of federal statutes including 18 U.S.C. §§ 1512 (witness tampering), 1513 (retaliation), and 1962 (RICO). These conclusions are based on personal experience, corroborated evidence, admissions by involved individuals, and patterns of conduct consistent with federal predicate offenses.

My claims include toxic torts, RICO, whistleblower retaliation, IIED, and civil rights violations. The district court dismissed many claims on procedural grounds or based on disputed factual characterizations that must be resolved at trial.

I allege that Apple's conduct formed a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961–1964. Predicate acts include:

- o Fraudulent concealment of hazardous emissions and fabrication activity;
- o Witness retaliation (18 U.S.C. § 1513) and witness tampering (18 U.S.C. § 1512);
- o Obstruction of environmental justice efforts;
- o Mail and wire fraud related to the suppression of environmental risks and investor deception.

The allegations are substantiated by government findings, including failure to replace scrubbers in the exhaust system for five years; dumping of chemicals including arsenic and phosphine into residential zones; fabrication of termination justifications following my protected disclosures.

8

I also allege that Apple used falsified HR processes to justify my firing, including invocation of "nudity" images generated from internal tools (e.g., Gobber app) and photographed without my knowledge. These images were circulated by internal security personnel and used post hoc to justify retaliation — a key factual component of both my RICO and IIED claims.

Further, I took thousands of internal documents with me when I left Apple which I have used to provide the government evidence of wrongdoing by Apple. I also have thousands of documents received through FOIA and PRA requests to support my claims. The few documents Apple has produced that I did not already have, have been incredibly damning – such as drafts of a performance review and peer feedback for the period when I was fired that essentially gave me a performance improvement plan that required me to stop engaging in protected activity.

## III.   FEDERAL AGENCY ENFORCEMENT CONFIRMS RETALIATION

In October 2021, shortly after I filed formal whistleblower and environmental complaints with federal and state regulators—including the U.S. EPA, OSHA, SEC, and DFEH—Apple placed me on administrative leave, attempted to interrogate me under false pretext, and then abruptly terminated my employment. The timing and context of these acts demonstrate clear retaliatory motive tied to my protected activity.

The National Labor Relations Board has independently investigated and found merit to my retaliation claims. In 2023, the NLRB issued a formal complaint against Apple for unlawfully suspending and firing me, as well as for making coercive threats intended to chill protected speech under the National Labor Relations Act. These findings validate my central claims that Apple engaged in coordinated retaliation and intimidation in violation of public policy and federal whistleblower statutes.

These NLRB findings and litigation further support my RICO claims. The retaliation confirmed by the NLRB constitutes a predicate act under 18 U.S.C. § 1513 (retaliation against a witness), especially where it follows disclosures to federal regulators and concurrent participation in official investigations. It also bolsters the credibility of my broader allegations regarding obstruction of justice, unlawful surveillance, witness intimidation, and cover-up of environmental violations.

The National Labor Relations Board (NLRB) has independently investigated Apple's conduct relating to my employment and found merit to my retaliation claims. In 2023, the NLRB issued a formal complaint against Apple for unlawfully suspending and firing me in violation of the National Labor Relations Act, and for making coercive threats to deter my protected concerted activity. The NLRB's General Counsel authorized litigation based on these findings, and the matter remains pending before the NLRB's Administrative Law Judge.

These formal agency findings independently corroborate the facts alleged in

10

my federal complaint. The retaliatory actions—especially termination shortly after protected disclosures to regulatory bodies and in the midst of ongoing protected whistleblowing—also serve as predicate acts under 18 U.S.C. § 1513, supporting my RICO and public policy retaliation claims.

## IV.   District Court Error And New Evidence

The district court dismissed key claims at the Rule 12(b)(6) stage despite my submissions of detailed factual allegations and new evidence. It failed to apply the discovery rule to my toxic tort claims, despite my only learning in 2023 of Apple's role in my exposure.

I have filed declarations, public records, expert findings, and EPA reports supporting the existence of harmful exposure and Apple's knowledge of the risks. Nonetheless, the district court characterized my claims as implausible or inconvenient, without addressing the newly submitted evidence or affording discovery.

Additionally, the court failed to accommodate my pro se status and PTSD-related accommodations despite precedent that requires liberality in pro se pleadings, and dismissed claims with prejudice that could have been cured through amendment.

The government has since acknowledged my role in reporting violations that

11

led to enforcement. I remain a named federal whistleblower, a CVRA-designated victim of crime, and have open complaints pending with the U.S. Department of Labor, EPA, and the NLRB — facts supporting the seriousness of the retaliation and ongoing harm.

## V.   VIOLENT CRIME

Between 2020 and 2021, I was repeatedly exposed to hazardous chemical substances due to Apple Inc.'s failure to disclose environmental contamination at its corporate facilities. While employed as a Senior Engineering Program Manager, I worked inside Apple's Sunnyvale office at 825 Stewart Drive, a site with a documented history of Superfund-level contamination. Apple never informed me of the ongoing vapor intrusion risk nor the site's known history of volatile organic compounds (VOCs), such as trichloroethylene (TCE) and arsine gas.

At the same time, my home was located next to Apple's Silicon Valley semiconductor fabrication facility.in Santa Clara In 2020, I began submitting complaints to local and federal authorities about chemical releases and odors. I became physically ill following several incidents — including a notable exposure event in mid-2021 when my entire apartment reeked of chemicals in the middle of the night. I filed reports with the Bay Area Air Quality Management District, EPA, and Santa Clara Fire Department. Their records confirmed that Apple operated a

high-risk semiconductor facility near residential zones, with limited oversight.

After raising these issues internally and externally, Apple retaliated against me through launching a retaliatory "workplace violence" investigation hours after I submitted complaints to the EPA, SEC, and FBI and firing me shortly after I refused to remain silent about the hazards and after confirming that I had filed formal criminal complaints with federal agencies.

I was informed that the FBI opened a criminal investigation in 2022 related to Apple's environmental conduct and that the EPA launched a formal criminal probe in 2023–2024. I cooperated with these investigations as a whistleblower and crime victim. However, I have received no further updates, and retaliation has only intensified during my participation in this civil litigation.

The symptoms I experienced are consistent with chemical assault, including exposure to compounds known to cause: seizures, internal bleeding, and neurological failure. liver and kidney damage.

These outcomes parallel injuries from violent crimes. I assert that Apple's conduct — intentional or reckless release of hazardous substances, failure to warn, and refusal to remediate — constitutes criminal violence under both the Crime Victims' Rights Act (CVRA) and Marsy's Law.

To this day, I suffer the long-term health consequences of the exposures. I live in constant fear that I may develop life-threatening illness due to that period. I have

13

lost access to health care due to Apple's retaliation, and cannot afford medical testing to evaluate the full extent of damage. The psychological burden of knowing I was poisoned by my employer — and then fired for reporting it — is profound and lasting.

I have followed every proper channel. I have waited months and years for internal accountability, federal agency review, and now judicial remedy. I am not trying to escalate — I am trying to survive the process long enough for this Court to decide what the law requires.

If the Court decides this is not its role, I have no other path. If retaliation this coordinated, this documented, and this unopposed isn't worth appellate protection, I genuinely don't know what is.

## VI.   INSTITUTIONAL ABANDONMENT

Over the past three years, I have attempted every lawful path available to protect myself as a whistleblower. I have filed formal complaints with the EPA, DOL, OSHA, NLRB, SEC, EEOC, and multiple state agencies. I have submitted Inspector General complaints, FOIA requests, and direct communications with agency leaders and committees. I have repeatedly provided evidence of retaliation, witness tampering, perjury, and systemic concealment. Despite all of this, not a single agency has taken meaningful action to stop the retaliation, correct the record, or hold Apple or its co-conspirators accountable.

14

My federal whistleblower complaints have been suppressed, stalled, or rerouted to internal legal counsel — including cases where agency staff had personal, professional, or financial connections to Apple or its outside counsel. In multiple instances, agency staff left their jobs and were subsequently hired by Apple. One EEOC official who likely handled my complaint joined Apple's Employee Relations team within months of my filing. At DOL and OSHA, my cases were dismissed before investigation — while Apple was secretly included in communications I was told were confidential. I was misled about the status of my filings, threatened with procedural dismissals, and denied access to basic safety records.

In September 2022, I published an open letter titled *"Justice at Apple: No One is Above the Law,"* documenting the breadth of this institutional failure. That letter outlined retaliation, regulatory interference, unethical coordination between government staff and Apple, and the systemic inability of any agency to hold Apple accountable. I sent this letter to multiple agency heads, Congressional committee staff, and oversight watchdogs. I received no response.

Based on this experience, I have no confidence that any agency or internal appeals mechanism will protect me. My protected speech has not only been chilled — it has been punished, criminalized, and stripped of institutional defense. The only remaining option is judicial relief. Without this Court's intervention, the retaliation will continue, the reputational damage will deepen, and the public record will remain

15

falsely poisoned by coordinated disinformation. No other body has intervened — not because they lack jurisdiction, but because they lack independence.

## VII. Judicial Conflict & Due Process Breakdown

When an unconstitutional gag order was filed against in me in 2022 based on my complaints against Apple, I appealed to the U.S. District Court in that region (Seattle, WA) with a request of emergency injunctive relief based on my rights as a government witness and whistleblower. The U.S. District Court Judge delegated to a magistrate judge, but abruptly intervened in the case and dismissed the action on jurisdictional grounds (Rooker-Feldman, Anti-Injunction Act), even though you were not seeking to relitigate the state judgment, but to protect federal witness rights and active legal participation.

Judge Richard A. Jones dismissed my prior motion for an emergency injunction in *Gjovik v. State of Washington*, is the uncle of Rashida Jones — one of the lead producers and actors in *Apple TV+'s* series Sunny, which began filming in Summer 2022, just weeks after your injunction and filings were dismissed. This show was:

- Produced by Apple TV+, the same company at the center of your labor and whistleblower claims.
- Co-produced by Rashida Jones, who has a documented familial relationship with the judge (half-niece).

16

- In production concurrently with your active litigation and appeals.

This temporal and relational overlap raises serious concerns about impartiality and conflict of interest under Canon 2 of the Judicial Conduct Code, especially given Apple's stake in undermining your credibility and silencing your speech during this time.

The show began filming in mid-2022, at the exact time my case was dismissed. Judge Jones did not disclose this relationship, nor his former affiliation with individuals now employed at Apple's defense firm. I believe this conflict created an appearance of partiality under 28 U.S.C. § 455(a), and that his intervention substantially undermined my access to justice.

I was denied the right to respond to the state's motion to dismiss. The presiding judge failed to rule on several federal preemption claims and NLRA arguments. The court mischaracterized my position by stating you "*self-styled*" yourself as a federal witness, despite open investigations with multiple federal agencies (NLRB, SEC, OSHA) and ongoing whistleblower retaliation cases.

## VIII.    REGULATORY CAPTURE AND INSTITUTIONAL RETALIATION

I have personally experienced what legal scholars and economists refer to as regulatory capture — a condition where public agencies and institutions become dominated by the private entities they are meant to regulate. In my case, Apple Inc., supported by its legal and political networks, leveraged its influence across federal

17

and state regulators, courts, and affiliated actors to suppress my disclosures, discredit me as a whistleblower, and obstruct legal recourse.

In 2021, I filed formal complaints with the U.S. EPA regarding toxic chemical exposure at my Apple office, which sits on the TRW Superfund site in Sunnyvale, CA Rather than investigate independently, the EPA immediately informed Apple of my complaints, coordinated meetings with Apple to "strategize" a response, and failed to disclose to me that they inspected the site and found safety violations — information later revealed only through FOIA requests. (Exhibits J, L-M)

The EPA refused to answer basic health and safety questions, delayed or obstructed FOIA responses, and coordinated media messaging that concealed the site's compliance issues. When I escalated the issues, the EPA removed engineers from communication and told me all future correspondence would be handled by legal counsel, who then declined to answer any substantive questions. (Exhibits J, L-M)

The EPA's then-Administrator, Michael Regan, visited Apple Park for a public "fireside chat" with Apple's VP Lisa Jackson — the former EPA Administrator — just two days before the EPA inspected my office. Jackson remains a key Apple executive and was involved in Apple's internal responses to my complaints. (Exhibits J, L-M)

In 2021–2022, I filed whistleblower complaints with the U.S. DOL under

18

CERCLA, OSHA, and SOX. Despite my detailed filings, the DOL attempted to dismiss my case without investigation, contradicting prior assurances that it had been opened. I later learned the DOL possessed EPA records supporting my claims, but never disclosed them to me or considered them in their review. (Exhibits J, L-M)

Agency officials gave me contradictory and misleading instructions, threatened that appealing would notify Apple of dismissal decisions, and even attempted to coerce me into withdrawing charges during intimidating phone calls.

When I filed an Inspector General complaint, a supervisor informed me my cases would likely be dismissed regardless — not based on evidence, but procedural positioning. DOL staff also discouraged me from referencing active SEC or EPA investigations, despite those being the core of my protected disclosures. I was told that any evidence I sent would be forwarded to Apple, discouraging whistleblowing even within the process. (Exhibits J, L-M)

At the EEOC, a key official handling my case — Bryan Hoss, Intake Supervisor — left the agency and immediately joined Apple's Employee Relations team, the same team implicated in my retaliation complaints. While still at EEOC, Hoss likely had access to my charge. His rapid transition to Apple, and the social media celebration by both Apple and EEOC staff, confirms the type of "revolving door" influence that undermines trust in regulatory oversight. (Exhibits J, L-M)

At the NLRB, the original Region 32 investigator discouraged me from

submitting evidence, altered my affidavit, and attempted to silence my testimony. After I filed an OIG complaint, multiple staff were recused for conflicts of interest, and my case was eventually transferred — but damage had already been done.

Their approach — denial, delay, discrediting — mirrors Apple's documented historical response to whistleblowers and is consistent with known capture strategies. I did not come to these conclusions suddenly. Over the course of 2021–2023, I uncovered and documented the systemic failures of multiple agencies and institutions in real time — while they were failing me. (Exhibits J, L-M)

In mid-2021, I discovered that my office sat on an EPA Superfund site, and Apple had failed to inform employees of associated risks. I filed complaints with Cal/OSHA and EPA Region 9, and began to notice signs of coordination between Apple and the agencies — including when my questions were referred to Apple, or when I received copy-pasted responses contradicting facts later revealed via FOIA. (Exhibits J, L-M)

In late 2021, after I filed NLRB and DOL complaints, I started receiving misleading and coercive communications from case handlers. In several cases, I later discovered that Apple received communications or evidence I had submitted in confidence. At OSHA, my case was closed despite exculpatory evidence in their possession. At DOL, I was encouraged to drop my complaint entirely. These actions suggested not just bias — but structural compromise. (Exhibits J, L-M)

20

In early 2022, I realized several agency staff working on my matters had former or future affiliations with Apple or their defense firms (Orrick, Morgan Lewis, etc.). I began filing Inspector General complaints and compiling a record of what I now understand to be regulatory capture. By summer 2022, I had mapped what appeared to be a pattern: Apple's outside counsel employed multiple former government officials, Apple was featured in PR events with regulators, and I could no longer get a clear answer from any agency handling my claims. (Exhibits J, L-M)

## IX.   BREAKDOWN OF PROCEDURAL PROTECTIONS AND JUDICIAL REFUSAL TO INTERVENE

Throughout the litigation, I have submitted multiple formal requests to the district court for basic protections and case management — all of which have been denied, ignored, or functionally reversed in ways that enhanced retaliation rather than prevented it.

I requested that the Court assign a magistrate to supervise discovery due to the nature of the claims and documented harassment. Instead, I was told to meet and confer with Apple, and that any dispute could only be raised via a three-page letter (1.5 pages per party) with no opportunity to report abuse, raise retaliation, or request real-time oversight.

I asked for protective conditions regarding depositions, including the ability to substitute interrogatories and to avoid being forced to discuss protected activity. The

21

Court denied or ignored these requests and stated flatly that I could not avoid being deposed.

I raised concerns that Apple was attempting to secure a blanket protective order that would retroactively shield their own retaliatory conduct — including their assertion that my nude images were "Apple property." I asked that the Court prevent abuse of protective orders and reject gagging protected disclosures. The Court ignored this and indicated it would likely grant Apple's order.

I submitted evidence of ongoing harassment, including social media campaigns, third-party interference, and bad faith discovery conduct. I asked the Court to investigate, issue warnings, or impose guardrails. The judge ignored my submissions, refused to hold Apple accountable, and issued no corrective instructions.

I asked that the Court schedule regular case management check-ins to prevent abuse. Instead, the Court canceled all upcoming management hearings. I asked for a trial schedule. The Court refused.

A nonparty who was secretly used as a witness by Apple filed multiple letters on the docket smearing me, calling for dismissal of my claims, and defending Apple. She also attended every hearing under her real name. I asked the Court to close the docket to prevent future intimidation and harassment. The Court did nothing.

I informed the magistrate judge that Apple was threatening sanctions for

22

future motion filings. I asked whether I was even allowed to file summary judgment, or whether I had to wait to be attacked again. I received no assurance, only a warning to follow the local rules.

I submitted requests for deadline extensions when PTSD and trauma symptoms made it impossible for me to meet deadlines. I disclosed panic attacks and psychological harm related to Apple's conduct. The judge responded in public session that I needed to "do better," and struck or ignored several filings as untimely without acknowledging those explanations.

The cumulative effect is a procedural environment where Apple is permitted to weaponize discovery and court rules against me, while I am denied every basic safeguard I've requested — even those rooted in statutory rights for whistleblowers and crime victims. I am not just unprotected. I am actively exposed, and the court has made clear it does not intend to intervene.

## CONCLUSION

For the reasons stated above, I submit this declaration to support the conclusion that Appellants have demonstrated a clear likelihood of prevailing in this appeal. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 12 2025 at Boston, Massachusetts.

23

_____

**Ashley M. Gjøvik**
/s/ Ashley M. Gjovik
Pro Se Appellant

24