CASE NO. 25-2028

---

# IN THE UNITED STATES COURT OF APPEALS

# FOR THE NINTH CIRCUIT

---

**ASHLEY M. GJØVIK**, *an individual*,

*Plaintiff-Appellant*

v.

**APPLE INC.**, *a corporation*,

*Defendant-Appellee.*

On Appeal from the United States District Court

for the Northern District of California

No. 3:23-CV-04597

The Honorable Judge Edward M. Chen

---

# APPELLANT'S DECLARATION I

---

**Ashley M. Gjøvik, JD**
*In Propria Persona*
2108 N. St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# TABLE OF CONTENTS

**DECLARATION OF ASHLEY GJØVIK IN SUPPORT OF MOTION**

**FOR INJUNCTION PENDING APPEAL – PUBLIC** ................................. 4

    I.   INTRODUCTION ................................... 4

    II.   PSYCHOLOGICAL & PHYSICAL HARM ............................... 4

    III.   FINANCIAL HARM ........................................ 8

    IV.   PRIVILEGE LOG & FALSE STATEMENTS ......................... 11

    V.  ONGOING HARASSMENT IN LITIGATION ........................... 14

    VI.   OTHER THREATS & INTIMIDATION .................................29

    VII.   DISCOVERY DISPUTES ........................................33

    VIII.  GOBBLER ........................................ 42

    IX.   VICTIM'S RIGHTS: PROTECTION FROM COERCIVE DEPOSITION AND

DISCOVERY  47

    X.   OBJECTION TO BLANKET PROTECTIVE ORDERS GAGGING

WHISTLEBLOWER AND PUBLIC SAFETY DISCLOSURES ........................47

    XI.   SCHEDULING & OVERSIGHT ......................... 48

    XII.  REQUEST FOR DISCLOSURE OF TERMINATION DECISION-MAKERS ..52

    XIII.  I DID NOT CONCEDE ........................................52

    XIV.  REQUEST FOR INTERROGATORY LIMIT ADJUSTMENTS BASED ON

2

JOINDER AND PRO SE STATUS ............................................................. 53

XV.    REQUEST FOR SCRUTINY OF LITIGATION TACTICS THAT SILENCE

PUBLIC SAFETY DISCLOSURES ........................................................ 53

XVI.   DISRUPTING COURT PROCEEDINGS & LOSS OF DUE PROCESS ......... 54

XVII. CONCLUSION ................................................................................ 58

**EXHIBITS .............................** ERROR! BOOKMARK NOT DEFINED.

# Declaration of Ashley Gjøvik in Support of Motion for Injunction Pending Appeal – Public

## I. Introduction

I, Ashley Marie Gjovik, declare as follows: I submit this declaration in support of Appellant's Motion for Injunction Pending Appeal, specifically to address the immediate and irreparable harm that will occur absent relief from this Court. The information provided herein is based on my direct experiences and knowledge and is offered to assist the Court in evaluating the necessity of interim relief.

I am the Plaintiff in multiple legal proceedings involving Apple Inc., the State of Washington, and affiliated actors. I submit this declaration in support of ongoing requests for judicial relief, including but not limited to injunctions to prevent further retaliation, protect the integrity of proceedings, and correct the record relating to unlawful and coordinated efforts to silence my whistleblowing disclosures. I declare all facts herein based on my personal knowledge, experience, and documentation unless otherwise stated.

I am also filing a sealed version of the declaration and exhibits that includes: communications with law enforcement, federal investigations, and private financial information.

## II. Psychological & Physical Harm

In 2020, I lived adjacent to Apple's property at 3250 Scott Blvd., Santa Clara

4

— a location where Apple was secretly operating an illegal semiconductor fabrication facility. While living in my apartment next to this site, I was repeatedly exposed to toxic industrial gases, including arsine, phosphine, silane, and hydrochloric acid — substances used in wafer and chip fabrication. These chemicals are regulated under RCRA, TSCA, and California hazardous air pollutant standards.

In one instance, my bedroom was filled with a gas cloud matching the profile of arsine gas exposure — a substance that is lethal in small quantities. I experienced acute symptoms and lasting health consequences. At the time, I did not know what the exposure was.

Apple never notified residents, regulators, or employees about this activity. Their failure to report, monitor, or mitigate these emissions constitutes a serious public health threat and may have caused other exposures in the community.

I experienced profound and lasting emotional harm as a direct result of Apple Inc.'s misconduct. Beginning in 2020, I suffered extreme physical illness and psychological distress due to toxic chemical exposures from Apple's semiconductor facility near my home, as well as ongoing workplace exposure at an Apple office built on a contaminated Superfund site.

Despite my repeated safety and whistleblower complaints to Apple and government agencies, I was subjected to an escalating campaign of harassment, intimidation, surveillance, and retaliation. Apple's managers and employee relations

5

agents silenced my concerns, discouraged my cooperation with regulators, threatened my employment, and ultimately fired me in September 2021 for engaging in legally protected activity — including discussing work conditions, cooperating with investigations, and speaking out publicly.

On September 30, 2021, prior to receiving the above package, I asked on Twitter what people thought Apple was sending me. A Twitter account, later associated with Apple's PR or Global Security, responded with an image from a film implying Apple had mailed me the severed head of a loved one. This post deeply alarmed me and escalated my emotional distress.

In September 2021, I heard two men walking above my apartment office in the attic. My property manager confirmed that the attic could only be accessed through my bedroom closet, but I had not seen anyone enter. I found strange wiring in the attic; the manager had no explanation for its presence. I reported this to the FBI and police on August 9, 2022. Evidence of further entry followed, including insulation left under the attic hatch and my dog smelling strongly of cigarettes.

On or around September 29, 2021, I received a package from Apple Inc. containing my personal belongings. The items had been intentionally damaged and were covered in glass shards. Most disturbingly, the package contained what I later discovered to be a hidden listening device. This parcel was designed to threaten and emotionally destabilize me. I gave it to the police and filed a police report. (See Sealed

6

Declr.)

The emotional toll of these events has been devastating. I have endured:

- **Severe anxiety**, triggered by retaliation and the threat of workplace violence;

- **Sleep disruption and panic attacks**, especially after late-night chemical exposure symptoms and hostile threats online;

- **Persistent fear**, especially during events where Apple's surveillance and intimidation tactics mirrored stalking or retaliation;

- **Professional isolation and reputational damage**, which derailed my legal career aspirations and ended my career in engineering at Apple;

- **Emotional breakdowns**, triggered by intrusive requests for sensitive medical data and retaliatory gag orders;

- **Social withdrawal**, following widespread public smearing and harassment;

- **Profound feelings of betrayal**, particularly by leaders I had trusted professionally;

- **Loss of identity and purpose**, as my role and standing at Apple were central to my career and advocacy efforts.

**See Exhibit C – *Medical*.**

To this day, Apple's continued actions — including denial of wrongdoing, concealment of key facts, false accusations against me, and interference with my career — have prolonged and deepened my emotional injuries. The retaliation I

7

experienced has affected every aspect of my life: personal relationships, physical health, career prospects, financial stability, and sense of safety. I have had to rely on unemployment, Medicaid, and SNAP assistance after losing not just a job, but my entire professional trajectory. I continue to suffer the effects of emotional trauma, including complex PTSD symptoms, and am still engaged in ongoing litigation to seek redress and accountability.

Between May 16 and May 28, 2022, I experienced several call dropouts, ultimately discovering surveillance hardware hidden in a decorative statue. I contacted the FBI on May 30, 2022, and on May 31, 2022, someone attempted to break into my home around midnight. A police report was filed (see sealed exhibits).

Each of these incidents contributed to a deteriorating sense of safety and repeated trauma. I have been in contact with law enforcement multiple times, reported these events to the FBI, and continue to live in a state of heightened fear. The conduct described here was systematic, targeted, and retaliatory. These intrusions into my home, privacy, and bodily autonomy constitute not only egregious boundary violations but criminal conduct under multiple state and federal statutes.

## III.  Financial Harm

Following my retaliatory termination by Apple Inc. in September 2021, I experienced a complete financial collapse. At the time, I had just managed to pay off

8

longstanding debts and had begun to accumulate limited savings. I did not own a home, a car, or any other significant assets. My high-paying role at Apple was my only source of financial security, and its sudden loss—without severance and amidst active whistleblower activity—plunged me into crisis. (see sealed exhibits).

After my firing, I was unable to secure new employment due to the reputational damage stemming from Apple's actions and the high-profile nature of my whistleblower complaints. I was forced to rely on unemployment insurance, SNAP, and Medicaid. My savings quickly evaporated, and I now have approximately $1,500 to my name.

My monthly rent is $3,000, and I have only two months of unemployment insurance eligibility remaining. I currently have no medical insurance, as I can no longer afford premiums, and my unemployment benefits disqualify me from Medicaid due to being slightly over the income limit. As a result, I have had to stop all of my prescribed medications, which has worsened my health and compounded my emotional and physical distress.

I am also burdened by hundreds of dollars in outstanding medical bills, which I am unable to pay. In addition, my overall financial state has deteriorated dramatically:

- My total credit card debt exceeds $68,000, compared to a combined credit limit of $27,500—representing a credit utilization rate of over 250%.

9

- My FICO credit score is now 512, classifying me as a high-risk borrower with "Poor" credit.

- I have multiple seriously delinquent accounts:

  - JPMorgan Chase Card #1: $31,952 balance, $3,757 past due, closed by creditor after 150+ days late.
  - JPMorgan Chase Card #2: $8,489 balance, $801 past due, also closed by creditor.
  - Bank of America Card: $17,741 balance, $2,353 past due, over 110% utilization.
  - Apple Card (Goldman Sachs): $10,708 balance, $730 past due, 107% utilization.

These accounts have all reported multiple missed payments, including 30, 60, 90, and even 120–150 days late, further damaging my credit. On top of this, I carry over $81,000 in federal student loan debt. Although these loans are in deferment, payments will resume soon, adding further pressure to an already unmanageable situation. (see sealed exhibits).

As a result of these financial conditions, I cannot qualify for housing loans, auto financing, or even basic credit lines. I am effectively locked out of the financial system. I live in constant fear of eviction, utility shutoffs, medical emergencies, and irrecoverable financial ruin. I continue to suffer ongoing harm due to the consequences of Apple's unlawful and retaliatory actions.

10

## IV.   Privilege Log & False Statements

Despite this lawsuit being filed Sept. 7 2023, Apple did not share any version of its privilege log until March 27 2025. The document appears, to me, to be evidence of a criminal conspiracy to cover up the issues I was reporting, to silence me, and to intimidate my coworkers to stay silent. (See Exhibit A – *Apple's Privilege Log*). It also revealed Apple had been making numerous false statements to the court.

Apple's counsel represented in court that the company did not monitor my Slack or Twitter activity and was unaware of my press involvement. However, Apple's own privilege log proves otherwise. Internal emails reference my posts in a Slack channel. By August 4, Apple executives were circulating my tweet and the *Verge* article with the subject including my name. (See Exhibit A).

Apple's legal and PR teams circulated multiple emails about me to Kate Adams (General Counsel), Deirdre O'Brien (SVP), and Stella Low, summarizing my social media and media coverage in real time. These logs confirm Apple was not only aware of my protected activity, but actively documenting and distributing it inside the company — despite courtroom denials.

On Feb 21 2025, at a hearing in this matter, Apple's counsel was asked by the court about whether I sufficiently pled knowledge of protected activity – specifically posts on Apple's internal communication tool Slack. Apple's counsel responded:

Yes, Your Honor. My understanding on the Slack is that she said that she was

11

questioned about the Slack posts on July 27, 2021, but she didn't participate in the pay survey until August of 2021. And, therefore, even if the company had been asking her about her Slack in July of 2021, it would not have found something that she later put in Slack and, therefore, it couldn't -- there would be no reason to say that it knew that she had posted the paid survey in August of '21 just because they looked at her Slack on July 28th

July 27, 2021, Pg23-24.

Apple and its counsel repeatedly told the Court that they did not know about my Slack posts or pay survey until August 2021, and did not know I was speaking to the press. However, Apple's own Privilege Log shows they began internally discussing my Slack posts in June 2021, and were distributing screenshots of my Twitter posts and press alerts about me by July 2021.

These documents directly contradict Apple's statements to the Court and demonstrate a pattern of dishonesty and concealment. For example, on August 4, Apple's internal communications include a subject line, *'Ashley tweet – Verge story in 30 minutes'*, which was circulated to Apple's executive leadership, including Kate Adams and Deirdre O'Brien.

Apple cannot truthfully argue ignorance of my protected activity while simultaneously screenshotting, analyzing, and sharing it internally with leadership and PR in real time. While Melinda Reichert and Apple claimed in court that they didn't know what I was posting on social media or sharing with the press, the privilege log shows detailed internal communications about your media exposure,

12

press quotes, and Twitter activity

Similarly, on May 16 2024, Apple's counsel argued to the court they were not on notice of me alleging any specific violation of CERCLA and so my claim should be dismissed, and the court did dismiss on that basis – however, the U.S. EPA found my complaints actionable enough to require a mandatory onsite inspection in less than 30 days, found multiple CERCLA issues, and ordered numerous corrective actions.

> MS. RIECHERT: Yeah. We believe that there is a degree of specificity and that just saying "CERCLA" is not enough. I think the -- Cleveland is the case that says that just saying "CERCLA" is not enough. Just saying "Labor Code" is not enough. We know the Labor Code is like 900 pages. So I do believe that some form of specificity – we have to know what statute she complained that we violated. And she doesn't have to use a code number or anything like that when she made the complaint, but she needs to say, I made a complaint about this, and that violated this statute. And we don't have that in this complaint yet. And I complained to this person on -- about this. Whether the law requires you have to say the person, I can't say a hundred percent that that's required, but I do think we're entitled to know who she complained to and the nature of the complaint. And then in the complaint she needs to say: And that violated this section of the Labor Code, that section of CERCLA. (Dkt 75 at 20).

When the court asked Apple's counsel point blank about the falsified manifests, Apple's counsel refused to Answer. The U.S. EPA inspection report from August 2024 and January 2024 revealed hundreds of RCRA manifest violations, of potentially criminals statutes.

> THE COURT: All right. Let me get Ms. Reichert's response just on that specific example, that allegation of fraud between the environmental company

13

and the false filing or missing manifests with regard to disposal of, I don't know, some kind of toxic chemical. (Dkt 75 at 17).

MS. RIECHERT: Again, I don't think that that's been the focus of the allegations to date. But, again, if it's just reinvesting in the same business, not in a separate legitimate business that caused the plaintiff harm, but if you're just reinvesting the proceeds of your conspiracy in your business, that's just not a RICO violation, for the reasons that we've said in the case. The *Sybersound versus UAV* is one of the cases that we rely on. (Dkt 75 at 17).

## V.   Ongoing Harassment in Litigation

Since initiating litigation against Apple Inc., I have been subjected to a sustained pattern of procedural coercion, reputational interference, and psychological distress that continues to cause me irreparable harm. These harms are not limited to typical burdens of litigation, but instead arise from abusive and retaliatory tactics that target me as a whistleblower, a pro se litigant, and a legally recognized victim under the Crime Victims' Rights Act (CVRA), Marsy's Law, and whistleblower protection statutes.

Apple has refused to participate in a good-faith Rule 26(f) discovery plan, declined to identify custodians or search terms, and has withheld responsive documents without justification. Despite my numerous requests, Apple has refused to disclose even the number of withheld documents or provide basic transparency regarding its privilege log. Apple continues to demand that I respond to intrusive interrogatories, sit for deposition, and provide medical records related to trauma, while simultaneously blocking discovery into its own internal conduct surrounding

14

my termination.

Apple has made production of key documents—such as an "Informed Consent Agreement" central to their defense—contingent on my acceptance of a highly restrictive protective order. They have stated their intent to use that document at my deposition and then immediately designate both the document and my testimony as confidential, threatening contempt if I speak about it publicly. I have proposed alternatives such as redaction or in-camera review; Apple has categorically refused.

During recorded discovery conferences, Apple's counsel made coercive and unlawful threats, including discouraging filings, raising the specter of Rule 11 sanctions, and misrepresenting the procedural posture of my Ninth Circuit appeal. These threats chilled my ability to assert my rights in court and were made with full knowledge of my pro se status and financial distress. In one instance, opposing counsel refused to substantiate their accusations that I cited false legal cases, despite knowing I lacked access to Westlaw due to financial hardship.

Apple's conduct appears designed not only to delay or obstruct this litigation, but to punish me for engaging in protected activity. Their refusal to participate in discovery, their insistence on protective orders without scope or justification, and their effort to relitigate previously settled motions appear to be part of a broader strategy to isolate, suppress, and overwhelm me as a whistleblower. In some

15

instances, Apple removed their labor counsel from communications involving NLRA-protected activity, while adding attorneys unrelated to the core issues, compounding procedural confusion and ethical concerns.

I continue to experience emotional trauma, including PTSD symptoms, triggered in part by Apple's ongoing litigation tactics, including threats, surveillance, and reputational attacks. I respectfully request that the Court take notice of these ongoing harms in evaluating the need for protective relief, sanctions, or injunctive measures to preserve my ability to pursue justice and assert my legal rights without further retaliation or coercion.

During the July 8, 2024 meet-and-confer, Apple's lead counsel Melinda Reichert explicitly stated: "*The whole purpose of the protective order is otherwise we say we don't have to give you this because it's confidential.*" (Exhibit D - Transcript, 18:04–18:20) I believe this was a coercive attempt to force me to adopt an overbroad protective order by threatening to unlawfully withhold discovery. This contradicts the Federal Rules of Civil Procedure, which require production of relevant, non-privileged material even absent an order. Apple never explained how these materials would fall under trade secret or legally privileged exemptions. I also believe the intent was to intimidate and threaten me, by implying that I would receive nothing unless I forfeited rights protected under the First Amendment, the CVRA, and whistleblower laws.

16

When I expressed concerns about overbreadth in the proposed protective order and explained that public safety and human rights cases typically require narrower terms, Apple's counsel stated: "You have an uphill battle if you're going to try to convince the federal judge that the order that the federal judge came up with is not the right order." (Transcript, 26:22)

This was said after I had already described a history of Apple misusing confidentiality to suppress whistleblower disclosures. The implication here was that I should not challenge the model order or risk judicial disfavor — which, as a pro se litigant, I experienced as a veiled threat. Such discouragement contradicts my rights.

Apple's counsel repeatedly argued that they had "already done" all required disclosures under General Order 71, and would not provide more. However, my case includes non-employment tort claims, including ultra-hazardous activity, nuisance, and consumer protection (UCL), which are not covered under General Order 71.

Despite this, Apple's legal team refused to commit to disclosing any documents beyond those in the scope of employment-based termination. I believe this violates Rule 26(a)(1), and that they are using General Order 71 as a pretext to suppress material relevant to tort claims that threaten their liability.

When I raised the issue of Apple's missing employee relations investigation file regarding my termination — specifically records of contacts on September 3 and 7, 2021 — Apple's counsel responded: "We give you the documents that we have…

17

Just because we didn't produce something doesn't mean we're hiding it."
(Transcript, 35:06)

This fails to address whether Apple conducted a full search of the internal case
management system referenced in prior Apple whistleblower policy documents. As
a whistleblower, I am legally entitled to discovery about retaliatory motive and
pretext. Apple's vague denial and refusal to provide this file — central to my NLRA
and labor claims — strongly suggests improper withholding and potential spoliation.

Apple's legal team also unilaterally labeled my performance reviews, salary,
and benefits information "confidential," without notice, negotiation, or a meet-and-
confer. As I explained: "You guys failed to do any kind of meeting confer about that
and didn't even ask me whether I thought that would be confidential or not..."
(Transcript, 25:15)

Apple's counsel responded by citing their internal policies rather than seeking
agreement or judicial determination. Under Rule 26(c) and the Northern District's
Model Protective Order, confidentiality designations must be based on good faith and
allow prompt challenge. Unilateral classification of my personal information,
including documents I have a legal right to share, is inappropriate and retaliatory.

Apple has informed me that it intends to subpoena all of my medical records
— including mental health therapy notes — from the last ten years. This includes
sessions I attended for unrelated reasons, as well as the possibility of issuing

18

subpoenas for any therapist I see *now*, in real time, to address the ongoing trauma caused by this litigation.

In addition, Apple has indicated it will seek a Rule 35 mental examination. However, they are demanding that the examiner not only interrogate me about a decade of personal mental health history, but also review those entire ten years of records in advance and use that information to shape the written report.

I now fear seeking therapy about the trauma this process is causing, because I know Apple has already threatened to subpoena any therapist I talk to. As a result, I am being forced to live with litigation-induced mental health harm without medical treatment, in order to avoid giving Apple further access to weaponize against me. This is not a discovery dispute. This is procedural retaliation designed to punish me for trying to get help

Apple has admitted its intentions with the protective order are to threaten me. During the July 8 2024 Meet and Confer, Apple's counsel, admitted: "Y*eah. I mean, the whole purpose of the protective order is otherwise we say we don't have to give you this because it's confidential. The protective order protects us by requiring to keep it confidential with the **_threat_** of a violation*." (See transcript exhibit).

Apple has also admitted its motions to dismiss were based on avoiding discovery of evidence related to my claims. On May 16, 2024, during a court hearing before Judge Edward M. Chen, Apple's counsel Melinda Reichert stated: *"She wants*

*to assert a broad claim so that she can get broad discovery, and that's the exact reason why we do not think that she has the right to assert these broad claims."*

On May 2 2025, during a Meet and Confer, Apple's counsel repeatedly threatened me in order to prevent me from filing any future motions in this litigation. I complained I felt their comments were unlawful.

> GJOVIK: I'm deeply distressed to see that Jessica Perry was involved in those termination emails back to early August with her response with the sworn declaration of the court with my prior motion to disqualify, which feels very material and misleading. I am considering the best path forward. Right now I'm thinking maybe reviving the motion to disqualify. I may also do a fraud on the court to try to undo some prior decisions for withholding information. I
>
> [Melinda Reichert (Partner at Orrick, Herrington & Sutcliffe)] (46:07 - 46:10) And you already argued that and the judge already denied it.
>
> [Ashley Gjovik (Pro Se)] (46:10 - 46:12) And you guys misled about your involvement.
>
> [Melinda Reichert (Partner at Orrick, Herrington & Sutcliffe)] (46:13 - 46:21) You've got to show there's something false in the declaration and there is nothing false. We've all gone back and look at it. There is nothing false in the declaration.
> … So if you want to renew your motion, but by the way, there's got to be an end to these motions. You can't keep filing all these motions all the time.
>
> [Ashley Gjovik (Pro Se)] (46:34 - 46:36) You guys filed six motions to dismiss.
>
> [Melinda Reichert (Partner at Orrick, Herrington & Sutcliffe)] (46:37 - 46:43) Yeah, but they were consecutive and they were granted. You've been filing endless motions and they're denied.
>
> [Ashley Gjovik (Pro Se)] (46:43 - 46:44) What motion?

20

[Melinda Reichert (Partner at Orrick, Herrington & Sutcliffe)] (46:45 - 46:51) I can't even list all the motions you filed. Sometimes they come in four a day, whatever. So- four a day.

[Ashley Gjovik (Pro Se)] (46:52 - 46:58) You say I filed four motions a day and you cannot tell me what a single one of those motions are except for the motion to disqualify.

[Melinda Reichert (Partner at Orrick, Herrington & Sutcliffe)] (46:58 - 47:06) Four discovery motions. I remember the motion to disqualify the motion. I have a list of all your motions here somewhere, but it's obviously on the court docket.

[Ashley Gjovik (Pro Se)] (47:07 - 47:21) And you're telling me that I need to stop filing motions? Motions that have no basis. Which of my motions have no basis?

[Melinda Reichert (Partner at Orrick, Herrington & Sutcliffe)] (47:22 - 47:36) Most of them, all of them as far as I could tell. A dismissal or a denial is not the same as no basis. And we believe they have no basis and we believe that the use of these AI generated stuff is unacceptable and the motions have no basis. And there just has to be a stop to these motions.

[Ashley Gjovik (Pro Se)] (47:37 - 47:46) So my motions are about Apple violating the LRA, Apple's settlement agreement, a motion to disqualify. I have the motion to strike and ask for a more definite statement.

[Melinda Reichert (Partner at Orrick, Herrington & Sutcliffe)] (47:47 - 47:47) Yeah.

[Ashley Gjovik (Pro Se)] (47:47 - 47:50) I've had motions of notice of pendency.

[Melinda Reichert (Partner at Orrick, Herrington & Sutcliffe)] (47:51 - 47:53) Those are- Four discovery motions.

[Ashley Gjovik (Pro Se)] (47:53 - 47:53) These are what you're saying are baseless?

[Melinda Reichert (Partner at Orrick, Herrington & Sutcliffe)] (47:54 - 47:55)
Four discovery motions.

[Ashley Gjovik (Pro Se)] (47:55 - 47:59) And you're saying "AI generated nonsense" is abuse of the court. Yeah.

[Melinda Reichert (Partner at Orrick, Herrington & Sutcliffe)] (48:00 - 48:03)
And you have four discovery motions to the magistrate.

[Ashley Gjovik (Pro Se)] (48:03 - 48:04) Discovery motions.

[Melinda Reichert (Partner at Orrick, Herrington & Sutcliffe)] (48:05 - 48:13)
And as I say, I do not have in front of me a list of all the motions, but all I can say is that there needs to be an end to these motions.

[Ashley Gjovik (Pro Se)] (48:13 - 48:19) Can you elaborate further on your coercive statement to help me understand exactly what you were saying?

[Melinda Reichert (Partner at Orrick, Herrington & Sutcliffe)] (48:19 - 48:23)
Yes. So I've said it all in the motions. I really have.

[Ashley Gjovik (Pro Se)] (48:23 - 48:38)
You're saying there has to be an end with like a gravelly tone, which is very close to violating the NLRA again. So I'm just asking for more information of exactly what you're trying to censor and stop and suppress and what this implied threat is at the gravelly end of the statement.

[Melinda Reichert (Partner at Orrick, Herrington & Sutcliffe)] (48:39 - 48:46)
This is not on our agenda for this call. We have enough to cover in the call without going through the fact.

[Ashley Gjovik (Pro Se)] (48:47 - 49:19) Just to be clear, if I feel like a motion should be filed and there's a valid reason to file it, I'm going to file it. And I'm trying to be as responsible as I can with how I file and how much research I can do. But as you know, you guys have like 30 billion dollars and I have negative everything and I am one person and you have hundreds of thousands. How much does it work out? So that's unfair bullying for you to come at me saying it's not perfect. Whatever. Anyways, I object to that generally and I find that to be harassment.

22

[Melinda Reichert (Partner at Orrick, Herrington & Sutcliffe)] (49:20 - 49:44) But I've already told you in our oppositions to your motions why we believe the motions are without merit. And the judge will end up deciding those whether the motions are without merit or not. But we have said everything we intend to say with respect to the repeated filing of motions with cases that don't exist. And no, I don't mind.

[Ashley Gjovik (Pro Se)] (49:44 - 49:50) You refuse to give me any evidence that nothing exists. I've asked repeatedly for some kind of evidence of nonexistence.

[Melinda Reichert (Partner at Orrick, Herrington & Sutcliffe)] (49:50 - 49:59) It's all in the brief. Every time you had a site, we went and looked at that site and it doesn't exist. I can't give you evidence that something doesn't exist.

[Ashley Gjovik (Pro Se)] (49:59 - 50:05 But you can. You go into Westlaw, you search it. It says no result. You give me a copy. I asked for that three times and you expressly said no.

[Melinda Reichert (Partner at Orrick, Herrington & Sutcliffe)] (50:06 - 50:16) No, I haven't expressly said no on anything. It's all in our motion. We're not going to debate. We're not going to debate the motions that are currently pending. The judge will decide those. They're fully.

[Ashley Gjovik (Pro Se)] (50:16 - 50:23) You're making allegations against me about filing frivolous motions and saying that I'm incompetent and that I'm using false cases.

[Melinda Reichert (Partner at Orrick, Herrington & Sutcliffe)] (50:23 - 50:24) I haven't said any of those things.

[Ashley Gjovik (Pro Se)] (50:24 - 50:31) You won't give me evidence that something doesn't even exist when all you have to do is print a PDF to show it doesn't exist?

[Melinda Reichert (Partner at Orrick, Herrington & Sutcliffe)] (50:32 - 50:55) I haven't said you were incompetent in any sense. I've said you file briefs that cite to cases that don't exist. Those motions are fully briefed. The judge will

decide them. You've already made your point that we did not produce proof that they didn't exist and the judge will decide if that's a valid objection or not. Okay. But we're not here to re-argue the motions.
(May 2 2025 Meet & Confer – See transcript exhibit).

In my experience, Apple and its legal representatives engaged in multiple efforts to suppress or conceal evidence related to my protected activity. Examples include:

- Apple's internal communications with Appleseed, as reflected in records produced in response to my OSHA FOIA request, which included materials referencing nude images of me, created after my protected disclosures, and used in post hoc justifications for my termination.
- Apple's privilege log, which documents multi-month internal conversations among senior executives, including Kate Adams and Deirdre O'Brien, about how to respond to my protected activity — including a document titled "DRAFT talking points – AG EE_Witnesses.pages" circulated on August 15, 2021.
- Records produced via my EPA FOIA request, which show that Apple was the subject of environmental enforcement activity at sites I had raised concerns about, including a formal inspection prior to my termination.

On May 16 2024, during a hearing, Apple's counsel said there is "no statute that says its illegal to have the Gobbler application." (Dkt 75 at 19).

MS. RIECHERT: If I could just speak on the 1102.5, the whistleblower claim. (Dkt 75 at 19).

THE COURT: Yeah.

24

> MS. RIECHERT: Again, there has to be a violation of a statute or a regulation or the Constitution. And I think you have to say to whom you complained. I mean, it's only fair for us to know who she complained to. But she says she was protesting the Gobbler application, but that's not illegal, and there is no statute that she says it's illegal to have the Gobbler application. (Dkt 75 at 19).

However, Apple's own FAQs openly admit the Gobbler application violates at least international and foreign law.

Then on May 16, 2024, during the same hearing before Judge Edward M. Chen, Apple's counsel Melinda Reichert made the following statement regarding my claim under California Labor Code § 435: *"She did talk about audio, video recordings in the bathroom under 437 -- 435 of the Labor Code. But all she says is that the photo -- some sort of photo was taken, not that it was -- you know, that it violated that statute."*

> MS. RIECHERT: She did talk about audio, video recordings in the bathroom under 437 -- 435 of the Labor Code. But all she says is that the photo -- some sort of photo was taken, not that it was -- you know, that it violated that statute. So I still think on 1102.5 there's not enough; but if we're just going to go forward, take out the ones that we don't think are appropriate, we can live with 1102.5. (Dkt 75 at 19).

Apple's counsel claimed ignorance to Gobbler taking photos and videos in bathrooms, despite Apple's counsel's defense against me apparently resting on photos of me naked and in the bathroom. (See Exhibit G-H for examples). They hid this from me and made false statements to the court to try to get the claim dismissed, knowing there is direct concrete evidence of retaliation for this very claim.

25

In the Courts Oct. 1 2024 decision, it complained that I would not publicly name a coworker who I spoke to about concerns about Gobbler, despite fear of retaliation for this person since Apple said it would fire anyone who disclosed the topic. The court said I "have no right" to protect my friends as other witnesses, and even repeatedly used the word "snitch." Dkt 112 at 10. This was all for nothing as Apple knew exactly who I complained to (The Verge/the public) and what I complained about, as they were concurrently concealing naked photos of me from me and the court.

On December 18, 2024, I received documents from the Occupational Safety and Health Administration (OSHA) via a FOIA request related to my whistleblower complaint. Those documents included internal communications and evidence submitted by Apple's counsel during the OSHA investigation. The materials include a report submitted by Apple that referenced and included photos of me, taken using the Gobbler application, including intimate images. These materials were submitted as part of Apple's defense to OSHA's investigation, and the photos were tied to a complaint filed against me on September 15, 2021, six days after Apple terminated my employment.

These documents show that Apple used the Gobbler-related materials after my termination, in support of its defense in whistleblower proceedings. This evidence was not available to me when I filed my earlier pleadings, including my

Second and Fifth Amended Complaints, and I obtained them through a federal records request from OSHA in December 2024.

During my employment, Apple used internal surveillance tools to monitor me without consent. It retained and catalogued nude images of me through internal apps and tools. When I disclosed that this had occurred, Apple did not deny it — it claimed those images were its property. It fired me for talking about them. And it has continued to assert ownership over that material in its legal defense.

For instance, on Feb. 21 2025 I argued that Apple should not escape liability for the toxic torts due to their ongoing harassment and witness intimidation against me. During this hearing Apple also claimed its never been in trouble about the 3250 Scott Blvd fab, despite hundreds of citations from U.S. EPA and BAAQMD – so that was a material fraudulent statement disproven by evidence already on thh record. The court essentially approve the corporate tactic of witness intimidation in order to defeat statute of limitations for environmental crimes.

> GJOVIK: If I may, I also just want to say that I also have the additional arguments of fraud and some version of duress of where she asks, why couldn't I figure that out in 2021. One of the factors would be the extensive harassment and retaliation I was facing, that was a bit distracting from my environmental investigations.
>
> THE COURT: All right. Well, so it seems like the key is how -- whether that information was available. (2/21 hearing at pg 14).

27

I frequently felt singled out by the court and held to higher expectations and more strict rules then the local rules and FRCP, while it seemed like Apple could break any rule they wanted.

Apple seemed to brag about this, and instigate it, for instance in the last hearing:

MS. RIECHERT: I would just like to make one more point, Your Honor, if I could.

THE COURT: Okay.

MS. RIECHERT: You've admonished the plaintiff in this case that she needs to comply with the rules, meet the deadlines, meet the page limit requirements and yet she's continuing to not do that. She filed her opposition late. She filed -- the second version of the opposition was late and it was 30-some pages long. So again, it violated your rules by being late and I just think it's really important that we make it pg 26  clear, you make it clear to the plaintiff that she's got to comply with your rules. She's got to get these things done on time and she's got to comply with the page limit requirements.

THE COURT: Right. I am going to say that in my order, whatever I decide, that I expect at this point, I've given dispensation, because she's not represented although she has a legal education. But from this point on, the rules are going to be enforced. So I will make that clear and I'm going to make that clear in the order. Whatever goes forward from here, that's going to be my expectation. So I will take the matter under submission, but it's my intent to close the pleading stage of this case and move forward with whatever is left and we'll set a further schedule at that point.

THE COURT: Well, I've already indicated that my inclination is to close the pleadings in this case. We've already had now a fifth amended complaint. We need to move forward with what we've got after I decide the issue before me now. So you will hear from me shortly.

(2/21/25 transcript at 27).

I asked the court several times to ask Apple to stop making false allegations against me, personal attacks, and bullying me but the court never responded – or seemed to join in with Apple.

## VI.   OTHER THREATS & INTIMIDATION

In 2021, I filed whistleblower complaints with the U.S. EPA, OSHA, NLRB, DOJ, and other agencies against Apple Inc. concerning environmental violations, retaliation, and internal misconduct. These were lawful, protected filings under federal whistleblower statutes. Apple responded by placing me on administrative leave days after being notified of a pending EPA inspection. I was terminated weeks later without meaningful explanation.

On September 15, 2021, I learned that a then-Apple Legal Security employee — whom I refer to as "Appleseed" — submitted an internal complaint to Apple about me, including nude images. I did not consent to this submission. These images were irrelevant to any investigation or legitimate business purpose. Apple never informed me they were submitted or used. I later discovered this complaint formed part of Apple's internal justification for my termination.

Apple accepted this material, used it as part of its legal defense narrative, and never disavowed its use. Appleseed was not acting alone. Her submission was

29

reviewed, retained, and incorporated by Apple's Legal and HR departments. They accepted and relied on the benefit.

Between August and December 2021, Appleseed publicly attacked me in coordination with others, calling me a liar, a grifter, and a predator. She told press not to write about me, and told others not to support me. She accused me of falsifying my complaints to extort a settlement. These defamatory statements were made during active federal investigations and directly interfered with protected activity.

On January 11, 2022, I filed a third NLRB charge, naming Appleseed and other Apple employees for witness intimidation and retaliation. On January 29, I submitted a DOJ memo detailing Apple's pattern of threats and retaliation — including Appleseed's conduct. (See Exhibit P). That same weekend, Appleseed filed a petition for a civil harassment order against me. She explicitly cited the NLRB and DOJ filings as her motive.

On February 5, 2022, Appleseed sent me a message demanding I "remove" her statements from my January U.S. DOJ memo. These tweets contained direct evidence of her public defamation and coordination. In the same message, she falsely claimed she had never testified against me — even though she had done so five days earlier. Her demand came during an active court proceeding . I understood it as a threat: alter the record, or face legal consequences.

After she obtained a temporary court order, Appleseed reported the public

30

PDF version of my DOJ memo to my web host as child pornography. This was a legal filing submitted to multiple federal agencies. Her report caused it to be removed from public access.

In 2023, OSHA dismissed my whistleblower case after interviewing only one person — Appleseed — who again falsely accused me of lying. OSHA did not contact any of my witnesses. Appleseed's statement was the only testimony cited in their ruling.

In 2024, Appleseed filed a sworn declaration in this litigation in support of Apple's Motion to Strike. She admitted her actions were due to my complaints, and confirmed she contacted Apple's attorneys to assist in removing claims. Apple did not dispute it, disclaim it, or reject her help. I asked the court to "close the docket" in my pleadings – complaining about harassment from the filings and Appleseed showing up at every hearing to intimidate me, but the court refused to acknowledge my requests.

These facts do not describe a personal dispute. They describe an enterprise. Apple created the legal and strategic conditions under which Appleseed operated. They enabled her access. They accepted her unlawful submissions. They incorporated her narrative into their defense. When she escalated her conduct through false reports, restraining orders, and threats, Apple remained silent — because it helped them.

31

This pattern constitutes a RICO enterprise under 18 U.S.C. § 1962(c). The actors (Apple Legal, Apple HR, Appleseed, and others) engaged in a coordinated structure of retaliatory conduct. The predicate acts include:

- Submission of false evidence (nude photos) to discredit a whistleblower;
- Use of civil litigation to silence protected legal filings (§ 1513(e));
- Threats to alter federal complaints (§ 1512(b));
- False criminal reporting to remove federal evidence (obstruction);
- Retaliatory coordination with government proceedings (OSHA).

Apple's role was not passive. Apple retained, accepted, and used all of this conduct. Apple attorneys worked with Appleseed post-employment. Apple filed her declarations in court. Apple attorneys have now signaled plans to seek a new gag order covering similar facts — the DOJ memo, the nude photos, Appleseed's complaint, and Apple's defense narrative.

If this order is granted, it will again criminalize my ability to describe this pattern of retaliation and obstruction. It would allow Apple and its agents to use civil and criminal threats to permanently erase their role in silencing a protected whistleblower — while using the results in their defense.

I submit this declaration to establish not just the harm I have endured, but the legal structure that supports my appeal: this is a case about a retaliation enterprise operating through formal channels with strategic deniability. I respectfully request

that the Court issue injunctive relief to prevent further obstruction of protected proceedings and preserve the ability to adjudicate this case on the merits.

## VII.  DISCOVERY DISPUTES

On or about July 8, 2024, I participated in a meet-and-confer with Apple's outside counsel, including Melinda Reichert and Kathryn Mantoan. Based on prior experience, I had a good-faith belief that Apple's attorneys would again violate my labor rights under the National Labor Relations Act (NLRA). I therefore recorded the conversation to preserve evidence for a pending NLRB investigation. During the call, Apple's attorneys:

- Refused to disclose a definitive reason for my termination despite ongoing litigation,
- Admitted they had no intention of producing certain categories of evidence absent a protective order,
- Confirmed that they were controlling discovery based on internal criteria I had no access to.

I disclosed to Apple that I had recorded the call and submitted it to the NLRB. Shortly after, Apple's attorneys stated that they would seek a court order requiring me to delete the recording, and later moved the Court accordingly. At the time of that request, Apple did not possess a copy of the recording and had not reviewed its contents. I believe this conduct constitutes retaliation for protected activity under the NLRA, and was an attempt to suppress evidence relevant to multiple claims in

33

this case.

I lawfully recorded the July 8, 2024 meet-and-confer to preserve evidence for a pending NLRB proceeding, in which I alleged that Apple and its attorneys were violating federal labor law. After learning that I recorded the call, Apple's counsel stated they would seek a court order requiring me to delete the recording. They made this threat without knowing what was on the recording, which I had submitted as evidence to the NLRB.

On July 8, 2024, Apple's counsel Melinda Reichert stated: *"We've done a very exhaustive search of the documents that we believe are the relevant documents. So just because we didn't produce something doesn't mean we're hiding it."* Despite this, Apple later produced multiple responsive documents they had clearly possessed for years — including my 2021 annual performance review, which referenced protected activity and was material to my retaliation claims.

Later in the same conversation, while discussing Apple's demand for a protective order, Reichert stated: *"The whole purpose of the protective order is otherwise we say we don't have to give you this because it's confidential. The protective order protects us by requiring [you] to keep it confidential with the threat of a violation."*

I understood this as a direct admission that Apple was using the protective order to both withhold discovery and to establish a basis for sanctions if I disclosed material they wanted hidden.

34

I objected on the call and explained that I believed Apple was using the protective order as a weapon to suppress disclosures protected under federal labor and environmental laws. Apple's counsel never denied this characterization — they simply referred to it as the "standard process."

I included the recording as evidence to the NLRB and when Apple's counsel found out they accused me of criminal conduct, and suggested they would get Judge Chen or Order me to delete the recording. I protested that my conduct was protected and it was criminal of them to try to interfere with agency proceedings.

On July 16 2024, Apple's counsel did raise the matter to Judge Chen accusing me of violating state law and asking to no longer have to meet and confer with me in this litigation.

> MS. RIECHERT: -- with respect to the meet-and-confer. We did meet-and-confer with the plaintiff with respect to the motion to dismiss. The plaintiff wanted to record that call. We said that we did not. I declined to allow her to record the call, and she recorded the call anyway. And so I would like for us not to have to meet-and-confer. We believe that the recording was not permitted by California law. And I don't think we should be required to meet-and-confer and have calls recorded against my consent and in violation of California law.

> THE COURT: Okay.

> MS. GJOVIK: Your Honor, the defendant is intentionally misrepresenting what that was. That was me gathering evidence for a pending NLRB proceeding where these lawyers were named in December, and it was further evidence of that to give strictly to NLRB as part of their investigation as well as a new charge. I explained this. And the recent Starbucks NLRB decision last year made very clear that the Garmon preemption applies to those two-way

35

consent laws if you're gathering evidence for NLRB. So I'm kind of distressed they continue to bring it up with this framing, which sounds like I'm -- have misconduct, but I'm actually trying to help the government investigate. I'm also kind of concerned because, even before that recording, Apple repeatedly refused -- they didn't want to meet and confer. The last time we talked about meet and conferring, they demanded there be no witnesses or record. But they've already used that meeting we had -- the one without a court reporter or anything -- and I feel like misrepresented our conversation in my Department of Labor case. And I filed a complaint about that. So I -- I would be happy to meet with Apple and talk. I do prefer to have a record based on, I mean, what's happening in this lawsuit. But that's also part of my lawsuit from three years ago --

THE COURT: All right. Well, there's --

MS. GJOVIK: -- is this kind of stuff.

THE COURT: There are separate issues here. Whatever you do with respect to [N]LRBs is a separate question. I'm talking about meeting and conferring to see if you can come to an agreement. There's nothing binding coming out of that until there's an agreement. So there's no need to record that. And I can't order and I won't order, at this juncture, recording of an informal meet-and-confer just to see if you can agree on a discovery plan for the next, let's say, 60 days or 90 days. It's a very narrow scope. It's not intended for anybody to make admissions. It's intended to say here's what we can do, et cetera, et cetera. Now, if it gets to a point where the parties continue to have differing versions of, well, you agree to do X, and I agree to do Y; no, you didn't agree to do X, et cetera, et cetera, you know, then I will consider, you know, other -- other things. Now, one of the things I am considering and I will do -- I'm also going to appoint a magistrate judge to assist with discovery. And if there's a problem with the meet-and-confer, there's somebody you can go to very quickly if -- that can manage this discovery. So I'm going to assign that. It will go to a randomly assigned magistrate judge. And you'll get notice of that.

MS. GJOVIK: Your Honor --

THE COURT: But that magistrate judge will act under my directive. And that is for the parties to meet-and-confer, figure out Phase 1 -- or Stage 1 -- of the nonemployment. That the GO 71 will apply concurrently to the employment

36

so that we're not at a total standstill. But discovery's got to proceed sort of phased. Because if I end up dismissing all the nonemployment cases, then there won't be any more discovery. So we will address that. So I will give some overall directive with respect to staging. But in terms of working out the details, if there's dispute over what the scope should be for Phase 1, I want the magistrate judge to help you all resolve that. So --

MS. RIECHERT: Can we have an agreement with – from Your Honor that she will not record any phone calls that we have going forward?

MS. GJOVIK: I gathered evidence for the federal government for an ongoing --

THE COURT: Okay.

MS. GJOVIK: -- government investigation.

THE COURT: What I'm going to order is that, with respect to this case, any meet-and-confer, whether it's by phone or live, will not be recorded unless I order or the magistrate judge orders otherwise. I don't have jurisdiction over whatever NLRBs. If there's a call with respect to some other proceeding, I don't have jurisdiction over that, so I can't say "yes" or "no" on that front. So your conversations should be clear that if you're talking about this case before me, that won't get recorded. Now, if you want to have another conversation about NLRB evidence gathering, that's between you all and the NLRB, not -- I'm not intervening there. MS. GJOVIK: Understood, Your Honor. I am concerned though -- I mean, this is four years running – about misrepresentations of communications when they're not written. This has been an ongoing issue with the defendant. And I even asked if I can bring a witness just to sit with me, so if someone had to testify to what happened, there could be someone that's not just me. And they said "no," expressly. If recordings are completely forbidden, can I get approval to have a witness with me?

THE COURT: I'm going to allow the magistrate judge to determine what is the best process for you all to meet-and-confer, whether you meet and confer in a physical place, maybe with a magistrate judge, or, you know, you can talk to the magistrate judge about the disputes you've had and whether it makes any sense or not, at this point, until further developments.

37

(Dkt 88, July 16 2024, Page 10-15).

....

Meanwhile, I will appoint a magistrate judge to assist you with any meet-and-confer disputes, or discovery disputes, scope questions.

(Dkt 88, July 16 2024, Page 17).

Despite this, when I requested help from the magistrate Judge, I was met with condemnation. (Dkts 170 and 181).

On February 11, 2025, Plaintiff filed four discovery letter briefs. (Dkt. Nos. 162-165.) The undersigned, however, does not entertain unilateral discovery letters. Instead, the parties are required to meet and confer and file joint discovery letters to address pending discovery disputes in accordance with the Court's Standing Order. (Judge Westmore's General Standing Order ¶¶ 13-14, http://cand.uscourts.gov/kaworders.) Accordingly, Plaintiff's four unilateral discovery letters are TERMINATED, and the parties are ordered to meet and confer to resolve all pending disputes without court intervention. If those efforts fail to fully resolve all issues of contention, the parties shall jointly write and file a letter outlining any remaining disputes consistent with the Court's Standing Order.

(Dkt 170).

I did not know how I was supposed to get the Magistrate's assistance in establishing boundaries for Meet and Confers, if I had to Meet and Confer about not trusting the Defendant to Meet and Confer in good faith, prior to asking for help. So I filed a request for reconsideration.

On February 20, 2025, Plaintiff filed a motion for reconsideration of the Court's order terminating the discovery letters.1 (Pl.'s Mot., Dkt. No. 171.) Specifically, Plaintiff requested "reconsideration of her request for a Judge-supervised meet and confer telephone conference, as prescribed by the Honorable Judge Chen last year, due to the open and ongoing discovery disputes between the parties." Id. at 3.2 On February 27, 2025, Defendant filed an opposition and explained that Plaintiff filed her request for reconsideration

38

without asking Apple to meet and confer in accordance with the Court's Standing Order. (Opp'n, Dkt. No. 178 at 1.) Defendant further represented that it remains willing to meet and confer in accordance with the Court's standing order. Id.

Accordingly, Plaintiff's motion for leave to file a motion for reconsideration regarding her request for a judge-supervised meet and confer telephone conference is DENIED. At this juncture, the Court finds no basis to depart from the procedures set forth in the standing order, which requires that the parties meet and confer in person or via video conference. (Judge Westmore's General Standing Order ¶ 13.) If Plaintiff is concerned about the possibility of Defendant making "unlawful threats and coercive statements" during the meet and confer or the potential that the discussions will be misrepresented, the parties can meet via video conference and record the meet and confer session. (See Dkt. No. 171 at 2.) The parties are advised to limit their discussions to the relevant discovery device(s) at issue. This meet and confer process is not the appropriate venue to air general grievances. (Dkt 181).

The District Court then apparently punished me by staying it was inclined to grant Apple a blanket protective order in the litigation without requiring that Apple make a showing as to why it needs it, and despite my protests.

Finally, the parties are directed to meet and confer regarding the Northern District's model stipulated protective order (available at https://cand.uscourts.gov/forms/model-protective-orders/). If the parties are unable to agree, the Court is inclined to adopt the model order for standard litigation. (Dkt 181).

Reading this made me extremely depressed and anxious., and I continue to experience PTSD and anxiety symptoms about it – as Apple has continued to raise the issue and repeatedly threatened to get this order, and to use it on my protected activity and to cover up their misconduct – specifically the naked photos taken of me by the Gobbler app.

During a Meet and Confer on May 2 2025, Appels' counsel disclosed they plan to use the protective order to gag me about my "consent" to them taking secret naked photos of me with the Gobbler application, will not give me a copy, and confirmed that I could be incarcerated for telling anyone about the terms of the agreement.

Melinda (Apple)  6:47

[Melinda Reichert (Partner at Orrick, Herrington & Sutcliffe)] (4:57 - 5:53)
Okay, so first of all, yes, we are withholding documents pursuant to the lack of a protective order. We've produced the documents that were not subject, that are not confidential, that we don't think need to be produced pursuant to protective order. So it's not correct that we've agreed we produced all documents. We've only agreed to be produced all documents other than those that we intend to produce under a protective order. Secondly, protective order is standard in all cases. I have never had a case where we didn't have one. Third, you wanted an example. For example, one of the documents that we intend to use in this case is the consent form that you signed for the Gobbler application. You don't believe that the one that we have is the right one. I need to show you the entire document so that you can agree that that is the document that you signed. And so a reduction doesn't help because— I signed.

[Ashley Gjovik (Pro Se)] (5:53 - 5:58)
You won't give me a copy of a contract I signed without a confidentiality order about the contract.

[Melinda Reichert (Partner at Orrick, Herrington & Sutcliffe)] (5:59 - 6:05)
I will not give you a copy of the consent order, the consent agreement that you signed without a confidentiality agreement.

[Ashley Gjovik (Pro Se)] (6:05 - 6:43)
That's just one example of many— That's exactly why you won't tell me this stuff and why I want to know it. Because I'm like, yes, we will contest that to a judge because that's also like the nexus of the case. If you can't say some weird contract that probably has a bunch of illegal
terms that I was coerced into signing with armed guards in a parking lot on a 100-degree day is somehow confidential and I can't even tell people what's in

40

this agreement I signed and you won't give me a copy. I think that violates contract law, employment law, labor law, probably like Dodd-Frank SOX stuff. So each of these are things that I think are ripe issues to bring in front of the court for the purpose of public policy conversations.

[Melinda Reichert (Partner at Orrick, Herrington & Sutcliffe)] (6:43 - 6:46)
And you're absolutely entitled to do that under the protective order.

[Ashley Gjovik (Pro Se)] (6:46 - 6:54)
But doesn't that give you kind of this blank[check] until it is resolved I can be jailed for talking about whatever it is?

[Melinda Reichert (Partner at Orrick, Herrington & Sutcliffe)] (6:55 - 7:02)
I don't know if jailed is the right word, but you would be subject to the protective order. Yes, you could be held in contempt if you violate it.

[Ashley Gjovik (Pro Se)] (7:02 - 7:19)
That's prior restraint. And if I know you're going to do prior restraint on stuff that I believe in my heart of hearts violates public policy and the law, like I would not intentionally enter into that kind of agreement with Apple again. I did that a few times and now we're here sorting that out. I'm not going to do that again.

[Melinda Reichert (Partner at Orrick, Herrington & Sutcliffe)] (7:19 - 7:39)
So we want a protective order. We want the model protective order. If you don't want to enter into a protective or any protective order or the model one, then feel free to write the beginnings of the three-page letter.

(May 2 2025 Meet and Confer transcript).

I wrote an email after with multiple objections to the statements made during the meeting, and Apple's counsel responded about the order saying:

I did not acknowledge that a protective order allows Apple to seek sanctions in court directly, rather than filing a separate breach of contract or trade secret suit. You were the one who raised this issue, and said Apple wanted to put you in jail, which I disputed. (M. Richert, 5/2/25)

41

All Apple said to dispute my concerns about another illegal gag order they can use to incarcerate me was saying that she didn't "know if jailed was the right word," but then said I would be "held in contempt."

## VIII.  Gobbler

Apple submitted materials to OSHA that include photos taken using the Gobbler application, which showed my body in a state of undress. Apple referred to these images in its submission to OSHA as "CONFIDENTIAL – EXEMPT FROM FOIA," and did not disclose them to me in litigation. Apple later stated in a sworn declaration to the court that the materials "do not contain any nude photographs of Plaintiff."

Apple also stated that it could not produce the unredacted version of these documents because I had refused to sign a protective order. These photos are of me. They were taken in Apple's workplace through software installed on Apple-issued devices. At no point was I informed that photos of my body taken in the workplace could be claimed by Apple as confidential information or withheld from me in litigation.

These images were taken without my knowledge or consent using Gobbler, a program that was designed to capture photos automatically when it detected a face. This software ran in the background on Apple-issued devices I used for

approximately four years while working at Apple.

Based on the frequency and duration of Gobbler's activity and how it worked, I believe it likely captured many other intimate images of me, including images while I was undressed or in the bathroom. The images described above are only the ones I have records of.

On August 20, 2021, I sent a topless image of myself — taken by the Gobbler application — to journalist Zoe Schiffer while she was preparing an article about Apple's internal surveillance. The image showed my bare upper torso, from the shoulders to just above the nipples, and was taken in a bathroom mirror by Gobbler's automated capture system running on an Apple-issued device. In a text exchange that same day, I told Ms. Schiffer: *"And there's one topless in those pics I sent... so you can say, indeed an employee saw the app was taking pics of them naked."*

On February 14, 2025, in opposition to my motion to disqualify Apple's outside counsel, Orrick Herrington & Sutcliffe, attorney Jessica Perry submitted a sworn declaration to the Court (Dkt. 167-1). In Paragraph 10 of that declaration, she stated: *"The unredacted version of Dkt. No. 155-2 at 31–45 does not contain any nude photographs of Plaintiff."*

This statement is false. The document does contain a topless image of me, which I had previously described publicly and privately. Apple submitted it to OSHA, and it was produced back to me by OSHA in December 2024 in response to a FOIA

43

request. The copy I received from OSHA matches the image I referenced in the August 20, 2021 text message to the journalist.

At the time Ms. Perry submitted this declaration, Apple had already had possession of that image for more than three years and had used it in a federal proceeding. The image was labeled "CONFIDENTIAL" by Apple and withheld from production to me during discovery in this case.

I raised internal complaints and formal government disclosures about Apple's unpermitted semiconductor fabrication activities at 3250 Scott Blvd., Santa Clara. Based on EPA records I later obtained through FOIA, this facility was generating and improperly managing up to 8 tons of hazardous waste per year, including gases such as arsine, phosphine, and hydrochloric acid — in close proximity to a residential neighborhood, a large apartment complex, and a public playground.

In the months after I made these disclosures, Apple terminated me and began submitting internal documents and images to federal regulators that included a topless image of me, captured through the Gobbler surveillance application on my Apple-issued devices. That photo was included in a complaint Apple submitted to OSHA on September 15, 2021, six days after my termination.

That statement ignored the context, the contents, and the fact that Apple submitted the image to a federal agency and used it in its defense — while refusing to disclose it to me in discovery.

44

On May 16, 2024, during a hearing before Judge Edward M. Chen, Apple's counsel Melinda Reichert stated: *"She did talk about audio, video recordings in the bathroom under 437 -- 435 of the Labor Code. But all she says is that the photo -- some sort of photo was taken, not that it was -- you know, that it violated that statute." Transcript of Proceedings, May 16, 2024, Page 19*

In Apple's opposition to my Motion to Disqualify, filed on February 14, 2025, attorney Jessica Perry stated under penalty of perjury: *"The unredacted version of Dkt. No. 155-2 at 31–45 does not contain any nude photographs of Plaintiff." Declaration of Jessica Perry, ¶10, Dkt. No. 167-1*

Additionally, Apple stated that it could not produce this material in discovery due to the lack of a protective order, and implied that I had obstructed that process. *Dkt. No. 167, p. 6; Perry Decl. ¶12–14*

On or about December 18, 2024, I obtained a set of documents through a FOIA request from the U.S. Department of Labor – OSHA. These documents included records and exhibits that Apple submitted to OSHA during its investigation of my whistleblower complaint (Case No. 9-3290-22-051).

Included in this production was a multi-page exhibit (referenced in Dkt. No. 155-2 at 31–45) that contained:

- Internal communications referencing Gobbler and images of me,
- One or more images of me in a state of undress that were captured via Apple

45

systems,

- A complaint sent to OSHA by a third party on September 15, 2021, referencing those images and other internal material.

At the time Apple made the above representations to the Court — that I had not specified how the Gobbler recordings violated the law and that the referenced images were not material — Apple had already submitted these materials to a federal agency in their own defense. The evidence confirms the materials existed, were relevant, and were being used by Apple — all while being withheld from me and denied in court.

These facts contradict Apple's claims that it had no knowledge of the materials' content or significance and that I had not sufficiently alleged a connection between the Gobbler surveillance and my termination.

In Jessica Perry's sworn declaration (Dkt. 167-1 ¶10), she states: *"The unredacted version of Dkt. No. 155-2 at 31–45 does not contain any nude photographs of Plaintiff."*

Apple submitted materials to OSHA that include screenshots of your text messages stating things like *"more boobs… nips removed"* and *"I have nudes in there too"*; Internal messages from a witness saying you sent them photos and that you let Zoe Schiffer publish some of them "to show just how invasive it is" and several image attachments labeled "CONFIDENTIAL – EXEMPT FROM FOIA," with the

46

context clearly showing they are of you, from the Gobbler app, in a state of undress.

## IX.  VICTIM'S RIGHTS: PROTECTION FROM COERCIVE DEPOSITION AND DISCOVERY

On August 20, 2024, in the Joint Case Management Statement (Dkt. 97, p. 9), I stated that I was evaluating my options to refuse to be subject to deposition by Apple's counsel under Marsy's Law, the Crime Victims' Rights Act (CVRA), and other victim protections due to: My role as a witness in open federal investigations, My diagnosis of severe PTSD, and Apple's pattern of ongoing abusive litigation behavior. I cited California Constitution Art. I, § 28(b)(5), which states I have the right: *"To refuse an interview, deposition, or discovery request by the defendant… and to set reasonable conditions on the conduct of any such interview to which the victim consents."*. On Aug 28 2024, during the hearing and in the minutes, the court said no. (Dkt # 106)

## X.  OBJECTION TO BLANKET PROTECTIVE ORDERS GAGGING WHISTLEBLOWER AND PUBLIC SAFETY DISCLOSURES

On July 9, 2024, and again on August 20, 2024, I objected to Apple's demand for a blanket protective order that would restrict my ability to speak about my working conditions and retaliation, environmental health and safety complaints, and other topics of public interest. In Dkt. 77 at p. 7, I requested that the Court: "…scrutinize any requests from Defendant… that appear to be an attempt to censor and silence

47

[me] – especially about topics like public safety."

In Dkt. 97 at p. 6, I stated that Apple had already tried to classify "confidentiality of matters that are protected topics and matters of public concern (work conditions, public safety, labor disputes…)" under a proposed protective order. These attempts infringe on my First Amendment rights, my rights under NLRA §7, and my rights as a whistleblower under 42 U.S.C. § 9610 and the OSHA 11(c) framework.

## XI.  SCHEDULING & OVERSIGHT

I repeatedly asked the District Court for a case schedule, for frequent case management meetings, and close oversight due to concerns about misconduct by the defendant. The court has not issued a schedule. As of now there is no schedule, no trial, and no next steps.

In the initial Case Management Statement, Apple rejected my request to stipulate to an e-discovery protocol, despite knowing the case involved complex, multi-agency digital evidence. "Plaintiff is receptive to the idea [of a stipulated e-discovery order]… Defendant does not believe that a stipulated e-discovery order is necessary or appropriate in this action." This refusal impairs case coordination and raises spoliation concerns, especially in a matter involving internal investigations and whistleblower complaints.

In May 2024, the court expressed it wanted to "move this case along" and to "avert a longer litigation process." The court then allowed Apple to file a fifth 12(b)(6) motion, acknowledge it violated Rule 12(g) and 12(h), dismissed many of my claims for discretionary reasons, and then failed to set any sort of schedule or create any plan for the case.

> MS. RIECHERT: I think you took it off calendar.
> THE COURT: Okay. What I will do is once I rule on the pleadings here, I will set a CMC, and at that point I'll also want to talk about, you know, how we can move this case along, whether there's any interest in any kind of alternative dispute resolution, is there some way that the parties can engage in a process that might avert a longer litigation process here. So I'd like you to think about that as well.

(5/2024, Dkt 75 at 18).

The District Court previously ordered us to create a Discovery Plan and for Apple to complete initial disclosures on all claims, but Apple never completed initial disclosures on employment claims, and refused to provide any initial disclosures on non-employment claims. Apple also refused to create a Discovery Plan and we still do not have a discovery plan.

On Aug. 28 2024, the court solely addressed Apple's counsel as to next steps in case management, never asking my opinion or for my input, and making multiple decisions directly against the things I requested in the Joint Case Mgmt. statement and at prior hearings. Apple's counsel also informed the court that the court believe my case was only about retaliation (which is not what the court had said prior), but

49

the court would then rule to make the case only about labor and retaliation, as Apple's counsel instructed.

MR. RIECHERT: Your Honor, we did have a case management conference today on calendar.

THE COURT: All right. Well, let's talk about that. So what's your view of the next step? I mean, obviously I have to rule on these pleadings so there's only so much we can do, but what -- do you have some suggestion as to next steps?

MR. RIECHERT: Yeah. So at the last hearing you asked us to do the Rule 26 disclosures --

THE COURT: Yes.

MR. RIECHERT: -- and that is due September the 16th. And then once we get a ruling on the motion to dismiss, then I think we will be ready to move forward on what we hope is just the retaliation for complaining part of the case, which is what Your Honor has said is the gist of this case. She complained, she was fired; therefore, she was fired for complaining. That's what we think this case is about and should be about, and we're trying to get it narrowed so that there are not disputes on discovery, which we anticipate if we don't get a very clear statement of what this case is about.

THE COURT: All right. Well, I'm going to require that at least the disclosures, because that's not that burdensome, proceed as we go. With respect to discovery, although I normally don't stay discovery pending a motion to dismiss, here it's sort of fundamental, and I think given the breadth of the complaint, I am going to stay discovery until I rule so you-all know what the scope of this case is. But once I do, I'm going to order that discovery commence forthwith and that the discovery plan be negotiated, et cetera, et cetera. But I will suspend that for now, but once I decide what's in this case, I will order that discovery commence. I would like you pursuant to Rule 16, Rule 26, to work out a discovery plan. Remind me about what did we talk about in terms of any ADR.

MR. RIECHERT: What we talked about is the -- we wanting to have ADR.

50

We've agreed to have a settlement plan. conference with a magistrate judge. We would like to do that after we've taken the plaintiff's deposition. The plaintiff has said in her case management conference statement that she would prefer ENE. We do think a settlement conference is better with a magistrate judge.

**THE COURT:** All right. Ms. Gjovik, your thought about ADR?

In this exchange the court expressly excluded me from the conversation about discovery, the scope of the case, and case management planning – despite asking the opinion and input from opposing counsel. The court then made several prejudicial decisions against me including staying discovery, refusing my request for ENE, and ordering a settlement conference which Apple used solely to harass me as I expected. (See sealed declaration and exhibits).

On Feb 11 2025, at Dkt. 166 at p. 5, I documented that Apple refused to engage in an e-discovery protocol, despite knowing this is a multi-agency, multi-jurisdictional litigation with overlapping digital evidence. I stated: "*Plaintiff had repeatedly requested [a stipulated e-discovery order] but Defendant has refused.*" This refusal obstructs proper data handling, contradicts the Court's own ESI guidelines, and raises concerns about preservation and spoliation.

Despite there being no schedule, plan, or trial – on Feb. 21 2025, the court said it was denying my request to Amend and Supplement the Complaint due to wanting to "get going on this case." After dismissing half of my case and refusing to allow me

51

amend, the court took no steps to schedule, plan, or communicate next steps.

I also will feel that whatever I rule with respect to this complaint, I am not inclined to allow further amendments to the pleadings here. We need to get going on this case and there's been enough back and forth on the pleadings, but I will rule on those matters once we -- I rule on what's before me now. (2/21/25 hearing at pg 26).

## XII.    REQUEST FOR DISCLOSURE OF TERMINATION DECISION-MAKERS

On Aug 20 2204, at Dkt. 97 at p. 4, I stated: "Defendant still has not disclosed to Plaintiff who was involved in making the decision to terminate her employment, the timing of that decision, or their investigations into her and her complaints." This information is essential to establish retaliatory motive and pretext under whistleblower laws and labor protections. Apple's refusal violates its Rule 26(a)(1) disclosure obligations.

## XIII.    I DID NOT CONCEDE.

The court repeatedly I conceded and somehow consented to have my claims dismissed. I never conceded. I specifically wrote I did not concede. And in an abundance of caution I tried to file a sur-reply with a supplemented complaint, which was denied. I also asked to file a supplement brief after a hearing, and was also denied. However, the order then claimed I conceded – which I did not.

**MS. GJOVIK:** Your Honor?

**THE COURT:** Pardon?

52

**MS. GJOVIK:** Would you be willing to perhaps allow me to file a, like, 10-page brief on the key things we talked about just so I can point out those laws I was trying to cite, that there are --

**THE COURT:** No, I'm not going to take any more. There's been a lot of briefing on this and everybody's had their chance, and so I'm going to base it on the briefing that I have.

**MS. GJOVIK:** Okay.

**THE COURT:** So the matter is submitted. Thank you.
(8/28/24 hearing)

## XIV.   REQUEST FOR INTERROGATORY LIMIT ADJUSTMENTS BASED ON JOINDER AND PRO SE STATUS

On July 9 2024, at Dkt. 77 at p. 6, I asked the Court for: "Interrogatory quantity being allotted for at least the whistleblower/labor and toxic tort causes separately (so double)." Because I am financially unable to afford depositions and this case involves distinct legal theories joined under Rule 18, I requested an equitable increase in interrogatories to preserve my discovery rights.

## XV.   REQUEST FOR SCRUTINY OF LITIGATION TACTICS THAT SILENCE PUBLIC SAFETY DISCLOSURES

On July 9 2024, at Dkt. 77 at p. 7, I specifically warned against litigation tools designed to: "Censor and silence [me] – especially about topics like public safety." This was reiterated in Dkt. 97 at p. 6, where I detailed how Apple had already abused confidentiality designations and discovery rules to hide whistleblower-related

53

materials and suppress protected speech.

I went on to complaint that Apple labeled basic materials like my health benefits, performance reviews, and environmental complaints as "confidential" under a proposed protective order — without any meet-and-confer or specific justification. In Dkt. 77 at p. 7, I wrote: "Defendant's actions in December 2023 under the premise of General Order 71 and a Protective Order (where Defendant claimed Plaintiff's performance reviews, health benefits, and EHS complaints were secret and confidential) violated federal law." These overdesignations obstruct the public's right to know and chill my protected speech under NLRA §7, the First Amendment, and multiple whistleblower statutes.

## XVI.   DISRUPTING COURT PROCEEDINGS & LOSS OF DUE PROCESS

On August 28, 2024, I appeared via Zoom at a hearing before Judge Edward M. Chen. That appearance was marred by multiple and prolonged technical failures, including complete audio dropout from the court side. I was unable to hear much of what the Court or Defendant's counsel said during the hearing.

I stated repeatedly that I could not hear, and I notified the Courtroom Deputy (CRD) during and after the hearing. Other Zoom attendees also told me they had lost audio. Despite these warnings, the hearing continued and concluded without my ability to meaningfully participate. [Dkt. 106, see also Dkt. 116, p. 6–9]

54

Judge Chen accused me of interrupting, warned me that I would be forced to attend in-person, and threatened sanctions—all *while I was unaware I was speaking over him, because I could not hear him at all. "You are not to talk over me... I will make you come here into court."* — [Dkt. 106, p. 11]; *"Ma'am, I'm going to cut you off if you don't let me speak."* — [Dkt. 106, p. 11]

**MS. GJOVIK:** So this is actually defined --

**THE COURT:** Hold on. Hold on.

**MS. GJOVIK:** -- in the statutory analysis that they --

**THE COURT:** Hold on.

**MS. GJOVIK:** -- that they also said there were --

**THE COURT:** Hold on. Ms. Gjovik, Ms. Gjovik I'm going to cut you off.

**MS. GJOVIK:** -- interpretations that "operations" --

**THE COURT:** Ma'am --

**MS. GJOVIK:** -- means workplace.

**THE COURT:** Ma'am, I'm going to cut you off if you don't let me speak. And next time I'm going to have you here in court because you're not listening to me. You are talking over me. You are not to do that. Do you understand?

**MS. GJOVIK:** I couldn't hear anything you just said. I'm sorry, Your Honor.

**THE COURT:** You are not to talk over me. I'm asking you a question and you talked over me. So the next time we have a hearing, I'm going to make you come here into court. I asked you a specific question. Why does the statute say "workplace operations" and not just "workplace"? Why shouldn't that mean that the exposure must come from operations and not from preexisting

ambient conditions?
(Dkt 106 at 11).

I never intentionally interrupted the court. I stated during the hearing that I was experiencing technical difficulties, and I attempted to clarify this immediately afterward via email and a declaration.

On September 27, 2024, the Court issued an order acknowledging that the hearing suffered from technical failures: "This order reflects the Court's understanding that there were connectivity… problems with the hybrid (Zoom/in-person) hearing." — [Dkt. 122] Despite acknowledging those failures, the Court insisted — without any basis — that they "did not impact" my rights or participation. That is not accurate.

In the October 1, 2024 Order (Dkt. 112), the Court made numerous false statements about the August 28 hearing. For example: "Because Ms. Gjovik has failed to address the remaining arguments made by Apple, the Court deems any opposition waived." — [Dkt. 112, p. 33] "She did not raise these arguments…" — [Id.]

These conclusions are incorrect and contradict the reality that I was denied any opportunity to respond due to the Court's own audio malfunction. The Court then used these supposed "failures" to dismiss critical claims with prejudice — claims I was prepared to argue and had briefed.

56

I submitted a formal report to the FBI after the August 28 hearing, alleging that the connectivity loss may have been caused by an illegal signal jammer. This was based on other attendees losing audio and coordinated disinformation online after the hearing I believe Apple's lawyers used some sort of jammer in the US District Court... then social media accounts immediately tried to gaslight me. (See sealed declaration).

Because I could not hear the hearing, I was denied a meaningful opportunity to be heard, a chance to clarify disputed facts or law, and procedural fairness before claims were dismissed. The denial of participation, paired with subsequent rulings attributing waiver or concession to me, constitutes a violation of my Due Process rights under the Fifth Amendment and well-established precedent

At multiple points, Judge Edward M. Chen raised his voice, cut off the plaintiff mid-sentence, and made aggressive procedural threats: "Ma'am, I'm going to cut you off if you don't let me speak. And next time I'm going to have you here in court because you're not listening to me." — *Page 11, Dkt. 106* "You are not to talk over me... I will make you come here into court." — *Page 11*

## XVII.  Conclusion

Given the clear and imminent harms outlined above, I respectfully request that the Court consider these facts when evaluating Appellants' motion for injunctive relief. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

I tried to write these filings the best I could with extremely limited time and resources. I deeply apologize for any typos, oversights, delays, or other issues – and I mean no disrespect to the court. Thank you.

Executed on May 12 2025 at Boston, Massachusetts.


Dated: May 12 2025

_____

**Ashley M. Gjøvik**
/s/ Ashley M. Gjovik
Pro Se Appellant