CASE NO. 25-2028

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

**ASHLEY M. GJØVIK**, *an individual*,
*Plaintiff-Appellant*

v.

**APPLE INC.**, *a corporation*,
*Defendant-Appellee.*

On Appeal from the United States District Court
for the Northern District of California
No. 3:23-CV-04597
The Honorable Judge Edward M. Chen

---

## APPELLANT'S REQUEST FOR JUDICIAL NOTICE:
## EXHIBITS I: VIOLENCE

---

**Ashley M. Gjøvik, JD**
*In Propria Persona*
2108 N. St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# Gjovik v. Apple

# Exhibit A

5/20/25, 4:52 PM          RE: [EXTERNAL] Possible Environmental Crime; Fear of Retaliation, Harassment, or Worse for Exposing It - Ashley Gjovik - Outlook

 **Outlook**

---

## RE: [EXTERNAL] Possible Environmental Crime; Fear of Retaliation, Harassment, or Worse for Exposing It

**From** Ashley M. Gjøvik <ashleymgjovik@protonmail.com>

**Date** Mon 9/11/2023 3:02 AM

**To** Porter; Bud <bporter@dao.sccgov.org>

📎 2 attachments (6 MB)

3250 Scott Complaint - Final.pdf; Gjovik v Apple Complaint.pdf;

Hey Bud,

I hope you're are doing well. I wanted to give you a head's up. I ended up resorting to filing a civil lawsuit in federal court last week, and among other claims, I'm going after Apple for RICO, which will include their environmental misconduct through mail fraud, wire fraud, and 18 USC 229 (chemical weapons -- they leaked an impressive amount of phosphine, and arsine, and silane into the outdoor air at 3250 Scott Blvd).

I'm attaching the civil complaint. You might want to give DA Rosen a heads up because one of my RICO predicate acts is the Thomas Moyer/criminal bribery charge that DA Rosen just won the appeal of and the charge was re-instated. If you haven't been following that, I wrote about it here: https://ashleygjovik.substack.com/p/apple-corporate-crime-update Moyer is part of the schemes and enterprise I allege were behind how I got sick and all the retaliation I faced.

In the complaint, I also mentioned the conversations I had with you since Apple would have seen I was talking to you back in 2021 (on corporate devices) and thus that bolsters my claims of predicate acts of witness intimidation and retaliation (18 USC 1512, 1513). I wanted to ensure you knew and weren't caught by surprise on that.

Come to find out, when I got sick at that 3255 Scott Blvd apartment complex in 2020, it probably wasn't from the Superfund or Brownfield. It was probably the fact that Apple was operating a stealth semiconductor manufacturing plant at 3250 Scott Blvd, without proper permits and almost no abatement or monitoring tech, that was just straight up venting its solvent fumes and toxic/lethal gases into the outdoor air right out side our home windows. They reported nearly 8 tons of VOC fumes in just 2020, along with over 200 pounds of the now banned NMP just released up into the air that year. My industrial hygienist report noted a number of their industrial chemicals, my 24/7 air monitors showed the VOC peaks around 7am and 10pm each day (like automated exhaust systems), and my blood rests showed exposure to arsine gas during one of the 3am choking/dying spells. NMP turns yellow when it oxidizes and could have been behind my white clothing turning yellow where it met air flow.

I discovered this factory in February 2023 (through my own research) & filed a complaint to a number of agencies. US EPA RCRA compliance and enforcement took lead and apparently conducted a surprise inspection last month (RCRA & CAA). I'm waiting to hear what came out of it but I had already found a number of issues myself which I included in the complaint -- attaching that complaint here as well. I'm not sure if you would get pulled in on this since its at a federal level, and city had taken complete control over haz mat (pushing out county and state). But seems like something you probably want to be aware of. I'm sure this won't be the last of this matter with Apple exposing thousands of people to these carcinogens and toxic chemicals from 2015-current. I'd expect cancer clusters, miscarriage clusters, and other high-risk exposure long-term outputs.

The silicon fabrication factory venting its toxic emissions only < 300 ft from thousands of apartment windows and an open-air children's playground was operated by my ex-employer Apple. Based on PRA & FOIA documents, and other research, I'm confident Apple knew no later than Nov 2020 that they were the ones who made me sick in Feb-Sept 2020, and thus my conversations with you about my concerns would have been of interest to Apple and they would have "known" when they chose to retaliate, fire me in Sept 2021, & try to silence me. That's part of the RICO claim.

Let me know if any questions or if you want to talk about it more, or if you want the US EPA contacts, if you don't already have them.

-Ashley

---

**Ashley M. Gjøvik**

**BS, JD, PMP**

Sent with Proton Mail secure email.

------- Original Message -------
On Thursday, December 15th, 2022 at 1:23 PM, Ashley M. Gjøvik <ashleymgjovik@protonmail.com> wrote:

> Hi Bud! I hope you're well. Thank you for the email below. Understood about my own whistleblower cases.
>
> I just wanted to follow up to let you know that after many FOIA requests on my part, I'm finally getting to the bottom of what happened at the TRW Microwave Superfund site (my Apple office in Sunnyvale).
>
> It appears Northrop Grumman knew since 2020 that the HVAC was pulling in the toxic waste vapors & sending them into our indoor air. Apple appears to have learned that around May 2021. EPA discovered it July 2021 - as a result of my complaints. It appears EPA was helping Apple & Northrop cover it all up for some time, and still is. I was fired Sept 9 2021 following an EPA mandated safety inspection on Aug 19 2021 which found a number of concerns.
>
> I still have open NLRB, & CA + US DOL whistleblower cases. I've also filed complaints to EPA OIG & and the FBI even before I recently received the FOIA docs exposing the worst of this so far.
>
> As for actions that could be referred to your office - at this point it appears US EPA has jurisdiction (not CalEPA), and CalOSHA told me they have zero jurisdiction because it's a Superfund site (which is wrong, but whatever). I don't expect US EPA to refer the matter themselves since they appear to be complicit in the cover-up.
>
> The building is currently owned by CalSTRS (California gov) and the faulty HVAC/SSD configuration was set up in 2015 when there was still California Water Board oversight. (they then transferred it to US EPA).
>
> I'm attaching a timeline summary for you with the new FOIA discoveries - because this seems like something you may want to have on your radar over the next couple years.  Beyond my own whistleblower cases, I'd expect when all of this starts coming to light, there to be toxic tort & other negligence litigation - at least civil.
>
> Let me know if you have any questions.
>
> —
>
> **Ashley M. Gjøvik**, J.D., B.S., PMP
> Director, A. M. Gjovik Consulting, L.L.C.
> Phone: +1 415-964-6272 (EST)
> Personal: ashleygjovik.com | ashleymgjovik@protonmail.com
> Consulting: gjovik.co | consulting@ashleygjovik.com
>
> Sent with Proton Mail secure email.
>
> ------- Original Message -------
> On Wednesday, February 23rd, 2022 at 12:36 PM, Porter, Bud <bporter@dao.sccgov.org> wrote:

Hi Ashley,

The DA's Office is, for the most part, responsible for reviewing and prosecuting criminal cases brought to the office by investigating agencies such as local police departments. When it comes to private civil disputes, like a wrongful termination case, the DA's Office does not get involved and does not represent individual citizens in their complaints against other individuals or businesses. We cannot give legal advice to the public, so we cannot help you in that regard. As to your question about the intake process, we receive reports from agencies after they have completed an investigation and they have determined that there is enough evidence to present the case to the DA's Office for prosecution. In your situation, as it relates to the investigation of workplace vapor intrusion and/or Superfund site remediation or monitoring issues, the relevant agencies that come to mind are possibly Cal/OSHA, the Bay Area Air Quality Management District, USEPA, Cal/EPA including DTSC, the Santa Clara County Dept. of Environmental Health, and the State Water Board. I don't know whether any of those agencies would investigate your claims, and we do not direct them to take action or not take action. Finally, keep in mind, when it comes to environmental or workplace safety complaints, most investigations do not lead to a referral to the DA's Office—even when violations exist, the agency may have civil, administrative, and/or voluntary compliance types of remedies available.


Take care,

Bud


Bud Porter

Supervising Deputy District Attorney

Santa Clara County District Attorney's Office

70 W. Hedding Street, West Wing

San Jose, CA  95110

Phone:  (408) 792-2962

Pronouns: he/him/his

**From:** Ashley M. Gjøvik <ashleymgjovik@protonmail.com>
**Sent:** Monday, February 21, 2022 8:43 PM
**To:** Porter, Bud <bporter@dao.sccgov.org>
**Subject:** Re: [EXTERNAL] Possible Environmental Crime; Fear of Retaliation, Harassment, or Worse for Exposing It

Hi Bud! I hope you're doing well.

I wanted to check-in again. I think I could use the SCC DA's help.

Since last April, I ended up blowing the whistle on Apple Inc & Northrop Grumman over my Superfund Apple office. There was a long history of vapor intrusion while it was vacant, then they did some limited testing, moved Apple folks in, and never tested again. I expressed concerns. Apple told me several times to not talk to anyone about my safety concerns. I started mentioning "labor laws" and things got worse.

(I guess it was good I learned so much from that Irvine Company apartment in 2020, but wow I'm getting sick of these Brownfields)

The responsible party for the Apple office building is Northrop Grumman who acquired that company & it's HQ (TRW Microwave) a while back. It's part of the "Triple Site" in Sunnyvale.

The previous CEO of Northrop & TRW now sits on the Apple Board of Directors as the Chair of the Finance and Audit committee. I started asking Apple is they were intimidating witnesses and breaking labor laws as a normal thing, or if this was special because of the conflict of interest. Apple said they'd no longer answer any more of my "safety questions" after that. I was emailing the Federal EPA about it all starting back in April/May and by July was forwarding those emails back to Apple, pleading for them to do the right thing. They didn't.

Also, Apple realized in June there's a bunch of cracks in the floor (which is how vapor intrusion occurs) and refused to test the indoor air until after they fixed the cracks, even when I was sending them emails pleading they test before so I can plan appropriate "cancer monitoring." I got some coworkers to take pictures of the cracks before Apple went into fix them, but Apple suspended me the next day.

I filed complaints with CA DOL DIR, NLRB, US DOL, SEC, CA EPA, US EPA, etc & was in the press frequently about it starting in August. Apple then fired me for no reason on September 9, 2021.

I met prima facie for US Dept of Labor Whistleblower Retaliation for CERCLA, SOX, & OSHA. Apple's working on their defense for the cases. I met prima facie for numerous CA Dept of Labor statutes but DIR is paused while the feds investigate. I have several charges with the US NLRB, but they're taking forever.

Meanwhile, Apple's managers, employees, & agents have been threatening me, intimidating me, harassing me, & trying to coerce me to drop my charges.It started late Aug after my filings, and many of the online comments directly mention me talking to the press & gov about my safety & fraud concerns as the reason for me being fired. The threats include threats of: violence, assassination, bankruptcy, general "ruin," blacklisting, failing moral character, etc.

I called the FBI a couple weeks ago and filed a complaint with them but haven't heard back .I left a voicemail on the US DA's system but haven't heard back. I assume this is at least 18 USC 1513 & 1514.

I was wondering if there are state/local laws that are also implicated? And if so how I can intake with the SCC DA?

Thanks!

All case info here: https://www.ashleygjovik.com/apple-legal-battle.html

Threat/harassment campaign info ehre: https://www.ashleygjovik.com/threats.html

Info on office is here: https://www.ashleygjovik.com/uploads/1/3/7/0/137008339/us_dol_-_825_stewart_dr_-_overview_memo.pdf

Press here: https://www.ashleygjovik.com/press-on-ashleys-apple-saga.html

Overview here: https://www.ashleygjovik.com/ashleys-apple-story.html

—

**Ashley M. Gjøvik, J.D. Candidate, B.S., PMP**

ashleygjovik.com | https://linktr.ee/ashleygjovik | +1`415-964-6272 (Signal)

Sent with ProtonMail Secure Email.

------- Original Message -------
On Friday, April 16th, 2021 at 2:42 PM, Ashley Gjovik <agjovik@scu.edu>
wrote:

> Hi Bud,
>
> It was great to meet you today. Thanks again for the call.
>
> As discussed, if I have any other incidents where I'm feeling
> threatened in the future at my new apartment (if they rise to
> being illegal) — I will call my local police. As mentioned, I
> encouraged the current residents to also call the police if they feel
> threatened. Not sure what was going on with the dark car &
> binoculars, hopefully a weird coincidence.
>
> If you are interested in learning more about The Irvine Company, I
> did some initial research and am sharing the rough annotated
> bibliography of what I found publicly available so far below.
> Nothing terribly revelatory, but raised a lot more questions. Hope
> that helps. Also, attaching the email warning I received below. The
> El Toro base he mentions is in my research.

If you ever want to talk about this more — specific to my old apartment — or generally about increasing accountability on these types of site — I'm always happy to chat. Thanks again for all the work you're doing. Have a great weekend!

-Ashley

# Gjovik v. Apple

# Exhibit: B

## S. Exhibit S: Police Report, Santa Clara Police Department, May 31 2022.

# Gjovik v. Apple

# Exhibit: C

an image from the movie SE7EN that implies it contained a severed head of one of her loved ones.[232]



*Exhibit: The "Severed Head" Post*

557.    BabyHummingbird's Twitter account had just a small number of posts, almost entirely directed at Gjovik. BabyHummingbird also liked posts about Gjovik, including the "don't get Gjovik'd" posts. BabyHummingbird's first "like" was a post from 2014 that said, "Apple's Back, Better than Ever." Under information and belief, "BabyHummingbird" was Apple.



*Exhibit: First "Like" from BabyHummingbird*

---

[232] 18 U.S.C. § 876(c) prohibits mailing "any threat to kidnap any person or any threat to injure the person of the addressee or of another."

244

558. On September 30 2021, Gjovik received a box of her personal items, full of broken glass.



559. On October 1 2021, another fake Twitter account, "FemaleInTech," commented on one of Gjovik's Twitter posts where Gjovik complained she just "*spent 5min pulling a chunk of glass out of the sole of my foot & I'd like to remind everyone that #Apple sent me this box of spite after taking away my health insurance the day I was fired.*" The Apple account replied, "*I think it would also be really impactful to post a picture of your bleeding wounds w/ a tweet calling out their HR people by name. At this point why not shame the individuals there for their unambiguous, documented spitefulness with horrifying photographic evidence!*" Assumably Apple wanted Gjovik to call out "people by name" as a preemptive defense of individual liability for their actions and wanted a photo to assess liability for the physical harm. Under information and belief, FemaleInTech, is Apple because the account was primarily used to post about and to Gjovik, did not seem authentic, and made several highly suspicious posts/comments.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

647.    On May 29 2022, Gjovik discovered one of the items Apple mailed her from desk was emitting RF and EMF signals. Gjovik posted about it on Twitter.[260]



*Exhibits: The Bugged Statue*

648.    On May 30 2022, Gjovik contacted the FBI to report hacking and the bugged object. The FBI agent she talked to advised Gjovik to give the object to the local police.[261]

649.    Several hours later Gjovik heard someone trying to break into her apartment through the front door. Gjovik posted on Twitter about it, blaming Apple.[262]

---

[260] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1530764537611288576 ; https://twitter.com/ashleygjovik/status/1530775382626025474
[261] Bugged items in violations of Cal. Penal Code [§§ 631, 632, 632.5, 632.6, 632.7] and US Code Title 18 [§§ 2511(1)(a), (c), (d); 2701-2712].
[262] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1531176997803679744 ; https://twitter.com/ashleygjovik/status/1531177000831959042

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

*Exhibit: 9to5Mac Article Harassing Gjovik*

482. On September 3 2021, at 8:36am Okpo texted Gjovik asking for her to join a WebEx meeting with him in less than two hours. Okpo said, *"Hi Ashley Good Morning, I would like to schedule time for us to connect today at 10:30am PT via WebEx for an update. Will this time work for you? Thank you."* He then emailed her at 10:07am asking for the 10:30am meeting.

483. Per Apple's March 2022 Position Statement, Apple had already started investigating Gjovik prior to September 3 2021, however at no time prior to September 9 2021 did Apple tell Gjovik she was under investigation. Under information and belief, Okpo contacted Gjovik on September 3 2021 claiming he wanted to talk to Gjovik about the investigation into Gjovik's concerns, but Okpo planned to surprise-attack Gjovik with the investigation into Gjovik. Okpo assumably did not warn Gjovik so she did not try to record or get a witness for whatever it was Okpo planned to do to Gjovik. Under information and belief, Apple and MWE arranged the smear article to occur shortly before an attempted interrogation and forced settlement.

203

formal statement that Apple had no intention to ever notify consumers of the practice or seek their consent.



*Exhibit: Collection of Photos/Biometrics Taken by Gobbler*

1026.   Additionally problematic is that Apple knew back in 2017 that the use of the Gobbler application in France or Germany is illegal, however Apple also know that employees traveling for work or even going on vacation, may end up in these countries, or in other EU countries.[613]

1027.   This section is incorporated in the Cal. Labor Code § 1102.5 claim for § 435, and the Tamney claims under the same, the California Constitution Right to Privacy, and the FTC Act – and those sections are also incorporated here.

1028.   Apple's statements about privacy related to tracking and data collection are false.

*Wiretapping*

---

[613] Apple, Privacy Governance, (last accessed 12/2/2023), https://www.apple.com/legal/privacy/en-ww/governance/

441



*Exhibit: One of the Millions of Secret Siri Recordings, via Telerama* [618]

### 3) Fraud: Compliance and Ethics

1031.   Apple's Global Whistleblowing Policy starts with the statement: "*Apple conducts business ethically, honestly, and in compliance with applicable laws and regulations.*"[619] Apple does not say that 'Apple tries to conduct…' or 'believes that it is important to conduct'– no, Apple says it <u>does conduct</u>. Apple states a conclusive, definite fact that the company is ethical, honest, and never violates laws or regulations. Apple's statement is false, as well as preemptive threatening against whistleblowers speaking out, as if Apple is doing nothing wrong, there is nothing to blow the whistle about.

1032.   Apple's website has a homepage for "Ethics and Compliance" that leads with a prominent statement, similarly saying: <u>*"Apple conducts business ethically, honestly, and in full compliance with the law.*</u> *We believe that how we conduct ourselves is as critical to Apple's*

---

[618] Olivier Tesquest, *Siri, l'assistant vocal d'Apple ? C'est une taupe !*, February 24 2021, https://www.telerama.fr/debats-reportages/siri-lassistant-vocal-dapple-cest-une-taupe-6822626.php
[619] Apple, Global Whistleblowing Policy, (last visited 12/2/2023), https://www.apple.com/compliance/pdfs/Apple-Global-Whistleblowing-Policy.pdf

490.    On September 5 2021, Gjovik posted on Twitter about the US DOJ case against Apple lawyer Gene Levoff. Gjovik said she found a denied motion in the case where Levoff's defense was arguing "*insider trading laws don't exist*" and/or do exist "*but are unconstitutional.*"[209]  [See RICO Predicate Acts: Securities Fraud and Wire Fraud]

491.    On September 6 2021, Gjovik posted on Twitter as screenshot, captioned: "Aug 2 iMessage with Apple coworker: "*Seriously though, ER's face about the COVID vaccine & Riccio's demotion. He really thought I was exaggerating. I'm like if you want a witness please talk to Deirdre O'Brien.*" @TheJusticeDept; NCDF Disaster Complaint: Hoarding/Other [photo of DOJ complaint & iMessage].[210]

492.    On September 6 2021, Gjovik posted on social media about her cases with a status update and the report numbers. In addition to the prior charges, she now also referenced her SEC whistleblower tip, FBI tip, and DOJ complaint.[211]

**Ashley M. Gjøvik**
@ashleygjovik

@NLRB Case: 32-CA-282142
@OSHA_DOL Whistleblower Claim: 1218-023
@USEEOC Case: 556-2021-00608
@SEC_Enforcement Whistleblower Claim: 16304-612-987-465
@CivilRights Complaint: 98145-RJH
@CA_DIR Whistleblower Claim: RCI-CM-842830
@CalDFEH Case: 202108-14540123

7:12 AM · Sep 6, 2021

*Exhibit: Gjovik's Sept. 6 2021 Post about Cases*

---

[209] *US v. Gene Levoff,* USDC of NJ (Aug 12, 2020), Docket No. 19-cr-780, Motion to dismiss: Denied; Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1434406050275287043
[210] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1434830527140229124
[211] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1434836915086188544

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

*Exhibit: Gjovik's 9/6/21 Twitter post about FBI complaint about Smuggling*

493. On September 6 2021, Gjovik replied to the US EEOC confirming she was working on a draft of her complaint and was targeting to submit it to them by September 8 2201, responding to US EEOC sending her a 'courtesy reminder' on September 3 2021, to complete the draft.

494. On September 6 2021, Gjovik posted on Twitter about the Slack discussion from July 27 2021 where she and her coworkers discussed Apple systemically retaliating against them for raising valid concerns.

495. On September 7 2021, Gjovik posted on Twitter about the Batterygate/nude photographs matter. Gjovik finally disclosed the construction termination that occurred leading

207

1   up to Apple's intimidating conduct. Gjovik posted, "*I spent much time pondering why my nudes*
2   *were so critical to #Apple's doc collection for the Batterygate lawsuits...I worry Apple wanted to*
3   *intimidate me to never openly discuss how I was constructively term'ed for speaking-up abt*
4   *the 🔋 situation when I ran sw failure analysis.*" [212] Gjovik then added, "*#Apple*
5   *Batterygate/Nudegate/Constructiveterminationgate.*"[213]
6



*Exhibit: Gjovik's Sept. 7 2021 Post about Batterygate & RICO*

[212] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1435444339019182083
[213] Twitter, Ahsely Gjovik, https://twitter.com/ashleygjovik/status/1435444945117073414

208

*Exhibit: Gjovik's Sept 7 2021 Post about "ConstructiveTerminationGate"*

496. On September 7 2021, Gjovik discovered a Santa Clara County Superior Court lawsuit against Apple filed by one of her ex-coworkers. The ex-coworker, Crystal Brown, sued Apple due to harassment and retaliation from her manager, who was also Gjovik's manager, Dan West. The lawsuit was filed in 2018 and settled in 2019. Gjovik posted on Twitter about it tagging Tim Cook and Apple's Twitter accounts and complained that Apple had tried to claim they investigated West but found no 'policy violations' when he was sued by another employee only a couple of years prior and Apple had quickly settled the case.

497. On September 7 2021 at 8:42pm, Okpo contacted Gjovik again asking to speak with Gjovik by September 10 2021. (Gjovik's NLRB affidavit was due September 13 2021). Now Okpo said there were some "*inconsistencies*" he wanted to discuss. Okpo had never responded to Gjovik's concerns on September 3 2021 and this was the last email Gjovik would receive from Okpo.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

insisted they talk to Gjovik prior to 9/13 (which would give them time to get Gjovik to recant
even if she already testified).

### xiv.    The Day Apple Fired Gjovik (September 9 2021)

502.    On September 9 2021, around 1 AM the day Gjovik was fired, Gjovik was tipped
off that Apple may be surveilling her through her work and personal devices. Gjovik posted
publicly about her concerns at 12:06 AM including *"Any reason Apple wouldn't be reading my
[personal] iCloud email and iMessages?"* [214] To which members of the Info Sec community
assured Gjovik Apple was likely doing that and more.

503.    Gjovik immediately began removing her data from Apple's servers. Realizing
how terrified she had become of her employer; she began searching for legal resources. At
2:16am that morning Gjovik downloaded the US DOJ guide to litigating civil RICO cases,
which Apple would have seen.



*Exhibit: 9/9 RICO Download*

504.    Minutes later at 2:27 AM September 9 2021, a self-declared "burner" Twitter
account, with zero posts or "likes" ever, @Guybrus55626232, sent Gjovik a direct message
accusing her of making a claim that was *"verifiably incorrect and complete misrepresentation of
facts."* The user claimed that when Gjovik posted she found the *Crystal Brown v Apple* lawsuit,
and said Apple settled (which Apple did), she was "*unequivocally misrepresenting facts, most*

---

[214] Note: California employers cannot eavesdrop on or record employees' private telephone, email, or in-person conversations without prior consent by all participants. See. Cal. Penal Code §§ 631(a), 632(a).

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023



*Exhibit: The Post About Apple Breaking into People's Homes*

214

## XIII.   APPENDIX III: SUMMARY OF FALSE STATEMENTS

**Senior District Judge Chen's Standing Order Rule #10** [1320]
***Complaints in Federal Securities Fraud Cases***

"Where a plaintiff files a federal securities fraud case, the plaintiff shall attach to its complaint a chart regarding any allegedly fraudulent/misleading statement(s) or omission(s)."

**SOX Act & Dodd Frank Act Whistleblower Retaliation**

| # | SAC ¶ | Speaker, Date, Occasion | False/Misleading Statement or Omission | Reason Why False/Misleading When Made | Facts Giving Rise to Strong Inference of Scienter |
|---|---|---|---|---|---|
| 1 | 786, 999 | Alysha Johnson. Reuters, December 6, 2016, California EPA says settled with Apple on hazardous waste claims | "We've worked closely with [the Department of Toxic Substance Control] to ensure that going forward we have the proper permits for our current site. As we do with all our facilities, we followed our stringent set of health and safety standards, which go well beyond legal requirements." [1321] | Apple does the bare minimum required and tells employees that | Gjovik to Cohen: "But when it comes to working on contaminated chemical release sites, apparently Apple's stance is to only do what is absolutely legally required. At least that's what they told me." |
| 2 | 787 | Lisa Jackson, Apple Press Release, 4/21/21 | The resources and community initiatives we're sharing today are all about amplifying voices too often unheard, and giving | Apple showed complete indifference to the health impact of communities around its toxic waste sites; Apple | Gjovik tired to escalate Env Justice concerns & the Inclusion & Diversity team told her |

---

[1320] US Courts, CAND, *Judge Chen's Standing Orders*, https://www.cand.uscourts.gov/wp-content/uploads/judges/chen-emc/Standing-Order-Civil-General-REVISED-12-1-2022.pdf
[1321] California DTSC, *Apple Agrees to Pay $450,000 to Settle Hazardous Waste Violations*, 2016, https://dtsc.ca.gov/2016/12/06/apple-agrees-to-pay-450000-to-settle-hazardous-waste-violations/; Reuters, https://www.reuters.com/article/idUSKBN13V2HS/

1

| | | | people the tools to learn, engage, and be part of the solution… As people around the world celebrate Earth Day, Apple's focus remains on supporting those communities most impacted by climate change and environmental challenges."[1322] | has poor management of its hazardous waste sites | to pitch why Apple shouldn't poison Black people |
|---|---|---|---|---|---|
| 3 | 781 | Abstract, attributed to many statements by Apple | "Cares about Human Rights" | AG: "A company that likes to pretend it cares about human rights… pretends seems to be the important words there…" | |
| | | | | | |

**RICO Predicate Act: Wire Fraud and/or Mail Fraud**

| # | SAC ¶ | Speaker, Date, Occasion | False/Misleading Statement or Omission | Reason Why False/Misleading When Made | Facts Giving Rise to Strong Inference of Scienter |
|---|---|---|---|---|---|
| 1 | 986 | Apple, 2021, NMP Manifests in TRI filing | Apple claimed it shipped NMP to waste facilities but there were no manifests so it didn't | Cover-up how many chemicals it vented on Gjovik | It's literally a crime under RCRA |
| 2 | 990 | Apple, 2021, Art Fong | Claimed NMP is priority chemical and eliminated since 2016 | Have tons at 3250 Scott Blvd & launch it into the air | CAA violation |
| 3 | 1007 | Apple to EPA, May 28 2021 | "While proper ventilation and engineering controls can protect the health and safety of those | See, 3250 Scott Blvd emissions | CAA/RCRA violations |

---

[1322] Apple, *Apple Celebrates Earth Day 2021*, April 21 2021, https://www.apple.com/newsroom/2021/04/apple-celebrates-earth-day-2021/

2

| | | | working in supplier facilities, we went a step further to protect those working in our supply chain and the surrounding communities" | | |
|---|---|---|---|---|---|
| 4 | 1015 | Apple, 2018, to EPA | Apple generates 100% of our operational load through clean energy."[1323] | Proven they do not | |
| 5 | 1018 | Tim Cook, Apple Website, 12/21/21 | "Privacy is a fundamental human right. It's also one of our core values."[1324] | They claim employees have no right to privacy, which either means they're lying or they don' think their employees are humans | See to the left |
| 6 | 1031, 1032 | Apple, Ethics & Compliance Website, Current | "Apple conducts business ethically, honestly, and in full compliance with the law. | See all of Apple's fines, violations, sanctions, investigations | Corruption |
| | 1033 | Business Conduct Policy, Current, Apple | "Apple conducts business ethically, honestly, and in full compliance with applicable laws and regulations | See all of Apple's fines, violations, sanctions, investigations | Corruption |

---

[1323] US EPA, Docket ID No. EPA-HQ-OAR-2017-0355, *Apple Comments on EPA Proposal re Emission Guidelines for Greenhouse Gas Emissions …* (at 83 FR 45588, September 18, 2018).
[1324] Apple, Privacy, (last accessed 12/17/2023), https://www.apple.com/privacy/

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

511. Ten minutes later, at 2:08pm PST, Gjovik was contacted by Aleks Kagramanov, a "*Workplace Violence and Threat Assessment*" investigator demanding to speak with Gjovik on the phone "*within the hour.*" The email had no subject line and Gjovik had never heard of the team or person who reached out. The person claimed to be Employee Relations but said he was "*looking into a sensitive Intellectual Property matter*" and he wanted to speak with Gjovik about it. He said he wanted to talk as soon as possible, within this hour (so less than 52 minutes). He said he was sending her an iCal for a call but could reschedule as long as they meet that day. He said they "*sincerely appreciate [her] prioritizing this call and being flexible.*" He said Gjovik's "*cooperation and participation [are] imperative,*" however he never said Gjovik was under investigation.

> On Sep 9, 2021, at 2:08 PM, Aleks Kagramanov <akagramanov@apple.com> wrote:
>
> Hi Ashley,
>
> This is Aleks Kagramanov from Employee Relations. We're looking into a sensitive Intellectual Property matter that we would like to speak with you about. We would like to connect with you at as soon as possible today; within this hour, and you should see an iCal come through shortly. We sincerely appreciate you prioritizing this call and being flexible. If you absolutely cannot make this time, please propose a few other times for us to connect today. I wanted to send this introductory email so you know who I am when I set it up. I can share more details when we meet.
>
> As part of Apple's policy, your cooperation and participation is imperative.
>
> Thank you in advance, and talk soon.
>
> Best,
>
> Aleks Kagramanov
> Employee Relations
> AMR Threat Assessment & Workplace Violence (TAT)
> Apple
> One Apple Park Way, mail stop
> Cupertino, CA 95014, USA
> iPhone +1-408-202-4963
> akagramanov@apple.com

*Exhibit: Email from Workplace Violence on 9/9/2021 2:08pm*

215

*Exhibit: Gjovik's Posts on 9/9/2021 – Knock on Door*

512.    Gjovik promptly responded at 2:10 PM PST, two minutes later, saying that she was willing to participate, she wanted there to be a written record of their conversations. She said she will respond as quickly as she can. Kagramanov did not respond so Gjovik replied again.



*Exhibit: Gjovik's email to Workplace Violence on 9/9/21 2:20 and 2:27 PM*

513.    Gjovik responded again at 2:27 PM PST complaining to the Workplace Violence interrogator of "*witness intimidation the day before her affidavit*" and telling him she forwarded his emails to her NLRB investigator.

216

514.    Gjovik was posting screenshots of the conversation on Twitter in real time, along with her commentary and research discoveries about the team who contacted her. Gjovik posted on Twitter complaining of witness intimidation at 2:33 PM PST.



*Exhibit:: Gjovik's Posts on 9/9/2021 2:33pm*



*Exhibit: Gjovik's Posts on 9/9/2021 2:34pm*

217

# Gjovik v. Apple

# Exhibit

**B. Exhibit: Map: Location of 3250 Scott Blvd Santa Clara, CA, 95054.**



*Figure 1: 3250 Scott Blvd, Santa Clara, California,*
https://www.santaclaraca.gov/our-city/about-santa-clara/maps



*Figure 2: Santa Clara County Property Profile,*
https://clerkrecorder.sccgov.org/services-we-provide/assessor-property-address-search-apn-lookup



*Figure 3: Google Maps Measure Distance (154 feet from building to building)*



*Figure 4: Google Maps Measure Distance (86 feet curb to curb)*

**⨯ one medical**

Kevin Fell, MD
1299-A Oakmead Parkway
Sunnyvale, CA 94085
p: 408-520-4510 f: 408-520-4519

## Request for Diagnostic Testing

**From:**   Kevin Fell

**To:**   Mountain View Center Radiology (PAMF)

**Date:**   Mar 25, 2020

**Urgency:** **URGENT**

### Patient

Name:   Ashley Gjovik

Birth Date:   08/26/1986

Phone:   408-204-9976

Is patient pregnant:   not pregnant

Last serum creatinine: 0.82 on Mar 14, 2020

See attached for complete demographic and insurance information.

### Test

Brain MRI with & without contrast, 70553

### Indication

Numbness (ICD-10CM: R20.0)

### Reason for Test / Clinical Question

33 yr old woman with dizziness, headaches, intermittent numbness in body and face, intermittent foul taste in the mouth, and spasms of muscles in the arms and legs, debilitating and worsening x 5 weeks.

### Send Report To

408-520-4519

Thank you,

Kevin Fell
(NPI: 1215990494)
kfell@onemedical.com

# ⁘ one medical

<div align="right">

Kevin Fell, MD
1299-A Oakmead Parkway
Sunnyvale, CA 94085
p: 408-520-4510 f: 408-520-4519

</div>

**Patient:**

| | | | |
|---|---|---|---|
| **Name:** Ashley Gjovik | | **Address:** | 3390 Octavius Dr |
| **DOB:** 08/26/1986 (33) | | | Apt 349 |
| **Sex:** F | | | Santa Clara, CA 95054 |
| **Pronouns:** She/Her | | | 408-204-9976 |
| **PCP:** Kevin Fell | | | |

**Insurance:**

Carrier: United Healthcare
Type: PPO
Subscriber: Ashley Gjovik
███████████████████

**Authorization Code:** no auth required

**Lab Provider:**

Mountain View Center Radiology (PAMF)
701 E. El Camino Real, Floor 1, Mountain View, CA 94040
phone: 650-934-7700  fax: 650-934-7790

UCSF MyChart - Visit Summary                                                  5/3/21, 5:53 PM

Name: Ashley Gjovik | DOB: 8/26/1986 | MRN:█████ | PCP: Kevin C Fell, MD

**A Note to Patients:** Symptoms are concisely summarized to inform treatment recommendations. For reasons of privacy and brevity, this note does not attempt to capture all experiences that were discussed.

# Progress Notes

## Robert J. Harrison at 4/29/2021 11:00 AM

**ATTESTATION**

My date of service is 4/30/21. I reviewed the video consultation note of Dr. Hall dated 4/30/21 and discussed the case with his. I was present during the videovisit and am personally involved in the management of the patient.

I agree with the findings and care plans as documented. I spent a total of 40 minutes directly pertaining to the management of the clinical and occupational health problems, and 40 minutes of that time (>50%) was spent counseling regarding the prevention, treatment options, prognosis and coordination of care for her chemical exposures. I reviewed the extensive blood and urine laboratory testing for VOC metabolites, pesticides and organochlorines; as well as the results of VOC testing in her apartment. These do not suggest persistent body burden of chemicals, and the levels of VOCs in the air of her apartment do not exceed the threshold set by the DTSC for long term cancer and/or chronic non-cancer effects. While this is reassuring from her personal health standpoint, there remains a concern about potential pathways for residential exposures, and these should be addressed by the county and State environmental agencies. All questions and issues were addressed and discussed, and I remain available as needed for any additional concerns about health issues.

**Plan**

Robert Harrison, MD, MPH
Clinical Professor of Medicine

## Darren Martin Hall at 4/29/2021 11:00 AM

**REFERRAL SOURCE AND REASON**
Ms. Ashley Gjovik was referred to the Mt. Zion Occupational and Environmental Clinic for evaluation and treatment of potential health effects occurring in the setting of exposure to toxic chemicals from working near Superfund sites.

**HISTORY OF PRESENT ILLNESS**
Ms. Gjovik is a 34 y/o female senior engineering program manager for Apple who experienced a sudden onset of sxs after she moved into her apartment in Feb 2020.

These sxs largely resolved when she moved out in Sept 2020. Specifically, she was experiencing severe dizzy spells, a large decrease in resting heart rate, palpitations, hypotension, fatigue, chest pain, numbness, spasms, rash, shortness of breath, multiple growths (mole, polyp, nodules), nausea, paresthesias, blurry vision, abnormal vaginal bleeding, and swollen glands.

She also notes an unexplained episode of fainting at work in Sept 2019 at her office on a Superfund site with a long history of vapor intrusion issues in the building.

She states her apartment was built in an industrial area next to a the Synertek Superfund and next to Apple Materials Superfund and Intel Magnetics Superfund.

She also notes her current office is in TRW Microwave building on an EPA Superfund "Triple Site."

She has been seeing Dr. Kevin Fell (PCP from One Medical) and Dr. Kari Nadeau.

**WORK STATUS**

She is currently working as a senior engineering program manager for Apple. Previously she worked as a project manager for Apple from 2015 - 2017, a release and HR manager for Nike from 2012 - 2015, a project manager for Portland State University from 2011 - 2012, and other various jobs for a school district from 2000 - 2010.

**EXPOSURE HISTORY**

The primary exposure associated with this diagnosis are environmental toxic substances.

Past Medical History:





**Past Surgical History:**

| Procedure | Laterality | Date |
| --- | --- | --- |

## REVIEW OF SYSTEMS

*I have reviewed the following symptoms and except as noted in **bold** are negative:*

GENERAL: No fevers or chills. HEENT: No change in vision, no earache, sore throat or sinus congestion. CARDIOVASCULAR: No chest pain or pressure. **palpitations**. PULMONARY: No shortness of breath, cough or wheeze. GASTROINTESTINAL: No abdominal pain, nausea, vomiting or diarrhea, melena or bright red blood per rectum. GENITOURINARY: No urinary frequency, urgency, hesitancy or dysuria. DERMATOLOGIC: No rash, no itching, no lesions. ENDOCRINE: No polyuria, polydipsia, no heat or cold intolerance. No recent change in weight. HEMATOLOGICAL: **easy bruising (factor 8 deficiency)** or bleeding. NEUROLOGIC: No headache, seizures, numbness, tingling or weakness. PSYCHIATRIC**: anxiety / stress,** No depression, no loss of interest in normal activity or change in sleep pattern.

## PHYSICAL EXAMINATION
Physical exam was limited due to telehealth constraints.
GENERAL APPEARANCE: Well developed, well nourished, alert and cooperative, and appears to be in no acute distress
PSYCHIATRIC: Oriented to person, place and time. Able to demonstrate good reason, without hallucinations, abnormal affect or behaviors during the examination.

## ASSESSMENT and PLAN

1. **Exposure to environmental toxic substances**

Ms. Gjovik is a 34 y/o female who experienced multiple symptoms for an 8 month period that began when she moved into her apartment and spontaneously resolved

when she moved out. She is currently in good health but is concerned about working around hazardous waste / toxic environmental chemicals and any long term health consequences from these exposures.

**Human Exposure Environmental Indicator**

EPA categorizes each National Priorities List (NPL) and Superfund Alternative Approach (SAA) site as follows:

Human Exposure Under Control describes sites where EPA assessments indicate there are currently no unacceptable human exposure pathways anywhere on site. This is generally because either the entire site has been cleaned up to levels that do not adversely affect public health, or controls have been implemented that prevent human exposure to contamination.

Human Exposure Not Under Control describes sites that have not had pathways to human exposure to contamination completely controlled, mitigated or eliminated. This category includes sites where response actions are under way but are not yet complete.

Specifically, these are sites where:

- An unsafe level of contamination has been detected somewhere on site; and
- Contamination has not yet been fully treated, stabilized or contained across the entire site to prevent current human exposure; and
- Though there may not be any actual exposures occurring, there is potential for individuals to be exposed to the contamination somewhere within the site's boundaries.

Even if these conditions exist at a very small portion of the site, or advisory signs are posted, EPA will classify the site as Human Exposure Not Under Control until all potential exposures are addressed.

EPA's first priority is to ensure that effective measures are taken quickly to ensure people are not exposed to harmful contaminants. At many of these sites, substantial cleanup work has already been completed but some portion still poses potential risk. EPA categorizes these sites as Human Exposure Not Under Control until those portions are addressed.

EPA and other applicable federal agencies post warning signs, construct fences, and conduct outreach to communities to educate residents of the potential health risk.

Site Name - **TRW MICROWAVE, INC (BUILDING 825)**
Region - 9
City - Sunnyvale
State - California
Federal Facility Status - Non-Federal
NPL Status - Final
Human Exposure Status - Not under control

*Human Exposure Status Description*

UCSF MyChart - Visit Summary            5/3/21, 5:53 PM

As of September 2020, the TRW Site is designated Human Exposure Not Under Control due to conditions at the off-property area associated with the site – the Offsite Operable Unit (OOU). The TRW site was transferred from the State back to EPA in August 2014, subsequent to which EPA ordered the Responsible Parties (RPs) to conduct vapor intrusion (VI) evaluations at on- and off-property buildings associated with the site to determine whether the vapor intrusion(VI) pathway for TCE is complete and whether a remedy is required. The on-property evaluation showed no evidence of unacceptable VI. The off-property evaluations are in progress and show evidence of unacceptable TCE VI in approximately 40 residential and 12 school buildings. Steps were taken to address the VI inhalation risks, including building ventilation improvements, operation of indoor air purifiers, installation of sub-slab and sub-membrane depressurization systems, and confirmatory sampling and long-term maintenance plans to confirm the continued effectiveness of mitigation measures. Additionally, residents, parents, school staff and school administrators were informed via fact sheets and community meetings. To address long-term risks, a framework for preemptive mitigation and post-response site controls was negotiated with the RPs, which was finalized in September 2019 in an ASAOC, to submit work plans to address risks in certain remaining residences above the groundwater contaminant plume and to ensure the long-term stewardship of the vapor mitigation measures put in place. As of August 2020, the VI work plans have been submitted and addressing the remaining residences and school buildings is moving forward.

Site Name - **INTEL MAGNETICS**
Region - 9
City - SANTA CLARA
State - California
Federal Facility Status - Non-Federal
NPL status - Final
Human Exposure Status - Under control

*Human Exposure Status Description*
Human exposure is under control at INTEL MAGNETICS

I spent a total of 60 minutes face-to-face with the patient and 40 minutes of that time was spent counseling regarding the prevention and treatment of toxic environmental substances.

**Patient was seen and examined with Dr. Harrison. The above note reflects our discussion.**

**Signed,**
**Darren Hall, DO, MPH**
**UCSF Occupational Medicine Resident**

MyChart - Visit Summary

11/25/20, 11:21 AM

**Print This Page** | **Close This Window**



Name: Ashley Gjovik | DOB: 8/26/1986 | MRN: ▆▆▆▆▆ PCP: Kevin Charles Fell, MD

## Appointment Details

- **Visit Summary** • Notes

# Ashley Gjovik

11/6/2020 9:00 AM   Office Visit
MRN ▆▆▆▆▆

Provider: Kari Christine Nadeau, MD      Department: Allergy Clinic Portola Valley      Dept Phone: 650-723-6961

## Stanford Health Care

### Progress Notes

#### Kari Christine Nadeau, MD

Status: **Addendum**

### ALLERGY CLINIC - ALLERGY TEMPLATE

**CLINIC VISIT:** 11/6/2020

Patient: Ashley Gjovik ▆▆▆▆▆▆▆▆▆▆▆▆

Fell, Kevin Charles
1299-A Oakmead Pkwy
Sunnyvale CA 94085
(408)520-4510
408-520-4519

Self-Referred
NON BLUE SHIELD ONLY
N/A

Dear Dr.

I had the pleasure of seeing your patient, Ashley Gjovik, at our Allergy and Immunology Clinic for evaluation of her possible allergies.
**Please see her intake form for her past med hx, past surgical hx, medications, and social hx and family hx.**

MyChart - Visit Summary                                                                    11/25/20, 11:21 AM



No facility-administered medications prior to visit.

**Allergies**



No family history on file.

**Social History**

Socioeconomic History
- Marital status:              Single
     Spouse name:              Not on file
- Number of children:         Not on file
- Years of education:         Not on file
- Highest education level:   Not on file

Tobacco Use
- Smoking status:             Never Smoker
- Smokeless tobacco:          Never Used

## ROS:
All 14 points were reviewed and completed and otherwise negative.

## Visit Vitals
BP                       129/81 (Patient site: Right arm,
                         Patient Position: Sitting)

MyChart - Visit Summary                                                                                    11/25/20, 11:21 AM

| | |
|---|---|
| Pulse | 66 |
| Temp | 36.5 °C (97.7 °F) (Temporal) |
| Ht | 1.676 m (5' 6") |
| Wt | 85.3 kg (188 lb) |
| SpO2 | 99% |
| BMI | 30.34 kg/m² |

GENERAL: Well appearing, no distress.
HEAD: Normal. Hair normal in texture.
EYES: Conjunctivae white and quiet.
EARS: AD: External auditory canal normal. Tympanic membrane grey and translucent.
          AS: External auditory canal normal. Tympanic membrane grey and translucent.
NECK: Symmetric, no masses. No thyromegaly. Trachea midline.
CHEST: Normal configuration.
LUNGS: Normal respiratory effort and rate. Alveolar breath sounds bilaterally. No adventitial sounds.
CARDIAC: Heart sounds normal. No extra sounds. No murmurs.

SKIN: Fitzpatrick skin type VI. No urticaria or angioedema. No keratosis pilaris. No palmar hyperlinearity (type 0). Eczema not present R/O/S (redness/oedema/scratches, 3 point scale) 0/0/0. NO dermatographism. With many tattoos.

**Labs:**

No results found for this or any previous visit (from the past 1008 hour(s)).

**Impression:**   This is a 34 yo female who had moved into an apartment in Santa Clara (see record for location) in which she reports she was exposed to chemicals in the water and in the air which affected her health (abdominal issues, breathing issues, skin issues). She has since moved away and lives in a filtered unit in San Francisco. She reports she now feels better. There was no prior history of multiple chemical sensitivities.
It sounds Ashley's symptoms were a response to chemical exposure, and the timing of her symptoms aligns with her living in the Santa Clara Square apartment. The severity and timing of the symptoms points to some type of industrial chemicals in her apartment and/or the property beneath it.
**Recommendations:** I recommended she continue living in a place that has filters in the air and that she lives in areas where she can review the water and air quality first to ensure no issues. I am happy to have her RTC in 6-12 mo.  I recommend the government agency in charge of the remediation site where she was living, investigate the soil and groundwater as potential causes for her symptoms.

Thank you for this referral and involving us in care of Ashley Gjovik.

**Provider Report**

Details for
# Physician Emergency Department Note

Encounter ID: Q00856217231

## 16
February

| Patient | Dictation Date | Facility |
|---|---|---|
| ASHLEY M GJOVIK | 2/16/2020 2:19 PM | REGIONAL MEDICAL CENTER OF SAN JOSE |
| | | 225 N. JACKSON AVENUE |
| | | SAN JOSE CA 95116 |
| | | () |

## Summary

```
REGIONAL MEDICAL CENTER OF SAN JOSE (COCGBT)
EMERGENCY PROVIDER REPORT
REPORT#:0216-0409  REPORT STATUS: Signed
DATE:02/16/20 TIME: 1419

PATIENT: GJOVIK,ASHLEY M            UNIT #: Q001240235
ACCOUNT#:                           ROOM/BED:
DOB: 08/26/86  AGE: 33    SEX: F    PCP PHYS: NO PRIMARY OR FAMILY PHYSICIAN
SERVICE DT: 02/16/20                AUTHOR: Malcolm,Douglas MD
REP SRV DT: 02/16/20        REP SRV TM: 1419
* ALL edits or amendments must be made on the electronic/computer document *


HPI-General Illness

Free Text HPI Notes
Free Text HPI Notes
33 year old female with a PMH of bigeminy PAC's presents to ED c/o sharp non-
radiating chest pain and tingling of her left arm that began intermittently
since last night. Pt also reports palpitations and dizziness that have been
worsening since the last 2 weeks. She states that her doctor thinks her PAC's is
related to stress, and she has an appt with a Cardiologist soon. Denies SOB,
nausea, diaphoresis, vomiting, or abdominal pain.

General
```

Confirmed Patient Yes
Initial Greet Date/Time 02/16/20 1211

Presentation
Chief Complaint Chest pain
Hx Obtained From Patient
Onset Occurred Yesterday

Portions of this section were scribed by PANUGANTI,BHAVYA on 02/16/20 at 1419

Review of Systems

Free Text ROS Notes
Free Text ROS Notes
Constitutional: Denies fever. Denies chills.
Eyes: Denies visual changes.
ENT: Denies congestion. Denies sore throat.
Neck: Denies stiffness. Denies pain.
Respiratory: Denies cough. Denies shortness of breath.
Cardiovascular: +chest pain. + palpitations.
Gastrointestinal: Denies abdominal pain. Denies nausea. Denies vomiting. Denies
diarrhea.
Neurological: Denies headache. Denies dizziness. +tingling of left arm
Musculoskeletal: Denies joint pains.
Skin: Denies rash.
GU: Denies dysuria.
All other systems reviewed   negative, except as marked.

Portions of this section were scribed by PANUGANTI,BHAVYA on 02/16/20 at 1419

Past Medical History — Adult
Allergies

Home Medications
Reported Medications

Review of Nursing Notes Rev avail, and agree
Past Medical History:
Denies: Diabetes mellitus, Hypertension.
Other Social History Local resident, Good social support

Portions of this section were scribed by PANUGANTI,BHAVYA on 02/16/20 at 1419

Physical Exam

Vital Signs
Vital Signs
First Documented:

|  | Result | Date | Time |
|---|---|---|---|
| Pulse Ox | 99 | 02/16 | 1212 |
| B/P | 185/105 | 02/16 | 1212 |
| B/P Mean | 131 | 02/16 | 1212 |
| O2 Delivery | Room air | 02/16 | 1212 |

```
                               Temp           36.8  02/16 1212
                               Pulse             74  02/16 1212
                               Resp              20  02/16 1212

Last Documented:

                                 Result    Date Time
               Pulse Ox               99  02/16 1212
               B/P              185/105  02/16 1212
               B/P Mean             131  02/16 1212
               O2 Delivery   Room air  02/16 1212
               Temp               36.8  02/16 1212
               Pulse                 74  02/16 1212
               Resp                  20  02/16 1212
```

Review of Vital Signs Reviewed

Free Text PE Notes
Free Text PE Notes
Appearance: Alert. Oriented X3. No acute distress.
Eyes: Pupils equal, round and reactive to light. Eyes normal inspection.
ENT: Moist mucous membranes. Pharynx normal.
Neck: Normal inspection. Neck supple. No lymphadenopathy
Respiratory/Chest: No respiratory distress. Normal breath sounds. Left anterior
chest wall tenderness
Heart: Regular rate and rhythm. No murmur. Normal heart sounds. Normal pulses
Abdomen: Soft and nontender. Bowel sounds normal. No mass.
Back: Normal external inspection. Normal ROM.
Skin: Skin warm and dry. No rash
Extremities: Extremities exhibit normal ROM. No lower extremity edema.
Neuro: Oriented X 3. No motor deficit. No sensory deficit

Portions of this section were scribed by PANUGANTI,BHAVYA on 02/16/20 at 1419

Interpretation   Diagnostics

Lab Results Interpretation
Considerations Independ review imaging
Results
Laboratory Tests

02/16/20 1240:
[Embedded Image Not Available]
Laboratory Tests:

```
                                      02/16    02/16    02/16
                                      1240     1238     1230
      Chemistry
         Sodium (136 – 145 mmol/L)            134 L
         Potassium (3.5 – 5.1 mmol/L)          4.0
         Chloride (98 – 107 mmol/L)            105
         Carbon Dioxide (21 – 32 mmol/L)        26
         Anion Gap (10 – 20 mmol/L)             7 L
         BUN (7 – 18 mg/dL)                     10
         Creatinine (0.55 – 1.3 mg/dl)        0.93
         Estimated GFR (MDRD) (*)              >60
         Glucose (74 – 106 mg/dL)               91
         Calcium (8.5 – 10.1 mg/dL)            8.5
         Total Bilirubin (0.2 – 1.0 mg/dL)     0.5
```

```
        AST (15 - 37 Units/L)                    29
        ALT (12 - 78 Units/L)                    37
        Total Alk Phosphatase (46 - 116 Units/L)    67
        Troponin I Ultra-Sens (< or = 0.05 ng/mL)  <0.02
        NT-Pro-B Natriuret Pep (<125 pg/mL)      133 H
        Serum Total Protein (6.4 - 8.2 g/dL)     7.7
        Albumin (3.4 - 5.0 g/dL)                 3.9
        Globulin (2.1 - 4.1 g/dL)                3.8
        Albumin/Globulin Ratio (1.0 - 2.0)       1.0
        TSH (0.36 - 3.74 *)                      2.20
     Hematology
        WBC (4.5 - 11.0 K/mm3)                   9.0
        RBC (4.20 - 5.40 M/mm3)                  4.58
        Hgb (12.0 - 16.0 gm/dL)                  14.1
        Hct (37.0 - 47.0 %)                      41.1
        MCV (80.0 - 99.0 fL)                     89.7
        MCH (27.0 - 32.0 pg)                     30.8
        MCHC (30.0 - 37.0 g/dL)                  34.3
        RDW (11.0 - 16.0 %)                      12.7
        Plt Count (150 - 350 K/mm3)              265
        MPV (7.4 - 10.4 fL)                      11.7 H
        Neut % (Auto) (50 - 70 %)                68.6
        Lymph % (Auto) (20 - 40 %)               21.4
        Mono % (Auto) (0 - 8 %)                  6.8
        Eos % (Auto) (0 - 5 %)                   2.4
        Baso % (Auto) (0 - 2 %)                  0.6
     Toxicology
        Urine Opiates Screen                        NEGATIVE
        Ur Barbiturates, Qual                       NEGATIVE
        Ur Phencyclidine Scrn                       NEGATIVE
        Ur Amphetamine Screen                       NEGATIVE
        U Benzodiazepines Scrn                      NEGATIVE
        U Cocaine Metab Screen                      NEGATIVE
        U Cannabinoids Screen                       NEGATIVE
        Drugs of Abuse Comment
     Urines
        Urine Color (YELLOW)                             YELLOW
        Urine Clarity (CLEAR)                            CLEAR
        Urine pH (5.0 - 8.0)                                7.5
        Ur Specific Gravity (1.005 - 1.030)              1.004 L
        U Specif Grav (Refrac)                           1.004
        Urine Protein (NEGATIVE mg/dL)                   NEGATIVE
        Urine Glucose (UA) (NEGATIVE mg/dL)              NEGATIVE
        Urine Ketones (NEGATIVE mg/dL)                   NEGATIVE
        Urine Blood (NEGATIVE)                           NEGATIVE
        Urine Nitrite (NEGATIVE)                         NEGATIVE
        Urine Bilirubin (NEGATIVE)                       NEGATIVE
        Urine Urobilinogen (0.2 - 1.0 mg/dL)                0.2
        Ur Leukocyte Esterase (NEGATIVE)                 NEGATIVE
        Urine HCG, Qual                                  NEGATIVE


Recent Impressions:
GENERAL DIAGNOSTICS  - GD CHEST 1V 02/16 1303
*** Report Impression - Status: SIGNED  Entered: 02/16/2020 1311


IMPRESSION:
No acute findings.


loc:  4
```

Impression By: PRKWOKE — Keith Kwok, M.D.


 Lab   Imaging Statement
Laboratory   radiographic studies reviewed and considered in the medical
decision—making.


Point of Care Testing
Pulse Oximetry
   Pulse Ox % 99
   On: Room air
   Interpretation Interpreted by me, Pulse oximetry normal

ECG #1 Interpretation
Text/Dict Note
Sinus rhythm at 68 bpm with sinus arrthymia with occasional premature
ventricular complexes. Normal axis. No STEMI
ECG Documented in MUSE Yes
Date 02/16/20
Time 1210
Interpreted by and reviewed by me, ED physician


Portions of this section were scribed by PANUGANTI,BHAVYA on 02/16/20 at 1419


Patient Discharge   Departure

Vital Signs/Condition
Vital Signs
First Documented:

|  | Result | Date Time |
|---|---|---|
| Pulse Ox | 99 | 02/16 1212 |
| B/P | 185/105 | 02/16 1212 |
| B/P Mean | 131 | 02/16 1212 |
| O2 Delivery | Room air | 02/16 1212 |
| Temp | 36.8 | 02/16 1212 |
| Pulse | 74 | 02/16 1212 |
| Resp | 20 | 02/16 1212 |

Last Documented:

|  | Result | Date Time |
|---|---|---|
| Pulse Ox | 99 | 02/16 1212 |
| B/P | 185/105 | 02/16 1212 |
| B/P Mean | 131 | 02/16 1212 |
| O2 Delivery | Room air | 02/16 1212 |
| Temp | 36.8 | 02/16 1212 |
| Pulse | 74 | 02/16 1212 |
| Resp | 20 | 02/16 1212 |

All vital signs available at the time of this entry have been reviewed.


Condition Stable

Clinical Impression
Clinical Impression
Primary Impression: Palpitations
Secondary Impressions: Chest wall tenderness


Disposition Decision
Discharge

```
           )( Discharged to Home Yes
           )( Time 1426
           )( Date 02/16/20
```

Discharge/Care Plan
Counseled Regarding Diagnosis, Lab results, Imaging studies, Need for follow-up,
When to return to ED
Referrals
NO PRIMARY OR FAMILY PHYSICIAN


Supervising Physician Note
 Scribe Statement
PANUGANTI,BHAVYA, 02/16/20 1424, scribing for and in the presence of Douglas
Malcolm MD
 Signed By: PANUGANTI,BHAVYA, 02/16/20 1424

 Provider Scribed Statement
I personally performed the services described in this documentation and reviewed
the documentation that was dictated to the scribe(s) in my presence, and it
accurately records my words and actions. MALCOLM, DOUGLAS 02/16/20


Portions of this section were scribed by PANUGANTI,BHAVYA on 02/16/20 at 1419

I personally performed the services described in this documentation and reviewed
the documentation that was dictated to the scribe in my presence, and it
accurately records my words and actions. Malcolm,Douglas B. ,  MALDO, 02/17/20;
1543.


Electronically Signed by Malcolm,Douglas MD on 02/17/20 at 1543

RPT #: 0216-0409
***END OF REPORT***

```
                    DIAGNOSTIC IMAGING REPORT
    REGIONAL MEDICAL CTR. - 225 N. Jackson Ave.  -   San Jose, CA 95116
    PHONE #: 408-259-5000                  FAX #: 408-729-2878
-----------------------------------------------------------------------
Name: GJOVIK,ASHLEY M          Loc: Q.ED      Radiology No:

DOB: 08/26/1986 Age: 33     Sex: F Status: REG ER   Unit No: Q001240235

Phys: OSHJA01 - O'Shea,James MD        Acct: Q00856217231

Reason For Exam: ?                          Exam Date:02/16/2020
-----------------------------------------------------------------------


 EXAMS:                              CPT:
002034073 GD CHEST 1V                    71045


     - GD CHEST 1V


   HISTORY:  Chest pain

   TECHNIQUE: Portable AP view of the chest 2/16/2020 12:15 PM

   COMPARISON: None

   FINDINGS:
   The lungs are clear. The cardiomediastinal silhouette is within normal
   limits.  The osseous structures are intact.

    IMPRESSION:
    No acute findings.

    loc:  4



** Electronically Signed by M.D. Keith Kwok on 02/16/2020 at 1309 **
                Reported and signed by: Keith Kwok, M.D.
```

CC: James O'Shea MD

```
Dictated Date/Time: 02/16/2020 (1307)
Technologist: Villanueva,Romil
Transcribed Date/Time: 02/16/2020 (1307)
Transcriptionist: QRAD.VR
Electronic Signature Date/Time: 02/16/2020 (1309)
Printed Date/Time: 02/16/2020 (1311) BATCH NO: N/A


PAGE  1                    Signed Report
```

Lab Result

Details for

# Pro B-type Natriuretic Peptide

**Encounter ID: Q00856217231**

## 16
February

Results for ASHLEY M GJOVIK                    Ordered by O'Shea James MD                    Role Referring

Facility REGIONAL MEDICAL CENTER            Specimen collected 2/16/2020 12:40            Results posted 2/16/2020 1:22 PM
OF SAN JOSE                                  PM
225 N. JACKSON AVENUE
SAN JOSE CA 95116

() 4082595000 (tel:4082595000)

Status Final results; Can only be changed with a corrected result.

NOTE: Lab results are just one tool used in diagnosis. It is important to discuss the results with your physician in order to fully understand what the findings mean in your situation.

| TEST | RESULT | RANGE | LAB | PAST RESULTS | REMARKS |
|---|---|---|---|---|---|
| PRO B-TYPE NATRIURETIC PEPTIDE | 133 pg/mL   H | ⓘ High | Regional Medical Center of SJ 225 N. Jackson Ave. San Jose CA 95116 | View past results | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



*Exhibit: One of Gjovik's Emails to Apple about the Site*

185.    At no time in 2020 or later did Apple ever disclose their fabrication activities and

chemical/gas emissions at 3250 Scott Boulevard to Gjovik. The prior TRI registration was for a

different company and Apple did not submit their first filing until mid-2021. For all Gjovik

knew, 3250 Scott Blvd was currently a simple office building. The Apple Real Estate manager



Exhibit: 9/2/20 Text Messages



Exhibit: Data Showing tVOC Trends

184.    Gjovik noticed there was an Apple facility at 3250 Scott Boulevard across the street and it was also on the Superfund groundwater plume. Gjovik mentioned the facility to Apple on at least September 8, 9, 10, and 13 2020 – inquiring if anyone was familiar with the area because Apple had an office there and Apple having at least one phone call with her – Elizabeth Schmidt, who was also actually in charge of the EH&S team overseeing Gjovik's Superfund office at 825 Stewart Drive.

*Exhibit: Gjovik's 3/26/21 Article*

223.    On March 29 2021, Gjovik messaged a coworker, Mike, who also reported to Powers, and she said, *"As of last Monday Dave has forbidden me from talking about health concerns about [Stewart 1 office] to anyone other than him, HR, and EH&S. I actually found some stuff and I can tell you, but you have to promise to tell him I'm not telling you."* Mike confirmed he would not tell Powers Gjovik was discussing safety concerns, so Gjovik did not get in trouble with Powers.

224.    Mike responded to Gjovik's map of their office with vapor intrusion results saying, *"Holy hell. Where did that [Stewart 1 office] map come from? If the entire 1st floor is over the U.S. EPA max, why is the building still open?"* Mike worked only feet away from Gjovik in their office. Gjovik explained she *made the map overlaying data from historical testing [Apple and Northrop Grumman] did with [Apple's] own maps so we can see that one place and bring it home [to Apple] that this is [Apple's] employees."* Then Mike responded, *"What's crazy is that on the Geotracker, they say no day care, no elder care, no residential, etc.*

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

*Exhibit: Gjovik's texts with West – 4/5/21*

232.  On April 5 2021, Gjovik messaged with West about an article she wrote about the apartment on hazardous waste she lived at that made her ill in 2020. Gjovik informed West five other people contacted her who were also sick at the apartment and that she had been warned about retaliation, possibly including physical violence, from the property owner, Irvine Company.

233.  Gjovik told West she had sleeping with a knife under her pillow and West told her not to sleep with the knife anymore, or a gun, so it will not be used against her and to instead obtain pepper spray or a taser.

234.  West also warned Gjovik should worry about digital surveillance as well and suggested Gjovik purchase a necklace that includes a panic button and calls ADT agents. West told Gjovik *"If you don't have a therapist give EAP a call. You're in a stressful situation (to say the least)."*

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                              DECEMBER 21 2023

265.     On April 30, 2021, there was another phosphine gas leak at the 3255 Scott Blvd facility. The city Fire Department/HazMat agency report said the leak required an evacuation and that phosphine gas was vented into the exterior air. Two weeks later, on May 13 2021, Apple submitted manifests to transport sixty pounds of '*vacuum filters with glass shards*' to a waste disposal facility. [140]



| | 9c. U.S. DOT Description (including Proper Shipping Name, Hazard Class, ID Number, and Packing Group (if any)) | | 10. Containers | | 11. Total Quantity | 12. Unit Wt./Vol. | 13. Wa |
| | | | No. | Type | | | |
| GENERATOR | X | 1. UN1993, Waste Flammable liquids, n.o.s. (Isopropanol, Acetone), 3 , PGII RQ (D001) | 2 | TP | 4400 | P | 214 | DO |
| | X | 2. UN2582, Waste Ferric chloride, solution, 8 , PGIII | 1 | DF | 100 | P | 551 | DO |
| | X | 3. UN3288, Toxic solid, inorganic, n.o.s. (Vacuum Filter Contaminated with Glass Dust), 6.1 , PGII | 1 | DF | 60 | P | 181 | |
| | | | | | | | |

14. Special Handling Instructions and Additional Information       Project Number  294422       Document #: D357979
1) ERG#128;  CH1505600 APC *101, 102*  2x tote  3) ERG#151;  CC74476 SP= LCCRC APC *104*  17

*Exhibit: 5/13/21 Manifest with "Glass Dust"*

---

[140] Uniform Hazardous Waste Manifest, Apple Inc, May 13 2021, Tracking # 015756482

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

**Phosphine Leak (2021)**

Governor's Office Emergency Services
**Hazardous Materials Spill Report**

| DATE: 04/30/2021 TIME: 1014 | RECEIVED BY: | CONTROL#: Cal OES - 21-2288 NRC - |
|---|---|---|

1.a. PERSON NOTIFYING Cal OES:

| 1. NAME: | 2. AGENCY: Santa Clara FD | 3. PHONE#: | 4. Ext: | 5. PAG/CELL: |
|---|---|---|---|---|

1.b. PERSON REPORTING SPILL (If different from above):

| 1. NAME: | 2. AGENCY: | 3. PHONE#: | 4. Ext: | 5. PAG/CELL: |
|---|---|---|---|---|

2. SUBSTANCE TYPE:

| 2. a. SUBSTANCE: | b.QTY:>=< | Amount | Measure | c. TYPE: | d. OTHER: | e. PIPELINE | f. VESSEL >= 300 Tons |
|---|---|---|---|---|---|---|---|
| 1. Phosphine Gas | = | 0.001145 | Lbs. | VAPOR | | No | No |
| 2. | = | | | | | No | No |
| 3. | = | | | | | No | No |

g. DESCRIPTION: While purging a cylinder the release occurred, material vented into the atmosphere inside a structure, a scrubber system apparently malfunctioned and the material entered the buildings ventilation system, approximately 50 employees were evacuated and have been allowed to return, FD and Responsible Party handled the containment and no clean up required.

| h. STOPPAGE/CONTAINMENT: | i. WATER INVOLVED: | j. WATERWAY: | k. DRINKING WATER IMPACTED |
|---|---|---|---|
| Stopped, Contained | No | | |

m. KNOWN IMPACT
None

3. a. INCIDENT LOCATION: 3250 Scott Blvd, Aria

| b. CITY: Santa Clara | c. COUNTY: Santa Clara County | d. ZIP: 95054 | BAY AREA AQMD |
|---|---|---|---|

4. INCIDENT DESCRIPTION:

| a. DATE: 04/30/2021 | b. TIME (Military): 0828 | c. SITE: Merchant/Business | d. REPORTED CAUSE Human Error |
|---|---|---|---|
| e. INJURIES No | f. FATALITY No | g. EVACUATION Yes Evacs #: 50 | h. CLEANUP BY: N/A |

*Exhibit:4/30 CalOES entry filed by Santa Clara FD*

266.    The "*vacuum filters with glass shards*" and temporal proximity to the leak of a highly flammable and unstable gas,[141] suggests, there was an explosion during/related to the April 30 2021 leak. Under information and belief there was a phosphine explosion on April 30, 2021. Under information and belief, the residents in the apartments were never notified of the explosion or the venting of phosphine into their air.

267.    Phosphine gas is a reportable substance under 42 U.S. Code §§ 1712, 9602, and 9603. Phosphine is an "Extremely Hazardous Substance" under CERCLA Section 103 and EPCRA Section 304.

---

[141] NOAA, *Cameo Chemicals – Phosphine*, https://cameochemicals.noaa.gov/chemical/1322 "Very toxic by inhalation at extremely low concentrations. Prolonged heating may cause containers to rupture violently and rocket… Highly flammable. Usually ignites spontaneously in air. Burns with a luminous flame… Phosphine can explode with powerful oxidizers. The gas is heavier than air and may travel along the ground to an ignition source. Container may explode in heat of fire… Reacts violently with: air… Liquefied phosphine can be detonated… Forms explosive mixtures with even small amounts of oxygen. Autoignites at low pressure."

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

# Gjovik v. Apple

# Exhibit: D

443.    On August 21 201, Gjovik submitted the first revised Issue Confirmation to Okpo and also posted on Twitter about it. On Twitter, she provided screenshots of the document where she suggested Apple needed to investigate itself for RICO Act violations including "*fraud*" and "*organized witness tampering*" among other concerns.[183]



**Ashley M. Gjøvik**
@ashleygjovik

Based on my experience, & the non-stop horror stories I now hear EVERY DAY from current & past #Apple employees, I'm now also asking employee relations to investigate themselves.
One "issue" I'm raising to them is literally RICO.
@USDOL, I may need to schedule an interview soon.

- **Concerns Raised (DRAFT):**
  - Hostile work env based on sex (2015-current)
  - Hostile work env based on disability (2020-current)
  - Failure to resolve hostile work environment (2015-current)
  - Sexual harassment (2015, 2018, 2019)
  - Civil assault & battery (2015)
  - False imprisonment (2015-6)
  - Negligence & battery (2017-2020)
  - Civil assault (2021)
  - Quid pro quo / bribe (2015)
  - Intentional Infliction of Emotional Distress (2015, 2021)
  - Bullying (2015-2016, 2021)
  - ADA & FMLA violations (2020-2021)
  - Unsafe work conditions (2017-current)
  - Toxic tort, occupational exposure (2017-current)
  - Violation of OSHA laws & Right to Know statute (2017-current)
  - Failure to report workplace injuries (2017, 2019)
  - Failure to seek medical attention for life threatening injury (2017)
  - Retaliation for whistleblowing (2016, 2020, 2021)
  - Retaliation for protected concerted activities (2020-2021)
  - Retaliatory constructive termination (2015, 2016, 2016, 2021)
  - RICO (Unknown-current)
    - Misrepresentation & fraud
    - Racketeering
    - Organized witness tampering
    - Organized intimidation
    - Corporate corruption
    - Cronyism & nepotism

**Protected Activities & Whistleblowing:**

4:12 PM · Aug 21, 2021

*Exhibit: Gjovik's Issue Confirmation Concern List, 8/21*

444.    Shortly after Gjovik's post about Apple and RICO, a fake Twitter account called "Mel Nayer," began replying to Gjovik's posts making threats and wild allegations. Nayer said, "*This is an ACTIVE @Apple investigation and the managers accused are now receiving death*

---

[183] Twitter, Ashley Gjovik, https://twitter.com/ashleygjovik/status/1429174603713191936

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

# GJOVIK V. APPLE

# EXHIBIT: E



**Orrick, Herrington & Sutcliffe LLP**
1000 Marsh Road
Menlo Park, CA 94025-1015

+1 650 614 7400
orrick.com

March 4, 2022

<u>**VIA ELECTRONIC MAIL**</u>

**Jessica R. Perry**

Andrea Diangco, Regional Investigator
Whistleblower Protection Program
U.S. Department of Labor, OSHA
300 Fifth Avenue, Room 1280
Seattle, Washington 98104
diangco.andrea@dol.gov

| E | jperry@orrick.com |
| D | +1 650 614 7350 |
| F | +1 650 614 7401 |

Ashley Gjovik, Complainant
1050 Benton Street, Apt. 2310
Santa Clara, California 95050
ashleymgjovik@protonmail.com

Re:    *Ashley Gjovik v. Apple Inc.*, Case No. 9-3290-22-051

Dear Ms. Diangco:

This firm is counsel to Respondent Apple Inc. in the above-referenced matter. This letter is Apple's initial response to the amended complaint ("Complaint") filed by Ashley Gjovik on November 2, 2021. This response[1] contains confidential business information belonging to Apple; accordingly, Apple requests that it be kept confidential and that Apple receive pre-disclosure notification pursuant to 29 C.F.R. § 70.26 in the event of any FOIA request covering this response.

Apple submits this response without waiving its right to respond further, including to any additional submission that Ms. Gjovik may make. While we believe that this response demonstrates Ms. Gjovik's retaliation claim has no merit, please let us know if you believe additional information would be helpful.

Except as expressly admitted below, Apple denies Ms. Gjovik's allegations in the Complaint in full.

**I.    INTRODUCTION**

Ms. Gjovik's retaliation claims here hinge on her proving that Apple retaliated against her for raising concerns about (1) unsafe work conditions and (2) an Apple board member's alleged conflict of interest regarding efforts to remediate those alleged conditions. All of her claims are without merit.

---

[1] Apple has a compendium of evidence in support of this response available upon request, should you believe it would be helpful in connection with your review of Ms. Gjovik's Complaint.



Andrea Diangco
March 4, 2022
Page 2

Apple did not terminate Ms. Gjovik's employment because she voiced concerns, but instead because she violated Apple policy by ***intentionally disclosing confidential information about Apple products on Twitter and, as Apple later discovered, to the press***, in clear breach of her confidentiality obligations. And she refused to meaningfully cooperate in Apple's investigatory process.

Indeed, Ms. Gjovik's termination was well after she first voiced the concerns on which the present Complaint is based. According to Ms. Gjovik, she first raised concerns to Apple in March 2021, more than six months before she was terminated; in the interim, Apple engaged repeatedly and in good faith in an effort to address Ms. Gjovik's concerns. Apple had legitimate business reasons to terminate Ms. Gjovik's employment, and the six-month time gap is too attenuated to support any inference causation – a key element of each of Ms. Gjovik's three claims under the Occupational Safety and Health Act ("OSHA") section 11(c), the Sarbanes-Oxley Act ("SOX"), and the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA").

## II.    FACTUAL BACKGROUND

### A.    Apple Prohibits Discrimination, Harassment, and Retaliation.

Apple has a firm and long standing commitment to diversity and inclusion and does not tolerate discrimination, harassment, or retaliation of any kind. Apple takes seriously its legal obligations to maintain a workplace free of discrimination, harassment, and retaliation and complies with all federal and state requirements imposed upon it. Apple has and strictly enforces its non-discrimination, anti-harassment, and non-retaliation policies.

Apple has an Employee Relations ("ER") team within its People function that investigates internal complaints of discrimination, harassment, and retaliation. Employees can complain openly or anonymously. And there are many avenues for them to raise complaints: they may speak directly to any Apple manager, contact Apple's People Support team and/or their People Business Partner, contact the confidential Business Conduct Helpline via phone, email, or online submission, or submit a confidential or anonymous report to EthicsPoint, Apple's third-party vendor. Apple policy strictly prohibits retaliation for reporting any complaints or concerns.

### B.    Ms. Gjovik Worked at Apple for Six Years in a Role That Furnished Her Access to Highly Confidential Apple Product Information – Which She Agreed to Protect.

Apple hired Ms. Gjovik as an iOS Build Engineer Project Manager at Apple's Sunnyvale, California location in February 2015. She subsequently transitioned to an Engineering Program Manager role and then was



Andrea Diangco
March 4, 2022
Page 3

promoted to a Senior Engineering Program Manager role in January 2017. She held that position until the termination of her employment on September 10, 2021.[2]

Upon joining Apple, Ms. Gjovik agreed—as a condition of employment—to comply with Apple's confidentiality policies. On January 31, 2015, Ms. Gjovik signed the Confidentiality and Intellectual Property Agreement ("Confidentiality Agreement"). The Confidentiality Agreement "prohibits [Ms. Gjovik], during or after employment, from using or disclosing, or permitting any other person or entity to use or disclose, any Proprietary Information without the written consent of Apple, except as necessary to perform [her] duties as an Apple employee." "Proprietary information" includes, inter alia, non-public "materials or information relating to past, existing, or future products and services." Ms. Gjovik agreed to "strictly comply with all of Apple's rules and policies regarding proprietary information" and understood that breach of the agreement could result in termination of her employment. Additionally, the importance of protecting Apple's confidential pre-release product information is clearly set out in the company's Business Conduct Policy: "One of [Apple's] greatest assets is information about [its] products and services, including future product offerings." To safeguard information about Apple's products, employees are prohibited from disclosing confidential information without prior approval of management.

As a Senior Engineering Program Manager, Ms. Gjovik had access to proprietary and trade secret information about unreleased products and features under development, which was shared internally only with those who had a business need to know. From time to time, Ms. Gjovik was given the opportunity to participate in new product or feature user studies and to test unreleased prototypes. On each occasion, Ms. Gjovik's participation was entirely voluntary and at times required her to agree to additional confidentiality obligations that prohibited her from disclosing any information about the existence of the study or her participation in it.

In July 2018, Ms. Gjovik participated in a user study of an internal and proprietary application called "Alpha."[3] Because the Alpha application was still in testing phase and unavailable to the public, Apple required all participants— as a condition of participating—to maintain strict confidentiality. Ms. Gjovik signed the Alpha Study Consent Form and expressly acknowledged that any information about the study, including her participation, was confidential under the Confidentiality Agreement and could not to be disclosed to third parties ("[b]y agreeing to participate in this study, you acknowledge that any information about the Study, including any Study details or the fact of your participation, are considered Apple Confidential Information, and are covered by the obligations under your agreements with Apple.").

---

[2] In 2018, Ms. Gjovik requested, and Apple granted, a flexible work schedule to allow her to continue working full-time while also attending law school. This arrangement continued until the termination of Ms. Gjovik's employment.

[3] Apple refers to this study by the codename "Alpha" in an effort to protect Apple's confidential product information from further unauthorized disclosure.



Andrea Diangco
March 4, 2022
Page 4

**C.      Ms. Gjovik Disclosed Apple's Confidential Information In Violation Of Her Written Confidentiality Agreements and Refused to Meaningfully Participate in the Investigation Into Her Conduct.**

On August 28, 2021, Ms. Gjovik tweeted[4] details about a proprietary study Apple was conducting, codenamed "Omega," about a confidential Apple product.[5] Like the Alpha study, the details of Omega were not known except to a small select group within Apple, and certainly not outside Apple, and Ms. Gjovik agreed to keep them confidential under her Confidentiality Agreement. Despite this, Ms. Gjovik's tweet both identified the name and purpose of the study regarding an unreleased product under development. Ms. Gjovik's tweet was retweeted the same day by an account dedicated to posting predictions about future Apple products. The next day, Apple received a formal complaint through its Business Conduct Hotline that Ms. Gjovik had publicly disclosed confidential information about the Omega study.

On August 30, 2021, Ms. Gjovik tweeted photographs and a video of herself created by the Alpha application, thus disclosing Apple confidential information. She also linked to a story published in The Verge, a technology blog, in which she disclosed her participation in the Alpha study.[6]

Ms. Gjovik knew her conduct was inappropriate; she had previously reported similar conduct by other Apple employees as a violation of their employee confidentiality obligations. In January 2020, Ms. Gjovik reported to Apple conduct of former employees who gave an interview in which they disclosed, among other things, internal code names, which Ms. Gjovik stated were "trade secret."

Upon learning of her unauthorized disclosure, Apple promptly launched an investigation. On September 9, an Apple investigator requested to speak with Ms. Gjovik as part of that investigation. Ms. Gjovik refused to be interviewed, and Apple completed its investigation based on the available information, including her publicly available Twitter posts. Based on clear evidence, Apple concluded that Ms. Gjovik had violated her confidentiality agreements and Apple policy.

---

[4] In March 2021—the same time Ms. Gjovik asserts she began raising alleged concerns with Apple—Ms. Gjovik created and has since maintained an active Twitter account.

[5] As with the Alpha study, Apple refers to this study by the codename "Omega" in an effort to safeguard Apple's confidential product information.

[6] Zoe Schiffer, *Apple Cares About Privacy, Unless You Work at Apple*, The Verge (Aug. 30, 2021), https://www.theverge.com/22648265/apple-employee-privacy-icloud-id.



Andrea Diangco
March 4, 2022
Page 5

**D.**   **Apple Terminated Ms. Gjovik's Employment Because She Violated Her Confidentiality Obligations And Refused to Cooperate During An Internal Investigation.**

On September 9, Apple terminated Ms. Gjovik's employment effective the following day for her violation of her Intellectual Property Agreement, company policy, and her refusal to cooperate during Apple's internal investigation process. Apple's Misconduct and Discipline Policy provides that certain conduct may warrant immediate termination, specifically including "[v]iolating confidential, proprietary, and trade secret information obligations (including those stated in Apple's Intellectual Property Agreement)" and "interfering or failing to cooperate with an investigation."

**E.**   **Ms. Gjovik Subsequently Admitted That She Disclosed Apple's Confidential Information.**

On September 15, 2021, a different Apple employee made another report to the Business Conduct Helpline that Ms. Gjovik had publicly disclosed information about the Alpha study. The employee attached screenshots of text messages they had exchanged with Ms. Gjovik dated August 20, 2021. In the text messages, *Ms. Gjovik admitted to disclosing confidential information* about the Alpha study to Zoe Schiffer, a reporter from The Verge:

> I'm helping Zoe with the privacy article. I gave her [Alpha] details because that bothers me too … I'm even letting her include a few pics from [Alpha].

As discussed above, Ms. Gjovik's very involvement with the Alpha study constitutes confidential information, as do any details about the study or photos or other documents that are the product of it.[7] Apple's subsequent confirmation that she admitted to disclosing confidential information publicly and intentionally further justifies Apple's termination decision.

**F.**   **Ms. Gjovik Made Other Various Claims Apple Has Diligently Investigated.**

**1.**   **Apple Investigated Ms. Gjovik's Safety Concerns And Repeatedly Encouraged Her to Raise Them.**

Beginning in March 2021, Ms. Gjovik raised various concerns about a vapor intrusion study in the Stewart 1 building in which she worked. In response, Apple met with Ms. Gjovik at least seven times to provide her with numerous reports per her requests, encouraged her to report any further concerns she had to Apple's

---

[7] Apple promptly contacted Twitter to request removal of Ms. Gjovik's tweets disclosing confidential information. Twitter refused. Through counsel, Apple then contacted Ms. Gjovik and she agreed to remove the tweets.



Andrea Diangco
March 4, 2022
Page 6

Environmental, Health & Safety ("EHS") team, and worked with her to find a reasonable accommodation for her perceived concerns.

Stewart 1 is a Superfund site that has been redeveloped for commercial use and was deemed acceptable for occupancy by the Environmental Protection Agency (EPA). *See* https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.redevelop&id=0901181). Apple conducts periodic evaluations and preventative maintenance of buildings with vapor intrusion mitigation systems as part of its vapor intrusion management program. Accordingly, on February 18, 2021, Apple notified building access managers of Stewart 1 that it would be conducting a routine "vapor intrusion survey" in Stewart 1. On March 17, 2021, Ms. Gjovik began asking questions about the planned work, while alleging to have experienced hazardous vapor intrusion before at a non-Apple site and the issue had, in her words, "become a bit of a personal crusade." Ms. Gjovik requested to meet with Apple's EHS department and over the next four months, EHS and Apple management met with Ms. Gjovik repeatedly in an effort to address her questions and concerns:

- <u>March 22, 2021</u>: Ms. Gjovik met with her manager to discuss the vapor intrusion survey, and her manager invited Ms. Gjovik to share any concerns she had with Apple's experts in the EHS department.

- <u>April 2, 2021</u>: Ms. Gjovik met with an EHS expert and ER representative to discuss the vapor intrusion survey. Ms. Gjovik sent a list of 17 questions to the EHS expert and ER representative before the meeting which, as Ms. Gjovik noted in her meeting recap, they addressed during the meeting. Specifically, Ms. Gjovik's notes state that EHS informed Ms. Gjovik that a vapor intrusion mitigation system had been installed in 2014 before Apple moved into the building, and no unacceptable vapor intrusion was occurring at the site, per 2015 testing results, which EHS also provided to Ms. Gjovik. Additionally, Ms. Gjovik's notes state that Apple personnel reiterated during the meeting that she could "speak freely about [her] working conditions" without fear of retaliation, expressly stated that she was permitted to contact the EPA, and encouraged her to report to EHS any chemical odors as soon as possible.[8]

- <u>April 9, 2021</u>: EHS sent Ms. Gjovik links to reports about vapor intrusion per her request.

---

[8] Shortly after EHS told Ms. Gjovik that she may contact the EPA, Ms. Gjovik reached out to the EPA to express her concerns. On June 7, 2021, the EPA described to Ms. Gjovik the various protective measures that have been implemented to prevent vapor intrusion into the Stewart 1 building, and further explained that the 2015 testing results "demonstrated that the chemicals related to the [site] were less than EPA's indoor air human health risk screening values for workers." The EPA assured Ms. Gjovik that it "believes the remedy in place at the [site] remains protective." The EPA additionally clarified to Ms. Gjovik that "there is no specific EPA requirement to notify each site visitor or construction or office worker of a mitigated potential risk."

4161-3255-5828



Andrea Diangco
March 4, 2022
Page 7

- <u>April 11, 2021</u>: Ms. Gjovik thanked the EHS expert for his "transparency" and sent him 16 additional questions.

- <u>April 27, 2021</u>: Ms. Gjovik met with an ER representative and alleged that her manager had told her she could not share her concerns about the Stewart 1 site (a claim he denied). ER again told Ms. Gjovik's that she was free to share information about "the terms and conditions of [her] employment" (without restriction), and encouraged her to strive to ensure information she shared (including about what Apple personnel had told her) was accurate and complete.

- <u>May 17, 2021</u>: Ms. Gjovik had another meeting with EHS and ER, during which EHS reassured her there was no concerning vapor intrusion at the Stewart 1 site. EHS also answered the 16 follow-up questions Ms. Gjovik had posed in her April 11 email. Per Ms. Gjovik's meeting notes, ER again told her she could share her concerns with anyone and "Apple would never restrict [her] right to speak about workplace safety concerns."

- <u>May 18, 2021</u>: Ms. Gjovik met with her skip-level manager. During the meeting he encouraged her to continue to raise any concerns she had with EHS and ER, and in a follow-up email stated "Apple does not tolerate retaliation for raising concerns. … I know you raised some issues to EH&S about Stewart 1 … so please continue to work with EH&S to address your questions/concerns."

- <u>June 10, 2021</u>: Ms. Gjovik met with ER and discussed the possibility of an accommodation to work remotely, allegedly due to her concerns about the safety of the Stewart 1 site. ER answered Ms. Gjovik's questions about the accommodation request process and continued to work with Ms. Gjovik over the next six weeks in an effort to identify a reasonable accommodation that would work for both Ms. Gjovik and Apple.[9]

- <u>July 2, 2021</u>: ER emailed Ms. Gjovik to follow up on Ms. Gjovik's questions regarding scheduled work in the building. ER provided an update, and explained that Apple was in the middle of a three-step project—first announced in February 2021— that involved (1) evaluating potential pathways through which vapors could potentially enter the building, (2) voluntarily and preventatively sealing any potential pathways, including cracks in the floor that were the result of natural floor movement, and (3) conducting indoor air testing once the sealing was complete.

- <u>July 7, 2021</u>: Ms. Gjovik met with EHS and ER to discuss the voluntary plan to preventatively seal potential pathways for vapor intrusion and to conduct air testing. EHS assured Ms. Gjovik of the

---

[9] Ultimately, Ms. Gjovik's request for an accommodation became moot in August 2021 when Apple granted Ms. Gjovik's request for paid administrative leave while Apple investigated a separate and unrelated complaint she had made about her work environment.



Andrea Diangco
March 4, 2022
Page 8

building's safety, explaining that measures were in place to mitigate the potential for vapor intrusion. EHS again reviewed the three-step project announced in February 2021 and explained it was part of Apple's regular maintenance, not due to concerns regarding the safety of the building. EHS also explained that no EPA reporting was necessary because Apple's planned work was routine and voluntary.

Far from retaliating against Ms. Gjovik in an effort to stifle her concerns about workplace safety, Apple devoted significant time and resources to addressing them.

### 2.   **Apple Investigated Ms. Gjovik's Concerns About an Alleged Conflict Of Interest by an Apple Board Member.**

On July 19, 2021, Ms. Gjovik wrote to the EPA regarding her belief that a member of Apple's Board of Directors (Ronald Sugar) had a conflict of interest regarding the Stewart 1 building. She contended that because Mr. Sugar had previously been the CEO of Northrup Grumman – which Ms. Gjovik asserted was primarily responsible for maintaining environmental safety at Stewart 1 – Mr. Sugar had made or supported decisions favorable to Northrup Grumman in connection with Stewart 1, at Apple's expense. Ms. Gjovik forwarded her communications with the EPA to the ER team on July 27, 2021 and again the following day.

Apple did not stifle Ms. Gjovik's concerns; it instead investigated them and found that they lacked merit. By the time Apple's investigation regarding this issue was complete, however, Ms. Gjovik had been terminated for breach of her confidentiality obligations.

### 3.   **Apple Granted Ms. Gjovik's Request To Be Placed On Paid Administrative Leave.**

On July 20, 2021, Ms. Gjovik raised new concerns that she believed her managers were creating a "hostile work environment."[10] When she met with an ER Investigator to discuss those concerns, Ms. Gjovik suggested administrative leave as a "short-term" solution to the alleged issue and confirmed her suggestion in the email summary she sent ER after their discussion.

On August 4, 2021, Ms. Gjovik met with ER again and expressly requested to be placed on paid administrative leave. ER agreed and confirmed by email:

---

[10] Apple expressly denies Ms. Gjovik's hostile work environment claims, which are not at issue here but instead are the subject of her separate charges with the DFEH, EEOC, and NLRB. Apple does, however, discuss her hostile work environment allegations herein to the limited extent relevant here (e.g., responding to her claim that she was "suspended" in August 2021 which in fact she requested and was granted paid administrative leave).



Andrea Diangco
March 4, 2022
Page 9

> I want to confirm our conversation a few minutes ago. ***Per your request, you are now on paid administrative leave so as to not interact with your managers***.

Ms. Gjovik did not email ER back. But that same day, Ms. Gjovik misrepresented their meeting in a tweet, alleging that Apple had "suspended" her by placing her on an involuntary "indefinite" leave. ER emailed Ms. Gjovik to correct her misrepresentation the following day. ER told Ms. Gjovik that since the paid leave was at her request, she could return to work at any time. Ms. Gjovik never responded.

## III.    **ARGUMENT**

Apple terminated Ms. Gjovik's employment because she chose to disclose confidential Apple product information she was under an obligation to keep in confidence, and then refused to participate into the internal investigation of that disclosure. Simply put, there was no retaliation under OSHA, SOX, or CERCLA. Ms. Gjovik has not established—and cannot establish—a *prima facie* case of retaliation. All three statutes require that Ms. Gjovik show: (1) she engaged in a protected activity; (2) Apple knew or suspected that she engaged in the protected activity; (3) she suffered an adverse action; and (4) the protected activity was at least a contributing factor[11] in the adverse action. *See* 29 U.S.C.A. § 660(c)(1) (OSHA 11(c)); 18 U.S.C.A. § 1514A(a) (SOX); 42 U.S.C.A. § 9610(a) (CERCLA).[12] Because none of her expressions of concern was a "contributing factor" in her termination, she cannot establish retaliation on the facts.

---

[11] While the three statutes have different causation standards, it is immaterial because Ms. Gjovik cannot establish causation even under the most lenient "contributing factor" standard. 29 C.F.R. § 1980.104(e)(2)(iv) (SOX) (contributing factor causation standard); 29 C.F.R. § 24.104(e)(2)(iv) (CERCLA) (motivating factor causation standard); 29 C.F.R. § 1977.6(b) (OHSA) (but-for causation standard).

[12] Apple does not concede that Ms. Gjovik can establish any of the four elements of a retaliation claim under these statutes. For example, Ms. Gjovik's allegedly activity would not qualify as protected under SOX (and thus could not ground any SOX whistleblower claim). In the Complaint and memorandum Ms. Gjovik submitted to the DOL, she asserts that she engaged in a number of activities including reporting an Apple board member's alleged conflict of interest, reporting that Apple failed to notify employees they worked on a Superfund site, and reporting a failure to address workplace safety, among others. None of these alleged actions constitute protected SOX activity, however. *See* 18 U.S.C. § 1514A(a)(1) (employee must allege conduct the employee "reasonably believes constitutes a violation of section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities fraud], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders"); *see also Verfuerth v. Orion Energy Sys., Inc.*, 879 F.3d 789, 793-94 (7th Cir. 2018) (complaints about conflicts of interest and violations of internal company protocol not about "fraud" within meaning of SOX); *Gauthier v. Shaw Grp., Inc.*, 2012 WL 6043012, at *6 (W.D.N.C. Dec. 4, 2012) (dismissing plaintiff's complaint, finding that his reports were related to nuclear safety, not fraud against shareholders); *Levi v. Anheuser-Busch Cos., Inc.*, ALJ Case No. 2006-SOX-37, 2006 WL 3246840, at *16 (May 3, 2006) (complaints about workplace safety and manager incompetence did not contain any allegations of fraud). For purposes of this responsive statement, however, Apple focuses on select elements of her *prima facie* case (as a failure to establish any of them is fatal) without prejudice to additional arguments that may be available.



Andrea Diangco
March 4, 2022
Page 10

### A.   Apple Terminated Ms. Gjovik For Legitimate Reasons Unrelated to Her Concerns.

Apple terminated Ms. Gjovik for legitimate business reasons: she violated her own written confidentiality agreements with Apple and Apple's policies, both by disclosing confidential product information and by refusing to cooperate in an internal investigation. Because Apple would have terminated Ms. Gjovik for this conduct even had she never raised any safety or conflict of interest (or any other) concerns, Ms. Gjovik's claims fail under CERCLA, SOX, and OSHA. *See Crosby v. U.S. Dep't of Lab.*, 53 F.3d 338 (Table), 1995 WL 234904, at *1 (9th Cir. 1995) (affirming that employer did not violate CERCLA where the employer showed that it had legitimate, nondiscriminatory reasons for terminating the employee, including poor work quality, insubordination, and refusal to work on a project); *Riedell v. Verizon Commc'ns*, ALJ Case No. 2005-SOX-00077, 2006 WL 3246893, at *11 (Aug. 14, 2006) (dismissing SOX claim where complainant failed to offer evidence sufficient to undermine employer's contention that he was fired for legitimate reason of refusing to participate in a meeting with management); *Solis v. Consol. Gun Ranges*, 2011 WL 1215028, at *8 (W.D. Wash. Mar. 30, 2011) (determining under OSHA section 11(c) that employee's protected activity was not but-for cause of termination where employer showed that it would have terminated employee in any event).

The **only** reason that Apple terminated Ms. Gjovik's employment was due to her own deliberate breaches of her confidentiality agreements and violations of Apple policy. Disclosing confidential product information and refusing to meaningfully participate in internal investigations are both bases for immediate termination under Apple's Misconduct and Discipline policy. They are also recognized as legitimate bases for termination under relevant case law. *See, e.g., Galinsky v. Bank of Am., Corp.*, ALJ Case No. 2011-SOX-010, ARB Case No. 11-057, 2012 WL 5391424, at *10-11 (ARB Oct. 31, 2012) (substantial evidence supported finding that complainant would have been discharged in any event due to, among other things, violating company policy by downloading sensitive corporate information for his personal use); *Grove v. EMC Corp.*, ALJ Case No. 2006-SOX-00099, 2007 WL 7135739, at *24-25 (July 2, 2007) (finding that complainant's termination was due to his unreasonable refusal to cooperate in respondent's investigation of the issues he raised and thus not actionable under SOX).

Ms. Gjovik knew when she disclosed the confidential information on social media that she was violating Apple's policies; she had reported others less than two years prior for doing the exact same thing. There is no evidence that Apple's reasons for termination were pretext, nor is there any evidence that Apple harbored animus toward Ms. Gjovik for raising concerns; on the contrary, it took them seriously and engaged in good faith investigations of the issues she raised. Indeed, Ms. Gjovik's termination was consistent with Apple's practice of terminating other employees who violated their confidentiality agreements by disclosing unreleased product information; since 2017, Apple has terminated the employment of at least nine employees for violating their confidentiality obligations.

In short, Ms. Gjovik's expressions of concern played no role in her termination – nor is there any evidence that they did – and her retaliation claims should be dismissed.



Andrea Diangco
March 4, 2022
Page 11

**B.    Ms. Gjovik's Repeated Expressions of Concern Even After Apple Had Responded Do Not Support A Retaliation Claim.**

Apple (and later the EPA) thoroughly responded to Ms. Gjovik's initial workplace safety concerns, and thus Ms. Gjovik's subsequent expressions of concern regarding workplace safety were unreasonable and her activities lost any protected status as a matter of law. *See, e.g., Williams v. U.S. Dep't of Labor*, 157 Fed. App'x 564, 570 (4th Cir. 2005) (teacher's whistleblowing activities initially protected under CERCLA but "[o]nce her concerns were addressed … it was no longer reasonable for her to continue claiming that these schools were unsafe and her activities lost their character as protected activity"); *Day v. Staples, Inc.*, 555 F.3d 42, 58 (1st Cir. 2009) (under SOX, employee's complaints "were not initially reasonable as beliefs in shareholder fraud and they became less reasonable he was given explanations" by the employer); *see also Grant v. Dominion East Ohio Gas*, ALJ Case No. 2004-SOX-00063, 2005 WL 6185928, at *40 (Mar. 10, 2005) (under SOX, finding whistleblower protections do not "protect an employee who simply raises questions about virtually everything with which [she] disagrees or does not understand" or who "simply assumes a company has retaliated against [her] because [she] raised a lot of questions, lodged a lot of complaints, and labels [herself] a 'whistleblower'").

Apple responded to Ms. Gjovik's concerns regarding its plan to voluntarily and preventatively seal potential pathways for vapor intrusion and to subsequently conduct air testing; thus, Ms. Gjovik's continued expressions of concern about the plan do not constitute protected activity. Ms. Gjovik first expressed concerns related to the planned work on March 17, 2021. On April 2, 2021, EHS informed Ms. Gjovik that measures had been taken prior to Apple occupying Stewart 1 to mitigate potential for unacceptable vapor intrusion, and that further testing – which was performed after those measures had been implemented – confirmed that no unacceptable vapor intrusion at the site was occurring. On May 17, 2021, EHS reassured Ms. Gjovik that there was no concerning vapor intrusion at the Stewart 1 site, and answered Ms. Gjovik's sixteen questions from her April 11 email. And on July 7, EHS met with Ms. Gjovik to (1) again reassure her that measures were in place to mitigate the potential for vapor intrusion; (2) explain the work was part of Apple's regular maintenance program, not due to any concerns regarding building safety; and (3) explain that no EPA reporting was necessary because the planned work was routine and voluntary.

The EPA also assuaged Ms. Gjovik's concerns, letting her know on June 7, 2021 that the Agency "believ[ed] the remedy in place at the [site] remain[ed] protective" and that "[f]or a site where conditions are protective of human health there is no specific EPA requirement to notify each site visitor or construction or office worker of a mitigated potential risk." Because Apple as well as the EPA responded to Ms. Gjovik's concerns regarding workplace safety through multiple conversations and written communications, her continued repetitions of the same concerns were not reasonable and do not constitute "protected activity" that can supply the predicate for a retaliation claim.



Andrea Diangco
March 4, 2022
Page 12

### C. Apple's Decision to Terminate Ms. Gjovik for Policy Violations Was Removed From Her Alleged Protected Activity.

Ms. Gjovik's alleged protected activity is too remote in time to suggest that any of her expressions of concern were in fact the true reason for her September 2021 termination. For her OSHA and CERCLA claims (premised on the same alleged protected activity), Ms. Gjovik first raised concerns in March 2021, six months before her termination, and Apple met with her multiple times in March, April, May, June, and July 2021 to both discuss her safety concerns and explain that Apple was doing routine preventative evaluation, maintenance, and testing to mitigate the potential for vapor intrusion. As for SOX, Ms. Gjovik's Complaint claims that she raised concerns about Mr. Sugar's alleged conflict of interest in July 2021, almost two months before her termination. *See, e.g., Carr v. West LB Admin., Inc.*, 171 F. Supp. 2d 302, 309-10 (S.D.N.Y. 2001) (periods "as short as three months" can fail to support causal connection); *Grant*, 2005 WL 6185928, at *42 (one-month temporal proximity held insufficient to demonstrate a causal connection given facts of case).

Regardless, any finding of temporal proximity would be immaterial given Ms. Gjovik's intervening conduct – her clear violation of her confidentiality obligations and Apple policy – which operated to break any alleged causal chain. *See, e.g., Fraser v. Fiduciary Tr. Co. Int'l*, 2009 WL 2601389, at *6 (S.D.N.Y. Aug. 25, 2009) (dismissing SOX claim where plaintiff's attempt to establish an unauthorized hedge fund and market it to respondent's clients was a legitimate intervening basis for termination); *Klopfenstein v. PCC Flow Techs. Holdings, Inc.*, ALJ Case No. 2004-SOX-11, ARB Case No. 07-021, 07-022, 2009 WL 2844805, at *6 (ARB Aug. 31, 2009) (denying SOX complaint where discovery of misconduct committed by plaintiff was intervening event), *aff'd, Klopfenstein v. Admin. Review Bd.*, 402 F. App'x 936 (5th Cir. 2010); *Williams*, 157 F. App'x at 570-71 (denying CERCLA complaint based on intervening event where employer fired complainant for obtaining unauthorized access to confidential information).

### D. Ms. Gjovik's Allegation That Apple Suspended Her in Retaliation For Her Concerns Fails Because She Requested a Leave of Absence.

Finally, Ms. Gjovik's alleged "suspension" was not an adverse employment action at all, and thus cannot ground any retaliation claim. Ms. Gjovik expressly asked Apple to place her on a paid leave of absence while ER investigated her hostile work environment concerns. Apple granted her request and ER summarized their conversation in an email to Ms. Gjovik that same day. Ms. Gjovik never disputed ER's summary—specifically, his statement that *"[p]er your request, you are now on paid administrative leave"*—or otherwise responded to his email. Granting an employee's request for a leave of absence is not adverse action as a matter of law. *See, e.g., Baker v. Cty. of Merced*, 2011 WL 2708936, at *5 (E.D. Cal. July 12, 2011) (no adverse action where the employer complied with employee's requests to take a leave of absence). Because Ms. Gjovik cannot show any adverse action, her claim for retaliation premised on an alleged "suspension" also fails.



Andrea Diangco
March 4, 2022
Page 13

## IV.    CONCLUSION

The evidence demonstrates that Apple terminated Ms. Gjovik's employment because she disclosed confidential, proprietary information in violation of her confidentiality obligations – conduct to which she has admitted – and refusing to participate into Apple's investigation of that disclosure. Her termination had nothing to do with any allegedly protected activity; on the contrary, Apple actively investigated Ms. Gjovik's concerns. Based on the evidence described above, Ms. Gjovik's retaliation claims should be dismissed with no further investigation.

If you require any further information, please contact us.

Respectfully submitted,

ORRICK, HERRINGTON & SUTCLIFFE LLP
Attorneys for Apple Inc.

By:

Jessica R. Perry

# Gjovik v. Apple

# Exhibit: F

41.     The industry standard for stack design is to ensure the stacks place the vent at least 10 feet above the rooftop.[56] The National Fire Protection Association specifies minimum stack height of 10 ft to protect rooftop workers. For laboratory exhaust, the American Industrial Hygiene Association recommends minimum stack height of 10 feet above adjacent roof line, and stack height extending one stack diameter above any screen.[57] (Compare to Apple's 1 foot).



**Exhibit**: *Annotated photos of the 825 Stewart rooftop HVAC and sub-slab vents*

---

[56] OSHA Technical Manual (OTM), Section III: Chapter 3, *Ventilation Investigation* ("Should be 10 ft higher than any roof line or air intake located within 50 ft of the stack (Figure III:3-8). For example, a stack placed 30 ft away from an air intake should be at least 10 ft higher than the center of the intake.") https://www.osha.gov/otm/section-3-health-hazards/chapter-3
[57] ANSI/AIHA Z9.5 ("Be in a vertical up direction at a minimum of 10 feet above the adjacent roof line as so located with respect to opening and air intakes of the laboratory or adjacent buildings to avoid re-entry.")

22

Fig. 1    **Flow Recirculation Regions and Exhaust Parameters**
(Wilson 1982)

*Exhibit: Exhaust Diagram from ASHRAE Handbook*[58]

42.    Apple penetrated the slab (concrete floor) of the building at 825 Stewart Drive in late 2015. US EPA records note that *"tenant improvements performed in late 2015… included… penetration and subsequent re-sealing of the concrete slab for installation of additional piping and utilities."*[59] Apple claims only AECOM inspected the floor prior to penetration and after sealing.[60] Under information and belief, Apple never engaged an independent professional engineer for inspection and certification as Northrop Grumman did in May 2015.

43.    In May 2015, vapor intrusion testing at 825 Stewart Drive showed indoor air pollution of Trichloroethylene (TCE), 1,2-Dichloroethene (1,2-DCE), Toluene, Chloroform, Methylene Chloride, and Ethylbenzene. The testing also showed outdoor air contamination on

---

[58] 2019 ASHRAE Handbook—HVAC Applications, BUILDING AIR INTAKE AND EXHAUST DESIGN, pg 46.2, https://www.ashrae.org/file%20library/technical%20resources/ashrae%20handbook/i-p_a19_ch46.pdf
[59] AECOM for Apple, *Vapor Intrusion Evaluation Report, Former TRW Microwave Site, 825 Stewart Drive Sunnyvale, California,* US EPA SEMS-RM DOCID # 1158560 (February 2016), https://semspub.epa.gov/work/09/1158560.pdf
[60] Id.

24

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

outdoor air.[76] (Note: 3 µg/m of TCE in indoor air from vapor intrusion is unacceptable for commercial buildings).



Figure 6. TCE Concentrations in Outdoor Air

Fifth Five-Year Review – AMD 901/902 and TRW Superfund Sites and the Offsite OU

*Exhibit: TCE in the Outdoor Air of the Triple Site, 2019*[77]

55.     In 2020, Northrop Grumman described the Triple Site and TRW Microwave site to the US EPA saying,

> "The Triple Site plume in the Santa Clara Valley represents a classic example of a '*complex contaminated groundwater*' site" …. Despite more than three decades of intense characterization and remediation efforts, including nearly four decades of groundwater pump and treat system operation from multiple locations across the plume since 1982, significant uncertainties remain regarding subsurface fluid flow, plume containment, and restoration timeframes. Remedy performance has lagged far behind expectations." [78]

---

[76] Id.
[77] Id.
[78] US EPA, Development of The Environmental Sequence Stratigraphy, supra at pg16.

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

**From:** Ashley Gjovik <ashleygjovik@icloud.com>
**Sent:** Wednesday, April 21, 2021 9:29 PM
**To:** Schulman, Michael <Schulman.Michael@epa.gov>
**Subject:** Questions about TRW Microwave (Building 825) in Sunnyvale CA - CAD009159088

Hi Michael! I hope you're well.

I work for Apple in the TRW Microwave (Building 825) site in Sunnyvale — part of the "Triple Site."

I have some concerns about the current status of the building. I'm talking to our EH&S team at work about it and they said I'm allowed to reach out to you and talk to you directly as well.

I've skimmed the majority of the site documentation on the EPA and Water Boards portals. (Thanks for adding the 2019 FYR!) Apple also shared the Dec 2015 indoor air testing summary.

Would you be open to a phone call to discuss the site and some of my open technical questions? I can talk before 10:30a or between 2-4pm tomorrow, or anytime Friday before 11am, or between 12-2, or after 3pm.

*Excerpt: Gjovik Email to EPA 4/21*

250.    On April 23 2021, the US EPA told Apple that Gjovik contacted them about her Apple office. EPA's emails about Gjovik's questions and concerns advised, per Fatima Ty, that Apple should be included in any conversation that the US EPA had with Gjovik about the TRW Microwave Superfund site. Ty justified this requirement due to Ty's work "*in EHS at IBM.*" US EPA (Margot Perez-Sullivan, Fatima Ty, Edwin "Chip" Poalinelli, and Michael Schulman) drafted an email to Gjovik informing Gjovik they told Apple that Gjovik contacted them, but never sent it.

251.    On April 29 2021, Gjovik visited an occupational exposure doctor (Dr. Robert Harrison who directs the UCSF Occupational Health Services department and the Worker Investigation Program for California Department of Public Health[131]), about her exposure at

---

[131] UCSF, Dr. Robert Harrison MD MPH, https://profiles.ucsf.edu/robert.harrison

# Gjovik v. Apple

# Exhibit: G

## New police report about Apple breaking into my apartment, again

From   Ashley Gjovik <ashleymgjovik@protonmail.com>

To     Sollett, Mathew<Mathew.Sollett@nlrb.gov>, Diangco, Andrea - OSHA<Diangco.Andrea@dol.gov>,
       **DIR OSHA**Retaliation<OSHARetaliation@dir.ca.gov>

Date   Tuesday, August 9th, 2022 at 10:36 PM

---

*Note for my CA DOL DIR Retaliation, US NLRB, & US DOL WPP cases against Apple Inc*

Hi,

There's new apartment break in to add to the file. It appears Apple broke into my Santa Clara attic last fall, probably to install surveillance equipment.

I'm preparing to move apartments and am having move out discussions with the current landlord. Back in September last year (i don't remember the exact date) i heard two men up in my attic installing/repairing things for about 2-3 hours. It's always seemed weird & bothered me so I finally talked to my landlord about it.

The landlord has no record of them/maintenance/vendors ever being up in my attic during my lease.

I tried to go up there last week and my ladder wasn't tall enough & there was something alive up there (mouse? bat?) so I quickly retreated - but I was first able to snap some photos & videos of weird wiring/cables that looked out of place.

My landlord said they have no idea what that wiring/cables are & were not expecting them to be there.

Info security friends for some time now have suspected Apple may have tried to intercept my home internet directly and/or installed surveillance equipment wired into my electrical so they don't have to replace batteries. There's also now a theory that they could also be using auditory weapons as well - I'm trying to find a spectrum analyzer - apparently infrasound can be used to cause anxiety/distress and other peculiar side effects. It would make sense for them to try along with their CIA-style psyops of online harassment & other manipulation. **The dystopian future really sucks.**

So this is now the working theory of what they must have done in my attic in September. I assume Northrop Grumman (Ronald Sugar's company) helped - as they literally build military & private security spyware as one of their product lines.

There is attic access from the individual apartments - but I was in my apartment at the time. The working theory for that is they must have hacked into the digital locks of an adjacent apartment (there was one vacant next to mine) and found their way into my attic space from that other unit's attic space.

My landlord had no other explanation for how men could be in my attic space if they did not go up through my closet.

I reported it to the FBI to add my file with them yesterday, August 8 2022. The FBI still won't confirm if I have an open case or if anyone is actually looking into any of this.

The FBI did tell me to also file a police report with the local police department. I filed a report with the Santa Clara PD today - it's incident number 0087 for Aug 9 2022. He said he'd follow up with the landlord about the repeated break-ins & also to ensure whatever is in the attic is dealt with before someone else moves in.

Please add to my cases. Thank you.

PS: My landlord tried to get me to sign a big NDA / confidentiality agreement about it last week, but I refused.

—

10/23/22, 12:50 PM          Ashley M. Gjøvik, J.D. on Twitter: "Agents of Apple referred to my protected activities as worthy of death, made references to m…



🔍 Search Twitter

← **Thread**

**Home**

**Explore**

**Notifications**

**Messages**

**Bookmarks**

**Top Articles**

**Profile**

**More**

Ashley M. Gjøvik, J.D. 
@ashleygjovik

Agents of Apple referred to my protected activities as worthy of death, made references to me dying from "double tap" gunshot wounds, that in Russia I'd die from a "car accident," noted I was deserving of "death and rape threats," & alluded to mailing me a box with a severed head

**Relevant people**

**Ashley M. Gjøvik, J.D.** 
@ashleygjovik
Human rights lawyer, w
author, & activist. Likes
health, & the common
corruption, pollution, &

Terms of Service   Privacy Policy   Co
Accessibility   Ads info   More …
© 2022 Twitter, Inc.



U.S. NLRB; U.S. DEPT OF LABOR; CALIFORNIA DEPT OF LABOR
ASHLEY GJØVIK V APPLE INC | PROPAGANDA CAMPAIGN V2

**UNLAWFUL THREATS MADE BY APPLE INC**

**THREATS OF VIOLENCE**
- **4 Aug 2021:** If you didn't know that you were gonna get [**death & rape**] threats then you are honestly still a child. There's always consequences to you actions whether good or bad. I dont think you are child so I believe you just want attention. (Twitter) ¹
- **7 Sept 2021:** **Espionage** has long been treated as a crime **worthy of death** and all Apple would need to do is to make it apply to corporations and not just nations." (Reddit) ²
- **9 Sept 2021:** A certified interrogator from Apple's "**Workplace Violence**" team emails me and demands I get on the phone with him within the hour, but won't tell me why.
- **9 Sept 2021:** "I said it in the last thread about bad, criminal employees, and I'll say it again. It's time for Apple to take out the trash. Do whatever it takes to identify and catch the leakers and then **ruin their lives.** Fire them, prosecute and go after them. Do whatever it takes. **Hunt them down like wild animals.** Leakers and other activist employees who believe that they can do as they please have no business being at Apple. I want to see them gone and **I want to see them destroyed.** Trashy employees do not belong at Apple. And who is surprised that the leakers go running to the garbage site called the Verge? They already had one campaign that backfired on them when the lunatic woman leaker was fired, now it's time to get rid of any remaining leakers and criminals. Go get 'em Tim! **Espionage** has long been treated as a crime **worthy of death** and all Apple would need to do is to make it apply to corporations and not just nations." (Reddit) ³
- **22 Sept 2021:** [**Tim Cook**] gonna f@^k some perps up (picture of racecar driver with a baseball bat) ⁴
- **29 Sept 2021:** **Don't open it!** (Picture from the movie "7" with Brad Pitt in a field next to a box with a *severed human head* and the words: "WHAT'S IN THE BOX") ⁵
- **30 Sept 2021:** #Apple prides itself in it's packaging… but this is what arrived at my doorstep today. My personal effects from my office, shoved haphazardly in a random box, no packing materials, infused with **Superfund fumes, [rocks], shards of glass, & spite.** (Ashley Gjøvik) ⁶
- **15 Oct 2021:** Maybe [Janneke] can go to Afghanistan and form her AppleToo group there , see how Taliban deals with her. (Apple Insider) ⁷
- **15 Oct 2021:** Good riddance! Another entitled brat who tried to politicize the workplace, and get a fat payout as a result. In **a country like Russia, they would have a car accident.** (Apple Insider) ⁸
- **20 Dec 2021:** Tomorrow's headline: **Apple Whistleblower found dead of heart attack at 22 (never mind the double tap,** nothing to see here). ⁹

¹ Twitter, https://twitter.com/k1aps/jzam3s/status/1423455566879076354
² Reddit, https://www.reddit.com/r/apple/comments/ps91/n3/comment/hdx7qhi/ :

4:29 PM · Feb 3, 2022 · Twitter Web App

📊 View Tweet analytics

💬          🔁          ♡          ⬆️

Tweet your reply                    **Reply**





← **Thread**

 **Ashley M. Gjøvik, J.D.**
@ashleygjovik
· · ·

Any normal reason this statue would give off a consistent 39-43 V/m electric field? (calibrated Cambridge Labs meter, 0 µT magnetic field)

Anything I need to do before I bust it open to see what's inside?

They must've known this'd be the one thing I wouldn't throw in the trash



 **phase_loop** @phase_loop · May 28

Replying to @ashleygjovik

simplest explanation: maybe you have an old-school wiretap in your lamp or electric socket and they don't need to fiddle with phone or computer microphones. Getting sound from windows is possible - but probably can be reduced by placing a radio next to a glass for intr. noise

12:14 AM · May 29, 2022 · Twitter Web App

lıl View Tweet analytics

| ⚪ | ⇄ | ♡ | ⬆ |

Tweet your reply                     Reply

**Relevant people**

**Ashley M. Gjøvik, J.D.**
@ashleygjovik
Human rights lawyer, v
author, & activist. Likes
health, & the common
corruption, pollution, &

**phase_loop**
@phase_l... Follows you

**What's happening**

Premier League · LIVE
**Tottenham Hotspur vs Newca:
United**
Trending with **Miggy**

**#SouthwestHeart**
Go with Heart.
⊠ Promoted by Southwest Airlines

Trending
**Stephen Miller**
2,666 Tweets

Entertainment · Trending
**Madonna**
53.4K Tweets

**Bloomberg** ⬤ · Last night
**Xi and These Six Men Will
Reshape the Future of China**

Show more

Terms of Service  Privacy Policy  Co
Accessibility  Ads info  More · · ·
© 2022 Twitter, Inc.

 Ashley M. Gjøvik, ...  · · ·
@ashleygjovik



← **Thread**



**Ashley M. Gjøvik, J.D.**
@ashleygjovik

...

Thank you to everyone who reached out last night with advice on how to deal with this. I captured photos & videos of the readings, & backed it up

I sequestered the statue for the weekend

I'm contacting the feds on my Apple cases about it & will insist they ask the DOJ to engage

> 🔵 Ashley M. Gjøvik, J.D. @ashleygjovik · May 29
> Any normal reason this statue would give off a consistent 39-43 V/m electric field? (calibrated Cambridge Labs meter, 0 µT magnetic field)
>
> Anything I need to do before I bust it open to see what's inside?
>
> They must've known this'd be the one thing I wouldn't throw in the trash
> twitter.com/phase_loop/sta...
>
> Show this thread

7:38 PM · May 29, 2022 · Twitter Web App

ıl View Tweet analytics

○           ⇄           ♡           ↥

Tweet your reply                    Reply

**Relevant people**



**Ashley M. Gjøvik, J.D.**
@ashleygjovik
Human rights lawyer, v
author, & activist. Likes
health, & the common
corruption, pollution, &

**What's happening**

Premier League · LIVE
**Tottenham Hotspur vs Newca**
**United**
Trending with Miggy

**#SouthwestHeart**
Go with Heart.
🅰 Promoted by Southwest Airlines

Trending
**#COVIDIsAirborne**
3,677 Tweets

Trending
**Cybertruck**
4,686 Tweets

🔵 Bloomberg ✓ · Last night
**Xi and These Six Men Will**
**Reshape the Future of China**

Show more

Terms of Service  Privacy Policy  Co
Accessibility  Ads info  More ···
© 2022 Twitter, Inc.



Ashley M. Gjøvik, ...  ...
@ashleygjovik

Messages              ⊟ ≫

Q Search Twitter



## Apple Gestapo: How Apple Hunts Down Leaks

Jesus Diaz
12/15/09 5:38PM

440    2

They call themselves the Worldwide Loyalty Team. Among some employees, they are known as the Apple Gestapo, a group of moles always spying in headquarters and stores, reporting directly to Jobs and Oppenheimer.

*Exhibit: Apple Gestapo Article* [495]

925.    Worldwide Loyalty engages in other activities that include individuals and groups outside of Apple Inc. The group was *"known for its network of informers and ruthless, systemic pursuit of leakers."* [496] The team has an *"undisclosed number of investigators around the world"* (foreign commerce) to control information and prevent *"leaks"* from reaching *"the press,"* and to *"hunt down"* the source when leaks occur." [497] The team also has a sub-team called "Secrecy

---

[495] Jesus Diaz, *Apple Gestapo: How Apple Hunts Down Leaks*, Gizmodo, Dec 15 2009, https://gizmodo.com/apple-gestapo-how-apple-hunts-down-leaks-5427058
[496] Ryan Tate, *Apple's Sleazy Secret Police Lose Their Leader*, Gawker, Nov 4 2011, https://www.gawker.com/5856260/apples-sleazy-secret-police-lose-their-leader
[497] William Turton, *Leaked Recording: Inside Apple's Global War on Leakers*, The Outline, June 20 2017, https://theoutline.com/post/1766/leaked-recording-inside-apple-s-global-war-on-leakers

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

r/technews · 2 yr. ago
magenta_placenta

**Apple Employee Blows Whistle on Illegal Spying and Toxic Working Conditions**

truthout.org                    Open

⬆ 6.9K ⬇    💬 240    ↑ Share

Single comment thread ─────────── See full discussion

[deleted] · 2 yr. ago

Tomorrow's headline: Apple Whisleblower found dead of heart attack at 22 (never mind the double tap, nothing to see here).

⬆ 1 ⬇    💬 Reply    ↑ Share    ...

*Exhibit: "Never mind the double tap"*

886.    Under California Penal Code § 136.1(c), Apple's acts of witness intimidation (§ 136.1a-b) would be felonies when they were accompanied by an express or implied threat of force or violence against Gjovik or her property, where Apple's acts were in furtherance of a larger conspiracy, and where the acts were committed for pecuniary gain.[443] Apple attempted to influence Gjovik's legal filings and contracts through threats and menace in violation of state and federal witness tampering statutes.[444]

887.    Apple engaged in threats and actual acts of violence against Gjovik and her property, including physical violence, psychological violence, emotional violence, and moral harassment. Numerous California cases (criminal threats, domestic violence, custody battles, and

---

[443] California Penal Code, "CHAPTER 6. Falsifying Evidence, and Bribing, Influencing, Intimidating or Threatening Witnesses," § 136.1(a),(b),(c).
[444] Civ. Code § 1570; *Odorizzi v. Bloomfield Sch. Dist.* (1996) 246 Cal. App. 2d 123, 128.

391

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023



← **Thread**

Ashley M. Gjøvik, J.D.
@ashleygjovik                                    ...

Also, update µT magnetic field went crazy after I posted on Twitter about this.

I was looking at it for a good 5min+ before with zero µT. Then posted on Twitter. Then went hot.

Is that how a self-destruct/erase would look?



12:57 AM · May 29, 2022 · Twitter Web App

ılı View Tweet analytics

◯        ⇄        ♡        ⬆

Tweet your reply                            Reply



Q Search Twitter

**Relevant people**

Ashley M. Gjøvik, J.D.
@ashleygjovik
Human rights lawyer, v
author, & activist. Likes
health, & the common
corruption, pollution, &

Terms of Service  Privacy Policy  Co
Accessibility  Ads info  More ---
© 2022 Twitter, Inc.

Ashley M. Gjøvik, ...   ...
@ashleygjovik

Messages            ✉ ⌃

← **Thread**

**Ashley M. Gjøvik, J.D.**
@ashleygjovik                                    ...

🪑Contacted @FBI at 8:35pm (20:35) tonight about the statue/EMF, call drops, network attacks

Asked the FBI to take & analyze the statue for spycraft

Abt 20min ago I heard noises in my living room, like someone messing with the locks on my front door. Dog went nuts (good dog)

> 🔘 Ashley M. Gjøvik, J.D. @ashleygjovik · May 29
> Thank you to everyone who reached out last night with advice on how to deal with this. I captured photos & videos of the readings, & backed it up
>
> I sequestered the statue for the weekend
>
> I'm contacting the feds on my Apple cases about it & will insist they ask the DOJ to engage twitter.com/ashleygjovik/s...
> Show this thread

3:33 AM · May 30, 2022 · Twitter Web App

📊 View Tweet analytics

  ♡          ⇄          ♡          ⬆

### Relevant people

**Ashley M. Gjøvik, J.D.**
@ashleygjovik
Human rights lawyer, v
author, & activist. Likes
health, & the common
corruption, pollution, &

**FBI** ✓
@FBI
Official FBI Twitter. Sub
tips.fbi.gov. Public info
for authorized purpose
justice.gov/doj/privacy

Terms of Service  Privacy Policy  Co
Accessibility  Ads info  More ···
© 2022 Twitter, Inc.

**Ashley M. Gjøvik, ...** ...
@ashleygjovik

**Messages**

🔍 Search Twitter

← **Tweet**



**Ashley M. Gjøvik, J.D.**
@ashleygjovik                                              ...

Shut down all my computers for the night, everything was going haywire.

I think they were all trying to hack me at once?

You should take turns if you want to do it secretly.

Do you guys not have a cross-functional project manager?

11:24 PM · May 22, 2022 · Twitter for Android

ılıl View Tweet analytics

○              ⇄              ♡              ↑

Tweet your reply                                        Reply




☐ Home

# Explore

🔔 Notifications

✉ Messages

🔖 Bookmarks

◍ Top Articles

👤 Profile

☺ More

**Relevant people**

**Ashley M. Gjøvik, J.D.**
@ashleygjovik
Human rights lawyer, v
author, & activist. Likes
health, & the common
corruption, pollution, &

**What's happening**

NFL · Starts at 1:00 PM
**Colts at Titans**
Trending with Alec Pierce

**#SouthwestHeart**
Go with Heart.
🔳 Promoted by Southwest Airlines

Trending
**Cybertruck**
4,683 Tweets

Trending
**Sacheen**
8,743 Tweets

🔵 Bloomberg ✓ · Last night
**Xi and These Six Men Will Reshape the Future of China**

Show more

Terms of Service   Privacy Policy   Co
Accessibility   Ads info   More ···
© 2022 Twitter, Inc.

Ashley M. Gjøvik, ...   ...
@ashleygjovik

Messages                    🗨 ☆

Q Search Twitter

Home

Explore

Notifications

Messages

Bookmarks

Thread

Ashley M. Gjøvik, J.D.
@ashleygjovik

Literally a period minutes...

| Protocol | Length | Info |
|---|---|---|
| TCP | 1514 | [TCP Out-Of-Order] 44 |
| TCP | 357 | [TCP Out-Of-Order] 44 |
| TCP | 357 | [TCP Out-Of-Order] 44 |
| TCP | 193 | [TCP Out-Of-Order] 44 |

Search Twitter

Relevant people

Ashley M. Gjøvik, J.D.
@ashleygjovik
Human rights lawyer, v
author, & activist. Likes
health, & the common
corruption, pollution, &

What's happening

NFL · Starts at 1:00 PM

10/23/22, 12:26 PM                    Ashley M. Gjøvik, J.D. on Twitter: "Literally a period minutes... https://t.co/xz3KpbsmCm" / Twitter

Top Articles

Profile

More

| | | |
|---|---|---|
| TCP | 128 | [TCP Out-Of-Order] 44 |
| TCP | 195 | [TCP Out-Of-Order] 44 |
| TCP | 1514 | [TCP Out-Of-Order] 44 |
| TCP | 193 | [TCP Out-Of-Order] 44 |
| TCP | 357 | [TCP Out-Of-Order] 44 |
| TCP | 325 | [TCP Out-Of-Order] 44 |
| TLSv1.3 | 1445 | [TCP Previous segment |
| TLSv1.3 | 128 | [TCP Previous segment |
| TLSv1.3 | 124 | [TCP Previous segment |
| TCP | 1514 | [TCP Previous segment |
| TCP | 1414 | [TCP Previous segment |
| TCP | 54 | [TCP Retransmission] |
| TCP | 143 | [TCP Retransmission] |
| TCP | 143 | [TCP Retransmission] |
| TCP | 143 | [TCP Retransmission] |
| TCP | 143 | [TCP Retransmission] |
| TCP | 143 | [TCP Retransmission] |
| TCP | 143 | [TCP Retransmission] |
| TCP | 143 | [TCP Retransmission] |
| TCP | 142 | [TCP Retransmission] |
| TCP | 1514 | [TCP Retransmission] |
| TCP | 195 | [TCP Retransmission] |
| TCP | 66 | [TCP Retransmission] |
| TCP | 66 | [TCP Retransmission] |
| TCP | 66 | [TCP Retransmission] |
| TCP | 110 | [TCP Retransmission] |
| TCP | 66 | [TCP Retransmission] |
| TCP | 66 | [TCP Retransmission] |
| TCP | 66 | [TCP Retransm |
| TCP | 1414 | [TCP Retrans |
| TCP | 1414 | [TCP Retransmission] |
| TCP | 173 | [TCP Retransmission] |
| TCP | 161 | [TCP Retransmission] |
| TCP | 150 | [TCP Retransmission] |
| TCP | 54 | [TCP Retransmission] |
| TCP | 54 | [TCP Retransmission] |
| TCP | 325 | [TCP Spurious Retransr |
| TCP | 325 | [TCP Spurious Retransr |
| TCP | 125 | [TCP Spurious Retransr |
| TCP | 1514 | [TCP Spurious Retrans |

ALT

**Colts at Titans**
Trending with Alec Pierce

**#SouthwestHeart**
Go with Heart.
🔁 Promoted by Southwest Airlines

Trending
**Cybertruck**
4,686 Tweets

Entertainment · Trending
**Madonna**
53.8K Tweets

🅦 The Wall Street Jou... ✔ · Yeste
**How China has changed unde**
**Jinping**

Show more

Terms of Service  Privacy Policy  Co
Accessibility  Ads info  More ···
© 2022 Twitter, Inc.


Ashley M. Gjøvik, ...   ...
@ashleygjovik



Home

Explore

Notifications

Messages

Bookmarks

Messages

Search Twitter

**Relevant people**


**Ashley M. Gjøvik, J.D.**
@ashleygjovik
Human rights lawyer, w
author, & activist. Likes
health, & the common
corruption, pollution, &

**What's happening**

NFL · Starts at 1:00 PM

10/23/22, 12:27 PM          Ashley M. Gjøvik, J.D. on Twitter: "Like, what if instead of doing this, they tried to solve world hunger? Or keep the planet from b...



← **Thread**

**Ashley M. Gjøvik, J.D.**                                       ...
@ashleygjovik

Like, what if instead of doing this, they tried to solve
world hunger? Or keep the planet from burning to ash?



2:49 AM · May 25, 2022 · Twitter Web App

📊 View Tweet analytics

🏠 Home

\# Explore

🔔 Notifications

✉ Messages

🔖 Bookmarks

◍ Top Articles

å Profile

⊙ More

Q Search Twitter

**Relevant people**



**Ashley M. Gjøvik, J.D.**
@ashleygjovik
Human rights lawyer, w
author, & activist. Likes
health, & the common
corruption, pollution, &

**What's happening**

Premier League · LIVE
**Tottenham Hotspur vs Newca**
**United**
Trending with Miggy

#SouthwestHeart
Go with Heart.
📣 Promoted by Southwest Airlines

Trending
**Masks**
42.9K Tweets

Entertainment · Trending
**Keffals**
5,833 Tweets

War in Ukraine · LIVE
**Latest updates on the war in**
**Ukraine**

Show more

Terms of Service   Privacy Policy   Co
Accessibility   Ads info   More ···
© 2022 Twitter, Inc.

(94 of 97), Page 94 of 97    Case: 25-2028, 05/20/2025, DktEntry: 27.2, Page 94 of 97

10/23/22, 12:27 PM          Ashley M. Gjøvik, J.D. on Twitter: "@phase_loop ALSO i went to wash my face before resetting the router and then going to be...



🔍 Search Twitter

← **Tweet**

**Relevant people**

Ashley M. Gjøvik, J.D.
@ashleygjovik

Replying to @ashleygjovik and @phase_loop

ALSO i went to wash my face before resetting the router and then going to bed. I came back to my computer and it was OFF. It 'crashed.' It never crashes.

WAS SOMEONE CLEANING UP THEIR DIRTY LAUNDRY? Get out, you goons.



4:35 AM · May 25, 2022 · Twitter Web App

View Tweet analytics

**Ashley M. Gjøvik, J.D.**
@ashleygjovik
Human rights lawyer, w
author, & activist. Likes
health, & the common
corruption, pollution, &

**phase_loop**
@phase_l... Follows you

**What's happening**

Premier League · LIVE
**Tottenham Hotspur vs Newca:
United**
Trending with Miggy

**#SouthwestHeart**
Go with Heart.
Promoted by Southwest Airlines

Trending
**Cybertruck**
4,693 Tweets

Entertainment · Trending
**Keffals**
5,833 Tweets

Bloomberg ✔ · Last night
**Xi and These Six Men Will
Reshape the Future of China**

Show more

Terms of Service  Privacy Policy  Co
Accessibility  Ads info  More···
© 2022 Twitter, Inc.

Tweet your reply

Reply

Ashley M. Gjøvik, ...  ···
@ashleygjovik

Messages

10/23/22, 12:32 PM          Ashley M. Gjøvik, J.D. on Twitter: "I SWEAR TO GOD, APPLE / NORTHROP/ PINKERTONS/ ET AL DO NOT EVEN TRY IT. I ...



← **Thread**

Ashley M. Gjøvik, J.D.
@ashleygjovik                                          ...

# I SWEAR TO GOD, APPLE / NORTHROP/ PINKERTONS/ ET AL DO NOT EVEN TRY IT. I WILL SCREAM BLOODY MURDER.

It's been almost nine months of this godforsaken nightmare. How are we back here again? Twitter should not be a critical aspect of my personal security



Ashley M. Gjøvik, J.D. @ashleygjovik · Sep 9, 2021
Hey #Apple, "This feels a little like witness intimidation. I let @NLRB know." Love, Ashley

Clutches panic button & Mace while still laying on floor pondering the brutality of U.S. capitalism...

Show this thread

---

Ashley Marie Gjøvik                                                2:27 PM
Re:
To:  ▓▓▓▓▓▓       Cc:  Ashley G (Work)           Details

FYI, I forwarded your email & my reply to the investigator on my NLRB case so he's aware you just reached out to me the day before my Affadavit is supposed to be taken...

This feels a little like witness intimidation, etc...

...
Ashley M. Gjøvik
⚲ Senior Engineering Program Manager, Apple
Juris Doctor Candidate & Public International Law Certificate Candidate, Santa Clara University, Class of 2022
ashleygjovik.com | linkedin.com/in/ashleygjovik/ | muckrack.com/ashleygjovik

---

3:33 AM · May 30, 2022 · Twitter Web App

◁ıI View Tweet analytics

---

  ♡          ⇄          ♡          ⬆

---

Tweet your reply                                          Reply

## Left sidebar

Home
# Explore
Notifications
Messages
Bookmarks
Top Articles
Profile
More

## Right sidebar

🔍 Search Twitter



**Relevant people**

Ashley M. Gjøvik, J.D.
@ashleygjovik
Human rights lawyer, ▓
author, & activist. Likes
health, & the common▓
corruption, pollution, &

NLRB ✔
@NLRB
National Labor Relation▓
español: @NLRBes For▓
Counsel: @NLRBGC



**What's happening**

Premier League · LIVE
**Tottenham Hotspur vs Newca▓ United**
Trending with Almiron, Grealish

**#SouthwestHeart**
Go with Heart.
📢 Promoted by Southwest Airlines

Trending
**Sacheen**
8,777 Tweets

Trending
**#COVIDIsAirborne**
3,713 Tweets

wsj The Wall Street Jou... ✔ · Yeste▓
**How China has changed unde▓ Jinping**

Show more

Terms of Service   Privacy Policy   Co▓
Accessibility   Ads info   More ···
© 2022 Twitter, Inc.



← **Thread**



**Ashley M. Gjøvik, J.D.**
@ashleygjovik
···

Happened again yesterday. Now at 2x phone call & 1x Signal call in <2wk

Signal - wifi went down completely for both parties

Phone calls dropped w/out note

Yesterday: District Attorney's office was saying, "can't promise anything but here's how I'm going to try to help y[drop]"

> Ashley M. Gjøvik, J.D. @ashleygjovik · May 24
> I now experienced 2 instances in 1wk where I'm on a call & someone's abt to tell me something very helpful to me & very obstructive to Apple's retaliation
>
> They lead into it, & suddenly my WiFi goes down & the call drops
>
> Hasn't gone down otherwise in months
>
> I'm deeply unsettled twitter.com/ashleygjovik/s...
> Show this thread

8:51 AM · May 27, 2022 · Twitter Web App

ılı View Tweet analytics

○          ↻          ♡          ↥

Tweet your reply                    Reply

**Relevant people**

Ashley M. Gjøvik, J.D.
@ashleygjovik
Human rights lawyer, w
author, & activist. Likes
health, & the common
corruption, pollution, &



Terms of Service  Privacy Policy  Co
Accessibility  Ads info  More···
© 2022 Twitter, Inc.

Ashley M. Gjøvik, ...  ···
@ashleygjovik

Messages          ⊡  ≫

Q  Search Twitter

10/23/22, 12:25 PM    Ashley M. Gjøvik, J.D. on Twitter: "The first call/WiFi crash: political &amp; judicial corruption The second, just now: Apple's sur...

