CASE NO. 25-2028

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

**ASHLEY M. GJØVIK**, *an individual*,

*Plaintiff-Appellant*

v.

**APPLE INC.**, *a corporation*,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Northern District of California
No. 3:23-CV-04597
The Honorable Judge Edward M. Chen

---

## APPELLANT'S REQUEST FOR JUDICIAL NOTICE:
## EXHIBITS II: GLOBALLY RECOGNIZED
## WHISTELBLOWER

---

**Ashley M. Gjøvik, JD**
*In Propria Persona*
2108 N. St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# Gjovik v. Apple

# Exhibit: A

OXFORD

# Foundations of
# Business



Andrew Gillespie

**Chapter 11** Business ethics and corporate social responsibility   **487**



## Key concepts

A **code of ethics** sets out the expectations that the company has for how employees should behave in any given situation, to assist with decision-making.

**Whistle-blowing** occurs when an individual within a business reveals information that highlights illegal or unethical behavior by others within the organization.

bank had failed to do due diligence on those depositing money, although the bank rejected the claims, saying the information had been taken out of context and was largely historical.

In some situations, employees may be reluctant to speak up about unethical behaviour occurring within the business because of pressure from others. There may be a sense of group loyalty which prevents people making public what is actually happening. There may also well be a fear of what will happen if they speak up. Indeed, according to the Institute of Business Ethics survey of 2021, the most common reasons why people do not speak up are that they are concerned that they might jeopardize their job (34%) and that they do not believe that their organization would take corrective action (34%). 43% of employees who said they had spoken up about misconduct say that they experienced retaliation as a result.

An extreme example of people responding to a whistle-blower occurred in 2022 in Johannesburg when Babita Deokaran was shot dead. As acting financial officer at Gauteng Provincial Government Department of Health, Babita had been a whistle-blower, and a key witness in an investigation into alleged corruption involved in the procurement contracts of COVID-19 protective clothing.

In many countries, laws exist to protect whistle-blowers. This is to encourage people to speak up. Governments also use the information of whistle-blowers to act against businesses. For example, in December 2021 the US Department of Labor said it was investigating Apple over claims that it retaliated against an employee who complained of workplace harassment and unsafe working conditions. According to the *Financial Times*, Ashley Gjovik, 35, had been a senior engineering program manager for six years at Apple when she was fired in September for allegedly leaking confidential information. Gjovik has written regularly on Twitter about her allegations of harassment, surveillance, and workplace safety issues. She has alleged that she was dismissed under a false pretext following numerous complaints that led to more than a dozen instances of retaliation including job reassignment.

**Can you now answer this question from the Introductory case study?** 

Why does Sony want a 'speak up' culture?

## 11.1.5 **Why do people act unethically?**

People may act unethically for their own personal gain or to avoid an undesirable outcome. For example, a salesperson may mislead customers to increase their commission or to ensure sales targets are met and to make sure they keep their job. Unethical behaviour is often

**11**

Copyrighted material

# Gjovik v. Apple

# Exhibit: B

**Apple Inc**

# US labour board examines retaliation claims against Apple

Senior engineering program manager's allegations include workplace harassment and job reassignment



Ashley Gjovik was placed on indefinite paid administrative leave a month ago while Apple investigated her accusations © Mike Segar/Reuters

**Patrick McGee** in San Francisco SEPTEMBER 2 2021

The US National Labor Relations Board is looking into allegations that Apple retaliated against a senior employee who has accused the tech group of permitting a hostile work environment.

Ashley Gjovik, a senior engineering program manager who joined Apple in 2015, filed a "Charge against Employer" last week describing 13 instances of alleged retaliation including workplace harassment, job reassignment and reduction of supervisory responsibilities. Gjovik was placed on indefinite paid administrative leave a month ago while Apple investigated the matter.

The NLRB accepted the case on August 30, according to documents seen by the Financial Times.

Another Apple software engineer, Cher Scarlett, filed a complaint to the NLRB on September 1 on behalf of herself and other employees alleging the suppression of worker organising, specifically with regard to pay surveys and gender pay equity.

The action came after she built a tool that supported pay transparency at Apple, which resulted in both support and criticism of her actions, which she documented on Twitter. Reuters first reported the news.

Gjovik, who told the FT that her tenure at Apple had been a "nonstop hostile work environment and bullying and retaliation", has been prolific on social media in recent weeks in drawing attention to allegations of sexism and a hostile work environment at Apple.

Apple said in a statement: "We are and have always been deeply committed to creating and maintaining a positive and inclusive workplace. We take all concerns seriously and we thoroughly investigate whenever a concern is raised and, out of respect for the privacy of any individuals involved, we do not discuss specific employee matters."

Gjovik's advocacy came as the tech giant was already on the defensive from #AppleToo, a social media movement of anonymous Apple employees who have called for more accountability at the $2.5tn tech group long known for corporate secrecy.

The advocacy group said on its website: "We've exhausted all internal avenues. We've talked with our leadership. We've gone to [Apple's] people team . . . Nothing has changed."

Gjovik's specific complaints against Apple date back to mid-March, when she cited unsafe working conditions related to "chemical exposure" at her Apple office in Sunnyvale, California, where more than 100 employees are based.

Her office, known as "Stewart 1" within Apple, is located on what the Environmental Protection Agency refers to as the "TRW Microwave Superfund site", a location requiring special oversight owing to previous contamination by hazardous waste materials in the soil and groundwater beneath the building.

In 2016, Apple paid $450,000 to settle state claims that it mishandled hazardous electronic waste at facilities at their Cupertino headquarters and Sunnyvale.

Gjovik said her concerns were brushed aside and she was warned against speaking up about them. In her letter to the NLRB, she said Apple's employee relations department "intimidated me not to speak about my safety concerns", that a manager advised she quit Apple and that she was subject to sexism and a "dramatically increased" workload.

Matters escalated when she took her complaints to Apple's Slack channels, specifically a 2,000-member forum for female software engineers. She said she was flooded with supportive comments and similar stories of workplace harassment — but she had since been banned from using Slack as part of her administrative leave.

## #techFT daily newsletter

#techFT brings you news, comment and analysis on the big companies, technologies and issues shaping this fastest moving of sectors from specialists based around the world. Click here to get #techFT in your inbox.

Copyright The Financial Times Limited 2021. All rights reserved.

# Gjovik v. Apple

# Exhibit: C

**Apple Inc**

## Apple faces probe over whether it retaliated against whistleblower

US labour department inquiry follows claims by ex-senior engineering program manager



The US Department of Labor will focus on whether Apple retaliated against a whistleblower who claimed there were poor working conditions at the company © Stephane Mahe/Reuters

**Patrick McGee** in San Francisco and **Patrick Temple-West** in New York DECEMBER 13 2021

The US Department of Labor is investigating Apple over claims that it retaliated against an employee who complained of workplace harassment and unsafe working conditions.

Ashley Gjovik, 35, had been a senior engineering program manager for six years at Apple when she was fired in September for allegedly leaking confidential information.

Gjovik, who has written regularly on Twitter about her allegations of harassment, surveillance and workplace safety issues, alleged that she was dismissed under a false pretext following numerous complaints that led to more than a dozen instances of retaliation including job reassignment.

The labour department declined to comment but confirmed its investigation in a letter to Gjovik seen by the Financial Times, dated December 10.

Stephen Kohn, an employment lawyer and an expert in US whistleblowing law, said the burden of proof needed for the agency to open an investigation was high, as the employee must have already established enough evidence that, unless rebutted, would prove the case.

He said the case would be closely watched because it was especially rare for a labour dispute with Big Tech "to break into the public" domain. The labour department rarely investigated such cases, he added, because of the widespread use of non-disclosure agreements to "silence and intimidate whistleblowers".

Apple declined to discuss specific employee matters, citing privacy, but said: "We are and have always been deeply committed to creating and maintaining a positive and inclusive workplace. We take all concerns seriously and we thoroughly investigate whenever a concern is raised."

Mary Inman, head of the international whistleblower practice at the law firm Constantine Cannon, described the case as "a breath of fresh air" as Joe Biden's administration signals a more aggressive stance to hold companies to account.

Last month, the labour department's top attorney announced an initiative to collaborate with other civil law enforcement agencies to protect workers from discrimination and misconduct.

For Apple, the investigation could mark the most significant setback in a series of labour disputes this year that included a shareholder proposal requesting more information about the company's use of nondisclosure agreements. The proposal alleged the iPhone maker extended its culture of secrecy into workplace areas protected by state and federal laws.

Gjovik's original complaints stemmed from mid-March, when she cited "chemical exposure" concerns at her Apple office in Sunnyvale, California. The facility is located on a Superfund site, requiring special oversight owing to previous contamination by hazardous waste materials beneath the building.

When Apple sent an email about wanting to test the site for "vapour intrusion", Gjovik's questions about it were rebuffed by Apple's employee relations department. "They intimidated me not to speak about my safety concerns," Gjovik alleged.

The labour department will examine whether Apple retaliated over claims about occupational safety and hazardous waste management liability, alongside a third allegation that falls under the Sarbanes-Oxley Act, or Sox, which sets out the rules for financial record keeping.

Gjovik pointed to a potential conflict of interest regarding Apple board member Ronald Sugar, chair of the audit committee, as he was previously chief executive of Northrop Grumman, the defence company responsible for the dump — and maintenance — of waste materials beneath the Sunnyvale office.

Sugar could not be immediately reached for comment.

Gjovik's case was "especially unusual" and noteworthy because of the three separate statutes or laws that may have been broken, said Michael Duff, a former attorney at the National Relations Labor Board.

"Federal agencies exercise what in the context of criminal law is known as prosecutorial discretion," he said. "They are very careful of what cases they move forward because they have scarce resources, so they must have a strong reason to believe they can prevail."

Other prominent investigations by the labour department included allegations that Google had a "systemic" problem underpaying female employees. The case was resolved this year, with the search giant agreeing to pay $3.8m.

Palantir, a data analytics company, in 2017 paid the labour department $1.6m to settle allegations that it discriminated against Asian candidates in recruiting engineers.

Seth Goldstein, a pro-bono attorney who has been representing Amazon employees alleging unfair labour practices, said Gjovik's actions were a reflection of her generation wanting companies to live up to the values they espoused. "It's a sea change in the fact that people are standing up for what's right," he said.

## Daily newsletter

#techFT brings you news, comment and analysis on the big companies, technologies and issues shaping this fastest moving of sectors from specialists based around the world. Click here to get #techFT in your inbox.

# FINANCIAL TIMES

WEDNESDAY 15 DECEMBER 2021    **INTERNATIONAL NEWSPAPER OF THE YEAR**    USA $2.50 Canada C$3.00

**Capitalism works**
The global supply chain has passed its big test — MARTIN SANDBU, PAGE 19

**ECB tightrope**
Rising inflation demands balancing act from Lagarde — BIG READ, PAGE 17



**Art of restructuring**
Chinese pupil's lessons for his Wall St teacher — TOM MITCHELL, PAGE 6

## Inflation alert
## IMF urges UK to raise rates

The IMF has urged the Bank of England to raise interest rates without delay, accusing the central bank's interest rate setters of "inaction bias" as inflation spirals in the UK.

Ahead of the BoE's next big meeting tomorrow, the fund warned that UK inflation would rise to 5.5 per cent early next year, saying it had allowed prices to soar by finding excuses to do nothing.

The fund said raising rates did not mean stimulus had to end, adding that the central bank should understand the delicate balance between undermining confidence and allowing inflation to become more persistent.
**Call on UK** page 2
**Pressure on Fed** page 4
**Big Read** page 17



**UK inflation**
Annual % change in consumer prices

Sources: ONS, IMF  Photo: Dominic Lipinski/PA

### Briefing

▶ **Efficacy of Pfizer antiviral pill confirmed**
Final trial results have confirmed earlier data on the drug that showed it cut risk of hospitalisation or death by up to 89 per cent in high-risk people. Pfizer says the pill will work against Omicron.— PAGE 6

▶ **Ukraine tensions propel gas prices**
Concern that a potential Russian invasion would further disrupt supplies have sent European and UK gas prices to new highs, beating October's records.— PAGE 12; JONATHAN BREARLEY, PAGE 19

▶ **Pressure on Japan's female union boss**
Tomoko Yoshino, the first woman to lead the Rengo union group, has said male colleagues urged her to reject the job as her gender would harm wage battles.— PAGE 4

▶ **Apple under fire after retaliation claims**
The US labour department has said it is probing claims the company retaliated against an employee who complained of harassment. Ashley Gjovik was fired for allegedly leaking confidential data.— PAGE 8

▶ **Rentokil cleans up with Terminix deal**
The London-listed group has agreed to buy its market rival Terminix in North America in a $6.7bn deal that will create the world's biggest pest control provider.— PAGE 8 & LEX, PAGE 20

▶ **Nato chief eyes Norway central bank job**
Jens Stoltenberg has applied to be the next governor in a move set to spark debate over monetary policy independence and custody of Oslo's $1.4tn oil fund. He is friends with premier Jonas Gahr Store.— PAGE 2

▶ **Gourmet food for isolating HK bankers**
Bankers furious at being caught up in one of the strictest quarantine regimes have been taking deliveries of wine and expensive bites from senior staff at the territory's de facto central bank.— PAGE 4

# Freeze on UAE's $23bn warplane deal as ties cool with Washington

● Abu Dhabi suspends talks ● US wants to add strings ● Fears over Huawei exposure

**ANDREW ENGLAND AND SIMEON KERR — DUBAI**

The United Arab Emirates has suspended talks with the US over its $23bn deal to buy 50 F-35 fighter jets in a sign of friction in the Gulf state's relations with Washington.

An Emirati official said yesterday Abu Dhabi had informed the US that it was reassessing the deal because of "technical requirements, sovereign operational restrictions and cost-benefit analysis".

The sale of the F-35s was agreed last year by the Trump administration after the UAE signed an accord to normalise relations with Israel. But the deal has come under mounting scrutiny since President Joe Biden took office.

Abu Dhabi has raised concerns over the restrictions Washington is seeking to put on the Gulf state's use of the warplanes. The White House has also been worried that its use of Huawei's 5G technology raises the risk that sensitive information could be leaked to Beijing.

Washington has been putting pressure on the UAE to reduce its reliance on the Chinese telecoms technology. General Kenneth F McKenzie, commander of the US central command, said this year that he was concerned by the risk of technology transfer. He added that the US was "working hard both internally within the United States and with our UAE partners to ensure that's resolved satisfactorily".

But as the talks have dragged on, the UAE — a key US ally in the Arab world — has become frustrated with pressure from the US, as it tries to strike a balance between its relations with Washington and China, its biggest trade partner.

Emirati officials argued there were few cost-effective alternatives to Huawei's 5G technology and worried that they would be sucked into a new cold war between the US and China.

The decision to suspend the talks, first reported by the Wall Street Journal, comes a week after the UAE sealed a €17bn-plus deal with France to buy 80 Rafale jets and 12 Caracal helicopters made by French groups Dassault Aviation and Airbus. Sheikh Mohammed bin Zayed al-Nahyan, Abu Dhabi crown prince and de facto UAE leader, has a deepening relationship with Emmanuel Macron, the French president.

There is also unease over perceived US disengagement from the region,



**Abu Dhabi has raised concerns over the restrictions Washington wants to place on the Gulf state's use of the F-35 fighter jets**

exacerbated by the chaotic withdrawal from Afghanistan.

A person briefed on the UAE position said Abu Dhabi was confident that issues related to Huawei could be resolved. But the critical matter was whether the US would put limits on how the UAE could use the F-35s.

"They want the strongest possible relations with the US," the person said. "The question is: is the US ready to reciprocate and be committed?"

The Biden administration said it was committed to the deal "even as we continue consultations to ensure that we have a clear, mutual understanding of Emirati obligations and actions before, during, and after delivery".
*Additional reporting by Aime Williams in Washington*

### Datawatch

**Hitched**
Civil partnerships ('000)



Civil partnerships made a comeback in 2020. Having fallen significantly since same-sex marriage was legalised in 2014, they became an option for opposite-sex couples in England and Wales at the end of 2019

— Same-sex
— Opposite-sex

2008 10 12 14 16 18 20
England and Wales  Source: ONS

**Patrick McGee** (He/Him) • Following ✓ **Following** • • •

I write about Apple, adtech, driverless cars and dro...

10m • 🌐

Thought this was a great story as soon as I got the tip, but it was a Friday night and I was taking my wife on our first double-date in literally years. (We have two kids and there's a pandemic).

Also wasn't certain others not following this case would feel the same. So I spent hours writing this on Sunday, mostly late in the evening once the kids were asleep, and got 4 lawyers on the phone (and others, unquoted) to ensure the Labor Department doesn't just open these cases willy-nilly. We published at a less-than-ideal time just to get it out, further deepening my fears that it would go unnoticed.

So imagine my delight that it got picked up by the New York Times, Axios, Washington Post, CNET, Yahoo, MSN, and all the Apple blogs.

The gist is that DoL is investigating Apple over whether it retaliated against Ashley Gjovik, 35, after she complained of workplace harassment and unsafe working conditions. She was fired in September. The underlying claims aren't at issue; what matters is how Apple reacted.

This case could take years and could offer insight into how Apple operates internally. The Labor Dept is probing three different potential statute/law violations, which is "especially unusual" and noteworthy according to Michael Duff, a former attorney at the National Relations Labor Board.

"Federal agencies exercise what in the context of criminal law is known as prosecutorial discretion," he said. "They are very careful of what cases they move forward because they have scarce resources, so they must have a strong reason to believe they can prevail."

Full story here and in Wednesday's print FT:
**Ashley Gjøvik #Apple**



**Apple faces probe over whether it retaliated against whistleblower**

ft.com • 4 min read

# Gjovik v. Apple

# Exhibit: D

**CXO**

# Apple settles unfair labor charges brought by fired engineering manager

## Whistleblower Ashley Gjøvik hails iWatershed iMoment for iStaff iRights

🔥 Thomas Claburn                                                    Thu 10 Apr 2025 // 00:29 UTC

Apple has agreed to settle charges of labor rights violations filed with America's employment watchdog by whistleblower Ashley Gjøvik.

"Today marks a monumental moment in my legal battles for accountability and worker rights: The National Labor Relations Board (NLRB) has finalized a settlement with Apple, requiring the company to rescind its unlawful workplace policies on a nationwide basis," Gjøvik said in a statement on her website this week.

Gjøvik, a former senior engineering program manager at Apple who presently oversees an air pollution research program at Northeastern University and advocates for corporate responsibility, filed a complaint with the NLRB in 2021.

Under the settlement [PDF] stemming from that complaint, Apple acknowledged its Confidentiality and Intellectual Property Agreement with its workers "does not include wages, hours, and working conditions," and does not bar employees from speaking to the press about these topics. It also says Apple acknowledges employees can share personal contact information with coworkers and can engage in union activity and other protected concerted action.

The iPhone giant was pushed to publicly acknowledge the above after Gjøvik claimed she was fired for engaging in activity that's supposed to be protected under labor law, such as raising concerns about working conditions.

For example, per her NLRB complaint, she circulated a petition among employees about return-to-office concerns, talked to newspaper outlets about employees' workplace complaints and concerns, and posted about workplace complaints and concerns on social media channels and on Apple's Slack workspace.

Doing so made her fall foul of the terms of the staff confidentiality agreement, Cupertino claimed, leading to her dismissal, terms the Mac titan has now disavowed.

Apple did not respond to a request for comment.

> ## Apple thought fear could hold its system together

Gjøvik says this is the first public labor settlement of its kind Apple has ever executed.

"Apple thought fear could hold its system together," Gjøvik told *The Register*. "But unlawful policies don't become lawful just because people are afraid to challenge them. This federal enforcement action revealed how deeply Apple's power depended on silencing its workers — and how fragile that power truly is."

Though Gjøvik has agreed to the settlement, she said in a related memorandum [PDF] she still has some reservations about the limitations of the agreement.

"For one, the settlement's policy revisions, while significant – do not address several categories of retaliation and coercive behavior that remain unremedied or unexamined, including: Surveillance, email interception, and device monitoring in relation to protected activities; threats or internal referrals aimed at chilling protected disclosures; and retaliation based on public statements regarding working conditions," she said.

Wendy Musell, counsel to employment law firm Levy Vinick Burrell Hyams LLP, told *The Register* that while Apple's concessions don't change much for workers in California, they could make protected labor activity easier for Apple employees in other US states.

"The rollbacks of provisions that suppressed employees' rights to discuss wages, hours, working conditions, to speak to the press, and for employees to come to share their own contact information and engage in union activity – from my perspective under California law, all of those things are already rights that exist for California workers," she said.

"Some of these rights already exist as well under the NLRA [National Labor Relations Act]. I think what's really important is the market forces.

"So having an employer like Apple enter into a settlement agreement where they have to acknowledge that these are rights that workers currently have under federal law, and that they cannot engage in conduct to prohibit employees from discussing their terms and conditions of employment, including their wages, and engaging in concerted activity, is extremely important as a market force issue and ensuring changes across the sector, especially in states like Texas."

And the existence of this agreement, Musell said, could become an important piece of evidence in future adversarial proceedings if similar allegations are brought against Apple.

The NLRB claim is one of several complaints filed by Gjøvik alleging that Apple violated labor and environmental laws.

Gjøvik has submitted complaints with other US agencies, including the Equal Employment Opportunity Commission (EEOC), the federal Department of Labor, the California Department of Labor, and the California Department of Fair Employment and Housing (DFEH) – renamed the California Civil Rights Department (CRD) in 2022.

The EEOC and DFEH complaints have since been merged into a federal lawsuit [PDF].

Gjøvik, who earned a law degree in June 2022, filed her September 2023 claim against Apple *pro se* – she's representing herself in court against one of the largest companies in the world.

The federal case, since amended several times, has been appealed to the Ninth Circuit following a judge's motion in February 2025 that dismissed some claims. Apple presently is trying to have the appeal tossed and Gjøvik is pushing back.

Gjøvik's grievances date back to February 2020, when she moved into Santa Clara Square Apartments, adjacent to a stealth Apple semiconductor fabrication facility at 3250 Scott Boulevard, in Santa Clara, California.

The EPA-documented site has experienced numerous toxic chemical leaks over the years, as detailed in documents uploaded to Gjøvik's website and entered into the court record. Such events have been recorded at an Apple datacenter in North Carolina. Gjøvik says she experienced severe health effects from chemical exposure due to her proximity to the Scotts Boulevard site.

Upon moving into her apartment near the Apple chip fab, Gjøvik says she "quickly became severely ill with severe fainting spells, dizziness, chest pain, palpitations, stomach aches, exhaustion, fatigue, and strange sensations in her muscles and skin."

Her complaint details many other health problems: "Bradycardia, volatile blood pressure with hypertension and hypotension, and a high frequency of premature ventricular contractions," as well as skin rashes, burns, hives, and hair loss.

Gjøvik raised concerns about environmental safety at the Santa Clara facility and elsewhere with Apple.

The result, she maintains, was retaliation, suspension, and ultimately termination – for which the NLRB has sued Apple in a separate proceeding.

The NLRB hearing on Gjøvik's dismissal from Apple is scheduled for August. ®

# Gjovik v. Apple

# Exhibit: E

INDEX ON CENSORSHIP | VOL.50 | NO.4

# "Apple poisoned me: physically, mentally, spiritually"

Ashley Gjøvik, who was fired by the tech giant after blowing the whistle on toxic waste under her office, tells **MARTIN BRIGHT** that her fight will go on

ASHLEY GJØVIK KNEW things had become serious when she received an email on 9 September 2021 from Apple's Threat Assessment and Workplace Violence team asking her to discuss a "sensitive intellectual property matter".

Gjøvik, 35, had been raising concerns about toxic waste under her office for six months, and had become known as "The Apple Whistleblower", but this was the first time she had been contacted by this scary-sounding unit.

She emailed back to say she was "happy to help" but with one condition: everything had to be done via email. "I wanted everything in writing so they are not misrepresenting me, they're not trying to gaslight and intimidate me."

But she never discovered what the sensitive IP matter was because she was fired for failing to co-operate with the investigation, despite repeated attempts to express her willingness to do so. The letter terminating her employment accused her of disclosing "confidential product-related information" but did not go into detail.

By the time she was sacked, Gjøvik had become a fearsome employee-activist conducting a full-scale campaign over hazardous waste in Silicon Valley. She had gone public on workplace harassment, Apple's surveillance of employees and its culture of secrecy. But it all began when she started to raise

perfectly regular concerns about her own safety and that of her fellow workers.

In February 2020, Gjøvik had moved into a new apartment in Santa Clara, California, only a short drive from her office in nearby Sunnyvale. On the face of it, Gjøvik had an enviable job as a senior engineering programme manager ("We work behind the scenes to make sure everything gets done. We make sure the products actually get out the door").

She worked hard in a stressful environment – while training to be a lawyer in her spare time – but prided herself on her resilience. Despite the punishing hours of work and study, she was in good health. However, within days of moving into the apartment, she started experiencing dizzy spells.

"I'm starting to have chest pain and palpitations and I'm like, what the hell is going on?" she told Index. She went to see about 20 different doctors and even attended a nervous system clinic at Stanford University. "My blood pressure's doing crazy stuff. My heart's doing crazy stuff, but no one knows why. I'm getting all these rashes. No one knows why. I have a growth on my thyroid… all this weird stuff happening all at once."

By the end of February, she was already so ill that she could barely function: "I'm passing out sitting. I can't focus. I have to lay down all the time. My body starts going nuts."

Before the pandemic hit, Gjøvik was already working from home and by March she was signed off on a medical leave of absence.

As the months passed and she became sicker and sicker, Gjøvik realised she was waking regularly at 3am feeling as if she was choking. She began to wonder if her failing health had anything to do with the apartment itself. By chance, one day in September 2020, she was talking to a friend whose husband was an engineer and he suggested she check the carbon monoxide levels.

She discovered a spike in volatile organic compounds (VOCs) in the early hours of the morning. These VOCs, essentially toxic gases, are present in everyday household products such as disinfectants, aerosols, pesticides and paints. But they are not usually found at levels dangerous to people's health. Nor do they tend to spike at particular times without a cause such as cooking or cleaning.

Gjøvik immediately set about doing some serious detective work. When she looked at the environmental assessment report on her apartment she saw it contained a 40-page section entitled "hazardous waste". Silicon Valley was favoured by defence contractors before it became the centre of America's tech miracle and was once dominated by factories and heavy industry.

It turned out the apartment was built on a so-called Superfund site, a designation from the US Environmental Protection Agency. Such sites demand a special industrial clean-up before people can live and work in the

≣ Apple was planning for the post-pandemic
≣ return to work, but Gjøvik felt it was unsafe

CREDIT: Handout

FEATURES



LEFT: "I had to get the word out," says Ashley Gjøvik, who became the 'Apple Whistleblower'

She raised her concerns with the California and Federal EPA as well the state and county departments of environmental health and the local water boards. She moved out of the apartment later that month and all the symptoms stopped immediately. She was even able to return to work.

By the spring of 2021, Gjøvik had become an armchair expert on Superfunds, vapour intrusion and the science of toxic groundwater plumes. So when she saw an email from Apple's environmental health and safety team on 17 March notifying staff of "a large-scale project" across the company's building portfolio to carry out vapour intrusion testing, alarm bells started ringing.

The building, a slick glass office with an octagonal atrium, had been leased by Apple since 2015 and was known to be built on the site of a factory owned by TRW Microwave Inc, a notorious Superfund polluter. Gjøvik found a 2016 report of vapour intrusion in homes next to the office and a 2019 lawsuit by the EPA against the polluters. The real concern was the presence of trichloroethylene (TCE), a carcinogen associated with kidney cancer.

Gjøvik was keen to know if the new testing was the result of a new vapour intrusion incident and asked if any testing had been carried out since Apple employees had moved in six years earlier. She was initially told not to discuss her concerns with anyone except her manager, the HR department and environmental health and safety so as not to cause panic.

But already Gjøvik was building a reputation as a toxic waste whistleblower through the campaign around her Santa Clara apartment. She had written an article in the local paper, San Francisco Bay View, entitled "I thought I was dying: My apartment was built on toxic waste". She had also brokered a meeting ➔

area, involving deep excavation and "backfilling" with concrete. If this is not carried out properly the risk is that vapour from toxic underground plumes can escape into the atmosphere (and people's homes).

Gjøvik discovered that so-called "vapour intrusion" can occur through sewer pipes, plumbing, sprinkler systems and air conditioning. She pestered her landlord and the fire department for diagrams of all the pipes in the building

to isolate the source. To this day she does not know exactly why the levels of toxic gas spiked at 3am, but she believes it is possible that it had something to do with the automated air conditioning or the flushing of the fire sprinklers.

"The apartment block had 1,800 units with two or three bedrooms. So, thousands of people could be sick and not know it. I literally could not sleep at night. I had to get the word out," said Gjøvik.

ABOVE: The Apple HQ under construction in Cupertino, Silicon Valley, California, a place favoured by defence contractors before it became the centre of America's tech revolution

➔ with California Senate member Bob Wieckowsi to discuss her concerns.

In mid-April she visited experts in public health and occupational medicine at University of California San Francisco and it became increasingly clear that it would be difficult to separate her concerns about her former apartment from those about her office.

Throughout the spring and summer of 2021, Gjøvik put pressure on Apple to reveal why the new testing was being carried out and whether it was connected with cracks that had appeared in the floor of her office. She also urged her employers

> My blood pressure's doing crazy stuff. My heart's doing crazy stuff, but no one knows why

to test the air in the office before the cracks were repaired to establish whether workers had been put at risk since 2015.

Apple was planning for the post-pandemic return to work, but Gjøvik said she felt it was unsafe for her and her colleagues to return to work without assurances about the toxic waste under their office. Some co-workers had been given special permission to return to work as early as May 2020.

The relationship with Apple had almost completely broken down by this point. The company did begin an investigation into Gjøvik's complaints of bullying and sexual harassment, but she believes this simply sparked further intimidation. In a last-ditch attempt to force Apple to engage publicly, she began live-tweeting her interactions with the company and eventually, in August, she was suspended on indefinite administrative leave.

In a statement on the case to the tech website The Verge, Apple spokesperson Josh Rosenstock said: "We are and have always been deeply committed to creating and maintaining a positive and inclusive workplace. We take all concerns seriously and we thoroughly investigate whenever a concern is raised and, out of respect for the privacy of any individuals involved, we do not discuss specific employee matters."

But Gjøvik is refusing to roll over: "I want to document it and show the world this is what Apple did: You poisoned me physically, mentally, spiritually. Fuck you guys."

Ashley Gjøvik has become a nightmare for Apple, which prides itself on its employees' loyalty. Following the classic whistleblower playbook, rather than address the issues she raised about toxic waste, the company has taken the decision to shoot the messenger. ✖

*Martin Bright is editor of Index on Censorship*

50(04):42/44|DOI:10.1177/03064220211068699

CREDIT: Hans Blossey / Alamy Stock Photo

# Gjovik v. Apple

# Exhibit: F

(24 of 67), Page 24 of 67    Case: 25-2028, 05/20/2025, DktEntry: 27.5, Page 24 of 67

5/4/23, 7:41 PM    Apple workplace rules violate U.S. labor law, agency finds | Secondary Sources | National | Westlaw Precision



**38 No. 01 Westlaw Journal Employment 03**

February 7, 2023

Labor Relations
Westlaw Journal Employment
Copyright © 2023 Thomson Reuters.

# Apple workplace rules violate U.S. labor law, agency finds

(Reuters Jan. 31, 2023) – Apple Inc maintains workplace policies that unlawfully discourage employees from discussing working conditions, a U.S. labor agency has found.

The National Labor Relations Board will issue a complaint targeting the policies and claiming Apple executives made comments that stymied worker organizing unless the company settles first, an agency official said on Monday in an email reviewed by Reuters.

The official had sent the email to Ashley Gjovik, a former Apple senior engineering manager who filed complaints against the company in 2021.

The NLRB investigates charges filed by workers and unions and decides whether to issue formal complaints against companies. The agency can seek to strike down workplace policies and require employers to notify workers of legal violations.

Apple did not respond to a request for comment. The company has said it takes worker complaints seriously and thoroughly investigates them.

An NLRB spokeswoman did not immediately respond to a request for comment.

Gjovik in an email on Tuesday said she hoped the development will spur more Apple workers to speak up about working conditions and to organize.

In her complaints, Gjovik said various Apple rules, including those relating to confidentiality and surveillance policies, deter employees from discussing issues such as pay equity and sex

2

discrimination with each other and the media.

Gjovik also cited a 2021 email from Apple Chief Executive Tim Cook that allegedly sought to stop workers from speaking to the press and said "people who leak confidential information do not belong here."

Many tech companies have strict confidentiality policies designed to protect trade secrets.

U.S. labor law prohibits policies that could discourage workers from exercising their right to band together to improve working conditions.

Apple is facing several pending NLRB complaints, including one claiming the tech giant unlawfully required workers at an Atlanta retail store to attend anti-union meetings. Apple has denied wrongdoing.

*(Reporting by Alexia Garamfalvi, Bernadette Baum and Daniel Wiessner)*

38 No. 01 WJEMP 03

---

End of Document

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Contact us · Live chat · Training and support · Improve Westlaw Precision/Report an error · Transfer My Data · Pricing guide · Sign out

1-800-REF-ATTY (1-800-733-2889)



Westlaw Precision. © 2023 Thomson Reuters     Accessibility · Privacy · Supplier terms                    *Thomson Reuters is not providing professional advice*

# Gjovik v. Apple

# Exhibit: G

**WIRTSCHAFT**

Unternehmen drohe ein Bußgeld von bis zu 50 000 Euro.

Und: »Wenn die Firmen ihr Verhalten nicht ändern, handeln sie vorsätzlich.« Sogar eine Strafverfolgung wegen Betrugs mit deutlich höheren Geldstrafen sei dann möglich.

Sämtliche Produzenten der positiv getesteten Würste bestreiten den Einsatz von Separatorenfleisch. Ein Unternehmenssprecher einer Tönnies-Tochter zweifelt die Untersuchungsmethode der Hochschule Bremerhaven an: Die vom Labor angezeigten Marker seien kein Nachweis von Separatorenfleisch, schreibt er. »In den genannten Produkten setzen wir Verarbeitungsfleisch von jungem Geflügel ein. Dies kann zu einem geringen Teil auch Knorpelzellen enthalten.«

Dagegen spricht: Die Methode springt auf einen geringen Anteil des Knorpel-Markers Kollagen II Alpha I gar nicht an.

Eine von Wiesenhof beauftragte Anwaltskanzlei schickte eidesstattliche Versicherungen der Geschäftsführer betroffener Fabriken, dass man kein Separatorenfleisch einsetze, was sich auch mit den regelmäßig selbst durchgeführten Kontrollen auf Basis amtlich anerkannter histologischer Untersuchungen und mit Überprüfungen des Kalziumgehaltes beweisen ließe.

Bei Wittkes Methode handle es sich »lediglich um einen neuen wissenschaftlichen Ansatz, ... der in der Praxis bisher jedoch keine Anwendung gefunden hat« und amtlich noch nicht anerkannt sei, schreibt die Kanzlei. Kollagene seien auch in anderen Körperteilen zu finden, insbesondere Sehnen. Außerdem sei das Verfahren bislang nur für Hähnchenfleisch entwickelt und nicht für Putenfleisch, der Hauptkomponente der Wiesenhof-Wurst.

Tatsächlich beinhalten sämtliche positiv getesteten Produkte auch Hähnchen. Und Sehnen enthalten laut einer Studie der Universität Lyon zwar Kollagene – nicht aber das spezifische Eiweiß Kollagen Typ II alpha 1, auf das die Laboruntersuchungen zielen.

Kontrollbehörden sind von dem neuen Prüfverfahren jedenfalls angetan, es könnte sich bald weiter durchsetzen und neue Erkenntnisse bringen. »Die Methode ist für uns sehr zukunftsweisend«, sagt Matthias Denker, Dezernatsleiter des Landesamts für Lebensmittelsicherheit in Mecklenburg-Vorpommern. Die nötige Ausstattung sei in amtlichen Laboren vorhanden; Lebensmittelkontrolleure könnten die Methode in ihrem Prüfalltag wohl nutzen.

Forscher Wittke gibt sich damit nicht zufrieden. Künftig will er – gefördert durch das Bundeswirtschaftsministerium – auch Separatorenfleisch anderer Tiere in Wurst aufspüren, insbesondere beim Schwein, dem meistverkauften Fleisch hierzulande.

Könnte sein, dass sich deutsche Wurstfabrikanten bald ein neues Geschäftsmodell suchen müssen.

Claus Hecking, Anne Martin, Leonie Voss, Carolin Wahnbaeck ∎



*Apple-Chef Cook*

Brooks Kraft / Apple Inc.

# iPhone is watching you

**TECHKONZERNE** Die Whistleblowerin Ashley Gjøvik hat aufgedeckt, dass Apple heimlich aufgenommene Fotos seiner Beschäftigten nutzt, um die Gesichtserkennung auf iPhones zu trainieren. Jetzt will sie nachlegen.

**D**ie Mail kam Ashley Gjøvik sofort eigenartig vor: An einem Augusttag vor fünf Jahren erhielt die Apple-Projektmanagerin eine Einladung zu einer »Data Collection Social Hour«. Die Party sollte gegenüber von Apples Ufo-artigen Zentrale im kalifornischen Cupertino stattfinden.

Ihr Kollege aus dem Team für Nutzerstudien versprach Getränke, Musik und »20 Minuten Datensammlung in sozialer Umgebung«. Teilnehmen durften nur fest angestellte Mitarbeiterinnen und Mitarbeiter, die »nicht empfindlich auf Licht reagieren«, so stand es in seiner Mail. Wirklich freiwillig habe sich das Event nicht angefühlt, erzählt Gjøvik heute. Sie ging hin, weil das erwartet wurde. Ihre Chefs hätten oft Druck auf sie ausgeübt, eine Teamplayerin zu sein.

Was Gjøvik damals erlebte, löste im vergangenen Sommer einen der größten Datenskandale im Apple-Reich aus. Denn sie entschloss sich, nicht über ihre Erkenntnisse zu schweigen: Der Konzern nutzt unbemerkt aufgenommene Fotos seiner Beschäftigten, um seinen Algorithmus zu trainieren. Gjøvik wurde zur Whistleblowerin – mit einer Mission, die inzwischen auch nach Europa reicht.

Dass Datenschützer aus Deutschland vielleicht bald gegen den wertvollsten Technologiekonzern der Welt vorgehen, hat mit Gjøvik zu tun.

Die 35-Jährige erzählt ihre Geschichte auf einer Parkbank in Santa Clara im Silicon Valley, ein paar Meilen von Cupertino entfernt. Bei Apple arbeitet Gjøvik heute nicht mehr, der iPhone-Konzern hat sie im Streit um die Schnüffel-App im vergangenen September entlassen. Für Apples Geschmack hatte Gjøvik zu viel preisgegeben. Auf Anfrage wollte sich der Konzern zu den Vorwürfen nicht äußern.

An die Datensammelaktion von damals erinnert sich Gjøvik so: Statt einer Party sei da ein Parkplatz gewesen, auf dem zwei Reihen schwarz verkleideter Stahlzäune standen, drei Meter hoch. Bewacht wurde der Ort von Sicherheitskräften und Kameras. An der Bar bediente ein misslauniger Mitarbeiter im Hawaii-Hemd, ein anderer führte Gjøvik und vier andere Apple-Beschäftigte an einen Klapptisch und erklärte ihnen ihre Aufgabe: Selfies machen.

Sie unterschrieb eine digitale Einverständniserklärung, von der sie nie eine Kopie bekam. Dann habe jeder das neue, noch nicht veröffentlichte iPhone-Modell X erhalten, darauf installiert eine App, die damals noch »Gobbler« hieß. Auf Deutsch »Verschlinger«. Erst später änderte Apple den Namen in einen weniger drastischen: »Glimmer«.

WIRTSCHAFT

So hätten sie bei knapp 40 Grad in der brütenden Sonne gesessen und sich schwitzend selbst fotografiert, berichtet Gjøvik. Von oben, von der Seite, mit Sonnenbrille oder eine Grimasse schneidend. Die Kamera und mehrere Sensoren nahmen biometrische Bilder auf, in denen Gesichter dreidimensional vermessen werden, um einen Nutzer auch mit glänzender Stirn und in gleißendem Sonnenlicht zu erkennen.

Zweck der Übung: Die Apple-Mitarbeiter sollten den Algorithmus hinter Face ID füttern. Das Feature, ein Telefon über eine Gesichtserkennung zu entsperren, sollte ein paar Monate später auf dem nächsten iPhone-Modell eingeführt werden. Heute ist es von Apples Smartphones nicht mehr wegzudenken. Verbessert wird die Technik seit Jahren auch von Apple-Mitarbeitern wie Gjøvik: unfreiwillig und mit unbemerkt geschossenen Bildern aus intimsten Alltagssituationen. Im vergangenen August hatte die Whistleblowerin auf die Vorgänge aufmerksam gemacht, als sie ein Video und jene Bilder twitterte, die die Glimmer-App aufgenommen hatte.

Für Apple ist das mehr als peinlich. Keiner der großen Technologiekonzerne hat sich so sehr dem Datenschutz verschrieben wie der iPhone-Hersteller. Tim Cook, Apples sonst eher sanftmütiger Chef, attackiert regelmäßig Datenkraken wie Meta oder Alphabet und setzt sich gern demonstrativ von zweifelhaften Praktiken der Branche ab: Mit strengeren Privatsphäre-Regeln auf Apple-Geräten hat Cook fast eigenhändig Metas Wachstum abgewürgt, indem er den Hunderten Millionen iPhone- und iPad-Nutzerinnen und -Nutzern im vergangenen Jahr die Möglichkeit gab zu untersagen, dass andere Anbieter ihr Verhalten zu Werbezwecken nachverfolgen. Meta, das zu der Zeit noch Facebook hieß, warnte seine Investoren vor möglichen negativen Folgen für das Geschäft, und tatsächlich brach die Aktie wenig später ein.

Cook gibt sich stets, als ginge es ihm um Höheres und als sei in seinem eigenen Konzern alles anders: »Wenn wir anfangen, uns permanent überwacht zu fühlen, verändert sich unser Verhalten«, sagte er neulich auf einer Konferenz des »Time«-Magazins. »Wir fangen an, weniger zu tun. Weniger nachzudenken.«

Gjøvik will jetzt offenlegen, dass das Unternehmen nicht nur seine Versprechen bricht, sondern möglicherweise auch geltendes Recht. Sie hat gerade ihr Jura-Examen bestanden und arbeitet inzwischen bei einer Nichtregierungsorganisation, die gegen Zensur in China kämpft. Fertig ist sie mit Apple aber noch nicht. Wegen der Verletzung ihrer Privatsphäre ist sie mit Kaliforniens Datenschutzbehörde in Kontakt, deutsche Behörden sind ebenfalls eingeschaltet.

»Was Apple mir angetan hat, könnten sie auch deutschen Mitarbeitern (und ihren Familien und Freunden) antun oder schon an-

## »Alle Daten, die eure Gesichter im Bild haben, sind gute Daten.«

**Mail eines Studienleiters an Apple-Beschäftigte**

getan haben«, schreibt Gjøvik in einer E-Mail an den Bundesdatenschutzbeauftragten, die dem SPIEGEL vorliegt. Dieser hat den Fall inzwischen an seinem bayerischen Kollegen weitergegeben, der zuständig ist. Apples Deutschlandzentrale sitzt in München – und forscht hier unter anderem an Bilderkennung und Anwendungen wie Face ID.

Laut der Arbeitsrechtlerin Annegret Balzer könnte dadurch ein Datenschutzverstoß vorliegen, wenn fotografierte Personen nicht wussten, dass sie aufgenommen wurden oder durch das Abhängigkeitsverhältnis zu ihrem Arbeitgeber nicht wirklich freiwillig mitgemacht haben: Fehle eine informierte und ausdrückliche Einwilligung der Benutzer für die Gesichtserkennung, »ist eine Verarbeitung kaum vorstellbar und wäre damit rechtswidrig«.

Auch eine Geldstrafe in Millionenhöhe wäre dann möglich. Für einen Konzern mit mehr als 200 Milliarden Dollar Cashreserven wäre auch das kaum ein Problem. Doch infrage steht, ob Apple nur dann das Hoheleid der Privatsphäre predigt, wenn es seinen Konkurrenten schadet.

Wie heikel der Einsatz von Glimmer außerhalb der USA ist, scheint Apple durchaus bewusst zu sein: Im August 2017 schrieb der Leiter der Studie in einer Mail an Teilnehmer, dass Mitarbeiter aus Frankreich und Deutschland ausgeschlossen seien. Eine solche Nutzerstudie würde nach dortiger Rechtslage immer als Zwang interpretiert, erklärte er später in einem LinkedIn-Post.



Juristin Gjøvik

Einen Monat nach der Parkplatzparty erhielt Gjøvik ein iPhone X, auf dem sie ein – im Apple-Sprech – »leben« sollte. Apple-Mitarbeiter seien grundsätzlich angehalten, die eigenen Produkte ständig im Alltag zu testen, sagt Gjøvik.

Zur Verbesserung der Gesichtserkennung fotografierte die Glimmer-App ihre Nutzer über Jahre permanent und automatisch, sobald sie das Gerät in die Hand nahmen. »Alle Daten, die eure Gesichter im Bild haben, sind gute Daten«, instruierte der Studienleiter die Teilnehmer. Der Algorithmus sei »datenhungrig«. Die Mitarbeiter sollten die Selfie-Routine als Spiel sehen: Wer 100 Bilder pro Tag oder 2000 im Monat hochlud, bekam einen virtuellen Orden.

Ende 2020 prahlte der Studienleiter in einem Blogbeitrag, Apple habe für den Start von Face ID eine Milliarde Bilder gesammelt. Gjøvik glaubt, Apple sei einfach zu geizig gewesen, ausschließlich externe Probanden für die Aufgabe zu bezahlen.

Rund vier Jahre lang fotografierte die App sie im Halbschlaf oder auf der Toilette, selbst Nacktbilder von ihr seien gespeichert gewesen. Hunderte Bilder, schätzt sie, habe die App pro Tag aufgenommen. Die, die Gjøvik öffentlich teilen will, zeigen, wie zufällig die App Schnappschüsse ihres Privatlebens aufnahm: Mal ein halber Kopf, mal mit Maske, mal sieht man weit in ihr Wohnzimmer hinein. Dass Glimmer auch Freunde, Geschwister oder Wildfremde fotografiert, die dem nie zugestimmt haben, sei kaum zu verhindern, sagt Gjøvik.

Sie habe aus der Studie nur noch rausgewollt, sich aber nicht getraut zu fragen. »Apples Kultur der Geheimnisserei sickert tief ins Bewusstsein ein. Du hast Angst, selbst mit Behörden über offensichtliches Fehlverhalten zu reden.«

Wie wichtig es Apple war, das Programm geheim zu halten, lernte Gjøvik, nachdem sie die umstrittenen Glimmer-Aufnahmen veröffentlicht hatte. Einige Wochen später erhielt sie ein Schreiben eines von Apple beauftragten Anwalts, der sie aufforderte, die Tweets zu löschen.

Im September feuerte Apple sie nach sechseinhalb Jahren im Unternehmen. Gjøvik habe mit der Veröffentlichung der Bilder ihre Vertraulichkeitsverpflichtung gebrochen, argumentierten Apples Anwälte im Rahmen einer Stellungnahme an das Whistleblower-Programm des US-Arbeitsministeriums. Sie liegt dem SPIEGEL vor. Gjøviks Anwalt hält dagegen, Apple halte kein Urheberrecht an Bildern von Gjøvik.

Gegen ihre Kündigung kämpft sie nun vor dem nationalen Arbeitsschutzgremium NLRB. Auch die Börsenaufsicht SEC interessiert sich nach SPIEGEL-Informationen dafür, ob Apple eine Whistleblowerin kaltstellen wollte.

Solche Verfahren ziehen sich oft lange hin. Eine mutige Trennung ging ganz schnell: Gjøvik hat jetzt ein Android-Smartphone.

Patrick Beuth, Alexander Demling ∎



Startseite  ›  Netzwelt  ›  Gadgets  ›  Apple  ›  Apple lädt Mitarbeiter zu Daten-Party, um Gesichter zu scannen



Foto: Brooks Kraft / Apple Inc.

**»20 Minuten in sozialer Umgebung«**

# Apple lädt Mitarbeiter zu Datenparty – um Gesichter zu scannen

Whistleblowerin Ashley Gjovik bringt Apple in Bedrängnis: Sie hat aufgedeckt, wie der Konzern Fotos von Beschäftigten sammelte, um die Gesichtserkennung im iPhone zu trainieren. Sie schaltete auch deutsche Behörden ein.

Von **Alexander Demling** und **Patrick Beuth**
24.06.2022, 14.51 Uhr  •  aus **DER SPIEGEL 26/2022**



Artikel zum Hören  •  10 Min
**Einen Monat für 1 Euro**                      **Testen  ›**

Für nur 1 Euro erhalten Sie einen Monat Zugriff auf alle Artikel und jeden

AI Translation by DeepL

Companies could face a fine of up to 50,000 euros.

And: "If the companies do not change their behavior, they are acting intentionally." Even prosecution for fraud with significantly higher fines is then possible.

All producers of the sausages that tested positive deny the use of se- parator meat. A company spokesman for a Tönnies subsidiary questions the testing method used by the Bremerhaven University of Applied Sciences: The markers indicated by the laboratory are not evidence of mechanically recovered meat, he writes. "We use processed meat from young poultry in the products mentioned. This may also contain a small proportion of cartilage cells."

One argument against this is that the method does not respond at all to a small proportion of the cartilage marker collagen II alpha I.

A law firm commissioned by Wiesenhof sent affidavits from the managing directors of the factories concerned stating that they did not use mechanically recovered meat, which could also be proven by the regular checks they carried out themselves on the basis of officially recognized histological examinations and by checking the calcium content.

Wittke's method is "certainly a new scientific approach ... which has not yet been used in practice" and is not yet officially recognized, the law firm writes. Collagens are also found in other parts of the body, in particular the eyes. Furthermore, the process has so far only been developed for chicken meat and not for turkey meat, the main component of the Wiesenhof sausage.

In fact, all products that tested positive also contain chicken. And according to a study by the University of Lyon, tendons do contain collagen - but not the specific protein collagen type II alpha 1, which is the target of the laboratory tests.

Inspection authorities are certainly impressed by the new testing method, which could soon become more widespread and provide new insights. "The method is very forward-looking for us," says Matthias Denker, Head of Department at the State Office for Food Safety in Mecklenburg-Western Pomerania. The necessary equipment is available in official laboratories; food inspectors could well use the method in their day-to-day testing.

Researcher Wittke is not satisfied with this. In the future - with funding from the Federal Ministry of Economics - he also wants to detect cuttlefish meat from other animals in sausages, especially pork, the most commonly sold meat in this country.

It could be that German sausage manufacturers will soon have to look for a new business model.

Claus Hecking, Anne Martin, Leonie Voss, Carolin Wahnbaeck                      ∎



Apple boss Cook

*Brooks Kraft/Apple Inc.*

# iPhone is watching you

**TECH CONCERNS** Whistleblower Ashley Gjøvik has revealed that Apple uses secretly taken photos of its employees to to train facial recognition on iPhones. Now it wants to follow up.

The e-mail immediately struck Ashley Gjøvik as peculiar: On an August day five years ago, the Apple project manager received an invitation to a "Data Collection Social Hour". The party was to take place opposite Apple's UFO-like headquarters in Cupertino, California.

Her colleague from the user studies team promised drinks, music and "20 minutes of data collection in a social environment". Only permanent employees who were "not sensitive to light" were allowed to take part, according to his email. The event didn't really feel voluntary, Gjøvik says today. She went because it was expected. Her bosses often put pressure on her to be a team player.

What Gjøvik experienced back then triggered one of the biggest data scandals in the Apple empire last summer. She decided not to keep quiet about her findings: The company uses unnoticed photos of its employees to train its algorithm. Gjøvik became a whistleblower - with a mission that has since spread to Europe.

The fact that data protectionists from Germany may soon be fighting the most valuable tech

The world's largest logistics group has to do with Gjøvik.

The 35-year-old tells her story on a park bench in Santa Clara in Silicon Valley, a few miles from Cupertino. Gjøvik no longer works at Apple; the iPhone company fired her last September in a dispute over the snooping app. Gjøvik had revealed too much for Apple's taste. The company declined to comment on the allegations when asked.

Gjøvik remembers the data collection campaign from back then as follows: instead of a party, there was a parking lot with two rows of black-clad steel fences, three meters high. The place was guarded by security guards and cameras. At the bar, a disgruntled employee in a Hawaiian shirt served Gjøvik and four other Apple employees at a folding table and explained their task: to take selfies.

She signed a digital declaration of consent, of which she never received a copy. Then everyone received the new, as yet unreleased iPhone model X, with an app installed on it, which at the time was still in its infancy.
was called "Gobbler". In German "Verschlinger". It was only later that Apple changed the name to something less drastic: "Glimmer".

AI Translation by DeepL

ECONOMY

Gjøvik reports that they sat in the sweltering sun at almost 40 degrees and photographed themselves sweating. From above, from the side, wearing sunglasses or grimacing. The camera and several sensors recorded biometric images in which faces are measured three-dimensionally in order to recognize a user even with a shiny forehead and in glaring sunlight.

Purpose of the exercise: Apple employees were to feed the algorithm behind Face ID. The feature of unlocking a phone using facial recognition was to be introduced a few months later on the next iPhone model. Today, Apple's smartphones would be unthinkable without it. Apple employees such as Gjøvik have also been improving the technology for years: involuntarily and with pictures taken unnoticed in the most intimate everyday situations. Last August, the whistleblower drew attention to what was happening when she tweeted a video and the images taken by the Glimmer app.

This is more than embarrassing for Apple. None of the major technology companies is as committed to data protection as the iPhone manufacturer. Tim Cook, Apple's otherwise rather mild-mannered boss, regularly attacks data giants such as Meta or Alphabet and likes to demonstratively distance himself from the industry's two-faced practices: With stricter privacy rules on Apple devices, Cook almost single-handedly stifled Meta's growth by allowing the hundreds of millions of iPhone and iPad users last year to prohibit other providers from tracking their behavior for advertising purposes. Meta, which was still called Facebook at the time, warned its investors of possible negative consequences for the business, and the share price did indeed collapse shortly afterwards.

Cook always acts as if he is concerned with something higher and as if everything is different in his own company: "When we start to feel constantly monitored, our behavior changes," he recently said at a Time magazine conference. "We start to do less. To think less."

Gjøvik now wants to reveal that the company is not only breaking its promises, but possibly also the law. She has just passed her law exams and now works for a non-governmental organization that fights against censorship in China. But she is not finished with Apple yet. She is in contact with California's data protection authority about the violation of her privacy, and German authorities are also involved.

"What Apple did to me, they could do to German employees (and their families and friends) or have already done to them.

## "All data containing your faces in the image are good data."

Mail from a study director to Apple employees

have done," writes Gjøvik in an email to the Federal Data Protection Commissioner, which is available to SPIEGEL. He has since passed the case on to his Bavarian colleague, who is responsible. Apple's German headquarters are based in Munich - where they conduct research into image recognition and applications such as Face ID, among other things.

According to employment law expert Annegret Balzer, this could constitute a breach of data protection law if the people photographed did not know that they were being recorded or did not really participate voluntarily due to their relationship of dependence on their employer: If users did not give their informed and explicit consent for facial recognition, "processing is hardly conceivable and would therefore be unlawful".

A fine in the millions would then also be possible. For a company with more than 200 billion dollars in cash reserves, this would hardly be a problem. But the question is whether Apple only preaches the song of privacy when it harms its competitors.

Apple seems to be fully aware of how sensitive the use of mica is outside the USA: In August 2017, the head of the study wrote in an email to participants that employees from France and Germany were excluded. Such a user study would always be interpreted as coercion under local law, he later explained in a LinkedIn post.



Then Tuffs / mauritius images / Alamy

Lawyer Gjøvik

One month after the parking lot party, Gjøvik received an iPhone X, which she was supposed to "live on" - in Apple parlance. Apple employees are always encouraged to test their own products in everyday life, says Gjøvik.

To improve facial recognition, the Glimmer app continuously and automatically photographed its users for years as soon as they picked up the device. "Any data that has your faces in the picture is good data," the head of the study instructed the participants. The algorithm is "data-hungry". The employees should see the selfie route as a game: Those who uploaded 100 pictures per day or 2000 per month received a virtual medal.

At the end of 2020, the head of the study boasted in a blog post that Apple had collected one billion images for the launch of Face ID. Gjøvik believes that Apple was simply too stingy to pay only external test subjects for the task.

For around four years, the app photographed her when she was half asleep or on the toilet, and even nude pictures of her were stored. She estimates that the app took hundreds of pictures a day. The ones that Gjøvik wants to share publicly show how randomly the app took snapshots of her private life: sometimes half a head, sometimes with a mask, sometimes you can see far into her living room. The fact that Glimmer also photographs friends, siblings or complete strangers who have never consented to this can hardly be prevented, says Gjøvik.

She just wanted to get out of the study, but didn't dare to ask.
"Apple's culture of secrecy seeps deep into your consciousness. You're afraid to even talk to the authorities about obvious misconduct."

Gjøvik learned how important it was for Apple to keep the program secret after she published the controversial Glimmer recordings. A few weeks later, she received a letter from a lawyer hired by Apple asking her to delete the tweets.

In September, Apple fired her after six and a half years with the company. Gjøvik had breached her confidentiality obligation by publishing the images, Apple's lawyers argued in a statement to the US Department of Labor's whistleblower program in March. It is available to SPIEGEL. Gjøvik's lawyer, on the other hand, argues that Apple holds no copyright to Gjøvik's images.

She is now fighting her dismissal before the National Labor Relations Board (NLRB). According to SPIEGEL, the SEC is also interested in whether Apple wanted to shut down a whistleblower.

Such proceedings often take a long time. Only one separation went very quickly: Gjøvik now has an Android smartphone.

Patrick Beuth, Alexander Demling

# Gjovik v. Apple

# Exhibit: H

Accueil　　Débats & Reportages

# Ashley Gjøvik, lanceuse d'alerte licenciée par Apple, seule contre tous

La faute de cette salariée, licenciée en 2021 : avoir révélé que la firme californienne transforme ses employés en cobayes. Allant jusqu'à les traquer dans leur intimité.



Photo Pascal Perich pour Télérama

**Par Olivier Tesquet**

Ashley Gjøvik, lanceuse d'alerte licenciée par Apple, seule contre tous

Réservé aux abonnés

Publié le 14 mars 2023 à 06:00    Mis à jour le 14 mars 2023 à 15:39

« **R**espect de la vie privée, c'est ça l'iPhone »,* claironne une récente réclame d'Apple. De longue date, la marque à la pomme a construit sa réputation sur une promesse : ses appareils au design impeccable sont des doudous qui ne mouchardent pas, ceux qui les utilisent peuvent dormir sur leurs deux oreilles. C'est beaucoup moins vrai pour les salariés de l'entreprise.

Demandez à Ashley Gjøvik. Responsable du programme d'ingénierie, cette Américaine de 36 ans a été brutalement licenciée en septembre 2021. Sa faute ? Avoir révélé que, pour améliorer les fonctionnalités de ses produits, la firme de Cupertino n'hésite pas à transformer ses équipes en cobayes, soumis à une surveillance invasive et astreints au secret comme s'ils travaillaient pour un service de renseignement. À l'aide de centaines de documents confidentiels recoupés par de multiples témoignages, *Télérama* peut raconter une culture d'entreprise où le silence est une valeur cardinale et l'intimidation, une pratique déployée au plus haut niveau. Sollicitée, Apple s'est refusée à tout commentaire.

## Je suis devenue révolutionnaire quand j'ai compris qu'ils se fichaient de savoir que nous pouvions mourir.

L'histoire de Gjøvik commence comme un remake d'Erin Brockovich, cette lanceuse d'alerte immortalisée au cinéma par Julia Roberts. Début 2020, en emménageant à Santa Clara, au cœur de la Silicon Valley, sa santé se dégrade. Vertiges, palpitations, saignements, vomissements… Elle s'inquiète, consulte des cohortes de médecins et finit par découvrir que son logement est construit sur un terrain rongé par les déchets toxiques. Ils sont particulièrement envahissants dans cette partie de la Californie : pendant des décennies, la production massive de semi-conducteurs a pollué les sols, chargés de solvants cancérigènes qui remontent à la surface au fil des ans. Sur son lieu de travail tout proche, au campus d'Apple, à Sunnyvale, la jeune femme ressent des symptômes similaires. Elle avise sa hiérarchie, réclame des tests.

Son insistance agace : son employeur finit par lui intimer de ne plus évoquer le problème avec ses collègues. Elle prévient l'agence américaine de protection de l'environnement. En 2021, sur la messagerie Slack, dans un canal créé par des

salariées au moment où le mouvement #MeToo percute Apple, elle mâche de moins en moins ses mots et rassemble les colères. Au premier rang desquelles le sort que le temple du cool technologique réserve à ses ouailles. *« Je suis devenue révolutionnaire quand j'ai compris qu'ils se fichaient de savoir que nous pouvons mourir »,* se souvient-elle.

## Je n'ai jamais réussi à vraiment m'intégrer, ça m'a facilité la tâche au moment de tout brûler.

Gjøvik n'est pas un produit des élites technologiques californiennes, qui n'ont qu'à traverser la rue depuis le campus de Stanford pour rejoindre une multinationale offrant salaires à six chiffres et bonus confortables. Elle a vécu *« une enfance de merde »* dans une ferme en périphérie de Portland, dans l'Oregon pluvieux. Elle travaille dès 14 ans, manifeste contre la guerre en Irak à 16 et coupe les ponts avec sa famille à 20.

Après avoir débuté chez Nike *(« J'essayais de ne pas penser au travail des enfants »),* elle atterrit un peu par hasard chez Apple en 2015, fauchée et endettée. *« J'ai commencé à travailler dans la technologie parce que j'avais besoin de comprendre les systèmes complexes »,* explique-t-elle d'une voix de mitraillette rigolarde, son chien Captain sur les genoux. Elle se tue à la tâche, soixante-dix heures par semaine pendant cinq ans. Elle prend du galon, mais pas le pli de la culture locale, qui, souvent, ressemble à une expérimentation sociale en milieu clos : *« Je n'ai jamais réussi à vraiment m'intégrer, ça m'a facilité la tâche au moment de tout brûler. »*

Goûtant peu ce vent de rébellion, Apple décide de la mettre au repos forcé en août 2021, invoquant une enquête interne lancée sur la base de ses accusations. Pas refroidie, Gjøvik saisit l'agence fédérale chargée de faire respecter le droit du travail. Fin août, elle dévoile sur Twitter l'existence d'un programme clandestin, Gobbler (plus tard rebaptisé Glimmer). Déployé en 2017 auprès des salariés, cet outil interne a accompagné le lancement de Face ID, la fonctionnalité de reconnaissance faciale d'Apple, qui permet de déverrouiller son téléphone avec son visage. Dans un e-mail envoyé le 3 août 2017, et que nous avons pu consulter, un ingénieur de l'équipe vidéo explique les grandes lignes : pour entraîner l'algorithme, il faut le nourrir. Une fois activé, Gobbler prend une photo dès qu'il détecte un visage. C'est un œil qui ne cligne jamais. *« En matière de données, nous en voulons plus »,* ajoute l'ingénieur gourmand.

| À lire aussi :

> De "The Social Network" à "Super Pumped", dix films et séries qui dégomment la Silicon Valley

Dans un autre document, Apple précise quelques règles. L'application ne peut pas être utilisée en France ou en Allemagne (elle y serait illégale du fait des réglementations locales) et les salariés sont priés de ne pas télécharger de clichés immortalisés dans des lieux intimes. Gjøvik est récalcitrante, mais pour arracher le consentement de ses cobayes, l'employeur sait ruser. Un jour d'été, elle est invitée à un *« apéro de collecte de données »* d'une vingtaine de minutes, sans plus de précisions. Interdiction d'en parler sans obtenir le feu vert du service juridique. Une fois sur place, à deux pas du siège historique de la société, elle découvre *« ce qui ressemble à un complexe militaire »* protégé par des gardes. Il faut donner son téléphone, passer une porte, la refermer, en ouvrir une autre, et pénétrer quatre par quatre dans un espace cylindrique en plein cagnard pour se faire tirer le portrait. Un vrai trombinoscope composé par la force, dont l'objectif est d'améliorer l'intelligence artificielle

Quelques jours après ses premières révélations, le 9 septembre, Apple la licencie et la convoque dans l'heure, invoquant une violation de la propriété intellectuelle de l'entreprise. Elle se retrouve dans le viseur de la *« Worldwide Loyalty Team »*, des investigateurs maison qui ont souvent fait carrière dans la police ou les services secrets. Par le passé, ces privés n'ont pas hésité à pénétrer dans des domiciles afin de retrouver un prototype d'iPhone égaré. En 2017, Apple s'est même vantée d'avoir fait arrêter douze salariés trop bavards. On ne badine pas avec les secrets industriels de la première capitalisation boursière de la planète. Dans un courrier transmis au Département du travail le 4 mars 2022, les avocats d'Apple justifient le licenciement d'Ashley Gjøvik : *« Elle a choisi de divulguer des informations qu'elle était tenue de garder confidentielles. »* Gobbler n'y est jamais nommé, la société se bornant à évoquer *« l'étude »* sous le nom de code Omega.

Au fil des ans, Apple a multiplié les expérimentations de ce type, enregistrant et stockant toutes sortes d'informations intimes et biométriques sur ses salariés-testeurs : scan des conduits auditifs pour optimiser l'ergonomie des AirPods (les designers s'enorgueillissant de posséder *« l'une des plus larges bibliothèques d'oreilles de la planète »*), mesure du sommeil, pression artérielle et même surveillance du cycle menstruel. Sous couvert d'anonymat, une ex-salariée a accepté de nous transmettre les photos d'un kit proposé par Apple en 2019 en échange d'un bon d'achat de 10 dollars, afin de mesurer la qualité des glaires cervicales de son utérus. Inquiète des conséquences d'un refus, elle a accepté de se prêter à l'exercice, qui la hante encore.

Ashley Gjøvik, lanceuse d'alerte licenciée par Apple, seule contre tous

# Vous ne devez avoir aucune attente en matière de vie privée lorsque vous utilisez vos appareils personnels ou ceux de quelqu'un d'autre à des fins professionnelles. Apple

Si le géant de la tech n'hésite pas à coloniser le corps de ses collaborateurs, ceux-ci sont priés de ne pas moufter. La politique interne d'Apple, elle aussi confidentielle, annonce la couleur : *« Vous ne devez avoir aucune attente en matière de vie privée lorsque vous utilisez vos appareils personnels ou ceux de quelqu'un d'autre à des fins professionnelles, lorsque vous utilisez les systèmes ou les réseaux d'Apple, ou lorsque vous vous trouvez dans les locaux d'Apple. »* Mais ça pourrait ne pas durer. Fin janvier, le gendarme du droit du travail a estimé que la politique d'omerta de l'entreprise violait la loi, ouvrant la voie à un procès. Est notamment visé un mémo intimidant envoyé par le grand patron, Tim Cook, une semaine après le licenciement de la lanceuse d'alerte. *« Nous savons que les auteurs de fuites constituent un petit nombre de personnes, écrivait-il. Nous savons également que les personnes qui divulguent des informations confidentielles n'ont pas leur place ici. »*

> **À lire aussi :**
>
> "Les désobéissants" sur France.tv : 10 récits de combats citoyens pour faire éclater la vérité

Pour l'avocat Seth Goldstein, qui a récemment aidé les travailleurs d'Amazon à combattre les pratiques antisyndicales de Jeff Bezos, c'est un signal important : *« Les révélations d'Ashley mettent en lumière le pire de la culture d'entreprise dans la Silicon Valley. J'ai bon espoir que son cas permette de faire bouger les choses, car les gens n'ont plus confiance en ces sociétés. »* La lanceuse d'alerte, elle, n'est pas près de rendre les armes, même si le combat l'a éprouvée. *« J'ai parfois l'impression d'avoir perdu mon identité, et je n'ai jamais été aussi proche du suicide depuis l'adolescence »,* explique-t-elle au bord des larmes, en ajoutant qu'elle a trouvé du réconfort dans un livre sur les blessures morales des GI de retour de guerre. Début février, elle a eu rendez-vous avec des enquêteurs de la Securities and Exchange Commission, l'autorité des marchés financiers américains. Dans la plainte qu'elle a adressée à une douzaine d'autorités judiciaires ou de protection de la vie privée, elle annonce avec une pointe d'humour sa future reconversion en droit international public, droits humains et *« méga-corporations dystopiques ».*

AI Translation by DeepL

Home        Debates & Reports

# Ashley Gjøvik, whistleblower fired by Apple, alone against all odds

The fault of this employee, who will be dismissed in 2021: she revealed that the Californian firm turns its employees into guinea pigs. Even stalking them in their private lives.



Photo Pascal Perich pour Télérama

**By Olivier Tesquet**

https://www.telerama.fr/debats-reportages/ashley-gjovik-lanceuse-d-alerte-licenciee-par-apple-seule-contre-tous-7014661.php

AI Translation by DeepL

Reserved for subscribers

Published on March 14, 2023 at 06:00   Updated on March 14, 2023 at 15:39

**"R**espect for privacy, that's the iPhone," trumpets a recent Apple advert. The Apple brand has long built its reputation on one promise: its impeccably-designed devices. are soft toys that don't snitch, so those who use them can rest easy. This is much less true for company employees.

Just ask Ashley Gjøvik. Head of the engineering program, this 36-year-old American was brutally fired in September 2021. Her fault? Revealing that, in order to improve the functionalities of its products, the Cupertino firm does not hesitate to turn its teams into guinea pigs, subjected to invasive surveillance and sworn to secrecy as if they were working for an intelligence service. With the help of hundreds of confidential documents cross-checked by multiple testimonies, *Télérama* can tell the story of a corporate culture where silence is a cardinal value and intimidation a practice deployed at the highest level. When contacted, Apple refused to comment.

## I became a revolutionary when I realized that they didn't care if we died.

Gjøvik's story begins like a remake of Erin Brockovich, the whistleblower immortalized in film by Julia Roberts. In early 2020, when she moves to Santa Clara, in the heart of Silicon Valley, her health takes a turn for the worse. Vertigo, palpitations, bleeding, vomiting... She becomes worried, consults cohorts of doctors and ends up discovering that her home is built on land eaten away by toxic waste. Toxic waste is particularly pervasive in this part of California: for decades, the massive production of semiconductors has polluted the soil with carcinogenic solvents, which have surfaced over the years. At her nearby workplace, the Apple campus in Sunnyvale, the young woman experienced similar symptoms. She notified her superiors and requested tests.

Her insistence annoyed her employer, who finally told her not to raise the issue with her colleagues. She notifies the U.S. Environmental Protection Agency. In 2021, on the messaging service Slack, in a channel created by

salaried employees at a time when the #MeToo movement is hitting Apple, she's mincing her words less and less and gathering anger. Foremost among these is the fate that the temple of technological cool reserves for its flock. "*I became a revolutionary when I realized that they didn't care if we died,*" she recalls.

## I never really managed to fit in, which made it easier for me when it came time to burn the place down.

Gjøvik is not a product of California's tech elites, who only have to cross the street from the Stanford campus to join a multinational offering six-figure salaries and comfortable bonuses. She has lived
She *had a "shitty childhood"* on a farm on the outskirts of Portland, in rainy Oregon. She worked from the age of 14, protested against the war in Iraq at 16 and cut ties with her family at 20.

After starting out at Nike *("I was trying not to think about child labor"),* she landed somewhat by chance at Apple in 2015, broke and in debt. *"I started working in technology because I needed to understand complex systems,"* she explains in a laughing machine-gun voice, her dog Captain on her lap. She worked herself to the bone, seventy hours a week for five years. She grew in stature, but not in the local culture, which often resembled a social experiment in a closed environment: *"I never really managed to fit in, which made it easier for me when it came time to burn the place down.*

Tasting little of this wind of rebellion, Apple decided to put her on forced rest in August 2021, citing an internal investigation launched on the basis of her accusations. Undaunted, Gjøvik took her case to the federal agency responsible for enforcing labor law. At the end of August, she revealed on Twitter the existence of a clandestine program, Gobbler (later renamed Glimmer). Deployed to employees in 2017, this internal tool accompanied the launch of Face ID, Apple's facial recognition feature, which allows you to unlock your phone with your face. In an e-mail sent on August 3, 2017, and which we were able to consult, an engineer from the video team explains the broad outlines: to train the algorithm, you have to feed it. Once activated, Gobbler takes a photo as soon as it detects a face. It's an eye that never blinks. "*When it comes to data, we want more,*" adds the greedy engineer.

**Read also:**

AI Translation by DeepL

> From "The Social Network" to "Super Pumped", ten films and series that put Silicon Valley to shame

In another document, Apple specifies a few rules. The application cannot be used in France or Germany (it would be illegal there due to local regulations), and employees are asked not to download snapshots taken in intimate places. Gjøvik is recalcitrant, but to obtain the consent of her guinea pigs, the employer knows how to trick them. One summer day, she is invited to a 20-minute *"data collection aperitif"*, with no further details. She was forbidden to talk about it without a green light from the legal department. Once on site, a stone's throw from the company's historic headquarters, she discovers *"what looks like a military complex"* protected by guards. You have to hand over your phone, pass through a door, close it again, open another, and enter four by four into a cylindrical space in the middle of a hot summer to have your portrait taken. A real trombinoscope composed by force, with the aim of improving artificial intelligence.

A few days after her first revelations, on September 9, Apple fired her and summoned her within the hour, citing a violation of the company's intellectual property. She found herself in the crosshairs of the *Worldwide Loyalty Team*, in-house investigators who often had careers in the police or secret services. In the past, these privates have not hesitated to enter homes in order to track down a misplaced iPhone prototype. In 2017, Apple even boasted of having twelve overly talkative employees arrested. be trifled withThe industrial secrets of the world's largest market capitalization are not to . In a letter sent to the Department of Labor on March 4, 2022, Apple's lawyers justify Ashley Gjøvik's dismissal: *"She chose to disclose information that she was required to keep confidential."* Gobbler is never named, the company merely referring to *"the study"* under the code name Omega.

Over the years, Apple has multiplied experiments of this kind, recording and storing all kinds of intimate and biometric information on its employee-testers: ear canal scans to optimize AirPods ergonomics (the designers boast *"one of the largest ear libraries on the planet"*), sleep measurements, blood pressure and even menstrual cycle monitoring. On condition of anonymity, a former employee agreed to send us photos of a kit offered by Apple in 2019 in exchange for a $10 voucher, to measure the quality of cervical mucus in her uterus. Worried about the consequences of refusal, she agreed to take part in the exercise, which still haunts her.

AI Translation by DeepL

Ashley Gjøvik, whistleblower fired by Apple, alone against all odds

# You should have no expectation of privacy when using your personal devices or someone else's for business purposes. Apple

If the tech giant doesn't hesitate to colonize the bodies of its employees, the latter are asked not to squawk. Apple's internal policy, also confidential, announces the color: *"You should have no expectation of privacy when using your personal devices or anyone else's for business purposes, when using Apple systems or networks, or when on Apple premises."* But it might not last. At the end of January, the labor law watchdog ruled that the company's omerta policy violated the law, paving the way for a lawsuit. At issue is an intimidating memo sent by CEO Tim Cook a week after the whistleblower's dismissal. *We know that leakers are a small number of people,"* he wrote. *We also know that people who disclose confidential information have no place here."*

> **Read also:**
>
> "Les désobéissants" on France.tv: 10 stories of citizens' struggles to get the truth out

For attorney Seth Goldstein, who recently helped Amazon workers fight Jeff Bezos' anti-union practices, this is an important signal: *"Ashley's revelations highlight the worst of corporate culture in Silicon Valley. I'm hopeful that her case will help shake things up, because people no longer trust these companies."* As for the whistleblower, she's not about to give up, even if the battle has taken its toll on her. "*I sometimes feel like I've lost my identity, and I've never been so close to suicide since I was a teenager,"* she explains, on the verge of tears, adding that she has found solace in a book about the moral wounds of GIs returning from war. In early February, she had an appointment with investigators from the Securities and Exchange Commission. In the complaint she sent to a dozen judicial and privacy protection authorities, she humorously announces her future reconversion to public international law, human rights and the protection of privacy. *"dystopian megacorporations".*

# Gjovik v. Apple

# Exhibit: I



**legaltemplates.**

Home ❯ Resources ❯ Business ❯ You Can Break an NDA to Report a Crime. But Should You?

# You Can Break an NDA to Report a Crime. But Should You?



Updated February 7, 2024 | Written by Raina Chou
Reviewed by Brooke Davis



A non-disclosure agreement (NDA) is a legal contract that establishes confidentiality and prohibits the disclosure of certain information.

However, when it comes to reporting a crime or serious misconduct, the question arises: Can you break an NDA to report a crime?

consequences.



# 1. Is the information truly about illegal activity or serious misconduct?

To determine if an activity you're considering reporting falls under illegal activities or serious misconduct, ask yourself these questions:

1. **Does the activity violate a specific law or regulation?** – Research the relevant laws or regulations that might apply to the situation you've observed. This could include employment laws, environmental regulations, financial fraud statutes, etc.

2. **Is there harm or potential harm to others?** – Consider whether the activity causes direct harm to individuals, the public, or the environment. Serious misconduct often has a

detrimental impact on others or poses a significant risk.

3. **Is the activity intentionally deceptive or fraudulent?** – Many illegal acts involve deceit or an attempt to defraud individuals, companies, or government entities.

4. **Does the activity involve misuse of power or breach of trust?** – Actions that exploit a position of power or betray a fiduciary duty often fall under serious misconduct.

Reporting illegal activity or serious misconduct is generally considered a moral obligation. In fact, you could face legal action for not disclosing such information if you are aware of specific misconduct but fail to report it to authorities.

Understanding the difference between civil and criminal matters can also guide your decision.

**Civil cases** involve disputes between parties over rights and obligations that are not criminal in nature, such as personal injuries or contract breaches. The outcome typically involves compensation to the aggrieved party rather than imprisonment.

**Criminal cases**, on the other hand, deal with actions that violate laws designed to protect public safety and welfare, leading to prosecution by the government. Convictions may result in fines, community service, probation, or imprisonment.

**Some behaviors can lead to both civil and criminal cases**, like in instances of assault, where the perpetrator might face criminal charges and a civil lawsuit for damages. The distinction between criminal acts and civil wrongs is crucial in deciding whether to break an NDA.

While NDAs cannot legally prevent reporting of criminal activities, as it goes against public policy, the line becomes blurrier with civil wrongs like sexual harassment, which may not always be criminally actionable but still represents serious misconduct.

Consulting with legal counsel can help clarify these distinctions and guide your actions in a way that aligns with both legal obligations and moral imperatives.

All in all, it is essential to ensure that **the information is of sufficient gravity to warrant breaking the NDA**.

 **Case study: The #AppleToo Initiative**

Senior program manager Ashley Gjøvik was fired by Apple in September 2021. Apple claimed Gjøvik was terminated for violating its confidentiality policies.

Still, Gjøvik believed the firing was Apple's retaliation for her public complaints about Apple's surveillance of employees and other wrongful conduct, of which the employees should have the right to report to authorities regardless of a confidentiality agreement in place.

The US National Labor Relations Board prosecutors initiated an investigation and eventually found Apple's policies imposed on employees were "illegal" as they "violate workers' rights."

► *READ MORE:* Should You Sign That NDA?

# 2. Am I protected under whistleblower laws?

Whistleblower laws protect individuals who report illegal activities or wrongdoing within organizations. These laws vary by jurisdiction, so it is crucial to understand the legal protections available to you.

The wrongdoing you are reporting determines the type of whistleblower law that can afford you legal protection from retaliation by your employer.

Some common business misconducts and crimes may include the following:

## Workplace Harassment and Discrimination

*Law:* Title VII of the Civil Rights Act of 1964 and others
*Enforcing Authority:* EEOC
*Anonymity:* No
*Anti-Retaliation:* Yes

The EEOC is responsible for enforcing federal laws and regulations regarding sexual harassment and discrimination in the workplace. More specifically, 29 CFR § 1604.11 states that all employers

# Gjovik v. Apple

# Exhibit: J

Home ❯ Resources ❯ Business ❯ Understanding Confidential Information in NDAs

# Understanding Confidential Information in NDAs



Updated June 5, 2023 | Written by Raina Chou
Reviewed by Brooke Davis



**Non-disclosure agreements** (NDAs) have become instrumental tools for protecting confidential information. However, understanding what can be considered "confidential information" under an NDA is sometimes not as easy as it may seem. What does "confidential information" mean, and why is it essential to distinguish it?

# A Crime Is NOT Confidential Information



# ILLEGAL CONDUCT
# IS NOT
# CONFIDENTIAL

NDAs are sometimes used unethically.



sexual harassment.







Victims and witnesses often fear
reporting misconduct due to
possible **NDA breach consequences.**

Individuals who disclose
information about illegal activities
generally **won't be punished**



6/24/23, 10:15 PM                                   Understanding Confidential Information in NDAs

despite an NDA listing the
information as "confidential."





**Failure to report** a known crime
can constitute a **misdemeanor**
offense or even a **crime** in itself
in some states.

NDAs should **never** be
a shield for criminal
activity.





There has been unethical use of NDAs that attempted to cover up illegal activities (i.e., sexual
harassment) under various circumstances. Victims and witnesses were reluctant to report such
misconduct to authorities for fear of bearing the consequences of an NDA breach.

However, common law generally finds that **any act resulting in a crime will not be afforded protection**. Although this can vary on the specific situation, an individual who discloses information to law enforcement in an official capacity during illegal activity will likely not face any consequences. If you are aware of certain misconduct but fail to report it to authorities, you could also face legal action for not disclosing such information.

 **Case study: The #AppleToo Initiative**

Senior program manager Ashley Gjøvik was fired by Apple in September 2021. Apple claimed Gjøvik was terminated for violating its confidentiality policies, but Gjøvik believed the firing was Apple's retaliation for her public complaints about Apple's surveillance of employees and other wrongful conducts, of which the employees should have rights to report to authorities regardless of a confidentiality agreement in place.

The US National Labor Relations Board prosecutors initiated an investigation and eventually found that Apple's policies imposed on employees were "illegal" as they "violate workers' rights."

# What Is Everyone Protecting?

Let's explore some enlightening statistics that reveal the diversity and shifts in trends of information listed as confidential in NDAs created in 2021 and 2022.

# Gjovik v. Apple

# Exhibit: K

4/10/22, 4:45 PM                                     Apple whistleblower brings spying claims to UK

# The Telegraph



News   Ukraine   Sport   **Business**   Opinion   Money   Life   Style   Travel   Culture

See all Business

# Apple whistleblower brings spying claims to UK

## Data watchdog opens investigation into privacy accusations against iPhone maker

*By* Lucy Burton, EMPLOYMENT EDITOR

10 April 2022 • 9:00am



Britain's information watchdog is investigating claims that Apple was able to access personal information on workers' phones after a privacy complaint was lodged by a whistleblower.

[Ashley Gjøvik](), a former senior Apple engineer, has filed a 54-page privacy complaint against the iPhone maker alleging unlawful data collection and invasion of employee privacy over "years and multiple countries".

In the filing, which has been lodged with the UK Data Protection Information Commissioner's Office (ICO) and its counterpart in Brussels, Ms Gjøvik claimed that she publicly expressed concerns about Apple "pressuring its employees to participate in invasive data collection procedures, including scans of ears/ear canals".

She also accused the company of using an app on employees' iPhones that "automatically took photos/videos whenever it 'thought it saw a face'".

In the filing Ms Gjøvik said: "I respectfully request that you investigate the matters I raised and open a larger investigation into these topics within Apple's corporate offices globally."

The complaint was also submitted to the Data Protection Commission in Ireland and London-based Big Brother Watch, the privacy campaigning organisation.

An ICO spokesman said: "We are aware of this matter and we will assess the information

An Apple spokesman said: "We are aware of this matter and we will assess the information provided."

Ms Gjøvik [was fired by Apple last September](#) for allegedly violating the company's rules against leaking confidential information.

She claimed to have begun raising concerns about workplace safety in March last year, including those related to Apple's policies on how it can search and surveil employees' work phones.

Ms Gjøvik has also alleged that she has faced bullying and harassment from her manager and other colleagues, in a campaign that has been dubbed Apple's "MeToo" moment.

This is thought to be the first time that she has tried to take her battle against the notoriously secretive tech giant to the UK.

The campaign dragged Apple into [a growing wave of employee activism](#) affecting its Silicon Valley rivals. In 2018, more than 20,000 Google staff held a walkout against forced arbitration agreements and alleged payouts related to sexual harassment.

An Apple spokesman said: "We are and have always been deeply committed to creating and maintaining a positive and inclusive workplace. We take all concerns seriously and we thoroughly investigate whenever a concern is raised and, out of respect for the privacy of any individuals involved, we do not discuss specific employee matters."

---

## Business Briefing newsletter

Our daily digest packed with news and analysis



|  |
| --- |
| Sign up |

---

Related Topics

Apple, Privacy, Information Commissioner Office

      

# Gjovik v. Apple

# Exhibit: L

## The Telegraph

News   Ukraine   Sport   **Business**   Opinion   Money   Life   Style   Travel   Culture

See all Business



## Apple whistleblower Ashley Gjøvik: 'My life is a goddamn nightmare now'

Ashley Gjøvik, co-founder of whistleblower campaign #AppleToo, finds being an enemy of the tech giant makes her life far more difficult

*By* Lucy Burton, EMPLOYMENT EDITOR
17 April 2022 • 11:00am

    

Blowing the whistle on one of the most powerful companies in the world does not come without consequences.

Ashley Gjøvik, the former Apple employee, has spent the last year documenting and publicly speaking out against potential safety concerns, allegations of bullying and surveillance of employees at the iPhone maker. Gjøvik thinks a lot, however, about whether the saga has been worth it.

"I think about this all the time because my life is such a goddamn nightmare now," the 35-year-old says from her home in California.

"Should I have done this? The answer is always wholeheartedly yes, because it was all based on safety." Gjøvik's initial complaint in March 2020 accused the Cupertino-based company of chemical exposure at her office.

While she doesn't regret her decision, Gjøvik admits that becoming an enemy of Apple has made her life far more difficult.

As senior engineering program manager, she was earning the equivalent of almost £300,000 a year and enjoying lavish company parties before

being fired from Apple last September for allegedly leaking confidential information.

Not only has she lost her job, but also close friends who worked with her at the tech giant. She now battles regular online harassment and admits to feeling paranoid about dark cars driving around her neighbourhood with tinted windows. One of the latest messages in her inbox reads: "if Steve Jobs was still around he would pull you out by your hair and force you to turn tricks on the corner because that's the only talent you have".

Yet she laughs often. Despite the difficulties and mental battles each day, she is studying public international law and human rights at Santa Clara University and her passion for calling Silicon Valley to account hasn't waned.

"We need to reassess how we treat these companies. Every day that goes by they become more powerful, we become more dependent on them. We need to see more whistleblowers, we need to see more people coming out," she argues.

"It's harder for people like me who were in a senior position [to speak out]. I was very embedded with executives and strategic decisions and I was paid a lot of money, so much money, I cry about that a lot. Last year I made $386,000, I believe."

Gjøvik is known as the most outspoken out of a group of Apple staff to break from the company's culture of secrecy and complain about its workplace policies last year. As well as supposed environmental health and safety issues, she has spoken about privacy concerns and alleged that Apple pressured her into revealing details of sexual harrasment she says she had experienced.

Most of the others shared their stories anonymously in a campaign that became known as #AppleToo, dragging the tech giant into a growing wave of employee activism that had already started to take hold across Silicon Valley. At Google, for instance, more than 20,000 staff held a walkout against forced arbitration agreements and alleged payouts related to sexual harassment in 2018.

While Gjøvik thinks the industry needs more whistleblowers to come forward, she admits that doing what she did isn't necessarily a good idea - and says that trauma therapy is vital for anyone who publicly blows the whistle, not something to be taken lightly. In fact, Gjøvik isn't sure she'd advise doing this at all.

"I do not recommend blowing the whistle," she says in a burst of laughter. "We talked about the online stuff, but there's also the ostracisation. I lost a huge social circle. Because Apple's so secretive, pretty much all your friends are co-workers.

"Also, just coming forward, everyone's questioning your integrity, your ethics, your honesty, your sanity, everything. Constantly, you're under the microscope. It's hard and I'm lucky in a sense that the only one impacted beyond me directly is the dog. If people have family, if they have a spouse that will also be under that microscope."

She urges anyone working in big tech who wants to call their company to account to tread with care and consider the downsides first.

"When I say I would not recommend, that doesn't mean I'm saying don't do it. I just would never go around and say everyone should be a whistleblower - it's a nightmare. I was in a position where I had a lot of insider knowledge and documents that were meaningful. If you're going to come forward, you need to do a risk benefit analysis.

"With whistleblowing you can't just think about today, tomorrow, or the next month. You have to think, what does that whole path look like? What do you want to achieve?" she adds.

"If you just have a stack of documents you want to get out, you can do that anonymously, potentially. But maybe you need the credibility of someone authenticating it.

"It really does need to be checklists and spreadsheets, to see if it's worth it. The more we have people coming forward who can make a difference, it helps run the waters a little bit."

---

### Ashley Gjøvik CV

**Age:** 35

**Education:** Bachelor of Science, Portland State University; Juris Doctor & Public International Law Certificate Candidate, Santa Clara University

**Career:** Joined Apple in 2015 as engineering project manager, following roles as software manager and human resources at Nike

**Hobbies:** Reading (Non-Fiction); Volunteering; Travelling

---

Gjøvik has a number of cases open against Apple. If some are successful, she could receive various remedies including reinstatement, which would mean that Apple has to rehire her in the same role or a similar one.

Surely a return would be unbelievably awkward? "I would do it," she says, bursting into laughter again. "I was on the fence, but the more I think about your question - how do we get more whistleblowers - I would suck it up, I would walk in smiling, cooperative, friendly, willing to do a good job.

"We say [it is] 'chilling' when companies do sh---y stuff, that it chills, but I feel like if I could walk back into Apple that would warm. People would think 'maybe I can speak up, look at that'. I would take one for the team."

Gjøvik was never planning to go into big tech, let alone become a whistleblower. She had studied literature and wanted to do a masters in fine arts and poetry when she met someone at a job fair who convinced her to work in tech, as she was good with computers.

In 2015 she joined Apple, a brand she says she respected - and admits she still sort of does - because it "led the way in having customer friendly computers". There is irony in the fact that, despite her battles, Gjøvik is currently using an Apple Mac.

"I'm trying to switch but I sit on [rival] computers and I think this is a piece of c---, so I keep going back," she confesses, although has managed to part ways with her iPhone.

"Me fighting them, I feel like more of a mother being like 'you're better than this, we both know'. They're not going anywhere. You've got to work with them to make them better. I still love my Mac, when I look at it I debate with myself [and think] 'you know you shouldn't be' [using it]."

Apple declined to comment.

## Business Briefing newsletter

Our daily digest packed with news and analysis



| Sign up |
| --- |

Related Topics

Apple, Jobs and employment

   

The Telegraph values your comments but kindly requests all posts are on topic, constructive and respectful. Please review our commenting policy.

| Show comments |
| --- |

**More stories**

# More from Business



Energy bills will only fall if we learn from our many past mistakes

Money & Business | 17 Apr 2022

# The Sunday Interview

# 'Should I have blown the whistle? The answer is always wholeheartedly yes'

**Ashley Gjøvik: Apple whistleblower who was sacked by the iPhone maker tells *Lucy Burton* why she would walk straight back in if reinstated**

Blowing the whistle on one of the most powerful companies in the world does not come without consequences.

Ashley Gjøvik, the former Apple employee, has spent the last year documenting and publicly speaking out against potential safety concerns, allegations of bullying and surveillance of employees at the iPhone maker. Gjøvik thinks a lot, however, about whether the saga has been worth it.

"I think about this all the time because my life is such a goddamn nightmare now," the 35-year-old says from her home in California. "Should I have done this? The answer is always wholeheartedly yes, because it was all based on safety." Gjøvik's initial complaint in March 2020 accused the Cupertino-based company of chemical exposure at her office.

While she doesn't regret her decision, Gjøvik admits that becoming an enemy of Apple has made her life far more difficult.

As senior engineering program manager, she was earning the equivalent of almost £500,000 a year and enjoying lavish company parties before being fired last September for allegedly leaking confidential information.

Not only has she lost her job, but also close friends who worked with her at the tech giant. She now battles regular online harassment and admits to feeling paranoid about dark cars driving around her neighbourhood with tinted windows. One of the latest messages in her inbox reads: "If Steve Jobs was still around he would pull you out by your hair and force you to turn tricks on the corner because that's the only talent you have."

Yet she laughs often. Despite the difficulties and mental battles each day, she is studying public international law and human rights at Santa Clara University with a passion for calling Silicon Valley to account that wasn't hers.

"We need to reassess how we treat these companies. Every day that goes by they become more powerful, we become more dependent on them. We need to see more whistleblowers, we need to see more people coming out," she argues.

"It's harder for people like me who were in a senior position [to speak out]. I was embedded with executives and strategic decisions and I was paid a lot of money, so much money, I cry about that a lot. Last year I made $386,000 (£295,000), I believe."

Gjøvik is known as the most outspoken out of a group of Apple staff to break from the company's culture of secrecy and complain about its workplace policies last year. As well as surprised environmental health and safety issues, she has spoken about privacy concerns and alleged that Apple pressured her into revealing

details of sexual harassment she says she had experienced.

Most of the others shared their stories anonymously in a campaign that became known as AppleToo, dragging the tech giant into a growing wave of employee activism that had already started to take hold across Silicon Valley. At Google, for instance, more than 20,000 staff held a walkout against forced arbitration agreements and alleged payouts related to sexual harassment in 2018.

While Gjøvik thinks the industry needs more whistleblowers to come forward, she admits that doing what she did isn't necessarily a good idea – and says that trauma therapy is vital for anyone who publicly blows the whistle, not something to be taken lightly. In fact, Gjøvik isn't sure she'd advise doing this at all.

"I do not recommend blowing the whistle," she says in a burst of laughter. "We talked about the online stuff, but there's also the ostracisation. I lost a huge social circle. Because Apple's so secretive, pretty much all your friends are co-workers.

"Also, just coming forward, everyone's questioning your integrity, your ethics, your honesty, your sanity, everything. Constantly, you're under the microscope. It's hard and I'm lucky in a sense that the only one impacted beyond me directly is the dog. If people have family, if they have a spouse that will also be under that microscope."

She urges anyone working in big tech who wants to call their company to account to tread with care and consider the downsides first.

"When I say I would not recommend, that doesn't mean I'm saying don't do it. I just would never go around and say everyone should be a whistleblower – it's a nightmare. I was in a position where I had a lot of insider knowledge and documents that were meaningful. If you're going to come forward, you need to do a risk benefit analysis.

"With whistleblowing you can't just think about today, tomorrow, or the next month. You have to think, what does that whole path look like? What do you want to achieve?" she adds.

"If you just have a stack of documents you want to get out, you can do that anonymously, potentially. But maybe you need the credibility of someone authenticating it.

"It really does need to be checklists and spreadsheets, to see if it's worth it. The more we have people coming forward who can make a difference, it helps run the waters a little bit."

Gjøvik has a number of cases open against Apple. If some are successful, she could receive various remedies including reinstatement, which would mean that Apple has to rehire her in the same role or a similar one.

Surely a return would be unbelievably awkward? "I would do it," she says, bursting into laughter again. "I was on the fence, but the more I think about your question – how do we get more whistleblowers – I would suck it up, I would walk in smiling, co-operative, friendly, willing to do a good job.

"We say [it is] 'chilling' when companies do sh—y stuff, that it chills, but I feel like if I could walk back into Apple that would warm. People would think 'maybe I can speak up, look at that'. I would take one for the team."

Gjøvik was never planning to go into big tech, let alone become a whistleblower. She had studied literature and wanted to do a masters



in fine arts and poetry when she met someone at a job fair who convinced her to work in tech, as she was good with computers.

In 2015 she joined Apple, a brand she says she respected – and admits she still sort of does – because it "led the way to having customer friendly computers". There is irony in the fact that, despite her battles, Gjøvik is currently using an Apple Mac.

"I'm trying to switch but I sit on [rival] computers and I think this is a

**'I was embedded with executives. I was paid so much money, I cry about that a lot'**

piece of c—, so I keep going back," she confesses, although has managed to part ways with her iPhone.

"Me fighting them, I feel like more of a mother being like 'you're better than this, we both know'.

"They're not going anywhere. You've got to work with them to make them better. I still love my Mac, when I look at it I debate with myself [and think], 'You know you shouldn't be' [using it]."

Apple declined to comment.

**CV**

**Age** 35

**Education** Bachelor of science, Portland State University; Juris doctor & public internal law certificate candidate, Santa Clara University

**Career** Joined Apple in 2015 from Nike

**Hobbies** Reading, volunteering and travelling

Ashley Gjøvik, a former senior engineering program manager at the tech titan, says her life is a nightmare but she would do it again

**Facts**

**500**
Claims of workplace discrimination and harassment that a group of anonymous Apple employees said they received in 2021

**$386,000**
Gjøvik's salary last year

**$2.4 trillion**
Apple's market cap

**4**
The cases Gjøvik says she has open against Apple

**$123.9bn**
Apple's revenue reported for the fiscal fourth quarter of 2021

# Gjovik v. Apple

# Exhibit: M

4/11/22, 12:33 PM · Ex-Apple employee takes Face ID privacy complaint to Europe

HOME    MAIL    NEWS    FINANCE    SPORTS    ENTERTAINMENT    LIFE    SEARCH    SHOPPING    YAHOO PLUS    MORE
Download the Yahoo News app

 yahoo!news

Sign in          Mail

News   US   Politics   World   COVID-19   Climate Change   Originals   Health   Science   Podcasts   Contact Us   Videos

**TC TechCrunch**

# Ex-Apple employee takes Face ID privacy complaint to Europe



 **Natasha Lomas**
Mon, April 11, 2022, 10:58 AM · 8 min read



Privacy watchdogs in Europe are considering a complaint against Apple made by a former employee, Ashley Gjøvik, who alleges the company fired her after she raised a number of concerns, internally and publicly, including over the safety of the workplace.

Gjøvik, a former senior engineering program manager at Apple, was fired from the company last September after she had also raised concerns about her employer's approach towards staff privacy, some of which were covered by the Verge in a report in August 2021.

## TRENDING                                           ✕

**Audio captures Russian soldiers discussing killing and raping Ukrainians, with one saying, 'If...**
Business Insider · 2 min read          

**Connecticut advances death notification bill after tragic deaths of 2 Black women**
Yahoo News · 4 min read               

**Putin's War in Ukraine Shatters an Illusion in Russia**
The New York Times · 8 min read       

**72 people at high-profile D.C. dinner test positive for Covid**
NBC News · 3 min read                 

**How did quarterback Dwayne Haskins die on a South Florida highway? Here's what we know.**
Miami Herald · 1 min read             

## POPULAR



**Employee experience is as strong as ever at the 100 Best Companies**
Fortune



**Moving to Florida? New Florida residents rack up complaints against moving companies**
WFTS-Tampa

## yahoo!news

Sign in    Mail

News   US   Politics   World   COVID-19   Climate Change   Originals   Health   Science   Podcasts   Contact Us   Videos

At the time, Gjøvik had been placed on administrative leave by Apple after raising concerns about sexism in the workplace, and a hostile and unsafe working environment which it had said it was investigating. She subsequently filed complaints against Apple with the US National Labor Relations Board.

Those earlier complaints link to the privacy complaint she's sent to international oversight bodies now because Gjøvik says she wants scrutiny of Apple's privacy practices after it formally told the US government its reasons for firing her -- and "felt comfortable admitting they'd fire employees for protesting invasions of privacy", as she puts it -- accusing Apple of using her concerns over its approach to staff privacy as a pretext to terminate her for reporting wider safety concerns and organizing with other employees about labor concerns.

The UK's Information Commissioner's Offie (ICO) and France's CNIL both confirmed receipt of Gjøvik's privacy complaint against Apple.

A spokesperson for the ICO told TechCrunch: "We are aware of this matter and we will assess the information provided."

France's CNIL also sent confirmation that it's looking at Gjøvik's complaint.

"We have received this complaint which it is currently being investigated," a CNIL spokesperson told us, adding: "I cannot communicate any further details at this time."

The development was first covered by the Telegraph -- which reported yesterday that it's thought to be the first time Gjøvik has sought to press her privacy complaint against Apple in the UK.

[ Story continues ]

**RECOMMENDED STORIES**

### Why Apple Stock Is Falling Today

Motley Fool



### Exclusive-Apple faces extra EU antitrust charge in music streaming probe -source

Reuters



### Rebuttal: Bill protects online privacy, security

Palm Beach Daily News



### Regions Bank Wins Gallup Exceptional Workplace Award

News Direct



### Here are the Fortune 100 Best Companies to Work For® in 2022, according to nearly 1 million employees

News Direct

# Gjovik v. Apple

# Exhibit: N

4/20/22, 8:48 PM                    Ex-employee accuses Apple of training iPhone biometrics by violating staff privacy | Biometric Update



About Us    |    Subscribe

All Content ▾    Search

| BIOMETRICS NEWS | BIOMETRICS STOCKS | ID FOR ALL | FEATURES & INTERVIEWS | INDUSTRY INSIGHTS | BRAND FOCUS | BIOMETRICS COMPANIES | WHITE PAPERS | BIOMETRICS EVENTS |

Share

Tweet

Link

Comment

# Ex-employee accuses Apple of training iPhone biometrics by violating staff privacy

Apr 20, 2022, 6:51 pm EDT | Chris Burt

CATEGORIES    Biometric R&D  |  Biometrics News  |  Mobile Biometrics



Apple was questioned about where it collected the 1 billion images it trained the Face ID biometric algorithm with by a member of U.S. Congress back in 2017, but no direct answer was offered. Now, an ex-employee of the company is taking it to court in Europe over sourcing those training images from its staff, The Telegraph reports.

Minnesota Senator Al Franken requested information on a range of points when Apple first introduced face biometrics to the iPhone X, some but not all of which was provided in the company's response.

Former Apple employee Ashley Gjøvik was placed on administrative leave after complaining to the company about a sexist work environment, and then was fired, she says for raising concerns about violations of staff privacy. She has also filed a complaint with the National Labor Relations Board in the U.S.

The company invited its employees to participate in product testing, and sometimes to have their biometrics collected, but Gjøvik says the testing and collection seemed to be mandatory. She describes the use of Apple's internal Gobbler app (later called Glimmer) to upload personal data employees had collected to company servers, and directly claims that employee data is the source of the billion images used to train Face ID.

## MOST READ THIS WEEK

**Stakeholders review Ethiopia's proposed digital ID legislative framework**

**Biometrics partnerships set up billions in revenues forecast by analysts**

**Biden urged to consider federal digital identity framework**

**Biometrics secure UNHCR direct cash payments to Ukrainian refugees**

**UK government opens bid for mobile fingerprint biometric enrollment devices**

**It's fun. It's trendy. It's putting your iris biometrics on the market for free**

**GSA finds 'bias' in facial recognition errors, plans tests but no deployment**

**Paravision and HID Global co-developing new line of face biometric solutions**

**iProov brings counter-suit against FaceTec in biometric liveness IP dispute**

**Biometrics capture with feature phones to boost Africa's financial inclusion**

Daily Biometrics News

FEATURED COMPANY



The future of identity lives here. Fast mobile authentication using your face, voice, or fingerprint? We helped invent that technology. And today, we're building even faster, safer ways to help connect your customers to the services they love, in every channel, for life.

LEARN MORE

France's data protection authority CNIL and the UK's Information Commissioner's Office have each confirmed that they are investigating the allegations, according to TechCrunch, and other regulators are listed in the complaint but have not confirmed investigations.

Ultimately, Gjøvik is alleging non-disclosure agreements and employee privacy policies that do not meet legal standards.

Controversy around the origin of biometric training data has led to lawsuits and recent ethical commitments from biometrics developers.

## Article Topics

Apple | biometric data | biometrics | data collection | data protection | face biometrics | Face ID | iPhone | privacy

## Latest Biometrics News

Autoencoder approach to vein biometrics development shows promise in EAB presentation

Panel recommends non-intrusive airport biometrics for India

Chinese, U.S. researchers turn teeth-grinding into a biometric identifier

Affective computing draws Intel's attention, prompts debate

Easier and Idemia to collaborate on biometric Entry/Exit System for Lithuania

GAO says US military playing too loose with AI development management

## Comments

## Leave a Reply

This site uses Akismet to reduce spam. Learn how your comment data is processed.

## Subscribe To The BiometricUpdate.com Email Newsletter

Stay on the cutting edge of the biometrics industry by subscribing to daily news updates from BiometricUpdate.com

LEARN MORE



### BIOMETRICS RESEARCH

More Biometrics Companies

**Expect digital ID to balloon in users and revenue by 2026: Juniper Research**

**Two analyses project facial recognition market at around $13B by 2028**

**Ponemon Institute highlights rise in authentication failure rates and related costs**

More Biometrics Research

### BIOMETRICS WHITE PAPERS

**The validation and development of the QuantumCrypt technology**

**On-demand webinar – Human or machine: AI proves best at spotting biometric attacks**

**ID document verification impact report**

More White Papers

### BIOMETRICS EVENTS

**ID4Africa LiveCasts: Mobile for Identity Management and Inclusive ID4D**
Online: Mar 9 - Apr 27, 2022

**TDK Ventures presents DX Week 2022**
Online: Apr 18 - Apr 21, 2022

**SECON 2022**
KINTEX, Korea: Apr 20 - Apr 22, 2022

More Biometrics Events