CASE NO. 25-2028

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

**ASHLEY M. GJØVIK**, *an individual*,
*Plaintiff-Appellant*

v.

**APPLE INC.**, *a corporation*,
*Defendant-Appellee.*

On Appeal from the United States District Court
for the Northern District of California
No. 3:23-CV-04597
The Honorable Judge Edward M. Chen

---

## APPELLANT'S REQUEST FOR JUDICIAL NOTICE:
## EXHIBITS III: COMPLAINTS & PROCEEDINGS

---

**Ashley M. Gjøvik, JD**
*In Propria Persona*
2108 N. St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# GJOVIK V. APPLE

# EXHIBIT

32-CA-284428

FORM NLRB-4722




# NOTICE TO EMPLOYEES

## POSTED PURSUANT TO A SETTLEMENT AGREEMENT APPROVED BY A REGIONAL DIRECTOR OF THE NATIONAL LABOR RELATIONS BOARD

### AN AGENCY OF THE UNITED STATES GOVERNMENT

**THE NATIONAL LABOR RELATIONS ACT GIVES YOU THE RIGHT TO:**

- Form, join, or assist a union;
- Choose a representative to bargain with us on your behalf;
- Act together with other employees for your benefit and protection;
- Choose not to engage in any of these protected activities.

**WE WILL NOT** interfere with, restrain, or coerce you in the exercise of the above rights.

**YOU HAVE THE RIGHT** to discuss wages, hours and working conditions and **WE WILL NOT** do anything to interfere with your exercise of that right.

**WE WILL NOT** promulgate, maintain, or enforce any rule that defines confidential information as "anything not explicitly, publicly, or purposefully disclosed by Apple."

**WE WILL NOT** promulgate, maintain, or enforce a Confidentiality and Intellectual Property Agreement, Business Conduct Policy, Misconduct and Discipline Policy, Social Media and Online Communications Policy, Confidentiality Obligations Upon Termination of Employment statement, or a Business Conduct and Global Compliance FAQ regarding confidential information that broadly defines "confidential" or "proprietary" information, or relies upon any other overly broad definitions of those terms, without contemporaneously notifying employees of their rights to discuss wages, hours, or working conditions and their rights to engage in union or other protected, concerted activity under the NLRA.

**WE WILL NOT** promulgate, maintain, or enforce a Business Conduct Policy that broadly restricts public speaking, responses to press inquiries and publishing articles without contemporaneously notifying employees of their rights to speak publicly, respond to press inquiries and publish articles regarding their wages, hours, or working conditions, or their union or other protected, concerted activity under the NLRA.

**WE WILL NOT** promulgate, maintain, or enforce a Business Conduct Policy that broadly restricts "conflicts of interest" or "outside activities," without contemporaneously notifying employees that such policies do not restrict their right to form, join or assist a union, or engage in other protected, concerted activity and that these activities are not considered to be conflicts of interest or outside activities under such policy.

**WE WILL NOT** promulgate, maintain, or enforce a Business Conduct Policy that broadly prohibits sharing of employee personal identifying information if such policy could be interpreted as prohibiting the sharing of personal contact information, employment history, compensation or other terms and conditions of employment.

**WE WILL NOT** promulgate, maintain, or enforce a Workplace Searches and Privacy Policy that advises you that we have the right to access Apple's network or systems, or any non-Apple device used to conduct Apple business, without contemporaneously advising you that we will not exercise our right of access to monitor your union or other protected, concerted activity.

The National Labor Relations Board is an independent Federal agency created in 1935 to enforce the National Labor Relations Act. We conduct secret-ballot elections to determine whether employees want union representation and we investigate and remedy unfair labor practices by employers and unions. To find out more about your rights under the Act and how to file a charge or election petition, you may speak confidentially to any agent with the Board's Regional Office set forth below or you may call the Board's toll-free number 1-844-762-NLRB (1-844-762-6572). Hearing impaired callers who wish to speak to an Agency representative should contact the Federal Relay Service (link is external) by visiting its website at https://www.federalrelay.us/tty (link is external), calling one of its toll free numbers and asking its Communications Assistant to call our toll free number at 1-844-762-NLRB.
**THIS IS AN OFFICIAL NOTICE AND MUST NOT BE DEFACED BY ANYONE.**
THIS NOTICE MUST REMAIN POSTED FOR 60 CONSECUTIVE DAYS FROM THE DATE OF POSTING AND MUST NOT BE ALTERED DEFACED OR COVERED BY ANY OTHER MATERIAL. ANY QUESTIONS CONCERNING THIS NOTICE OR COMPLIANCE WITH ITS PROVISIONS MAY BE DIRECTED TO, THE ASSISTANT TO THE REGIONAL DIRECTOR NATHAN SEIDMAN AT nathan.seidman@nlrb.gov or (213) 634-6518. **PANEL 1 OF 3**

32-CA-284428



FORM NLRB-4722

# NOTICE TO EMPLOYEES

**POSTED PURSUANT TO A SETTLEMENT AGREEMENT
APPROVED BY A REGIONAL DIRECTOR OF THE
NATIONAL LABOR RELATIONS BOARD**

**AN AGENCY OF THE UNITED STATES GOVERNMENT**



**THE NATIONAL LABOR RELATIONS ACT GIVES YOU THE RIGHT TO:**

- Form, join, or assist a union;
- Choose a representative to bargain with your employer on your behalf;
- Act together with other employees for your benefit and protection;
- Choose not to engage in any of these protected activities.

**WE WILL NOT** promulgate, maintain, or enforce a Misconduct and Discipline Policy that fails to reiterate employee rights during investigations that Apple may conduct regarding alleged unfair labor practices under the National Labor Relations Act, and/or contains overly broad restrictions on photography and recording.

**WE WILL NOT** advise you that you are subject to discipline for violating overly broad rules regarding confidential or proprietary information or for failing to report alleged violations of overly broad rules relating to confidential or proprietary information.

**WE WILL NOT** advise you that you are subject to discipline for violating overly broad rules regarding photographing, video or audio recording that prohibit the recording of protected, concerted activity.

**WE HAVE** clarified the aspects of the Confidentiality and Intellectual Property Agreement described above and revised it to make clear that the definition of "Proprietary Information," which was changed to "Apple Confidential Information," does not include wages, hours, and working conditions, to reiterate employee rights about discussing terms and conditions of employment and reporting to governmental agencies, and to make clear that prohibitions against "conflicting outside interests" do not cover forming or joining (or refraining from joining) labor organizations of an employee's choice and **WE HAVE** informed employees of these clarifications.

**WE HAVE** rescinded the aspects of Business Conduct and Global Compliance FAQ regarding Confidential Information described above and revised it to conform with the definition of Apple Confidential Information described above and **WE HAVE** informed employees of these revisions.

**WE HAVE** rescinded the aspects of the Business Conduct Policy described above and revised it to make clear that Apple Confidential Information does not include wages, hours, and working conditions, that employees may communicate about labor disputes, to clarify that employees may not respond to public inquiries or participate in speaking engagements where employees could be construed as speaking on behalf of Apple, to clarify that employees may publish articles but must receive approval about articles about Apple products or services or could be seen as a conflict of interest, make clear that a conflict of interest does not include forming, joining, or assisting a union, or engaging in protected, concerted activity, to make clear that employees do not need to notify a manager of outside employment that complies with our policy, and to inform employees that searches will not be used to monitor employees' protected, concerted activity, and **WE HAVE** informed employees of these revisions.

*The National Labor Relations Board is an independent Federal agency created in 1935 to enforce the National Labor Relations Act. We conduct secret-ballot elections to determine whether employees want union representation and we investigate and remedy unfair labor practices by employers and unions. To find out more about your rights under the Act and how to file a charge or election petition, you may speak confidentially to any agent with the Board's Regional Office set forth below or you may call the Board's toll-free number 1-844-762-NLRB (1-844-762-6572). Hearing impaired callers who wish to speak to an Agency representative should contact the Federal Relay Service (link is external) by visiting its website at https://www.federalrelay.us/tty (link is external), calling one of its toll free numbers and asking its Communications Assistant to call our toll free number at 1-844-762-NLRB.*

**THIS IS AN OFFICIAL NOTICE AND MUST NOT BE DEFACED BY ANYONE.**
THIS NOTICE MUST REMAIN POSTED FOR 60 CONSECUTIVE DAYS FROM THE DATE OF POSTING AND MUST NOT BE ALTERED DEFACED OR COVERED BY ANY OTHER MATERIAL. ANY QUESTIONS CONCERNING THIS NOTICE OR COMPLIANCE WITH ITS PROVISIONS MAY BE DIRECTED TO, THE ASSISTANT TO THE REGIONAL DIRECTOR NATHAN SEIDMAN AT nathan.seidman@nlrb.gov or (213) 634-6518.

**PANEL 2 OF 3**

32-CA-284428

FORM NLRB-4722

  

# NOTICE TO EMPLOYEES

**POSTED PURSUANT TO A SETTLEMENT AGREEMENT
APPROVED BY A REGIONAL DIRECTOR OF THE
NATIONAL LABOR RELATIONS BOARD**

**AN AGENCY OF THE UNITED STATES GOVERNMENT**

**THE NATIONAL LABOR RELATIONS ACT GIVES YOU THE RIGHT TO:**

- Form, join, or assist a union;
- Choose a representative to bargain with your employer on your behalf;
- Act together with other employees for your benefit and protection;
- Choose not to engage in any of these protected activities.

**WE HAVE** rescinded the aspects of the Workplace Searches and Privacy Policy described above and revised it to conform with the definition of Apple Confidential Information described above and to inform employees that searches will not be used to monitor employees' protected, concerted activity and **WE HAVE** informed employees of these revisions.

**WE HAVE** rescinded the aspects of the Misconduct and Discipline Policy described above and revised it to conform with the definition of Apple Confidential Information described above, to reiterate employee rights under the National Labor Relations Act relating to certain workplace investigations relating to alleged unfair labor practices under the National Labor Relations Act, to clarify when recording and photography is permitted and prohibited, and **WE HAVE** informed employees of these revisions.

**WE HAVE** rescinded the aspects of the Social Media and Online Communications Policy described above and revised it to conform with the definition of Apple Confidential Information described above and **WE HAVE** informed employees of these revisions.

**WE HAVE** rescinded the prior version of the Confidentiality Obligations Upon Termination of Employment statement, which contained an overbroad definition of proprietary information, and revised it to conform with the definition of Apple Confidential Information described above and **WE HAVE** informed employees of these revisions.

**WE WILL NOT** in any like or related manner interfere with your rights under Section 7 of the Act.

<div align="center">

**APPLE INC.**

_____
(Charged Party)

</div>

**Dated:** _____    **By:** _____
                                       (Representative)          (Title)

*The National Labor Relations Board is an independent Federal agency created in 1935 to enforce the National Labor Relations Act. We conduct secret-ballot elections to determine whether employees want union representation and we investigate and remedy unfair labor practices by employers and unions. To find out more about your rights under the Act and how to file a charge or election petition, you may speak confidentially to any agent with the Board's Regional Office set forth below or you may call the Board's toll-free number 1-844-762-NLRB (1-844-762-6572). Hearing impaired callers who wish to speak to an Agency representative should contact the Federal Relay Service (link is external) by visiting its website at https://www.federalrelay.us/tty (link is external), calling one of its toll free numbers and asking its Communications Assistant to call our toll free number at 1-844-762-NLRB.*

**THIS IS AN OFFICIAL NOTICE AND MUST NOT BE DEFACED BY ANYONE.**

THIS NOTICE MUST REMAIN POSTED FOR 60 CONSECUTIVE DAYS FROM THE DATE OF POSTING AND MUST NOT BE ALTERED DEFACED OR COVERED BY ANY OTHER MATERIAL. ANY QUESTIONS CONCERNING THIS NOTICE OR COMPLIANCE WITH ITS PROVISIONS MAY BE DIRECTED TO, THE ASSISTANT TO THE REGIONAL DIRECTOR NATHAN SEIDMAN AT nathan.seidman@nlrb.gov or (213) 634-6518.

**PANEL 3 OF 3**

# UNITED STATES GOVERNMENT
## NATIONAL LABOR RELATIONS BOARD
## SETTLEMENT AGREEMENT

**IN THE MATTER OF**

**APPLE INC.**                                             **Case 32-CA-284428**

Subject to the approval of the Regional Director for the National Labor Relations Board, the Charged Party Apple Inc. and the Charging Party Ashley Marie Gjovik

**HEREBY AGREE TO SETTLE THE ABOVE MATTER AS FOLLOWS**:

**POSTING OF NOTICE TO EMPLOYEES** — The Charged Party will post a link to a copy of the Notice in English and in additional languages if the Regional Director decides that it is appropriate to do so, on the Policies and Notices page of its People intranet and keep such link continuously posted there for 60 consecutive days from the date it was originally posted. Such link will read, "This Notice is Posted Pursuant to a Settlement Agreement Approved by the Regional Director of Region 21 of the National Labor Relations Board in Case 32-CA-284428." Charged Party will also post, on a public-facing website maintained indefinitely by Charged Party containing legal notices, an explanation of revisions to the definition of Confidential Information (or comparable term) in the Confidentiality and Intellectual Property Agreement. To document its compliance with this requirement, the Charged Party will submit screen shots of the posting to include screen shots of the path to the intranet page that shows the Notice, along with a fully completed Certification of Posting form, via the Agency's e-filing portal at www.nlrb.gov. Should further investigation or verification of the intranet or website posting become necessary, the Charged Party will provide appropriate intranet or website access to the Compliance Assistant or Compliance Officer assigned to the case(s).

**COMPLIANCE WITH NOTICE** — The Charged Party will comply with all the terms and provisions of said Notice.

**NON-ADMISSION**—By entering into this Agreement the Charged Party does not admit to any violation of the National Labor Relations Act ("Act").

**ADDITIONAL TERMS** – The Charged Party agrees that it will not enforce the definition of Proprietary Information (or similar terms) set forth in any version of the Confidentiality and Intellectual Property Agreement ("IPA") effective as of the date that this Agreement is executed to the extent that such definition covers terms and conditions of employment protected under Section 7 of the Act.

A further material term of this Agreement is that the Charged Party is directed to prospectively clarify the definition of Proprietary Information (or similar terms) in the IPA and make other clarifications to the IPA relating to the Section 7 rights of employees or at its option issue a new IPA for certain employees with prospective effect, with such clarified definition of Proprietary

Charged Party Initials: __MLS__                    Charging Party Initials: __AMG__

Information (or similar terms) or such new agreement as reflected in the attached Appendix A, and has agreed to revise certain other policies, as reflected in the attached Appendix B.[1]

**SCOPE OF THE AGREEMENT** — This Agreement settles only the allegations in the above-captioned case(s), including all allegations covered by the attached Notice to Employees made part of this agreement, and does not settle any other case(s) or matters, including, but not limited to, 32-CA-282142, 32-CA-283161, and 32-CA-284441. It does not prevent persons from filing charges, the General Counsel from prosecuting complaints, or the Board and the courts from finding violations with respect to matters that happened before this Agreement was approved regardless of whether General Counsel knew of those matters or could have easily found them out. The General Counsel reserves the right to use the evidence obtained in the investigation and prosecution of the above-captioned case(s) for any relevant purpose in the litigation of this or any other case(s), and a judge, the Board and the courts may make findings of fact and/or conclusions of law with respect to said evidence.

**PARTIES TO THE AGREEMENT** — If the Charging Party fails or refuses to become a party to this Agreement and the Regional Director determines that it will promote the policies of the National Labor Relations Act, the Regional Director may approve the settlement agreement and decline to issue or reissue a Complaint in this matter. If that occurs, this Agreement shall be between the Charged Party and the undersigned Regional Director. In that case, a Charging Party may request review of the decision to approve the Agreement. If the General Counsel does not sustain the Regional Director's approval, this Agreement shall be null and void.

**AUTHORIZATION TO PROVIDE COMPLIANCE INFORMATION AND NOTICES DIRECTLY TO CHARGED PARTY** — Counsel for the Charged Party authorizes the Regional Office to forward the cover letter describing the general expectations and instructions to achieve compliance, a conformed settlement, original notices and a certification of posting directly to the Charged Party. If such authorization is granted, Counsel will be simultaneously served with a courtesy copy of these documents.

Yes _____        No _MLS_____
        Initials                        Initials

**PERFORMANCE** — Performance by the Charged Party with the terms and provisions of this Agreement shall commence immediately after the Agreement is approved by the Regional Director, or if the Charging Party does not enter into this Agreement, performance shall commence immediately upon receipt by the Charged Party of notice that no review has been requested or that the General Counsel has sustained the Regional Director. The Charged Party agrees that in case of non-compliance with any of the terms of this Settlement Agreement by the Charged Party, and after 14 days notice from the Regional Director of the National Labor Relations Board of such non-compliance without remedy by the Charged Party, the Regional Director will reissue the complaint previously issued on October 3, 2024, in the instant case. Thereafter, the General Counsel may file a motion for default judgment with the Board on the

---

[1] Charged Party, through counsel, will provide Charging Party with notice of these revisions.

Charged Party Initials: _MLS_____        Charging Party Initials: _AMG_____

allegations of the complaint. The Charged Party understands and agrees that the allegations of the aforementioned complaint will be deemed admitted and its Answer to such complaint will be considered withdrawn. The only issue that may be raised before the Board is whether the Charged Party defaulted on the terms of this Settlement Agreement. The Board may then, without necessity of trial or any other proceeding, find all allegations of the complaint to be true and make findings of fact and conclusions of law consistent with those allegations adverse to the Charged Party on all issues raised by the pleadings. The Board may then issue an order providing a full remedy for the violations found as is appropriate to remedy such violations. The parties further agree that a U.S. Court of Appeals Judgment may be entered enforcing the Board order ex parte, after service or attempted service upon Charged Party/Respondent at the last address provided to the General Counsel.

**NOTIFICATION OF COMPLIANCE** — Each party to this Agreement will notify the Regional Director in writing what steps the Charged Party has taken to comply with the Agreement.  This notification shall be given within 5 days, and again after 60 days, from the date of the approval of this Agreement.  If the Charging Party does not enter into this Agreement, initial notice shall be given within 5 days after notification from the Regional Director that the Charging Party did not request review or that the General Counsel sustained the Regional Director's approval of this agreement.  No further action shall be taken in the above captioned case(s) provided that the Charged Party complies with the terms and conditions of this Settlement Agreement and Notice.

| **Charged Party Apple Inc.** | **Charging Party Ashley Marie Gjovik** |
|---|---|
| By:        Name and Title      Date | By:        Name and Title              Date |
| /s/ Mark L. Stolzenburg        March 25, 2025 | *Ashley M. Gjovik*             April 3 2025 |
| Print Name and Title below | Print Name and Title below |
| Attorney for Apple Inc. | **Ashley M. Gjovik, Charging Party** |
| Recommended By:                      Date | Approved By:                          Date |
| /s/ Elvira Pereda          4/4/2025 | Digitally signed by NATHAN SEIDMAN<br>Date: 2025.04.04 11:53:05 -07'00' |
| ELVIRA PEREDA | NATHAN M. SEIDMAN |
| Counsel for the Acting General Counsel | Acting Regional Director, Region 21 |

Charged Party Initials: _MLS_            Charging Party Initials: _AMG_

**(To be printed and posted on official Board notice form)**

**THE NATIONAL LABOR RELATIONS ACT GIVES YOU THE RIGHT TO:**

- Form, join, or assist a union;
- Choose a representative to bargain with us on your behalf;
- Act together with other employees for your benefit and protection;
- Choose not to engage in any of these protected activities.

**WE WILL NOT** interfere with, restrain, or coerce you in the exercise of the above rights.

**YOU HAVE THE RIGHT** to discuss wages, hours and working conditions and **WE WILL NOT** do anything to interfere with your exercise of that right.

**WE WILL NOT** promulgate, maintain, or enforce any rule that defines confidential information as "anything not explicitly, publicly, or purposefully disclosed by Apple."

**WE WILL NOT** promulgate, maintain, or enforce a Confidentiality and Intellectual Property Agreement, Business Conduct Policy, Misconduct and Discipline Policy, Social Media and Online Communications Policy, Confidentiality Obligations Upon Termination of Employment statement, or a Business Conduct and Global Compliance FAQ regarding confidential information that broadly defines "confidential" or "proprietary" information, or relies upon any other overly broad definitions of those terms, without contemporaneously notifying employees of their rights to discuss wages, hours, or working conditions and their rights to engage in union or other protected, concerted activity under the NLRA.

**WE WILL NOT** promulgate, maintain, or enforce a Business Conduct Policy that broadly restricts public speaking, responses to press inquiries and publishing articles without contemporaneously notifying employees of their rights to speak publicly, respond to press inquiries and publish articles regarding their wages, hours, or working conditions, or their union or other protected, concerted activity under the NLRA.

**WE WILL NOT** promulgate, maintain, or enforce a Business Conduct Policy that broadly restricts "conflicts of interest" or "outside activities," without contemporaneously notifying employees that such policies do not restrict their right to form, join or assist a union, or engage in other protected, concerted activity and that these activities are not considered to be conflicts of interest or outside activities under such policy.

**WE WILL NOT** promulgate, maintain, or enforce a Business Conduct Policy that broadly prohibits sharing of employee personal identifying information if such policy could be interpreted as prohibiting the sharing of personal contact information, employment history, compensation or other terms and conditions of employment.

**WE WILL NOT** promulgate, maintain, or enforce a Workplace Searches and Privacy Policy that advises you that we have the right to access Apple's network or systems, or any non-Apple

Charged Party Initials: MLS          Charging Party Initials: AMG

device used to conduct Apple business, without contemporaneously advising you that we will not exercise our right of access to monitor your union or other protected, concerted activity.

**WE WILL NOT** promulgate, maintain, or enforce a Misconduct and Discipline Policy that fails to reiterate employee rights during investigations that Apple may conduct regarding alleged unfair labor practices under the National Labor Relations Act, and/or contains overly broad restrictions on photography and recording.

**WE WILL NOT** advise you that you are subject to discipline for violating overly broad rules regarding confidential or proprietary information or for failing to report alleged violations of overly broad rules relating to confidential or proprietary information.

**WE WILL NOT** advise you that you are subject to discipline for violating overly broad rules regarding photographing, video or audio recording that prohibit the recording of protected, concerted activity.

**WE HAVE** clarified the aspects of the Confidentiality and Intellectual Property Agreement described above and revised it to make clear that the definition of "Proprietary Information," which was changed to "Apple Confidential Information," does not include wages, hours, and working conditions, to reiterate employee rights about discussing terms and conditions of employment and reporting to governmental agencies, and to make clear that prohibitions against "conflicting outside interests" do not cover forming or joining (or refraining from joining) labor organizations of an employee's choice and **WE HAVE** informed employees of these clarifications.

**WE HAVE** rescinded the aspects of Business Conduct and Global Compliance FAQ regarding Confidential Information described above and revised it to conform with the definition of Apple Confidential Information described above and **WE HAVE** informed employees of these revisions.

**WE HAVE** rescinded the aspects of the Business Conduct Policy described above and revised it to make clear that Apple Confidential Information does not include wages, hours, and working conditions, that employees may communicate about labor disputes, to clarify that employees may not respond to public inquiries or participate in speaking engagements where employees could be construed as speaking on behalf of Apple, to clarify that employees may publish articles but must receive approval about articles about Apple products or services or could be seen as a conflict of interest, make clear that a conflict of interest does not include forming, joining, or assisting a union, or engaging in protected, concerted activity, to make clear that employees do not need to notify a manager of outside employment that complies with our policy, and to inform employees that searches will not be used to monitor employees' protected, concerted activity, and **WE HAVE** informed employees of these revisions.

**WE HAVE** rescinded the aspects of the Workplace Searches and Privacy Policy described above and revised it to conform with the definition of Apple Confidential Information described above and to inform employees that searches will not be used to monitor employees' protected, concerted activity and **WE HAVE** informed employees of these revisions.

Charged Party Initials: _MLS_____    Charging Party Initials: _AMG_____

**WE HAVE** rescinded the aspects of the Misconduct and Discipline Policy described above and revised it to conform with the definition of Apple Confidential Information described above, to reiterate employee rights under the National Labor Relations Act relating to certain workplace investigations relating to alleged unfair labor practices under the National Labor Relations Act, to clarify when recording and photography is permitted and prohibited, and **WE HAVE** informed employees of these revisions.

**WE HAVE** rescinded the aspects of the Social Media and Online Communications Policy described above and revised it to conform with the definition of Apple Confidential Information described above and **WE HAVE** informed employees of these revisions.

**WE HAVE** rescinded the prior version of the Confidentiality Obligations Upon Termination of Employment statement, which contained an overbroad definition of proprietary information, and revised it to conform with the definition of Apple Confidential Information described above and **WE HAVE** informed employees of these revisions.

**WE WILL NOT** in any like or related manner interfere with your rights under Section 7 of the Act.

<div align="center">

**APPLE INC.**
_____
(Charged Party)

</div>

**Dated:** _____  **By:** _____
(Representative)          (Title)

---

_The National Labor Relations Board is an independent Federal agency created in 1935 to enforce the National Labor Relations Act. We conduct secret-ballot elections to determine whether employees want union representation and we investigate and remedy unfair labor practices by employers and unions. To find out more about your rights under the Act and how to file a charge or election petition, you may speak confidentially to any agent with the Board's Regional Office set forth below or you may call the Board's toll-free number 1-844-762-NLRB (1-844-762-6572). Callers who are deaf or hard of hearing who wish to speak to an NLRB representative should send an email to relay.service@nlrb.gov. An NLRB representative will email the requestor with instructions on how to schedule a relay service call._

US Court House, Spring Street          **Telephone:** (213)894-5200
312 N Spring Street, 10th Floor          **Hours of Operation:** 8:30 a.m. to 5 p.m.
Los Angeles, CA 90012

---

### THIS IS AN OFFICIAL NOTICE AND MUST NOT BE DEFACED BY ANYONE
This notice must remain posted for 60 consecutive days from the date of posting and must not be altered, defaced or covered by any other material. Any questions concerning this notice or compliance with its provisions may be directed to the above Regional Office's Compliance Officer.

Charged Party Initials: MLS _____          Charging Party Initials: AMG _____



UNITED STATES GOVERNMENT
## NATIONAL LABOR RELATIONS BOARD
REGION 21
US Court House, Spring Street
312 N Spring Street, 10th Floor
Los Angeles, CA 90012

Agency Website: www.nlrb.gov
Telephone: (213)894-5200
Fax: (213)894-2778

Agent's Direct Dial: (213) 634-6409
Email address: sylvia.meza@nlrb.gov

April 14, 2025

**Served via email only**
Mark L. Stolzenburg, Attorney at Law
Morgan Lewis & Bockius LLP
Email: mark.stolzenburg@morganlewis.com

Brian Mahoney, Attorney at Law
Morgan, Lewis & Bockius LLP
Email: brian.mahoney@morganlewis.com

Harry I. Johnson III, Attorney at Law
Morgan, Lewis & Bockius LLP
Email: harry.johnson@morganlewis.com

Kelcey J. Phillips, Esquire
Morgan, Lewis & Bockius LLP
Email: kelcey.phillips@morganlewis.com

Crystal S. Carey, Attorney at Law
Morgan, Lewis & Bockius, LLP
Email: crystal.carey@morganlewis.com

Re:     **Apple Inc.**
        **Case: 32-CA-284428**

Dear Gentlepersons:

Enclosed is a conformed copy of the Settlement Agreement in the above matter that was approved on April 4, 2025. The Settlement Agreement has been assigned to me to secure compliance with its terms. This letter discusses what the Charged Party needs to do to comply with the Agreement and sets forth deadlines for the return of documentary evidence and certification demonstrating the Charged Party's efforts to comply. In corresponding with the Agency during the compliance phase, please be advised that the NLRB requires the mandatory electronic filing of all case documents via the Agency's e-filing portal at www.nlrb.gov.

Apple Inc.                                  - 2 -                                  April 14, 2025

Case(s) 32-CA-284428

**Intranet Posting of Notice:** The Agreement provides that the Charged Party will post a link to a copy of the Notice in English on the Policies and Notices page of its People intranet and keep such link continuously posted there for 60 consecutive days from the date it was originally posted. Such link will read, "This Notice is Posted Pursuant to a Settlement Agreement Approved by the Regional Director of Region 21 of the National Labor Relations Board in Case 32-CA-284428." To document its compliance with this requirement, the Charged Party will submit a screenshot of the intranet or website posting to include a screenshot of the path to the intranet page that shows the Notice, along with a fully completed Certification of Posting form, via the Agency's e-filing portal at www.nlrb.gov. Should further investigation or verification of the intranet or website posting become necessary, the Charged Party will provide appropriate intranet or website access to the Compliance Assistant or Compliance Officer assigned to the case(s).

The Settlement Agreement further provides that the Charged Party will also post on a public-facing website maintained indefinitely by Charged Party containing legal notices, an explanation of revisions to the definition of Confidential Information (or comparable term) in the Confidentiality and Intellectual Property Agreement. To document its compliance with this requirement, the Charged Party will submit a screenshot of the posting to include a screenshot of the path to the intranet page that shows the explanation of revisions to the definition of Confidential Information (or comparable term) in the Confidentiality and Intellectual Property Agreement along with a fully completed Certification of Posting form, via the Agency's e-filing portal at www.nlrb.gov. Should further investigation or verification of the intranet or website posting become necessary, the Charged Party will provide appropriate intranet or website access to the Compliance Assistant or Compliance Officer assigned to the case(s).

**Provided Charging Party with Notice of Revisions:** As set forth in the Settlement Agreement, Charged Party, through counsel, will provide Charging Party with notice of said revisions.

By **April 28, 2025**, the Charged Party must:

- Post a link to a copy of the Notice to Employees on the Charged Party 's intranet as set forth in the Settlement Agreement.

- E-file a copy of a screenshot of the intranet or website posting to include a screenshot of the path to the intranet page that shows the Notice, along with a fully completed Certification of Posting form, via the Agency's e-filing portal at www.nlrb.gov.

- E-file a copy of a screenshot that shows the explanation of revisions to the definition of Confidential Information (or comparable term) in the Confidentiality and Intellectual Property Agreement.

**Apple Inc.**         - 3 -         April 14, 2025

**Case(s) 32-CA-284428**

- E-file a copy of the signed and dated Notice to Employees via the Agency's e-filing portal at www.nlrb.gov.

- Charged Party, through counsel, will provide Charging Party with notice of said revisions.

    **Certification of Compliance**:  Certification of Posting form is enclosed. The Charged Party  must complete and return the following form by the deadline listed below:

- By **April 28, 2025**, return via e-file the completed Certification of Posting form, along with a color copy of the signed Notice and, if applicable, documentary evidence to support the Charged Party's compliance with distributing the signed Notice to employees through other methods and any other requested documentary evidence.

    **Electronic Filing of Documents**:  The NLRB requires mandatory electronic filing of all case documents. See GC 20-01 for more information. Written instructions for using the Agency's e-filing system and the Agency's Electronic Filing Terms and Conditions have been posted on the Agency's website. The Agency's website also contains a video demonstration which provides step-by-step instructions for e-filing.

**Case Closing**

    When all the affirmative terms of the Settlement Agreement have been fully complied with and there are no reported violations of its negative provisions, you will be notified that this case has been closed on compliance. Timely submission of the Certification of Posting, along with the documents requested within, will assist the Regional Office in recommending the closing of this case in a timely manner.

    Your cooperation in this matter will be appreciated.

    Thank you,

    /s/ *Sylvia Meza*
    Sylvia Meza
    Compliance Officer

Enclosures:     Copy of Conformed Settlement Agreement
               Notice to Employees
               Certification of Posting Form

## CERTIFICATION OF POSTING

RE:    **Apple Inc.**
**Case(s) 32-CA-284428**

**Due Date: April 28, 2025**

**(If additional space is needed to provide a full response, attach a sheet(s) with the necessary information.)  As required by the Settlement Agreement in this matter, this document is a sworn certification of the steps that the Charged Party  has taken to comply**

### Intranet Posting

The Charged Party posted a link to a copy of the Notice to Employees on the Policies and Notices page of its People intranet on (date)_____.  A screenshot of the intranet/website posting to include screenshots of the path to the intranet page that show the Notice was e-filed together with this Certification.

_____

_____

_____

**A legible copy of the signed Notice displaying full text of the Notice, including the date, signature, and title of the responsible official of the Charged Party  was e-filed together with this Certification.**

### Electronic Posting of Revisions:

On  (date)_____  an explanation of revisions to the definition of Confidential Information (or comparable term) in the Confidentiality and Intellectual Property Agreement was posted on a public-facing website maintained indefinitely by Charged Party containing legal notices.

A screenshot of the explanation of revisions must be e-filed together with this Certificate of Posting.

**Continued next page**

Apple Inc.                                    - 2 -
Case(s) 32-CA-284428
Certification of Compliance
Page 2

## **Provided Charging Party with Notice of Revisions**

On (date) _____, the Charged Party, through counsel, provided

the Charging Party with notice of the revisions as set forth in the Settlement Agreement via the

following method (ex. e-mail, U.S. Mail) _____ .

I have completed this Certification of Posting and state under penalty of perjury that it is true and
correct.

### **CHARGED PARTY**

By:     _____

Title:  _____

Date:   _____

This form should be returned to the Regional Office together with **ONE** original Notice, dated and
signed in the same manner as those posted. The Certification of Posting form and color-scanned
signed Notice should be returned via e-file at www.nlrb.gov.

(17 of 414), Page 17 of 414 Case: 25-2028, 05/20/2025, DktEntry: 27.6, Page 17 of 414
Case 3:23-cv-04597-EMC    Document 146    Filed 04/14/25    Page 27 of 523
4/14/25, 7:12 PM    (email ashleymgjovik@protonmail.com) Proton Mail

## Apple Inc. 32-CA-284428

| | |
|---|---|
| From | Meza, Sylvia <Sylvia.Meza@nlrb.gov> |
| To | Stolzenburg, Mark L.<mark.stolzenburg@morganlewis.com>, Mahoney, Brian<brian.mahoney@morganlewis.com>, harry.johnson<harry.johnson@morganlewis.com>, kelcey.phillips@morganlewis.com, Carey, Crystal S.<crystal.carey@morganlewis.com> |
| CC | Ashley Gjovik<ashleymgjovik@protonmail.com> |
| Date | Monday, April 14th, 2025 at 4:43 PM |

> **CAUTION:** This email and any attachments may contain Controlled Unclassified Information (CUI). National Archives and Records Administration (NARA) regulations at 32 CFR Part 2002 apply to all executive branch agencies that designate or handle information that meets the standards for CUI.

Dear Gentlepersons:

Attached you will find a copy of the:

1.  Informal Settlement Agreement

2.  Detailed letter soliciting compliance

3.  Notice to Employees.  **The Employer is to make color copies of the attached Notice on 8½ by 14 legal-sized paper and ensure each copy of the Notice retains the heading at the top of the Notice and the Region's contact information at the bottom of the Notice.  Please note that this Notice consists of three separate panels marked Panel 1 of 3, Panel 2 of 3, and Panel 3 of 3.**

4.  **Note:  Physical copies of the above documents will NOT follow via mail.**

**E-filing Requirements.** The NLRB is requiring the mandatory electronic filing of all case documents. See GC 20-01**.** Written instructions for using the Agency's E-filing system and the Agency's Electronic Filing Terms and Conditions have been posted on the Agency's website. The Agency's website also contains a video demonstration which provides step-by-step instructions for e-filing.

Thank you,

Sylvia Meza, Compliance Officer

National Labor Relations Board, Region 21

US Court House, Spring Street

312 North Spring Street, Suite 1050, 10th Floor

Los Angeles, CA 90012

Please be aware that this email may be subject to public disclosure under the Freedom of Information Act or other authorities, though exceptions may apply for certain case-related information, personal privacy, and other matters.

**1.83 MB**   5 files attached

LTR.32-CA-284428 - APPLE INC - LETTER SOLICITING COMPLIANCE  BILATERAL ISA - 4-4-2025.pdf 242.15 KB

NEE.32-CA-284428  - APPLE INC - Notice to Employees - Panel 1 of 3.pdf 265.69 KB

NEE.32-CA-284428 - APPLE INC - Notice to Employees - Panel 2 of 3.pdf 288.01 KB

NEE.32-CA-284428 - APPLE INC - Notice to Employees - Panel 3 of 3.pdf 260.80 KB

SET.32-CA-284428.Approved Bilateral Settlement Agreement.pdf 814.56 KB

# Gjovik v. Apple

# Exhibit

5/20/25, 2:11 PM                                      Inbox | ashleymgjovik@protonmail.com | Proton Mail

# CalVCB Online Account Registration Confirmation

From    CalVCB Online <CalVCBOnlineAccess@victims.ca.gov>

To      Ashley Gjovik<ashleymgjovik@protonmail.com>

Date    Sunday, November 3rd, 2024 at 7:21 PM

**Hello, Ashley Gjovik,**

Welcome to CalVCB Online.

To complete your account set-up, please click on the button below:

   Activate Your Account

*This button will be valid for 24 hours.*

**NOTE:** Protecting your information is important to us. When you log in, you will be asked a security question to verify your identity.

Once your account is activated you may complete a compensation application as soon as you are ready.

If an application is not created within 30 days of account activation, the account will be deactivated. If this occurs and you wish to continue with your account, you may contact Customer Service to reactivate the account and complete an application.

If you have any questions, please contact Customer Service at (800) 777-9229 or CalVCBOnlineAccess@victims.ca.gov. Representatives are available Monday through Friday, 8:00 am to 5:00 pm, PT.

Thank you,

California Victim Compensation Board

www.victims.ca.gov

*Our mission is to provide financial assistance to victims of crime.*



X Quick Escape

Language ▼

Hello, Ashley Gjovik

Applications    Messages    Upload    Forms    Profile                    FAQ    Feedback    Log off

New Application

On the Applications Tab you may begin new applications, edit applications in draft, and view information for your submitted applications. Adults may file applications for themselves and their dependents. Please note an adult can only file an application for another adult when they are legally responsible for that adult, such as a guardian or conservator.

## Applications in Process

### Ashley Gjovik
**Date of Birth:** 08/26/1986
**Date of Crime:**
**Draft - Not yet submitted**
**OLA ID:** TEMPID-06370467

Edit    Delete

## Submitted Applications

For assistance please contact CalVCB Customer Service at 1-800-777-9229 or CalVCBOnlineAccess@victims.ca.gov

Privacy Policy
Notice of Collection
Online Privacy
© 2025 - California Victim Compensation Board



X Quick Escape

Language ▾

Hello, Ashley Gjovik

Home | Personal Info | Crime Info | Expenses | Insurance | Representative | Upload | Sign and Submit                FAQ   Log off

57%

## Application for **Ashley Marie Gjovik**: TEMPID-06370467

### Crime Victim Information

Help Me

**What is Ashley's relationship to the victim of the crime? ***

They were the victim of the crime

Please enter the following information for the victim of the crime:

**First Name ***          **Middle Name**          **Last Name ***

Ashley                     Marie                    Gjovik

**Mailing Address**              ☐ **Same as My Address**

**Street Number and Name or PO Box ***

███████████

**City ***              **State ***              **Zip Code ***          **Country ***

Boston                 Massachusetts           ██████             USA

**Date of Birth ***

08/26/1986

**While not required for eligibility, do you have a social security number? ***     **Social Security Number**

Yes                                                            XXX-XX-XXXX

**Gender Identity**

Female

**Race/Ethnicity**

White Non-Latino/Caucasian

#### Additional Information

**Was Ashley disabled prior to the crime?**              Yes

**Was Ashley disabled due to the crime?**                Yes

**Are you applying on behalf of a minor who witnessed a violent crime?**     No

Minor witnesses (under 18 years of age) are eligible for mental health treatment only. Please provide all crime information you are able to.

### Mass Casualty

## Crime Information

Help Me

### Date of Crime

**From** *

mm/dd/yyyy

**To**

mm/dd/yyyy

**Type of Crime** *

**Description of the crime** *

3000 characters left.

**Did the crime occur while the victim was on the job or at the workplace?** *

**Describe physical and/or emotional injuries** *

3000 characters left.

### Location of Crime

**Address, Intersection, or other details** *

**City**

**State**

California

**Zip Code**

**County** *

**Country** *

USA

## Reporting Information

Help Me

Please include all information about the crime avaiable to you. Providing law enforcement agency names, report numbers, officer names and contact information will help CalVCB request and obtain crime documentation to better assist you.

**Was the crime reported to Law Enforcement?** *

Yes

**Was the crime disclosed to another person or organization?** *

Yes

## Suspect Information

Help Me

**Do you know the name of the suspect(s)?** *

Yes

Save My Progress     Continue



X Quick Escape

Language ▼

CalVCB Online is a convenient way to submit applications for compensation, check the status of submitted applications and view documents.

## CalVCB Online allows you to:

- Complete an application and apply for yourself and your dependents
- Communicate with Customer Service
- Submit any bills or documents related to your application
- Update your contact information

## What you will need to create an online account:

- First and Last Name
- Email Address
- Mailing Address

## What can we help you with?

- Log in to your online account
- Answer any questions regarding your application
- The status of your application and bills

## Information that will be requested for your CalVCB application:

- Basic Personal Information
- Crime Information
- Types of expenses you have
- Insurance Information
- Employer Contact Information

  *(if requesting lost income for yourself or family member)*
- Civil Suit Information (if planning to file or filed)
- Electronic Signature

Back    Continue

For assistance please contact CalVCB Customer Service at 1-800-777-9229 or CalVCBOnlineAccess@victims.ca.gov

Privacy Policy
Notice of Collection
Online Privacy
© 2025 - California Victim Compensation Board

# Gjovik v. Apple

# Exhibit

# CALIFORNIA UNEMPLOYMENT INSURANCE APPEALS BOARD



**SAN JOSE OFFICE OF APPEALS**  (408) 232-3036
**2665 N FIRST ST STE 100**
**SAN JOSE CA 95134**

---

ASHLEY M GJOVIK
Claimant-Appellant

Case No. **7253819**

Issue(s): 1256

Date Appeal Filed: 03/07/2022

EDD:  0190   BYB: 09/05/2021

---

**Date and Place of Hearing(s):**
(1)  07/14/2022

**Parties Appearing:**
Claimant

---

# DECISION

The decision in the above-captioned case appears on the following page(s).

The decision is final unless appealed within 30 calendar days from the date of mailing shown below. See the attached "Notice to Parties" for further information on how to file an appeal. If you are entitled to benefits and have a question regarding the payment of benefits, call EDD at 1-800-300-5616.

**Douglas Bird**, Administrative Law Judge

ASHLEY M GJOVIK
1050 BENTON ST APT 2310
SANTA CLARA, CA 95050-4875

Date Mailed:  JUL 2 7 2022

**Case No.: 7253819**              **San Jose Office of Appeals**
CLT/PET: Ashley M. Gjovik          ALJ: Douglas Bird
Parties Appearing:  Claimant
Parties Appearing by Written Statement:  None

## ISSUE STATEMENT

The claimant appealed from a determination disqualifying the claimant for
unemployment benefits under Unemployment Insurance Code section 1256. The
issue in this case is whether the claimant was discharged for misconduct
connected with the most recent work.

## FINDINGS OF FACT

Prior to the filing of the claim for benefits the claimant last work in September of
2021 as a senior engineering program manager at a salary of $169,000 per year.
She worked approximately six and a half years for the employer.

The claimant received notice from the vice president that she was being
discharged.  The notice was vague and incomplete and stated that the claimant
had disclosed confidential information and had not fully participated in some
investigation.  Although the claimant requested specific information from the
employer, no specific information was provided.

Prior to the separation of the employment the claimant received great
performance reviews and prior to the separation the claimant received no oral or
written warning notifying her that job was in jeopardy.  At all times the claimant
performed her job duties to the best of her ability.

## REASONS FOR DECISION

An individual is disqualified for benefits if he or she has been discharged for
misconduct connected with his or her most recent work. (Unemployment
Insurance Code, section 1256.)

The employer has the burden of proving misconduct. (*Prescod v. California
Unemployment Insurance Appeals Board* (1976) 57 Cal.App.3d 29.)

Mere ineptitude or failure to work "up to par" is not misconduct. (Precedent
Decision P-B-224.)

In Precedent Decisions P-B-214, P-B-222, and P-B-224 the appeals board held that poor work performance, inefficiency, ineptitude, or a failure to perform "up to par" does not normally constitute misconduct.

In Precedent Decision P-B-222 the claimant performed poorly despite being counseled, causing substantial financial loss to the employer. The appeals board found that the evidence did not establish a wilful disregard of the employer's interests and held his discharge was not for misconduct.

In this matter the evidence shows that the claimant was discharged for reasons other than misconduct connected with the most recent work. Since the claimant performed her job duties to the best of her ability and had not received warnings putting her on notice that her job was in jeopardy, the claimant was discharged for reasons other than misconduct and she is qualified for benefits under section 1256.

## DECISION

The department determination is reversed. The claimant is not disqualified from benefits under section 1256 of the code. Benefits are payable provided the claimant is otherwise eligible.


BARSU:mgDAB1/2

7253819-000000                                    3

# Gjovik v. Apple

# Exhibit

4/11/22, 1:24 PM (325) All mail | ashleymgjovik@protonmail.com | ProtonMail

# Complaint against Apple Inc

From: Ashley Gjovik <ashleymgjovik@protonmail.com>

To opa@ftc.gov

Date: Friday, April 1st, 2022 at 11:39 PM

April 2nd, 2022

To Whom it May Concern,

This is a complaint against Apple Inc for unlawful data collection & invasion of employee privacy that spans years and multiple countries/continents, violating numerous laws and international agreements. While this complaint focuses on the rights of Apple's employees, the implications of Apple's violations for broader society should be self-evident.

I worked for Apple as a Senior Engineering Program Manager from February 2015 until my termination on September 9 2021, along with a Legal & Policy Internship working in Apple Products Legal in 2019. In August 2021, I expressed public concerns about Apple's overly restrictive/invasive employee polices, and Apple pressuring its employees to participate in invasive data collection procedures, including scans of ears/ear canals (which I believed captured employee data that could be used for biometric identification and mass surveillance). I also raised concerns about an iOS application (Gobbler/Glimmer) on employee's iPhones that automatically took photos/videos whenever it "thought it saw a face." I raised concerns about Apple's unlawfully invasive "Search and Privacy Policy" for employees, Apple's limitless access to employee's personal iCloud/Apple-server-based data, and Apple's culture of intimidation and secrecy (including a secret/private police force).

Apple terminated me on September 9 2021 for reasons unknown to me at that time but assumed by myself and the press to be retaliation for my protected activities (I had filed labor and retaliation charges with the U.S. government only weeks earlier). Apple reached out to me via external lawyers a week after I was fired, to complain about several Twitter posts I made. Suggesting these posts were reason for my termination, was so farfetched & pretextual a detailed article was written about it, titled "Apple Wanted Her Fired. It Settled on an Absurd Excuse."

This year, Apple offered their explanation for my termination to the U.S Department of Labor (in response to my allegations of federal whistleblower retaliation in violation of SOX, CERCLA, and OSHA statutes). Apple doubled down on the "absurd excuse" & cited my opposition to their harvesting of employee biometrics and their secret, invasive photography of employees - as a legitimate justification for my termination. I am now even more concerned knowing Apple felt comfortable telling the U.S. government that they believe their unlawful invasion of employee privacy is "legitimate" and any employees who protest privacy invasions deserve to be terminated, as I was. Thus, I write to you today.

Please see attached legal memo for details.*

Thank you.

Respectfully,
-Ashley M. Gjovik


*Note: this complaint will also be submitted to the other government agencies, international bodies, and NGOs noted on page two.


—
**Ashley M. Gjøvik, J.D. Candidate, B.S., PMP**
ashleygjovik.com | +1`415-964-6272

Sent with ProtonMail secure email.

**2.46 MB**    1 file attached

Gjovik v Apple - Privacy Complaint - Final.pdf  2.46 MB

# Gjovik v. Apple

# Exhibit

12/30/22, 5:12 PM

**Complaint has been submitted**

From   no-reply@consumersentinel.gov <no-reply@consumersentinel.gov>

To     Ashley Gjovik<ashleymgjovik@protonmail.com>

Date   Friday, December 30th, 2022 at 2:32 PMFriday, December 30th, 2022 at 2:32 PM

Your report has been submitted to the Federal Trade Commission.

**Report Number: 154835129**

Thank you for helping our work to protect consumers.

Learn about common scams and how to recover from them at ftc.gov/scams.
To file a report online, go to **ReportFraud.ftc.gov**.

**FTC Next Steps**

- We use reports to investigate and bring cases against fraud, scams, and bad business practices, but we can't resolve reports on behalf of individuals.
- We will share your report with our law enforcement partners.
- We use reports to spot trends, educate the public, and provide data about what is happening in your community. You can check out what is going on in your state or metro area by visiting **ftc.gov/exploredata**.

When we bring cases, we try to get money back for people. Check out **ftc.gov/refunds** to see recent FTC cases that resulted in refunds.

**Additional Information**

How to Avoid a Scam

# GJOVIK V. APPLE

# EXHIBIT

*ROB BONTA*
*Attorney General*

*State of California*
*DEPARTMENT OF JUSTICE*



**PUBLIC INQUIRY UNIT**
P.O. BOX 944255
SACRAMENTO, CA 94244-2550
(916) 210-6276
TOLL FREE: (800) 952-5225
TTY: CA Relay Service
(800) 735-2922

June 29, 2022

PIU: 1006590

Ashley M. Gjovik
1050 Benton Street, #2310
Santa Clara, CA 95050-4875

Dear Ashley Gjovik:

Thank you for your correspondence to the Office of the Attorney General regarding your allegation of unlawful labor practices by an employer. We appreciate your bringing this matter to our attention. The Attorney General's Office works to protect workers' rights on behalf of all the people of California. Complaints may help develop information about patterns of business activity that might indicate the need for formal investigation or other actions by our office. If we require further information from you about the practices you have identified, we may contact you. Additionally, even though we cannot represent individuals, the below resources may be able to help you.

The state agency with the authority to adjudicate wage claims and enforce labor laws is the Labor Commissioner's Office, also known as the Division of Labor Standards Enforcement (DLSE). Examples of possible wage claims include the nonpayment of wages, overtime, or vacation, and underpayment when workers are misclassified as independent contractors. Examples of possible labor law violations include failure to provide workers compensation insurance, child labor, certain cash pay, unlicensed contractors, minimum wage and overtime claims, failure to provide rest and/or meal periods, and discrimination or retaliation for exercising employee rights or engaging in protected activities. To file a wage claim or report a labor law violation, please contact the DLSE district office closest to the location where you performed work. A list of DLSE district offices and their contact information is attached for your reference.

The Division of Occupational Safety and Health, also known as Cal/OSHA, protects and improves workers' health and safety. To report a dangerous condition or a workplace accident, or to file a complaint, please contact the Cal/OSHA office closest to the workplace where the accident occurred or the complaint conditions exist. A list of Cal/OSHA district offices and their contact information is attached for your reference.

If your employer retaliates against you because of your efforts to report alleged wrongdoing; or you receive unequal pay based on your sex, race, or ethnicity; or if you experience unfair immigration-related practices, you may wish to file a complaint. You may file a complaint in person at any DLSE office, or by mail to the DLSE's Retaliation Complaint Investigation Unit. This agency may be contacted as follows:

Labor Commissioner
Retaliation Complaint Investigation Unit
2031 Howe Avenue, Suite 100
Sacramento, CA 95825

Page 2

Labor Commissioner
Retaliation Complaint Investigation Unit
320 W. Fourth St., Ste. 450
Los Angeles, CA 90013

In addition, individuals who experience violations of law can often file a lawsuit in court. You may wish
to consult with a private attorney about what legal options you may have and what time limits apply
depending on your possible claims. If you need legal assistance to resolve your dispute, we suggest that you
consult a private attorney. You may obtain a referral to a lawyer referral service that may provide a free
consultation by contacting the State Bar at 866-442-2529 (toll-free in California) or 415-538-2250 (from
outside California), or via their website at: http://www.calbar.ca.gov. You may also use the website
www.LawHelpCa.org to find free or low cost legal help in your area. Assistance may be available in several
languages. An attorney would directly represent your interests and is the one whose advice would be most
helpful to you.

The Department of Fair Employment and Housing investigates workplace discrimination complaints
based on race, color, ancestry, religion, age (40 and over), sex (including pregnancy), sexual orientation,
marital status, or national origin (including language restrictions), and other categories. If you wish to pursue
the matter further, we suggest you contact:

California Department of Fair Employment and Housing
2218 Kausen Drive, Suite 100
Elk Grove, CA 95758
Phone: (800) 884-1684
Email: contact.center@dfeh.ca.gov
Website: http://www.dfeh.ca.gov/complaintprocess/

If you have information that this employer is committing tax evasion, please contact the appropriate state
and/or federal tax enforcement agencies. These agencies may be contacted as follows:

State income tax:
Franchise Tax Board
Investigations Bureau
P.O. Box 942857
Sacramento, CA 94257-0540

State payroll tax:
Employment Development Department
Underground Economy Operations
P.O. Box 276262
Sacramento, CA 95827-6262
Telephone: 1-800-528-1783

State sales tax:
Department of Tax and Fee Administration
Investigations Division, MIC: 42
P.O. Box 942879
Sacramento, CA 94279-0042
Telephone: 1-888-334-3300

Page 3

Federal income tax:
Internal Revenue Service
Criminal Investigations
Fresno, CA 93888
Tax Fraud Hotline: 1-800-829-0433

While we are not able to offer direct personal assistance with your problem, we sincerely appreciate your efforts in providing us with the information contained in your complaint. If we have questions about the problem described in your complaint or it results in a formal action, we will have your name and address in our files and we will be able to contact you directly.

Again, thank you for contacting the Office of the Attorney General.

Sincerely,

Casey Hallinan
Public Inquiry Unit

For    ROB BONTA
       Attorney General

Enclosure

STATE OF CALIFORNIA
PIU 2
(Rev. 04/2021)

**Rob Bonta**
**Attorney General**
PUBLIC INQUIRY UNIT
(916) 210-6276 / (800) 952-5225 Toll Free - CA only
TTY/TDD (800) 735-2929 (California Relay Service)
For TTY/TDD outside California contact your state's relay service
number at http://www.fcc.gov/cgb/dro/trsphonebk.html
AG Web Site: http://www.oag.ca.gov/

DEPARTMENT OF JUSTICE
PAGE 1 of 3

# CONSUMER COMPLAINT AGAINST A BUSINESS/CORPORATION

**Please read the Information Collection, Use and Access notice on page 3.**

**Mail Form to:**

**Public Inquiry Unit**
**Office of the Attorney General**
**P.O. Box 944255**
**Sacramento, CA 94244-2550**

[Print Form] [Save Form] [Reset Form]

## SECTION 1 - Your Information

| First Name | MI | Last Name |
|---|---|---|
| Ashley | M | Gjovik |

| Mailing Address | City | State | Zip Code |
|---|---|---|---|
| 1050 Benton Street 2310 | Santa Clara | California | 95050 |

| County of Residence | Country, if not U.S. | Day Phone Number | Cell Phone Number | E-Mail Address |
|---|---|---|---|---|
| Santa Clara | | 415-964-6272 | | ashleymgjovik@protonmail.com |

Do you have a disability? (optional) [X] Yes [ ] No

Age Range (optional):
[ ] 12 & under [ ] 13-17 [ ] 18-19 [ ] 20-29 [ ] 30-39 [ ] 40-49 [ ] 50-59 [ ] 60-69 [ ] 70-79 [ ] 80 & over

Are you a member of the U.S. Armed Forces or a dependent? (optional)
[ ] Yes [X] No

If yes, please specify your military status:
[ ] Active Duty Service Member
[ ] Dependent Spouse - Service Member
[ ] Dependent Child/Other - Service Member [ ] DoD Civilian [ ] Dependent Spouse - DoD Civilian
[ ] Dependent Child/Other - DoD Civilian [ ] Military Retiree/Veteran
[ ] Reserve Not on Active Duty/National Guard

## SECTION 2 - Information About Company Against Which You Are Complaining

Full Name of Company
Apple Inc.

Mailing Address
1 Apple Park Way

| City | State | Zip Code | Country, if not U.S. |
|---|---|---|---|
| Cupertino | CA | 95014 | |

| Company's Internet Address (URL) | E-Mail Address |
|---|---|
| apple.com | |

| Telephone Number | Fax Number |
|---|---|
| | |

## SECTION 3 - Complaint Information

Product, item or service involved
Filed on behalf of California-based Apple employees, filed on behalf of customers using Apple features developed based on the privacy invasions of California-based Apple employeees

| Date of Transaction | Account Number (if applicable) |
|---|---|
| at least 2015 & forward | n/a |

| Total amount paid | Amount in dispute | How was payment made: |
|---|---|---|
| n/a | n/a | [ ] Cash [ ] Check [ ] Credit Card [ ] Debit Card [ ] Money Order [ ] Wire Transfer [ ] Finance Agreement [ ] Other _____ |

| Did you sign a contract or lease? [X] Yes [ ] No | Where was the contract signed? | Starting date Feb 23 2015 (start of employment) | Expiration date Unknown |
|---|---|---|---|

| Date you complained to the company or individual | Person Contacted | His/Her phone number |
|---|---|---|
| 2021-2022 [ ] By Mail [ ] By Telephone [ ] In Person | n/a | n/a |

Results
Termination of employment. Ongoing harassment, blacklisting, & defamation. Retaliatory litigation/threats of litigation & reports to law enforcement.

What result would you consider fair?
Protection of my, and my coworkers, constitutional rights to privacy. Enforcement against Apple for violating our right to privacy. Investigation into Apple's labor practices & employment policices.

Have you contacted another agency about this? [X] Yes [ ] No    If yes, name of agency
See memo

Do you have an attorney in this case? [ ] Yes [X] No    If yes, name of your attorney
n/a    Attorney's Phone Number
n/a

Has your complaint been heard or is it scheduled to be heard in court? [ ] Yes [X] No

If yes, where and when?

If already heard, what was the result?

**PLEASE DESCRIBE COMPLAINT ON NEXT PAGE**

STATE OF CALIFORNIA
PIU 2
(Rev. 04/2021)

DEPARTMENT OF JUSTICE
PAGE 2 of 3

**Rob Bonta**
**Attorney General**

# CONSUMER COMPLAINT AGAINST
# A BUSINESS/CORPORATION

| SECTION 4 - Information About the Transaction | |
|---|---|
| How was initial contact made between you and the business? | Where did the transaction take place? |
| ☐ Person came to my home | ☒ At my home |
| ☐ I went to company's place of business | ☒ At company's place of business |
| ☐ I received a telephone call from business | ☐ By mail |
| ☐ I telephoned the business | ☒ Over the phone |
| ☐ I received information in the mail | ☒ Via computer (website or e-mail) |
| ☐ I responded to a radio/television ad | ☐ Trade show or convention |
| ☐ I responded to a printed advertisement | ☒ Other  unknown |
| ☐ I responded to a website or e-mail solicitation | |
| ☐ I received a fax solicitation | |
| ☐ I attended a trade show or convention | |
| ☒ Other  employment | |

**SECTION 5 - Important Information**

- If the complaint falls within the jurisdiction of another local, state or federal agency, you will be provided with appropriate referral information. In addition, the complaint may be shared with other government agencies.
- Please include copies of any supporting documents you may have, such as correspondence, contracts, invoices, receipts, etc. Do not send originals.
- This office does not have the authority to give private legal advice or provide private legal representation to individual consumers.

**SECTION 6 - Details of Complaint (use additional sheets if necessary)**

This is a complaint against Apple Inc on behalf of myself and my fellow Apple employees for violations of our privacy.

Please see attached memo.

Apple has violated our constitutionally protected right to privacy (California Constitution, Article; Semore v. Pool (1990) 217 Cal.App.3d 1034)

Apple has coerced its workers into unlawful contracts attempting to waive our unwaivable rights. (Foley v. Interactive Data Corp., 47 Cal.3d at p. 670 (1988)

Apple terminated me for protesting their invasions of our privacy in violation of California public policy. (Hill, 7 Cal.4th, Borse v. Piece Goods Shop, Inc., 963 F.2d)

Apple violated Labor Code 435(a) by taking photos/videos of employees in bathrooms & lockerrooms

Apple violated CA Penal Code 647(j) by taking secret photos of employee's in their bedrooms/private areas

The Restatement of Employment Law is clear that invasion of employee privacy is a wrongful intrusion tort.

Apple violated the NLRB and California labor laws by creating the impression (if not reality) of 24/7 surveillance

Apple violated 18 U.S.C. § 1801 by taking secret photos of employee genitals

Apple violated numerous foreign & international laws and norms.

| SECTION 7 - Statement | | | |
|---|---|---|---|
| I affirm that the information herein is true and accurate, and will sign a statement if needed. | | ☒ YES | ☐ NO |
| You may send this complaint to the party named.  By filing this complaint, I hereby give the business complained about my consent to communicate, including disclosure of non-public personal information, with the Office of the Attorney General about any and all matters connected with this complaint. | | ☒ YES | ☐ NO |
| **Signature:** | | **Date:** | |

# Gjovik v. Apple

# Exhibit



David L. Hecht
Partner
P: (212) 851-6821
E: dhecht@hechtpartners.com

October 6, 2021

**VIA E-MAIL**

David R. Eberhart
O'Melveny & Myers LLP
Two Embarcadero Center
28th Floor
San Francisco, California 94111-3823
deberhart@omm.com

**<u>Re: Ashley Gjøvik</u>**

Dear Mr. Eberhart,

 I represent Ms. Gjovik. I am in receipt of your letter dated September 15, 2021 and subsequent email communication with my client. Going forward, please direct all such correspondence to me.

 As you are aware, Ms. Gjovik has already complied with your September 15, 2021 demand to remove certain images from some of her Twitter posts. However, I write regarding the inappropriateness of your requests, which may comprise copyright misuse. While I understand that Apple is not opposed to taking aggressive litigation postures (and indeed has a history of doing so), I remind you of your ethical duties as an attorney regarding the assertion of claims that have no basis in fact or law.

 Your September 15, 2021 letter alleges that Ms. Gjovik violated the Confidentiality and Intellectual Property Agreement with Apple dated January 31, 2015 (the "IPA"). You are incorrect. The IPA does not cover the images/video that Ms. Gjovik posted. For example, you take issue with Ms. Gjovik's post of screenshots of an automated email sent to Ms. Gjovik from "Ask," "an internal survey solution." The email itself was not marked as confidential. Further, there is no suggestion in the email that the in-person study referenced in the email was restricted to Apple employees or that its existence was confidential. The content of the automated email also contained nothing that could be considered secret or otherwise proprietary: there was no disclosure of the content, methodology, identity of any participants in the survey (other than Ms. Gjovik), or any of the survey's findings. The posted image of the email merely noted what was already known

to the public: Apple was conducting 3D scans of human ears to "collect representative ear geometry data across age, gender, and ethnic groups" and to benefit "audio research efforts and better our understanding of ear geometry variance."  It is no secret that Apple has been scanning a wide range of human ears to perfect its various AirPods products.  In fact, Apple's Vice President of Product Marketing, Greg Joswiak, spoke publicly about the 3D ear scans over a year ago:

> "We had done work with Stanford to 3D-scan hundreds of different ears and ear styles and shapes in order to make a design that would work as a one-size solution across a broad set of the population," Joswiak says. "With AirPods Pro, we took that research further – studied more ears, more ear types. And that enabled us to develop a design that, along with the three different tip sizes, works across an overwhelming percentage of the worldwide population."

*See* Jeremy White, *The secrets behind the runaway success of Apple's AirPods*, Wired (September 5, 2020), *available at* https://www.wired.co.uk/article/apple-airpods-success.

Accordingly, Ms. Gjovik cannot face restriction in disclosing a non-confidential email about the mere existence of a survey concerning 3D ear scanning (scanning that Apple had already publicly disclosed much earlier) sent to her during the period in which Apple put her on administrative leave.  Apple's demand for Ms. Gjovik to remove such content appears, therefore, to be pretextual.

Your September 15, 2021 letter and subsequent email communication also takes issue with image/video that you contend "were generated by a confidential internal Apple application during confidential Apple-internal user studies."  Apple holds no copyright to these images, which were not authored by a human.  As you are aware, United States copyright law only protects "the fruits of intellectual labor" that "are founded in the creative powers of the mind."  *Trade-Mark Cases*, 100 U.S. 82, 94 (1879).  Because copyright law is limited to "original intellectual conceptions of the author," Apple would be unable to register any of the images or video generated by the "Glimmer" app since a human being did not create the work.  *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 58 (1884).  Apple therefore cannot allege infringement of any copyright by Ms. Gjøvik.

To the extent Apple argues that the images taken by the Glimmer app are confidential, they are not marked as such.  You also have not alleged how mere images of Ms. Gjøvik, in her home, taken by the Glimmer app, on Ms. Gjøvik's own phone, could quality as confidential and/or

proprietary information under the IPA. For example, your letter fails to acknowledge that the images posted were (a) taken by an automated process running on Ms. Gjøvik's own iPhone and (b) captured her own likeness and portions of her living space. There can be no doubt that Ms. Ms. Gjøvik is permitted to post to the public her legitimate concerns about images of her, in her home, captured by an automated process, on her own phone. Additionally, your letter fails to acknowledge that beyond the non-proprietary images Ms. Gjøvik posted, she intentionally rendered unreadable any conceivably non-public information when posting these otherwise non-proprietary images. Your claims of any violation of the IPA based on the posting of these images appear, therefore, to have no basis in fact or law.

Given Ms. Gjøvik's removal of the content you referred to, coupled with the infirmities of your intellectual property claims in the September 15, 2021 letter, we consider this issue closed, and expect that Apple will immediately cease sending any further inappropriate demands.

Sincerely,

David L. Hecht
Hecht Partners LLP

cc: Erika Heath, Esq.
Ashley M. Gjøvik

# Gjovik v. Apple

# Exhibit

**STATE OF CALIFORNIA**                                                    **GAVIN NEWSOM,** *Governor*

DEPARTMENT OF INDUSTRIAL RELATIONS
Division of Occupational Safety and Health
Foster City District Office
1065 East Hillsdale Blvd, Suite 110
Foster City, CA 94404
Tel. # (650) 573-3812    Fax # (650) 573-3817



March 7, 2022

Ashley Gjovik
1050 Benton Street #2310
Santa Clara, CA 95050

Dear Ashley Gjovik:

I have received your complaint (Complaint No. 160 - 1855100) of alleged hazards at Apple, Inc. 825 Stewart Drive in Sunnyvale.

After careful review, I have decided not to conduct an investigation because:

1. The hazard(s) you brought to my attention do/does not fall within the jurisdiction of the Division of Occupational Safety and Health.

If you are able to provide additional information about your complaint which you think I should consider, or disagree with my decision and would like to review the reasons for the decision, please contact me at the address on the letterhead.

If you are still unsatisfied with the action taken by me on your complaint after reviewing the reasons with me, you have the right to review my decision with my Regional Manager.

California law protects any person who makes a complaint about a workplace safety or health hazard from being treated differently, discharged or discrimination against in any manner by their employer. If you believe that you have been discriminated against because you made a complaint to the Division of Occupational Safety and Health, you may file a discrimination complaint with the nearest office of the Division of Labor Standards Enforcement (Labor Commissioner). However, you must file your complaint within six (6) months of the discriminatory action.

Thank you for your concern about workplace safety and health.

Sincerely,

Barbara Kim
District Manager

/vb

reference: Complaint No. 160 - 1855100 - Ltr A (CORRECTED)

STATE OF CALIFORNIA

GAVIN NEWSOM, *Governor*

DEPARTMENT OF INDUSTRIAL RELATIONS
Division of Occupational Safety and Health
Foster City District Office
1065 East Hillsdale Blvd, Suite 110
Foster City, CA 94404
Tel. # (650) 573-3812   Fax # (650) 573-3817



February 6, 2023

Ashley Gjovic
Sent via e-mail: ashleymgjovik@protonmail.com

Dear Ashley Gjovik:

I have received your complaint (Complaint No. 143-1995509) of alleged hazards at Apple Inc.  825 Stewart Drive in Sunnyvale.

After careful review, I have decided not to conduct an investigation because the hazard(s) you brought to my attention do/does not fall within the jurisdiction of the Division of Occupational Safety and Health.

Your concerns may be better addressed by the EPA at www.epa.gov as Cal/OSHA does not enforce DTSC standards.

If you are able to provide additional information about your complaint which you think I should consider, or disagree with my decision and would like to review the reasons for the decision, please contact me at the address on the letterhead.

If you are still unsatisfied with the action taken by me on your complaint after reviewing the reasons with me, you have the right to review my decision with my Regional Manager.

California law protects any person who makes a complaint about a workplace safety or health hazard from being treated differently, discharged or discrimination against in any manner by their employer.  If you believe that you have been discriminated against because you made a complaint to the Division of Occupational Safety and Health, you may file a discrimination complaint with the nearest office of the Division of Labor Standards Enforcement (Labor Commissioner). However, you must file your complaint within six (6) months of the discriminatory action.

Thank you for your concern about workplace safety and health.

Sincerely,

Barbara Kim
District Manager

/mfr

enclosure: Citation(s) from previous inspection, *if applicable*
reference: Complaint No. 143-1995509 - Ltr A

# GJOVIK V. APPLE

# EXHIBIT

**Tips, Complaints, and Referrals**
Summary Page - Submitted Externally

**Submission Number 16304-612-987-465 was submitted on Wednesday, September 01, 2021 at 02:02:09 AM EDT**

**This PDF was generated on Wednesday, September 01, 2021 at 02:02:15 AM EDT**

Thank you for contacting the United States Securities and Exchange Commission.  This automated response confirms that your submission has been received successfully.  We are always interested in hearing from the public, and your submission will be given careful consideration in view of the Commission's overall responsibilities under the federal securities laws.  Please note, however, that it is the Commission's policy to conduct its investigations on a non-public basis in order to preserve the integrity of its investigative process.  Subject to the provisions of the Freedom of Information Act, we cannot disclose to you any information which we may gather, nor can we confirm the existence or non-existence of an investigation, unless such information is made a matter of public record in proceedings brought before the Commission or the courts.  Therefore, this may be the only response that you receive.  If you want to learn more about how the Commission handles inquiries or complaints, please visit http://www.sec.gov/complaint/info_tipscomplaint.shtml.

## What is your complaint about?

**Q: Please select the option that best describes your complaint.**

**A:** Other

**Q: Is this supplemental information to a previous complaint?**

**A:** No

**Q: In your own words, describe the conduct or situation you are complaining about.**

**A:** One of Apple Inc's board of directors is Ronald Sugar, who joined the board in 2021. Sugar is and has been chair of the Finance & Audit Committee. https://www.apple.com/newsroom/2010/11/17Ronald-D-Sugar-Joins-Apples-Board-of-Directors/ Sugar used to be CEO/President of Northrup Grumman, and TRW Microwave before that, for many years. In 2014, Apple began to lease an office building at 825 Stewart Dr in Sunnyvale, CA. The building is owned by GI Partners LP since 2016. Before that, starting in 2014, the building was owned by Hines real estate firm & Oaktree Capital Management L.P. 825 Stewart Dr is an active EPA Superfund site (the "TRW Microwave" site). Apple calls this building "Stewart 1" and has 100+ employees working there, including myself. See: https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.cleanup&id=0901181 The EPA's "responsible party" for the clean up of the toxic chemicals under the building, is Northrup Grumman (and TRW Microwave before that, until Northrup Grumman acquired TRW Microwave). This 825 Stewart building was the California HQ for TRW Microwave, so Sugar must be very familiar with it. I have a separate complaint with the

Page 1 of 19

**Tips, Complaints, and Referrals**
Summary Page - Submitted Externally

Federal EPA about my concerns about hazardous waste vapor intrusion in the indoor air of the building -- and negligent, if not reckless & fraudulent due diligence of the safety & health oversight of the employees by Apple. I was even intimidated by my Manager & Apple Employee Relations to not speak openly about my workplace safety concerns. I have since faced multiple types of retaliation for continuing to speak about my concerns about work place safety & Apple's unethical, if not illegal, behavior related to the building. (I have a separate NLRB complaint for all that). Meanwhile Ronald Sugar is supposed to be overseeing Finance & Audit for Apple, which I assume includes the budget and oversight of due diligence programs like this. This seems like a very big conflict of interest.

**Q: Are you having or have you had difficulty getting access to your funds or securities?**

**A:** No

**Q: Did you suffer a loss?**

**A:** No

**Q: When did you become aware of the conduct? (mm/dd/yyyy)**

**A:** 07/01/2021

**Q: When did the conduct begin? (mm/dd/yyyy)**

**A:** 11/17/2010

**Q: Is the conduct ongoing?**

**A:** Yes

**Q: Has the individual or firm acknowledged the conduct?**

**A:** No

**Q: How did you learn about the conduct? You may select more than one answer.**

**A:** Conversations; Internal business documents; Publicly available information

**Q: Have you taken any action regarding your complaint? You may select more than one answer.**

**A:** Complained to firm; Complained to other regulator; Complained to other

**Tips, Complaints, and Referrals**
Summary Page - Submitted Externally

**Q: Provide details.**

**A:** I complained verbally to Apple Employee Relations several times in July 2021 and asked them to look into it and they refused to look into it. I asked them who I could complain to or where I could file a complaint, and they said "no idea." I complained to the federal EPA (via Margot Perez-Sullivan) on July 19th 2021, via email. She didn't acknowledge my concern about a conflict of interest. I complained about this apparent conflict of interest to Apple Business Conduct on Aug 23, 2021. On Aug 28, 2021 Apple Business Conduct closed my ticket and said, "Thank you for raising your concerns to the Business Conduct Helpline. Apple takes your concerns seriously, and we have shared them with the appropriate internal teams for review and investigation. This request is closed and can't be reopened. If you need more help with this issue, create a new request."

## Who are you complaining about?

**Subject # 1**

**Q: Are you complaining about a person or a firm?**

**A:** Firm

**Q: Select the title that best describes the person or firm that you are complaining about.**

**A:** Publicly held company

**Q: Are you or were you associated with the person or firm when the alleged conduct occurred?**

**A:** Yes

**Q: How are you or were you associated with the person or firm you are complaining about?**

**A:** I am an employee of Apple Inc. I am a senior engineering program manager in the hardware engineering organization.

**Q: Identifier Type**

**A:** Ticker Symbol

**Q: Ticker Symbol**

**Tips, Complaints, and Referrals**
Summary Page - Submitted Externally

**A:** AAPL

**Q: Are you a current or former Employee, Officer, Partner, or Employee Director of any entity you are complaining about?**
**A:** Yes

**Q: Check all that apply.**
**A:** Employee

**Q: Are you a current or former Non-Employee Director, Consultant, Contractor or Trustee of any entity you are complaining about?**
**A:** No

**Q: Firm Name**
**A:** Apple Inc.

**Q: Street Address**
**A:** 1 Apple Park Way

**Q: Zip / Postal Code**
**A:** 95014

**Q: City**
**A:** CUPERTINO

**Q: State / Province**
**A:** CA

**Q: Country**

**Tips, Complaints, and Referrals**
Summary Page - Submitted Externally

**A:** US

**Q: Website**
**A:** apple.com

**Q: If the complaint is about an entity or person that has custody or control of your investments, have you had difficulty contacting that entity or person?**
**A:** No

**Subject # 2**

**Q: Are you complaining about a person or a firm?**
**A:** Firm

**Q: Select the title that best describes the person or firm that you are complaining about.**
**A:** Publicly held company

**Q: Are you or were you associated with the person or firm when the alleged conduct occurred?**
**A:** No

**Q: Identifier Type**
**A:** Ticker Symbol

**Q: Ticker Symbol**
**A:** NOC

**Q: Are you a current or former Employee, Officer, Partner, or Employee Director of any entity you are complaining about?**
**A:** No

**Tips, Complaints, and Referrals**
Summary Page - Submitted Externally

**Q: Are you a current or former Non-Employee Director, Consultant, Contractor or Trustee of any entity you are complaining about?**

**A:** No

**Q: Firm Name**

**A:** Northrop Grumman Corp

**Q: Street Address**

**A:** 2980 Fairview Park Drive

**Q: Zip / Postal Code**

**A:** 22042

**Q: City**

**A:** FALLS CHURCH

**Q: State / Province**

**A:** VA

**Q: Country**

**A:** US

**Q: Work Phone**

**A:** 703-280-2900

**Q: Website**

**A:** northropgrumman.com

**Tips, Complaints, and Referrals**
Summary Page - Submitted Externally

**Q: If the complaint is about an entity or person that has custody or control of your investments, have you had difficulty contacting that entity or person?**

**A:** No

**Subject # 3**

**Q: Are you complaining about a person or a firm?**

**A:** Firm

**Q: Select the title that best describes the person or firm that you are complaining about.**

**A:** Private fund company (including hedge fund, private equity fund, venture capital fund or real estate fund)

**Q: Are you or were you associated with the person or firm when the alleged conduct occurred?**

**A:** No

**Q: Identifier Type**

**A:** Unknown

**Q: Firm Name**

**A:** GI Partners L.P.

**Q: Street Address**

**A:** 188 The Embarcadero

**Q: Address (Continued)**

**A:** Suite 700

**Q: Zip / Postal Code**

**A:** 94105

**Tips, Complaints, and Referrals**
Summary Page - Submitted Externally

**Q: City**
**A:** SAN FRANCISCO

**Q: State / Province**
**A:** CA

**Q: Country**
**A:** US

**Q: Work Phone**
**A:** 415-688-4800

**Q: Email Address**
**A:** info@gipartners.com

**Q: Website**
**A:** gipartners.com

**Q: If the complaint is about an entity or person that has custody or control of your investments, have you had difficulty contacting that entity or person?**
**A:** No

**Subject # 4**

**Q: Are you complaining about a person or a firm?**
**A:** Firm

**Q: Select the title that best describes the person or firm that you are complaining about.**
**A:** Private fund company (including hedge fund, private equity fund, venture capital fund or real estate fund)

**Tips, Complaints, and Referrals**
Summary Page - Submitted Externally

**Q: Are you or were you associated with the person or firm when the alleged conduct occurred?**
**A:** No

**Q: Identifier Type**
**A:** Unknown

**Q: Are you a current or former Non-Employee Director, Consultant, Contractor or Trustee of any entity you are complaining about?**
**A:** No

**Q: Firm Name**
**A:** Hines Interests Limited Partnership

**Q: Street Address**
**A:** 2800 Post Oak Blvd

**Q: Zip / Postal Code**
**A:** 77056

**Q: City**
**A:** HOUSTON

**Q: State / Province**
**A:** TX

**Q: Country**
**A:** US

**Tips, Complaints, and Referrals**
Summary Page - Submitted Externally

**Q: Work Phone**

**A:** 713 621 8000

**Q: Website**

**A:** hines.com

**Q: If the complaint is about an entity or person that has custody or control of your investments, have you had difficulty contacting that entity or person?**

**A:** No

**Subject # 5**

**Q: Are you complaining about a person or a firm?**

**A:** Firm

**Q: Select the title that best describes the person or firm that you are complaining about.**

**A:** Publicly held company

**Q: Are you or were you associated with the person or firm when the alleged conduct occurred?**

**A:** No

**Q: Identifier Type**

**A:** Ticker Symbol

**Q: Ticker Symbol**

**A:** OAK

**Q: Are you a current or former Employee, Officer, Partner, or Employee Director of any entity you are complaining about?**

**Tips, Complaints, and Referrals**
Summary Page - Submitted Externally

**A:** No

**Q: Are you a current or former Non-Employee Director, Consultant, Contractor or Trustee of any entity you are complaining about?**
**A:** No

**Q: Firm Name**
**A:** Oaktree Capital Management

**Q: Street Address**
**A:** 333 South Grand Ave.

**Q: Address (Continued)**
**A:** 28th Floor

**Q: Zip / Postal Code**
**A:** 90071

**Q: City**
**A:** LOS ANGELES

**Q: State / Province**
**A:** CA

**Q: Country**
**A:** US

**Q: Work Phone**
**A:** 213 830-6300

**Tips, Complaints, and Referrals**
Summary Page - Submitted Externally

**Q: Website**
**A:** oaktreecapital.com

**Q: If the complaint is about an entity or person that has custody or control of your investments, have you had difficulty contacting that entity or person?**
**A:** No

**Subject # 6**

**Q: Are you complaining about a person or a firm?**
**A:** Person

**Q: Select the title that best describes the person or firm that you are complaining about.**
**A:** Executive officer or director

**Q: Where is the person that you are complaining about employed?**
**A:** Apple

**Q: Are you or were you associated with the person or firm when the alleged conduct occurred?**
**A:** Yes

**Q: How are you or were you associated with the person or firm you are complaining about?**
**A:** I am currently an employee at Apple.

**Q: Person's Title**
**A:** Mr

**Q: First Name**
**A:** Ronald

**Tips, Complaints, and Referrals**
Summary Page - Submitted Externally

**Q: Middle Name**

**A:** D.

**Q: Last Name**

**A:** Sugar

**Q: Website**

**A:** https://www.apple.com/newsroom/2010/11/17Ronald-D-Sugar-Joins-Apples-Board-of-Directors/

**Q: If the complaint is about an entity or person that has custody or control of your investments, have you had difficulty contacting that entity or person?**

**A:** Unknown

## Which investment products are involved?

**Q: Select the type of product involved in your complaint.**

**A:** Other

**Q: Please select the category that best describes the security product.**

**A:** Other

**Q: For other, please provide more information.**

**A:** I'm not sure of the extent of this issue

**Q: Enter the ticker symbol, if known.**

**A:** AAPL

**Tips, Complaints, and Referrals**
Summary Page - Submitted Externally

## About you

**Submitter # 1**

**Q: Are you filing this tip under the SEC's whistleblower program?**
**A:** Yes

**Q: Are you an attorney filling out this form on behalf of an anonymous whistleblower client who is seeking an award?**
**A:** No

**Q: First Name**
**A:** Ashley

**Q: Middle Name**
**A:** Marie

**Q: Last Name**
**A:** Gjovik

**Q: Street Address**
**A:** 1050 Benton Street #2310

**Q: Zip / Postal Code**
**A:** 95050

**Q: City**
**A:** SANTA CLARA

**Tips, Complaints, and Referrals**
Summary Page - Submitted Externally

**Q: State / Province**

**A:** CA

**Q: Country**

**A:** US

**Q: Mobile Telephone**

**A:** ▨▨▨▨▨▨▨▨▨

**Q: Email Address**

**A:** ashleygjovik@icloud.com

**Q: Are you represented by an attorney in connection with this matter, or would you like to provide your attorney's contact information?**

**A:** No

**Q: Select the profession that best represents you.**

**A:** Other

**Q: For Other, please specify.**

**A:** Sr Engineering Program Manager

**Q: Have you reported the matter at issue in this submission to your supervisor, compliance office, whistleblower hotline, ombudsman, or any other available mechanism for reporting possible violations at any entity you are complaining about?**

**A:** Yes

**Q: If you answered "Yes," please provide details.**

**Tips, Complaints, and Referrals**
Summary Page - Submitted Externally

**A:** I complained verbally to Apple Employee Relations several times in July 2021 and asked them to look into it and they refused to look into it. I asked them who I could complain to or where I could file a complaint, and they said "no idea." I complained about Ronald Sugar's apparent conflict of interest. But I also complained that Lisa Jackson and Alisa Johnson seem to be heavily involved in Apple's haz waste public relations (see 2x 2016 DTSC settlement PDFs attached). It worries me this is a Federal EPA Superfund site already with 1 conflict of interest with Sugar, but also more if Lisa Jackson's team is doing PR about Apple's hazardous waste crimes/infractions -- and Lisa used to run the Federal EPA & Alisa was the press secretary for Lisa at the Federal EPA. I complained about this apparent conflict of interest to Apple Business Conduct on Aug 23, 2021. On Aug 28, 2021 Apple Business Conduct closed my ticket and said, "Thank you for raising your concerns to the Business Conduct Helpline. Apple takes your concerns seriously, and we have shared them with the appropriate internal teams for review and investigation. This request is closed and can't be reopened. If you need more help with this issue, create a new request."

**Q: Were you retaliated against for reporting the matter at issue in this submission either internally at the entity or to a regulator?**

**A:** Yes

**Q: If you answered "Yes," please provide details.**

**A:** Early March 2021 - raise concerns about work place safety at my office at 825 Stewart Dr 3/11/21 - "warning" from Apple manager to stop expressing concerns about workplace safety 4/9 - retaliatory, nonconsensual sexism investigation by Apple ER (on my behalf) in response to expressing concerns about workplace safety 4/29 - Apple constructive termination; failure to resolve hostile work env 5/6 - Apple job reassignment, reduction of supervisory responsibilities 6/21 - Apple manager insists I must return to unsafe work env 6/28 - harassment from Apple manager 7/2 - Apple ER forces me to submit an ADA request to work remotely to avoid the Superfund vapor intrusion, despite my protests 7/15 - Apple manager substantially increases my workload with unfavorable work 7/28 - other Apple manager withholds my work assignments 8/4 - Apple employee relations forces me on paid admin leave

**Q: Has anyone taken steps to prevent you from reporting this violation to the SEC?**

**A:** Yes

**Q: If you answered "Yes," please provide details.**

**A:** Maybe -- no one told me is this something I could complain to the SEC about. I complained verbally to Apple Employee Relations several times in July 2021 and asked them to look into it and they refused to look into it. I asked them who I could complain to or where I could file a complaint, and they said "no idea."

**Q: Are documents or other information being submitted that could potentially identify the whistleblower?**

**A:** Yes

**Tips, Complaints, and Referrals**
Summary Page - Submitted Externally

**Q: Identify with particularity any documents or other information in your submission that you believe could reasonably be expected to reveal your identity.**

**A:** I don't think anyone else has complained about this other than me.

**Q: Does the whistleblower want to be eligible to apply for a whistleblower award?**

**A:** No

**Tips, Complaints, and Referrals**
Summary Page - Submitted Externally

## Documents

| Document Name | Document Type |
|---|---|
| GI Partners Announces Acquisition of 825 Stewart Drive in Sunnyvale, California | News | GI Partners.pdf | application/pdf |
| Hines:Oaktree Venture Acquires 825 Stewart - Hines.pdf | application/pdf |
| Request detail - Business Conduct.pdf | application/pdf |
| Request - Business Conduct.pdf | application/pdf |
| RE Questions about TRW Microwave.pdf | application/pdf |
| 20200819-Audit-and-Finance-Committee-Charter copy.pdf | application/pdf |
| 2018.02.12_Corp_Governance_Guidelines.pdf | application/pdf |
| 2018.02.12_Director_Conflicts_Guidelines.pdf | application/pdf |
| Ronald D. Sugar Joins Apple's Board of Directors - Apple.pdf | application/pdf |

**Tips, Complaints, and Referrals**
Summary Page - Submitted Externally

| | |
|---|---|
| Re ADA Medical Request for Full Remote Work Accommodation Certificate Form Attached PII.pdf | application/pdf |
| Re Questions about TRW Microwave1.pdf | application/pdf |
| Apple Directory.jpeg | image/jpeg |
| Gjovik Workers Comp - Signed.pdf | application/pdf |
| Re follow up.pdf | application/pdf |
| Work place safety concerns ADA Remote Work request process concerns .pdf | application/pdf |
| Apple Agrees to Pay $450,000 to Settle Hazardous Waste Violations I Department of Toxic Substances Control.pdf | application/pdf |
| Apple settles claims of mishandling toxic waste I Resource Magazine.pdf | application/pdf |

# Gjovik v. Apple

# Exhibit

**STATE OF CALIFORNIA**                                                Gavin Newsom, *Governor*

DEPARTMENT OF INDUSTRIAL RELATIONS
Labor Commissioner's Office
*Retaliation Complaint Investigation Unit*
2031 Howe Avenue Suite 100
Sacramento, CA 95825
Phone: (916) 263-2991 Email: retaliation@dir.ca.gov



October 22, 2021

Ashley Gjovik
1050 Benton Street #2310
Santa Clara, CA 95050


Re:     Ashley Gjovik v. Apple Inc.
        State Case No. RCI-CM-842830

Dear Ashley Gjovik:

This office has received your retaliation complaint, filed with this office on August 29,
2021, alleging that you suffered unlawful retaliation in violation of California law.

**Parties are encouraged to engage in settlement discussions amongst
themselves. Alternatively, if you are interested in participating in an informal
meeting to resolve your complaint, please send an email to retaliation@dir.ca.gov
with "SETTLEMENT" in the subject line. Your participation is voluntary. Only if
both parties agree, your case <u>will be temporarily assigned</u> to a Deputy Labor
Commissioner who is experienced in working with parties to reach satisfactory
settlements.**

**Please keep in mind that RCI investigations can be lengthy and may not result in
your desired outcome. Settlement allows the parties to come to a compromise
and provide relief, resolution, and peace of mind.**

As soon as the case is assigned to an investigator, you and the employer will be
contacted and given an opportunity to present documents, position statements, or
witness names to support your respective positions. Hold on to these documents until
the assigned investigator requests them from you.

We suggest that you obtain the first and last names, addresses, and telephone numbers
for witnesses who may be able to tell us more about your claim.  Also, please save any
documentation that you may have, such as wage statements, emails, letters, text
messages, or notices.  It is helpful if you keep notes of any conversations you have had,
noting the date and with whom the conversation took place.  Also, if you have a
recollection of what happened, it is helpful if you write it down while your memory is
fresh.  A chronology of events can be very useful.

Do not delete, destroy, or discard any potential evidence that relates to the claims,
facts, or defenses raised by the complaint. This includes, but is not limited to, any
relevant electronic evidence, such as text messages, social media posts, emails, or

RCI 4.3 CASE ACCEPTED WITHOUT DEPUTY ASSIGNMENT (REV. 12/20)

State Case No. RCI-CM-842830
October 22, 2021
Page 2 of 2

voicemails. If you have a policy or practice of regularly deleting, destroying, or discarding documents, information, or things, those policies or practices should be suspended in relation to any potential evidence. Deleting, destroying, or discarding any potential evidence is against the law.

Please tell us if your address or phone number changes.  If we are unable to contact you, we will be unable to proceed with the investigation, and we will be forced to close your case.

The enclosed "Summary of Procedures" will provide additional information about our process.  Again, we will be in contact with you to let you know who the investigator is that will be investigating your complaint.

During the investigation, you are required to mitigate your damages by looking for other employment or working elsewhere. As you apply for employment opportunities, keep detailed records of the positions you apply for, any interviews that you attend, and any employment offers that are made to you. If you do accept an offer, please let me know. Keeping these records will assist the agency with calculating and proving what you may be owed.

If you filed a retaliation complaint because you made a workplace health or safety complaint, you may also file a separate complaint with the U.S. Department of Labor within 30 days of the date of the violation.

Keep in mind that legal claims cannot be brought indefinitely; legal claims have a "statute of limitations," which is a time limit. Filing a complaint with our agency may not prevent the statute of limitations from running out on all the claims you may have, so if you are interested in pursuing this claim or other related claims in a lawsuit, consult with an attorney right away.

Sincerely,

Alejandro Cortez
Deputy Labor Commissioner

RCI 4.3 CASE ACCEPTED WITHOUT DEPUTY ASSIGNMENT (REV. 12/20)

**Labor Commissioner's Office**
*Retaliation Complaint Investigation Unit*

**Retaliation Complaint**
State Case Number: RCI-CM-842830
Date Filed: August 29, 2021



Department of
Industrial Relations
STATE OF CALIFORNIA

### Complainant Information

| First Name | Last Name | Phone Number | Birthdate |
|---|---|---|---|
| Ashley | Gjovik | 415-964-6272 | August 26, 1986 |

| Street Address | City | State | Zip Code |
|---|---|---|---|
| 1050 Benton Street #2310 | Santa Clara | CA | 95050 |

| Interpreter Requested? | Language | Email |
|---|---|---|
| No | | ashleymgjovik@protonmail.com |

### Complainant's Representative/Advocate

| Representative/Advocate Name | | | |
|---|---|---|---|
| Phone Number | Email | | |
| Street Address | City | State | Zip Code |

### Employer Information

| Employer / Business Name | Phone Number | | |
|---|---|---|---|
| Apple Inc. | | | |

| Business Address | City | State | Zip Code |
|---|---|---|---|
| 1 Apple Park Way | Cupertino | CA | 95014 |

| Address where Complainant worked (if different from Business Address) | City | State | Zip Code |
|---|---|---|---|
| 825 Stewart Drive | Sunnyvale | CA | 94086 |

| Name of Person in Charge | Job Title / Position of Person in Charge |
|---|---|
| Tim Cook | CEO |

| Type of Work Performed | Total Number of Employees | Employer still in Business? |
|---|---|---|
| | | Yes |

### Immigration Threat

| Did your employer make immigration related threats? | No |
|---|---|
| *Please Explain:* | |

STATE CASE NO. RCI-CM-842830                                   Date Filed: August 29, 2021

| Other Claims Filed | | | |
|---|---|---|---|
| *Claim for unpaid wages?* | *Date claim filed:* | *Claim filed by:* | *Case Number* |
| No | | | |
| *Issued claimed:* | | | |
| | | | |
| *Are other employees also filing retaliation claims against your employer?* | | *Have you filed or do you plan to file a separate EPA (Equal Pay Act) complaint?* | |
| I don''t know | | No | |

| Employment Status | | | |
|---|---|---|---|
| *Date of Hire* | *Quit on* | *Suspended on* | *Discharged on* |
| February 23, 2015 | | | |
| | *Still working for employer?* | *Other:* | |
| | Yes | | |
| *Final Rate of Pay* | | *Last job title with Employer* | |
| | | Sr Engineering Program Manager | |

| Retaliation Complaint | | | |
|---|---|---|---|
| *Why was this Complaint Filed* | *Date* | *Name of Person Carrying out Change* | *Title of Person Carrying out Change* |
| Other | August 4, 2021 | Unknown | Apple Human Resources & Employee Relations; Apple Environmental Health & Safety; managers |

*Describe what happened:*

I raised concerns about work place safety and was told to stop speaking about my concerns. Then I was threatened, harassed, intimidated, suspended, & constructively terminated.

*What reason would the employer give for the changes you experienced that you selected from the list above and described?*

None

*What right did you exercise or action did you take that led to your change in employment?*

workplace safety & whistleblower protections

*Describe how your employer knew about the right you exercised or the action(s) you took?*

I kept saying "stop it you guys, there's labor laws about this"

| Witnesses | | | |
|---|---|---|---|
| *First Name* | *Last Name* | *Phone Number* | *Email* |

STATE CASE NO. RCI-CM-842830                                    Date Filed: August 29, 2021

| 1. | | | |
|---|---|---|---|
| *Street Address* | *City* | *State* | *Zip Code* |
| 1. | | | |
| *Please provide a brief explanation of what they saw/heard related to your complaint.* | | | |
| 1. | | | |

| **Remedies** |
|---|
| *Briefly describe what you hope happens as a result of filing the complaint.* |
| Accountability & redress |

| **Authorizations to Release Information** |
|---|
| ☑ By submitting this form, I hereby certify that the information I have provided is true to the best of my knowledge and/or recollection, and I further acknowledge that this information is being collected by the State and may be shared with another state agency or a private party in accordance with California Civil Code section 1798.24 and the Information Practices Act of 1977 generally. |

**Labor Commissioner's Office**
*Retaliation Complaint Investigation Unit*

**Retaliation Complaint**
State Case Number: RCI-CM-846638
Date Filed: September 29, 2021



**Department of Industrial Relations**
**STATE OF CALIFORNIA**

## Complainant Information

| First Name | Last Name | Phone Number | Birthdate |
|---|---|---|---|
| Ashley | Gjovik | 415-964-6272 | August 26, 1986 |

| Street Address | City | State | Zip Code |
|---|---|---|---|
| 1050 Benton Street #2310 | Santa Clara | CA | 95050 |

| Interpreter Requested? | Language | Email |
|---|---|---|
| No | | ashleymgjovik@protonmail.com |

## Complainant's Representative/Advocate

| Representative/Advocate Name | |
|---|---|
| | |
| Phone Number | Email |
| | |
| Street Address | City | State | Zip Code |

## Employer Information

| Employer / Business Name | Phone Number |
|---|---|
| Apple Inc. | |

| Business Address | City | State | Zip Code |
|---|---|---|---|
| 1 Apple Park Way | Cupertino | CA | 95014 |

| Address where Complainant worked (if different from Business Address) | City | State | Zip Code |
|---|---|---|---|
| 825 Stewart Drive | Sunnyvale | CA | 94086 |

| Name of Person in Charge | Job Title / Position of Person in Charge |
|---|---|
| Tim Cook | CEO |

| Type of Work Performed | Total Number of Employees | Employer still in Business? |
|---|---|---|
| Computer Manufacturing | 100,000 | Yes |

## Immigration Threat

| Did your employer make immigration related threats? | No |
|---|---|

*Please Explain:*

STATE CASE NO. RCI-CM-846638          Date Filed: September 29, 2021

## Other Claims Filed

| Claim for unpaid wages? | Date claim filed: | Claim filed by: | Case Number |
|---|---|---|---|
| No | | | |

| Issued claimed: |
|---|
| |

| Are other employees also filing retaliation claims against your employer? | Have you filed or do you plan to file a separate EPA (Equal Pay Act) complaint? |
|---|---|
| I don''t know | No |

## Employment Status

| Date of Hire | Quit on | Suspended on | Discharged on |
|---|---|---|---|
| February 23, 2015 | | August 4, 2021 | September 9, 2021 |
| | Still working for employer? | Other: | |
| | No | Amendment to: RCI-CM-842830 | |

| Final Rate of Pay | Last job title with Employer |
|---|---|
| 169,000/year | Senior Engineering Program Manager |

## Retaliation Complaint

| Why was this Complaint Filed | Date | Name of Person Carrying out Change | Title of Person Carrying out Change |
|---|---|---|---|
| Terminated/Discharged/Fired | September 9, 2021 | Yannick Bertolus; Aleks Kagramanov | Vice President of the Product Integrity team; Investigator in the Workplace Violence team |

| Describe what happened: |
|---|
| 3/17: Raised concerns abt safety at my Superfund office; |
| 3/22: Told to stop sharing concerns; |
| 3/29: Reported intimidation to ER & then ER retaliated; |
| Apr: Constructive termination (HWE) by Sr Dir; |
| Apr-Jun: Still raising concerns abt safety & also abt sexism & retaliation; |
| July: ER launches 2nd investigation I actually req; |
| 8/3: Taking pics of safety issues; |
| 8/4: ER suspends me & pressures me to stop organizing with other employees; 9/9: Terminated |
| 9/10: NLRB affidavit abt Apple |

| What reason would the employer give for the changes you experienced that you selected from the list above and described? |
|---|
| |

STATE CASE NO. RCI-CM-846638                                      Date Filed: September 29, 2021

VP: "Apple has determined that you have engaged in conduct that warrants termination of employment, including, but not limited to, violations of Apple policies. You disclosed confidential product-related information in violation of Apple policies and your obligations under the Intellectual Property Agreement (IPA). We also found that you failed to cooperate and to provide accurate and complete information during the Apple investigatory process."

Workplace Violence: "We are investigating allegations that you improperly disclosed Apple confidential information. Since you have chosen not to participate in the discussion, we will move forward with the information that we have, and given the seriousness of these allegations, we are suspending your access to Apple systems"

*What right did you exercise or action did you take that led to your change in employment?*

I reported concerns about unsafe working conditions & possible violations/noncompliance of multiple laws to the state and federal government, as well as my Apple supervisor, the Apple Env Health Safety team, and Apple Human Resources & Employee Relations

*Describe how your employer knew about the right you exercised or the action(s) you took?*

Beyond raising concerns to Apple, I informed Apple of my complaints to the government in July, providing them copies of the emails and even forwarding the emails to them. I also filed more complaints in Aug & it was reported by major news sources.

| Witnesses | | | |
|---|---|---|---|
| *First Name* | *Last Name* | *Phone Number* | *Email* |
| 1. ▨ ▅▅▅ | ▅▅▅▅ | | ▅▅▅▅▅▅▅▅ |
| 2. ▨ ▅ | ▅ | ▅▅▅▅ | ▅▅▅▅▅▅ |
| 3. ▨▨ | ▅ | ▅▅▅▅ | ▅▅▅▅▅▅ |
| 4. ▨▨ | ▅▅ | | |
| 5. ▨▨ | ▅▅▅▅ | ▅▅▅▅ | |
| 6. ▨▨ | ▅▅▅ | | ▅▅▅▅▅▅▅ |

| Street Address | City | State | Zip Code |
|---|---|---|---|
| 1. UCSF & CA Dept of Public Health | | CA | |
| 2. Worked in my building with me (825 Stewart Drive) | | CA | |
| 3. Worked in my building with me (825 Stewart Drive) | | CA | |
| 4. Worked in my building with me (825 Stewart Drive) - ask Simon for contact info | | CA | |
| 5. Federal EPA | | CA | |
| 6. | | CA | |

*Please provide a brief explanation of what they saw/heard related to your complaint.*

1. I discussed my safety & chemical exposure concerns about my office with Dr. Harrison during an UCSF office visit in April 2021

Case 3:23-cv-04597-EMC Document 35-5 Filed 12/25/23 Page 11 of 70

STATE CASE NO. RCI-CM-846638                                          Date Filed: September 29, 2021

| 2. Mike and I were working together starting in March 2021 to investigate and raise concerns about the safety of our office |
|---|
| 3. Simon was helping me gather evidence of active safety issues in the office in July |
| 4. Eddie was helping me gather evidence of active safety issues in the office in July |
| 5. I was emailing with the Federal EPA about my concerns about the safety of my office & being intimidated to not speak about my concerns starting in April |
| 6. Michael was the EH&S manager overseeing the safety of my Superfund office, but after i started asking questions he went on leave and then quit Apple after working there 7 years |

| **Remedies** |
|---|
| *Briefly describe what you hope happens as a result of filing the complaint.* |
| Injunctive: warning to and/or discipline for Apple, including broader labor investigation into Apple by the DOL |
| Damages: payment of lost wages, reinstatement of benefits including RSUs, punitive damages if available |

| **Authorizations to Release Information** |
|---|
| ☑ By submitting this form, I hereby certify that the information I have provided is true to the best of my knowledge and/or recollection, and I further acknowledge that this information is being collected by the State and may be shared with another state agency or a private party in accordance with California Civil Code section 1798.24 and the Information Practices Act of 1977 generally. |

# Gjovik v. Apple

# Exhibit

# T. Exhibit T: CARB

BAY AREA AIR QUALITY MANAGEMENT DISTRICT

COMPLAINT INVESTIGATION REPORT

## Complaint - (CPM448152)

TASK NUMBER CPE290153

**Complaint Details**

Complaint Type: **Other**
Occurence Date & Time: **9/4/2020 9:00 AM**
Complaint Description: **This facility's doing semiconductor fab since 2015, but without required permits, and illegally zoned. They did not ask for a proper CARB permit until 2024, after the US EPA RCRA enforcement inspections. RCRA found the operator was treating and disposing of haz waste without permit, including air emissions. The site is across the street from thousands of apartments & a playground. I filed a Complaint in 2020 due to a chemical emergency from unknown source. This is the source. Please investigate.**

**Alleged Location**

Emission Source: **Business**
Site/Facility Name: **Apple, Inc**
Address: **3250 Scott Boulevard, Santa Clara, CA, 95054-5054**

**Complaint Status**

**Unconfirmed**
Emission was no longer present

**Reporting Inspector**

**Erin Phillips**
Inspector
--

INSPECTION DATE
**7/22/2024 1:23 PM**

### INFORMATION

Name: **Ashley Gjovik**
Address: [redacted]
Phone: [redacted]
Contact Options: **Complainant willing to share contact information**
Email: **ashleymgjovik@protonmail.com**
Follow Up: **Provide Complaint Report by Email**

### RESPONSE

How complainant was initially contacted: **By phone - Spoke with complainant**
Time Contacted: **7/22/2024 1:23 PM**
Contacted after-hours / IR:
Complainant Statements: **Emission is still going**
Complainant available to meet with the R/I:
Location where complainant observed the emissions: **N/A**
Other Statements: **C stated they were injured by emissions from Apple in 2020. C no longer lived in the Bay Area and was monitoring Apple's compliance activity. C shared RCRA and fire code reports and violations with R/I via email.**

8/5/2024 9:42:43 AM 375 Beale Street, Suite 600 - San Francisco, CA 94105 - (415) 771.6000 - WWW.BAAQMD.GOV Page 1 of 2



 

**BAY AREA AIR QUALITY MANAGEMENT DISTRICT**

**COMPLAINT INVESTIGATION REPORT**

 **Complaint - (CPM448152)**

 TASK NUMBER
CPE290153

 **INVESTIGATIONS**

Investigation conducted at: **Phone investigation only**
Emissions observed by R/I at time of investigation: **No**        Date & Time: **7/22/2024 1:23 PM**
R/I observed emissions with complainant:                  Date & Time:
Emissions observed by R/I, if applicable:
Investigation conducted in general area where complainant observed alleged emissions:
Investigation conducted upwind and downwind of alleged site or potential source of emissions:
Emissions observed and traced to source:         Date & Time:       **Different site or facility from alleged**
Investigation conducted at source of emissions:          Date & Time:
                                                         Site or Facility Name: **Apple, Inc**
                                                         Name/Title of Site of Facility Contact:
Alleged site and/or source of emissions informed of the complaint:
Other potential source(s) of emissions observed in the area:

 **INVESTIGATIONS  (continued)**

Visible Emissions:
Sample(s) taken:          Lab Sample#:
Wind data:        Direction:             Speed (mph):          Location:
Air District Permit:
Complaint referred to other agency:            Date & Time:
                                               Agency Name:
                                               Contact:
                                               Telephone Number: **#Error**
                                               Email:
NOV/NTC Issued:
Complainant Notified of Investigation Findings:             Date & Time: **TBU**

 **FACILITY OR SITE INFORMATION**

**Facility #22839     -     Permitted**
3250 Scott Boulevard, Santa Clara, CA 95054-5054

 **GENERAL COMMENTS**

General Comments: R/I informed the AQ Inspection Specialist assigned to the alleged facility, of the complaint.

---

8/5/2024 9:42:43 AM          375 Beale Street, Suite 600 - San Francisco, CA 94105 - (415) 771.6000 - WWW.BAAQMD.GOV          Page 2 of  2

(80 of 414), Page 80 of 414
Case: 25-2028, 05/20/2025, DktEntry: 27.6, Page 80 of 414
Case 3:23-cv-04597-EMC    Document 151    Filed 01/22/25    Page 77 of 84



(/en/)

**A HEALTHY BREATHING ENVIRONMENT FOR EVERY BAY AREA RESIDENT**

District (/en/)  /  Rules & Compliance (/en/rules-and-compliance)  /  Compliance Assistance (/en/rules-and-compliance/compliance-assistance)

Notices of Violations (/en/rules-and-compliance/compliance-assistance/notices-of-violations)

Notices of Violation Issued (/en/rules-and-compliance/compliance-assistance/notices-of-violations/novs-issued)

# Notices of Violation Issued

View Notices of Violation issued to facilities as part of the Air District's compliance and enforcement activities.

| Issuance Date | Violation | Name | City |
|---|---|---|---|

9/12/2024            A64216A            Apple , Inc            Santa Clara

## Status
Pending
9/12/2024
## Penalty Amount ⑦

## Facility
22839
## Site
E2839
## Address
3250 Scott Boulevard
Santa Clara, CA 95054-5054

## Applicable Regulation
2-1-301
Regulation Details (/en/rules-and-compliance/current-rules?event=963eaab9-9f56-4328-8671-d9600bfa823f)

## Rule Language
Regulation 2, Rule 1: Permits — General Requirements (Amendments Adopted 12/15/2021) - Effective 7/1/2022 (/~/media/dotgov/files/rules/reg-2-permits/2021-amendments/documents/20211215_rg0201-pdf.pdf?rev=103cc60e706947d3ad1e4f5a090483c1&sc

⎙ (407 Kb PDF, 47 pgs, posted 5/26/2022)

9/12/2024            A64216B            Apple , Inc            Santa Clara

## Status
Pending
9/12/2024
## Penalty Amount ⑦

## Facility
22839
## Site
E2839
## Address
3250 Scott Boulevard
Santa Clara, CA 95054-5054

## Applicable Regulation
2-1-302
Regulation Details (/en/rules-and-compliance/current-rules?event=963eaab9-9f56-4328-8671-d9600bfa823f)

## Rule Language
Regulation 2, Rule 1: Permits — General Requirements (Amendments Adopted 12/15/2021) - Effective 7/1/2022 (/~/media/dotgov/files/rules/reg-2-

permits/2021-amendments/documents/20211215_rg0201-pdf.pdf?rev=103cc60e706947d3ad1e4f5a090483c1&sc

 (407 Kb PDF, 47 pgs, posted 5/26/2022)

| 9/12/2024 | A64218A | Apple , Inc | Santa Clara |

## Status
Pending
9/12/2024

## Penalty Amount ⑦

## Facility
22839
## Site
E2839
## Address
3250 Scott Boulevard
Santa Clara, CA 95054-5054

## Applicable Regulation
9-7-307.1
Regulation Details (/en/rules-and-compliance/current-rules-event=024ec7d1-f6b9-4604-addf-18fc09504118)

## Rule Language
Nitrogen Oxides and Carbon Monoxide from Industrial, Institutional, and Commercial Boilers, Steam Generators, and Process Heaters (/~/media/dotgov/files/rules/reg-9-rule-7-nitrogen-oxides-and-carbon-monoxide-from-industrial-institutional-and-commercial-boiler/documents/rg0907.pdf?rev=ab95f36c2dd146528f1cf3c10596bce3&sc_l

 (107 Kb PDF, 11 pgs, revised 4/24/2018)

| 9/12/2024 | A64219A | Apple , Inc | Santa Clara |

## Status
Pending
9/12/2024

## Penalty Amount ⑦

## Facility
22839
## Site
E2839
## Address
3250 Scott Boulevard
Santa Clara, CA 95054-5054

## Applicable Regulation
9-7-307.1
Regulation Details (/en/rules-and-compliance/current-rules-event=024ec7d1-f6b9-4604-addf-18fc09504118)

## Rule Language

Santa Clara, CA 95054-5054

Nitrogen Oxides and Carbon Monoxide
from Industrial, Institutional, and
Commercial Boilers, Steam Generators,
and Process Heaters
(/~/media/dotgov/files/rules/reg-9-rule-7-
nitrogen-oxides-and-carbon-monoxide-
from-industrial-institutional-and-
commercial-boiler/documents/rg0907.pdf?
rev=ab95f36c2dd146528f1cf3c10596bce3&sc_l

📄 (107 Kb PDF, 11 pgs, revised 4/24/2018)

| 8/29/2024 | A64215A | Apple , Inc | Santa Clara |

### Status
Pending
8/29/2024

### Penalty Amount ⓘ

### Facility
22839

### Site
E2839

### Address
3250 Scott Boulevard
Santa Clara, CA 95054-5054

### Applicable Regulation
2-1-301
Regulation Details (/en/rules-and-
compliance/current-rules?
event=963eaab9-9f56-4328-8671-
d9600bfa823f)

### Rule Language
Regulation 2, Rule 1: Permits – General
Requirements (Amendments Adopted
12/15/2021) - Effective 7/1/2022
(/~/media/dotgov/files/rules/reg-2-
permits/2021-
amendments/documents/20211215_rg0201-
pdf.pdf?
rev=103cc60e706947d3ad1e4f5a090483c1&sc

📄 (407 Kb PDF, 47 pgs, posted 5/26/2022)

| 8/29/2024 | A64215B | Apple , Inc | Santa Clara |

### Status
Pending
8/29/2024

### Facility
22839

### Site

### Applicable Regulation
2-1-302
Regulation Details (/en/rules-and-

8/29/2024

## Penalty Amount ⓘ

## Site

E2839

## Address

3250 Scott Boulevard
Santa Clara, CA 95054-5054

Regulation Details (/en/rules-and-compliance/current-rules?event=963eaab9-9f56-4328-8671-d9600bfa823f)

## Rule Language

Regulation 2, Rule 1: Permits – General Requirements (Amendments Adopted 12/15/2021) - Effective 7/1/2022 (/~/media/dotgov/files/rules/reg-2-permits/2021-amendments/documents/20211215_rg0201-pdf.pdf?rev=103cc60e706947d3ad1e4f5a090483c1&sc

📄 (407 Kb PDF, 47 pgs, posted 5/26/2022)

Items per Page: 10 ▾

1 6 6 items in 1 page

## Related Links

Hearing Board Meetings (/en/about-the-air-district/hearing-board/agendas-reports-orders)

Notices of Violation (/en/rules-and-compliance/compliance-assistance/notices-of-violations)

Public Records (/en/contact-us/request-public-records)

Last Updated: 7/19/2024

375 Beale Street, Suite 600
San Francisco, CA 94105
415.749.5000 | 1.800.HELP AIR

# BAY AREA AIR QUALITY MANAGEMENT DISTRICT

**375 Beale Street, Suite 600, San Francisco, CA 94105**
**(415) 749-5000**

## NOTICE OF VIOLATION                 No. A 64215

ISSUED TO: **Apple, Inc.**                    ☑P ☐G ☐N# **E2839**

ADDRESS: **3250 Scott Blvd.**

CITY: **Santa Clara**          STATE: **CA**      ZIP: **95054**

PHONE: (     )

☐ N# Mailing Address on F61

---

**OCCURRENCE**

NAME:

ADDRESS:                                        ☑ Same As Above

CITY:                          ZIP:

SOURCE: S# **3**   NAME: **Solvent Waste Tank**

EMISSION PT: P#_____ NAME:

DATE: **7/15/2017**        TIME: **6:00**      HRS

---

| | | |
|---|---|---|
| ☑ **REG 2 RULE 1 SEC 301** No Authority to Construct | ☑ **REG 2 RULE 1 SEC 302** No Permit to Operate |
| ☐ **REG 1 SEC 301** H & S CODE - 41700 Public Nuisance | ☐ **REG 2 RULE___ SEC 307** Failure to Meet Permit Condition |
| ☐ **REG 5 SEC 301** Prohibited Open Burning | ☐ **REG 6 RULE 1 SEC 301** Excessive Visible Emissions |
| ☐ REG____ RULE____ SECTION____CODE | |
| ☐ REG____ RULE____ SECTION____CODE | |

Details: **Installation and Operation of Solvent Waste Tank without AC/PO.**

RECIPIENT NAME: **KEVIN SUNG**

TITLE: **EHS LEAD**

SIGNING THIS NOTICE IS NOT
AN ADMISSION OF GUILT          X

➤ WITHIN 10 DAYS, RETURN A COPY OF THIS NOTICE WITH A WRITTEN
DESCRIPTION OF THE IMMEDIATE CORRECTIVE ACTION YOU HAVE
TAKEN TO PREVENT CONTINUED OR RECURRENT VIOLATION. **THIS
VIOLATION IS SUBJECT TO SUBSTANTIAL PENALTY.** YOUR RESPONSE
DOES NOT PRECLUDE FURTHER LEGAL ACTION.

---

ISSUED BY: **Leif Halvorson**                    INSP # **894**

DATE: **8/29/2024**          TIME: **13:05**      HRS ☐ MAILED

**PLEASE PRESS HARD**

Continued On Reverse

(415) 749-5000

# NOTICE OF VIOLATION    No. A 64218

ISSUED TO: Apple, Inc.    ☑P ☐G ☐N# E2834
ADDRESS: 3250 Scott Blvd.
CITY: Santa Clara    STATE: CA    ZIP: 95054
PHONE: (408) 908-0167
☐ N# Mailing Address on F61

**OCCURRENCE**
NAME:
ADDRESS:    ☑ Same As Above
CITY:
SOURCE S#:    NAME: Boiler #2    ZIP:  - 3MMBtu/hr
EMISSION PT P#:    NAME:
DATE: 11/17/2023    TIME:    HRS:

| | |
|---|---|
| ☐ REG 2 RULE 1 SEC 301 No Authority to Construct | ☐ REG 2 RULE 1 SEC 302 No Permit to Operate |
| ☐ REG 1 SEC 301 H & S CODE - 41700 Public Nuisance | ☐ REG 2 RULE ___ SEC 307 Failure to Meet Permit Condition |
| ☐ REG 5 SEC 301 Prohibited Open Burning | ☐ REG 6 RULE 1 SEC 301 Excessive Visible Emissions |

☑ REG 9 RULE 7 SECTION 307.1 CODE
☐ REG ___ RULE ___ SECTION ___ CODE ___

Details: Exceeding 30ppm NOx @ 3% O2 on Boiler #2

RECIPIENT NAME: KEVIN SUNG
TITLE: ___ EHS LEAD
SIGNING THIS NOTICE IS NOT
AN ADMISSION OF GUILT    X ___

→ WITHIN 10 DAYS, RETURN A COPY OF THIS NOTICE WITH A WRITTEN
DESCRIPTION OF THE IMMEDIATE CORRECTIVE ACTION YOU HAVE
TAKEN TO PREVENT CONTINUED OR RECURRENT VIOLATION. **THIS
VIOLATION IS SUBJECT TO SUBSTANTIAL PENALTY.** YOUR RESPONSE
DOES NOT PRECLUDE FURTHER LEGAL ACTION.

ISSUED BY: Leif Halvorson    INSP #: 894
DATE: 9/12/2024    TIME: 14:00    HRS ☐    MAILED

## PLEASE PRESS HARD

Continued On Reverse

Air Quality Management District  375 Beale Street, Suite 600, San Francisco, CA 94105
(415) 749-5000

# NOTICE OF VIOLATION          No. A 64219

ISSUED TO  Apple, Inc.                    ☑P ☐G ☐N# E2839

ADDRESS   3250 Scott Blvd.

CITY  Santa Clara          STATE  CA       ZIP  95054

PHONE (408) 908-0167

☐ N# Mailing Address on F61

---

OCCURRENCE

NAME _____

ADDRESS _____                    ☑ Same As Above

CITY _____

SOURCE  S# _____ NAME  Boiler #3 - 3MMBt-hr

EMISSION PT  P# _____ NAME: _____

DATE  7/1/2024        TIME: _____        HRS

---

☐ REG 2 RULE 1 SEC 301          ☐ REG 2 RULE 1 SEC 302
No Authority to Construct         No Permit to Operate

☐ REG 1 SEC 301               ☐ REG 2 RULE ___ SEC 307
H & S CODE - 41700            Failure to Meet Permit Condition
Public Nuisance

☐ REG 5 SEC 301               ☐ REG 6 RULE 1 SEC 301
Prohibited Open Burning        Excessive Visible Emissions

☑ REG  9  RULE  7  SECTION  307.1  CODE

☐ REG ___ RULE ___ SECTION ___ CODE

Details  Exceeding 30ppm NOx @ 3% O2 on Boiler #3

RECIPIENT NAME  KEVIN SUNG

TITLE  EHS LEAD

SIGNING THIS NOTICE IS NOT
AN ADMISSION OF GUILT          X _____

➤ WITHIN 10 DAYS, RETURN A COPY OF THIS NOTICE WITH A WRITTEN
DESCRIPTION OF THE IMMEDIATE CORRECTIVE ACTION YOU HAVE
TAKEN TO PREVENT CONTINUED OR RECURRENT VIOLATION.  THIS
VIOLATION IS SUBJECT TO SUBSTANTIAL PENALTY.  YOUR RESPONSE
DOES NOT PRECLUDE FURTHER LEGAL ACTION.

---

ISSUED BY  L.O.F Halvorson                    INSP #  894

DATE  9/2/2024        TIME  14:00      HRS ☐  MAILED

## PLEASE PRESS HARD

Continued On Reverse

375 Beale Street, Suite 600, San Francisco, CA 94105
(415) 749-5000

AIR QUALITY
MANAGEMENT
DISTRICT

# NOTICE OF VIOLATION  No. A 64219

ISSUED TO **Apple, Inc** ☑P ☐G ☐N# **E2839**
ADDRESS **3250 Scott Blvd.**
CITY **Santa Clara** STATE **CA** ZIP **95054**
PHONE **(408) 908-0167**
☐ N# Mailing Address on F61

OCCURRENCE
NAME _____
ADDRESS _____ ☑ Same As Above
CITY _____
SOURCE S# ____ NAME **Boiler #3** - **3MMBt.hr**
EMISSION PT. P# ____ NAME _____
DATE **7/1/2024** TIME _____ HRS

☐ REG 2 RULE 1 SEC 301 No Authority to Construct
☐ REG 2 RULE 1 SEC 302 No Permit to Operate
☐ REG 1 SEC 301 H & S CODE - 41700 Public Nuisance
☐ REG 2 RULE __ SEC 307 Failure to Meet Permit Condition
☐ REG 5 SEC 301 Prohibited Open Burning
☐ REG 6 RULE 1 SEC 301 Excessive Visible Emissions
☑ REG **9** RULE **7** SECTION **307.1** CODE ____
☐ REG __ RULE __ SECTION __ CODE ____

Details **Exceeding 30ppm NOx @ 3% O2 on Boiler #3**

RECIPIENT NAME **KEVIN SUNG**
TITLE **EHS LEAD**
SIGNING THIS NOTICE IS NOT AN ADMISSION OF GUILT X _____

➤ WITHIN 10 DAYS, RETURN A COPY OF THIS NOTICE WITH A WRITTEN DESCRIPTION OF THE IMMEDIATE CORRECTIVE ACTION YOU HAVE TAKEN TO PREVENT CONTINUED OR RECURRENT VIOLATION. **THIS VIOLATION IS SUBJECT TO SUBSTANTIAL PENALTY.** YOUR RESPONSE DOES NOT PRECLUDE FURTHER LEGAL ACTION.

ISSUED BY **L.O.F Halvorson** INSP # **894**
DATE **9/2/2024** TIME **14:00** HRS ☐ MAILED

## PLEASE PRESS HARD

Continued On Reverse

# Gjovik v. Apple

# Exhibit



**COMMISSION NATIONALE**
**INFORMATIQUE & LIBERTÉS**

**Madame Ashley ASHLEYGJOVIK**
1050 BENTON ST, 2310
95050 - SANTA CLARA, ETATS-UNIS

**Lettre recommandée avec AR**
N°AR : RW60 298 203 3 FR

Instruction du dossier :
Sophie GENVRESSE

Paris, le   **0 9 JUIN 2022**

N/Réf. : MLD/SGE/PZN/CLP221047
**Saisine n°22006530**
**(à rappeler dans toute correspondance)**

Madame,

Vous avez saisi la Commission nationale de l'informatique et des libertés (CNIL) d'une plainte à l'encontre de la société APPLE, concernant la collecte illicite de données personnelles et l'atteinte à la vie privée de ses salariés « *dans de nombreux pays* ».

En premier lieu, vous indiquez qu'APPLE impose l'installation et l'activation d'une application nommée « Gobbler » ou « Glimmer » sur le téléphone professionnel de ses salariés et collecte, par ce biais, des données "d'empreinte faciale" de chacun d'entre-eux, empreintes constituées à partir de photos et vidéos prises à leur insu. Ce traitement viserait à améliorer la fonctionnalité « Face ID ».

À cet égard, les éléments portés à notre connaissance ne nous permettent pas d'établir que le Règlement Général sur le Protection des Données (RGPD) trouverait à s'appliquer au traitement de données en cause.

En effet, je vous rappelle que l'article 3 du RGPD dispose que :

« *1. Le présent règlement s'applique au traitement des données à caractère personnel effectué dans le cadre des activités d'un établissement d'un responsable du traitement ou d'un sous-traitant sur le territoire de l'Union, que le traitement ait lieu ou non dans l'Union.*

*2. Le présent règlement s'applique au traitement des données à caractère personnel relatives à des personnes concernées qui se trouvent sur le territoire de l'Union par un responsable du traitement ou un sous-traitant qui n'est pas établi dans l'Union, lorsque les activités de traitement sont liées :*

*a) à l'offre de biens ou de services à ces personnes concernées dans l'Union, qu'un paiement soit exigé ou non desdites personnes ; où*

*b) au suivi du comportement de ces personnes, dans la mesure où il s'agit d'un comportement qui a lieu au sein de l'Union ».*

───── RÉPUBLIQUE FRANÇAISE ─────

3 Place de Fontenoy, TSA 80715 - 75334 PARIS CEDEX 07 - 01 53 73 22 22 - www.cnil.fr

*Les données personnelles nécessaires à l'accomplissement des missions de la CNIL sont traitées dans des fichiers destinés à son usage exclusif.*
*Les personnes concernées peuvent exercer leurs droits Informatique et Libertés en s'adressant au délégué à la protection des données (DPO) de la CNIL*
*via un formulaire en ligne ou par courrier postal. Pour en savoir plus : www.cnil.fr/donnees-personnelles.*

Or, en l'espèce, le traitement semble être principalement effectué à Cupertino (Etats-Unis), au Canada ou en Israël. Il est par ailleurs mentionné dans la documentation interne d'Apple « *qu'aucune donnée de Glimmer ne doit être téléchargée en provenance de certaines régions* », plus précisément « *En France ni en Allemagne* » (Page 11 sur 54). D'après notre compréhension, dans l'hypothèse où l'application serait installée sur les appareils professionnels de salariés d'Apple en France (élément sur lequel nous ne disposons d'aucune information), les données collectées par l'application resteraient stockées localement, sur les téléphones professionnels des salariés.

En second lieu, vous nous indiquez qu'APPLE mettrait en œuvre un autre dispositif biométrique. Vous précisez en effet avoir reçu, depuis 2018, plusieurs emails d'APPLE vous invitant à participer à une étude dans laquelle des scans 3D haute résolution des oreilles des participants seraient réalisés. Aussi, vous précisez que le brevet " AirPods " de l'organisme décrit le dispositif comme un système permettant de capturer de nombreuses données de santé sur les utilisateurs, notamment le rythme cardiaque, le volume sanguin ou le rythme respiratoire des personnes concernées.

Concernant les données personnelles collectés dans le cadre du développement des « AirPods », votre réclamation se fonde uniquement sur le brevet déposé par Apple et plusieurs articles de presse en ligne, sans avancer d'autres preuves matérielles permettant d'attester que de tels traitements seraient mis en œuvre sur le territoire européen et/ou concernerait des personnes résidant dans l'Union Européenne.

Au regard de ce qui précède, les traitements de données à caractère personnel objets de votre saisine n'apparaissent donc pas relever du champ d'application territorial du RGPD.

Au demeurant, j'attire votre attention sur le fait que, pour les traitements qui relèvent du RGPD, l'autorité compétente pour en connaître est l'autorité de contrôle cheffe de file, c'est-à-dire l'autorité où se situe l'établissement principal du responsable de traitement. En l'occurrence, s'agissant d'Apple, il s'agirait de l'autorité irlandaise. Ainsi, et sauf à ce que le traitement de données à caractère personnel en cause ne soit pas transfrontalier et soumis au mécanisme de coopération prévu par le RGPD, la CNIL n'a en principe pas compétence pour contrôler les traitements mis en œuvre par APPLE.

Nous prenons néanmoins bonne note des éléments communiqués et resterons attentifs à d'éventuels compléments ou évolution conduisant à considérer que de tels traitements constituent une violation de la réglementation française ou européenne en matière de protection des données.

Je vous prie d'agréer, Madame, l'expression de mes salutations distinguées.

Marie-Laure DENIS
Présidente

---

*Sous réserve de l'intérêt pour agir des requérants, les décisions de la CNIL sont susceptibles de faire l'objet d'un recours devant le Conseil d'Etat dans un délai de deux mois à compter de leur notification.*





CNIL.
COMMISSION NATIONALE
INFORMATIQUE & LIBERTÉS

3 Place de Fontenoy
TSA 80715
75334 PARIS
CEDEX 07

PRIORITAIRE
PRIORITY
Document

PARIS
75
10 06 2
883 I1 0M 064
FFF3 75 30

€ R.F.
008,20
LA POSTE
CP 651372

R FRANCE
Niveau de garantie : R1 ☐ R2 ☐
PRIO
RW 60 298 203 3 FR
RW 60 298 203 3 FR
REGISTERED MAIL ATTEMPTED DELIVERY
RW 60 298 203 3 FR
RECOMMANDÉ / REGISTERED

LA POSTE

FRANCE

Destinataire de l'envoi (nom, prénom, adresse) :

Ashley GJOVIK
1050 BENTON ST., 2310
95050 - SANTA CLARA
ETATS-UNIS

A remplir par l'expéditeur

A remplir par le bureau de dépôt

☐ courrier ☐ colissimo ☐ livre ☐ sac M — montant Valeur déclarée :

☐ mandat n° : — montant :

À compléter à destination / To be completed at destination :

L'envoi mentionné ci-dessus a été dûment : / This item has been duly :

☐ Remis / Delivered ☐ Payé / Paid

Date et signature / Day of delivery and signature *

* Cet avis pourra être signé par le destinataire ou, si les règlements du pays de destination le prévoient, par une autre personne autorisée ou par l'agent du bureau de destination.
This item has to be signed by the addressee, (if it's authorized by the regulation of country of destination) by someone else authorized, or by the postal worker at destination.

Service des Postes
AVIS DE RÉCEPTION

PRIORITAIRE / PAR AVION
AVIS DE PAIEMENT

N° de l'envoi : RW 60 298 203 3 FR

MLD/SGE/PZN/CLP221047

Timbre du bureau renvoyant l'avis
Stamp of the Post Office returning the advice

CNIL - Commission Nationale de l'Informatique et des Libertés
3 Place de Fontenoy
TSA 80715
75334 PARIS CEDEX 07

FRANCE

Zone réservée au traitement Poste

**COMMISSION NATIONALE INFORMATIQUE & LIBERTÉS**

Ms Ashley ASHLEY GJOVIK
1050 BENTON ST, 2310
95050 - SANTA CLARA, UNITED STATES

**Registered letter with acknowledgement of receipt**
N°AR :RW60298 203 3 FR

Instniction du dossier :                    Paris, le    09 June 2022
Sophie GENVRESSE

Ref. number: MLD/SGE/PZN/CLP221047
**Referral n°22006530**
**(to be included in all correspondence)**

Madam,

You have lodged a complaint with the French Data Protection Authority (Commission nationale de l'informatique et des libertés - CNIL) against APPLE, concerning the illicit collection of personal data and the invasion of the privacy *of* its employees « in many countries ».

Firstly, you state that APPLE requires its employees to install and activate an application called "Gobbler" or "Glimmer" on their work phones, thereby collecting "facial imprint" data from photos and videos taken without their knowledge. The aim is to improve Face ID functionality.

In this respect, the elements brought to our attention do not allow us to establish that the General Regulation *on* Data Protection (RGPD) would find application to the data processing in question.

Indeed, I remind you that Article 3 of the RGPD states that.

*" 1. This Regulation shall apply to the processing of personal data carried out in the course of the activities of a controller or of a service provider within the territory of the Union, whether or not the processing takes place within the Union.*

*2. The present regulation applies to the processing of personal data relating to the persons concerned who are on the territory of the Union by a processing re.open.battle or soas-truitunt which is not established in the Union, where the processing activities are linked to - the processing of personal data relating to the persons concerned who are on the territory of the Union by a processing re.open.battle or soas-truitunt which is not established in the Union, where the processing activities are linked to - the processing of personal data relating to the persons concerned who are on the territory of the Union.*

*a) the offering of goods or services to such data subjects in the Union, whether or not a payment is required from them; or*
*b) the monitoring of their behavior, insofar as such behavior takes place within the Union.*

However, in this case, processing appears to be carried out mainly in Cupertino (United States), Canada, or Israel. Apple's internal documentation also states that "*no Glimmer data should be downloaded in certain regions.*" More specifically, "*In France or Germany*" (page 11 of 54). According to our understanding, in the event that the application were to be installed on the professional devices of Apple employees in France (about which we have no information), the data collected by the application would remain stored locally on the employees' professional phones.

Secondly, you indicate that APPLE is implementing another biometric device. You specify that, since 2018, you have received several emails from APPLE inviting you to participate in a study in which high-resolution 3D scans of participants' ears would be taken. You also specify that the "AirPods" patent describes the device as a system capable of capturing a wide range of health data on users, including heart rate, blood volume and breathing rate.

Regarding the personal data collected in connection with the development of "AirPods," your complaint is based solely on the patent filed by Apple and several online press articles, without providing any other material evidence to support the claim that such tracking is being carried out in the European Union and/or affects individuals residing in the European Union.

In light of the above, the processing of personal data that is the subject of your referral does not appear to fall within the territorial scope of the GDPR.

Furthermore, I would like to draw your attention to the fact that, for processing operations falling within the scope of the GDPR, the competent authority is the lead supervisory authority, i.e. the authority where the data controller has its main establishment. In this case, as it concerns Apple, would be the Irish authority. Therefore, unless the processing of personal data in question is cross-border and subject to the cooperation mechanism provided for by the GDPR, the CNIL does not, in principle, have jurisdiction to supervise the processing carried out by APPLE.

We nevertheless take note of the information provided and will remain attentive to any additional information or developments that could lead us to consider that such processing constitutes a violation of French or European data protection regulations.

Yours sincerely

Marie-Laure DENIS President



**CNIL.**
COMMISSION NATIONALE
INFORMATIQUE & LIBERTÉS

Madame Ashley ASHLEYGJOVIK
1050 BENTON ST, 2310
95050 SANTA CLARA

Paris, le 5 avril 2022

**Accusé de réception de votre courrier**

Votre numéro de dossier : 22006530
*(à rappeler lors de tout contact avec la CNIL)*

Nous avons bien reçu votre demande le 02 avril 2022.

**Après analyse de sa recevabilité, elle a été transmise pour instruction au service des plaintes de la CNIL qui vous informera de l'état d'avancement de votre dossier.**
A cette occasion, des éléments complémentaires pourront vous être demandés.

Lorsque 3 mois se seront écoulés, pour savoir où en est votre dossier, vous pourrez nous contacter en précisant le numéro figurant sur le présent accusé de réception, sur le site de la CNIL depuis le formulaire de la rubrique Besoin d'aide « Comment savoir où en est ma réclamation? ».

Si dans le délai de 3 mois vous avez d'éventuels compléments à apporter, vous pouvez également utiliser ce même formulaire en ligne.

**Nous appelons votre attention sur le fait que les délais de traitement peuvent être importants en raison du grand nombre de saisines que nous recevons.**

Au terme de l'instruction, vous serez informé de l'issue de votre dossier.

Le Service des Relations avec les Publics

Les données personnelles nécessaires à l'accomplissement des missions de la CNIL sont conservées et traitées dans des fichiers destinés à son usage exclusif.
Les personnes concernées peuvent exercer leurs droits Informatique et Libertés en s'adressant au délégué à la protection des données de la CNIL via un formulaire en ligne
ou par courrier postal. Pour en savoir plus : www.cnil.fr/donnees-personnelles.



**CNIL.**
CODE IVSION NATIONALE IN
FORMATIQTJE & LIBERTÉS

Mrs Ashley ASHLEYGJOVIK 1050
BENTON ST, 2310
95050 SANTA CLARA

Paris, April 5, 2022

Your file number: 22006530
*(to be remembered when contacting **the CNIL)***

We received your request on April 02, 2022.

**After analysis of its admissibility, it was forwarded to the complaints department for processing. of the CNIL, which will** keep you **informed** of the progress **of your case.**
You may be asked to provide additional information.

When 3 months have elapsed, to find out the status of your claim, you can contact us by specifying the number shown on this acknowledgement of receipt, on the CNIL website from the form in the Need help section "How to find out the status of my claim†".

If you need to make any additions within 3 months, you can also use the same online form.

**We would like to draw your attention to the fact that processing times can be long due to the large number of** referrals we receive.

At the end of the instruction, you will be informed of Pissne dewtre dmsier.

Public Relations Department

————————————————————————— R Ê PUBLIQUE FRANÇAISE —————

The Wayback Machine - https://web.archive.org/web/20230105104914/https://www.cnil.fr/en/advertising-id-apple-dist…

# Advertising ID: APPLE DISTRIBUTION INTERNATIONAL fined 8 million euros

04 January 2023

On 29 December 2022, the CNIL's restricted committee imposed an administrative fine of 8 million euros on the company APPLE DISTRIBUTION INTERNATIONAL because it did not collect the consent of iPhone's French users (iOS 14.6 version) before depositing and/or writing identifiers used for advertising purposes on their terminals.

## Background information

Following a complaint concerning the ad personalization in the App Store, the CNIL carried out several investigations in 2021 and 2022 in order to verify compliance with the applicable regulations.

The CNIL services found that under the old version 14.6 of the operating system of the iPhone, when a user visited the App Store, identifiers used for several purposes, including personalization of ads on the App Store, were by default automatically read on the terminal without obtaining consent.

## The breach of the French Data Protection Act

Due to their advertising purpose, these identifiers are not strictly necessary for the provision of the service (the App Store). Therefore, they must not be read and/or deposited without the user's prior consent. However, in practice, the advertising targeting settings available from the "Settings" icon of the iPhone were pre-checked by default.

Moreover, the user had to perform a large number of actions in order to deactivate this setting, since this option was not included in the initialization process of the phone. Therefore, the user had to click on the "Settings" icon of the iPhone, then go to the "Privacy" menu and finally to the section entitled "Apple advertising". These elements did not allow to collect the prior consent of users.

Consequently, the restricted committee, the CNIL's body responsible for issuing sanctions, found a breach of Article 82 of the French Data Protection Act and imposed a fine of 8 million euros on APPLE DISTRIBUTION INTERNATIONAL, which was made public.

It explained this amount by the scope of the processing limited to the Apple Store, the number of people concerned in France, the profits the company made from advertising revenues indirectly generated from data collected by these identifiers and the fact that since then, the company has reached compliance.

## Jurisdiction of the CNIL

The CNIL is **materially competent** to verify and sanction operations related to identifiers deposited and/or read by the company on the terminals of Internet users located in France. The cooperation mechanism provided for by the GDPR (the "one-stop shop" mechanism) is not intended to apply in these procedures insofar as the operations linked to the use of the identifiers fall within the scope of the " ePrivacy " directive, transposed in Article 82 of the French Data Protection Act.

The restricted committee considered that the CNIL is also **territorially competent** because the use of identifiers is carried out within the "framework of the activities" of the companies APPLE RETAIL FRANCE and APPLE FRANCE, which constitute the "establishments" on French territory of the APPLE group.

*Note:* APPLE DISTRIBUTION INTERNATIONAL, *whose head office is in Ireland, presents itself as the controller of the processing regarding the ad personalization on the App Store, in the European region. The companies APPLE RETAIL FRANCE and APPLE FRANCE are the establishments in France of the Apple group.*

Texte reference

## The decision (in French)

> Délibération de la formation restreinte n°SAN-2022-025 du 29 décembre 2022 concernant la société APPLE DISTRIBUTION INTERNATIONAL - Légifrance

Texte reference

## Pour approfondir

> The sanctions procedure

> [FR] Identifiant publicitaire : sanction de 8 millions d'euros à l'encontre de APPLE DISTRIBUTION INTERNATIONAL

Haut de page

# Gjovik v. Apple

# Exhibit

 Federal Commissioner
for Data Protection and
Freedom of Information

POSTAL ADDRESS  The Federal Commissioner for Data Protection and Freedom of Information
PO box 1468, 53004 Bonn, Germany

Ms
Ashley M. Gjovik

Only as e-mail:
ashleymgjovik@protonmail.com

STREET ADDRESS  Graurheindorfer Straße 153, 53117 Bonn,
Germany

PHONE  +49 (0)228 997799-1117

E MAIL  Referat11@bfdi.bund.de

PERSON IN CHARGE  Frau Wollnik

INTERNET  www.bfdi.bund.de

DATE  Bonn, 23.06.2022

FILE NUMBER  11-540 II#3693

**Please always indicate the above file-number in all
replies.**

SUBJECT  **Your e-mail from 14. June 2022**

Dear Ms Gjovik,

Unfortunately, I have to inform you that we have handed over your submission to the re-
sponsible state data protection authority in Bavaria.

You can reach our colleagues as follows:

Bayerische Landesamt für Datneshcutzaufsicht

Promenade 18
91522 Ansbach

Telefon: 0981/180093-0

E-Mail: poststelle@lda.bayern.de

Homepage: https://www.lda.bayern.de

Best regards,
By order

Wollnik

54464/2022

DELIVERY ADDRESS  Graurheindorfer Straße 153, 53117 Bonn, Germany
TRANSPORT CONNECTION  Tram 61 and 65, Innenministerium
Bus 550 and S660, Innenministerium

6/2022 10:36 AM      (331) 40 mail | ashleymgjovik@protonmail.com - Proton Mail

## Re: Ihre Meldung vom 19.04.2022

From: Ashley Gjovik <ashleymgjovik@protonmail.com>

To: poststelle@bfdi.bund.de <POSTSTELLE@bfdi.bund.de>

Date: Tuesday, June 14th, 2022 at 9:45 AM

Hello,

I wanted to check in on my question below.

I also want to let you know that a German journalist has been investigating this matter and found that these activities are occurring in Apple offices in Germany. The article should be published next week or the week after. I will share it when it is out. Is there a way for me to contact the investigator assigned to my case?

Thank you!
-Ashley

Hallo!

Ich wollte meine Frage unten überprüfen. Ich möchte Sie auch wissen lassen, dass ein deutscher Journalist diese Angelegenheit untersucht hat und festgestellt hat, dass diese Aktivitäten in Apple-Büros in Deutschland stattfinden. Der Artikel sollte nächste Woche oder die Woche danach veröffentlicht werden. Ich werde es teilen, wenn es draußen ist. Gibt es eine Möglichkeit für mich, den mit meinem Fall beauftragten Ermittler zu kontaktieren? Vielen

Dank! -Ashley

Sent with Proton Mail secure email.

------- Original Message -------
On Sunday, May 8th, 2022 at 8:51 PM Ashley M. Gjovik <ashleymgjovik@protonmail.com> wrote:

Hello,

Thank you very much. I would like to provide evidence of my charges, including, emails, documents, and photos. Is there a way for me to send these documents now? Or do I need to wait to hear from the investigator? Thank you

.......

Google Traduire / Google Übersetzer

Ashley M. Gjovik

Juris Doctor Candidate, International Law Scholar, B.S., PMP

ashleygjovik.com | +1 415-964-6272

-U.S. Rep. John Lewis

"Never ever be afraid to make some noise and get in good trouble, necessary, trouble."

---

6/2022 10:39 AM      (331) 40 mail | ashleymgjovik@protonmail.com - Proton Mail

Hallo, Vielen Dank. Ich möchte Beweise für meine Anklagen vorlegen, einschließlich E-Mails, Dokumente und Fotos. Gibt es eine Möglichkeit für mich, diese Dokumente jetzt zu senden? Oder muss ich warten, um vom Ermittler zu hören? Vielen Dank!

Sent with Proton Mail secure email.

------- Original Message -------
On Tuesday, May 3rd, 2022 at 11:26 PM POSTSTELLE@bfdi.bund.de POSTSTELLE@bfdi.bund.de wrote:

Der Bundesbeauftragte für den Datenschutz und die Informationsfreiheit

Az: 11-840/II#0893

Sehr geehrte Frau Gjovik,

zu standig erhaltliche haben wir Ihre Beschwerde an das Bayerische Landesamt für Datenschutzaufsicht weiter geleitet.

Mit freundlichen Grüßen
Im Auftrag
Davon Zeven
.....
Der Bundesbeauftragte für den Datenschutz und die Informationsfreiheit
Referat Z3
Graurheindorfer Str. 153, 53117 Bonn
Fon (0228) 997799-0
Fax (0228) 997799-550
E-Mail poststelle@bfdi.bund.de
Internet http://www.datenschutz.bund.de

*****************************************************
Diese Nachricht (inklusive Anlagen) der BfDI für den E-Mail Verkehr und die Erfüllung ihrer öffentlichen Aufgaben insgesamt machenbestehtn Einrichtungen an den Internetauftritt der BfDI unter www.bfdi.bund.de
http://www.bfdi.bund.de/DE/Service/Datenschutzerklaerung/datenschutzerklaerung-node.html [sommmd_419D16E624C8G749093F9F8T8OU4VIP692__cut9Y9]
*****************************************************
Kein Zugang für elektronisch signierte Dokumente
*****************************************************

Hinweis:

Diese ist eine vertrauliche Nachricht und nur für den Adressaten bestimmt. Es ist nicht erlaubt, diese Nachricht zu kopieren oder Dritten zugänglich zu machen. Sollten Sie irrtümlich diese Nachricht erhalten haben, informieren Sie bitte sofort den Absender und vernichten diese E-Mail.

# GJOVIK V. APPLE

# EXHIBIT

🇺🇸 An official website of the United States government    [Here's how you know](#)

# NCDF DISASTER COMPLAINT FORM

**Your complaint has been received and will be reviewed for further action.  An investigative agency may reach out to you (unless you have chosen to remain anonymous) should additional information be desired. Thank you for helping to combat disaster fraud by submitting this complaint.**

Go back to the form

**From:** OCI.ContactUs@fda.hhs.gov
**Subject:** [TICK:55272] FDA-OCI Website Contact Us - COVID-19
**Date:** September 3, 2021 at 10:28 PM
**To:** ashleygjovik@icloud.com

-+-+-  Please reply above this line to add a comment  -+-+-

Thank you for contacting FDA Office of Criminal Investigations (OCI).

Please reference message # TICK:55272 for further communication to OCI concerning this matter.
http://www.fda.gov/oci/contact.html

Please do not reply to this email as this is un-monitored mailbox.

# Gjovik v. Apple

# Exhibit

# OFFICIAL US EPA RCRA REPORT

# FOR 3250 SCOTT BLVD, SANTA CLARA

---

**Report Title:** Region 9 Enforcement and Compliance Assurance Division Inspection Report

Compliance Evaluation Inspection on August 17 2023 and August 18 2023
Focused Compliance Inspection on January 16 2024

**Date of Report:** April 30 2024

**Agency**: US Environmental Protection Agency
**Division**: Enforcement and Compliance Assurance
**Branch**: Air, Waste and Chemicals

---



### Region 9 Enforcement and Compliance Assurance Division
# INSPECTION REPORT

| Inspection Date(s): | August 17 – 18, 2023 and January 16, 2024 | | Inspection(s) Announced: No |
| --- | --- | --- | --- |
| **Time #1:** | Entry #1: 10:05 am (August 17, 2023) | | Exit #1: 2:29 pm (August 18, 2023) |
| **Time #2:** | Entry #2: 9:20 am (January 16, 2024) | | Exit #2: 4:50 pm (January 16, 2024) |
| **Media:** | RCRA | | |
| **Regulatory Program(s)** | RCRA Subtitle C: Hazardous Waste Program; | | |

| | | | |
| --- | --- | --- | --- |
| **Company Name:** | Apple, Inc. | | |
| **Facility or Site Name:** | Same | | |
| **Facility Location(s):** (city, state, zip code) | 3250 Scott Blvd, Santa Clara, CA 95054 | | |
| **Mailing Address:** (city, state, zip code) | 1 Apple Park Way, M/S 319 EHS Cupertino, CA 95014 | | |
| **Geographic Coordinates:** | 37.378670 / -121.971840 [www.latlong.net] | | |
| **County:** | Santa Clara County | | |
| **Facility/Site Contact:** | Tom Huynh | | EHS Manager |
| | tom_huynh@apple.com | | |
| | (408) 595-0947 | | |

| | |
| --- | --- |
| **Facility/Site Identifier:** | EPA ID Number: CAR 000 278 176 and CAT 000 623 983 |
| **Generator Status:** | EPA inspected one Apple, Inc. (Apple) facility located at 3250 Scott Blvd in Santa Clara, CA (EPA ID Number CAR 000 278 176). This facility operates as Large Quantity Generator (LQG) of RCRA and non-RCRA hazardous waste (NRHW) in the State of California. This facility also operates as a Small Quantity Handler of Universal Waste Batteries.<br><br>According to RCRA Info, Apple's Santa Clara location was also assigned a second EPA ID Number (i.e., CAT 000 623 983) in September of 1986. This second EPA ID Number is related to a historic clean-up, initiated by one of the previous owners of the site, Synergy Semiconductor. On November 6, 2020, Apple notified EPA that this specific cleanup activity and the EPA ID Number associated with the cleanup (i.e., CAT 000 623 983), are no longer active under RCRA. |
| **NAICS:** | 334111 [Electronic Computer Manufacturing]. |
| **SIC:** | 3571 [Electronic Computers]. |

| **Facility/Site Personnel Participating in Inspection:** | | | |
| --- | --- | --- | --- |
| Tom Huynh, PE | Apple, Inc. | EHS Manager | tom_huynh@apple.com (408) 595-0947 |

Apple, Inc.
08/17/2023, 08/18/2023 and 01/16/2024

| Kevin Sung | Apple, Inc. | EHS Engineer | kevin_sung@apple.com (408) 908-0167 |
|---|---|---|---|
| Grace Fisk | Apple, Inc. | EHS Engineer | gfisk@apple.com |
| Sameei Al Khafaji | ACT Enviro | Field Chemist | salkhafaji@actenviro.com (408) 548-5050 |
| Demonte Rose | ACT Enviro | | |
| Allen Sherlock | Apple, Inc. | | |
| Joe Loft | Apple, Inc. | Facilities Engineer | |
| **Other Personnel Participating in Inspection:** | | | |
| Frederick Chun | Santa Clara Fire Department | Assistant Fire Marshall / CUPA Manager | fchun@santaclaraca.gov (408) 615-4961 |
| **Inspector(s):** | | | |
| Christopher Rollins (Lead Inspector) | CHRISTOPHER ROLLINS — Digitally signed by CHRISTOPHER ROLLINS Date: 2024.04.25 09:43:36 -07'00' | | |
| | US EPA, Region 9 Mail Code: ENF 2-2 | Environmental Protection Specialist | rollins.christopher@epa.gov (415) 947-4166 |
| Anuka King | US EPA, Region 9 Mail Code: ENF 2-2 | Physical Scientist | king.anuka@epa.gov (415) 972-3470 |
| Mark Anthony Relon | US EPA, Region 9 Mail Code: ENF 2-2 | Physical Scientist | relon.markanthony@epa.gov (415) 972-3252 |
| **Peer Review:** | | | |
| Mark Anthony Relon | MARK ANTHONY RELON — Digitally signed by MARK ANTHONY RELON Date: 2024.04.29 17:31:53 -07'00' | | |
| | US EPA, Region 9 Mail Code: ENF 2-2 | Physical Scientist | relon.markanthony@epa.gov (415) 972-3252 |
| Kaoru Morimoto | Morimoto, Kaoru — Digitally signed by Morimoto, Kaoru Date: 2024.04.30 08:42:42 -07'00' | | |
| | US EPA, Region 9 Mail Code: ENF 2 | Assistant Director, Air, Waste & Chemicals Branch | morimoto.kaoru@epa.gov (415) 972-3306 |

Apple, Inc.
08/17/2023, 08/18/2023 and 01/16/2024

## SECTION I – INTRODUCTION

### Purpose of the Inspection

The purpose of the inspection was to determine Apple, Inc.'s (Apple) compliance with applicable federal environmental statutes and regulations, and in particular, the Resource Conservation and Recovery Act (RCRA), as amended, the hazardous waste regulations provided in the Code of Federal Regulations (CFR), Chapter 40, Parts 260 - 266, 268, 270, 273, and 279, the California Health and Safety Code (HSC), Division 20, Chapter 6.5; and the California Code of Regulations (CCR), Title 22, Division 4.5.[1]

### Opening Conference

### August 17, 2023

On August 17, 2023, EPA Region 9 Inspector Christopher Rollins, arrived at Apple's 3250 Scott Blvd facility in Santa Clara, CA at 10:00 am. Frederick Chun, Assistant Fire Marshall for the Santa Clara Fire Department (the CUPA)[2] was already onsite. EPA's participation in the inspection was unannounced. However, the CUPA inspector had previously scheduled a Large Quantity Generator (LQG) and Business Plan inspection with the facility three weeks prior.

Upon our arrival at the main entrance, both EPA and the CUPA were greeted by Apple's environmental staff. The inspectors were introduced to Tom Huynh (EHS Manager), Kevin Sung (EHS Engineer) and Grace Fisk (EHS Engineer) of Apple at 10:05 am.

After introductions, the inspectors were escorted to a small table located outside of the facility to begin the Opening Conference. The EPA inspector (Christopher Rollins) presented his federal credentials to the Apple representatives and informed the facility that this RCRA hazardous waste inspection was based on a Tip and Complaint from the public.

EPA also informed Apple, that the agency would be evaluating the facility's RCRA operations and reviewing the facility's records to confirm compliance with the LQG requirements. Once EPA answered some of the facility's questions regarding the Tip and Complaint the inspector gave an overview of the inspection process to all those present.

---

[1] All citations in this report that refer to the California Code of Regulations (CCR) refer to Division 4.5 of Title 22 of the current California Code of Regulations. EPA is enforcing California hazardous waste management program requirements as approved and authorized by the United States on August 1, 1992 (see 57 Fed. Reg. 32726, July 23, 1992), September 26, 2001 (66 Fed. Reg. 49118, September 26. 2001), and October 7, 2011 (see 76 Fed. Reg. 62303, October 7, 2011). Corresponding Federal citations are provided as a convenience in brackets.
[2] CUPA stands for the Certified Unified Program Agency and is made up of local entities certified by CalEPA to implement and enforce six hazardous waste and hazardous materials regulatory management programs in California.

Apple, Inc.
08/17/2023, 08/18/2023 and 01/16/2024

The inspection would consist of a general walk-through of the facility, which would include the facility's Central Accumulation Area (CAA)[3], Satellite Accumulation Areas (SAAs), and Laboratories. EPA would also review the facility's storage records, hazardous waste manifests, and other operating records required under RCRA. EPA then donned personal protective equipment and began the facility walk-through[4].

**August 18, 2023**
The following day, Inspector Rollins continued the RCRA inspection and arrived at the Apple facility at 8:15 am. The purpose of the second day of inspections was to review records and focus on the waste generation process onsite. EPA departed the site at 2:29 pm.

The CUPA's Frederick Chun did not participate in EPA's second day of inspections. However, EPA's Anuka King from Region 9's Risk Management Program managed under the Clean Air Act (i.e., 112 r Program) did accompany Inspector Rollins on the inspection.

**January 16, 2024**
A follow-up inspection was conducted by EPA Region 9 at the Apple site on January 16, 2024. The purpose of the follow-up inspection was to walk the ███B(4)███ Floor and review certain ██B(4)██ in order to understand Apple's ██B(4)██ processes, and the wastes generated from those processes.

EPA inspectors Christopher Rollins and Mark Anthony Relon participated in the follow-up inspection. No CUPA inspectors were present during this follow-up inspection, which began at 9:20 am and ended at 4:50 pm the same day.

**Facility/Site Description**

Apple's Santa Clara facility is a ██B(4)██ ██B(4)██ Research and Development (R&D) Facility. The facility has two buildings in the immediate area and has a total of approximately 300 - 350 employees. The Santa Clara site has been in operation since about 2016. Apple's main building (Building 1) operates 24 hours a day, 5 days a week (M-F) and generates primarily RCRA organic and corrosive hazardous wastes (i.e., solids and liquids) from various R&D operations onsite. Building 2 serves as an office building and generates no wastes.

The Bay Area Air Quality Management District (BAAQMD) issued Apple a Permit to Operate (Plant No. 22839) under the Clean Air Act on or about May 6, 2023 (Attachment B). The permit

---

[3] As of May 30, 2017, EPA refers to less than 90-day hazardous waste accumulation areas (for Large Quantity Generators) and less than 180-day hazardous waste accumulation areas (for Small Quantity Generators) as Central Accumulation Areas (reference 81 FR 85732 and 81 FR 85743).

[4] The observations of each walk-through inspection and the records review findings are captured in "Section II – Observations, Potential Violations and Areas of Concern" of this inspection report. Only those observations that were recorded and/or documented as potential violations or areas of concern were noted in Section II.

Apple, Inc.
08/17/2023, 08/18/2023 and 01/16/2024

allows the facility to use solvents and corrosives at their Solvent Sink Stations, Solvent Vapor
Stations, in their Wipe Cleaning Operations, and in their ████ B(4) ████ and Solvent Base
██ B(4) ██ Operations. These same chemicals once spent are potentially regulated under RCRA
as federal and/or state regulated hazardous wastes. Apple's BAAQMD permit is expected to
expire on May 1, 2024.

On November 20, 2020, Apple obtained an Industrial Wastewater Discharge Permit (Permit No.
SC-461B) from the San Jose-Santa Clara Regional Wastewater Facility (Attachment C) and
manages an Acid Waste Neutralization (AWN) Tank System and a Heavy Metals Rinsate (HMR)
Tank System that were issued under the State of California's "Permit By Rule," provisions [Title
22 of the California Code of Regulations (CCR) § 67450.2]. As such, the facility is authorized to
treat corrosive hazardous wastes in its AWN Tank System, separate out heavy metals using the
facilities HMR Tank System, and discharge the treated wastewater directly to the sanitary sewer
(Attachments D & E).

The facilities AWN Tank System includes four tanks, comprising of equalization and pH
adjustment tanks. Apple's HMR Tank System includes two lift stations (SLW2/HMR-LS and HMR-
LS), two equalization tanks (HMR-TNK-2 and HMR-TNK-4), a pH adjuster tank (HMR-TNK-3), a
vacuum distillation evaporator (VDE-1), and a heavy metal concentrate tank (HMC-TNK-2).
Apple's AWN Tank System and HMR Tank System are also covered under the State of
California's "Permit by Rule" provisions.

Apple also manages a 1,700-gallon RCRA hazardous waste solvent tank that is also regulated
under California's "Permit by Rule"[5] provisions (Attachment F). The spent solvent waste
accumulated in the facility's spent solvent tank is generated from various R&D ████ B(4) ████
██ B(4) ██ operations upstream. During the August 17, 2023 inspection, EPA documented that
Apple's 1,700-gallon solvent tank vents to a 55-gallon canister of activated carbon. At the time
of the inspection, the canister of activated carbon was not permitted under the Clean Air Act.
Nor was the canister being managed by Apple under RCRA's air emission regulations.

The facility's solvent waste tank system is comprised of a 67-gallon double-walled solvent waste
lift station (SW-LS) that pumps solvent wastes within the building; a solvent waste collection
cabinet (SW-CC)[6] with two 55-gallon containers used historically for storage; a 1,700-gallon
double-walled storage tank (SW-TNK-2); and a solvent waste transfer station (SW-TFS-1). The

---

[5] The State of California's "Permit By Rule" Provisions are codified under 22 CCR § 67450.2.
[6] Currently, the solvent waste collection cabinet is no longer in service and does not directly contact or store
solvents pumped through the system.

(111 of 414), Page 111 of 404
Case: 25-2028, 05/20/2025, DktEntry: 27.6, Page 111 of 414
Case 3:23-cv-04597-EMC   Document 86-1   Filed 07/31/24   Page 8 of 47

Apple, Inc.
08/17/2023, 08/18/2023 and 01/16/2024

solvent waste transfer station is used to transfer solvents from the storage tank to a vacuum truck or tote for the purposes of disposal.

The specific waste streams observed and/or documented onsite consist primarily of spent solvent waste, corrosive wastes, corrosive solvent mixtures, sludges and solid lab debris. Based on the facility's 2021 Biennial Report the facility reports generating federally regulated hazardous waste with EPA waste codes D001, D002, D003, D004, D011, D035, F003 and F005.

According to the California Environmental Reporting System (CERS), Apple was last inspected by the CUPA on October 26, 2020 and December 23, 2020. No RCRA violations were documented during these inspections.

EPA checked the agency's RCRAInfo database and according to that database, R9 doesn't appear to have inspected this location prior to the Agency's August 17, 2023 inspection.

**SECTION II – OBSERVATIONS, POTENTIAL VIOLATIONS AND AREAS OF CONCERN**

| Observation(s) | Photograph(s) | Potential Violations |
|---|---|---|
| Observation #1 (Aug 2023): EPA observed nineteen closed 5-gallon containers of liquid waste stacked against the wall in Apple's Building 1 East - Compartment 1 Indoor CAA Shed (The Bunker Area). The labels on the majority of the nineteen containers identified the contents of each waste stream as containing corrosive liquids (D002 Waste).<br><br>The nineteen containers were stacked in a pile three containers high, four containers across, and two containers in depth. Two of the 5-gallon containers on the very top of the pile (Photo 1a), were missing their hazardous waste labels and not properly marked with Accumulation Start Dates (ASDs), as required while in storage at the CAA.<br><br>According to Apple, the two containers missing their labels and | B(4)<br><br>Photo 1a (P8170006.JPG)<br><br>B(4)<br><br>Photo 1b (P8180009.JPG) | Potential Violation #1 (Aug 2023): EPA observed nineteen closed 5-gallon containers of corrosive liquids (D002 Waste) in Apple's Bunker Area. Two of the containers were not properly dated to indicate how long the waste had been stored onsite or marked to identify the contents as hazardous under RCRA.<br><br>In addition, eleven of the hazardous waste container labels were not clearly visible for inspection, and one container was stored onsite for greater than 90-days, with an ASD of March 2, 2023. These waste streams all appear to be RCRA regulated hazardous waste.<br><br>Sections §§ 66262.34(a)(1)(A) and 66262.34(f)(1) – (3) of Title 22 of the California Code of Regulations (CCR) states that generators who accumulate hazardous waste on site without a permit or grant of interim |

Apple, Inc.
08/17/2023, 08/18/2023 and 01/16/2024

ASDs were placed in the Bunker Area the morning of EPA's inspection. The staff maintaining the area would later return to properly mark and date the waste in accordance with RCRA. These 5-gallon containers were required to be properly labeled and dated prior to arriving at the CAA.

The inspectors also observed that eight of the nineteen 5-gallon containers stacked in the back of the pile and three of the containers stacked in the front of the pile were not clearly visible for inspection, without physically moving each of the containers. In addition, one of the nineteen containers of corrosive waste stacked in the back of the pile was stored onsite for greater than 90-days (Photo 1c). The ASD on this container was listed as March 2, 2023, and the contents for this container were marked as "B(4)⁷".

The next day, Apple did mark the two unlabeled containers, properly identifying the contents of the waste streams as corrosive waste (D002 Waste). The facility recorded the ASD of August 17, 2023 on each container.

Apple managed this area as a less than 90-day hazardous waste accumulation area. Prior to EPA's inspection, no Apple employees were actively working in the Bunker Area, filling or emptying any of the containers while they were in storage.



B(4)

Photo 1c (P8180010.JPG)

status shall comply with the following:

(1) The date upon which each period of accumulation begins shall be clearly marked and visible for inspection on each container and portable tank;

(2) The date the applicable accumulation period specified in subsection (a) or (d) of this section begins, for purposes of subsections (a) and (b) of this section, shall be clearly marked and visible for inspection on each container and tank;

(3) Each container and tank used for onsite accumulation of hazardous waste shall be labeled or marked clearly with the words, "Hazardous Waste." Additionally, all containers and portable tanks shall be labeled with the following information:

A) Composition and physical state of the wastes;

B) Statement or statements which call attention to the particular hazardous properties of the waste (e.g., flammable, reactive, etc.);

C) Name and address of the person producing the waste [40 CFR § 262.17(a)(5)(A) – (5)(C)].

Section § 66262.34(c) of Title 22 of the CCR states that a generator who accumulates hazardous waste for more than 90 days is an operator of a storage facility and is subject to the requirements of chapters 14 and 15 of this division and the permit

---

⁷ Later it was determined by EPA that the correct name for this waste stream was " B(4) ." According to Apple's Safety Data Sheet, this chemical substance was manufactured in Japan and has no pH or Flash Point value established for this product.

Apple, Inc.
08/17/2023, 08/18/2023 and 01/16/2024

| | | |
|---|---|---|
| The Bunker Area is located downstream from Apple's initial waste generation activities. | 

RTC Photo | requirements of chapter 20 of this division unless the generator has been granted an extension to the 90-day period or meets the requirements of subsection (d) or (e) of this section [40 CFR § 262.17(b)].

**The facility returned to compliance with these potential violations on or about September 8, 2023. Specifically, Apple labeled and dated the two unknown 5-gallon containers of waste, processed the 5-gallon container of "** B(4) **" waste through the Acid Waste Neutralization (AWN) System, and manifested the empty container off for disposal on Manifest 018419007 FLE (See RTC Photo).**

**Lastly, according to Apple, the facility changed its storage procedures so that all of the labels on the 5-gallon containers in the Bunker Area are now stored with their labels pointing outward.** |
| Observation #2 (Aug 2023): EPA observed one open 5-gallon container marked as "Adhesive Liquids and Tape" in Apple's Bunker Area (Photo 2a). According to the label on the container, the waste was being managed as both a flammable and toxic waste (Photo 2b). At the time of the inspection, EPA could not determine whether this waste was federal, or state only regulated waste.

The container had an ASD of July, 22, 2023 and appeared to have too many metal canisters of flammable liquid waste inside of the container that prevented the lid from closing properly. | 

Photo 2a (P8170013.JPG) | Potential Violation #2 (Aug 2023): EPA observed an open 5-gallon container of "Adhesive Liquids and Tape" in Apple's Bunker Area. It was later determined that this waste stream was California Only waste and therefore not regulated by EPA.

Section § 66265.173(a) of Title 22 of the CCR states that a container holding hazardous waste shall always be closed during transfer and storage, except when it is necessary to add or remove waste.

**The facility returned to compliance with this potential violation on August 18, 2023, when Apple closed the container in accordance with California's regulations (See Photo 2c).** |

Apple managed this area as a less than 90-day hazardous waste storage area. Prior to EPA's inspection, no Apple employees were actively working in the Bunker Area, filling or emptying any of the containers that were in storage.

The Bunker Area is located downstream from Apple's initial waste generation activities.



Photo 2b (P8170014.JPG)



Photo 2c (P8180013.JPG)

Observation #3 (Aug 2023): EPA observed a closed 5-gallon container marked as "Silicone" waste in Apple's Bunker Area (Photo 3a). According to the label on the container the waste was being managed as a toxic waste. At the time of the inspection, EPA could not determine whether this waste was federal, or state only regulated waste.

In addition, the container appeared to be stored onsite for greater than 90-days. The ASD on this container was recorded as March 16, 2022 on the label.

Apple managed this area as a less than 90-day hazardous waste



Photo 3a (P8170015.JPG)

Potential Violation #3 (Aug 2023): EPA observed a closed 5-gallon container of "Silicone" waste in Apple's Bunker Area. Based on the container's ASD the waste was stored onsite for more than 90-days (ASD = March 16, 2022), without a RCRA permit as required by State law.

It was later determined that this waste was California Only waste (NRHW), and therefore not regulated by EPA.

Section § 66262.34(c) of Title 22 of the CCR states that a generator who accumulates hazardous waste for more than 90 days is an operator of a storage facility and is subject to

Apple, Inc.
08/17/2023, 08/18/2023 and 01/16/2024

storage area. Prior to EPA's inspection, no Apple employees were actively working in the Bunker Area, filling or emptying any of the containers that were in storage.

The Bunker Area is located downstream from Apple's initial waste generation activities.



RTC Photo

the requirements of chapters 14 and 15 of this division and the permit requirements of chapter 20 of this division unless the generator has been granted an extension to the 90-day period or meets the requirements of subsection (d) or (e) of this section.

**The facility returned to compliance with this potential violation on or about September 8, 2023. Specifically, Apple removed the one dispenser tube inside of the container used to dispense adhesives (See RTC Photo) and disposed of the material as NRHW on Manifest 018419007 FLE.**

Observation #4 (Aug 2023): EPA observed different sized waste containers on the floor in Apple's Bunker Area (Photo 4a). Specifically, EPA observed six 1-gallon containers of "███████ ████ ███ ███," a small container of "Boric Acid," and three unknown containers of waste in this area.

According to Apple, the waste containers on the floor were expired waste that were placed in the Bunker Area the morning of August 17, 2023, and just hadn't been marked as hazardous waste or dated, prior to EPA's arrival. These waste containers were required to be properly labeled and dated prior to arriving at the CAA.

Apple managed this area as a less than 90-day hazardous waste storage area. Prior to EPA's inspection, no Apple employees were actively working in the Bunker Area, filling or emptying



Photo 4a (P8170016.JPG)

Potential Violation #4 (Aug 2023): EPA observed six 1-gallon waste containers of "███████ ████ ███ ███" (D002 Waste), a small container of "Boric Acid" (NRHW), and three unknown containers in Apple's Bunker Area. At the time of EPA's inspection, a waste determination had not been performed on the waste streams to determine if the materials were hazardous waste or whether they were regulated federally or by the State of California.

It was later determined that this waste was a mixture of NRHW and RCRA regulated hazardous waste. Therefore, some of the waste is regulated by EPA.

Section § 66262.11 of Title 22 of the CCR states that a person who generates a waste, as defined in section 66261.2, shall determine if that waste is a hazardous waste [40 CFR § 262.11].

**The facility returned to compliance with this potential violation on or**

Apple, Inc.
08/17/2023, 08/18/2023 and 01/16/2024

| | | |
|---|---|---|
| any of the containers that were in storage.<br><br>The Bunker Area is located downstream from Apple's initial waste generation activities. | | **about September 8, 2023. Specifically, Apple properly containerized, labeled and dated the waste containers in this area in accordance with RCRA.** |
| Observation #5 (Aug 2023): EPA observed one open 55-gallon container marked as "Mega Posit," waste in Apple's Bunker Area (Photo 5a). The label on the container indicated that the waste was being managed as a corrosive liquid (Photo 5b).<br><br>According to Apple, the container's bung cap was left open in order to prevent the container from building up too much pressure while in storage. EPA informed the facility that the container must always remain closed during storage, and recommended that the facility purchase a closure device, for future use, to allow the container to periodically vent pressure while in storage.<br><br>Apple managed this area as a less than 90-day hazardous waste storage area. Prior to EPA's inspection, no Apple employees were actively working in the Bunker Area, filling or emptying any of the containers that were in storage.<br><br>The Bunker Area is located downstream from Apple's initial waste generation activities. | <br>Photo 5a (P8170020.JPG)<br><br><br>Photo 5b (P8170021.JPG) | Potential Violation #5 (Aug 2023): EPA observed one open 55-gallon container marked as "Mega Posit," waste in Apple's Bunker Area. The waste was being managed as a corrosive liquid (D002 Waste).<br><br>According to Apple, the container was left open in order to prevent the container from building up too much pressure while in storage. This waste stream appears to be a RCRA regulated hazardous waste.<br><br>Sections §§ 66262.34(a)(1)(A) and 66265.173(b) of Title 22 of the CCR states that a container holding hazardous waste shall not be opened, handled, transferred or stored in a manner which may rupture the container or cause it to leak. Re-use of containers for transportation shall comply with the requirements of the U.S. Department of Transportation regulations, including those set forth in 49 CFR section 173.28 [40 CFR § 262.17(a)(1)(iv)(A)].<br><br>**The facility returned to compliance with this potential violation on or about September 8, 2023. Specifically, Apple closed the 55-gallon container of "Mega Posit," while in storage (See Photo 5c) and then placed the waste through the Acid Waste Neutralization (AWN) System.**<br><br>**Moving forward, Apple states that the "Mega Posit" will no longer be managed in a 55-gallon container** |

Apple, Inc.
08/17/2023, 08/18/2023 and 01/16/2024

| | | but in a 5-gallon container and poured directly into the AWN Tank System. |
|---|---|---|
| |   Photo 5c (P8180012.JPG) | |

Observation #6 (Aug 2023): EPA observed one 1,700-gallon stainless-steel solvent waste tank (SW-TNK-2) inside Building 1 of Apple's facility (Photo 6a). The stainless steel, double-walled tank is used for the accumulation of spent solvent waste generated from R&D operations onsite, and is filled continuously on a 24 hour, 5-days a week basis (M-F).

Based on Apple's records, the spent solvent waste was being managed as a NRHW liquid (CA-133 – Attachment G). Specifically, the waste was identified as "Water with Solvents," directly on the hazardous waste label posted on Apple's solvent waste tank (Photos 6a and 6b).

Previous waste profiles and manifests identify Apple's spent solvent waste as containing either F-Listed waste (D001 and F003 waste) or ignitable waste (D001 waste). Both of the previous waste streams are federally regulated. Therefore, if regulated as a D001 or F003 waste, Apple would be required to store,


Photo 6a (P8170051.JPG)

Potential Violation #6 (Aug 2023): EPA observed a 1,700-gallon stainless-steel, double-walled solvent waste tank (SW-TNK-2) inside Building 1 of Apple's facility. The contents of the hazardous waste tank were being managed as a NRHW liquid (CA-133 Waste). To date, Apple has not provided evidence regarding how the spent solvents were determined to be California Only waste.

After EPA's inspection it was determined that the source of the spent solvent waste entering the solvent waste tank is characteristic for ignitability and should be, at a minimum, managed as a D001 hazardous waste stream at the point of origination.

Moreover, Apple appears to have been improperly treating the waste entering this hazardous waste unit, without a permit by diluting the solvent waste with water and other wastes.

Under RCRA, diluting hazardous waste whether intentionally or unintentionally to remove a wastes'

Apple, Inc.
08/17/2023, 08/18/2023 and 01/16/2024

manifest and dispose of the solvents based on specific Land Disposal Restrictions (LDR) listed under 40 CFR Part 268 of RCRA. At the time of the inspections Apple did not provide adequate documentation verifying why the facility is currently managing their solvent waste as California Only Waste (CA-133).

Later, it was determined by EPA (See Potential Violations #9 and #10) that the source of the waste that is being placed in the solvent waste tank meets the definition of ignitable waste (D001 Waste). As such, the tank is regulated as a RCRA hazardous waste storage tank.

At the time of EPA's inspection, the spent solvent tank was in operation, not being repaired or solvents removed while in service, and the tank was not being managed under any exemptions.



Photo 6b (P8170052.JPG)

characteristics is considered a form of treatment. It is improper to treat hazardous waste without a permit unless the type of treatment is covered under an exemption.

Apple does not have a permit to treat its solvent waste in the 1,700-gallon solvent waste tank. Nor does the facility appear to meet an exemption from treatment under RCRA.

Section § 66262.11 of Title 22 of the CCR states that a person who generates a waste, as defined in section 66261.2, shall determine if that waste is a hazardous waste [40 CFR § 262.11].

Section § 66270.1(c) of Title 22 of the CCR states that a permit is required for the "transfer," "treatment," "storage," and "disposal of any waste which is hazardous waste pursuant to section 66261.3 and as defined in section 66260.10 [40 CFR § 270.1(c)].

**These potential violations are still outstanding.**

Observation #7 (Aug 2023): EPA observed one 55-gallon canister of "Activated Carbon" on the roof of Building 1 (Photo 7a). The container was connected to Apple's 1,700-gallon spent solvent tank (SW-TNK-2). The device was used to capture Volatile Organic Compounds (VOCs) released from the spent solvent tank located directly below. This device was not described or referenced in Apple's October 2022 Hazardous Waste Tank System Assessment.

According to Apple, the device was covered under a Clean Air Act



Photo 7a (P8170062JPG)

Potential Violation #7 (Aug 2023): EPA observed a 55-gallon canister of "Activated Carbon" on the roof of Building 1. At the time of the inspection, Apple's canister of "Activated Carbon" was not covered under the facility's Clean Air Act permit as an air emissions device. Nor was the device included or referenced in Apple's October 2022 Hazardous Waste Tank System Assessment.

Later it was determined that Apple has been managing their "Activated Carbon" as a NRHW since at least December 14, 2020. However, Apple

Apple, Inc.
08/17/2023, 08/18/2023 and 01/16/2024

application submitted to the BAAQMD. The use of "Activated Carbon" canisters to remove VOCs can be regulated under both the Clean Air Act and RCRA. At the time of EPA's inspection, BAAQMD had not received Apple's Clean Air Act Permit application to regulate the container as a device under the Clean Air Act[8].

On September 13, 2023, Apple applied for a Permit Modification to BAAQMD requesting that the facility's 55-gallon canister of "Activated Carbon" be added as an abatement device for the facility's 1,700-gallon solvent waste tank (Attachment H).



Photo 7b (P8170061.JPG)

does not appear to have performed a waste determination on the spent "Activated Carbon," between 2020 and 2023, to justify why it has been managing the waste as NRHW. Further review of this waste stream and the process by which it is managed is required to determine if the "Activated Carbon" is a hazardous waste or not at disposal.

Section § 66262.11 of Title 22 of the CCR states that a person who generates a waste, as defined in section 66261.2, shall determine if that waste is a hazardous waste [40 CFR § 262.11].

**This potential violation is still outstanding.**

---

Observation #8 (Jan 2024): EPA observed three chemicals being used in Tool 8-02C in B(4) B(4) - B(4) of Apple's Area (Photo 8a). The three chemicals used were " B(4) (Flashpoint = 90⁰F)", " B(4) B(4) – Flashpoint = 52.5⁰F)", and " B(4) (pH = 13.2)". Once spent, the " B(4) " and " B(4) " wastes are managed as ignitable (D001 Waste) solvents and pumped into 5-gallon carboy containers that are located under the grated floor in B(4) (Attachments I – K). The spent solvent containers are then transferred to Apple's Bunker Area for long-term storage.

However, the " B(4) " chemical is not used as a solvent in the process but is accumulated in the same 5-gallon carboys used to



B(4)

Photo 8a (IMG_5542.JPG)

Potential Violation #8 (Jan 2024): EPA observed the chemical " B(4) " being used in Tool 8-02C in B(4) B(4) - B(4) of Apple's Area. Based on the SDS (Attachment K), " B(4) " has a pH of 13.2 prior to use. Under RCRA, a spent liquid with a pH of greater than 12.5 may be regulated as a corrosive waste (D002 Waste) when disposed of and therefore should be evaluated for its corrosive properties upon disposal. Apple does not appear to have performed a waste determination on the spent waste and this waste stream appears to be a RCRA regulated hazardous waste.

Moreover, Apple does not appear to have a permit to treat its solvent or corrosive waste in the 5-gallon carboy units. Nor does the facility appear to meet an exemption from treatment, under RCRA.

---

[8] A copy of Apple's Clean Air Act permit application was requested, and it was documented that Apple applied for the device to be covered under the Clean Air Act on September 13, 2023, after EPA's initial RCRA inspection.

Apple, Inc.
08/17/2023, 08/18/2023 and 01/16/2024

| | | |
|---|---|---|
| store the spent solvents. Based on the SDS, " B(4) " has a pH of 13.2 prior to use. Under RCRA, a spent liquid with a pH greater than or equal to 12.5 is considered a corrosive waste (D002 Waste). Apple does not appear to have performed a waste determination on the 5-gallon carboys, to verify whether the mixture of spent solvents (D001 Waste) and the " B(4) " waste, are also hazardous for corrosivity at the point of origination.

At the time of EPA's inspection, Apple was managing the 5-gallon carboy containers (D001 Waste) used to accumulate the solvent waste, as SAA containers. These containers are attached to Apple's solvent tools and are filled on a continuous basis.

Under RCRA, SAA containers and containers under 26.4-gallons (0.1 m³) are exempt from the RCRA air emission requirements for containers. Therefore, the containers and the equipment in contact with solvents greater than 10% ppmw are not subject to the monitoring, tagging or record keeping requirements for hazardous waste units under Subparts BB and CC of RCRA. | | Section § 66262.11 of Title 22 of the CCR states that a person who generates a waste, as defined in section 66261.2, shall determine if that waste is a hazardous waste [40 CFR § 262.11].

Section § 66270.1(c) of Title 22 of the CCR states that a permit is required for the "transfer," "treatment," "storage," and "disposal of any waste which is hazardous waste pursuant to section 66261.3 and as defined in section 66260.10 [40 CFR § 270.1(c)].

Please note, diluting hazardous waste whether intentionally or unintentionally to remove a wastes' characteristics is considered a form of treatment. Under RCRA it is improper to treat hazardous waste without a permit unless the type of treatment is covered under an exemption.

**These potential violations are still outstanding.** |
| Observation #9 (Jan 2024): EPA observed two solvent baths of "Isopropyl Alcohol" (100%) being used in Apple's Solvent B(4) B(4) (Tool 8-112) and Solvent B(4) (Tool 6-15) tools located in the facility's B(4) – B(4) Area (Photos 9a – 9d). Signs were posted on the outside of the tools, documenting what specific solvents were being used in each | 

Photo 9a (IMG_5554.JPG) | Potential Violation #9 (Jan 2024): Apple failed to perform a waste determination for its spent "Isopropyl Alcohol" waste generated from the facility's Solvent B(4) B(4) (Tool 8-112) and B(4) B(4) (Tool 6-15) tools located in the facility's B(4) – B(4) Area. For both of these tools, "Isopropyl Alcohol" once spent may be regulated as a D001 ignitable |

Apple, Inc.
08/17/2023, 08/18/2023 and 01/16/2024

tool. At the time of EPA's inspection, the "Isopropyl Alcohol" solvents were not being managed as a waste but as a product.

Under RCRA, once a solvent is classified as spent, Apple is required to perform a waste determination to determine whether the materials are hazardous in nature at the point of origination.

Furthermore, according to Apple's SDS for "Isopropyl Alcohol", the chemical contains highly flammable liquids and has a flash point of 53.6ºF, prior to use (Attachment L). Under RCRA, a spent solvent waste with a flash point of less than 140°F is considered characteristically hazardous for ignitability (D001 waste) and therefore should be tested to confirm if the waste is hazardous due to its ignitability.

In addition, Apple also does not appear to have properly characterized its " B(4) " waste, to verify whether this waste is corrosive (D002 Waste) at the point of origination. According to the SDS for " B(4) " there is no data available on the pH for this chemical product prior to use (Attachment M). Under RCRA, Apple is required to properly characterize the pH of the liquid to determine whether the liquid is characteristically hazardous for corrosivity (D002 Waste) upon disposal.



Photo 9b (IMG_5555.JPG)



Photo 9c (IMG_5556.JPG)

Photo 9d (IMG_5557.JPG)

waste at the point of origination. This waste stream appears to be a RCRA regulated hazardous waste upon disposal.

Apple also failed to properly characterize its " B(4) " waste to verify whether this waste is corrosive (D002 Waste) at the point of origination. It is unknown whether this waste stream is RCRA regulated hazardous waste upon disposal.

Section § 66262.11 of Title 22 of the CCR states that a person who generates a waste, as defined in section 66261.2, shall determine if that waste is a hazardous waste [40 CFR § 262.11].

**Please note, diluting hazardous waste whether intentionally or unintentionally to remove a wastes' characteristics is considered a form of treatment. Under RCRA it is improper to treat hazardous waste without a permit unless the type of treatment is covered under an exemption.**

**This potential violation is still outstanding.**

Apple, Inc.
08/17/2023, 08/18/2023 and 01/16/2024

**Observation #10 (Jan 2024):** EPA observed at least two solvent baths of "Isopropyl Alcohol" (100% and 98-100%) and one bath of "████ B(4) ████" (< 100%), being used in conjunction with Apple's Solvent ████ B(4) ████ (Tool 8-133), ████ B(4) ████ (Tool 8-134), and ✗✗✗✗✗ B(4) ✗✗✗✗✗ B(4) ████ tools located in the facility's ████ B(4) ████ Area (Photos 10a – 10c). Signs were posted on the outside of ████ B(4) ████, ████ B(4) ████ and the Solvent Spray Processor indicating what specific solvents were being used in each tool. At the time of EPA's inspection, the "Isopropyl Alcohol" and "✗✗ B(4) ✗✗ B(4) ✗✗✗" solvents were not being managed as a waste but as a product.

Under RCRA, once a solvent is classified as spent, Apple is required to perform a waste determination to verify whether the wastes generated are hazardous in nature at the point of origination.

Furthermore, according to Apple's SDS for "Isopropyl Alcohol (Attachment L)" and "✗✗ B(4) ✗✗✗ (Attachment N)", the chemicals are highly flammable liquids with flash points of 53.6°F and > 109°F respectively, prior to use. Under RCRA, a liquid waste with a flash point of less than 140°F is considered characteristically hazardous for ignitibility (D001 waste) and therefore should be tested to confirm if the wastes are hazardous due to ignitability.

Apple also does not appear to have properly characterized its "████ B(4) ████" and "██ B(4) ██"



Photo 10a (IMG_5565.JPG)

Photo 10b (IMG_5567.JPG)

Photo 10c (IMG_5568.JPG)

**Potential Violation #10 (Jan 2024):** Apple failed to properly characterize its spent "Isopropyl Alcohol" and "██ B(4) ██ B(4) ██" waste generated from the facility's Solvent ████ B(4) ████ (Tool 8-133), ████ B(4) ████ (Tool 8-133), and ✗✗✗✗✗ B(4) ✗✗✗✗✗ (██ B(4) ██) tools located in the facility's ████ B(4) ████ Area as a D001 ignitable waste at the point of origination.

Apple also failed to properly characterize its "████ B(4) ████" and "████ B(4) ████" wastes to verify whether these wastes are corrosive (D002 Waste) at the point of origination.

All four of these waste streams appear to be RCRA regulated hazardous waste upon disposal.

**Please also note, diluting hazardous waste whether intentionally or unintentionally to remove a wastes' characteristics is considered a form of treatment. Under RCRA, it is improper to treat hazardous waste without a permit unless the type of treatment is covered under an exemption.**

Section § 66262.11 of Title 22 of the CCR states that a person who generates a waste, as defined in section 66261.2, shall determine if that waste is a hazardous waste [40 CFR § 262.11].

**This potential violation is still outstanding.**

(123 of 414), Page 123 of 404
Case: 25-2028, 05/20/2025, DktEntry: 27.6, Page 123 of 414
Case 3:23-cv-04597-EMC    Document 86-1    Filed 07/31/24    Page 20 of 47

Apple, Inc.
08/17/2023, 08/18/2023 and 01/16/2024

| | | |
|---|---|---|
| wastes, to verify whether these wastes are corrosive (D002 Waste) at the point of origination. According to the SDS for " ████ ████ (Attachment O)", the pH has not been evaluated, prior to use and the product contains < 4% of Tetramethylammonium Hydroxide, a known corrosive. In addition, the ████ " chemical has a pH between 11.5 and 12.5, prior to use (Attachment P). Under RCRA, a pH greater than or equal to 12.5 is considered a corrosive waste upon disposal. | | |

Observation #11 (Jan 2024): EPA observed that Apple's solvent waste vents are connected to the facility's 5-gallon carboy spent solvent containers in Apple's ████ Areas (Photo 11a). These same solvent waste vents are also connected to each of the facility's solvent tools and spray units onsite.

According to Apple, each solvent vent in the ████ Area is further connected to the facility's overall solvent exhaust system which carries VOCs from each ████ to "Activated Carbon" boxes located on the roof of Building 1 (Photo 11b). The purpose of the "Activated Carbon" boxes is to capture any VOCs introduced to the solvent exhaust system, prior to the vapors being released directly to the atmosphere through the two general exhaust stacks (Photo 11c).

Based on the information provided to EPA, it does not appear that the facility has properly tested the "Activated Carbon" for the purposes of



Photo 11a (IMG_5548.JPG)



Photo 11b (IMG_5589.JPG)



Photo 11c (IMG_5591.JPG)

Potential Violation #11 (Jan 2024): EPA observed several "Activated Carbon" boxes on the roof of Building 1. Specifically, each of the ████ in the ████ Area vent directly to an "Activated Carbon" box which is responsible for filtering out VOCs that are generated onsite.

At the time of the inspection, Apple's "Activated Carbon" boxes were not covered under the facility's Clean Air Act permit as an air emissions device. Nor were the devices included or referenced in Apple's October 2022 Hazardous Waste Tank System Assessment.

Later it was determined that Apple has been managing their "Activated Carbon" as a NRHW since at least December 14, 2020. However, Apple does not appear to have performed a waste determination on the spent "Activated Carbon," between 2020 and 2023, to justify why it has been managing the waste as NRHW. Further review of this waste stream and the process by which it is managed is required.

Section § 66262.11 of Title 22 of the CCR states that a person who

Apple, Inc.
08/17/2023, 08/18/2023 and 01/16/2024

| | | |
|---|---|---|
| disposal. Apple manages its "Activated Carbon" waste as NRHW.<br><br>Apple also does not appear to have included all of the solvent waste streams when calculating the breakthrough times for the "Activated Carbon" boxes to ensure that no VOCs are released into the atmosphere onsite.<br><br>Apple's current BAAQMD Permit, does not reference the "Activated Carbon" boxes (i.e., Abatement Device No. A-13). Nor does it discuss the overall management of the boxes.<br><br>Based on Apple's 02/23/24 response letter to EPA, the facility confirmed that the devices are part of a pending application for a BAAQMD air permit modification. Additional review of Apple's test results pertaining to its "Activated Carbon" waste are needed to determine if the waste is regulated as a hazardous waste. | | generates a waste, as defined in section 66261.2, shall determine if that waste is a hazardous waste [40 CFR § 262.11].<br><br>**This potential violation is still outstanding.** |
| **Observation #12 (Jan 2024):** EPA observed eleven closed 5-gallon containers of liquid waste stacked against the wall in Apple's Bunker Area (Photo 12a). The labels on these eleven containers identified the contents as corrosive liquids (D002 Waste).<br><br>The labels on three of the eleven containers were not clearly visible for inspection without physically moving each of the containers (Photo 12a). The ASDs on each container appeared to be less than the 90-day storage time frames for long-term storage (Photo 12b). | <br>Photo 12a (IMG_5592.JPG) | **Potential Violation #12 (Jan 2024):** EPA observed eleven closed 5-gallon containers of corrosive liquids (D002 Waste) in Apple's Bunker Area. Three of the container labels were not clearly visible for inspection.<br><br>This waste all appeared to be RCRA regulated hazardous waste.<br><br>Sections §§ 66262.34(a)(1)(A) and 66262.34(f)(1) of Title 22 of the CCR states that generators who accumulate hazardous waste on site without a permit or grant of interim status shall comply with the following:<br>(1) The date upon which each period of accumulation begins |

Apple, Inc.
08/17/2023, 08/18/2023 and 01/16/2024

| | | |
|---|---|---|
| Apple managed this area as a less than 90-day hazardous waste accumulation area. At the time of EPA's inspection, an Apple employee was actively working in the Bunker Area, but did not appear to be filling or emptying the containers.<br><br>The Bunker Area is located downstream from Apple's initial waste generation activities. Apple's 5-gallon corrosive waste containers are not tested at the point of origination but managed as corrosive waste (D002 Waste) once transferred to the Bunker Area for long-term storage. | <br>Photo 12b (IMG_5603.JPG) | shall be clearly marked and visible for inspection on each container and portable tank [40 CFR § 262.17(a)(5)(A) – (5)(C)].<br><br>**This potential violation is still outstanding.** |
| <u>Observation #13 (Jan 2024)</u>: EPA observed twelve additional closed 5-gallon containers of liquid waste stacked against the opposite wall in Apple's Bunker Area (Photo 13a). The labels on these twelve containers identified the contents as flammable liquids (D001 Waste).<br><br>The labels on eight of the twelve 5-gallon containers stored in the Bunker Area were not clearly visible for inspection, without physically moving each of the containers (Photo 13a). The ASDs were written on each container and appeared to be stored in the Bunker for less than 90-days (Photos 13b and 13c).<br><br>Apple does manage this area as a less than 90-day hazardous waste accumulation area. At the time of EPA's inspection, an Apple employee was actively working in the Bunker Area, but did not appear to be filling or emptying the containers. | <br>Photo 13a (IMG_5594.JPG)<br><br><br>Photo 13b (IMG_5598.JPG) | <u>Potential Violation #13 (Jan 2024)</u>: EPA observed twelve closed 5-gallon containers of flammable liquids (D001 Waste) in Apple's Bunker Area. Eight of the twelve container labels were not clearly visible for inspection.<br><br>This waste all appeared to be RCRA regulated hazardous waste.<br><br>Sections §§ 66262.34(a)(1)(A) and 66262.34(f)(1) of Title 22 of the CCR states that generators who accumulate hazardous waste on site without a permit or grant of interim status shall comply with the following:<br>(1) The date upon which each period of accumulation begins shall be clearly marked and visible for inspection on each container and portable tank [40 CFR § 262.17(a)(5)(A) – (5)(C)].<br><br>**This potential violation is still outstanding.** |

Apple, Inc.
08/17/2023, 08/18/2023 and 01/16/2024

| The Bunker Area is located downstream from Apple's initial waste generation activities. Apple's 5-gallon solvent waste containers are not tested at the point of origination but managed as ignitable waste (D001 Waste) once transferred to the Bunker Area for long-term storage. |  Photo 13c (IMG_5600.JPG) | |
|---|---|---|

## AREAS OF CONCERN

### Apple's CAA (The Bunker Area)

- Apple's Bunker Area appears to be too small to handle the volume and frequency of hazardous waste containers being generated onsite. EPA recommends that Apple expand the area currently being used to accumulate hazardous waste in the CAA long-term – **Corrected by 01/16/24.**
- Some of Apple's hazardous waste containers that enter the less than 90-day Bunker Area for long-term storage, are not properly labeled or dated prior to being stored in the facility's CAA – **Corrected by 02/23/24.**
- All hazardous waste containers that are stored in Apple's less than 90-day Bunker Area shall have labels that are clearly visible for inspection without having to physically move the containers.

### Apple's ▓B(4)▓ Area

- EPA observed red SAA containers (Step Cans) in Apple's ▓B(4)▓ Area, inside and outside Room 1025. The containers were marked as having as its contents, "Wipes and or PPE contaminated with IPA, Acetone, Ethanol and Butylacetate." According to Apple, this waste description for the facility's solid waste stream is incorrect and they will remove the words "Ethanol" and "Butylacetate" from the waste description but continue to manage the contents as RCRA regulated hazardous waste – **Corrected by 02/23/24.**

### Apple's ▓B(4)▓ Area

EPA observed a red SAA container (Step Can) in Apple's ▓B(4)▓ Area (Room 1021). The container was marked as having as its contents, "Wipes and or PPE contaminated with IPA, Acetone, Ethanol and Butylacetate." According to Apple, this waste description for the facility's solid waste stream is incorrect and they will remove the words "Ethanol" and "Butylacetate" from the waste description but continue to manage the contents as RCRA regulated hazardous waste – **Corrected by 02/23/24.**

### Chemical Pass-Through Area

Apple, Inc.
08/17/2023, 08/18/2023 and 01/16/2024

- EPA observed red SAA containers (Step Cans) in Apple's Chemical Pass-Through Area.
  The containers were marked as having as its contents, "Wipes and or PPE contaminated
  with IPA, Acetone, Ethanol and Butylacetate." According to Apple, this waste description
  for the facility's solid waste stream is incorrect and they will remove the words
  "Ethanol" and "Butylacetate" from the waste description but continue to manage the
  contents as RCRA regulated hazardous waste – **Corrected by 02/23/24.**

**Apple's** ██B(4)██ / ██B(4)██2 Area

- EPA observed a red SAA container (Step Can) in Apple's ██B(4)██ / ██B(4)██2 Area. The
  container was marked as having as its contents, "Wipes and or PPE contaminated with
  IPA, Acetone, Ethanol and Butylacetate." According to Apple, this waste description for
  the facility's solid waste stream is incorrect and they will remove the words "Ethanol"
  and "Butylacetate" from the waste description but continue to manage the contents as
  RCRA regulated hazardous waste – **Corrected by 02/23/24.**

**Apple's** ██B(4)██ / ██B(4)██ Area

- EPA observed a red SAA container (Step Can) in Apple's ██B(4)██ Area. The container was
  marked as having as its contents, "Wipes and or PPE contaminated with IPA, Acetone,
  Ethanol and Butylacetate." According to Apple, this waste description for the facility's
  solid waste stream is incorrect and they will remove the words "Ethanol" and
  "Butylacetate" from the waste description but continue to manage the contents as
  RCRA regulated hazardous waste – **Corrected by 02/23/24.**

**Apple's** ██B(4)██ / ██B(4)██ Area

- EPA observed a red SAA container (Step Can) in Apple's ██B(4)██ Area. The container was
  marked as having as its contents, "Wipes and or PPE contaminated with IPA, Acetone,
  Ethanol and Butylacetate." According to Apple, this waste description for the facility's
  solid waste stream is incorrect and they will remove the words "Ethanol" and
  "Butylacetate" from the waste description but continue to manage the contents as
  RCRA regulated hazardous waste – **Corrected by 02/23/24.**
- EPA observed that the sign posted on Solvent Tool 8-113 ( ██B(4)██ ) in Apple's ██B(4)██ /
  ██B(4)██ Area needs to be updated to remove the chemical "██B(4)██" from the
  posted sign, which according to Apple is no longer being used in the facility's
  semiconductor process.

**Records Review**

| Record(s) | Year(s) | Observation(s) and Potential Violations |
|---|---|---|
| Manifests: | 2020 - 2023 | Potential Violation #14: According to Apple's records, the facility shipped 83 shipments of waste designated as "Water with Solvents" (CA-133 Waste) to the World Oil Recycling facility located at 2000 |

Apple, Inc.
08/17/2023, 08/18/2023 and 01/16/2024

| | | |
|---|---|---|
| | | N. Alameda St in Compton, CA (EPA ID No. CAT 080 013 352) between 06/29/22 and 12/08/22. This waste was being sent off for the purposes of disposal and appears to have been improperly characterized as NRHW liquid by Apple. The waste actually appears to be an ignitable waste (D001 Waste) under RCRA (See Potential Violation #6).<br><br>Apple also shipped approximately 145 shipments of waste designated as "Water with Solvents" (CA-133 Waste) to the World Oil Recycling facility in Compton, CA between 01/05/23 and 12/22/23. This waste was being sent off for the purposes of disposal and appears to have been improperly characterized as NRHW liquid by Apple. The waste appears to be an ignitable waste (D001 Waste) under RCRA (See Potential Violation #6).<br><br>Because Apple appears to have improperly characterized this waste stream, the facility did not include the proper federal waste codes on the manifest that best describes the waste being shipped off-site, a potential violation under RCRA.<br><br>Section § 66262.23(a)(1) of Title 22 of the CCR requires the generator of any hazardous or extremely hazardous waste to be transported off-site or into California shall complete the generator and waste section and sign the manifest certification according to the Uniform Hazardous Waste Manifest, EPA Form 8700-22 and EPA Form 870-2A)and instructions [40 CFR § 262.20(a)(1)].<br><br>**This potential violation is still outstanding.** |
| LDR Forms: | 2020 - 2023 | Potential Violation #15: According to Apple's records, the facility shipped 83 shipments of waste designated as "Water with Solvents" (CA-133 Waste) to the World Oil Recycling facility located at 2000 N. Alameda St in Compton, CA (EPA ID No. CAT 080 013 352) between 06/29/22 and |

Apple, Inc.
08/17/2023, 08/18/2023 and 01/16/2024

12/08/22. This waste was being sent off for the purposes of disposal and appears to have been improperly characterized as NRHW liquid by Apple. The waste actually appears to be an ignitable waste (D001 Waste) under RCRA (See Potential Violation #6).

Apple also shipped approximately 145 shipments of waste designated as "Water with Solvents" (CA-133 Waste) to the World Oil Recycling facility in Compton, CA between 01/05/23 and 12/22/23. This waste was being sent off for the purposes of disposal and appears to have been improperly characterized as NRHW liquid by Apple. The waste actually appears to be an ignitable waste (D001 Waste) under RCRA (See Potential Violation #6).

Failure to properly characterize this waste may have resulted in the improper treatment and disposal of this waste stream under the Land Disposal Restriction (LDR) requirements of RCRA.

Prior to World Oil Recycling's May 5, 2022 Waste Profile Sheet was created for Apple's "Water and Solvents" waste (Attachment G), Apple was managing its spent solvent waste as both an ignitable waste and as a F-Listed waste stream (D001 and F003 Waste - Attachment Q). Under RCRA, the improper characterization and disposal of a hazardous waste are strictly prohibited.

As such, because Apple was venting the VOCs from its spent solvent tank, through the "Activated Carbon" canister, then the "Activated Carbon" generated prior to May 5, 2022, should also have been managed as an F-Listed waste stream. Apple does not appear to have managed its "Activated Carbon" as a hazardous waste, prior to May 5, 2022.

Apple, Inc.
08/17/2023, 08/18/2023 and 01/16/2024

| | | |
|---|---|---|
| | | Apple shipped at least 3 manifests of improperly characterized "Activated Carbon" waste (Attachment R) off-site as NRHW. Failure to properly characterize this waste may have resulted in the improper treatment and disposal of this waste stream under the Land Disposal Restriction (LDR) requirements of RCRA.<br><br>Specifically, the facility shipped RCRA regulated waste (D001 and F003 waste) off as NRHW on 12/14/20 (Manifest 014565900 FLE), 11/05/21 (Manifest 015769563 FLE) and 02/02/22 (Manifest - 15769825 FLE).<br><br>Section § 66268.7 of Title 22 of the CCR requires a generator of hazardous waste to determine if the waste has to be treated to meet applicable treatment standards before it can be land disposed [40 CFR § 268.7].<br><br>**These potential violations are still outstanding.** |
| Biennial Reports: | 2019 and 2021 | Reviewed. |
| Exception Reports: | 2020 - 2023 | Not Reviewed. |
| Weekly Inspections: | 2023 | Potential Violation #16: LQGs are required to conduct weekly inspections of their CAAs as well as document that those weekly inspections were conducted, under RCRA. Apple does not appear to have either performed weekly inspections or maintained records documenting that the weekly inspections were performed in 2023.<br><br>Apple is missing 15 weekly inspection logs for calendar year 2023. Specifically, the facility is missing inspection logs for the weeks of **02/20/23, 05/19/23, 05/26/23, 06/02/23, 06/09/23, 06/16/23, 06/23/23, 06/30/23, 07/07/23, 07/14/23, 07/21/23, 07/28/23, 08/04/23, 08/11/23, and 08/18/23.**<br><br>Section § 66265.174 of Title 22 of the CCR states that the owner or operator shall |

Apple, Inc.
08/17/2023, 08/18/2023 and 01/16/2024

| | | |
|---|---|---|
| | | inspect areas used for container storage or transfer, at least weekly, looking for leaking containers and for deterioration of containers and the containment system caused by corrosion or other factors [40 CFR § 262.17(a)(1)(v)]. **This potential violation is still outstanding.** |
| Subpart BB Monitoring Equipment Calibrations: | 2020 - 2023 | Potential Violation #17: EPA reviewed Apple's Field Service Reports, monitoring data and the facility's Subparts BB and CC Emissions Monitoring Procedures. Based on EPA's review, Apple did not properly calibrate its Eagle 2 Multigas Detector with PID sensor, a total of 34 times [34 Times = 4 Times (2020) +  12 Times (2021) + 12 Times (2022) + 7 Times (2023)] between 2020 and 2023. |
| | | Between 09/01/20 and 07/31/23, Apple only calibrated its Multigas Detector on one occasion (i.e., 11/24/20) before use, on the same day of use, when monitoring for VOC emissions onsite. Specifically, Apple documented that it calibrated the RKI Eagle 2 Multigas Detector with PID Sensor on 06/25/19, 11/25/19, 07/08/20, 11/24/20, 06/17/21, 07/5/22, 01/12/23, and 06/20/23. The only calibration day that matches the days of monitoring between 09/01/20 and 07/31/23 is the calibration performed on 11/24/20. Failure to calibrate a monitoring device before use, on the same day of use is a potential violation under RCRA. |
| | | Section § 66265.1063(b)(3) of Title 22 of the CCR states that leak detection monitoring, as required in Sections 66265.1052 through 66263.1062, shall comply with following requirements: (1) Monitoring shall comply with Reference Method 21 in 40 CFR, part 60, incorporated by reference in Section 66260.11 of this chapter. (2) The detection instrument shall meet the performance criteria of Reference Method 21. |

Apple, Inc.
08/17/2023, 08/18/2023 and 01/16/2024

| | | |
|---|---|---|
| | | (3) The instrument shall be calibrated before use on each day of its use by the procedures specified in Reference Method 21.<br>(4) Calibration gases shall be:<br>  (A) Zero air (less than 10 ppm of hydrocarbon in air);<br>  (B) A mixture of methane or n-hexane and air at a concentration of approximately, but less than, 10,000 ppm methane or n-hexane [40 CFR § 265.1063(b)(3)].<br><br>**This potential violation is still outstanding.** |
| Subpart BB Monitoring Records: | 2020 - 2023 | Reviewed. |
| Daily Tank Inspections: | 2023 | Potential Violation #18: EPA reviewed the 2023 daily tank inspection records for Apple's 1,700-gallon solvent waste tank. Based on the documents submitted, the facility doesn't appear to have performed daily inspections of Apple's 1,700-gallon spent solvent tank every day that RCRA hazardous waste (D001 Waste) was stored in the tank. Between 01/01/23 and 08/18/23, Apple appears not to have performed daily inspections 48 times over the weekend in 2023.<br><br>Specifically, the facility is missing daily inspection records for **01/07/23, 01/08/23, 01/14/23, 01/15/23, 01/21/23, 01/22/23, 02/04/23, 02/05/23,  02/25/23, 02/26/23, 03/04/23, 03/05/23, 03/11/23, 03/12/23, 03/18/23, 03/19/23, 04/01/23, 04/02/23, 04/08/23, 04/09/23, 04/15/23, 04/16/23, 04/22/23, 04/23/23, 04/29/23, 04/30/23, 05/13/23, 05/14/23, 05/27/23, 05/28/23, 06/03/23, 06/04/23, 06/10/23, 06/11/23, 06/17/23, 06/18/23, 06/24/23, 06/25/23, 07/01/23, 07/02/23, 07/08/23, 07/09/23, 07/22/23/ 07/23/23, 07/29/23, 07/30/23, 08/12/23, and 08/13/23**.<br><br>After the inspection, EPA determined that Apple's solvent waste tank should have been regulated as a hazardous waste unit and the solvents regulated as an ignitable |

Apple, Inc.
08/17/2023, 08/18/2023 and 01/16/2024

| | | |
|---|---|---|
| | | waste (D001 Waste) in 2023 (See Potential Violation #6). Under RCRA, daily inspections are required to be performed on hazardous waste tanks subject to the Subpart J requirements, anytime a RCRA hazardous waste is being accumulated in a RCRA hazardous waste tank, including weekends and holidays.<br><br>Section § 66265.195(a) of Title 22 of the CCR states that the owner or operator shall inspect, where present, at least once each operating day [40 CFR § 265.195(a)].<br><br>**This potential violation is still outstanding.** |
| Subpart CC Applicability:<br>- Spent Solvent Waste Tank (1,700-gallons)<br>- Solvent Waste Lift Station (67-gallons) | 2020 - 2023 | Potential Violation #19: After EPA's inspection, it was determined that the source of the spent solvent waste entering Apple's 1,700-gallon solvent waste tank is characteristic for ignitability and should be, at a minimum, be managed as a D001 hazardous waste stream at the point of origination.<br><br>As such, Apple failed to properly evaluate the facility's spent solvent waste tank (SW-TNK-2) and the solvent waste lift station (SW-LS) to determine if the hazardous waste management units are subject to the RCRA air emission standards under RCRA.<br><br>Section § 66265.1083(b) of Title 22 of the CCR states that the owner or operator shall control air pollutant emissions from each hazardous waste management unit in accordance with standards specified in sections 66265.1085 through 66265.1088 as applicable to the hazardous waste management unit, except as provided for in subsection (c) of this section [40 CFR § 265.1083(b)].<br><br>**This potential violation is still outstanding.** |
| Employee Training Records:<br>- Allan Sherlock<br>- Demonte Rose<br>- Sameei Al Khafaji | 2021 - 2023 | Reviewed. |

Apple, Inc.
08/17/2023, 08/18/2023 and 01/16/2024

| Consolidated Emergency Response/Contingency Plan: | 01/21/22 | Reviewed. |
|---|---|---|
| Spill Reports: | 2020 - 2023 | Not Applicable. |
| San Jose-Santa Clara Regional Wastewater Facility Industrial Wastewater Discharge Permit:<br>- Permit No. SC-461B | 11/20/20 – 11/19/25 | Reviewed. |
| Bay Area Air Quality Management District – Permit to Operate:<br>- Air Permit No. 22839 | 05/06/23 – 05/01/24 | Reviewed. |

**Closing Conference**

On August 17, 2023, August 18, 2023 and January 16, 2024, Apple's representatives participated in Closing Conferences with EPA Region 9. The EPA inspectors reviewed the inspection activities and summarized some potential violations and areas of concern.

Inspector Rollins gave an estimated date as to when Apple might receive the final RCRA hazardous waste inspection report. EPA thanked the facility for its hospitality and full cooperation. The overall inspection was concluded on January 16, 2024 at 4:50 pm.

**SECTION III – LIST OF ATTACHMENTS**
Attachment A - Apple Photograph Log
Attachment B - SB01 Air Permit 22839
Attachment C - SB01 Industrial Wastewater Permit
Attachment D - Tiered Permitting Unit – AWN System
Attachment E - Tiered Permitting Unit – HMR System
Attachment F - Tiered Permitting Unit – Solvent Tank System
Attachment G - SB01 Water with Solvents Profile
Attachment H - Permit Modification Application_ Plant 22839
Attachment I - (B)(4) SDS
Attachment J - (B)(4) SDS
Attachment K - (B)(4) SDS
Attachment L - IPA SDS
Attachment M - (B)(4) ((B)(4)) SDS
Attachment N - (B)(4) UHP SDS
Attachment O - (B)(4) SDS
Attachment P - (B)(4) ( (B)(4) ) SDS
Attachment Q - CH1505500 Mixed Flam Liquid SB01
Attachment R - Improperly Characterized Activated Carbon Shipments



**Region 9 Enforcement and Compliance Assurance Division**
## RCRA INSPECTION REPORT PHOTOGRAPH LOG
Apple, Inc. – 08/17/2023, 08/18/2023 and 01/16/2024



**Photograph 1a (P8170006.JPG - 08/17/23):** A photo of nineteen 5-gallon containers of corrosive waste in Apple's Building 1 East, Compartment 1 Indoor CAA Shed (The Bunker Area). Two containers were unlabeled and undated, eleven of the container labels were not clearly visible, and one container was stored on-site for more than 90-days.

**Photograph 1b (P8180009.JPG - 08/18/23):** A photo of the two unlabeled and undated containers with new RCRA hazardous waste labels placed on them. The Accumulation State Dates (ASDs) on the containers were dated 08/17/23.

Apple, Inc.
Photograph Log
08/17/23, 08/18/23 and 01/16/24



**Photograph 1c (P8180010.JPG - 08/18/23):** A close-up photo of a 5-gallon container of corrosive liquids in Apple's Bunker. The container was marked " B(4) " and the ASD on the container was 03/02/23. The correct name was later determined to be " B(4) ."



**Photograph 2a (P8170013JPG - 08/17/23):** A photo of an open 5-gallon container of "Adhesive Liquids and Tape" waste in Apple's Bunker Area. The lid of the container was not secured, and the waste was being managed as non-RCRA hazardous waste.



**Photograph 2b (P8170014.JPG - 08/17/23):** A close-up photo of the hazardous waste label on the 5-gallon container of "Adhesive Liquids and Tape" waste in Apple's Bunker Area. The ASD on the label was documented as 07/22/23.



**Photograph 2c (P8180013.JPG - 08/18/23):** A close-up photo of the closed 5-gallon container of "Adhesive Liquids and Tape" waste in Apple's Bunker Area. The container was closed on 08/18/23.



**Photograph 3a (P8170015.JPG - 08/17/23):** A photo of a 5-gallon container of "Silicone" waste in Apple's Bunker Area. The container was closed but had an ASD of 03/16/22, more than 90-days from the date of EPA's inspection. This waste was regulated as a non-RCRA hazardous waste.



**Photograph 4a (P8170016.JPG - 08/17/23):** A photo of several containers of expired chemicals on the floor of Apple's Bunker Area. According to the facility representative, the containers were placed in the Bunker Area that morning and hadn't been properly labeled with a hazardous waste label or dated, prior to EPA's arrival.

Apple, Inc.
Photograph Log
08/17/23, 08/18/23 and 01/16/24



**Photograph 5a (P8170020.JPG - 08/17/23):** A photo of an open 55-gallon container of "Mega Posit" in Apple's Bunker Area. At the time of the inspection, the cap was laying on top of the opening of the container (not as depicted here). According to Apple, the container was left opened in order to prevent the container from expanding and bulging.



**Photograph 5b (P8170021.JPG - 08/17/23):** A close-up photo of the label on the open 55-gallon container of "Mega Posit" waste in Apple's Bunker Area. The label was starting to peel off of the container while inside the Bunker Area.

Apple, Inc.
Photograph Log
08/17/23, 08/18/23 and 01/16/24



**Photograph 5c (P8180012.JPG - 08/18/23):** A photo of the cap placed back on the container, officially closing the container. This container was documented as closed on 08/18/23.



**Photograph 6a (P8170051.JPG - 08/17/23):** A photo of Apple's 1,700-gallon stainless-steel hazardous waste tank. The tank was marked with the words, "Hazardous Waste" and used for the accumulation of spent solvent waste. At the time of the inspection, the solvents were being managed as California Only Waste.

6

Apple, Inc.
Photograph Log
08/17/23, 08/18/23 and 01/16/24



**Photograph 6b (P8170052.JPG - 08/17/23):** A photo of The hazardous waste label on the 1,700-gallon solvent waste tank in the Bunker Area. At the time of the inspection, the waste was marked as "Water with Solvents" and managed as California Only Waste.



**Photograph 7a (P8170062.JPG - 08/17/23):** A photo of a 55-gallon container filled with "Activated Carbon" and located on the roof of Building 1. This drum is used to capture the VOC emissions from Apple's 1,700-gallon spent solvent waste tank. The container was not labeled or identified in Apple's air permit or their RCRA tank assessment.

Apple, Inc.
Photograph Log
08/17/23, 08/18/23 and 01/16/24



**Photograph 7b (P8170061.JPG - 08/17/23):** A photo of three vents connected to Apple's 55-gallon container filled with "Activated Carbon". The two vents on the left are emergency vents for the double-walled tank. The vent on the right is the main vent.



**Photograph 8a (IMG_5542.JPG - 01/16/24):** A photo of Tool 8-01C in B(4) - B(4) of Apple's B(4) Area. The tool utilizes three chemicals that once spent are managed as a flammable waste (D001 Waste) onsite.

8

Apple, Inc.
Photograph Log
08/17/23, 08/18/23 and 01/16/24



**Photograph 9a (IMG_5554.JPG - 01/16/24):** A close-up photo of the two chemicals that are used in Tool 8-112 located in ▮ B(4) ▮ – ▮ B(4) ▮ Area. The label identifies that there is one solvent and one corrosive chemical being used in this tool when in operation.



**Photograph 9b (IMG_5555.JPG - 01/16/24):** A photo of the solvent and water baths inside of Tool 8-112 located in ▮ B(4) ▮ – ▮ B(4) ▮ Area.

Apple, Inc.
Photograph Log
08/17/23, 08/18/23 and 01/16/24



**Photograph 9c (IMG_5556.JPG - 01/16/24):** A close-up photo of the three chemicals that are used in Tool 6-51 located in ████ B(4) ████ – █ B(4) █ Area. The label identifies that there are two solvents and one corrosive chemical being used in this tool when in operation.



**Photograph 9d (IMG_5557.JPG - 01/16/24):** A photo of the solvent and water baths inside Tool 6-15 located in ████ B(4) ████ – █ B(4) █ Area.

Apple, Inc.
Photograph Log
08/17/23, 08/18/23 and 01/16/24



**Photograph 10a (IMG_5565.JPG - 01/16/24):** A close-up photo of the four chemicals that are used in Tool 8-133 located in the ▇▇ B(4) ▇▇ Area. The label identifies that there are two solvents and two corrosive chemicals being used in this tool when in operation.



**Photograph 10b (IMG_5567.JPG - 01/16/24):** A close-up photo of two chemicals posted on a sign near Tool 8-134 located in the ▇ B(4) ▇ Area. The label identifies that there are two solvent chemicals being used in this tool when in operation.



**Photograph 10c (IMG_5568.JPG - 01/16/24):** A close-up photo of three chemicals posted on a sign near the 8-29 [B(4)] located in the [B(4)] Area. The label identifies that there is one solvent and two corrosive chemicals being used in this tool when in operation.



**Photograph 11a (IMG_5548.JPG - 01/16/24):** A photo of Apple's solvent waste vent in the [B(4)] [B(4)] Area of the facility's [B(4)] Area connecting to Apple's solvent exhaust piping system. The solvent waste vent connects to piping on each of the 5-gallon carboy containers located in the grated floor in the room.



**Photograph 11b (IMG_5589.JPG - 01/16/24):** A photo of Apple's solvent exhaust system on the right ( B(4) ) emerging from the ceiling in the B(4) Area and connecting to the larger exhaust system piping on the roof. The "Activated Carbon" box for B(4) is located on the left side of the photo, which is used to vent VOCs.



**Photograph 11c (IMG_5591.JPG - 01/16/24):** A photo of Apple's solvent exhaust piping connecting to one of the main general exhaust systems on the roof of Building 1. The general exhaust system vents the air directly to the atmosphere.



**Photograph 12a (IMG_5592.JPG - 01/16/24):** A photo of eleven 5-gallon containers of corrosive waste (D002 Waste) in Apple's Bunker Area. The labels on three of the eleven 5-gallon containers were not clearly visible for inspection, without physically moving each of the containers.



**Photograph 12b (IMG_5603.JPG - 01/16/24):** A close-up photo of Apple's 5-gallon container of " B(4) " waste. This waste is managed as a corrosive waste (D002 Waste) and has an accumulation start date of 01/09/24.

Apple, Inc.
Photograph Log
08/17/23, 08/18/23 and 01/16/24



**Photograph 13a (IMG_5594.JPG - 01/16/24):** A photo of twelve 5-gallon containers of mixed solvent waste in Apple's Bunker Area. The labels on eight of the twelve containers were not clearly visible during the inspection. The waste from these containers were accumulated upstream in Apple's ██B(4)██ Area.



**Photograph 13b (IMG_5598.JPG - 01/16/24):** A photo of one 5-gallon container of mixed solvents in Apple's Bunker Area. The container is marked as a flammable waste (D001 Waste) and has an accumulation state date of 01/16/24.



**Photograph 13c (IMG_5600.JPG  - 01/16/24):** Another photo of a 5-gallon container of mixed solvent waste in Apple's Bunker Area. The container is marked as a flammable waste (D001 Waste) and has an accumulation state date of 01/11/24.

A. **Exhibit: US EPA, RCRA Enforcement, 3250 Scott Blvd Inspection Report**

**Report attached as separate PDF "US EPA RCRA Enforcement Report, 3250 Scott Blvd."**

The FOIA request to US EPA that provided the report:

**REGION 9**
SAN FRANCISCO, CA  94105

Ashley Gjovik
ashleymgjovik@protonmail.com

Re:  Freedom of Information Act Request No. 2024-EPA-04320

Final Response

Dear Ashley Gjovik:

This letter concerns the above-referenced Freedom of Information Act (FOIA) request, received by the U.S. Environmental Protection Agency (EPA) on May 21, 2024, in which you requested the recent inspection report for RCRA compliance at 3250 Scott Blvd., in Santa Clara, California.

Final Response

EPA has now concluded its search for records responsive to your FOIA request. A portion of the record is available through the EPA FOIAXpress Public Access Link (PAL) at https://foiapublicaccessportal.epa.gov/.

To access the records, please go to the *Sign In* link in the upper right-hand corner of the PAL and log in to your FOIAXpress account, if you have one. If you are not a FOIAXpress user and want to create an account, please contact FOIA_HQ@epa.gov to request an account invitation email.

The records are also available in EPA's virtual public Reading Room. To access the records, select the *Reading Room* link at the top of the PAL. Enter "*04320" for the FOIA Case Number, click on *Search*, and locate the records associated with FOIA Request No. 2024-EPA-04320.

EPA is withholding information under Exemption 4 of the FOIA, 5 U.S.C. § 552(b)(4). EPA has determined that the withheld material may contain Confidential Business Information, which is exempt from disclosure under Exemption 4. Pursuant to 40 C.F.R. § 2.204(d)(1), your request is being initially denied, with respect to these portions of the records, because further inquiry by EPA is required before a final determination can be made.

An official website of the United States government

MENU

Search EPA.gov



Enforcement and
Compliance History Online

Search Options     Analyze Trends     Find EPA Cases     Data Services     Help

Login     Contact Us <https://epa.gov/resources/general-info/contact-us>

<https://echo.epa.gov/>

# Violation Report

Help <https://epa.gov/help/reports/hazardous-waste-violation-help>

## Facility Summary

**APPLE INC**

**3250 SCOTT BLVD, SANTA CLARA, CA 95054** ⓘ

**RCRA (Resource Conservation and Recovery Act) ID:** CAR000278176

**FRS (Facility Registry Service) ID:** 110001168254

**Industry:** 541715 - Research and Development in the Physical, Engineering, and Life Sciences (except Nanotechnology and Biotechnology)

### Related Reports

☐ Detailed Facility Report

View Envirofacts Reports

## Hazardous Waste Violation Information

**Violation Type:** 262.A - Standards Applicable to Generators of HW: General

**Determined By:** EPA

**Responsible Agency:** EPA

**Determined Date:** 01/16/2024

**Return to Compliance Date:** --

**Return to Compliance Qualifier:** --

**Violation Activity Location:** CA

### Citations

| Citation ⇕ | Description ⇕ |
|---|---|
| 262.17(a)(5)(ii)(B) | Mark or label its tanks with an indication of the hazards of the contents (examples include, but are not limited to, the applicable hazardous waste characteristic(s) (i.e., ignitable, corrosive, react |
| 262.11 | Generators must determine if their solid waste is a hazardous waste |
| 262.17(a)(5)(i)(C) | date each period of accumulation begins is marked and visible on each LQG container |

### Linked Compliance Monitoring

| Compliance Monitoring Type ⇕ | Agency ⇕ | Date ⇕ |
|---|---|---|
| Focused Compliance Inspection | EPA | 01/16/2024 |

### Linked Enforcement Actions

| Type of Action ⇕ | Agency ⇕ | Date ⇕ | Penalty Assessed ⇕ |
|---|---|---|---|
| INSPECTION REPORT WRITTEN | EPA | 04/30/2024 | -- |

⌃ Top of Page

🇺🇸 An official website of the United States government

MENU

Search EPA.gov

Search Options    Analyze Trends    Find EPA Cases    Data Services    Help

# ECHO
Enforcement and
Compliance History Online
<https://echo.epa.gov/>

Login    Contact Us <https://epa.gov/resources/general info/contact us>

# Violation Report

❓ Help <https://epa.gov/help/reports/hazardous waste violation help>

## Facility Summary

**APPLE INC**

**3250 SCOTT BLVD, SANTA CLARA, CA 95054** ⓘ

**RCRA (Resource Conservation and Recovery Act) ID:** CAR000278176

**FRS (Facility Registry Service) ID:** 110001168254

**Industry:** 541715   Research and Development in the Physical, Engineering, and Life Sciences (except Nanotechnology and Biotechnology)

**Related Reports**

⬛ Detailed Facility Report

View Envirofacts Reports

## Hazardous Waste Violation Information

**Violation Type:** 262.A   Standards Applicable to Generators of HW: General

**Determined By:** EPA

**Responsible Agency:** EPA

**Determined Date:** 08/17/2023

**Return to Compliance Date:** 09/08/2024

**Return to Compliance Qualifier:** D   Documented

**Violation Activity Location:** CA

## Citations

| Citation ↕ | Description ↕ |
|---|---|
| 262.11 | Generators must determine if their solid waste is a hazardous waste |

## Linked Compliance Monitoring

| Compliance Monitoring Type ↕ | Agency ↕ | Date ↕ |
|---|---|---|
| Compliance Evaluation Inspection | EPA | 08/17/2023 |

## Linked Enforcement Actions

| Type of Action ↕ | Agency ↕ | Date ↕ | Penalty Assessed ↕ |
|---|---|---|---|
| INSPECTION REPORT WRITTEN | EPA | 04/30/2024 | |

︿ Top of Page



## Discover.

**Accessibility**
<https://www.epa.gov/accessibility>

**Budget & Performance**
<https://www.epa.gov/planandbudget>

**Contracting**
<https://www.epa.gov/contracts>

**EPA www Web Snapshots**
<https://www.epa.gov/home/wwwepagov snapshots>

## Connect.

**Data.gov** ☑ <https://www.data.gov/>

**Inspector General**
<https://www.epa.gov/office inspector general/about epas office inspector general>

**Jobs** <https://www.epa.gov/careers>

**Newsroom**
<https://www.epa.gov/newsroom>

## Ask.

**Contact EPA**
<https://www.epa.gov/aboutepa/forms/contact epa>

**EPA Disclaimers**
<https://www.epa.gov/web policies and procedures/epa disclaimers>

**Hotlines**
<https://www.epa.gov/aboutepa/epa hotlines>

🇺🇸 An official website of the United States government

MENU

Search EPA.gov

| Search Options | Analyze Trends | Find EPA Cases | Data Services | Help |

Login    Contact Us <https://epa.gov/resources/general info/contact us>

**ECHO**
Enforcement and
Compliance History Online
<https://echo.epa.gov/>

# Violation Report

❓ Help <https://epa.gov/help/reports/hazardous waste violation help>

## Facility Summary

**APPLE INC**

**3250 SCOTT BLVD, SANTA CLARA, CA 95054** ⓘ

**RCRA (Resource Conservation and Recovery Act) ID:** CAR000278176

**FRS (Facility Registry Service) ID:** 110001168254

**Industry:** 541715   Research and Development in the Physical, Engineering, and Life Sciences (except Nanotechnology and Biotechnology)

**Related Reports**

⬛ Detailed Facility Report

View Envirofacts Reports

## Hazardous Waste Violation Information

**Violation Type:** 262.A   Standards Applicable to Generators of HW: General

**Determined By:** EPA

**Responsible Agency:** EPA

**Determined Date:** 08/17/2023

**Return to Compliance Date:** 09/08/2024

**Return to Compliance Qualifier:** D   Documented

**Violation Activity Location:** CA

## Citations

| Citation | ↕ | Description | ↕ |
|---|---|---|---|
| 262.17(a)(1)(iv) | | Closed container during storage in LGQ CAA, with limited exceptions. | |

## Linked Compliance Monitoring

| Compliance Monitoring Type | ↕ | Agency | ↕ | Date | ↕ |
|---|---|---|---|---|---|
| Compliance Evaluation Inspection | | EPA | | 08/17/2023 | |

## Linked Enforcement Actions

| Type of Action | ↕ | Agency | ↕ | Date | ↕ | Penalty Assessed | ↕ |
|---|---|---|---|---|---|---|---|
| INSPECTION REPORT WRITTEN | | EPA | | 04/30/2024 | | | |

⌃ Top of Page



## Discover.

**Accessibility**
<https://www.epa.gov/accessibility>

**Budget & Performance**
<https://www.epa.gov/planandbudget>

**Contracting**
<https://www.epa.gov/contracts>

**EPA www Web Snapshots**
<https://www.epa.gov/home/wwwepagov snapshots>

## Connect.

**Data.gov** ☑ <https://www.data.gov>

**Inspector General**
<https://www.epa.gov/office inspector general/about epas office inspector general>

**Jobs** <https://www.epa.gov/careers>

**Newsroom**
<https://www.epa.gov/newsroom>

## Ask.

**Contact EPA**
<https://www.epa.gov/aboutepa/forms/contact epa>

**EPA Disclaimers**
<https://www.epa.gov/web policies and procedures/epa disclaimers>

**Hotlines**
<https://www.epa.gov/aboutepa/epa hotlines>

(155 of 414), Page 155 of 404
1/22/25, 4:48 PM
Case 3:23-cv-04597-EMC   Document 55-7   Filed 05/22/25   Page 64 of 84
Case: 25-2028, 05/20/2025, DktEntry: 27.6, Page 155 of 414
Violation Report | ECHO | US EPA

🇺🇸 An official website of the United States government

MENU

Search EPA.gov



Search Options    Analyze Trends    Find EPA Cases    Data Services    Help

Login   Contact Us <https://epa.gov/resources/general-info/contact-us>

<https://echo.epa.gov/>

# Violation Report

❓ Help <https://epa.gov/help/reports/hazardous-waste-violation-help>

## Facility Summary

**APPLE INC**

**3250 SCOTT BLVD, SANTA CLARA, CA 95054** ⓘ

**RCRA (Resource Conservation and Recovery Act) ID:** CAR000278176

**FRS (Facility Registry Service) ID:** 110001168254

**Industry:** 541715 - Research and Development in the Physical, Engineering, and Life Sciences (except Nanotechnology and Biotechnology)

### Related Reports

⬛ Detailed Facility Report

View Envirofacts Reports

## Hazardous Waste Violation Information

**Violation Type:** 262.A - Standards Applicable to Generators of HW: General

**Determined By:** EPA

**Responsible Agency:** EPA

**Determined Date:** 08/17/2023

**Return to Compliance Date:** 09/08/2024

**Return to Compliance Qualifier:** D - Documented

**Violation Activity Location:** CA

### Citations

| Citation ↕ | Description ↕ |
|---|---|
| 262.17(a)(5)(ii)(B) | Mark or label its tanks with an indication of the hazards of the contents (examples include, but are not limited to, the applicable hazardous waste characteristic(s) (i.e., ignitable, corrosive, react |
| 262.17(a)(5)(i)(C) | date each period of accumulation begins is marked and visible on each LQG container |

### Linked Compliance Monitoring

| Compliance Monitoring Type ↕ | Agency ↕ | Date ↕ |
|---|---|---|
| Compliance Evaluation Inspection | EPA | 08/17/2023 |

### Linked Enforcement Actions

| Type of Action ↕ | Agency ↕ | Date | Penalty Assessed ↕ |
|---|---|---|---|
| INSPECTION REPORT WRITTEN | EPA | 04/30/2024 | -- |

⌃ Top of Page

An official website of the United States government

MENU

Search EPA.gov

| Search Options | Analyze Trends | Find EPA Cases | Data Services | Help |

ECHO
Enforcement and
Compliance History Online
<https://echo.epa.gov/>

Login    Contact Us <https://epa.gov/resources/general info/contact us>

# Violation Report

❓ Help <https://epa.gov/help/reports/hazardous waste violation help>

## Facility Summary

**APPLE INC**

**3250 SCOTT BLVD, SANTA CLARA, CA 95054** ⓘ

**RCRA (Resource Conservation and Recovery Act) ID:** CAR000278176
**FRS (Facility Registry Service) ID:** 110001168254
**Industry:** 541715   Research and Development in the Physical, Engineering, and Life Sciences (except Nanotechnology and Biotechnology)

### Related Reports

⬛ Detailed Facility Report

View Envirofacts Reports

## Hazardous Waste Violation Information

**Violation Type:** 262.A   Standards Applicable to Generators of HW: General
**Determined By:** EPA
**Responsible Agency:** EPA

**Determined Date:** 08/17/2023
**Return to Compliance Date:** 09/08/2024
**Return to Compliance Qualifier:** D   Documented
**Violation Activity Location:** CA

## Citations

| Citation ⇅ | Description ⇅ |
|---|---|
| 262.17(b) | If LQG accumulates for longer than 90 days, it is a storage facility, unless granted an extension |

## Linked Compliance Monitoring

| Compliance Monitoring Type ⇅ | Agency ⇅ | Date ⇅ |
|---|---|---|
| Compliance Evaluation Inspection | EPA | 08/17/2023 |

## Linked Enforcement Actions

| Type of Action ⇅ | Agency ⇅ | Date ⇅ | Penalty Assessed ⇅ |
|---|---|---|---|
| INSPECTION REPORT WRITTEN | EPA | 04/30/2024 | |

⌃ Top of Page



## Discover.

**Accessibility**
<https://www.epa.gov/accessibility>

**Budget & Performance**
<https://www.epa.gov/planandbudget>

**Contracting**
<https://www.epa.gov/contracts>

**EPA www Web Snapshots**
<https://www.epa.gov/home/wwwepagov snapshots>

## Connect.

**Data.gov** ↗ <https://www.data.gov>

**Inspector General**
<https://www.epa.gov/office inspector general/about epas office inspector general>

**Jobs** <https://www.epa.gov/careers>

**Newsroom**
<https://www.epa.gov/newsroom>

## Ask.

**Contact EPA**
<https://www.epa.gov/aboutepa/forms/contact epa>

**EPA Disclaimers**
<https://www.epa.gov/web policies and procedures/epa disclaimers>

**Hotlines**
<https://www.epa.gov/aboutepa/epa hotlines>

An official website of the United States government

MENU

Search EPA.gov

# ECHO
Enforcement and
Compliance History Online
<https://echo.epa.gov/>

Search Options    Analyze Trends    Find EPA Cases    Data Services    Help

Login    Contact Us <https://epa.gov/resources/general info/contact us>

# Violation Report

Help <https://epa.gov/help/reports/hazardous waste violation help>

## Facility Summary

**APPLE INC**

**3250 SCOTT BLVD, SANTA CLARA, CA 95054** ⓘ

**RCRA (Resource Conservation and Recovery Act) ID:** CAR000278176

**FRS (Facility Registry Service) ID:** 110001168254

**Industry:** 541715  Research and Development in the Physical, Engineering, and Life Sciences (except Nanotechnology and Biotechnology)

**Related Reports**

■ Detailed Facility Report

View Envirofacts Reports

## Hazardous Waste Violation Information

**Violation Type:** 270.A  EPA Administered Permit Programs: the HW Permit Program General Information

**Determined By:** EPA

**Responsible Agency:** EPA

**Determined Date:** 08/17/2023

**Return to Compliance Date:**

**Return to Compliance Qualifier:**

**Violation Activity Location:** CA

### Citations

| Citation | ↕ | Description | ↕ |
|---|---|---|---|
| 270.1(c) | | O/O PERMIT AND POST CLOSURE PERMIT REQUIREMENTS | |

### Linked Compliance Monitoring

| Compliance Monitoring Type ↕ | Agency ↕ | Date ↕ |
|---|---|---|
| Compliance Evaluation Inspection | EPA | 08/17/2023 |

### Linked Enforcement Actions

| Type of Action ↕ | Agency ↕ | Date ↕ | Penalty Assessed ↕ |
|---|---|---|---|
| INSPECTION REPORT WRITTEN | EPA | 04/30/2024 | |

︿ Top of Page



## Discover.

**Accessibility**
<https://www.epa.gov/accessibility>

**Budget & Performance**
<https://www.epa.gov/planandbudget>

**Contracting**
<https://www.epa.gov/contracts>

**EPA www Web Snapshots**
<https://www.epa.gov/home/wwwepagov snapshots>

## Connect.

**Data.gov** ☑ <https://www.data.gov/>

**Inspector General**
<https://www.epa.gov/office inspector general/about epas office inspector general>

**Jobs** <https://www.epa.gov/careers>

**Newsroom**
<https://www.epa.gov/newsroom>

## Ask.

**Contact EPA**
<https://www.epa.gov/aboutepa/forms/contact epa>

**EPA Disclaimers**
<https://www.epa.gov/web policies and procedures/epa disclaimers>

**Hotlines**
<https://www.epa.gov/aboutepa/epa hotlines>



An official website of the United States government

MENU

Search EPA.gov

| Search Options | Analyze Trends | Find EPA Cases | Data Services | Help |

Login    Contact Us <https://epa.gov/resources/general-info/contact-us>

<https://echo.epa.gov/>

# Violation Report

Help <https://epa.gov/help/reports/hazardous-waste-violation-help>



## Facility Summary

**APPLE INC**

**3250 SCOTT BLVD, SANTA CLARA, CA 95054** ⓘ

**RCRA (Resource Conservation and Recovery Act) ID:** CAR000278176

**FRS (Facility Registry Service) ID:** 110001168254

**Industry:** 541715 - Research and Development in the Physical, Engineering, and Life Sciences (except Nanotechnology and Biotechnology)

### Related Reports

☐ Detailed Facility Report

View Envirofacts Reports

## Hazardous Waste Violation Information

**Violation Type:** 262.B - Standards Applicable to Generators of HW: Manifest Requirements Applicable to Small and Large Quantity Generators

**Determined By:** EPA

**Responsible Agency:** EPA

**Determined Date:** 01/16/2024

**Return to Compliance Date:** --

**Return to Compliance Qualifier:** --

**Violation Activity Location:** CA

### Citations

| Citation ↕ | Description ↕ |
|---|---|
| 262.20(a)(1) | A generator who transports, or offers for transport a hazardous waste for offsite treatment, storage, or disposal (TSD), or a TSD facility who offers for transport a rejected hazardous waste load |

### Linked Compliance Monitoring

| Compliance Monitoring Type ↕ | Agency ↕ | Date ↕ |
|---|---|---|
| Focused Compliance Inspection | EPA | 01/16/2024 |

### Linked Enforcement Actions

| Type of Action ↕ | Agency ↕ | Date ↕ | Penalty Assessed ↕ |
|---|---|---|---|
| INSPECTION REPORT WRITTEN | EPA | 04/30/2024 | -- |

︿ Top of Page



An official website of the United States government

MENU

Search EPA.gov

Search Options     Analyze Trends     Find EPA Cases     Data Services     Help

**ECHO**
Enforcement and
Compliance History Online
<https://echo.epa.gov/>

Login     Contact Us <https://epa.gov/resources/general info/contact us>

# Violation Report

❓ Help <https://epa.gov/help/reports/hazardous waste violation help>

## Facility Summary

**APPLE INC**

**3250 SCOTT BLVD, SANTA CLARA, CA 95054** ⓘ

**RCRA (Resource Conservation and Recovery Act) ID:** CAR000278176

**FRS (Facility Registry Service) ID:** 110001168254

**Industry:** 541715   Research and Development in the Physical, Engineering, and Life Sciences (except Nanotechnology and Biotechnology)

**Related Reports**

⬛ Detailed Facility Report

View Envirofacts Reports

## Hazardous Waste Violation Information

**Violation Type:** 265.J   Interim Status Standards for Owners and Operators of HW TSDs: Tank Systems

**Determined By:** EPA

**Responsible Agency:** EPA

**Determined Date:** 01/16/2024

**Return to Compliance Date:**

**Return to Compliance Qualifier:**

**Violation Activity Location:** CA

## Citations

| Citation | Description |
|---|---|
| 265.195(a) | DAILY INSPECTION REQUIREMENTS |

## Linked Compliance Monitoring

| Compliance Monitoring Type | Agency | Date |
|---|---|---|
| Focused Compliance Inspection | EPA | 01/16/2024 |

## Linked Enforcement Actions

| Type of Action | Agency | Date | Penalty Assessed |
|---|---|---|---|
| INSPECTION REPORT WRITTEN | EPA | 04/30/2024 | |

⌃ Top of Page



### Discover.

**Accessibility**
<https://www.epa.gov/accessibility>

**Budget & Performance**
<https://www.epa.gov/planandbudget>

**Contracting**
<https://www.epa.gov/contracts>

**EPA www Web Snapshots**
<https://www.epa.gov/home/wwwepagov snapshots>

### Connect.

**Data.gov** ☑ <https://www.data.gov/>

**Inspector General**
<https://www.epa.gov/office inspector general/about epas office inspector general>

**Jobs** <https://www.epa.gov/careers>

**Newsroom**
<https://www.epa.gov/newsroom>

### Ask.

**Contact EPA**
<https://www.epa.gov/aboutepa/forms/contact epa>

**EPA Disclaimers**
<https://www.epa.gov/web policies and procedures/epa disclaimers>

**Hotlines**
<https://www.epa.gov/aboutepa/epa hotlines>

An official website of the United States government

MENU

Search EPA.gov

# ECHO
Enforcement and
Compliance History Online
<https://echo.epa.gov/>

Search Options    Analyze Trends    Find EPA Cases    Data Services    Help

Login    Contact Us <https://epa.gov/resources/general info/contact us>

# Violation Report

❓ Help <https://epa.gov/help/reports/hazardous waste violation help>

## Facility Summary

**APPLE INC**

**3250 SCOTT BLVD, SANTA CLARA, CA 95054** ⓘ

**RCRA (Resource Conservation and Recovery Act) ID:** CAR000278176

**FRS (Facility Registry Service) ID:** 110001168254

**Industry:** 541715   Research and Development in the Physical, Engineering, and Life Sciences (except Nanotechnology and Biotechnology)

**Related Reports**

⬛ Detailed Facility Report

View Envirofacts Reports

## Hazardous Waste Violation Information

**Violation Type:** 270.A  EPA Administered Permit Programs: the HW Permit Program General Information

**Determined By:** EPA

**Responsible Agency:** EPA

**Determined Date:** 01/16/2024

**Return to Compliance Date:**

**Return to Compliance Qualifier:**

**Violation Activity Location:** CA

## Citations

| Citation | ↕ | Description | ↕ |
|---|---|---|---|
| 270.1(c) | | O/O PERMIT AND POST CLOSURE PERMIT REQUIREMENTS | |

## Linked Compliance Monitoring

| Compliance Monitoring Type | ↕ | Agency ↕ | Date ↕ |
|---|---|---|---|
| Focused Compliance Inspection | | EPA | 01/16/2024 |

## Linked Enforcement Actions

| Type of Action ↕ | Agency ↕ | Date ↕ | Penalty Assessed ↕ |
|---|---|---|---|
| INSPECTION REPORT WRITTEN | EPA | 04/30/2024 | |

⌃ Top of Page



## Discover.

**Accessibility**
<https://www.epa.gov/accessibility>

**Budget & Performance**
<https://www.epa.gov/planandbudget>

**Contracting**
<https://www.epa.gov/contracts>

**EPA www Web Snapshots**
<https://www.epa.gov/home/wwwepagov snapshots>

## Connect.

**Data.gov** ☑ <https://www.data.gov>

**Inspector General**
<https://www.epa.gov/office inspector general/about epas office inspector general>

**Jobs** <https://www.epa.gov/careers>

**Newsroom**
<https://www.epa.gov/newsroom>

## Ask.

**Contact EPA**
<https://www.epa.gov/aboutepa/forms/contact epa>

**EPA Disclaimers**
<https://www.epa.gov/web policies and procedures/epa disclaimers>

**Hotlines**
<https://www.epa.gov/aboutepa/epa hotlines>

🇺🇸 An official website of the United States government

MENU

Search EPA.gov

| Search Options | Analyze Trends | Find EPA Cases | Data Services | Help |

# ECHO
Enforcement and
Compliance History Online
<https://echo.epa.gov/>

Login    Contact Us <https://epa.gov/resources/general info/contact us>

# Violation Report

❓ Help <https://epa.gov/help/reports/hazardous waste violation help>

## Facility Summary

**APPLE INC**

**3250 SCOTT BLVD, SANTA CLARA, CA 95054** ⓘ

**RCRA (Resource Conservation and Recovery Act) ID:** CAR000278176

**FRS (Facility Registry Service) ID:** 110001168254

**Industry:** 541715   Research and Development in the Physical, Engineering, and Life Sciences (except Nanotechnology and Biotechnology)

### Related Reports

■ Detailed Facility Report

View Envirofacts Reports

## Hazardous Waste Violation Information

**Violation Type:** 265.BB   Interim Status Standards for Owners and Operators of HW TSDs: Air Emission Standards for Equipment Leaks

**Determined By:** EPA

**Responsible Agency:** EPA

**Determined Date:** 01/16/2024

**Return to Compliance Date:**

**Return to Compliance Qualifier:**

**Violation Activity Location:** CA

## Citations

| Citation ↕ | Description ↕ |
|---|---|
| 265.1063(b)(3) | CALIBRATION OF INSTRUMENT BY PROCEDURES SPECIFIED IN REFERENCE METHOD 21 |

## Linked Compliance Monitoring

| Compliance Monitoring Type ↕ | Agency ↕ | Date ↕ |
|---|---|---|
| Focused Compliance Inspection | EPA | 01/16/2024 |

## Linked Enforcement Actions

| Type of Action ↕ | Agency ↕ | Date ↕ | Penalty Assessed ↕ |
|---|---|---|---|
| INSPECTION REPORT WRITTEN | EPA | 04/30/2024 | |

∧ Top of Page



# Discover.

**Accessibility**
<https://www.epa.gov/accessibility>

**Budget & Performance**
<https://www.epa.gov/planandbudget>

**Contracting**
<https://www.epa.gov/contracts>

**EPA www Web Snapshots**
<https://www.epa.gov/home/wwwepagov snapshots>

# Connect.

**Data.gov** ☑ <https://www.data.gov/>

**Inspector General**
<https://www.epa.gov/office inspector general/about epas office inspector general>

**Jobs** <https://www.epa.gov/careers>

**Newsroom**
<https://www.epa.gov/newsroom>

# Ask.

**Contact EPA**
<https://www.epa.gov/aboutepa/forms/contact epa>

**EPA Disclaimers**
<https://www.epa.gov/web policies and procedures/epa disclaimers>

**Hotlines**
<https://www.epa.gov/aboutepa/epa hotlines>



An official website of the United States government

MENU

Search EPA.gov

| Search Options | Analyze Trends | Find EPA Cases | Data Services | Help |

Login    Contact Us <https://epa.gov/resources/general-info/contact-us>

Enforcement and
Compliance History Online

<https://echo.epa.gov/>

# Violation Report

Help <https://epa.gov/help/reports/hazardous-waste-violation-help>

## Facility Summary

**APPLE INC**

**3250 SCOTT BLVD, SANTA CLARA, CA 95054** ⓘ

**RCRA (Resource Conservation and Recovery Act) ID:** CAR000278176

**FRS (Facility Registry Service) ID:** 110001168254

**Industry:** 541715 - Research and Development in the Physical, Engineering, and Life Sciences (except Nanotechnology and Biotechnology)

### Related Reports

☒ Detailed Facility Report

View Envirofacts Reports

## Hazardous Waste Violation Information

**Violation Type:** 265.CC - Interim Status Standards for Owners and Operators of HW TSDs: Air Emission Standards for Tanks, Surface Impoundments and Containers

**Determined By:** EPA

**Responsible Agency:** EPA

**Determined Date:** 01/16/2024

**Return to Compliance Date:** --

**Return to Compliance Qualifier:** --

**Violation Activity Location:** CA

### Citations

| Citation ↕ | Description ↕ |
|---|---|
| 265.1083(c)(1) | TANK, SURFACE IMPOUNDMENT, OR CONTAINER FOR WHICH ENTERING HAZARDOUS WASTE HAS AVERAGE VO CONCENTRATION AT POINT OF ORIGINATION < 500 PPMW; HOW VO CONCENTRATION SHALL BE DETERMINED; FREQUENCY OF REVIE |

### Linked Compliance Monitoring

| Compliance Monitoring Type ↕ | Agency ↕ | Date ↕ |
|---|---|---|
| Focused Compliance Inspection | EPA | 01/16/2024 |

### Linked Enforcement Actions

| Type of Action ↕ | Agency ↕ | Date ↕ | Penalty Assessed ↕ |
|---|---|---|---|
| INSPECTION REPORT WRITTEN | EPA | 04/30/2024 | -- |

∧ Top of Page

# Gjovik v. Apple

# Exhibit



CONSOLIDATED INSPECTION REPORT
**DEPARTMENT OF PUBLIC SAFETY**
**FIRE PREVENTION & HAZARDOUS MATERIALS**
**CERTIFIED UNIFIED PROGRAM AGENCY**
505 W. Olive Ave, Suite 150
Sunnyvale, CA 84086
(408) 730-7212 | Fax: (408) 328-0726
FirePrevention@Sunnyvale.ca.gov

## CONSOLIDATED INSPECTION REPORT

**Facility Name:** Apple Inc. - Stewart Drive 1   **CERS ID:** 10687162  **Purpose:** Routine   **Date:** 09/09/2021

**Address:** 825 Stewart Dr Sunnyvale CA 94085   **Consent to Inspect Granted:** ☑ **By:** Tom Huynh

### OBSERVATIONS AND CORRECTIVE ACTIONS

**Fire Prevention  -  HazMat**

36 -   **Observation:** PCI Cart with misc. storage is present in the facility's exterior electrical room.
       **Code Section:** CFC 315.3.3
       **Violation Type:** Repeat
       **Correct By:** 10/09/2021

**Additional Comments:**   Fire extinguishers are current.

5-year riser certification was performed April 2017. Annual riser certification was performed Oct. 2020.

Flammable storage cabinets are utilized and are self closing.

Secondary containment is provided - clean and dry.

No signature obtained due to COVID-19 protocols. Verbal consent to inspect granted.

This report shall serve as a "NOTICE TO COMPLY" for Minor Violations, and a "NOTICE OF VIOLATION" for Class I or II violations. You are, hereby, ordered to correct the above noted violations within 30 days, or as otherwise specified. Formal enforcement and/or penalty assessment may be initiated at any time without further notice for Class I or II violations noted, and for Minor violations not corrected within 30 days.

### OBSERVATIONS AND CORRECTIVE ACTIONS

**Hazardous Waste Generator - Small Quantity Generator  -  Routine**

**Additional Comments:**   Hazardous waste is properly labeled.

Solder waste is collected at the point of generation. Discussed housekeeping of solder areas.

Accumulation times - OK.

Manifests - OK. Log documenting when manifests are sent to DTSC are maintained.

No signature obtained due to COVID-19 protocols. Verbal consent to inspect granted.

There were no violations observed during this inspection.

All violations must be corrected within 30 days of the date of this notice unless otherwise noted. H&SC 25187.8 requires that you write a brief description of the corrective action taken to bring this facility into compliance and submit that information to this office by email or fax within 5 days of achieving compliance.

Corrective Action Taken:   PCI cart was removed from the facilities exterior electrical room following the HazMat inspection.

Certification: I certify under penalty of perjury that this facility has corrected all items identified in this Notice of Violation.
Name of Owner/Operator:   Austin J DeBaene   Signature: *Austin J DeBaene*   Date:   11/17/21

**Inspected By:** _____

Morgan Kaman

**Facility Representative:** _____

N/A

Tom Huynh

**https://semspub.epa.gov/work/09/1158560.pdf**

SEMS-RM DOCID # 1158560

# AECOM

# VAPOR INTRUSION
# EVALUATION REPORT

## FORMER TRW MICROWAVE SITE
## 825 STEWART DRIVE
## SUNNYVALE, CALIFORNIA

Prepared for:
Apple Inc.

Prepared by:
AECOM
999 W. Town and Country
Orange, CA 92868

# FEBRUARY 2016

# FIFTH FIVE-YEAR REVIEW REPORT

# FOR

# ADVANCED MICRO DEVICES 901/902 AND TRW MICROWAVE SUPERFUND SITES

# INCLUDES THE COMPANIES' OFFSITE OPERABLE UNIT

# SANTA CLARA COUNTY, CALIFORNIA



PREPARED BY

U.S. Army Corps of Engineers, Seattle District

FOR

**U.S. Environmental Protection Agency**

**Region IX**

Approved by:                              Date:

_Dana Barton_                             _9/18/19_

Dana Barton, Branch Chief

California Site Cleanup and Enforcement Branch

U.S. Environmental Protection Agency, Region 9



Search Apple Inc.

Eddie Borjas, Simon Moen

Aug 3 2021

Today

**Ashley Gjøvik** 11:03 AM
weird ask but if either of you are in stewart today can you please try to take detailed pics of any cracks you see in tl
fix it tomrorow-ish i want evidence of what they looked like before tehy do

mike was goign to try but hasnt made it over there

and i cant get there utnil thursday

(i think that's how the vapor instrusion was getting into our air, through those cracks)

EHS is refusing to test the air until after they seal them

so if you can take pics, also note or landmark where they're at — simcity espeically, that's the hot spot

**Simon Moen** 11:18 AM
I'm in the office. If you can point me to where the cracks are I can take a pic

**Eddie Borjas** 11:18 AM
Im here too

**Simon Moen** 11:18 AM
12 to 1 no meeting for me, I can help

1

**Simon Moen** 11:50 AM
Do you consider this a crack?

Image from iOS

Message Eddie Borjas, Simon Moen

*Exhibit: Slack chat about the cracks in the floor at 825 Stewart Drive*

+ Add a bookmark

**Aug 4 2021**

**Simon Moen** 9:27 AM
Here is what I see in front of Mike's office and your row. Not deep.

2 files

EHS folks are here by the way

**Ashley Gjøvik** 9:28 AM
thank you!!!!!!

**Simon Moen** 9:28 AM
With so many devices

Nice job

💙 1

**Ashley Gjøvik** 9:28 AM
omg can you take pics of them too plz low key

(if you feel comfortable)

or even not low key if you want

"smile"

"ashley says hi"

**Simon Moen** 9:30 AM
They are in the conf room next to DP's office. Very difficult to take pic.

**Ashley Gjøvik** 9:31 AM
they're legit hiding

*Exhibit: Slack chat about the cracks in the floor at 825 Stewart Drive*



*Exhibit: Slack chat about the cracks in the floor at 825 Stewart Drive*

Gjovik's coworker responded that he "*did a quick walk and it's all over the place.*" He

said he can "take pics" "but it is everywhere." Gjovik responded,

"If there's any way to show depth like sticking clay in a deep one and showing
how deep it is that would be amazing. It sounds like they're trying to cover all this

146

SECOND AMENDED COMPLAINT | 3:23-CV-04597-EMC                    DECEMBER 21 2023

417.   This was unusual and highly suspicious. On August 12 2021, Global Security also hosted the first "*NPS Secrecy and Awareness Training*" for all of West's organization.

418.   Gjovik heard that around this time the managers in Dan West's organization were being instructed to avoid putting employee/labor things in writing due to how much evidence Gjovik was able to obtain.

**Table A-4: Apple's 825 Stewart Maintenance Work After 7/27 US EPA Inspection Notice**

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|--------|--------|---------|-----------|----------|--------|----------|
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| August 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | Sept 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |

419.   On August 15 2021, Alisha Johnson (reporting to Lisa Jackson) sent US EPA Apple's talking points about Apple's environmental practices. Including: *"We've achieved Zero Waste to Landfill certifications at all supplier final assembly facilities for core product lines. In fiscal year 2020, we diverted more than 70% of waste across Apple facilities including retail stores. We have active Zero Waste to Landfill goals for retail, corporate facilities and our supply chain."*

420.   On August 16 2021, Apple emailed Gjovik and her coworkers about a "EH&S Walkthrough 8/18 8/19" at her Superfund office. The email included a map of the office created by EKI.

421.   On August 16 2021, Apple (Okpo) sent the "Issue Confirmation" of what they were supposedly investigating. (It is unknown what Apple was doing for the twelve days

172

Message

| | |
|---|---|
| **From:** | Handley, Bianca [Handley.Bianca@epa.gov] |
| **Sent:** | 7/30/2021 7:43:24 PM |
| **To:** | Schulman, Michael [Schulman.Michael@epa.gov] |
| **CC:** | Johnson, AudreyL [Johnson.AudreyL@epa.gov] |
| **Subject:** | SEMD Fieldwork Request - initial approval status |

**Importance:**   Low

THIS IS NOT YOUR FINAL APPROVAL EMAIL.
The following work has been approved by the QA Manager.
If this is EPA contractor travel, after approval from all involved branches, you will receive an email approving contractor travel.

If this is EPA staff travel during Phase 1, after approval from all involved branches, the request will be automatically sent to the Regional Approver through John Lyons. You must receive a final approval email before proceeding with travel.

Destination: TRW Microwave Site (Triple Site), Sunnyvale, Santa Clara County, CA
Dates: 2021-08-19
Description of work: A site visit to an Apple office building is necessary to conduct a visual inspection of the building's vapor intrusion mitigation measures. An Apple employee recently contacted EPA and notified EPA that there were cracks in the building's foundation. If true and the cracks are significant, this could impact the effectiveness of the VI mitigation system the protectiveness of human health. The onsite work will include visual inspections to the: (1) The vapor intrusion passive sub-slab depressurization system. (2) The building's concrete slab and past cracks that where sealed to prevent vapor intrusion. (3) Past 2013 to 2015 indoor air sampling locations. (4) The indoor location where contaminated soil was excavated from underneath the building. (5) The spaces between the walls of the three sections of the buildings that were sealed in 2014-2015. (6) The groundwater in-situ bioremediation system (outdoors).
Travel Method: Separate vehicles, one person per vehicle, local travel, no overnight stay.

# 825 Site Visit - Aug 19, 2021

Thursday, August 19, 2021    8:03 AM

- 07:50: Meet on-site:  NGG: Michael Shannon; The Dextra Group: Kurt Batsel; AECOM: Holly Holbrook
- Meet Colin Scanlon - Apple Lease manager: cscanlon@apple.com / Apple, Real Estate & Development Mobile: 510.290.7726
  - HVAC - not sure how operating

- Pre-arrange Site Visit Agenda:
  - The sub-slab depressurization system that was installed underneath the site building to vent vapors to the atmosphere.
  - The building's concrete slab and cracks that where sealed to prevent vapor intrusion. As well as any building concrete slab penetrations (e.g., from pipes or seams in the building).
  - Past indoor air sampling locations.
  - The location where contaminated soil was excavated from underneath the building.
  - The spaces between the walls of the three sections of the buildings that were sealed in 2014-2015.
  - The emulsified vegetable oil in-situ bioremediation system.
  - The location of groundwater monitoring wells.

- Holly: 4 HVAC zones 1st floor
  - Can't access vent riser pipes - no ports

- Building Elevator Maintenance:
  - Elevator shaft in GW in a pvc sleeve.

- IA-4: Open area in front of elevator.
- Matt: Roof, West Bldg Vents are exactly 10' from HVAC, just meeting code. Not great for VOCs bc venting into hvac. Would be better / need to extend 10' high.
- Matt: Roof, East bldg stack issues. Vents too close to chiller. Cut too low.
- Photo. PVC pipes in in service room; unk source. Suspect drain from roof (it's flat). Around pipe openings sealed (good). Room is has hvac air (good).
- Older concrete floor cracks well sealed. Photo examples.
- SS-05 under carpet (photo). Identified by Apple. Right SS diameter, but grout sealed. Seems mislabeled as SS-5 location not shown here in 2016 VI rpt. Matt: Seal sub slab ports. Not abandoned properly. Rusted. Use brass and SS. Reinstall or abandon.  Seal and can redrill if needed. Don't need a permanent SS port.
- SS-4 (photo) not poured well.
- Room 12-19 has drain. Room under negative pressure -4. It's hvac well balanced. Sample this room bc of drain and neg pressure.
- Matt: Room 12-14 (w/saw?) pressure 5.6 pascals.  Has positive pressure. Would sample in hallway because has lower pressure. Otherwise sampling vent air.
- Justin with Apple, part of tour. Rooms are supposed to be warm, but have high turn over. Bldg has turn over. Didn't change for COVID. On 24 hrs because do thermal testing overnight.
- IA-2. Environmental room. Raised floor.
- Cube office work area IA-7: 3 pascals lower then hallway.
- IA-8 Has a higher pressure. Unlikely to be an issue here.
- IA sample where pressure is lower
- Need to look at past SS concentrations
- IA-9: Bathroom neg pressure. -15.7 pascals. Drain has no measurable floor, but the drain cover are too small to get tubing down. Can't feel flow. EPA assumption is all drains leak, but not representative.

ED_006475C_00003016-00001

Negative means air comes in to roof.

- SS-3 (Photo): Cannot locate SS-10 and SS-11. Indoor building layout has had changes (?) since 2015. AECOM will look at their records.

- Matt / EPA Comments:
    - EPA samples with hvac off because venting changes with economizers and season and we can't control for those future scenarios.
    - 4 stacks need to be extended. Ok per code but not COCs. Main bldg is under chiller stack, not even sure how extend.
    - Be nice to get the HVAC test and balance reports to know where to sample. Want economizers to be closed and heater on. Usually in January.
    - Want HVAC off for worst case short-term exposure scenario.
    - Destroy the indoor SS ports.
    - Crack inspection documentation.
    - Locate the indoor SS missing ports.
    - Apple is operating bldg (HVAC) perfectly. Pressure right. But, long term we have no control over.
    - Recommend cages around ladders to roof.

- 

ED_006475C_00003016-00002

**Vapor Intrusion Assessment 825 Stewart Drive, Sunnyvale**



**General**

Passive subslab depressurization systems (SSDs) were installed on the three connected buildings at 825 Stewart Drive prior to installation of a building ventilation system. It appears that the mechanical design of the HVAC system applied the standard 10-foot distance between building exhaust vents and HVAC intakes to the SDD exhaust for the west and main buildings. The HVAC system upgrades also included features that limited air flow from the SSD vents on these buildings. It is recommended that these impacts to the SSD operations be mitigated.

It was also generally noted that:

- SSD vent pipes are not accessible inside the buildings.

- Active, balanced ventilation systems were observed, and the buildings appear to maintain a positive pressure in regularly occupied spaces. Test and balance information for the HVAC systems is requested to confirm this.

- Exposed, sealed concrete was present throughout much of the buildings.

- Subslab sampling ports, left in place, have not been regularly sampled or maintained and several could not be located. It is recommended that these be located and maintained or decommissioned.

ED_013761_00001537-00001

**West Building**

The west building is two stories with an approximately 15,000 square foot footprint. The west building houses the main entrance lobby for the building which is open to the second floor. The building elevator is also present towards to rear of the lobby area. The following were noted:

- Significant, visible slab cracks, gaps and penetrations had been sealed.
- There was positive pressure between the lobby and outside of approximately 1.5 pascal during the visit.
- The elevator pit and penetrations appear to be sealed from the subsurface. The elevator is a typical piston type low rise elevator. The piston housing remains a potential pathway for vapor entry, as it penetrates deep into the subsurface (typically these are twenty feet or more deep).
- The SSD vents on the roof are not significantly elevated above the roof (~ 3 feet) and are sheltered from wind.
- A main HVAC intake is approximately 10-feet from the western SSD vent. It is recommended that the vent stacks be reconfigured to avoid vapor intake from the HVAC.



ED_013761_00001537-00002

**Main Building**

The main building is one story with an approximately 30,000 square foot footprint. The building is divided into office spaces and test areas and the building pressure appear to have been balanced to accommodate the various building uses. The following were noted:

- There was positive pressure between the break room and outside of approximately 6 pascals during the visit. Office areas adjacent to this break area had pressures of approximately 2 to 3 pascals lower and the adjacent men's restroom had a pressure of 16 pascals lower than the break room area. It is recommended that sampling take place in both office spaces, where building pressure is lower than the break room area.
- The SSD vents on the roof are under the building chiller plant piping and are within 12-feet of a ventilation system intake. There is not significant air flow near the SSD vent stacks and it is likely that the SSD vents are not functioning as intended and vapors could be building up on the roof near the HVAC intake.
- Generally, the slab had been sealed, however some large test equipment is bolted to the slab and it is unclear if any of these installations penetrate the slab.



**North Building**

The north building is one story with an approximately 14,000 square foot footprint. The following were noted:

- There was positive pressure between the rear hall and the outside of 4 pascals.
- Several subslab ports could not be located.
- The SSD vents on the roof are approximately 25 feet from the nearest HVAC intake and they were relatively unobstructed by HVAC and roof structures.



ED_013761_00001537-00004

ECHO Gov Login    Contact Us

Your report has been successfully sent. Your confirmation is below.

# Report Environmental Violations - Submitted

Thank you for submitting information on a possible environmental violation. The information will be reviewed by EPA enforcement personnel.

This notice will be the only response you will receive regarding your submission. Due to the sensitive manner in which enforcement information must be managed by EPA, we cannot provide status reports or updates regarding any submission we receive through the Report Environmental Violations form.

Back to Report Environmental Violations page

# Report Confirmation

| | |
|---|---|
| **Received** | Aug 29, 2021 at 4:44pm EDT |
| | |
| **Your Name** | Ashley Gjovik |
| **Your Email** | ashleymgjovik@protonmail.com |
| **Your Phone Number** | ✕✕✕✕ |
| | |
| **Suspected Violator's Name *** | Apple Inc |
| **Suspected Violation Location *** | 825 Stewart Drive |

ED_013213_00001121-00001

| | |
|---|---|
| **Suspected Violation City \*** | Sunnyvale |
| **Suspected Violation State \*** | California |
| **Suspected Violation ZIP Code \*** | 94086 |
| **Responsible Party** | Company |
| | |
| **Is the suspected violation still occurring?** | Yes |
| **Date of Incident** | |
| **Characterized incident as:** | |
| **Intention \*** | Intentional |
| **Violation Method \*** | Falsified |
| **Affected Subject(s)** | Air, Worker, Documents |
| | |

| | |
|---|---|
| **Violation Description *** | As reported to the EPA Superfund site community contact (Margot PerezSullivan), I've had concerns since March 2021 about Apple's oversight & lack of due diligence for the safety of their employees in the TRW Microwave Superfund site (825 Stewart). I've expressed concerns about negligence and even recklessness, possible violations of Right to Know & OSHA. Worse, Apple's response has been to misrepresent their activities and the site, intimidate me to not speak about workplace safety concerns related to the site, and have refused to notify the Federal EPA of changed circumstances at the site (e.g. cracks in the cement floor requiring repair). Apple has frequently told me they refuse to answer any of my questions about safety or the site, and even pressured me into requesting an ADA accommodation request to work remotely to not be exposed to the chemicals at the site, after pressuring me to file a worker's comp claim for a fainting spell I had in 2019, which I believe to be caused by vapor intrusion. Apple has refused to test the indoor air for vapor intrusion until after they seal the cracks, despite the last testing being done in 2015 and was limited (10hrs) and the only time the results ever came back without vapor intrusion above max EPA industrial limits (there was a long history of toxic indoor air vapor intrusion in the building). Further, Northrup Grumman is the responsible party and their ex-CEO/President, Ronald Sugar, is now on the Board of Directors of Apple & the Chair of the Finance & Audit committee. I can provide documentation for all of the above. I reported my concerns about conflicts of interest to Apple. I've also filed DOL OSHA Whistleblower retaliation complaints, and claims with the EEOC, NLRB, & CA DEFH. |
| **File(s) Uploaded** | No files uploaded. |
| | |

LAST UPDATED ON AUGUST 19, 2021

DATA REFRESH INFORMATION

ED_013213_00001121-00003

Message

| | |
|---|---|
| **From**: | Debra Rubenstein [drubenstein@apple.com] |
| **Sent**: | 8/11/2021 7:16:29 PM |
| **To**: | Reynolds, Rebekah [Reynolds.Rebekah@epa.gov] |
| **CC**: | Colin Scanlon [cscanlon@apple.com] |
| **Subject**: | Letter re CBI for EPA Visit to 825 Stewart Drive, Sunnyvale |
| **Attachments**: | 8-11-21 Letter to EPA re CBI for 825 Stewart Drive.pdf |

Rebekah,
In follow up to our conversation, I enclose a letter on behalf of Apple Inc. claiming CBI relating to any information collected and/or documented during the EPA site visit on August 19, 2021.  Any questions let me know.
Debra


*****************************************************************

**Debra Rubenstein |** Senior Counsel I Environment Health & Safety I ☐ Apple  Inc. **|** desk +1 669.276.9741 **|** mobile +1 408.893.9762 **|**  One Apple Park Way MS  60-2LAW Cupertino, CA 95014 **|** drubenstein@apple.com

This email and any attachments may be privileged and may contain confidential information intended only for the recipient(s) named above. Any other distribution, forwarding, copying or disclosure of this message is strictly prohibited. If you have received this email in error, please notify me immediately by telephone or return email, and delete this message from your system.



August 11, 2021

**VIA Email** reynolds.rebekah@epa.gov
Rebekah Reynolds, Assistant Regional Counsel
US EPA Region 9
75 Hawthorne Street
*Mail Code:* ORC-3-2
San Francisco, CA 94105

**Re: 825 Stewart Drive, Sunnyvale, CA – TRW Microwave Superfund Site (the Site)**

Dear Ms. Reynolds,

Please accept this letter on behalf of Apple Inc. (Apple) in follow up to our discussion on August 10, 2021, and to formally request that any information relating to Apple operations at the Site (including but not limited to any hardware, process or other sensitive information) viewed or documented by EPA during its upcoming Site visit on August 19, 2021, be maintained as confidential business information (CBI) pursuant to *40 CFR Part 2, Subpart B, §2.203(b).*

A CBI claim is defined as "a claim or allegation that business information is entitled to confidential treatment for reasons of business confidentiality, or a request for a determination that such information is entitled to such treatment." *40 CFR §2.201(h)*

"The basis for claims of business confidentiality include the concept of trade secrecy and other related legal concepts which give (or may give) a business the right to preserve the confidentiality of business information and to limit its use or disclosure by others in order that the business may obtain or retain business advantages it derives from its rights in the information. The definition is meant to encompass any concept which authorizes a Federal agency to withhold business information under 5 U.S.C. 552(b)(4), as well as any concept which requires EPA to withhold information from the public for the benefit of a business under 18 U.S.C. 1905 or any of the various statutes cited in §§2.301 through 2.309." *40 CFR §2.201(e)*

We have been informed that EPA is interested in viewing the following areas at the Site:

- The sub-slab depressurization system.
- The building's concrete slab and cracks that were sealed to prevent vapor intrusion as well as any building concrete slab penetrations (e.g., from pipes or seams in

**Apple**
One Apple Park Way
Cupertino, CA 95014
T  408 996-1010
www.apple.com

the building). EPA also asked to see the spaces between the walls of the three sections of the buildings that were sealed in 2014–2015.
- Past indoor air sampling locations.
- The location where contaminated soil was excavated from underneath the building.
- The location of groundwater monitoring wells.
- The location of the previous bioremediation system and injection locations.

Some of these areas are located inside the Site building, which is made up of several highly confidential laboratories. As such, EPA may see or be interested in documenting or photographing certain operations and areas, which contain trade secret, proprietary and/or company confidential information. These operations and areas are entitled to protection and should all be maintained as CBI. Therefore, all information collected and documentation created during or relating to the Site visit (e.g. field notes and photographs) are being claimed by Apple as CBI and EPA should treat the information as such under the CBI regulations at 40 CFR Part 2.

If EPA would like to take a photograph during the visit to the Site, we request that EPA asks in advance of taking a photograph to limit, as much as possible, that any materials covered by CBI are being photographed. We will also request that any photographs taken by EPA be shared with Apple at the conclusion of the Site visit and marked as CBI if appropriate.

Should you have any questions or require any additional information in relation to this CBI request, you can reach me at +1.415.893.9762 or at drubenstein@apple.com.


Very truly yours,

Apple Inc., a California corporation

By:    *Debra J Rubenstein*

**Debra J Rubenstein**
*Senior Counsel, Environment, Health & Safety*


CC:    Colin Scanlon


**Apple**
One Apple Park Way
Cupertino, CA 95014
T  408 996-1010
www.apple.com

# Apple Confidentiality Agreement

This Apple Confidentiality Agreement (the "**Agreement**") between Apple Inc., a California corporation located at One Apple Park Way, Cupertino, California 95014 United States (**"Apple"**) and Environmental Protection Agency, located at Environmental Protection Agency  75 Hawthorne Street  San Francisco, CA 94105, United States, ("**Company**"), is effective as of August 9, 2021 ("**Effective Date**").

## 1. Scope

This Agreement governs any Confidential Information disclosed in connection with the Purpose.

In this Agreement: (i) "**Confidential Information**" means any nonpublic information, or material, which may include product plans, specifications, designs, photographs, costs, prices, project names, business plans, marketing plans, forecasts, orders, materials, components, prototypes, or pre-release products, disclosed by one party or any of its Affiliates (the "**Discloser**") to the other party or any of its Affiliates (the "**Recipient**") in connection with the Purpose, including information Recipient learns from Discloser's employees or Consultants or through inspection of Discloser's property; (ii) "**Purpose**" means Apple's evaluation, purchase or use of Company's, or its Affiliates', goods, services, technology, or other property (including intellectual property, real property, and personal property); (iii) "**Affiliate**" means any entity that Controls, is Controlled by, or is under common Control with a party; (iv) "**Control**" means the legal, beneficial, or equitable ownership, directly or indirectly, of more than 50% of the capital stock (or other ownership interest, if not a corporation) of such entity ordinarily having voting rights; and (v) "**Consultants**" means a party's bankers, accountants, auditors, attorneys, financial advisers, and independent contractors.

Confidential Information also includes: the fact that the parties and their respective Affiliates and Consultants have discussed the Purpose; the substance of their discussions; and the terms, conditions, and existence of this Agreement.

## 2. Disclosure and Use Restrictions

Recipient may only disclose Confidential Information to its employees or Consultants who: (i) have a need to know in order to accomplish the Purpose; and (ii) are bound by a written agreement that prohibits any unauthorized disclosure or use of the Confidential Information that is at least as restrictive as the terms and conditions of this Agreement. Recipient shall not disclose, and shall cause its Consultants not to disclose, Confidential Information to any other person or entity without Discloser's prior written consent in each instance. Recipient and its Consultants may only use Confidential Information for the Purpose. Recipient and its Consultants must use a reasonable degree of care to protect Confidential Information it receives and to prevent any unauthorized use or disclosure of Confidential Information. Recipient shall be directly liable for any liabilities, losses, damages, costs, and expenses, including reasonable attorneys' fees, as incurred by either party and their respective

Page 1 of 4

Apple Confidential

ED_006475_00000040_00001

Affiliates, related to any unauthorized disclosure or use of Discloser's Confidential Information by Recipient or any of its Consultants.

## 3. Exclusions

Confidential Information does not include information that: (i) was known by Recipient without restriction before receipt of the Confidential Information; (ii) is publicly available through no fault of Recipient; (iii) is rightfully received by Recipient from a third party without a duty of confidentiality; or (iv) is independently developed by Recipient. Recipient may disclose Confidential Information to the extent it is required by law if it makes reasonable efforts to provide prior notice to Discloser and seeks protective treatment of the Confidential Information. The fact that a disclosure was legally required will not alter the nature of the Confidential Information.

## 4. Intellectual Property

Except as expressly set forth in this Agreement, nothing in this Agreement is intended to grant a license to or waive any rights in either party's patents, copyrights, trademarks, or mask works. Receipt of Confidential Information will not constitute or be used to show or support notice or knowledge of any patents.

## 5. Feedback

Any ideas, suggestions, or recommendations made by Recipient regarding Discloser's Confidential Information in connection with the Purpose, ("**Feedback**"), may be used and incorporated into Discloser's products, technologies, and services without paying royalties and without any other obligations or restrictions so long as Discloser does not infringe Recipient's patents, copyrights or trademark rights.

## 6. Residuals

In connection with the Purpose, Apple and its Affiliates shall be free to use any ideas, concepts, know-how and techniques retained in the unaided memory of the persons who had access to the Confidential Information ("**Residuals**") for any purpose (subject to any patents or copyrights of Company and its Affiliates), and Apple and its Affiliates have no obligation to limit or restrict the assignment of such persons. A person's memory is unaided if the person has not intentionally memorized the Confidential Information.

## 7. Independent Development

Each party acknowledges that the other party may, currently or in the future: (i) make or use goods, services, or technologies that compete with its own; (ii) develop information internally or receive information from other third parties that may be similar to its own Confidential Information; or (iii) evaluate, invest in, or do business with its competitors or potential competitors. Neither party's execution of this Agreement nor its receipt of any Confidential Information will restrict such activities.

## 8. Warranty

Page 2 of 4

Apple Confidential

Each party warrants that it has the right to disclose its Confidential Information. All Confidential Information is provided AS IS and without any warranty, express, implied, or otherwise, regarding its accuracy or performance.

## 9. No Press Releases or Other Public Statements

Neither party nor their respective Affiliates or Consultants shall issue press releases or other public statements regarding this Agreement or its subject matter without the other party's prior written approval; provided, however, Apple and its Affiliates may disclose the final results of any supplier responsibility assessments pursuant to its corporate compliance, corporate responsibility, and/or annual reporting programs.

## 10. General Compliance with Laws

The parties shall, and shall cause their respective Affiliates and Consultants to, comply with all applicable laws including export control and sanction controls.

## 11. No Assignment

This Agreement is not assignable or transferable by a party without the prior written consent of the other party. Any purported or attempted assignment, delegation, change of control, or other transfer without such consent will be null and void and will constitute a breach of this Agreement.

## 12. Return of Confidential Information

Upon written notice, Recipient shall return all tangible Confidential Information then in its, its Affiliates' and its Consultants', possession to Discloser and destroy all Confidential Information that cannot be returned, including any emails or other electronic documents containing Confidential Information (but excluding automatic electronic back-ups and archive systems) within 15 days after receipt of such notice.

## 13. Protection Period

Restrictions on use and disclosure of Confidential Information will remain in effect for 7 years from the date the Confidential Information was disclosed, however Confidential Information containing personally identifiable information will remain in effect perpetually.

## 14. Term and Termination

Either party may terminate this Agreement upon 15 days advance written notice to the other party. Upon termination of this Agreement Feedback, and Residual rights, and each party's disclosure and use obligations shall survive.

## 15. Governing Law & Disputes

This Agreement will be governed by the laws of the State of Delaware, without reference to conflict of laws principles. The confidentiality provisions of this Agreement will be enforceable under the Delaware Uniform Trade Secrets Act, Del. Code Ann. Title 6 Secs. 2001 et seq.

Page 3 of 4

V. 03192021

Apple Confidential

All disputes arising under or in connection with this Agreement will be finally settled under the then current Rules of Arbitration of the International Chamber of Commerce by three arbitrators appointed in accordance with such rules. The arbitration will be conducted in English in San Francisco, California. Judgment upon any award rendered by the arbitrator may be confirmed or enforced in any court having jurisdiction. The arbitrators shall award to the prevailing party, if any, its costs and expenses, including its attorneys' fees. The prevailing party shall also be entitled to its attorneys' fees and costs in any action to confirm and/or enforce any arbitration award in any judicial proceedings. All materials in the proceedings created for the purpose of the arbitration, all other documents produced by another party in the proceedings not otherwise in the public domain, and all awards in the arbitration will be deemed "Confidential Information", except to the extent disclosure may be required of a party by legal duty to protect or pursue a legal right or to enforce or challenge an award in legal proceedings before a court or other judicial authority.

Either party may bring court proceedings in any court having jurisdiction to seek an injunction, specific performance, or other equitable relief to enforce any right or obligation under this Agreement. The parties agree that no bond need be posted to obtain injunctive or equitable relief, but if required by law or the court, the parties consent to a bond in the lowest amount permitted by law.

## 16. Entire Agreement

This Agreement constitutes the entire agreement between the parties with respect to, and supersedes all prior or contemporaneous oral or written agreements or contractual provisions concerning any Confidential Information disclosed between the parties in connection with the same or similar purpose. Any amendments and waivers must be in writing and signed by both parties. Agreements, addenda, or supplements entered into between the parties prior to the Effective Date and that reference prior confidentiality provisions in connection with the same or similar purpose are amended to reference this Agreement in place of the prior provisions.

## 17. Miscellaneous

Company and Apple shall each ensure that its Affiliates comply with the terms and conditions of this agreement. A written notification addressed to the authorized representative(s) of a party will be deemed to be notice (i) when personally delivered; (ii) when sent by confirmed facsimile; (iii) one day after having been sent by commercial overnight carrier specifying next-day delivery with written verification of receipt; or (iv) three days after having been sent by first class or certified mail postage prepaid. A copy of any notice sent to Apple or its Affiliates must also be sent simultaneously to Apple's General Counsel at [disclosurenotices@apple.com]. The words "include" or "including" will be deemed followed by "without limitation."

Understood and agreed by the parties' authorized representatives:

V. 03192021                                                    Apple Confidential

Message

| | |
|---|---|
| **From**: | Reynolds, Rebekah [Reynolds.Rebekah@epa.gov] |
| **Sent**: | 8/10/2021 7:41:00 PM |
| **To**: | Schulman, Michael [Schulman.Michael@epa.gov]; Plate, Mathew [Plate.Mathew@epa.gov] |
| **CC**: | Poalinelli, Edwin [POALINELLI.EDWIN@EPA.GOV] |
| **Subject**: | RE: Site visit: TRW Microwave Site 825 Stewart Drive building |

I spoke with the attorney for apple.

We are not going to be signing the proposed NDA. She is going to send a letter to me saying that everything you create during the Site Walk (e.g., field notes, photos) is being claimed by Apple as CBI and we will treat it as such under our CBI regulations at 40 CFR Part 2. After the visit, you can send apple back everything you created and they can substantiate their claim. You may want to work with the apple representative while you are there to minimize any creation of CBI. So, for example, if it is possible to take a photo at an angle that wouldn't be claimed as CBI that would get you the info you need, you would probably want to do that.

Let me know if you have any questions.

Thanks.

**From:** Schulman, Michael <Schulman.Michael@epa.gov>
**Sent:** Monday, August 9, 2021 1:05 PM
**To:** Plate, Mathew <Plate.Mathew@epa.gov>; Reynolds, Rebekah <Reynolds.Rebekah@epa.gov>
**Cc:** Poalinelli, Edwin <POALINELLI.EDWIN@EPA.GOV>
**Subject:** FW: Site visit: TRW Microwave Site 825 Stewart Drive building

Hi Matt, FYI below, Apple is very interested in exactly where we want to go in the building. Apparently, this is a product development building with sensitive work underway. Attached are the figures and photos associated with past mitigation measures. I've requested a copy of the NDA, which Rebekah will review and if we can sign. I now also have a Montrose briefing with Enrique at 1-2 pm on Aug 19 that I need to attend, can you do an earlier morning start time? Or, if later, cover some of the site walk for me?

Thanks!
Michael

**From:** Kurt Batsel <batsel@dextra-group.com>
**Sent:** Monday, August 9, 2021 11:41 AM
**To:** Schulman, Michael <Schulman.Michael@epa.gov>
**Subject:** RE: Site visit: TRW Microwave Site 825 Stewart Drive building

Michael – I sent them quite a few maps as they were looking for details on each of the areas you want to visit. Here is the list I sent to them and attachments from previous reports that show where these areas are:

1. The sub-slab depressurization system. **Attachment 1** shows the locations of the roof vents and the interior vapor collection riser pipes, which collectively comprise the system.
2. The building's concrete slab and cracks that were sealed to prevent vapor intrusion as well as any building concrete slab penetrations (e.g., from pipes or seams in the building). EPA also asked to see the spaces between the walls of the three sections of the buildings that were sealed in 2014-2015. These items are shown on **Attachment 2**; however, much of this may no longer be accessible.

3. Past indoor air sampling locations (see **Attachment 3**).
4. The location where contaminated soil was excavated from underneath the building (see **Attachment 4**).
5. The location of groundwater monitoring wells (see **Attachment 5**).
6. The location of the previous bioremediation system and injection locations (see **Attachment 6**).

---

**From:** Schulman, Michael <Schulman.Michael@epa.gov>
**Sent:** Monday, August 9, 2021 2:31 PM
**To:** Kurt Batsel <batsel@dextra-group.com>
**Subject:** RE: Site visit: TRW Microwave Site 825 Stewart Drive building

HI Kurt, I just got the NDA and having it looked at. Can you send me the map you sent Apple showing what we'd be visiting? Thanks, Michael

---

**From:** Kurt Batsel <batsel@dextra-group.com>
**Sent:** Monday, August 9, 2021 11:24 AM
**To:** Schulman, Michael <Schulman.Michael@epa.gov>
**Subject:** RE: Site visit: TRW Microwave Site 825 Stewart Drive building

Michael – We will all be there the night before so early start is no problem. Just let me know what works for you guys. Also, AECOM has an office in downtown San Jose that we could use for meeting space before or after if you think that would be beneficial. There isn't any meeting space that we could use at the Apple building. Just let me know on that as I will need to reserve the AECOM space if we want to use it.

Finally, I spoke with Apple last week and they are very interested in exactly where we want to go in the building. Apparently, this is a product development building with sensitive work underway. Based on your request to me, I forwarded Apple a list of there areas we would want to see and some maps showing where these things are/were. They also told me that they would expect all visitors to sign a Non-Disclosure Agreement and that they would forward the agreement directly to you and Matt Plate via email for signature. Not sure what EPA's position is on signing those, but I am just letting you know what Apple has requested.

---

**From:** Schulman, Michael <Schulman.Michael@epa.gov>
**Sent:** Monday, August 9, 2021 2:08 PM
**To:** Kurt Batsel <batsel@dextra-group.com>
**Subject:** RE: Site visit: TRW Microwave Site 825 Stewart Drive building

Hi Kurt,

Do you have a start time restriction? With traffic it is better for me to have an early morning start. Thanks, Michael

---

**From:** Kurt Batsel <batsel@dextra-group.com>
**Sent:** Monday, August 2, 2021 7:57 AM
**To:** Schulman, Michael <Schulman.Michael@epa.gov>
**Subject:** RE: Site visit: TRW Microwave Site 825 Stewart Drive building

Michael – Thanks for the confirmation.

---

**From:** Schulman, Michael <Schulman.Michael@epa.gov>
**Sent:** Friday, July 30, 2021 7:27 PM

**To:** Kurt Batsel <batsel@dextra-group.com>
**Subject:** RE: Site visit: TRW Microwave Site 825 Stewart Drive building

Hi Kurt,

EPA management has approved the site visit. Have a good weekend.

Michael

---

**From:** Kurt Batsel <batsel@dextra-group.com>
**Sent:** Friday, July 30, 2021 12:06 PM
**To:** Schulman, Michael <Schulman.Michael@epa.gov>
**Subject:** RE: Site visit: TRW Microwave Site 825 Stewart Drive building

Michael - GI Partners did not indicate any plans to attend.

---

**From:** Schulman, Michael <Schulman.Michael@epa.gov>
**Sent:** Friday, July 30, 2021 3:04 PM
**To:** Kurt Batsel <batsel@dextra-group.com>
**Subject:** RE: Site visit: TRW Microwave Site 825 Stewart Drive building

Thanks, I need to document the number of people for COVID. Do you think the building manager will want to be present?

---

**From:** Kurt Batsel <batsel@dextra-group.com>
**Sent:** Friday, July 30, 2021 11:54 AM
**To:** Schulman, Michael <Schulman.Michael@epa.gov>
**Subject:** RE: Site visit: TRW Microwave Site 825 Stewart Drive building

Hi, Michael – We will have the following people attend:

- Michael Shannon – Northrop Grumman's Corporate Manager, Environmental Remediation.
- Holly Holbrook – AECOM's Project Manager
- Myself – Northrop Grumman's Project Manager

I am expecting we will also have an escort from Apple but I have not yet been able to confirm who that will be. I'll let you know as soon as I hear back from Apple.

---

**From:** Schulman, Michael <Schulman.Michael@epa.gov>
**Sent:** Friday, July 30, 2021 11:43 AM
**To:** Kurt Batsel <batsel@dextra-group.com>
**Subject:** Re: Site visit: TRW Microwave Site 825 Stewart Drive building

Hi Kurt, excluding the EPA, how many people will be on the site walk?

Thanks!

On Jul 30, 2021, at 7:17 AM, Kurt Batsel <batsel@dextra-group.com> wrote:

Hi, Michael – Sounds good. I confirmed with GI Partners also. The Apple contact is on vacation this week, but I will talk to her about logistics first thing next week.

**From:** Schulman, Michael <Schulman.Michael@epa.gov>
**Sent:** Friday, July 30, 2021 12:34 AM
**To:** Kurt Batsel <batsel@dextra-group.com>
**Subject:** RE: Site visit: TRW Microwave Site 825 Stewart Drive building

Hi Kurt,

Myself and Matt Plate will be able to visit the site on Thursday 8/19. The only caveat is that we both need final approvals for field work considering the current high COVID-19 transmission rates; however, this should not be an issue.

Thank you,
Michael

**From:** Schulman, Michael
**Sent:** Wednesday, July 28, 2021 11:41 AM
**To:** Kurt Batsel <batsel@dextra-group.com>
**Subject:** RE: Site visit: TRW Microwave Site 825 Stewart Drive building

Thanks, the date is OK for me and looks OK on Matt's calendar, but I'm confirming.

**From:** Kurt Batsel <batsel@dextra-group.com>
**Sent:** Wednesday, July 28, 2021 10:46 AM
**To:** Schulman, Michael <Schulman.Michael@epa.gov>
**Subject:** RE: Site visit: TRW Microwave Site 825 Stewart Drive building

Hi, Michael – We are available on Thursday 8/19. I am still waiting for confirmation from GI Partners and Apple, but I would not expect there to be any issues with them. I will give you final confirmation on it by the end of the week, but I wanted to go ahead and let you know that 8/19 is looking the best for us. We will plan to arrive the evening before so could start as early as you would like in the AM.

**From:** Schulman, Michael <Schulman.Michael@epa.gov>
**Sent:** Monday, July 26, 2021 2:47 PM
**To:** Kurt Batsel <batsel@dextra-group.com>
**Subject:** Site visit: TRW Microwave Site 825 Stewart Drive building

Hi Kurt,

EPA requests a site walk and inspection visit of the TRW Microwave Site 825 Stewart Drive building. Can you arrange for EPA access to the building from the current property owner, which I believe is GI DC Sunnyvale LLC? Myself and Matt Plate with EPA request reasonable access to visit the items addressed in the attached annual inspection memo and the 2014-2015 building mitigation measures that addressed the potential for vapor intrusion into the building, which included:

- The sub-slab depressurization system that was installed underneath the site building to vent vapors to the atmosphere.
- The building's concrete slab and cracks that where sealed to prevent vapor intrusion. As well as any building concrete slab penetrations (e.g., from pipes or seams in the building).
- Past indoor air sampling locations.
- The location where contaminated soil was excavated from underneath the building.
- The spaces between the walls of the three sections of the buildings that were sealed in 2014-2015.
- The emulsified vegetable oil in-situ bioremediation system.
- The location of groundwater monitoring wells.

EPA also wants to review any post 2014-2015 building modifications or changes to the building.

Can you get back to me this week with some dates for a site visit in August? Northrup Grumman and your consultant are also invited to attend, understanding that there may be COVID-19 related restrictions in how many people can visit the building or congregate. I am available for a site visit any week, except for August 9-11 and the week of August 23-27 and Matt Plate typically has limited availability on Fridays.

Feel free to call me to go over,
Thank you,

**Michael Schulman**
Remedial Project Manager
USEPA Region 9
75 Hawthorne St, San Francisco, CA 94105
415-972-3064 (o)
628-629-2421 (m)

---

**From:** Kurt Batsel <batsel@dextra-group.com>
**Sent:** Tuesday, May 25, 2021 2:03 PM
**To:** Schulman, Michael <Schulman.Michael@epa.gov>
**Cc:** TWright@gesonline.com; Holbrook, Holly <Holly.Holbrook@aecom.com>
**Subject:** TRW Microwave - 2020 SSD Inspection Memo

Hi, Michael – As you requested during our last discussion on TRW Microwave, attached is a technical memorandum prepared by GES that summarizes the 2020 SSD system inspection conducted at the onsite building currently leased by Apple. Please let me know if you have any questions or need any additional info.

**Kurt R. Batsel, P.E.** | The Dextra Group, Inc.
**T:** 770.578.9696 | batsel@dextra-group.com

Message

| | |
|---|---|
| **From:** | Schulman, Michael [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=35D7024F00644B3D8B5DBA4940506834-SCHULMAN, M] |
| **Sent:** | 2/12/2022 2:38:30 AM |
| **To:** | Nandi, Joshua [US] (ES) [Joshua.Nandi@ngc.com] |
| **CC:** | Holbrook, Holly [Holly.Holbrook@aecom.com]; L'Esperance, James [US] (ES) [James.L'Esperance@ngc.com]; Kurt Batsel [batsel@dextra-group.com]; Michael Shannon (Michael.Shannon@ngc.com) [Michael.Shannon@ngc.com]; Poalinelli, Edwin [POALINELLI.EDWIN@EPA.GOV]; Lilian Abreu (abreu.lilian@epa.gov) [abreu.lilian@epa.gov] |
| **Subject:** | RE: TRW Microwave Site, 825 Stewart Dr: Follow-up on the Aug 19 2021 Site Visit |
| **Attachments:** | 2016-05-18 TRW EPA sets forth PPA's reasonable steps, 1160217.pdf; 2021-10-07 EPA Letter, Follow up on 825 Steward Site Visit_s.pdf |

Hi Josh,

It has been a couple months since your last update and half-a-year since we conducted the site visit to 825 Stewart Ave. Please provide an update on whether NGC's preliminary review of the SSD system is complete and whether an additional site visit was required.

In line with NGC's schedule below, **please submit by March 15, 2022, a complete response to EPA's October 7, 2021, comments**. Include in NGC's response any proposed modifications to the SSD system vent stacks to address potential emissions from being pulled into the building's HVAC. Also include in NGC's response a schedule to implement the proposed SSD system modifications.

Additionally, by **March 31, 2022, please respond** to EPA's October 7, 2021, request to submit a plan that documents the scope of the SSD system's long-term operations and maintenance and a figure showing where the existing sub-slab sampling ports are located. We expect that GI DC Sunnyvale, LLC will cooperate with NGC's efforts consistent with EPA's 2014 prospective purchaser letter (attached).

Thank you in advance for your cooperation to address EPA's comments. If NGC is unable or does not intend to meet this schedule, please contact me immediately so that we can discuss the issue and EPA can evaluate other alternatives for completing this necessary work in a timely manner.

Thank you,

_____
**Michael Schulman**
Remedial Project Manager
US EPA Region 9
415-972-3064 (o)

**From:** Nandi, Joshua [US] (ES) <Joshua.Nandi@ngc.com>
**Sent:** Monday, December 13, 2021 17:25
**To:** Schulman, Michael <Schulman.Michael@epa.gov>
**Cc:** Holbrook, Holly <Holly.Holbrook@aecom.com>; L'Esperance, James [US] (ES) <James.L'Esperance@ngc.com>; Kurt Batsel <batsel@dextra-group.com>; Poalinelli, Edwin <POALINELLI.EDWIN@EPA.GOV>
**Subject:** RE: TRW Microwave Site, 825 Stewart Dr: Follow-up on the Aug 19 2021 Site Visit

Hi Michael,
We'll conduct a preliminary review of the SSD system in the upcoming weeks based on the photos taken during the recent Site visit. If an additional Site visit is needed, we plan on coordinating an inspection in January 2022 and have a draft evaluation of the SSD system ready, as well as the system O&M work plan, by mid-March 2022.

Please let me know if you have any questions.
Thank you,
Josh

**JOSHUA** NANDI | Project Manager, Environmental Remediation
Northrop Grumman | Enterprise Services
C: 310-912-8307 | joshua.nandi@ngc.com

**From:** Schulman, Michael <Schulman.Michael@epa.gov>
**Sent:** Monday, December 13, 2021 8:19 AM
**To:** Nandi, Joshua [US] (ES) <Joshua.Nandi@ngc.com>
**Cc:** Holbrook, Holly <Holly.Holbrook@aecom.com>; L'Esperance, James [US] (ES) <James.L'Esperance@ngc.com>; Kurt Batsel <batsel@dextra-group.com>; Poalinelli, Edwin <POALINELLI.EDWIN@EPA.GOV>
**Subject:** EXT :RE: TRW Microwave Site, 825 Stewart Dr: Follow-up on the Aug 19 2021 Site Visit

Schulman, Michael has shared a OneDrive for Business file with you. To view it, click the link below.

 2021-11-05_TRW Microwave_USEPA Letter RTCs_Final.pdf

Hi Josh,

I'm following up on below and our call last week. Can you give me an update by **this Wednesday** on EPA's comments and RTCs attached? I particularly need to know the specifics for what changes to the roof vents for the SSD system that NGC is recommending for EPA review and what plans NGC has to formalize the SSD system maintenance and inspections.

Feel free to call me if there is anything you want to go over. Thank you,
Michael

———————————————
**Michael Schulman**
Remedial Project Manager
US EPA Region 9, Superfund Division
75 Hawthorne St, San Francisco, CA 94105
628-629-2421 (m)

**From:** Nandi, Joshua [US] (ES) <Joshua.Nandi@ngc.com>
**Sent:** Friday, November 5, 2021 1:01 PM
**To:** Schulman, Michael <Schulman.Michael@epa.gov>
**Cc:** Holbrook, Holly <Holly.Holbrook@aecom.com>; Kurt Batsel <batsel@dextra-group.com>; L'Esperance, James [US] (ES) <James.L'Esperance@ngc.com>
**Subject:** RE: TRW Microwave Site, 825 Stewart Dr: Follow-up on the Aug 19 2021 Site Visit

Hi Michael,
Please find NGC's response to the EPA's comments regarding the 19 August 2021 Site visit attached.
Thank you,
Josh

**JOSHUA** NANDI | Project Manager, Environmental Remediation
Northrop Grumman | Enterprise Services
C: 310-912-8307 | joshua.nandi@ngc.com

**From:** Schulman, Michael <Schulman.Michael@epa.gov>
**Sent:** Thursday, October 7, 2021 6:44 PM
**To:** Kurt Batsel <batsel@dextra-group.com>; Nandi, Joshua [US] (ES) <Joshua.Nandi@ngc.com>
**Subject:** EXT :TRW Microwave Site, 825 Stewart Dr: Follow-up on the Aug 19 2021 Site Visit

Hi Kurt and Josh,

Please find attached in a letter EPA's follow up comments on the August 19, 2021 site visit of the 825 Stewart Drive building. EPA requests that NGC provide a written response to EPA's comments in the next 30-days. Please feel free to contact me anytime if you have any questions or there is anything you want to go over.

Thank you,
Michael

———————————
**Michael Schulman**
Remedial Project Manager
U.S. EPA Superfund and Emergency Response Division
75 Hawthorne St, San Francisco, CA 94105
415-972-3064 (o)
628-629-2421 (m)

**From:** Kurt Batsel <batsel@dextra-group.com>
**Sent:** Tuesday, August 10, 2021 2:58 PM
**To:** Schulman, Michael <Schulman.Michael@epa.gov>
**Subject:** Re: Site visit: TRW Microwave Site 825 Stewart Drive building

Ok - Sounds good. We'll plan to meet you there a little before 8:00 am.

Sent from my mobile

> On Aug 10, 2021, at 5:04 PM, Schulman, Michael <Schulman.Michael@epa.gov> wrote:
>
> Hi Kurt, thanks. we'll start at 08:00 then. I'll get to the site around 07:30 to 07:45. I have a briefing I need to give from 1-2 pm, so we'll either be done by then or Matt will fill in for me.
>
> Regarding the NDA the EPA site attorney spoke to an Apple attorney and EPA is not going to sign the Apple NDA. Apple will send a letter to EPA saying that everything we create during the Site Walk (e.g., field notes, photos) is being claimed by Apple as CBI and we will treat it as such under our CBI regulations at 40 CFR Part 2. After the visit, we will send Apple back everything we created so they can then substantiate their claim. We will want to work with the Apple representative while onsite to minimize any creation of CBI. So, for example, if it's possible to take a photo at an angle that wouldn't be claimed as CBI that is probably what we'd want to do. Let me know if you have any questions.
>
> Thank you,
> Michael

**From:** Kurt Batsel <batsel@dextra-group.com>
**Sent:** Tuesday, August 10, 2021 11:51 AM

**To:** Schulman, Michael <Schulman.Michael@epa.gov>
**Subject:** RE: Site visit: TRW Microwave Site 825 Stewart Drive building

Michael – I heard back from Apple that the earliest that can get us in the building is 8:00 AM.

**From:** Kurt Batsel
**Sent:** Monday, August 9, 2021 2:45 PM
**To:** Schulman, Michael <Schulman.Michael@epa.gov>
**Subject:** RE: Site visit: TRW Microwave Site 825 Stewart Drive building

Michael – Just came to mind that although my team can start whenever, I'm not sure if Apple would have constraints as they will want to escort us. If you let me know when you want to start, I will reach out and confirm it with them.

**From:** Schulman, Michael <Schulman.Michael@epa.gov>
**Sent:** Monday, August 9, 2021 2:08 PM
**To:** Kurt Batsel <batsel@dextra-group.com>
**Subject:** RE: Site visit: TRW Microwave Site 825 Stewart Drive building

Hi Kurt,

Do you have a start time restriction? With traffic it is better for me to have an early morning start. Thanks, Michael

**From:** Kurt Batsel <batsel@dextra-group.com>
**Sent:** Monday, August 2, 2021 7:57 AM
**To:** Schulman, Michael <Schulman.Michael@epa.gov>
**Subject:** RE: Site visit: TRW Microwave Site 825 Stewart Drive building

Michael – Thanks for the confirmation.

**From:** Schulman, Michael <Schulman.Michael@epa.gov>
**Sent:** Friday, July 30, 2021 7:27 PM
**To:** Kurt Batsel <batsel@dextra-group.com>
**Subject:** RE: Site visit: TRW Microwave Site 825 Stewart Drive building

Hi Kurt,

EPA management has approved the site visit. Have a good weekend.

Michael

**From:** Kurt Batsel <batsel@dextra-group.com>
**Sent:** Friday, July 30, 2021 12:06 PM
**To:** Schulman, Michael <Schulman.Michael@epa.gov>
**Subject:** RE: Site visit: TRW Microwave Site 825 Stewart Drive building

Michael - GI Partners did not indicate any plans to attend.

**From:** Schulman, Michael <Schulman.Michael@epa.gov>
**Sent:** Friday, July 30, 2021 3:04 PM
**To:** Kurt Batsel <batsel@dextra-group.com>
**Subject:** RE: Site visit: TRW Microwave Site 825 Stewart Drive building

Thanks, I need to document the number of people for COVID. Do you think the building manager will want to be present?

**From:** Kurt Batsel <batsel@dextra-group.com>
**Sent:** Friday, July 30, 2021 11:54 AM
**To:** Schulman, Michael <Schulman.Michael@epa.gov>
**Subject:** RE: Site visit: TRW Microwave Site 825 Stewart Drive building

Hi, Michael – We will have the following people attend:

- Michael Shannon – Northrop Grumman's Corporate Manager, Environmental Remediation.
- Holly Holbrook – AECOM's Project Manager
- Myself – Northrop Grumman's Project Manager

I am expecting we will also have an escort from Apple but I have not yet been able to confirm who that will be. I'll let you know as soon as I hear back from Apple.

**From:** Schulman, Michael <Schulman.Michael@epa.gov>
**Sent:** Friday, July 30, 2021 11:43 AM
**To:** Kurt Batsel <batsel@dextra-group.com>
**Subject:** Re: Site visit: TRW Microwave Site 825 Stewart Drive building

Hi Kurt, excluding the EPA, how many people will be on the site walk?

Thanks!

> On Jul 30, 2021, at 7:17 AM, Kurt Batsel <batsel@dextra-group.com> wrote:
>
> Hi, Michael – Sounds good. I confirmed with GI Partners also. The Apple contact is on vacation this week, but I will talk to her about logistics first thing next week.
>
> **From:** Schulman, Michael <Schulman.Michael@epa.gov>
> **Sent:** Friday, July 30, 2021 12:34 AM
> **To:** Kurt Batsel <batsel@dextra-group.com>
> **Subject:** RE: Site visit: TRW Microwave Site 825 Stewart Drive building
>
> Hi Kurt,
>
> Myself and Matt Plate will be able to visit the site on Thursday 8/19. The only caveat is that we both need final approvals for field work considering the current high COVID-19 transmission rates; however, this should not be an issue.
>
> Thank you,
> Michael

**From:** Schulman, Michael
**Sent:** Wednesday, July 28, 2021 11:41 AM
**To:** Kurt Batsel <batsel@dextra-group.com>
**Subject:** RE: Site visit: TRW Microwave Site 825 Stewart Drive building

Thanks, the date is OK for me and looks OK on Matt's calendar, but I'm confirming.

**From:** Kurt Batsel <batsel@dextra-group.com>
**Sent:** Wednesday, July 28, 2021 10:46 AM
**To:** Schulman, Michael <Schulman.Michael@epa.gov>
**Subject:** RE: Site visit: TRW Microwave Site 825 Stewart Drive building

Hi, Michael – We are available on Thursday 8/19. I am still waiting for confirmation from GI Partners and Apple, but I would not expect there to be any issues with them. I will give you final confirmation on it by the end of the week, but I wanted to go ahead and let you know that 8/19 is looking the best for us. We will plan to arrive the evening before so could start as early as you would like in the AM.

**From:** Schulman, Michael <Schulman.Michael@epa.gov>
**Sent:** Monday, July 26, 2021 2:47 PM
**To:** Kurt Batsel <batsel@dextra-group.com>
**Subject:** Site visit: TRW Microwave Site 825 Stewart Drive building

Hi Kurt,

EPA requests a site walk and inspection visit of the TRW Microwave Site 825 Stewart Drive building. Can you arrange for EPA access to the building from the current property owner, which I believe is GI DC Sunnyvale LLC? Myself and Matt Plate with EPA request reasonable access to visit the items addressed in the attached annual inspection memo and the 2014-2015 building mitigation measures that addressed the potential for vapor intrusion into the building, which included:

- The sub-slab depressurization system that was installed underneath the site building to vent vapors to the atmosphere.
- The building's concrete slab and cracks that where sealed to prevent vapor intrusion. As well as any building concrete slab penetrations (e.g., from pipes or seams in the building).
- Past indoor air sampling locations.
- The location where contaminated soil was excavated from underneath the building.
- The spaces between the walls of the three sections of the buildings that were sealed in 2014-2015.
- The emulsified vegetable oil in-situ bioremediation system.
- The location of groundwater monitoring wells.

EPA also wants to review any post 2014-2015 building modifications or changes to the building.

Can you get back to me this week with some dates for a site visit in August? Northrup Grumman and your consultant are also invited to attend, understanding that there may be COVID-19 related restrictions in how many people can visit the building or congregate. I am available for a site visit any week, except for August 9-11 and the week of August 23-27 and Matt Plate typically has limited availability on Fridays.

Feel free to call me to go over,
Thank you,

_____

**Michael Schulman**
Remedial Project Manager
USEPA Region 9
75 Hawthorne St, San Francisco, CA 94105
415-972-3064 (o)
628-629-2421 (m)

---

**From:** Kurt Batsel <batsel@dextra-group.com>
**Sent:** Tuesday, May 25, 2021 2:03 PM
**To:** Schulman, Michael <Schulman.Michael@epa.gov>
**Cc:** TWright@gesonline.com; Holbrook, Holly <Holly.Holbrook@aecom.com>
**Subject:** TRW Microwave - 2020 SSD Inspection Memo

Hi, Michael – As you requested during our last discussion on TRW Microwave, attached is a technical memorandum prepared by GES that summarizes the 2020 SSD system inspection conducted at the onsite building currently leased by Apple. Please let me know if you have any questions or need any additional info.

**Kurt R. Batsel, P.E.** ¦ The Dextra Group, Inc.
**T:** 770.578.9696 ¦ batsel@dextra-group.com

## RE: Questions about TRW Microwave

| | |
|---|---|
| From | PerezSullivan, Margot <PerezSullivan.Margot@epa.gov> |
| To | Ashley Gjovik <ashleygjovik@icloud.com> |
| Date | Tuesday, August 3rd, 2021 at 12:41 PM |

Good morning, Ashley,

My out of office message was not set to reply to external parties, which is my mistake. I am out of the office most of the month due to a family emergency.

It sounds like I've offended you with my suggestion to check the website. I'm so sorry, that was not my intent. We are working to ensure all of our superfund site web pages are updated with the latest information and I often suggest interested parties check the web for updates.

I'm not sure what conversations you're referring to – if it's the conversations that occur with responsible parties, I am not a part of those calls so I don't know what was said.

I want to reiterate that I appreciate your time and patience and let you know we take your on-the-ground observations seriously.

Very respectfully,

Margot

Margot Perez-Sullivan
U.S. Environmental Protection Agency
D: 415.947.4149 C: 415.412.1115

E: perezsullivan.margot@epa.gov

---

**From:** Ashley Gjøvik <ashleygjovik@icloud.com>
**Sent:** Monday, August 2, 2021 8:18 PM
**To:** PerezSullivan, Margot <PerezSullivan.Margot@epa.gov>
**Subject:** Re: Questions about TRW Microwave

Thanks, Margot. Are you telling me there will be an update posted to the website about this? Or just suggesting a hobby that I can check the website every day to see if anything changes?

Can you share the outcomes of those conversations please? It sounds like they're doing some kind of maintenance work at the office on Wednesday. Since Apple refuses to answer any more of my questions I'd be curious if you know what they're doing.

You should be getting a call / email tomorrow from the NYT.

Sent from my iPhone

> On Jul 28, 2021, at 1:24 PM, PerezSullivan, Margot <PerezSullivan.Margot@epa.gov> wrote:
>
> Hi Ashley,
>
> Thanks again for your continued interest in this site and providing your on-the-ground observations. EPA communicates regularly with responsible parties on issues related to superfund sites as part of the agency's CERCLA obligations. Similarly, EPA also routinely follows up on concerns raised by the public in regards to superfund sites. The agency takes these communications and on-the-ground observations seriously. Please continue to check the website for any site updates.
>
> Please do connect me with the reporter you're working with on this and thank you again for voicing your concerns and providing us with such detailed information.
>
> Margot
>
> Margot Perez-Sullivan
> U.S. Environmental Protection Agency
> D: 415.947.4149 C: 415.412.1115
>
> E: perezsullivan.margot@epa.gov
>
> ---
>
> **From:** Ashley Gjovik <ashleygjovik@icloud.com>
> **Sent:** Tuesday, July 27, 2021 6:31 PM

**To:** PerezSullivan, Margot <PerezSullivan.Margot@epa.gov>
**Subject:** Re: Questions about TRW Microwave

Thank you very much, Margot. I look forward to hearing how the conversation goes and if any changes will be made to the plan of record.

—

**Ashley M. Gjøvik**

Juris Doctor Candidate & Public International Law Certificate Candidate, Santa Clara University, Class of 2022

https://www.linkedin.com/in/ashleygjovik/

https://muckrack.com/ashleygjovik

(415) 964-6272

On Jul 22, 2021, at 3:15 PM, PerezSullivan, Margot <PerezSullivan.Margot@epa.gov> wrote:

Hi Ashley, I'm meeting with the site team next week, regarding the reporter you're working with I'm the right person to work with. Thanks so much for your patience – we will be touch!

Margot Perez-Sullivan
U.S. Environmental Protection Agency
D: 415.947.4149 C: 415.412.1115

E: perezsullivan.margot@epa.gov

**From:** Ashley Gjovik <ashleygjovik@icloud.com>
**Sent:** Tuesday, July 20, 2021 5:07 PM
**To:** PerezSullivan, Margot <PerezSullivan.Margot@epa.gov>
**Subject:** Re: Questions about TRW Microwave

Hi Margot! Thanks....I see the May test was 10hr.

Ok, so my question about when the last time a 24hr+ indoor air test was performed in the TRW Microwave/825 Stewart building where the COCs were within the acceptable EPA range for indoor air in industrial buildings.... Is NEVER. They've always failed. Got it.

Did you talk to Apple & NG about the cracks in the floor and floor sealing plan? They told me they didn't notify the EPA about and didn't plan to, despite me telling them they probably are required too. They kept saying everything was "voluntary."

If the journalist wants to talk to someone at the EPA about all this, who should I have them reach out to? It's a very big publisher, so I assume they will want to chat. You?

-Ashley

—

**Ashley M. Gjøvik**

Juris Doctor Candidate & Public International Law Certificate Candidate, Santa Clara University, Class of 2022

https://www.linkedin.com/in/ashleygjovik/

https://muckrack.com/ashleygjovik

(415) 964-6272

On Jul 20, 2021, at 1:05 PM, PerezSullivan, Margot <PerezSullivan.Margot@epa.gov> wrote:

Hi Ashley,

Thanks so much for your patience.

The May 2015 indoor air testing was reported in a June 2015 report available on the EPA TRW Microwave website here: https://semspub.epa.gov/src/document/09/1158562.

Your inline screenshot below is from the 1991 Record of Decision for the site, which shows the maximum detected soil concentrations for ethylbenzene at 2 milligram per kilogram (mg/kg) and for toluene at 3 mg/kg. The concentration values are from 30 years ago and during that time the contaminated soil was removed. Therefore, these chemicals are not documented in the Record of Decision as chemicals of concern.

For your reference, the attached California Environmental Protection Agency Office of Environmental Health Hazard Assessment has adopted EPA Region 9's screening values for TCE.  TCE is the primary chemical of concern for the site and since 2013, subsequent to the remedial actions taken at the building, TCE indoor air sample results have been less than EPA's applicable health risk screening values.

I hope this information is helpful.

Thank you!

Margot

Margot Perez-Sullivan
U.S. Environmental Protection Agency
D: 415.947.4149 C: 415.412.1115

E: perezsullivan.margot@epa.gov

---

**From:** Ashley Gjovik <ashleygjovik@icloud.com>
**Sent:** Monday, July 19, 2021 6:39 PM
**To:** PerezSullivan, Margot <PerezSullivan.Margot@epa.gov>
**Subject:** Re: Questions about TRW Microwave

Hi Margot,

Checking in — any update? I'm locking this down with a national journalist.

P.S. if you haven't already connected the dots, the "responsible party" for the Sunnyvale TRW Microwave site is *Northrup Grumman,* who's ex-CEO and ex-President (and ex-CFO of TRW Microwave), Ronald Sugar, is a current & long time Apple board member (10yrs+).

So the guy who was running the companies responsible for this site's pollution, clean-up, vapor intrusion etc — is one of only [eight](#) Apple board members. He also chaired Apple's Audit & Finance committee, which I assume would oversee budgets for things like... Apple's facility and safety oversight.

If you're trusting they're all doing the right thing, maybe they are, but I'd hope you might poke around a bit and see what exactly this whole floor crack / floor sealing thing is about — in additional to the lack of air testing, and refusal to test the air before they seal the floor.

[https://www.apple.com/newsroom/2010/11/17Ronald-D-Sugar-Joins-Apples-Board-of-Directors/](https://www.apple.com/newsroom/2010/11/17Ronald-D-Sugar-Joins-Apples-Board-of-Directors/)

*Dr. Sugar served as Chairman and Chief Executive Officer at Northrop Grumman Corporation from 2003 until his retirement in 2010. Previous to Northrop, he held executive positions at Litton Industries and TRW Inc., where he served as chief financial officer.*

[https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.Cleanup&id=0901181#bkground](https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.Cleanup&id=0901181#bkground)

*The TRW Site was occupied by Aertech Industries from 1968 until it was sold to TRW Inc (TRW) in 1974. In 1987, TRW sold the facility to FEI Microwave, Inc. In 1993, FEI Microwave stopped production and in 1995 the site was acquired by Stewart Associates and leased to research and development companies until 2001. The exterior of the building was remodeled between 2001 and 2003, including demolition of part of the existing structure and construction of a new two-story building. In December 2002, TRW merged with Northrop Grumman. In 2004, the property was purchased by Pacific Landmark, and then by*

*Hines in 2014 and then GI Partners, the current owner, in 2016. During these changes in site ownership, TRW and then Northrop Grumman retained responsibility for site cleanup.*

https://www.microwaves101.com/encyclopedias/where-are-they-now#trw

*TRW Microwave is long gone, but not the superfund site they left behind in Sunnyvale California. The name TRW comes from the 1958 merger of Thompson Products and Ramo-Wooldridge. TRW followed the "ITT model" of rapid expansion, getting caught cheating on military contracts, polluting ground water and putting employees at danger, then finally retrenchment into obscurity. In addition to credit reporting, TRW produces automotive air bags, another dual opportunity for OSHA violations and site pollution due to highly toxic sodium azide that is used to inflate the bag.*

https://en.wikipedia.org/wiki/Ronald_Sugar

*Sugar served as the president and chief operating officer of TRW Aerospace and Information Systems. From 2000 to 2001, he served as the president and chief operating officer of Litton Industries. He then served as the president and chief operating officer of Northrop Grumman Corporation from 2001 to 2003, and as its chairman and CEO from 2003 to 2009.[3] He was succeeded by Wesley G. Bush. [4] Sugar has also been a director of Chevron Corporation since 2005 and Apple Inc. since 2010.[5]*

—

**Ashley M. Gjøvik**

Juris Doctor Candidate & Public International Law Certificate Candidate, Santa Clara University, Class of 2022

https://www.linkedin.com/in/ashleygjovik/

https://muckrack.com/ashleygjovik

(415) 964-6272

On Jul 7, 2021, at 4:21 PM, Ashley Gjovik <[ashleygjovik@icloud.com](mailto:ashleygjovik@icloud.com)> wrote:

Only updates are:

- They're refusing to test the indoor air *before* they seal the floor and won't give me any reasons why other than the 8hr limited testing from 2015
- They won't give me any details of what the "floor sealing process" entails
- They said they only did a "quick walk-through survey" for cracks and only saw what was readily available (I asked if they looked under the carpet by my desk, which is a hot spot in the building, and they said no) — they made sure to say it wasn't an "evaluation" for whatever reason. They admitted this is the first walk through they've done since 2015 in the building.
- When they do test the indoor air they plan to do a 1week passive sampler, with HVAC fully on, and with employees using the facilities as normal. I pointed out HVAC on would bring in outdoor air and dilute the indoor air if VI — and pointed out that if they results come back high, they won't know if its' VI or if it's employees that were cleaning/etc. They told me what they're doing is routine, best practice, and above and beyond what's required. I asked if they could at least do a 48hr summa with HVAC off & employees out in addition to the 1wk one and they said no, saying their way would give better results.
- They kept saying the whole process was routine but eventually admitted they've never done it before for any of their Apple buildings with employees actively working inside.
- They also told me again that now they won't answer any more of my questions about the safety of the building.
- I told them I remain very concerned the building is not safe.

P.S. not sure if you're aware, but apparently TRW Microwave building has NEVER had an EIR. It was made a Superfund after it was already constructed (that's where the leaking/dumping happened). Then they did a negative declaration for the expansion and that was it. I didn't see anything for Apple's remodel either. I PR'd Sunnyvale city records and they sent me what they had. Quite limited.

-Ashley

—

**Ashley M. Gjøvik**

Juris Doctor Candidate & Public International Law Certificate Candidate, Santa Clara University, Class of 2022

https://www.linkedin.com/in/ashleygjovik/

(415) 964-6272

On Jul 7, 2021, at 1:08 PM, Ashley Gjovik <ashleygjovik@icloud.com> wrote:

Hi Margot,

Thank you for your responses! I have a few follow up questions below.

Also, as you mentioned *"it is important for EPA to be aware if there's a significant change to site conditions,"* I would hope you've already been informed that there are apparently cracks in the floor of Stewart 1 and Apple is pursuing a "floor sealing plan." See quote below from Apple EH&S. They apparently did their first formal "vapor intrusion evaluation" walkthrough <u>ever</u> this May and noticed the cracks. I'd ask again, considering this and considering my fainting spell in 2019, if the EPA is still confident that the the vapor intrusion is under control.

> In May we performed step one of a three step process. We did the floor pathway survey, checking for cracks and gaps that can build over time due to natural floor movement. Based on that, we developed a floor sealing plan. Right now, we are in step two scheduling the floor crack sealing work by a contractor (expected within a month according to verbal from the construction management team).

In addition, I'm not sure if you're aware but after I started asking a lot of questions to Apple EH&S about their oversight of TRW Microwave, they went from planning to test the indoor air this year to then saying they may no longer test the air and if they do it's at a TBD time. They offered no explanation for why they decided not to test and also told me they wouldn't answer any more of my questions. Further, the environmental engineer who has overseen Apple's environmental engineering & due diligence program for over seven years is now leaving Apple. He went on medical leave within an hour of my last conversation with them when they said they wouldn't

answer my questions and they might not test the air now — and upon coming back from leave he's now leaving Apple imminently. This all seems quite peculiar to me.

Finally, my follow-up questions for the EPA are inline below and also summarized here:

- A) Can you please share a link to the May 2015 indoor air testing report? Apple told me the Dec 2015 report included the May 2015 data and there was no separate May 2015 report. That didn't sound right and I've been trying to track down the detailed May report.
- B) Can you confirm if the May 2015 testing was only 8hrs in duration like the Dec 2015 testing was? Was there any 24hr+ Summa testing ever performed in the TRW building that passed the EPA indoor air thresholds?
- C) I see ethylbenzene and toluene noted as related chemicals for TRW in earlier EPA reports (copy inline). Did you mean to say they're not "contaminants of concern?" Does it change your analysis knowing they have been known to be part of the historical contamination?

I would appreciate a quicker response this time if possible. After I reminded Apple of labor laws & stuff, they clarified they'd "never prohibit me from speaking out about workplace safety concerns," and as such I am now actively looking into publishing something about this.

Apple EH&S reached out with the environmental engineer leaving and are "providing me an update" later this afternoon. I'll let you know if there's anything else they say I think you'll care about — or which raise questions for the EPA.

Thanks!

—

**Ashley M. Gjøvik**

Juris Doctor Candidate & Public International Law Certificate Candidate, Santa Clara University, Class of 2022

https://www.linkedin.com/in/ashleygjovik/

(415) 964-6272

On Jun 7, 2021, at 8:29 AM, PerezSullivan, Margot <PerezSullivan.Margot@epa.gov> wrote:

Hi Ashley, I'm out this week, but wanted to send this on. Thanks!

**Question**: I am curious what the EPA's expectations are for the frequency (how often) & duration (how long/intensive) of indoor air testing in a building like TRW Microwave. Did you approve that they could stop doing indoor air testing after 2015 — or is it up to the responsible party to decide? Are Ethylbenzene and Tolulene COCS for the great Triple Site plume — could they be migrating?

**Response:** *Superfund cleanups are governed by a complex network of laws, regulations, and guidance. Where there are vapor intrusion concerns, assessments and monitoring are conducted based on site-specific information, such as contaminant concentrations, site uses, history, available data, and mitigation measures.*

*At the TRW Microwave Superfund Site, groundwater monitoring has been ongoing. Since 2016, groundwater concentrations for the TRW Microwave site-specific constituents of concern (primarily TCE and breakdown daughter products) have been stable. Because TRW Microwave Site conditions have not changed, EPA believes the remedy in place at the site remains protective and has not required additional ongoing indoor air sampling.*

*The Regional Water Quality Control Board (RWQCB) and EPA have overseen the cleanup actions at the TRW Microwave Site. Over the decades, site remedies have greatly reduced contaminant concentrations,*

*including the primary constituent of concern, TCE in groundwater. TCE concentrations at the TRW Microwave Site have declined from upwards of 10,000 parts per billion (ug/L) in the 1980s to generally less than 100 µg/L today (for context, 1 part per billion would be equal to 1 drop of ink in 1 billion drops of water).*

*The vapor intrusion risk at the site has been addressed under RWQCB and EPA oversight multiple times by the Northrup Grumman Corporation (the responsible party), and the current owner of the property. In 2013 indoor air sampling was conducted in the then unoccupied 825 Stewart Avenue building, which was unfinished and had open conduits in the sub-slab. The results indicated that a few volatile organic compounds were present at concentrations greater than the generic health risk screening values at the time for workers. The 2013 results are available on the EPA TRW Microwave website:*https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.docdata&id=0901181

*Since 2013, the 825 Stewart Avenue building was renovated and Northrup Grumman and the now current property owner proactively implemented a number of protective measures to prevent vapor intrusion into the building:*

    o *August/September 2014:*

        *A sub-slab vapor collection system was installed underneath the site building to vent vapors to the atmosphere.*

    o *October/November 2014:*

        *Contaminated soil from underneath the building in the former TRW Microwave source area was excavated and*

*removed to prevent contaminants in the soil from volatilizing into the building. Additionally, small diameter groundwater wells inside the building were decommissioned and sealed to eliminate a potential vapor intrusion pathway into the building. These mitigation measures are documented in a 2015 Source Area Soil Removal Report, which can be found on the EPA TRW Microwave website.*

o *December 2014:*

*To reduce contamination in groundwater and the potential for vapor intrusion, when the building was unoccupied emulsified vegetable oil was injected underneath the building to accelerate the biological degradation of PCE, TCE, and associated by-products. The results are in the annual groundwater monitoring reports, which are available on the EPA TRW Microwave website.*

o *April 2015:*

*Openings through pipes, seams, or cracks in the building's concrete sub-slab were sealed to prevent vapor intrusion. Additionally, the spaces between the walls of the three sections of the buildings were also sealed.*

*After the protective measures above were implemented, indoor air sampling was conducted in May 2015. The May sampling event was conducted with the HVAC system turned off as a worst-case scenario. The indoor air results were less than EPA's generic health risk screening values based on a workplace exposure of 250 days per year for 25 years and demonstrated the effectiveness of the post-2013 measures to mitigate vapor intrusion. The results are available in a June 2015 report available on the EPA TRW Microwave website.*

A) Can you please share a link to the May 2015 indoor air testing report? Apple told me the Dec 2015 report included the May 2015 data and there was no separate May 2015 report. That didn't sound right and I've been trying to track down the detailed May report.

B) Can you confirm if the May 2015 testing was only 8hrs in duration like the Dec 2015 testing was? Was there any 24hr+ Summa testing ever performed in the TRW building that passed the EPA indoor air thresholds?

> *Due to building renovations subsequent to the May 2015 indoor air sampling event, another indoor air sampling event was conducted in December 2015, which EPA agree with. The indoor air sampling event was conducted with the HVAC system off, except for one zone where it was reported that the HVAC system could not be turned off. The December 2015 results again demonstrated that the chemicals related to the TRW Microwave Superfund Site were less than EPA's indoor air human health risk screening values for workers (note, ethylbenzene and toluene are not associated with the TRW Microwave Superfund Site).*

C) I see ethylbenzene and toluene noted as related chemicals for TRW in earlier EPA reports. Did you mean to say they're not "contaminants of concern?" Does it change your analysis knowing they have been known to be part of the historical contamination?

i.e.

<1991 Triple Site Toxins.png>

## 2) <u>Communication</u>:

**Background**: Next, from what Apple has told me, they said they decided internally that they have no legal obligation to have to inform employees about the status of these buildings related to chemicals in the soil or groundwater, or Superfund status, etc. I pressed further if there's an ethical obligation and they said that would be a "bigger conversation." It sounds like they think they only have to inform employees if there's a concrete and immediate risk to employee health (which I argued... how would they know that if they're not testing?... no answer). I'm also feeling pressure to not talk to co-workers about any of this either (from my direct manager and our employee relations teams).

**Question**: I am curious what the EPA's expectations are for responsible parties related to informing workers in these buildings about the chemicals, the gov status, etc. Maybe this is more OSHA & "Right to Know" — but any guidance you can provide here would be helpful. Also, anything about workers' rights to be able to talk about these sites. I would also appreciate any guidance you have about learning more about possible chemical exposure from this site from an unbiased party. I talked to Dr. Robert Harrison about it yesterday for a bit, but he says we don't have enough data because no one was testing while I was there. I was also going to see if Tracy Barreau and Dr. Prudhomme would take a look informally. Let me know if you know of anyone else who might have thoughts.

**Response:** *EPA is not aware of any regulation or limitation to workers or the public to talk about a Superfund site. EPA supports transparency and providing information to the public, other than where prevented by regulation, guidance, or to protect personally identifiable or confidential business information.*

*There is no specific right-to-know requirement in the TRW Microwave Record of Decision, which documents the remedy selected for the Site. For a site where conditions are protective of human health there is no specific EPA requirement to notify each site visitor or construction or office worker of a mitigated potential risk. However, EPA does conduct regular community outreach and provides further transparency to the public though websites, fact sheets, and responses to public inquires. Note that different sites may have different public notification needs or requirements.*

**3) <u>Monitoring</u>:**

**Background**:  Further, because none of us know this is a Superfund site — we don't know not to mess with sub slat vent covers, or to not mess with the HVAC, or to report if there's any usual smells etc. I brought this up with him and he'd said he'd back to me a couple weeks ago — but said that the Env Health Safety team does know and does visit the site. I communicated that does not seem sufficient. In fact, with the wild fire smoke last year, we had EHS turn off the HVAC so outdoor air wasn't being brought it — from what I've seen, it doesn't seem like the vapor intrusion mitigation system was ever considered when they did turn it off. I believe it was off for a week or two. I brought this up too - and he hasn't gotten back to me either. I know I've seen people kicking at those SS-V plugs not knowing what they are too.

**Response:** *Thank you for conveying that during the wildfires last year the HVAC system was turned off, as it is important for EPA to be aware if there's a significant change to site conditions. Even with the HVAC system off, the sub-slab vapor collection system will continue to vent vapors that collect under the building to the atmosphere.*

**Question:** Similar question as #2, but I'm curious what the EPA's expectations are for responsible parties (and companies they may lease to) to communicate to workers in these buildings about how to monitor for their issues (weird smells, weird health issues, etc) or how to report trouble or what not to mess with (plugs, HVAC, etc). Etc.

These are my best attempt at mapping results.... But take with a grain of salt... I only play an industrial hygienist on TV. J/k. But seriously, also mapped where I fainted in 2019. Our HR team pushed me to file a workers comp claim about it and the workers comp administrator wanted to call it "continuous trauma" for my time working in at least that building. (Apple had plenty other Superfunds and chemical release sites I visited too). I'm not sure where this will go though... if Apple wasn't testing the indoor air, it seems impossible to know if there were problematic chemicals in the air or not when it happened.

I did have more fainting in the office in 2020, but it was while this was going on too: https://sfbayview.com/2021/03/i-thought-i-was-dying-my-apartment-was-built-on-toxic-waste/

So I just assumed the fainting in 2020 was carry over from the apartment I moved into Feb 2020. I haven't been back to the office since last year. I've been fine since I moved out of that apartment in Sept 2020 (and haven't been back to the office either).

***Response:*** *EPA believes the remedy in place at the TRW Microwave Site remains protective. EPA will continue to evaluate the protectiveness of the remedy if conditions at the Site change. EPA will also continue to evaluate the protectiveness at the Site during*

*the mandatory Five-Year Review, which was last completed for the TRW*
*Microwave and the Triple Site in late 2019.*

Margot Perez-Sullivan

U.S. Environmental Protection Agency

D: 415.947.4149 C: 415.412.1115

E: <u>perezsullivan.margot@epa.gov</u>

On May 27, 2021, at 12:10 PM, Ashley Gjøvik <<u>ashleygjovik@icloud.com</u>> wrote:

 Hi Margot,

Checking in. 🤪

Sent from my iPhone

On May 4, 2021, at 10:58 AM, Ashley Gjovik <<u>ashleygjovik@icloud.com</u>> wrote:

Hi Margot!

Thank you very much.  No deadline; I understand you're busy. Just generally sooner than later
would be great.

P.S. I don't have anything in the pipeline publishing wise about the TRW Microwave site — though I am speaking with several other agencies about it — in addition to talking with Apple directly. As mentioned, as of my last conversation with Apple Employee Relations, I'm unsure if I can actually talk about the site at work without getting in trouble for doing so — let alone publishing anything.

Thanks again! Appreciate your help.

-Ashley

—

**Ashley M. Gjøvik**

Juris Doctor Candidate & Public International Law Certificate Candidate, Santa Clara University, Class of 2022

*I'm not a lawyer and nothing I say should be considered legal advice.*

https://www.linkedin.com/in/ashleygjovik/

(415) 964-6272

On May 4, 2021, at 10:13 AM, PerezSullivan, Margot <PerezSullivan.Margot@epa.gov> wrote:

Hi Ashley, Thanks so much for sending, I was about to hit send when this came through! Rest assured, we are working on responses to your questions. I know you've been publishing your work – is there a specific deadline you need us to meet? Please let me know, thank you!

Margot Perez-Sullivan

U.S. Environmental Protection Agency

D: 415.947.4149 C: 415.412.1115

E: [perezsullivan.margot@epa.gov](mailto:perezsullivan.margot@epa.gov)

---

**From:** Ashley Gjovik <[ashleygjovik@icloud.com](mailto:ashleygjovik@icloud.com)>
**Sent:** Friday, April 30, 2021 4:29 PM
**To:** PerezSullivan, Margot <[PerezSullivan.Margot@epa.gov](mailto:PerezSullivan.Margot@epa.gov)>
**Subject:** Re: Questions about TRW Microwave

Hi Margot,

As discussed, my questions relate to testing, communication, and monitoring/response. I'm already talking to Apple's Env Health & Safety team to hear their side of things — but I'm interested in hearing the EPA's perspective on these topics. I'd like to understand what y'alls expectations are. I understand it will be much high level policy and may be entirely inline with what Apple is already saying — but it'd like to be able to compare/contrast. If the EPA doesn't have their own guidance on items below, that's fine, just let me know.

**1) <u>Testing</u>:**

**Background**: First, from what I've learned from Apple — it sounds like there hasn't been any indoor air testing (sub slat or indoor air) since 2015. (They are currently planning to do testing this year, though they didn't fully explain why they decided to start testing this year after six years). I reviewed the indoor air reports from 2003, 2004, 2013, & 2015. It appears there is a long history of indoor air measurements with chemicals of concern above max industrial risk levels. My desk looks to be in a bit of a hot spot too. In 2015, there was some testing done (May & Dec it appears) but instead of 24/48hr — they did 10hr, at least for Dec. I'm still waiting to see the details of the May testing. And at least in Dec 2015, it appears they weren't able to fully shut off the HVAC either. And the Dec results came back with high levels of Ethylbenzne and Tolulene that were suspected to be resulted to the construction, but does not appear to have been verified by an additional test later. It also appears that the building was vacant until Apple moved my team in there in 2015-ish.

**Question**: I am curious what the EPA's expectations are for the frequency (how often) & duration (how long/intensive) of indoor air testing in a building like TRW Microwave. Did you approve that they could stop doing indoor air testing after 2015 — or is it up to the responsible party to decide? Are Ethylebenze and Tolulene CoCs for the great Triple Site plume — could they be migrating?

## 2) **Communication**:

**Background**: Next, from what Apple has told me, they said they decided internally that they have no legal obligation to have to inform employees about the status of these buildings related to chemicals in the soil or groundwater, or Superfund status, etc. I pressed further if there's an ethical obligation and they said that would be a "bigger conversation." It sounds like they think they only have to inform employees if there's a concrete and immediate risk to employee health (which I argued... how would they know that if they're not testing?... no answer). I'm also feeling pressure to not talk to co-workers about any of this either (from my direct manager and our employee relations teams).

**Question**: I am curious what the EPA's expectations are for responsible parties related to informing workers in these buildings about the chemicals, the gov status, etc. Maybe this is more OSHA & "Right to Know" — but any guidance you can provide here would be helpful. Also anything about workers rights to be able to talk about these sites. I would also appreciate any guidance you have about learning more about possible chemical exposure from this site from an unbiased party. I talked to Dr. Robert Harrison about it yesterday for a bit, but he says we don't have enough data because no one was testing while I was there. I was also going to see if Tracy Barreau and Dr. Prudhomme would take a look informally. Let me know if you know of anyone else who might have thoughts.

## 3) **Monitoring**:

**Background**:  Further, because none of us know this is a Superfund site — we don't know not to mess with sub slat vent covers, or to not mess with the HVAC, or to report if there's any usual smells etc. I brought this up with him and he'd said he'd back to me a couple weeks ago — but said that the Env Health Safety team does know and does visit the site. I communicated that does not seem sufficient. In fact, with the wild fire smoke last year, we had EHS turn off the HVAC so

outdoor air wasn't being brought it — from what I've seen, it doesn't seem like the vapor intrusion mitigation system was ever considered when they did turn it off. I believe it was off for a week or two. I brought this up too - and he hasn't gotten back to me either. I know I've seen people kicking at those SS-V plugs not knowing what they are too.

**Question:** Similar question as #2, but I'm curious what the EPA's expectations are for responsible parties (and companies they may lease to) to communicate to workers in these buildings about how to monitor for their issues (weird smells, weird health issues, etc) or how to report trouble or what not to mess with (plugs, HVAC, etc). Etc.

These are my best attempt at mapping results…. But take with a grain of salt… I only play an industrial hygienist on TV. J/k. But seriously, also mapped where I fainted in 2019. Our HR team pushed me to file a workers comp claim about it and the workers comp administrator wanted to call it "continuous trauma" for my time working in at least that building. (Apple had plenty other Superfunds and chemical release sites I visited too). I'm not sure where this will go though… if Apple wasn't testing the indoor air, it seems impossible to know if there were problematic chemicals in the air or not when it happened.

I did have more fainting in the office in 2020, but it was while this was going on too: https://sfbayview.com/2021/03/i-thought-i-was-dying-my-apartment-was-built-on-toxic-waste/

So I just assumed the fainting in 2020 was carry over from the apartment I moved into Feb 2020. I haven't been back to the office since last year. I've been fine since I moved out of that apartment in Sept 2020 (and haven't been back to the office either).

Anyhow, FYI.

<image001.png>

<image002.png>

—

**Ashley M. Gjøvik**

Juris Doctor Candidate & Public International Law Certificate Candidate, Santa Clara University, Class of 2022

https://www.linkedin.com/in/ashleygjovik/

(415) 964-6272

On Apr 29, 2021, at 10:19 AM, Ashley Gjovik <ashleygjovik@icloud.com> wrote:

Hi Margot! No worries at all. Hope things calm down.

Actually, if you'd prefer, I can send you a note today or tomorrow summarizing my questions. I'll start drafting!

—

**Ashley M. Gjøvik**

Juris Doctor Candidate & Public International Law Certificate Candidate, Santa Clara University, Class of 2022

https://www.linkedin.com/in/ashleygjovik/

(415) 964-6272

On Apr 29, 2021, at 10:03 AM, PerezSullivan, Margot
<PerezSullivan.Margot@epa.gov> wrote:

Ashley, I have not forgotten about you – I got slammed yesterday afternoon. I will be writing them up and sending them on to ensure I captured all of the items for which you are seeking information. I appreciate your time!

Margot Perez-Sullivan

U.S. Environmental Protection Agency

D: 415.947.4149 C: 415.412.1115

E: perezsullivan.margot@epa.gov

---

**From:** PerezSullivan, Margot
**Sent:** Monday, April 26, 2021 10:57 AM
**To:** ashleygjovik@icloud.com
**Subject:** Questions about TRW Microwave

Hi Ashley,

Michael forwarded your note and asked that I follow up with you.  Please let me know a good time to chat so I can better understand your questions.  I will be out of the office tomorrow, but am working the rest of the week.  Many thanks!
Margot

Margot Perez-Sullivan

U.S. Environmental Protection Agency

D: 415.947.4149 C: 415.412.1115

E: perezsullivan.margot@epa.gov

<OEHHA TCE in Indoor Air Risk Fact Sheet, 2018.pdf>

# Gjovik v. Apple

# Exhibit

# News Release

T – 19 – 16

**Barbara A. Lee, Director**

**FOR IMMEDIATE RELEASE**
December 6, 2016

Contact: Sanford (Sandy) Nax
(916) 327-6114
Sanford.Nax@dtsc.ca.gov

## Apple Agrees to Pay $450,000 to Settle Hazardous Waste Violations

**SACRAMENTO** – A settlement agreement between the California Department of Toxic Substances Control (DTSC) and Apple Inc. was filed in Santa Clara County Superior Court by the California Attorney General's Office on behalf of DTSC.

Apple has agreed to pay $450,000 to DTSC and to increase facility inspections to settle allegations of hazardous waste violations at facilities in Silicon Valley. The settlement stems from violations that DTSC found during a June 13, 2013 inspection of an Apple electronic waste shredding facility in Sunnyvale and a subsequent review of records. DTSC discovered that Apple had opened, operated and then closed an electronic waste shredding facility from 2011 to 2012 in Cupertino without DTSC's knowledge and without complying with universal waste regulations,
including the mismanagement of metal dust from shredder operations.

Apple processed about 1.1 million pounds of electronic waste at the Cupertino facility before closing it in January 2013, and shifting operations to a facility in Sunnyvale. In Sunnyvale, Apple dismantled, shredded and disposed of more than 800,000 pounds of electronic waste before notifying DTSC of the plant's existence and complying with all universal waste regulations.

Universal waste, such as electronic devices, batteries and other discarded consumer products containing hazardous substances, are subject to California universal waste regulations. Since they are considered a type of hazardous waste, universal waste handlers who accept universal waste must notify DTSC and handle the waste according to management standards required by law.

The shredding process produces a fine dust that is collected by a baghouse and filter system. The dust is classified as a hazardous waste due to the concentration of metals. The shredded devices are shipped offsite for recycling and sold as scrap metal. Apple, however, shipped hazardous dust and floor sweep from Sunnyvale to a recycling facility in Roseville that was not authorized to handle Apple's hazardous waste.

After the inspection, records review and dust sampling, DTSC alleged the following violations:

Apple Agrees to Pay $450000 to Settle Hazardous Waste Violations | Department of Toxic Substances Control
Case 4:22-cv-04597-YMR  Document 151-3  Filed 12/05/23  Page 4 of 88
5/11/21, 5:58 PM

After the inspection, records review and dust sampling, DTSC alleged the following violations:

- Transportation of hazardous waste without a proper manifest

- Failing to report and track exports of hazardous waste

- Failing to label or otherwise mark used oil containers as "hazardous waste"

- Failing to provide notice of closure for the facility in Cupertino

- Failing to submit a written closure plan and cost estimate for closing the facility in Cupertino and for eventual closure of the one in Sunnyvale

- Failing to demonstrate financial assurance to fund the eventual closure of the two facilities

"Compliance with the hazardous waste law is fundamental in protecting the health of workers and communities as well as the environment," said Keith Kihara, Chief of DTSC's enforcement division. "We are encouraged by the settlement and that Apple is working with us to take the necessary steps to comply with California's hazardous waste law."

As part of the settlement, Apple has agreed to maintain a closure plan and financial insurance for the facility, conduct weekly inspections of areas where hazardous waste is generated and stored, and will ensure that electronic waste, including shredded electronic waste, is properly labeled and not put into containers with dust derived from its shredding operations.

View the Complaint for Civil Penalties

View the Final Judgment Pursuant to Stipulation

# # #

FOR GENERAL INQUIRIES: Contact the Department of Toxic Substances Control by phone at (800) 728-6942 or visit www.dtsc.ca.gov. To report illegal handling, discharge, or disposal of hazardous waste, call the Waste Alert Hotline at (800) 698-6942.

DTSC's Mission is to protect California's people, communities, and environment from toxic substances, to enhance economic vitality by restoring contaminated land, and to compel manufacturers to make safer consumer products.



CALIFORNIA ENVIRONMENTAL PROTECTION AGENCY
# Department of Toxic Substances Control

# News Release

T – 19 – 16
**Barbara A. Lee, Director**

**FOR IMMEDIATE RELEASE**
December 6, 2016

Contact: Sanford (Sandy) Nax
(916) 327-6114

## Apple Agrees to Pay $450,000 to Settle Hazardous Waste Violations

**SACRAMENTO –** A settlement agreement between the California Department of Toxic Substances Control (DTSC) and Apple Inc. was filed in Santa Clara County Superior Court by the California Attorney General's Office on behalf of DTSC.

Apple has agreed to pay $450,000 to DTSC and to increase facility inspections to settle allegations of hazardous waste violations at facilities in Silicon Valley. The settlement stems from violations that DTSC found during a June 13, 2013 inspection of an Apple electronic waste shredding facility in Sunnyvale and a subsequent review of records. DTSC discovered that Apple had opened, operated and then closed an electronic waste shredding facility from 2011 to 2012 in Cupertino without DTSC's knowledge and without complying with universal waste regulations, including the mismanagement of metal dust from shredder operations.

Apple processed about 1.1 million pounds of electronic waste at the Cupertino facility before closing it in January 2013, and shifting operations to a facility in Sunnyvale. In Sunnyvale, Apple dismantled, shredded and disposed of more than 800,000 pounds of electronic waste before notifying DTSC of the plant's existence and complying with all universal waste regulations.

Universal waste, such as electronic devices, batteries and other discarded consumer products containing hazardous substances, are subject to California universal waste regulations. Since they are considered a type of hazardous waste, universal waste handlers who accept universal waste must notify DTSC and handle the waste according to management standards required by law.

The shredding process produces a fine dust that is collected by a baghouse and filter system. The dust is classified as a hazardous waste due to the concentration of metals. The shredded devices are shipped offsite for recycling and sold as scrap metal. Apple, however, shipped hazardous dust and floor sweep from Sunnyvale to a recycling facility in Roseville that was not authorized to handle Apple's hazardous waste.

After the inspection, records review and dust sampling, DTSC alleged the following violations:

- Transportation of hazardous waste without a proper manifest
- Failing to report and track exports of hazardous waste
- Failing to label or otherwise mark used oil containers as "hazardous waste"
- Failing to provide notice of closure for the facility in Cupertino

- Failing to submit a written closure plan and cost estimate for closing the facility in Cupertino and for eventual closure of the one in Sunnyvale
- Failing to demonstrate financial assurance to fund the eventual closure of the two facilities

"Compliance with the hazardous waste law is fundamental in protecting the health of workers and communities as well as the environment," said Keith Kihara, Chief of DTSC's enforcement division. "We are encouraged by the settlement and that Apple is working with us to take the necessary steps to comply with California's hazardous waste law."

As part of the settlement, Apple has agreed to maintain a closure plan and financial insurance for the facility, conduct weekly inspections of areas where hazardous waste is generated and stored, and will ensure that electronic waste, including shredded electronic waste, is properly labeled and not put into containers with dust derived from its shredding operations.

Here is a link to the Complaint for Civil Penalties:
http://www.dtsc.ca.gov/HazardousWaste/Projects/upload/Apple_Complaint.pdf

Here is a link to the Final Judgment Pursuant to Stipulation:
http://www.dtsc.ca.gov/HazardousWaste/Projects/upload/Apple_Final-Judgment.pdf



**# # #**

FOR GENERAL INQUIRIES: Contact the Department of Toxic Substances Control by phone at (800) 728-6942 or visit www.dtsc.ca.gov. To report illegal handling, discharge, or disposal of hazardous waste, call the Waste Alert Hotline at (800) 698-6942.

*The mission of DTSC is to protect California's people and environment from harmful effects of toxic substances by restoring contaminated resources, enforcing hazardous waste laws, reducing hazardous waste generation, and encouraging the manufacture of chemically safer products.*

# Gjovik v. Apple

# Exhibit

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 21**

**APPLE, INC.**                                                      **Case    32-CA-284428**

     **and**

**ASHLEY GJOVIK, an Individual**

<u>**CORRECTED COMPLAINT AND NOTICE OF HEARING**</u>

On September 27, 2024, Region 21 of the National Labor Relations Board issued a

Complaint and Notice of Hearing in this case, which inadvertently did not include Attachments

A-I referenced in the Complaint. This corrected Complaint and Notice of Hearing includes these

Attachments. This corrected Complaint and Notice of Hearing is based on a charge filed by

Ashley Gjovik ("Charging Party" or "Gjovik").  It is issued pursuant to Section 10(b) of the

National Labor Relations Act (the Act), 29 U.S.C. § 151 et seq., and Section 102.15 of the Rules

and Regulations of the National Labor Relations Board (the Board) and alleges that Apple, Inc.

("Respondent"), has violated the Act as described below.

1.      The charge was filed by Gjovik on October 12, 2021, and a copy was served on

Respondent by U.S. mail on October 13, 2021.

2.      (a)     At all times reasonably encompassed by this corrected complaint

and any answer Respondent may file, i.e., all material times, Respondent, a California

corporation with a headquarters at One Apple Park Way, Cupertino, CA and retail

facilities throughout the U.S.,  has been engaged in the development, manufacture, and retail

sale of consumer electronics and software.

(b)     Annually, in the course and conduct of its operations, Respondent

derives gross revenues in excess of $500,000, and purchased and received at its California

facilities products, goods and materials valued in excess of $5,000 directly from points outside the State of California.

(c)     At all times reasonably encompassed by this corrected complaint and any answer Respondent may file, i.e., all material times, Respondent  has been an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.

3.     Since at least April 13, 2021, in a **Frequently Asked Questions** page on its intranet, a copy of which is attached to this corrected Complaint as Attachment A and is incorporated herein in its entirety, Respondent has defined confidential information as follows:

> Apple Confidential information is anything not explicitly, publicly, or purposefully disclosed by Apple. Examples of Apple Confidential information include unannounced products (including their release dates, pricing, and specifications), unannounced sales promotions, certain AppleWeb announcements, organizational charts, financial forecasts, and customer information.

4.     Since at least April 13, 2021, Respondent has maintained a "**Confidentiality and Intellectual Property Agreement**" (IPA), a copy of which is attached to this corrected Complaint as Attachment B and is incorporated herein in its entirety.

(a)     Under the section heading "**I. Confidential and Proprietary Information**," the IPA states, inter alia:

> You understand that your employment by Apple creates a relationship of confidence and trust with respect to any confidential, proprietary, or non-public information that may be disclosed to you or otherwise learned by you in the course of employment at Apple, including but not limited to any confidential information of third parties disclosed to Apple. As referred to herein, "Proprietary information" means all information not generally known outside Apple and/or kept confidential by Apple, including for example but not limited to (a) trade secrets, R&D records, reports, samples, manuals, plans, specifications, inventions, ideas, designs, prototypes, software, source code, or any other materials or information relating to past, existing, and future products and services whether or not developed, marketed, used, or rejected by Apple or persons or companies dealing with Apple; (b) sales, profits, organization, customer lists, pricing, sources of material, supply, costs, manufacturing, financials, forecasts, market research, or any other information relating to the business operations or affairs of Apple or persons or companies dealing with Apple; and (c) the

employment and personnel information of Apple, such as compensation, training, recruiting, and other human resources information.

(b)      There is a footnote at the end of the paragraph quoted above that states:

Nothing in this Agreement should be interpreted as restricting your rights to speak freely about your wages, hours, or working conditions as legally permitted.

(c)      Under the section heading "**I. Confidential and Proprietary Information**," the IPA further states:

> **A. Treatment of Proprietary Information**. You understand and agree that your employment by Apple prohibits you, during or after employment, from using or disclosing, or permitting any other person or entity to use or disclose, any Proprietary Information without the written consent of Apple, except as necessary to perform your duties as an employee of Apple. You understand and agree to strictly comply with all of Apple's rules and policies regarding Proprietary Information and use best efforts to safeguard such Proprietary Information and protect it against disclosure, misuse, loss, or theft. Upon termination of employment with Apple, you will promptly deliver to Apple all documents and materials of any kind pertaining to your work at Apple, and you agree that you will not take with you any documents, materials, or copies thereof, whether on paper or any other medium, containing any Proprietary Information.

5.      Since at least April 13, 2021, Respondent has maintained a **Business Conduct Policy** (BCP), and since at least April 13, 2021, Respondent has maintained as part of the BCP the rules and provisions set forth below. A copy of the 2020 version of the BCP is attached to this corrected Complaint as Attachment C and is incorporated herein in its entirety.

(a)      Under the section heading "**The Way We Do Business Worldwide**," the BCP states, inter alia:

> **Your Responsibilities and Obligation to Take Action**
>
> Everything we do is a reflection of Apple. We expect you to:
>
> - **Follow the Policy**. Comply with the letter and spirit of Apple's Business Conduct Policy and all applicable legal requirements.
>
> - **Speak up**. If you see or hear of any violation of Apple's Business Conduct Policy, other Apple policies, or legal or regulatory

3

requirements, you must notify either your manager, People Team, Legal, or Business Conduct.

- **Use good judgment and ask questions**. Apply Apple's principles of business conduct, and review our policies and legal requirements. When in doubt about how to proceed, discuss it with your manager, your People Business Partner, Legal, or Business Conduct. Any failure to comply with Apple's Business Conduct Policy—or failure to report a violation—may result in disciplinary action, up to and including termination of employment.

You are also required to fully cooperate in any Apple investigation, and keep any information shared with you confidential to safeguard the integrity of the investigation.

(b)     Under the section heading "**The Way We Do Business Worldwide**," the 2020 BCP further states:

**Your Rights as an Employee**

While we expect employees to follow the Business Conduct Policy, nothing in this Policy should be interpreted as being restrictive of your right to speak freely about your wages, hours, or working conditions.

In the August 2022 BCP, this subsection was modified to read as follows:

**Your Rights as an Employee**

You are permitted to speak freely about your wages, hours, and working conditions, including information about harassment, discrimination, or any other conduct you have reason to believe is unlawful, and nothing in this Policy, or any Apple policy, should be interpreted as being restrictive of your right to do so.

(c)     Under the section heading "**Protecting Apple**," the BCP states:

**Protecting Apple's Assets and Information**

You play a key role in helping us protect Apple. Assets include Apple's proprietary information (such as intellectual property, confidential business plans, unannounced product plans, sales and marketing strategies, and other trade secrets), as well as physical assets such as cash, equipment, supplies and product inventory.

- **Watch what you say**. Being aware of where you are, who is around you, and what they might see or overhear is an important way we all protect Apple's secrets.

4

- **Protect our assets**. Keep track of the assets and information Apple has entrusted you, and prevent loss, misuse, waste, or theft.

- **Set an example**. Model behavior that protects our assets and information at all times.

(d)     Under the section heading "**Protecting Apple**," the BCP further states:

## Apple Confidential Information

One of our greatest assets is information about our products and services, including future product offerings. Never disclose confidential, operational, financial, trade-secret, or other business information without verifying with your manager whether such disclosure is appropriate. We are very selective when disclosing this type of information to vendors, suppliers, or other third parties, and only do so once a non-disclosure agreement is in place. Even with Apple, confidential information should only be shared on a need-to-know basis. The Intellectual Property Agreement that you signed when you joined Apple outlines your duty to protect our information.

For more information, visit the Global Security website.

(e)     Under the section heading "**Protecting Apple**," the BCP further states:

## Non-Disclosure/Confidentiality Agreements

Never share confidential information about Apple's products or services without your manager's approval. When there is a business need to share confidential information with a supplier, vendor, or other third party, never volunteer more than what is necessary to address the business at hand. Any confidential information shared outside Apple should be covered by a non-disclosure/confidentiality agreement (NDA). Contact Legal in your region to obtain an NDA. In the United States, you can find NDA information and support on the Legal website.

(f)     Under the section heading "**Protecting Apple**," the BCP further states:

## Accuracy of Records and Reports

Accurate and honest records are critical to meeting our legal, financial, and management obligations. You should ensure that all records and reports, including timecards, customer information, technical and product information, correspondence, and public communications are comprehensive, fair, accurate, timely, and understandable.

Do not misstate facts, omit critical information, or modify records or reports in any way to mislead others, and never assist others in doing so. Intentional manipulation of Apple records is a form of fraud.

(g)     Under the section heading "**Protecting Apple**," the BCP further states:

5

**Public Speaking and Press Inquiries**

All public or outside speaking engagements that relate to Apple's business or products must be pre-approved by your manager and Corporate Communications. If your request is approved, you may not request or accept any form of personal compensation from the organization that requested your participation, but you may accept reimbursement for incurred expenses. All inquiries from the media, industry, or financial analyst community must be referred to Corporate Communications or Investor Relations.

(h)     Under the section heading "**Protecting Apple**," the BCP further states:

**Publishing Articles**

If you want to contribute an article or other type of submission to a publication or blog on a topic that relates to Apple's business or products or could be seen as a conflict of interest, you must first request approval from Corporate Communications. If your contribution is technical or academic and relates to Apple, complete the Academic and Industry-Related Activities Questionnaire to obtain review from Legal and Business Conduct. If your contribution is determined to be a conflict of interest, you will need to get senior vice president approval. For additional information, see the Social Media and Online Communications guidelines.

(i)     Under the section heading "**Individual Accountability**," the BCP states:

**Avoiding Conflicts of Interest**

A conflict of interest is any activity that may damage Apple's reputation or financial interests, or gives the appearance of impropriety or divided loyalty. Avoid any situation that creates a real or perceived conflict of interest. If you are unsure about a potential conflict, talk to your manager, Business Conduct, or your People Business Partner.

(j)     Under the section heading "**Individual Accountability**," the BCP further states:

**Conflicts of Interest and Outside Activities**

You may participate in outside activities, including secondary employment, businesses, inventions, and serving on boards, only if they do not present a conflict of interest and you adhere to the rules set out below.

Apple generally considers an outside activity to be a conflict of interest if it:

[…]

- Would require you to disclose or use confidential Apple information.

6

[…]

- Arises from your role in Apple's business relationship with the organization.

(k)     Under the sub-heading "**Conflicts of Interest and Outside Activities**," the

BCP further states:

Work with your manager and Business Conduct to evaluate a potential conflict of interest. If an outside activity presents a conflict of interest, you must partner with a People Business Partner, and obtain written approval from your manager, Legal (if applicable), and the senior most person reporting to the CEO of both your and any relevant organizations. Contact Business Conduct to assist with Legal review.

(l)     Under the sub-heading "**Conflicts of Interest and Outside Activities**," the

BCP further states:

Any employee, full or part-time, who is participating in an outside activity, must comply with the following rules. **Do not:**

- Use any time at work or any Apple assets for your outside activity. This includes Apple's workspace, phones, computers, internet access, photocopiers, and any other Apple assets or services.

[…]

- Use confidential Apple information.

(m)     Under the section heading "**Individual Accountability**," the BCP further

states:

**Outside Employment and Inventions**

Before participating in creating inventions or businesses that are in the same area as your work for Apple, or that compete with or relate to Apple's present or reasonably anticipated business, products or services, you must have written permission from your manager and the senior vice president of your organization. Before taking any paid employment outside of Apple, you should notify your manager. Visit the Conflicts of Interest page for more information on what would be considered a conflict.

(n)     Under the section heading "**Business Integrity**," the BCP states:

**Private Employee Information**

You should never share a coworker or prospective employee's personal information. This includes information regarding their employment history,

7

personal contact information, compensation, health information, or performance and disciplinary matters. Any Legal or business need-to-know exceptions should be approved by your manager and Legal.

(o) Under the section heading "**Business Integrity**," the BCP further states:

As an Apple employee, you should understand that subject to local laws and regulations and in accordance with Apple's review process, we may do one of the following when you access Apple's network or systems, or use any device, regardless of ownership, to conduct Apple business:

- Access, search, monitor, and archive all data and messages sent, accessed, viewed, or stored (including those from iCloud, Messages, or other personal accounts).

- Conduct physical, video, or electronic surveillance, search your workspace (e.g. file cabinets, desk drawers, and offices, even if locked), review phone records, or search any non-Apple property (e.g. backpacks, handbags) while on company premises.

- Disclose to law enforcement, without prior notice, any information discovered during a search that may indicate unlawful behavior.

(p) Under the section heading "**Business Integrity**," the BCP further states:

While limited personal use of Apple equipment and systems is allowed, Apple may monitor equipment and systems. You should not have any expectation about the privacy of content or personal information on Apple systems or networks, including VPN. To learn more, read our Information Security Policies and guidance on Personal Information Privacy on the People site, which explain Apple's rights and your rights when conducting Apple business or using Apple-provided equipment. For more information, contact the Privacy team.

6. Since at least April 13, 2021, Respondent has maintained an "**About Workplace Policies**" (AWP) page on its intranet, a copy of which is attached to this corrected Complaint as Attachment D and is incorporated herein in its entirety.

(a) Under the section heading "**Important points to know**," the AWP states, inter alia:

- If you have knowledge of a possible violation of Apple's Business Conduct Policy (PDF), any other Apple policy, or legal or regulatory requirements, you must notify your manager, your People Business Partner, People Support, or the Business Conduct Helpline.

8

7.      Since at least April 13, 2021, Respondent has maintained a **Workplace Searches and Privacy Policy** (WSPP), a copy of which is attached to this corrected Complaint as Attachment E and is incorporated herein in its entirety.

(a)      The first paragraph of the WSPP states:

In order to protect Apple confidential and sensitive information and maintain the security and integrity of our networks and equipment, any use of Apple property, as well as use of your personal devices for Apple business or for accessing Apple networks, is subject to this policy.

(b)      Under the section heading "**Use of Apple systems and data**," the WSPP states:

All Apple facilities, furnishings, supplies, equipment, networks, and electronic systems (such as internet and intranet access, voicemail, email, instant messaging, and collaboration tools) are company property and are provided to conduct Apple business. Personal use is permitted as long as such use is reasonable and doesn't interfere with normal business activities. It must also not affect your performance, violate Apple policies and practices, or applicable local laws.

Generally, you should use Apple equipment to conduct Apple business. If you use your personal property to conduct Apple business (such as computers, data storage devices, mobile devices, and so on), or to access Apple networks, you must act in accordance with Apple policies. In addition, your property may be subject to search and the Apple-related content may be removed.

(c)      Under the section heading "**Workplace searches**," the WSPP states:

Only in cases where allowed under local law, Apple may:

- Access, search, monitor, archive, and delete Apple data stored on all of its property, as well as non-Apple property, if used for Apple business or if used for accessing Apple data, servers, or networks. This includes all data and messages sent, accessed, viewed, or stored (including those from iCloud, Messages, or other personal accounts) using Apple equipment, networks, or systems.

- Conduct physical, video, or electronic surveillance, search your workspace such as file cabinets, desks, and offices (even if locked), review phone records, or search any non-Apple property (such as backpacks, purses) on company premises.

9

This means that you have no expectation of privacy when using your or someone else's personal devices for Apple business, when using Apple systems or networks, or when on Apple premises.

The search or removal of Apple-related content on a device will be determined on a case-by-case basis when there is a business need and subject to local approval processes. Refusing to permit a search or removal of Apple-related content may result in disciplinary action up to and including termination of employment.

8.      Since at least April 13, 2021, Respondent has maintained a "**Misconduct and Discipline Policy**" (MDP), a copy of which is attached to this corrected Complaint as Attachment F and is incorporated herein in its entirety.

(a)      Under the section heading "**Conduct warranting immediate termination**," the MDP states, inter alia:

Conduct that may warrant immediate termination of employment includes, but isn't limited to:

**Policy violations**

- Violating confidential, proprietary, and trade secret information obligations (including those stated in Apple's Intellectual Property Agreement).

- Using Apple time, materials, facilities, equipment, or electronic resources for purposes unrelated to Apple business without your manager's express permission

(b)      Under the section heading "**Conduct warranting immediate termination**," the MDP further states:

**Other violations**

- Video or audio recording others without their prior consent. Apple may use recording or surveillance equipment for safety or security reasons.

- Photography at any Apple facility or home office or during meetings at any location where Apple confidential information could be compromised.

10

9.      Since at least April 13, 2021, Respondent has maintained a "**Social Media and Online Communications Policy**" (SMOCP), a copy of which is attached to this corrected Complaint as Attachment G and is incorporated herein in its entirety.

      (a)      The SMOCP states, inter alia:

Most of us rely on online resources such as email, social media, blogs, and wikis to stay connected.

It's your decision whether or not to engage in these or other online communications. But keep in mind that Apple's policies and guidelines apply to any activities that affect your performance, the performance of other Apple employees, or Apple's business interests.

This is true even if you blog, tweet, write, post, comment, share visual or other media, or otherwise communicate online outside of work — even if you do not identify yourself as an Apple employee. So before you click or tap "send," keep these guidelines in mind:

- **Protect Apple's confidential information**. As we conduct business around the world, our competitive strategy requires us to keep Apple's intellectual property and proprietary information confidential. This includes non-public information such as the timing, pricing, and design of Apple products; Apple's overall business performance; and the layout of our stores (including back-of-house areas, which contain competitive business operations information, customer data, sales targets, and other proprietary information).

All Apple employees have an obligation to protect this information. Doing so respects the significant amount of time and energy Apple puts into introducing our customers to new products and new retail stores. For more information on confidentiality, see the Intellectual Property Agreement you signed when you were hired. You can also learn more about protecting Apple's assets and confidential information in Apple's Business Conduct Policy.

[…]

Nothing in these guidelines should be interpreted as restricting your right to speak freely about your wages, hours, or working conditions.

10.     Since at least April 13, 2021, Respondent has maintained a "**Confidentiality Obligations Upon Termination of Employment Policy**" (COTEP), a copy of which is attached to this corrected Complaint as Attachment H and is incorporated herein in its entirety.

(a)     The COTEP states, inter alia:

During your employment, you had access to proprietary information of Apple Inc. and its subsidiaries (Apple). Examples of such proprietary information means all information not generally known outside Apple and/or kept confidential by Apple including for example and without limitation (a) trade secrets, R&D records, reports, samples, manuals plans, specifications, inventions, ideas, designs, prototypes, software, source code, or any other materials or information relating to past, existing, and future products and services whether or not developed, marketed, used, or rejected by Apple or persons or companies dealing with Apple; (b) sales, profits, organization, customer lists, pricing, sources of material, supply, costs, manufacturing, financials, forecasts, budgets, market research, marketing or advertising plans, or any other information relating to business operations or affairs of Apple or persons or companies dealing with Apple; (c) the employment and personnel information of Apple, such as compensation, training, recruiting, and other human resource information. You may have created such information in the course of your everyday work. You may have additionally had access to proprietary information in the course of your work at Apple obtained by third parties including subsidiaries, affiliates, vendors, suppliers, customers, consultants, licensees, and dealers. You are obligated not to disclose any above described proprietary information to any other person or company (other than with Apple's prior consent) or use it for your own benefit. Furthermore you are obligated to have returned to Apple all documents and materials of any kind pertaining to your work at Apple and containing any proprietary information.

Certainly Apple has no desire to prevent you from the lawful exercise of your professional skills. However, any unauthorized disclosure or use of Apple proprietary information in conjunction with your new employment— or otherwise—would be a breach of your agreement with Apply, as well as a violation of the laws relating to the protection of such information. Your obligations continue until such time as the proprietary information is generally available to the public.

[…]

If you have any questions regarding the Confidentiality and Intellectual Property Agreement, if you are concerned about the use or disclosure of proprietary information, or if you should find yourself in a position where you are uncertain about whether an idea or invention should have been disclosed to Apple, please promptly contact the *Apple IP Transactions Department* at [redacted] and we will be pleased to review the matter with you.

11.    Since at least April 13, 2021, Respondent has maintained a "**Checklist for Employees Leaving Apple**" (Checklist), a copy of which is attached to this corrected Complaint as Attachment I and is incorporated herein in its entirety.

        (a)    The Checklist states, inter alia:

        Confidentiality: As a reminder, you are expected to continue to abide by the provisions of the Intellectual Property Agreement after your employment with Apple ends. Examples include but are not limited to unreleased product information, new product schedules, budgets, marketing plans, organization charts, customer lists, and vendor contacts.

12.    By the conduct described above in paragraphs 3, 4(a), 4(c), 5(a), 5(c) – 5(p), and 6 – 11, Respondent has been interfering with, restraining, and coercing employees in the exercise of the rights guaranteed in Section 7 of the Act in violation of Section 8(a)(1) of the Act.

13.    The unfair labor practices of Respondent described above affect commerce within the meaning of Section 2(6) and (7) of the Act.

**WHEREFORE,** as part of the remedy for the unfair labor practices alleged above, the General Counsel seeks an Order requiring:

- Respondent to physically and electronically post, and electronically distribute to all current and former employees employed by Respondent at any time since April 13, 2021 at all its facilities in the United States and its Territories, any Notice that may issue in these proceedings if Respondent customarily uses electronic means such as an electronic bulletin board, e-mail, website, text messaging, internal apps, or intranet to communicate with those employees.

The General Counsel further seeks all other relief as may be just and proper to remedy the unfair labor practices alleged.

## ANSWER REQUIREMENT

Respondent is notified that, pursuant to Sections 102.20 and 102.21 of the Board's Rules

and Regulations, it must file an answer to the corrected complaint. The answer must be **<u>electronically filed with this office on or before Thursday, October 17, 2024</u>.** Respondent also must serve a copy of the answer on each of the other parties.

The answer must be filed electronically through the Agency's website. To file electronically, go to [www.nlrb.gov](www.nlrb.gov), click on **E-File Documents**, enter the NLRB Case Number, and follow the detailed instructions. Responsibility for the receipt and usability of the answer rests exclusively upon the sender. Unless notification on the Agency's website informs users that the Agency's E-Filing system is officially determined to be in technical failure because it is unable to receive documents for a continuous period of more than 2 hours after 12:00 noon (Eastern Time) on the due date for filing, a failure to timely file the answer will not be excused on the basis that the transmission could not be accomplished because the Agency's website was off-line or unavailable for some other reason. The Board's Rules and Regulations require that an answer be signed by counsel or non-attorney representative for represented parties or by the party if not represented. See Section 102.21. If the answer being filed electronically is a pdf document containing the required signature, no paper copies of the answer need to be transmitted to the Regional Office. However, if the electronic version of an answer to a complaint is not a pdf file containing the required signature, then the E-filing rules require that such answer containing the required signature continue to be submitted to the Regional Office by traditional means within three (3) business days after the date of electronic filing. Service of the answer on each of the other parties must still be accomplished by means allowed under the Board's Rules and Regulations. The answer may not be filed by facsimile transmission. If no answer is filed, or if an answer is filed untimely, the Board may find, pursuant to a Motion for Default Judgment, that the allegations in the corrected complaint are true.

14

## NOTICE OF HEARING

PLEASE TAKE NOTICE THAT on **January 22, 2025, at 9:00 a.m.** at the National Labor Relations Board, Region 21, 312 N. Spring Street, 10th Floor, Los Angeles, CA, and on consecutive days thereafter until concluded, a hearing will be conducted before an administrative law judge of the National Labor Relations Board.  At the hearing, Respondent and any other party to this proceeding have the right to appear and present testimony regarding the allegations in this complaint.  The procedures to be followed at the hearing are described in the attached Form NLRB-4668.  The procedure to request a postponement of the hearing is described in the attached Form NLRB-4338.

Dated:  October 3, 2024

Nathan Seidman, Acting Regional Director
National Labor Relations Board, Region 21
US Court House, Spring Street
312 North Spring Street, 10th Floor
Los Angeles, CA 90012

Attachments

15

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 21**

APPLE, INC.                                        Case    32-CA-284428

    **and**

ASHLEY GJOVIC, an Individual

<u>**COMPLAINT AND NOTICE OF HEARING**</u>

    This Complaint and Notice of Hearing is based on a charge filed by Ashley Gjovik ("Charging Party" or "Gjovik").  It is issued pursuant to Section 10(b) of the National Labor Relations Act (the Act), 29 U.S.C. § 151 et seq., and Section 102.15 of the Rules and Regulations of the National Labor Relations Board (the Board) and alleges that Apple, Inc. ("Respondent"), has violated the Act as described below.

    1.    The charge was filed by Gjovik on October 12, 2021, and a copy was served on Respondent by U.S. mail on October 13, 2021.

    2.    (a)    At all times reasonably encompassed by this complaint and any answer Respondent may file, i.e., all material times, Respondent, a California corporation with a headquarters at One Apple Park Way, Cupertino, CA and retail facilities throughout the U.S., has been engaged in the development, manufacture, and retail sale of consumer electronics and software.

        (b)    Annually, in the course and conduct of its operations, Respondent derives gross revenues in excess of $500,000, and purchased and received at its California facilities products, goods and materials valued in excess of $5,000 directly from points outside the State of California.

(c)     At all times reasonably encompassed by this complaint and any

answer Respondent may file, i.e., all material times, Respondent has been an employer

engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.

3.     Since at least April 13, 2021, in a **Frequently Asked Questions** page on its intranet,

a copy of which is attached to this Complaint as Attachment A and is incorporated herein in its

entirety, Respondent has defined confidential information as follows:

> Apple Confidential information is anything not explicitly, publicly, or
> purposefully disclosed by Apple. Examples of Apple Confidential
> information include unannounced products (including their release dates,
> pricing, and specifications), unannounced sales promotions, certain
> AppleWeb announcements, organizational charts, financial forecasts, and
> customer information.

4.     Since at least April 13, 2021, Respondent has maintained a "**Confidentiality and**

**Intellectual Property Agreement**" (IPA), a copy of which is attached to this Complaint as

Attachment B and is incorporated herein in its entirety.

(a)     Under the section heading "**I.   Confidential and Proprietary**

**Information**," the IPA states, inter alia:

> You understand that your employment by Apple creates a relationship of
> confidence and trust with respect to any confidential, proprietary, or non-
> public information that may be disclosed to you or otherwise learned by you
> in the course of employment at Apple, including but not limited to any
> confidential information of third parties disclosed to Apple. As referred to
> herein, "Proprietary information" means all information not generally
> known outside Apple and/or kept confidential by Apple, including for
> example but not limited to (a) trade secrets, R&D records, reports, samples,
> manuals, plans, specifications, inventions, ideas, designs, prototypes,
> software, source code, or any other materials or information relating to past,
> existing, and future products and services whether or not developed,
> marketed, used, or rejected by Apple or persons or companies dealing with
> Apple; (b) sales, profits, organization, customer lists, pricing, sources of
> material, supply, costs, manufacturing, financials, forecasts, market
> research, or any other information relating to the business operations or
> affairs of Apple or persons or companies dealing with Apple; and (c) the
> employment and personnel information of Apple, such as compensation,
> training, recruiting, and other human resources information.

(249 of 414), Page 249 of 414
Case: 25-2028, 05/20/2025, DktEntry: 27.6, Page 249 of 414
Case 3:23-cv-04597-EMC  Document 111  Filed 09/30/24  Page 8 of 28

(b)    There is a footnote at the end of the paragraph quoted above that states:

Nothing in this Agreement should be interpreted as restricting your rights to speak freely about your wages, hours, or working conditions as legally permitted.

(c)    Under the section heading "**I. Confidential and Proprietary Information**," the IPA further states:

**A. Treatment of Proprietary Information**. You understand and agree that your employment by Apple prohibits you, during or after employment, from using or disclosing, or permitting any other person or entity to use or disclose, any Proprietary Information without the written consent of Apple, except as necessary to perform your duties as an employee of Apple. You understand and agree to strictly comply with all of Apple's rules and policies regarding Proprietary Information and use best efforts to safeguard such Proprietary Information and protect it against disclosure, misuse, loss, or theft. Upon termination of employment with Apple, you will promptly deliver to Apple all documents and materials of any kind pertaining to your work at Apple, and you agree that you will not take with you any documents, materials, or copies thereof, whether on paper or any other medium, containing any Proprietary Information.

5.    Since at least April 13, 2021, Respondent has maintained a **Business Conduct Policy** (BCP), and since at least April 13, 2021, Respondent has maintained as part of the BCP the rules and provisions set forth below. A copy of the 2020 version of the BCP is attached to this Complaint as Attachment C and is incorporated herein in its entirety.

(a)    Under the section heading "**The Way We Do Business Worldwide**," the BCP states, inter alia:

**Your Responsibilities and Obligation to Take Action**

Everything we do is a reflection of Apple. We expect you to:

- **Follow the Policy**. Comply with the letter and spirit of Apple's Business Conduct Policy and all applicable legal requirements.

- **Speak up**. If you see or hear of any violation of Apple's Business Conduct Policy, other Apple policies, or legal or regulatory requirements, you must notify either your manager, People Team, Legal, or Business Conduct.

3

- **Use good judgment and ask questions**. Apply Apple's principles of business conduct, and review our policies and legal requirements. When in doubt about how to proceed, discuss it with your manager, your People Business Partner, Legal, or Business Conduct. Any failure to comply with Apple's Business Conduct Policy—or failure to report a violation—may result in disciplinary action, up to and including termination of employment.

You are also required to fully cooperate in any Apple investigation, and keep any information shared with you confidential to safeguard the integrity of the investigation.

(b)     Under the section heading "**The Way We Do Business Worldwide**," the

2020 BCP further states:

**Your Rights as an Employee**

While we expect employees to follow the Business Conduct Policy, nothing in this Policy should be interpreted as being restrictive of your right to speak freely about your wages, hours, or working conditions.

In the August 2022 BCP, this subsection was modified to read as follows:

**Your Rights as an Employee**

You are permitted to speak freely about your wages, hours, and working conditions, including information about harassment, discrimination, or any other conduct you have reason to believe is unlawful, and nothing in this Policy, or any Apple policy, should be interpreted as being restrictive of your right to do so.

(c)     Under the section heading "**Protecting Apple**," the BCP states:

**Protecting Apple's Assets and Information**

You play a key role in helping us protect Apple. Assets include Apple's proprietary information (such as intellectual property, confidential business plans, unannounced product plans, sales and marketing strategies, and other trade secrets), as well as physical assets such as cash, equipment, supplies and product inventory.

- **Watch what you say**. Being aware of where you are, who is around you, and what they might see or overhear is an important way we all protect Apple's secrets.

- **Protect our assets**. Keep track of the assets and information Apple has entrusted you, and prevent loss, misuse, waste, or theft.

- **Set an example**. Model behavior that protects our assets and information at all times.

(d)       Under the section heading "**Protecting Apple**," the BCP further states:

**Apple Confidential Information**

One of our greatest assets is information about our products and services, including future product offerings. Never disclose confidential, operational, financial, trade-secret, or other business information without verifying with your manager whether such disclosure is appropriate. We are very selective when disclosing this type of information to vendors, suppliers, or other third parties, and only do so once a non-disclosure agreement is in place. Even with Apple, confidential information should only be shared on a need-to-know basis. The Intellectual Property Agreement that you signed when you joined Apple outlines your duty to protect our information.

For more information, visit the Global Security website.

(e)       Under the section heading "**Protecting Apple**," the BCP further states:

**Non-Disclosure/Confidentiality Agreements**

Never share confidential information about Apple's products or services without your manager's approval. When there is a business need to share confidential information with a supplier, vendor, or other third party, never volunteer more than what is necessary to address the business at hand. Any confidential information shared outside Apple should be covered by a non-disclosure/confidentiality agreement (NDA). Contact Legal in your region to obtain an NDA. In the United States, you can find NDA information and support on the Legal website.

(f)       Under the section heading "**Protecting Apple**," the BCP further states:

**Accuracy of Records and Reports**

Accurate and honest records are critical to meeting our legal, financial, and management obligations. You should ensure that all records and reports, including timecards, customer information, technical and product information, correspondence, and public communications are comprehensive, fair, accurate, timely, and understandable.

Do not misstate facts, omit critical information, or modify records or reports in any way to mislead others, and never assist others in doing so. Intentional manipulation of Apple records is a form of fraud.

(g)       Under the section heading "**Protecting Apple**," the BCP further states:

**Public Speaking and Press Inquiries**

All public or outside speaking engagements that relate to Apple's business or products must be pre-approved by your manager and Corporate Communications. If your request is approved, you may not request or accept any form of personal compensation from the organization that requested your participation, but you may accept reimbursement for incurred expenses. All inquiries from the media, industry, or financial analyst community must be referred to Corporate Communications or Investor Relations.

(h)     Under the section heading "**Protecting Apple,**" the BCP further states:

**Publishing Articles**

If you want to contribute an article or other type of submission to a publication or blog on a topic that relates to Apple's business or products or could be seen as a conflict of interest, you must first request approval from Corporate Communications. If your contribution is technical or academic and relates to Apple, complete the Academic and Industry-Related Activities Questionnaire to obtain review from Legal and Business Conduct. If your contribution is determined to be a conflict of interest, you will need to get senior vice president approval. For additional information, see the Social Media and Online Communications guidelines.

(i)     Under the section heading "**Individual Accountability,**" the BCP states:

**Avoiding Conflicts of Interest**

A conflict of interest is any activity that may damage Apple's reputation or financial interests, or gives the appearance of impropriety or divided loyalty. Avoid any situation that creates a real or perceived conflict of interest. If you are unsure about a potential conflict, talk to your manager, Business Conduct, or your People Business Partner.

(j)     Under the section heading "**Individual Accountability,**" the BCP further states:

**Conflicts of Interest and Outside Activities**

You may participate in outside activities, including secondary employment, businesses, inventions, and serving on boards, only if they do not present a conflict of interest and you adhere to the rules set out below.

Apple generally considers an outside activity to be a conflict of interest if it:

[…]

6

- Would require you to disclose or use confidential Apple information.

[…]

- Arises from your role in Apple's business relationship with the organization.

(k)     Under the sub-heading "**Conflicts of Interest and Outside Activities**," the

BCP further states:

> Work with your manager and Business Conduct to evaluate a potential conflict of interest. If an outside activity presents a conflict of interest, you must partner with a People Business Partner, and obtain written approval from your manager, Legal (if applicable), and the senior most person reporting to the CEO of both your and any relevant organizations. Contact Business Conduct to assist with Legal review.

(l)     Under the sub-heading "**Conflicts of Interest and Outside Activities**," the

BCP further states:

> Any employee, full or part-time, who is participating in an outside activity, must comply with the following rules. **Do not:**

- Use any time at work or any Apple assets for your outside activity. This includes Apple's workspace, phones, computers, internet access, photocopiers, and any other Apple assets or services.

[…]

- Use confidential Apple information.

(m)     Under the section heading "**Individual Accountability**," the BCP further

states:

**Outside Employment and Inventions**

Before participating in creating inventions or businesses that are in the same area as your work for Apple, or that compete with or relate to Apple's present or reasonably anticipated business, products or services, you must have written permission from your manager and the senior vice president of your organization. Before taking any paid employment outside of Apple, you should notify your manager. Visit the Conflicts of Interest page for more information on what would be considered a conflict.

(n)     Under the section heading "**Business Integrity**," the BCP states:

7

**Private Employee Information**

You should never share a coworker or prospective employee's personal information. This includes information regarding their employment history, personal contact information, compensation, health information, or performance and disciplinary matters. Any Legal or business need-to-know exceptions should be approved by your manager and Legal.

(o)     Under the section heading "**Business Integrity**," the BCP further states:

As an Apple employee, you should understand that subject to local laws and regulations and in accordance with Apple's review process, we may do one of the following when you access Apple's network or systems, or use any device, regardless of ownership, to conduct Apple business:

- Access, search, monitor, and archive all data and messages sent, accessed, viewed, or stored (including those from iCloud, Messages, or other personal accounts).

- Conduct physical, video, or electronic surveillance, search your workspace (e.g. file cabinets, desk drawers, and offices, even if locked), review phone records, or search any non-Apple property (e.g. backpacks, handbags) while on company premises.

- Disclose to law enforcement, without prior notice, any information discovered during a search that may indicate unlawful behavior.

(p)     Under the section heading "**Business Integrity**," the BCP further states:

While limited personal use of Apple equipment and systems is allowed, Apple may monitor equipment and systems. You should not have any expectation about the privacy of content or personal information on Apple systems or networks, including VPN. To learn more, read our Information Security Policies and guidance on Personal Information Privacy on the People site, which explain Apple's rights and your rights when conducting Apple business or using Apple-provided equipment. For more information, contact the Privacy team.

6.      Since at least April 13, 2021, Respondent has maintained an "**About Workplace Policies**" (AWP) page on its intranet, a copy of which is attached to this Complaint as Attachment D and is incorporated herein in its entirety.

(a)     Under the section heading "**Important points to know**," the AWP states, inter alia:

- If you have knowledge of a possible violation of Apple's Business Conduct Policy (PDF), any other Apple policy, or legal or regulatory requirements, you must notify your manager, your People Business Partner, People Support, or the Business Conduct Helpline.

7.      Since at least April 13, 2021, Respondent has maintained a **Workplace Searches and Privacy Policy** (WSPP), a copy of which is attached to this Complaint as Attachment E and is incorporated herein in its entirety.

(a)      The first paragraph of the WSPP states:

In order to protect Apple confidential and sensitive information and maintain the security and integrity of our networks and equipment, any use of Apple property, as well as use of your personal devices for Apple business or for accessing Apple networks, is subject to this policy.

(b)      Under the section heading "**Use of Apple systems and data**," the WSPP states:

All Apple facilities, furnishings, supplies, equipment, networks, and electronic systems (such as internet and intranet access, voicemail, email, instant messaging, and collaboration tools) are company property and are provided to conduct Apple business. Personal use is permitted as long as such use is reasonable and doesn't interfere with normal business activities. It must also not affect your performance, violate Apple policies and practices, or applicable local laws.

Generally, you should use Apple equipment to conduct Apple business. If you use your personal property to conduct Apple business (such as computers, data storage devices, mobile devices, and so on), or to access Apple networks, you must act in accordance with Apple policies. In addition, your property may be subject to search and the Apple-related content may be removed.

(c)      Under the section heading "**Workplace searches**," the WSPP states:

Only in cases where allowed under local law, Apple may:

- Access, search, monitor, archive, and delete Apple data stored on all of its property, as well as non-Apple property, if used for Apple business or if used for accessing Apple data, servers, or networks. This includes all data and messages sent, accessed, viewed, or stored (including those from iCloud, Messages, or other personal accounts) using Apple equipment, networks, or systems.

9

- Conduct physical, video, or electronic surveillance, search your workspace such as file cabinets, desks, and offices (even if locked), review phone records, or search any non-Apple property (such as backpacks, purses) on company premises.

This means that you have no expectation of privacy when using your or someone else's personal devices for Apple business, when using Apple systems or networks, or when on Apple premises.

The search or removal of Apple-related content on a device will be determined on a case-by-case basis when there is a business need and subject to local approval processes. Refusing to permit a search or removal of Apple-related content may result in disciplinary action up to and including termination of employment.

8.      Since at least April 13, 2021, Respondent has maintained a "**Misconduct and Discipline Policy**" (MDP), a copy of which is attached to this Complaint as Attachment F and is incorporated herein in its entirety.

(a)     Under the section heading "**Conduct warranting immediate termination**," the MDP states, inter alia:

Conduct that may warrant immediate termination of employment includes, but isn't limited to:

**Policy violations**

- Violating confidential, proprietary, and trade secret information obligations (including those stated in Apple's Intellectual Property Agreement).

- Using Apple time, materials, facilities, equipment, or electronic resources for purposes unrelated to Apple business without your manager's express permission

(b)     Under the section heading "**Conduct warranting immediate termination**," the MDP further states:

**Other violations**

- Video or audio recording others without their prior consent. Apple may use recording or surveillance equipment for safety or security reasons.

10

- Photography at any Apple facility or home office or during meetings at any location where Apple confidential information could be compromised.

9.      Since at least April 13, 2021, Respondent has maintained a "**Social Media and Online Communications Policy**" (SMOCP), a copy of which is attached to this Complaint as Attachment G and is incorporated herein in its entirety.

(a)      The SMOCP states, inter alia:

Most of us rely on online resources such as email, social media, blogs, and wikis to stay connected.

It's your decision whether or not to engage in these or other online communications. But keep in mind that Apple's policies and guidelines apply to any activities that affect your performance, the performance of other Apple employees, or Apple's business interests.

This is true even if you blog, tweet, write, post, comment, share visual or other media, or otherwise communicate online outside of work — even if you do not identify yourself as an Apple employee. So before you click or tap "send," keep these guidelines in mind:

- **Protect Apple's confidential information**. As we conduct business around the world, our competitive strategy requires us to keep Apple's intellectual property and proprietary information confidential. This includes non-public information such as the timing, pricing, and design of Apple products; Apple's overall business performance; and the layout of our stores (including back-of-house areas, which contain competitive business operations information, customer data, sales targets, and other proprietary information).

All Apple employees have an obligation to protect this information. Doing so respects the significant amount of time and energy Apple puts into introducing our customers to new products and new retail stores. For more information on confidentiality, see the Intellectual Property Agreement you signed when you were hired. You can also learn more about protecting Apple's assets and confidential information in Apple's Business Conduct Policy.

[…]

Nothing in these guidelines should be interpreted as restricting your right to speak freely about your wages, hours, or working conditions.

10.    Since at least April 13, 2021, Respondent has maintained a "**Confidentiality Obligations Upon Termination of Employment Policy**" (COTEP), a copy of which is attached to this Complaint as Attachment H and is incorporated herein in its entirety.

(a)    The COTEP states, inter alia:

During your employment, you had access to proprietary information of Apple Inc. and its subsidiaries (Apple). Examples of such proprietary information means all information not generally known outside Apple and/or kept confidential by Apple including for example and without limitation (a) trade secrets, R&D records, reports, samples, manuals plans, specifications, inventions, ideas, designs, prototypes, software, source code, or any other materials or information relating to past, existing, and future products and services whether or not developed, marketed, used, or rejected by Apple or persons or companies dealing with Apple; (b) sales, profits, organization, customer lists, pricing, sources of material, supply, costs, manufacturing, financials, forecasts, budgets, market research, marketing or advertising plans, or any other information relating to business operations or affairs of Apple or persons or companies dealing with Apple; (c) the employment and personnel information of Apple, such as compensation, training, recruiting, and other human resource information. You may have created such information in the course of your everyday work. You may have additionally had access to proprietary information in the course of your work at Apple obtained by third parties including subsidiaries, affiliates, vendors, suppliers, customers, consultants, licensees, and dealers. You are obligated not to disclose any above described proprietary information to any other person or company (other than with Apple's prior consent) or use it for your own benefit. Furthermore you are obligated to have returned to Apple all documents and materials of any kind pertaining to your work at Apple and containing any proprietary information.

Certainly Apple has no desire to prevent you from the lawful exercise of your professional skills. However, any unauthorized disclosure or use of Apple proprietary information in conjunction with your new employment— or otherwise—would be a breach of your agreement with Apply, as well as a violation of the laws relating to the protection of such information. Your obligations continue until such time as the proprietary information is generally available to the public.

[…]

If you have any questions regarding the Confidentiality and Intellectual Property Agreement, if you are concerned about the use or disclosure of proprietary information, or if you should find yourself in a position where you are uncertain about whether an idea or invention should have been

disclosed to Apple, please promptly contact the *Apple IP Transactions Department* at [redacted] and we will be pleased to review the matter with you.

11.     Since at least April 13, 2021, Respondent has maintained a "**Checklist for Employees Leaving Apple**" (Checklist), a copy of which is attached to this Complaint as Attachment I and is incorporated herein in its entirety.

      (a)     The Checklist states, inter alia:

      Confidentiality: As a reminder, you are expected to continue to abide by the provisions of the Intellectual Property Agreement after your employment with Apple ends. Examples include but are not limited to unreleased product information, new product schedules, budgets, marketing plans, organization charts, customer lists, and vendor contacts.

12.     By the conduct described above in paragraphs 3, 4(a), 4(c), 5(a), 5(c) – 5(p), and 6 – 11, Respondent has been interfering with, restraining, and coercing employees in the exercise of the rights guaranteed in Section 7 of the Act in violation of Section 8(a)(1) of the Act.

13.     The unfair labor practices of Respondent described above affect commerce within the meaning of Section 2(6) and (7) of the Act.

**WHEREFORE,** as part of the remedy for the unfair labor practices alleged above, the General Counsel seeks an Order requiring:

- Respondent to physically and electronically post, and electronically distribute to all current and former employees employed by Respondent at any time since April 13, 2021 at all its facilities in the United States and its Territories, any Notice that may issue in these proceedings if Respondent customarily uses electronic means such as an electronic bulletin board, e-mail, website, text messaging, internal apps, or intranet to communicate with those employees.

The General Counsel further seeks all other relief as may be just and proper to remedy the unfair labor practices alleged.

## ANSWER REQUIREMENT

Respondent is notified that, pursuant to Sections 102.20 and 102.21 of the Board's Rules and Regulations, it must file an answer to the complaint.  The answer must be **electronically filed with this office on or before Friday, October 11, 2024.**  Respondent also must serve a copy of the answer on each of the other parties.

The answer must be filed electronically through the Agency's website.  To file electronically, go to www.nlrb.gov, click on **E-File Documents**, enter the NLRB Case Number, and follow the detailed instructions.  Responsibility for the receipt and usability of the answer rests exclusively upon the sender.  Unless notification on the Agency's website informs users that the Agency's E-Filing system is officially determined to be in technical failure because it is unable to receive documents for a continuous period of more than 2 hours after 12:00 noon (Eastern Time) on the due date for filing, a failure to timely file the answer will not be excused on the basis that the transmission could not be accomplished because the Agency's website was off-line or unavailable for some other reason.  The Board's Rules and Regulations require that an answer be signed by counsel or non-attorney representative for represented parties or by the party if not represented. See Section 102.21.  If the answer being filed electronically is a pdf document containing the required signature, no paper copies of the answer need to be transmitted to the Regional Office.  However, if the electronic version of an answer to a complaint is not a pdf file containing the required signature, then the E-filing rules require that such answer containing the required signature continue to be submitted to the Regional Office by traditional means within three (3) business days after the date of electronic filing.  Service of the answer on each of the other parties must still be accomplished by means allowed under the Board's Rules and Regulations.  The answer may not be filed by facsimile transmission.  If no answer is filed, or if

14

an answer is filed untimely, the Board may find, pursuant to a Motion for Default Judgment, that the allegations in the complaint are true.

## **NOTICE OF HEARING**

PLEASE TAKE NOTICE THAT on **January 22, 2025, at 9:00 a.m.** at the National Labor Relations Board, Region 21, 312 N. Spring Street, 10th Floor, Los Angeles, CA, and on consecutive days thereafter until concluded, a hearing will be conducted before an administrative law judge of the National Labor Relations Board.  At the hearing, Respondent and any other party to this proceeding have the right to appear and present testimony regarding the allegations in this complaint.  The procedures to be followed at the hearing are described in the attached Form NLRB-4668.  The procedure to request a postponement of the hearing is described in the attached Form NLRB-4338.

Dated:  September 27, 2024

William B. Cowen
Regional Director, Region 21
National Labor Relations Board
US Court House, Spring Street
312 N Spring Street, 10th Floor
Los Angeles, CA 90012

Attachments

15

(262 of 414), Page 262 of 404
Case: 25-2028, 05/20/2025, DktEntry: 27.6, Page 262 of 414
Case 3:23-cv-04597-EMC Document 111 Filed 09/30/24 Page 21 of 28

FORM NLRB 4338
(6-90)

**UNITED STATES GOVERNMENT**
**NATIONAL LABOR RELATIONS BOARD**
**NOTICE**

Case 32-CA-284428

The issuance of the notice of formal hearing in this case does not mean that the matter cannot be disposed of by agreement of the parties. On the contrary, it is the policy of this office to encourage voluntary adjustments. The examiner or attorney assigned to the case will be pleased to receive and to act promptly upon your suggestions or comments to this end.

An agreement between the parties, approved by the Regional Director, would serve to cancel the hearing. However, unless otherwise specifically ordered, the hearing will be held at the date, hour, and place indicated. Postponements **will not be granted** unless good and sufficient grounds are shown **and** the following requirements are met:

(1) The request must be in writing. An original and two copies must be filed with the Regional Director when appropriate under 29 CFR 102.16(a) or with the Division of Judges when appropriate under 29 CFR 102.16(b).

(2) Grounds must be set forth in **detail**;

(3) Alternative dates for any rescheduled hearing must be given;

(4) The positions of all other parties must be ascertained in advance by the requesting party and set forth in the request; and

(5) Copies must be simultaneously served on all other parties (listed below), and that fact must be noted on the request.

Except under the most extreme conditions, no request for postponement will be granted during the three days immediately preceding the date of hearing.

Tim Cook, Chief Executive Officer
Apple, Inc.
One Apple Park Way
Cupertino, CA 95014
tcook@apple.com

Christopher Foster, Attorney at Law
McDermott Will & Emory LLP
415 Mission Street, Suite 5600
San Francisco, CA 94105
cfoster@mwe.com

Syed Mannan, Attorney at Law
McDermott Will & Emery LLP
415 Mission Street, Suite 5600
San Francisco, CA 94105
smannan@mwe.com

Crystal S. Carey, Attorney at Law
Morgan, Lewis & Bockius, LLP
101 Park Avenue
New York, NY 10178
crystal.carey@morganlewis.com

Brian Mahoney, Attorney at Law
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921
brian.mahoney@morganlewis.com

Kelcey J. Phillips, Attorney at Law
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Ave
Washington, DC 20004
kelcey.phillips@morganlewis.com

(continue' s next page)

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
REGION 21

APPLE INC.

   and

                                    Cases 32-CA-282142
                                            32-CA-283161

ASHLEY MARIE GJØVIK, an Individual

## ANSWER TO CONSOLIDATED COMPLAINT

Pursuant to Sections 102.20 and 102.21 of the Rules and Regulations of the National Labor Relations Board ("NLRB" or "Board"), Apple Inc. ("Apple" or "Respondent"), through its undersigned counsel, submits the following Answer to the Consolidated Complaint ("Complaint") according to the Complaint's numbered paragraphs. To the extent the Complaint's introduction contains allegations and legal conclusions, each and every one is denied.

## RESPONSES TO SPECIFIC ALLEGATIONS

1.     (a)    The original charge in Case 32-CA-282142 was filed by the Charging Party on August 26, 2021, and a copy was served on Respondent by U.S. mail on August 30, 2021.

          (b)    The amended charge in Case 32-CA-282142 was filed by the Charging Party on April 1, 2022, and a copy was served on Respondent by U.S. mail on April 4, 2022.

          (c)    The charge in Case 32-CA-283161 was filed by the Charging Party on September 16, 2021, and a copy was served on Respondent by U.S. mail on September 20, 2021.

**Response:**

On information and belief, Apple admits the allegations of Paragraph 1(a).

On information and belief, Apple admits the allegations of Paragraph 1(b).

On information and belief, Apple admits the allegations of Paragraph 1(c).

Apple denies each and every remaining allegation and legal conclusion contained in Paragraphs 1(a), 1(b), and 1(c).

2.      (a)      At all times, Respondent, a California corporation with a headquarters at One Apple Park Way, Cupertino, California has retail facilities throughout the United States, has been engaged in the development, manufacture, and retail sale of consumer electronics and software.

        (b)      Annually, in the course and conduct of its operations, Respondent derives gross revenues in excess of $500,000, and purchased and received at its California facilities products, goods and materials valued in excess of $5,000 directly from points outside the State of California.

**Response:**

Apple admits the allegations of Paragraph 2(a).

Apple admits the allegations of Paragraph 2(b).

Apple denies each and every remaining allegation and legal conclusion contained in Paragraphs 2, 2(a), and 2(b).

3.      At all material times, Respondent has been an employer engaged in commerce within the meaning of Sections 2(2), (6), and (7) of the Act.

**Response:** Apple admits the allegations of Paragraph 3.

4.      At all material times, the following individuals held the positions set forth opposite their respective names and have been supervisors of Respondent within the meaning of Section 2(11) of the Act or agents of Respondent within the meaning of Section 2(13) of the Act:

Jenna Waibel          Corporate Employee Relations Representative

2

| | |
|---|---|
| David Powers | Software Development Engineering Director |
| Ekelemchi Okpo | Corporate Employee Relations Representative |

**Response:**

Because "material times" is not defined in the Complaint, Apple is without a basis to respond to any and all allegations set forth in Paragraph 4 relating to "material times" and therefore denies that allegation.

Apple admits that Jenna Waibel was an Employee Relations representative until approximately April 2024. Apple admits that Waibel was a supervisor within the meaning of Section 2(11) of the Act from approximately summer 2021 until approximately April 2024. Apple admits that during her employment Waibel was an agent of Apple within the meaning of Section 2(13) of the Act for some, but not all, purposes. Apple denies each and every remaining allegation and legal conclusion contained in Paragraph 4 relating to Waibel.

Apple admits that David Powers is a Director. Apple admits that Powers is a supervisor within the meaning of Section 2(11) of the Act. Apple admits that Powers is an agent of Apple within the meaning of Section 2(13) of the Act for some, but not all, purposes. Apple denies each and every remaining allegation and legal conclusion contained in Paragraph 4 relating to Powers.

Apple admits that Ekelemchi Okpo is an Employee Relations Partner. Apple admits that Okpo is an agent of Apple within the meaning of Section 2(13) of the Act for some, but not all, purposes. Apple denies each and every remaining allegation and legal conclusion contained in Paragraph 4 relating to Okpo.

Apple denies each and every remaining allegation and legal conclusion contained in Paragraph 4.

5.      About March 22, 2021, Respondent, by David Powers, by telephone:

3

      (a)    Directed employees to refrain from talking about workplace environmental health and safety concerns with other employees.

      (b)    Impliedly threatened employees with discipline by telling employees that the instruction to refrain from talking about workplace environmental health and safety concerns with other employees, was a warning.

**Response:**

Apple denies each and every allegation and legal conclusion contained in Paragraphs 5 and 5(a).

Apple denies each and every allegation and legal conclusion contained in Paragraphs 5 5(b).

Apple denies each and every remaining allegation and legal conclusion in Paragraphs 5, 5(a), and 5(b).

6.    About April 27, 2021, Respondent, by Jenna Waibel:

      (a)    By telephone, told employees to use the following five-point balancing test in advance of communicating workplace health and safety concerns to other employees:

    ○    make sure the information is complete

    ○    make sure the information is accurate

    ○    that it does not cause panic

    ○    that it does not make an assessment about safety; and

    ○    that people talk to the Employer's Environmental Health and Safety (EHS) department directly.

(b)    By email, told employees that when discussing terms and conditions of employment, they should ensure that the information shared was as accurate and complete as possible.

(c)    By email, told employees to refrain from discussing their terms and conditions of employment by telling employees to first communicate their workplace health and safety concerns directly with Respondent.

**Response:**

Apple denies each and every allegation and legal conclusion contained in Paragraphs 6 and 6(a).

Apple denies each and every allegation and legal conclusion contained in Paragraphs 6 and 6(b).

Apple denies each and every allegation and legal conclusion contained in Paragraphs 6 and 6(c).

Apple denies each and every remaining allegation and legal conclusion in Paragraphs 6, 6(a), 6(b), and 6(c).


7.    Respondent, by Ekelemchi Okpo:

(a)    About August 4, 2021, during a video meeting, directed employees not to talk to other employees about Respondent's investigation of employees' workplace health and safety concerns.

(b)    About August 4, 2021, by email, told employees to refrain from sharing communications about Respondent's investigation into employees' workplace health and safety concerns.

(c)    About August 5, 2021, by email, told employees that he was "disappointed" that they "misrepresented" their discussion on August 4, 2021.

**Response:**

Apple denies each and every allegation and legal conclusion contained in Paragraphs 7 and 7(a).

Apple denies each and every allegation and legal conclusion contained in Paragraphs 6 and 7(b).

In response to Paragraph 7(c), Apple admits that Okpo wrote to Gjovik that he was "disappointed about you misrepresenting our discussion." Apple denies each and every remaining allegation and legal conclusion contained in Paragraphs 7 and 7(c).

Apple denies each and every remaining allegation and legal conclusion in Paragraphs 7, 7(a), 7(b), and 7(c).


8.    (a)    From about March 22, 2021, to about September 2021, Respondent's employee Gjøvik concertedly complained to Respondent regarding the wages, hours, and working conditions of Respondent's employees, by inter alia, raising workplace environmental health and safety concerns.

(b)    From about June 2021, to about September 2021, Respondent's employee Gjøvik engaged in concerted activities for the purposes of mutual aid and protection, by, inter alia, circulating a petition amongst employees regarding return-to-work concerns, talking to newspaper outlets about employees' workplace complaints and concerns, posting about workplace complaints and concerns on social media as well as on Respondent's Slack channel platform.

(c)    About August 4, 2021, Respondent suspended its employee Gjøvik.

(d)    About September 9, 2021, Respondent discharged its employee Gjøvik.

6

(e)     Respondent engaged in the conduct described above in paragraphs 8(c) and 8(d), because Gjøvik engaged in the conduct described above in paragraphs 8(a) and 8(b), and to discourage employees from engaging in these or other concerted activities.

**Response:**

Paragraph 8(a) states a legal conclusion to which no response is required. To the extent a response is required, Apple denies each and every allegation and legal conclusion set forth in Paragraphs 8 and 8(a).

Paragraph 8(b) states a legal conclusion to which no response is required. To the extent a response is required, Apple denies each and every allegation and legal conclusion set forth in Paragraphs 8 and 8(b).

Apple denies each and every allegation and legal conclusion contained in Paragraphs 8 and 8(c).

In response to Paragraph 8(d), Apple admits that it discharged Gjovik from employment effective September 10, 2021. Apple denies each and every remaining allegation and legal conclusion contained in Paragraphs 8 and 8(d).

Paragraph 8(e) states a legal conclusion to which no response is required. To the extent a response is required, Apple denies each and every allegation and legal conclusion set forth in Paragraphs 8 and 8(e).

Apple denies each and every remaining allegation and legal conclusion in Paragraphs 8, 8(a), 8(b), 8(c), 8(d), and 8(e).


9.     By the conduct described above in paragraphs 5 through 8 Respondent has been interfering with, restraining, and coercing employees in the exercise of the rights guaranteed in Section 7 of the Act in violation of Section 8(a)(1) of the Act.

7

**Response:**

Paragraph 9 states a legal conclusion to which no response is required. To the extent a response is required, Apple denies each and every allegation and legal conclusion set forth in Paragraph 9.

10.    The unfair labor practices of Respondent described above affect commerce within the meaning of Section 2(6) and (7) of the Act.

**Response:**

Paragraph 10 states a legal conclusion to which no response is required. To the extent a response is required, Apple denies each and every allegation and legal conclusion set forth in Paragraph 10.

Any and all remaining allegations contained in the Complaint are denied, along with each and every related legal conclusion.

## AFFIRMATIVE AND OTHER DEFENSES

1.    The Complaint fails to state a claim upon which relief can be granted.

2.    Under Section 10(c) of the National Labor Relations Act, Gjovik was discharged for cause and no order of the Board may require her reinstatement or the payment to her of any backpay.

3.    Gjovik failed to mitigate any alleged damages.

4.    Under a *de novo* interpretation of the Act, required by *Loper Bright v. Raimondo*, 603 U.S. ___, 144 S. Ct. 2244 (2024), the alleged statements by supervisors or agents of Apple identified in the Complaint are lawful.

5.      Under the Takings Clause in the Fifth Amendment of the United States Constitution, the relief sought in the Complaint, including but not limited to the deprivation of the Respondent's property rights in its own business communication systems, the surrender of those systems for Board agents to use for multiple government-conducted "training sessions", and compensation to an employee who is not entitled to such compensation, is a taking without just compensation.

6.      The Complaint interferes with the Respondent's rights under Section 8(c) of the Act and the First Amendment to the United States Constitution generally by forbidding Respondent, and its supervisors and agents from stating their views when Respondent's policies are criticized and even disparaged by employees, from responding to false statements, and from establishing its own internal communications protocols.

7.      Any finding of an unfair labor practice based in whole or in part on statements and/or publications disseminated by Apple or its agents in any meetings, one-on-one discussions, or written or other communications which "contains no threat of reprisal or force or promise of benefit" constitutes an unconstitutional infringement on the First Amendment rights of freedom of speech and the right of the people peaceably to assemble. Under the U.S. Supreme Court's decision in *Counterman v. Colorado*, 600 U.S. 66 (2023), the First Amendment requires that, for regulation of an alleged threat to be constitutionally permitted, it must be a "true threat" and the Government must demonstrate from the context of the statement that the author of the threat acted at least in reckless disregard of whether the subject might actually find it threatening. In this case, the NLRB has failed to plead any of the required elements required under *Counterman*, and even if it had, it could not prove them. The Board's attempts to regulate Apple's speech therefore exceeds the constitutional limits identified by the Supreme Court in *Counterman*.

8.      The remedies sought are further punitive, inappropriate, and non-remedial to the extent that they seek the posting and/or circulation of notices to employees outside of the facility where the charge originated, the reading of notices, require the preparation and transmission of so-called apology letters, and to require Board agents to conduct required training of Apple personnel on Company time.

9.      The Board's decision in *Thryv, Inc.*, 372 NLRB No. 22 (2022), and the Board's request for consequential damages in its prayer for relief, violates Apple's Seventh Amendment right to a trial by jury in an Article III court.

10.     The Complaint is barred inasmuch as Gjovik failed to properly serve the charges on the Respondent as required by Section 102.14(a) of the Board's Rules and Regulations.

11.     Some or all of the allegations of the Complaint are barred in whole or in part because such allegations were not within the scope of the allegations made in any underlying unfair labor practice charge(s).

12.     Some or all of the allegations of the Complaint are barred in whole or in part by the applicable limitations period under Section 10(b) of the NLRA.

13.     No remedy is appropriate as Apple has not engaged in any unfair labor practice. Further, the remedies requested in the Complaint are punitive, inappropriate, non-remedial, violate Apple's freedom of speech rights under the First Amendment (as noted above), violate the takings clause of the Fifth Amendment (as noted above), and are beyond the authority of the Board to order.

Apple further reserves the right to amend and/or supplement its answers and affirmative defenses.

Dated:  Chicago, Illinois
        January 2, 2025

Respectfully submitted,


/s/ Mark L. Stolzenburg
Mark L. Stolzenburg
mark.stolzenburg@morganlewis.com
MORGAN, LEWIS & BOCKIUS LLP
110 N. Wacker Dr.
Chicago, IL  60606-1511
Tel.  +1.312.324.1000
Fax  +1.312.324.1001

Crystal S. Carey
crystal.carey@morganlewis.com
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
Tel.  +1.212.309.6000
Fax  +1.212.309.6001

*Attorneys for Apple Inc.*

**From:** dgecpb32@nlrb.gov e-Service@service.nlrb.gov
**Subject:** RE: Inquiry # 1-2995241861 - Signed Charge Against Employer, Documentary Evidence
**Date:** August 26, 2021 at 6:57 PM
**To:** ashleygjovik@icloud.com

D

Confirmation Number: **1052852702**

You have successfully accomplished the steps for E-Filing a *Charge - CA* with NLRB Region 32, Oakland, California. This email notes the official date and time of the receipt of your submission. Please save this email for future reference. Please note that this receipt is not confirmation that your case has been docketed; rather, this email solely constitutes the regional office's acknowledgment of receipt of your document(s).

Until your case is docketed and is assigned an NLRB Case Number by the Region, please use **Inquiry No. 1-2995241861** to E-file any documents you wish to present regarding your charge. Click the link below to E-File additional documents and/or to view your previous E-filings with the NLRB. Your account profile is saved in our system. When you use this link to E-File documents your contact information will be pre-populated.

Your account profile is saved in the NLRB My Account Portal. Click here to view your account information, the cases and inquiries you are a party to and any of your previous E-Filings with the NLRB. You will also be able to E-File documents you wish to present regarding this charge or any other case or inquiry you are a party to. You will use Account No. **1-2995241880** and the email address you used to file your inquiry to access your account. When you use this link to E-File documents your contact information will be pre-populated on the E-Filing page, so that you do not have to reenter your information.

| | |
|---|---|
| Date Submitted: | Thursday, August 26, 2021 6:48 PM Pacific Standard Time |
| Dispute Location: | Sunnyvale, CA |
| Regional, Sub-Regional Or Resident Office: | Region 32, Oakland, California |
| Charge Type: | CA |
| Inquiry Number: | 1-2995241861 |
| Filing Party: | Charging Party |
| Name: | Gjovik, Ashley Marie |
| Email: | ashleygjovik@icloud.com |
| Address: | 1050 Benton Street #2310 Santa Clara, CA 95050 |
| Telephone: | (415) 964-6272 |
| Fax: | |
| Attachments: | Signed Charge Against Employer : CHG.1-2995241861.SignedChargeAgainstEmployer_Wiz.pdf Documentary Evidence : DEV.1-2995241861.AdditionalInfoSupportingCharge.pdf |

**Chrome is the preferred browser. If you are experiencing problems, please try again using the latest version of Chrome.**

## Confirmation

You have successfully E-Filed Charge Against Employer . You will receive an E-mail acknowledgement from this office when it receives your submission. This E-mail will note the official date and time of the receipt of your submission. Please save this E-mail for future reference. Please print this page for your records.

**NOTE:** This confirms only that the form was filed. It does not constitute acceptance by the NLRB.

**Confirmation Number:** 1052852702

**Date Submitted:** Thursday, August 26, 2021 6:48 PM (Pacific Standard Time)

**Form Submitted to Office:** Region 32, Oakland, California

File New Charge / Petition

Chrome is the preferred browser. If you are experiencing problems, please try again using the latest version of Chrome.

Review - Charge Against Employer

Review the information below before submitting the form. Click on the Edit icon under each section to make any changes.

## Charging Party Information

| | |
|---|---|
| **Name:** | Ms. Ashley Marie Gjovik |
| **Email:** | ashleygjovik@icloud.com |

**Address:** 1050 Benton Street , #2310, Santa Clara, CA 95050

**Phone:** (415) 964-6272

## Employer Information

| | |
|---|---|
| **Employer Name:** | Apple Inc. |
| **Dispute Location:** | Sunnyvale,CA |
| **Region Assigned:** | Region 32, Oakland, California |
| **Number of Employees:** | 200 |
| **Type of Business:** | Computer Hardware |

**Address:** One Apple Park Way, Cupertino, CA 95014

**Phone:** (408) 996-1010

## Basis of Charge

If you want to file a charge concerning situations not covered by this list, please use the forms provided on our website and/or contact the Information Officer at one of our field offices. You can find the field office nearest you by clicking here or by calling 1-844-762-NLRB.

Within the previous six months, the Employer disciplined or retaliated against an employee(s) because the employee(s) engaged in protected concerted activities by, inter alia, discussing wages, hours, or other terms and conditions of employment and in order to discourage employees from engaging in protected concerted activities.

| # | Name of employee disciplined/retaliated against | Type of discipline/retaliation | Approximate date of discipline/retaliation |
|---|---|---|---|
| 1 | Ashley Gjovik | Forced on paid admin leave | 08/04/2021 |
| 2 | Ashley Gjovik | Substantial increase in workload &unfavorable work | 07/15/2021 |
| 3 | Ashley Gjovik | Reduction of supervisory responsibilities | 05/06/2021 |
| 4 | Ashley Gjovik | Job reassignment | 05/06/2021 |
| 5 | Ashley Gjovik | employee feedback "warning" from manager | 03/22/2021 |
| 6 | Ashley Gjovik | Retaliatory, nonconsensual ER investigation | 04/09/2021 |
| 7 | Ashley Gjovik | Constructive term; fail to resolve hostile wk env | 04/29/2021 |
| 8 | Ashley Gjovik | ER shared my ID with sexual harasser w/out consent | 05/20/2021 |
| 9 | Ashley Gjovik | Manager insists I must return to unsafe work env | 06/21/2021 |
| 10 | Ashley Gjovik | Harassment from manager | 06/28/2021 |
| 11 | Ashley Gjovik | Forced 2 submit ADA request due to unsafe work env | 07/02/2021 |
| 12 | Ashley Gjovik | Manager refuses to consider remote work | 06/21/2021 |
| 13 | Ashley Gjovik | Withholding of work | 07/28/2021 |

Within the previous six months, the Employer disciplined or retaliated against an employee(s) because the employee(s) engaged in protected concerted activities by, inter alia, protesting terms and conditions of employment and in order to discourage employees from engaging in protected concerted activities.

| # | Name of employee disciplined/retaliated against | Type of discipline/retaliation | Approximate date of discipline/retaliation |
|---|---|---|---|
| 1 | Ashley Gjovik | Forced on paid admin leave | 08/04/2021 |
| 2 | Ashley Gjovik | Substantial increase in workload &unfavorable work | 07/15/2021 |
| 3 | Ashley Gjovik | Reduction of supervisory responsibilities | 05/06/2021 |
| 4 | Ashley Gjovik | Job reassignment | 05/06/2021 |
| 5 | Ashley Gjovik | employee feedback "warning" from manager | 03/22/2021 |
| 6 | Ashley Gjovik | Retaliatory, nonconsensual ER investigation | 04/09/2021 |
| 7 | Ashley Gjovik | Constructive term; fail to resolve hostile wk env | 04/29/2021 |
| 8 | Ashley Gjovik | ER shared my ID with sexual harasser w/out consent | 05/20/2021 |
| 9 | Ashley Gjovik | Manager insists I must return to unsafe work env | 06/21/2021 |
| 10 | Ashley Gjovik | Harassment from manager | 06/28/2021 |
| 11 | Ashley Gjovik | Forced 2 submit ADA request due to unsafe work env | 07/02/2021 |
| 12 | Ashley Gjovik | Manager refuses to consider remote work | 06/21/2021 |
| 13 | Ashley Gjovik | Withholding of work | 07/28/2021 |

Within the previous six-months, the Employer has interfered with, restrained, and coerced its employees in the exercise of rights protected by Section 7 of the Act by maintaining work rules that prohibit employees from discussing wages, hours, or other terms or conditions of employment.

## Additional Information

1) On March 17 2021, I raised concerns about unsafe work conditions at my Apple office (825 Stewart Dr, Sunnyvale CA 94085 - a.k.a. the "TRW Microwave" federal EPA Superfund site) to my managers and & colleagues. I was given a "warning" by Manager #1 & told not to speak to my colleagues or publicly about my concerns 2) Apple Employee Relations got involved in March. In April ER intimidated me to not speak about my safety concerns or the status of the office as a Superfund ***Filed workers comp claim for office chemical exposure on 4/26 3) In May, after I complained about my boss prohibiting me from speaking about workplace safety, Apple Employee Relations forced me into a sexism investigation on my behalf, & they used the investigation to make my work situation even more hostile, including naming me to someone who sexually harassed me (with me as the accuser) despite my protests for them not to. 4) End of April, my skip level, Manager #2, refused to resolve a long-running hostile work environment with my direct manager, Manager #1, and told me I can quit Apple instead. In May, Manager #2 began reassigning my projects to other employees & refusing to allow me to work on other projects he previously assigned to me. 5) In June, Manager #1 became even more hostile and harassing. He denied to consider my request to work remotely and demanded I return to in-office work at 825 Stewart despite my concerns about unsafe work conditions. 6) In July, Manager #1 dramatically increased my workload (>4x) with unfavorable work, despite my protests. 7) In July, when I complained again about unsafe work conditions, Employee Relations said I could submit an ADA accommodation req for remote work in order to not be exposed to the uncontrolled industrial chemicals. I protested but they insisted that was the only way I could avoid working in the Superfund office. The request is pending. 8) 8/4, ER put me on paid admin leave ***Throughout ER & EH&S refused to answer my safety qs

My Account

8/26/21, 6:48 PM

Acknowledged By: Ashley Marie Gjovik



Back          Submit

My Account

9/16/21, 8:13 PM

Chrome is the preferred browser. If you are experiencing problems, please try again using the latest version of Chrome.

# Confirmation

🖨 Print

You have E-Filed your document(s) successfully. You will receive an E-Mail acknowledgement noting the official date and time we received your submission. Please save the E-Mail for future reference. You may wish to print this page for your records

**Note:** This confirms only that the document was filed. It does not constitute acceptance by the NLRB

**Please be sure to make a note of this confirmation number.**

**Confirmation Number:** 1053610863
**Date Submitted:** Thursday, September 16, 2021 8:13 PM Pacific Standard Time
**Submitted E-File To Office:** Region 32, Oakland, California

**Contact Information:**
**Ashley Marie Gjovik**
1050 Benton Street #2310, Santa Clara, CA 95050
Ph: (415) 964-6272
E-mail: ashleymgjovik@protonmail.com

**Attached Documents:**
Charge Against Employer:Second Charge for AG - FINAL.pdf

File New Charge / Petition



UNITED STATES GOVERNMENT
NATIONAL LABOR RELATIONS BOARD



REGION 21
US Court House, Spring Street
312 N Spring Street, 10th Floor
Los Angeles, CA 90012

Agency Website: www.nlrb.gov
Telephone: (213)894-5200
Fax: (213)894-2778

Download
NLRB
Mobile App

January 12, 2022

ASHLEY MARIE GJOVIK
1050 BENTON STREET, #2310
SANTA CLARA, CA 95050

Re:     **Apple, Inc.**
        **Case 32-CA-288816**

Dear Ms. Gjovik:

The charge that you filed in this case on January 10, 2022 has been docketed as case number 32-CA-288816. This letter tells you how to contact the Board agent who will be investigating the charge, explains your right to be represented, discusses presenting your evidence, and provides a brief explanation of our procedures, including how to submit documents to the NLRB.

**Investigator:** This charge is being investigated by Field Attorney MATHEW SOLLETT whose telephone number is (213)634-6522. If this Board agent is not available, you may contact Supervisory Attorney CATHERINE VENTOLA whose telephone number is (510)671-3049.

**Right to Representation:** You have the right to be represented by an attorney or other representative in any proceeding before us. If you choose to be represented, your representative must notify us in writing of this fact as soon as possible by completing *Form NLRB-4701, Notice of Appearance*. This form is available on our website, www.nlrb.gov, or from an NLRB office upon your request.

If you are contacted by someone about representing you in this case, please be assured that no organization or person seeking your business has any "inside knowledge" or favored relationship with the National Labor Relations Board. Their knowledge regarding this proceeding was only obtained through access to information that must be made available to any member of the public under the Freedom of Information Act.

**Presentation of Your Evidence:** As the party who filed the charge in this case, it is your responsibility to meet with the Board agent to provide a sworn affidavit, or provide other witnesses to provide sworn affidavits, and to provide relevant documents within your possession. Because we seek to resolve labor disputes promptly, you should be ready to promptly present your affidavit(s) and other evidence. If you have not yet scheduled a date and time for the Board agent to take your affidavit, please contact the Board agent to schedule the affidavit(s). If you fail to cooperate in promptly presenting your evidence, your charge may be dismissed without investigation.

Apple, Inc.
Case 32-CA-288816

- 2 -

January 12, 2022

**Preservation of all Potential Evidence:** Please be mindful of your obligation to preserve all relevant documents and electronically stored information (ESI) in this case, and to take all steps necessary to avoid the inadvertent loss of information in your possession, custody or control. Relevant information includes, but is not limited to, paper documents and all ESI (e.g. SMS text messages, electronic documents, emails, and any data created by proprietary software tools) related to the above-captioned case.

**Prohibition on Recording Affidavit Interviews:** It is the policy of the General Counsel to prohibit affiants from recording the interview conducted by Board agents when subscribing Agency affidavits. Such recordings may impede the Agency's ability to safeguard the confidentiality of the affidavit itself, protect the privacy of the affiant and potentially compromise the integrity of the Region's investigation.

**Correspondence:** All documents submitted to the Region regarding your case MUST be filed through the Agency's website, www.nlrb.gov. This includes all formal pleadings, briefs, as well as affidavits, documentary evidence, and position statements. The Agency requests all evidence submitted electronically to be in the form it is normally used and maintained in the course of business (i.e., native format). Where evidence submitted electronically is not in native format, it should be submitted in a manner that retains the essential functionality of the native format (i.e., in a machine-readable and searchable electronic format).

If you have questions about the submission of evidence or expect to deliver a large quantity of electronic records, please promptly contact the Board agent investigating the charge. If you cannot e-file your documents, you must provide a statement explaining why you do not have access to the means for filing electronically or why filing electronically would impose an undue burden.

In addition, this Region will be issuing case-related correspondence and documents, including complaints, compliance specifications, dismissal letters, deferral letters, and withdrawal letters, electronically to the email address you provide. Please ensure that you receive important case-related correspondence, please ensure that the Board Agent assigned to your case has your preferred email address. These steps will ensure that you receive correspondence faster and at a significantly lower cost to the taxpayer. If there is some reason you are unable to receive correspondence via email, please contact the agent assigned to your case to discuss the circumstances that prevent you from using email.

Information about the Agency, the procedures we follow in unfair labor practice cases and our customer service standards is available on our website, www.nlrb.gov or from an NLRB office upon your request. *NLRB Form 4541, Investigative Procedures* offers information that is helpful to parties involved in an investigation of an unfair labor practice charge.

Apple, Inc.                                         - 3 -                                    January 12, 2022
Case 32-CA-288816

We can provide assistance for persons with limited English proficiency or disability.
Please let us know if you or any of your witnesses would like such assistance.

Very truly yours,

William B. Cowen
Regional Director

Technology
+ Equality

# Apple Executives Violated Worker Rights, US Labor Officials Say



Tim Cook  *Photographer: David Paul Morris/Bloomberg*

By Josh Eidelson
January 30, 2023 at 5:09 PM EST

Comments by Apple Inc. executives and policies imposed on employees have been deemed illegal by US National Labor Relations Board prosecutors, who say they violate workers' rights.

The NLRB general counsel's office has determined that "various work rules" imposed by the tech giant "tend to interfere with, restrain or coerce employees" from exercising their rights to collective action,

spokesperson Kayla Blado said Monday. The agency "found merit to a charge alleging statements and conduct by Apple – including high-level executives – also violated the National Labor Relations Act."

Unless Apple settles, the board's regional director will issue a complaint against the Cupertino, California-based company, Blado said in an email.

The dispute was brought to the agency by former employee Ashley Gjovik, who filed claims in 2021 alleging that an email Chief Executive Officer Tim Cook sent pledging to punish leakers, as well as a set of policies in Apple's employee handbook, violated federal law. Gjovik's filings cited policies restricting staff from disclosing "business information," talking to reporters, revealing co-workers' compensation or posting impolite tweets.

In his all-staff email, sent in September 2021, Cook wrote that "people who leak confidential information do not belong here." Cook's message said that Apple was "doing everything in our power to identify those who leaked" and that it didn't "tolerate disclosures of confidential information, whether it's product IP or the details of a confidential meeting."

His email followed media reports about a companywide internal meeting the prior week at which management fielded questions about topics such as pay equity and Texas' anti-abortion law.

Apple didn't immediately respond to requests for comment Monday on the NLRB's finding.

At a hearing earlier this month, company attorney Jason Stanevich said, "Apple fosters an open and inclusive work environment whereby employees are not just permitted, but encouraged, to share their feelings and thoughts on a range of issues, from social justice topics to pay equity to anything else that they feel is an important cause to promote in the workplace."

US labor law protects workers' rights to communicate with one another and engage in collective action about workplace issues. Complaints issued by NLRB prosecutors are reviewed by administrative law judges, whose rulings can be appealed to labor board members in Washington – and, from there, to federal court. The agency lacks the ability to impose punitive damages or hold executives personally liable for violations, but can order companies to change workplace policies.

Apple, the world's most valuable company, has faced an unusual wave of public dissent in recent years among its white collar staff, as well as unprecedented organizing campaigns by retail employees, who voted to unionize last year in Maryland and Oklahoma. NLRB prosecutors in recent months have also found merit in claims that Apple illegally coerced workers at its retail stores in Atlanta and New York City, where some employees were seeking to unionize. The company has denied wrongdoing.

Read more: Apple's labor tactics deemed illegal by NLRB

Gjovik, a senior engineering program manager, was fired by Apple in September 2021 after filing complaints with several state and federal agencies. In documents shared by Gjovik, Apple claimed she was terminated for violating policies such as the disclosure of confidential product information. Gjovik has said she was fired in retaliation for her prior complaints, which alleged that – after voicing fears about workplace health hazards – she was harassed, humiliated and asked not to tell co-workers about her concerns.

"My hope is that for the first time Apple is told by the government that this culture of secrecy is not OK," Gjovik said Monday. "I also hope that this sends shockwaves through other corporations that even Apple can be held accountable."

Terms of Service    Trademarks Privacy Policy
©2023 Bloomberg L.P. All Rights Reserved
Careers Made in NYC Advertise Ad Choices ▷ Help

## NLRB Cases 32-CA-284428 & 32-CA-284441 (Apple): Current Case Status

| | |
|---|---|
| From | Sollett, Mathew <Mathew.Sollett@nlrb.gov> |
| To | Ashley Gjovik<ashleymgjovik@protonmail.com>, Foster, Christopher<cfoster@mwe.com>, Smannan@mwe.com |
| Date | Monday, January 30th, 2023 at 2:00 PM |

**CAUTION:** This email and any attachments may contain Controlled Unclassified Information (CUI). National Archives and Records Administration (NARA) regulations at 32 CFR Part 2002 apply to all executive branch agencies that designate or handle information that meets the standards for CUI.

I am writing to provide you with an update on several outstanding unfair labor practice charges filed against Apple.  The Division of Advice has responded to Region 32's request for guidance in cases 32-CA-284428 and 32-CA-284441 and has instructed the Region to issue a Complaint, absent settlement, alleging various violations of Section 8(a)(1) of the National Labor Relations Act regarding Apple rules/policies and various unlawful statements by Apple supervisors/managers.  As soon as possible, the Region will contact the parties individually to discuss the meritorious allegations in further detail and to explore the possibility of pre-Complaint settlement.

Thank you very much,

Mathew Sollett, Field Attorney

National Labor Relations Board, Region 21

312 N. Spring Street, 10th Floor

Los Angeles, CA 90012

Phone: 213-634-6522

Fax: 213-894-2778

*My Pronouns: he/him/his*

INTERNET
FORM NLRB-501
(2-08)

DO NOT EXEMPT UNDER 44 U.S.C 3512

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
**CHARGE AGAINST EMPLOYER**

| DO NOT WRITE IN THIS SPACE | |
|---|---|
| Case | Date Filed |

**INSTRUCTIONS:**
File an original with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.

## 1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT

| | |
|---|---|
| a. Name of Employer<br>Apple Inc. | b. Tel. No. (408) 996-1010 |
| | c. Cell No. |
| | f. Fax No. |
| d. Address *(Street, city, state, and ZIP code)*<br>One Apple Park Way, Cupertino, CA 95014 | e. Employer Representative<br>Tim Cook<br>Chief Executive Officer |
| | g. e-Mail |
| | h. Number of workers employed<br>200+ |
| i. Type of Establishment *(factory, mine, wholesaler, etc.)*<br>Office complex | j. Identify principal product or service<br>Computer hardware |

k. The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1) and *(list subsections)* _____ of the National Labor Relations Act, and these unfair labor practices are practices affecting commerce within the meaning of the Act, or these unfair labor practices are unfair practices affecting commerce within the meaning of the Act and the Postal Reorganization Act.

2. Basis of the Charge *(set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)*

Since on or about September 21, 2021, the above-named employer has interfered with, restrained, and coerced its employees in the exercise of rights protected by Section 7 of the Act by promulgating, maintaining, and enforcing work rules that prevent or discourage employees from engaging in protected concerted activities.

3. Full name of party filing charge *(if labor organization, give full name, including local name and number)*

Ashley Marie Gjovik

| 4a. Address *(Street and number, city, state, and ZIP code)*<br>1050 Benton Street, #2310, Santa Clara, CA 95050 | 4b. Tel. No. (415) 964-6272 |
|---|---|
| | 4c. Cell No. |
| | 4d. Fax No. |
| | 4e. e-Mail<br>ashleymgjovik@protonmail.com |

5. Full name of national or international labor organization of which it is an affiliate or constituent unit *(to be filled in when charge is filed by a labor organization)*

| 6. DECLARATION | |
|---|---|
| I declare that I have read the above charge and that the statements are true to the best of my knowledge and belief.<br><br>By _____<br>*(signature of representative or person making charge)*  Ashley Gjovik, an Individual<br>*(Print/type name and title or office, if any)* | Tel. No. (415) 964-6272 |
| | Office, if any, Cell No. |
| | Fax No. |
| | e-Mail<br>ashleymgjovik@protonmail.com |
| Address  1050 Benton Street, #2310, Santa Clara, CA 95050  _____ *(date)* | |

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)**
**PRIVACY ACT STATEMENT**
Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.* The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information will cause the NLRB to decline to invoke its processes.

INTERNET
FORM NLRB-501
(2-08)

DO NOT WRITE IN THIS SPACE — DO NOT EXEMPT UNDER 44 U.S.C 3512

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
**CHARGE AGAINST EMPLOYER**

| DO NOT WRITE IN THIS SPACE | |
|---|---|
| Case | Date Filed |
| **32-CA-284428** | **10-12-2021** |

**INSTRUCTIONS:**
File an original with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.

## 1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT

a. Name of Employer
Apple Inc.

b. Tel. No. (408) 996-1010

c. Cell No.

f. Fax No.

d. Address (Street, city, state, and ZIP code)
One Apple Park Way, Cupertino, CA 95014

e. Employer Representative
Tim Cook
Chief Executive Officer

g. e-Mail

h. Number of workers employed
200+

i. Type of Establishment (factory, mine, wholesaler, etc.)
Office complex

j. Identify principal product or service
Computer hardware

k. The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1) and (list subsections) _____ of the National Labor Relations Act, and these unfair labor practices are practices affecting commerce within the meaning of the Act, or these unfair labor practices are unfair practices affecting commerce within the meaning of the Act and the Postal Reorganization Act.

2. Basis of the Charge (set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)

Within the past six months and continuing to the present date, the above-named employer has interfered with, restrained, and coerced its employees in the exercise of rights protected by Section 7 of the Act by promulgating, maintaining, and enforcing work rules that prevent or discourage employees from engaging in protected concerted activities, including the employment agreement policy, the confidentiality agreement policy, the business conduct policy, and other policies enforced against employees contained within the employee handbook.

3. Full name of party filing charge (if labor organization, give full name, including local name and number)

Ashley Marie Gjovik

4a. Address (Street and number, city, state, and ZIP code)
1050 Benton Street, #2310, Santa Clara, CA 95050

4b. Tel. No. (415) 964-6272

4c. Cell No.

4d. Fax No.

4e. e-Mail
ashleymgjovik@protonmail.com

5. Full name of national or international labor organization of which it is an affiliate or constituent unit (to be filled in when charge is filed by a labor organization)

6. DECLARATION

I declare that I have read the above charge and that the statements are true to the best of my knowledge and belief.

By _____
(signature of representative or person making charge)

Ashley Gjovik, an Individual
(Print/type name and title or office, if any)

Tel. No. (415) 964-6272

Office, if any, Cell No.

Fax No.

e-Mail
ashleymgjovik@protonmail.com

Address 1050 Benton Street, #2310, Santa Clara, CA 95050 _____ (date)

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)**

PRIVACY ACT STATEMENT

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq. The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information will cause the NLRB to decline to invoke its processes.

# Gjovik v. Apple

# Exhibit

**U.S. Department of Labor**

**Occupational Safety and Health Administration**
**San Francisco Federal Building**
**90 7th Street, Suite 2650**
**San Francisco, CA  94103**



**Via Electronic Mail**
December 10, 2021

Ashley Gjovik
1050 Benton Street, Apt. 2310
Santa Clara, CA 95050
ashleymgjovik@protonmail.com

| | |
|---|---|
| Complainant(s): | Ashley Gjovik |
| Respondent(s): | Apple Inc. |
| Case Number: | Apple Inc./Gjovik/9-3290-22-051 |
| Law/Statute 1: | Section 11(c) of the Occupational Safety and Health Act (OSHA),  29 U.S.C. §660 |
| Law/Statute 2: | Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. §9610 |
| Law/Statute 3: | Sarbanes-Oxley Act (SOX),  18 U.S.C.A. §1514A |
| Regulation 1: | OSHA 11(c) Complaint Procedures:  29 CFR Part 1977 |
| Regulation 2: | EPA Complaint Procedures:  29 CFR Part 24 |
| Regulation 3: | SOX Complaint Procedures:  29 CFR Part 1980 |

Dear Ms. Gjovik:

This office has received a complaint filed by the above-named Complainant(s) against the above-named Respondent(s). The complaint alleges retaliatory employment practices in violation of the Law(s)/Statute(s) cited above. A copy of the complaint allegation is enclosed.

The Occupational Safety and Health Administration's Whistleblower Protection Program (WPP) is responsible for enforcing the anti-retaliation provisions of the law(s) cited above and will conduct its investigation following the procedures outlined in the regulation(s) cited above. You may obtain a copy of the law(s) and regulation(s) at: **_www.whistleblowers.gov_**. Upon request, a printed copy of these materials will be mailed to you.

WPP has provided a copy of the complaint to Respondent(s) and has requested a written position statement. You will receive a copy of the position statement(s) with any supporting evidence and will be given an opportunity to respond.

You have the right to be represented in this matter. If you choose to have a lawyer or someone else represent you, please have that person complete and promptly return to the assigned investigator the enclosed Designation of Representative form.

You are expected to cooperate in this investigation and failure to do so may cause the complaint to be dismissed.

WPP will send most, if not all, correspondence by email - this includes final disposition letters that include time sensitive appeal rights.

**WPP policy encourages the voluntary resolution of complaints. If you are interested in settlement discussions and/or Alternative Dispute Resolution (ADR), please contact the assigned investigator.**

You are responsible for retaining all relevant records and documents relating to the above-captioned case. In addition, if you have not already done so, **within 20 days** of receiving this letter, please email the investigator (**AND** send to all named parties) any evidence related to the complaint, such as notes, minutes, letters, emails, texts, voice messages, etc. If you have not already done so, email the investigator (but **DO NOT** send to any named parties) a list of the names, addresses, and telephone numbers of potential witnesses, along with a brief summary of what each witness should know.

*Please send documents to WPP via email, if possible, using the investigator's email address below and also send a copy to all named parties listed below:*

ASSIGNED INVESTIGATOR:                        RESPONDENT(S):
Andrea Diangco, Regional Investigator          Apple Inc.
Whistleblower Protection Program               One Apple Park Way
U.S. Department of Labor, OSHA                 Cupertino, CA 95014
300 Fifth Avenue, Room 1280
Seattle, Washington 98104
Phone: 206-757-6699
E-mail: Diangco.Andrea@dol.gov

**All communications and submissions should be made to the investigator, identified above.**

Finally, OSHA is not responsible for enforcing the underlying regulatory violation and/or concerns. You are encouraged to contact the following agency to report the underlying violations:

**The Environmental Protection Act (EPA)** is the federal government agency responsible for regulating environmental protection matters: https://echo.epa.gov/report-environmental-violations.
Finally, OSHA is not responsible for enforcing the underlying regulatory violation and/or concerns. You are encouraged to contact the following agency to report the underlying violations:

**The U.S. Securities and Exchange Commission (SEC)** is the federal government agency responsible for enforcing the federal securities laws, proposing securities rules, and regulating the securities industry, which is the nation's stock and options exchanges, and other activities and organizations, including the electronic securities markets in the United States: https://www.sec.gov/tcr.

Sincerely,


For Ryan Himes
Assistant Regional Administrator

Enclosures:     (1) Designation of Representative Form
                (2) Alternative Dispute Resolution FAQ
                (3) Copy of Complaint Allegation

# Gjovik v. Apple

# Exhibit

**In the matter of:**


*3250 Scott Blvd.*

*Santa Clara, California*

# COMPLAINT

**Federal**
- The Occupational Safety and Health Act (1970)
- The Clean Air Act (1970)
- The Clean Water Act (1972)
- The Safe Drinking Water Act (1974)
- The Resource Conservation and Recovery Act (1976)
- The Toxic Substances Control Act (1976)
- Comprehensive Environmental Response, Compensation, and Liability Act (1980)
- Emergency Planning and Community Right-to-Know Act
- Pollution Prevention Act (1990)

**State of California**
- Cal. Code Regs., Title 22, Division 4.5
- Cal. Health and Safety Code, Ch.3.5 & 6.5
- Cal. Fire Code, Title 24, Part 9, Ch. 50
- Cal. Penal Code, § 372, Nuisance
- Safe Drinking Water and Toxic Enforcement Act of 1986 (Proposition 65)

**County of Santa Clara**
- Title B, Div. B11, Ch. II, §B11-6 Nuisance
- Title B, Div. B11, Ch. IV, Wastewater
- Title B, Div. B11, Ch. XII, Hazardous Materials
- Title B, Div. B11, Ch. XIV, Toxic Gas

**City of Santa Clara**
- §8 Ch.25 Waste & Ch. 30 Nuisance
- §13 Ch.10 Hazardous Materials & Ch.60 Hazards
- §18 Ch.48 "Light Industrial" Zoning Intent


*Potential RCRA § 7002(a)(1)(B) Action*


DATE: JUNE 12 2023        COMPLAINANT: ASHLEY M. GJØVIK

# TABLE OF CONTENTS

**COMPLAINT & REQUEST FOR INVESTIGATION** ...................................................................**3**

    IMMINENT AND SUBSTANTIAL ENDANGERMENT ............................................................... 4

    SITE USE ISSUES (PERMITTING & REPORTING) ............................................................... 8

    CONTAMINATION (SPILLS & CLEAN-UP) ..................................................................... 21

    RESPONSIBLE PARTY ............................................................................................... 23

    CONCLUSION & REQUEST ......................................................................................... 25

**3250 SCOTT: CONCERN SUMMARY** ........................................................................**27**

**REFERENCES** ...........................................................................................................**28**

DATE: JUNE 12 2023                                            COMPLAINANT: ASHLEY M. GJØVIK

## COMPLAINT ABOUT A SEMICONDUCTOR MANUFACTURING PLANT
### RE: 3250 SCOTT BLVD SANTA CLARA, CALIFORNIA

# Complaint & Request for Investigation

To Whom It May Concern,

This complaint concerns a high-risk semiconductor manufacturing plant operating in a sensitive population in Santa Clara California. Over the last eight years, the operator of this plant appears to have been engaged in unauthorized storage and disposal of hazardous waste; unlawful disposal of hazardous waste into the air, sewers, and storm drains; repeated spills and leaks of 'very dangerous substances' (including into outdoor air); and apparent violations of RCRA/Right to Know and Proposition 65.

The operations at this plant have been registered as a "*Chemical Storage Facility, Hazardous Waste Onsite Treatment; Above Ground Petroleum Storage Tank; Hazardous Chemical Management; Hazardous Waste Generator; and RCRA Large Quantity Hazardous Waste Generator*" since June 22, 2015.[1] The plant is not registered with CalEPA for RCRA or as a 'Treatment-Storage-Disposal Facility' (TSDF). The city government also opted out of oversight by the Santa Clara County Department of Environmental Health, so the city Fire Department and local wastewater facility solely manage supervision. It appears there are no records of hazardous waste treatment inspections ever.

I believe the plant requires a Full Permit from DTSC. The current DTSC permit, if there was one, was inappropriate (a permissive Permit-by-Rule without rules or conditions) and expired in 2021. In 2022, the operator told the city Planning department the site is not a hazardous material/waste site (claiming it was not on Envirostor, even though it is, but marked as 'inactive').



---

[1] CalEPA CERS, https://siteportal.calepa.ca.gov/nsite/map/results/detail/385316
[2] Envirostor, DTSC ID 71003503, https://www.envirostor.dtsc.ca.gov/public/profile_report?global_id=71003503

## COMPLAINT ABOUT A SEMICONDUCTOR MANUFACTURING PLANT
### RE: 3250 SCOTT BLVD SANTA CLARA, CALIFORNIA

## IMMINENT AND SUBSTANTIAL ENDANGERMENT[3]

The plant in this complaint is only 273 feet from a large apartment complex (1,800+ units with 2,000-6,000 tenants). It is also 800 feet from the exposed San Tomas Aquino Creek waterway, which flows to the San Francisco Bay. The groundwater under the plant and flowing south/southwest under the apartments is shallow at only 6-10 feet below ground. The apartments included 'fresh air vents', which appear to have intake fans on the roof of the building that pulls outdoor air (including factory exhaust) into the HVAC for the apartment units.[4]

The apartment complex next to the manufacturing plant is the "Santa Clara Square Apartments."[5] There is a large grocery store 1,000 feet away from the factory. The factory is only 360 feet from an open-air children's playground and less than 600 feet from three large, open-air community swimming pools.



After moving into this apartment complex in February 2020, I became mysteriously ill and severely disabled. Doctors documented slowed heart rate, arrhythmias, premature ventricular

---

[3] "For claims brought pursuant to RCRA § 7002(a)(1)(B), the statutory requirement that the plaintiff give "notice of the endangerment" implicitly requires that the plaintiff detail the specific endangerment situation that exists or may be created as a result of the defendant's conduct or neglect."

[4] The property manager of the apartments is The Irvine Company (signing DTSC agreements as "3255 Scott Boulevard, LLC"). Current activities at 3250 Scott were omitted from Environmental Impact Reports for the apartments. DTSC oversees the apartment complex as a CLRRA cleanup site starting July 15, 2015. DTSC's website noted that the clean-up was "fast-tracked."

[5] based at 3320 Montgomery Drive (or 3255 Scott Blvd in contracts)

### COMPLAINT ABOUT A SEMICONDUCTOR MANUFACTURING PLANT
#### RE: 3250 SCOTT BLVD SANTA CLARA, CALIFORNIA

contractions, volatile blood pressure, hypotension, hypertension, rashes and hives, and tumors – but no explanation of what caused the issues. I was fainting constantly and suffering from respiratory, GI, pericarditis-like, and MS-like symptoms. These symptoms often worsened around 7-8 am and 8-11 pm. In addition, every 3-4 weeks, I would wake up precisely at 3 am, choking and suffocated, nauseous and sweaty, dizzy and disoriented, and feeling like I was dying. The 3 am choking spells included symptoms that appeared to be heart failure, though two echocardiograms were okay.



I went on short-term disability and was billed over $100,000 in medical bills trying to figure out what was wrong with me. In September 2020, I discovered the apartment complex was a Brownfield site on a Superfund plume.[6] [7] Within a week of vacating the location in October 2020, my disabling medical issues vanished. My heart rate and blood pressure stabilized, I was no longer dizzy or fainting, and I had no more 3 am choking spells. Over a few months, the rashes subsided, and the tumor shrank. Two chemical exposure doctors diagnosed my 2020 illness as acute solvent exposure.

---

[6] Santa Clara Square Apartments, Draft EIR, EKI/2013, https://www.envirostor.dtsc.ca.gov/public/final_documents2?global_id=60002212&doc_id=60395782, Final EIR: Impact Sci/2015: https://www.santaclaraca.gov/home/showdocument?id=17071
[7] US EPA, Synertek, https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.scs&id=0902620&doc=Y&colid=70135%C2%AEion=09&type=SC

### COMPLAINT ABOUT A SEMICONDUCTOR MANUFACTURING PLANT
#### RE: 3250 SCOTT BLVD SANTA CLARA, CALIFORNIA



In 2021, I was connected to six additional victims after I published an article about what happened to me and what I discovered about the contamination on-site.[8] Two women complained of health issues similar to mine. One of these women then contacted the local government and CalEPA DTSC, though nothing was done by these agencies, even with additional victims reporting illness.

Limited indoor air testing via a two-hour sorbent tube showed the presence of several chemicals inside my apartment which are known to be used at the semiconductor factory, including Acetonitrile, 1,2,4-TCB, Ethylbenzene, Hexane, Toluene, Ethyl acetate, 2-Methyl-1-propanol, Acetic Acid, Acetone, and Xylenes. There was also Freon 113, which had been released in vast quantities at the plant in the 1980s-1990s.

Dr. Harrison at UCSF Occupational Health Services instructed in his visit notes that "*there remains a concern about potential pathways for residential exposures, and these should be addressed by the county and State environmental agencies.*" (April 29, 2021). Dr. Harrison also directs the worker tracking and investigation program for the California Department of

---

[8] Ashley Gjovik, SF Bay View, https://sfbayview.com/2021/03/i-thought-i-was-dying-my-apartment-was-built-on-toxic-waste/

COMPLAINT ABOUT A SEMICONDUCTOR MANUFACTURING PLANT
RE: 3250 SCOTT BLVD SANTA CLARA, CALIFORNIA

Public Health. Stanford's Dr. Nadeau also saw me and diagnosed me with Multiple-Chemical Sensitivity Syndrome caused by solvent exposure.[9]

When I notified the property manager of unexplained spiking VOCs in my apartment that aligned with my symptoms, they said they sent PG&E to inspect the area. They said they were unconcerned because there was no evidence of 'gas leaks' or 'chemical spills,' thus 'no evidence suggesting that [my apartment] was unsafe.'[10] As we now know, multiple gas leaks and chemical spills occurred nearby at 3250 Scott Blvd.

While DTSC apparently never evaluated the exposure beyond the possibility of vapor intrusion from soil or groundwater, the apartment's property manager later hired an ex-DTSC employee who now does 'environmental public relations' to deal with me. Within only a couple of days, she even agreed with me that something was wrong. She wrote, *"It sure seems something is going on, but a lot of weird things too, and I can't quite tie it all together in my head"* and *"This all just confounds me, but it sure seems something is going on."*[11]

In February of 2023, I discovered through public records requests that manufacturing activities were taking place next to my apartment at this 3250 Scott Blvd factory.[12] Upon further investigation, I discovered numerous noncompliance issues, known leaks/spills, and other chemical emissions. This factory is a direct vector for my chemical exposure and medical issues. Chemicals known to cause the symptoms I experienced are known to be on-site and even known to have leaked/spilled, and several of them were found in the indoor air of my apartment.

---

[9] Solid Waste Disposal Act § 7002, 42 U.S.C.A. § 6972(a)(1)(B). *Fresh Air for the Eastside, Inc. v. Waste Management of New York, L.L.C.,* 405 F. Supp. 3d 408 (W.D. N.Y. 2019).
[10] See Appendix, Apartment, Page 15
[11] See Appendix, Apartment, Page 16
[12] Santa Clara city PRA: https://santaclara.nextrequest.com/requests/20-508; https://santaclara.nextrequest.com/requests/23-127; https://santaclara.nextrequest.com/requests/23-517; https://santaclara.nextrequest.com/requests/23-518; https://santaclara.nextrequest.com/requests/23-548

### COMPLAINT ABOUT A SEMICONDUCTOR MANUFACTURING PLANT
#### RE: 3250 SCOTT BLVD SANTA CLARA, CALIFORNIA

## SITE USE ISSUES (PERMITTING & REPORTING)

The operator appears to have some waste handling permits; however, they do not seem sufficient to cover the actual activities. Further, the operator repeatedly violated record-keeping and reporting requirements. It also appears possible that the operator does not have a valid or active waste handler permit at all despite handling hazardous waste, including treatment and disposal of hazardous waste. [13]

The facility is actively used for RCRA activities. There is storage of enormous amounts of chemicals, including corrosive, ignitable, reactive, toxic, explosive, oxidizers, pyrophoric, carcinogens, and 'very dangerous substances.' There is a tremendous amount of waste removed to treatment facilities; however, also a significant gap between disposal and inventories, implying a similarly large amount of waste is treated and disposed of on-site. HazMat/Haz Waste tanks, containers, drip pads, evaporation systems, abatement systems, scrubbers, neutralization systems, and exhaust vents are mentioned. However, there are only two regulatory filings about treatment over eight years.

The operator has used an "Acid Waste Neutralization system" since at least March 2016. The operator reported this system in a letter requesting a discharge to the local wastewater treatment facility. In this letter, the operator noted plans to process and discharge 3,000 gallons of a corrosive solution (hydrogen peroxide, acetic acid, and peroxyacetic acid) over two days via their "neutralization system." It appears the operator has used the neutralization system for specific toxic substances and non-specific RCRA sources, such as spent solvent wastes.

Comparing Haz Mat to CERS, the operator has persistently failed to keep its chemical inventory current in CERS, omitting numerous extremely hazardous substances stored and used in large quantities. This includes chemicals like phosphine, silane, arsine, chlorine, phosphorus trichloride, hydrogen chloride, and other very dangerous chemicals, including those categorized as chemical weapons (i.e., DHS's 'weapons of mass effect').

---

[13] RCRA § 7002(a)(1)(A)

### COMPLAINT ABOUT A SEMICONDUCTOR MANUFACTURING PLANT
#### RE: 3250 SCOTT BLVD SANTA CLARA, CALIFORNIA

## 3250 Scott Blvd: Rogue Chemicals; Risk Categories

| | Release / Leak / Spill / Violation | California "Proposition 65" [14] | US EPA "Extremely Hazardous Substances"[15] | TSCA Review: "Unreasonable Risks to Public Health"[16] | DHS Chemicals of Interest[17] |
|---|---|---|---|---|---|
| **Acrylonitrile** | Indoor Air | x (cancer) | x | | x (flammable) |
| **Phosphine Gas** | Multiple Leaks | | x | | x (flammable; weapon of mass effect) |
| **Silane Gas** | Multiple Leaks | | x | | x (flammable) |
| **Chlorine Gas** | Code violation for not reporting | | x | | x (toxic; weapon of mass effect) |
| **Benzene** | Indoor Air | x (cancer) | | | |
| **Ethylbenzene** | Indoor Air | x (cancer) | | | |
| **Toluene** | Indoor Air | x (cancer) | | | |
| **1,2-Dichloroethylene** | Indoor Air; WW Filings | | | | |
| **Xylenes** | Indoor Air; Urine | | | | |
| **Trichloroethylene (TCE)** | Groundwater; Wastewater | x (cancer) | | x (January 2023) | |
| **2-Methyl-1-propanol (NMP)** | Intentional Release | x (development) | | x (December 2022) | |
| **1,2,4-Trichlorobenzene** | Indoor Air; Groundwater | | | | |

The operator's building records show the installation of several hydride abatement systems in 2019-2022 designed for phosphine and silane. However, there are no records of off-site disposal of silane or phosphine, so gases must be treated and disposed of on-site. Haz Mat inventories from 2021 report storage of at least 1,664 cubic feet (160 lbs) of phosphine and 705 cubic feet (63 lbs) of silane. At least 208 feet of diluted phosphine gas is also reported in a closed-loop system.

---

[14] Proposition 65, https://oehha.ca.gov/media/downloads/proposition-65/p65chemicalslistsinglelisttable2021p.pdf
[15] Appendix A to Part 355—The List of Extremely Hazardous Substances and Their Threshold Planning Quantities, https://www.ecfr.gov/current/title-40/chapter-I/subchapter-J/part-355
[16] TSCA, https://www.epa.gov/assessing-and-managing-chemicals-under-tsca/risk-management-existing-chemicals-under-tsca
[17] DHS CISA: https://www.cisa.gov/sites/default/files/publications/appendix-a-to-part-27-508.pdf

## COMPLAINT ABOUT A SEMICONDUCTOR MANUFACTURING PLANT
### RE: 3250 SCOTT BLVD SANTA CLARA, CALIFORNIA

There have been at least two phosphine/silane leaks. The first was disclosed in response to a public records request to the Fire Department. On June 1, 2019, a phosphine and silane spill resulted in an evacuation and a city Haz Mat visit. The incident report noted that the alarm was triggered by silane and phosphine "in scrubbers." This assumably refers to a treatment system and implies that the gas left a closed-loop system. It is unclear if the gases were exhausted to the outdoor air. This spill was never reported to DTSC, US EPA, or CalOES. I reported this spill to CalOES on June 8, 2023, as a historical report and to obtain more details about what occurred.[18]

Then, in 2021 there was apparently another phosphine leak. This one is only recorded in CalOES (reported by the Fire Department), but no records were released as part of the public records request, nor was the spill noted in any US EPA or CalEPA records.[19] The April 30, 2021 spill notes say phosphine gas was "*vented into the atmosphere*." The report noted that the 'scrubber system' malfunctioned (again), and the toxic gas "*entered the ventilation system*." This leak appears to be due to treatment failures, resulting in an evacuation and Haz Mat visit. Perhaps related – two weeks later, hazardous waste manifests show that 60 pounds of 'vacuum filters contaminated with glass dust' were sent for offsite incineration, implying there was some interior explosion related to the phosphine leak. Was there a phosphine explosion?

Silane (aka silicon tetrahydride) exposure can cause dizziness, asphyxiation, nausea, and burns.[20] Exposure to phosphine can cause difficulty breathing, suffocation, low blood pressure, vomiting, arrhythmia, blue skin, pulmonary edema, heart failure, coma, and death. Both gases are pyrophoric and can self-ignite in the air. An air concentration of 500 ppm (parts-per-million) of phosphine is lethal in 30 minutes, and 1000 ppm is fatal 'after a few breaths.'[21] The half-life for these chemicals is 5-28 hours in the air, and the chemical is heavier than air, so it tends to pool instead of rise. In case of spills or leaks of either chemical, the area must be evacuated at

---

[18] CalOES, 2023 for 2019, https://w3.calema.ca.gov/Operational/MALHaz.NSF/SpillAllDocs/81CAD51F3ABACB5A882589C90070829D
[19] CalOES, 2021, https://w3.calema.ca.gov/operational/malhaz.nsf/f1841a103c102734882563e200760c4a/197d45cf4cd38421882586c7005ec199
[20] Silane: https://www.nj.gov/health/eoh/rtkweb/documents/fs/2768.pdf
[21] Phosphine: https://cameochemicals.noaa.gov/chemical/1322, https://www.epa.gov/sites/default/files/2016-09/documents/phosphine.pdf

# COMPLAINT ABOUT A SEMICONDUCTOR MANUFACTURING PLANT

## RE: 3250 SCOTT BLVD SANTA CLARA, CALIFORNIA

least 300-1,000 feet 'in all directions,' but evacuation is 2,640-5,280 feet downwind for larger spills.[22] The apartments are only 273 feet away. Why weren't the apartment residents notified?[23]

In 2020, I repeatedly complained to doctors that my 3 am choking spells included waking up with my right arm cold, blue, and tingling; gasping for air; low blood pressure, bradycardia, and arrhythmia. Doctors performed two echocardiograms to rule out heart failure (as these are symptoms of heart failure). A cloud of phosphine gas, perhaps auto-released at 3 am, could have induced heart failure despite no anatomical defect.

City records show a 'Community Risk Reduction' meeting with the operator in 2022 about the silane and phosphine gas systems, noting it was the first risk reduction review. [Note: silane and phosphine are extremely hazardous substances, and CESQT cannot govern treatment]. The Risk Reduction report includes notes that imply exhaust ducts were not labeled and were constructed with inappropriate materials; hazardous waste may have been disposed of improperly; there was no emergency shutdown automation if the containment systems failed; and there are concerns about the distance of solvent exhausts from nearby properties.

Additional building permits and records reflect several 'Gas Bunkers' and 'Gas Abatement units.' City records show frequent updates to vents, exhaust, and ductwork. In 2019, the city issued "compliance comments" for the site, apparently expressing concerns that the operator was uncertain where all its exhaust ducts were, where they went, and what was inside them. Further, the comments reflect concerns about backdrafts and exhaust vent heights on the roof related to air intake from the roof. [Note: a similar situation is an active safety issue at my Sunnyvale office with the same operator, the US EPA has ordered corrective actions.[24]]

Further, ignitable and reactive waste is supposed to be stored at least 50 feet from the property line. However, the operator's Acid Neutralization Tank is only 38 feet from the building

---

[22] Phosphine: https://nj.gov/health/eoh/rtkweb/documents/fs/1514.pdf

[23] When a § 7002 (a)(1)(B) claim is based on an endangerment to human health, the plaintiff must offer proof to establish that a risk of potential exposure and likelihood of potential injury exist, which constitute a sufficiently perilous condition necessary to satisfy the "may present an imminent and substantial endangerment to health" standard. To accurately assess whether a specific factual situation involving hazardous wastes poses a potential health risk, the National Academy of Sciences has established health risk assessment guidelines, which recommend a four-step analytical process: (1) hazard identification; (2) dose-response assessment; (3) exposure assessment; and (4) risk characterization."

[24] US EPA, TRW Microwave, https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.scs&id=0901181&doc=Y&colid=40417&region=09&type=SC

### COMPLAINT ABOUT A SEMICONDUCTOR MANUFACTURING PLANT
#### RE: 3250 SCOTT BLVD SANTA CLARA, CALIFORNIA

to its west. It also appears there is no Waste Minimization Plan, Recyclable Materials Biennial report, Waste Stream Analysis, Pollution Prevention (P2) reports, Treatment Unit permits, Leak Detection monitoring or controls, and no record of financial assurance for closure/post-closure or 3rd party liability insurance.

In February 2016, the city requested the operator participate in CalARP due to the tenant's "certain regulated chemicals above a reporting threshold" and asked the tenant to submit a Risk Management Plan. The plan was made available for comment physically at the Fire Department for 45 days. There have been no plans submitted since. The Clean Air Act requires these plans for 'facilities that use extremely hazardous substances,' which must be revised and resubmitted to EPA every five years.' Here, the plan was not submitted to EPA, and the plan did not even leave the physical premises of a local city Fire Department. The plan also should have been revised in 2021, two years ago.

In 2020, the factory registered the treatment and release of a highly regulated and now-banned chemical through 'point emissions' and 'on-site treatment' occurring in 2020. The facility did not report these activities to US EPA Toxic Release Inventory until June 2021. The operator said 2,342 pounds of the combustible solvent NMP (N-Methylpyrrolidone) was treated onsite, and 260 pounds of NMP was released onsite via "air emissions." The waste treatment method noted was "absorber," however, the standard treatment of NMP is offsite disposal "*in original containers*" and "*do not mix with other waste*." NMP vapor is heavier than air, and the half-life in the air is estimated to be 5.2 hours. Safety sheets advise conducting downwind evacuation at least 1,000 feet in case of a spill. The apartments are 273 feet away. The Material Safety Data Sheet clearly states that NMP "*should not be released into the environment,*" "*do not let product enter drains,*" and instructs to "*do not breath vapors.*"[25] This release was never reported to CalOES, so I also reported the NMP release to CalOES on June 8, 2023.[26]

The TRI entry for the NMP also noted that 14,742 Pounds of the NMP was 'treated offsite' in 2020 and noted three Transporters who supposedly transported the chemical offsite.[27]

---

[25] Material Safety Data Sheet, NMP, https://www.sigmaaldrich.com/US/en/sds/SIGALD/270458
[26] CalOES, 2023 for 2020, https://w3.calema.ca.gov/Operational/MALHaz.NSF/SpillAllDocs/79B09C90D1E843A9882589C9000091E0?OpenDocument
[27] US EPA TRI, https://enviro.epa.gov/enviro/tri_formr_v2.fac_list?rptyear=2020&facopt=dcn&fvalue=1320219310885&fac_search=fac_beginning

## COMPLAINT ABOUT A SEMICONDUCTOR MANUFACTURING PLANT
### RE: 3250 SCOTT BLVD SANTA CLARA, CALIFORNIA

However, the TRI entry does not note Manifest IDs and a thorough review of the Manifests for the site does not show any NMP. There are no Manifests for removing NMP between 2015 and the current day.[28] This data submitted to TRI appears to be falsified with no NMP actually moved offsite, or if it was, then without manifests.

The EPA banned NMP as a whole chemical under TSCA in December of 2022 after proposing a rule to ban NMP back in 2017.[29] There appears to be no plan on how the operator will dispose of this now-banned chemical, and in 2021, they reported over 190 gallons of it still onsite. The operator apparently previously treated and disposed of the NMP onsite – is that what they plan to do with the rest? Are they treating and disposing on-site now? Or perhaps they are using unauthorized Transporters without manifests?

In addition to my medical issues and other symptoms, extensive property damage was consistent with NMP exposure. My white linens (clothing, sheets, towels, etc.) turned yellow; many of my metals showed corrosion and reactions (jewelry, belts, shoes, clothing, etc.); and some of my plastics also turned yellow. NMP is known to attack copper and degrade certain plastics.[30] The yellowing of lines was not a stain; there was no way to get it out. A state Public Health medical doctor suggested it appeared to be accelerated ozone yellowing from a solvent or other VOC. *"NMP tends to oxidize in the presence of air, giving a yellow color."*[31]

The environmental consultant assigned to the site from October 2019-March 2020, signing hazardous waste manifests during that time, posted on his LinkedIn profile that during his time working at 3250 Scott, he worked to *"find cost savings for [his] client"* and *"c[a]me up with innovative methods for disposal of unique wastes."* What types of disposals did he "innovate" to cut costs? What kind of "innovation" did he undertake?

[28] DTSC Haz Waste Tracking System, 3250 Scott CAR000278176, https://hwts.dtsc.ca.gov/facility/CAR000278176 (2017-current); https://hwts.dtsc.ca.gov/facility/CAT000623983 (2016-2021)
[29] US EPA, TSCA: NMP, https://www.epa.gov/assessing-and-managing-chemicals-under-tsca/final-risk-evaluation-n-methylpyrrolidone-nmp
[30] https://inchem.org/documents/icsc/icsc/eics0513.htm
[31] https://chemistry.stackexchange.com/questions/165011/why-is-nmp-developing-a-yellow-color-after-distillation/165594

## COMPLAINT ABOUT A SEMICONDUCTOR MANUFACTURING PLANT
### RE: 3250 SCOTT BLVD SANTA CLARA, CALIFORNIA

 



Despite a "Hazardous Waste Onsite Treatment" designation in CERS from the city agency, there is no RCRA permit, nor are there any apparent TTU permits or other treatment permits released in the public records request.[32] There are also no records of local agencies ever conducting a Hazardous Waste Onsite Treatment inspection – despite the use of at least an acid neutralization system, numerous gas abatement systems (and two silane and phosphine leaks from that system), and over ten thousand pounds of NMP treated on site.

The operator also has an "evaporation system" in its service yard. A building permit was requested in 2018 to install a new 'HMR evaporation system"; however, it appears there was an evaporation system that also existed prior. The service yard is not contained; it is open-air with a non-enclosed canopy roof. There are also at least two 'gas bunkers.' It is unclear what work is done in the yard and if solvents are being evaporated into the open air.

There are significant gaps between the chemicals noted in CERS compared to those pointed out in the Haz Mat inventories and again compared to the manifests for disposal. There are a large number of chemicals that are listed in the inventories, yet with no record of any offsite disposal or offsite treatment. This infers that a substantial amount of hazardous waste is being treated and disposed of onsite. However, there was only one TRI filing ever – the NMP in

---

[32] Note: a more specific request, specifically requesting these documents, has been submitted to verify, but there are no responsive documents yet.

COMPLAINT ABOUT A SEMICONDUCTOR MANUFACTURING PLANT
RE: 3250 SCOTT BLVD SANTA CLARA, CALIFORNIA

2020. Why were no other chemicals recorded in TRI? Why wasn't the 2019 silane and phosphine leak reported? Why was this NMP release recorded in TRI? Was it only filed due to the solvent exposure issues reported by me and others?

## 3250 Scott Blvd: Reporting Status of Rogue Chemicals

| | Release / Leak / Spill / Violation | CERS | "Inventory Form" | DTSC Manifests |
|---|---|---|---|---|
| **Acrylonitrile** | Indoor Air | None | Listed | None |
| **Phosphine** | Multiple Leaks | None | Listed | None |
| **Silane** | Multiple Leaks | None | Listed | None |
| **Chlorine** | Code violation for not reporting | None | Listed | None |
| **Benzene** | Indoor Air | None | Unknown (Solutions) | Unknown (Solutions) |
| **Ethylbenzene** | Indoor Air | None | Unknown (Solutions) | Unknown (Solutions) |
| **Toluene** | Indoor Air | None | Unknown (Solutions) | Listed (5lb, 2021) |
| **Trichloroethylene (TCE)** | Groundwater; Wastewater | None | None | None |
| **1,2-Dichloroethylene** | Indoor Air; WW Filings | None | None | None |
| **Xylenes** | Indoor Air; Urine | None | Unknown (Solutions) | Listed (4lb, 2022) |
| **2-Methyl-1-propanol (NMP)** | Intentional Release | Listed | Listed | None |
| **1,2,4-Trichlorobenzene** | Indoor Air; Groundwater | None | Listed as Solution | None |

Per documents from the local wastewater facility, the operator regularly flushes at least 40,000 gallons of water daily into wastewater lines and repeatedly fails to comply with permit requirements to frequently test the water to ensure it does not include chemical contamination above acceptable limits. The sewer lines from the plant flow near and around the apartment complex. In the fall of 2020, I reported possible vapor issues from the fire-riser drainage system

COMPLAINT ABOUT A SEMICONDUCTOR MANUFACTURING PLANT

RE: 3250 SCOTT BLVD SANTA CLARA, CALIFORNIA

outside my bedroom with a compromised p-trap and improperly installed plumbing in the bathroom resulting in unsealed sewer connections.[33]



*My Industrial Hygienist inspection (2020)*

The operator's semi-annual wastewater self-monitoring reports have included many contaminants, including solvents. The records show TCE was present in the operator's wastewater on at least August 2017 at 24 ug/L and February 2020 at 0.248 ug/L, per the lab reports. So far, no records show the operator's registering storage, use, or disposal of TCE at this site. Hence, it is unclear if the operator has additional chemicals on site that have not been registered in CERS or with the city. The new and increasing TCE in the nearby groundwater well may also suggest TCE leaks or dumping. In January 2023, the US EPA decided that TCE is now banned due to the whole chemical having an unreasonable risk to human health.[34]

The operator has filed several 'Toxic Organic Compound' worksheets with the regional wastewater facility reporting use and disposal of 1,2-dichloroethylene; however, there is no 1,2-dichloroethylene noted in either CERS or the Haz Mat inventory documents. Similarly, wastewater filings note 'off-site disposal' of the chemical, yet there were no manifests for 1,2-dichloroethylene. Similarly, Ethylbenzene is reported in wastewater filings noted as 'off-site

---

[33] Sewer Gas: An Indoor Air Source of PCE to Consider During Vapor Intrusion Investigations, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3740581/
[34] US EPA, TSCA: TCE, https://www.epa.gov/assessing-and-managing-chemicals-under-tsca/risk-management-trichloroethylene-tce

COMPLAINT ABOUT A SEMICONDUCTOR MANUFACTURING PLANT

RE: 3250 SCOTT BLVD SANTA CLARA, CALIFORNIA

disposal,' yet there are no manifests for Ethylbenzene. These chemicals were found inside my living room during indoor air testing.

Disposal manifests are also inconsistent, with several chemicals only disposed of once and never again. These are often very toxic chemicals that appear in inventory sheets in large quantities. This infers that either the waste is being stockpiled for years before disposal or the waste is being treated and disposed of on-site. Some examples of these chemicals include manifests for 23lbs of white phosphorus only in 2017; 44lbs yellow phosphorus only in 2020; 936lbs of hexane only in 2016; and 377lbs of ferric chloride and 5lbs of toluene only in 2021. Hexane and Toluene were found in my living room. The only offsite disposal of xylenes was four pounds in 2022. Xylenes were found in my living room and in my urine.

Manifests also reflect several concerning operational issues, including that the activated carbon onsite was only first replaced in December 2020 (six years after 2015). After 2020, following my complaints, the carbon was replaced for the first time and then every year after. Generally, activated charcoal for activities like this is replaced at least every six months – not every six years. Charcoal loses its ability to filter and must be replaced; otherwise, it no longer filters, and any chemical released is not abated before entering the open air.

| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|
| **Activated Charcoal (Carbon)** | 0 | 0 | 0 | 0 | 0 | 630lbs | 980lbs | 1255lbs |
| **Roof HVAC Filters** | 0 | 0 | 0 | 0 | 0 | 0 | 400lbs | 0 |
| **Vacuum Filters** | 0 | 0 | 0 | 0 | 0 | 0 | 60lbs (with glass) | 0 |

Similarly, the roof's HVAC filters' (400 pounds) were only first replaced in 2021. Was the carbon and filters only replaced because of my complaints? Were they used to the point that they were no longer filtering when I and others were ill?

The operator's RCRA Biennial reports claimed that equal amounts of waste were generated as was shipped offsite: 344 tons in 2017, 706 tons in 2019, and 491 tons in 2021. However, these reports do not match the total amounts reflected in the manifests. Further, the

- Page 17 of 28 -

COMPLAINT ABOUT A SEMICONDUCTOR MANUFACTURING PLANT

RE: 3250 SCOTT BLVD SANTA CLARA, CALIFORNIA

2021 Biennial report claimed no record of 'Generated Waste Managed On-Site,' yet the 2020 TRI report noted thousands of pounds of NMP managed onsite in 2020. How can the operator treat and dispose of thousands of pounds of hazardous waste onsite the same year the operator also claims it managed no hazardous waste on-site?

| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|
| **TRI – Treated Onsite** | 0 | 0 | 0 | 0 | 0 | 2,341 pounds | 0 | 0 |
| **TRI – Disposed Offsite** | 0 | 0 | 0 | 0 | 0 | 14,743 pounds | 0 | 0 |
| **TRI – Disposed Onsite** | 0 | 0 | 0 | 0 | 0 | 260.17 pounds | 0 | 0 |
| **BR – Treated Onsite** | 0 | 0 | | 0 | | 0 | | 0 |
| **BR – Disposed Offsite** | 0 | 344.2 tons | | 705.8 tons | | 290.6 tons | | 0 |
| **Manifests ID 1 – Disposed Offsite** | 2411 tons | 80.9 tons | 316.9 tons | 12.5 tons | 0 | 0 | 0 | 0 |
| **Manifests ID 2 – Disposed Offsite** | 0 | 0 | 1.1 tons | 927 tons | 835 tons | 254 tons | 512 tons | 441.5 tons |

The Biennial source codes are also peculiar, including 2.6 tons of 'spent acid' in 2021 and 6.3 tons of 'spent acid' in 2019 were tagged as 'off-specification, aged, or surplus organics.' The waste is coded as '<u>spent</u> acid' – implying tons of hazardous waste may have been stored so long it became 'aged' waste?[35] The operator also has mercury on-site and appears to have never reported it to the EPA.[36]

---

[35] US EPA, Biannual Reports,
https://enviro.epa.gov/envirofacts/br/report?handlerId=CAR000278176&reportingYear=2017,
https://enviro.epa.gov/envirofacts/br/report?handlerId=CAR000278176&reportingYear=2019 ,
https://enviro.epa.gov/envirofacts/br/report?handlerId=CAR000278176&reportingYear=2021
[36] US EPA, Mercury, https://www.epa.gov/mercury/frequent-questions-about-epas-mercury-inventory-reporting-rule

## COMPLAINT ABOUT A SEMICONDUCTOR MANUFACTURING PLANT
### RE: 3250 SCOTT BLVD SANTA CLARA, CALIFORNIA

The operator has already been cited for several violations of fire, hazmat, environment, and health and safety laws at the plant – with the Fire Department, city planning, and the county wastewater facility writing them up repeatedly for failure to keep proper documentation, file reports on time or at all, failure to track chemicals, and failure to have business plans or spill plans. The 'root cause' of issues for two of the violations was noted as "*negligence*." [37]

Only two routine Fire Department/Haz Mat inspections are noted in CERS: in 2016 and 2020. There were apparently six violations arising out of those two inspections, and four violations from 2016 appear to have not been corrected until 2020. Further, the inspection in October of 2020 revealed several issues, including 1,700 gallons of diesel were 'missing' and the operator's stockpile of chlorine gas (a weapon of mass effect) was not reported to regulators despite having over 200 pounds on site.

Many of these violations have sat open for over three years without apparent follow-up by the city agency. In addition, some of these violations show fundamental gaps in planning and oversight – such as concurrently using two EPA IDs for hazardous waste disposal for over three years, no hazardous material training, and failure to have a business license for the 3260 Scott office adjacent to 3250 Scott.  Two inspections were noted in the US EPA RCRA system on 10/26/2020 and 12/23/2020. These dates match assessments conducted by the city of Santa Clara. Therefore, it appears the city believes the facility is registered as an RCRA site, even though it does not have a DTSC permit.

---

[37] "Endangerment is 'substantial,' for purposes of RCRA's imminent hazard citizen suit, where there is reasonable cause for concern that someone or something may be exposed to risk of harm by release, or threatened release, of hazardous substances in event remedial action is not taken." Resource Conservation and Recovery Act of 1976, § 2(a)(1)(B), 42 U.S.C.A. § 6972(a)(1)(B). Burlington Northern and Santa Fe Ry. Co. v. Grant, 505 F.3d 1013 (10th Cir. 2007).

## COMPLAINT ABOUT A SEMICONDUCTOR MANUFACTURING PLANT
### RE: 3250 SCOTT BLVD SANTA CLARA, CALIFORNIA

### 3250 Scott: Violations (Excerpt)

| | City Fire Department | Other |
|---|---|---|
| **2022** | | |
| **2021** | • Phosphine leak/spill | |
| **2020** | • Fire code violations<br>• Using 2 EPA IDs<br>• Inaccurate hazmat inventory information<br>• No SPCC plan or training<br>• No signature from supervisor on records<br>• No spill prevention briefings<br>• No tank facility plan<br>• No business permit | • Wastewater testing violations |
| **2019** | • Phosphine & silane leak/spill | • Wastewater testing violations |
| **2018** | | |
| **2017** | | |
| **2016** | • Fire code violation<br>• CalASPA violation<br>• Health & Safety code violation | • Spilling cooling water solution into storm drains |
| **2015** | | • City planning 'stop work' order due to construction without permits and failure to heed prior warnings |

## COMPLAINT ABOUT A SEMICONDUCTOR MANUFACTURING PLANT
### RE: 3250 SCOTT BLVD SANTA CLARA, CALIFORNIA

### CONTAMINATION (SPILLS & CLEAN-UP)



The groundwater at 3250 Scott is shallow and flows downgradient under the apartment complex. The US EPA Superfund site has a groundwater plume of TCE and other solvents that extends under the property.

Despite being located on a Superfund plume and having a history of waste disposal into the land/groundwater, there is no record of a clean-up assessment for the plant in Geotracker or Envirostor. There should be a remedial investigation into this site due to the US EPA TRI records of thousands of pounds of hazardous waste disposal into the ground and air due to the 'acid pit' due to the active Superfund plume and due to unstable solvents in the groundwater on site where existing groundwater wells show increasing solvents (i.e., 1,1-DCE, vinyl chloride, 1,2,4-TCB, TCE, and more).

As noted, the property also contained at least an "acid neutralization plant," "acid waste tank," and "acid neutralization pit." All of these are for waste treatment and disposal. US EPA TRI records for the plant also note repeated disposal of hazardous waste via onsite 'injection wells,' "stack/point emissions," "fugitive and non-point emissions," "surface impound," and "other disposal" from 1987-1991. The fugitive onsite air releases include 26,277 pounds of Freon 113, 260 pounds of sulfuric acid, and 250 pounds of phosphoric acid.[38] Both terms 'injection wells' and 'surface impound' infer, at the very least, some form of Underground Storage Tanks. The city also cited the operator for spilling cooling water into a storm drain in June 2016.

There appears to be insufficient oversight of the contamination at the apartments and 3250 Scott. For example, per EPA documents, one of the groundwater wells flagged for

---

[38] US EPA TRI,
https://enviro.epa.gov/enviro/tri_formr_v2.fac_list?rptyear=2020&facopt=dcn&fvalue=1320219310885&fac_search=fac_beginning

## COMPLAINT ABOUT A SEMICONDUCTOR MANUFACTURING PLANT
### RE: 3250 SCOTT BLVD SANTA CLARA, CALIFORNIA

increasing solvent contamination was accidentally buried under a sidewalk when the apartments were constructed in 2017 and required a specialty consultant to 'find' the missing well in 2022.[39] [40]



Although the DTSC plan approved the apartments and claimed groundwater was not a concern, there is increasing contamination in at least three wells around the 3250 Scott property, the 'missing' well, a well on-site at 3250 Scott, and also another well near where my apartment was located that has new and increasing TCE from an unknown source – perhaps related to the TCE found in 3250 Scott's wastewater.

Despite the US EPA overseeing vapor intrusion testing of buildings on the Superfund plume, the 3250 Scott building was somehow excluded without explanation, despite it being on the plume. I complained to US EPA and USACE about this months ago, but they have yet to respond. It seems incredibly dangerous not to evaluate 3250 Scott for vapor intrusion with all the highly reactive and explosive chemicals used at the plant.

The US EPA has also inexplicably disavowed the groundwater well on the 3250 Scott property as no longer associated with the plume and left the well unaccounted for, despite increasing contamination of 1,2,4-Trimethylbenzene that appears to potentially be caused by a recent spill or leak near the operator's acid neutralization system. The operator's Haz Mat inventories list at least one product that contains 1,2,4-TCB (Rinse Solvent T1100) and 1,2,4-TCB fumes were also found in my living room. The spill occurred at some point after 2014 and no later than 2020, a period in which the operator had control



[39] Geotracker, Synertek, https://geotracker.waterboards.ca.gov/profile_report?global_id=SL721241222
[40] US EPA, Synertek, https://cumulis.epa.gov/supercpad/cursites/csitinfo.cfm?id=0902620

## COMPLAINT ABOUT A SEMICONDUCTOR MANUFACTURING PLANT
### RE: 3250 SCOTT BLVD SANTA CLARA, CALIFORNIA

of the property where the well was located. The well with this contaminated groundwater is only 150 feet upgradient from the apartment complex buildings.

Without RCRA oversight for eight years, multiple chemical spills and leaks have already impacted the surrounding community. There has already been harm which could have been prevented by compliance with regulations.

## RESPONSIBLE PARTY

The manufacturing plant is at 3250 Scott Blvd in Santa Clara. Informally, it is called Scott 1 and was known as Synergy Semiconductor prior.[41] The tenant and operator is Apple Inc which has code-named its involvement in project documents "Project Aria."  On November 8, 2016, the operator submitted a Phase 1 tiered permit application. However, on November 11, 2016, DTSC noted the application as a "Permit by Rule" despite high-risk activities, conflicting information being provided and no inspection. In addition, the operator's responses (per a third-party geologist) in the application are not complete or accurate. Finally, no approval letter was even sent, nor were any instructions provided about the PBR if one was granted.

The November 22 2016, approval letter from DTSC noted that the information provided by the applicant would "be verified by DTSC through a site visit in the near future." But, per DTSC this year, there was never any follow-up or further communication about the site after that letter. US EPA also claimed they have no records or knowledge of the site.

The records I was able to obtain reveal that the operator must have known about its RCRA and other environmental/safety responsibilities by at least 2016, yet continued to fail to meet its essential regulatory obligations or seek appropriate permits and oversight. The situation at hand exceeds the bounds of strict liability. The operator knew they caused harm and only attempted to cover up what they did while failing to take precautions to avoid future harm.

The plant operator has a long-time pattern and practice of noncompliance with local, state, and federal health/safety and environmental laws. The company even agreed to a consent decree with CalEPA DTSC in 2016 due to egregious violations of the Hazardous Waste Control Law for universal waste (§25100), including operating two off-book waste processing facilities

---

[41] The active EPA ID is CAR000278176.

## COMPLAINT ABOUT A SEMICONDUCTOR MANUFACTURING PLANT
### RE: 3250 SCOTT BLVD SANTA CLARA, CALIFORNIA

that unlawfully processed over 2,000,000 pounds of universal waste. DTSC's complaint noted that the operator processed waste "*without informing the Department of the existence of [the] facility or complying with the Department's universal waste regulations.*" DTSC also complained that the operator had shipped hazardous waste as non-hazardous waste, used a Transporter not authorized to store or treat the operator's hazardous waste, and even violated international law by shipping unauthorized hazardous waste to Canada.[42]

The operator was also recently cited and fined in North Carolina for RCRA violations, including transporting and disposing of hazardous waste by unregistered Transporters and Treaters, failure to conduct proper waste determinations, failure to register as a Large Quantity Generator, failure to track hazardous waste transports with manifests, and failing to submit reports to federal and state regulators about hazardous waste activities onsite. North Carolina's Division of Waste Management found Apple's handling of hazardous waste was "*negligent*" with a major deviation from legal requirements and with a major risk of harm to human health and the environment.[43] There are many other incidents in California and other states as well.

I am a prior long-time employee of Apple Inc. I am a state and federal witness in several open investigations and cases against Apple for labor, fraud, and whistleblower retaliation violations –based on violations of health/safety and environmental laws related to the TRW Microwave Superfund site in Sunnyvale, California (my previous office). My reports to the US EPA about the property led to a mandatory inspection, numerous correction actions, and federally overseen testing and mitigations.[44] I was promptly and violently fired for snitching.[45] I also have open California Department of Labor Retaliation cases, including retaliation under Proposition 65.

As mentioned, I also lived in the apartment complex next to the plant in 2020. I continue to suffer from the chemical exposure at the apartments and my office. While the most severe issues seem to have been resolved, I now have asthma severe enough to require an inhaler. Much

---

[42] California DTSC's lawsuit against Apple over universal waste and resulting consent agreement in 2016 can be found at *People of the State of California ex rel DTSC v Apple Inc*, Case No. 16CV303579.

[43] North Carolina's lawsuit against Apple over Hazardous Waste Rules can be found at *In Re: Apple Computer Inc.*, NCR000149526, Docket #2017-04.

[44] US EPA, TRW, https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.scs&id=0901181&doc=Y&colid=40417&region=09&type=SC

[45] Index on Censorship, https://journals.sagepub.com/doi/pdf/10.1177/03064220211068699

COMPLAINT ABOUT A SEMICONDUCTOR MANUFACTURING PLANT

RE: 3250 SCOTT BLVD SANTA CLARA, CALIFORNIA

of my hair fell out, and I am still trying to regrow the bald patches. I have what appears to be permanent scar tissue on my skin from the chemical burns. I worry daily about my increased risk for cancer and disease due to the exposure. I also suffer severe PTSD from the experience. I will never be the same after what happened to me living next to 3250 Scott Blvd for eight months.

## CONCLUSION & REQUEST

I respectfully request an investigation and inspection. When I contacted US EPA and California DTSC earlier this year, they expressed no knowledge of the site. The site must be contacted about its lapsed and missing permits. I want professional inspectors to investigate this site. Does this site require an RCRA permit? What is occurring on-site? What is being released? Are testing and clean-up required? Have there been other spills and leaks?

Factories like that at 3250 Scott are supposed to properly manage their toxic chemicals and adequately track what is done with them to protect human health and the environment. Programs like Right to Know were intended to prevent chemical emergencies and ensure publicly available information about nearby hazardous substances and releases. These laws were created after deadly clouds of toxic fumes killed and disabled thousands of people in 1985.

Today, we have a factory releasing clouds of toxic chemicals around an apartment complex with thousands of people – at least some of whom became ill and disabled because of it. If the factory operator at 3250 Scott does not comply with RCRA laws and does not feel like it has to, then this operator is not incentivized to improve its environmental and health/safety performance. There is no deterrence effect to dissuade from engaging in risky and dangerous behavior. Every day the egregious misconduct is tolerated, the operator is further empowered to continue in their dangerous malfeasance.

I hope this complaint is found to justify an investigation as the situation is an ongoing threat to public health and the environment, the issues reflect persistent noncompliance by the operator, and those issues and noncompliance involve multiple agency jurisdictions. I also believe that some of this conduct may rise to criminal activity. Apple has clearly had knowledge

COMPLAINT ABOUT A SEMICONDUCTOR MANUFACTURING PLANT

RE: 3250 SCOTT BLVD SANTA CLARA, CALIFORNIA

of the imminent and substantial risks, yet has shown persistent reckless indifference for human life. [46]

In September 2020, I contacted Apple (my then-employer), informing them about the solvent exposure diagnosis and asking if they knew of conditions around my apartment complex, noting there appeared to be an Apple office next door at 3250 Scott. Apple's Real Estate EH&S team promptly contacted me and suggested I use a special type of paid time-off called "Extreme Condition Leave" to evacuate the area and move to a new apartment. (The leave was intended for natural disasters). I also warned Apple's in-house medical clinic that other Apple employees had also reported health issues at the apartments and suggested they screen for health issues at the location. Shortly after, I also reported CERCLA non-compliance at my office to the US EPA. Apple responded by harassing and firing me.[47]

Apple's known for two years what it has done but only cares about covering up its misconduct and silencing witnesses. The government must intervene to prevent further harm. I have additional concerns and extensive supporting evidence. Please feel free to contact me with any questions, for an interview, and to obtain additional documentation.



Respectfully,

**Ashley M. Gjovik**

ashleymgjovik@protonmail.com

---

[46] "Where it was shown in an RCRA criminal endangerment case that the defendant's employees had been exposed to toxic wastes while at work, the Tenth Circuit Court of Appeals, in affirming the defendant's conviction, held that evidence that the employees were suffering from psychoorganic syndrome as a result of the exposure, which could have impaired their mental faculties, was sufficient to meet the 'imminent danger of serious bodily injury' standard." *U.S. v. Protex Industries, Inc.*, 874 F.2d 740 (10th Cir. 1989).

[47] Gizmodo, https://gizmodo.com/apple-wanted-her-fired-it-settled-on-an-absurd-excuse-1847868789

COMPLAINT ABOUT A SEMICONDUCTOR MANUFACTURING PLANT

RE: 3250 SCOTT BLVD SANTA CLARA, CALIFORNIA

# 3250 Scott: Concern Summary

| | Human Health: Residential | Human Health: Non-Residential | Ecological Repairs & Resource Restoration |
|---|---|---|---|
| **Air (Outdoor)** | • Prevent exposure to chemicals from exhaust vents<br>• Prevent exposure to chemicals from waste processing<br>• Notify community | • Prevent exposure to chemicals from exhaust vents<br>• Prevent exposure to chemicals from waste processing | n/a |
| **Air (Indoor)** | • Prevent vapor intrusion from VOCs in groundwater to occupied buildings<br>• Vapor intrusion testing | • Prevent vapor intrusion from VOCs in groundwater to occupied buildings<br>• Prevent worker exposure | n/a |
| **Groundwater** | • Develop well monitoring plan to alert if contaminated groundwater has traveled downgradient under apartments | • Evaluate groundwater contamination on-site<br>• Prevent employee exposure to groundwater<br>• Develop treatment plan, if applicable | • Establish attainment levels & attain levels in all groundwater on site, if appropriate |
| **Surface Water** | • Evaluate if any contamination of San Tomas Aquino Creek | | |
| **Soil** | • Contain any contaminated soil to prevent exposure to apartment residents | • Perform soil testing and assessment<br>• Prevent worker exposure to contaminated soil | • Cease all unauthorized land disposals<br>• Prevent any contamination from leaching into groundwater |
| **Waste** | • Contain waste<br>• Establish waste exposure monitoring (air monitoring, etc.) | • Prevent employee exposure to waste | • Evaluate contamination from acid pit, acid neutralization system, injection well disposal, point emissions, and other historic disposal<br>• Develop clean-up plan for contamination, if applicable |

COMPLAINT ABOUT A SEMICONDUCTOR MANUFACTURING PLANT
RE: 3250 SCOTT BLVD SANTA CLARA, CALIFORNIA

# References

**Appendixes**

Exhibits: Factory History [48]

Exhibits: Factory Operations [49]

Exhibits: Santa Clara Square Apartments [50]

**Complaint Submitted To**

California EPA; US EPA; Santa Clara Fire Department; Santa Clara Planning Division; Mayor Gillmor; Santa Clara County Department of Environmental Health; see associated cases below

**Associated Open Cases:**

U.S. Department of Labor: *Ashley Gjovik v Apple* (9-3290-22-051)

California Department of Labor: *Ashley Gjovik v Apple* (RCI-CM-842830)

US NLRB: *NLRB v Apple Inc*, Complainant Ashley Gjovik (32-CA-284428 & 32-CA-284441)

**Associated Investigations:**

U.S. EPA: Synertek Superfund (CAD990832735)

U.S. EPA: TRW Microwave Superfund (CAD009159088)

U.S. NLRB: 32-CA-282142, 32-CA-283161, & 32-CA-288816

U.S. SEC: 16304-612-987-465

---

[48] Access: https://drive.google.com/drive/folders/1ND6hcHW8iCnX-zCm3511JDLzfQ-IizHK?usp=sharing
[49] Access: https://drive.google.com/drive/folders/1ND6hcHW8iCnX-zCm3511JDLzfQ-IizHK?usp=sharing
[50] Access: https://drive.google.com/drive/folders/1ND6hcHW8iCnX-zCm3511JDLzfQ-IizHK?usp=sharing

Login    Contact Us

Your report has been successfully sent. Your confirmation is below.

# Report Environmental Violations - Submitted

Thank you for submitting information on a possible environmental violation. The information will be reviewed by EPA enforcement personnel.

This notice will be the only response you will receive regarding your submission. Due to the sensitive manner in which enforcement information must be managed by EPA, we cannot provide status reports or updates regarding any submission we receive through the Report Environmental Violations form.

Back to Report Environmental Violations page

# Report Confirmation

| | |
|---|---|
| Received | Jun 12, 2023 at 12:34am EDT |
| | |
| Your Name | Ashley Gjovik |
| Your Email | ashleymgjovik@protonmail.com |
| Your Phone Number | 4159646272 |
| | |
| Suspected Violator's Name * | Apple Inc |
| Suspected Violation Location * | 3250 Scott Blvd |

6/12/23, 12:34 AM                     Report Environmental Violations - Submitted | ECHO | US EPA

| | |
|---|---|
| Suspected Violation City * | Santa Clara |
| Suspected Violation State * | California |
| Suspected Violation ZIP Code * | 95054 |
| Responsible Party | Company |
| | |
| Is the suspected violation still occurring? | Yes |
| Date of Incident | |
| Characterized incident as: | |
| Intention * | Unknown |
| Violation Method * | Release |
| Affected Subject(s) | Land, Air, Worker, Documents |
| | |

| Violation Description * | Please access and attach the complaint and exhibits here: https://drive.google.com/drive/folders/1ND6hcHW8iCnX-zCm3511JDLzfQ-IizHK?usp=sharing |
|---|---|
| | Excerpt of text from the complaint (does not include tables or images): |
| | To Whom It May Concern, |
| | This complaint concerns a high-risk semiconductor manufacturing plant operating in a sensitive population in Santa Clara California. Over the last eight years, the operator of this plant appears to have been engaged in unauthorized storage and disposal of hazardous waste; unlawful disposal of hazardous waste into the air, sewers, and storm drains; repeated spills and leaks of 'very dangerous substances' (including into outdoor air); and apparent violations of RCRA/Right to Know and Proposition 65. |
| | The operations at this plant have been registered as a "Chemical Storage Facility, Hazardous Waste Onsite Treatment; Above Ground Petroleum Storage Tank; Hazardous Chemical Management; Hazardous Waste Generator; and RCRA Large Quantity Hazardous Waste Generator" since June 22, 2015. The plant is not registered with CalEPA for RCRA or as a 'Treatment-Storage-Disposal Facility' (TSDF). The city government also opted out of oversight by the Santa Clara County Department of Environmental Health, so the city Fire Department and local wastewater facility solely manage supervision. It appears there are no records of hazardous waste treatment inspections ever. |
| | I believe the plant requires a Full Permit from DTSC. The current DTSC permit, if there was one, was inappropriate (a permissive Permit-by-Rule without rules or conditions) and expired in 2021. In 2022, the operator told the city Planning department the site is not a hazardous material/waste site (claiming it was not on Envirostor, even though it is, but marked as 'inactive'). |
| | The plant in this complaint is only 273 feet from a large apartment complex (1,800+ units with 2,000-6,000 tenants). It is also 800 feet from the exposed San Tomas Aquino Creek waterway, which flows to the San Francisco Bay. The groundwater under the plant and flowing south/southwest under the apartments is shallow at only 6-10 feet below ground. The apartments included 'fresh air vents', which appear to have intake fans on the roof of the building that pulls outdoor air (including factory exhaust) into the HVAC for the apartment units. |
| | The apartment complex next to the manufacturing plant is the "Santa Clara Square Apartments." There is a large grocery store 1,000 feet away from the factory. The factory is only 360 feet from an open-air children's playground and less than 600 feet from three large, open-air community swimming pools. |
| | After moving into this apartment complex in February 2020, I became mysteriously ill and severely disabled. Doctors documented slowed heart rate, arrhythmias, premature |

ventricular contractions, volatile blood pressure, hypotension, hypertension, rashes and hives, and tumors – but no explanation of what caused the issues. I was fainting constantly and suffering from respiratory, GI, pericarditis-like, and MS-like symptoms. These symptoms often worsened around 7-8 am and 8-11 pm. In addition, every 3-4 weeks, I would wake up precisely at 3 am, choking and suffocated, nauseous and sweaty, dizzy and disoriented, and feeling like I was dying. The 3 am choking spells included symptoms that appeared to be heart failure, though two echocardiograms were okay.

I went on short-term disability and was billed over $100,000 in medical bills trying to figure out what was wrong with me. In September 2020, I discovered the apartment complex was a Brownfield site on a Superfund plume. Within a week of vacating the location in October 2020, my disabling medical issues vanished. My heart rate and blood pressure stabilized, I was no longer dizzy or fainting, and I had no more 3 am choking spells. Over a few months, the rashes subsided, and the tumor shrank. Two chemical exposure doctors diagnosed my 2020 illness as acute solvent exposure.

In 2021, I was connected to six additional victims after I published an article about what happened to me and what I discovered about the contamination on-site. Two women complained of health issues similar to mine. One of these women then contacted the local government and CalEPA DTSC, though nothing was done by these agencies, even with additional victims reporting illness.

Limited indoor air testing via a two-hour sorbent tube showed the presence of several chemicals inside my apartment which are known to be used at the semiconductor factory, including Acetonitrile, 1,2,4-TCB, Ethylbenzene, Hexane, Toluene, Ethyl acetate, 2-Methyl-1-propanol, Acetic Acid, Acetone, and Xylenes. There was also Freon 113, which had been released in vast quantities at the plant in the 1980s-1990s.

Dr. Harrison at UCSF Occupational Health Services instructed in his visit notes that "there remains a concern about potential pathways for residential exposures, and these should be addressed by the county and State environmental agencies." (April 29, 2021). Dr. Harrison also directs the worker tracking and investigation program for the California Department of Public Health. Stanford's Dr. Nadeau also saw me and diagnosed me with Multiple-Chemical Sensitivity Syndrome caused by solvent exposure.

When I notified the property manager of unexplained spiking VOCs in my apartment that aligned with my symptoms, they said they sent PG&E to inspect the area. They said they were unconcerned because there was no evidence of 'gas leaks' or 'chemical spills,' thus 'no evidence suggesting that [my apartment] was unsafe.' As we now know, multiple gas leaks and chemical spills occurred nearby at 3250 Scott Blvd.

While DTSC apparently never evaluated the exposure beyond the possibility of vapor intrusion from soil or groundwater, the apartment's property manager later hired an ex-DTSC employee who now does 'environmental public relations' to deal with me.

Within only a couple of days, she even agreed with me that something was wrong. She wrote, "It sure seems something is going on, but a lot of weird things too, and I can't quite tie it all together in my head" and "This all just confounds me, but it sure seems something is going on."

In February of 2023, I discovered through public records requests that manufacturing activities were taking place next to my apartment at this 3250 Scott Blvd factory. Upon further investigation, I discovered numerous noncompliance issues, known leaks/spills, and other chemical emissions. This factory is a direct vector for my chemical exposure and medical issues. Chemicals known to cause the symptoms I experienced are known to be on-site and even known to have leaked/spilled, and several of them were found in the indoor air of my apartment.

The operator appears to have some waste handling permits; however, they do not seem sufficient to cover the actual activities. Further, the operator repeatedly violated record-keeping and reporting requirements. It also appears possible that the operator does not have a valid or active waste handler permit at all despite handling hazardous waste, including treatment and disposal of hazardous waste.

The facility is actively used for RCRA activities. There is storage of enormous amounts of chemicals, including corrosive, ignitable, reactive, toxic, explosive, oxidizers, pyrophoric, carcinogens, and 'very dangerous substances.' There is a tremendous amount of waste removed to treatment facilities; however, also a significant gap between disposal and inventories, implying a similarly large amount of waste is treated and disposed of on-site. HazMat/Haz Waste tanks, containers, drip pads, evaporation systems, abatement systems, scrubbers, neutralization systems, and exhaust vents are mentioned. However, there are only two regulatory filings about treatment over eight years.

The operator has used an "Acid Waste Neutralization system" since at least March 2016. The operator reported this system in a letter requesting a discharge to the local wastewater treatment facility. In this letter, the operator noted plans to process and discharge 3,000 gallons of a corrosive solution (hydrogen peroxide, acetic acid, and peroxyacetic acid) over two days via their "neutralization system." It appears the operator has used the neutralization system for specific toxic substances and non-specific RCRA sources, such as spent solvent wastes.

Comparing Haz Mat to CERS, the operator has persistently failed to keep its chemical inventory current in CERS, omitting numerous extremely hazardous substances stored and used in large quantities. This includes chemicals like phosphine, silane, arsine, chlorine, phosphorus trichloride, hydrogen chloride, and other very dangerous chemicals, including those categorized as chemical weapons (i.e., DHS's 'weapons of mass effect').

The operator's building records show the installation of several hydride abatement systems in 2019-2022 designed for phosphine and silane. However, there are no records of off-site disposal of silane or phosphine, so gases must be treated and disposed of on-site. Haz Mat inventories from 2021 report storage of at least

1,664 cubic feet (160 lbs) of phosphine and 705 cubic feet (63 lbs) of silane. At least 208 feet of diluted phosphine gas is also reported in a closed-loop system.

There have been at least two phosphine/silane leaks. The first was disclosed in response to a public records request to the Fire Department. On June 1, 2019, a phosphine and silane spill resulted in an evacuation and a city Haz Mat visit. The incident report noted that the alarm was triggered by silane and phosphine "in scrubbers." This assumably refers to a treatment system and implies that the gas left a closed-loop system. It is unclear if the gases were exhausted to the outdoor air. This spill was never reported to DTSC, US EPA, or CalOES. I reported this spill to CalOES on June 8, 2023, as a historical report and to obtain more details about what occurred.

Then, in 2021 there was apparently another phosphine leak. This one is only recorded in CalOES (reported by the Fire Department), but no records were released as part of the public records request, nor was the spill noted in any US EPA or CalEPA records. The April 30, 2021 spill notes say phosphine gas was "vented into the atmosphere." The report noted that the 'scrubber system' malfunctioned (again), and the toxic gas "entered the ventilation system." This leak appears to be due to treatment failures, resulting in an evacuation and Haz Mat visit. Perhaps related – two weeks later, hazardous waste manifests show that 60 pounds of 'vacuum filters contaminated with glass dust' were sent for offsite incineration, implying there was some interior explosion related to the phosphine leak. Was there a phosphine explosion?

Silane (aka silicon tetrahydride) exposure can cause dizziness, asphyxiation, nausea, and burns. Exposure to phosphine can cause difficulty breathing, suffocation, low blood pressure, vomiting, arrhythmia, blue skin, pulmonary edema, heart failure, coma, and death. Both gases are pyrophoric and can self-ignite in the air. An air concentration of 500 ppm (parts-per-million) of phosphine is lethal in 30 minutes, and 1000 ppm is fatal 'after a few breaths.' The half-life for these chemicals is 5-28 hours in the air, and the chemical is heavier than air, so it tends to pool instead of rise. In case of spills or leaks of either chemical, the area must be evacuated at least 300-1,000 feet 'in all directions,' but evacuation is 2,640-5,280 feet downwind for larger spills. The apartments are only 273 feet away. Why weren't the apartment residents notified?

In 2020, I repeatedly complained to doctors that my 3 am choking spells included waking up with my right arm cold, blue, and tingling; gasping for air; low blood pressure, bradycardia, and arrhythmia. Doctors performed two echocardiograms to rule out heart failure (as these are symptoms of heart failure). A cloud of phosphine gas, perhaps auto-released at 3 am, could have induced heart failure despite no anatomical defect.

City records show a 'Community Risk Reduction' meeting with the operator in 2022 about the silane and phosphine gas systems, noting it was the first risk reduction review. [Note: silane and phosphine are extremely hazardous substances, and CESQT cannot govern treatment]. The Risk Reduction report includes

notes that imply exhaust ducts were not labeled and were constructed with inappropriate materials; hazardous waste may have been disposed of improperly; there was no emergency shutdown automation if the containment systems failed; and there are concerns about the distance of solvent exhausts from nearby properties.

Additional building permits and records reflect several 'Gas Bunkers' and 'Gas Abatement units.' City records show frequent updates to vents, exhaust, and ductwork. In 2019, the city issued "compliance comments" for the site, apparently expressing concerns that the operator was uncertain where all its exhaust ducts were, where they went, and what was inside them. Further, the comments reflect concerns about backdrafts and exhaust vent heights on the roof related to air intake from the roof. [Note: a similar situation is an active safety issue at my Sunnyvale office with the same operator, the US EPA has ordered corrective actions. ]

Further, ignitable and reactive waste is supposed to be stored at least 50 feet from the property line. However, the operator's Acid Neutralization Tank is only 38 feet from the building to its west. It also appears there is no Waste Minimization Plan, Recyclable Materials Biennial report, Waste Stream Analysis, Pollution Prevention (P2) reports, Treatment Unit permits, Leak Detection monitoring or controls, and no record of financial assurance for closure/post-closure or 3rd party liability insurance.

In February 2016, the city requested the operator participate in CalARP due to the tenant's "certain regulated chemicals above a reporting threshold" and asked the tenant to submit a Risk Management Plan. The plan was made available for comment physically at the Fire Department for 45 days. There have been no plans submitted since. The Clean Air Act requires these plans for 'facilities that use extremely hazardous substances,' which must be revised and resubmitted to EPA every five years.' Here, the plan was not submitted to EPA, and the plan did not even leave the physical premises of a local city Fire Department. The plan also should have been revised in 2021, two years ago.

In 2020, the factory registered the treatment and release of a highly regulated and now-banned chemical through 'point emissions' and 'on-site treatment' occurring in 2020. The facility did not report these activities to US EPA Toxic Release Inventory until June 2021. The operator said 2,342 pounds of the combustible solvent NMP (N-Methylpyrrolidone) was treated onsite, and 260 pounds of NMP was released onsite via "air emissions." The waste treatment method noted was "absorber," however, the standard treatment of NMP is offsite disposal "in original containers" and "do not mix with other waste." NMP vapor is heavier than air, and the half-life in the air is estimated to be 5.2 hours. Safety sheets advise conducting downwind evacuation at least 1,000 feet in case of a spill. The apartments are 273 feet away. The Material Safety Data Sheet clearly states that NMP "should not be released into the environment," "do not let product enter drains," and instructs to "do not breath vapors." This release was never reported to CalOES, so I also reported the NMP release to CalOES on June 8, 2023.

The TRI entry for the NMP also noted that 14,742 Pounds of the NMP was 'treated offsite' in 2020 and noted three Transporters who supposedly transported the chemical offsite. However, the TRI entry does not note Manifest IDs and a thorough review of the Manifests for the site does not show any NMP. There are no Manifests for removing NMP between 2015 and the current day. This data submitted to TRI appears to be falsified with no NMP actually moved offsite, or if it was, then without manifests.

The EPA banned NMP as a whole chemical under TSCA in December of 2022 after proposing a rule to ban NMP back in 2017. There appears to be no plan on how the operator will dispose of this now-banned chemical, and in 2021, they reported over 190 gallons of it still onsite. The operator apparently previously treated and disposed of the NMP onsite – is that what they plan to do with the rest? Are they treating and disposing on-site now? Or perhaps they are using unauthorized Transporters without manifests?

In addition to my medical issues and other symptoms, extensive property damage was consistent with NMP exposure. My white linens (clothing, sheets, towels, etc.) turned yellow; many of my metals showed corrosion and reactions (jewelry, belts, shoes, clothing, etc.); and some of my plastics also turned yellow. NMP is known to attack copper and degrade certain plastics. The yellowing of lines was not a stain; there was no way to get it out. A state Public Health medical doctor suggested it appeared to be accelerated ozone yellowing from a solvent or other VOC. "NMP tends to oxidize in the presence of air, giving a yellow color."

The environmental consultant assigned to the site from October 2019-March 2020, signing hazardous waste manifests during that time, posted on his LinkedIn profile that during his time working at 3250 Scott, he worked to "find cost savings for [his] client" and "c[a]me up with innovative methods for disposal of unique wastes." What types of disposals did he "innovate" to cut costs? What kind of "innovation" did he undertake?

Despite a "Hazardous Waste Onsite Treatment" designation in CERS from the city agency, there is no RCRA permit, nor are there any apparent TTU permits or other treatment permits released in the public records request. There are also no records of local agencies ever conducting a Hazardous Waste Onsite Treatment inspection – despite the use of at least an acid neutralization system, numerous gas abatement systems (and two silane and phosphine leaks from that system), and over ten thousand pounds of NMP treated on site.

The operator also has an "evaporation system" in its service yard. A building permit was requested in 2018 to install a new 'HMR evaporation system"; however, it appears there was an evaporation system that also existed prior. The service yard is not contained; it is open-air with a non-enclosed canopy roof. There are also at least two 'gas bunkers.' It is unclear what work is done in the yard and if solvents are being evaporated into the open air. There are significant gaps between the chemicals noted in CERS compared to those pointed out in the Haz Mat inventories and again compared to the manifests for disposal. There are a large number of chemicals that are listed in the inventories, yet with no

record of any offsite disposal or offsite treatment. This infers that a substantial amount of hazardous waste is being treated and disposed of onsite. However, there was only one TRI filing ever – the NMP in 2020. Why were no other chemicals recorded in TRI? Why wasn't the 2019 silane and phosphine leak reported? Why was this NMP release recorded in TRI? Was it only filed due to the solvent exposure issues reported by me and others? Per documents from the local wastewater facility, the operator regularly flushes at least 40,000 gallons of water daily into wastewater lines and repeatedly fails to comply with permit requirements to frequently test the water to ensure it does not include chemical contamination above acceptable limits. The sewer lines from the plant flow near and around the apartment complex. In the fall of 2020, I reported possible vapor issues from the fire-riser drainage system outside my bedroom with a compromised p-trap and improperly installed plumbing in the bathroom resulting in unsealed sewer connections.

The operator's semi-annual wastewater self-monitoring reports have included many contaminants, including solvents. The records show TCE was present in the operator's wastewater on at least August 2017 at 24 ug/L and February 2020 at 0.248 ug/L, per the lab reports. So far, no records show the operator's registering storage, use, or disposal of TCE at this site. Hence, it is unclear if the operator has additional chemicals on site that have not been registered in CERS or with the city. The new and increasing TCE in the nearby groundwater well may also suggest TCE leaks or dumping. In January 2023, the US EPA decided that TCE is now banned due to the whole chemical having an unreasonable risk to human health.

The operator has filed several 'Toxic Organic Compound' worksheets with the regional wastewater facility reporting use and disposal of 1,2-dichloroethylene; however, there is no 1,2-dichloroethylene noted in either CERS or the Haz Mat inventory documents. Similarly, wastewater filings note 'off-site disposal' of the chemical, yet there were no manifests for 1,2-dichloroethylene. Similarly, Ethylbenzene is reported in wastewater filings noted as 'off-site disposal,' yet there are no manifests for Ethylbenzene. These chemicals were found inside my living room during indoor air testing.

Disposal manifests are also inconsistent, with several chemicals only disposed of once and never again. These are often very toxic chemicals that appear in inventory sheets in large quantities. This infers that either the waste is being stockpiled for years before disposal or the waste is being treated and disposed of on-site. Some examples of these chemicals include manifests for 23lbs of white phosphorus only in 2017; 44lbs yellow phosphorus only in 2020; 936lbs of hexane only in 2016; and 377lbs of ferric chloride and 5lbs of toluene only in 2021. Hexane and Toluene were found in my living room. The only offsite disposal of xylenes was four pounds in 2022. Xylenes were found in my living room and in my urine.

Manifests also reflect several concerning operational issues, including that the activated carbon onsite was only first replaced in December 2020 (six years after 2015). After 2020, following

my complaints, the carbon was replaced for the first time and then every year after. Generally, activated charcoal for activities like this is replaced at least every six months – not every six years. Charcoal loses its ability to filter and must be replaced; otherwise, it no longer filters, and any chemical released is not abated before entering the open air. Similarly, the roof's HVAC filters' (400 pounds) were only first replaced in 2021. Was the carbon and filters only replaced because of my complaints? Were they used to the point that they were no longer filtering when I and others were ill?

The operator's RCRA Biennial reports claimed that equal amounts of waste were generated as was shipped offsite: 344 tons in 2017, 706 tons in 2019, and 491 tons in 2021. However, these reports do not match the total amounts reflected in the manifests. Further, the 2021 Biennial report claimed no record of 'Generated Waste Managed On-Site,' yet the 2020 TRI report noted thousands of pounds of NMP managed onsite in 2020. How can the operator treat and dispose of thousands of pounds of hazardous waste onsite the same year the operator also claims it managed no hazardous waste on-site?

The Biennial source codes are also peculiar, including 2.6 tons of 'spent acid' in 2021 and 6.3 tons of 'spent acid' in 2019 were tagged as 'off-specification, aged, or surplus organics.' The waste is coded as 'spent acid' – implying tons of hazardous waste may have been stored so long it became 'aged' waste? The operator also has mercury on-site and appears to have never reported it to the EPA.

The operator has already been cited for several violations of fire, hazmat, environment, and health and safety laws at the plant – with the Fire Department, city planning, and the county wastewater facility writing them up repeatedly for failure to keep proper documentation, file reports on time or at all, failure to track chemicals, and failure to have business plans or spill plans. The 'root cause' of issues for two of the violations was noted as "negligence."

Only two routine Fire Department/Haz Mat inspections are noted in CERS: in 2016 and 2020. There were apparently six violations arising out of those two inspections, and four violations from 2016 appear to have not been corrected until 2020. Further, the inspection in October of 2020 revealed several issues, including 1,700 gallons of diesel were 'missing' and the operator's stockpile of chlorine gas (a weapon of mass effect) was not reported to regulators despite having over 200 pounds on site. Many of these violations have sat open for over three years without apparent follow-up by the city agency. In addition, some of these violations show fundamental gaps in planning and oversight – such as concurrently using two EPA IDs for hazardous waste disposal for over three years, no hazardous material training, and failure to have a business license for the 3260 Scott office adjacent to 3250 Scott. Two inspections were noted in the US EPA RCRA system on 10/26/2020 and 12/23/2020. These dates match assessments conducted by the

city of Santa Clara. Therefore, it appears the city believes the facility is registered as an RCRA site, even though it does not have a DTSC permit.

The groundwater at 3250 Scott is shallow and flows downgradient under the apartment complex. The US EPA Superfund site has a groundwater plume of TCE and other solvents that extends under the property.

Despite being located on a Superfund plume and having a history of waste disposal into the land/groundwater, there is no record of a clean-up assessment for the plant in Geotracker or Envirostor. There should be a remedial investigation into this site due to the US EPA TRI records of thousands of pounds of hazardous waste disposal into the ground and air due to the 'acid pit' due to the active Superfund plume and due to unstable solvents in the groundwater on site where existing groundwater wells show increasing solvents (i.e., 1,1-DCE, vinyl chloride, 1,2,4-TCB, TCE, and more).

As noted, the property also contained at least an "acid neutralization plant," "acid waste tank," and "acid neutralization pit." All of these are for waste treatment and disposal. US EPA TRI records for the plant also note repeated disposal of hazardous waste via onsite 'injection wells," "stack/point emissions," "fugitive and non-point emissions," "surface impound," and "other disposal" from 1987-1991. The fugitive onsite air releases include 26,277 pounds of Freon 113, 260 pounds of sulfuric acid, and 250 pounds of phosphoric acid. Both terms 'injection wells' and 'surface impound' infer, at the very least, some form of Underground Storage Tanks. The city also cited the operator for spilling cooling water into a storm drain in June 2016.

There appears to be insufficient oversight of the contamination at the apartments and 3250 Scott. For example, per EPA documents, one of the groundwater wells flagged for increasing solvent contamination was accidentally buried under a sidewalk when the apartments were constructed in 2017 and required a specialty consultant to 'find' the missing well in 2022.

Although the DTSC plan approved the apartments and claimed groundwater was not a concern, there is increasing contamination in at least three wells around the 3250 Scott property, the 'missing' well, a well on-site at 3250 Scott, and also another well near where my apartment was located that has new and increasing TCE from an unknown source – perhaps related to the TCE found in 3250 Scott's wastewater.

Despite the US EPA overseeing vapor intrusion testing of buildings on the Superfund plume, the 3250 Scott building was somehow excluded without explanation, despite it being on the plume. I complained to US EPA and USACE about this months ago, but they have yet to respond. It seems incredibly dangerous not to evaluate 3250 Scott for vapor intrusion with all the highly reactive and explosive chemicals used at the plant.

The US EPA has also inexplicably disavowed the groundwater well on the 3250 Scott property as no longer associated with the plume and left the well unaccounted for, despite increasing contamination of 1,2,4-Trimethylbenzene that appears to

potentially be caused by a recent spill or leak near the operator's acid neutralization system. The operator's Haz Mat inventories list at least one product that contains 1,2,4-TCB (Rinse Solvent T1100) and 1,2,4-TCB fumes were also found in my living room. The spill occurred at some point after 2014 and no later than 2020, a period in which the operator had control of the property where the well was located. The well with this contaminated groundwater is only 150 feet upgradient from the apartment complex buildings.

Without RCRA oversight for eight years, multiple chemical spills and leaks have already impacted the surrounding community. There has already been harm which could have been prevented by compliance with regulations.

The manufacturing plant is at 3250 Scott Blvd in Santa Clara. Informally, it is called Scott 1 and was known as Synergy Semiconductor prior. The tenant and operator is Apple Inc which has code-named its involvement in project documents "Project Aria." On November 8, 2016, the operator submitted a Phase 1 tiered permit application. However, on November 11, 2016, DTSC noted the application as a "Permit by Rule" despite high-risk activities, conflicting information being provided and no inspection. In addition, the operator's responses (per a third-party geologist) in the application are not complete or accurate. Finally, no approval letter was even sent, nor were any instructions provided about the PBR if one was granted.

The November 22 2016, approval letter from DTSC noted that the information provided by the applicant would "be verified by DTSC through a site visit in the near future." But, per DTSC this year, there was never any follow-up or further communication about the site after that letter. US EPA also claimed they have no records or knowledge of the site.

The records I was able to obtain reveal that the operator must have known about its RCRA and other environmental/safety responsibilities by at least 2016, yet continued to fail to meet its essential regulatory obligations or seek appropriate permits and oversight. The situation at hand exceeds the bounds of strict liability. The operator knew they caused harm and only attempted to cover up what they did while failing to take precautions to avoid future harm.

The plant operator has a long-time pattern and practice of noncompliance with local, state, and federal health/safety and environmental laws. The company even agreed to a consent decree with CalEPA DTSC in 2016 due to egregious violations of the Hazardous Waste Control Law for universal waste (§25100), including operating two off-book waste processing facilities that unlawfully processed over 2,000,000 pounds of universal waste. DTSC's complaint noted that the operator processed waste "without informing the Department of the existence of [the] facility or complying with the Department's universal waste regulations." DTSC also complained that the operator had shipped hazardous waste as non-hazardous waste, used a Transporter not authorized to store or treat the operator's hazardous waste, and even violated international law by shipping unauthorized hazardous waste to Canada.

The operator was also recently cited and fined in North Carolina for RCRA violations, including transporting and disposing of hazardous waste by unregistered Transporters and Treaters, failure to conduct proper waste determinations, failure to register as a Large Quantity Generator, failure to track hazardous waste transports with manifests, and failing to submit reports to federal and state regulators about hazardous waste activities onsite. North Carolina's Division of Waste Management found Apple's handling of hazardous waste was "negligent" with a major deviation from legal requirements and with a major risk of harm to human health and the environment. There are many other incidents in California and other states as well.

I am a prior long-time employee of Apple Inc. I am a state and federal witness in several open investigations and cases against Apple for labor, fraud, and whistleblower retaliation violations – based on violations of health/safety and environmental laws related to the TRW Microwave Superfund site in Sunnyvale, California (my previous office). My reports to the US EPA about the property led to a mandatory inspection, numerous correction actions, and federally overseen testing and mitigations. I was promptly and violently fired for snitching. I also have open California Department of Labor Retaliation cases, including retaliation under Proposition 65.

As mentioned, I also lived in the apartment complex next to the plant in 2020. I continue to suffer from the chemical exposure at the apartments and my office. While the most severe issues seem to have been resolved, I now have asthma severe enough to require an inhaler. Much of my hair fell out, and I am still trying to regrow the bald patches. I have what appears to be permanent scar tissue on my skin from the chemical burns. I worry daily about my increased risk for cancer and disease due to the exposure. I also suffer severe PTSD from the experience. I will never be the same after what happened to me living next to 3250 Scott Blvd for eight months.

I respectfully request an investigation and inspection. When I contacted US EPA and California DTSC earlier this year, they expressed no knowledge of the site. The site must be contacted about its lapsed and missing permits. I want professional inspectors to investigate this site. Does this site require an RCRA permit? What is occurring on-site? What is being released? Are testing and clean-up required? Have there been other spills and leaks?

Factories like that at 3250 Scott are supposed to properly manage their toxic chemicals and adequately track what is done with them to protect human health and the environment. Programs like Right to Know were intended to prevent chemical emergencies and ensure publicly available information about nearby hazardous substances and releases. These laws were created after deadly clouds of toxic fumes killed and disabled thousands of people in 1985.

Today, we have a factory releasing clouds of toxic chemicals around an apartment complex with thousands of people – at least

some of whom became ill and disabled because of it. If the factory operator at 3250 Scott does not comply with RCRA laws and does not feel like it has to, then this operator is not incentivized to improve its environmental and health/safety performance. There is no deterrence effect to dissuade from engaging in risky and dangerous behavior. Every day the egregious misconduct is tolerated, the operator is further empowered to continue in their dangerous malfeasance.

I hope this complaint is found to justify an investigation as the situation is an ongoing threat to public health and the environment, the issues reflect persistent noncompliance by the operator, and those issues and noncompliance involve multiple agency jurisdictions. I also believe that some of this conduct may rise to criminal activity. Apple has clearly had knowledge of the imminent and substantial risks, yet has shown persistent reckless indifference for human life.

In September 2020, I contacted Apple (my then-employer), informing them about the solvent exposure diagnosis and asking if they knew of conditions around my apartment complex, noting there appeared to be an Apple office next door at 3250 Scott. Apple's Real Estate EH&S team promptly contacted me and suggested I use a special type of paid time-off called "Extreme Condition Leave" to evacuate the area and move to a new apartment. (The leave was intended for natural disasters). I also warned Apple's in-house medical clinic that other Apple employees had also reported health issues at the apartments and suggested they screen for health issues at the location. Shortly after, I also reported CERCLA non-compliance at my office to the US EPA. Apple responded by harassing and firing me. Apple's known for two years what it has done but only cares about covering up its misconduct and silencing witnesses. The government must intervene to prevent further harm. I have additional concerns and extensive supporting evidence. Please feel free to contact me with any questions, for an interview, and to obtain additional documentation.

| File(s) Uploaded | No files uploaded. |
|---|---|

# Gjovik v. Apple

# Exhibit

**Ashley M. Gjovik, JD**
*In Propria Persona*
2108 N St. Ste. 4553
Sacramento, CA, 95816
(408) 883-4428
legal@ashleygjovik.com

# United States District Court

## Northern District of California

|  |  |
|---|---|
| **Ashley M. Gjovik,**<br>*an individual*,<br><br>Plaintiff,<br><br>vs.<br><br>**Apple Inc.,**<br>*a corporation, et al.,*<br><br>Defendant. | D.C. Case No. 3:23-CV-04597-EMC<br><br>Ninth Circuit Case No. 24-6058<br><br>**Plaintiff's Fifth Amended Complaint**<br><br>Claims: Civil Litigation<br><br>Demand for Jury Trial. |

# Table of Contents

SUMMARY OF THE CASE ................................................................................................. 1

JURISDICTION AND VENUE ......................................................................................... 2

PARTIES .......................................................................................................................... 3

PROCEDURAL HISTORY ................................................................................................ 3

STATEMENT OF FACTS ................................................................................................. 4

LEGAL CLAIMS ............................................................................................................ 40

    KNOWLEDGE OF PROTECTED ACTIVITIES ................................................................. 40

    COUNT ONE: WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY ............... 42

    COUNT TWO: CALIFORNIA WHISTLEBLOWER PROTECTION (CAL.LAB.C. § 1102.5) ... 45

    COUNT THREE: CALIFORNIA LABOR CODE § 6310 ..................................................... 46

    COUNT FOUR: CALIFORNIA LABOR CODE § 98.6. ..................................................... 47

    TOXIC TORT TOLLING THEORIES ............................................................................. 50

    COUNT FIVE: PRIVATE NUISANCE ........................................................................... 53

    COUNT SIX: TORT OF FEAR OF CANCER & DISEASE .................................................. 56

    COUNT SEVEN: TORT OF OUTRAGE .......................................................................... 60

        *Burglary, SWATing, & Destruction of Property* ..................................................... 61

        *Defamation, Trade Libel, Intimidation, Retaliation* ............................................... 63

        *Stalking, Obstruction, & Deranged Harassment* .................................................... 65

        *Injuries and Impact* .............................................................................................. 68

    VICARIOUS LIABILITY, RATIFICATION, & NEGLIGENCE ............................................ 69

CONCLUSION & PRAYER FOR RELIEF ......................................................................... 74

## SUMMARY OF THE CASE

1.  This lawsuit arises from Apple Inc.'s ("Defendant") reckless disregard of environmental regulations and safety requirements at two different Silicon Valley properties and subsequent concealment of their unlawful acts and the extensive harm they caused.

2.  In 2020, Apple severely injured and nearly killed Ashley Gjovik ("Plaintiff") with Apple's unlawful toxic waste dumping from a stealth semiconductor fabrication facility in Santa Clara, California (Plaintiff did not discover that Apple was responsible for her injuries until 2023, but Apple is believed to have known by mid-2021). In 2021, Plaintiff also exposed that Apple violated health, safety, and environmental rules and regulations at her team's office on a triple Superfund site in Sunnyvale, California.

3.  Plaintiff filed environmental and safety complaints and partnered with numerous government agencies to document and investigate the issues. Apple repeatedly made statements to Plaintiff instructing her not to talk to her coworkers or the government about her safety and compliance concerns, pressured her not to ask questions, prevented her from gathering evidence, and tried to conceal their unlawful activities from her and the government.

4.  Apple management retaliated against Plaintiff when she asked questions and expressed concerns. They repeatedly said the retaliation was because of her safety and environmental complaints. They incited and encouraged others to harass and intimidate the Plaintiff. Apple took negative employment actions against Plaintiff to coerce her into quitting the company, but Apple fired her when she did not stop.

5.  Apple's explanation for firing the Plaintiff has changed multiple times and was not communicated until a week after her termination. The reason proffered is pretextual but unlawful itself. Three years later, Apple still has not admitted who initiated the decision to terminate Plaintiff's employment and has refused Plaintiff's requests for them to provide this information.

6.  During Apple's marathon of retaliation against Plaintiff in 2021, Plaintiff was in law school studying to become a human rights lawyer. She was in a position to report serious environmental and safety issues effectively and to lobby for policy reform. Plaintiff used her knowledge, experience, and resources to confer with government agencies, meet with various elected officials

1    and their staff, publish op-eds calling for legislation, was interviewed and written about by the press,

2    and served as a witness for government agencies and legislative committees.

3        7.  Plaintiff spoke out publicly, organized with coworkers, lobbied on their behalf, and called

4    for change in Apple's environmental and labor practices. Plaintiff's advocacy also brought

5    awareness to her prior neighbors of the pollution issues where she had lived in 2020, leading to

6    more chemical exposure victims joining Plaintiff in complaining to the government.

7        8.  In 2021, Plaintiff filed retaliation and discrimination complaints with multiple

8    administrative agencies, including the U.S. NLRB, U.S. EEOC, U.S. Department of Labor,

9    California Department of Labor, and California DFEH. The EEOC and DFEH claims were merged

10    into this lawsuit. The U.S. Department of Labor whistleblower retaliation case is currently with the

11    Administrative Review Board.[1] U.S. NLRB is prosecuting Apple for unlawful employment policies,

12    per Plaintiff's October 2021 charge.[2] NLRB will start prosecution imminently against Apple for its

13    retaliation and unfair labor practices committed against Plaintiff.

14        9.  Over the last three years, due to Plaintiff's investigations and advocacy, multiple

15    government inspections of Apple's two facilities have been noted, resulting in citations for

16    environmental and safety regulatory violations, ordered corrective actions, and required

17    monitoring. The plaintiff still regularly speaks with the U.S. EPA ("EPA") as a community

18    advocate.

19        10.  Apple continued harassing and retaliating against Plaintiff after she was fired and through

20    the current day, intentionally interfering with and severely damaging her career, reputation,

21    relationships, finances, physical condition, mental health, and every aspect of her life.

22    <div align="center">**JURISDICTION AND VENUE**</div>

23        11.  The U.S. District Courts have diversity jurisdiction over this case because the amount in

24    controversy exceeds $75,000 and the parties are of diverse state citizenship. [28 U.S.C. § 1332].

25    When the complaint was filed, Plaintiff was domiciled in New York and is now domiciled in the

26

27    [1] *Ashley Gjovik v Apple Inc,* 2024-CER-00001 (OALJ), 2024-0060 (ARB); CERCLA 42 U.S.C. §9610, Clean
Air Act 42 U.S.C. §7622, RCRA 42 U.S.C. §6971, TSCA 15 U.S.C. §2622.

28    [2] NLRA 29 U.S. Code § 158.

1    Commonwealth of Massachusetts. Apple is a corporation headquartered in California. The venue

2    is proper in the District Court of Northern California because Apple is headquartered and operates

3    in this district. Many of Plaintiff's claims arose from acts, omissions, and injuries within the

4    District of Northern California [Civil L.R. 3-5(b)].

5                                        **PARTIES**

6        12. Ashley Gjovik, ("Plaintiff"), is a natural person currently domiciled in Boston,

7    Massachusetts.[3] The plaintiff holds a recently awarded Juris Doctor degree from Santa Clara

8    University School of Law and is appearing as a pro se. The plaintiff was an employee of Apple Inc.

9    from February 2015 through September 2021. The plaintiff held a leasehold at a Santa Clara

10   residential property at 3255 Scott Blvd, next to Apple's semiconductor fabrication at 3250 Scott

11   Blvd, from February 2020 through October 2020.

12       13. Apple Inc. is a business engaged in and affecting interstate commerce and a covered

13   entity under the federal statutes at issue here.[4] Apple is a corporation headquartered at One Apple

14   Park Way in Cupertino, California Apple says it "*designs, manufactures and markets smartphones,*

15   *personal computers, tablets, wearables and accessories, and sells a variety of related services.*" As of

16   November 2024, Apple Inc. claimed an annual revenue of $394.33B.[5]

17       14. At all pertinent times, Apple was the tenant and operator controlling the facilities at both

18   825 Stewart Drive in Sunnyvale and 3250 Scott Blvd. in Santa Clara, California at both properties,

19   Apple registered its state and federal Resource Conservation and Recovery Act activities under its

20   own name and with Apple EH&S as the contact for the government and public.

21                                  **PROCEDURAL HISTORY**

22       15. Plaintiff now files her 5th Amended Complaint ("5-AC"), in an abbreviated version but

23   with the same substantive content as the prior 5-AC version. The plaintiff filed her original

24   complaint on September 7 2023. The 1st Amended Complaint was filed in October 2023 per

25   _____

26   [3] The plaintiff established a consulting LLC in California in 2022, which she manages with a virtual office
     in Sacramento. The LLC address is used on papers for privacy.

27   [4] "*Apple*" refers to its successors and assigns; controlled subsidiaries, divisions, groups, affiliates,
     partnerships, and joint ventures; and their directors, officers, managers, agents, and employees.

28   [5] Apple Inc, 2024 10K, https://investor.apple.com/sec-filings/default.aspx

1   stipulation, to allow Apple more time to prepare, as needed due to Apple's delayed arrival in court.

2       16.   The 2nd Amended Complaint was filed on December 21 2023 as a matter of course but

3   was dismissed sua sponte by this court without prejudice and with leave to amend on January 30

4   2024, ordering Plaintiff to reduce the length by over five hundred pages.

5       17.   The 3rd Amended Complaint was filed on February 27 2024, met with a Motion to

6   Dismiss and Motion to Strike, and was ruled upon with a decision and order issued May 20 2024.

7   The 4th Amended Complaint was filed on June 18 2024, also met with Motions to Dismiss and

8   Strike, and was ruled upon with a decision and order issued October 1 2024. The plaintiff was

9   ordered to revise her complaint again.

10      18.   On October 1, 2024, the Plaintiff filed an appeal to the 9th Circuit Court of Appeals,

11  contesting denied injunctions, collateral orders, and the dismissal with prejudice of dozens of her

12  claims, mostly due to discretionary procedural reasons not related to the potential merit of the

13  claims. The plaintiff filed a pending Motion to Stay pending appeal.

14                            ## STATEMENT OF FACTS

15      19.  **3250 Scott Blvd, Santa Clara:**  In early 2015, Apple started stealth semiconductor

16  fabrication activities in a facility located at 3250 Scott Blvd. in Santa Clara, California. Like some

17  sort of skunkworks, Apple codenamed the facility "*Aria*" and even tried to use the codename on

18  regulatory paperwork. Apple's intentional actions to obfuscate the owner and nature of the facility

19  delayed Plaintiff's discovery of Apple's fabrication activities for years.

20      20.   The 3250 Scott fabrication operated less than three hundred feet from thousands of

21  homes where Plaintiff lived in 2020, the Santa Clara Square Apartments. Within three hundred

22  feet of the building were two public parks, picnic tables, outdoor fitness stations, and a children's

23  playground. Within one thousand feet of 3250 Scott, there was also a church, a school, an elder

24  care facility, and the San Tomas Aquino Creek, which flows into the Pacific Ocean.

25      21.   At 3250 Scott, Apple was cited for building, environmental, health, safety, and fire code

26  violations in 2015 (stop work order due to construction without permits), 2016 (spill of cooling

27  water into storm drains, fire code and California ASPA violations, health and safety code violations,

28  failure to monitor wastewater discharge adequately), 2019 (wastewater testing violations), 2020

1    (fire code violations, using two EPA ID numbers, inaccurate hazardous materials inventory data,

2    no spill plans or training, no business permit, no signature from supervisor on records, and failure

3    to monitor wastewater discharge again adequately).

4        22.    Apple intentionally vented its fabrication exhaust, unabated, and consisting of toxic

5    solvent vapors, gases, and fumes, into the ambient outdoor air. The factory was one story, while the

6    apartments were four stories high, creating a high likelihood that Apple's factory exhaust entered

7    the interior air of the apartments through open windows and the 'fresh air intake' vents.

8        23.    Santa Clara City Fire Department records for 3250 Scott include at least sixteen

9    chemical spill reports at 3250 Scott within only three years. These reports included eight confirmed

10    leaks/spills: leaks of phosphine and silane on June 1 2019; a phosphine leak on October 21 2019; a

11    tetraethyl orthosilicate leak on July 17 2020; a significant phosphine leak on April 30 2021; a 5%

12    fluorine gas leak on April 18 2022, a hexafluorobutadiene leak on May 29 2022, and leaks of two

13    unnamed toxic gases on September 20 2022 and December 21 2022.

14        24.    Later, in 2021-2022, Apple reported to the government that in 2020, Apple released at

15    least 7.8 tons (15,608 pounds) of volatile organic compounds and 260 pounds of the combustible

16    solvent N-Methyl-2-pyrrolidone (NMP) into the exterior air. In 2022, the EPA severely restricted

17    the legal use of NMP as *"it presents an unreasonable risk of injury to human health"* under the TSCA.

18        25.    Per a review of Apple's manifests, Apple did not replace the carbon/charcoal in its

19    exhaust system for over five years, with the first replacement occurring December 14, 2020 – only

20    after Plaintiff had notified Apple EH&S and environmental legal about what occurred to her near

21    3250 Scott. Apple also reported to the Bay Area Air Quality Management Board ("BAAQMD"),

22    in difficult-to-find agency filings, that in at least 2019-2021, 3250 Scott exhausted reportable

23    amounts of mercury, arsenic, carbon monoxide, and formaldehyde into the ambient air around the

24    factory.

25        26.    The leaks, spills, and releases were not limited to the air. Apple's wastewater discharge

26    monitoring repeatedly showed the presence of heavy metals and organic solvents. In 2017,

27    government-mandated testing revealed the presence of 29 µg/L of 1,1-dichloropropane, 24 µg/L

28    of trichloroethylene, and 6.7 µg/L of ethyl tertiary-butyl ether. It is unclear why Apple had

1    trichloroethylene on site but not in any of its chemical inventories, and why exactly Apple was

2    pouring that trichloroethylene down the drain.

3        27.  3250 Scott reported an average daily water usage of around 44,000 gallons, and the sewer

4    pipes carrying 3250 Scott's discharges flowed downhill and directly around the apartment where

5    Plaintiff lived in 2020. In 2020, the government had already started investigating the plumbing at

6    her apartment as a vector for some unknown solvent vapor pollution.

7        28.  Apple was fully aware of this facility and its operations, as every year, Apple submitted a

8    financial assurance document to the Santa Clara Fire Department which detailed hazardous waste

9    treatment and disposal operations and was signed by Apple's Chief Financial Officer, Luca Maestri

10   – including affixing a company seal. Financial assurance filings also attached a detailed confirmation

11   letter from Apple's third-party auditor, E&Y, on behalf of Apple. Maestri was also on the email

12   distribution list for notification of hazardous waste violations at the facility.

13       29.  **Chemical Injuries in 2020:** In February 2020, Plaintiff moved into a new apartment at

14   the Santa Clara Square Apartments (adjacent to 3250 Scott) and quickly became severely ill with

15   severe fainting spells, dizziness, chest pain, palpitations, stomach aches, exhaustion, fatigue, and

16   strange sensations in her muscles and skin. The plaintiff also suffered bradycardia, volatile blood

17   pressure with hypertension and hypotension, and a high frequency of premature ventricular

18   contractions. Due to the solvent exposure, Plaintiff also suffered skin rashes, burns, and hives, and

19   her hair fell out and she had a shaved head for a year as the bald patches slowly grew back.

20       30.  Plaintiff visited the emergency room on February 13 2020, and Urgent Care (at Apple's

21   for-profit clinic) on February 20 2020. Plaintiff then consulted with dozens of doctors who

22   screened her for all sorts of diseases, subjecting Plaintiff to extensive blood draws, urine samples,

23   injections, and scans – including potentially dangerous procedures like MRI and CT scans with

24   contrast. From February - September 2020, Plaintiff was screened for multiple severe and fatal

25   diseases and disorders, including M.S., brain tumors, deadly arrhythmias, and NMO. The plaintiff

26   was too sick to work and went on disability.

27       31.  Plaintiff transitioned her medical care to a different clinic and provider after her Apple

28   primary care provider at AC Wellness refused to help her triage her 2020 medical issues. Instead,

she suggested Plaintiff was suffering from anxiety and enrolled Plaintiff in an Apple internal study related to blood pressure, requiring Plaintiff to share her iPhone medical and fitness data and participate in weekly life coaching sessions (while being exposed to Apple's solvent vapor and gas exhaust).

32. While sick in 2020, Plaintiff would wake up occasionally at 3 AM feeling like she was dying and with symptoms of heart failure and asphyxia. Heart monitoring showed arrhythmias, bradycardia, and low blood pressure. On September 2 2020, Plaintiff discovered elevated levels of volatile organic compounds in her home. What immediately captured Plaintiff's attention was the significant spike in volatile organic compounds that had occurred the night prior, around 3 AM, while she had been suffering from a "dying" spell.

33. Plaintiff sought out occupational and environmental exposure doctors, who told Plaintiff that all her symptoms were consistent with solvent and other chemical exposure. The plaintiff quickly filed complaints with the Santa Clara Fire Department, U.S. EPA California EPA. She also called Poison Control, who said what she described sounded like Benzene exposure. Before moving out Plaintiff also gathered extensive video, photo, medical monitoring, and air monitoring data – which supports the claims in this lawsuit.

34. All the reported toxic gas leaks during the time frames Plaintiff her symptoms in 2020 were the worst around 8-9 AM, 10-11 PM, and sometimes around 2-3 AM. One of the few chemical spills that did not occur during those times was caused by an Apple engineer accidentally turning on lethal fluorine gas. Another incident was root caused to an Apple engineer accidentally installing the gas for a tool "backwards." In the two weeks following the April 2021 phosphine leak, Apple's manifests included sixty pounds of "*vacuum filters contaminated with glass dust*" implying there may have been a phosphine explosion. The TEOS leak occurred on July 17 2020. That day Plaintiff was covered in hives, rashes, and skin abnormalities. She visited a dermatologist who had no idea what caused the rash.

35. In September 2020, Plaintiff hired an industrial hygienist to evaluate the indoor air at her apartment. She ordered an inspection, soil testing, and a two-hour sorbent tube-based TO-17 air panel. Plaintiff's testing returned results showing several of the chemicals in use by Apple at 3250

Scott including acetone, acetonitrile, acetaldehyde, benzene, 1,2-dichloroethane, ethanol, ethylbenzene, hexane, isopropanol, isopropyl toluene, methylene chloride, toluene, and xylene.

36. In September 2020, Plaintiff set up more air monitors to observe the levels of volatile organic compounds in her apartment next to the 3250 Scott factory (though she was not aware of the factory exhaust at that time). The results of the data confirmed what Plaintiff had noticed with her symptoms and ad hoc testing – that the volatile organic compounds mostly spiked early in the morning and late at night as if they were being exhausted from an automated mechanical system (which it was). The plaintiff notified several Apple executives of her findings and activities, including her managers Powers and West, and her Apple coworkers, Josh and Aidria.

37. In September 2020, Plaintiff's blood and urine test results showed industrial chemicals, including arsenic, mercury, toluene, and xylenes. Also noteworthy are the symptoms of Plaintiff's 3 AM attacks, (including both subjective reporting and physical real-time heart monitoring) match phosphine and arsine gas exposure.[6]

38. Phosphine and arsine are extremely dangerous, exposure can be fatal, and there are no antidotes. Apple has a significant quantity of arsine gas onsite, and Plaintiff's medical tests from September 2020, on the morning after a 3 AM attack, revealed significant arsenic in her blood with no other explanation than arsine gas exposure within the prior 8 hours.

39. In September 2020, Plaintiff noticed an Apple facility at 3250 Scott across the street, which was on the same Superfund groundwater plume as her apartment. The plaintiff mentioned the facility to Apple in September 2020, inquiring if anyone was familiar with the area because Apple had an office there. Apple EH&S (Elizabeth) and Plaintiff had at least two phone calls. The woman who responded oversaw EH&S teams involved in 825 Stewart Drive and the activities at 3250 Scott. In September 2020, Elizabeth suggested that Plaintiff use a special paid leave to move out of the apartment called '*extreme condition leave*' designated for disasters. Later, in September 2021, Apple Employee Relations, Waibel, conferred with Elizabeth about Plaintiff's environmental concerns only hours before Plaintiff was abruptly fired.

---

[6] US CDC, NIOSH, *Arsine Emergency Response.*

40. In October 2020, Plaintiff asked her manager from Apple Legal, Joyce, if she knew anyone who practiced environmental law because Plaintiff may be interested in the field and wanted to learn more. The plaintiff was introduced to Deborah, Apple's EH&S counsel. Deboarh met with Plaintiff twice on a video chat, in November 2020. The plaintiff spoke about her experience in 2020.

41. During the conversation the lawyer admitted to Plaintiff that Apple did not have EH&S counsel before her, that she was still catching up, that Apple needed to be doing inspections and testing that it had not done, and that she was trying to get them to start soon. Deborah was Apple's legal representative with the EPA for the August 2021 inspection of Plaintiff's Superfund office. Deborah was and is also in charge of EH&S legal matters for 3250 Scott.

42. On February 21, 2023, the Plaintiff discovered the semiconductor fabrication activities at 3250 Scott. She shared the discovery on Twitter that day, expressing severe distress about Apple engaging in potentially lethal and ultrahazardous activities directly next to apartments. The plaintiff's posts also complained explicitly about the presumed toxic exhaust Apple would release from the roof of 3250 Scott and into the windows of her apartment. Until that day, Plaintiff did not know it was Apple who was responsible for making her so ill in 2020 and did not know these chemicals were potentially lethal to human life.

43. Plaintiff undertook months of research about 3250 Scott, consulting with more experts, meeting with government agencies, requesting more public records, and drafting a formal complaint. On June 23 2023, Plaintiff filed complaints about 3250 Scott to the EPA, CalEPA, the city of Santa Clara, and Santa Clara County.

44. U.S. EPA's Enforcement and Compliance div. for Hazardous Waste and Chemicals assigned an inspector and a formal investigation was opened around July 12 2023.[7] Plaintiff met with the EPA's Resource Conservation and Recovery Act Enforcement and Compliance team several times before they inspected Apple's factory in August 2023 and January 2024.

45. Per the formal report, the EPA inspectors identified at least 19 unique violations of the

---

[7] US Environmental Protection Agency, ECHO, 3250 Scott Blvd # 110001168254.

civil and criminal provisions of the Resource Conservation and Recovery Act at 3250 Scott. Apple was found to be illegally treating, storing, disposing, and transporting hazardous waste without permits, manifests, or other required documentation.

46. EPA found Apple was emitting exhaust from its fabrication activities through a system that did not have required permits and did not have any monitoring. The EPA also found Apple did not inspect the waste on weekends, instead hoping for the best until they returned on Mondays. The enforcement action(s) is still underway.

47. The plaintiff filed a complaint with the BAAQMD in July of 2024, which resulted in at least six violation notices thus far; including failure to obtain "*Authority to Construct,*"[8] failure to obtain a "*Permit to Operate,*"[9] and for exceeding the "*Final Emission Limits*" for nitric oxide (NO), nitrogen dioxide ($NO_2$), and carbon monoxide (CO) emissions.[10] This confirmed that Apple was operating 3250 Scott without required permits and also illegally exhausting toxic chemicals.

48. **825 Stewart Drive:** Plaintiff's Apple office at the time of her termination was located at 825 Stewart Drive in Sunnyvale, California, also known as the "*TRW Microwave*" Superfund site, part of the EPA Triple Site (three adjacent Superfund sites in Sunnyvale, forming a mile-long groundwater solvent mega-plume).

49. The "TRW Microwave" Superfund site is a former industrial semiconductor manufacturing facility at 825 Stewart Drive The primary contaminants in the groundwater plume are chlorinated volatile organic compounds, including the carcinogen trichloroethylene and its daughter products cis-1,2-dichloroethene and vinyl chloride. The contaminated groundwater under 825 Stewart Drive is as shallow as only 2.6 feet below the ground surface, with shallow trichloroethylene concentrations up to 1,400 μg/L and vinyl chloride up to 51 μg/L.[11]

50. Northrop Grumman, the primary Potentially Responsible Party under the Comprehensive Environmental Response, Compensation, and Liability Act, conducted an initial vapor intrusion evaluation at 825 Stewart Drive in 2003 and 2004. The assessment indicated that

---

[8] Rule 2-1-301: August 29 and September 12, 2024.
[9] Rule 2-1-30: August 29 and September 12, 2024.
[10] Rule 9-7-307: September 12, 2024.
[11] AECOM for Northrop Grumman, *2021 Annual Groundwater Monitoring Report* (3/17/2022).

1    trichloroethylene concentrations in indoor air present an inhalation risk exceeding acceptable

2    health and safety levels, with results at 5.1 µg/m3 and 5.2 µg/m3, respectively.[12]

3        51.  Indoor air pollution due to vapor intrusion worsened over time, and indoor air

4    concentrations increased to 7.7 µg/m³ in 2013, the accelerated action level for trichloroethylene in

5    commercial buildings. In 2024, the EPA proposed a full ban on trichloroethylene as a whole

6    substance in the U.S., prohibiting it under the TSCA as an unreasonable danger to human health.

7        52.  In May 2015, Northrop Grumman installed a sub-slab ventilation system inside the

8    building. (The slab refers to the concrete foundation, and the sub-slab is under the slab.) Northrop

9    Grumman installed horizontal collection pipes beneath the slab foundation, which allows vapors to

10   move laterally. It connected the collection pipes to vertical vent risers, allowing sub-slab

11   contaminant vapors to discharge into the atmosphere. The risers vent to the rooftop via wind-

12   powered turbines.

13

14       53.  Apple became a tenant in 2015. Apple's installation of a new HVAC system in late 2015

15   included sawing the sub-slab exhaust vent stacks on the main building roof down from three feet to

16   one foot and then installing the HVAC system intakes in close proximity to the sub-slab vapor

17   exhaust vents, without consideration for the function of the sub-slab system vents and their

18   function.[13]  The HVAC intakes for the area of the building where Plaintiff worked were in the

19   assumed sphere of influence of the vent exhaust, including the chemicals trichloroethylene and

20   vinyl chloride.

21       54.  Apple's tampering with the exhaust stacks and indifference towards the exhaust's

22   proximity to HVAC intakes resulted in a significant risk of re-entrainment of the hazardous waste

23   vapors and gases into the HVAC system, and thus into the indoor air of the building where Plaintiff

24   and her coworkers would be exposed. California law prohibits the exhaust of gas and vapor in a way

25   that causes harmful exposure to employees and requires that these types of stacks exhaust upward

26
27   [12] Fifth Five Year at pg4; AECOM for Northrop Grumman, 2021 Annual Groundwater Monitoring
     Report,825 Stewart Drive, Sunnyvale CA, March 17, 2022.
28   [13] AECOM for Northrop Grumman, Evaluation of Passive Sub-Slab Depressurization System, Former TRW
     Microwave Site, page 1 (April 15, 2022).

from at least seven feet above the highest portion of the roof and outdoor air intakes be placed at least twenty-five feet away from any "*exhaust outlets of ventilating systems… that may collect …. noxious fumes.*"[14]  Apple constructed the HVAC intakes only ten feet away from the exhaust vents.



*Figure 1: Exhaust Diagram from ASHRAE Handbook*



*Figure 2: Image with annotations of the roof of 825 Stewart Drive*

---

[14] Cal.Lab.C. §§ 5143(a)(1); 5143(c)(1); 5154.1(e)(4)(d); Cal.Mech.C. § 407.2.1.

55. In May 2015, Northrop Grumman's vapor intrusion testing at 825 Stewart Drive reported indoor air pollution of trichloroethylene, 1,2-dichloroethylene, toluene, chloroform, methylene chloride, and ethylbenzene.[15] From December 2015 to January 2016, Apple managed and submitted a second vapor intrusion testing report to the EPA.[16]

56. Testing results showed an increase in indoor air pollution and the sub-slab ventilation system compared to the May 2015 results. The highest indoor air reading of trichloroethylene doubled between May and December 2015. In May, it was 0.58 μg/m³ while the highest indoor air trichloroethylene reading in December was 1.2 μg/m³.

57. Apple's report also noted a "*noticeable increase*" of trichloroethylene, tetrachloroethylene, and chloroform in the sub-slab venting system and elevated levels of toluene and ethylbenzene in the indoor air.[17] Apple moved employees in and never tested again.

58. EPA issued a formal letter to the current building owner in 2016 explaining that if there were any issues with the integrity of the slab, such as cracks, the EPA must be notified, consulted, and oversee the repairs and subsequent evaluation that the repairs were successful. Similarly, there is a public land use covenant attached to the property that runs with the land, which instructs that serious issues with the engineering controls and vapor intrusion systems must be reported, and EPA must be consulted on the next steps.

59. **Employment at Apple:** Plaintiff worked at Apple from 2015 to 2021. At the time of her termination, her title was Senior Engineering Program Manager, and her base salary was $169,000. In the last full year, Plaintiff worked at Apple, her total annual W-2 compensation was $386,382.

60. Plaintiff joined Apple on February 23, 2015, as an Engineering Project Manager in the Software Project Management Office and worked in that Department until January 2017. The plaintiff reported to several managers under the same Director during this time. Plaintiff experienced severe harassment, discrimination, bullying, and an untenable hostile work environment during those two years, primarily from her coworkers, Rob Marini and Brad Reigel.

---

[15] U.S. EPA, TRW Microwave, Site Documents, Vapor Intrusion.
[16] AECOM for Apple, Vapor Intrusion Evaluation Report, Former TRW Microwave Site.
[17] AECOM for Apple, Vapor Intrusion Evaluation Report, Former TRW Microwave Site.

1    The director, Venkat Memula, repeatedly failed to correct their behavior.

2        61.  Memula assigned Plaintiff to share an office with Marini. Marini told Plaintiff in the first

3    week that all his prior officemates either quit the company, left the country, or killed themselves.

4    Marini asked Plaintiff which path she would choose.

5        62.  Marini bragged that he was known to executives as their "*Little Gestapo*." Marini often

6    planned and orchestrated malicious schemes to harass Plaintiff and cause her distress, including

7    getting multiple members of the team to attack Plaintiff physically, spreading rumors about

8    Plaintiff, and frequently pressuring Plaintiff to drink hard alcohol at work. Marini often made cruel

9    comments. He once told Plaintiff that her mother should have had an abortion. Both Marini and

10   Reigel cursed at Plaintiff, called her names, and wrote harassing statements and nicknames on

11   whiteboards about her. Marini made a work tracking ticket for all to see titled "*Make Ashley's Life*

12   *a Living Hell*" and then assigned it to Reigel.

13       63.  Reigel was an active police officer, had ammunition in his office, and supposedly kept a

14   gun in his car at times. Reigel once kept Plaintiff in a conference room with the door closed and

15   berated her for a prolonged period while she wept and begged him to stop. He sometimes made

16   '*joking*' comments, like he would 'smack her' if she did not do what he said.

17       64.  The plaintiff's first manager, Linda, tried to bribe the Plaintiff in exchange for a positive

18   review from Linda's manager, Memula. The plaintiff reported this to Memula and Human

19   Resources. When Linda left the organization, the Plaintiff was later transferred to report to Reigel.

20   The plaintiff tried to move to a different team but was blocked by Reigel, who provided negative

21   feedback about her to the hiring manager and could not explain why.

22       65.  Plaintiff was then transferred under Evan Buyze and Shandra Rica, still in Memula's

23   organization, to run a program called "Early Field Failure Analysis" for new product launches,

24   where she received positive feedback and praise until one specific field issue occurred which led to

25   a retaliatory constructive termination.

26       66.  Plaintiff's managers had become upset because Plaintiff was earnestly trying to

27   investigate a trend of battery failures in the field. Plaintiff's managers preferred to "ignore it and

28   hope it goes away" and told Plaintiff to also "ignore it," which Plaintiff refused to do. Buyze and

Rica told Plaintiff not to tell people why she was leaving their organization, with Shandra saying she "*doesn't like people who talk shit*." This battery failure issue and Apple's resulting response would be publicly nicknamed "*Batterygate*." Apple has been fined over $600M over their conduct related to the *Batterygate* issues.

67. Plaintiff joined Product Systems Quality in Hardware Engineering in January 2017. Plaintiff now reported to senior director Dan West and director David Powers as a Senior Engineering Program Manager and chief of staff. Both West and Powers engaged in harassing, discriminatory, and inappropriate conduct toward Plaintiff – including remarks and decisions that discriminated against Plaintiff based on sex, gender, and disability.

68. In December 2017, West tried to coerce Plaintiff to engage in a romantic relationship with one of West's business partners, which would benefit West personally. Plaintiff complained. Later, in 2020, West admitted it was "*one of the worst things [he's] ever done*." Other leaders in West's organization also discriminated against Plaintiff, including John, who often pressured Plaintiff to "*settle down*" and "*have kids*." The plaintiff complained to John and West about the statements, but John persisted for years.

69. While Plaintiff's performance reviews were positive, Powers and West often gave Plaintiff 'feedback' outside the reviews, like she was too emotional, aggressive, or expressive. The plaintiff gave both men 'feedback' in response to their feedback, complaining about inappropriate comments. West would usually listen and thank her for being honest with him, though he continued with the same behavior. Powers did not respond well and often berated her.

70. Plaintiff wanted to continue working at Apple even after she graduated from law school in June 2022. She intended to stay at Apple if she could transfer to a better role (not in a hostile work environment). The plaintiff had initiated friendships with leadership in Apple Legal in 2018, hoping she could intern with them (which she did in 2019) and convince them to hire her upon graduation. She continued mentioning this plan into 2021.

71. Plaintiff's supervisor, West, frustrated several of Plaintiff's attempts to transfer to other Apple roles focused on law, legislation, and policy – including directly blocking an offer in 2020 for Plaintiff to work on Apple's implementation of circular economy legislation.

72.   On March 17, 2021, the Plaintiff's team administrative assistant sent an email on behalf of EH&S announcing to the Plaintiff and Powers' management team that it would be testing 825 Stewart Drive for vapor intrusion but saying nothing more.

73.   Plaintiff replied and informed her coworkers that their office was a Superfund site on March 17 2021, providing a link to the EPA website for the site and news articles referring to their office as a "*paved over environmental disaster zone*" due to the "*massive amounts of trichloroethylene in the soil and groundwater from nearly 30 years of chip manufacturing*."[18]

74.   Plaintiff explained to her team what vapor intrusion means, told them to take it seriously, and expressed concerns that Apple employees "*should be better informed about these types of environmental risks at our offices.*" The plaintiff added, "*The chemicals under [the 825 Stewart Drive office] if in high enough quantities, can cause cancer.*"

75.   Plaintiff's manager, Powers, forwarded Plaintiff's email to Human Resources and West, complaining, "I think Ashley should be keeping these emails private and not needlessly scaring the team about something she doesn't know about." During their next weekly meeting, powers gave Plaintiff a 'warning' and forbade her from discussing safety or toxic waste dumps with her coworkers. Things went downhill from there.

76.   *The plaintiff* asked in her email for details of what type of testing was to be performed and for what duration, if there would be a risk assessment, and if EH&S would share the findings with the employees in the building. EH&S initially agreed to meet with Plaintiff to discuss her concerns. The plaintiff's coworkers thanked her for sharing this information and informing them about the site. Two of Plaintiff's friends, a manager and senior manager at Apple, texted her, affirming her concerns were reasonable and appropriate.

77. One manager called the situation "*a really important life-threatening situation,*" after reviewing documentation for the site, another questioned, "*Why is the building still open*?" One of the managers noted: "*What is crazy is … they say no daycare, no elder care, no residential, etc. So, it is fine and dandy for everyone else to get slowly poisoned? … So glad you are digging into this stuff for all of*

---

[18] Alexis C. Madrigal, *Not Even Silicon Valley Escapes History,* The Atlantic ( July 23, 2013); Beth Winegarner, *Silicon Valley's Toxic Past Haunts Sunnyvale Neighborhood,* KQED ( June 15, 2017).

*us."* Around this time, Plaintiff also raised concerns about various workplace safety concerns, including COVID-19 safety, wildfire smoke safety, Right to Know, Proposition 65, and Apple's reporting and tracking of injuries.

78. On March 26, 2021, the SF Bay View newspaper published an article Plaintiff wrote about her chemical exposure experience with the air around 3250 Scott, titled "*I thought I was dying: My apartment was built on toxic waste."*[19] After reading the article, more victims and witnesses came forward; some were also Apple employees.

79. On April 5, 2021, Plaintiff told West about the other victims, and West warned her she was "*kicking a hornet's nest.*" West asked Plaintiff not to send information about Plaintiff's chemical exposure at her apartment next to 3250 Scott to his personal work email, saying: "*Can you send that stuff to my Gmail instead of work? My mail account is routinely scanned for lawsuits.*"

80. In late March 2021, the Plaintiff repeatedly raised concerns about the Superfund site to her supervisors. After reviewing hundreds of pages of documentation for the site, Plaintiff advised that the site was unsafe and complained that Apple seemed unwilling to comply with environmental and health/safety regulations. She was distressed to see that the 'hot spot' for the building was her desk with 1900 ug/m3 of trichloroethylene under the slab.

81. Plaintiff connected the vapor intrusion risk to a strange fainting spell she experienced at the office in September 2019. The only other time she felt a dizzy spell like that was when Apple exposed her to industrial chemicals at her apartment in 2020. The plaintiff began complaining she was worried her 2019 fainting spell was due to vapor intrusion at the office.

82. Powers threatened her and ordered her to stop talking with her coworkers about her safety and environmental concerns. He said she must believe whatever EH&S tells her. West first claimed Apple sealed the poisonous gas under the floor but, after learning the floor was cracked, told Plaintiff if she did not like her work conditions, she could leave her role and find a new job.

83. On April 5, 2021, Plaintiff notified the Director of Apple "AC Wellness" employee medical Centers that more people came forward from the apartments next to 3250 Scott, reporting

---

[19] Ashley Gjovik, "*I thought I was dying: My apartment was built on toxic waste,*" SF Bay View (March 26, 2021).

1    illness, due to her article. "*Two are Apple employees. At least one went through AC Wellness, but no one*

2    *could figure out what was wrong with them*." The plaintiff suggested directing the clinic to "*screen local*

3    *folks*" with symptoms that match solvent exposure.

4          84.  From September 2020 through April 2021, the plaintiff emailed the EPA and California

5    EPA about the issues; many Apple leaders knew she did so. Starting in early 2021, Plaintiff also

6    contacted and met with local, state, and federal politicians about what occurred to her next to 3250

7    Scott—and Apple was aware of this. For example, the Plaintiff met with Senator Bob Weickowski

8    and his staff on April 7, 2021.

9          85.  Plaintiff also met with Assembly Member Lee's staff once and Mayor Lisa Gillmor

10   several times. On April 7 2021, Plaintiff told West about the meetings. On April 9 2021, Plaintiff

11   contacted the County District Attorney's office, talked to Bud Porter, Supervising Deputy District

12   Attorney for Environmental Crimes, and met with him on April 16 2021.

13         86.  Plaintiff was also meeting with the California Department of Public Health's

14   Environmental Health office, where she volunteered to help create state-wide education resources

15   for tenants and workers around chemical exposure from toxic waste dumps. Around this time, the

16   plaintiff met a prior Silicon Valley mayor who had advocated for the clean-up of Silicon Valley's

17   toxic waste sites for decades. Plaintiff shared his analysis of the testing and concerns about the

18   property clean-up where Plaintiff got sick with Mayor Gillmor and asked her for further

19   investigation from the city.

20         87.  Plaintiff met with Apple EH&S on April 2 2021, May 17 2021, and July 7 2021. For some

21   reason, Employee Relations, Jenna Waibel was also there. Waibel refused to tell Plaintiff why she

22   was involved, as Powers had asked for help from Apple's Employee Relations team to assist him in

23   silencing Plaintiff. Around early April 2021, Waibel and Polkes texted and emailed about their plans

24   to silence Plaintiff.

25         88.  In February 2021, Plaintiff completed her self-review for Apple's mid-year review cycle;

26   however, Powers never provided Her with her review. Powers told his managers to complete mid-

27   year reviews with their teams in the spring but never mentioned it to the Plaintiff. The plaintiff also

28   completed her annual performance self-review around June 2021; however, Powers never reviewed

1    her. Apple has repeatedly refused to provide any discovery documents related to these reviews and

2    confirm their existence.

3          89.  Plaintiff asked questions to Apple EH&S about the status of the site and the rationale for

4    design and monitoring decisions. EH&S (Michael Stieger) told her Apple Legal and EH&S

5    intentionally do not tell employees if they work on Superfund sites and admitted that Apple does

6    not train workers about safety procedures related to toxic waste exposure from clean-up sites. The

7    plaintiff said that was both unsafe and unwise.

8          90.  The plaintiff also complained that the prior testing used insufficient durations and

9    methods and had concerning results, there were known open risks for vapor intrusion vectors (*e.g.,*

10   compromised sub-slab ports), and the land use covenant is outdated and requires revision. The

11   plaintiff complained that Apple should have tested the indoor air more often than every six years.

12         91.  On April 11, 2021, Plaintiff emailed Powers, forwarding her emails with Steiger and

13   Waibel about compromised and missing sub-slab vents per the documentation, telling Powers,

14   *"None of this sounds safe."*

15         92.  By April 14, 2021, Powers had become very hostile towards Plaintiff and was snapping at

16   her meetings. Complaining to West about it resulted in the response, 'You can just quit if you don't

17   like it.'

18         93.  On April 21 2021, Plaintiff complained to Apple's Human Resources Inclusion &

19   Diversity team about the disparate impact of chemical exposure in Apple buildings. Apple Human

20   Resources asked her to write a business proposal about why Apple should not poison Black people.

21         94.  The plaintiff then complained to her friend Josh, a Senior Director, that Apple's actions

22   related to environmental compliance and employee chemical exposure were "morally wrong" and

23   that Apple was publicly misrepresenting its actual operations.

24         95.  The plaintiff also complained to a friend in Lisa Jackson's Environmental lobbying team

25   about what was happening at her office and that Apple's public statements seemed fraudulent. Her

26   coworker agreed, saying: "*Uhhh... I kind of feel the need to make sure Lisa is aware. I'm about to present*

27   *a proposal to several execs on an Environmental Justice program and this kind of feels like not consistent*

28   *with that."*

96. The plaintiff also emailed back and forth with the EPA public relations teams from April through August 2021, and Apple knew she was doing so. The EPA informed Apple about the Plaintiff's outreach around April 28 2021.

97. In response to the Plaintiff's concerns and escalations, Powers and Waibel issued gag orders against the Plaintiff. Waibel even went as far as to provide Plaintiff with a five-point balancing test if she wanted to tell her coworkers about Superfund sites or workplace safety. She told the Plaintiff there should be no discussions about workplace safety with her coworkers.[20]

98. On April 29 2021, Plaintiff visited an occupational exposure doctor about her chemical exposure in the apartments next to Apple's 3250 Scott factory and at the 825 Stewart Drive office. UCSF visit notes summarized Plaintiff's 2020 medical symptoms, saying:

> She was experiencing severe dizzy spells, a significant decrease in resting heart rate, palpitations, hypotension, fatigue, chest pain, numbness, spasms, rash, shortness of breath, multiple growths (mole, polyp, nodules), nausea, paresthesia, blurry vision, abnormal vaginal bleeding, and swollen glands"…."there remains a concern about potential pathways for residential exposures, and the county and State environmental agencies should address these…. she also notes an unexplained episode of fainting at work in Sept 2019 at her office on a Superfund site with a long history of vapor intrusion issues…[21]

99. Plaintiff continued to attend medical appointments and follow ordered testing and monitoring in response to her injuries and illness. On April 30 2021, she went to Stanford Hospital for a CT angiography with and without contrast. She had been having palpitations again, and on May 10 2021, she told her manager, Powers, that her doctor said she needed another echocardiogram to ensure the chemical exposure did not cause permanent injury to her heart. Apple knew Plaintiff was highly vulnerable.

100. On May 17 2021, Plaintiff met with EH&S and Waibel again. They informed her they might not test the indoor air, they would not answer her safety or environmental questions, and Steiger was abruptly leaving Apple. The plaintiff became concerned about a cover-up and started

---

[20] In September 2024, the NLRB issued a decision of merit that there is substantial evidence that Waibel's 'five-point balancing test' violated federal labor laws.

[21] Dr. Robert Harrison, MD – who directs the UCSF Occupational Health Services department and the Worker Investigation Program for the California Department of Public Health.

1  complaining about her meeting with Apple EH&S lawyer in November 2020. She shared with at

2  least one coworker that the lawyer had told her Apple had been negligent and needed to catch up

3  on testing and inspections.

4      101. Apple EH&S and Employee Relations, Waibel, notified Plaintiff on June 2, 2021, that

5  Apple will repair the foundation of 825 Stewart Drive before they test the air. The plaintiff

6  complained that they were legally required to notify the EPA, have the EPA oversee the repair and

7  testing plan, and test the air before and after the repairs. EPA later confirmed this. Apple refused

8  and told Plaintiff they do not have to tell EPA anything; they will repair the floor but will not provide

9  details on how or when, and now they may not test the indoor air.

10      102. Waibel responded to Plaintiff's complaints by opening an investigation into Plaintiff's

11  bosses for sexism despite Plaintiff asking Waibel not to do that and complaining it would only cause

12  more retaliation. Waibel did not investigate anything but told at least three leaders that Plaintiff

13  complained about them. She also harassed Plaintiff's friends and Plaintiff.

14      103. Waibel also told Plaintiff that if Plaintiff did not want to be exposed to vapor intrusion

15  at her office, Plaintiff must submit an Americans with Disabilities Act accommodation request and

16  Plaintiff to release all of her medical records to "Apple Inc." Waibel then suggested Apple provide

17  the Plaintiff with an air purifier at her desk to help with the trichloroethylene air pollution. The

18  plaintiff complained that Americans with Disabilities Act accommodations are not intended for

19  employees to ask their bosses not to poison them. By July 2021, somehow, Waibel even got ahold

20  of Plaintiff's May 2021 mammogram results.

21      104. The plaintiff complained about Waibel in May and June 2021 to no avail and then began

22  meeting with Waibel's manager, Antonio Lagares, in mid-June 2021. The plaintiff complained that

23  Apple was acting insane, and if this is usually how Apple handles employee concerns, then Apple

24  is lying to its employees and the public that it acts in good faith. Lagares agreed with Plaintiff and

25  said Apple's marketing makes "*his job harder*."  Plaintiff complained to Lagares that Waibel had

26  already ruined her career at Apple, that she was already constructively terminated by West, that

27  Powers was harassing her more than ever, and that he should have to investigate all of the terrible

28  things Apple's done to her for nearly seven years.

105. On July 2, 2021, Employee Relations, Waibel, and EH&S notified Plaintiff via email that there were cracks in the slab/floor of Plaintiff's office and that they would seal the cracks and then test the air. The plaintiff asked if they could also test the air before sealing the cracks. She explained she wanted to know if she was exposed to chemicals through the cracks and, if so, which ones. She said, "*for cancer monitoring.*"

106. On June 30, 2021, two days before hinting at the existence of cracks in the slab, Apple EH&S and legal filed the first and only Toxics Release Inventory filing to the EPA for air emissions at 3250 Scott in 2020. It is unclear why Apple never submitted a Toxics Release Inventory filing before 2020 or after the 2020 record.

107. Under information and belief, the Toxics Release Inventory filing was submitted to try to manufacture for Apple some statute of limitations excuse later if the Plaintiff ever found out what they did—without them having to share the information in a way they thought she would not notice.

108. In July 2021, Plaintiff notified the EPA about the cracked slab at her toxic waste dump site office, and Apple insisted they did not have to tell the EPA and refused to test the air until after they sealed the floor. The plaintiff expressed it was her understanding that Apple needed to notify the EPA of the cracks and obtain EPA approval for a work plan for the testing and sealing plans. The plaintiff notified Lagares, Okpo, and Waibel that she was reporting them to EPA. The plaintiff also complained to Lagares that Apple EH&S was "*going out of their way to avoid having evidence of their negligence.*"

109. In early July 2021, Plaintiff discovered that West had been reassigning her best projects (things that would help her receive a positive review). Then, on July 15 2021, Powers suddenly quadrupled her workload with highly unfavorable projects (things that were certain to upset people and fail). Powers was snapping at and harassing her, West was ignoring her, and Plaintiff reported these issues to Lagares, Waibel, and Human Resources Business Partner Helen Polkes. Still, Apple did nothing, or they also harassed Plaintiff.

110. The plaintiff became more vocal about her concerns about retaliation and fraud at Apple on Apple's Slack discussion tool and began threatening Lagares that she planned to sue Apple for

what they had done to her and that she was also talking to the press about Apple. This led Lagares to assign a new investigator, Ekelemchi Okpo, and open an additional investigation into Plaintiff's concerns starting in 2015.

111. By late July 2021, Plaintiff was openly complaining on Slack, to reporters, with coworkers, and now also on Twitter about Apple's terrible behavior (including intimidation, retaliation, cover-ups, and fraud). The plaintiff complained about the Superfund and safety issues, Apple's offensive use of accommodations, the persistent suggestion that she take leave in response to their harassment, Apple's illegal non-disclosure agreements and gag orders, and Apple's antagonistic and obstinate attitude towards legitimate and important concerns. The plaintiff repeatedly told Tony Lagares, Ekelemchi Okpo, Jenna Waibel, and Helen Polkes that Apple needed to fix the systemic issues.

112. The plaintiff had still been lobbying politicians for expanded safety protections for workers and tenants on toxic dump sites. A Senator told the Plaintiff he would talk to the California EPA about her concerns. The plaintiff checked with his office for a status update. On July 16 2021, the Senator's Legislative Director wrote to Plaintiff confirming and informed Plaintiff he *"conveyed [her concerns] [himself] on the Senator's behalf with the Govender's staff and leadership of both houses."*

113. On July 18 2021, Plaintiff had sent her weekly status to Powers and the management team, and at the very bottom, she added a little personal note that a state hazardous waste bill she had been lobbying for passed, and she was excited about it. Powers became upset and escalated the comment to Employee Relations, Waibel, asking for guidance on how to 'coach' Plaintiff about it and ensure Plaintiff understand not to talk about such things in the workplace.

114. Around July 23, 2021, Plaintiff spoke on the phone with one of the three women who ever reported to West at Apple and had quit Apple due to the harassment she faced from West and his team. She validated the Plaintiff, confirming she noted many of the same issues that the Plaintiff had been reporting and that West and his management, or Human Resources, had done nothing to address the problems.

115. On July 23 2021, the New York Times quoted Plaintiff in an article about "return to work," with Plaintiff criticizing Apple's COVID-19 response. On July 24, 2021, the New York

1      Times made Plaintiff's quote "*Quotation of the Day*" for the entire New York Times.[22]

2      116. Lagares told Plaintiff that Apple was upset that Plaintiff was talking to the press and

3 criticizing Apple. The plaintiff told Lagares she was taking Labor Law and learned she could speak

4 about her work conditions regardless of non-disclosure agreements. Lagares told her it is

5 "*annoying*" to Apple when employees "*figure that out*."

6      117. Apple and Northrop Grumman were notified on July 26, 2021, that EPA wanted an

7 inspection of 825 Stewart Drive due to the cracked slab (that Plaintiff brought to EPA's attention)

8 and because EPA discovered what Apple did with the hacksaw, vents, and HVAC on the roof in

9 2015, with the EPA Quality Assurance team exclaiming it was "*not appropriate*" and asking for air

10 samples.[23]

11      118. On July 26 2021, Plaintiff posted on Apple's Slack, complaining that Apple's response

12 to her concerns was to retaliate against her and intimidate her into silence. Many of Plaintiff's

13 coworkers responded that they had also experienced retaliation from Apple for raising real and

14 reasonable concerns. On July 27 2021, Okpo interrogated Plaintiff for over an hour about her Slack

15 posts and responses from coworkers – repeatedly asking her to stop posting and encouraging others

16 to post their concerns and instead directing all employees to speak privately. The plaintiff told him

17 no. She would not help him retaliate against her coworkers.

18      119. During the July 27, 2021, meeting, Okpo said Apple may give the Plaintiff a severance

19 ("exit") package of around $600,000 if she signs a preemptive litigation waiver. Apple agreed that

20 Plaintiff would not have to sign another non-disclosure agreement but made the severance

21 negotiation contingent on Plaintiff waiving all claims. The plaintiff expressed concerns about the

22 settlement amount and her potential medical costs if she were to get cancer from the exposure at

23 her office.

24      120. At the time, the plaintiff did not know about the activities and spills at the 3250 Scott

25 facility near her apartment or what Apple had done to the HVAC at 825 Stewart Drive. Apple was

26 intentionally concealing those facts. Apple wanted all claims waived and denied the severance on

27 ───────────────

28 [22] "*Quotation of the Day: Virus Surge Complicates Return-to-Office Plans*," New York Times, July 24, 2021.
[23] U.S. EPA, TRW Microwave Site, Vapor Intrusion FOIA documents.

those conditions, violating California Gov't Code § 12964.5(a).

121.   On July 27 2021, a non-profit organization asked Plaintiff to testify as a witness to state Senator Dave Cortese about her experience with hazardous waste clean-up sites in Santa Clara County, and Plaintiff accepted.

122.   On July 28, 2021, the Plaintiff emailed Okpo and Lagares about her discussions with coworkers. She discovered a pattern of discrimination and harassment issues across Apple and systemic cover-ups of those issues. She complained that Apple fraudulently holds itself out publicly as caring about human rights and the law. It was clear to Plaintiff that Okpo was still trying to get her to quit, or she would be fired.

123.   On July 28 2021, Plaintiff asked for a "citizen oversight -type role" to help reform Apple's Human Resources practices. Okpo said it may be possible but that she must stay in her same role. The plaintiff asked Okpo what the outcome of his investigation could be. Okpo informed Plaintiff that he would propose a "non-binding suggestion" to Plaintiff's senior leadership (the same ones she complained about). The plaintiff realized Apple had designed an Employee Relations system to retaliate and cover up issues.

124.   On July 30 2021, Plaintiff posted on Twitter complaining about Apple: "*They offered EAP and suggested medical leave after I spoke up about sexism, discrimination, and a hostile work environment. They also suggested requesting ADA disability accommodations after I raised concerns about unsafe work conditions.*"

125.   After posting this, ex-Apple employees contacted Plaintiff to share similar experiences. The plaintiff decided to start sharing more of what was happening between her and Apple on social media to help others understand the issues so they could advocate for the employees, hoping it would pressure Apple to act more reasonably.

126.   On July 30 2021, Plaintiff posted on Apple's Slack discussion tool complaining in detail about Apple's misconduct, including retaliation, unsafe work conditions, and cover-ups.

127.   On August 2, 2021, the Plaintiff started posting on Twitter about several minor things she complained to Waibel about. She told Okpo and Lagares it was work conditions so that she could talk about it. The plaintiff posted several examples on Twitter.

128. In response, on August 2, 2021, Apple suddenly announced they were conducting extensive maintenance at 825 Stewart Drive starting August 4, 2021. Then, on August 3, 2021, Lisa Jackson's environmental lobbying team scheduled a Public Relations blitz about how safe and thoughtful Apple is.[24]

129. Apple also tried to get the EPA to sign a non-disclosure agreement about the inspection of 825 Stewart Drive that would prohibit the EPA from discussing the inspection. The EPA declined to sign the non-disclosure agreement.

130. When Plaintiff saw Apple's EH&S notice on August 2, 2021, about maintenance at 825 Stewart Drive, she quickly arranged for coworkers in the office to gather evidence of the cracks, warning them that Apple was trying to cover up environmental and safety issues.

131. Plaintiff's coworkers gathered photos of the cracks for Plaintiff. They also asked many of the same questions the plaintiff had asked EH&S. The plaintiff shared EH&S's responses and was concerned about Apple's position and conduct. The plaintiff informed Apple that she and her coworkers were gathering evidence before Apple could cover up the cracks.

132. On August 4, 2021, Okpo forced the Plaintiff on indefinite administrative leave and refused to provide any estimated period for the next steps. Okpo informed her that Apple removed her "*from the workplace and all workplace interactions*." The plaintiff complained that it was illegal for them to tell her to stop talking to her coworkers. Okpo made it clear he also wanted her off Slack. The plaintiff told Okpo he could not keep her off Twitter. The plaintiff posted on Slack, informing her coworkers of what Okpo had just done.

133. On August 4 2021, a reporter at an online blog contacted Plaintiff after coworkers told the reporter what Plaintiff had posted. The plaintiff agreed to let her write an article about the Plaintiff being put on leave. The plaintiff also posted about it on Twitter, and more outlets picked up the story.[25]

---

[24] FOIA; Axios, *Exclusive: EPA administrator visits Apple HQ to talk climate, environmental justice*.

[25] *e.g.,* The Telegraph, "*Apple worker who complained about sexism and 'hostile' workplace put on paid leave*," 8/5/2021; Yahoo Finance, "*Senior Apple employee alleges sexism at work, is put on indefinite leave*," 8/5/2021; Fox News, "*Apple exec says she was placed on leave after raising sexism concerns, other workplace issues*," 8/5/2021.

134. Okpo sent Plaintiff several bitter emails about her continuing to speak out. He was reading the news articles and her Twitter posts complaining about Apple's conduct. The plaintiff made three Twitter posts on August 4 2021.

> So, following up on raising concerns with #Apple about #sexism, #hostileworkenvironment, and #unsafeworkconditions, I am now on indefinite paid administrative leave per #Apple Employee Relations while they investigate my concerns. This seems to include me not using Apple's internal Slack.

> Apple employee relations' first sexism investigation only arose while I was complaining about unsafe work conditions and related intimidation. They tried quickly brushing me off and prevented me from raising more concerns. This time, I gave them 558 pieces of evidence to review.

> When I say "unsafe #workconditions," I mean physically unsafe, #dangerous chemicals, #OSHA. You will hear much more about this in a bit.

135. Starting on August 4 2021, Plaintiff began receiving harassing and threatening replies and comments from clearly fake social media accounts. On August 4 2021, one account posted about Plaintiff, that she: "*needs psychiatric help and confinement*" and that Plaintiff "*is a psychopath and frankly is a danger to other Apple Employees*!" The account went on to call Plaintiff an "*ambulance chasing psychopath*" and said, "*Apple needs to bring the hammer and make an example of people like this.*" Thousands of posts like this followed and continue to this day – causing Plaintiff severe distress.

136. After Plaintiff was on leave, she heard conversations within her team confirming she would be fired soon. Managers in West's organization mentioned West's plans to "*discuss the Ashley Issue*" at the upcoming October All Hands. The plaintiff realized they would not discuss the "*Ashley Issue*" at a future All Hands if she were there. One of Plaintiff's friends, a manager in West's organization, told her Apple instructed all the managers to not to write anything about employee issues because they were in trouble.

137. The plaintiff saw emails come in steadily while she was on leave about EH&S activities at the building. EH&S sent notices that they would be on-site for prolonged periods: August 4, 6, 7, 8, 11, 13, 14, 15, 18, 19, 20, 21, 22, 27, 28, 29, and September 3, 4, 5, 2021.

138. When the EPA inspected, they noted "*freshly sealed cracks*." On August 9 2021, the EPA sent travel approval requests to visit Plaintiff's office, and the justification for the visit cited Plaintiff's disclosures. The EPA's justification for the inspection was: "*A site visit to an Apple office building is necessary to conduct a visual inspection of the building's vapor intrusion mitigation measures. An Apple employee recently contacted EPA and notified EPA that there were cracks in the building's foundation. If true and cracks are significant, this could impact the effectiveness of the VI mitigation system and the protectiveness of human health.*"

139. In August 2021, the Plaintiff filed complaints with the U.S. EEOC and California DFEH. The plaintiff also shared concerns on social media and with the press.

140. On August 17, 2021, Business Insider published an article about some of Plaintiff's complaints based on Plaintiff's Twitter posts and embedded Plaintiff's Twitter posts in the article. The article also noted: "*Insider approached Apple for comment.*" [26]

141. On August 15 2021, Plaintiff posted on Twitter that she had met with US Representatives, state Senators, Assembly Members, and Mayors about her chemical exposure.

142. Between August 16, 2021, and August 23, 2021, Okpo sent a first draft of an "Issue Confirmation" document that captured all of the Plaintiff's complaints that he would then investigate.

143. The document was incomplete and contained misleading statements, and the formatting implied that multiple people drafted it. The plaintiff asked for a Microsoft Word version, but Okpo refused, validating her suspicion that the document was an Apple legal and human resources group project.

144. The plaintiff created her own version, supplemented and corrected Okpo's content, and sent Okpo a final version on August 23, 2021.

145. Starting August 17 2021, Plaintiff insisted that all communication with Okpo and Apple be in writing because he repeatedly misrepresented her statements while documenting her complaints. Okpo never replied to her emails about it.

---

[26] Business Insider, *An Apple employee on leave after publicly alleging sexism says co-workers kept a scoreboard to make her quit (August 17,* 2021).

146. On August 19 2021, the EPA conducted an onsite inspection of Plaintiff's Apple office due to Plaintiff's complaints to the EPA. EPA's notes from the August 19, 2021, site visit and inspection included concerns and issues with the HVAC, sub-slab ventilation system, missing sub-slab ports, integrity of the slab, and lack of documentation for inspections of the slab.

147. The plaintiff had previously registered for a three-part training about racial justice at Apple University and wanted to attend. Her friend Josh led the class, and he confirmed he would be happy to have her participate if Employee Relations approved and did not discipline her for attending. On August 20, 2021, Okpo told Plaintiff she could not participate "*because she's on leave.*" The plaintiff complained about retaliation and said she did not want to be on leave, but Okpo ignored her.

148. While the Plaintiff was on leave, she repeatedly asked Okpo for updates about her office, but he refused to provide any. The plaintiff also complained about Apple Board Member Ronald Sugar and her office. Sugar was a top executive at TRW Microwave when they manufactured semiconductors and microwave equipment at the plaintiff's office. Before joining Apple's board, Sugar was the CEO of Northrop Grumman – the responsible party for the toxic waste cleanup under her office.

149. The plaintiff included detailed complaints of fraud, organized witness tampering, obstruction of justice, toxic torts, corruption, negligence, conflicts of interest, racketeering, and environmental crimes.

150. On August 23 2021, a member of EPA's Quality Assurance team captured notes about the inspection of 825 Stewart, writing: "*Significant, visible slab cracks, gaps, and penetrations had been sealed… However, large test equipment is bolted to the slab, and it is unclear if these installations penetrate the slab.*" He added that related to the sub-slab exhaust on the roof above Plaintiff's desk, "*vapors could be building up on the roof near the HVAC intake.*"

151. On August 23, 2021, a news article discussing Apple's employment practices commented, "*One Apple employee, Ashley Gjovik, has been very vocal on Twitter by stating multiple problems within Apple. She alleges a powerful cover-up culture within Apple that led to her eventual administrative leave.*"

1   152. On August 26 2021, Plaintiff filed an NLRB charge against Apple and posted on Twitter

2   that she did so. The next day, on August 27 2021, Apple's Business Conduct team closed Plaintiff's

3   complaint about Ronald Sugar and Plaintiff's office. A couple of days later, around August 30 2021,

4   a third-party law firm (McDermott, Will, & Emery) filed a notice of appearance for five attorneys

5   in Gjovik's NLRB claim against Apple.

6   153. Apple did not fire Plaintiff until September 9, 2021, raising the question of whether

7   opposing counsel in this lawsuit (Orrick, Herrington & Sutcliffe) was also retained by Apple for this

8   dispute prior to Plaintiff's termination and, if so, if they covertly interacted with Plaintiff or

9   Plaintiff's coworkers, or otherwise influenced the situation.

10  154. On August 29 2021, Plaintiff filed a formal complaint to the EPA about Apple and her

11  office at 825 Stewart Drive, complaining of Apple's *"lack of due diligence, "negligence,"*

12  *"recklessness,"* *"violations of Right to Know and OSHA,"* intimidation, misrepresentations, and

13  refusal to *" notify the EPA of changed circumstances at the site."* The plaintiff did not know about the

14  EPA safety inspection ten days prior.

15  155. On August 29 2021, Plaintiff filed a Whistleblower Protection Program complaint with

16  the U.S. Department of Labor, reference number ECN76833. On August 29 2021, Plaintiff filed

17  retaliation and labor code violation charges to the California Department of Labor.

18  156. On September 1 2021, Plaintiff posted on Twitter that she had filed a complaint with

19  the California Department of Labor. A question on the form asked: How did your employer know

20  about the protected right you exercised? Plaintiff wrote, *"I kept saying, 'Stop it, you guys. There's*

21  *Labor laws about this."*

22  157. While Plaintiff was stuck on leave, Apple had emailed her three times to ask if they

23  could capture three-dimensional scans of her ears and ear canals, and Plaintiff complained that

24  Apple's requests were harassing and invasive.

25  158. Plaintiff complained that Apple often asked that Plaintiff and her coworkers participate

26  in invasive, oppressive, and humiliating medical studies, anatomical studies (like ear scans), DNA

27  tests, biometrics data collection, and other highly personal examinations. Apple did not disclose

28  the details of the experiments until after Plaintiff signed a secrecy oath and 'consented' to the

1    activity, and then repeatedly threatened Plaintiff with termination if she was to speak about it even
2    to a doctor or attorney (as was expressly written in one Deed Poll).

3        159.   Around August 30, 2021, and August 31, 2021, Plaintiff shared an article titled "Apple
4    Cares about Privacy Unless You Work at Apple" and confirmed the blog interviewed her and she
5    provided information for the article, including multiple images of secret photos Apple took of her
6    in her home from the Gobbler application.

7        160.   In her posts she complained of Apple's surveillance of workers and Apple's culture of
8    intimidation and retaliation and compared working at Apple to being in a panopticon. [27]   The article
9    discussed several examples of Apple's invasions of employee privacy, which were brought forward
10   by Apple employees who wanted the public's help in reforming Apple's business and labor
11   practices.

12       161.   In the article, Plaintiff complained about the Gobbler app installed on her phone taking
13   photos of her anytime, including at home; and was quoted saying, "*If they did this to a customer,*
14   *people would lose their goddamn minds.*"

15       162.   On August 31 2021, the U.S. Department of Labor contacted Plaintiff to start intake for
16   Plaintiff's Whistleblower Protection Program charges.

17       163.   Newspapers published articles about the Plaintiff's charges against Apple starting
18   around September 2, 2021. Bloomberg reported about Plaintiff's U.S. NLRB, U.S. Department of
19   Labor, California Department of Labor, and U.S. EEOC charges. The same day, the Financial
20   Times and Reuters also wrote about the Plaintiff's complaints. [28]

21       164.   The press continued to cover what Apple was doing to Plaintiff, and a movement started
22   among Apple employees who began speaking out and organizing around work conditions and
23   human rights. Apple workers, past and present, began publicly sharing their own stories of
24   discrimination, retaliation, and cover-ups. The press wrote about this, too. The plaintiff was not
25   only a catalyst for many employees to come forward, but these employees also catalyzed the

26

---

27   [27] The Verge, *Apple Cares about Privacy, Unless You Work at Apple,* 8/30/2021.
28   [28] Bloomberg, *Apple Worker Complaints Reviewed by Labor Relations Board*, 9/2/2021; Financial Times, *US labour board examines retaliation claims against Apple*, 9/2/2021.

1    plaintiff's view and protest of Apple's misconduct.

2    165.  Okpo contacted Plaintiff again on September 3, 2021, and September 7 2021, asking to

3    meet with her on Webex (a video conferencing platform), implicitly denying her request to keep

4    things in writing, and refusing to tell her what the meeting was about. Both times, Plaintiff asked

5    Okpo to keep things in writing due to the misrepresentation and intimidation. If he refused, she

6    requested a Business Conduct review of his decision, noting he is a lawyer and there is a power

7    imbalance. Okpo never responded.

8    166.  On September 5 2021, Plaintiff messaged Josh, her friend and a Senior Director,

9    complaining about Apple Employee Relations, commenting she had been researching Apple's labor

10   history and the issues were "*very systemic*" and with "*lots of bad faith conduct*," but "*not completely

11   diabolical.*"  (Plaintiff would later refer to this dynamic instead as '*Waco meets Enron.*')

12   167.  In late August and early September 2021, Plaintiff posted on social media about her U.S.

13   NLRB, California Department of Labor, U.S. EEOC, and California DFEH cases with a status

14   update and the report numbers. Around that time, Plaintiff also tweeted about her U.S. SEC

15   whistleblower tip, U.S. FBI, and U.S. Department of Justice complaints.

16   168.  The plaintiff interviewed with the U.S. EEOC on September 2, 2021. On September 6,

17   2021, the Plaintiff replied to the U.S. EEOC confirming she was working on a draft of her complaint

18   and targeted sending it to them by September 8, 2021.

19   169.  On September 7 2021, Plaintiff discovered the second woman to ever report to West

20   had sued Apple over West's retaliation, constructive termination in violation of public policy, and

21   Intentional Infliction of Emotional Distress only two years prior. The ex-colleague's complaint

22   explained she saw reprisals and intimidation in West's organization and that West spoke openly

23   about knowledge of his employee's fear of retaliation. She said that after she raised concerns with

24   West about these issues, West began retaliating against her, too.

25   170.  The complaint alleged three sham Employee Relations investigations into her concerns,

26   finding no policy violations related to West's conduct. Employee Relations put her on

27   administrative leave, waited a few weeks, and then told her she could either accept two months of

28   severance and sign a release of rights to pursue legal action against Apple, or she could return to

1   work as things are except that West will be even more angry at her now. She was West's
2   administrative assistant. The coworker resigned and filed suit instead.[29] Apple settled shortly after.
3   The plaintiff complained about it on Twitter and messaged the legal filings to West's current
4   administrative assistant, informing her about it.

5       171.  On September 8 2021, Plaintiff replied to the U.S. Department of Labor with copies of
6   her prior filed complaints to the U.S. EEOC, U.S. NLRB, EPA, California EPA, and U.S. SEC. The
7   plaintiff noted she was working on answering the investigator's questions and would reply by the
8   deadline, which was September 10 2021.

9       172.  On September 8, 2021, Plaintiff emailed the U.S. EEOC her draft of the language for
10   her charge. The Plaintiff did not request an investigation but did request a Right to Sue letter, which
11   she received before her termination. On September 9 2021, at 12:39 PM PST, Plaintiff emailed the
12   U.S. EEOC investigator assigned to her case and asked the investigator if she needed anything else
13   from Plaintiff to move forward. Then again, at 1:02 PM, asking the U.S. EEOC how she could sign
14   the charge to meet the deadline.

15      173.  On the morning of September 9, 2021, it occurred to Plaintiff, and she shared in real-
16   time on Twitter, that Apple was likely spying on her personal phone and computer because their
17   work policies say they are allowed to spy on employees' personal devices (Apple-made devices
18   communicating with Apple servers).[30] Plaintiff began removing her data from her accounts on
19   Apple servers, including migrating her email, photos, and documents.

20      174.  On September 9 2021, at 2:08 PM, a man named Aleks Kagramanov, an Apple
21   "*Workplace Violence and Threat Assessment*" investigator, contacted the Plaintiff, asking to speak
22   with her on the phone "*within the hour.*" The email had no subject line, and Plaintiff did not know
23   the team. Kagramanov said he was "*looking into a sensitive IP matter*" and wanted to speak with
24   Plaintiff. He said Apple "*sincerely appreciates [her] prioritizing this call and being flexible.*" He never
25   said the Plaintiff was under investigation.

26

27   [29] *Brown v Apple Inc*, Case No. 18CV330922, Superior Court of the State of California, County of Santa
     Clara, Complaint (July 2 2018).
28   [30] The NLRB is now suing Apple over that policy.

175. The plaintiff was certain she was about to be fired, but she promptly responded at 2:10 PM, saying she was willing to participate but wanted a written record of their conversations. She said she would respond as quickly as she could.

176. Kagramanov did not respond, so Plaintiff responded again at 2:27 PM, complaining of "*witness intimidation the day before her affidavit*" and telling him she forwarded his emails to the NLRB attorney assigned to her NLRB case. The plaintiff also posted on Twitter complaining of witness intimidation and fear of violence from Apple. [31]

177. There was no legitimate explanation for why this team was contacting Plaintiff. [32] The plaintiff opined about it on Twitter while she waited for Kagramanov's response, posting at 2:34 PM: "*...so does he investigate the threats and violence, or is he the one that provides that as a service?*"

178. Kagramanov replied to Plaintiff's email at 2:50 PM: "*We are investigating allegations that you improperly disclosed Apple's confidential information.*" Kagramanov also claimed Plaintiff refused to participate in his farcical investigation and announced he was suspending all of Plaintiff's Apple account access.

179. Kagramanov never disclosed that an Apple lawyer was also waiting on the call to speak with her and Kagramanov. This specific lawyer was a New York state criminal Assistant District Attorney in Manhattan before joining Apple a few years prior. It is unclear what their plan was if the Plaintiff agreed to speak with them.

180. Plaintiff responded to Kagramanov at 3:07 PM, reiterating that she wanted to participate. "*As mentioned, I am definitely willing to participate in your investigation. I only asked that the discussion be kept to email — I said nothing about not participating in the discussion at all.*" She added: "*I offered to help via email to ensure we have a documented [record] of our conversations considering everything that's currently going on with my investigation and my complaints to the government... I would really like the opportunity to remedy any actual issues.*" The plaintiff still did not

---

[31] "*Hey #Apple, 'This feels a little like witness intimidation. I let @NLRB know.' Love, Ashley. Clutches panic button & Mace while still laying on the floor pondering the brutality of U.S. capitalism.*" -- @ashleygjovik (September 9, 2021, 2:33 PM).

[32] Cal.Lab.C. § 6401.9 defines "workplace violence" as the threat or use of physical force, including incidents involving guns and dangerous weapons.

1    know what she was accused of.

2    181. She added, "*In the meantime, without any additional context or effort to communicate with*
3    *me in email, this really does feel like intimidation and additional retaliation, and I will consider it as*
4    *such.*"

5    182. On September 9, 2021, the U.S. EEOC investigator posted the final version of the
6    charge and asked the Plaintiff to sign it. The plaintiff digitally signed her U.S. EEOC charge against
7    Apple. Then, the Plaintiff emailed the U.S. Department of Labor with responses to their questions
8    about her protected activity and Apple's retaliation. The plaintiff replied again at 5:26 PM PST,
9    informing them Apple's Workplace Violence interrogator had just suspended her account access
10   and threatened her.

11   183. On September 9 2021, at 6:54 PM, Yannick Bertolus, Plaintiff's Vice President and
12   West's close friend, sent Plaintiff an email with the subject line "*Your employment status*" and
13   attached a letter providing vague and ambiguous reasons as the basis for Apple's decision to end
14   her employment.

15   184. On September 15 2021, at 7:40 PM PST, nearly a week after Apple fired the Plaintiff,
16   Apple's lawyers at O'Melveny and Myers, via Partner David R. Eberhart, emailed Plaintiff a letter
17   implying Apple terminated her due to her complaining about Apple asking to 3-D scan her ear
18   canals and also because she posted some of the surveillance photos Apple secretly took of her at
19   home through her phone when it was illegally harvesting her biometrics through its face Gobbler
20   application.[33] Eberhart threatened her and demanded she delete several Twitter posts but never
21   cited any legal authority.

22   185. The plaintiff told Eberhart that nothing he mentioned was confidential and that she had
23   the right to protest and discuss her work conditions. She deleted the posts Eberhart referenced
24   because Apple had effectively intimidated her with their threats. However, a lawyer responded to
25   Eberhart more formally a couple of weeks later, on Plaintiff's behalf, warning Eberhart about Rule

26

27   [33] At this point, Apple had retained at least two law firms to defend it from Plaintiff's claims, which again
     raises the question of whether Orrick, Herrington & Sutcliffe were also retained and, if so, what role they
28   played in the actions Apple took against Plaintiff.

1    11 sanctions if he tried to pursue the matter in court as his claims have no basis in fact or law.

2    Eberhart never responded. The posts Eberhart coerced Plaintiff to delete are below.



*Figure 3: The Twitter posts that Apple claims justified Plaintiff's immediate termination.*



186. On September 21, 2021, Apple CEO Timothy Cook emailed all Apple staff, complaining that an Apple employee had spoken publicly to reporters about work conditions. Cook said Apple is "*doing everything in our power to identify those who leaked*." Cook said, "*People who leak confidential information do not belong here*."

187. On September 10 and 14, 2021, Plaintiff testified to the U.S. NLRB for her first sworn statement. On December 13, 2021, the U.S. Department of Labor docketed Plaintiff's Sarbanes–Oxley Act, Comprehensive Environmental Response, Compensation, and Liability Act, and OSH Act cases. Financial Times published an article about it on December 13, 2021, and Plaintiff's claims were referenced on the front page.[34]

188. On May 20 2022, the EPA sent a letter to Northrop Grumman about 825 Stewart Drive, instructing that: "*EPA requires that one round of indoor air samples be collected... under current conditions.*"[35] This request confirmed Apple had to test the air in Plaintiff's office, and it was not optional or voluntary as they had insisted.

189. EPA's letter included an attached memo from the EPA's team of vapor intrusion experts instructing Northrop Grumman and Apple that there should be an annual inspection of "*verification that the floor slab and barrier system have not been breached or otherwise compromised; evaluation to confirm that the building has not been modified in a manner that could compromise the system; evaluation of changes to building use,*" in addition to also inspection roof components.[36] This further validated Plaintiff that she was correct and Apple should have followed her advice.

190. On May 27, 2022, the EPA admitted to the Plaintiff that an inspection had been conducted at her office on August 19, 2021—Apple had been able to conceal it from the Plaintiff for a year.

191. On July 28, 2022, Northrop Grumman told the EPA they were late responding to its questions because Apple and the building owner had stopped responding for weeks regarding the EPA's requests related to CERCLA obligations.

---

[34] Financial Times, "*Apple faces probe over whether it retaliated against a whistleblower,*" Dec. 13 2021.
[35] U.S. EPA, re: EPA Technical Comments on the Passive SSDS O&M Plan and Evaluation, 825 Stewart Avenue Sunnyvale, CA, TRW Microwave Superfund Site, May 20 2022.
[36] U.S. EPA, Passive SubSlab Depressurization System Operation & Maintenance, April 25 2022.

192. On July 14 2022, Plaintiff argued her unemployment insurance appeal. Before this, the agency had rejected her claim based on inaccurate information from Apple. Plaintiff won her appeal, and a decision was issued by an Administrative Law Judge saying: "*The evidence shows that the [plaintiff] was discharged for reasons other than misconduct connected with the most recent work.*"[37]

193. In 2022, the US Representative's office discussed bringing the Plaintiff's complaints about Apple's environmental violations to a US House Subcommittee that the US Representative chaired.

194. After Apple fired Plaintiff, Plaintiff filed additional U.S. NLRB and California Department of Labor charges about Cook's email and Apple's non-disclosure agreements and other employment policies, charging they violated federal labor laws – and the U.S. NLRB agreed with Plaintiff, issuing a Decision of Merit on her charges against Apple in January 2023, and complaint in September 2024.

195. On January 20 2023, EPA told Northrop Grumman to plan to do vapor intrusion testing at Plaintiff's office in March 2023. On August 31, 2023, the EPA published a letter responding to Apple's May 2023 testing results at Plaintiff's Apple office, the first testing since December 2015, complaining that Apple's testing report and strategy "*fundamentally incorrect*," had "*no fundamental basis*," was "*not accurate*," "*confusing*," and "*misleading*."[38]

196. From September 2023 through September 2024, Plaintiff worked as a program manager for an air pollution research project at a research university. The role was temporary and did not use her legal or engineering experience. After two years of searching and hundreds of applications, it was the first and only job offer she could obtain.[39]

197. The role at the university was far lower in seniority than her role at Apple. The university offered the Plaintiff a salary that was 41% less than her salary at Apple, and her total compensation was reduced by 74%. The position ended after the one-year contract, and now

---

[37] *Ashley M Gjovik* (Claimant-Appellant); California Unemployment Insurance Appeals Board, Case No. 7253819, July 14 2022.
[38] U.S. EPA, TRW Microwave Site, Northrop Grumman Vapor Intrusion Evaluation Report, Aug 31 2023.
[39] Except for brief expert consulting work for a large law firm on a class action fraud lawsuit – consulting which abruptly ended upon Apple's counsel demanding that Gjovik be removed from working on the lawsuit – a direct example of denylisting.

1    Plaintiff is back on Medicaid and unemployment insurance and applying for the Supplemental

2    Nutrition Assistance Program support.

3    198. On September 27, 2024, the EPA published the "Five Year Report" for the Triple Site,

4    including the TRW Microwave site. The report reiterated that a new Record of Decision is still

5    needed to address the vapor intrusion at 825 Stewart. The report also revealed that the investigation

6    into elevated levels of trichloroethylene in the outdoor air is now focused on the shallow

7    groundwater beneath 825 Stewart, Plaintiff's office.[40]

8    199. U.S. ACE and EPA ordered more testing and evaluations because, if true, the

9    contaminated groundwater plume just a couple of feet below the surface at the Plaintiff's Apple

10   office is releasing dangerous levels of trichloroethylene into the outdoor air and the neighboring

11   properties.

12   200. The EPA shared the raw data from Apple's 2023 indoor air testing with Plaintiff. The

13   results showed that vapor intrusion still occurs inside but with chemicals at 'acceptable' levels,

14   apart from unexplained elevated levels of benzene.

15   201. On September 27, 2024, the NLRB issued a complaint against Apple regarding its

16   Business Conduct Policy, non-disclosure agreements, non-competes, and other employment

17   policies – including its misconduct, social media, and surveillance policies. [41]

18   202. The NLRB issued a Decision of Merit in January 2023 (thus, the NLRB will issue a

19   complaint and sue Apple if Apple does not settle first) about an email Chief Executive Officer Tim

20   Cook sent his staff in September 2021 (shortly after the Plaintiff was fired). [42]

21   203. In October 2024, the NLRB issued a decision of merit stating that there is substantial

22   evidence that Apple's placement of Plaintiff on leave was an unlawful suspension and that both the

23   suspension and termination of her employment violated federal labor laws.[43] Plaintiff is unable to

24   get a straight answer from the NLRB about consolidating the pending email and retaliation claims,

25   _____

26   [40] U.S. ACE & U.S. EPA, *Sixth Five-Year Review Report for Advanced Micro Devices 901/902 & TRW Microwave Superfund Sites Includes The Companies' "Offsite" Operable Unit*, Sept. 27 2024, https://semspub.epa.gov/work/09/100038437.pdf

27   [41] 32-CA-284428

     [42] 32-CA-284441

28   [43] 32-CA-282142, 32-CA-283161

1  raising an inference that there may be evidence that Cook's email was about Plaintiff and the still
2  unnamed executives who decided to terminate Plaintiff's employment.

3  ## LEGAL CLAIMS

4  **204.** Plaintiff now incorporates by reference every allegation and fact above and below into
5  each section where that allegation and facts is needed to support the claim at issue. Some facts and
6  allegations are not repeated to meet page limits.  Where any statute of limitations is in question of
7  being expired for an alleged claim, Plaintiff, where reasonable, will argue that the statute of
8  limitations should be tolled due to Apple's fraudulent concealment of many material facts (some of
9  which Apple continues to conceal, including the identity of who proposed to fire her). Where
10 applicable, the plaintiff will also claim the doctrine of continuing violations, equitable tolling, and
11 the discovery rule.

12 **205.** For California Labor Code §§ 98.6 and 1102.5, any issues with statute of limitations
13 related to the claims or remedies (*i.e.*, penalties/fines) are equitably tolled by Plaintiff's timely
14 complaints sitting in the California Department of Labor queue for years before Plaintiff kicked the
15 claims out into this lawsuit. This lawsuit replaced the California Department of Labor DIR case
16 *Ashley Gjovik v Apple Inc*, RCI-CM-842830. Plaintiff filed the first claim on August 29 2021, before
17 Apple terminating her employment.

18 ## KNOWLEDGE OF PROTECTED ACTIVITIES

19 **206.** The plaintiff threatened Apple that she would talk to the press about her work
20 conditions in June 2021. She did talk to the press and was quoted by the New York Times about
21 Apple starting in July 2021. Apple Employee Relations told Plaintiff they saw it, were aware, and
22 were annoyed she figured out labor laws. The press covered the plaintiff and her social media posts
23 through August and September 2021. The plaintiff provided quotes, commentary, and more
24 information to journalists for their articles. Each time a new article was published, the press directly
25 notified Apple's public relations team, requesting comment.

26 **207.** In mid-July 2021, the plaintiff notified Employee Relations that she and other
27 coworkers were posting on social media, complaining that Apple was invading their privacy with
28 overly aggressive medical release forms for Americans with Disabilities Act accommodation

requests. Apple Employee Relations interrogated Plaintiff on July 29, 2021, about her discussions with her coworkers about their work conditions (a culture of retaliation and cover-ups at Apple) on Apple's Slack discussion tool. Okpo urged her to stop discussing work conditions and asked her to direct her coworkers to speak with him privately. The plaintiff told Okpo she would not help him intimidate and retaliate against her coworkers.

208. After Okpo put Plaintiff on leave on August 4, 2021, Plaintiff began speaking out more on Twitter and to the press. The plaintiff was still discussing work conditions. Okpo quickly emailed Plaintiff on August 5, 2021, complaining about her, discouraging her from speaking out, and falsely accusing her of lying.[44]

209. Plaintiff observed an incredible response from her coworkers while she was sharing stories and documents in August 2021, with many discussions on Apple's Slack tool for employees, including many employees saying and telling her that they had reported the people she complained about and asked Apple to do the right thing with Plaintiff. One of Plaintiff's posts even led to a petition within Apple. The plaintiff shared a Radar work tracking ticket that Marini titled with the goal of making her life "*a living Hell*" and assigned it to Reigel. After learning of the Radar from Plaintiff's social media, dozens of employees started commenting on the Radar, condemning the bullying, and demanding Apple improve its conduct. Several people told Plaintiff they reported the Radar to Human Resources around August 16 2021.

210. Then, in Apple's 2022 position statement to U.S. Department of Labor, Apple claimed it was investigating Plaintiff's Twitter posts starting from around August 28 2021 and through September 9, 2021. This claim from Apple implies they were reading all of Plaintiff's Twitter posts and monitoring her other social media activity. Either Apple was surveilling her as they claimed in 2022 and thus knew about all of the protected activity and harassment, or Apple lied to the federal government in 2022.

211. Finally, another fact conclusively evidencing Apple's knowledge of Plaintiff's activities – is that as part of the steps leading to Plaintiff's termination, one of the supposed reasons she was

---

[44] In September 2024, the NLRB issued a Decision of Merit, saying that there is substantial evidence that Okpo's email violated federal labor laws.

1   to be terminated, as communicated by Human Resources to her VP, was that Plaintiff supposedly

2   failed to participate in the Employee Relations investigation by redacting the evidence she provided

3   Employee Relations. However, she did not redact any records in her Box folders for Employee

4   Relations. The plaintiff did, however, redact the internal records she posted on Twitter. Apple

5   Human Resources must have gotten confused and mixed up their Twitter stalking screenshots with

6   the records Plaintiff provided them directly. Apple never raised the matter to Plaintiff, and Plaintiff

7   only discovered this fact via discovery.

8   212.  Apple continued to monitor her posts after September 2021 (attempting to get Twitter

9   to delete some of them, admitted in U.S. Department of Labor filings) and through January 2022

10  (Appleseed wrote to the Plaintiff, upset that she tried to get the Plaintiff's Twitter posts deleted

11  but found out Apple also reported them, and it was Apple's reports that resulted in the posts being

12  deleted). Apple has undoubtedly read Plaintiff's Twitter and other social media for years. Apple

13  also knew about Plaintiff's activities through direct updates from Plaintiff, information shared by

14  agencies arising out of Plaintiff's complaints, press coverage of Plaintiff, and any surveillance they

15  were conducting of her personal and work devices (which Apple's policies said they would do).

16      COUNT ONE: WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY

17  213.  Apple retaliated against Plaintiff and discharged Plaintiff's employment for multiple

18  reasons that violated public policy. Among other unlawful reasons, Apple suspended and fired

19  Plaintiff in violation of the "*strong public interest*" reflected "*in encouraging employee reports of illegal*

20  *activity in the workplace*." Specific concurrent claims are incorporated here as Tamney sub-claims.

21  Specifically: Cal.Lab.C. §§ 96(k), 98.6, 232, 232.5, 1102.5, and 6310. These sub-claims are included

22  in addition.

23  **214. Illegal Data Harvesting [California Constitution Article I, Section 1; FTC Act]:**

24  Apple's coercive and unlawful data collection of biometric, genetic, anatomical, and surveillance

25  data is a gross and egregious violation of Article I Section 1 of the California Constitution; the

26  California Privacy Rights Act; the U.S. FTC Act; Cal.Pen.C. § 637.7, and the International

27  Covenant on Civil and Political Rights: Article VII.

28  215.  While false and pretextual, Apple's proffered reason for terminating Plaintiff is illegal

1   itself. Apple claims it fired Plaintiff for complaining about Apple's surveillance of employees,

2   including coercive data collection of biometrics and invasive 24/7 video recording.

3   216. Apple discriminated against Plaintiff, including ending her employment, because of

4   Plaintiff's actions related to her constitutional and statutory right to privacy, which are substantial

5   and fundamental rights that benefit the public and were firmly established at the time of discharge.

6   Apple's decision to use this as their excuse for firing the Plaintiff reveals Apple's animus against

7   California employees' privacy rights.

8   217. Apple also intruded into Plaintiff's seclusion, physically and constructively invading

9   Plaintiff's privacy in violation of California Civ. Code § 1708.8(a), (b), (d), and Apple surveilled

10  Plaintiff and forced Plaintiff to surveil others with the always-on video camera in her iPhone,

11  including in bathrooms and locker rooms, in violation of California Labor Code § 435.

12  218. The Gobbler application captured videos and photos of the plaintiff in the bathroom;

13  the plaintiff has copies of those images. Apple's use of Gobbler on Plaintiff's phone also forced

14  Plaintiff to take part in Apple's unlawful acts by facilitating Apple's secret capture, storage, and

15  processing of photos, videos, and biometrics of the public without their knowledge or consent.

16  Apple's termination of Plaintiff claimed that she would be fired if she warned people about the

17  surveillance occurring on her phone. Therefore, Apple's unfair business practices made consent

18  from the public impossible. The public had a reasonable expectation of privacy for sensitive

19  biometrics.

20  219. Apple also violated § 5 of the FTC Act in unlawfully coercing employees to provide

21  personal and sensitive data for commercial product development, which was also engaging in unfair

22  acts or practices that can harm consumers, cannot be avoided by consumers, and are unreasonable

23  and misleading statements to consumers. Employees can be consumers under the FTC Act as an

24  employee of Apple who goes out and buys an iPhone is an Apple customer who now owns an Apple

25  product with consumer protection laws protecting them.

26  **220. Employment Discrimination [California DFEH; U.S. EEOC]:** The Plaintiff

27  reported and testified about complaints about sex, gender, and disability discrimination, which are

28  fundamental rights for a *Tamney* claim. The plaintiff filed California DFEH and U.S. EEOC claims

on August 12 2021, then testified and provided evidence. She requested a Right to Sue letter, granted on September 9 2021, just hours before Apple fired her. Apple retaliated against Plaintiff for opposing Apple's discriminatory practices. Before her termination, the plaintiff also filed employment discrimination claims with the U.S. NLRB and the U.S. Department of Justice Civil Rights Department.

**221.** Apple discriminated against Plaintiff because of Plaintiff's actions exercised her constitutional and statutory rights to be protected from discrimination due to her sex and due to her disabilities, which is a right that benefits the public, is a substantial and fundamental right, and which was firmly established at the time of discharge.

**222. Crime Victim/Witness Discrimination [California Labor Code § 230(e)]:** The plaintiff was a "*victim of a crime that caused physical injury*" and suffered "*physical, psychological, and financial harm due to the attempted commissions of a crime.*" Apple discriminated against Plaintiff due to Plaintiff's actions related to constitutional and statutory rights to be protected from crime and seek justice for injury caused by crime, which is a right that benefits the public, is a substantial and fundamental right, and which was firmly established at the time of discharge.

**223. Legislative Witness Discrimination [California Government Code § 9414]:** Apple knew Plaintiff was speaking with politicians about what occurred to her next to 3250 Scott. West and Plaintiff even texted about it. Apple also knew it was responsible for Plaintiff's harm, and Plaintiff's contacts with legislatures risked exposing what Apple did.

**224.** Apple knew Plaintiff may testify at legislative committees about the air pollution caused by Apple, even if she did not yet know it was Apple. Apple undertook an effort to ensure Plaintiff did not testify and to harass Plaintiff because Plaintiff may testify to a committee. Apple also knew Plaintiff was talking to elected officials about its retaliation against Plaintiff after her termination, including a State Senator, a U.S. Representative, and a U.S. Senator. Apple had reason to believe Plaintiff planned to be a witness for an agency or committee.

**225.** Under Cal P.C. 140(a) 137(b) 136.1., it is illegal to intimidate or threaten witnesses before and after testimony. Further, Apple also engaged in a misdemeanor public offense under California Government Code § 9414 to harass and retaliate against the Plaintiff, attempting to

1   prevent and dissuade the Plaintiff's testimony in a proceeding and depriving, threatening, and

2   attempting to deprive or requesting that the Plaintiff not be employed due to the Plaintiff's being a

3   witness for a committee and giving testimony to a committee as a witness or victim.

4   COUNT TWO: CALIFORNIA WHISTLEBLOWER PROTECTION (CAL.LAB.C. § 1102.5)

5       226. Plaintiff re-alleges and incorporates by reference every allegation set forth above, as

6   though fully in this Claim for Relief. Apple violated § 1102.5 when it took adverse employment

7   action against Plaintiff due to Plaintiff's protected activity in disclosing information to a

8   governmental or law enforcement agency, to a person with authority over the employee, and to

9   another employee who has authority to investigate, discover, or correct the violation; and providing

10  information to or testifying before, any public body conducting an investigation, hearing, or inquiry.

11  Apple was watching Plaintiff's social media activity and articles, so Apple was also informed of her

12  disclosures through that surveillance.

13      227. Cal.Lab.C. § 1102.5 covers Plaintiff's public disclosures due to Apple's extreme power

14  and control over the government agencies who are supposed to be able to regulate it; often, the

15  public is the only party in a position to force Apple to correct an issue. Many of Plaintiff's public

16  statements in August and September 2021, and statements to coworkers in June and July 2021, all

17  before her termination, explained that was why Plaintiff was bringing her complaints forward to her

18  coworkers and the public – so the public pressure may force Apple to do the right thing.

19      228. Plaintiff filed several complaints under multiple laws known to Apple executives,

20  bosses, and administrators by Plaintiff informing them directly, by Plaintiff speaking about them

21  publicly on social media, the press, and by Apple's surveillance of Plaintiff before her termination.

22      229. Apple discharged and discriminated against Plaintiff in retaliation for Plaintiff's

23  disclosure of information about Apple's unlawful acts and omissions. The plaintiff disclosed

24  Apple's violations of numerous laws to government agencies, the public, the press, and Apple

25  management. The plaintiff had reasonable cause to believe that the information she disclosed

26  evidenced Apple's violations of the statutes and non-compliance with rules and regulations.

27      230. The plaintiff complained of violations of environmental laws and the anti-retaliation

28

1    provisions of environmental regulations.[45] The plaintiff filed complaints to the EPA, CalEPA, and

2    the U.S. Department of Labor around August 29 2021. The plaintiff filed complaints to the U.S.

3    NLRB about NLRA § 8(a)(1) violations on August 26 2021. The plaintiff initiated proceedings, and

4    an NLRB field agent contacted the Plaintiff for an interview in early September 2021.[46] Plaintiff

5    also filed complaints to the California Department of Labor and the U.S. Department of Labor re:

6    CCR, Title 8, General Industry Safety Order 5194.

7        231.   The plaintiff complained of violations of 29 U.S.C. § 660. She filed complaints with the

8    California Department of Labor and the U.S. Department of Labor. In early September 2021, the

9    plaintiff initiated proceedings with a Wage and Hour investigator.

10       232.   The plaintiff complained of violations of the California Constitution's right to privacy,

11   made a complaint to Apple management in August 2021, and shared concerns with a reporter for

12   an advocacy article in August 2021 titled *"Apple Cares about Privacy, Unless You're an Apple*

13   *Employee,"* and made complaints on social media in August – September 2021.

14       233.   The plaintiff complained of 42 U.S.C. § 2000e violations and California Government

15   Code § 12920 anti-discrimination laws. In August 2021, the plaintiff filed complaints to the U.S.

16   Department of Justice Civil Rights Department, the U.S. EEOC, and California DFEH.[47]

17                    COUNT THREE: CALIFORNIA LABOR CODE § 6310.

18       234.   Apple violated § 6310 by discrimination, suspension, discharge, and threat of discharge

19   against Plaintiff because Plaintiff complained about unsafe work conditions and practices,

20   instituted and caused to be instituted proceedings related to her right to safe and healthful working

21   conditions, testified about workplace safety, and exercised her rights under the California OSH Act.

22   Apple also took the above negative actions for fear that Plaintiff would engage, or engage further,

23   in the above activities. The plaintiff's safety complaints and inquiries motivated Apple to

24   discharge, discipline, and discriminate against the Plaintiff.

25       235.  Apple discriminated against and discharged Plaintiff because Plaintiff complained

26

27   _____
     [45] 42 U.S.C. §§ 9610 and 7622 and 15 U.S.C. 2622.
28   [46] NLRB issued a decision of merit on Plaintiff's claims and sued Apple in Oct. 2024.
     [47] Title VII of the Civil Rights Act, 42 U.S.C. §2000e; Cal. Government Code § 12920.

about safety and health conditions or practices at the workplace to Apple managers and her coworkers. Apple discriminated against and discharged Plaintiff because Plaintiff reported work-related injuries and illnesses and requested information about work-related injury and illness reports or records.

236. Apple knew about Plaintiff's complaints through conversations, emails, meeting notes, internal complaints, external complaints, public interviews, and social media posts. Plaintiff filed a Retaliation claim with the California Department of Labor on August 29 2021, and Apple was notified of such before her termination. The plaintiff complained of unsafe work conditions and internal violations of safety laws, rules, and standards to Apple, EPA, California EPA, and OSHA.

237. The plaintiff complained about violations of, and issues related to, multiple topics, including Hazard Communication and employee exposure to chemicals;[48] COVID-19 safety and communication;[49] wildfire smoke safety;[50] employee injury tracking and reporting;[51] e-waste reduction and Apple's prior e-waste violations;[52] environmental safety, including vapor intrusion exposure,[53] Right to Know and Proposition 65,[54] the Safe Drinking Water and Toxic Enforcement Act of 1986,[55] and Workplace Violence under the OSH Act.[56]

238. Apple retaliated against Plaintiff preemptively out of fear that Plaintiff would file more workplace health and safety complaints. Apple hoped its retaliation would cause Plaintiff to drop her existing complaints out of fear and intimidation and prevent her from filing more complaints.

### COUNT FOUR: CALIFORNIA LABOR CODE § 98.6.

239. Apple violated Cal.Lab.C. § 98.6 when Apple discharged and discriminated against Plaintiff for engaging in certain activities, including *"filing a complaint with the Labor Commissioner*

---

[48] Cal.Lab.C. §§ 6398, 6400-6405, 6408; Cal.C.Reg., Title 8, § 340.2; 29 CFR Z § 1910.1020.
[49] Cal.Lab.C. §§ 6325; 6409.6, 6432.
[50] Cal.C.Reg., Title 8, § 5141.1.
[51] Cal.C.Reg., Title 8, § 14300.
[52] Cal. Health and Safety Code; Resource Conservation and Recovery Act.
[53] Cal.Lab.C. § 6406; the Comprehensive Environmental Response, Compensation, and Liability Act; the Superfund Amendments and Reauthorization Act; Resource Conservation and Recovery Act; Clean Air Act; and the Occupational Safety & Health Act.
[54] The Emergency Planning and Community Right-to-Know Act; Cal.Lab.C. § 6399.7.
[55] Cal. Health and Safety Code §§ 25249.5 to 25249.14.
[56] Cal.Lab.C. §§ 6401.7, 6401.9.

1   *or testifying in such proceedings*." The plaintiff filed a complaint with the California Labor

2   Commissioner on August 29, 2021, and Apple knew she did so through her public statements and

3   the notification from the agency.

4   240. Apple violated § 98.6 by retaliating against Plaintiff because Plaintiff filed a claim and

5   caused to be instituted proceedings related to the rights under the jurisdiction of the California

6   Labor Commissioner and for exercising rights provided to her under the California Labor Code on

7   behalf of herself and on behalf of other employees. Apple punished her for doing so.

8   241. Apple's forbidden animus was revealed in multiple comments and communications

9   from employees, managers, and agents before and after Apple fired Plaintiff. Comments referenced

10  Plaintiff's protected activities but claimed Plaintiff was lying and acting in bad faith and argued that

11  Plaintiff should be punished because Plaintiff made those complaints.

12  242. Apple retaliated against Plaintiff due to Plaintiff's protected activity, and she suffered

13  adverse actions with a causal connection to the protected activity. Apple engaged in actions

14  prohibited by this section within 90 days of Plaintiff's protected activity.

15  243. **Violation of California Labor Code § 232.5 via §§ 98.6, 98.7:** Apple violated

16  California Labor Code §§ 232 and 232.5 by disciplining, discriminating against, and terminating

17  the Plaintiff for discussing her wages and working conditions. The Plaintiff engaged in protected

18  activities under § 232.5, which includes sharing information about wages and work conditions with

19  coworkers and the public. In violation of these protections, Apple retaliated against Plaintiff for

20  disclosing information regarding Apple's work conditions and wages, including her participation

21  in employee pay surveys, social media posts, and public advocacy.

22  244. In late July 2021, the Plaintiff participated in a pay survey among coworkers. The

23  plaintiff suggested adding a question about gender to the survey. In August 2021, she participated

24  in another pay survey shared via Slack, where she again included a gender-related question.

25  245. In August 2021, the Plaintiff also openly discussed her wages on social media and

26  encouraged her coworkers to do the same. Apple was aware of her actions and retaliated by placing

27  her on leave on August 4, 2021, the day after she shared a post on Slack referencing Apple's policies

28  on employees' right to speak freely about wages, hours, and working conditions. Her post

1    encouraged her colleagues to speak out and organize.

2    246. Apple retaliated more when it shut down the pay survey, reportedly because it included

3    a question about gender. The closure of the survey and the later media coverage criticizing Apple's

4    actions sparked public concern about pay equity at the company. Articles published in August 2021

5    noted that Apple had shut down employee-run surveys on pay equity. The articles criticized

6    Apple's policies on diversity data in these surveys. The Plaintiff also shared information and

7    commented on Twitter about an earlier U.S. Department of Justice lawsuit against Apple for illegal

8    wage-fixing practices. Apple admitted to reviewing Plaintiff's public posts on social media before

9    firing her, which further underscores the retaliatory nature of the actions taken against her.[57]

10    247. The Plaintiff's actions to raise awareness about wage discrepancies and to speak out

11    against these practices were consistent with her rights under labor laws that protect wage disclosure

12    and organizing activities.[58] A charge was filed with the NLRB in September 2021 about Apple

13    shutting down the pay surveys. The NLRB issued a decision in January 2023 that there is

14    substantial evidence Apple violated labor laws by doing so, further confirming the Plaintiff's claims.

15    248. **Violation of Cal.Lab.C. § 96(k) via §§ 98.6, 98.7**: Apple violated Cal.Lab.C. § 96(k)

16    when it demoted, suspended, discharged from employment, threatened discharge, and

17    discriminated against Plaintiff because of Plaintiff's lawful conduct that occurred during

18    nonworking hours away from the employer's premises, and the conduct involved the exercise of

19    rights protected by the California Constitution.

20    249. The plaintiff engaged in lawful conduct asserting recognized constitutional rights and

21    rights under the Labor Code during nonworking hours while on leave away from Apple's premises.

22    Apple put the Plaintiff on leave, but the plaintiff did not want to be on leave. The plaintiff asked to

23    come back, but Apple said no. Apple cannot turn around and claim the leave was work time or the

24    workplace. Apple told Plaintiff she had been "*removed from the workplace*." Until Apple let Plaintiff

25    

26    [57] The Verge, *Apple keeps shutting down employee-run surveys on pay equity,* 8/9/202; The

27    Verge, *Apple just banned a pay equity Slack channel but let's fun dogs channel lie*, 8/31/2021.

28    [58] The Verge, *Apple says it has pay equity, but informal employee survey suggests otherwise*, 8/23/2021.

1    return to work, Plaintiff was off duty. Plaintiff posting about work conditions in her personal time

2    does not transform Plaintiff's personal time into work time.

3        250.  Apple fired Plaintiff for various illegal reasons, including many of the public statements

4    Plaintiff made while on leave in August – September 2021.

5        251.  Apple fired Plaintiff for complaining on social media and to the press about harassment

6    and safety issues at Apple, as was her inherent right to be free from discrimination under California

7    Constitution Article 1, §§ 8, 31, and her right to physical safety under California Constitution

8    Article 1, § 1.

9        252.  Apple fired Plaintiff for complaining on social media and to the press about unlawful

10   and unethical surveillance and invasions of privacy by Apple to Plaintiff and her coworkers. Apple's

11   legitimate justification is illegitimate. Plaintiff has a self-executing right to protest invasions of

12   privacy under California Constitution Art. 1, § 1.

13       253.  Apple fired the Plaintiff for complaining on social media and to the press about the

14   environmental crimes she witnessed and was a victim of at her apartment in 2020 and Apple's

15   conduct at her office.

16       254.  Apple fired Plaintiff for complaining on social media and to the press about the

17   intimidation and threats she received due to her status as a crime victim and because she advocated

18   for crime victim's rights – as was her right under California Constitution Article 1, § 28.

19       255.  Apple violated Cal.Lab.C. § 96(k) when it retaliated against Plaintiff for making any and

20   all of these statements, which she had a constitutional right to make and which she made outside

21   of worktime and outside of the workplace.

22                              TOXIC TORT TOLLING THEORIES

23       256.  In 2022, Plaintiff continued monitoring the *TRW Microwave* and Honeywell *Synertek*

24   Superfund sites. She requested public records via FOIA and engaged with the EPA's corrective

25   actions involving Apple and Northrop Grumman. The cause of her illness remained unclear in

26   2020-2021, but EPA investigations into solvent contamination from the *Synertek* site's groundwater

27   plume near her apartment suggested a potential link.

28       257.  In July 2022, Plaintiff discovered that the EPA had conducted groundwater testing in

2021, following her complaints, revealing increased levels of trichloroethylene near her former residence. She contacted the EPA and U.S. Army Corps of Engineers in January 2023 for further clarification on the health risks and the agency's remediation efforts.

258. Simultaneously, Plaintiff investigated Apple's facilities for environmental violations, compiling a database of over 160 sites. When she found inspection records for Apple's 3250 Scott facility on January 11, 2023, she asked the EPA about potential vapor intrusion.

259. On February 21, 2023, after filing multiple Public Records Act requests about various Apple buildings, Plaintiff received documents revealing disturbing information about Apple's operations at 3250 Scott – permits for semiconductor fabrication equipment. Recognizing the significance of this discovery from her prior experience working on hardware bring-up at Apple, she publicly connected Apple's hazardous manufacturing activities at 3250 Scott to her 2020 illness.

260. The plaintiff's findings were further substantiated through communication with an environmental safety expert. Lenny highlighted the acute health risks of gases used in semiconductor manufacturing and pointed out a 2019 gas leak report that mentioned phosphine—an indicator of Apple's toxic emissions at 3250 Scott. This information confirmed Plaintiff's belief that Apple's activities at the facility caused her illness.

261. Throughout 2020-2022, Plaintiff spent significant time researching potential causes of her illness, reviewing environmental databases and public records for nearby facilities, including 3250 Scott. Records on the EPA's Toxics Release Inventory (TRI) and other federal and state databases showed no significant toxic chemical releases from 3250 Scott. Without knowledge of the semiconductor operations at the facility, Plaintiff could not connect these records to her illness or find the source of her exposure.

262. The plaintiff noticed that 3250 Scott was registered as a hazardous waste generator—a designation common in Silicon Valley—but she could not have connected this to her injury. The region's history of industrial activity and the current presence of research and development facilities that generate hazardous waste did not raise any alarms. Furthermore, the unusual nature of Plaintiff's illness—including manifesting as a sudden heart failure while sleeping in her

1  apartment—was not something typical of the environmental risks she had seen associated with the

2  local tech industry.

3      263.  Government agencies, including the EPA, had also investigated the area and found no

4  records that would indicate a direct link to her health issues. They, too, could not identify a clear

5  cause, which further obscured Plaintiff's ability to connect the dots before discovering Apple's

6  involvement in February 2023.  Apple further obstructed transparency by pressuring government

7  agencies like the fire department and EPA to avoid documenting or discussing its activities.

8  Notably, Apple tried to force the EPA to sign an extensive and unlawful NDA before allowing an

9  inspection of Plaintiff's office in August 2021—another clear example of its attempts to prevent

10  the discovery of its hazardous operations.

11      264.  Additionally, Plaintiff had worked at Apple for several years and was familiar with the

12  company's unconventional, often eccentric, research and development activities. While often

13  questionable, these operations never caused harm like she experienced in 2020. The plaintiff had

14  no reason to suspect that Apple's activities were related to her injury.

15      265.  In 2020 and 2021, Plaintiff raised concerns about nearby facilities, including 3250

16  Scott, with Apple's Environmental Health & Safety (EH&S) and Legal departments. Apple's

17  failure to warn her implicitly reassured her that nothing unusual or hazardous occurred at the

18  facility, leading Plaintiff to assume that 3250 Scott posed no significant health risk. As a result, she

19  focused her research on other potential sources of contamination.

20      266.  By early 2023, government agencies, including the EPA, had conducted extensive

21  investigations into the Plaintiff's illness, ruling out nearby Superfund contamination and vapor

22  intrusion. The prevailing theory was that Plaintiff's symptoms were caused by something in the

23  building materials at her apartment, not industrial contamination. However, Plaintiff's discovery

24  of Apple's semiconductor fabrication activities at 3250 Scott in February 2023 revealed the true

25  cause of her illness, as the facility's toxic emissions were the source of her exposure.

26      267.  Apple intentionally concealed its hazardous operations at 3250 Scott, using misleading

27  permits and improper classifications that obscured the facility's true nature. This deception,

28  coupled with Apple's failure to disclose relevant information and its use of non-disclosure

1  agreements to silence employees and avoid regulatory oversight, prevented Plaintiff from
2  identifying the source of her illness until February 2023. Apple has unclean hands.

3  268. Upon learning of the semiconductor fabrication at 3250 Scott, Plaintiff immediately
4  identified the facility's toxic emissions as the plausible cause of her severe health problems and set
5  to work on further research, filing complaints, and initiating litigation. Apple's deliberate efforts to
6  hide its operations effectively prevented Plaintiff from bringing her claims in a timely manner.

7  269. Therefore, the statute of limitations for Plaintiff's toxic tort claims, including nuisance
8  and intentional infliction of emotional distress (IIED) based on fear of cancer, should be tolled until
9  February 2023, the date when Plaintiff first discovered the nature of Apple's hazardous activities
10  at 3250 Scott. Before this discovery, Plaintiff had no reasonable basis to suspect that Apple's
11  operations were responsible for her illness.

12  <div align="center">COUNT FIVE: PRIVATE NUISANCE</div>

13  **270. Creation and Maintenance of a Private Nuisance at 3250 Scott Blvd:** In operating
14  an unpermitted semiconductor fabrication facility next to an apartment complex, Apple created
15  and maintained a condition violating Cal.Civ.C. § 3479. This nuisance was demonstrably injurious
16  to health, indecent, and offensive to the senses, and obstructed the unrestricted use of property. By
17  acting and not acting, Apple created a condition and allowed a condition to exist that was harmful
18  to health, as well as a fire, explosion, and poisoning hazard. Apple's conduct in acting or not acting
19  was intentional, unreasonable, negligent, and reckless.

20  **271.** Apple continuously casts pollution upon the owner's property and tenants of adjacent
21  properties, as it knew it would do when it constructed its exhaust HVAC and hazardous waste
22  systems. It knew then, as it knows now, that so long as it would continue its operation, the pollution
23  would continue to fall, not by accident or mishap, but in conformity with the knowledge it had
24  before the construction of the systems. Apple should be presumed to have intended its act's natural,
25  known, and reasonable consequences.

26  **272.** Apple's interference would and did substantially annoy or disturb persons of normal
27  health and sensibilities in the same community. Apple's operations at the factory and Superfund
28  site are both continuing nuisances, and every continuation of the nuisance or trespass gives rise to

separate damages claims. Apple has the agency and ability to stop the nuisance (it is not permanent), so until it does, the nuisance Apple created will continue.

273. Apple's conduct was a substantial factor in causing Plaintiff's harm. Plaintiff did not consent to the defendant's conduct, and the seriousness of the harm outweighs the social utility of Apple's conduct. Apple damaged Plaintiff's property and injured Plaintiff's person. Due to Apple's actions, Plaintiff's property was destroyed, the leasehold degraded, she became terribly ill, and she suffered severe emotional distress.

274. Apple's exhaust caused injury to Plaintiff's body and mind, Plaintiff's dog, and Gjovik's property. For example, the chemicals and gases turned her white clothes yellow, yellowed her plastics, caused reactions on the copper fasteners of her jeans, and dissolved the glues in her shoes and jewelry. The chemicals harmed Plaintiff's body, causing rashes, hives, tumors, scarring, burns, heart and lung issues, neurological issues, and severe trauma.



*Figure 8: Yellowing of Plaintiff's white fabrics.*



*Figure 7: Yellowing of Plaintiff's white fabrics: Yellowing of Plaintiff's white fabrics.*



*Figure 6: Yellowing of Plaintiff's white fabrics.*



*Figure 5: yellowing of some of Plaintiff's plastics, but not others.*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



*Figure 3: Plaintiff's shoe falling apart in use due to dissolved glues.*



*Figure 2: Chemical reaction to copper alloy on Plaintiff's jeans.*

(Figure 4: Chemical reaction to copper alloy on Plaintiff's jeans.)



*Figure 1: Degraded plastic on Plaintiff's coffee grinder.*

275. In or about 2015, Apple constructed, or caused to be built, exhaust vents and open tanks at 3250 Scott near the common borderline of Apple's and Plaintiff's property. The exhaust vents were installed and maintained negligently, recklessly, and unskillfully. Apple exhausted through the vents and emptied various substances into the open tanks, which caused a foul, obnoxious, and disagreeable odor and polluted the ambient and indoor air of Plaintiff's property.

276. Apple's facility emits large quantities of vapors, chemicals, and other contaminants into the air, which are carried by the natural winds and air currents onto Plaintiff's property and collect Plaintiff's chattel property, and are generally injurious to Plaintiff's health, are offensive to the senses, and interfered with Plaintiff's comfortable enjoyment of life and property. Apple created the nuisance due to unnecessary, unreasonable, and injurious methods of operation of their business. The emissions were a business decision to be able to report reduced waste sent to landfills.



*Figure 4: Image of 3250 Scott in relation to the apartments.*

### COUNT SIX: TORT OF FEAR OF CANCER & DISEASE

277. Apple deliberately vented toxic, carcinogenic, and lethal substances into the ambient air around the Santa Clara Square Apartments where Plaintiff lived in 2020. Apple engaged in this conduct with reckless disregard for the injuries specific to be caused by that plan of conduct, and knowing people exactly like Plaintiff would be exposed to its dangerous, toxic chemical fumes and vapors.

278. Semiconductor fabrication, like what Apple is doing at 3250 Scott, is an ultrahazardous activity and absolute nuisance when conducted next to homes due to the highly toxic gases, reactive and pyrophoric gases, and the sheer quantity of dangers, poisonous chemicals that are on-site and in use for fabrication  Apple's conduct was also a nuisance to Plaintiff, and Apple's exhaust trespassed into Plaintiff's home, and assaulted Plaintiff's body.

1    279. Where there is no strict liability, Apple had a concrete, critical duty to warn those

2    around the facility – but instead, Apple failed to file required permits, failed to characterize the

3    facility properly, put no signs in front to designate the type of activity, filed only one Toxics Release

4    Inventory report, repeatedly tried to avoid filing mandatory spill/leak reports to the government

5    and also deliberately made false statements to conceal their misconduct.

6    280. Apple's activities at 3250 Scott violated rules, regulations, and statutes at local, state,

7    and federal levels. Apple has already received notice of dozens of violations, including illegal

8    chemical emissions. Apple's unlawful and outrageous conduct caused Plaintiff to suffer severe

9    emotional distress when Apple exposed Plaintiff to carcinogenic chemicals. Apple's conduct with

10    the carcinogen chemicals was outrageous. Apple's intentional, reckless, and negligent conduct

11    exposed Plaintiff to carcinogens, including trichloroethylene, toluene, arsine, and vinyl chloride.

12    281. Apple knew it would cause tenants at the Santa Clara Square Apartments distress and

13    acted with reckless disregard for the probability that people like Plaintiff would suffer emotional

14    distress knowing she was present where there were lethal and carcinogenic chemicals. The plaintiff

15    suffered severe emotional distress from a reasonable fear of developing cancer and disease, and

16    Apple's conduct was a substantial factor in Plaintiff's severe emotional distress.

17    282. As a proximate result of the acts of the defendant, Plaintiff suffered severe emotional

18    distress, including the fear of developing cancer and other diseases and an increased risk of

19    developing cancer and other diseases. Her fear also extended to her dog, a tiny eight-pound

20    Chihuahua mix exposed to the semiconductor fabrication exhaust with Plaintiff. The plaintiff

21    discusses this at every veterinarian appointment and always orders a CBC and metabolic workup

22    for him if she can afford it.

23    283. It is documented that Apple used and exhausted carcinogenic chemicals into the

24    ambient air outside the Santa Clara Square Apartments. It was also reported by an industrial

25    hygienist running a two-hour TO-17 that the same carcinogenic chemicals Apple had exhausted

26    were also found in the indoor air of the plaintiff's home. Plaintiff was also able to capture evidence

27    of some of the chemicals in her blood and urine. The plaintiff was extensively exposed.

28    284. The plaintiff suffered a wide array of physical symptoms attributed to the toxic

chemicals at 825 Stewart Drive and 3250 Scott, including spasms, nausea, hair loss, rashes, hives, burns, heart failure symptoms, asphyxia, dizziness, headache, seizures, arrhythmia, etc. These physical manifestations of the injuries and exposure to dangerous carcinogenic chemicals establish a reasonable fear of future disease. Further, the fear and horror of personally being exposed to a cloud of poison gas or knowing that family members have been exposed are absolute emotional trauma in its purest form.

285. After Apple's injuries to Plaintiff due to chemical exposure in 2020, Plaintiff experienced many new medical issues (e.g., diagnosed hypertension, hypotension, depression, rashes, growths, labile blood pressure, etc.), some of which still have not fully healed (e.g., scarred, and damaged skin, hair loss, worsened asthma, and breathing troubles, etc.).

286. This occurred during Plaintiff's second and third years of law school, causing her to suffer academically. Plaintiff now also faces a significantly increased risk of contracting cancer and other diseases in her lifetime. Further, after Apple's psychological and emotional injuries to Plaintiff in 2020-2024, Plaintiff now suffers from dramatically worsened anxiety, post-traumatic stress disorder, and concentration issues – as well as new depression, insomnia, panic attacks, weight gain, suicidal ideation, post-traumatic stress, disordered eating, loneliness, grief, crying fits, and moral injury.

287. At the time of Apple's termination of Plaintiff's employment on September 9 2021, Plaintiff still did not know Apple was responsible for what happened to her in 2020. Apple continued harassing and tormenting Plaintiff despite and because of it before knowingly subjecting Plaintiff to exposure to a highly toxic substance while purposefully concealing from Plaintiff the severe injuries that might result from such exposure and in reckless disregard of these risks. The plaintiff's physical exposure to Apple's illegal fabrication exhaust was unrelated to her employment, and thus, Worker's Compensation does not apply. Further, Apple was the operator in control of the facilities at 3250 Scott during the pertinent times, and actions taken related to Apple's hazardous waste can be directly attributed to the corporation.

288. Apple had knowledge and a reckless disregard for the fact that people just like Plaintiff would be injured by its illegal dumping. Apple knew beyond speculation that people would be

injured. This fabrication is across the street from these apartments – where every employee would see them daily. Apple spent millions on this facility and entered into a long-term lease, and Apple's Chief Financial Officer signed the Resource Conservation and Recovery Act papers. Every time Apple vented its fabrication exhaust into the ambient air, Apple knew people like the Plaintiff would be injured and deeply traumatized when they discovered what they were exposed to.

289. Apple's employees and contractors have already revealed not only evidence of knowledge but also gross recklessness – with one of their ACT Environmental contractors who was leading the hazardous waste disposal efforts in 2020 at the site, when Plaintiff was doused in chemicals, bragging in his LinkedIn profile that during that time he found "*innovative*" ways to save Apple money on hazardous waste disposal. Meanwhile, Plaintiff still has bald spots after Apple burned all her hair off. These issues were not new to Apple either, as Apple is notorious for failed manufacturing attempts in the U.S.,[59] as well as gassing their own employees at data centers.[60]

290. Corporations that knowingly and intentionally dump hazardous waste or otherwise pollute the environment, violating environmental and safety laws, do so because the practice is less costly and more profitable than complying with the regulation. Apple's intentional evasion of paying required fees and costs associated with proper hazardous waste management and disposal allows it to operate its research and development at a much lower price than its competitors, who follow the law. In addition, Apple also recently launched a "*zero waste*" program where Apple purports to divert hazardous waste from landfills. Apple's environmental reports show 3250 Scott is responsible for around 30 percent of Apple's global corporate hazardous waste. At 3250 Scott, Apple's diversions of waste from landfills include midnight dumping into apartments and creating toxic vapor clouds in public parks.[61]

291. Apple also instituted an ESG modifier for executive pay (bonuses worth multi-millions

---

[59] NY Times, "*Apple Computers Used to Be Built in the U.S. It Was a Mess.*," Dec 2018; CultureofMac, *A brief history of Apple's misadventures in manufacturing: Part 1*, 2019.
[60] The Register, *Chlorine gas horror leak at Apple data center puts five in hospital*, June 2015; The Guardian, *Five injured in chlorine gas leak at Apple data centre*, June 2015; NBC News, *Report: Deadly gas leak at Apple supplier's plant in China*, July 2012.
[61] Apple, *Apple releases 13th annual Supplier Responsibility Progress Report*, March 6 2019./

of dollars) that can increase or decrease executive compensation by 10% based on environmental and other practices. Apple's intentional environmental violations were not just to reduce costs required for properly disposing of toxic waste, but Apple's midnight-dumping also to increase bonuses for their executives. Further, Apple's continued harassment of Plaintiff despite everything else that has happened, including her exposures, is sick and depraved. The amount of stress puts her even more at risk for cancer and disease after she has already suffered significant bodily injury from Apple's illegal conduct and emissions.[62]

### COUNT SEVEN: TORT OF OUTRAGE

292.  Apple's actions toward Plaintiff were intentional, malicious, and extreme, targeting Plaintiff with the specific purpose of causing emotional distress. Apple's conduct was calculated to inflict severe emotional harm, with full knowledge of Plaintiff's vulnerabilities and the foreseeable consequences of their actions. Apple acted with the substantial certainty that Plaintiff would suffer extreme emotional distress in California, New York, and Massachusetts.

293.  The Plaintiff lived in California until August 31, 2022, in New York from September 1, 2022, to September 7, 2023, and in Massachusetts from September 23, 2023, to the present. The California statute of limitations covers the Plaintiff's residence in California from September 7, 2021, through September 1, 2022; the New York statute of limitations applies from September 7, 2022, to September 23, 2023; and the Massachusetts statute of limitations applies from September 23, 2023, to the present.

294.  Many ways Apple tortured and tormented Plaintiff would be impossible for most other corporations and businesses. To harass the Plaintiff to the extent that Apple did needs the resources, connections, and impunity of a corporation as large, wealthy, and politically connected as Apple is. However, even though most companies cannot do these things, that does not restrain Apple and other huge corporations from engaging in this misconduct. Corporations like Apple are

---

[62] California H.S.C. § 42400.1 California P. C. § 12022.7.

1    infamous for deranged harassment, stalking, and surveillance of their critics.[63]

2    295. Conversely, the Plaintiff had never experienced anything like what Apple had done to

3 her. She lived a quiet, private life and had a good relationship with most people. There is no one

4 else except Apple that Plaintiff could plausibly attribute responsibly for the things that have

5 occurred to her since 2020. No one else would have the motive or resources to do these things, and

6 the harassment was perfectly timed with her conflict with Apple. Discovery will show most of this

7 conduct, if not all of it – was initiated, carried out, authorized, ratified, and supported by Apple.

8 ### *Burglary, SWATing, & Destruction of Property*

9    296. On September 29, 2021, Apple mailed Plaintiff a package containing her personal

10 items, which were intentionally damaged and covered in glass shards. (18 U.S.C. § 876). The

11 package also contained a hidden listening device, which further violated the Plaintiff's privacy and

12 caused her emotional harm. The deliberate destruction of Plaintiff's personal belongings, including

13 planting a listening device in one of her items, was part of an ongoing campaign to frighten,

14 torment, and emotionally distress Plaintiff. Apple employees' actions in posting provocative

15 messages about the Plaintiff were meant to distress her further.

16    297. Before the package arrived at Plaintiff's home on September 30, 2021, Plaintiff asked

17 on Twitter what people thought Apple was mailing her. One account, *BabyHummingbird*, later

18 revealed to be associated with Apple public relations or global security, posted an image from a

19 movie implying that Apple had mailed Plaintiff the severed head of one of Plaintiff's loved ones.

20 The account only posted to/about Plaintiff, and its first "like" was an ad that read, "*Apple's back*

21 *better than ever!*" It also liked posts harassing Plaintiff made by other suspicious accounts.

22

23 ---

[63] e.g., Bloomberg, *When Elon Musk Tried to Destroy a Tesla Whistleblower, March 13 2019;*
24 U.S. DOJ, *eBay Inc. to Pay $3 Million in Connection with Corporate Cyberstalking Campaign Targeting Massachusetts Couple,* January 11 2024; PBS, *Feds charge eBay $3 million over*
25 *employees who sent live spiders and cockroaches to couple,* January 11 2024; VICE, *Secret Amazon Reports Expose the Company's Surveillance of Labor and Environmental Groups,*
26 November 23 2020; BGR, *Apple accused of impersonating police during effort to recover lost iPhone 5 ,* Dec. 192018, LA Times, *How the FBI and the L.A. Times destroyed Jean Seberg's*
27 *life,* June 7 2020; Lubbers, E . 2015. *Undercover Research—Corporate and Police Spying on Activists. An Introduction to Activist Intelligence as a New Field of Study.* Surveillance
28 & Society13(3/4): 338-353 (2020); etc.

1

2     298. Later, in May 2022, the Plaintiff experienced three suspicious call dropouts (May 16 at

3    6:29 P.M., May 24 at 2:03 P.M., and May 26 at 1:59 P.M.), which led her to discover hacking on her

4    network (May 28, 2022) and surveillance devices placed within her home, including the previously

5    mentioned bugged statue (May 29, 2022).

6     299. The plaintiff reported the matter to the FBI on May 30, 2022, and the FBI directed

7    her to the local police to take physical possession of the statue. That night, around midnight,

8    someone tried to break into Plaintiff's home but fled upon Plaintiff's dog barking. The plaintiff

9    called the police on May 31, 2022, and the police filed a report (SC PD Report No. 2205310079)

10   about the statue and the attempted break-in and took possession of the statute. The plaintiff alleged

11   Apple was behind it all, explaining to the police that she was a safety and environment

12   whistleblower and that Apple had not responded well.

13     300. After that, the plaintiff still experienced suspicious network activity, which led her to

14   find that someone had installed some sort of electronic equipment in her fake fig tree. It was giving

15   off radio frequency and electromagnetic signals, as the statue did. The plaintiff was hesitant to

16   report more issues because she knew she potentially sounded insane. She was exhausted and

17   resorted to throwing the fig tree in a dumpster.

18     301. These acts were done with the intent to invade Plaintiff's privacy and cause emotional

19   harm. After reporting these intrusions to the police and the FBI, Plaintiff endured further

20   violations, including attempted break-ins, which she attributed to Apple. These actions were aimed

21   at intimidating and distressing the Plaintiff. The acts were outrageous and done with the knowledge

22   that by reporting the things Apple was doing to her, she risked harming her own credibility. It would

23   sound crazy if people were unaware that corporations engaged in misconduct like this. This was all

24   part of Apple's scheme.

25     302. Around September 2021, the Plaintiff heard two men in her apartment attic, walking

26   around and doing something for a few hours directly above her office. Later, Plaintiff's property

27   manager, Prometheus, explained to Plaintiff that the only way to access her attic was through the

28   closet in her bedroom – but Plaintiff did not see anyone enter or exit. Upon further investigation,

1   neighboring units shared the same attic space, including one vacant unit, with thin plywood
2   separating the units. The plaintiff also found strange-looking cords and cables in the attic, and the
3   property manager said they had never seen them before, and they did not know what they were.

4   303. On August 9, 2022, Plaintiff reported to the FBI and the police that in September 2021,
5   Apple had apparently broken into her attic and installed surveillance equipment. [SCPD Report
6   No. 2208090087]. Despite filing a report to law enforcement, Apple entered Plaintiff's home again
7   before law enforcement arrived, leaving insulation under the attic entry and her dog smelling
8   strongly of cigarettes. All of this further aggravated her emotional distress.[64]

9   304. On September 28, 2023, early in the morning before Plaintiff's first day at her new job,
10  Apple trespassed on Plaintiff's property in Massachusetts, leaving evidence of entry into her
11  backyard. This invasion of privacy and the emotional distress caused by the prior actions led
12  Plaintiff to report the intrusion to Apple's CEO, Tim Cook when she filed this lawsuit.

13  305. Later, Apple entered her apartment again, leaving evidence that someone had been
14  inside. In February 2024, Apple staged a fake carbon monoxide alarm in Plaintiff's basement to get
15  Plaintiff out of her house and, upon returning with an all-clear from the fire department, found no
16  evidence of the gas; she found her laptop, reporting an alert that the bottom case while she was
17  outside.

18  306. Apple employees continued to stalk and harass Plaintiff, following her physical and
19  digital movements, taking photos of her, and breaking into her home.

20  307. The plaintiff found no evidence that Apple broke into her home in New York, but she
21  intentionally moved into a house directly across the street from the Governor's mansion. The
22  governor's mansion provided a 24/7 state police presence and video surveillance, which deterred
23  Apple for a year. However, she was harassed by at least two private investigators in front of her
24  building, both engaging in conduct that left no doubt they were there specifically to harass the
25  Plaintiff.

26              ***Defamation, Trade Libel, Intimidation, Retaliation***

27

28  ─────────────
    [64] Cal.Pen.C. §§ 647(h), 647(i); Cal.Pen.C. §§ 459, 602.5.

308. Apple's defamatory statements, falsely accusing Plaintiff of dishonesty and criminal conduct, were made with malicious intent as part of a broader campaign of harassment and retaliation for Plaintiff's protected whistleblower activities, including labor complaints. Apple's actions, including defamation, trade libel, fraud, invasion of privacy, and interference with business relationships, were extreme, outrageous, and retaliatory. They involved true threats, civil rights interference, and discriminatory conduct based on sex and disability.

309. From July 2021 onward, Apple employees repeatedly harassed Plaintiff through unwanted communications, surveillance, false accusations, and intimidation of her friends, creating a smear campaign to discredit Plaintiff's whistleblowing. Starting in August 2021, fake social media accounts used by Apple spread defamatory statements and threats against Plaintiff, accusing her of perjury and calling for punitive action.

310. On September 1, 2021, Apple employee Shantini Vyas tweeted defamatory statements about Plaintiff, accusing Plaintiff of lying and making unsubstantiated complaints to the government. These posts were shared by other Apple employees, Apple managers, and fake accounts, further harassing Plaintiff.

311. On September 3, 2021, 9to5Mac.com published an article casting doubt on Plaintiff's NLRB charge against Apple, based on quotes from Vyas and Apple manager Mondello. The article was planted only a couple of days after the McDermott, Will, & Emery law firm had filed a notice of appearance in the Plaintiff's NLRB case. The blog article was retracted a few days later after the Plaintiff threatened legal action.

312. Apple employees, including "crissnovak," posted defamatory content about Plaintiff in September 2021, including disparaging remarks about Plaintiff's mental health, career prospects, and legal actions, with threats to undermine her reputation. Ian ("Neoform"), a coworker, participated in the harassment, posting defamatory comments on social media about Plaintiff's alleged mental health issues and involvement in her firing. On September 10, 2021, crissnovak threatened legal and professional consequences for the Plaintiff, including stating she would be financially ruined. These posts were part of a broader campaign to intimidate and threaten Plaintiff.

313. From late 2021 through 2022, Apple employee Appleseed continued the harassment,

1    spreading false accusations about Plaintiff to Plaintiff's friends, filing false reports to law

2    enforcement, and making threats in emails and public posts. Appleseed's social media posts from

3    December 2021 to May 2023 included accusations of perjury, defamation, and stalking while also

4    threatening Plaintiff with legal and professional consequences, including retaliation through law

5    enforcement and civil litigation.

6        314. Throughout this period, Apple and its agents used social media to amplify the

7    harassment, posting defamatory statements, insulting comments, and threatening messages to

8    discredit and intimidate Plaintiff. Apple's campaign of harassment and intimidation was calculated

9    to cause emotional distress, humiliation, and harm to Plaintiff's personal and professional life,

10   leaving her in a state of fear, anxiety, and distress.

11                    ***Stalking, Obstruction, & Deranged Harassment***

12       315. The Plaintiff was subjected to a sustained and aggressive campaign of harassment,

13   which began with online attacks across multiple platforms, including social media, email, forums,

14   and the webform on Plaintiff's website. This harassment involved offensive, threatening, and

15   defamatory messages designed to cause severe emotional distress. The messages were often sent

16   from IP addresses associated with spam or malicious activity, single-use accounts solely created to

17   harass the Plaintiff, and even accounts self-identifying as Apple employees.

18       316. Apple's agents have publicly repeatedly called Plaintiff a liar, predator, bitch, cunt,

19   toxic, attention-seeking, obnoxious, vindictive, entitled, cancer, racist, lacking credibility,

20   dishonest, malicious, a sociopath, a narcissist, ambulance chaser, a provocateur, a whore, unhinged,

21   insane, a lunatic, fat, chubby, overweight, universally hated, a psychopath, paranoid, bipolar,

22   psychotic, schizophrenic, not a real whistleblower, not a real activist, a grifter, a Karen, a Super

23   Karen, Karenx100, a typical feminist, and a classic cow.

24       317. The same accounts described Gjovik's litigation and protected activities as a vendetta,

25   warpath, perjury, unsubstantiated, merciless, baseless, fabricated nonsense, misleading rhetoric,

26   dead in the water, shakedown lawsuits, and misinformation.

27       318. In December 2021, a particularly bizarre email came from an IP address tied to Apple's

28   original manufacturing plant in Fremont, California. The sender, identifying as "The Messenger,"

1  warned Plaintiff to drop her legal actions against Apple, using Bible verses to justify the threat and

2  accusing Plaintiff of retaliation against the company.

3      319.  On December 8 2021, Gjovik received an email from her website webform from a

4  "Corporate" IP address based in Fremont and registered with Hurricane Electric. The email from

5  "The Messenger," said, "*Remember what Jesus Christ taught about retaliation. You are retaliating*

6  *back at Apple.*" The email then quoted Matthew 5:38-42 from the Christian Bible. Under

7  information and belief, the email came from Apple at or around Apple's first manufacturing facility

8  in Fremont (48233 Warm Springs Blvd). This address is now listed as a Hurricane Electric data

9  center.

10     320.  One of the most disturbing threats was posted on a forum on September 22, 2021,

11  where an individual, in response to Plaintiff's NLRB charge against Apple over Tim Cook's

12  September 2021 email, suggested that Plaintiff should be executed, urging Apple to "*ruin [her] life*"

13  and "*hunt [her] down like wild animals.*"[65] Additionally, on December 21, 2021, a social media post

14  explicitly stated, "*Tomorrow's headline: Apple Whistleblower found dead of a heart attack at 22 (never*

15  *mind the double tap, nothing to see here).*" These were just a few instances of the many hostile and

16  hostile communications Plaintiff received, which included threats of violence, personal attacks, and

17  derogatory remarks.

18     321.  The plaintiff's ongoing legal efforts, including filing charges related to witness

19  intimidation and retaliation, only worsened the harassment. On January 10, 2022, Plaintiff filed

20  official complaints concerning Apple's retaliatory actions with various agencies, including the U.S.

21

---

22  [65] "I said it in the last thread about bad, criminal employees, and I'll say it again. It's
   time for Apple to take out the trash. Do whatever it takes to identify and catch the
23  leakers and then ruin their lives. Fire them, prosecute and go after them. Do whatever
   it takes. Hunt them down like wild animals. Leakers and other activist employees who
24  believe that they can do as they please have no business being at Apple. I want to see
   them gone and I want to see them destroyed. Trashy employees do not belong at Apple.
25  And who is surprised that the leakers go running to the garbage site called the Verge?
   They already had one campaign that backfired on them when the lunatic woman leaker
26  [Plaintiff] was fired, now it is time to get rid of any remaining leakers and criminals.
   Go get 'em Tim! …. Espionage has long been treated as a crime worthy of death and all
27  Apple would need to do is to make it apply to corporations and not just nations. People
   just need to be optimistic and patient." (*PacManDaddy*, 9/22/2021).
28

1    NLRB and the U.S. Department of Labor. Following this, Plaintiff received a barrage of more

2    attacks across multiple platforms, including threats designed to intimidate and silence her.

3        322. In early 2023, the harassment intensified when a Twitter account, "*Sybil*," began to

4    stalk Plaintiff's social media posts relentlessly. This account falsely claimed that Plaintiff's

5    statements about N-Methyl-2-pyrrolidone were misleading and even accused her of improperly

6    laundering clothes. Despite Plaintiff blocking the account, Sybil continued to harass her by creating

7    new accounts and spreading false information, further disrupting Plaintiff's social media presence.

8    Plaintiff reported these activities to the FBI and U.S. EPA, suspecting that these accounts were part

9    of an orchestrated effort to intimidate her into abandoning her claims against Apple.

10       323. Additionally, on March 11, 2023, a fake email account named *"Comrade Jones"* posed

11    as a former EPA compliance officer and tried to persuade Plaintiff to cease discussing Apple's

12    environmental misconduct, including the company's involvement in hazardous activities related to

13    N-Methyl-2-pyrrolidone. This account was linked to IP addresses flagged for spam and malicious

14    activity.

15       324. The harassment continued through other creative tactics. On February 19, 2023,

16    Appleseed emailed Plaintiff, acknowledging that Plaintiff did not wish to hear from her, yet

17    continued defamatory statements about Plaintiff, likening their interactions to the movie

18    *Annihilation.*[66] In 2023, Appleseed also contacted Plaintiff's friends, claiming to be from Apple

19    Global Security and attempting to obtain personal information about Plaintiff and her personal

20    relationships.

21       325. On May 26-27, 2023, Appleseed tried to engage Plaintiff through a third party to speak

22    directly to Plaintiff about her evidence against Apple – wanting to ask Plaintiff to withdraw

23    testimony and conceal evidence. This effort to contact Plaintiff was part of Appleseed's broader

24    campaign of defamation and intimidation, which included repeatedly vandalizing Plaintiff's

25

---

26    [66] In the 2018 movie "*Annihilation*," a group of scientists ventures into a mysterious
location where reality bends & mutates; and plants, animals, & people undergo
27    terrifying transformations. On their journey, the scientists encounter grotesque
creatures & bizarre mind-warping phenomena. The further they travel, the more they
28    lose themselves and go insane.

1    Wikipedia page in 2022 and making multiple false allegations in various public forums from 2021

2    through the current day.

3        326.  Despite being blocked by Plaintiff from all social media platforms since November

4    2021, Appleseed remained aware of this case and its progress, evidenced by her repeated

5    submission of unwanted and harassing letters to the court, further defaming Plaintiff and strongly

6    indicating ongoing cyberstalking.

7        327.  This sustained pattern of online and offline harassment, including threats of violence,

8    intimidation, cyberstalking, defamation, and attempts to obstruct Plaintiff's legal efforts,

9    constitutes extreme and outrageous conduct that fulfills the prima facie elements of Intentional

10   Infliction of Emotional Distress (IIED).

11                              *Injuries and Impact*

12       328.  Apple's conduct was extreme, outrageous, and persistent beyond mere insults or

13   annoyances. Their actions caused Plaintiff to fear for her safety, the safety of her dog, and the

14   integrity of her property, leaving her feeling confined and in constant danger. The plaintiff

15   justifiably believed that leaving her home or not securing it would result in her death or harm to her

16   dog. This fear was a direct result of Apple's ongoing harassment and threats.

17       329.  Rather than acting decently, Apple bugged Plaintiff's property, sent her possessions in

18   a package with a threatening implication, sued her for reporting criminal conduct, and falsely

19   impersonated government employees to intimidate her. Apple repeatedly threatened to ruin

20   Plaintiff's life for multiple years.

21       330.  Plaintiff's disclosures to others about Apple's actions consistently result in expressions

22   of shock and disbelief. These actions have caused significant emotional distress, leading to the loss

23   of friends and a general atmosphere of fear and anxiety. Apple's behavior exhibited a reckless

24   disregard for Plaintiff's health and safety, exploiting her financial and medical vulnerabilities

25   through systematic, malicious conduct.

26       331.  As documented in medical records, Plaintiff has had severe insomnia, nausea, extreme

27   depression, suicidal ideation, uncontrollable crying, paralyzing anxiety, and significant weight

28   fluctuations, including gaining sixty pounds. Apple's conduct directly caused these symptoms. In

1  addition to physical symptoms like anxiety and upset stomach, Plaintiff experienced overwhelming

2  emotional distress, including shock, horror, shame, humiliation, and PTSD. These effects have

3  caused depersonalization and derealization. Due to these injuries, Plaintiff saw medical doctors and

4  psychologists and was prescribed new and additional psychiatric medication for depression,

5  anxiety, and PTSD.

6      332. Apple abused its significant power over Plaintiff, exploiting the power differential to

7  carry out a systematic campaign of terror through multiple employees and agents. Apple could

8  manipulate and control Plaintiff's environment as one of the world's largest corporations. Apple's

9  actions were despicable, vile, and contemptible, subjecting Plaintiff to severe hardship and

10  suffering. The conduct was willfully malicious, exceeding all bounds of decency tolerated by

11  society.

12      333. But this is not new for Apple. CNN described working at Apple as "*a brutal and

13  unforgiving place*," even after employees leave, "the fear of retribution persists for years," resulting

14  in silence about what occurred during their employment. A Gawker reporter described the culture

15  of working at Apple as "*bullying, manipulation, and fear*" and described Apple's leadership as

16  "*rude, dismissive, hostile, spiteful*," and "*deeply disturbing.*"[67]

17              VICARIOUS LIABILITY, RATIFICATION, & NEGLIGENCE

18      334. Plaintiff's claim for liability against Apple is firmly based on multiple agency theories,

19  including respondeat superior, ratification, and alter ego, which establish Apple's direct

20  responsibility for the actions of its employees and agents. These theories support the argument that

21  Apple is vicariously liable for the unlawful actions of its employees who harassed, retaliated against,

22  and sought to silence Plaintiff. The harassment was carried out by multiple Apple employees,

23  including individuals within Apple's Global Security team, acting in their official capacity and in

24  furtherance of Apple's interests.

25      335. The harassment was also the outgrowth of prior conduct and risk inherent in the

26  company's culture – all of which were reasonably foreseeable to Apple. The harassment was

27  ───────────────

28  [67] CNN Money, *How Apple works: Inside the world's biggest startup*, August 2011; Ryan Tate, *What Everyone Is Too Polite to Say About Steve Jobs*, Gawker, October 2011.

undertaken by many Apple employees, under their names and identifying as Apple employees, but also an extensive amount of clearly fake social media accounts – often created solely to harass the Platiniff, that knew way too much about Plaintiff and her dispute with Apple, and took an extremely biased position against Plaintiff and in defense of Apple. T

336. Social media accounts, both named employees and anonymous, also frequently acted in concert and branded the harassment as an Apple product. For instance, citing Apple products or themes in their fake screen names (for example, "*SquareinaRoundHole*" referencing the famous Apple commercial), designing threats modeled after Apple heritage (i.e., threatening employees that if they speak publicly about work conditions, they will get "*Gjovik'd*" – an iteration on the phrase "*Steve'd*" referencing Steve Jobs' habit of abruptly firing people without proper justification). The burner accounts (not representative of real people and created just to harass Plaintiff) also showed Apple connections through their activity and were used solely to harass Apple legal adversaries including Plaintiff, Epic Games, and Corellium.

337. The posts on many public forums (*e.g.*, Reddit, HackerNews, AppleInsider, etc.) about Plaintiff were so hateful and vile that even pro-Apple moderators were complaining the posts about Plaintiff were "*full of toxicity*" and noted there were also a "*number of pretty unpleasant posts [about Plaintiff that] [the public] cannot see as [Moderators] have removed them.*" Others commented the harassment of Plaintiff was "*out of hand,*" the entire thread was "*people tearing this woman down,*" and "*Jesus, I know you guys like your iPhone, but God damn.*" HackerNews threads were often so biased and hateful that established accounts would complain that the harassment was coming from burner accounts that appeared to be "*Apple Global Security*" or "*Apple Public Relations.*"

338. The single-use anonymous accounts also became overly involved. For instance, the Twitter account "Mel Nayer" repeatedly referenced internal Apple tools and began replying to Plaintiff's posts, making threats and wild allegations. Nayer demanded Plaintiff delete "the work screenshots" because "lives are at risk" and there were vague "death threats." Nayer added, "*People at Apple have been fired for sharing less*." The account claimed to be an Apple employee.

339. Another suspicious account, "*crissnovak*," also identified as an Apple employee, amplified the named employee's Twitter posts harassing Plaintiff about Plaintiff's NLRB and US

DOJ complaints. "*Apple (w/it's army of lawyers) can sue her, and it would be an easy win because it's a simple breach of contract case. Her counter suit for retaliation/harassment will be very challenging especially if her coworkers don't have her back. They may be enjoying all that Apple $$$. Lawsuit would be chump change for Apple but will certainly bankrupt her. I've never seen anyone so intent on ruining their own reputation/livelihood.*"

340.  One employee, Ian (a.k.a. "*Neoform*"), was Plaintiff's coworker who sat across the aisle at 825 Stewart Drive. He posted on several platforms under an alias, and Plaintiff did not identify the person behind the account until 2023. The account made many posts accusing Plaintiff of lying and being insane, claiming Plaintiff's complaints were meritless and holding himself out as having insider information about what happened with Plaintiff's complaints and termination. This employee sat in the same office as Powers and was directly involved or overheard material conversations about Plaintiff and felt it appropriate to publicly harass Plaintiff in response.

341.  Apple employees, particularly those working in Apple's Global Security team, were central in harassing Plaintiff. For example, Appleseed made public threats and defamatory statements and posted online as if she was representing Apple's interests. For example, Appleseed directly communicated that she had reported Plaintiff's actions to Apple, positioned herself as speaking on Apple's behalf, and even shared insider information about Apple's retaliatory actions against Plaintiff. Her actions included filing a Business Conduct complaint against Plaintiff, engaging in a public smear campaign, incessantly claiming Plaintiff leaked trade secrets, and collaborating with other Apple employees to create a fabricated paper trail to discredit Plaintiff and enable Apple to lie about why it fired Plaintiff.

342.  Apple was aware of Appleseed's conduct, and where it did not incite or authorize it, it did nothing to stop it. It accepted all benefits provided to it, demonstrating the company's tacit approval or active encouragement of these actions. Further, other Global Security employees harassed Gjovik for years, even as recently as last month, with an Apple Global Security Crisis Manager, Vicki, calling Plaintiff on October 2, 2024, to harass Plaintiff about Plaintiff's struggle to litigate against Apple's army of attorneys. Vicki's call occurred during a workday and during work hours, and the intent and content of the communication were all related to her official duties as a

Global Security Crisis Manager.

343. Many other employees, including Ricky Mondello, also participated in the harassment. Mondello, an Apple Security team manager, made online statements defending Apple's business practices related to Plaintiff's allegations while defaming Plaintiff and repeatedly posting under his name. The fact that these actions were taken by individuals in managerial and security roles within Apple further strengthens the argument that Apple is vicariously liable for this behavior. These actions, taken by employees acting within the scope of their roles, were directly related to the retaliation Plaintiff faced for speaking out about Apple's workplace and environmental issues.

344. Moreover, Apple fostered an environment where employees were rewarded for silencing dissent. For example, it's unclear how Ricky got involved in harassing the Plaintiff, but it came to light that he is friends with Plaintiff's first team at Apple, including Marini. There were multiple conspiracies, from Apple's Global Security, Legal, Public Relations, and Human Resources teams – but also with the managers and executives who Gjovik complained about.

345. In another example, Appleseed admitted to being in direct contact with Apple employees, including those in Global Security, and was actively involved in attempts to censor Plaintiff's social media posts and silence her complaints. On one occasion, she posted on Twitter that Apple Global Security employees alerted her to any posts referencing Plaintiff. This network of employees acting in concert to harass Plaintiff indicates a coordinated effort, which Apple failed to prevent or address and likely incited, encouraged, and rewarded.

346. Apple's failure to intervene is particularly evident when considering that Plaintiff repeatedly reported the harassment to Apple through a variety of forums. Despite these complaints, Apple did nothing to stop the harassment. In fact, Apple appeared to enable retaliatory behavior by encouraging its employees to continue their abusive conduct. For example, after Plaintiff's NLRB charge, Apple employees, including Appleseed and Vicki, continued their online attacks and publicly mocked Plaintiff's legal efforts. This sustained harassment was tolerated by Apple and seemed to be an integral part of the company's response to Plaintiff's public criticisms.

347. Additionally, external legal counsel hired by Apple, including the firm McDermott and Will & Emery, was implicated in the harassment. Despite having no formal direct involvement in

Appleseed's retaliatory litigation against Plaintiff, the firm promptly requested the defamatory paper trail created by Appleseed to use in their defense of Plaintiff's NLRB charges against Apple.

348. The firm's attorneys were aware of Plaintiff's complaints and used fake social media accounts to attack her. McDermott, Will & Emery employees not only degraded Plaintiff publicly but also engaged in behavior that directly mirrored the retaliatory tactics employed by Apple employees. The firm's participation in harassment, along with Apple's failure to address it, reinforces the argument that Apple is liable for the conduct of its agents.

349. Apple's knowledge of the harassment is clear from multiple sources. Not only did Plaintiff directly inform Apple of the harassment, but Apple also conducted its own "investigation" into Plaintiff's social media activity. Despite this awareness, Apple failed to intervene, sending a message that such behavior was permissible and even expected. This inaction, coupled with Apple's culture of retaliating against employees who speak out, was further amplified following Tim Cook's illegal email in September 2021, directly contributing to the severe emotional distress experienced by Plaintiff.

350. The conduct of Apple employees was not merely incidental to their jobs but was an outgrowth of Apple's corporate culture, which emphasized silencing internal dissent at all costs. Apple encouraged and rewarded the retaliation against Plaintiff, fostering an environment where employees felt emboldened to engage in online harassment, create fake accounts to attack Plaintiff and undermine her legal efforts.

351. Furthermore, Apple's active involvement in creating a paper trail to falsely accuse Plaintiff, as evidenced by the complaints filed by Appleseed, demonstrates a direct link between Apple's corporate interests and the harassment Plaintiff endured. The company's participation in fabricating false claims, including the use of McDermott, Will & Emery to coordinate the smear campaign, indicates that Apple is responsible for the emotional distress suffered by Plaintiff.

352. In conclusion, Apple's actions, or lack thereof, demonstrate clear liability under the principles of vicarious liability, agency, and respondeat superior. Apple must be held accountable for the harassment and retaliation against Plaintiff, as its employees acted within the scope of their roles, facilitated a toxic work environment, and directly contributed to Plaintiff's emotional

1    distress. The evidence shows that Apple not only failed to stop the harassment but also accepted

2    its benefits and actively participated in and encouraged it, making the company liable for the actions

3    of its employees and agents.

4                              ## CONCLUSION & PRAYER FOR RELIEF

5    WHEREFORE, Plaintiff prays that this court enter judgment in her favor on every claim for relief

6    set forth above and award its relief, including, but not limited to, the relief as follows:

7        –    A Judgment entered in her favor, and an award of damages in an amount to be determined

8    at trial.

9        –    Employee whistleblowers "make whole relief" with compensatory damages, including lost

10   wages (including but not limited to: back pay, lost benefits, lost bonuses and pay raises, lost stock

11   grants and vesting, etc.).

12       –    Reinstatement of employment at a prior or higher level, re-establishing benefits and

13   seniority and the promise of a respectful and healthy workplace. If that cannot be provided, then at

14   least ten years of front-pay or up to retirement age.

15       –    Compensatory damages for financial harm, including lost future wages, lost benefits, lower

16   earning capacity, past and future medical expenses, counseling, medication, physical and digital

17   security expenses, reputation management expenses, mental/emotional injury (post-traumatic

18   stress disorder, anxiety, depression, insomnia, disordered eating); property damage, degradation,

     and conversion; and moving costs to relocate.

19       –    Compensatory and special damages for non-pecuniary harm, including emotional distress,

20   humiliation, loss of enjoyment, annoyance, discomfort, inconvenience, disfigurement, pain and

21   suffering, mental anguish, and reputational harm. Plaintiff now suffers from permanent

22   psychological trauma and damage because of Plaintiff's actions. Plaintiff is entitled to

23   compensation for any special damages she suffered resulting from Apple's outrageous and

24   defamatory acts.

25       –    Compensatory damages for the injury suffered to Plaintiff's body, mind, and property by

26   Apple's nuisances and ultrahazardous activities, including the cost to replace ruined clothing and

27   other degraded chattel property that was damaged by Apple's tortfeasing.

28       –    Costs for medical monitoring and medical intervention for any lifetime illnesses attributable

to the chemicals Apple exposed her to.

– Consequential, expectation, reliance damages, where applicable.

– A civil penalty of $10,000 per employee for each violation of Cal.Lab.C. § 98.6 and § 1102.5. (If this request prevents other damages, this request may be waived).

– Punitive damages for all available claims (*Tamney*, Cal.Lab.C § 1102.5, Nuisance, and Intentional Infliction of Emotional Distress), with the amount to be decided at trial.

– Declaratory relief stating Plaintiff is a Crime Victim under federal and state law so that Plaintiff can be afforded her relevant rights.

– Litigation costs, expert witness fees, pro se attorney's fees, and other reasonable expenses. Pre-judgment and post-judgment interest. The offset for the tax bracket increase is due to the lump sum payment.

– Where no damages or other relief are available, entry of declaratory relief and nominal damages of $1.00 (or $2 or $3 where double or treble damages apply).

– Such other and further relief as the Court deems just and proper.

Plaintiff hereby requests a trial by jury on all issues so triable.

## CERTIFICATION & CLOSING

353. Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and the complaint otherwise complies with the requirements of Rule 11. I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: November 26 2024

Respectfully submitted,

**/s/ Ashley M. Gjovik**

*Pro Se Plaintiff*

**Physical Address**: Boston, Massachusetts
**Mailing Address:** 2108 N St. Ste. 4553 Sacramento, CA, 95816
**Email**: legal@ashleygjovik.com
**Phone**: (408) 883-4428